# Exhibit A

# OFFICIAL REPORT OF PROCEEDINGS

# BEFORE THE

# NATIONAL LABOR RELATIONS BOARD

_____

_____

In the Matter of:                          **Case No.:**  29-CA-331253


PARKING SYSTEMS PLUS,INC.           :

         Respondent,           :

And                                 :

LOCAL 1102, RETAIL, WHOLESALE &     :

DEPARTMENT STORE UNION, UNITED      :

FOOD AND COMMERICAL WORKERS,        :

        Charging Party.       :


Place:   New York, New York
Dates:   June 18, 2024
Pages: 1 through 101
Volume: 1

_____

_____

**OFFICIAL REPORTERS**

## BURKE COURT REPORTING, LLC
**64 Magnolia Place**
**Wayne, NJ 07470**
**(973) 692-0660**

```
 1                        BEFORE THE

 2              NATIONAL LABOR RELATIONS BOARD

 3    --------------------------------: Case No.:  29-CA-331253

 4    In the Matter of:               :

 5    PARKING SYSTEMS PLUS,INC.       :

 6                Respondent,         :

 7    And                            :

 8    LOCAL 1102, RETAIL, WHOLESALE &  :

 9    DEPARTMENT STORE UNION, UNITED   :

10    FOOD AND COMMERICAL WORKERS,     :

11                Charging Party.     :

12    --------------------------------:

13

14        The above-entitled matter came on for hearing

15    Pursuant to Notice, before Administrative Law Judge BENJAMIN

16    GREEN, at the National Labor Relations Board, Region 29, 26

17    Federal Building, GSA Conference Room, New York, New York, on

18    Tuesday, June 18, 2024 at 10:00 a.m.

19

20

21

22

23

24

25
```

```
 1                    A P P E A R A N C E S

 2

 3   On Behalf of the General Counsel:

 4

 5        MATTHEW JACKSON, ESQ.

 6        EMILY CABRERA, ESQ.

 7        National Labor Relations Board, Region 29

 8        2 Metrotech Center, Suite 5100

 9        Brooklyn, NY 11201

10

11   On Behalf of the Respondent:

12

13        ROBERT F. MILMAN, ESQ.

14        MICHAEL MAURO, ESQ.

15        Milman Labuda Law Group, PLLC

16        3000 Marcus Avenue,Suite 3W8

17        Lake Success, NY 11042-1009

18        rob@mmmlaborlaw.com

19        mmauro@MLLABORLAW.COM

20        516-328-8899

21

22

23

24

25
```

1

2   On Behalf of the Charging Party:

3

4        MATTHEW P. ROCCO, ESQ.

5        Rothman Rocco LaRuffa, LLP

6        3 West Main Street, Suite 200

7        Elmsford, NY 10523

8        mrocco@rothmmanrocco.com

9        914-478-2801

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                    I N D E X

2

3   WITNESS           DIRECT   CROSS   REDIRECT   RECROSS   VOIR DIRE

4

5   Francis Gil Reyes    35     --       --         --        59

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26
```

```
 1    E X H I B I T S

 2    EXHIBITS                    IDENTIFIED          RECEIVED

 3    GENERAL COUNSEL'S

 4     GC-1                       7                   7

 5     GC-3                       57                  62

 6     GC-3(a)                    99                  100

 7     GC-4                       86                  94

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                      P R O C E E D I N G S
 2                                     (Time Noted: 12:12 p.m.)
 3           JUDGE GREEN:  On the record.
 4           Okay.  So we're on the record in Parking Systems
 5     Plus, Inc., case number 29-CA-331253.  It's June 18th 2024 and
 6     the Administrative Law Judge is Benjamin Green.  Would the
 7     counsel for the parties state their appearances for the record,
 8     beginning with the General Counsel?
 9           MR. JACKSON:  Matthew A. Jackson, Region 29, National
10     Labor Relations Board.
11           JUDGE GREEN:  And for the Union?
12           MR. ROCCO:  Good afternoon, Your Honor.  Matthew
13     Rocco from Rothman Rocco LaRuffa, LLP, 3 West Main Street,
14     Suite 200, Elmsford, New York on behalf of the Union.
15           JUDGE GREEN:  Thank you.  And for the Respondent?
16           MR. MILMAN:  Yes, Your Honor.  Good afternoon.
17     Richard Mlman of the law firm Milman Labuda Law Group, PLLC on
18     behalf of the Respondent employer Parking Systems et al.
19           JUDGE GREEN:  Okay.  Anybody else for the -- making
20     an --
21           MR. MILMAN:  Yes --
22           MR. MAURO:  Yes.  Michael J. Mauro, M-A-U-R-O, Milman
23     Labuda Law Group.  That's it.
24           JUDGE GREEN:  Okay.  So has the Respondent been shown
25     a copy of the formal papers?
```

```
1              MR. JACKSON:  Yes, Your Honor.
2              MR. MILMAN:  Yes, Your Honor.  And Mr. Mauro had
3    submitted a response to counsel for counsel for General Counsel
4    not objecting to the formal papers.
5              JUDGE GREEN:  Okay.  So GC-1 is admitted.
6        (General Counsel's GC-1 identified & received in evidence)
7              MR. MILMAN:  I notice somebody new in here that has a
8    computer.  I don't know who this gentleman is over here.
9              MR. JACKSON:  He's the interpreter we're going to be
10   using for --
11             MR. MILMAN:  Ah, okay, great.
12             Welcome.  Do you have a card?
13             THE INTERPRETER:  Yes.
14                       (Counsel confer)
15             MR. MILMAN:  Thank you.  Thank you very much.
16             JUDGE GREEN:  Is there anything -- is there other --
17   are there any preliminary matters that we have to deal with?
18             MR. JACKSON:  Yes, Your Honor.  Off the record we had
19   discussed a sequestration order.
20             MR. MAURO:  Thank you.
21             MR. JACKSON:  There are a number of observers, non-
22   witnesses in this case who are present.  I see some other
23   people who are going to be witnesses in the gallery as well.
24   So I think all parties agree the sequestration order is in --
25   is --
```

```
 1              JUDGE GREEN:  Okay.

 2              MR. JACKSON:  -- appropriate.

 3              JUDGE GREEN:  So before I read the -- my standard

 4   sequestration order, let's pick the representatives.  So for

 5   the GC, do you want anybody or --

 6              MR. JACKSON:  No.

 7              JUDGE GREEN:  And how about the Union?

 8              MR. ROCCO:  Ayse Porsuk is the Union's.

 9              JUDGE GREEN:  How do you spell that?

10              MS. PORSUK:  A-Y-S-E P-O-R-S-U-K.

11              JUDGE GREEN:  Okay.  And for the Respondent?

12              MR. MILMAN:  Yes.  Our representative is Mr. Bobby

13   Gust.  G-U-S-T.

14              JUDGE GREEN:  Right.  He's listed in the --

15              MR. MILMAN:  Yes, sir.

16              JUDGE GREEN:  -- complaint.

17              MR. MILMAN:  Yes, Your Honor.

18              JUDGE GREEN:  Okay.  So a sequestration order is

19   being issued in this proceeding.  This means that all people

20   who expect to be called as witnesses, other than a person

21   designated as essential to the presentation of a party's case

22   will be required to remain outside the courtroom, whenever

23   testimony or other proceedings are taking place.  A limited

24   exception applies to witnesses who are alleged discriminatees

25   in this matter.  They may be present in the courtroom at all
```

1  times, except when the General Counsel or a Charging Party are

2  giving testimony regarding the same events that the alleged

3  discriminatees are expected to testify about.

4         The sequestration order also prohibits all witnesses

5  from discussing with any other witness or possible witness the

6  testimony they have already given or will give.  Likewise,

7  counsel for a party may not disclose to any witness the

8  testimony of any other witness.  Counsel may however inform

9  their own witnesses of the content of testimony given by an

10  opposing party's witnesses, to prepare to rebut that testimony.

11  It is counsel's responsibility to make sure that they and their

12  witnesses comply with the sequestration rule.

13         So having said that, at this time what do yo want to

14  do, as far as people staying in the room?

15         MR. JACKSON:  Yeah, Your Honor.  There are two

16  witnesses in the gallery for the General Counsel; Francis Gil

17  Reyes and Edward Arias (ph).  And I'll ensure that they're not

18  present when the other is testifying.

19         JUDGE GREEN:  Okay.  All right.  Other than the

20  sequestration rule, are there any other preliminary matters

21  that we have to deal with?

22         MR. MILMAN:  Yes, Your Honor.  There have -- there

23  are pending subpoenas.

24         JUDGE GREEN:  Okay.

25         MR. MILMAN:  Both party and non-party subpoenas.

1    With respect to -- and we received your ruling -- your order,

2    Your Honor, on counsel for General Counsel's motion to quash.

3               JUDGE GREEN:  Right.

4               MR. MILMAN:  And we respect that ruling.  And we have

5    complied with that order, keeping mindful of your decision to

6    try to meet and confer, so there wouldn't be --

7               JUDGE GREEN:  Right.

8               MR. MILMAN:  But we just didn't have time to meet and

9    confer.

10              JUDGE GREEN:  Right.

11              MR. MILMAN:  So -- but we think we've done a pretty

12   good job on finding out which subpoena requests might be

13   duplicative.  And we have a electronic discovery.   We have --

14              What do we have?  A --

15              MR. MAURO:  A link.

16              MR. MILMAN:  A link.  A link for all the electronic

17   discovery.  And it is not a -- just a document dump.  We've

18   categorized various different -- Mr. Mauro, will speak on it.

19   But we have that present today.

20              And we have some subpoenas outstanding to Classic,

21   who is a -- the predecessor employer, as well as Stony Brook,

22   who is the contractor, of which we -- it's our position they

23   should be necessary parties, but they're not.  In any event, we

24   have subpoenas.  I'll defer to Mr. Mauro on what production

25   we've received or not received.  And it may very well be

1  possible that we might need to seek a federal court order to

2  compel to -- you know, after we raise the proffer to Your Honor

3  on it.

4          JUDGE GREEN:  Okay.  You know, the way that works is

5  you ask -- you know, you ask the general -- the Region to do

6  it.  They don't really have any choice.  It's just, you know --

7          MR. MILMAN:  Yeah.

8          JUDGE GREEN:  -- you -- I mean unless it's not --

9          MR. MILMAN:  Right.

10          JUDGE GREEN:  It's not accurate.

11          MR. MILMAN:  Right.  It is a Board subpoena.

12          JUDGE GREEN:  That they're anything that --

13          MR. MILMAN:  Correct.

14          JUDGE GREEN:  -- that's missing.

15          MR. MILMAN:  Right.

16          JUDGE GREEN:  You know, that's the way it works.  So

17  I mean do you think you're missing anything from Classic or --

18          MR. MILMAN:  Well, that's a good question.  We

19  believe -- yeah --

20          MR. MAURO:  So Stony Brook responded to our subpoena.

21  They're -- they've complained.  So we have no issue with Stony

22  Brook.

23          As to Classic Valet, they have not responded.  I have

24  been in contact.  They have labor counsel, who I've reached out

25  to several times.  At least I was referring to labor counsel.

1    They're apparently not here today.  So we will be seeking

2    enforcement by the Region.

3              JUDGE GREEN:  Okay.  So they haven't produced

4    anything?

5              MR. MAURO:  That's correct.

6              JUDGE GREEN:  Okay.  You know, I mean the

7    Respondent's case doesn't -- probably won't start until a

8    couple of days from now.  So we'll see what we can do before

9    then, but we'll take it as it comes.

10             MR. MAURO:  That's it.  Thank you.

11             JUDGE GREEN:  Okay.  Anything else, as a preliminary

12   matters?

13             MR. JACKSON:  Yes, Your Honor.   Respondent in it's

14   answer to the complaint admits to its status an as Employer

15   within the meaning of the Act, yet Respondent denied the

16   commerce allegations asserted in the complaint.

17             JUDGE GREEN:  Okay.

18             MR. JACKSON:  I understand they might lack knowledge

19   of certain other parties, third parties, non-parties to this

20   case, and their commerce, which is how the complaint reads.

21   But I would like to propose a stipulation on Respondent's level

22   of interstate commerce.  And I propose to following.

23             That Respondent stipulate that during the past 12

24   months, which period is representative of its business

25   operations in general, Respondent in conducting its operations

1 | purchased and received at it's New York State facilities good

2 | valued in excess of $50,000 directly from points outside the

3 | State of New York.

4 |         MR. MILMAN:  So stipulated.

5 |         JUDGE GREEN:  Okay.  Okay.  So the issue of

6 | jurisdiction is -- and commerce is resolved.  Anything else?

7 |         MR. JACKSON:  Well, I do want to formally request

8 | production of the subpoena materials that are response to the

9 | General Counsel's subpoena.  I haven't received that link that

10 | you referenced earlier.

11 |         MR. MAURO:  Of course.

12 |         JUDGE GREEN:  So do you want to email the link?

13 |         MR. MAURO:  Just --

14 |         JUDGE GREEN:  Is that all there is?  There's an

15 | electronic production?

16 |         MR. MAURO:  I just sent -- yeah, I sent it now.

17 |         JUDGE GREEN:  Okay.  Is there any hard copies all

18 | right with anything or no, it's just --

19 |         MR. MAURO:  No.

20 |         JUDGE GREEN:  -- that?

21 |         MR. MAURO:  Too many.

22 |         JUDGE GREEN:  Okay.  So apparently it's on it's way

23 | to you by email.

24 |         MR. JACKSON:  Okay.  You know, General Counsel would

25 | at some point like to have some time to review that, obviously

1    before we close our case, but we're prepared to proceed

2    without --

3                 JUDGE GREEN:  Okay.

4                 MR. JACKSON:  -- having reviewed them.

5                 JUDGE GREEN:  Okay.  So other than that, is there

6    anything else we have to deal with before we move on to opening

7    statements?

8                 MR. JACKSON:  Nothing from the General Counsel, Your

9    Honor.

10                JUDGE GREEN:  Anybody else?  No?  No?

11         Okay.  So would the General Counsel like to make an

12   opening statement?

13                MR. JACKSON:  Yes, Your Honor.

14         The case before Your Honor today is simple.  The

15   unionized parking service provider lost it's contract with

16   Stony Brook University Hospital.  And its successor employer,

17   the Respondent here, unlawfully refused to hire all of the 34

18   unionized workers because of their union affiliation.

19         Since November 2015, Local 1102 RWDSU-USCW, had

20   represented a bargaining unit comprised of valet parking

21   attendants working at Stony Brook University Hospital.  The

22   Union had developed a stable and productive collective

23   bargaining relationship with the employees' employer, a company

24   called Classic Valet Parking.  And those parties entered

25   successive collective bargaining agreements establishing the

1  terms and conditions of employment for bargaining unit

2  employees.

3          But in November 2023 Classic Valet Parking lost its

4  contract to provide parking services at Stony Brook University

5  Hospital, as the University opted to contract with a different

6  parking services company, Respondent Parking Systems Plus, Inc.

7  Respondent agreed to assume control of the parking services

8  operations at the Hospital staring December 1 of 2023.

9          Initially, Respondent appreciated the obviously value

10  of hiring the employees of Classic, many of whom had been

11  working at Stony Brook University Hospital for five years or

12  more.  The employees were already well-trained and experienced

13  in performing the essential functions of valet attendants at

14  the Hospital and had deep knowledge of the Hospital facilities,

15  which helped the incumbent employees provide valuable services

16  to customers, including being able to direct visitors around

17  the sprawling hospital campus.

18          In inertial attempt -- in an initial attempt to

19  retain these experienced workers, Respondent deployed its

20  agents including recruitment specialize Robert Bobby Gust to

21  the Hospital campus to solicit employees to apply for jobs with

22  Respondent.  Respondent's agents told employees that Respondent

23  looked forward to working with them, and distributed job

24  applications for the employees to share with their co-workers.

25          However, Respondent's intent to hire Classic

1    employees suddenly changed after it became clear to Respondent

2    that these experienced workers were represented by the Union.

3    On November 9, 2023 the Union's -- the Union sent Respondent's

4    Vice President of Operations a letter noting the Union's

5    representation of the parking service employees at Stony Brook,

6    and requesting that Respondent hire the incumbent employees,

7    and recognize and bargain with the Union.  Respondent did not

8    respond to the Union's letter.

9          By November 25, Respondent's initial openness to

10   hiring the existing parking staff at the Hospital had

11   evaporated.  The evidence will show that most if not all of the

12   incumbent employees had submitted job applications during

13   November 2023, to keep working at the Hospital under

14   Respondent.  But Respondent refused to hire any of them.

15         Respondent declined to respond in any way to most of

16   the applications it had received from Classic employees.

17   However, Respondent called one employee back; Francis Gil

18   Reyes.  They called her for an interview, in response to her

19   application.  And it was an interview that proved to be fraught

20   with intimidation and coercion.

21         During that interview, which took place on November

22   25, the evidence will show Respondent's recruit specialist

23   Bobby Gust and two other company representatives directly told

24   Ms. Gil Reyes that Respondent did not intend to hire current

25   parking employees at the Hospital, because they were

1    represented by the Union and Respondent does not work with

2    unions.  Gust offered Ms. Gil Reyes a job, and even told her

3    she could pick up to four co-workers to join her in keeping

4    their jobs, but only if they agreed to give up on the Union.

5            When Ms. Gil Reyes demanded that Respondent hire all

6    of the existing employees, Respondent repeated that it would

7    not hire more than a few of them, in order to avoid the Union.

8    Not only do Mr. Gust's statements clearly coerce employees in

9    the exercise of Section 7 right and constitute an independent

10   violation of Section 8(a)(1) of the Act, but they also

11   crystallize Respondent's unlawful motive for refusing to hire

12   the predecessor's workforce.

13           Both Ms. Gil Reyes and her co-workers Edward Arias

14   were present during this meeting with Mr. Gust and his

15   colleagues.  And each employee will provide mutually

16   corroborating testimony establishing these damning admissions

17   by Respondent.

18           To her credit, Ms. Gil Reyes courageously and

19   selflessly declined Mr. Gust's coercive offer.  She refused to

20   sell out her co-workers or the Union.  Respondent in turn

21   refused to hire Ms. Gil Reyes.  Indeed, Respondent refused to

22   hire any of the incumbent employees before it began operations

23   of the parking services at the Hospital on December 1.

24           The evidence will therefore establish that Respondent

25   discriminated against all of the incumbent employees in

1    violation of Section 8(a)(3) of the Act.  Respondent's claim

2    that it refused to hire employees, because it somehow felt

3    there were unqualified or because Respondent wanted to use it's

4    own existing workforce to staff the Stony Brook operation, is

5    belied.  It's belied not only by Gust's own admission, but also

6    by the evidence establishing that Respondent was urgently

7    soliciting job applications online in the weeks after it began

8    running the operations.  As well as the evidence establishing

9    that Respondent hired several of the former Classic employees,

10   after Respondent erroneously believed it had side-stepped the

11   Union threat.  The evidence will further show, and Respondent

12   admitted during the investigation of the underlying unfair

13   labor practice charge that Respondent continued operated the

14   parking services operation at the Hospital in essentially

15   unchanged form relative to what exited under Classic.

16           Respondent discrimination against incumbent employees

17   based on their union affiliation thus renders Respondent a

18   successor employer under Love's Barbeque, 245 NLRB 78, with an

19   obligation to recognize and bargain with the Union.

20   Respondent's failure to recognize and bargain with the Union

21   thus violates Section 8(a)(5) of the Act.  And Respondent must

22   be ordered to immediately recognize and bargain with the Union.

23           Respondent's unlawful discrimination further results

24   in Respondent being prohibited from unilaterally setting it's

25   terms and conditions of employment for the parking services

1    employees at Stony Brook Hospital.  Instead, Respondent was

2    obliged to adopt the terms and conditions that exited under the

3    predecessor employer Classic, including those set forth in a

4    collective bargaining agreement between Classic and the Union.

5    Thus to the extent that Respondent altered its employees' terms

6    and conditions of employment relative to what is called for

7    under the collective bargaining agreement, Respondent must be

8    required to rescind those changes and make employees whole for

9    any lost wages or benefits that resulted from Respondent's

10   unilateral changes.

11                  Respondent's conduct in this case

12   illustrates its flippant disregard for the requirements the Act

13   imposes upon successor employers, as well as a callous

14   indifference to the rights and the livelihoods of the employees

15   Respondent suddenly left unemployed and without income to

16   support their families.  To fully and meaningfully remedy

17   Respondent's egregious violations in this case, it is necessary

18   for the Administrative Law Judge to recommend and for the Board

19   to order notice reading, notice mailing, training of

20   Respondent's supervisors and managers regarding the

21   requirements of the Act, and all other remedies called for in

22   the complaint, including a full make whole remedy for the

23   discriminatees named in the complaint, including consequential

24   damages and all other remedies Your Honor deems appropriate, in

25   light of the violations established by the record in this case.

1    Thank you.

2              JUDGE GREEN:  Thank you.

3              Would the Union like to add to that?

4              MR. ROCCO:  No thank you, Judge.

5              JUDGE GREEN:  Okay.

6              So for the Respondent, would you like to make an

7    opening statement now or would you like to defer to the start -

8    -

9              MR. MILMAN:  You know --

10             JUDGE GREEN:  -- of your --

11             MR. MILMAN:  -- I was going to defer, Your Honor, but

12   I feel compelled to respond.  So I'm going to --

13             JUDGE GREEN:  Okay.

14             MR. MILMAN:  -- do my opening statement now.

15             JUDGE GREEN:  Okay.

16             MR. MILMAN:  Okay.  It's interesting in this case

17   that -- a few things.   Interesting what Mr. Jackson, counsel

18   for the General Counsel said in his opening statement.  And

19   it's  interesting how this case has played out in the

20   chronology.

21             December 1st our client Parking Systems did take over

22   operations pursuant to a bid that it prevailed.  A bid that it

23   prevailed in early July.  This was a bid that went out at the

24   end of June, early July to a number of contractors that were

25   bidding on that in Long Island.

1          You'll receive testimony into the evidence that the

2     bid went out, there was pre-bid specs and questions.  There was

3     -- Classic participated in that bid, the predecessor employer.

4     And Parking Systems was awarded that bid.

5          Stony Brook Hospital was the contractor employer that

6     was bidding out the valet services for its hospital, at about

7     four or five different locations at the Hospital such as the

8     emergency care, the front entrance, side entrance and such.

9     Approximately --

10         Mr. Jackson, is it correct?  Approximately about 30-

11    32 employees to cover those shift hours.  And it could range

12    different on different companies, and different operations and

13    how they staff, but let's go with that number.

14         Now, in that bid, there was questions from various

15    contractors.  10-12 contractors.  And the Union has this

16    information, the Region has this information.

17         And in those bid questions you can anything you want.

18    And you'll see when it's offered into evidence and I've laid

19    foundation through a witness unless it's stiped, that you'll

20    see various contractors' questions.  Some contractors are

21    asking about staffing needs, price, pools, you know, flow of

22    traffic.  And then you see other contractors in June and July,

23    they're asking of this; is it a union shop?  Is there a

24    collective bargaining agreement?  Do we have to recognize the

25    Union?  What are the wage rates?  What is -- can we get a copy

1    of the collective bargaining agreement?

2              But guess who you will not see those questions from?

3    Parking Systems.  This is before a charge was filed in

4    December.  This is before they were awarded the contract.  If

5    this was this big, bad anti-union company, certainly those

6    questions would have been asked.

7              And by the way the questions are submitted

8    anonymously, but they're in groups.  So you see that if one

9    contractors has 10 questions, you'll see 10 questions, those

10   exact in a row.  Another contractors might have five.  You'll

11   see those five.  There's approximately three contractors that

12   asked those questions, but not Parking Systems.

13             Way before any of this issue that you heard Mr.

14   Jackson testify about not -- refusing to hire, they learned in

15   November that is was union.  They learned in July it was union.

16   That's a major flaw in Mr. Jackson's opening statement; in

17   November they learned it was union, decided not to hire them.

18             That's completely wrong.  Defies counsel for the

19   General Counsel's theory of the case.  Let me tell you what

20   really happened here.

21             First of all, Parking Systems has a union at one of

22   its divisions.  There's no anti-union animus with this

23   employer.  So let's see what happened.  Let's walk through what

24   happened here.

25             So Parking Systems is extremely present in Long

1    Island.  They have approximately 206 locations in Long Island.

2    At any given time, they have staffing upwards of 1,000

3    employees.  Well, maybe they don't work at the same time, but

4    they're available for shifts, different events.

5            And they bidded it like everybody else.  Not knowing

6    whether it was union or non-union, because they'd never done

7    work at Stony Brook Hospital.  They do work at the Coliseum and

8    they're union.

9            In fact, you will hear testimony that at a metal

10   division they bidded on years ago, that division had Local 1917

11   and the Teamsters.  So I know very well.  I negotiated with

12   them in a lot of automobile dealerships.

13           And I learned that in preparing for this case that

14   they were looking -- they got a prospect to bid, and one of the

15   other Stony Brook was 1917 and Teamsters.  And guess what?

16   Stony Brook required in that bid to include the collective

17   bargaining agreement and to include recognitional rights of

18   1917 and the Teamsters.

19           And you will also see evidence that will be entered

20   into record of internal communications of Parking Systems said

21   okay, you know, what do you think these -- you know, what do

22   you think these rates are going to be?  What do you think the

23   terms are going to be?  Is it going to be the same thing as our

24   other union?  Maybe this other union can go in there?

25               No union animus.  If it's union, fine.  If it's non-

1   union, fine.

2          But they have a business model that is very similar

3   to what's argued in accretion issues.   Accretion vs successor.

4   We see it all the time.  Right?  In labor law.

5          The --- and what's interesting, why I felt so

6   compelled to respond and not defer my opening statement, and I

7   had nothing drafted, is that the true successor case law,

8   Supreme Court Barron's case law.  The Dattco case.  Okay?  NLRB

9   -- 338 NLRB at 50.

10         These are traditional.  They're the heart of

11  successorship case law, and the guideposts to figuring what if

12  there's a criteria for successor.  Is it a Burns successor?  Is

13  it a clear concise successor?  What is it?

14         Or is it no successor, like we're arguing, Your

15  Honor?  And we're very confident that the probative evidence

16  and the reliable witnesses will support our theory of the case.

17         But let's look at what the Region did.  So Mr.

18  Jackson said in his opening statement they found out in

19  November and they didn't hire.  Hogwash!  They new in July and

20  into June, because the contractors that asked about the CBA and

21  the Union were three contractors.  We don't know who they are,

22  but it's in their grouping.  But it's not Parking Systems.

23         They went forward with the bid.  These are pre-bid

24  specs.  They went forward with the bid.

25         They have a union.  If they're a union, they do it.

1    But this is not the traditional successorship laws, where a

2    company purchased another occasion, or acquires a company, or

3    there's a merger, or there's a consolidation, where you take

4    the assets, you take the business and you have to take the

5    employees.

6             Or let's say you buy an automobile dealership.

7    You're going to have 50 mechanics to bring there right away or

8    you're going to take it from your other dealership?  Because

9    there are no mechanics out there.  We see, I represent all the

10   school bus companies.  There's no mechanics there.

11            This industry, there's parking attendants.  It's a

12   very important job.  All right?  It requires a skill.  It's

13   minimum wage.  Minimum wage is up to $16 and going up higher.

14   It's a respectable job.

15            But there are attendants out there.  We have -- we

16   get upwards of 2,000 applicants, Your Honor, which is produced.

17   2,000 applicants we still have.  All right?  To vet through.  I

18   won't even raise that for back pay, if it ever gets to that,

19   which I hope it doesn't and I don't think it will.

20            So Parking Systems bid on it, pre-bid inspection,

21   union, there's a collective bargaining agreement.  We don't

22   know what it is.  Can't produce it because it's with Classic

23   and the employees.  We don't what the rates are.  We've bid it

24   like we did anything else, based upon our staffing hours and

25   our projection.

```
 1          Now, to further impeach -- and I know it's only
 2   opening statements, not evidence.  But to further impeach the
 3   statements made by Mr. Jackson, the bid specs call for the
 4   startup on November 1st 2023.  When did this union letter go
 5   out?  We're a union shop.  You gotta recognize us for a smooth
 6   transition.  November 9th.
 7          After the startup date, which was November 1 and the
 8   bid as conveniently extended 30 days.  Maybe we'll find out why
 9   that happened?  But it doesn't even matter according to the law
10   and successorship laws.
11          Parking Systems was ready to go into Stony Brook
12   valet hospital parking business November 1.  Counsel for the
13   General Counsel knows it, the Union knows it.  But guess who
14   doesn't know it?  The employees sitting back here.  You know
15   why?  Because Classic never told them.
16          And you know who also never told them, Your Honor,
17   which is why I don't know why Classic and Stony Brook aren't
18   named as necessary parties?  Stony Brook never told them
19   either.
20          You'll hear testimony and evidence; please don't say
21   anything.  We don't want employees jumping ship before the
22   contract ends on November 30th.  And you, Parking Systems, the
23   winning bid, takes over December 1st.
24          I'll tell you something else under the law.  You
25   can't even find successorship.  Is because as of November 30th
```

1    2023, they were Classic employees.  They can't hire them.

2            General Counsel will have you believe, yeah, you know

3    what?  November 30th they'll stop.  December 1st, they'll all

4    work for you.

5            Well suppose they won't work for us.  You're going

6    December 1st, not knowing which employees are going to work for

7    us?  We had different staffing to startup than we had -- we bid

8    more than 32 employees to see how it's going to work.  But

9    we're going to wait until December 1st, General Counsel --

10   counsel for the General Counsel.  Now --

11           We're going to wait for December 1st, when the

12   employees are told they no longer work for Classic, hey, come

13   work for us.  What, maybe 10 will work?  20?  30?  Who knows?

14   That's out business model?

15           I know counsel for the General Counsel and the Region

16   everything about union.  Well, guess what?  Not everything is

17   about unions.

18           There's a lot of issues that go into play when a

19   company makes a to take on a business that have nothing to do

20   with unions.  They don't care if it's union or not.  So what?

21   There's no union animus.

22           But how are we supposed to hire Classic employees

23   before December 1, when they're working for Classic?  That's

24   where counsel for the General Counsel's case start and ends!

25   It shouldn't even be here, Judge Green.

1           But, when they filed they charge in December, the

2    first charge before the amended charge, there's no mention of

3    these negative statements to employees that you have

4    disaffiliate from the Union.  And we will impeach those

5    statements guaranteed.  But guess what?  In November -- in

6    December, when they filed a first charge, there's no mention of

7    that.  Just a clear cut successor issue.

8           You didn't hire the employees.  You didn't recognize

9    the Union.  You're a successor.  But they didn't have the

10   8(a)(3)'s yet.  They were relying on that.

11          I guess Mr. Jackson knows somewhere along the line

12   that that won't even meet any Wright line test, because they

13   don't have anything to claim yet.  And they don't meet any

14   successor case.  So what happens?

15          Later in December they file an amended charge for

16   something that happened November 25th allegedly.  And which

17   certainty General Counsel was involved in 2015 in arguing the

18   appropriateness of the unit.  And I think he had the same

19   witnesses in here today.

20          He knew November 25th if there's a conversation.  He

21   had to have known; the Region.  When they filed their first

22   charge, yeah, there was this alleged communication November

23   25th.  Why wasn't that in the first charge?  But it was in the

24   second one.

25          Clearly, there's no successorship.  Let's try to

1     bridge the gap with some of these 8(a)(3), and then argue an

2     automatic successor, and just usurp Burns and Dattco.

3            I'll even tell you to look at Allways East.  That was

4     my case.  I won the 10(j) in that in 2015.  And I won that in

5     Region 3 before Judge Flynn.

6            And in that case, it's more akin to this case than

7     anything.  In that case it is a reverse accretion.  And Judge

8     Flynn, as well as Judge Roman in District Court, agreed with

9     me.

10           Judge Roman's decision on the 10(j) was issued

11   November 12th 2000 -- I'm sorry, Judge Flynn in Region 3, her

12   decision was issued November 12th 2015.  Agreeing with our

13   arguments, and our case law, and our evidence on a reverse

14   accretion where a non-union shop gobbles up a certain union

15   portion, and it is accredited in,  because there is full

16   interchange, with respect to that operation.

17           Judge Roman denied the 10(j) on those very grounds

18   also.  And that decision by Judge Roman on the 10(j) was

19   December 1st 2014, almost a year before Judge Flynn's November

20   12th 2015 decision.

21           Now, let's look at Allways East Transportation, which

22   was a school bus company I represented that took up a division

23   of employees, all right, that was represented by Durham and

24   they had the Teamsters.  There's about 35 drives.  Allways East

25   had about 250.

1          Those 35 drivers were integrated, not even nearly

2    close to Parking Systems' operations.  But in that case, in

3    Allways East, those 35 drivers that were Teamsters that were

4    part of Durham, when Allways East my client took that over,

5    there was field trips, there was mid-day trips, there was

6    emergency -- and they were integrated, covered under operation.

7          It was unworkable to claim that it wasn't an

8    accretion.  They tried to argue it was a successor stand alone.

9    The Union was wrong.  They had a good argument, but they were

10   wrong.  Judge Flynn agreed as well as Judge Roman in the 10(j).

11         In this case, if you go back to 2015 when Mr. Jackson

12   was presiding over an R hearing, because I read his decision

13   thoroughly -- okay?  He was arguing, you know what?  When

14   Classic was here, we believe that the Union -- okay?  The

15   Charging Party here, we believe that the Stony Brook operation

16   is enough to be a stand alone, because they didn't have many --

17   really, really didn't have many Long Island interchange.  They

18   had Brooklyn, and Queens and New Rochelle.

19         Well, guess what?  Parking Systems, 206 locations on

20   Long Island.  You will see testimony you've never seen

21   integration like this.  Okay?

22         In any given day, employees could be working at

23   Jake's 58, at the Coliseum, at Stony Brook and hundreds of

24   other locations.  If Parking Systems was the employer of record

25   during the R case, oh, there would be overwhelming integration,

1    that wouldn't be appropriate unit.  It'd have to go to a wall-
2    to-wall unit.
3         And that's why I come full circle in our argument.
4    Notwithstanding the fact that counsel for General Counsel has
5    totally bypassed our succession clause, to try to bring in an
6    8(a)(3), to try to now argue automatic successor.  That is not
7    going to happen, Your Honor.  Okay?
8         You got to comply with the law.  You got to make your
9    case on true successorship.  And we are not.  We are more of a
10   integrated reverse accretion than Allways East ever was.
11        We have upwards of 1,000 employees at any given time
12   that could be dispatched.  We have 2,000 applications sitting.
13   All right?  These employees are totally integrated.
14        But we didn't care about union or not.  It wasn't
15   even our thought process.  Because our business model is when
16   we win a contract, it's better if we win a contract from the
17   competitor.  We're not here to poach all the employees.
18
19        And you want to know something else?  When we lose a
20   contract, we absorb the employees in our operation.  We had no
21   intent whatsoever to even hire those employees, because we --
22   sure, we'll take applications.  We might hire some.  But when
23   we get a new location, we bring in the bulk of our experienced
24   employees, our experienced management team to run that
25   operations to see how it works out.

1     We could not hire before December, when they weren't

2  our employees!  It's ridiculous why we're even here!  The only

3  reason reason why here, I would think, is because counsel for

4  the General Counsel added this amended charge of this alleged

5  statement, oh, you can't be union.  Of the same employees who

6  testified in 215 (sic) why that's an appropriate unit. Same two

7  test -- employees are going to testify on this case, which are

8  through Matt Jackson again.

9     It is our position, Your Honor, you will hear

10  reliable, credible, unimpeachable testimony that this is an

11  accretion issue more so than Allways East ever was.  More so

12  than when Judge Roman ruled against their 10(j) ever was.

13     We had no union animus.  We have unions.  We were

14  ready to roll November 1st, fully operated, fully ready to go!

15  As per the bid November 1st.

16     Well, Stony Brook said you've got 30 days.  Okay.

17  We're ready to go.

18     November 9th we knew they were union?  He knows.  We

19  all know.  Everybody knew in July.

20     Union never even came into our thought process,

21  because if it did we would think, as the testimony and the

22  evidence you will see, that they were putting in a bid, like

23  they did the other division with 9-17.  With that said --

24     JUDGE GREEN:  Sir --

25     MR. MILMAN:  -- Your Honor -- with that said, I

1    hadn't planned to go into an opening statement, but I felt

2    compelled to respond to that.  So it's our position, as a

3    matter of fact, as a matter of law, you will find no 8(a)(3)

4    violations, you will fine no union animus, and you will find no

5    successor.  Not even in the most, remotest form.  Thank you.

6            JUDGE GREEN:  Okay.  Thank you very much.

7            Okay.  So is the General Counsel ready to proceed?

8            MR. JACKSON:  Yes, Your Honor.

9            JUDGE GREEN:  Okay.

10           MR. JACKSON:  One moment, Your Honor.

11                           (Pause.)

12           Your Honor, are we off the record?

13           JUDGE GREEN:  Off the record.

14            (Whereupon, a brief recess was taken)

15           JUDGE GREEN:  On the record.

16           MR. MILMAN:  I'm sorry.  Is the interpreter through

17    the Region.

18           MR. JACKSON:  It's a third party provider.

19           MR. MILMAN:  No affiliation with any discriminatees

20    or anything?

21           MR. JACKSON:  Not that I know of.

22           MR. MILMAN:  Okay.  Thank you.

23           MR. JACKSON:  Do you know anybody in the room?

24           THE INTERPRETER:  No.

25           MR. MILMAN:  Thank you.

1          MR. JACKSON:  Just --

2          JUDGE GREEN:  So are we ready?

3          MR. JACKSON:  Yes.

4          JUDGE GREEN:  Okay.  So let me just swear in the

5    interpreter.

6        (Interpreter sworn to interpret Spanish into English)

7          JUDGE GREEN:  Okay.  Thank you.

8          So would the General Counsel like to call your first

9    witness?

10         MR. JACKSON:  Yes, Your Honor.  General Counsel calls

11   Francis Gil Reyes.

12         JUDGE GREEN:  So, yeah, you can have a seat right

13   there.  Okay.  So I'm going to swear you in as well.  If you

14   would raise your right hand?

15   Whereupon,

16                        FRANCIS GIL REYES

17   Having been first duly sworn, was called as a witness and

18   testified herein as follows:

19         JUDGE GREEN:  Okay.  So please just state and spell

20   your name for the record.

21         THE WITNESS:  Francis Gil Reyes.

22         JUDGE GREEN:  So spell it.

23         THE WITNESS:  F-R-A-N-C-E-A-I-S (sic).

24         JUDGE GREEN:  Okay.  Then?

25         THE INTERPRETER:  Last name?

1          THE WITNESS:  G-I-L R-E-G-E-S (sic).  E-S.

2          JUDGE GREEN:  So it's Reyes with a J not a Y?

3          THE WITNESS:  (In English) Yes (sic).

4          THE INTERPRETER:  No.  With a Y.

5          JUDGE GREEN:  Oh, it is with a Y?  Okay.  Okay.

6          THE WITNESS:  Y.

7          JUDGE GREEN:  Gil and Reyes are two different words?

8   Two different names.  Okay.  Thank you very much.

9          THE INTERPRETER:  That's right.

10          JUDGE GREEN:  Okay.  All right.

11          So anytime you're ready, Mr. Jackson.

12          The government attorney is going to have some

13   questions for you.

14                    DIRECT EXAMINATION

15   BY MR. JACKSON:

16   Q    Hello, Ms. Gil Reyes.  Thank you for joining us.

17   A    Thank you.

18   Q    Are you currently employed?

19   A    No.

20   Q    Did you at one time work as a Valet Parking Attendant at

21   Stony Brook University Hospital?

22   A    Yes.

23   Q    Yes.

24   Q    Who was your employer, during the time that you work at

25   Stony Brook University Hospital?

1    A    Classic Valet Parking.

2    Q    And when did you begin working for Classic?

3    A    Approximately November 2016.

4    Q    And when did you employment with Classic end?

5    A    November 30th 2023.

6    Q    Did you continuously work as a Valet Attendant for Classic

7    at Stony Brook, during that period from the time you started in

8    2015 until November 30th 2023?

9            THE INTERPRETER:  I'm sorry, can you repeat that

10   question?

11           MR. JACKSON:  Yeah.  Did you continuously work as a

12   Valet Attendant for Classic at Stony Brook, throughout that

13   period from 2015 though the end of November 2023?

14           THE WITNESS:  Yes.

15   BY MR. JACKSON:

16   Q    Did you have any other job that -- during that time?

17   A    No.

18   Q    And how did you support yourself and your family

19   financially?

20   A    With what we were earning during those times there and

21   with the tips from patients.

22   Q    Do you live alone in your household?

23           MR. MILMAN:  Objection, relevance.  Objection.

24           JUDGE GREEN:  Yeah.  What the relevance?

25           MR. JACKSON:  I'll withdraw the question.

1           JUDGE GREEN:  Okay.

2   BY MR. JACKSON:

3   Q    What were your job duties as a Valet Attendant at Stony

4   Brook University Hospital?

5   A    Okay.  So we were in charge of receiving the patients in

6   the section of the Hospital where we were working.   We provide

7   them with tickets for their car, a receipt with numbers that we

8   also write and take the keys, and park the cars in the garage.

9   And then we -- when the patients comes back to us, we return

10  the car to the patient.

11  Q    Did you have a union at that job?

12  A    Yes.

13  Q    What was the name of the Union?

14  A    Local 1102.

15  Q    Was Local 1102 the union in place at the job throughout

16  your employment with Classic?

17  A    Yes.

18  Q    At some time during 2023, did you learn that Classic was

19  no longer --

20           MR. MILMAN:  Objection, leading.

21           JUDGE GREEN:  We don't have the question yet, but

22  overrule.

23           MR. JACKSON:  At some time during 2023, did you learn

24  that Classic was no longer going to be running the parking

25  services --

```
 1              MR. MILMAN:  Objection --

 2              MR. JACKSON:  -- operation?

 3              MR. MILMAN:  -- leading.

 4              JUDGE GREEN:  Overruled.

 5              THE INTERPRETER:  Did you mention 2022?

 6              MR. JACKSON:  Yeah.  2023.

 7              THE WITNESS:  Yes.

 8    BY MR. JACKSON:

 9    Q    Approximately when did you learn that?

10    A    I don't exactly remember the precise date, but a month

11    before November.

12    Q    And how did you --

13              MR. MILMAN:  I'm sorry, Your Honor.  That means

14    October?  I don't understand a month before November.  It's --

15    I need more clarity, Your Honor, please.  Especially --

16              JUDGE GREEN:  Okay.  I mean listen, we'll get to

17    that.  If it's not clarified --

18              MR. MILMAN:  Because if it's not it's going --

19              JUDGE GREEN:   -- you can clarify it on cross.

20              MR. MILMAN:  -- to end up in brief as being --

21              MR. JACKSON:  And Your Honor I'm going to --

22              JUDGE GREEN:  It's not an objectionable.  It's --

23              MR. JACKSON:  Yeah.  It's --

24              JUDGE GREEN:  Yeah.  You can --

25              MR. JACKSON:  -- not a proper objection.  And I'm
```

1    going to --

2            JUDGE GREEN:  Right.

3            MR. JACKSON:  -- ask that that counsel not interrupt

4    the flow of with these --

5            JUDGE GREEN:  Okay.

6            MR. JACKSON:  -- non-objections.

7            JUDGE GREEN:  I mean you're allowed to -- listen, it

8    was one objection.

9            MR. JACKSON:  If he has a question about the timing

10   or something, that is something he can ask during cross-

11   examination.

12           MR. MILMAN:  I respect that.  And I believe it was

13   extremely leading, but I respect Your Honor's ruling,

14   especially to move it along.  I get it.

15           But getting a response a month before November is

16   extremely ambiguous and vague.  I would like more -- just a

17   more direct --

18           JUDGE GREEN:  But you can ask about that on cross.

19           MR. MILMAN:  All right.  But I don't know if the

20   interpreter is -- I don't know if she's -- if that's how she --

21   I mean --

22           JUDGE GREEN:  You don't know if the interpretation --

23           MR. MILMAN:  It's an odd statement; a month before

24   November.

25           JUDGE GREEN:  I understand.  Let's move on.  It's --

1    you know, to the extent there's an objection, it's overruled,

2    you know?  Yeah, we can get -- re-polish it and get clarity on

3    it.

4              MR. MILMAN:  Thank you. \

5              MR. JACKSON:  It's our understanding you don't recall

6    the date that you learned about parking -- excuse me, Classic

7    losing its contract.  Can you estimate how long it was before

8    the end of your employment?

9              THE WITNESS:  I don't remember exactly when it was,

10   but I can tell there were several weeks before I finished the

11   contract.

12                    CONTINUED DIRECT EXAMINATION

13   BY MR. JACKSON:

14   Q    How did you learn about it?

15   A    So the manager told us -- told me.  And then we also have

16   a meeting that was set up by the owner of the company,

17   informing us that the contract will end on November 30th.

18   Q    Okay.  Who's your manager?

19   A    Richard Roue.

20   Q    And how do you spell Richard's last name?

21   A    R-O-U-E.

22   Q    And so Richard was the first one to tell you that Classic

23   was losing its contract?

24             MR. MILMAN:  Objection, that assumes facts not in

25   evidence, Your Honor.

1              JUDGE GREEN:  Okay.  Sustained.

2              MR. JACKSON:  Okay.

3    BY MR. JACKSON:

4    Q    Who was the first one who told you?  I believe it was, but

5    was the first one who told you that Classic was losing its

6    contract?

7    A    The manager in charge.

8    Q    That's Richard?

9    A    Yes, sir.

10   Q    And what did he tell you?

11   A    He told us that there was a bidding process with many

12   other companies for the contract.  And that the old -- then

13   another company won the contract.  And the name of that company

14   is Parking Systems.

15   Q    Did Richard tell you when was going to be Classic's last

16   day at the operation?

17   A    He didn't provide a date specifically, but he told us that

18   the owner of the company will have a meeting with us to tell us

19   exactly what will be the last day of our work.

20   Q    And you testified that that meeting did in fact occur?

21   A    Yes.

22   Q    Do you remember -- you don't remember the date of that

23   meeting, do you?

24   A    No.

25   Q    How long after Richard first advised you of the fact that

1   they were losing their contract, did you have the meeting with

2   the owner?

3   A    Probably one week after he informed us that the Mister

4   will come to talk to us.

5   Q    Okay.  Where was this meeting held?

6   A    At the Hospital lobby.

7   Q    Okay.  And who was present?

8   A    We meet in different groups, because people were working.

9   So some people that were not working were able to meet with the

10  owner.  And then the other people that were working, after was

11  -- were able to meet with the owner again.

12  Q    Do you know the owner's name?

13  A    Yes.

14  Q    What is it?

15  A    Julian Marte.

16  Q    And what do you recall Mr. Marte saying during that

17  meeting?

18  A    He was telling us that the work that we were doing was

19  about to end on November the 30th.  And after that day, the new

20  company that won the contract will take over.

21  Q    Did  Mr. Marte tell you anything about what that might

22  mean for your employment status?

23  A    So he told us that after November 30th there will be no

24  more work with Classic, but maybe the new company taking over

25  will be able to offer them jobs.  But that he couldn't extend

1    more information.

2    Q    Do you recall anything else that was discussed during this

3    meeting?

4    A    No.  We only discussed that up to that date we will be

5    providing our work as part of Classic.

6    Q    I want to talk about your job and what you did for

7    Classic.  So were there different stations or areas where

8    parking employees worked at Stony Brook Hospital?

9    A    Yes.

10   Q    And which station did you work at primarily?

11   A    I was working in the Cancer Center area.

12   Q    And aside from the Cancer Center area, what other stations

13   were there?

14   A    You have the main entrance in the the Hospital.  There is

15   the main entrance to emergency.  And there's also service areas

16   for employees that are also providing valet services.

17   Q    For employees of who?  That last station you mentioned

18   were for whose employees?

19   A    Hospital employees.

20   Q    And how many other parking employees would typically work

21   with you at the Cancer Center area?

22   A    At that moment we were four in total.

23   Q    Is that four in total or four per shift?

24   A    Okay.  Daily we were four person in that location.  So

25   four per shift.

1  Q    Okay.  And did you always work at the Cancer Center

2  station or did you work at other stations as well?

3  A    The end of my period, I was only working at the cancer

4  section, but before that I worked in other areas.

5  Q    Were the job duties different depending on which station

6  you were working at?

7  A    So it's very similar, but the system for the tickets is

8  different.  And in some other places you take four to parking.

9  Q    You take what?

10 A    Some areas you charge for the car, according to where the

11 car is going.  And in other sections, you don't charge the car.

12 Q    So whether you charge or not, how did that affect your job

13 as a Valet Attendant?

14 A    Basically, at the main entrance you charge, because it's

15 the visitor entrance.  So at the cancer section you didn't

16 charge the patients, because they have full access to that

17 areas.

18 Q    So the question is does that change what you did, as a

19 Valet Attendant?

20 A    We were doing the same thing.  We receive, welcome the

21 client, and give him the ticket for the car to put their car

22 away.  And then we return the car to the client, when he was

23 back.

24 Q    Can you describe the Hospital facility itself?  Were there

25 multiple buildings?

1    A    Yes.

2    Q    Okay.  How far is the main entrance from the Cancer Center

3    entrance?

4    A    There was two minutes in car driving around the building

5    on the street.  Or you can also go a straight directly through

6    the parking lot.  Probably one, two minutes.

7    Q    What about walking?  How long would it take to walk from

8    one to the other?

9    A    Two or three minutes.  We were taking -- you know, we had

10   to take the car and then walk back to the booth.

11   Q    Aside from the Cancer Center and the main entrance, were

12   there any other buildings as part of the hospital?

13   A    So there was the same building, for the entrance and the

14   back part.  But behind that building there was another building

15   for the Cancer Center.

16   Q    Were you expected to interact with patients or visitors at

17   all, as part of your job?

18   A    Yes, we were interacting.  When the patients arrived,

19   welcome them and talk to them.  And when we were picking up

20   their vehicles, they stay around us speaking to us, while we

21   return the car.

22   Q    Did you typically ask customers or visitors what they were

23   visiting for?

24   A    Yes.

25   Q    Why would you ask them that?

1   A    Yes.  I ask the visitors where the objective of their

2   visit, because if they were visitors then I direct them to go

3   to the main entrance.  And if they were patients, then I

4   welcome them there.

5   Q   How did you know how to direct visitors around the

6   Hospital?

7   A    Through my time working working in the Hospital, I knew

8   the different of the main entrance and the cancer section.  So

9   if people arrive at the cancer section but they were visitors,

10  then actually they have to go to the main entrance and go

11  through that part.

12  Q   And how did you know how to tell them that?  How did you

13  know where to tell them to go?

14  A    So I gave them instructions if the -- how to drive around

15  the Hospital to get to the main entrance, indicating that they

16  were two flags at the main entrance.  If they were visitors,

17  that was the area where they should enter.

18  Q   Yeah.  And how did you know that information?  How did you

19  know you know how to tell them where to go?

20  A   Because I asked them for where did they go?  Where do they

21  go?  Where would they go?

22  Q   How do you know the facility so well?

23  A   So through communication with other workers, we get to

24  know where the access to different sections in the Hospital.

25  So if a visitor were coming for maternity, to pediatry (sic), I

1   know exactly how to get to these areas from the main entrance

2   or other sections in the Hospital.

3   Q    Do you have to give patients or visitors a claim check or

4   some kind of ticket?

5            MR. MILMAN:  Objection, asked and answered.  And

6   relevance.

7            JUDGE GREEN:  Overruled.

8            THE WITNESS:  Yes.  It was the ticket the proof that

9   showed the numbers pertaining to the car that we need to return

10  to the visitor.

11  BY MR. JACKSON:

12  Q    Okay.  So they would give you the keys and you would give

13  them a ticket?

14  A    Yes --

15  Q    And what did you do with the keys that you received from

16  customers?

17  A    We placed the ticket with the key.  Take the -- we took

18  the car to the parking place, and then returned back to the

19  booth and put the key on a box or table -- kind of table that

20  we have, that has numbers, according to the ticket numbers.

21  And that's how we kept the keys.

22  Q    Do you know how many employees typically worked at the

23  main entrance station?

24            MR. MILMAN:  Objection.  He used the word typically.

25  It's vague.  It calls for a -- calls for speculation.

```
 1              JUDGE GREEN:  Okay.  Would you like to be more
 2   specific?
 3              MR. JACKSON:  Sure.
 4              During any given shift on any given day, do you know
 5   how many employees were assigned to work at the main entrance?
 6              THE WITNESS:  Between five and seven employees.
 7   BY MR. JACKSON:
 8   Q    How many at the emergency room on any particular day?
 9   A    Between five and seven employees.
10              JUDGE GREEN:  Can I just ask, is there just one shift
11   of employees per day or are there more than one shift?
12              THE WITNESS:  There's several shifts.
13              JUDGE GREEN:  Okay.  Thank you.
14   BY MR. JACKSON:
15   Q    Do you know what the shifts are?  What the different
16   shifts work?
17              THE INTERPRETER:  Can you repeat the question?
18              MR. JACKSON:  Yeah.  What were the different shifts,
19   if you know?
20              THE WITNESS:  The Cancer Center, a facility is with a
21   -- the shift started at 7:30 until 6:30.  And -- but not
22   everybody got in at those time.  I used to get in at 9:00, and
23   I stay until closing.
24   BY MR. JACKSON:
25   Q    Are you familiar with the different shifts at the
```

1    emergency room?

2    A    More or less.

3    Q    What do you -- what can you tell us about those shifts?

4    A    I know that the emergency works 24 hours.  The person

5    works overnight, leaves between 7:00 and 8:00 in the morning.

6    6:00 or 7:00 in the morning.  Sorry.

7            So the shift, it starts sometimes 9:00 in the

8    morning, 10:00 in the morning, 11:00 in the morning.  And I

9    know that some people were getting in at 7:00 in the morning.

10    Q    And what do you understand about the shifts at the main

11    entrance?

12    A    So I know that some of them start at 5:00 o'clock in the

13    morning, but also others -- employees arrive at 7:00, 8:00,

14    9:00, 11:00, 12:00.  And it's --

15    Q    Do you know what the hours of the main entrance valet

16    station were?

17    A    In the main entrance it started at 5:30 and it ends at

18    9:00 at night.  9:00 in the evening.  In the evening.

19    Q    And what about the employee parking station?  Do you know

20    how many employees were e] at that station on any given day?

21    A    More or less seven, eight people.

22    Q    And what were the hours of the employee parking operation?

23    A    From 7:00 in the morning to 6:00 in the afternoon.

24    Q    At some point during your employment have you worked at

25    each of those stations?

1   A    Yes.

2        JUDGE GREEN:  So I'm sorry, the cancer station, what

3   time did that -- did the cancer station -- the Cancer Center

4   station close?

5        THE WITNESS:  6:30.

6        JUDGE GREEN:  Okay.  So you worked from 9:00 to 6:30?

7        THE WITNESS:  Yes.

8        JUDGE GREEN:  Thank you.

9   BY MR. JACKSON:

10  Q    You testified that your manager or your supervisor was

11  Richard, correct?

12  A    Yes.

13  Q    What was Richard's role as supervisor or manager?

14  A    He coordinated the shifts and schedule of the people

15  working in the valet parking, taking care of the moments when

16  employees had to take the day off.

17  Q    Were there any other supervisors -- well, first of all,

18  I'll strike that.  Did Richard typically work -- well,

19  customarily on any given day, did Mr. Richard -- I forgot his

20  last name, but did Richard usually work at the Hospital site?

21  A    Yes.

22  Q    Were there any other supervisors or managers for Classic

23  who worked usually at the site?

24  A    No.

25  Q    Were you required to wear a uniform, as part of your job?

1  A    Yes.

2  Q    What did the uniform consist of?

3  A    White shirt, black pants, black shoes, tie.  And we use a

4  vest with the company logo.

5  Q    What color is the vest?

6  A    Green.

7  Q    Now, while you were still employed at Stony Brook, do you

8  remember seeing representatives of Parking Systems, the new

9  company, walking around campus?

10          MR. MILMAN:  Objection, leading.

11          JUDGE GREEN:  Overruled.

12          THE WITNESS:  Yes.

13  BY MR. JACKSON:

14  Q    What do you remember in that regard?

15  A    The beginning I saw some of them walking around the area.

16  They never get close to us.

17  Q    Okay.  Do you recall approximately when you first saw

18  these individual walking around?

19  A    I don't remember when.

20  Q    Was it before or after you had the meeting with Julian

21  Marte?

22  A    Before.

23  Q    How do you know that these were Parking Systems

24  representatives that you saw?

25  A    We were aware before that they were coming.  And we saw

1     them walking around in group of two or three.  And we noticed

2     that they were all dressed in black.

3     Q     How did you know that they were coming?

4     A     We were aware that a new company was coming.  So we were

5     expecting them to come and introduce themself.  We were also

6     open for working and open to be be offered work.

7     Q     Was the first time you saw the Parking Systems

8     representatives before or after you learned from Richard that

9     Classic was losing was its contract?

10    A     So we were expecting -- we were in expectation to know if

11    we were about to continue there with our company or with the

12    new company.  So we were expecting them to come in.  I don't

13    remember exactly if it was before or after the meeting with

14    Julian.  But a lot of things were happening during that time,

15    and things were mixing up.

16    Q     On how many days did you notice Parking Systems

17    representatives walking around the Hospital facility?

18    A     Two, three times.

19    Q     And is it true that initial -- the first time you saw

20    them, no -- none of them came to speak with you?

21    A     No.

22    Q     Did one of the Parking Systems representatives at some

23    point come to speak with you?

24    A     At a moment, yes.

25    Q     Okay.  So it wasn't the first time you saw them.  Was it

1   the second time.

2   Q    It was the first time they approached to me and introduced

3   themself as from Parking Systems.

4   Q    Okay.  Do you recall whether that was the first, second or

5   third day that you noticed these people at your jobsite?

6   A    I think it was the second time, the day that I saw them,

7   was when they approached to me -- approached me.

8   Q    Where did a Parking Systems representative approach you?

9   Where was it?

10  A    It was in the Cancer Center area.

11  Q    Was it one representative who approached you or was it

12  multiple?

13  A    I think there were around three, but one approached me.

14  Q    Okay.  So what did -- well, was it a man or a woman, as

15  far as you could tell?

16  A    Man.

17  Q    Okay.  And what did this man say to you, when he

18  approached?

19          THE INTERPRETER:  Say to you when?

20          MR. JACKSON:  When he approached you.

21          THE WITNESS:  He came, he greeted us and he

22  introduced himself as a person from Parking Systems.

23  BY MR. JACKSON:

24  Q    Okay.  At that time did you know what Parking Systems was?

25  A    No.  I learned at that moment, when he introduced himself

1   as a member of Parking System (sic).

2   Q   So you didn't know what parking -- like, did you know that

3   Parking Systems was going to be the new company taking over, at

4   the time this man approached you?

5   A   Yes.

6   Q   Did the man tell you his name?

7   A   Yes.  He mentioned his name, but I don't remember now his

8   name.  I don't know the name of the person that approached me

9   at that moment.

10   Q   Okay.  So after he introduced himself, did the man say

11   anything further?

12   A   No.

13   Q   Okay.  Did you say anything?

14   A   I returned the greeting and I gave him my name.

15   Q   Okay.  Do you recall anything else that happened, during

16   this initial interaction?

17   A   No.

18   Q   How did the interaction end?

19   A   It was just a quick greeting.  I was working.  I couldn't

20   leave my work.  So then after that, they went away.

21   Q   Did a Parking Systems representative approach you another

22   time while you were working?

23   A   Yes.

24   Q   Okay.  How long after the first interaction did this

25   second interaction happen?

1   A    Days after.  I don't remember exactly.

2   Q    Approximately what month are these meetings happening?

3            MR. MILMAN:  Objection.  Calls for speculation.

4            JUDGE GREEN:  Overruled.

5            THE WITNESS:  The beginning of the month of November.

6   BY MR. JACKSON:

7   Q    Of last year, 2023, correct?

8   A    Yes.

9   Q    Okay.  So the second time a Parking Systems representative

10  approached you, where were you?

11  A    At the same place of work.

12  Q    At the Cancer Center?

13  A    Yes.

14  Q    Okay.  What happened when the man approached?  Well, first

15  of all was it a man or a woman who approached you the second

16  time?

17  A    A man.

18  Q    Okay.  And what did the man say when he approached you?

19  A    He approached to us at the booth for a little bit.  He

20  introduced himself.  He gave me his name.  I gave him my name.

21  Returned the greeting.  It was very quickly.

22  Q    Okay.  Was it the same man who had approached you days

23  earlier?

24  A    No.

25  Q    Okay.  After the man introduced himself, did he say

1   anything else?

2   A    He gave me his card, and he told me that I can use

3   information there to apply for employment with Parking System

4   (sic).

5   Q    Did he give you one card or multiple cards?

6   A    They gave me several cards.

7          MR. JACKSON:  Okay.

8                        (Pause.)

9          Your Honor, I'm not sure how you'd like me to do

10  this.  I have -- I'd like to move GC exhibit -- I have a

11  physical copy of the business card, I believe.  Well, I have a

12  physical copy of a business card, and I have photos of the

13  same.  I'd like to move them both.  I don't have --

14         JUDGE GREEN:  Do you want to move the actual business

15  card in?  I mean do you want to give that to -- or you want to

16  keep that?

17         MR. MILMAN:  Why don't you mark them first?

18         JUDGE GREEN:  I mean you can.

19         MR. JACKSON:     You know what?  It's okay.

20         JUDGE GREEN:  This is GC-2?

21         MR. JACKSON:  I'm going to actually mark it as GC-3.

22         JUDGE GREEN:  Oh, okay.

23         MR. JACKSON:  I'd like to hold one open.

24         JUDGE GREEN:  Okay.

25         MR. JACKSON:  So I've presented the witness with a

1   document I'm asking to be marked for identification as GC

2   exhibit 3.

3   BY MR. JACKSON:

4   Q    Ms. Gil Reyes, do you recognize the paper that's before

5   you?  The document that's reflected there?

6   A    Yes.

7   Q    Can you tell us what it is?

8   A    It is the business card they provide us, they day they

9   introduced to us.

10                 (General Counsel's GC-3 identified)

11               MR. JACKSON:  Okay.

12               THE INTERPRETER:  The introduced themselves to us.

13

14  BY MR. JACKSON:

15  Q    Is this a photo of the card?

16               THE INTERPRETER:  Can you repeat the question?

17               MR. JACKSON:  Is this a photo of the cards?

18               THE WITNESS:  Yes.  That is a picture I took the day

19  I received it, and I gave her (sic) to our union representative

20  Ayse here.

21  BY MR. JACKSON:

22  Q    And how did you give it to Ayse?

23  A    Via message I sent a picture of the card?

24  Q    And what device did you use to take the photo?

25  A    My mobile number itself.

1  Q    And how did you share the photo you took with Ayse?

2              THE INTERPRETER:  Repeat the question.

3              MR. JACKSON:  How did you share the photo you took

4  with Ayse?

5              THE WITNESS:  Text message.

6              JUDGE GREEN:  I'm sorry.  Are these two pictures the

7  front and the back of the card?

8              THE WITNESS:  Yes.

9              JUDGE GREEN:  Thank you.

10             COURT REPORTER:  Can we go off the record for a

11  moment?

12             JUDGE GREEN:  Off the record for one moment, just for

13  the court reporter.

14                  (Whereupon, a brief recess was taken)

15             JUDGE GREEN:  Back on the record.

16  BY MR. JACKSON:

17  Q    So you testified that you took a picture of the front of

18  the card and a separate picture of the back of the card, is

19  that correct?

20  A    Yes.

21  Q    And those photos you took are reflected on General Counsel

22  exhibit 3?

23             THE INTERPRETER:  What is the --

24             MR. JACKSON:  General Counsel exhibit 3.

25             THE WITNESS:  Yes.

```
 1              MR. JACKSON:  I move for the admission of GC-3.

 2              JUDGE GREEN:  Any --

 3              MR. MILMAN:  Ah!  Yeah.  Not so fast.  I'd like to

 4   voir dire the document, please.

 5              JUDGE GREEN:  Okay.

 6   ]          MR. MILMAN:  Okay.

 7                           VOIR DIRE EXAMINATION

 8   BY MR. MILMAN:

 9   Q    Good afternoon.

10   A    Good afternoon.

11   Q    Thank you.  My name is Richard Milman.  I'm the attorney

12   for Parking Systems.  And I'm just going to ask you a couple

13   questions regarding this document.  Is that you, Francis?

14   A    Yes.

15   Q    Okay.  Where's the date on this?

16   A    November 16th.

17   Q    Okay.  Where does it say that through?

18   A    It's right here.  It's not copy it, but it's on my phone.

19              MR. MILMAN:  Okay.  I would argue that this document

20   is inadmissible, Your Honor.  It's a violation of the

21   completeness rule.  It's not authenticated because it doesn't'

22   have the date.  The witness had testified that she has the date

23   November 16 on her phone, yet this text message --

24              JUDGE GREEN:  Yeah.

25              MR. MILMAN:  -- has no date.
```

1          JUDGE GREEN:  No.  It's just a copy of the card.

2          MR. MILMAN:  Well --

3          JUDGE GREEN:  It's the card is the complete document.

4          MR. MILMAN:  But the --

5          JUDGE GREEN:  We're using it, we're using it like

6     it's a copy.  I mean if you want to take a -- if you want to

7     put in a copy of the card --

8          MR. MILMAN:  I know --

9          JUDGE GREEN:  -- that doesn't -- that's not an image,

10    then --

11         MR. MILMAN:  Well --

12         JUDGE GREEN:  -- we could do that, but it's a waste

13    of time.

14         MR. MILMAN:  I -- well, the point is also -- look, I

15    don't know what the proffer is, but the point is if this is

16    offered to do a chronology, November 16th, apparently General

17    Counsel -- I don't know what his case -- what he's trying to

18    make out of this, but he's taking a position on these dates of

19    when these folks saw him, who it was.  I've got to believe he's

20    going wrap it up, as the date is important.

21         If the date is important, we should have -- since the

22    --

23         JUDGE GREEN:  No.  That might be true.  I mean that

24    might be true.  If you want to enter into -- do you want to

25    enter into evidence the -- you know, the --

1          MR. JACKSON:  I don't have a copy that shows the date

2    of November 16th, but the witness just testified that she

3    believes that these text messages were sent on November 16th.

4    So I'm not sure what the objection is.

5          MR. MILMAN:  Well, the objection -- it could be the

6    18th.

7          JUDGE GREEN:  Okay.  So --

8          MR. MILMAN:  That's the objection.

9          JUDGE GREEN:  -- listen for purposes, we have the

10   actual card here.  This is an image of the card that's

11   accurate.  To the extent that either party wants to ask for a

12   screenshot of the phone, we do that.

13         MR. MILMAN:  That -- I mean --

14         JUDGE GREEN:   That's helpful.  I would think that --

15         MR. MILMAN:  Yeah.

16         JUDGE GREEN:  -- you know, the General Counsel might

17   want that.

18         MR. JACKSON:  Fine.  I could try to supplement this

19   with a different --

20         JUDGE GREEN:  Okay.

21         MR. JACKSON:  -- document.

22         JUDGE GREEN:  It's a different piece of evidence.  So

23   you could do it now, you could do it later, or the Respondent

24   can do it during cross.

25         MR. MILMAN:  I would object to its admission until

1    then.

2            JUDGE GREEN:  No.  because it's just a copy of the

3    card.

4            MR. MILMAN:  Well --

5            JUDGE GREEN:  We have a copy of the card.  We can see

6    it's an accurate copy of the card.

7            MR. MILMAN:  Well --

8            JUDGE GREEN:  I'm admitting it.  I'm overruling the

9    objection --

10           MR. MILMAN:  Thank you, Your Honor.

11           JUDGE GREEN:  -- and admitting it for that purpose.

12           MR. MILMAN:  Okay.

13           JUDGE GREEN:  The -- it's not -- it doesn't indicate

14   -- I understand that it doesn't indicate the date, and it's not

15   going to be useful for that purpose.

16           (General Counsel's GC-3 received in evidence)

17           MR. MILMAN:  Okay.  Thank you.  With that, I have no

18   objection.

19           JUDGE GREEN:  Okay.  So GC-3 is admitted.

20                   CONTINUED DIRECT EXAMINATION

21   BY MR. JACKSON:

22   Q    So Ms. Gil Reyes, you believe that you sent the photos of

23   the cards to Ayse on November 16th?

24   A    Yes.

25   Q    And when, in relation to when the man gave you the cards,

1   did you send the photo to Ayse?

2            THE INTERPRETER:  Repeat the question, please.

3            MR. JACKSON:  when, in relation to when you received

4   the cards, did you send the photo of them to Ayse?

5            THE WITNESS:  I don't remember exactly if it was the

6   same day or the next day.  It could be the next -- it could

7   have been the next day.

8   BY MR. JACKSON:

9   Q    So it was either on November -- so you met with -- so did

10  you meet with the Parking Systems representative who gave you

11  the cards on either November 15th or November 16th?

12           MR. MILMAN:  Objection, leading.

13           MR. JACKSON:  It's not leading.

14           JUDGE GREEN:  Overruled.

15           THE WITNESS:  Days before -- I sent the picture to

16  her on the 16th.  And I got that car -- business card days

17  prior to that.

18  BY MR. JACKSON:

19  Q    So it could have been several days?

20  A    Yes.

21  Q    Now, the Parking Systems representative who gave you

22  cards, he gave you more than one card, is that right?

23  A    Yes.

24  Q    Did the may say anything about what you should do with the

25  cards?

1   A    Yes.  He told us that on the back of the card there was a

2   code that we could scan to access the information and the

3   application for a job.

4   Q    Okay.  You said he told us.  Was there more than -- who

5   was present during this conversation?

6   A    Because one approached to me, but there were more than one

7   that day, that that man approached to me.

8           MR. JACKSON:  I don't understand the response.  Okay.

9   So all right.

10          MR. MILMAN:  Are you going to interpret that?

11          MR. JACKSON:  No.

12          JUDGE GREEN:  No, it's not a question to the witness.

13  It was just a comment.

14          MR. MILMAN:  Okay.  Fair enough.

15  BY MR. JACKSON:

16  Q    So when the man -- so we're talking about the second time

17  a Parking Systems representative approached you.  Okay.

18  A    (In English)  Okay.

19  Q    When the man approached you, was anyone else present?

20  A    There were patients that were coming out, and there were

21  also other parking workers that were picking up cars and coming

22  back and forth.

23  Q    Was anyone else part of the conversation you were having?

24  A    Not at that moment.

25  Q    Okay.  Did anyone join the conversation at some point?

1   A     No.

2   Q     Okay.  So did the man representing Parking Systems tell

3   you what you should do with the multiple cards he gave you?

4   A     Yes.  He told us to scan the code on the card, to complete

5   the job application for the job.

6   Q     Did he explain to you why he gave you more than one card?

7   A     Yes.  So I can provide it to the co-workers.

8   Q     Did the man say anything suggesting whether or not Parking

9   Systems would hire you?

10  A     He told us, when he approached to us, that he will like to

11  work -- he will like us to work together.

12              MR. MILMAN:  Objection, hearsay.

13              JUDGE GREEN:  So this we're saying is Mr. Gust?

14              MR. JACKSON:  We're saying it is an unnamed

15  representative representative of the Respondent.

16              MR. MILMAN:  Really?

17              JUDGE GREEN:  Right.  Okay.  So overruled for now.  I

18  mean, I guess we're going to determine who this is and whether

19  it's an agent, you know, a supervisor of the Respondent.

20

21              MR. MILMAN:  I have a standing objection then, Your

22  Honor, that this is all hearsay testimony.  But this witness is

23  testifying to what an agent of my client is purportedly making

24  a statement on regarding hiring.  They could --

25              JUDGE GREEN:  Right.

```
 1              MR. MILMAN:  -- call my --

 2              JUDGE GREEN:  But if it's --

 3              MR. MILMAN:  -- witness in.  They could --

 4              JUDGE GREEN:  But if it's an agent, it's admissible.

 5              MR. MILMAN:  Well --

 6              MR. JACKSON:  And also, Your Honor, it's not being --

 7   it could be offer for the proof, and it also has a purpose.

 8   It's not for the truth of the matter asserted.  It's just what

 9   a person was --

10              JUDGE GREEN:  Well, no.

11              MR. JACKSON:  -- supposedly --

12              JUDGE GREEN:  I mean --

13              MR. JACKSON:  representing Parking Systems said to

14   the employee.

15              JUDGE GREEN:  That is not -- listen, maybe it's

16   helpful as some background, but it's not going to be helpful to

17   establish what you're to prove, if it's not actually an agent.

18   Right?  That's not going to be helpful.

19              If somebody wearing a Parking Systems shirt comes up

20   to an employee of Classic said says we want you to work -- come

21   work with us, that's not going to be helpful for the General

22   Counsel's case.  And maybe it's some background perhaps.  I

23   don't know how you're putting on your evidence, but that's not

24   going to be helpful.  That's going to be hearsay.

25              Either that this was Mr. Rust (sic), who was an
```

1    alleged supervisor, that would be helpful obviously.  And that

2    would not be hearsay.

3              Is this not Mr. Rust?

4                    CONTINUED DIRECT EXAMINATION

5    BY MR. JACKSON:

6    Q    Ms. Gil Reyes, do you recall the man's name who spoke to

7    you and gave you the cards?

8    A    No.

9              MR. MILMAN:  I --

10             THE WITNESS:  I didn't know these people previously.

11   If I see you here today and I see you three days later, maybe I

12   don't remember?  Maybe I won't recall who you were?

13             MR. MILMAN:  I reinstate my objection, Your Honor.

14             JUDGE GREEN:  Okay.  Listen, I'm going to take it

15   under advisement.  I'm not sustaining the objection now, but

16   you know, it's going to be up to the General Counsel to

17   establish that this is a agent of the company, in order to

18   establish that it's not hearsay, unless there's some other

19   hearsay exception that applies.

20   BY MR. JACKSON:

21   Q    Did the man tell you he was representing Parking Systems,

22   before he gave you the card?

23             MR. MILMAN:  Objection.

24             JUDGE GREEN:  Overruled.

25             THE WITNESS:  Yes.

BY MR. JACKSON:

Q    Did he tell you what his position was with the company?

A    I don't remember that he said that clearly.

Q    Do you remember whether he said his position, or you don't remember what the position was he said?

A    I don't remember.

JUDGE GREEN:  Can I ask you, do you know what this person looked like?

THE WITNESS:  The people who approached us during that time, I don't remember how they look, but the person who approached to me for a interview, I do remember him.

JUDGE GREEN:  Okay.  But this person who handed you the card on this particular day, you don't recall what that person looked like?

THE WITNESS:  No.  I don't --

JUDGE GREEN:  Okay.

THE WITNESS:  -- remember him physically.

BY MR. JACKSON:

Q    Was the man wearing a black jacket?

A    Yes.

Q    Did it have any insignia or logo on it?

A    Yes.  Here on the side he has the Parking System -- Systems logo.

Q    Is that on the left side of the jacket?

A    Yes.

1    Q    Did you observe men wearing those Parking Systems jackets

2    speaking with anybody else -- speaking with any of your co-

3    workers at the Hospital campus?

4    A    No.

5    Q    Did you distribute the cards that the Parking Systems

6    representative gave you to any of your co-workers?

7    A    Yes.

8    Q    Okay.  What did you say to your co-workers, when you gave

9    them the cards?

10   A    A representative of this company came for me to distribute

11   these business cards among you guys.

12   Q    Did you tell them what to do with the cards?

13   A    Yes.

14   Q    What did you tell them?

15   A    The same thing they told me; that on the back of the card

16   there's a code they can scan for the work application.

17   Q    Did you apply for a job with Parking Systems?

18   A    Yes.

19   Q    Approximately when did you apply?

20   A    Days after I received the business card.

21   Q    And how did you apply?

22   A    Yes, with my mobile, I applied.  I opened the application,

23   scanning the code.  And there were some questions that I

24   answered.      They were not the typical questions of a work

25   application.  We completed those questions and never heard from

1    them.

2    Q    You say we.  Did you fill out an application at the same

3    time as someone else?

4    A    There were some -- a co-workers with me at the moment.

5    And the others did it on their own time.

6    Q    So when you were filling out the application with your

7    phone, there were other people with you?

8    A    The co-workers.

9    Q    Which co-workers?

10   A    My other three co-workers from the shifts.  Of course, we

11   didn't do it altogether, because we were working.  But I think

12   we all did it throughout the day.

13   Q    Did you complete the application?

14   A    Yes.

15   Q    Did you provide all the information called for in the

16   application?

17   A    Yes.

18   Q    Did you submit the application?

19   A    Yes.

20   Q    How do you know you submitted it?

21   A    After I submitted the application, I received a message

22   with a phone number mentioning that if I want more information

23   I can get it through that number.

24   Q    Okay.  How did you receive this message?

25   A    Right there at the moment of submitting the application,

```
 1  that was the thing that shows up on the screen.
 2  Q    And what did the screen say that appeared after you
 3  submitted?
 4  A    The -- if you want more information -- additional
 5  information about it, that I should call that number.
 6            MR. MILMAN:  That should be -- Matt --
 7            Could we go off the record for a second?
 8            JUDGE GREEN:  Off the record.
 9            (Whereupon, a brief recess was taken)
10            COURT REPORTER:  On the record.
11            JUDGE GREEN:  All right.  So whenever you're ready.
12            MR. JACKSON:  Thank you, Your Honor.
13  BY MR. JACKSON:
14  Q    Ms. Gil Reyes, you were talking about a screen that
15  appeared on your phone, after you submitted the application.
16  Do you recall that?
17  A    Yes.
18  Q    And the screen that appeared had a phone number for you to
19  call, right?
20  A    Yes.
21  Q    Did you ever call that phone number?
22  A    Yes.
23  Q    Approximately how long after you submitted the application
24  did you call the number?
25  A    Some days after.
```

1    Q    Okay.  Why did you call?

2    A    Because I didn't get any response from the application.

3    Q    Did you speak with anyone, when you call the number?

4    A    Yes.

5    Q    Do you recall who you spoke with?

6    A    No.

7    Q    Okay.  What did you say to the person who answered the

8    call?

9    A    I was saying that I was calling in regard to my

10   application, because I was looking for a job in Stony Brook.

11   So I called Parking Systems and told them that I sent my

12   application.

13   Q    Okay.  And what did the person who -- on the other end of

14   the phone call say, in response to that?

15   A    She said that she doesn't have any information regarding

16   my call.  She didn't have my name or number.  And -- but that

17   she will call me, if she finds out about it.  And she never

18   called.

19   Q    So this was a woman who answered your call?

20   A    Yes.

21   Q    Did -- Do you know what her position or role was?

22   A    No, I only know that they answer my call -- she answered

23   my call, and that was the answer that I got.

24   Q    Did you provide your information to her?

25   A    Yes.

1  Q    What information did you provide?

2  A    Name, phone number and email address.

3  Q    So after you made this call and gave the woman you contact

4  information, did anyone from Parking Systems call you after

5  that?

6  A    Yes.  Some days after.

7  Q    Who called you?

8  A    Mr. Bobby.

9  Q    Do you know Bobby's last name?

10  A    Bobby Ghost, Bobby Guest.  Something like that.

11  Q    Do you recall the date that he called you?

12  A    Yes.  November 23rd.

13  Q    Okay.  And what did Bobby say when he called?

14  A    So he asked my name and he said that he wanted to

15  interview me for the job.

16  Q    Okay.  And how did you respond to that?

17  A    That it was okay.  That I would do the interview.  And I

18  asked if the interview will take place right there in Stony

19  Brook.

20  Q    And how did Bobby -- did Bobby give you an answer to that

21  question?

22  A    Yes.  He said we will do the interview, but not there.

23  And he told me on hotel room.  In casino hotel AG-58 (sic).

24  Q    Okay.  Was it Jake's 58?

25  A    Jake 58.

1   Q     Yeah.   Like J-A-K-E apostrophe S.

2   A     Yes.

3   Q     Did you agree to meet Bobby at Jake's 58?

4   A     Yes.

5   Q     When Bobby called you, what language did he speak to you

6   in?

7   A     English.

8   Q     Oh, and prior -- and earlier, when the Parking Systems

9   representatives approached you at the Cancer Center parking

10  area, did they speak to you in English then too?

11  A     Yes.

12  Q     And you responded in English?

13  A     Yes.

14  Q     What is Jake's 58?

15  A     It's a hotel and casino.

16  W         And where is Jake's 58 located relative to Stony

17  Brook University Hospital?

18  A     So it's located on Exit 58 of 495.

19  Q     Okay.   Is that also known as that -- that's a -- 485,

20  you're referencing a highway?

21  A     Yes.

22           MR. MILMAN:   Objection.   Expressway.

23           JUDGE GREEN:   Okay.   Overruled.

24  BY MR. JACKSON:

25  Q     Okay.   And how far is Jake's 58 from the Stony Brook

1  campus?

2  A    Some 20-25 minutes.

3  Q    Is that by car?

4  A    Yes.

5  Q    Did -- so when did Bobby tell you he wanted to meet you at

6  Jake's 58?

7  A    Saturday the 25th at 1:00 p.m.

8  Q    Did you go to Jake's 58 at that time?

9  A    Yes.

10 Q    Did you go there alone, or were you accompanied by someone

11 else?

12 A    With someone.  With someone.

13 Q    Who'd you go with?

14 A    With Edward Arias, which is also an employee of Classic,

15 and he's also my son.

16 Q    Why did you go there with Edward?

17 A    First of all, I didn't know exactly the area.  I didn't

18 know where it was.  So I didn't want to go alone.  I want to be

19 with someone.

20        And also, I didn't know how extended the conversation

21 would be.  And in that case, if the conversation will ended up

22 being a little complex, so in English I will -- probably will

23 need help.  So he could help me with the language if -- because

24 I know English, but certain there words I don't know no.  And

25 then I may need some time with some help.

1  Q    Okay.  So can you describe what happened at first, when

2  you and Edward arrived at Jake's 58 on November 25?

3  A    So the first thing that I noticed, I didn't see any

4  company information around there.  So I call -- I texted him.

5  And he told me that I was in the back of the building.  That I

6  should go around to meet with him.

7  Q    Did you go around to the back?

8  A    Yes.

9  Q    What did you see there when -- in the back?

10  A    So I found some his workers working there, and I told them

11  that I came here to meet with him.  So they called him.  And he

12  came.  He was inside the building and he came out to meet with

13  me.

14  Q    When you say you saw some of his workers, what do you mean

15  by that?

16  A    I mean the staff that he had working on that area.

17  Q    Okay.  How do you know that the people you saw were staff

18  that Bobby had working in that area?

19          THE INTERPRETER:  Can you repeat the question?

20          MR. JACKSON:  Yeah.  What did you see, that made you

21  determine that these people were staff working under Bobby?

22          THE WITNESS:  It was certain people dressed in black

23  with the Parking System (sic) logo working at valet parking.

24  BY MR. JACKSON:

25  Q    Was it the same logo that you saw on the black jacket of

1   the man who spoke to you at the Cancer Center?

2   A    Yes.

3   Q    Okay.  So when you arrived to the back, did you speak with

4   Bobby?

5   A    Yes.  He came out to encounter me at the door, and then we

6   walked inside.

7   Q    Okay.  Was it only Bobby or were there -- was he

8   accompanied by anyone else?

9   A    I think two more people.

10  Q    Okay.  Were they wearing the Parking Systems jackets?

11  A    Yes.

12  Q    All three of them?

13  A    Yes.

14  Q    Did you recognize any of these three men, from what you

15  saw at the Hospital campus in terms of men in black Parking

16  Systems jacket walking around?  Were any of them the same

17  people that you saw at the Hospital?

18  A    Yes.  One was the same person, and another one I didn't

19  recall his physical appearance well.

20  Q    I see.  Was Bobby one of the people who you saw walking

21  around the Hospital campus earlier?

22  A    No.

23  Q    So Bobby asked you to come inside the casino?

24  A    Yes.

25  Q    Did you go inside?

1  A    Yes.

2  Q    Did anyone say anything about Edward being present?

3  A    No.

4  Q    So did Edward come inside with you too?

5  A    Yes.

6  Q    Once you entered the casino, where did you go?

7  A    We went to a small area.  I think was the first floor.

8  And there were some tables where some people were sitting

9  there.

10  Q    Did you sit down there?

11  A    Yes.

12  Q    And who as sitting down?

13  A    The other two people, my son Edward and me.  Bobby and me.

14  Q    So after you sat down, how did the meeting begin?

15  A    We exchanged greetings, he told me that he want to

16  interview me for the job and we start talking.

17  Q    Okay.  After that, what did you start talking about?

18  A    So I -- he said that he wanted to -- want me to work for

19  him.  He also inquire about my shifts, my schedule at the

20  Hospital.  And then I asked him if he was only interviewing me,

21  because I didn't see anybody else, and he said yes.

22  Q    How did you respond, when he told you that the interview

23  was only for you?  How did you respond, when he told you --

24  A    I asked that why only me?  If there were many who fill out

25  the applications before, why he was just interviewing me?

1  Q    And did Bobby respond?

2  A    He said that he wanted to work with me and maybe some

3  other three or four that I could chose for him.  And those were

4  the people that were not working with the Union.

5                    (Counsel confer)

6  BY MR. JACKSON:

7  Q    I want to --

8              THE INTERPRETER:  Sorry.  I think I made a mistake.

9  If she didn't know the people, right, what she was told, you

10 know, he was looking for people that doesn't work with the

11 Union.

12             JUDGE GREEN:  Hold on just one moment.  I think we

13 have an issue with the translation.  Do we have an issue with

14 the translation?

15             MS. CABRERA:  Yeah.

16             MR. JACKSON:  I believe so, Your Honor.

17                    (Counsel confer)

18 BY MR. JACKSON:

19 Q    Let me ask you a different question, and see if we can get

20 your response?  Did --

21             JUDGE GREEN:  Okay, but -- okay.  I mean if there's

22 an issue with that translation, I'd like to clarify what the

23 proper translation should have been.

24             MR. MILMAN:  And if I may, maybe try to answer in

25 English?

1          JUDGE GREEN:  I mean you could ask.  If mean if you

2    want to ask --

3          MR. MILMAN:  Ask --

4          JUDGE GREEN:  -- the question, to have the question

5    answered in English, you can have the question answered in

6    English.

7          MR. JACKSON:  Are you able to remember what Bobby

8    said to you, if speaking in English?

9          THE WITNESS:  (In English) Yes.

10          THE INTERPRETER:  Yes.

11    BY MR. JACKSON:

12    Q    Okay.  So in English, can you tell us your best

13    recollection of what he said to you, when you asked him why is

14    this interview only for me?

15    A    (In English) Okay.  I asked him why he meeting just me.

16    And he say I will like you work with me, with us.  But -- and I

17    ask him why just me?  And he say I can hiring you and another

18    three or four people, because we can hire all the staff,

19    because you guys have a union and we don't work with union.

20    Q    What did you say in response to that?

21          MR. JACKSON:  Back with the translation.

22          THE WITNESS:  So I said that I didn't feel

23    comfortable that he just want to hire me and not the other co-

24    workers, because we are all -- we all belong to a union, and

25    that we've been working together for a long time.

1  Q    Did Bobby respond to what you said?

2  A    So I was telling him again that I didn't feel comfortable,

3  because my co-workers were all men and women with families, and

4  we need a job to -- for our families.  And I want -- and that's

5  it.

6                        (Counsel confer)

7             MR. JACKSON:  Can we go off the record, Your Honor?

8             JUDGE GREEN:  Off the record.

9                 (Whereupon, a brief recess was taken)

10            JUDGE GREEN:  You think that there might have been

11  something additional in the testimony.  Do you remember what

12  that was, or would you prefer us to ask the question again?

13            THE INTERPRETER:  I prefer to ask the question again.

14            JUDGE GREEN:  Okay.  So why don't we try it.  And if

15  you could, Ms. Reyes, just -- you've been doing well in this

16  regard, but try to keep the answers like in fairly short like

17  one or two sentences, let the translator translate and then

18  move on.

19            THE WITNESS:  (In English) Okay.

20            JUDGE GREEN:  Okay?

21            THE WITNESS:  (In English) Okay.

22  BY MR. JACKSON:

23  Q    Okay.  Can you repeat what Bobby said to you, after you

24  explained that you thought that your co-workers all deserved

25  jobs?

1    A    So that he couldn't hire everybody.  Only two or three

2    people.  Because they worked with the Union and -- sorry.  The

3    company didn't work with the Union, and they were all workers

4    with a union.

5    Q    So he told you that twice?

6    A    Yes.

7    Q    Did you say anything further back to him?

8    A    So again I said that I didn't feel comfortable, because

9    everybody working there were head of families.  And therefore I

10   won't accept the proposal.

11   Q    Did Bobby respond to that?

12   A    So he said that I could think about it and call him later

13   with whatever decision I will reach, I will take or I will

14   make.

15   Q    How did the meeting end?

16   A    So I asked my son, you know, do you hear what he said?

17   And then my son said yes, and I think there's nothing else we

18   can do here.  We should leave.

19   Q    And did you leave at that time?

20   A    Yes.

21   Q    Approximately how long did this meeting last?

22   A    15 minutes approximately.

23   Q    Now, the other two Parking Systems -- well, I'll say other

24   other two men who were wearing Parking Systems' jackets, and

25   who were present for this meeting, did they say anything?  Do

```
 1  you remember them saying anything during the meeting?
 2  A    Didn't inquire much.  They just said -- mentioned that
 3  probably we'll work together, and that's it.  Nothing else.
 4  Q    Did Edward say anything during the meeting?
 5  A    No.
 6  Q    Did you -- well, first strike that.  Did Bobby speak in
 7  English during this meeting?
 8  A    Yes.
 9  Q    And did you respond in English?
10  A    Yes.
11  Q    Was there ever a point during the meeting that you felt
12  you didn't understand what Bobby was saying to you?
13  A    I tried to understand the most of the conversation and I
14  think understood the most important part.
15  Q    Was there something that he said that you didn't
16  understand, to your recollection?
17  A    No.
18  Q    Did you ever ask Edward to translate for you?
19  A    I didn't need it, because I understood what he had spoke
20  with me.
21  Q    Now, after you left that meeting did you discuss what
22  happened with someone from the Union?
23  A    Yes.
24  Q    Who did you speak with?
25  A    With Ms. Ayse here, present here.
```

1    Q    Okay.  How did you speak with Ayse?

2    A    I tried to call her, but she didn't answer.  And then she

3    called me back after.

4    Q    When did you -- how long after the meeting ended did you

5    try to call Ayse first?

6    A    I tried to communicate with her on the same day.

7    Q    Was it minutes later?  Hours later?  Do you know?

8    A    So our -- I call her minutes after the meeting, and she

9    called me back hours later.

10   Q    What did you tell Ayse about the meeting, when she called

11   you back?

12   A    I told her that Bobby told me that he couldn't hire

13   everybody because we worked with a union, and they don't hire

14   people from the Union.

15   Q    How did Ayse respond?

16   A    How come, because we are in a union would be the reason

17   for not hiring us?

18   Q    Do you remember anything else you and Ayse discussed at

19   that time?

20   A    We only spoke about what happened on those moments during

21   the interview.

22   Q    Did you tell any of your co-workers about the meeting you

23   had with Bobby Gust?

24   A    Yes.  So the next day I went to work, and I told my co-

25   workers about the meeting.

1    Q    Do you remember which co-workers you told?

2    A    First, I told the people that work in my group.  And then

3    through the day, whenever I encounter other people from other

4    groups, I was telling --

5    Q    And what did you tell them?

6    A    That probably we won't be able to find a job, because the

7    new company told me that they couldn't hire us because we have

8    a union or were part of the Union.

9    Q    And you said it was your next day at work.  Do you

10   remember which day that was?

11   A    The meeting was on Saturday.  So then it was a Monday when

12   I went back to work.

13   Q    Okay.  And how many of your co-workers did you tell that

14   Monday?

15   A    In total, I think it might have been some 20 that was I

16   told the people in my group that day.  And in the following

17   days, probably we were communicating, and probably 20 total.

18   Q    Did you tell all of them on November 27th?  That Monday?

19   A    So I was passing the information at the beginning in the

20   entrance.  And then as I was working in other sections, I was

21   sharing the information with other people.  And I think at the

22   end everybody knew.

23   Q    So all these conversations happened that Monday?

24   A    To just the people that was able to see that Monday.  Then

25   the following day, I also encountered other people.  They asked

```
 1  me about the interview, and I told them what happened.
 2                       (Pause.)
 3           MR. JACKSON:  Okay.  Presenting the witness with a
 4  document I asked to me marked for identification as General
 5  Counsel exhibit 4 or GC-4.
 6  BY MR. JACKSON:
 7  Q    Okay.  Do you recognize the document before you?
 8  A    Yes.
 9  Q    What is it?
10  A    It's a note that I share with Ms. Ayse, and telling her
11  the -- that I told the information to a couple of people
12  mentioned there.
13                 (General Counsel's GC-4 identified)
14  Q    Okay.  Can you do this?  Can you read out loud your
15  message, so that the interpreter can read it into the record in
16  English?
17  A    Yes.  Hi Ayse, I am Francis Gil.  I spoke with neck and
18  them -- Nick and them today in the morning.  And they
19  themselves said that the new company don't want to hire us
20  because we have the Union.  And they don't work with a union.
21  So and is the same what Bobby told me on Saturday from the same
22  company.  Who told me on that Saturday, when they meet with me
23  to make the proposition to stay with them, because only five
24  people can stay with them -- with us.
25  Q    Thank you.  And that's the message you sent to Ayse?
```

1    A    Yes.

2    Q    Can you tell us when you sent that message to her?

3    A    Monday afternoon.

4    Q    Monday, November 27th, correct?

5    A    27th.

6    Q    And did Ayse respond to your message?

7    A    Yes.

8    Q    Oh, and how did you send the message to her?

9    A    Text.

10   Q    And she responded via text?

11   A    After that, she called me.

12   Q    So she responded first with the word gracias?

13   A    Yes.

14   Q    And then she called you?

15   A    Yes.

16   Q    How long after you sent the message did she call you?

17   A    I don't know how much after -- how long after, but it was

18   on the same day.

19        THE INTERPRETER:  In the afternoon?

20        THE WITNESS:  Si.

21   HY MR. JACKSON:

22   Q    Okay.  And what did Ayse say when she called you?

23   A    We spoke about the same subject; that the company didn't

24   want to hire the full valet staff, because they -- because of

25   the fact that we had union.

1    Q    Okay.  Now, you referenced a few names in your text.  The

2    first one is, it looks like, N-E-C-K?  Who is that?

3    A    It's one of the persons from the new company in charge of

4    parking at the new -- in charge of parking at the Hospital.

5    Q    Okay.  Do you know who -- is it Nick or is it Neck?  Is it

6    N-E-C-K or is it N-I-C-K?

7    A    (In English) Nick.  I don't know how to pronounce --

8             THE INTERPRETER:  Nick?

9             THE WITNESS:  Nick.

10            MR. JACKSON:  Nick.

11            THE INTERPRETER:  Nick.

12   BY MR. JACKSON:

13   Q    Okay.  And Do you know who Nick works for?

14   A    Who?  The name I don't remember, but he works for the

15   Hospital.

16   Q    I see.  Okay.  Do you know Nick's last name?

17   A    No.

18   Q    Did you -- had you had any interaction with Nick before

19   November 27th?

20   A    I've seen him several times there, because he was already

21   integrated working in the area.

22   Q    Okay.  And what about the second name here?  It appears D-

23   A-M.  Who is that person?

24   A    Another of his co-workers.

25   Q    Is it Dem with a M or Dan with a N?

1    A    I don't know I wrote it like this; Dan or Dam.

2    Q    Had you seen Dan before November 27th?

3    A    Yes.  Several times because he also worked there.

4    Q    So he worked for the Hospital?

5    A    Yes.

6    Q    Where did you see these two hospital employees on November

7    27th?  Excuse me.  I'll strike that.  Did you see them in

8    person on November 27th?

9    A    Yes.

10   Q    Where did you see them?

11   A    In the lobby at the cafe that is there; a Starbuck (sic).

12   Q    The lobby of what?

13   A    Hospital.

14   Q    Okay.  And they spoke to you at that time?

15   A    Yes.

16   Q    Who started the conversation?

17   A    They say hi, and simply know that I'm working there in

18   that place.  They ask me if I will stay working there.

19   Q    And what did you say to them?

20   A    That I wasn't sure, because I was -- I just met with one

21   of the people from the company, and he said that he will not

22   hire people from the Union.

23   Q    Did Nick or Dan say anything in response to what you told

24   them?

25   A    Yes.  They told me that, yes, that they heard that they

1  didn't work with the Union.

2  Q    Okay.  And there's -- it appears to be a third name

3  referenced here.  There's a B-A-B-Y.  The word baby.  What did

4  you mean to write there?

5  A    He was trying to -- sorry.  I was trying to write Bobby.

6          MR. JACKSON:  Okay.  I move for the admission of GC

7  exhibit 4.

8          MR. MILMAN:  I have voir dire.

9          JUDGE GREEN:  Okay.

10                        VOIR DIRE EXAMINATION

11  BY MR. JACKSON:

12  Q    Hi.  Me again.

13  A    (In English)  Hi.

14  Q    Hey.

15  A    Hi.

16  Q    Going to ask you a few questions.  This box, this box and

17  this box is all your discussion, correct?

18  A    Yes.

19  Q    And this box and that bok is -- box is Ayse, correct?

20  A    Yes.

21  Q    Okay.  Why are these two boxes in English and this box is

22  in Spanish?

23  A    Because sometime I write in English, but I use the

24  translator.

25  Q    So these two were translated?  Top two?

1    A    Yes.

2    Q    Why wasn't this translated?

3    A    because that's the way I communicate with her.  Sometimes

4    I do it in English, sometime I do it in Spanish, Sometime I use

5    the Google translation to communicate.

6    Q    I understand, but why -- just in this situation, why these

7    two in English and this in Spanish?

8              MR. JACKSON:  Your Honor, I'm going to object that

9    this is going beyond the scope of voir dire.

10             MR. MILMAN:  Really?

11             JUDGE GREEN:  It is.

12             MR. MILMAN:  Beyond the scope of voir dire.  This --

13             JUDGE GREEN:  It's --

14             MR. JACKSON:  This is cross-examination.

15             JUDGE GREEN:  What we're looking at for voir dire,

16   what we really want is something -- is questioning regarding

17   the admissibility of --

18             MR. MILMAN:  And --

19             JUDGE GREEN:  -- the document.

20             MR. MILMAN:  And that's what I'm trying to get into.

21   I'm trying to say that this is not the best evidence.  You have

22   part in English, part in Spanish.  The English is translating

23   with a translator.

24             I don't know why this is in English, this is in

25   Spanish.  I don't think this is the best evidence.  I don't

1  think this is --

2          JUDGE GREEN:  Okay.  So to the extent that's going to

3  be the objection, that objection is going to be overruled.

4          MR. MILMAN:  Okay.  Well --

5          JUDGE GREEN:  But is there any other objection?

6          MR. MILMAN:  Yes.  I will think of it as best I can.

7  Yeah.  Second objection is -- I think the second objection is

8  also is I just -- if this -- okay.

9          If this document is going to be used, okay, to

10 supplement her testimony, all right, then I don't think it's

11 deemed to be admissible.  Because again, this was done I think

12 -- I think was it all done it Spanish, and it's just these two

13 are English, or was it all all done in English and --

14                 CONTINUED VOIR DIRE EXAMINATION

15 BY MR. MILMAN:

16 Q    I mean when you -- let me ask you a question --

17         JUDGE GREEN:  Let me ask you -- let me ask you,

18 because I think you are onto something there.

19         Let me ask the General Counsel, what is your purpose

20 of introducing GC-4?

21         MR. JACKSON:  To show that -- it bolsters the

22 credibility.  I'm sure her credibility will be under attack.

23         JUDGE GREEN:  Okay.  But so basically you're saying

24 it's a prior -- but it's not really a prior statement.  But

25 that's what you're basically saying.  You're saying it's a

1  consistent statement with --

2            MR. JACKSON:  With her testimony.

3            JUDGE GREEN:  -- what -- with what testimony?

4            MR. JACKSON:  With her testimony concerning --

5            JUDGE GREEN:  This conversation?

6            MR. JACKSON:  This conversation, as well as the

7  conversation she had with Bobby on November 25th.

8            JUDGE GREEN:  Okay.  All right.  That's weak.

9            MR. MILMAN:  Yeah --

10            JUDGE GREEN:  That's going to be weak.  Just hold on

11  a second.

12            MR. MILMAN:  So -- yep.

13            JUDGE GREEN:  I mean that's really not what we talk

14  about, when we talk about a prior consistent statement.  For --

15  you know, a prior consistent statement is something that's said

16  by an employee before they had a reason to fabricate it.  It's

17  really not a post -- you know, an after that fact statement,

18  which is just going to be conveniently the same as what the

19  original alleged statement is.

20            I mean listen, it is -- I'll accept it.  I'll accept

21  it, for what it's worth.  But it's not going to be worth much,

22  as far as I can tell, if anything.  I mean the testimony in all

23  likelihood is going to be credited based upon Ms. Reyes'

24  testimony.

25            It actually potentially has some relevance, in terms

1   of to the extent an 8(a)(1) statement was stated to either the

2   Union or -- and/or to employees, or to the Union and then to

3   employees, that could part of the totality of the

4   circumstances, for purposes of an 8(a)(1) analysis.  It could

5   be useful for that.

6           For purposes of bolstering Ms. Reyes' testimony

7   regarding the statement, it's really -- you know, it's really

8   just hearsay that's not going to be all that helpful.  But I

9   will allow it.  I will will allow it, and you can argue it in

10  the brief.

11          MR. MILMAN:  And thank you, Your Honor, for your

12  ruling.  I would just like to add one follow up to that.  And I

13  understand your argument an it's articulated.  It was well-

14  said.

15          The statement that counsel for the General Counsel

16  said that this is also used to corroborate the previous

17  conversation with Mr. Gust, this witness has testified she

18  spoke to him in English.  So if she spoke to him in English and

19  then she is decidingly to covert -- to state this in Spanish,

20  that -- it might be -- is a problem.  Or I say incorporate what

21  is the best evidence, aside from her testimony.

22          JUDGE GREEN:  I don't think that's the issue.

23          MR. MILMAN:  Okay.

24          JUDGE GREEN:  I don't think -- I mean the reason why

25  -- I assume the reason why the GC is saying that this

1  essentially corroborates the testimony regarding the Mr. Gust

2  conversation is because it references the Mr. Gust

3  conversation.  I don't really think it matters that it's in

4  Spanish.  But I don't really think it's compelling, whether

5  it's in English or or Spanish.

6            MR. MILMAN:  Thank you, Your Honor.  No objection

7  then.

8            JUDGE GREEN:  Okay.  I mean you have objection.  I'll

9  take the objection.

10           MR. MILMAN:  I have a standing objection --

11           JUDGE GREEN:  Right, yeah.

12           MR. MILMAN:  -- but I accept your ruling --

13           JUDGE GREEN:  Right.

14           MR. MILMAN:  -- to --

15           JUDGE GREEN:  Understood.  Okay.  So GC-4 is

16  admitted.

17           (General Counsel's GC-4 received in evidence)

18                 CONTINUED DIRECT EXAMINATION

19  BY MR. JACKSON:

20  Q    Ms. Gil Reyes, did you tell any of your co-workers about

21  what Nick and Dan said to you?

22  A    I don't remember.

23  Q    Have you had any contact with Bobby Gust or anyone else

24  representing Parking Systems, since you had that meeting at

25  Jake's 58?

1              THE INTERPRETER:  Repeat the question, please.

2              MR. JACKSON:  Have you had any contact with Bobby

3    Gust since the meeting on -- at Jake's 58?

4              THE WITNESS:  No.

5    BY MR. JACKSON:

6    Q    Have you had any contract with anyone else representing

7    Parking Systems since that meeting?

8    A    No.

9    Q    Has Parking Systems ever offered you a job?

10   A    That time.

11   Q    Okay.  Let me -- I'll ask a different question.  Before

12   December 1, 2023 did Parking Systems offer you a job?

13             MR. MILMAN:  Objection, asked and answered.  She said

14   November 25th.  That's the date.

15             JUDGE GREEN:  Okay.  Overruled.

16             THE INTERPRETER:  22?

17             MR. JACKSON:  Three.

18             THE WITNESS:  No.

19   BY MR. JACKSON:

20   Q    Perhaps you didn't understand my question.  I'm not sure

21   if it was clear or not.  I apologize.

22             I mean as best -- aside from the comments Mr. Gust

23   made to you on November 25th at Jake's 58, did anyone from

24   Parking Systems offer you a job?

25   A    No.

1  Q     To your knowledge were any of your co-workers offered a

2  job with Parking Systems before December 1?

3  A     I don't remember.

4           MR. JACKSON:  Okay.  No further questions.

5           JUDGE GREEN:  Okay.  Is there going to be anything

6  from the Union?

7           MR. ROCCO:  I have one question.

8                      DIRECT EXAMINATION

9  BY MR. ROCCO:

10 Q     Hi.  Good afternoon.  Have you ever -- prior to today,

11 have you ever testified in proceeding before the National Labor

12 Relations Board?

13          THE INTERPRETER:  National?

14          MR. ROCCO:  National Labor Relations Board.

15          THE WITNESS:  Yes.

16 BY MR. ROCCO:

17 Q     When was that?

18 A     A week ago.

19 Q     Okay.  I just want to -- have you ever come to court?

20 A     No.

21 Q     Have you ever been to Brooklyn, to testify at the National

22 Labor Relations Board?

23 A     No.

24 Q     So what you just referenced a week ago, was that a

25 reference to a preparation session?

```
1   A    Yes.

2           MR. ROCCO:  Thank you.  No further questions.

3           JUDGE GREEN:  Okay.  Is there going to be any cross?

4   Yeah.

5           MR. MILMAN:  And Your Honor also, I mean under Jencks

6   and its progeny, I'm going to have to review any statements,

7   affidavits or -- and that's going to take a little bit.

8           JUDGE GREEN:  Right.  So let me just ask you, before

9   we move on to the government -- to the -- excuse me, to the

10  Respondent's questioning, just me just ask you a couple of

11  questions.  Do you have this before you; GC-4?  This.

12          THE WITNESS:  You mean the paper?

13          JUDGE GREEN:  Yes.

14          THE WITNESS:  I have this conversation on my phone.

15          JUDGE GREEN:  Right.  I understand.  So at the time

16  that you texted to Ayse this text, did you know whether it was

17  lawful for a company to refuse to hire you, because you were

18  represented by a union?

19          THE WITNESS:  I really didn't know.

20          JUDGE GREEN:  Okay.  And so when you sent this text,

21  did you think that you were telling Ayse that Parking Systems

22  was doing something illegal?

23          THE WITNESS:  Yes.  I communicated to Ayse to see --

24  since  she is our representative, to see what can she do for us

25  as our representative.
```

```
 1              JUDGE GREEN:  Okay.  All right.  So thank you.

 2         So why don't you hand over the Jencks statements?

 3              MR. JACKSON:  So I have two Jencks -- oh, actually,

 4    Your Honor, can I just do one more thing with the witness?  I'm

 5    sorry.

 6              JUDGE GREEN:  Yes.

 7              MR. JACKSON:  I apologize.

 8              JUDGE GREEN:  Yeah.

 9              MR. JACKSON:  It's just a clean up from before.  I'm

10    going to have marked for identification GC-3(a).  3(a).

11                   CONTINUED DIRECT EXAMINATION

12    BY MR. JACKSON:

13    Q    And Ms. Gil Reyes, do you recognize this document?

14    A    Yes.

15    Q    Can you tell us how it relates to the other exhibit that

16    contains photos of the Robert Gust cards?

17    A    It's the same card.

18              (General Counsel's GC-3(a) identified)

19    Q    Is it the same set of text messages?

20    A    Yes.

21    Q    Okay.  And does the 3(a), the one I just showed you more

22    recently, does that show the date on which the text was sent?

23    A    Yes.

24    Q    And what date was that?

25    A    November 16.
```

1           MR. JACKSON:  Okay.  I'll move for the admission of

2    GC-3(a).

3           MR. MILMAN:  No objection.  I withdraw the previous

4    objection on GC-3.

5           JUDGE GREEN:  Okay.   So GC-3(a) is admitted.

6         (General Counsel's GC-3(a) received in evidence)

7           MR. JACKSON:  Now, no further questions, Your Honor.

8    Thank you.

9           MR. MILMAN:  Your Honor, can we go off the record?

10          JUDGE GREEN:  Off the record.

11          (Whereupon, at 4:16 p.m. the hearing in the above

12    entitled matter was recessed to reconvene on June 20, 2024)

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1
 2                        CERTIFICATION
 3          This is to certify that the attached proceedings
 4  before the National Labor Relations Board (NLRB), Region (29),
 5  in the matter of Parking Systems Plus, Inc. and Local 1102,
 6  Retail, Wholesale & Department Store Union Limited, United Food
 7  and Commercial Workers, Case No. 29-CA-331253, at New York, New
 8  York, on June 18, 2024, was held according to the record, and
 9  that this is the original, complete, and true and accurate
10  transcript that has been compared to the recording from the
11  hearing, that the exhibits are complete and no exhibits
12  received in evidence or in the rejected file are missing.
13
14
15
16
17
18
19  _____
20  Adrian Morris
21
22
23
24
25
```

**$**

**$16 (1)**
25:13
**$50,000 (1)**
13:2

**A**

**able (7)**
15:16;42:9,11,25;
80:7;85:6,24
**above (1)**
100:11
**above-entitled (1)**
1:14
**absorb (1)**
31:20
**accept (4)**
82:10;93:20,20;
95:12
**access (3)**
44:16;46:24;64:2
**accompanied (2)**
75:10;77:8
**according (3)**
26:9;44:10;47:20
**accredited (1)**
29:15
**accretion (7)**
24:3,3;29:7,14;
30:8;31:10;32:11
**accurate (3)**
11:10;61:11;62:6
**acquires (1)**
25:2
**Act (6)**
12:15;17:10;18:1,
21;19:12,21
**actual (2)**
56:14;61:10
**actually (5)**
46:10;56:21;66:17;
93:25;99:3
**add (2)**
20:3;94:12
**added (1)**
32:4
**additional (2)**
71:4;81:11
**address (1)**
73:2
**Administrative (3)**
1:15;6:6;19:18
**admissibility (1)**
91:17
**admissible (2)**
66:4;92:11
**admission (5)**
18:5;59:1;61:25;
90:6;100:1
**admissions (1)**

17:16
**admits (1)**
12:14
**admitted (5)**
7:5;18:12;62:19;
95:16;100:5
**admitting (1)**
62:8,11
**adopt (1)**
19:2
**advised (1)**
41:25
**advisement (1)**
67:15
**affect (1)**
44:12
**affidavits (1)**
98:7
**affiliation (3)**
14:18;18:17;33:19
**afternoon (8)**
6:12,16;49:23;59:9,
10;87:3,19;97:10
**AG-58 (1)**
73:23
**again (8)**
32:8;42:11;81:2,12,
13;82:8;90:12;92:11
**against (3)**
17:25;18:16;32:12
**agent (7)**
65:19,23;66:4,17;
67:17
**agents (2)**
15:20,22
**ago (3)**
23:10;97:18,24
**agree (2)**
7:24;74:3
**agreed (4)**
15:7;17:4;29:8;
30:10
**Agreeing (1)**
29:12
**agreement (6)**
19:4,7;21:24;22:1;
23:17;25:21
**agreements (1)**
14:25
**Ah (1)**
7:11
**Ah! (1)**
59:3
**akin (1)**
29:6
**al (1)**
6:18
**allegations (1)**
12:16
**alleged (6)**
8:24;9:2;28:22;
32:4;67:1;93:19
**allegedly (1)**

28:16
**allow (2)**
94:9,9
**allowed (1)**
39:7
**Allways (7)**
29:3,21,24;30:3,4;
31:10;32:11
**almost (1)**
29:19
**alone (3)**
30:8,16;36:22;
75:10,18
**along (2)**
28:11;39:14
**altered (1)**
19:5
**altogether (1)**
70:11
**always (1)**
44:1
**A-M (1)**
88:23
**ambiguous (1)**
39:16
**amended (3)**
28:2,15;32:4
**among (1)**
69:11
**analysis (1)**
94:4
**and/or (1)**
94:2
**animus (5)**
22:22;23:25;27:21;
32:13;33:4
**anonymously (1)**
22:8
**answered (8)**
47:5;69:24;72:7,19,
22;80:5,5;96:13
**anti-union (1)**
22:5,22
**apologize (2)**
96:21;99:7
**apostrophe (1)**
74:1
**apparently (3)**
12:1;13:22;60:16
**appearance (1)**
77:19
**appearances (1)**
6:7
**appeared (3)**
71:2,15,18
**appears (2)**
88:22;90:2
**applicants (2)**
25:16,17
**application (18)**
16:19;64:3;65:5;
69:16,22,25;70:2,6,
13,16,18,21,25;71:15,

23;72:2,10,12
**applications (7)**
15:24;16:12,16;
18:7;31:12,22;78:25
**applied (1)**
69:22
**applies (2)**
8:24;67:19
**apply (5)**
15:21;56:3;69:17,
19,21
**appreciated (1)**
15:9
**approach (2)**
53:8;54:21
**approached (23)**
53:2;7,7,11,13,18,
20;54:4,8;55:10,14,
15,18,19,22;64:6,7,
17,19;65:10;68:9,11;
74:9
**appropriate (4)**
8:2;19:24;31:1;
32:6
**appropriateness (1)**
28:18
**Approximately (12)**
21:9,10;22:11;23:1;
36:3;38:9;51:17;55:2;
69:19;71:23;82:21,22
**area (12)**
43:11,12,21;46:17;
51:15;53:10;74:10;
75:17;76:16,18;78:7;
88:21
**areas (6)**
43:7,15;44:4,10,17;
47:1
**argue (5)**
29:1;30:8;31:6;
59:19;94:9
**argued (1)**
24:3
**arguing (3)**
24:14;28:17;30:13
**argument (3)**
30:9;31:3;94:13
**arguments (1)**
29:13
**Arias (3)**
9:17;17:13;75:14
**around (16)**
15:16;45:4,20;46:5,
14;51:9,15,18;52:1,
17;53:13;76:4,6,7;
77:16,21
**arrive (2)**
46:9;49:13
**arrived (3)**
45:18;76:2;77:3
**articulated (1)**
94:13
**aside (4)**

43:12;45:11;94:21;
96:22
**asserted (2)**
12:16;66:8
**assets (1)**
25:4
**assigned (1)**
48:5
**assume (2)**
15:7;94:25
**assumes (1)**
40:24
**attack (1)**
92:22
**attempt (2)**
15:18,18
**Attendant (6)**
35:20;36:6,12;37:3;
44:13,19
**attendants (4)**
14:21;15:13;25:11,
15
**attorney (2)**
35:12;59:11
**authenticated (1)**
59:21
**automatic (2)**
29:2;31:6
**automobile (2)**
23:12;25:6
**available (1)**
23:4
**avoid (1)**
17:7
**awarded (2)**
21:4;22:4
**aware (2)**
51:25;52:4
**away (3)**
25:7;44:22;54:20
**Ayse (23)**
8:8;57:20,22;58:1,
4;62:23;63:1,4;83:25;
84:1,5,10,15,18;
86:10,17,25;87:6,22;
90:19;98:16,21,23
**A-Y-S-E (1)**
8:10

**B**

**baby (1)**
90:3
**B-A-B-Y (1)**
90:3
**back (25)**
16:17;25:18;26:14;
30:11;37:9;44:23;
45:10,14;47:18;58:7,
15,18;64:1,22;69:15;
76:5,7,9;77:3;80:21;
82:7;84:3,9,11;85:12
**background (2)**

66:16,22
**bad (1)**
22:5
**Barbeque (1)**
18:18
**bargain (4)**
16:7;18:19,20,22
**bargaining (10)**
14:20,23,25;15:1;
19:4,7;21:24;22:1;
23:17;25:21
**Barron's (1)**
24:8
**based (3)**
18:17;25:24;93:23
**Basically (3)**
44:14;92:23,25
**became (1)**
16:1
**began (2)**
17:22;18:7
**begin (2)**
36:2;78:14
**beginning (4)**
6:8;51:15;55:5;
85:19
**behalf (2)**
6:14,18
**behind (1)**
45:14
**belied (2)**
18:5,5
**believes (1)**
61:3
**belong (1)**
80:24
**benefits (1)**
19:9
**BENJAMIN (2)**
1:15;6:6
**best (6)**
80:12;91:21,25;
92:6;94:21;96:22
**better (1)**
31:16
**beyond (2)**
91:9,12
**bid (20)**
20:22,22,23;21:2,3,
4,14,17;23:14,16;
24:23,24;25:20,23;
26:3,8,23;27:7;32:15,
22
**bidded (2)**
23:5,10
**bidding (3)**
20:25;21:6;41:11
**big (1)**
22:5
**bit (2)**
55:19;98:7
**black (7)**
51:3,3;52:2;68:19;

76:22,25;77:15
**BOARD (8)**
1:2,16;6:10;11:11;
19:18;97:12,14,22
**Bobby (33)**
8:12;15:20;16:23;
73:8,10,10,13,20,20;
74:3,5;75:5;76:18,21;
77:4,7,20,23;78:13;
79:1;80:7;81:1,23;
82:11;83:6,12;84:12,
23;86:21;90:5;93:7;
95:23;96:2
**Bobby's (1)**
73:9
**bok (1)**
90:19
**bolstering (1)**
94:6
**bolsters (1)**
92:21
**booth (3)**
45:10;47:19;55:19
**Both (3)**
9:25;17:13;56:13
**box (7)**
47:19;90:16,16,17,
19,19,21
**boxes (1)**
90:21
**bridge (1)**
29:1
**brief (6)**
33:14;38:20;58:14;
71:9;81:9;94:10
**bring (3)**
25:7;31:5,23
**Brook (31)**
10:21;11:20,22;
14:16,21;15:4,11;
16:5;18:4;19:1;21:5;
23:7,15,16;26:11,17,
18;30:15,23;32:16;
35:21,25;36:7,12;
37:4;43:8;51:7;72:10;
73:19;74:17,25
**Brooklyn (2)**
30:18;97:21
**Building (7)**
1:17;45:4,13,14,14;
76:5,12
**buildings (2)**
44:25;45:12
**bulk (1)**
31:23
**Burns (2)**
24:12;29:2
**bus (2)**
25:10;29:22
**business (14)**
12:24;24:2;25:4;
26:12;27:14,19;
31:15;56:11,12,14;

57:8;63:16;69:11,20
**buy (1)**
25:6
**bypassed (1)**
31:5

## C

**CABRERA (1)**
79:15
**cafe (1)**
89:11
**call (24)**
26:3;34:8;66:1;
71:5,19,21,24;72:1,3,
8,14,16,17,19,22,23;
73:3,4;76:4;82:12;
84:2,5,8;87:16
**called (21)**
8:20;14:24;16:17,
18;19:6,21;34:17;
70:15;72:11,18;73:7,
11,13;74:5;76:11;
84:3,9,10;87:11,14,22
**calling (1)**
72:9
**callous (1)**
19:13
**calls (4)**
34:10;47:25,25;
55:3
**came (9)**
1:14;32:20;52:20;
53:21;69:10;76:11,
12,12;77:5
**campus (7)**
15:17,21;51:9;69:3;
75:1;77:15,21
**can (51)**
12:8;21:17,25;
23:24;34:12;36:9;
38:19,24;39:10,18;
40:2,7,10;44:24;45:5;
48:10,17;49:3;56:2,
18;57:7,16;58:10;
61:24;62:5;65:7;68:7;
69:16;70:23;76:1,19;
79:19;80:5,12,17,18;
81:7,23;82:18;86:14,
14,15,24;87:2;92:6;
93:22;94:9;98:24;
99:4,15;100:9
**Cancer (19)**
43:11,12,21;44:1,3,
15;45:2,11,15;46:8,9;
48:20;50:2,3,3;53:10;
55:12;74:9;77:1
**car (15)**
37:7,10;44:10,11,
11,21,21,22;45:4,10,
21;47:9,18;63:16;
75:3
**card (30)**

7:12;56:2,5,11,12,
15;57:8,15,23;58:7,
18,18;60:1,3,7;61:10,
10;62:3,5,6;63:16,22;
64:1;65:4,6;67:22;
68:13;69:15,20;99:17
**cards (16)**
56:5,6;57:17;62:23,
25;63:4,11,22,25;
65:3;67:7;69:5,9,11,
12;99:16
**care (4)**
21:8;27:20;31:14;
50:15
**cars (2)**
37:8;64:21
**Case (35)**
1:3;6:5;7:22;8:21;
12:7,20;14:1,14;
19:11,17,25;20:16,19;
22:19;23:13;24:7,8,8,
11,16;27:24;28:14;
29:4,6,6,7,13;30:2,11,
25;31:9;32:7;60:17;
66:22;75:21
**casino (4)**
73:23;74:15;77:23;
78:6
**categorized (1)**
10:18
**CBA (1)**
24:20
**Center (13)**
43:11,12,21;44:1;
45:2,11,15;48:20;
50:3;53:10;55:12;
74:9;77:1
**certain (4)**
12:19;29:14;75:24;
76:22
**certainly (1)**
22:5
**certainty (1)**
28:17
**change (1)**
44:18
**changed (1)**
16:1
**changes (2)**
19:8,10
**charge (19)**
18:13;22:3;28:1,2,
2,6,15,22,23;32:4;
37:5;41:7;44:10,11,
12,14,16;88:3,4
**Charging (3)**
1:11;9:1;30:15
**check (1)**
47:3
**choice (1)**
11:6
**chose (1)**
79:3

**chronology (2)**
20:20;60:16
**circle (1)**
31:3
**circumstances (1)**
94:4
**claim (4)**
18:1;28:13;30:7;
47:3
**clarified (1)**
38:17
**clarify (2)**
38:19;79:22
**clarity (2)**
38:15;40:2
**Classic (39)**
10:20;11:17,23;
14:24;15:3,10,25;
16:16;18:9,15;19:3,4;
21:3;25:22;26:15,17;
27:1,12,22,23;30:14;
36:1,2,4,6,12;37:16,
18,24;40:6,22;41:5;
42:24;43:5,7;50:22;
52:9;66:20;75:14
**Classic's (1)**
41:15
**clause (1)**
31:5
**clean (1)**
99:9
**clear (4)**
16:1;24:13;28:7;
96:21
**clearly (3)**
17:8;28:25;68:3
**client (5)**
20:21;30:4;44:21;
22;65:23
**close (4)**
14:1;30:2;50:4;
51:16
**closing (1)**
48:23
**co- (3)**
69:2;80:23;84:24
**code (4)**
64:2;65:4;69:16,23
**coerce (1)**
17:8
**coercion (1)**
16:20
**coercive (1)**
17:19
**Coliseum (2)**
23:7;30:23
**colleagues (1)**
17:15
**collective (8)**
14:22,25;19:4,7;
21:24;22:1;23:16;
25:21
**color (1)**

51:5
**comfortable (3)**
80:23;81:2;82:8
**coming (6)**
46:25;51:25;52:3,4;
64:20,21
**comment (1)**
64:13
**comments (1)**
96:22
**commerce (4)**
12:16,20,22;13:6
**COMMERICAL (1)**
1:10
**communicate (3)**
84:6;91:3,5
**communicated (1)**
98:23
**communicating (1)**
85:17
**communication (2)**
28:22;46:23
**communications (1)**
23:20
**companies (3)**
21:12;25:10;41:12
**company (32)**
14:23;15:6;16:23;
22:5;25:2,2;27:19;
29:22;40:16;41:13,
13,18;42:20,24;51:4,
9;52:4,11,12;54:3;
67:17;68:2;69:10;
76:4;82:3;85:7;86:19,
22;87:23;88:3;89:21;
98:17
**compel (1)**
11:2
**compelled (3)**
20:12;24:6;33:2
**compelling (1)**
95:4
**competitor (1)**
31:17
**complained (1)**
11:21
**complaint (6)**
8:16;12:14,16,20;
19:22,23
**complete (3)**
60:3;65:4;70:13
**completed (1)**
69:25
**completely (1)**
22:18
**completeness (1)**
59:21
**complex (1)**
75:22
**complied (1)**
10:5
**comply (2)**
9:12;31:8

**comprised (1)**
14:20
**computer (1)**
7:8
**concerning (1)**
93:4
**concise (1)**
24:13
**conditions (4)**
15:1;18:25;19:2,6
**conduct (1)**
19:11
**conducting (1)**
12:25
**confer (6)**
7:14;10:6,9;79:5,
17;81:6
**Conference (1)**
1:17
**confident (1)**
24:15
**consequential (1)**
19:23
**consist (1)**
51:2
**consistent (3)**
93:1,14,15
**consolidation (1)**
25:3
**constitute (1)**
17:9
**contact (4)**
11:24;73:3;95:23;
96:2
**contains (1)**
99:16
**content (1)**
9:9
**continue (1)**
52:11
**continued (7)**
18:13;40:12;62:20;
67:4;92:14;95:18;
99:11
**continuously (2)**
36:6,11
**contract (19)**
14:15;15:4,5;22:4;
26:22;31:16,16,20;
40:7,11,17,23;41:6,
12,13;42:1,20;52:9;
96:6
**contractor (2)**
10:22;21:5
**contractors (10)**
20:24;21:15,15,20,
22;22:9,10,11;24:20,
21
**contractors' (1)**
21:20
**control (1)**
15:7
**conveniently (2)**

26:8;93:18
**conversation (15)**
28:20;64:5,23,25;
75:20,21;83:13;
89:16;93:5,6,7;94:17;
95:2,3;98:14
**conversations (1)**
85:23
**coordinated (1)**
50:14
**copies (1)**
13:17
**copy (12)**
6:25;21:25;56:11,
12;59:18;60:1,6,7;
61:1;62:2,5,6
**corroborate (1)**
94:16
**corroborates (1)**
95:1
**corroborating (1)**
17:16
**counsel (49)**
6:7,8;7:3,3,3,14;
9:1,7,8,16;10:2;11:24,
25;13:24;14:8,11;
20:17,18;22:18;
26:12,13;27:2,9,10,
10,15,15,24;28:17;
31:4,4;32:3,4;33:7;
34:8,10;39:3;58:21,
24;60:17;61:16;
67:16;79:5,17;81:6;
86:5;92:19;94:15,15
**Counsel's (13)**
7:6;9:11;10:2;13:9;
22:19;27:24;57:10;
62:16;66:22;86:13;
95:17;99:18;100:6
**couple (4)**
12:8;59:12;86:11;
98:10
**courageously (1)**
17:18
**course (2)**
13:11;70:10
**court (7)**
11:1;24:8;29:8;
58:10,13;71:10;97:19
**courtroom (2)**
8:22,25
**cover (1)**
21:11
**covered (1)**
30:6
**covert (1)**
94:19
**co-workers (1)**
15:24;17:3,13,20;
65:7;69:6,8;70:4,8,9,
10;81:3,24;84:22;
85:1,13;88:24;95:20;
97:1

**credibility (2)**
92:22,22
**credible (1)**
32:10
**credit (1)**
17:18
**credited (1)**
93:23
**criteria (1)**
24:12
**cross (4)**
38:19;39:18;61:24;
98:3
**cross- (1)**
39:10
**cross-examination (1)**
91:14
**crystallize (1)**
17:11
**current (1)**
16:24
**currently (1)**
35:18
**customarily (1)**
50:19
**customers (3)**
15:16;45:22;47:16
**cut (1)**
28:7

# D

**D- (1)**
88:22
**Daily (1)**
43:24
**Dam (1)**
89:1
**damages (1)**
19:24
**damning (1)**
17:16
**Dan (5)**
88:25;89:1,2,23;
95:21
**date (18)**
26:7;38:10;40:6;
41:17,22;43:4;59:15,
22,22,25;60:20,21;
61:1;62:14;73:11;
96:14;99:22,24
**dates (1)**
60:18
**Dattco (2)**
24:8;29:2
**day (28)**
30:22;41:16,19;
42:19;48:4,8,11;
49:20;50:16,19;53:5,
6;57:8,18;63:6,6,7;
64:7;68:13;70:12;
84:6,24;85:3,9,10,16,
25;87:18

**days (14)**
12:8;26:8;32:16;
52:16;55:1,22;63:15,
16,19;67:11;69:20;
71:25;73:6;85:17
**deal (3)**
7:17;9:21;14:6
**dealership (2)**
25:6,8
**dealerships (1)**
23:12
**December (17)**
15:8;17:23;20:21;
22:4;26:23;27:3,6,9,
11,23;28:1,6,15;
29:19;32:1;96:12;
97:2
**decided (1)**
22:17
**decidingly (1)**
94:19
**decision (7)**
10:5;29:10,12,18,
20;30:12;82:13
**declined (2)**
16:15;17:19
**deemed (1)**
92:11
**deems (1)**
19:24
**deep (1)**
15:14
**defer (4)**
10:24;20:7,11;24:6
**Defies (1)**
22:18
**Dem (1)**
88:25
**demanded (1)**
17:5
**denied (2)**
12:15;29:17
**DEPARTMENT (1)**
1:9
**depending (1)**
44:5
**deployed (1)**
15:19
**describe (2)**
44:24;76:1
**deserved (1)**
81:24
**designated (1)**
8:21
**determine (2)**
65:18;76:21
**developed (1)**
14:22
**device (1)**
57:24
**different (23)**
10:18;15:5;21:7,12,
12,12;23:4;27:7;35:7,

8;42:8;43:7;44:5,8;
46:8,24;48:15,18,25;
61:19,22;79:19;96:11
**dire (8)**
59:4,7;90:8,10;
91:9,12,15;92:14
**direct (11)**
15:16;35:14;39:17;
40:12;46:2,5;62:20;
67:4;95:18;97:8;
99:11
**directly (3)**
13:2;16:23;45:5
**disaffiliate (1)**
28:4
**disclose (1)**
9:7
**discovery (2)**
10:13,17
**discriminated (1)**
17:25
**discriminatees (4)**
8:24;9:3;19:23;
33:19
**discrimination (2)**
18:16,23
**discuss (1)**
83:21
**discussed (4)**
7:19;43:2,4;84:18
**discussing (1)**
9:5
**discussion (1)**
90:17
**dispatched (1)**
31:12
**disregard (1)**
19:12
**distribute (2)**
69:5,10
**distributed (1)**
15:23
**District (1)**
29:8
**division (4)**
23:10,10;29:22;
32:23
**divisions (1)**
22:22
**document (13)**
10:17;57:1,5;59:4,
13,19;60:3;61:21;
86:4,7;91:19;92:9;
99:13
**doesn't' (1)**
59:21
**done (5)**
10:11;23:6;92:11,
12,13
**door (1)**
77:5
**down (3)**
78:10,12,14

**drafted (1)**
24:7
**dressed (2)**
52:2;76:22
**drive (1)**
46:14
**drivers (2)**
30:1,3
**drives (1)**
29:24
**driving (1)**
45:4
**duly (1)**
34:17
**dump (1)**
10:17
**duplicative (1)**
10:13
**Durham (2)**
29:23;30:4
**during (27)**
12:23;16:12,21;
17:14;18:12;30:25;
35:24;36:7,16,20;
37:18,23;39:10;
42:16;43:2;48:4;
49:24;52:14;54:15;
61:24;64:5;68:9;83:1,
4,7,11;84:20
**duties (2)**
37:3;44:5

## E

**e] (1)**
49:20
**earlier (4)**
13:10;55:23;74:8;
77:21
**early (2)**
20:23,24
**earning (1)**
36:20
**East (7)**
29:3,21,24;30:3,4;
31:10;32:11
**Edward (10)**
9:17;17:13;75:14,
16;76:2;78:2,4,13;
83:4,18
**egregious (1)**
19:17
**eight (1)**
49:21
**either (6)**
26:19;61:11;63:9,
11;66:25;94:1
**electronic (3)**
10:13,16;13:15
**Elmsford (1)**
6:14
**else (24)**
6:19;12:11;13:6;

14:6,10;23:5;25:24;
26:24;31:19;43:2;
54:15;56:1;64:19,23;
69:2;70:3;75:11;77:8;
78:21;82:17;83:3;
84:18;95:23;96:6
**email (3)**
13:12,23;73:2
**emergency (6)**
21:8;30:6;43:15;
48:8;49:1,4
**employed (2)**
35:18;51:7
**employee (8)**
16:17;17:15;49:19,
22;66:14,20;75:14;
93:16
**employees (63)**
15:2,10,12,15,21,
22,24;16:1,5,6,12,16,
25;17:6,8,22,25;18:2,
9,16;19:1,8,14;21:11;
23:3;25:5,23;26:14,
21;27:1,6,8,12,22;
28:3,8;29:23;30:22;
31:11,13,17,20,21,24;
32:5,7;43:8,16,17,18,
19,20;47:22;48:5,6,9,
11;49:13,20;50:16;
89:6;94:2,3
**employees' (2)**
14:23;19:5
**employees! (1)**
32:2
**employer (12)**
6:18;10:21;12:14;
14:16,23;18:18;19:3;
21:3,5;22:23;30:24;
35:24
**employers (1)**
19:13
**employment (9)**
15:1;18:25;19:6;
36:4;37:16;40:8;
42:22;49:24;56:3
**encounter (2)**
77:5;85:3
**encountered (1)**
85:25
**end (12)**
20:24;36:4,13;
38:20;40:8,17;42:19;
44:3;54:18;72:13;
82:15;85:22
**ended (2)**
75:21;84:4
**ends (2)**
26:22;49:17
**ends! (1)**
27:24
**enforcement (1)**
12:2
**English (34)**

34:6;35:3;64:18;
74:7,10,12;75:22,24;
79:25;80:5,6,8,9,12,
15;81:19,21;83:7,9;
86:16;88:7;90:13,21,
23;91:4,7,22,22,24;
92:13,13;94:18,18;
95:5
**enough (2)**
30:16;64:14
**ensure (1)**
9:17
**enter (3)**
46:17;60:24,25
**entered (3)**
14:24;23:19;78:6
**entitled (1)**
100:12
**entrance (22)**
21:8,8;43:14,15;
44:14,15;45:2,3,11,
13;46:3,8,10,15,16;
47:1,23;48:5;49:11,
15,17;85:20
**erroneously (1)**
18:10
**E-S (1)**
35:1
**Especially (2)**
38:15;39:14
**essential (2)**
8:21;15:13
**essentially (2)**
18:14;95:1
**establish (4)**
17:24;66:17;67:17,
18
**established (1)**
19:25
**establishing (4)**
14:25;17:16;18:6,8
**estimate (1)**
40:7
**et (1)**
6:18
**evaporated (1)**
16:11
**even (13)**
17:2;25:18;26:9,25;
27:25;28:12;29:3;
30:1;31:15,21;32:2,
20;33:5
**evening (2)**
49:18,18
**event (1)**
10:23
**events (2)**
9:2;23:4
**everybody (7)**
23:5;32:19;48:22;
82:1,9;84:13;85:22
**evidence (25)**
7:6;16:11,22;17:24;

18:6,8,11;21:1,18;
23:19;24:15;26:2,20;
29:13;32:22;40:25;
60:25;61:22;62:16;
66:23;91:21,25;
94:21;95:17;100:6
**exact (1)**
22:10
**exactly (8)**
38:10;40:9;41:19;
47:1;52:13;55:1;63:5;
75:17
**EXAMINATION (11)**
35:14;39:11;40:12;
59:7;62:20;67:4;
90:10;92:14;95:18;
97:8;99:11
**except (1)**
9:1
**exception (2)**
8:24;67:19
**excess (1)**
13:2
**exchanged (1)**
78:15
**excuse (3)**
40:6;89:7;98:9
**exercise (1)**
17:9
**exhibit (7)**
56:10;57:2;58:22,
24;86:5;90:7;99:15
**existing (3)**
16:10;17:6;18:4
**Exit (1)**
74:18
**exited (2)**
18:15;19:2
**expect (1)**
8:20
**expectation (1)**
52:10
**expected (2)**
9:3;45:16
**expecting (3)**
52:5,10,12
**experienced (5)**
15:12,19;16:2;
31:23,24
**explain (1)**
65:6
**explained (1)**
81:24
**Expressway (1)**
74:22
**extend (1)**
42:25
**extended (2)**
26:8;75:20
**extent (5)**
19:5;40:1;61:11;
92:2;94:1
**extremely (3)**

22:25;39:13,16

## F

**fabricate (1)**
93:16
**facilities (2)**
13:1;15:14
**facility (4)**
44:24;46:22;48:20;
52:17
**fact (7)**
23:9;31:4;33:3;
41:20,25;87:25;93:17
**facts (1)**
40:24
**failure (1)**
18:20
**Fair (1)**
64:14
**fairly (1)**
81:16
**familiar (1)**
48:25
**families (4)**
19:16;81:3,4;82:9
**family (1)**
36:18
**far (5)**
9:14;45:2;53:15;
74:25;93:22
**fast (1)**
59:3
**Federal (2)**
1:17;11:1
**feel (4)**
20:12;80:22;81:2;
82:8
**felt (4)**
18:2;24:5;33:1;
83:11
**few (4)**
17:7;20:17;88:1;
90:16
**field (1)**
30:5
**figuring (1)**
24:11
**file (1)**
28:15
**filed (4)**
22:3;28:1,6,21
**fill (2)**
70:2;78:24
**filling (1)**
70:6
**financially (1)**
36:19
**find (5)**
26:8,25;33:3,4;85:6
**finding (1)**
10:12
**finds (1)**

72:17
**fine (4)**
23:25;24:1;33:4;
61:18
**finished (1)**
40:10
**firm (1)**
6:17
**First (30)**
22:21;28:2,6,21,23;
34:8,17;40:22;41:4,5,
25;50:17;51:17;52:7,
19,25;53:2,4;54:24;
55:14;56:17;75:17;
76:1,3;78:7;83:6;
84:5;85:2;87:12;88:2
**five (7)**
15:11;21:7;22:10,
11;48:6,9;86:23
**flags (1)**
46:16
**flaw (1)**
22:16
**flippant (1)**
19:12
**floor (1)**
78:7
**flow (2)**
21:21;39:4
**Flynn (4)**
29:5,8,11;30:10
**Flynn's (1)**
29:19
**folks (1)**
60:19
**follow (1)**
94:12
**following (3)**
12:22;85:16,25
**follows (1)**
34:18
**FOOD (1)**
1:10
**forgot (1)**
50:19
**form (2)**
18:15;33:5
**formal (2)**
6:25;7:4
**formally (1)**
13:7
**former (1)**
18:9
**forth (2)**
19:3;64:22
**forward (3)**
15:23;24:23,24
**found (2)**
24:18;76:10
**foundation (1)**
21:19
**four (10)**
17:3;21:7;43:22,23,

23,24,25;44:8;79:3;
80:18
**F-R-A-N-C-E-A-I-S (1)**
34:23
**Francis (7)**
9:16;16:17;34:11,
16,21;59:13;86:17
**fraught (1)**
16:19
**front (3)**
21:8;58:7,17
**full (5)**
19:22;29:15;31:3;
44:16;87:24
**fully (3)**
19:16;32:14,14
**functions (1)**
15:13
**further (9)**
18:11,23;26:1,2;
54:11;82:7;97:4;98:2;
100:7

## G

**gallery (2)**
7:23;9:16
**gap (1)**
29:1
**garage (1)**
37:8
**gave (18)**
46:14;54:14;55:20,
20;56:2,6;57:19;
62:25;63:10,21,22;
65:3,6;67:7,22;69:6,
8;73:3
**GC (5)**
8:5;56:10;57:1;
90:6;94:25
**GC-1 (2)**
7:5,6
**GC-2 (1)**
56:20
**GC-3 (6)**
56:21;57:10;59:1;
62:16,19;100:4
**GC-3a (5)**
99:10,18;100:2,5,6
**GC-4 (6)**
86:5,13;92:20;
95:15,17;98:11
**General (41)**
6:8;7:3,6;9:1,16;
10:2;11:5;12:25;13:9,
24;14:8,11;20:18;
22:19;26:13;27:2,9,
10,15,24;28:17;31:4;
32:4;33:7;34:8,10;
57:10;58:21,24;
60:16;61:16;62:16;
66:21;67:16;86:4,13;
92:19;94:15;95:17;

99:18;100:6
**gentleman (1)**
7:8
**gets (1)**
25:18
**Ghost (1)**
73:10
**Gil (20)**
9:16;16:17,24;17:2,
5,13,18,21;34:11,16,
21;35:7,16;57:4;
62:22;67:6;71:14;
86:17;95:20;99:13
**G-I-L (1)**
35:1
**given (9)**
9:6,9;23:2;30:22;
31:11;48:4,4;49:20;
50:19
**giving (1)**
9:2
**go! (1)**
32:14
**gobbles (1)**
29:14
**Good (9)**
6:12,16;10:12;
11:18;13:1;30:9;59:9,
10;97:10
**Google (1)**
91:5
**gotta (1)**
26:5
**government (2)**
35:12;98:9
**gracias (1)**
87:12
**great (1)**
7:11
**GREEN (176)**
1:16;6:3,6,11,15,19,
24;7:5,16;8:1,3,7,9,
11,14,16,18;9:19,24;
10:3,7,10;11:4,8,10,
12,14,16;12:3,6,11,
17;13:5,12,14,17,20,
22;14:3,5,10;20:2,5,
10,13,15;27:25;
32:24;33:6,9,13,15;
34:2,4,7,12,19,22,24;
35:2,5,7,10;36:24;
37:1,21;38:4,16,19,
22,24;39:2,5,7,18,22,
25;41:1;47:7;48:1,10,
13;50:2,6,8;51:6,11;
55:4;56:14,18,20,22,
24;58:6,9,12,15;59:2,
5,24;60:1,3,5,9,12,23;
61:7,9,14,16,20,22;
62:2,5,8,11,13,19;
63:14;64:12;65:13,
17,25;66:2,4,10,12,
15;67:14,24;68:7,12,

16;71:8,11;74:23;
79:12,21;80:1,4;81:8,
10,14,20;90:9;91:11,
13,15,19;92:2,5,17,
23;93:3,5,8,10,13;
94:22,24;95:8,11,13,
15;96:15;97:5;98:3,8,
13,15,20;99:1,6,8;
100:5,10
**greeted (1)**
53:21
**greeting (3)**
54:14,19;55:21
**greetings (1)**
78:15
**grounds (1)**
29:17
**Group (5)**
6:17,23;52:1;85:2,
16
**grouping (1)**
24:22
**groups (3)**
22:8;42:8;85:4
**GSA (1)**
1:17
**guaranteed (1)**
28:5
**guess (8)**
22:2;23:15;26:13;
27:16;28:5,11;30:19;
65:18
**Guest (1)**
73:10
**guideposts (1)**
24:11
**Gust (14)**
8:13;15:20;16:23;
17:2,14;65:13;84:23;
94:17;95:1,2,23;96:3,
22;99:16
**G-U-S-T (1)**
8:13
**Gust's (3)**
17:8,19;18:5
**guys (2)**
69:11;80:19

## H

**hand (2)**
34:14;99:2
**handed (1)**
68:12
**happen (2)**
31:7;54:25
**happened (12)**
22:20,23,24;26:9;
28:16;54:15;55:14;
76:1;83:22;84:20;
85:23;86:1
**happening (2)**
52:14;55:2

**happens (1)**
28:14
**hard (1)**
13:17
**head (1)**
82:9
**hear (4)**
23:9;26:20;32:9;
82:16
**heard (3)**
22:13;69:25;89:25
**hearing (3)**
1:14;30:12;100:11
**hearsay (7)**
65:12,22;66:24;
67:2,18,19;94:8
**heart (1)**
24:10
**held (1)**
42:5
**Hello (1)**
35:16
**help (3)**
75:23,23,25
**helped (1)**
15:15
**helpful (8)**
61:14;66:16,16,18,
21,24;67:1;94:8
**here! (1)**
32:2
**herein (1)**
34:18
**hey (2)**
27:12;90:14
**Hi (6)**
86:17;89:17;90:12,
13,15;97:10
**higher (1)**
25:13
**highway (1)**
74:20
**himself (5)**
53:22,25;54:10;
55:20,25
**hire (31)**
14:17;15:25;16:6,
14,24;17:5,7,11,21,
22;18:2;22:14,17;
24:19;27:1,22;28:8;
31:21,22;32:1;65:9;
80:18,23;82:1;84:12,
13;85:7;86:19;87:24;
89:22;98:17
**hired (1)**
18:9
**hiring (5)**
15:10;16:10;65:24;
80:17;84:17
**Hogwash! (1)**
24:19
**hold (3)**
56:23;79:12;93:10

**Honor (46)**
6:12,16;7:1,2,18;
8:17;9:15,22;10:2;
11:2;12:13;14:9,13,
14;19:24;20:11;
24:15;25:16;26:16;
31:7;32:9,25;33:8,10,
12;34:10;38:13,15,
21;40:25;56:9;59:20;
62:10;65:22;66:6;
67:13;71:12;79:16;
81:7;91:8;94:11;95:6;
98:5;99:4;100:7,9
**Honor's (1)**
39:13
**hope (1)**
25:19
**Hospital (48)**
14:16,21;15:5,8,11,
14,14,17,21;16:10,13,
25;17:23;18:14;19:1;
21:5,6,7;23:7;26:12;
35:21,25;37:4,6;42:6;
43:8,14,19;44:24;
45:12;46:6,7,15,24;
47:2;50:20;52:17;
69:3;74:17;77:15,17,
21;78:20;88:4,15;
89:4,6,13
**hotel (3)**
73:23,23;74:15
**hours (7)**
21:11;25:24;49:4,
15,22;84:7,9
**household (1)**
36:22
**hundreds (1)**
30:23
**HY (1)**
87:21

**I**

**identification (3)**
57:1;86:4;99:10
**identified (4)**
7:6;57:10;86:13;
99:18
**illegal (1)**
98:22
**illustrates (1)**
19:12
**image (2)**
60:9;61:10
**immediately (1)**
18:22
**impeach (3)**
26:1,2;28:4
**important (4)**
25:12;60:20,21;
83:14
**imposes (1)**
19:13

**inadmissible (1)**
59:20
**Inc (2)**
6:5;15:6
**include (2)**
23:16,17
**including (5)**
15:16,20;19:3,22,
23
**income (1)**
19:15
**incorporate (1)**
94:20
**incumbent (6)**
15:15;16:6,12;
17:22,25;18:16
**Indeed (1)**
17:21
**independent (1)**
17:9
**indicate (2)**
62:13,14
**indicating (1)**
46:15
**indifference (1)**
19:14
**individual (1)**
51:18
**industry (1)**
25:11
**inertial (1)**
15:18
**inform (1)**
9:8
**information (18)**
21:16,16;43:1;
46:18;56:3;64:2;
70:15,22;71:4,5;
72:15,24;73:1,4;76:4;
85:19,21;86:11
**informed (1)**
42:3
**informing (1)**
40:17
**initial (4)**
15:18;16:9;52:19;
54:16
**Initially (1)**
15:9
**inquire (2)**
78:19;83:2
**inside (5)**
76:12;77:6,23,25;
78:4
**insignia (1)**
68:21
**inspection (1)**
25:20
**Instead (1)**
19:1
**instructions (1)**
46:14
**integrated (5)**

30:1,6;31:10,13;
88:21
**integration (2)**
30:21,25
**intend (1)**
16:24
**intent (2)**
15:25;31:21
**interact (1)**
45:16
**interacting (1)**
45:18
**interaction (5)**
54:16,18,24,25;
88:18
**interchange (2)**
29:16;30:17
**interesting (4)**
20:16,17,19;24:5
**internal (1)**
23:20
**interpret (2)**
34:6;64:10
**interpretation (1)**
39:22
**interpreter (30)**
7:9,13;33:16,24;
34:5,6,25;35:4,9;
36:9;38:5;39:20;
48:17;53:19;57:12,
16;58:2,23;63:2;
76:19;79:8;80:10;
81:13;86:15;87:19;
88:8,11;96:1,16;
97:13
**interrupt (1)**
39:3
**interstate (1)**
12:22
**interview (13)**
16:18,19,21;68:11;
73:15,17,18,22;78:16,
22;80:14;84:21;86:1
**interviewing (2)**
78:20,25
**intimidation (1)**
16:20
**into (13)**
21:1,18;23:20;
24:20;26:11;27:18;
32:20;33:1;34:6;
60:24,25;86:15;91:20
**introduce (1)**
52:5
**introduced (8)**
53:2,22,25;54:10;
55:20,25;57:9,12
**introducing (1)**
92:20
**investigation (1)**
18:12
**involved (1)**
28:17

**Island (1)**
20:25;23:1,1;30:17,
20
**issue (9)**
11:21;13:5;22:13;
28:7;32:11;79:13,13,
22;94:22
**issued (3)**
8:19;29:10,12
**issues (2)**
24:3;27:18

**J**

**jacket (4)**
68:19,24;76:25;
77:16
**jackets (3)**
69:1;77:10;82:24
**Jackson (134)**
6:9,9;7:1,9,18,21;
8:2,6;9:15;12:13,18;
13:7,24;14:4,8,13;
20:17;21:10;22:14;
24:18;26:3;28:11;
30:11;32:8;33:8,10,
18,21,23;34:1,3,10;
35:11,15;36:11,15,25;
37:2,23;38:2,6,8,21,
23,25;39:3,6,9;40:5,
13;41:2,3;47:11;48:3,
7,14,18,24;50:9;
51:13;53:20,23;55:6;
56:7,19,21,23,25;
57:3,11,14,17,21;
58:3,16,24;59:1;61:1,
18,21;62:21;63:3,8,
13,18;64:8,11,15;
65:14;66:6,11,13;
67:5,20;68:1,18;
71:12,13;74:24;
76:20,24;79:6,16,18;
80:7,11,21;81:7,22;
86:3,6;87:21;88:10,
12;90:6,11;91:8,14;
92:21;93:2,4,6;95:19;
96:2,5,17,19;97:4;
99:3,7,9,12;100:1,7
**Jackson's (1)**
22:16
**Jake (1)**
73:25
**J-A-K-E (1)**
74:1
**Jake's (12)**
30:23;73:24;74:3,
14,16,25;75:6,8;76:2;
95:25;96:3,23
**Jencks (3)**
98:5;99:2,3
**job (29)**
10:12;15:23;16:12;
17:2;18:7;25:12,14;

36:16;37:3,11,15;
43:6;44:5,12;45:17;
50:25;64:3;65:5,5;
69:17;72:10;73:15;
78:16;81:4;85:6;96:9,
12,24;97:2
**jobs (4)**
15:21;17:4;42:25;
81:25
**jobsite (1)**
53:5
**join (2)**
17:3;64:25
**joining (1)**
35:16
**Judge (188)**
1:15;6:3,6,11,15,19,
24;7:5,16;8:1,3,7,9,
11,14,16,18;9:19,24;
10:3,7,10;11:4,8,10,
12,14,16;12:3,6,11,
17;13:5,12,14,17,20,
22;14:3,5,10;19:18;
20:2,4,5,10,13,15;
27:25;29:5,7,8,10,11,
17,18,19;30:10,10;
32:12,24;33:6,9,13,
15;34:2,4,7,12,19,22,
24;35:2,5,7,10;36:24;
37:1,21;38:4,16,19,
22,24;39:2,5,7,18,22,
25;41:1;47:7;48:1,10,
13;50:2,6,8;51:11;
55:4;56:14,18,20,22,
24;58:6,9,12,15;59:2,
5,24;60:1,3,5,9,12,23;
61:7,9,14,16,20,22;
62:2,5,8,11,13,19;
63:14;64:12;65:13,
17,25;66:2,4,10,12,
15;67:14,24;68:7,12,
16;71:8,11;74:23;
79:12,21;80:1,4;81:8,
10,14,20;90:9;91:11,
13,15,19;92:2,5,17,
23;93:3,5,8,10,13;
94:22,24;95:8,11,13,
15;96:15;97:5;98:3,8,
13,15,20;99:1,6,8;
100:5,10
**Julian (3)**
42:15;51:20;52:14
**July (6)**
20:23,24;21:22;
22:15;24:19;32:19
**jumping (1)**
26:21
**June (6)**
1:18;6:5;20:24;
21:22;24:20;100:12
**jurisdiction (1)**
13:6

## K

**keep (3)**
16:13;56:16;81:16
**keeping (2)**
10:5;17:3
**kept (1)**
47:21
**key (2)**
47:17,19
**keys (4)**
37:8;47:12,15,21
**kind (2)**
47:4,19
**knew (5)**
28:20;32:18,19;
46:7;85:22
**knowing (2)**
23:5;27:6
**knowledge (3)**
12:18;15:14;97:1
**known (2)**
28:21;74:19
**knows (5)**
26:13,13;27:13;
28:11;32:18

## L

**LABOR (10)**
1:2,16;6:10;11:24,
25;18:13;24:4;97:11,
14,22
**Labuda (2)**
6:17,23
**lack (1)**
12:18
**laid (1)**
21:18
**language (2)**
74:5;75:23
**LaRuffa (1)**
6:13
**Last (10)**
34:25;40:20;41:15,
19;43:17;50:20;55:7;
73:9;82:21;88:16
**Later (7)**
28:15;61:23;67:11;
82:12;84:7,7,9
**Law (15)**
1:15;6:6,17,17,23;
19:18;24:4,7,8,11;
26:9,24;29:13;31:8;
33:3
**lawful (1)**
98:17
**laws (2)**
25:1;26:10
**leading (6)**
37:20;38:3;39:13;
51:10;63:12,13

**learn (4)**
37:18,23;38:9;
40:14
**learned (7)**
22:14,15,17;23:13;
40:6;52:8;53:25
**least (1)**
11:25
**leave (3)**
54:20;82:18,19
**leaves (1)**
49:5
**left (3)**
19:15;68:24;83:21
**less (2)**
49:2,21
**letter (3)**
16:4,8;26:4
**level (1)**
12:21
**light (1)**
19:25
**likelihood (1)**
93:23
**Likewise (1)**
9:6
**limited (1)**
8:23
**line (2)**
28:11,12
**link (5)**
10:15,16,16;13:9,
12
**listed (1)**
8:14
**listen (6)**
38:16;39:7;61:9;
66:15;67:14;93:20
**little (3)**
55:19;75:22;98:7
**live (1)**
36:22
**livelihoods (1)**
19:14
**LLP (1)**
6:13
**lobby (3)**
42:6;89:11,12
**LOCAL (5)**
1:8;14:19;23:10;
37:14,15
**located (2)**
74:16,18
**location (2)**
31:23;43:24
**locations (4)**
21:7;23:1;30:19,24
**logo (5)**
51:4;68:21,23;
76:23,25
**Long (15)**
20:25;22:25;23:1;
30:17,20;40:7;41:25;

45:7;54:24;71:23;
80:25;82:21;84:4;
87:16,17
**longer (3)**
27:12;37:19,24
**look (5)**
24:17;29:3,21;
60:14;68:10
**looked (3)**
15:23;68:8,14
**looking (4)**
23:14;72:10;79:10;
91:15
**looks (1)**
88:2
**lose (1)**
31:19
**losing (5)**
40:7,23;41:5;42:1;
52:9
**lost (3)**
14:15;15:3;19:9
**lot (4)**
23:12;27:18;45:6;
52:14
**loud (1)**
86:14
**Love's (1)**
18:18

## M

**mailing (1)**
19:19
**Main (17)**
6:13;43:14,15;
44:14;45:2,11;46:3,8,
10,15,16;47:1,23;
48:5;49:10,15,17
**major (1)**
22:16
**makes (1)**
27:19
**making (2)**
6:19;65:23
**man (21)**
53:14,16,17;54:4,6,
10;55:14,15,17,18,22,
25;62:25;64:7,16,19;
65:2,8;67:21;68:19;
77:1
**management (1)**
31:24
**manager (5)**
40:15,18;41:7;
50:10,13
**managers (2)**
19:20;50:22
**man's (1)**
67:6
**many (13)**
13:21;15:10;30:16,
17;41:11;43:20;

47:22;48:5,8;49:20;
52:16;78:24;85:13
**mark (2)**
56:17,21
**marked (3)**
57:1;86:4;99:10
**Marte (4)**
42:15,16,21;51:21
**materials (1)**
13:8
**maternity (1)**
46:25
**Matt (2)**
32:8;71:6
**Matter (8)**
1:4,14;8:25;26:9;
33:3,3;66:8;100:12
**matters (4)**
7:17;9:20;12:12;
95:3
**Matthew (2)**
6:9,12
**Mauro (15)**
6:22,22;7:2,20;
10:15,18,24;11:20;
12:5,10;13:11,13,16,
19,21
**M-A-U-R-O (1)**
6:22
**may (7)**
8:25;9:7,8;10:25;
63:24;75:25;79:24
**maybe (11)**
23:3,24;26:8;27:13;
42:24;66:15,22;
67:11,12;79:2,24
**mean (29)**
11:8,17;12:6;38:16;
39:7,21;42:22;56:15,
18;60:6,23;61:13;
65:18;66:12;76:14,
16;79:21;80:1,1;90:4;
92:16;93:13,20,22;
94:24;95:8;96:22;
98:5,12
**meaning (1)**
12:15
**meaningfully (1)**
19:16
**means (2)**
8:19;38:13
**mechanics (3)**
25:7,9,10
**meet (14)**
10:6,8;28:12,13;
42:8,9,11;63:10;74:3;
75:5;76:6,11,12;
86:22
**meeting (30)**
17:14;40:16;41:18,
20,23;42:1,5,17;43:3;
51:20;52:13;78:14;
80:15;82:15,21,25;

83:1,4,7,11,21;84:4,8,
10,22,25;85:11;
95:24;96:3,7
**meetings (1)**
55:2
**member (1)**
54:1
**men (5)**
69:1;77:14,15;81:3;
82:24
**mention (3)**
28:2,6;38:5
**mentioned (4)**
43:17;54:7;83:2;
86:12
**mentioning (1)**
70:22
**merger (1)**
25:3
**message (11)**
57:23;58:5;59:23;
70:21,24;86:15,25;
87:2,6,8,16
**messages (2)**
61:3;99:19
**met (2)**
63:9;89:20
**metal (1)**
23:9
**Michael (1)**
6:22
**mid-day (1)**
30:5
**might (12)**
10:12;11:1;12:18;
22:10;31:22;42:21;
60:23,24;61:16;
81:10;85:15;94:20
**MILMAN (107)**
6:16,17,21,22;7:2,7,
11,15;8:12,15,17;
9:22,25;10:4,8,11,16;
11:7,9,11,13,15,18;
13:4;20:9,11,14,16;
32:25;33:16,19,22,25;
36:23;37:20;38:1,3,
13,18,20;39:12,19,23;
40:4,24;47:5,24;
51:10;55:3;56:17;
59:3,6,8,11,19,25;
60:2,4,8,11,14;61:5,8,
13,15,25;62:4,7,10,
12,17;63:12;64:10,
14;65:12,16,21;66:1,
3,5;67:9,13,23;71:6;
74:22;79:24;80:3;
90:8;91:10,12,18,20;
92:4,6,15;93:9,12;
94:11,23;95:6,10,12,
14;96:13;98:5;100:3,
9
**mindful (1)**
10:5

**Minimum (2)**
25:13,13
**minutes (7)**
45:4,6,9;75:2;
82:22;84:7,8
**missing (2)**
11:14,17
**mistake (1)**
79:8
**Mister (1)**
42:3
**mixing (1)**
52:15
**Mlman (1)**
6:17
**mobile (2)**
57:25;69:22
**model (3)**
24:2;27:14;31:15
**moment (11)**
33:10;43:22;52:24;
53:25;54:9;58:11,12;
64:24;70:4,25;79:12
**moments (2)**
50:15;84:20
**Monday (7)**
85:11,14,18,23,24;
87:3,4
**month (6)**
38:10,14;39:15,23;
55:2,5
**months (1)**
12:24
**more (25)**
15:12;17:7;27:8;
29:6;31:9;32:11,11;
38:15;39:16,17;
42:24;43:1;48:1,11;
49:2,21;63:22;64:4,6;
65:6;70:22;71:4;77:9;
99:4,21
**morning (9)**
49:5,6,8,8,8,9,13,
23;86:18
**most (5)**
16:11,15;33:5;
83:13,14
**motion (1)**
10:2
**motive (1)**
17:11
**move (11)**
14:6;39:14,25;
56:10,13,14;59:1;
81:18;90:6;98:9;
100:1
**much (6)**
7:15;33:6;35:8;
83:2;87:17;93:21
**multiple (4)**
44:25;53:12;56:5;
65:3
**must (2)**

18:21;19:7
**mutually (1)**
17:15

**N**

**name (24)**
34:20,25;37:13;
40:20;41:13;42:12;
50:20;54:6,7,8,8,14;
55:20,20;59:11;67:6;
72:16;73:2,9,14;
88:14,16,22;90:2
**named (2)**
19:23;26:18
**names (2)**
35:8;88:1
**NATIONAL (7)**
1:2,16;6:9;97:11,
13,14,21
**nearly (1)**
30:1
**necessary (3)**
10:23;19:17;26:18
**neck (2)**
86:17;88:5
**N-E-C-K (2)**
88:2,6
**need (7)**
11:1;38:15;47:9;
75:23,25;81:4;83:19
**needs (1)**
21:21
**negative (1)**
28:3
**negotiated (1)**
23:11
**New (19)**
1:17,17;6:14;7:7;
13:1,3;24:19;30:18;
31:23;42:19,24;51:8;
52:4,12;54:3;85:7;
86:19;88:3,4
**next (5)**
63:6,6,7;84:24;85:9
**Nick (11)**
86:18;88:5,7,8,9,10,
11,13,18;89:23;95:21
**N-I-C-K (1)**
88:6
**Nick's (1)**
88:16
**night (1)**
49:18
**NLRB (3)**
18:18;24:8,9
**non- (2)**
7:21;23:25
**none (1)**
52:20
**non-objections (1)**
39:6
**non-parties (1)**

12:19
**non-party (1)**
9:25
**non-union (2)**
23:6;29:14
**note (1)**
86:10
**Noted (1)**
6:2
**Notice (5)**
1:15;7:7;19:19,19;
52:16
**noticed (3)**
52:1;53:5;76:3
**noting (1)**
16:4
**Notwithstanding (1)**
31:4
**November (59)**
14:19;15:3;16:3,9,
13,21;22:15,17;
24:19;26:4,6,7,12,22,
25;27:3;28:5,16,20,
22;29:11,12,19;32:14,
15,18;36:3,5,8,13;
38:11,14;39:15,24;
40:17;42:19,23;55:5;
59:16,23;60:16;61:2,
3;62:23;63:9,11,11;
73:12;76:2;85:18;
87:4;88:19;89:2,6,8;
93:7;96:14,23;99:25
**number (14)**
6:5;7:21;20:24;
21:13;57:25;70:22,
23;71:5,18,21,24;
72:3,16;73:2
**numbers (4)**
37:7;47:9,20,20

**O**

**object (2)**
61:25;91:8
**objecting (1)**
7:4
**Objection (36)**
36:23,23;37:20;
38:1,25;39:8;40:1,24;
47:5,24;51:10;55:3;
61:4,5,8;62:9,18;
63:12;65:12,21;
67:13,15,23;74:22;
92:3,3,5,7,7;95:6,8,9,
10;96:13;100:3,4
**objectionable (1)**
38:22
**objective (1)**
46:1
**obligation (1)**
18:19
**obliged (1)**
19:2

**observe (1)**
69:1
**observers (1)**
7:21
**obviously (3)**
13:25;15:9;67:1
**occasion (1)**
25:2
**occur (1)**
41:20
**o'clock (1)**
49:12
**October (1)**
38:14
**odd (1)**
39:23
**Off (12)**
7:18;33:12,13;
50:16;58:10,12;71:7,
8;81:7,8;100:9,10
**offer (5)**
17:19;42:25;66:7;
96:12,24
**offered (6)**
17:2;21:18;52:6;
60:16;96:9;97:1
**old (1)**
41:12
**Once (1)**
78:6
**one (38)**
16:17;22:8,21;
23:14;28:24;33:10;
35:20;39:8;40:22;
41:4,5;42:3;45:6,8;
48:10,11;52:22;
53:11,13;56:5,23;
58:12;63:22;64:6,6;
65:6;77:18,18,20;
79:12;81:17;88:2,3;
89:20;94:12;97:7;
99:4,21
**online (1)**
18:7
**only (16)**
17:4,8;18:5;26:1;
32:2;43:4;44:3;72:22;
77:7;78:20,23,24;
80:14;82:1;84:20;
86:23
**onto (1)**
92:18
**open (3)**
52:6,6;56:23
**opened (1)**
69:22
**opening (10)**
14:6,12;20:7,14,18;
22:16;24:6,18;26:2;
33:1
**openness (1)**
16:9
**operated (2)**

18:13;32:14
**operation (9)**
18:4,14;29:16;30:6,
15;31:20;38:2;41:16;
49:22
**operations (10)**
12:25,25;15:8;16:4;
17:22;18:8;20:22;
21:12;30:2;31:25
**opposing (1)**
9:10
**opted (1)**
15:5
**order (11)**
7:19,24;8:4,18;9:4;
10:1,5;11:1;17:7;
19:19;67:17
**ordered (1)**
18:22
**original (1)**
93:19
**others (2)**
49:13;70:5
**out (23)**
10:12;11:24;17:20;
20:19,23;21:2,6;
24:18;25:9,15;26:5,8;
27:14;31:25;60:18;
64:20;70:2,6;72:17;
76:12;77:5;78:24;
86:14
**outside (2)**
8:22;13:2
**outstanding (1)**
10:20
**over (9)**
7:8;20:21;26:23;
30:4,12;42:20,24;
54:3;99:2
**overnight (1)**
49:5
**overrule (1)**
37:22
**Overruled (11)**
38:4;40:1;47:7;
51:11;55:4;63:14;
65:17;67:24;74:23;
92:3;96:15
**overruling (1)**
62:8
**overwhelming (1)**
30:25
**own (4)**
9:9;18:4,5;70:5
**owner (5)**
40:16;41:18;42:2,
10,11
**owner's (1)**
42:12

**P**

**pants (1)**

51:3
**paper (2)**
57:4;98:12
**papers (2)**
6:25;7:4
**park (1)**
37:8
**PARKING (94)**
1:5;6:4,18;14:15,
20,24;15:3,4,6,6,7;
16:5,10,25;17:23;
18:14,25;20:21;21:4;
22:3,12,21,25;23:20;
24:22;25:11,20;
26:11,12,22;30:2,19,
24;35:20;36:1;37:24;
40:6;41:14;43:8,20;
44:8;45:6;47:18;
49:19,22;50:15;51:8,
23;52:7,16,22;53:3,8,
22,24;54:1,2,3,21;
55:9;56:3;59:12;
63:10,21;64:17,21;
65:2,8;66:13,19;
67:21;68:22;69:1,5,
17;72:11;73:4;74:8,9;
76:23,23;77:10,15;
82:23,24;88:4,4;
95:24;96:7,9,12,24;
97:2;98:21
**part (13)**
30:4;43:5;45:12,14,
17;46:11;50:25;
64:23;83:14;85:8;
91:22,22;94:3
**participated (1)**
21:3
**particular (2)**
48:8;68:13
**parties (7)**
6:7;7:24;10:23;
12:19,19;14:24;26:18
**Party (7)**
1:11;9:1,7,25;
30:15;33:18;61:11
**party's (2)**
8:21;9:10
**passing (1)**
85:19
**past (1)**
12:23
**patient (1)**
37:10
**patients (9)**
36:21;37:5,9;44:16;
45:16,18;46:3;47:3;
64:20
**Pause (3)**
33:11;56:8;86:2
**pay (1)**
25:18
**pediatry (1)**
46:25

**pending (1)**
9:23
**people (38)**
7:23;8:19;9:14;
42:8,9,10;46:9;49:9,
21;50:14;53:5;67:10;
68:9;70:7;76:17,21,
22;77:9,17,20;78:8,
13;79:4,9,10;80:18;
82:2;84:14;85:2,3,16,
21,24,25;86:11,24;
89:21,22
**per (4)**
32:15;43:23,25;
48:11
**performing (1)**
15:13
**perhaps (2)**
66:22;96:20
**period (4)**
12:24;36:7,13;44:3
**person (15)**
8:20;43:24;49:4;
53:22;54:8;66:9;68:8,
10,12,14;72:7,13;
77:18;88:23;89:8
**persons (1)**
88:3
**pertaining (1)**
47:9
**ph (1)**
9:17
**phone (11)**
59:18,23;61:12;
70:7,22;71:15,18,21;
72:14;73:2;98:14
**photo (7)**
57:15,17,24;58:1,3;
63:1,4
**photos (4)**
56:12;58:21;62:22;
99:16
**physical (3)**
56:11,12;77:19
**physically (1)**
68:17
**pick (2)**
8:4;17:3
**picking (1)**
45:19;64:21
**picture (3)**
57:18,23;58:17,18;
63:15
**pictures (1)**
58:6
**piece (1)**
61:22
**place (7)**
8:23;16:21;37:15;
47:18;55:11;73:18;
89:18
**placed (1)**
47:17

**places (1)**
44:8
**planned (1)**
33:1
**play (1)**
27:18
**played (1)**
20:19
**please (6)**
26:20;34:19;38:15;
59:4;63:2;96:1
**PLLC (1)**
6:17
**Plus (2)**
6:5;15:6
**PLUSINC (1)**
1:5
**pm (3)**
6:2;75:7;100:11
**poach (1)**
31:17
**point (7)**
13:25;49:24;52:23;
60:14,15;64:25;83:11
**points (1)**
13:2
**pools (1)**
21:21
**Porsuk (2)**
8:8,10
**P-O-R-S-U-K (1)**
8:10
**portion (1)**
29:15
**position (8)**
10:22;32:9;33:2;
60:18;68:2,4,5;72:21
**possible (2)**
9:5;11:1
**post (1)**
93:17
**potentially (1)**
93:25
**practice (1)**
18:13
**pre-bid (3)**
21:2;24:23;25:20
**precise (1)**
38:10
**predecessor (3)**
10:21;19:3;21:3
**predecessor's (1)**
17:12
**prefer (2)**
81:12,13
**preliminary (3)**
7:17;9:20;12:11
**preparation (1)**
97:25
**prepare (1)**
9:10
**prepared (1)**
14:1

**preparing (1)**
23:13
**present (12)**
7:22;8:25;9:18;
10:19;17:14;22:25;
42:7;64:5,19;78:2;
82:25;83:25
**presentation (1)**
8:21
**presented (1)**
56:25
**Presenting (1)**
86:3
**President (1)**
16:4
**presiding (1)**
30:12
**pretty (1)**
10:11
**prevailed (2)**
20:22,23
**previous (2)**
94:16;100:3
**previously (1)**
67:10
**price (1)**
21:21
**primarily (1)**
43:10
**prior (7)**
63:17;74:8;92:24,
24;93:14,15;97:10
**probably (8)**
12:7;42:3;45:6;
75:22;83:3;85:6,17,
17
**probative (1)**
24:15
**problem (1)**
94:20
**proceed (2)**
14:1;33:7
**proceeding (2)**
8:19;97:11
**proceedings (1)**
8:23
**process (3)**
31:15;32:20;41:11
**produce (1)**
25:22
**produced (2)**
12:3;25:16
**production (3)**
10:24;13:8,15
**productive (1)**
14:22
**proffer (2)**
11:2;60:15
**progeny (1)**
98:6
**prohibited (1)**
18:24
**prohibits (1)**

9:4
**projection (1)**
25:25
**pronounce (1)**
88:7
**proof (2)**
47:8;66:7
**proper (2)**
38:25;79:23
**proposal (1)**
82:10
**propose (2)**
12:21,22
**proposition (1)**
86:23
**prospect (1)**
23:14
**prove (1)**
66:17
**proved (1)**
16:19
**provide (10)**
15:4,15;17:15;37:6;
41:17;57:8;65:7;
70:15;72:24;73:1
**provider (2)**
14:15;33:18
**providing (2)**
43:5,16
**purchased (2)**
13:1;25:2
**purportedly (1)**
65:23
**purpose (4)**
62:11,15;66:7;
92:19
**purposes (3)**
61:9;94:4,6
**Pursuant (2)**
1:15;20:22
**put (3)**
44:21;47:19;60:7
**putting (2)**
32:22;66:23

**Q**

**quash (1)**
10:2
**Queens (1)**
30:18
**quick (1)**
54:19
**quickly (1)**
55:21

**R**

**raise (3)**
11:2;25:18;34:14
**range (1)**
21:11
**rates (3)**

21:25;23:22;25:23
**reach (1)**
82:13
**reached (1)**
11:24
**read (4)**
8:3;30:12;86:14,15
**reading (1)**
19:19
**reads (1)**
12:20
**ready (8)**
26:11;32:14,14,17;
33:7;34:2;35:11;
71:11
**really (15)**
11:6;22:20;30:17,
17;65:16;91:10,16;
92:24;93:13,17;94:7,
7;95:3,4;98:19
**reason (6)**
32:3,3;84:16;93:16;
94:24,25
**rebut (1)**
9:10
**recall (13)**
40:5;42:16;43:2;
51:17;53:4;54:15;
67:6,12;68:13;71:16;
72:5;73:11;77:19
**receipt (1)**
37:7
**receive (3)**
21:1;44:20;70:24
**received (15)**
7:6;10:1,25,25;
13:1,9;16:16;47:15;
57:19;62:16;63:3;
69:20;70:21;95:17;
100:6
**receiving (1)**
37:5
**recently (1)**
99:22
**recess (4)**
33:14;58:14;71:9;
81:9
**recessed (1)**
100:12
**recognitional (1)**
23:17
**recognize (11)**
16:7;18:19,20,22;
21:24;26:5;28:8;57:4;
77:14;86:7;99:13
**recollection (1)**
80:13;83:16
**recommend (1)**
19:18
**reconvene (1)**
100:12
**record (22)**
6:3,4,7;7:18;19:25;

23:20;30:24;33:12,
13,15;34:20;58:10,12,
15;71:7,8,10;81:7,8;
86:15;100:9,10
**recruit (1)**
16:22
**recruitment (1)**
15:20
**reference (1)**
97:25
**referenced (4)**
13:10;88:1;90:3;
97:24
**references (1)**
95:2
**referencing (1)**
74:20
**referring (1)**
11:25
**reflected (2)**
57:5;58:21
**refuse (1)**
98:17
**refused (6)**
14:17;16:14;17:19,
21,21;18:2
**refusing (2)**
17:11;22:14
**regard (3)**
51:14;72:9;81:16
**regarding (8)**
9:2;19:20;59:13;
65:24;72:15;91:16;
94:7;95:1
**R-E-G-E-S (1)**
35:1
**Region (11)**
1:16;6:9;11:5;12:2;
21:16;24:17;27:15;
28:21;29:5,11;33:17
**reinstate (1)**
67:13
**relates (1)**
99:15
**relation (2)**
62:25;63:3
**RELATIONS (6)**
1:2,16;6:10;97:12,
14,22
**relationship (1)**
14:23
**relative (3)**
18:15;19:6;74:16
**relevance (4)**
36:23,24;47:6;
93:25
**reliable (2)**
24:16;32:10
**relying (1)**
28:10
**remain (1)**
8:22
**remedies (2)**

19:21,24
**remedy (2)**
19:16,22
**remember (28)**
38:10;40:9;41:22,
22;51:8,14,19;52:13;
54:7;55:1;63:5;67:12;
68:3,4,5,6,10,11,17;
80:7;81:11;83:1;
84:18;85:1,10;88:14;
95:22;97:3
**remotest (1)**
33:5
**renders (1)**
18:17
**repeat (8)**
36:9;48:17;57:16;
58:2;63:2;76:19;
81:23;96:1
**repeated (1)**
17:6
**re-polish (1)**
40:2
**REPORTER (3)**
58:10,13;71:10
**represent (1)**
25:9
**representation (1)**
16:5
**representative (16)**
8:12;12:24;53:8,11;
54:21;55:9;57:19;
63:10,21;64:17;
65:15,15;69:6,10;
98:24,25
**representatives (8)**
8:4;16:23;51:8,24;
52:8,17,22;74:9
**represented (6)**
14:20;16:2;17:1;
29:22,23;98:18
**representing (5)**
65:2;66:13;67:21;
95:24;96:6
**request (1)**
13:7
**requesting (1)**
16:6
**requests (1)**
10:12
**required (4)**
8:22;19:8;23:16;
50:25
**requirements (2)**
19:12,21
**requires (1)**
25:12
**rescind (1)**
19:8
**resolved (1)**
13:6
**respect (5)**
10:1,4;29:16;39:12,

13
**respectable (1)**
25:14
**respond (14)**
16:8,15;20:12;24:6;
33:2;73:16;78:22,23;
79:1;81:1;82:11;83:9;
84:15;87:6
**responded (5)**
11:20,23;74:12;
87:10,12
**Respondent (49)**
1:6;6:15,18,24;
8:11;12:13,15,23,25;
14:17;15:6,7,9,19,22,
22;16:1,6,7,14,14,15,
17,24;17:1,5,6,17,20,
21,24;18:3,6,9,10,11,
13,16,17,21,24;19:1,
5,7,15;20:6;61:23;
65:15,19
**Respondent's (16)**
12:7;21;15:22,25;
16:3,9,22;17:11;18:1,
20,23;19:9,11,17,20;
98:10
**response (10)**
7:3;13:8;16:18;
39:15;64:8;72:2,14;
79:20;80:20;89:23
**responsibility (1)**
9:11
**resulted (1)**
19:9
**results (1)**
18:23
**RETAIL (1)**
1:8
**retain (1)**
15:19
**return (4)**
37:9;44:22;45:21;
47:9
**returned (1)**
47:18;54:14;55:21
**reverse (1)**
29:7,13;31:10
**review (2)**
13:25;98:6
**reviewed (1)**
14:4
**Reyes (21)**
9:17;16:18,24;17:2,
5,13,18,21;34:11,16,
21;35:2,7,16;57:4;
62:22;67:6;71:14;
81:15;95:20;99:13
**Reyes' (2)**
93:23;94:6
**Richard (12)**
6:17;40:19,22;41:8,
15,25;50:11,18,19,20;
52:8;59:11

**Richard's (2)**
40:20;50:13
**ridiculous (1)**
32:2
**Right (40)**
8:14;9:19;10:3,7,
10;11:9,11,15;13:18;
17:9;24:4;25:7,12,17;
29:23;31:13;34:12,
14;35:9,10;39:2,19;
59:18;63:22;64:9;
65:17,25;66:18;
70:25;71:11,19;
73:18;79:9;92:10;
93:8;95:11,13;98:8,
15;99:1
**rights (2)**
19:14;23:17
**Robert (2)**
15:20;99:16
**ROCCO (10)**
6:12,13,13;8:8;
20:4;97:7,9,14,16;
98:2
**Rochelle (1)**
30:18
**role (2)**
50:13;72:21
**roll (1)**
32:14
**Roman (5)**
29:8,17,18;30:10;
32:12
**Roman's (1)**
29:10
**Room (6)**
1:17;9:14;33:23;
48:8;49:1;73:23
**Rothman (1)**
6:13
**Roue (1)**
40:19
**R-O-U-E (1)**
40:21
**row (1)**
22:10
**rule (3)**
9:12,20;59:21
**ruled (1)**
32:12
**ruling (5)**
10:1,4;39:13;94:12;
95:12
**run (1)**
31:24
**running (2)**
18:8;37:24
**Rust (2)**
66:25;67:3
**RWDSU-USCW (1)**
14:19

**S**

**same (25)**
9:2;23:3,23;28:18;
32:5,6;44:20;45:13;
55:11,22;56:13;63:6;
69:15;70:2;76:25;
77:16,18;84:6;86:21,
21;87:18,23;93:18;
99:17,19
**sat (1)**
78:14
**Saturday (4)**
75:7;85:11;86:21,
22
**saw (15)**
51:15,17,24,25;
52:7,19,25;53:6;
60:19;76:14,17,25;
77:15,17,20
**saying (10)**
42:16;65:13,14;
72:9;83:1,12;92:23,
25,25;94:25
**scan (1)**
64:2;65:4;69:16
**scanning (1)**
69:23
**schedule (2)**
50:14;78:19
**school (2)**
25:10;29:22
**scope (2)**
91:9,12
**screen (4)**
71:1,2,14,18
**screenshot (1)**
61:12
**seat (1)**
34:12
**second (13)**
28:24;53:1,4,6;
54:25;55:9,15;64:16;
71:7;88:22;92:7,7;
93:11
**Section (9)**
17:9,10;18:1,21;
37:6;44:4,15;46:8,9
**sections (4)**
44:11;46:24;47:2;
85:20
**seeing (1)**
51:8
**seek (1)**
11:1
**seeking (1)**
12:1
**selflessly (1)**
17:19
**sell (1)**
17:20
**send (3)**
63:1,4;87:8
**sent (13)**
13:16,16;16:3;
57:23;61:3;62:22;
63:15;72:11;86:25;
87:2,16;98:20;99:22
**sentences (1)**
81:17
**separate (1)**
58:18
**sequestration (7)**
7:19,24;8:4,18;9:4,
12,20
**service (3)**
14:15;16:5;43:15
**services (10)**
15:4,6,7,15;17:23;
18:14,25;21:6;37:25;
43:16
**session (1)**
97:25
**set (3)**
19:3;40:16;99:19
**setting (1)**
18:24
**seven (3)**
48:6,9;49:21
**several (8)**
11:25;18:9;40:10;
48:12;56:6;63:19;
88:20;89:3
**share (4)**
15:24;58:1,3;86:10
**sharing (1)**
85:21
**shift (8)**
21:11;43:23,25;
48:4,10,11,21;49:7
**shifts (11)**
23:4;48:12,15,16,
18,25;49:3,10;50:14;
70:10;78:19
**ship (1)**
26:21
**shirt (2)**
51:3;66:19
**shoes (1)**
51:3
**shop (3)**
21:23;26:5;29:14
**short (1)**
81:16
**show (5)**
16:11,22;18:11;
92:21;99:22
**showed (2)**
47:9;99:21
**shown (1)**
6:24
**shows (2)**
61:1;71:1
**Si (1)**
87:20
**sic (12)**
32:6;34:23;35:1,3;
46:25;54:1;56:4;
57:19;66:25;73:23;
76:23;89:11
**side (3)**
21:8;68:22,24
**side-stepped (1)**
18:10
**similar (2)**
24:2;44:7
**simple (1)**
14:14
**simply (1)**
89:17
**sit (1)**
78:10
**site (2)**
50:20,23
**sitting (4)**
26:14;31:12;78:8,
12
**situation (1)**
91:6
**skill (1)**
25:12
**small (1)**
78:7
**smooth (1)**
26:5
**solicit (1)**
15:21
**soliciting (1)**
18:7
**somebody (2)**
7:7;66:19
**somehow (1)**
18:2
**someone (6)**
70:3;75:10,12,12,
19;83:22
**sometime (3)**
90:23;91:4,4
**sometimes (2)**
49:7;91:3
**somewhere (1)**
28:11
**son (4)**
75:15;78:13;82:16,
17
**sorry (11)**
29:11;33:16;36:9;
38:13;49:6;50:2;58:6;
79:8;82:2;90:5;99:5
**Spanish (10)**
34:6;90:22;91:4,7,
22,25;92:12;94:19;
95:4,5
**speak (10)**
10:18;52:20,23;
72:3;74:5,10;77:3;
83:6,24;84:1
**speaking (4)**
45:20;69:2,2;80:8
**specialist (1)**
16:22
**specialize (1)**
15:20
**specific (1)**
48:2
**specifically (1)**
41:17
**specs (3)**
21:2;24:24;26:3
**speculation (2)**
47:25;55:3
**spell (4)**
8:9;34:19,22;40:20
**spoke (10)**
67:6;72:5;77:1;
83:19;84:20;86:17;
87:23;89:14;94:18,18
**sprawling (1)**
15:17
**stable (1)**
14:22
**staff (8)**
16:10;18:4;21:13;
76:16,17,21;80:18;
87:24
**staffing (4)**
21:21;23:2;25:24;
27:7
**stand (2)**
30:8,16
**standard (1)**
8:3
**standing (2)**
65:21;95:10
**Starbuck (1)**
89:11
**staring (1)**
15:8
**start (6)**
12:7;20:7;27:24;
49:12;78:16,17
**started (4)**
36:7;48:21;49:17;
89:16
**starts (1)**
49:7
**startup (3)**
26:4,7;27:7
**state (5)**
6:7;13:1,3;34:19;
94:19
**stated (1)**
94:1
**statement (20)**
14:12;20:7,14,18;
22:16;24:6,18;32:5;
33:1;39:23;65:24;
92:24;93:1,14,15,17,
19;94:1,7,15
**statements (8)**
14:7;17:8;26:2,3;

28:3,5;98:6;99:2
**station (11)**
43:10,17;44:2,5;
47:23;49:16,19,20;
50:2,3,4
**stations (4)**
43:7,12;44:2;49:25
**status (2)**
12:14;42:22
**stay (5)**
45:20;48:23;86:23,
24;89:18
**staying (1)**
9:14
**still (2)**
25:17;51:7
**stiped (1)**
21:19
**stipulate (1)**
12:23
**stipulated (1)**
13:4
**stipulation (1)**
12:21
**Stony (31)**
10:21;11:20,21;
14:16,21;15:4,11;
16:5;18:4;19:1;21:5;
23:7,15,16;26:11,17,
18;30:15,23;32:16;
35:21,25;36:7,12;
37:3;43:8;51:7;72:10;
73:18;74:16,25
**stop (1)**
27:3
**STORE (1)**
1:9
**straight (1)**
45:5
**Street (2)**
6:13;45:5
**strike (3)**
50:18;83:6;89:7
**subject (1)**
87:23
**submit (1)**
70:18
**submitted (8)**
7:3;16:12;22:7;
70:20,21;71:3,15,23
**submitting (1)**
70:25
**subpoena (5)**
10:12;11:11,20;
13:8,9
**subpoenas (4)**
9:23,25;10:20,24
**succession (1)**
31:5
**successive (1)**
14:25
**successor (16)**
14:16;18:18;19:13;

24:3,7,12,12,13,14;
28:7,9,14;29:2;30:8;
31:6;33:5
**successorship (6)**
24:11;25:1;26:10,
25;28:25;31:9
**suddenly (2)**
16:1;19:15
**suggesting (1)**
65:8
**Suite (1)**
6:14
**supervisor (4)**
50:10,13;65:19;
67:1
**supervisors (1)**
19:20;50:17,22
**supplement (2)**
61:18;92:10
**support (3)**
19:16;24:16;36:18
**suppose (1)**
27:5
**supposed (1)**
27:22
**supposedly (1)**
66:11
**Supreme (1)**
24:8
**sure (8)**
9:11;31:22;48:3;
56:9;61:4;89:20;
92:22;96:20
**Sustained (1)**
41:1
**sustaining (1)**
67:15
**swear (2)**
34:4,13
**sworn (2)**
34:6,17
**system (5)**
44:7;54:1;56:3;
68:22;76:23
**SYSTEMS (56)**
1:5;6:4,18;15:6;
20:21;21:4;22:3,12,
21,25;23:20;24:22;
25:20;26:11,22;
30:19,24;41:14;51:8,
23;52:7,16,22;53:3,8,
22,24;54:3,21;55:9;
59:12;63:10,21;
64:17;65:2,9;66:13,
19;67:21;68:23;69:1,
5,17;72:11;73:4;74:8;
77:10,16;82:23;
95:24;96:7,9,12,24;
97:2;98:21
**Systems' (2)**
30:2;82:24

## T

**table (2)**
47:19,19
**tables (1)**
78:8
**talk (5)**
42:4;43:6;45:19;
93:13,14
**talking (4)**
64:16;71:14;78:16,
17
**team (1)**
31:24
**Teamsters (5)**
23:11,15,18;29:24;
30:3
**telling (5)**
42:18;81:2;85:4;
86:10;98:21
**terms (7)**
15:1;18:25;19:2,5;
23:23;77:15;93:25
**test (2)**
28:12;32:7
**testified (9)**
32:6;34:18;41:20;
50:10;58:17;59:22;
61:2;94:17;97:11
**testify (4)**
9:3;22:14;32:7;
97:21
**testifying (2)**
9:18;65:23
**testimony (24)**
8:23;9:2,6,8,9,10;
17:16;21:1;23:9;
26:20;30:20;32:10,
21;65:22;81:11;
92:10;93:2,3,4,22,24;
94:6,21;95:1
**texted (2)**
76:4;98:16
**theory (2)**
22:19;24:16
**therefore (2)**
17:24;82:9
**third (4)**
12:19;33:18;53:5;
90:2
**thoroughly (1)**
30:13
**though (1)**
36:13
**thought (3)**
31:15;32:20;81:24
**threat (1)**
18:11
**three (14)**
22:11;24:21;45:9;
52:1,18;53:13;67:11;
70:10;77:12,14;79:3;

80:18;82:1;96:17
**throughout (3)**
36:12;37:15;70:12
**thus (3)**
18:17,21;19:5
**ticket (6)**
44:21;47:4,8,13,17,
20
**tickets (2)**
37:7;44:7
**tie (1)**
51:3
**times (6)**
9:1;11:25;36:20;
52:18;88:20;89:3
**timing (1)**
39:9
**tips (1)**
36:21
**today (7)**
10:19;12:1;14:14;
28:19;67:11;86:18;
97:10
**together (3)**
65:11;80:25;83:3
**told (42)**
15:22;16:23;17:2;
26:15,16,18;27:12;
40:15,15;41:4,5,11,
17;42:23;56:2;64:1,4;
65:4,10;69:15;72:11;
73:23;76:5,10;78:15,
22,23;79:9;82:5;
84:12,12,24;85:1,2,7,
16;86:1,11,11,21,22;
89:23,25
**took (9)**
16:21;29:22;30:4;
47:17;57:18;58:1,3,
17,21
**Top (1)**
90:25
**total (4)**
43:22,23;85:15,17
**totality (1)**
94:3
**totally (2)**
31:5,13
**to-wall (1)**
31:2
**traditional (2)**
24:10;25:1
**traffic (1)**
21:22
**training (1)**
19:19
**transition (1)**
26:6
**translate (2)**
81:17;83:18
**translated (2)**
90:25;91:2
**translating (1)**

91:22
**translation (6)**
79:13,14,22,23;
80:21;91:5
**translator (3)**
81:17;90:24;91:23
**Transportation (1)**
29:21
**tried (4)**
30:8;83:13;84:2,6
**trips (2)**
30:5,5
**true (5)**
24:7;31:9;52:19;
60:23,24
**truth (1)**
66:8
**try (9)**
10:6;28:25;31:5,6;
61:18;79:24;81:14,
16;84:5
**trying (5)**
60:17;90:5,5;91:20,
21
**Tuesday (1)**
1:18
**turn (1)**
17:20
**twice (1)**
82:5
**two (25)**
9:15;16:23;32:6;
35:7,8;45:4,6,9;
46:16;52:1,18;58:6;
77:9;78:13;81:17;
82:1,23,24;89:6;
90:21,25,25;91:7;
92:12;99:3
**typical (1)**
69:24
**typically (5)**
43:20;45:22;47:22,
24;50:18

## U

**unchanged (1)**
18:15
**under (11)**
16:13;18:15,18;
19:2,7;26:24;30:6;
67:15;76:21;92:22;
98:5
**underlying (1)**
18:12
**understood (3)**
83:14,19;95:15
**unemployed (1)**
19:15
**unfair (1)**
18:12
**uniform (2)**
50:25;51:2

**unilateral (1)**
19:10
**unilaterally (1)**
18:24
**unimpeachable (1)**
32:10
**UNION (82)**
1:9;6:11,14;8:7;
14:18,22;16:2,3,7;
17:1,4,7,20;18:11,17,
19,20,22;19:4;20:3;
21:15,23,25;22:15,15,
17,21;23:6,8,24,24,
25,25;24:1,21,25,25;
25:21;26:4,5,13;
27:16,20,21;28:4,9;
29:14;30:9,14;31:14;
32:5,13,18,20;33:4;
37:11,13,15;57:19;
79:4,11;80:19,19,24;
82:2,3,4;83:22;84:13,
14,16;85:8,8;86:20,
20;87:25;89:22;90:1;
94:2,2;97:6;98:18
**unionized (2)**
14:15,18
**unions (4)**
17:2;27:17,20;
32:13
**Union's (4)**
8:8;16:3,4,8
**unit (6)**
14:20;15:1;28:18;
31:1,2;32:6
**UNITED (1)**
1:9
**University (9)**
14:16,21;15:4,5,11;
35:21,25;37:4;74:17
**unlawful (2)**
17:11;18:23
**unlawfully (1)**
14:17
**unless (3)**
11:8;21:19;67:18
**unnamed (1)**
65:14
**unqualified (1)**
18:3
**unworkable (1)**
30:7
**up (19)**
17:3,4;25:13,13;
29:14,22;38:20;
40:16;43:4;45:19;
52:15;60:20;64:21;
66:19;67:16;71:1;
75:21;94:12;99:9
**upon (3)**
19:13;25:24;93:23
**upwards (3)**
23:2;25:16;31:11
**urgently (1)**

18:6
**use (6)**
18:3;51:3;56:2;
57:24;90:23;91:4
**used (4)**
47:24;48:22;92:9;
94:16
**useful (2)**
62:15;94:5
**using (3)**
7:10;60:5,5
**usually (2)**
50:20,23
**usurp (1)**
29:2

**V**

**vague (2)**
39:16;47:25
**Valet (19)**
11:23;14:20,24;
15:3,13;21:6;26:12;
35:20;36:1,4,6,12;37:3;
43:16;44:13,19;
49:15;50:15;76:23;
87:24
**valuable (1)**
15:15
**value (1)**
15:9
**valued (1)**
13:2
**various (3)**
10:18;21:14,20
**vehicles (1)**
45:20
**vest (2)**
51:4,5
**vet (1)**
25:17
**Via (2)**
57:23;87:10
**Vice (1)**
16:4
**violates (1)**
18:21
**violation (3)**
17:10;18:1;59:20
**violations (3)**
19:17,25;33:4
**visit (1)**
46:2
**visiting (1)**
45:23
**visitor (3)**
44:15;46:25;47:10
**visitors (9)**
15:16;45:16,22;
46:1,2,5,9,16;47:3
**voir (3)**
59:4,7;90:8,10;
91:9,12,15;92:14

**vs (1)**
24:3

**W**

**wage (3)**
21:25;25:13,13
**wages (1)**
19:9
**wait (2)**
27:9,11
**walk (3)**
22:23;45:7,10
**walked (1)**
77:6
**walking (8)**
45:7;51:9,15,18;
52:1,17;77:16,20
**wall- (1)**
31:1
**wants (1)**
61:11
**waste (1)**
60:12
**way (7)**
11:4,16;13:22;
16:15;22:7,13;91:3
**weak (2)**
93:8,10
**wear (1)**
50:25
**wearing (5)**
66:19;68:19;69:1;
77:10;82:24
**week (3)**
42:3;97:18,24
**weeks (2)**
18:7;40:10
**Welcome (4)**
7:12;44:20;45:19;
46:4
**well- (1)**
94:13
**well-trained (1)**
15:12
**weren't (1)**
32:1
**West (1)**
6:13
**what's (2)**
24:3,5
**whatsoever (1)**
31:21
**whenever (3)**
8:22;71:11;85:3
**Where's (1)**
59:15
**Whereupon (6)**
33:14;34:15;58:14;
71:9;81:9;100:11
**White (1)**
51:3
**Who'd (1)**

75:13
**whole (2)**
19:8,22
**WHOLESALE (1)**
1:8
**Who's (1)**
40:18
**whose (1)**
43:18
**win (2)**
31:16,16
**winning (1)**
26:23
**withdraw (2)**
36:25;100:3
**within (1)**
12:15
**without (2)**
14:2;19:15
**witness (58)**
9:5,5,7,8;21:19;
34:9,17,21,23;35:1,3,
6;36:14;38:7;40:9;
47:8;48:6,12,20;50:5,
7;51:12;53:21;55:5;
56:25;57:18;58:5,8,
25;59:22;61:2;63:5,
15;64:12;65:22;66:3;
67:10,25;68:9,15,17;
76:22;80:9,22;81:19,
21;86:3;87:20;88:9;
94:17;96:4,18;97:15;
98:12,14,19,23;99:4
**witnesses (11)**
7:22,23;8:20,24;
9:4,9,10,12,16;24:16;
28:19
**woman (4)**
53:14;55:15;72:19;
73:3
**women (1)**
81:3
**won (4)**
29:4,4;41:13;42:20
**won't (1)**
27:5
**word (3)**
47:24;87:12;90:3
**words (2)**
35:7;75:24
**work (49)**
17:1;23:3,7,7;27:4,
5,6,8,12,13,13;35:20,
24;36:6,11;41:19;
42:18,24;43:5,10,20;
44:1,2;48:5,16;50:18,
20;52:6;54:20;55:11;
65:11,11;66:20,21;
69:16,24;78:18;79:2,
10;80:16,19;82:3;
83:3;84:24;85:2,9,12;
86:20;90:1
**worked (10)**

43:8;44:4;47:22;
49:24;50:6,23;82:2;
84:13;89:3,4
**WORKERS (12)**
1:10;14:18;15:19;
16:2;46:23;64:21;
69:3;76:10,14;80:24;
82:3;84:25
**workforce (2)**
17:12;18:4
**working (33)**
14:21;15:11,23;
16:13;27:23;30:22;
36:2;37:6;42:8,9,10;
43:11;44:3,6;46:7,7;
50:15;52:6;54:19,22;
70:11;76:10,16,18,21,
23;79:4;80:25;82:9;
85:20;88:21;89:17,18
**works (7)**
11:4,16;31:25;49:4,
5;88:5,13,14
**worth (2)**
93:21,21
**wouldn't (1)**
31:1
**wrap (1)**
60:20
**Wright (1)**
28:12
**write (4)**
37:8;90:4,5,23
**wrong (3)**
22:18;30:9,10
**wrote (1)**
89:1

**Y**

**year (2)**
29:19;55:7
**years (2)**
15:11;23:10
**yep (1)**
93:12
**yo (1)**
9:13
**York (5)**
1:17,17;6:14;13:1,3

**1**

**1 (7)**
15:8;17:23;26:7,12;
27:23;96:12;97:2
**1,000 (2)**
23:2;31:11
**1:00 (1)**
75:7
**10 (3)**
22:9,9;27:13
**10:00 (2)**
1:18;49:8

**10-12 (1)**
  21:15
**10j (6)**
  29:4,10,17,18;
  30:10;32:12
**11:00 (2)**
  49:8,14
**1102 (4)**
  1:8;14:19;37:14,15
**12 (1)**
  12:23
**12:00 (1)**
  49:14
**12:12 (1)**
  6:2
**12th (3)**
  29:11,12,20
**15 (1)**
  82:22
**15th (1)**
  63:11
**16 (2)**
  59:23;99:25
**16th (7)**
  59:16;60:16;61:2,3;
  62:23;63:11,16
**18 (1)**
  1:18
**18th (2)**
  6:5;61:6
**1917 (3)**
  23:10,15,18
**1st (10)**
  20:21;26:4,23;27:3,
  6,9,11;29:19;32:14,15

**2**

**2,000 (3)**
  25:16,17;31:12
**20 (4)**
  27:13;85:15,17;
  100:12
**200 (1)**
  6:14
**2000 (1)**
  29:11
**2014 (1)**
  29:19
**2015 (8)**
  14:19;28:17;29:4,
  12,20;30:11;36:8,13
**2016 (1)**
  36:3
**2022 (1)**
  38:5
**2023 (14)**
  15:3,8;16:3,13;
  26:4;27:1;36:5,8,13;
  37:18,23;38:6;55:7;
  96:12
**2024 (3)**
  1:18;6:5;100:12

**20-25 (1)**
  75:2
**206 (2)**
  23:1;30:19
**215 (1)**
  32:6
**22 (1)**
  96:16
**23rd (1)**
  73:12
**24 (1)**
  49:4
**245 (1)**
  18:18
**25 (3)**
  16:9,22;76:2
**250 (1)**
  29:25
**25th (7)**
  28:16,20,23;75:7;
  93:7;96:14,23
**26 (1)**
  1:16
**27th (7)**
  85:18;87:4,5;88:19;
  89:2,7,8
**29 (2)**
  1:16;6:9
**29-CA-331253 (2)**
  1:3;6:5

**3**

**3 (6)**
  6:13;29:5,11;57:2;
  58:22,24
**30 (3)**
  26:8;27:13;32:16
**30- (1)**
  21:10
**30th (8)**
  26:22,25;27:3;36:5,
  8;40:17;42:19,23
**32 (2)**
  21:11;27:8
**338 (1)**
  24:9
**34 (1)**
  14:17
**35 (3)**
  29:24;30:1,3
**3a (2)**
  99:10,21

**4**

**4 (2)**
  86:5;90:7
**4:16 (1)**
  100:11
**485 (1)**
  74:19
**495 (1)**

  74:18

**5**

**5:00 (1)**
  49:12
**5:30 (1)**
  49:17
**50 (2)**
  24:9;25:7
**58 (14)**
  30:23;73:24,25;
  74:3,14,16,18,25;
  75:6,8;76:2;95:25;
  96:3,23

**6**

**6:00 (2)**
  49:6,23
**6:30 (3)**
  48:21;50:5,6

**7**

**7 (1)**
  17:9
**7:00 (5)**
  49:5,6,9,13,23
**7:30 (1)**
  48:21
**78 (1)**
  18:18

**8**

**8:00 (2)**
  49:5,13
**8a1 (3)**
  17:10;94:1,4
**8a3 (4)**
  18:1;29:1;31:6;
  33:3
**8a3's (1)**
  28:10
**8a5 (1)**
  18:21

**9**

**9 (1)**
  16:3
**9:00 (6)**
  48:22;49:7,14,18,
  18;50:6
**9-17 (1)**
  32:23
**9th (2)**
  26:6;32:18

# OFFICIAL REPORT OF PROCEEDINGS

# BEFORE THE

# NATIONAL LABOR RELATIONS BOARD

_____

In the Matter of:                          **Case No.:** 29-CA-331253


PARKING SYSTEMS PLUS,INC.              :

             Respondent,          :

And                                    :

LOCAL 1102, RETAIL, WHOLESALE &        :

DEPARTMENT STORE UNION, UNITED         :

FOOD AND COMMERICAL WORKERS,           :

         Charging Party.          :


Place:   New York, New York
Dates:   June 20, 2024
Pages: 102 through 281
Volume: 2

_____

**OFFICIAL REPORTERS**

## BURKE COURT REPORTING, LLC

**64 Magnolia Place**
**Wayne, NJ 07470**
**(973) 692-0660**

```
 1                        BEFORE THE

 2              NATIONAL LABOR RELATIONS BOARD

 3   ---------------------------------: Case No.:

 4   In the Matter of:               : 29-CA-331253

 5   PARKING SYSTEMS PLUS, INC.,      :

 6              Respondent,           :

 7   And                             :

 8   LOCAL 1102, RETAIL WHOLESALE &   :

 9   DEPARTMENT STORES UNION,         :

10   UNITED FOOD AND COMMERCIAL       :

11   WORKERS,                        :

12              Charging Party.       :

13   ---------------------------------:

14

15        The above-entitled matter came on for hearing pursuant to

16   notice, before BENJAMIN GREEN, Administrative Law Judge, at the

17   National Labor Relations Board, Region 29, at 26 Federal Plaza,

18   2nd Floor, New York, New York 10278, on Thursday, June 20th,

19   2024, at 10:00 a.m.

20

21

22

23

24

25

26
```

```
1              A P P E A R A N C E S

2    On Behalf of the General Counsel:

3         MATTHEW JACKSON, ESQ.

4         EMILY CABRERA, ESQ.

5         The National Labor Relations Board, Region 29

6         One Metro Tech Center, 20th Floor

7         Brooklyn, New York 11201

8         matthew.jackson@nlrb.gov

9         emily.cabrera@nlrb.gov

10

11   On Behalf of the Respondent:

12        ROBERT F. MILMAN, ESQ.

13        MICHAEL MAURO, ESQ.

14        MICHAEL JACOBSON, ESQ.

15        Milman Labuda Law Group, PLLC.

16        3000 Marcus Avenue, Suite 3W8

17        Lake Success, New York 11041-1009

18        rob@mmlaborlaw.com

19        mmaura@mmlaborlaw.com

20        mjacobson@mmlaborlaw.com

21

22

23

24

25
```

```
 1            A P P E A R A N C E S (continued)
 2   On Behalf of the Charging Party:
 3        MATTHEW P. ROCCO, ESQ.
 4        Rothman Rocco Laruffa, LLP
 5        3 West Main Street, Suite 200
 6        Elmsford, New York 10523
 7        mrocco@rothmanrocco.com
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1                    I N D E X

 2   WITNESS          DIRECT  CROSS  REDIRECT  RECROSS  VOIR DIRE

 3   Edward Arias Gil  111    145      176      186       --

 4                     140    --       185      --        --

 5                     --     --       195      --        --

 6   Ayse Porsuk       208    261      --       --        217

 7                     --     --       --       --        251

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1               E X H I B I T S

 2  EXHIBITS                  IDENTIFIED           RECEIVED

 3  General Counsel's

 4  GC-2                      107                  108

 5  GC-5                      127                  128

 6  GC-6                      179                  183

 7  GC-7                      210                  211

 8  GC-8                      212                  222

 9  GC-9                      230                  237

10  GC-10                     248                  249

11  GC-11                     250                  254

12

13  Respondent's

14  R-1                       160                  166

15

16

17

18

19

20

21

22

23

24

25

26
```

```
1                    P R O C E E D I N G S

2                                (Time Noted:  10:05 a.m.)

3            JUDGE GREEN:  Okay.  So we're back in Parking Systems

4    Plus, Inc., 29-CA-331253.  It's June 20th, 2024.  We were

5    previously in the middle of testimony by Francis Gil Reyes.  We

6    had finished direct on the -- on June 18th, and we're going to

7    proceed with cross examination today.  However, we don't have a

8    -- an interpreter.

9            So the General Counsel has asked to take a witness

10   out of order who does not require an interpreter, and the

11   Respondent has not objected to that.  Therefore, that's what

12   we're going to do.  Do we have to do anything before we call

13   that witness?

14           MR. JACKSON:  There's one thing I'd like to do, Your

15   Honor.  I'd like to mark for identification GC Exhibit 2.  GC

16   Exhibit 2 is the certification of representative from case

17   number 29- RC-148399.

18           It is the document issued by the Regional Director

19   for Region 29 of the Board.  And it documents the certification

20   of Local 1102 as the bargaining representative for the unit of

21   employees listed in the complaint.  I ask that Your Honor take

22   administrative notice of GC Exhibit 2 and I'll ask for its

23   admission.

24       (General Counsel's Exhibit 2 identified)

25           JUDGE GREEN:  Okay.  Any objection?
```

1          MR. MILMAN:  I just would only like to get

2     verification from Mr. Jackson that there are no other documents

3     that were part of this packet.  And if there are, I just would

4     like to look at it.  I just noticed that this is a front and

5     back page.

6          I just don't know if there were an addendum to it or

7     anything else.  I'll rely on his verification.  There were --

8          MR. JACKSON:  So I retrieved this from the Agency's

9     record keeping system.  And in that system, this is how the

10    document appears, is a two page document.

11         MR. MILMAN:  No objection.

12         JUDGE GREEN:  Okay.  General Counsel Exhibit 2 is

13    admitted.  Can I just clarify?  You know, we didn't have a

14    conference call in this case.  Just -- I'd just like to make

15    sure I understand.

16         I heard -- I thought I heard in the General Counsel's

17    opening that the Respondent had potentially hired some of the

18    former Classic employees ultimately.

19       (General Counsel's Exhibit 2 received)

20         MR. JACKSON:  That's --

21         JUDGE GREEN:  But I take it you're not taking the

22    position that they ever hired a majority.

23         MR. JACKSON:  They have not hired a majority.

24         JUDGE GREEN:  Okay.  So your case is based entirely

25    on refusal to hire?

```
 1                    MR. JACKSON:  Correct.

 2                    JUDGE GREEN:  In order to establish successorship?

 3                    MR. JACKSON:  Correct.

 4                    JUDGE GREEN:  Okay.

 5                    MR. MILMAN:  And, Your Honor, if I just may just

 6    respond to that it brief.

 7                    JUDGE GREEN:  Sure.

 8                    MR. MILMAN:  Just so you know, part of our theory of

 9    the case on that issue is that even if we had hired every

10    single Classic employee at Stony Brook, there still would not

11    be any successor.  That would be based upon the accretion

12    issue.  And we --

13                    JUDGE GREEN:  So you're basically arguing that

14    there's -- there was not an appropriate unit?

15                    MR. MILMAN:  Exactly.

16                    JUDGE GREEN:  Okay.  I mean, that's an argument that

17    could be made in successor --

18                    MR. MILMAN:  And yeah.  Based upon full integration

19    and appreciation.

20                    JUDGE GREEN:  Okay.  I mean, it's hard.

21                    MR. MILMAN:  We think we could meet that burden, Your

22    Honor.

23                    JUDGE GREEN:  Okay.  You know, I'm not going to

24    prejudge your defense, it's just the -- it's hard.

25                    MR. MILMAN:  So we think we can meet that.  It's one
```

1    theory of our case, but --

2            JUDGE GREEN:  Okay.

3            MR. MILMAN:  It's -- it is a catchall that again, and

4    our position notwithstanding we hired every single one of them.

5    Our-- the business model, the business makeup, the geographical

6    locations of our client is completely different than Classic.

7            JUDGE GREEN:  Understood.

8            MR. MILMAN:  Yeah.

9            JUDGE GREEN:  And by the way, at the start, you know,

10   at the start of your case, if you want to have another, like go

11   at an opening statement, you can discuss that.  But in the

12   meantime, let's --

13           MR. MILMAN:  Thank you.

14           JUDGE GREEN:  Let's carry on.  So shall we call the

15   next witness?

16           MR. JACKSON:  Yes, Your Honor.  General Counsel calls

17   Edward Arias.

18           JUDGE GREEN:  So you can just have a seat right

19   there.  So I'm going to swear you in, so please just raise your

20   right hand.

21   Whereupon,

22                        EDWARD ARIAS,

23   was called as a witness having been first duly sworn, was

24   examined and testified as follows:

25           JUDGE GREEN:  Okay.  Thank you very much.  And please

1    just state and spell your name for the record.

2              THE WITNESS:  Edward Arias Gil, E-D-W-A-R-D A-R-I-A-S

3    G-I-L.

4              JUDGE GREEN:  Thank you very much.  So the Government

5    is going to have some questions for you.

6                         DIRECT EXAMINATION

7    BY MR. JACKSON:

8    Q.   Good morning, Mr. Arias.  Thank you for joining us and

9    thank you for your patience.  I understand that you were

10   waiting around on Tuesday.

11   A.   Mm-hmm.

12   Q.   Are you currently employed?

13   A.   No, sir.

14   Q.   Did you at one point work for -- excuse me.  Did you at

15   some point work as a valet parking attendant at Stony Brook

16   University?

17   A.   Yes, sir.

18   Q.   Who was your Employer when you worked there?

19   A.   My last Employer was Classic Valet Parking.

20   Q.   When did you begin working for Classic?

21   A.   I began working for Classic approximately March, 2019.

22   Q.   Okay.  And when did your employment with Classic end?

23   A.   My last day of employment with Classic was November 30th,

24   2023.

25   Q.   And did you work continuously as a valet attendant for

1    Classic at Stony Brook during -- throughout that time from

2    March, 2019 until the end of November last year?

3    A.    Yes, sir.

4    Q.    What were your job duties as a valet attendant at Stony

5    Brook University Hospital?

6    A.    I was to attend the needs of patients and visitors when it

7    came to assistance for parking.  So I took their cars when they

8    came in and offered the service to park the cars for them.

9    Q.    Okay.  Did you have a union in that job?  Yes,

10   A.    Sir.

11   Q.    What was the name of the Union?

12   A.    Local 1102.

13   Q.    Were there different stations for the valet attendants who

14   work -- did valet attendants work at different stations at the

15   hospital?

16   A.    Yes.  There were booths at different areas of the

17   hospital.

18   Q.    What were the areas?

19   A.    I was stationed at the Mark building or Cancer Center,

20   known as.  There were also boots at main entrance of the

21   hospital as well as emergency.  And we had a station at the

22   employee lot.

23   Q.    And what were your hours?

24   A.    I worked the early shift, which started at 7:30 until 4:00

25   p.m.

1   Q.   And what hours of the day was the Cancer Center parking

2   station open?

3   A.   The Cancer Center valet booth was open from 7:30 to 6:30.

4   Q.   How many employees work with you at the Cancer Center of

5   LA Station?

6   A.   Towards the end of the working period, there were only

7   four of us left.

8   Q.   And what days of the week did you work?

9   A.   We labored Monday through Friday.

10  Q.   Do you know what hours the main entrance was open?  I'm

11  talking in November of 2023.

12  A.   The main entrance was opened from 5:30 to 9:00 p.m.

13  Q.   And what about the emergency room?

14  A.   Emergency -- the process were 24 hours.

15  Q.   And do you know the hours of the valet station at the

16  employee parking area?

17  A.   Employee parking, I believe was from 7:00 a.m. to 6:00

18  p.m.

19  Q.   Did you work at other stations or did you only work

20  exclusively at the Cancer Center station?

21  A.   When I first began working for Classic Valet, I did have a

22  chance to operate at each different station.

23  Q.   Was the work different, depending on which station you

24  were at?

25  A.   It was relatively all the same.

1   Q.   Were you required to undergo any training as part of your

2   job?

3   A.   We had an exercise video but most of the training was on

4   the field.

5   Q.   What was the exercise video?

6   A.   The video was a -- it was a safety sort of training on the

7   do's and don'ts on the job.  So it basically informed the

8   employee of, you know, having a certain level of

9   professionalism when it came to doing the job.

10          Things like, you know, having respect for the

11  patients or visitors that came in as well as their vehicles.

12  Nothing, you know, no form of, you know, that would come off as

13  disrespect.  Always dressing in uniform, things of that nature.

14  Q.   And you said you had some training, like more hands-on

15  training?

16  A.   Yes, sir.

17  Q.   Can you describe what that was like?

18  A.   My training was on the field.  So I started and another

19  employee who was already had been working there took me through

20  the steps of how the vehicles had to be parked, where they had

21  to be parked, and how to tag the vehicle for the location that

22  it was parked on.

23  Q.   Were you required to interact with patients or visitors at

24  all?

25  A.   Yes, sir.

1   Q.   In what ways would you react?   In what ways would you

2   interact with them?

3   A.   Patients or visitors would come in and we would have a

4   computer print out the tickets.   We can split these tickets

5   into three portions.   One goes to the patient or visitor, one

6   goes to the vehicle, Dash, and the last one goes to the

7   vehicle's keys.

8           All tickets have their own respective number, so

9   there was no chance of getting keys mixed up or getting the

10  vehicles mixed up because they all had the same number

11  responding to the ticket number as well as the vehicle number.

12  Q.   And what did you do with the keys that you received from

13  customers?

14  A.   After parking the vehicle in its corresponding spots,

15  whatever was available, we tagged the location for that vehicle

16  on the ticket that the keys have.

17          And when we returned to the booth, we would hang the

18  keys on a board that was -- that had hooks placed all over it

19  that also had a one to three digit numerical value

20  corresponding to the last three digits on the ticket that the

21  keys had on it.

22  Q.   Were you expected to speak with visitors or patients when

23  they arrived at your station?

24  A.   Yes, sir.

25  Q.   What were you -- what would you say to them?

1    A.   We would greet them, simple hello, depending on which area

2    you were stationed at.  For the Cancer Center, we would greet

3    them.  We would ask them if they had an appointment or if they

4    were visiting.

5            That in turn, sometimes not every time, would

6    indicate whether they had an appointment in the Cancer Center

7    or they were visiting Children's Hospital, which was right next

8    to the entrance to the Cancer Center.

9    Q.   And after the visitor or customer told you what they were

10   there for, what would you do?

11   A.   We would direct them to the corresponding entrance so they

12   wouldn't get lost since a lot of people tend to not know where

13   they were going, if it -- they're a first time patient or

14   visitor.

15   Q.   Are there multiple buildings in the hospital?

16   A.   The hospital campus is very big.  There are multiple

17   entrances to get into Stony Brook Hospital in multiple areas.

18   So yes.

19   Q.   So it's one big building with multiple entrances?

20   A.   Basically, yes.

21   Q.   That's all right.  I'm handling this witness.  How did you

22   know how to direct patients around the campus or visitors

23   around the campus?

24   A.   From working the first few weeks at the Cancer Center, you

25   start to develop a knowledge because you yourself have to go

1    into the building if you were to use the bathroom or, you know,

2    have to go to the cafeteria for lunch.

3           So since a lot of people tend to come in the building

4    and then you see them come out, you would ask if they came at

5    the wrong date or the wrong time.

6           And they would mention that they had to go to the

7    other side because they were not either visiting or they didn't

8    have an appointment.

9    Q.    Who was your supervisor?

10   A.    When I worked for Classic Valet Parking, my supervisor was

11   Richard Arue.

12   Q.    How do you spell his last name?

13   A.    I believe it's spelled O-R-U-E.

14   Q.    And what was Richard's role?

15   A.    He was our manager.

16   Q.    And like do you -- what kinds of tasks did Richard do as

17   your manager as far as you understood?

18   A.    As far as I understood, he was in charge of keeping each

19   sections that we had stationed at the hospital in order.  He

20   made sure that everything was going according to the company

21   standards.

22          He went around to each booth, making sure that, you

23   know, there wasn't any issues or if there were any issues, he

24   would take care of it and resolve them with the patient or

25   visitors that had any issues with the department service.

1  Q.   Did Richard typically work at the hospital campus?

2  A.   Yes.  He was local.

3  Q.   So he was generally there Monday to Friday?

4  A.   Yes, sir.

5  Q.   Were there any other managers or supervisors for Classic

6  who were regularly working at the hospital?

7  A.   Not from my knowledge, no.

8  Q.   Did you receive tips as part of your compensation?

9  A.   Yes, sir.

10  Q.   And approximately, how much of your income came from tips?

11           JUDGE GREEN:  Is it like on a weekly basis or monthly

12  or yearly?

13  BY MR. JACKSON:

14  Q.   On a weekly basis.

15  A.   Weekly basis, I would say about half of my paycheck.

16  Q.   Were you required to wear a uniform as part of the job?

17  A.   Yes, sir.

18  Q.   What did the uniform consist of?

19  A.   Uniforms for Classic Valet Parking were black shoes, black

20  jeans.  We had to wear a white button up black tie, and we were

21  given green vests embroidered with the company logo.

22  Q.   Okay.  Are you familiar with any of the -- well, let me

23  ask a different question.  Do you know someone named Nick who

24  worked for Stony Brook University Hospital?

25  A.   Could you be specific?

1    Q.    Are you familiar with anyone named Nick who worked for

2    Stony Brook?  No?

3    A.    No, sir.

4    Q.    Okay.  What about Dan?

5    A.    I've heard the name.

6    Q.    Did you ever meet Dan?

7    A.    Personally?  No.

8    Q.    Okay.  Now, while you were still working for Classic at

9    Stony Brook Hospital, did you ever see -- well, actually I'll

10   strike that.  Are you aware that Classic lost its contract to

11   provide parking services at Stony Brook Hospital?

12   A.    Yes, sir.

13   Q.    How'd you become aware of that?

14   A.    We were informed towards the end of October, beginning of

15   November.

16   Q.    Okay.  Who informed you?

17   A.    Our manager, Richard.

18   Q.    And do you remember what he told you in that regard?

19   A.    We were told that Stony Brook was looking for other --

20   through other companies to take on a contract to work for the

21   hospital as a parking service.

22   Q.    Did he tell you that there was -- that the hospital had

23   selected a new company?

24   A.    He didn't state that they had selected one, but he -- we

25   were informed that it was possible that they weren't going to

1  receive a contract renewal.

2  Q.   Okay.  And did you ever get confirmation that that was in

3  fact the case?

4  A.   Yes, sir.

5  Q.   When did you get confirmation?

6  A.   It was just before November.  So basically that ending

7  October, he had stated that they were not getting a renewal.

8  Q.   Okay.  Did he tell you what the new company was going to

9  be?

10  A.   He did not state a name, no.

11  Q.   Okay.  Did you ever have a meeting otherwise with Classic

12  management about the transition?

13  A.   No, sir.

14  Q.   Okay.  Did you ever hear of a company called Parking

15  Systems?

16  A.   Yes, sir.

17  Q.   When was the first time you heard about Parking Systems?

18  A.   About second week of November.  We were informed that

19  there were -- the new company was walking around.  You could

20  see some gentlemen walking through the campus through the

21  parking garage at the hospital and around the main side of the

22  building.

23  Q.   Okay.  Did you notice what the gentlemen were wearing?

24  A.   They were wearing what I believe was uniforms, mostly all

25  black.

1    Q.    Did they have any logos or insignia on them?

2    A.    They had jackets.   They had a embroidery on the left side,

3    I believe.

4    Q.    Did you see the embroidery at all?

5    A.    it looked like a circle with lines on each side.

6    Q.    Did you see what the logo said?

7    A.    It was not specific on what the logo said.   They kept

8    their distance the first time they were around.

9    Q.    And how did you come to understand that these people in

10   the black jackets were from Parking Systems?

11   A.    They had a -- started to approach the boots that same week

12   they were walking around.   They came to greet everyone at the

13   booths.

14   Q.    And you saw them going into different booths?

15   A.    I was stationed at the Cancer Center, but the other booths

16   were talking in general about them walking around.

17   Q.    I see.   So you heard from coworkers that these people were

18   walking around to the booth?

19   A.    Yes, sir.

20   Q.    Did one of these gentlemen in the black jackets come to

21   the Cancer Center booth?

22   A.    Yes, sir.

23   Q.    Did you observe that?

24   A.    I'm sorry?

25   Q.    Did you see that happen?

1    A.    Yes, sir.

2    Q.    What did you see in that regard?

3    A.    They came up to the booth door and we're having a

4    conversation with one of my coworkers.

5    Q.    Which coworker?

6    A.    Francis Gil.

7    Q.    Is Francis Gil also your mother?

8    A.    Yes, sir.

9    Q.    Okay.  Did you hear anything that -- well, first of all,

10    first question is, how many of the gentlemen in black jackets

11    did you see approach Francis at the Cancer Center booth?

12    A.    I believe it was one or two people.

13    Q.    Okay.  Did you hear any of their interaction?

14    A.    No, sir.  I could not hear the conversation as I was still

15    working on my shift.

16    Q.    Okay.  And you recall that this was approximately the

17    second week of November?

18    A.    Yes, sir.  The week of the 13th.

19    Q.    How many times did you observe gentlemen in black jackets

20    who you understood to be Parking Systems representatives

21    walking around the campus?

22    A.    It was throughout that entire week.

23    Q.    Did any of them come to speak with you?

24    A.    Not me personally, no.

25    Q.    Did you ever receive a business card from a Parking

1    Systems business card?

2    A.    Yes.   Our booth did receive cards.   I'm unsure of other

3    booths, but I believe they also received the business cards.

4    Q.    Okay.   So how did you receive a card?

5    A.    Francis was given a couple of business cards.

6    Q.    Okay.   Bear with me for one moment, I'm trying to find a

7    document.   I am presenting the witness with GC Exhibit 3.

8         (General Counsel's Exhibit 3 identified)

9              MR. MILMAN:   Which one is that again?

10             MR. JACKSON:   3 Is the --

11             MR. MILMAN:   Business card?

12             MR. JACKSON:   One --

13             MR. MILMAN:   Oh, yeah.   Got it.   Okay.

14   BY MR. JACKSON:

15   Q.    Mr. Arias, do you recognize the business card depicted in

16   that document?

17   A.    Yes, sir.

18   Q.    Is that the card that Francis -- is that what -- did

19   Francis give you a copy of this card?

20   A.    Yes, sir.   This was the business card we had received.

21   Q.    Okay.   Did Francis say anything about how she got the

22   card?

23   A.    She had stated that she was handed those cards.

24   Q.    Did she say by whom?

25   A.    I wasn't given a name specifically.

1  Q.   Did Francis tell you anything about what you should do

2  with the card?

3  A.   Francis was told that --

4          MR. MAURO:  Objection.  That's going to be hearsay.

5          JUDGE GREEN:  I don't think it's being used for any

6  purpose, so overruled.

7  A.   Francis was told that there was a QR card on the back of

8  the car that we could scan to fill out an application.

9  BY MR. JACKSON:

10  Q.   Okay.  Did you do that?

11  A.   Yes, sir.

12  Q.   Okay.  So approximately, when did you scan the QR code to

13  initiate an application?

14  A.   It was approximately November 17th.

15  Q.   Okay.  And did you complete the application?

16  A.   Yes, sir.

17  Q.   Did you provide all the information called for on the

18  application?

19  A.   Yes, sir.

20  Q.   And did you submit the application?

21  A.   Yes, sir.

22  Q.   How do you know you submitted it successfully?

23  A.   At the bottom of the application page from scanning the QR

24  code was a submit button.  After you press the submit button,

25  it takes you to a new page.  It says you have successfully

1   submitted the application.

2   Q.   Do you remember if it provided any other information, like

3   a phone number or something?

4   A.   On the application?

5   Q.   No.  On that screen you said that successfully committed

6   the application.

7   A.   Phone number?  No.

8   Q.   Okay.  Did anyone from Parking Systems ever contact you in

9   response to your application?

10  A.   No, sir.

11  Q.   Did anyone from Parking Systems ever invite you to a job

12  interview?

13  A.   No, sir.

14  Q.   Did you reach out to or attempt to reach out to Parking

15  Systems in regard to your application?

16  A.   Yes, sir.

17  Q.   How'd you reach out?

18  A.   There was a phone number on one of the other business

19  cards, not this one.  I called that phone number and asked

20  about the applications that we had submitted, but the person on

21  the line did not have a response to that.

22       So we were given another phone number by that person.

23  We told call and text that number, so I texted that number.

24  Q.   Okay.  Do you -- well, first of all, you said that you

25  called the number that it's not the number that appears on GC

1    Exhibit 3 before you?

2    A.    Yes.  It's a different number.

3    Q.    Different number.  Okay.  So there was a different

4    business card that you had?

5    A.    Yes, sir.

6    Q.    Who gave you the other business card?

7    A.    It was Francis, from my knowledge, that had the other

8    business card as well.

9    Q.    Okay.  And what makes you say that it was a different

10   card?  How do you know it's a different card?

11   A.    The other business card didn't have the application

12   website on it.  It had multiple phone numbers on it.

13   Q.    Did it also have the name Robert Gust on it?

14   A.    I believe so, yes.

15   Q.    Okay.  So you called one of the numbers on the other card

16   that you had received from Francis.  Do you know who answered

17   that call?

18   A.    It was a young female that answered the phone.

19   Q.    Did you get a name?

20   A.    I could not remember her name, sir.

21   Q.    And that woman gave you a different number for you to call

22   and or text; is that right?

23   A.    Yes, sir.

24   Q.    And did you call or text that other number?

25   A.    I sent a text that same day.

1  Q.   And what did your text say?

2  A.   It was a text regarding the applications we had submitted

3  since we had not heard any response to the employees filling

4  out the applications.  I wanted to get information on what was

5  happening, whether or not they were going to accept or decline

6  the applications.

7  Q.   Did you receive a response to that text?

8  A.   No, sir.

9        MR. JACKSON:  Your Honor, could we go off the record

10  for a moment?

11        JUDGE GREEN:  Off the record.

12     (Brief Recess at 10:39 a.m./ Reconvened at 11:02 a.m.)

13  BY MR. JACKSON:

14  Q.   I've distributed to counsel for Respondent and Your Honor

15  a copy of a document I'd like marked for identification as GC

16  Exhibit 5.  Mr. Arias, do you have the document before you?

17     (General Counsel's Exhibit 5 identified)

18  A.   Yes, sir.

19  Q.   Do you recognize it?

20  A.   Yes, sir.

21  Q.   Can you tell us what it is?

22  A.   It is a picture of the text message I sent to the phone

23  number I was given.

24  Q.   Okay.  And the phone number you were given by whom?

25  A.   By the young woman I spoke to on the phone regarding the

1    applications.

2    Q.    And when did you send this text message?

3    A.    This was in Tuesday of November 21st, 2023.

4              MR. JACKSON:    I'll move for admission of GC Exhibit

5    5.

6              JUDGE GREEN:    Any objection?

7              MR. MAURO:    No objection.

8              JUDGE GREEN:    GC-5 is admitted.

9        (General Counsel's Exhibit 5 received)

10   BY MR. JACKSON:

11   Q.    Now, you stated in your text that you were informed that

12   you, along with all of your coworkers would be interviewed

13   starting November 20; is that right?

14   A.    Yes, sir.

15   Q.    How'd you get informed of that?

16   A.    Francis was informed that everybody should fill out the

17   applications from the QR code on the business card and they

18   would -- starting to bring people the following week.

19   Q.    That's what Francis told you?

20   A.    Yes, sir.

21   Q.    Okay.    And is it true that by the time you had sent this

22   text message, you had received no response?

23   A.    Yes, sir.

24   Q.    And to your knowledge, Francis had received no response?

25   A.    At the time, yes.

1  Q.   Okay.  And at the time you sent this text message, were

2  you aware that any of your coworkers from Classic had received

3  any response to applications they may have submitted?

4  A.   At that time, nobody had heard from the new company.

5  Q.   Are you aware whether or not after you sent this text

6  message, one of your coworkers received a response to his or

7  her application?

8  A.   Regarding this certain application, no.  But I was

9  informed by Francis that she had received a call.

10 Q.   Okay.  What did Francis tell you about the call she

11 received?

12 A.   She said that they wanted to speak with her and set up a

13 day and time for an interview.

14 Q.   Who wanted to speak with her?

15 A.   Parking Systems management.

16 Q.   Did Francis tell you she accepted the interview?

17 A.   Yes, sir.

18 Q.   Okay.  Did she ask you to come with her to the interview?

19 A.   Yes, sir.

20 Q.   Did Francis explain why she wanted you to go with her to

21 the interview?

22 A.   She asked me to come as an interpreter in case she needed

23 help with any translation or any understanding of what they

24 would say to her.

25 Q.   And did you agree to go with her?

1    A.    Yes, sir.

2    Q.    Do you remember when the interview was supposed to happen?

3    A.    It was on November 25th at Jake's 58 Casino.

4    Q.    What is Jake's 58 Casino?

5    A.    It's a casino.  It's placed between exits 56 and 57 on

6    495.

7    Q.    Okay.  And 495, what is that?

8    A.    A highway.

9    Q.    And is that in Long Island, New York?

10   A.    Yes, sir.

11   Q.    Did you go with Francis to Jake's 58 on November 25?

12   A.    Yes, sir.

13   Q.    What did you do immediately after you arrived at Jake's

14   58?

15   A.    When we arrived at Jake's 58, parked the car and we

16   entered through the front entrance of the casino.  We had to

17   show ID and enter through security to be able to go into the

18   building.  After we got past security, we were in the lobby but

19   the Parking Systems managers were not in the lobby of the

20   casino.

21        Francis had then called the person that contacted her

22   for the interview and were asked to go to the rear side of the

23   casino where the back entrance is.

24        So we exited through the front of the casino again

25   and walked around the building to the back of the casino where

1    Parking Systems had their booth and were operating valet

2    service there.

3    Q.   How do you know that Parking Systems was operating valet

4    parking services at Jake's 58?

5    A.   They had employees there and were also wearing Parking

6    Systems uniforms.

7    Q.   Who was wearing Parking Systems uniforms?

8    A.   Both the managers and employees.

9    Q.   Is it the same jacket you saw -- the same black jacket,

10   you saw the gentleman walking around the Stony Brook University

11   Hospital campus in?

12   A.   Yes, sir.  Black jackets with their logo embroidered on

13   the left side.

14   Q.   Okay.  Did you get a good look at the logo at Jake 58?

15   A.   Yes.  It had it -- said Parking Systems.  It had a P, it

16   was circle with the lines on sides.

17   Q.   And you said that there were employees and managers that

18   you perceived.  How could you tell the difference?

19   A.   The managers, as soon as we came around, walked up to

20   Francis and greeted her.  The rest of the employees were both

21   in the booth and attending a vehicle that was going to use

22   service.

23   Q.   Okay.  So how many of the individuals you perceived as

24   managers approached you when you came to the back area?

25   A.   Approximately, three people.

1  Q.   Were they men or women as far as you could tell?

2  A.   Men.

3  Q.   Okay.  Do you know the name of the Parking Systems?

4  Representative who called Francis.  Did she tell you who the

5  name was?

6  A.   I do not recall.

7  Q.   Okay.  Now, the three or so men that you perceived as

8  Parking Systems managers in the back of Jake's 58 did you

9  recognize any of them from Stony Brook campus walking around?

10  A.   Yes, sir.

11  Q.   All of them?

12  A.   From what I recall, I remember two people.

13  Q.   Two of the same persons who you met at Jake's 58, you also

14  saw at the Stony Brook Hospital campus?

15  A.   Yes, sir.

16  Q.   Do you know either of their names?

17  A.   Andrew and Bobby.

18       MR. MAURO:  I'm sorry, I didn't hear that last one.

19       THE WITNESS:  Andrew and Bobby.

20       MR. MAURO:  Bobby.

21  BY MR. JACKSON:

22  Q.   How do you know their names?

23  A.   We learned their names when they walked around and were

24  talking to Francis and as well as the business card.

25  Q.   Did the managers who you met in the back of Jake's 58, did

1    they introduce themselves when you met with them?

2    A.    Yes.   They all greeted us.

3    Q.    Did they say their names?

4    A.    Yeah.   They shook hands with Francis and mentioned their

5    names.   But I did not catch the third person's name.   I caught

6    Bobby and Andrew's names.

7    Q.    Okay.   So after you met with them in the back parking

8    area, what happened next?

9    A.    They wanted to go inside and get the interview started, so

10   we entered through the back entrance and had to go through a

11   security checkup as well in the rear.

12          So after we got past security, we entered and we went

13   down the staircase to a little cafe area on the right side.

14   Q.    And what'd you do once you got to the cafe area?

15   A.    We sat at an empty table.

16   Q.    After you sat down, how did the meeting begin?

17   A.    They had stated they were happy to see that she had

18   accepted the interview as they wanted to speak with her

19   personally.   They had stated that Stony Brook's Management had

20   spoke the -- spoken highly about her during her time operating

21   with Classic.

22   Q.    Okay.   Did Francis say anything in response to that?

23   A.    She said that she was looking forward to listening to what

24   they had to say in the interview.

25   Q.    Okay.   What happened next?

1  A.    They were very forward with saying that they were really

2  fond of how she was spoken about, and they wanted to have her

3  on board with the team.

4  Q.    Okay.  And did Francis say anything in response to that?

5  A.    She was happy to hear that she was well spoken for by the

6  Stony Brook management.  She was happy that they thought of her

7  that highly about how she handles work operations.

8  Q.    Okay.  Do you remember what any other -- any of the

9  managers said following that?

10  A.    They asked her if she was she was open to joining the

11  company, Parking Systems, and continue working at Stony Brook.

12  Q.    And what did Francis say?

13  A.    She wanted to -- she asked them what their plans were for

14  everybody else that she had been working with.

15  Q.    And did any of the managers respond?

16  A.    Yes.  They had stated that they were only interested in

17  her.  They had no interest in anybody else as they were

18  bringing in fresh employees along with them when they took

19  over.

20  Q.    Do you recall which manager said that?

21  A.    I don't specifically recall.  Who said that as they all

22  took turns speaking at the same time.

23  Q.    Did any of the managers explain why they weren't going to

24  hire other employees other than Francis?

25  A.    They had stated that they had no plans of hiring anybody

1  else as she was the only one spoken for.  They also stated that

2  they would give her a choice of four or five other coworkers

3  that she could bring along with her to work for the company.

4  Q.    Did Francis respond to that?

5  A.    Yes.  She said she didn't want to pick favorites out of

6  everybody that she had been working with for such a long time.

7  Q.    Okay.

8  A.    She exercised her opinion that she was not going to put

9  herself in front of others knowing that they're all going to

10  lose their jobs and she was going to, you know, continue

11  working.  She said they either hire all of us or none of us.

12  Q.    Did any of the managers respond to that?

13  A.    They were not happy with that response.  They said they

14  were not able to hire everybody.

15  Q.    Did they explain why they weren't able to hire everyone?

16  A.    Francis asked why specifically they didn't want to hire

17  anybody.  They had stated that they do not work with unions, so

18  they could not hire all the Union workers.

19  Q.    And you don't remember which manager said that?

20  A.    Not specifically.  They took turns speaking at the same

21  time.

22  Q.    What did Francis say when the managers told them that they

23  would not hire her coworkers because they were represented by

24  the Union?

25  A.    She was not happy to hear that they had a definite answer

1  as to why they didn't want to hire anybody else and just wanted

2  to hire her specifically alone.  She said that she didn't want

3  to be a part of that as it would make her seem selfish.

4  Q.   Did any of the company representatives respond to that?

5  A.   They were not specifically happy that she was declining

6  their offer, but they had stated that if she ever changed her

7  mind, she would be able to contact them and still have a spot

8  in working with the company.

9  Q.   In what language were the managers speaking during this

10 meeting?

11 A.   Everybody was speaking in English.

12 Q.   Francis as well?

13 A.   Yes, sir.

14 Q.   Did Francis ever ask for help with translation from you?

15 A.   No, sir.  I was there ready at all times, but she seemed

16 to not have any difficulty understanding or replying to their

17 questions.

18 Q.   Oh, and who was present during this meeting?

19 A.   It was Francis and I along with three managers for Parking

20 Systems.

21 Q.   Andrew, Bobby, and then the third one, whose name you

22 don't recall?

23 A.   Yes, sir.

24 Q.   Did you say anything during the meeting?

25 A.   No, sir, I was there solely as an interpreter.

1  Q.   Did you ever say anything like, as an aside to Francis

2  while you were sitting there?

3  A.   No, sir.  She didn't ask for any help understanding any of

4  the questions she was asked or answering,

5  Q.   Approximately, how long was the meeting?

6  A.   The meeting was -- it was short.  I would say

7  approximately 20, 30 minutes.

8  Q.   Okay.  How did it end?  How did the meeting end?

9  A.   The meeting ended when Francis stated that she did not

10 want to accept their offer as they would not be hiring

11 everybody that she had been working with for such a time.

12          And after they had stated that she was able to call

13 if she had changed her minds everybody stood up and said their

14 farewells.

15 Q.   And then you left the casino at that point?

16 A.   Yes, sir.

17 Q.   Did you tell any of your coworkers about what you heard

18 during this meeting?

19 A.   Me, specifically?  No.

20 Q.   Have you had any contact with anyone representing Parking

21 Systems since you left that meeting at Jake's 58?

22 A.   No, sir.

23 Q.   Have you been offered a job with Parking Systems?

24 A.   No, sir.

25 Q.   And have you worked -- strike that.  Now, after your last

1   day working at Stony Brook, did you have an opportunity to

2   return to the hospital site?

3   A.   Yes, sir.  That following week after the contract with

4   Classic had been terminated, I did drive by the main road of

5   the hospital.

6   Q.   Do you know the name of that street?

7   A.   It is 101 Nichols Road.

8   Q.   Okay.  And were you able to observe anything about the

9   parking operation inside the hospital campus from where you

10  were driving?

11  A.   Driving down the 101 Nichols Road, I could very easily see

12  both emergency and main entrance.  I could see that the boots

13  were populated with employees both inside and out, and it

14  seemed like operations had continued as usual.

15  Q.   Well, were those the same booth that had existed while you

16  were still employed there?

17  A.   Yes, sir.

18  Q.   And you said you noticed parking employees.  How do you

19  know that they were parking employees?

20  A.   They were wearing Parking Systems uniforms, black jackets

21  with the logo on the side.

22  Q.   Was that the same Parking Systems logo that you had

23  identified earlier?

24  A.   Yes.  It's -- the logo has color, I believe it's a -- oh,

25  it's outlined white, the circle with the lines on the sides,

1  and it has red on it.

2  Q.   And did you see how many workers were at each booth as you

3  drove by?

4  A.   At the time, I could see approximately five Parking

5  Systems employees.

6  Q.   At each station?

7  A.   Yes, sir.

8  Q.   And what speed were you driving down the road?

9  A.   It is a public open road.  A lot of not only students, but

10 patients, visitors and employees tend to walk down walk paths

11 that have flashing lights on the side.

12         So when somebody's crossing, you have to stop, wait

13 for everybody to cross.

14 Q.   Okay.  So can you describe the speed at which you were

15 passing through that road?

16 A.   Top speed is approximately 10 miles per hour.

17 Q.   Were you going that speed or a different speed?

18 A.   I was driving approximately 10 miles per hour coming to a

19 stop.

20 Q.   Did you observe that the operation had any significant

21 differences relative to how the operation worked when you were

22 last employed there?

23 A.   At the time, I could not see a difference in operations.

24         MR. JACKSON:  No further questions, Your Honor.

25 Thank you.  Anything from the Union?

```
 1                          DIRECT EXAMINATION
 2    BY MR. ROCCO:
 3    Q.   Just one question, sir.  Have you ever testified in a
 4    proceeding whether a representation or unfair labor practice
 5    proceeding before this National Labor Relations Board before?
 6    A.   No, sir.
 7              MR. ROCCO:  Thank you.  No further questions.
 8              JUDGE GREEN:  Is there going to be anything from the
 9    Respondent?
10              MR. MAURO:  Yeah.  So we'd -- if there was any Jencks
11    statement, we'd like to see that, take a break and review that.
12              MR. JACKSON:  So I have a -- only one Jencks
13    statement.  It's a five-page affidavit.
14              MR. MAURO:  Okay.  We want15 minutes.
15              JUDGE GREEN:  Well --
16              MR. MILMAN:  Yeah.
17              JUDGE GREEN:  Sorry.
18              MR. MILMAN:  Yeah.  Your Honor, we're going to need a
19    little more time.  This witness is taken out of order.  So we
20    anticipated that I was going to do cross for a while on the
21    first counsel for -- General Counsel's witness.
22              So, you know, there's a lot of documents that we need
23    to print or possibly print.  So we're going to need a little
24    more time than that.  I suggest that we go through lunch --
25              JUDGE GREEN:  For this cross you need?
```

1            MR. MILMAN:  Yeah.

2            JUDGE GREEN:  Okay.  Listen, it's not going to be

3    much longer than 15 minutes for a five page affidavit.  You

4    want to take -- try it, come back if you really need more time

5    --

6            MR. MILMAN:  No.  It's not -- with all due respect,

7    Your Honor, it's not only the five-page affidavit.  We have

8    certain exhibits that we have -- were allocated to do to each

9    witness.

10           We didn't anticipate this witness going on until --

11   well, until the afternoon.  I mean, I don't -- had a long cross

12   with the first witness.

13           JUDGE GREEN:  Okay.  So let me just --

14           MR. MILMAN:  You know, no good deed goes unpunished.

15   So there's no interpreter here.  So we let this witness go on,

16   you know, we have certain way that we prepare --

17           JUDGE GREEN:  Okay.  Let me just ask you what do you

18   need to do?  You need to -- you need to print stuff.

19           MR. MAURO:  Well, here's the other problem with that.

20   I still don't have access to the Internet.  I'm trying to

21   hotspot and I can't get access to my exhibits, which is a

22   problem.  That's another --

23           JUDGE GREEN:  Okay.

24           MR. MAURO:  -- structural issue I having.

25           JUDGE GREEN:  Mike, did you try going into a brow --

1   because I had to log in through like an acceptance page once I

2   logged onto the network.

3             MR. MAURO:  I'll try again.

4             MR. JACKSON:  I restarted my computer.

5             MR. MAURO:  Let me see if I can do that.

6             JUDGE GREEN:  So -- but what's going on?  I just --

7   I'm trying to understand.  You need a --

8             MR. MILMAN:  We need more than 15 minutes, Your

9   Honor, to cross this witness.

10            JUDGE GREEN:  To do what?

11            MR. MILMAN:  To go through our exhibits.  Go through

12  documents that we were preparing to eventually go --

13            JUDGE GREEN:  Okay.

14            MR. MILMAN:  -- this witness.  But we but we weren't

15  going to -- we were going to go to a remote area and do

16  printing.

17            JUDGE GREEN:  Right.

18            MR. MILMAN:  Or if there was printing here.

19            JUDGE GREEN:  Okay.

20            MR. MILMAN:  Okay.  That's what our plan was.  We

21  already canvased where place are --

22            JUDGE GREEN:  Okay.  So do you want to do that?  Do

23  you want to -- do you want to go to a --listen, we don't have

24  an interpreter, right?

25            MR. MAURO:  We do not.

1          JUDGE GREEN:  All right.  So if go and do whatever

2   you have to do, do it for both witnesses.  You'd break for an

3   hour to do that.

4          MR. MILMAN:  What time is it?  It's --

5          JUDGE GREEN:  It's 11:30.

6          MR. MILMAN:  We -- respectfully asked to come back at

7   one, Your Honor.

8          JUDGE GREEN:  Okay.

9          MR. MILMAN:  Thank you.

10          MR. MAURO:  All right.  Thank you.

11          JUDGE GREEN:  Please try and get like, whatever you

12   have to do for both witnesses though.

13          MR. MAURO:  Yeah.  We're going to go to the FedEx

14   down the block here.

15          JUDGE GREEN:  So I should say I don't think that

16   we're going to be able to have an interpreter today.

17          MR. JACKSON:  Unbelievable.

18          MR. MAURO:  So we'll be done after this witness then?

19          MR. JACKSON:  I have another English-speaking witness

20   I can call.  Or if that's unacceptable to you, we'll adjourn

21   after this week.

22          MR. MILMAN:  Call your witness.

23          JUDGE GREEN:  Okay.  Do -- wait.  So do we know who

24   that witness is?

25          MR. JACKSON:  Yeah.

1          JUDGE GREEN:  And is there -- it's you?

2          THE WITNESS:  Yeah.

3          JUDGE GREEN:  Do you need to print out anything for

4    her?

5          MR. MILMAN:  Yeah.

6          JUDGE GREEN:  Okay.  Well, do that now, please.

7          MR. MILMAN:  Yeah.  I was going to call you anyway.

8          THE WITNESS:  No worry.  I'm here.  Not going

9    nowhere.

10          JUDGE GREEN:  So off the record.

11      (Whereupon, at 11:29 a.m., a luncheon recess was taken)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

1          A F T E R N O O N   S E S S I O N

2                                              (1:09 p.m.)

3          JUDGE GREEN:  Okay.  So we're back on the record and

4   the Employer's attorney is going to have some questions for

5   you, okay?

6          MR. MAURO:  Are we on the record?

7          JUDGE GREEN:  Yes.

8                         CROSS EXAMINATION

9   BY MR. MAURO:

10  Q.   Oh, okay.  Sorry.  Good afternoon, Mr. Gil.  My name is

11  Michael Mauro, I'm counsel for the Respondent Parking Systems

12  Plus in this case.  If you could just refresh my memory, when

13  were you hired at Classic?

14  A.   I started working for Classic in the month of March, 2019.

15  Q.   Okay.  And when you started in 2019 your first posting was

16  at the Cancer Center; is that correct?

17  A.   No.  Not my first posting.  I started working main

18  entrance back in 2019.

19  Q.   Okay.  And when did you move -- at what point in time did

20  you leave being posted at the main entrance?

21  A.   I was at the main entrance up until sometime in the winter

22  of 2020.  I moved to the old building of the Cancer Center.

23  Q.   Okay.  So is it accurate that you went from the main

24  entrance and then you had a posting at the Cancer Center?  Is

25  that true?

1  A.   Yes, sir.

2  Q.   Okay.  And was your mother working at Classic prior to you

3  starting to work at Classic?

4  A.   Yes, sir.

5  Q.   Okay.  And did she -- oh, strike that.  And when she was

6  working at Stony Brook for Classic when you started in March of

7  2019, where was her posting?

8  A.   When I started back in 2019, she was posted at the main

9  entrance.

10 Q.   Okay.  So when you started working at the main entrance in

11 March, 2019, your mother was also working at the main entrance;

12 is that accurate?

13 A.   Yes, sir.

14 Q.   Okay.  And did there come a time when your mother moved to

15 a different posting at Stony Brook?

16 A.   From what I remember, she did move to a different post to

17 and from around the time.

18 Q.   Okay.  And do you know what post that was?

19 A.   She was also stationed at the Emergency Valet and the

20 employee lock.

21 Q.   Okay.  Did there come a time when she was posted to the

22 Cancer Center?

23 A.   Not before the new building was built.  After the new

24 building was built, that's when we all moved to that booth.

25 Q.   Okay.  And do you recall approximately when that happened?

1  A.    The building finished construction sometime in 2020.

2  Q.    Was your move to the Cancer Center voluntary or did -- or

3  were you told to move to that spot?

4  A.    I was stationed at the old Cancer Center because that's

5  where it was.   It was a smaller building, but they constructed

6  a new building, more modernized, bigger, a higher patient

7  capacity and they needed a booth specifically for that building

8  because it also sat next to what is known as the Children's

9  Hospital.

10 Q.    Okay.   And when your employment ended in November of 2023,

11 had you concluded your employment working at that -- the Cancer

12 Treatment Center, or were you working at some other post at the

13 end of your employment?

14 A.    At the end of my working period, I -- the Cancer Center

15 booth was the only place I was working at.

16 Q.    Okay.   Was your mother working at that booth as well?

17 A.    Yes, sir.

18 Q.    Okay.   And did you earn more tips at the Cancer Center

19 when you worked there or booth or when you were working at the

20 main entrance?

21 A.    It varied.

22 Q.    Okay.   Well, how did it vary?

23 A.    It varied on the day of the week.   There were certain days

24 that were busier than others.

25 Q.    Okay.   Was the -- to your knowledge, was the working the

1    booth at the Cancer Center -- did that give you an opportunity

2    to earn more tips there than at any other station in the

3    Classic's operation at Stony Brook?

4    A.    From my knowledge it was relatively the same, a little bit

5    more.

6    Q.    Okay.  And it's true that they -- employees at Classic at

7    Stony Brook did not pool their tips; is that correct?

8    A.    Repeat the question, I'm sorry.

9    Q.    Sure.  Is it -- it's true that the employees at Classic

10   that worked at Stony Brook did not pool their tips, meaning

11   share their tips with everybody else, correct?

12   A.    From my knowledge, every booth pooled their tips and split

13   it at the end of the -- of one of the working shifts.

14   Q.    Right.  But you didn't pool it with other booths.  Is that

15   not correct?

16   A.    No.  Each booth, each section of the Valet pooled its own

17   corresponding share.

18   Q.    All right.  Okay.  And your hours at the Cancer Center at

19   the time you were employed at that post, were -- was -- what

20   were those hours again?  From 7:30 to 4:00 p.m.; is that

21   correct?

22   A.    Yes, sir.

23   Q.    Okay.  And during the time you were at -- you were

24   stationed at the cancer booth -- I'm sorry, the Cancer Center

25   booth, did you ever -- were you ever assigned to working at

1  other booths on a temporary basis?

2  A.   Yes, sir.  Sometimes somebody would call out, so I would

3  fill in one of the other booth during that time.

4  Q.   Okay.  And did you -- were you called to another booth if

5  another booth got busy?

6  A.   Me specifically?  No.

7  Q.   Your manager, Richard, or -- I don't know how you say

8  that.  Arue?  Is that how you pronounced it?

9  A.   Arue.

10  Q.   Arue.  Was he -- he was the manager just for the Cancer

11  Center booth?

12  A.   No.  He managed the entirety of Classic -- Classic's

13  workforce that was stationed at the hospital campus.

14  Q.   Okay.  So was that one supervisor for the entire operation

15  at Stony Brook; is that correct?

16  A.   Yes, sir.

17  Q.   The primary staff lot, did you ever work that lot at all?

18  A.   I did have an opportunity to work the staff parking lot

19  once or twice.

20  Q.   Okay.  And did you earn tips when you worked at the

21  primary staff lot?

22  A.   No.  Not at the time.

23  Q.   Okay.  To your knowledge, the primary staff lot, is that a

24  lot that receives tips?  Strike that.  Is that a lot where

25  employees have worked for Classic would receive approximately

1  the same amount of tips as the other booths like Cancer Center?

2  A.   Not to my knowledge since I -- one of the times I worked

3  there, I was filling during somebody else's break.

4  Q.   Right.  And was your preference to work at the Cancer

5  Center over the primary staff lot; is that correct?

6  A.   Not necessarily.  I was placed at any post when manager

7  needed me to be.

8  Q.   Right.  But what I'm asking, was -- your preference was

9  Cancer Center, right?  Because you can earn more tips there;

10 isn't that correct?

11 A.   No.  There was no preference.

12 Q.   Okay.  So did you have a greater ability to earn tips at

13 the Cancer Center or the primary staff line?

14 A.   It felt relatively the same.

15 Q.   Okay.  So who would park in the primary staff line?

16 A.   The employees parked in the staff lot.

17 Q.   Now, you worked for Classic Valet from March, 2019 to

18 November 2023; is that correct?

19 A.   Yes, sir.

20 Q.   During that time, did you ever work at any other Classic

21 Valet company location other than Stony Brook?

22 A.   No, sir.

23 Q.   And you don't know if anyone else at Classic that worked

24 as a valet while you were there, ever worked at another Classic

25 Valet location during that time period?

1   A.    Not to my knowledge.

2   Q.    When you applied for your position at Classic, tell me

3   what exactly your -- what you did to apply for the position at

4   Classic?

5   A.    I was given an application to fill out, I handed in my

6   application to manager on poster, which is Richard.

7   Q.    Okay.  And do you recall the information that was

8   requested on that application?

9   A.    It was -- at the time it was a paper application.  They

10  included things such as first and last name, address, where you

11  live, availability time, phone number and email, things of that

12  nature.

13  Q.    If I can direct your attention to the period of October,

14  2023 and November, 2023, you had given some testimony earlier

15  today about that timeframe.

16        So if I understood your testimony, you claim that you

17  were told by Classic sometime in October of 2023 that Classic

18  Valet would no longer be providing valet services at Stony

19  Brook; is that correct?

20  A.    Yes, sir.

21  Q.    Do you remember who told you that?

22  A.    Our manager, Richard.

23  Q.    Okay.  Do you remember specifically what he said or is

24  that your best recollection?

25  A.    From what I remember, he mentioned that Stony Brook was

1    looking for a new company and that was the initial feedback we

2    received from him about the process.

3    Q.    Okay.  Had he told you at that point that the award --

4    that the -- that Classic had already lost the contract at that

5    point?

6    A.    He came back a second time and that's when he informed us

7    that Classic had lost the contract.

8    Q.    All right.  When was that second time?

9    A.    End of October, beginning of November.

10   Q.    All right.  So there was one interaction with Richard

11   where he told you that Classic may lose the job, and then the

12   second one where he told you lost the job; is that correct?

13   A.    Yes, sir.

14   Q.    Okay.  So I just want to make sure, in the first

15   interaction, he didn't tell you that Classic had already lost

16   the contract, did he?

17   A.    No, sir.

18   Q.    Okay.  Now, focusing on that second time -- second

19   interaction you had with Richard, where did this interaction

20   happen with Richard where he informed that information to you?

21   A.    It was on site.  I was on shift.

22   Q.    Okay.  And who was with you on shift?

23   A.    Everybody that I worked with at the Cancer Center.

24   Q.    All right.  And how long after the first interaction was

25   the second interaction?

1    A.    Approximately a week.

2    Q.    Okay.  And did you say anything to him in response when

3    you conveyed that information?

4    A.    At the time, I wasn't sure how to feel because I had been

5    with the company for a couple of years, so I guess I felt

6    scared that I was going to lose my job.

7    Q.    All right.  Did you ask him who was going to take over?

8    A.    Not at the time.

9    Q.    All right.  Did you ask him how he maybe could get a job

10   within the next company?

11   A.    He mentioned that I could apply with the next company in

12   hopes that they would hire me.

13   Q.    Okay.  Did he give you any information on how to apply?

14   A.    No, sir.

15   Q.    Did you ask him if he had work for -- at any other Classic

16   location?

17   A.    Not at the time, sir.

18   Q.    Okay.  Did you ever ask that question of Classic?

19   A.    What question?

20   Q.    To ask them that they could put you somewhere at some

21   other location Classic may have?

22   A.    Not at the time.

23   Q.    Never up until today?

24   A.    At the time it was difficult to go any further than the

25   distance that was the Stony Brook location.

1    Q.    I can understand.  I'm just asking a simple question.

2    From -- at any point in time up until today, have you ever

3    asked Classic to put you in another location that they operate?

4    A.    No, sir.

5    Q.    Okay.  So after this second interaction, you testified

6    that at some point you observed Parking Systems or some people

7    from Parking Systems on the Stony Brook campus.  Do you recall

8    testifying about that generally?

9    A.    Yes, sir.

10   Q.    Okay.  And you testified that you noticed these two people

11   wearing some type of logo on their shirt at Parking Systems.

12   Do you recall that?

13   A.    Yes, sir.

14   Q.    Okay.  And when -- how much time passed between being

15   informed of the -- by Richard that Classic lost the contract

16   and then the time in which you observed these individuals on

17   the Stony Brook campus?

18   A.    Approximately a week and a half.

19   Q.    Okay.  And you -- did you observe them speaking to

20   anybody?

21   A.    At the time that Parking Systems' representatives were

22   walking around initially?  No.

23   Q.    Okay.  And -- well, I'm just talking about this one

24   particular time you're -- you observed them.  So you didn't

25   observe them speaking to anybody, did you?

1   A.    When we first saw them walking around, no.

2   Q.    Okay.  When -- to -- you say when you first saw them

3   walking around.  Was there another time that you did see these

4   Parking Systems employees walking around the campus?

5   A.    They didn't initialize contact till a couple days later up

6   to a week.

7   Q.    Okay.  And when you say initialize contact, initialize

8   contact with who -- whom?

9   A.    Valet attendants at the time.

10  Q.    Okay.  And where were those valet attendants posted?

11  A.    Posted at emergency, main entrance, Cancer Center.

12  Q.    Okay.  So this was something you personally observed,

13  correct?

14  A.    From the Cancer Center booth, yes.

15  Q.    Okay.  And do you recall who the Parking Systems people

16  spoke with in terms of the cap -- Classic Valet people that you

17  observed?

18  A.    To my knowledge, they spoke with whoever was attending the

19  front, so it would be the cashier at the Cancer Center booth.

20  That would be Francis.

21  Q.    Okay.  And you testified earlier you didn't hear the

22  contents of any communication between them, correct?

23  A.    I was on the job running back and forth to the parking

24  lot, so no.

25  Q.    And you didn't have any conversation with them, did you?

1   A.    I wasn't spoken to directly.

2   Q.    Okay.  And so the -- and the previous time you saw them,

3   you didn't speak with them?

4   A.    No.  They were visualizing the campus, just walking

5   around.

6   Q.    So that first time when you saw the Parking Systems

7   people, did you understand at that time that Parking Systems

8   was just going to take over as a new valet company?

9   A.    Yes.

10  Q.    Okay.  And so now going back to the second interaction you

11  observed when the Parking Systems personnel had some type

12  communication with Francis, do you recall exact -- the exact

13  date of that interaction?

14  A.    That was approximately -- it was in the week of November

15  13.

16  Q.    Okay.  And after the communication that you observed

17  between your Francis and Parking Systems personnel, did you

18  speak with your mother about the contents of that interaction

19  between Francis and the Parking Systems' vehicle?

20  A.    She had informed everybody in the booth who they were and

21  she was also handed a stack of business cards.

22  Q.    Okay.  Did you see the Parking Systems people pass the

23  cards to your mother or was this after she was telling you

24  about this interaction?

25  A.    I was walking in into the booth as soon as they were

1  handing the cards.

2  Q.  Right.  Okay.  So your mother -- so if I understand your

3  testimony, is that after the Parking Systems people left, your

4  mother explained to the other Valets who were present that

5  Parking Systems personnel had just communicated with her, and

6  then she gave you these cards and she passed out the cards that

7  were given to her; is that correct or --

8  A.  That is correct.

9  Q.  And what else did Francis say at that time to -- while you

10 were present that all the cards were being passed out by your

11 mother?

12 A.  At that time she was informed that on the back of that

13 business card is the QR code to fill out the application for

14 Parking Systems in order to be hired.

15 Q.  Okay.  She told you to fill that QR code out?

16 A.  Yes, sir.

17 Q.  Okay.  And did she tell the other valets that were present

18 to fill it out?

19 A.  Yes, sir.

20 Q.  Okay.  And the witness -- I know if the witness has GC-3

21 in front, that's the business card that's in evidence.  I don't

22 know if you have -- do you have that before you?

23 A.  Yes, sir.

24 Q.  Was this -- this was the card, correct?

25 A.  Yes.

1   Q.   Okay.  Now, you testified there was a second card that you

2   were given that had a phone number on it.  Where did you get

3   that card from?

4   A.   The second one was a different card.  It had multiple

5   phone numbers on its -- Francis had it.

6   Q.   All right.  So the card on GC Exhibit 3, that does have a

7   phone number.  It's just for Robert Gust.  Did you ever call

8   this number?

9   A.   No.  That's not the number I dialed.

10  Q.   Okay.  The number you dialed was from a separate card; is

11  that correct?

12  A.   Yes, sir.

13  Q.   Okay.  And again, where did you get that second card from?

14  A.   Francis had the second business card.

15  Q.   All right.  And when did she give you that card?

16  A.   Approximately a day later she showed me the card.

17  Q.   She showed you the card.  Did she give it to you to keep?

18  A.   Personally, no.

19  Q.   Okay.  Do you have a copy of that card?

20  A.   No, sir.

21  Q.   Okay.  Do you know if Francis has a copy of that card?

22  A.   I'm not certain.

23  Q.   Okay.  All right.  So the QR code on the back, you

24  testified that you filled out -- you went onto the QR code and

25  you entered information after you pulled up the QR code; is

1    that correct?

2    A.    The QR code brought me to an application.

3    Q.    Right.  And you called it an application.  Why do you call

4    it an application?

5    A.    That's what it was.  It asked for basic information about

6    whoever was filling it out, name -- last name, email, days of

7    availability, and such.

8    Q.    Was it a similar application in form that you filled out

9    for Classic?

10   A.    Yes.  Only thing I did not ask for was home address

11   basically.

12   Q.    It -- okay.  Yeah.  It -- did it ask for, you know,

13   previous dates of employment of places you were employed prior

14   to working at Classic?

15   A.    No, sir.

16   Q.    Did it ask you if you were employed at Classic?

17   A.    No, sir.

18   Q.    Did it ask you what your wage rate was?

19   A.    No, sir.

20   Q.    Did they ask for references?

21   A.    No, sir.

22   Q.    Did they ask for any information regarding, you know, any

23   type of an arrest record or any other information?

24   A.    No, sir.

25             MR. MAURO:  All right.  So we'll have this marked for

1  identification Respondent's Exhibit 1.  It's just two pages.

2  You don't have two?

3        (Respondent's Exhibit 1 identified)

4            MR. JACKSON:  Thanks.

5            JUDGE GREEN:  Thank you.

6            MR. JACKSON:  Your Honor, we object to Respondent

7  going any further with this document.  This was not produced in

8  response to the subpoena.

9            JUDGE GREEN:  Is it responsive to the subpoena?

10           MR. JACKSON:  It is, Your Honor.  And I can enter the

11  subpoena in evidence if you'd like.

12  All right.  Well, it should have been produced, so --

13           MR. MAURO:  Well, yes, I know.  That's exactly the

14  issue that I raised to you yesterday.  Many of these documents

15  were not produced.

16           MR. JACKSON:  All right.  You need to be very

17  accurate when you say many of these documents need to be

18  produced because we had a conversation in the hallway where you

19  said these weren't produced and we showed that they were

20  produced.

21           You've raised an issue with two other text messages.

22  So when you say many weren't produced, that was not -- that's

23  not an accurate statement.  You have this now, you could take

24  five minutes to take a look at it.

25           JUDGE GREEN:  Okay.  So let me -- there's an

1    objection.  So this is a -- this is Mr. Arias' online

2    application?

3              MR. MAURO:  It is -- it's his online -- he -- this

4    was the information he filled out through the QR code.

5              JUDGE GREEN:  Okay.  And -- okay.  And this was

6    clearly responsive to the subpoena?

7              MR. MAURO:  Yes, Your Honor.

8              JUDGE GREEN:  I mean, do you want to take a look at

9    it and see if you actually want to object to it?  I mean, my

10   guess is you probably want this.

11             MR. JACKSON:  Well, no.  I don't object -- I -- it's

12   a -- it's kind of a principle -- an objection on principle.

13             JUDGE GREEN:  No, no.  I get that.  But as a

14   practical matter, you probably want this in, so take a look.

15             MR. MILMAN:  Was that produced today, Mike?

16             MR. JACKSON:  So, Your Honor -- so no.  I don't

17   object to the admission of the document.

18             JUDGE GREEN:  All right.  Well, we're not up to that

19   yet.  We need to like make sure that it's actually the --

20             MR. JACKSON:  Yeah.

21             JUDGE GREEN:  What he filled out.  But --

22             MR. JACKSON:  But again, General Counsel's concern,

23   and this was raised to Respondent yesterday was that we believe

24   that there are a lot more of these from Classic --

25             JUDGE GREEN:  Okay.

```
1            MR. JACKSON:  -- employees that were not produced,
2    including one from Edward Arias.
3            JUDGE GREEN:  So let's just take a minute to deal
4    with that.
5            MR. JACKSON:  Yeah.
6            JUDGE GREEN:  What do we -- what are we missing?
7            MR. MAURO:  I can address that.  Yes.  The issue was
8    raised to us yesterday.
9            JUDGE GREEN:  Okay.
10           MR. MAURO:  And we spent the night time looking for
11   everything.  We have them right now, the 45 of them.  I -- it
12   was my understanding it had been sent along and uploaded to the
13   drive for the General Counsel.  It wasn't.  We have them all
14   and we're going to do it right now.
15           JUDGE GREEN:  All right.  So why don't we -- do you
16   want a minute to look at them?
17           MR. MILMAN:  If I may share something, Matt?
18   Honestly, we -- last night, I think we produced a few thousand
19   documents.  Not overload documents, but documents.
20           I remember going over those documents because we had
21   -- we got the email from you last night, so we were going over
22   all of that.  I don't know why -- I picked the blank for it,
23   okay?
24           Because I remember seeing these extra QR, whatever it
25   was, okay?  I forgot how you labeled it.  I said, look, get it,
```

1  get it to Matt, get it to -- I saw the email.  I remember the

2  40 -- the batch of 45.

3           I thought when you spoke to Mike outside, you was

4  taking care of earlier.  It's on me.  I rarely don't supply

5  something that's asked, but it was inadvertent.  It wasn't

6  malicious or for tactical advantage.  I can tell you that.

7           JUDGE GREEN:  Okay.  So -- but let's --

8           MR. MAURO:  Yeah.

9           JUDGE GREEN:  -- send them over.

10          MR. MILMAN:  Yeah.

11          MR. MAURO:  Being done right now.

12          JUDGE GREEN:  Okay.  Do you want to look at them or

13  do you want to continue?

14          MR. JACKSON:  We can proceed with it.

15          MR. MILMAN:  Yeah.  I mean, we actually thought that

16  everybody would have their own.  There was no reason not to

17  produce it.

18          JUDGE GREEN:  Okay.  Yeah.  Well, I don't know that

19  they would -- I don't know how the employees would necessarily

20  have their own, but okay.  So let's move forward -- but let's

21  move forward with it.

22  BY MR. MAURO:

23  Q.   Yeah.  Okay.  So Mr. Arias, we have what's before you

24  marked for identification purposes Respondent's Exhibit 1.  If

25  you take a moment to review this document, let me know when

1   you've had enough time.

2   A.   Okay.

3   Q.   Okay.  Do you -- so at the top it says Friday, November

4   17th, 2023 at 2028 hours.  And it says to Bobby Gust, Parking

5   Systems.

6            The date of November 17th, 2023, which was a Friday,

7   does that refresh your recollection of when you utilized the QR

8   code to provide this information?

9   A.   Yes, sir.  As I stated, approximately the week of the

10  13th.

11  Q.   Okay.  And as we -- as you look at this document and --

12  let's share with my counsel here.  And is it accurate as you go

13  through this, these were the responses that you provided,

14  correct?

15  A.   Yes, sir.

16  Q.   Okay.  And other than -- and it's a two page document.

17  And other than what you see here in terms of these questions,

18  was there any other information requested at that time you

19  utilized this QR code?

20  A.   At that time there was no other information.

21  Q.   Right.  In other words, these were the only questions you

22  saw that you were being asked; is that correct?

23  A.   Yes, sir.

24  Q.   Was there any other information when you were -- had

25  utilized the QR code that wasn't soliciting information, but

1   just was information?

2          Any other, you know, language, any other written

3   words or content in the QR, you know, the QR code that you were

4   using?  In other words, it -- was these questions -- was there

5   anything else stated there?  Anything about the company being

6   an equal opportunity employer?

7   A.   Not from what I recall.

8   Q.   All right.  Anything about needing an -- any assistance to

9   even use the QR code because of any -- of a potential

10  disability?

11  A.   Not that I recall.

12  Q.   Okay.  Your Honor, Respondents move for the admission --

13  oh, and the other question is, does it say anywhere on here

14  that -- the word application for employment?

15  A.   Not on the application.

16  Q.   Okay.  Is there anywhere else utilizing QR code that said

17  application for employment?

18  A.   Repeat the question.  I'm sorry.

19  Q.   Yeah.  Did you see the words application for employment

20  anywhere while utilizing the QR code?

21  A.   It says it on the card, sir.  The business card says

22  apply.

23  Q.   Right.  But I'm saying the QR code itself, when you

24  utilize the QR code and, you know, you put your camera, you

25  know, phone -- your phone camera over it and it pops open the

1   website and you started populating this information, did

2   anywhere during the time after you had started using the QR

3   code say employment application or application for employment?

4   A.   Not from what I recall.

5            MR. MAURO:  Okay.  All right.  Respondents move

6   exhibit number -- Respondent Exhibit Number 1 into evidence?

7            JUDGE GREEN:   Any objection?

8            MR. JACKSON:   No objection.

9            JUDGE GREEN:   Okay.  R-1 is admitted.

10       (Respondent's Exhibit 1 received)

11  BY MR. MAURO:

12  Q.   Okay.  Mr. Arias, do you recall -- well, let me back up.

13  When you --

14  A.   Mm-hmm.

15  Q.   So again, directing your attention to a particular

16  timeframe, you testified about your mother providing cards that

17  she received from Parking Systems to you in approximately the

18  week of November 13th.  That's correct?

19  A.   Yes, sir.

20  Q.   Okay.  And you testified previous that you didn't ask

21  Classic to put you at another location you may have.  Do you

22  recall that testimony?

23  A.   Yes, sir.

24  Q.   Okay.  And around this time, that week of the 13th or

25  really any time in November, did you complain to your union

1    about -- that you weren't -- you -- what you believed to be not

2    being hired at Parking Systems?

3    A.    Can you rephrase the question?

4    Q.    Sure.  Did you complain to the Union about you believing

5    you aren't going to be hired at Parking Systems?

6    A.    Personally, no.

7    Q.    Did you ever complain to the Union about not being hired

8    at the -- by Parking Systems?

9    A.    At the time I was unsure of whether or not they were going

10   to hire anybody.

11   Q.    Right.  But at any time up until today, did you ever

12   complain to the Union about Parking Systems not hiring you?

13   A.    Yes.

14   Q.    When?

15   A.    Last week of November.

16   Q.    Okay.  And how did you do that?  Did it via an email, a

17   text, called somebody on the phone?

18   A.    We spoke in general with everybody at the booth about

19   contacting the Union.

20   Q.    Did you ask the Union to ask Classic to find you

21   employment?

22   A.    Me personally, no.

23   Q.    All right.  So Mr. Arias, do you recall giving a statement

24   -- let me back up.  Now, do you recall giving a statement to

25   the NLRB of a written confidential statement that you signed?

1   A.   Yes.

2   Q.   Okay.  Do you recall approximately when you did that?

3   A.   That was approximately middle of December.

4   Q.   Right.  And how did it come to be that you were giving a

5   statement at the NLRB?  Who asked you to give the statement?

6   A.   I was contacted by the Union to give a statement.

7   Q.   Okay.  And did you give the statement in person or were --

8   you did it like via Zoom remotely?

9   A.   It was a private video conference.

10  Q.   Okay.  And who was present on that private video

11  conference?

12  A.   It was me and Matt Jackson.

13  Q.   Okay.  Anybody else?

14  A.   No, sir.

15  Q.   All right.  And you were provided a copy of the affidavit

16  prior to you signing it?

17  A.   Yes, sir.

18  Q.   And did you review that affidavit -- did you review the

19  contents of the affidavit?

20  A.   At the time, yes.

21  Q.   All right.  And did you agree with everything that was

22  said in it?

23  A.   At the time, yes.

24  Q.   At the time.  Has there some -- something has changed

25  since the time?

1    A.    No, sir.

2    Q.    Okay.  So everything in that affidavit you wrote is

3    accurate and truthful; is that correct?

4    A.    Yes, sir.

5    Q.    Okay.  And you ultimately did sign the affidavit, correct?

6    A.    Yes, sir.

7    Q.    Okay.  And you signed it under penalty of perjury.  Do you

8    recall signing that under penalty of perjury?

9    A.    Yes, sir.

10          MR. MAURO:  Okay.  Now, I want to direct your --

11    well, we -- so if there's an additional -- if there's a copy of

12    this affidavit, I'd like to be shown to the witness for

13    impeachment purposes only.  I'll mark it for identification --

14    just for identification only.  There's no other copy than --

15          JUDGE GREEN:  That's okay.  I'll use an electronic

16    copy.

17    BY MR. MAURO:

18    Q.    All right.  Thank you.  So Mr. Arias, if you just take a

19    moment to review this document.  If you let me know you've had

20    a sufficient time to review it.

21    A.    Go ahead.

22    Q.    Okay.  So if I'll direct your attention to the last page

23    of the documents, Page 5, and there's a signature and the

24    signature block.  This is Edward Arias.  Is that your

25    signature?

1  A.  Yes, sir.

2  Q.  Okay.  So I'll direct your attention to Paragraph 3 of

3  this document, Page 2, where you state, I applied for a job

4  with Parking Systems to continue working in my job at Stony

5  Brook Hospital throughout the week beginning November 13th.

6        I saw a group of Parking Systems representatives

7  walking around to the different valet booths located at the

8  hospital and speaking with workers.

9        I spoke with the employer representatives, but I do

10  not recall any of their names.  One of them gave me a business

11  card and invited me to apply for a job with the new company.

12  The card had a QR code on the back that workers were supposed

13  to use to access an online job application.

14        So my question is, your previous testimony was you

15  did not have any interaction, you did not have any

16  communication with these Parking Systems people, and it was

17  your mother who gave you the business cards.

18        So what -- which is it?  Is what's accurate in this

19  Paragraph 3 or your testimony today about who gave you the

20  cards and not having interaction with the Parking Systems

21  people?

22  A.  At the time I had better recollection of the events that

23  had occurred.

24  Q.  At the time when?  What's the time you --

25  A.  When I was asked to do an affidavit.

1    Q.    Okay.  So the date of this document is December 14th,
2    2023; is that correct?
3    A.    Yes, sir.
4    Q.    Okay.  So your memory was better on December 14th, 2023
5    than it is now; is that correct?
6    A.    Yes, sir.
7    Q.    All right.  So your testimony today about who gave you the
8    cards is not accurate; is that correct?
9    A.    From what I recall, no.
10   Q.    Okay.
11   A.    It's not a hundred percent accurate.
12   Q.    Okay.  And your testimony about you having no interaction
13   with these employer representatives that you've given today is
14   incorrect; is that right?
15   A.    From what I remember now, no.
16   Q.    All right.  And just so I understand, so your testimony
17   today about not having any interaction with the employer
18   representatives is incorrect; is that right?
19   A.    From what I remember now.
20   Q.    Okay.  Okay.  So let's move forward now to the -- this --
21   your November 25th time you appeared at Jake's 58.  Again, it
22   was your -- it was Francis who asked you to attend with her?
23   A.    Yes, sir.
24   Q.    To translate; is that correct?
25   A.    Yes.  She asked me to be her interpreter at the time.

1   Q.   Okay.  And you didn't say anything at the meeting at all?

2   A.   No, sir.

3   Q.   Okay.  Did you record the meeting you had with your phone?

4   A.   No, sir.

5   Q.   Okay.  Did Francis record it?

6   A.   Not to my knowledge.

7   Q.   Okay.  And you are a hundred percent certain that you and

8   your mother were told that the company didn't work -- didn't

9   want to work with unions.  You recall your testimony today?  Do

10  you recall that?

11  A.   Yes, sir.

12  Q.   Okay.  And that's accurate?

13  A.   Yes sir.

14  Q.   Well, why should we believe you now when you're -- you

15  testified earlier that your recollection was better then than

16  it is today?

17  A.   What I remember now, what I testified today crossed with

18  what I testified for the affidavit back in December has not

19  changed.

20  Q.   Okay.

21  A.   That is precisely how I remember the events happening.

22  Q.   Right.  So some things you say you can remember accurately

23  and some things you just can't remember accurately; is that

24  correct?

25  A.   Based on the -- a timeline of events.

1    Q.    Okay.  Now, why didn't you accept a position for

2    employment at Parking Systems when you were invited to -- at

3    this conversation with Jake's 58?

4              MR. JACKSON:  Objection, misstates the evidence.

5              JUDGE GREEN:  Okay.  Assumes the fact not evidence?

6              MR. JACKSON:  Assumes.  That's correct.

7    BY MR. MAURO:

8    Q.    Okay.  Did your mother tell you to not take a job of

9    Parking Systems ever?

10   A.    No, sir.

11   Q.    Okay.  Did you agree with her when, according to your

12   testimony, that she said she didn't want to pick favorites by

13   taking a job at Parking Systems and a few other people?

14   A.    Yes, sir.

15   Q.    Okay.  Now, you testified before about you did a drive by

16   of the Stony Brook Hospital and you observed some Parking

17   Systems operation.  Do you recall that testimony?

18   A.    Yes sir.

19   Q.    Okay.  So did you get out of your car at any point, go and

20   interact with any Parking Systems employee?

21   A.    No, sir.

22   Q.    Did you -- and again, how fast were you driving when you

23   did the drive-by?

24   A.    It's a public open road in front of a hospital.  Max speed

25   limit is 10 miles an hour.

1    Q.    All right.  And did you stop at all?

2    A.    Yes.  To let the visitors and employees cross the

3    sidewalk.

4    Q.    Right.  Other than seeing the uniforms that the people

5    were wearing, the valets were wearing, and any -- and other

6    than seeing the booths that they were using, did you have any

7    knowledge of how Parking Systems operates the valet concession

8    at Stony Brook Hospital?

9    A.    No.  I'm unsure of how they operate internally.

10   Q.    Right.  So when you state in this affidavit, Paragraph

11   Number 9 it says -- I'll give you a moment to look at it.  Why

12   don't you go on ahead and pull up Paragraph 9 on the last page?

13   A.    Go ahead.

14   Q.    It's -- the last sentence it says, it is apparent that

15   Parking Systems has continued the valet parking operation at

16   Stony Brook Hospital in essentially the same form but with new

17   workers after the employer took over the operation from

18   Classic.  When you say essentially the same form, what is that

19   based on?

20   A.    Based on what I can see from the exterior, it's

21   essentially offering the same type of service.

22   Q.    You mean they were simply just wearing uniforms and in the

23   same boots that you used when you were at Classic?  Is there

24   anything more than their uniforms than they were standing in a

25   booth, any other knowledge about how the Parking Systems

1  operates that concession?

2  A.   No.  I do not know how they operate internally.

3  Q.   All right.  So then you don't -- no, it's not accurate to

4  say that Parking Systems is operating that facility in

5  essentially the same form; isn't that correct?

6          MR. JACKSON:  Objection, argumentative.

7          JUDGE GREEN:  Sustained.

8          MR. JACKSON:  So you have no firsthand knowledge

9  other than the uniforms and the booth; is that correct?  To say

10  that Parking Systems is basically running the same operation as

11  Classic; is that correct?

12  A.   Essentially, yes.

13  BY MR. MAURO:

14  Q.   Okay.  And going back in time to October -- well, let's go

15  back to November of 2023.  After you were informed that -- by

16  Richard that -- Classic loss of the contract, did you ever look

17  to see if there had been any job postings for valets at -- to

18  the Stony Brook Hospital valet concession?

19  A.   At the time, no.

20  Q.   Did you go on Indeed to take a look or any online job

21  board?

22  A.   At the time, no.

23  Q.   Okay.  Have you ever done that?

24  A.   Post losing my job, yes.

25  Q.   Okay.  And did you ever ask any other Classic employee in

1    November of 2023 about trying to find out whether Parking

2    Systems was hiring?

3    A.    We were informed after we got the business cards that it

4    would be proceeding interviews following the week after the

5    13th.

6    Q.    Okay.  And did you have any discussions with any other co-

7    employees about this hiring process that was going to be done

8    out in the public?  Did you talk to anybody about it?  Like,

9    hey, they're hiring.

10            Are you going to apply too?  I'm going to apply.

11   Like any conversation like that?

12   A.    We were all informed to fill out the applications

13   following interviews for the following week of the 13th.

14            MR. MAURO:  Okay.  If we could have one minute,

15   Judge.  I think it's just about done.

16            JUDGE GREEN:  Okay.  Off the record.

17       (Brief Recess at 1:56 p.m./ Reconvened at 1:56 p.m.)

18            JUDGE GREEN:  Hey, any recross?

19            MR. MAURO:  It's redirect.

20                    REDIRECT EXAMINATION

21   BY MR. JACKSON:

22   Q.    I'll do recross.  Arias, did reviewing your affidavit help

23   you remember your interactions with Parking Systems

24   representatives at the Stony Brook Hospital campus?

25   A.    Repeat the question, I'm sorry.

1  Q.   Did reviewing your affidavit just now help you refresh

2  your recollection about your interactions with Parking Systems'

3  representatives at Stony Brook campus?

4  A.   Yes, sir.

5  Q.   Okay.  Can you tell us what you remember about that now?

6  A.   They approached us greeted us primarily to -- assuming see

7  how we functioned.  But the interaction didn't last very long

8  and we were handed the business cards.

9  Q.   Okay.  How many Parking Systems' representatives

10 approached you at that time?

11 A.   Approximately two or three people.

12 Q.   Okay.  And did you recall any of the names that -- of the

13 people who approached you?

14 A.   At the time the only person's name -- whose name we got

15 was Bobby's.

16 Q.   And you said that they approached us.  Who was with you at

17 the time of this interaction?

18 A.   It was a few workers who will remain anonyms and Francis.

19 Q.   Why don't you want to name them?

20 A.   They are part of the majority of the rest of the workers

21 that ended up losing their jobs along with us.

22 Q.   Do you remember who they are, you just don't want to

23 reveal their names right now?

24 A.   I just don't want to reveal their names.

25 Q.   And when these two or three Parking Systems'

1  representatives approached you, was this at the Cancer Center

2  booth?

3  A.    Yes, sir.

4  Q.    Okay.  And do you recall what any of them said as they

5  approached?

6  A.    From what I recall, they just greeted us.  They were from

7  Parking Systems.  They were going to be taken over after

8  Classic, but the conversation was short since I was on the

9  shift.

10  Q.    You ever heard the name Michael Petruzzelli?

11  A.    No, sir.

12  Q.    Was -- sorry.  When these two or three Parking Systems'

13  representatives approached you and your coworkers at the Cancer

14  Center booth, was that the first day that you had noticed

15  Parking Systems agents at the hospital campus?

16  A.    No.  We had seen them walking around earlier in the week.

17  Q.    And somebody gave you a card at that time?

18  A.    Yes, sir.

19          MR. JACKSON:  Now, Your Honor, I have an electronic

20  document that I'd like to show the witness.  I don't have it

21  printed right now.

22          JUDGE GREEN:  Okay.  You want show it to the

23  Respondent's counsel first?

24          MR. JACKSON:  Sure.

25          MR. MAURO:  Your Honor, this might be beyond the

1   scope of redirect.

2          JUDGE GREEN:  I don't know what it is.

3          MR. JACKSON:  I'm projecting Respondent counsel with

4   my laptop computer that shows the document that I would like to

5   have marked for identification as GC Exhibit 6 when we can

6   figure out the best way to do that.

7      (General Counsel's Exhibit 6 identified)

8          MR. MILMAN:  And I'd like to just make a brief

9   proffer.  Your Honor, is that -- this is a card which counsel

10  for General Counsel asked -- inquired from this witness if he

11  knew a gentleman by the name of Michael Petruzzelli.

12         There's been absolutely no mention of a Michael

13  Petruzzelli.  He is a person who works in the organization but

14  there's been no foundation whatsoever to date on this card.

15  There's been evidence marking it to the evidence of a card as

16  Bobby Gust name on it.

17         There's been no testimony on Michael Petruzzelli

18  either to this witness nor even the first witness.  And our

19  opposition, Your Honor, is that this goes beyond the scope of

20  direct because we will have to recross this and the chain will

21  never end.  That's the whole point of keeping it within the

22  scope.

23         JUDGE GREEN:  Okay.

24         MR. MILMAN:  There no mention of Michael Petruzzelli,

25  Your Honor.  That's subsid.

```
 1              JUDGE GREEN:  It's generally related to the -- as far
 2   as I can tell, potentially to the cross examination in the
 3   sense that it sounds like you're saying this is the card that
 4   was received from --
 5              MR. JACKSON:  Well, I was going to ask the witness.
 6   That's why it's within the scope of direct.
 7              JUDGE GREEN:  All right.  So it's not beyond the
 8   scope, so --
 9              MR. MILMAN:  Thank you.  Thank you, Your Honor.
10              MR. JACKSON:  Would your right to see a copy?
11              MR. MILMAN:  Yes.  I mean, no.  Go ahead.  Yes.  I
12   could see it.
13   BY MR. JACKSON:
14   Q.   So I'm presenting the witness with a document that's in
15   evidence as the image of General Counsel Exhibit 6 on it.  Do
16   you recognize that what's depicted in this exhibit, Mr. Arias?
17   A.   Yes, sir.
18   Q.   Can you tell us what it is?
19   A.   It's a different business card that has different numbers
20   on it from the initial card we received.
21   Q.   Is this the initial card that you received?
22   A.   This is not the initial card we received.
23   Q.   Did you receive this card at any time?
24   A.   I did not.
25   Q.   You did not.  What was the -- do you remember the -- that
```

1  you testified on direct that you called a number from one of

2  the business cards you had received.  Do you remember the first

3  three digits of the number you dialed?

4  A.   It was an 800 number.

5  Q.   Does that number appear on this card?

6  A.   Yes, sir.  It does.

7          MR. MILMAN:  Objection, misleading.  Asking for the

8  first three digits of the telephone number and ask if the first

9  three digits are on that card.  That's misleading and it

10  mischaracterizes.

11          JUDGE GREEN:  I didn't hear first three digits.

12  BY MR. JACKSON:

13  Q.   No.  Is the entirety of the number you called -- can you

14  tell us whether the entirety of the number you called appears

15  on General Counsel Exhibit 6?

16  A.   The number I called, yes.

17  Q.   It does?

18  A.   Yes.

19          JUDGE GREEN:  Okay.  What's the number?

20          THE WITNESS:  It's the 800 number.  This one.

21          JUDGE GREEN:  Yeah.  So read it.

22          THE WITNESS:  It reads (800) 944-1424.

23          JUDGE GREEN:  Okay.

24  BY MR. JACKSON:

25  Q.   And as far as you recall, that phone number appeared on a

1  different card that's not General Counsel Exhibit 6 before you?

2  A.   No, sir.  The number's not on another business card.

3  Q.   Where did you get that 800 number from?

4  A.   To my knowledge, Francis received this business card.

5  Q.   I see.  Did Francis give you a copy of that business card?

6  A.   Me personally, no.  I --

7  Q.   How'd you get the 800 number?

8  A.   The number on the card, Francis told me to dial it to see

9  what was going on with the applications we had filled out.

10  Q.   So she -- so Francis gave you the number from the card on

11  GC Exhibit 6?

12  A.   She gave me the card to dial one of the few numbers on the

13  card.

14  Q.   Is that the card she gave you to dial the numbers?

15  A.   Yes, sir.

16         MR. JACKSON:  I'll move for General Counsel Exhibit

17  6's admission.

18         MR. MAURO:  Your Honor, I object to that.  It's clear

19  this witness is completely confused.  He's never seen this

20  card.  He's not the proper witness.

21         He didn't know where the number comes from.  He

22  testified earlier he didn't -- he doesn't even have a copy of

23  the other card to even compare the number.

24         JUDGE GREEN:  All right.  I mean, listen, let me just

25  ask you, have you ever seen that card before?

1          THE WITNESS:  That card specifically, yes.  It's
2    completely different from the first card because it has four
3    phone numbers.  The first card only has contact for the
4    application.
5          JUDGE GREEN:  Okay.  And -- okay.  So you can go into
6    this on recross, but I'm admitting GC-6.
7       (General Counsel's Exhibit 6 received)
8    BY MR. JACKSON:
9    Q.   When you drove by the hospital the following week after
10   you lost your job at Stony Brook, did you observe valet
11   attendants taking cars from customers?
12   A.   Yes.  As I drove by the hospital that week, operations
13   seemed to be going forward as normal.
14   Q.   Yeah.  Can you tell us specifically what you saw to make
15   you say that?
16   A.   At the time the booth seemed populated and there were
17   valets standing outside taking in cars from visitors and
18   patients.
19          JUDGE GREEN:  When you say taking in cars, what do
20   you mean by that?
21          THE WITNESS:  Servicing the cars, exchanging a ticket
22   for the service.  They were operating the -- what the job is,
23   valet.
24          JUDGE GREEN:  So they were taking -- were they -- did
25   you see them drive away with the cars?

```
 1              THE WITNESS:  Yes, sir.
 2              JUDGE GREEN:  Okay.  And parked them?
 3              THE WITNESS:  I didn't see them drive into the
 4    parking lot specifically, but they were driving cars, yes.
 5    BY MR. JACKSON:
 6    Q.   Mr. Arias, does your affidavit accurately describe what
 7    you observed and heard during the November 25 meeting at Jake's
 8    58 Casino?
 9    A.   Yes, sir.
10    Q.   And your testimony you gave on direct regarding that same
11    event is also accurate?
12    A.   Yes, sir.
13    Q.   In November of 2023, what was your understanding of how
14    you should go about applying for a job with Parking Systems?
15    A.   When we were given the business cards by the Parking
16    Systems' rep, we were told to scan and fill out the application
17    that's on the back.
18    Q.   And did the card that you personally received directly
19    from a Parking Systems' rep while at the cancer booth -- Cancer
20    Center booth --
21              MR. MAURO:  Objection, leading.
22              JUDGE GREEN:  Yeah.  I don't think we've even come
23    close to a question.
24    BY MR. JACKSON:
25    Q.   Let me start again.  The card that you received while at
```

1   the Cancer Center booth from the Parking Systems' agents who

2   approached you there, did that have a QR code?

3   A.   Yes, sir.

4   Q.   And did the agent who gave you that card tell you anything

5   about how to use the card or the QR code?

6   A.   He just said there's a QR code on the back for the

7   application.

8          MR. JACKSON:   No further questions.

9          JUDGE GREEN:   Anything from the Union?

10                  REDIRECT EXAMINATION

11  BY MR. ROCCO:

12  Q.   Just two or three brief questions.  Sir, you testified --

13  you were asked on cross examination about an affidavit that you

14  gave during the investigation?

15  A.   Yes, sir.

16  Q.   Okay.  And you testified on cross examination that the

17  facts in your affidavit concerning meeting a few Parking

18  Systems' representative during the week of November 13th, that

19  was -- that -- you testified that that was the correct version

20  of events?

21  A.   The version of the affidavit, yes.

22  Q.   Okay.  And that -- though -- your meeting with those

23  Parking Systems employees while you were on the job and running

24  to the cars, that was in mid-November 2023?  Was that in mid-

25  November 2023?

1    A.    Yes, sir.

2    Q.    Okay.  And did you give your affidavit in December, 2023?

3    A.    Yes, sir.

4    Q.    Okay.  And was your memory of events that happened in mid-

5    November, 2023, better in December, 2023 than it is as you sit

6    here today?

7    A.    Yes, sir.

8              MR. ROCCO:  No further questions

9              JUDGE GREEN:  Any recross?

10                        RECROSS EXAMINATION

11   BY MR. MAURO:

12   Q.    Yes.  Mr. Arias, so in response to a question from the

13   counsel for the General Counsel about the identity of the

14   employer representatives who allegedly interacted with you

15   personally, you said one of them was Bobby; is that correct?

16   A.    Yes, sir.

17   Q.    Okay.  And your recollection that you put into this

18   affidavit, as you just testified several times in response to

19   counsel for the Union and the General Counsel, is that this

20   affidavit is the accurate version of events, not your testimony

21   earlier today; isn't that correct?

22   A.    Yes, sir.

23   Q.    Okay.  So here, and I'll direct your attention again to

24   the affidavit in Paragraph 3, it says, I spoke with the

25   employer representatives, but I do not recall any of their

1   names.  Why isn't Bobby's name in this affidavit if you say

2   this is the accurate version of events?

3   A.   At the time I did not think that it was the same person

4   whose name was on the business card.

5   Q.   So you didn't know Bobby's name at that time?  Is that

6   what your testimony is now?

7   A.   I did not recall his name at the time that we were handed

8   the business cards.

9   Q.   So you -- right.  You now know his name way after you gave

10  this affidavit?  Is that what your testimony is?

11  A.   No.  I got his name when we went to Jake's 58 on the 25th

12  of November.

13  Q.   Right.  So when you claim that the employer representative

14  spoke to you, you claim that was before that November 25

15  meeting with Bobby; is that correct?

16  A.   Repeat the question, I'm sorry.

17  Q.   Yeah.  So this -- you claim in this affidavit that the

18  employer representative had personal interaction with you and

19  that was before that November 25 meeting, correct?

20  A.   Yes, sir.

21  Q.   Okay.  And your testimony is that you learned of Bobby for

22  the first time at the November 25 meeting, or you knew -- you

23  recognized the name from getting his card that day.  When you

24  say you got the card?

25  A.   I recognized him as a person when he approached us

1    initially to hand us the business cards.

2    Q.    Right.    So your testimony here today is that Bobby's the

3    one who handed you this card, GC-3(a) with the name Robert Gust

4    on it?

5    A.    Mm-hmm.

6    Q.    Right, that's what your testimony is?

7    A.    Yes, sir.

8    Q.    Okay.    So the guy at Jake's 58 was Bobby that you

9    recognized from previously giving you the card at the site?

10   A.    Yes, sir.

11   Q.    Okay.    So why isn't his name in this affidavit?    You had

12   his name when you got the card.    Why is it not in this

13   affidavit?

14   A.    At the time I did not remember his name.

15   Q.    But you had his card.    So how did you not -- why didn't

16   you give it to the -- include it in this submission to the

17   NLRB?

18   A.    I did not have his card personally.    I can --

19   Q.    Wait a second.    Hold on.    Your testimony here today, you

20   claim that Bobby gave you this card when you say in this

21   affidavit, the Employer rep showed up to the Stony Brook

22   Hospital, correct?

23   A.    Yes, sir.

24   Q.    Okay.    So the guy who gave you the card with his name on

25   it, you didn't include in this affidavit; isn't that correct?

1    A.    Yes.

2    Q.    You had this guy's card prior to filing -- filling out

3    this affidavit, didn't you?

4    A.    Not at the time.

5    Q.    So when did you get the card?

6    A.    When he first approached us at the booth.

7    Q.    And when -- what date was that?

8    A.    The week of November 13th.

9    Q.    Right.  And what's the date on this affidavit?  You were

10   just asked by union counsel?  It's December 14th.  So you had

11   this card the week of November 13th, a month before you filled

12   out this affidavit; isn't that correct?

13   A.    I did not have the card on my persons.

14   Q.    Oh, you didn't have it on your person, but you were in

15   possession of the card, weren't you?

16   A.    No.  Francis was in possession of the other copy of that

17   card.

18   Q.    Were you ever in possession of this card ever?

19   A.    Yes.  When we were approached on the week of the 13th.

20   Q.    Right.  So you knew Bobby Gust's name as of the 13th;

21   isn't that correct?

22   A.    At that time I did not know that he was Bobby Gust.  It

23   could have been another person's business card when he was just

24   --

25   Q.    Right.  But you claim you got a card from Bobby Gust,

1    right?  Your test -- you testified already that Bobby Gust was

2    the guy that gave you the card on the 13th, correct?

3    A.    Yes, sir.

4    Q.    Right.  And you had the card prior to filling this out a

5    month later, correct?

6    A.    Yes, sir.

7    Q.    And you met him in person on November 25th, correct?

8    A.    Yes, sir.

9    Q.    So prior to December 14th, Bobby Gust gave you this card

10   and you also met him in person prior to filling out this

11   affidavit on December 14th; isn't that correct?

12   A.    Yes, sir.

13   Q.    Okay.  And then here again you say, I don't recall any of

14   their names who gave me the card.  So only a few weeks after

15   getting the card and meeting the guy in person who said they

16   don't want to hire any union, you don't include that

17   information, that name in this affidavit; isn't that correct?

18   A.    Yes, sir.

19   Q.    And your recollection was better on December 14th than it

20   was today?  That's your testimony, correct?

21   A.    Yes, sir.

22   Q.    All right.  So you also testified to my cross examination

23   that you didn't have any interaction with anybody on the date

24   that you claimed in this affidavit because you were running

25   around to get cars.

1          So how is it that these guys approached you while you

2    were running around your cars?  Were they chasing after you

3    saying, hey Bobby, take my card.  Is that how that went?

4    A.    They stood in front of the booth as I was operating.

5    Q.    Okay.  Because you didn't, you didn't testify to that

6    earlier, right?  You didn't recall that you didn't say earlier,

7    right?

8    A.    Yes, sir.

9    Q.    Now, the Mike Petruzzelli card, what's that 1-800 number

10   you called?

11   A.    I called that --

12   Q.    No.  What are the digits?  Give me the numerics, 1-800

13   what?

14          MR. JACKSON:  Does the witness need to see General

15   Counsel Exhibit 6?

16   BY MR. ROCCO:

17   Q.    No.  He does not.  Well, what's the number?

18          JUDGE GREEN:  Okay.  No.  So the question is -- yeah.

19   Do you remember it?

20          THE WITNESS:  I do not recall the phone number at the

21   moment.

22   BY MR. ROCCO:

23   Q.    Right.  So when you were asked by the counsel for the

24   General Counsel, was the number on Petruzzelli card the same as

25   the other one?  You said, yes.  And now you just testified you

1    can't even recall the number.

2              When you testified a moment ago when you had the

3    Petruzzelli card in front of you, did you have the other card

4    in front of you to compare the two to verify it?

5    A.    I have the number on -- in my call history.

6    Q.    Right.  But you only had the number on the Petruzzelli

7    card here today; isn't correct.

8    A.    Repeat the question.

9    Q.    The only 1-800 number you have seen on any exhibit today

10   is on Petruzzelli card; isn't that correct?

11   A.    The one from my call history?

12   Q.    Yeah.  Today?

13   A.    No.

14   Q.    You had a document before you earlier the Petruzzelli

15   business card.  Do you recall that?

16   A.    Yes, sir.

17   Q.    And had a 1-800 number on it, right?

18   A.    Yes, sir.

19   Q.    Can you tell me what that 1-800 number is right now?

20   A.    I cannot recall the entire number, no.

21   Q.    Okay.  Can you recall the 1-800 number from the other card

22   that you've been testifying to?

23   A.    No, sir.

24   Q.    Okay.  So how can you say that the card -- the 1-800

25   number on the Petruzzelli card is the same one on the card from

1  the other business card?

2  A.    Because the 1-800 only appears on the second card.

3  Q.    Right.  But you've testified you don't even know what the

4  whole -- the number is from memory?

5  A.    Not from memory, sir.

6  Q.    With respect to the Parking Systems operation, you have

7  any -- you don't have any knowledge about whether the --

8  whether Parking Systems rotates valets during the day at

9  different boots, do you?

10  A.    Not from my knowledge.

11  Q.    Okay.  You don't have any knowledge about whether Parking

12  Systems uses valets from its other locations on Long Island at

13  times, to -- at Stony Brook, do you?

14  A.    Not From my knowledge.

15  Q.    Do you have any idea about whether they pooled tips among

16  all of the locations?

17  A.    Not from my knowledge.

18  Q.    Right.  Because Classic didn't pool tips amongst all, it

19  was just individual to the booths, correct?

20  A.    Yes, sir.

21  Q.    Okay.  And you have no idea whether, Parking Systems

22  utilizes valets from Stony Brook and puts them in other Long

23  Island locations?

24  A.    Not from my knowledge.

25  Q.    Okay.  And you don't have any knowledge about how parking

1   system handles higher volume cars to be valet at other

2   locations?  How it manages the staffing, do you?

3   A.    No.  I do not work for Parking Systems.

4   Q.    Right.  So when you testified to the -- on redirect to

5   counsel for General Counsel's question that you observed how

6   the Parking Systems was actually valeting the cars at a

7   particular -- was it the main entrance, was it ER or was it

8   Cancer Center?

9   A.    It was both emergency and main entrance.

10  Q.    Right.  And you said you were driving about 10 miles an

11  hour when you made this observation?

12  A.    Yes.  I was coming to a stop.

13  Q.    Okay.  And how far away were you at that time from the

14  main road to the valet spot?

15  A.    It crosses -- it's the same road that emergency and main

16  entrance is on.

17  Q.    Was it five feet, was it 10 feet, was it 50?  How far away

18  were you in the car from the valet stand?

19  A.    Approximately, 30 feet, 40 feet?

20  Q.    Right.  And did you see the ticket that were was being

21  handed out and what was written on the ticket to the people who

22  were giving a key to the attendant?

23  A.    I did not see it.

24  Q.    All right.  Did you see what they do with the keys once

25  they -- once the valet takes receipt of the key?

1   A.    No.

2   Q.    All right.  So you really don't know anything about the

3   operation at Parking Systems; isn't that correct.

4              MR. JACKSON:  Objection.

5              JUDGE GREEN:  Sustained.

6              MR. MAURO:  Your Honor, I have no further questions.

7              JUDGE GREEN:  Okay.  Last chance for redirect

8                          REDIRECT EXAMINATION

9   BY MR. JACKSON:

10  Q.    Yeah.  So, Mr. Arias, the number that you called to reach

11  out to Parking Systems, the 800 number, is that saved on your

12  phone?

13  A.    Yes, sir.

14  Q.    Have you looked at that number recently?

15  A.    Yes, sir.

16  Q.    Okay.  And what about the card I showed you on the

17  computer screen, General accountable Exhibit 6 made you think

18  it was the same number that you called call?

19  A.    It's the only 800 number that appears on either card.

20  Q.    Okay.  And how did the number that you saw relate to the

21  number you looked at on your cell phone?  That's saved on your

22  cell phone?

23  A.    That's the number that I called the week that we noticed

24  that they weren't contacting anybody.

25  Q.    How were you able to recognize that number from the

1    computer screen that I showed you?

2    A.   It was the only 800 number that I called.

3            MR. JACKSON:  Okay.  Nothing further.

4            MR. ROCCO:  No questions.

5            JUDGE GREEN:  Union?

6            MR. ROCCO:  Oh, I said no questions.  I'm sorry.

7            JUDGE GREEN:  Oh, okay.  Any re-cross?

8            MR. MAURO:  No.  Okay.

9            JUDGE GREEN:  Thank you very much.  You're free to

10   go.

11           THE WITNESS:  Thank you, Your Honor.

12           JUDGE GREEN:  So, do we have anything else for today?

13           MR. MAURO:  We do.

14           MR. JACKSON:  Yeah, I'm able to call another witness

15   if we want to proceed.

16           JUDGE GREEN:  Okay.

17           MR. JACKSON:  Thank you, Judge.

18           JUDGE GREEN:  Do that.

19           MR. JACKSON:  But I do want to address something

20   first.  So I've raised some issues with Respondent with respect

21   to the subpoena, document production in response to the General

22   Counsel's subpoena via email and both yesterday and today.

23           I think one of the issues that I raised came to light

24   during Mr. Aria's cross examination.  General Counsel had

25   subpoenaed applications for employment that Parking Systems had

1  received.

2        And it's apparent now that the production was

3  incomplete in that regard.  So I would again demand full

4  production of the applications.

5        I understand -- so I understand I just received a few

6  moments ago, a link to, I suppose, what is additional

7  subpoenaed documents.  Are you representing now that this

8  production is complete?

9        MR. MILMAN:  Tell you what, okay?  We will --

10  whatever time we break here, we will review the production.  We

11  will give you an affidavit and a certification.  We'll go over

12  it again that the production is complete.

13        We'll go over it.  And if you want my affidavit, I'll

14  give you an affidavit, we'll give you a certification.  Because

15  we don't have the custodian records here, but the documents

16  have all been received by the custodian of records.

17        He will also get on the stand when I call him as my

18  first witness, and I will ask him questions as a custodian of

19  records.  Has he gone through the documents?

20        Did he go through exhaust all avenues of collecting

21  the data?  Did he produce the data to us?  And then I'll give

22  you a certification, a lawyer's certification, that the

23  production is completed.

24        MR. JACKSON:  So I had also raised issues regarding

25  certain attachments that did not appear in the production with

1  the emails.  I want to know what --

2          MR. MILMAN:  Why --

3          MR. JACKSON:  The response was with respect to that,

4  or I see those attachments.

5          (Counsel confers with his client)

6          MR. MILMAN:  I don't know if you heard any of that,

7  so in other words, how we populate the documents for the

8  production.  And we wanted to break it -- we wanted to break it

9  down to you by files, which I think we did.  But when you

10 received it, I think you renamed the files.

11         If you could give us that name of those two

12 attachments, we will get it right at break, we can answer be

13 four o'clock.

14         MR. JACKSON:  Okay.  And I'd also raised issues

15 regarding certain text messages.  It didn't appear to be

16 complete.

17         MR. MILMAN:  I think we have an answer for that.  We

18 spoke about that at lunch.  And -- okay.  So we had discussed

19 that at break before we went to make copies that we believe

20 that they all have been produced, the sequence of the text.

21         If you can give us the renamed files, and we could

22 also look at that before four o'clock.

23         MR. JACKSON:  So you need the original name?

24         MR. MILMAN:  Huh?

25         MR. JACKSON:  You need the original name of the files

```
 1   order to find out --
 2            MR. MILMAN:  Not the original name, huh?  Yeah.  Yes.
 3            MR. JACKSON:  Yeah.  Okay.
 4            MR. MILMAN:  Yeah.  So, you know --
 5            MR. JACKSON:  Your Honor, can I take a moment off the
 6   record to find those original files?
 7            JUDGE GREEN:  Okay.  Off the record.
 8            MR. MILMAN:  Thank you, Your Honor.
 9       (Brief Recess at 2:30 p.m./ Reconvened at 2:39 p.m.)
10            JUDGE GREEN:  Okay.  So -- okay.  So why don't you
11   just state for the record that you're requesting a subpoena?
12            MR. JACKSON:  Yes, Your Honor.  Counsel for the
13   General Counsel requests the one subpoena ad testificandum.
14   Our intention is to call Robert Gust as part of the General
15   Counsel's case in chief.
16            I saw Mr. Gust here earlier this morning.  He's no
17   longer here.  And I'd like to assure his presence tomorrow so
18   that we can call.
19            JUDGE GREEN:  Okay.  So the subpoena -- you
20   authorized to issue a subpoena, just please email me the date
21   and number when it is served.
22            MR. JACKSON:  Yes, Your Honor.
23            JUDGE GREEN:  Okay.  Let's -- but -- that's fine, but
24   let's deal with that at the end.  But let's deal with
25   administrative --
```

200

```
 1              MR. MILMAN:  We have a position on that.  Yeah --
 2              JUDGE GREEN:  Let's just --
 3              MR. MILMAN:  Yeah.
 4              JUDGE GREEN:  Let's just -- I -- if we have a
 5     witness, I'd like to -- do we have a witness or is it Mr. Gust?
 6              MR. JACKSON:  No.  We have another witness --
 7              JUDGE GREEN:  Okay.
 8              MR. JACKSON:  Aside from Mr. Gust.
 9              JUDGE GREEN:  I mean, if I just, I'd like to knock
10     that person out, you know, if there's somebody hanging around.
11     Oh, wait.  It's you.  Right?  Okay.
12              THE WITNESS:  I was hanging out.
13              JUDGE GREEN:  Okay.  So that's not -- you're going to
14     be here for the duration, correct?  Yeah.  So, okay.  So that's
15     not so much an issue.
16              MR. MILMAN:  I -- excuse me.  I'd like to know if
17     we're having an interpreter here tomorrow so I can do my cross
18     examination of --
19              MR. JACKSON:  Yes.  The interpreter will be here at
20     10:00 a.m. tomorrow.
21              MR. MILMAN:  Okay.  Great.  I don't -- and as long as
22     the interpreter's here doesn't matter to me if you want me to
23     do her right away, you want to continue with your witness,
24     doesn't matter to me.  I'll leave that up to you.
25              MR. JACKSON:  Well, I'm hopeful we can finish this
```

1    witness.

2            JUDGE GREEN:  Well, that's why I'm suggesting that we

3    do that rather than some administrative stuff.

4            MR. JACKSON:  Your Honor, just bear with me for one

5    minute.

6            JUDGE GREEN:  Okay.

7            MR. JACKSON:  I'm asking -- trying to follow up on

8    your approval of the subpoena request.

9            JUDGE GREEN:  Yeah.

10           MR. MILMAN:  Yes.  We will be responding a responsive

11   motion on that.

12           JUDGE GREEN:  Okay.  Okay.  Can I just ask, what's

13   the problem with that, Mr. Milman?

14           MR. MILMAN:  Yeah.  Sure, Your Honor.  Mr. Gust is

15   one of our main witnesses, count -- and I notified Counsel that

16   he will be called as our first witness.  So me -- let me kindly

17   ask questions on cross examination on a lengthy, lengthy

18   testimony.  They had knowledge of Mr. Gust's involvement.

19           He's basically splattered all over their affidavits

20   and theory of the case.  They had ample time to submit a

21   subpoena to have him to testify.  I notified Counsel he's going

22   to be our first witness, and, you know, so that's not good

23   enough for Counsel.

24           So we are going to file a motion to quash that

25   subpoena in as much as is that, you know, we have a right to --

1  we have a right to protect our witnesses also that we will be

2  calling to put our on case in chief.

3        And it'll be -- there'll be not only duplicative

4  testimony, okay?  It'll be more than that.  He's going to have

5  to go forward.  I'm going to have to declare him as a hostile

6  witness.  I'm going to have to ask him questions, then I'll

7  have to call him again.

8        JUDGE GREEN:  He's not a hostile witness.

9        MR. MILMAN:  Sure.

10        JUDGE GREEN:  Okay.  Just let me just -- let's try

11  and be practical about this.  It's a -- it's -- he's a clearly

12  a relevant witness, right?  Because he's part of your case.  We

13  -- so we know that he's available tomorrow.

14        MR. MILMAN:  No.  I don't know if he's available.

15        JUDGE GREEN:  Okay.  Well, that's a different issue.

16  I mean, that's a different issue.  The subpoena's coming at the

17  11th hour and if he's not available, that is possible.

18        MR. MILMAN:  And the fact of the matter, Your Honor -

19  -

20        JUDGE GREEN:  Let's -- but -- I mean, I think I

21  understood you to say that if you were going to go tomorrow,

22  you intended to put him on tomorrow.

23        MR. MILMAN:  Yes.  But he would have to sit here all

24  day until we put them on.  So let's put it this way.  Our

25  position is that I don't know how long the Union representative

**Burke Court Reporting & Transcription**
**(973) 692-0660**

1  is going to testify.

2        I'll -- of course, I would like to do the cross

3  examination of the counsel for General Counsel's first witness,

4  and assuming they rest on that subject to rebuttal, I'm calling

5  him for the afternoon.  So --

6        JUDGE GREEN:  I know, but what's really your

7  objection?  You don't want him to -- you prefer -- I mean, you

8  prefer that you do the direct examination --

9        MR. MILMAN:  Of course, as any advocate would.

10        JUDGE GREEN:  Yes.  I mean, I don't know.

11        MR. MILMAN:  And look, had counsel for General

12  Counsel submitted a timely subpoena to have our key witness,

13  okay, appear, then we would've addressed the issues.  You

14  would've denied it.

15        Okay.  And he would've been here to testify, but

16  Counsel wants to throw it at the 11th hour, okay?  When they

17  could have called him on Tuesday.  They could have called him

18  this morning when they didn't have interpreter.

19        They could have called him when he had him this

20  morning, but they chose not to.  They have to live with that

21  decision.  I've already notified him that he's going to be our

22  first witness.  He's going to be our main witness.

23        JUDGE GREEN:  I understand that they're entitled to

24  put on their case.  They're, you know, they're entitled to call

25  adverse witnesses.

```
 1              MR. MILMAN:  Sure.

 2              JUDGE GREEN:  If he's a relevant witness and he's

 3    available --

 4              MR. MILMAN:  And we'll file a --

 5              JUDGE GREEN:  You know, I mean, just, you know, just

 6    kind of, you know, objecting because you don't get to ask him

 7    questions first.  I mean, you can object in that regard and

 8    file the motion, but it's not --

 9              MR. MILMAN:  I'll file -- I will file the motion.

10    And if we have to, we will file an interlocutory appeal on it.

11    It's that important to us and we have that right.  Counsel for

12    General Counsel could have set the subpoena out timely.

13    They're doing it to harass my client.

14              JUDGE GREEN:  Sure.

15              MR. MILMAN:  And harass my witness and bully my

16    witness.  You're going to have it.  But if you're going to go

17    that route, then we're going to take every avenue to protect

18    our client.

19              MR. JACKSON:  I have to address Mr. Milman's

20    misrepresentation.  It's not intent to bully.

21              MR. MILMAN:  Sure it is.

22              JUDGE GREEN:  I don't want to get into posturing on

23    the record.  It's -- I mean, you could show up for -- you can

24    show up for ULP hearing.  This happens pretty frequently.

25              MR. MILMAN:  Yes.
```

```
1              JUDGE GREEN:  Somebody happens to be in the pews and
2   you say, oh, you know, there's a that person.
3              MR. MILMAN:  I've done it many times.  I understand -
4   -
5              JUDGE GREEN:  We're going to call -- we're going to
6   call that person as an --
7              MR. MILMAN:  Sorry to interrupt you.
8              JUDGE GREEN:  -- adverse witness.
9              MR. MILMAN:  But -- right.  So --
10             JUDGE GREEN:  I mean, the fact that he's getting a
11  subpoena late in the day is not -- it's just, I'm not overly
12  sympathetic to that argument.
13             MR. MILMAN:  We planned on having --
14             JUDGE GREEN:  Quite often, there's no notice at all.
15             MR. MILMAN:  We planned on having Johnny Barron.  In
16  fact, Johnny Barron, this -- the whole issue -- Mr. Gust was
17  leaving today so Mr. Barron could come in the late afternoon
18  because we were going to prep him in the city, anticipating
19  that I'm going to call him as the next witness.  He didn't know
20  the interpreter was -- interpreter was going to be scheduled.
21             So that threw us out of whack.  So Mr. Gust is not
22  planning on being here this morning.  Mr. Barron isn't planning
23  on being here this morning because we do further prep with him.
24  So with that said, if I have to call Mr. Gust in this time and
25  the end of the day, I'm not going to delay.
```

1    He's going to be on call to get over here.  But Mr.

2    Barron has been prepared to be here today, which we told him

3    it's not necessary today because of what happened.

4    We still have to do Francis, it's going to be a long

5    cross.  So Mr. Barron is supposed to be here today.  I'm not

6    playing hide the witnesses.  That's what happened.

7    JUDGE GREEN:  Okay.  All right.

8    MR. MILMAN:  And I got witnesses to that effect all

9    of last night when we were preparing.

10    JUDGE GREEN:  Here's the truth.  I mean, here's the

11    truth.  If you don't make arrangements in advance to have a,

12    you know, a 6(11)(c) with this here, I -- like, I don't have

13    contempt -- I don't have a contempt power.

14    I can't send, send somebody out to go get them.  So,

15    you know, I mean, try to work it out.  Try to work it out so

16    that we're not, you know, arguing about something that to me

17    seems kind of a ploy more -- making more of it than it's really

18    an issue.

19    MR. MILMAN:  I agree, but it's not as if they didn't

20    know who Mr. Gust was.  I mean --

21    JUDGE GREEN:  I know.

22    MR. MILMAN:  His --

23    JUDGE GREEN:  But --

24    MR. MILMAN:  -- purport fingerprints are all over

25    their theory of the case.  And you know what?  If it was me, I

```
 1   would've called him as my first witness to make sure I got him
 2   on the stand.
 3               JUDGE GREEN:  Okay.  So -- did you want to say
 4   something?
 5               MR. JACKSON:  I would only say that the need to call
 6   Mr. Augusta King apparent after review of Respondent's document
 7   production.
 8               JUDGE GREEN:  Okay.
 9               MR. MILMAN:  Really?
10               JUDGE GREEN:  All right.  So do we want to move on to
11   the next witness?
12               MR. JACKSON:  Yes, sir.
13               JUDGE GREEN:  Okay.
14               MR. JACKSON:  One moment, Your Honor.
15               JUDGE GREEN:  Okay.  So, just state the witness that
16   you're calling.
17               MR. JACKSON:  Yeah.  General Counsel calls Ayse
18   Porsuk.
19               JUDGE GREEN:  Okay.  Thank you very much.  How do you
20   spell that last name?
21               THE WITNESS:  P-O-R-S-U-K.
22               JUDGE GREEN:  Thank you very much.
23               THE WITNESS:  Mm-hmm.
24               JUDGE GREEN:  Okay.  I'm going to ask you to do that
25   again later, but that's okay.  Yes, please raise your right
```

1    hand.

2    Whereupon,

3                          AYSE PORSUK,

4    was called as a witness having been first duly sworn, was

5    examined and testified as follows:

6              JUDGE GREEN:  Okay.  Thank you very much.  So I know

7    you just spelled your last name, but please state and spell

8    your name for the record.

9              THE WITNESS:  My first name is A-Y-S-E, last name is

10   P-O-R-S-U-K.  Ayse Porsuk.

11             JUDGE GREEN:  Okay.  Thank you.  And the Government

12   attorney's going to have some questions for you.

13                          DIRECT EXAMINATION

14   BY MR. JACKSON:

15   Q.   Good afternoon, Ms. Porsuk.  Are you currently employed?

16   A.   Yes.

17   Q.   Who is your employer?

18   A.   RWDSC Local 1102.

19   Q.   What is your position with the Union?

20   A.   Business agent.

21   Q.   How long approximately have you been in that position?

22   A.   Since '17, 2017.

23   Q.   And what are your job duties and responsibilities as a

24   business agent?

25   A.   I'm responsible to my area servicing, helping members

1  daily basis, and prepare the contract, communicating with daily

2  basis each day, what they need, any help servicing them (sic).

3  Q.    Are you familiar with an employer called Classic Valet

4  Parking?

5  A.    I am.

6  Q.    Did Local 1102 have a bargaining relationship with Classic

7  at some point?

8  A.    Yes.

9  Q.    Does your job as a business agent with the Union involved

10  working with employees of Classic?

11  A.    Yes.

12  Q.    Were you also involved in managing the bargaining

13  relationship between Classic and the Union?

14  A.    Yes.

15  Q.    For how long have you been working with employees of

16  Classic?

17  A.    Since '20 -- as a business agent, '20 -- since 2017, but I

18  have prior to '20 -- since 2015.

19  Q.    Oh, did you work for the Union prior to becoming a

20  business agent?

21  A.    Not directly.  I was the shop steward.

22  Q.    And did you help organize the bargaining unit?

23  A.    I did.

24  Q.    What was your role in organizing the bargaining unit?

25  A.    Communicating the workers.

1    Q.   Were you still working with Classic employees in November

2    of 2023?

3    A.   During the November 2023 last day -- oh, November 30.

4    Yes.

5    Q.   Did Local 1102 have a collective bargaining contract in

6    effect with Classic in November, 2023?

7    A.   Correct.  Yes.

8              JUDGE GREEN:  Thank you.

9    BY MR. JACKSON:

10   Q.   I ask to have marked for identification as General Counsel

11   Exhibit 7.  Handing the document to the witness.  Ms. Porsuk,

12   let me know when you've had a chance to look it over.

13        (General Counsel's Exhibit 7 identified)

14   A.   Okay.  I mean, I prep the contract.

15   Q.   Oh, so do -- can you tell us what the document is?  GC-7?

16   A.   This is a collective bargaining agreement between Employer

17   and Local 1102.

18   Q.   Which Employer?

19   A.   Classic Valet.

20   Q.   Okay.  And did you help negotiate this contract?

21   A.   I did.

22   Q.   Okay.  And did this document govern the terms and

23   conditions of employment for parking employees of Classic at

24   Stony Brook Hospital?

25   A.   Yes.

```
1           MR. JACKSON:  I'll move to admit GC Exhibit 7.

2           JUDGE GREEN:  Any objection?

3           MR. MILMAN:  No objection.

4           JUDGE GREEN:  GC-7 is admitted.

5       (General Counsel's Exhibit 7 received)

6   BY MR. JACKSON:

7   Q.   Did Local 1102 and Classic have any other agreements or

8   side agreements that supplemented the terms of this collective

9   bargaining agreement?

10  A.   No.

11  Q.   Were there any other documents that governed terms and

12  conditions of employment for parking employees of Classic at

13  Stony Brook?

14  A.   Beside this?  No.

15  Q.   Yeah.  Was this the first collective bargaining contract

16  entered between Classic and the Union, or were there prior

17  agreements?

18  A.   This is the -- no.  This is -- prior this, there's three

19  other different -- additional, different contracts.

20  Q.   There were three prior agreements before this?

21  A.   Yes.

22  Q.   Did Local 1102 maintain a list of each Classic employee in

23  the bargaining unit you represent?

24  A.   Yes.

25  Q.   Are you familiar with each of the employees in the unit?
```

```
 1    A.    I sure do, yes.

 2    Q.    Okay.  Do you recall how many there were in the unit as of

 3    November 30th, 2020?

 4    A.    34.

 5              MR. MILMAN:  Thank you.

 6              MR. JACKSON:  I ask to have marked for identification

 7    General Counsel Exhibit 8.

 8         (General Counsel's Exhibit 8 identified)

 9    A.    This a three page thing?

10    BY MR. JACKSON:

11    Q.    Yes.  It is a three page document.  And the paper I handed

12    you is double sided.  Do you recognize the document?  GC

13    Exhibit 8?

14    A.    I do.

15    Q.    Can you tell us what it is?

16    A.    This is our general member listing.  I do receive every

17    month part of my territory.

18    Q.    So who do you receive the list from?

19    A.    An internally -- our ITC, Technology Department usually

20    send it to us.

21    Q.    You said ITC?

22    A.    Yes.

23    Q.    Do you know what that stands for?

24    A.    Technology Internal.

25    Q.    Okay.
```

1    A.    Technician.    Internal Technician, ITC.

2    Q.    Okay.    So do you see at the top right corner actually of

3    each page of the exhibit, the words printed: 12/4/2023 appears.

4    Do you see that?    Top right corner, it says printed: 12/4/2023.

5    Do you see that?

6    A.    Yes.

7    Q.    Okay.    Can you tell us what that signifies?

8    A.    This is December -- printed for December 4th, 2023.

9    Q.    So what does that signify about this document?

10   A.    It's establishes how many members we have.

11   Q.    Okay.    Can you tell us when this document was printed?

12   A.    When they were printed?

13   Q.    Yeah.

14   A.    December 4th, 2023.

15   Q.    Did you print this on December 4th, 2023?

16   A.    I don't see my name.    Usually if I print it, usually my

17   name on it.

18   Q.    Okay.

19   A.    Usually, I --

20   Q.    So can you tell us whether you did or not?

21   A.    I did.    I do.

22   Q.    You did?

23   A.    I did.

24   Q.    Okay.

25   A.    But for some reason, my name is missing up here.

1    Q.    Okay.  And does the document list the name of each

2    bargaining unit representative -- excuse me.  Each bargaining

3    unit employee at Classic as of November 30, 2023?

4    A.    Yes.

5    Q.    Okay.  So there appears to be some information redacted in

6    the document.  Can you tell us what information has been

7    redacted?

8    A.    So the information that it's protected by their personal

9    phone address and union ID number and phone number.

10    Q.    Do you know who made the redactions?

11    A.    I do not know.

12    Q.    You didn't make them yourself?

13    A.    No.

14    Q.    Okay.  Yeah.  You were going to say something?

15    A.    Yeah.  When I sent it out to, it was maybe our technician

16    came to my email, then I shared that a document with you.

17          MR. MILMAN:  Sorry, can you repeat that?  I didn't

18    understand.

19          THE WITNESS:  I --

20          MR. MILMAN:  Your English is great.  I just didn't

21    hear it through the microphone.

22    A.    Well, are you talking I was whispering?  Excuse me.  Could

23    you please repeat your question?

24    BY MR. JACKSON:

25    Q.    I don't think there was one pending.  But here's my --

1              MR. MILMAN:  What was the answer?  I just didn't hear

2      the answer.

3              THE WITNESS:  Answer was --

4              MR. MILMAN:  Sure.

5              THE WITNESS:  -- I did not make this because I --

6      when we request the documentation, it comes from our Technology

7      Department, they usually do that for us.  It came to my email,

8      then I shared that information to NLRB.

9              JUDGE GREEN:  When you see that, you mean do that for

10     us?  You mean the redactions?

11             THE WITNESS:  Redaction.  Correct.

12             MR. MILMAN:  Okay.

13             JUDGE GREEN:  Okay.  Okay.

14             THE WITNESS:  Thank you.  To protect privacy.

15             JUDGE GREEN:  Understood.

16     BY MR. JACKSON:

17     Q.   How did the Union obtain the information that appears on

18     the list?

19     A.   It generally -- it generated on our system automatically.

20     Q.   Yeah.  But how does the system receive the information

21     that will ultimately appear on the list?

22     A.   All -- you mean all the names?

23     Q.   Names, the addresses, the last --

24     A.   There is a - there is a process to do this kind of, you

25     know, generate the member listing.  When the place being

1    organized and member listing, we create.  We go in there, I

2    introduce myself, collect some information, do the paperwork.

3          I do bring it in to do our billing department, gain

4    it in, make sure everything is secure and they do the process.

5    When they enter it, our systems generate and time to time, and

6    they come to us after that.

7    Q.   And how do you obtain a member's name, address, and other

8    contact information?

9    A.   I go there, see them individually, introduce myself, and

10   talk to them.  I give them all the paper need -- if they needed

11   to fill it out.

12   Q.   Okay.  And what do you do with the information you receive

13   after they fill it out?

14   A.   I bring it in our office and deliver it, you know, Billing

15   Department, and they do the rest.

16   Q.   I get it.  Got it, got it.  How do you know when or how

17   did you know when Classic hired a new employee?

18   A.   I have shop steward in there.  Shop steward usually tell

19   me there's a new employee or during the visit, I do, you know,

20   I've been told with the other member usually that we have a new

21   people, new person.

22          I say I would like to meet with you.  I go, we sit

23   down, talk to them, go over what is their, you know, step,

24   whether you not -- what's the contract for, what they will be

25   receiving from their contract, what is it their union benefits,

1    et cetera.

2            Then if they need to fill up to the application or

3    any paperwork necessary, I provide them.  I collect the

4    information, bring to our office.

5    Q.   And what about, if one of the employees in your bargaining

6    unit leaves the job, how do you become aware of that

7    A.   Employer send us to the unit information such a person,

8    such a date, no longer in the bargaining unit.

9    Q.   Okay.  So Classic would send you that information?

10   A.   Correct.

11   Q.   And what would you do with that information?  What would

12   you do with that?

13   A.   It's coming to the office, we mark down as a person who

14   left the job or leave the premises, move on to the other.

15   Q.   And how does that translate to what appears on the list?

16   A.   It's not going to be on the list.  They will be dismissed

17   from the list.

18   Q.   And was this list, GC Exhibit 8, was it up to date as of

19   November 30th, 2023?

20   A.   Yes.

21           MR. JACKSON:  I'll move for the admission of GC-8.

22           JUDGE GREEN:  Any objection?

23           MR. MILMAN:  I'd like to voir dire briefly.

24           JUDGE GREEN:  Okay.

25                         VOIR DIRE

1  BY MR. MILMAN:

2  Q.   So, Ms. Porsuk, you're a business agent.  That's who you

3  testified to, correct?

4  A.   Yes.

5  Q.   Right.  And as a business agent, you don't generate these

6  administrative documents, right?

7  A.   Correct.

8  Q.   Someone in the administrative office does it, correct?

9  A.   Correct.

10  Q.   And this is what we would call in our labor relations

11  world, sort of a remittance form?

12  A.   I'm not sure what you call them.  We have all different

13  department.  They have a different name.

14  Q.   Right.  Okay.  And this was generated, was it not, for

15  counsel for General Counsel list?

16  A.   No.

17  Q.   No?  How was --

18  A.   That's my -- one of the -- part of my -- one of the --

19  part of one of the -- part of my territory list.

20  Q.   Is a list?

21  A.   Member listing.

22  Q.   So let me ask you something.  It says -- let's say

23  someone, it says remitted dues, like last dues remitted

24  November 1st, 2023, right?  And let's say somebody quit on

25  November 15th, 2023, would that person be deleted from this

1  list?

2  A.    Correct.

3  Q.    They would?

4  A.    Yes.

5  Q.    Okay.  Is it your position that since the dues were --

6  since the dues were remitted, for example, on November 1st,

7  2023, is it your position from November 1st, 2023 up through

8  November 30th, the last day that employees worked for the

9  signatory employer, Classic, that no employee quit or was

10 discharged?

11         MR. JACKSON:  Objection.  Be beyond the scope of voir

12 dire.

13         MR. MILMAN:  No.  It goes to authenticate the

14 document.  If this is the proper witness, lay the foundation.

15         MR. JACKSON:  Overruled.

16         THE WITNESS:  I'm sorry, the printed date --

17         JUDGE GREEN:  Just if there's an objection, don't

18 respond.  If I overrule the objection, then you can respond.

19 If I sustain the objection --

20         THE WITNESS:  Thank you.

21         JUDGE GREEN:  -- then don't respond.  So -- okay.  So

22 the objection is overruled.  So ask the question.

23 BY MR. MILMAN:

24 Q.    Yes.  So, my question is, I understand it says last dues

25 and then underneath that it says last help.  Is it fair to say

1   that there's no help numbers or comments because there's no

2   help in contributions being paid to the Union, right?

3   A.   Correct.

4   Q.   Okay.  So focusing on the last dues, 11/1/2023, okay?  Are

5   dues paid the month before or the month after?

6   A.   Depend on the person when they hired.

7   Q.   Well, isn't it true that the company remits the dues to

8   you?  It's a dues checkup course.

9   A.   That's Billing Department.  They do generate it.  I'm not

10  --

11  Q.   Okay.  So you're not sure of how the dues are actually

12  remitted?

13  A.   I'm not telling you.  I'm not sure.  As the billing

14  department, they are fully educated how they bill what they

15  bill.

16  Q.   I'm sure they are.  But are you aware of how they bill?

17  A.   No.

18  Q.   Okay.  So you're unsure of that line item, what that

19  represents, correct?  Just to any certainty, correct?

20  A.   But all I know I'm telling you to just, you know?

21  Q.   I can read it like you could read it, I understand.  But

22  you don't really know what 11/1/2023 signifies.  You don't know

23  if dues are paid in October for November or they're paid in

24  December for November, correct?

25  A.   That's billing -- no.  That's billing to what department

1    responsible.  Yes.  That's correct.

2    Q.    Right.

3    A.    I do not know, that's Billing Department.

4    Q.    But what this document purports to show is probative

5    evidence that as of November 1st, 2023, dues were paid for this

6    individual, therefore possibly to conclude that they were still

7    employed.

8            But you really don't know from this document that it

9    represents still employed because you didn't input the data

10   into this document; isn't that correct?

11   A.    I did not put the document in.

12   Q.    Right.

13   A.    The data, yes, that's correct.  But I know for sure they

14   were employed until November 31st.

15   Q.    How do you know for sure because of the print date?

16   A.    Printing?

17   Q.    No.  The --

18   A.    I was at -- I was at the location physically by myself.

19           JUDGE GREEN:  Okay.  So that now, we're beyond the

20   scope of --

21           MR. MILMAN:  Yeah.

22           JUDGE GREEN:  -- voir dire.  But let me just ask a

23   question because -- let me just ask.

24           MR. JACKSON:  Mm-hmm.

25           JUDGE GREEN:  Do we not have some kind of payroll

```
 1   record from Classic?  Is that something that we're not getting?

 2             MR. MILMAN:  I was subpoenaed.  It's in my subpoena.

 3             JUDGE GREEN:  Okay.  That's good.  But -- the GC did

 4   not subpoena that.

 5             MR. JACKSON:  That's correct, Your Honor.

 6             JUDGE GREEN:  Okay.

 7             MR. JACKSON:  We were intent to rely --

 8             JUDGE GREEN:  I mean --

 9             MR. JACKSON:  -- on this list and this witness's

10   testimony to establish the --

11             JUDGE GREEN:  Okay.

12             MR. JACKSON:  -- identities of the --

13             JUDGE GREEN:  It's not -- I'm going to admit.  I'm

14   going to admit for what it's worth.  But it's not that great

15   for what you seem to want it for, which is to establish that

16   these people were employed for a lot of the reasons that -- the

17   questions that were being asked.

18             It's -- some don't have a dues date.  It doesn't have

19   a -- it doesn't have a help contribution.  I mean, what you're

20   looking for, right?  What you want to show really is that the

21   Union was getting a -- some sort of contribution.

22             It's some dues, some dues check off or a help

23   contribution in November, right?  That's what you want to show.

24        (General Counsel's Exhibit 8 received)

25             MR. JACKSON:  No, Your Honor, I'm not interested in
```

1   any monies received by the Union.  The purpose of GC Exhibit 8

2   is to identify the discriminatees listed in the complaint.

3            JUDGE GREEN:  That doesn't -- okay.  But it doesn't -

4   - it really doesn't show that they were employed.

5            MR. MILMAN:  And may I add one thing?  So --

6            JUDGE GREEN:  Okay.  She can testify.

7            MR. MILMAN:  Exactly.  This witness had testified she

8   knows from her own knowledge this document, there -- there is

9   somebody in administrative that could -- who actually did input

10  this data that could testify, correct, Ms. Porsuk?

11           THE WITNESS:  I can bring you that document.

12           MR. MILMAN:  No.  What I'm saying is there's somebody

13  in the Union --

14           MR. JACKSON:  Your Honor, you already rule this is

15  beyond the scope of voir dire.

16           JUDGE GREEN:  Yeah.

17           MR. JACKSON:  So let's --

18           JUDGE GREEN:  So listen, I've heard enough on the

19  document.  Like I understand its deficiencies.  I think it's

20  not the greatest, really.  If you are trying to prove -- if you

21  are trying to prove that these people were employed by Classic,

22  this is a fairly roundabout way of getting it.

23           The way to get it is the payroll records.  That is

24  the way to get it.  I'm glad that the Respondent subpoenaed it,

25  but I don't really understand why the GC did not.  Relying on a

1  union -- this is basically a membership as far as I can tell.

2        It's a membership list.  So they're union members.

3  That doesn't mean that they were employed by Classic.

4  BY MR. JACKSON:

5  Q.  Okay.  Ms. Porsuk, are you familiar with Irene Agyris?

6  A.  I am.

7  Q.  Did she work at Classic as of November 30th, 2023?

8  A.  Yes, she did.

9  Q.  How do you know that?

10  A.  I see her physically.

11  Q.  Do you know Virgilio Almonte Cepeda?

12  A.  Yes.

13  Q.  Okay.  Was he an employee of Classic as of November 30th,

14  2023?

15  A.  Yes.

16  Q.  How do you know that?

17  A.  I see him physically during my visit.

18  Q.  Okay.  And what did you see -- oh, with Irene too, what

19  did you see her doing?

20  A.  They were -- was parking car.  They were around.  I was

21  walking around, I see every location.

22  Q.  Okay.  Same with Virgilio?  Same with Virgilio Almonte

23  Cepeda?

24  A.  Yes.

25  Q.  Okay.  What about Juan Alvarado Tobar?

1   A.    Juan Alvarado Tobar were -- I believe I did not see him

2   because he was working at night.

3   Q.    Okay.  So you never saw him directly working at --

4   A.    I did.

5   Q.    You did?

6   A.    I did.  I mean, not that day.

7   Q.    Yeah.  I'm --

8   A.    Some other day, yes.  I see everyone of them during the

9   November I was there every week.  I see individual, everyone on

10  -- during every, you know, week.  I see all different shift.

11  Everyone working out there.

12  Q.    So you saw Mr. Alvarado Tobar working at Stony Brook

13  University?

14  A.    I did.

15  Q.    During November, 2023, did you see Jose --

16         JUDGE GREEN:  What date?  November.

17         MR. JACKSON:  During November, 2023.

18         JUDGE GREEN:  Okay.  I'm sorry to interrupt you, but

19  I just don't want to get bogged down on this.  You could ask --

20  you could ask whether you saw all the people named on this list

21  working at the site.

22         MR. MILMAN:  On November 30th.

23  BY MR. JACKSON:

24  Q.    At some point during November of 2023, did you see each

25  person listed on this GC Exhibit 8 working at Classic Valet?

1    A.   I see majority people -- during the November period, I see

2    all 34 people, all different shifts.

3    Q.   So is your testimony that you have -- at some point during

4    November, 2023, you saw each person listed on this GC Exhibit 8

5    working for Classic Valet at Stony Brook?

6    A.   I did.

7    Q.   Did you receive information from Classic at any point

8    during November '23 that anyone listed on GC Exhibit 8 was no

9    longer employed?

10   A.   Our Billing Department did, yes.  They inform us that

11   December -- November 30th, no longer a Classic Valet employee.

12   Q.   Yeah.  I'm asking a different question.  I'm ask -- so you

13   testified earlier that Classic would notify you whenever an

14   employee left their employ; is that right?

15   A.   Yes.

16   Q.   Okay.  During November of 2023, did Classic notify you in

17   that manner that any person on this list had left their employ?

18   A.   Yes.

19   Q.   How did -- what did they notify you of?

20   A.   They sent they -- us information saying that they lost the

21   -- there's no longer -- they will be no longer in the Stony

22   Brook.

23   Q.   So they told you that everybody on this list was no longer

24   on -- their employee?

25   A.   As a -- from Classic Valet, yes.

1  Q.   All right.  And prior -- and that was effective November -

2  - well, effective December 1st.

3  A.   December 1st.

4  Q.   Right.  Before that did -- during November, did any -- did

5  Classic notify you that any of these individual people by name

6  was not no longer in their employ?

7  A.   No.

8  Q.   Okay.  Do you see a column that says ORIG DOH?

9  A.   Original date of hire.

10  Q.   Yeah.  What does that signify?

11  A.   If anyone left and then we come back, the rehire it stay

12  that original date of hire.

13  Q.   Okay.  So in that column, there are often -- there always

14  are two sets of dates.  What does the date on top reference?

15  A.   Yeah.  Reference that original date of hire.

16  Q.   What is the date below it referenced?

17  A.   Rehire.

18  Q.   Okay.  And how did you know when someone had been rehired?

19  A.   We do have a original date of hire.  That's what like when

20  we receive -- when we see the new person.

21  Q.   Yeah.  How did you know if someone had been rehired?

22  A.   We do have information in our office.  We have a record of

23  those people when they hired first.

24  Q.   Okay.  I'm not talking about original date of hire.  I'm

25  talking about -- you said that the second number in that column

1    reference -- represents the date when the named employee was

2    rehired, right?

3    A.    Yeah.

4    Q.    How did you know when the employee was rehired?

5    A.    From the record of what we have.  So we do have -- if the

6    person is came that if I see him on the list and Mrs.  Irene

7    was rehired then I would see her, you know, her name -- her

8    original date of hire, and her last, you know, new hire.

9    Q.    Yeah.  How did you know when she got rehired?  How did you

10   know that Irene Agyris was rehired by a Classic on January 9th,

11   2023?

12   A.    I will discover during my visit.

13   Q.    I see.

14   A.    And a new hire employee and a new -- any employee that

15   came back.

16   Q.    So did you ask her when she came back?

17   A.    Yes.

18   Q.    And her response was January 29th, 2023?

19   A.    She said that she come -- she came back January.

20   Q.    And is that how you obtain the rehire date in similar

21   fashion for each person on the list?

22   A.    I usually give them new application to -- if they -- if

23   there was any change from home address or any other changes,

24   their privacy and they will put their original date, I mean, or

25   new hire date.

1    Q.    So when an employee got rehired, you asked them to fill
2    out --
3    A.    Refill out the application.
4    Q.    I see.  And do you maintain this list in the ordinary
5    course of your business?
6    A.    I'm sorry?
7    Q.    Do you maintain this list as part of the ordinary course
8    of your business?
9    A.    Not right now.  I had it on up on, November 30th, 2023.
10   Q.    Yeah.  At that time, were you maintaining this list --
11   A.    Yes.
12   Q.    -- as the ordinary course of your business?  Now, at some
13   point during 2023, did you learn that Classic was losing its
14   contract to provide parking services at Stony Brook?
15   A.    Yes.
16   Q.    Okay.  How did you learn that?
17   A.    We were informed by Employer and also member reached out
18   to me.
19   Q.    Do you recall when you learned that?
20   A.    I would say mid-October on about.
21   Q.    Did you at some point learn that a company named Parking
22   Systems was going to be taking over the operation?
23   A.    Yes.
24   Q.    When did you learn that?
25   A.    Mid October.

1    Q.    Okay.  And how did you learn?

2    A.    By members, our members.

3    Q.    Did the Union contact Parking Systems and request that the

4    company recognize and bargain with the Union?

5    A.    I believe our attorney did.

6    Q.    Okay.  Did you ever see that communication?

7    A.    I was a part of it.  Our attorneys was compliant with

8    that.

9    Q.    Okay.  So you did receive that communication?

10   A.    I was part of that communication.  I did.

11   Q.    I am asking to be marked for identification General

12   Counsel Exhibit 9.  So Ms. Porsuk, the document I presented to

13   you is six pages, double sided.  Let me know when you've had a

14   chance to look it over.

15         (General Counsel's Exhibit 9 identified)

16   A.    Okay.

17   Q.    What is this document?

18   A.    This is from our attorney office and reaching out to new

19   company, introducing himself within current CBA and assumption

20   agreement.

21   Q.    And who is Matthew P Rocco?

22   A.    Matt Rocco is our attorney from Rocco Law firm.

23   Q.    And do you know who Michael Petruzzelli is?

24   A.    I don't know him personally.  I know him by name.  I

25   receive, images, text, his copy of his business card.

1    Q.   Who'd you receive a copy of his business card from?

2    A.   Mrs.  Gils.  Francis Gils.

3    Q.   Francis Gil Reyes?

4    A.   Yes.

5    Q.   Do you recall approximately when?

6    A.   October 18-ish?  Late October.  I don't want to give a

7    date.  On or about October.

8    Q.   Did Francis tell you how she got that card?

9    A.   She was handing -- she was given --

10            MR. MILMAN:  Objection, hearsay.

11            MR. JACKSON:  It's not being offered for the proof of

12   the matter asserted.  I'm asking --

13            MR. MILMAN:  Then ask questions about the document.

14   You're going far afield of the document.

15            JUDGE GREEN:  Okay.  Overruled.

16            MR. MILMAN:  So I have a standing objection that --

17   on this, Your Honor, that this is complete hearsay testimony.

18   Has nothing to do with the document before her.  Linked to

19   trying to lay authenticity and foundation as this -- the proper

20   witness.  This --

21            JUDGE GREEN:  We're talking about GC-9?

22            MR. MILMAN:  Yeah.  10, GC-10.

23            JUDGE GREEN:  Oh.

24            MR. MILMAN:  He's trying to offer.

25            MR. JACKSON:  9.

```
 1              JUDGE GREEN:  9, right.
 2              MR. MILMAN:  Right.  Okay.  Yeah.  The lawyer's
 3    letter.
 4              JUDGE GREEN:  Okay.
 5    BY MR. JACKSON:
 6    Q.   So the question was, did Francis tell you where she got
 7    Michael Petruzzelli card from?
 8    A.   From the one of the new company representative?
 9              MR. MILMAN:  Objection.  Hearsay.
10              JUDGE GREEN:  Okay.  Overruled.
11    BY MR. JACKSON:
12    Q.   Did you receive a copy of this letter?
13    A.   Physically?  No.
14    Q.   Were you emailed a copy?
15    A.   I did email the copy, but text.  I received by text.  I
16    emailed the copy.
17    Q.   You received this by text?
18    A.   By -- via text.
19    Q.   Okay.  From whom?
20    A.   From Francisco.  Wait --
21    Q.   No.
22    A.   Wait, wait, wait.  You're talking.
23    Q.   Yeah.
24    A.   I'm sorry.  I apologize.
25    Q.   I'm going back to GC Exhibit 9.
```

1    A.    I heard, and you're stuck.

2    Q.    That's okay.

3    A.    I'm stuck in the car.  Yes.

4    Q.    It's okay.

5    A.    I --

6    Q.    Did you ever receive a copy of GC Exhibit 9?

7    A.    Yes, I did.

8    Q.    Okay.  Including the emails and the attachment you

9    received?

10   A.    Yes.

11   Q.    And how did you receive it?

12   A.    By -- via email.

13   Q.    From whom?

14   A.    Matt Rocco.

15   Q.    Yeah.  And when did you receive it?

16   A.    November 9th.

17          MR. JACKSON:  I'll move for the admission of GC

18   Exhibit 9.

19          JUDGE GREEN:  Any objection?

20          MR. MILMAN:  Yeah.  Objection on number of counts.

21   First of all, we requested and it was subpoenaed to the Union,

22   this information.  We requested any communications regarding

23   the employees of up through their last day and notice of --

24   with respect to their last day of employment.

25          All that was given to us from the Union was the CBA,

1    the list that was redacted, but unredacted in GC's-8, I

2    believe.  And we received another document, one page document.

3              We have not received any of these emails, any of

4    these texts that this witness had just testified to under oath.

5    We have not received one text, not one email, nothing.

6              JUDGE GREEN:  You're talking about -- I'm sorry.

7              MR. MILMAN:  Yeah.

8              JUDGE GREEN:  Okay.  That's not going to be

9    objectionable.

10             MR. MILMAN:  Okay.

11             JUDGE GREEN:  Do you have other objections?

12             MR. MILMAN:  Well, yes.  I do have -- I do have

13   objection.  This -- as to GC-10, this --

14             JUDGE GREEN:  9.

15             MR. MILMAN:  Well, GC-9, I just -- well, GC-9 is the

16   card.  That's already --

17             JUDGE GREEN:  What -- I have GC-9 as the email and

18   attachment letter.

19             MR. JACKSON:  Correct.

20             MR. MILMAN:  Oh, okay.

21             JUDGE GREEN:  Okay.

22             MR. MILMAN:  So then that gets business card is GC-8.

23             MR. JACKSON:  Which business card are you looking?

24             MR. MILMAN:  The one on Michael picture --

25             MR. JACKSON:  That's GC-6.

```
1              JUDGE GREEN:  That's 6.

2              MR. MILMAN:  Okay.

3              JUDGE GREEN:  That's --

4              MR. MILMAN:  Fine.

5              MR. ROCCO:  Can I just respond to one thing as well?

6   I mean, I sent this information to Mr. --

7              MR. MILMAN:  -- whether I have an objection to its

8   admissibility.

9              JUDGE GREEN:  The whole issue of the subpoena is not

10  going to -- that's not going to -- that's not going to be the

11  basis.

12             MR. ROCCO:  Also, I sent it to him, so --

13             JUDGE GREEN:  I just -- I was just going to say that

14  in advance, but -- okay.

15             MR. MILMAN:  Yeah.  Three documents today.  Okay.  So

16  --

17             MR. ROCCO:  I emailed them on June 3rd.

18             MR. MILMAN:  Okay.

19             MR. ROCCO:  So check your email.

20             MR. MILMAN:  You didn't get any of those texts or

21  emails from this individual?

22             MR. ROCCO:  I have it right here sent to you.

23             MR. MILMAN:  Now -- okay.  You had testified that you

24  were part of drafting the GC.

25             JUDGE GREEN:  All right.  So we're not dealing with
```

```
1   voir dire right now.

2             THE WITNESS:  I did not say --

3             JUDGE GREEN:  I'm sorry.  Please, please.

4             MR. MILMAN:  Okay.  Fair enough.

5             JUDGE GREEN:  We're not dealing with voir dire.

6             MR. MILMAN:  Fair enough.

7             JUDGE GREEN:  Let's just keep this orderly.

8             MR. MILMAN:  Fair enough.

9             JUDGE GREEN:  There's a -- he's moved -- the GC's

10  moved for admittance of GC-9.

11            MR. MILMAN:  Fair enough.

12            JUDGE GREEN:  Is there an objection?

13            MR. MILMAN:  Yes.  There is an objection.

14            JUDGE GREEN:  Okay.

15            MR. MILMAN:  Okay.  Besides opening the door to all

16  of attorney-client communication that this witness is going to

17  be involved in, I'll put that aside and I will not go there

18  because it's not how I do things.  But you will be opening the

19  door to attorney-client communication.

20            But in any event, this witness testified that she was

21  a part of drafting this letter.  She wasn't CC'd on the email,

22  she wasn't CC'd on the letter.  She said she received the

23  letter after the fact from her attorney.

24            There's been no testimony on how she was a part of

25  drafting the letter.  The proper witness is to call the
```

1  attorney.  That's the proper foundation on that letter which

2  was drafted by Mr. Rocco.

3        Not this witness.  This witness is a business agent

4  that they -- it's not part of legal.  That's my objection.

5  Take it for what it's worth, Judge.

6        JUDGE GREEN:  Okay.

7        MR. MILMAN:  It's just not the proper witness to lay

8  foundation.

9        JUDGE GREEN:  Right.  So I'm admitting GC-9.  Let me

10 just ask, is it denied that the Respondent received this

11 letter?  Is that going to be an issue here?

12    (General Counsel's Exhibit 9 received)

13        MR. MILMAN:  The issue is not going to be denied that

14 they received it.

15        JUDGE GREEN:  Okay.

16        MR. MILMAN:  We produce it.  All I'm saying is that

17 it's not the proper witness to lay foundation and enter the

18 document to evidence.  That's all I'm saying.

19        JUDGE GREEN:  Let's -- really, let's try to be

20 practical so we can finish at some point.

21        MR. MILMAN:  I know.  I hear you, Judge, but if I

22 have to bear witness to the testimony as to why this person is

23 the proper witness, I have to respond that it's not the proper

24 witness.

25        JUDGE GREEN:  Well -- I mean, she received the

1  document.

2           MR. MILMAN:  If counsel asked me to stick, I would've

3  stick to it.

4           JUDGE GREEN:  All right.  Okay.  Well, that's fine.

5  So GC-9 is admitted.

6  BY MR. JACKSON:

7  Q.   To your knowledge, did anyone from Parking Systems ever

8  respond to Mr. Rocco's letter?

9  A.   No.

10 Q.   Does Parking Systems currently recognize the Union as the

11 bargaining representative of parking services employees at

12 Stony Brook Hospital?

13 A.   No.

14 Q.   Has Parking Systems ever recognized Local 1102?

15 A.   No.

16 Q.   Has Parking Systems ever engaged in bargaining with the

17 Union over terms and conditions of employment for parking

18 services employees at the hospital?

19 A.   No.

20 Q.   Now, during November and December of 2023, did you

21 maintain contact with Classic employees or former Classic

22 employees?

23           MR. MILMAN:  Objection.  That's a compound question.

24 A.   Yes.

25           JUDGE GREEN:  Okay.

```
 1              MR. JACKSON:  Fine.
 2              JUDGE GREEN:  Do you want to take a one at a time?
 3    BY MR. JACKSON:
 4    Q.   I'll withdraw the question.  During November, 2023, did
 5    you maintain contact with Classic employees?
 6    A.   Yes.
 7    Q.   During December, 2023, did you maintain contact with
 8    former Classic employees?
 9    A.   Yes.
10    Q.   How did you keep in contact?  Well, first of all, in
11    November, how did you maintain contact with them?
12    A.   November -- after November, I was their valet on weekly
13    basis to make sure that everything is going to go well.  And
14    during the visit, I took call.  It was at daily basis -- weekly
15    basis.  In December we created a group chat.
16    Q.   Okay.  And where did the group chat exist?
17    A.   The app call WhatsApp.
18    Q.   Okay.  And when did you create the group chat?
19    A.   I was -- I did not create --
20    Q.   Oh, who did?
21    A.   The admin and his -- one of them employee.  We were, you
22    know, we were all invited to join the group.
23    Q.   So an employee created the group?
24    A.   Employee that created group I was invited to be part of.
25    Q.   Do you remember who created it?
```

240

1  A.   I don't remember the name.

2  Q.   Do you know whether any Classic employees while they were

3  employed with Classic, do you know whether any of them applied

4  for jobs with Classic?

5  A.   I don't know where they apply.  Were they being employed -

6  - but they were looking job during the period of time when they

7  did not get hired?

8        MR. MILMAN:   Objection.  It's nonresponsive to the

9  question, Your Honor.

10       JUDGE GREEN:   Overruled.

11  BY MR. JACKSON:

12  Q.   Do you know whether any Classic employees applied for a

13  job with Parking Systems during November of 2023?

14  A.   They did apply.

15  Q.   How do you know that?

16  A.   I've been told they showed me the app during the -- my

17  visit in November.

18  Q.   Okay.  So leaving aside what people told you, did you

19  observe anyone applying for a job?

20  A.   I have.

21  Q.   Who'd you see applying?

22  A.   I do see Miguel Perez, Ramon Perez, Edward Arias, Michael

23  Perez.

24  Q.   Okay.

25  A.   That I can remember now, but I do have four others.

1    Q.    Okay.  So let's start with Miguel Perez.  I didn't get all

2    those names you just said, but let's start with Miguel Perez.

3    What did you observe that causes you to believe that he applied

4    for a job with Parking Systems?

5    A.    They show me how they can apply.  They've been giving out

6    the card.  They -- how they can apply to the application.  They

7    don't have a physically application.  They can fill it out.

8    They do it electronic, that they want to make sure that they

9    were applied.

10   Q.    Were you with --

11            MR. MILMAN:  Objection, nonresponsive to the

12   question.

13            JUDGE GREEN:  No.  That wasn't non-responsive.  But

14   let me just ask you, I mean, we just had -- I know that the

15   Respondent is really not referring to these applications.

16            But setting that aside for a moment, they produced to

17   the General Counsel these copies of -- I'm just going to call

18   them the applications for now.

19            MR. MILMAN:  Sure.

20            JUDGE GREEN:  I don't know what else to call them.

21   Can we just put those in or stipulate that these were received?

22            MR. JACKSON:  Well, Your Honor, that's part of the

23   problem, which leads us to believe that the production, at

24   least the initial production, was incomplete.  It supplementary

25   production --

```
 1              JUDGE GREEN:  I understand.  I'm not blaming you for
 2   doing this.
 3              MR. JACKSON:  I haven't had a chance to review it
 4   yet.
 5              JUDGE GREEN:  Right.
 6              MR. JACKSON:  So I'm trying to put on my case
 7   otherwise.
 8              JUDGE GREEN:  What I'm saying is, can -- like, you
 9   know, the Respondent knows what you received.  Can we just get
10   a stip to the effect?
11              MR. MILMAN:  Of course we can, Your Honor.
12              JUDGE GREEN:  Okay.
13              MR. MILMAN:  I -- of course we can.  I have no
14   problem.  We could get some communication between Matt's office
15   and my office and whether it's me, Mike, or Michael and we'll
16   stip to it.
17              If we have it, we'll stip.  We'll do a checklist and
18   we'll stip.  I have no problem doing that.
19              JUDGE GREEN:  Okay.  I mean, we have the 34 -- that's
20   what we're looking for.  The 34 employees named in the
21   complaint, whether they submitted these online applications.
22              MR. MILMAN:  Yes.
23              JUDGE GREEN:  Okay.  I mean, it sounds to me like you
24   have it and the parties are going to be able to stip to it.  I
25   just, you know --
```

1           MR. MILMAN:  Okay.

2           JUDGE GREEN:  She's going to be, you know, she's

3    going to be here anyway.  If you need to call Mr. -- Ms. Porsuk

4    again, you can always do that to supplement, you know, anything

5    you don't have any form of a stipulation or in the

6    applications.

7    BY MR. JACKSON:

8    Q.    Okay.  Are you aware of any Classic employees being called

9    by Parking Systems during November, 2023 for an interview?

10   A.    Yes.

11   Q.    How many people are you aware of in that category?

12   A.    It was during my visit November 24th and I was walking

13   around and Ms. Gil came up to me and says, oh, I got a good

14   news.  They called me for interview.

15   Q.    And who is this that told you that?

16   A.    Ms. Gil Francis.

17   Q.    Did you hear about any other employee getting an

18   interview?

19   A.    No.

20   Q.    Okay.  And what did you -- strike that.  How did Francis

21   tell you that she had been called for an interview?

22   A.    I was at the location November 24 during my regular visit

23   walking around.  Said, I have any questions?  Because people

24   were nervous.  She came to me.  She said, I get a call, I have

25   interview tomorrow, which was November 25th.

1    Q.    Okay.  What'd you tell her when she gave you that

2    information?

3    A.    She said, good for you.  She's proceeded, you know, go,

4    hopefully they will call the other.

5    Q.    Did you give her any tips or suggestions about the

6    interview?

7    A.    She doesn't have to be nervous.  She should just go ahead

8    and deal with that.

9    Q.    Did you speak to Francis again on November 25th?

10   A.    Yes.

11   Q.    How'd you speak with her on November 25?

12   A.    She called me, I missed her call.  I know she had

13   interview at one o'clock.  I had to call her back by phone.

14   Q.    So you understood her interview was at 1:00 p.m.?

15   A.    She told me a day before, yes.

16   Q.    Do you remember what time you were able to connect with

17   her that day?

18   A.    Around afternoon.  I can't -- I don't want to give you

19   exact time.  Sometimes after, you know, maybe approximately

20   2:00, 2:30.

21   Q.    Sometime after 1:00 p.m.?

22   A.    After -- sometime after 1:00 p.m.  I could say late

23   afternoon.

24   Q.    Okay.  And what did you and Francis discuss during this

25   call?

1   A.   She was very upset.  She was very disappointed.  She said

2   that they will hire her.  They were interested in her.  They

3   will -- but they're not going to give everybody a job because

4   they do not work with the Union.

5   Q.   Do you recall anything else Francis told you at that time?

6   A.   All I know that she was very -- extremely upset.  She was

7   -- I want to say hysterical crying, but I can hear from her

8   voice that were upsetting.

9   Q.   Okay.  And how did you respond to what Francis told you?

10  A.   I said I will take all the information, just thank you.

11  I'll deliver the message to the -- our attorney.

12  Q.   Okay.

13          JUDGE GREEN:  Are we moving on to something else?

14          MR. JACKSON:  Yes.

15          JUDGE GREEN:  You know what?  Let's just take five

16  minutes, move to the bathroom.

17          MR. JACKSON:  Thank you, Your Honor.

18      (Brief Recess at 3:48 p.m./ Reconvened at 3:58 p.m.)

19          JUDGE GREEN:  Okay.  So back on the record.

20  BY MR. JACKSON:

21  Q.   Ms. Porsuk, I'm going to show you what's been received

22  into evidence as General Counsel Exhibit 4.  Okay.  So did you

23  receive a text message from Francis on November 27th?

24  A.   Yes.

25  Q.   Is that reflected in the document?

1    A.    Yes.

2    Q.    Do you know who Nick who works for Stony Brook is?

3    A.    I didn't know him personally, but I saw him and -- walking

4    around in Stony Brook parking lot.  Do you know what he did for

5    Stony Brook University?

6    He's responsible for parking, all I know of.

7    Q.    Did you ever interact with him as part of your job?

8    A.    My job is not interacting with him

9    Q.    Okay.  And what about Dan, do you know a Dan who worked at

10   Stony Brook?

11   A.    They were working together, usually.  Again, I don't know

12   him personally.  I've seen them.

13   Q.    Did you discuss or did you have a phone call with Francis

14   after you received this text message from her?

15   A.    When she texted me, I said, thank you, which is gracias.

16   I did call her after that.  She was extremely upset.

17   Q.    What did she say?

18   A.    She was saying that, you know, we're not going to have a

19   job because we have a union.  Like our new company will not

20   work with the Union.  She's constantly repeating herself.

21   Q.    Did she tell you anything about Nick or Dan?

22   A.    She did mention that they were -- they being, you know,

23   walking around telling that new company is not going to work

24   with the Union.

25   Q.    What'd you tell her in response?

1   A.   I said, we will look into it.  I will report to our

2   attorney.

3   Q.   Okay.  During December of 2023, did you do any

4   investigation into whether Parking Systems was hiring for

5   positions at Stony Brook?

6   A.   Yes.

7   Q.   How did you investigate that?

8   A.   I was informed that the application that all the members -

9   - I can't remember who, you know, filled it out.

10          MR. MILMAN:  Objection to the term application.

11          JUDGE GREEN:  Okay.  Overruled.

12   A.   They did not see the, you know, movement, and I will look

13   -- I searched the company and there were different website.  I

14   looked to the application portal, it's a different number to

15   what they put -- giving out to the current -- our numbers

16   during the November.

17          And then they were looking for urgent matter employee

18   at the Stony Brook.  I took a screenshot to -- from website, I

19   sent out to our attorney.

20   Q.   What website did you go to find this job posting?

21   A.   I looked all over, but like what -- they were listed on

22   the Indeed.

23   Q.   Is that indeed.com?

24   A.   Correct.

25   Q.   And how many times did you search Indeed for job offerings

1  at Stony Brook by Parking Systems?

2  A.   It just popped up right away.  I was looking for the other

3  site -- website, but it was just like right there.  I did it

4  once.

5  Q.   Just once?

6  A.   It pops up right away when I looked.

7  Q.   Yeah.  I'm asking you, how many times.  Did you check

8  multiple times during the --

9         MR. MILMAN:  Asked and answered, leading, coaching?

10         JUDGE GREEN:  Overruled.

11  BY MR. JACKSON:

12  Q.   Did you try it multiple times?

13  A.   I --

14         MR. MILMAN:  Coaching.

15         JUDGE GREEN:  Overruled.  It's been overruled, sir.

16  A.   I did multiple times.

17  BY MR. JACKSON:

18  Q.   Mark for identification GC Exhibit 10.  Can you identify

19  the document, Ms. Porsuk?

20      (General Counsel's Exhibit 10 identified)

21  A.   It's this -- it shows that I took a screenshot from Indeed

22  and it's Parking Systems job in Stony Brook, they were hiring.

23  When I took a screenshot, I sent it to Matt Rocco.

24  Q.   Okay.  And when did you take this screenshot?

25  A.   In December.  It tells you in the -- basically, and this

1   says December 12th.

2   Q.   Is that the date you took the screenshot?

3   A.   Yes.

4           MR. JACKSON:  I'll move for the admission of GC-10.

5           JUDGE GREEN:  Any objection?

6           MR. MILMAN:  No objection.

7           JUDGE GREEN:  GC-10 is admitted.

8       (General Counsel's Exhibit 10 received)

9   BY MR. JACKSON:

10  Q.   And I am sorry, I just want to make sure the record's

11  clear.  How did you arrive at this page?

12  A.   I would search job, to make sure that, you know --

13  Q.   Did --

14  A.   They were -- they did hire, they have a opening position.

15  Q.   Was this like an internet search?

16  A.   Internet, correct.

17  Q.   Did you use a search engine?

18  A.   I used a search engine, Google.

19  Q.   Google.  And what'd you put in Google

20  A.   Jobs in Stony Brook.  Parking lot driving in Stony Brook.

21  Pops up right away to Parking Systems.  And then text me the

22  Indeed, I searched again.  Texted in Indeed.  I did it multiple

23  times.

24  Q.   Thank you.  I'd ask this to be marked for identification

25  GC Exhibit 11.  I'm handing it to the witness.  Ms. Porsuk, can

1   you tell us what GC-11 is?

2        (General Counsel's Exhibit 11 identified)

3   A.   This is the other -- right after that I searched again.

4   It's December 16th.

5   Q.   Okay.  What kind of search did you perform on December

6   16th?

7   A.   Indeed, Google -- Indeed.

8   Q.   Did you follow the same process that you just described?

9   A.   Yes.

10  Q.   And when did you -- well, what are we looking at GC-11?

11  What is this?  Can you describe it?

12  A.   It says similar to this, it's looking for Parking Systems,

13  looking for parking valet attendant at Stony Brook Hospital.

14  And it tells you like what is other rate between $16 to $20?

15  Between $16 to $20.  It says apply.

16  Q.   Did you take a screenshot of the --

17  A.   I did.

18  Q.   And --

19  A.   I took a screenshot, I sent it to Matt Rocco.

20  Q.   Okay.  And is this your screenshot that you took?

21  A.   Yes.

22        MR. JACKSON:  Move for the admission of GC-11.

23        JUDGE GREEN:  Any objection?

24        MR. MILMAN:  I just have one question in voir dire.

25        JUDGE GREEN:  Yes.

```
 1                          VOIR DIRE
 2   BY MR. MILMAN:
 3   Q.   VOIR DIRE MILMAN If I may.  How do we know that your
 4   number was a screenshot?  How do we know this is not somebody
 5   else's?  Is your number --
 6   A.   How I'm going to get somebody else's number over here that
 7   you --
 8            MR. JACKSON:  That looks like an answer, not a
 9   question.
10            MR. MILMAN:  All right.  Easy, easy, easy.
11            JUDGE GREEN:  Let's do one thing.
12            MR. MILMAN:  Yeah.
13            JUDGE GREEN:  One at a time --
14            MR. MILMAN:  Yes.
15            JUDGE GREEN:  -- on the right.
16   BY MR. MILMAN:
17   Q.   Right.  Right.  So Ms. Porsuk, as the attorney, I have the
18   luxury of an asking the questions.  You don't have the luxury
19   of answering my question with a question, okay?
20            If you don't understand my question, you can say you
21   don't understand it.  I'll do my best to assert it a different
22   way that you understand it.
23   A.   Okay.
24   Q.   So my question is, where it says screenshot, okay?  How do
25   we know that you screenshot doesn't have your number on it?
```

1    That's just a screenshot, correct?

2    A.    Okay.  When you take a screenshot, send it as a email,

3    it's not going to show up your number.

4    Q.    Right.  So in other words, you have all these screenshots

5    saved in your phone, correct?

6    A.    In email, yes.

7    Q.    Email.  Great.

8    A.    Yeah.

9            MR. MILMAN:  Because that's part of the discovery

10   that we requested.  It's ongoing.  So we'd like, Mr. Rocco,

11   copies of all of those emails.  With that said, I will reserve

12   my objection, okay?

13           Assuming that what you say is accurate, we're going

14   to get that in discovery because we haven't gotten any of it.

15   So I'll reserve my objection until we see that discovery

16   production.  Thank you.

17           JUDGE GREEN:  Okay.  But what --

18           MR. MILMAN:  Okay.

19           MR. ROCCO:  All right.  We could talk after that.  I

20   mean, you didn't request anything similar to that.

21           MR. MILMAN:  All communications.  We requested record

22   --

23           MR. ROCCO:  Between my client and myself.

24           MR. MILMAN:  The union is your client, Mr. Rocco,

25   okay?

```
 1          MR. ROCCO:  So you requested internal communication -
 2  - I can show you the subpoena.  That's not what you requested.
 3          MR. MILMAN:  We'll go over it.  If we have to go over
 4  it, let the Judge -- let the judge review it in camera to see
 5  if you're not --
 6          JUDGE GREEN:  Well, no.  I mean, is there -- there's
 7  an objection.  If there's an objection, I need to know what the
 8  objection is.
 9          MR. MILMAN:  My objection -- well, the objection is
10  that the witness had testified that she does have a screenshot
11  in her email to support that it was the witness who took it.
12          JUDGE GREEN:  I mean, she just -- okay.  But she just
13  testified -- that's not an objection based on authenticity.
14  That's a different objection.  That's an objection basically
15  saying, we subpoenaed this doc like Mr. Jackson.
16          MR. MILMAN:  No.  That wasn't an objection.  That was
17  a request, but --
18          JUDGE GREEN:  Okay.
19          MR. MILMAN:  But it was an objection laying
20  foundation.
21          JUDGE GREEN:  No.  No.  She's testifying that she
22  took the screenshot.  That's enough to authenticate the
23  document.  If you have an objection that like it's a sanction -
24  -
25          MR. MILMAN:  Fair enough.  Fair enough.  Fair --
```

1   you're right.  Correct.  You -- I stand corrected, Your Honor.

2   You're right.  But we would like the documentation immediately.

3            JUDGE GREEN:  Okay.

4            THE WITNESS:  I have it, Your Honor.

5            JUDGE GREEN:  I'm going -- listen, I'm going to admit

6   GC-11.  If there's some issue regarding non-production of this

7   document pursuant to a subpoena, we can take that up.

8        (General Counsel's Exhibit 11 received)

9            MR. MILMAN:  I mean, we asked for all communications

10  with the Union and employees and regarding the job positions as

11  --

12           JUDGE GREEN:  I mean, let me just short circuit that.

13           MR. MILMAN:  Yeah.  I should be --

14           JUDGE GREEN:  Do you have any objections to sending

15  the email?

16           MR. ROCCO:  I got to look for the stuff, you know?

17           JUDGE GREEN:  Okay.

18           MR. ROCCO:  I --

19           JUDGE GREEN:  All right.

20           MR. ROCCO:  Look, it wasn't -- I could tell you I did

21  a thorough review of the subpoena.  I mean, despite what he

22  said before, I sent Mr. Mauro documents on June 3rd, including

23  that November 9th letter of the documents.

24           I gave him other correspondence as we gave to the

25  medical center, which is what they requested and the member

1  list they requested.  There is -- there's nothing in here

2  about, you know, her things -- her communications with counsel

3  for the purposes of advancing the case.

4          MR. MILMAN:  We don't want communication with

5  counsel.  You gave us four documents.

6          MR. ROCCO:  That's just what you asked for --

7          MR. MILMAN:  No.

8          MR. ROCCO:  -- just now.

9          MR. MILMAN:  No.  No.  It's not.  I have it right

10 before me, okay?  All documents that relate to the Union's

11 representation of the individuals identified in the complaint.

12 Ergo, the same GC-8 that you purport to be an authentic,

13 genuine document, okay?

14          Containing representation of set individuals in any

15 other -- for December 1, 2023 to present.  This is one of about

16 -- let's see, one of eight specific requests.

17          MR. ROCCO:  But how does a job posting relate to that

18 representation?

19          MR. MILMAN:  Yeah.  I don't see it --

20          MR. ROCCO:  I mean, you're talking nonsense.

21          MR. MILMAN:  I'm talking nonsense?  Okay.  So we'll -

22 -

23          JUDGE GREEN:  Let's not have --

24          MR. MILMAN:  We'll see.

25          JUDGE GREEN:  I don't mind certain amount of, you

1    know --

2         MR. MILMAN:  We got four documents from the Union.

3    Not one document -- four documents from Mr. Rocco.  Not one

4    document of emails and texts relating to this union

5    representing the employees concerning sustaining their jobs.

6    That --

7         JUDGE GREEN:  I don't see that -- this -- that in the

8    ad.  I just don't see it.

9         MR. MILMAN:  It's true.  It's -- the witness

10    testified the reason why she did it was to see if the -- to see

11    if Parking Systems was hiring and circumventing the employees

12    and discriminating into Section 7.

13         JUDGE GREEN:  Let me just short circuit this.

14         MR. MILMAN:  It's not that the Union -- not that the

15    attorney --

16         MR. ROCCO:  Judge, I'm also going to add, this is a

17    document that is in Parking Systems' possession because they

18    run the Indeed account on which it was posted.

19         JUDGE GREEN:  I mean, that's -- yeah.  That's a whole

20    other --

21         MR. MILMAN:  Matt, even if we have it, you still have

22    to produce it.

23         JUDGE GREEN:  Okay.  Thank you.

24         MR. MILMAN:  Okay.  But --

25         JUDGE GREEN:  All right.  GC-11 is admitted.  Look at

1  the rules of evidence again.  I would love to take that

2  position to GC.

3           MR. ROCCO:  You already have the document so we don't

4  need to produce it.

5           MR. JACKSON:  I believe you did take that position,

6  sir.

7           MR. MILMAN:  No, we didn't, sir.  Sir, we didn't.

8  BY MR. JACKSON:

9  Q.    Yeah.  Yeah.  All right.  Did Local 1102 have a bargaining

10 committee that included unit employees?

11 A.    Yes.

12 Q.    Which employees were on the bargaining unit?

13 A.    Ramon Perez and Edward Arias.

14 Q.    And how did they assist with bargaining?

15 A.    They were always sitting with me.  We got over together

16 the proposal that will be observing it during the contract

17 negotiation.

18 Q.    Okay.  And how did you communicate with members regarding

19 -- with other members aside from Mr. Perez and Mr. Edward

20 Arias?  How'd you commute with -- communicate with other

21 members regarding bargaining proposals and negotiations

22 A.    During the -- that period of time, I go around, I talk to

23 people, individual if they have a concern.  Any question, any

24 anything that they wanted to upgrade, they increase their

25 benefits during the, you know, during my visit time prior to

1   contract negotiation.

2   Q.    Did you have any shop stewards?

3   A.    Yes.

4   Q.    Who were the shop stewards?

5   A.    Ramon Perez and Edward Arias.

6   Q.    Did you rely at all on your shop stewards to understand

7   what bargaining unit members wanted or needed?

8   A.    Most the time, yes.  But I also have -- I go around for

9   them.

10  Q.    And how about if you wanted to communicate with the

11  Union's goals or demands were to members in the unit, what

12  would you do?

13              MR. MILMAN:  Objection.  Calls for speculation.  You

14  can ask the witnesses if this ever happened, what happened.

15              JUDGE GREEN:  Yeah.  You can ask.

16  BY MR. JACKSON:

17  Q.    Understood.  Has -- was there ever a time when you wanted

18  to communicate the Union's goals or demands in bargaining or

19  otherwise to unit members?

20  A.    Yes.

21  Q.    And how would you go about doing that?

22  A.    I'd go physically --

23  Q.    You yourself?

24  A.    In person.

25  Q.    Okay.  Was Mr. Perez or Mr. Edward Arias involved in that

1   at all?

2   A.   Yes.

3   Q.   How were they involved?

4   A.   During the work -- during the period time, they would go

5   walk around with me also.

6   Q.   Has Ramon Perez found another job?

7   A.   Yeah.

8           MR. MILMAN:   Objection, relevance.

9           JUDGE GREEN:   What is the relevance to that?

10  BY MR. JACKSON:

11  Q.   I'll withdraw the question.   Is -- the group chat via

12  WhatsApp, is that still active?

13  A.   Yes.

14  Q.   Has any member of the bargaining unit expressed

15  disappointment with the Union because they lost their job with

16  --

17  A.   Extremely.   Yes.

18  Q.   What did they tell you in that regard?

19  A.   They have no faith --

20          MR. MILMAN:   Objection.   It's a compound question.

21  What did they tell you as to they all said the same thing as a

22  group.   I think it should be broken down to individual --

23  BY MR. JACKSON:

24  Q.   I withdraw the question.   Can you recall any particular

25  comment from any member in that regard?

1    A.    Every individual, they made a comment.  They lost their

2    faith on the Union.

3    Q.    And where did they make those comment -- where -- well, do

4    you remember anybody specifically who made that kind of

5    comment?

6    A.    Every individual.  Yes.

7    Q.    How many people are in this?  Well, how did they make this

8    comment to you?

9    A.    They text, group texting.  There's a voicemail, recording

10   voicemail.  They lost their faith on the Union.  Union that's

11   not doing anything.  And there's a 2023 or -- on or about 22 or

12   23 people on the -- that group chat, including myself.

13   Q.    And you're saying that every one of them has --

14   A.    Every individual once stating that unions don't doing

15   nothing.  They lost on their faith on their union.  They lost

16   their job.

17            JUDGE GREEN:  So let me just ask, why do we need

18   this?

19            MR. JACKSON:  I don't need to go any further, Your

20   Honor.

21            MR. MILMAN:  If you don't mind, Judge, I don't mind.

22   Keep going with it.

23            JUDGE GREEN:  I do mind.

24            MR. JACKSON:  Okay.

25            JUDGE GREEN:  It's not relevant.

1          MR. JACKSON:  Okay.  No further questions.

2          JUDGE GREEN:  Okay.  Anything from the Union?

3          MR. ROCCO:  No, Your Honor.

4          JUDGE GREEN:  Okay.  How about --

5          MR. MILMAN:  Any statements, any production on the

6     Jencks that apply to this witness?

7          MR. JACKSON:  Yes.  There is one Jencks statement

8     that is a five and a half page affidavit.

9          MR. MILMAN:  Okay.  I have to review this five and a

10    half page statement.  Can I get 15 minutes?

11         JUDGE GREEN:  Yes.

12         MR. MILMAN:  Thank you, Your Honor.

13         JUDGE GREEN:  Okay.  Off the record.

14       (Brief Recess at 4:23 p.m./ Reconvened at 4:36 p.m.)

15         JUDGE GREEN:  And the Employer's attorney is going to

16    have some questions for you.

17                          CROSS EXAMINATION

18    BY MR. MILMAN:

19    Q.   Thank you.  Good afternoon, Ms. Porsuk.

20    A.   Afternoon.

21         MR. MILMAN:  I know we've seen each other in a

22    courtroom for the last few days, but for the record, I am just

23    going to reiterate something that you probably already know.

24    That I am the attorney for the Respondent Employer, Parking

25    Systems as well as the -- our staff attorneys, Mr. Mauro and

1    Mr. Jacobson.

2              But I will be asking you questions.  I'll be the only

3    one from our side as the attorney asking you questions in cross

4    examination based upon your direct examination with counsel for

5    the General Counsel.

6              If I ask you a question and you don't understand it,

7    just ask me to repeat it and I will do my best to frame it in a

8    way that makes sense to you.

9              And if you hear an objection from counsel for General

10   Counsel or Union counsel, please wait for the objection to be

11   ruled upon by the Judge before you answer any questions.  All

12   right.  And I'd like the witness to see GC-5, please.  It's the

13   text message.

14             MR. JACKSON:  I think that's 4.

15             MR. MILMAN:  Oh, is it?  GC -- text message, this is

16   Edward Arias.  Is that GC-4?

17             MR. JACKSON:  5.

18   BY MR. MILMAN:

19   Q.   5.  Please read that and when you finish reading it, just

20   look up, signify that you read it.

21   A.   Good afternoon.

22   Q.   No.  You don't have to read it out loud, just read it to

23   yourself.

24   A.   Okay.

25   Q.   Yeah.

263

1   A.   All right.  I'll do that.

2   Q.   This is already in evidence.  I don't have a problem with

3   you looking at it if you need to answer any questions.  I just

4   want to make clear that Edward Arias is not Edwin Arias,

5   correct?  Two different people; is that right?

6   A.   Correct.

7   Q.   Correct.  And Edward Arias is one of your shop stewards?

8   A.   Correct.

9   Q.   Okay.  So I wanted to make sure of -- okay.  Now, your

10  shop steward, when -- is it normal for a shop steward to write

11  to an employer on behalf of the Union?  Is that normal?  Is

12  that the normal cost of business of a shop steward in your

13  union to take apart -- take upon him or itself that function?

14  A.   This is not my shop steward.

15  Q.   Oh, okay.  Okay.  Edward Arias is not?

16  A.   There is a Edwin, there's an Edward.

17  Q.   Okay.  And this young --

18  A.   Edward.

19  Q.   -- that's Edward Arias, right?

20  A.   Yes.

21  Q.   Oh, so Edward Aria wrote the letter, not your shop

22  steward?

23  A.   Correct.

24  Q.   Oh, okay.  So then my question is even more inquisitive.

25  Is it normal for a non-shop steward rank and file employee to

1    write to an employer on behalf of union business?

2    A.    I don't see anything over here union business.

3    Q.    Well, okay.  Well you said you testified, did you not,

4    that it was a concern that the Union in November, mid-November

5    to make sure that your employees were the bargaining unit

6    members that are being taken care of and protected?  Did you

7    not testify to that?

8    A.    What has got to do with this?

9    Q.    Well, I -- well, I'll tell you.  Well, my question is that

10   considering the fact that you testified as the Union

11   representative, that it was in your best interest as a union

12   delegate taking care of the bargaining unit members in your

13   bargaining unit, right?

14          That you want to make sure that they're getting

15   proper representation.  So is it in a normal course of business

16   with your union, Local 1102, that not even a shop steward, a

17   rank and file member would write a letter inquiring on behalf

18   of the entire bargaining unit?  Is that --

19          MR. ROCCO:  Objection, argumentative.

20   A.    What is -- I don't -- I couldn't connect.

21          MR. ROCCO:  I'd also object that it lacks foundation.

22          JUDGE GREEN:  It's not -- well, it's--

23          MR. MILMAN:  Lacks foundation?

24          MR. ROCCO:  Yeah.

25          MR. MILMAN:  Okay.  This --

265

1    A.   It's not so much the lack foundation.  Could we -- can we

2    try to simplify the question a little bit?

3    BY MR. MILMAN:

4    Q.   Sure.  Okay.  You represent the bargaining unit members,

5    do you not Ms. Porsuk?

6    A.   Yes.

7    Q.   Right.  Your bargaining unit members 1102 in the valet

8    division, right?

9    A.   Yes.

10   Q.   Okay.  You have a shop steward, correct?

11   A.   Yes.

12   Q.   The -- what's the shop steward's function?

13   A.   Shop steward communicate with me.

14   Q.   And nobody else?

15   A.   The other employees, that's -- too.

16   Q.   And the employer.  Because it's the liaison; is it not?

17   A.   Employer or employee?

18   Q.   Well, let me take a shot at the 30 years of doing labor

19   relations, is it not a shop steward's function to be the

20   liaison between the bargaining members, sometimes even the

21   employer, like for Weingarten rights and such and the Union,

22   right?  Yes or you cannot --

23   A.   Yes.

24   Q.   Yes.  And when I say the Union, the shop still reports to

25   you, correct?

1   A.   Yes.

2   Q.   Right.  So I'll ask you again, is it normal union business

3   in your union that a rank and file, not even a member of the

4   Union or not even a shop steward would write inquiring about

5   employee's job security?  I'm just asking is that normal cause

6   of business with your union?

7   A.   He is asking his job security.  He is like -- it's -- yes.

8   It's kind of normal.

9   Q.   Right.

10  A.   He's asking himself and he is inquire with the -- it's --

11  are we going to have a job?

12  Q.   So you're saying then that it is normal in your union for

13  a rank and file member to write to any employer on behalf of

14  the entire bargaining unit?  Just any rank and file member.

15  That's normal.

16        This is the normal business dealings in your union

17  for somebody who's not a union officer or even a steward to

18  reach out on behalf of the bargaining unit?

19        MR. JACKSON:  I'm going to object.  This is beyond --

20  this is way beyond the scope of this --

21        JUDGE GREEN:  It's not an issue being beyond the

22  scope.  It is arguments in the sense that if you want to argue

23  that it's unusual or -- I mean we have it in a text, but I

24  don't know.  If you want to argue that somehow it's unusual and

25  I don't know exactly what you're inclined to do with it.

```
 1              MR. MILMAN:  I'll --

 2              JUDGE GREEN:  You can argue that.

 3    BY MR. MILMAN:

 4    Q.   I understand.  I'll follow up.  How come the steward

 5    didn't send this type of text?

 6              MR. JACKSON:  Objection.  Calls for speculation.

 7              MR. MILMAN:  No.  It's the Stewart reports to her.

 8    She -- in the course of her dealings in her business, the

 9    steward reports to her.  How come the steward didn't send this?

10    I'm sorry --

11              JUDGE GREEN:  That's sustained.  But you can ask did

12    you, you know, did you ask the steward or you didn't ask the

13    steward?

14    BY MR. MILMAN:

15    Q.   Did you ask steward to write this letter?

16    A.   He is not my shop steward.

17    Q.   Did you ask your steward to write this letter?

18    A.   I did not.  He's not my shop steward.

19    Q.   You're not -- Okay.  So as I said, I'll --

20              JUDGE GREEN:  Did you ask --

21    A.   No.

22              JUDGE GREEN:  Let me just -- let me just ask, did you

23    ask -- did you ask the shop steward to contact Parking Systems?

24              THE WITNESS:  No.

25              JUDGE GREEN:  Okay.
```

```
 1  BY MR. MILMAN:
 2  Q.   Okay.  Did you write any such letter to Parking Systems?
 3  A.   No.
 4  Q.   Why not?
 5  A.   I don't work for a Parking Systems.  I don't have a
 6  bargaining unit.  I don't have a working relationship with
 7  Parking System.
 8  Q.   So it's okay for a rank and file member to do it on behalf
 9  of the bargaining unit?
10  A.   He was not doing on behalf of a bargaining unit he's doing
11  for himself.
12  Q.   Oh.  Just for himself?
13  A.   And then he is asking for fellow colleagues.
14  Q.   Yeah.  But --
15  A.   It's very simple.
16  Q.   The bargaining unit --
17  A.   He is wondering -- he wants -- he was wondering if he's
18  going to have a job.
19  Q.   Well, did you -- did he tell you he was going to write
20  this letter before he do it?
21  A.   No.
22  Q.   Right.  So how do you know why he wrote it?
23  A.   Just what I'm understanding like you are understanding
24  from here.
25  Q.   No.  What I'm understanding is a lot different from what
```

1    you are understanding.

2    A.    Definitely.

3    Q.    So -- okay.  All right.  Now, what did the Union do, if

4    anything, in November, mid-November to try to secure employment

5    for your members?

6              MR. JACKSON:  Objection.  Relevance.

7              JUDGE GREEN:  Yeah.  What is the relevance?

8              MR. MILMAN:  The relevance goes, Your Honor, to our

9    whole theory on successorship versus appreciation.  The timing

10   is highly relevant in the criteria of determining successorship

11   status.  And if you want me to make a proffer, I'll make a

12   proffer.

13             Okay.  Is that the Union -- you know what?  I won't

14   make my proffer.  I'll stand -- I'll build my case on that.

15   All right.  I'll do it nice and slow and methodical.

16             But my position is this that is highly relevant of

17   what action the Union took to secure their government's theory

18   on establishing a successor.  There are a lot of elements that

19   go into a successor.

20             Knowing what the terms and conditions are, knowing

21   what the collective -- knowing the geographical scope, knowing

22   the flow of traffic.  And most important is timing.

23             JUDGE GREEN:  I'm sorry, ask the question again.

24   BY MR. MILMAN:

25   Q.    Sure.  What did the Union do -- focus on mid-November to

**Burke Court Reporting & Transcription**
**(973) 692-0660**

1   secure its members a job either with Classic or --

2            JUDGE GREEN:  Overruled.  For now.  Let's --

3            MR. MILMAN:  Okay.

4            JUDGE GREEN:  Let's move through it.

5   BY MR. MILMAN:

6   Q.   Okay.  What did the Union do in mid-November to protect

7   its members to secure employment either with Classic or with

8   Parking?

9   A.   Our attorney reached out to Parking Systems to send out --

10  to say, recognize our bargaining unit, which is November 20 --

11  November 9th as sent Edward.

12  Q.   Okay.

13  A.   And sent by Matt Rocco.

14  Q.   But is that all that that you did?  You didn't do anything

15  else?  Just have Mr. Rocco write a letter to -- very, very

16  detailed, well thought out legal letter.  But what did you do?

17            Did you do anything as a union rep besides that?  If

18  nothing, then nothing.

19  A.   I did rally.

20  Q.   Excuse me?

21  A.   We did rally.

22  Q.   In December?

23  A.   December.

24  Q.   What'd you do in November?

25  A.   I will not do anything this in November because if they

1  are still bargaining unit employees.

2  Q.    Okay.  Tell me about the impacts and effects bargaining

3  that the Union did with Classic

4          MR. JACKSON:  Objection.  Relevance.

5          MR. MILMAN:  It is highly relevant to understand what

6  took place up to the last days of their employment and when

7  Classic took over.  You are arguing a successorship issue.  I

8  know you'd like to just say --

9          JUDGE GREEN:  It really isn't -- it really is just --

10  no.  It's just not relevant.

11          MR. MILMAN:  It -- Your Honor, with all due respect,

12  it is relevant.

13          JUDGE GREEN:  It isn't.  Sustained.

14          MR. MILMAN:  Okay.  It goes to whether or not the --

15  fine, I object to your ruling on sustaining counsel for General

16  Counsel's objection that it's not relevant on what the Union --

17  how the Union conducted its business up until the last day.

18          If that is irrelevant, then the Union officials

19  shouldn't even be on the stand.

20          JUDGE GREEN:  So here's the -- here's what I

21  understand to be relevant.  It's -- so there's constitute --

22  continuity of the enterprise.

23          So whether the operation stayed the same, whether

24  there was a refusal to hire or not, that's going to be

25  relevant.  What -- I mean, it's just not clear.

```
 1              MR. MILMAN:  The Union's --

 2              JUDGE GREEN:  The Union's demand for -- the Union's

 3    demand, I guess it's --

 4              MR. MILMAN:  The Union -- the refusal to hire goes

 5    into every single step that the Union took when they do, or

 6    where they should have done.

 7              JUDGE GREEN:  Why does it matter?  Why does it matter

 8    what the Union did?  It's not what the Union did.

 9              MR. JACKSON:  Your Honor, Respondent is deflecting --

10    Counsel is trying to put the Union on trial here.  When it's

11    Respondent's conduct that's at issue.

12              MR. MILMAN:  I'll tell you why --

13              MR. JACKSON:  He's deflecting.

14              MR. MILMAN:  I'm not deflecting that.  I'll tell you

15    why.  The Union -- the General Counsel is relying on the Union,

16    okay?  For a large part to make their case on the 8(a)s and the

17    8(a)(3)s.  I have a right to show that the Union does not do

18    its business properly and walk the Judge through that.

19              JUDGE GREEN:  No.

20              MR. MILMAN:  To --

21              JUDGE GREEN:  You know, so if you want to make an

22    offer of proof, you can do that.  You can do it fine, then I'll

23    then you then what?

24              MR. MILMAN:  Then I'll tell you what Judge, if that's

25    the case, then I'm going to make an offer of proof in writing.
```

1    This is going to be a --

2              JUDGE GREEN:  Okay.

3              MR. MILMAN:  -- long offer of proof.

4              JUDGE GREEN:  That's --

5              MR. MILMAN:  And I have no further questions at this

6    point until that offer of proof gets ruled on.

7              JUDGE GREEN:  Okay.  Well, listen, you can always

8    recall Ms. Porsuk during your case in chief.

9              MR. MILMAN:  I am going to draft a long offer of

10   proof to you, Your Honor, and I'm going to supply case law to

11   that offer of proof.

12             JUDGE GREEN:  Okay.

13             MR. MILMAN:  Because I -- you are prohibited -- all

14   due respect to your ruling.  You're prohibiting my client from

15   making its case.  They called the Union rep to make their case.

16   They got into what this union did for its members.

17             She went on and on I do this for my members, I go

18   here, I go -- I stop by every -- almost every day in a month.

19   I know this person by name because I service the shop and I

20   don't have an opportunity to challenge whether the Union

21   effectively service the shop.  I'll make the offer approval.

22             JUDGE GREEN:  No.  It's not -- if you want to do it

23   in writing, you can do it for --

24             MR. MILMAN:  Oh, I want to do it now.

25             JUDGE GREEN:  Okay.  Go ahead.

1  BY MR. MILMAN:

2  Q.   Thank you.  Tell me about the impacts and effects

3  bargaining that you had with Classics.

4           JUDGE GREEN:  No.  No --

5           MR. JACKSON:  Object.

6           JUDGE GREEN:  It's not by question and answer.

7           MR. MILMAN:  Oh, okay.  Then I'll do it in writing.

8           JUDGE GREEN:  Yeah.

9           MR. MILMAN:  No problem.  It'll be in writing.  So at

10  this point, until I get a ruling on that --

11           JUDGE GREEN:  Okay.

12           MR. MILMAN:  -- it stalled on my questions for this

13  witness.

14           JUDGE GREEN:  Okay.  What do we -- it's -- tomorrow,

15  do we have anything?

16           MR. JACKSON:  So I'm just confused about Ms. Porsuk.

17  He's not -- he's finished with his cross examination with this

18  witness?

19           MR. MILMAN:  No.  You heard wrong.

20           JUDGE GREEN:  He's basically saying that he's going

21  to make an offer of proof as to what he's asking her to testify

22  to and why it's relevant.  And that'll go on the record and,

23  you know, the Board can consider it.

24           MR. MILMAN:  Yeah.  And Board consider it and then

25  I'll continue.

1          JUDGE GREEN:  And I, you know, and I can consider it.

2    I mean, if you want to produce case laws to --

3          MR. MILMAN:  Yeah.  And I'm not going to go into a

4    different area with this witness because my cross examination

5    all is interconnected.  So until I get a ruling on what I could

6    ask this witness about on the Union's --

7          JUDGE GREEN:  All right.  I'd take bigger objection

8    to it if it wasn't five o'clock -- close to five o'clock.

9          But it's close to five o'clock and the hole is the,

10   you know, I understand that we came down here in order to stay

11   late both days, but we're not going to finish by Friday anyway.

12   So, you know, it's the end of the day.

13         We'll stop for the day.  By the way, just how long is

14   the Respondent's -- do you have a sense of how long the

15   Respondent's case is going to be?

16         MR. MILMAN:  I do it depends how much mileage I can

17   get with this witness, and that will be one determining factor

18   of how long our direct case is going to be subject to rebuttal

19   witnesses.

20         But I will tell you, Your Honor, right now we plan on

21   calling no more at this point.  It is going in a lot different

22   direction than I thought it would be right now with certain

23   witnesses.

24         But going into this, we have planned to call three

25   employer witnesses.

```
 1              JUDGE GREEN:  Okay.  So we can -- we will finish by
 2    July 3rd.
 3              MR. MILMAN:  I will make it my effort.  I will make
 4    it my business to finish by July 3rd.
 5              JUDGE GREEN:  Okay.
 6              MR. MILMAN:  I want to get this done.
 7              JUDGE GREEN:  All right.
 8              MR. MILMAN:  I want to get it done where I put a full
 9    and fair case on behalf of my client.  And this objection on
10    relevance on the Union -- this witness -- how about -- forget
11    about relevance.  The door has been open.  I don't think we're
12    on the record, are we?
13              MR. MAURO:  We are.
14              MR. MILMAN:  Oh, great.  The door has been opened.
15    The relevance, I challenge that -- the objection.  I respected
16    your ruling, Your Honor.  But irrespective of that, the door's
17    been open.  This witness testified for over an hour.
18              JUDGE GREEN:  I really didn't hear that.  And I just
19    don't -- I just don't see it.  It doesn't, you know, this isn't
20    a bargaining case.  There's no issue of union misconduct.  It's
21    bargaining --
22              MR. MILMAN:  There is an issue of --
23              JUDGE GREEN:  It is not an offense to the success.
24              MR. MILMAN:  There's issue of -- I'm sorry.
25              JUDGE GREEN:  Or an 8(a)(3) or an 8(a) (1).
```

1          MR. MILMAN:  There's an issue of timing, which goes

2    towards the 8(a)(1) and 8(a)(3) remedy.  And it -- also issue

3    of timing that goes into, successorship, all right?  And all

4    the -- my argument, I don't need this witness.

5          But to go into successorship argument, I do need this

6    witness.  And it -- although I will make a proof of why I think

7    it's going to be a lengthy offer of proof.  You have to give

8    the Respondent some -- a path to build their case.

9          So we could connect the dots and our goal as a Judge

10   will say, ah, I see it.  But to argue it's irrelevant now when

11   the door has been opened as to what this union rep did.

12         I didn't -- I -- listen, I didn't tell them to call

13   this rep.  She testified what her job duties is, what she did

14   for the bargaining unit, how they're so disappointed.  Well,

15   maybe they should be disappointed.

16         JUDGE GREEN:  Well, I mean, that may be true, but

17   that wasn't relevant.

18         MR. MILMAN:  But the door was opened.  You allowed

19   it.

20         JUDGE GREEN:  And I -- no.  Actually I didn't.  I --

21   actually, I didn't.

22         MR. MILMAN:  Well, no.  She got to testify about the

23   whole chat group and how I objected that she was testifying as

24   all of them.  And then she went one by one.

25         JUDGE GREEN:  Listen, let's -- you can make your

```
1   offer proof.  I'll take a look at it.

2              MR. MILMAN:  Thank you.

3              JUDGE GREEN:  I will take a look at it.

4              MR. MILMAN:  I appreciate that.

5              JUDGE GREEN:  In the meantime, let's reconvene

6   tomorrow.  And I think the plan is to start with your cross of

7   Ms. -- is it Ms. Reyes or Ms. Gil?

8              MR. JACKSON:  It's Gil Reyes.

9              MR. MILMAN:  Gil Reyes.

10             JUDGE GREEN:  It's Gil Reyes.  Oh, it's -- okay.  I'm

11  saying that wrong.  Okay.

12             MR. JACKSON:  So I guess --

13             MR. MILMAN:  I will be ready --

14             MR. JACKSON:  -- I wanted to clarify this, Your

15  Honor.  So I -- my understanding is, Your Honor already ruled

16  and sustained my objection on relevance grounds to this line of

17  questions?

18             MR. MILMAN:  No.  To one question.

19             MR. JACKSON:  Or to one question I suppose.  So --

20             JUDGE GREEN:  He's asked -- he --

21             MR. JACKSON:  He's asking to give an offer of proof.

22             JUDGE GREEN:  My understanding is the Respondent has

23  asked that we not go forward, that he make an offer of proof,

24  you know, to get it on the record, but also try to convince me

25  that it's a relevant line of questions.
```

```
 1              MR. JACKSON:  Right.

 2              JUDGE GREEN:  And I'll listen to it.  But we are out

 3   of order anyway, so I don't really see any point in going

 4   farther tonight.  I think we should take it up tomorrow with

 5   Ms. Reyes anyway.

 6              MR. MILMAN:  I'm ready.  I'm ready to do it to this

 7   morning, okay?  If we had a interpreter, but I want to make it

 8   clear.  I have other lines of divisions of questions for this

 9   witness.  But it is all interrelated into the --

10              JUDGE GREEN:  Okay.  We'll see.

11              MR. MILMAN:  -- day-to-Day activities of the Union.

12   That's what all I'm saying.

13              JUDGE GREEN:  I don't -- I'd rather not --

14   regardless, I'd rather not have Ms. Reyes waiting around

15   anyway.  So, you know, she's going to be here regardless.  So

16   we can take her up after Ms. Reyes.

17              MR. JACKSON:  Okay.  So you're going to consider --

18              JUDGE GREEN:  So I'm going to consider it then we'll

19   see where it is.

20              MR. JACKSON:  -- reverse -- revising your ruling

21   based on his initial --

22              JUDGE GREEN:  Right.  Correct.

23              MR. JACKSON:  I understand.

24              JUDGE GREEN:  Okay.  Okay.  All right.

25              MR. MILMAN:  Thank you, Your Honor.
```

1          THE WITNESS:  Thank you.

2          JUDGE GREEN:  Thank you.

3    (Whereupon, at 4:57 p.m., the hearing in the above-entitled

4    matter was adjourned to reconvene on Friday, June 21st, 2024 at

5    10:00 a.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CERTIFICATION

1
2          This is to certify that the attached proceedings before
3    the National Labor Relations Board (NLRB), Region 29, in the
4    matter of Parking Systems Plus, Inc. and Local 1102, Retail
5    Wholesale & Department Stores Union, United Food and Commercial
6    Workers, Case No. 29-CA-331253, at 26 Federal Plaza, 2nd Floor,
7    New York, New York 10278, on June 20th, 2024, was held
8    according to the record, and that this is the original,
9    complete, and true and accurate transcript that has been
10   compared to the recording from the hearing, that the exhibits
11   are complete and no exhibits received in evidence or in the
12   rejected file are missing.

13
14                    *Barrington Moxie*
15
16             _____
17             Barrington Moxie
18
19
20
21
22
23

**$**

**$16 (2)**
250:14,15
**$20 (2)**
250:14,15

**A**

**ability (1)**
150:12
**able (11)**
130:17;135:14,15;
136:7;137:12;138:8;
143:16;195:25;
196:14;242:24;
244:16
**above-entitled (2)**
102:15;280:3
**absolutely (1)**
179:12
**accept (3)**
127:5;137:10;173:1
**acceptance (1)**
142:1
**accepted (2)**
129:16;133:18
**access (3)**
141:20,21;170:13
**according (2)**
117:20;173:11
**account (1)**
256:18
**accountable (1)**
195:17
**accretion (1)**
109:11
**accurate (15)**
145:23;146:12;
160:17,23;164:12;
169:3;170:18;171:8,
11;172:12;175:3;
184:11;186:20;187:2;
252:13
**accurately (3)**
172:22,23;184:6
**action (1)**
269:17
**active (1)**
259:12
**activities (1)**
279:11
**actually (10)**
119:9;161:9,19;
163:15;194:6;213:2;
220:11;223:9;277:20,
21
**ad (2)**
199:13;256:8
**add (2)**
223:5;256:16
**addendum (1)**

108:6
**additional (3)**
169:11;197:6;
211:19
**address (8)**
151:10;159:10;
162:7;196:19;204:19;
214:9;216:7;228:23
**addressed (1)**
203:13
**addresses (1)**
215:23
**adjourn (1)**
143:20
**adjourned (1)**
280:4
**admin (1)**
239:21
**Administrative (7)**
102:16;107:22;
199:25;201:3;218:6,
8;223:9
**admissibility (1)**
235:8
**admission (9)**
107:23;128:4;
161:17;165:12;
182:17;217:21;
233:17;249:4;250:22
**admit (4)**
211:1;222:13,14;
254:5
**admittance (1)**
236:10
**admitted (7)**
108:13;128:8;
166:9;211:4;238:5;
249:7;256:25
**admitting (2)**
183:6;237:9
**advance (2)**
206:11;235:14
**advancing (1)**
255:3
**advantage (1)**
163:6
**adverse (2)**
203:25;205:8
**advocate (1)**
203:9
**affidavit (39)**
140:13;141:3,7;
168:15,18,19;169:2,5,
12;170:25;172:18;
174:10;176:22;177:1;
184:6;185:13,17,21;
186:2,18,20,24;187:1,
10,17;188:11,13,21,
25;189:3,9,12;190:11,
17,24;197:11,13,14;
261:8
**affidavits (1)**
201:19

**afield (1)**
231:14
**afternoon (10)**
141:11;145:10;
203:5;205:17;208:15;
244:18,23;261:19,20;
262:21
**again (25)**
110:3;123:9;
130:24;142:3;148:20;
158:13;161:22;
166:15;171:21;
173:22;184:25;
186:23;190:13;197:3,
12;202:7;207:25;
243:4;244:9;246:11;
249:22;250:3;257:1;
266:2;269:23
**Agency's (1)**
108:8
**agent (9)**
185:4;208:20,24;
209:9,17,20;218:2,5;
237:3
**agents (2)**
178:15;185:1
**ago (2)**
192:2;197:6
**agree (4)**
129:25;168:21;
173:11;206:19
**agreement (3)**
210:16;211:9;
230:20
**agreements (4)**
211:7,8,17,20
**Agyris (2)**
224:5;228:10
**ah (1)**
277:10
**ahead (6)**
169:21;174:12,13;
180:11;244:7;273:25
**allegedly (1)**
186:14
**allocated (1)**
141:8
**allowed (1)**
277:18
**Almonte (2)**
224:11,22
**almost (1)**
273:18
**alone (1)**
136:2
**along (6)**
128:12;134:18;
135:3;136:19;162:12;
177:21
**although (1)**
277:6
**Alvarado (3)**
224:25;225:1,12

**Always (5)**
114:13;227:13;
243:4;257:15;273:7
**am/ (1)**
127:12
**among (1)**
193:15
**amongst (1)**
193:18
**amount (2)**
150:1;255:25
**ample (1)**
201:20
**Andrew (3)**
132:17,19;136:21
**Andrew's (1)**
133:6
**anonyms (1)**
177:18
**answered (3)**
126:16,18;248:9
**anticipate (1)**
141:10
**anticipated (1)**
140:20
**anticipating (1)**
205:18
**apart (1)**
263:13
**apologize (1)**
232:24
**app (2)**
239:17;240:16
**apparent (3)**
174:14;197:2;207:6
**appeal (1)**
204:10
**appear (5)**
181:5;197:25;
198:15;203:13;
215:21
**appeared (2)**
171:21;181:25
**appears (9)**
108:10;125:25;
181:14;193:2;195:19;
213:3;214:5;215:17;
217:15
**application (42)**
124:8,13,15,18,20,
23;125:1,4,6,9,15;
126:11;129:7,8;
151:5,6,8,9;157:13;
159:2,3,4,8;161:2;
165:14,15,17,19;
166:3,3;170:13;
183:4;184:16;185:7;
217:2;228:22;229:3;
241:6,7;247:8,10,14
**applications (15)**
125:20;127:2,4,6;
128:1,17;129:3;
176:12;182:9;196:25;

197:4;241:15,18;
242:21;243:6
**applied (6)**
151:2;170:3;240:3,
12;241:3,9
**apply (13)**
151:3;153:11,13;
165:22;170:11;
176:10,10;240:5,14;
241:5,6;250:15;261:6
**applying (3)**
184:14;240:19,21
**appointment (3)**
116:3,6;117:8
**appreciate (1)**
278:4
**appreciation (2)**
109:19;269:9
**approach (2)**
121:11;122:11
**approached (13)**
131:24;177:6,10,
13,16;178:1,5,13;
185:2;187:25;189:6,
19;191:1
**appropriate (1)**
109:14
**approval (2)**
201:8;273:21
**approximately (26)**
111:21;118:10;
122:16;124:12,14;
131:25;137:5,7;
139:4,16,18;146:25;
149:25;153:1;154:18;
156:14;158:16;164:9;
166:17;168:2,3;
177:11;194:19;
208:21;231:5;244:19
**area (9)**
113:16;116:1;
131:24;133:8,13,14;
142:15;208:25;275:4
**areas (3)**
112:16,18;116:17
**argue (4)**
266:22,24;267:2;
277:10
**arguing (3)**
109:13;206:16;
271:7
**argument (4)**
109:16;205:12;
277:4,5
**argumentative (2)**
175:6;264:19
**arguments (1)**
266:22
**Aria (1)**
263:21
**Arias (28)**
110:17,22;111:2,8;
123:15;127:16;162:2;

163:23;166:12;
167:23;169:18,24;
176:22;180:16;184:6;
186:12;195:10;
240:22;257:13,20;
258:5,25;262:16;
263:4,4,7,15,19
**Arias' (1)**
161:1
**Aria's (1)**
196:24
**A-R-I-A-S (1)**
111:2
**around (39)**
111:10;116:22,23;
117:22;120:19,21;
121:8,12,16,18;
122:21;130:25;
131:10,19;132:9,23;
146:17;154:22;155:1,
3,4;156:5;166:24;
170:7;178:16;190:25;
191:2;200:10;224:20,
21;243:13,23;244:18;
246:4,23;257:22;
258:8;259:5;279:14
**arrangements (1)**
206:11
**arrest (1)**
159:23
**arrive (1)**
249:11
**arrived (3)**
115:23;130:13,15
**Arue (4)**
117:11;149:8,9,10
**aside (6)**
137:1;200:8;
236:17;240:18;
241:16;257:19
**assert (1)**
251:21
**asserted (1)**
231:12
**assigned (1)**
148:25
**assist (1)**
257:14
**assistance (2)**
112:7;165:8
**Assumes (2)**
173:5,6
**assuming (3)**
177:6;203:4;252:13
**assumption (1)**
230:19
**assure (1)**
199:17
**attachment (2)**
233:8;234:18
**attachments (2)**
197:25;198:4,12
**attempt (1)**

125:14
**attend (2)**
112:6;171:22
**attendant (5)**
111:15,25;112:4;
194:22;250:13
**attendants (5)**
112:13,14;155:9,
10;183:11
**attending (2)**
131:21;155:18
**attention (5)**
151:13;166:15;
169:22;170:2;186:23
**attorney (15)**
145:4;230:5,18,22;
236:23;237:1;245:11;
247:2,19;251:17;
256:15;261:15,24;
262:3;270:9
**attorney-client (2)**
236:16,19
**attorneys (2)**
230:7;261:25
**attorney's (1)**
208:12
**Augusta (1)**
207:6
**authentic (1)**
255:12
**authenticate (2)**
219:13;253:22
**authenticity (2)**
231:19;253:13
**authorized (1)**
199:20
**automatically (1)**
215:19
**availability (2)**
151:11;159:7
**available (5)**
115:15;202:13,14,
17;204:3
**avenue (1)**
204:17
**avenues (1)**
197:20
**award (1)**
152:3
**aware (8)**
119:10,13;129:2,5;
217:6;220:16;243:8,
11
**away (7)**
183:25;194:13,17;
200:23;248:2,6;
249:21
**Ayse (3)**
207:17;208:3,10
**A-Y-S-E (1)**
208:9

## B

**back (35)**
107:3;108:5;124:7;
130:23,25;131:24;
132:8,25;133:7,10;
141:4;143:6;145:3,
18;146:8;152:6;
155:23;156:10;
157:12;158:23;
166:12;167:24;
170:12;172:18;
175:14,15;184:17;
185:6;227:11;228:15,
16,19;232:25;244:13;
245:19
**bargain (1)**
230:4
**bargaining (43)**
107:20;209:6,12,
22,24;210:5,16;211:9,
15,23;214:2,2;217:5,
8;238:11,16;257:9,12,
14,21;258:7,18;
259:14;264:5,12,13,
18;265:4,7,20;266:14,
18;268:6,9,10,16;
270:10;271:1,2;
274:3;276:20,21;
277:14
**Barron (6)**
205:15,16,17,22;
206:2,5
**based (9)**
108:24;109:11,18;
172:25;174:19,20;
253:13;262:4;279:21
**basic (1)**
159:5
**basically (11)**
109:13;114:7;
116:20;120:6;159:11;
175:10;201:19;224:1;
248:25;253:14;
274:20
**basis (10)**
118:11,14,15;
149:1;209:1,2;
235:11;239:13,14,15
**batch (1)**
163:2
**bathroom (2)**
117:1;245:16
**Bear (3)**
123:6;201:4;237:22
**become (2)**
119:13;217:6
**becoming (1)**
209:19
**began (2)**
111:21;113:21
**begin (2)**

111:20;133:16
**beginning (3)**
119:14;152:9;170:5
**behalf (8)**
263:11;264:1,17;
266:13,18;268:8,10;
276:9
**believing (1)**
167:4
**below (1)**
227:16
**benefits (2)**
216:25;257:25
**BENJAMIN (1)**
102:16
**Beside (1)**
211:14
**Besides (2)**
236:15;270:17
**best (5)**
151:24;179:6;
251:21;262:7;264:11
**better (5)**
170:22;171:4;
172:15;186:5;190:19
**beyond (9)**
178:25;179:19;
180:7;219:11;221:19;
223:15;266:19,20,21
**big (2)**
116:16,19
**bigger (2)**
147:6;275:7
**bill (3)**
220:14,15,16
**billing (8)**
216:3,14;220:9,13,
25,25;221:3;226:10
**bit (2)**
148:4;265:2
**black (11)**
118:19,19,20;
120:25;121:10,20;
122:10,19;131:9,12;
138:20
**blaming (1)**
242:1
**blank (1)**
162:22
**block (2)**
143:14;169:24
**BOARD (9)**
102:2,17;107:19;
115:18;134:3;140:5;
175:21;274:23,24
**Bobby (18)**
132:17,19,20;
133:6;136:21;164:4;
179:16;186:15;
187:15,21;188:8,20;
189:20,22,25;190:1,9;
191:3
**Bobby's (4)**

177:15;187:1,5;
188:2
**bogged (1)**
225:19
**booth (41)**
113:3;115:17;
117:22;121:18,21;
122:3,11;123:2;
131:1,21;138:15;
139:2;146:24;147:7,
15,16,19;148:1,12,16,
24,25;149:3,4,5,11;
155:14,19;156:20,25;
167:18;174:25;175:9;
178:2,14;183:16;
184:19,20;185:1;
189:6;191:4
**booths (11)**
112:16;121:13,14,
15;123:3;148:14;
149:1;150:1;170:7;
174:6;193:19
**boots (5)**
112:20;121:11;
138:12;174:23;193:9
**Both (9)**
131:8,20;138:12,
13;143:2,12;194:9;
196:22;275:11
**bottom (1)**
124:23
**break (8)**
140:11;143:2;
150:3;197:10;198:8,
8,12,19
**brief (8)**
109:6;127:12;
176:17;179:8;185:12;
199:9;245:18;261:14
**briefly (1)**
217:23
**bring (6)**
128:18;135:3;
216:3,14;217:4;
223:11
**bringing (1)**
134:18
**broken (1)**
259:22
**Brook (57)**
109:10;111:15;
112:1,5;116:17;
118:24;119:2,9,11,19;
131:10;132:9,14;
134:6,11;138:1;
146:6,15;148:3,7,10;
149:15;150:21;
151:19,25;153:25;
154:7,17;170:5;
173:16;174:8,16;
175:18;176:24;177:3;
183:10;188:21;
193:13,22;210:24;

211:13;225:12;226:5,
22;229:14;238:12;
246:2,4,5,10;247:5,
18;248:1,22;249:20,
20;250:13

**Brook's (1)**
133:19

**brought (1)**
159:2

**brow (1)**
141:25

**build (2)**
269:14;277:8

**building (14)**
112:19;116:19;
117:1,3;120:22;
130:18,25;145:22;
146:23,24;147:1,5,6,7

**buildings (1)**
116:15

**built (2)**
146:23,24

**bully (2)**
204:15,20

**burden (1)**
109:21

**busier (1)**
147:24

**business (63)**
110:5,5;122:25;
123:1,3,5,11,15,20;
125:18;126:4,6,8,11;
128:17;132:24;
156:21;157:13,21;
158:14;165:21;
170:10,17;176:3;
177:8;180:19;181:2;
182:2,4,5;184:15;
187:4,8;188:1;
189:23;192:15;193:1;
208:20,24;209:9,17,
20;218:2,5;229:5,8,
12;230:25;231:1;
234:22,23;237:3;
263:12;264:1,2,15;
266:2,6,16;267:8;
271:17;272:18;276:4

**busy (1)**
149:5

**button (3)**
118:20;124:24,24

**C**

**cafe (2)**
133:13,14

**cafeteria (1)**
117:2

**call (48)**
107:12;108:14;
110:14;125:23;
126:17,21,24;129:9,
10;137:12;143:20,22;

144:7;149:2;158:7;
159:3;192:5,11;
195:18;196:14;
197:17;199:14,18;
202:7;203:24;205:5,
6,19,24;206:1;207:5;
218:10,12;236:25;
239:14,17;241:17,20;
243:3,24;244:4,12,13,
25;246:13,16;275:24;
277:12

**called (33)**
110:23;120:14;
124:17;125:19,25;
126:15;130:21;132:4;
149:4;159:3;167:17;
181:1,13,14,16;
191:10,11;195:10,18,
23;196:2;201:16;
203:17,17,19;207:1;
208:4;209:3;243:8,
14,21;244:12;273:15

**calling (4)**
202:2;203:4;
207:16;275:21

**calls (4)**
110:16;207:17;
258:13;267:6

**came (22)**
102:15;112:7,8;
114:9,11;117:4;
118:10;121:12;122:3;
131:19,24;152:6;
196:23;214:16;215:7;
228:6,15,16,19;
243:13,24;275:10

**camera (3)**
165:24,25;253:4

**campus (18)**
116:16,22,23;
118:1;120:20;122:21;
131:11;132:9,14;
138:9;149:13;154:7,
17;155:4;156:4;
176:24;177:3;178:15

**Can (88)**
108:13;109:25;
110:11,18;114:17;
115:4;127:21;139:14;
142:5;143:20;150:9;
151:13;154:1;160:10;
162:7;163:6,14;
167:3;172:22;174:20;
177:5;179:5;180:2,
18;181:13;183:5,14;
188:18;192:19,21,24;
198:12,21;199:5,18;
200:17,25;201:12;
204:7,23;210:15;
212:15;213:7,11,20;
214:6,17;219:18;
220:21;223:6,11;
224:1;235:5;237:20;

240:25;241:5,6,7,21;
242:8,9,11,13;243:4;
245:7;248:18;249:25;
250:11;251:20;253:2;
254:7;258:14,15;
259:24;261:10;265:1;
267:2,11;272:22,22;
273:7,23;274:23;
275:1,16;276:1;
277:25;279:16

**Cancer (40)**
112:19;113:1,3,4,
20;116:2,6,8,24;
121:15,21;122:11;
145:16,22,24;146:22;
147:2,4,11,14,18;
148:1,18,24,24;
149:10;150:1,4,9,13;
152:23;155:11,14,19;
178:1,13;184:19,19;
185:1;194:8

**canvased (1)**
142:21

**cap (1)**
155:16

**capacity (1)**
147:7

**car (6)**
124:8;130:15;
173:19;194:18;
224:20;233:3

**card (118)**
122:25;123:1,4,11,
15,18,19,20,22;124:2,
7;126:4,6,8,10,10,11,
15;128:17;132:24;
157:13,21,24;158:1,3,
4,6,10,13,14,15,16,17,
19,21;165:21,21;
170:11,12;178:17;
179:9,14,15;180:3,19,
20,21,22,23;181:5,9;
182:1,2,4,5,8,10,12,
13,14,20,23,25;184:4,
5;187:4,23,24;188:3,
9,12,15,18,20,24;
189:2,5,11,13,15,17,
18,23,25;190:2,4,9,
14,15;191:3,9,24;
192:3,3,7,10,15,24,
25,25;193:1,2;195:16,
19;230:25;231:1,8;
232:7;234:16,22,23;
241:6

**cards (21)**
123:2,3,5,23;
125:19;156:21,23;
157:1,6,6,10;166:16;
170:17,20;171:8;
176:3;177:8;181:2;
184:15;187:8;188:1

**care (4)**

117:24;163:4;
264:6,12

**carry (1)**
110:14

**cars (13)**
112:7,8;183:11,17,
19,21,25;184:4;
185:24;190:25;191:2;
194:1,6

**Case (31)**
102:3;107:16;
108:14,24;109:9;
110:1,10;120:3;
129:22;145:12;
199:15;201:20;202:2,
12;203:24;206:25;
242:6;255:3;269:14;
272:16,25;273:8,10,
15,15;275:2,15,18;
276:9,20;277:8

**cashier (1)**
155:19

**Casino (10)**
130:3,4,5,16,20,23,
24,25;137:15;184:8

**catch (1)**
133:5

**catchall (1)**
110:3

**category (1)**
243:11

**caught (1)**
133:5

**cause (1)**
266:5

**causes (1)**
241:3

**CBA (2)**
230:19;233:25

**CC'd (2)**
236:21,22

**cell (2)**
195:21,22

**Center (39)**
112:19;113:1,3,4,
20;116:2,6,8,24;
121:15,21;122:11;
145:16,22,24;146:22;
147:2,4,12,14,18;
148:1,18,24;149:11;
150:1,5,9,13;152:23;
155:11,14,19;178:1,
14;184:20;185:1;
194:8;254:25

**Cepeda (2)**
224:11,23

**certain (11)**
114:8;129:8;141:8,
16;147:23;158:22;
172:7;197:25;198:15;
255:25;275:22

**certainty (1)**
220:19

**certification (6)**
107:16,19;197:11,
14,22,22

**cetera (1)**
217:1

**chain (1)**
179:20

**challenge (2)**
273:20;276:15

**chance (6)**
113:22;115:9;
195:7;210:12;230:14;
242:3

**change (1)**
228:23

**changed (4)**
136:6;137:13;
168:24;172:19

**changes (1)**
228:23

**charge (1)**
117:18

**Charging (1)**
102:12

**chasing (1)**
191:2

**chat (6)**
239:15,16,18;
259:11;260:12;
277:23

**check (3)**
222:22;235:19;
248:7

**checklist (1)**
242:17

**checkup (2)**
133:11;220:8

**chief (3)**
199:15;202:2;273:8

**Children's (2)**
116:7;147:8

**choice (1)**
135:2

**chose (1)**
203:20

**circle (3)**
121:5;131:16;
138:25

**circuit (2)**
254:12;256:13

**circumventing (1)**
256:11

**city (1)**
205:18

**claim (6)**
151:16;187:13,14,
17;188:20;189:25

**claimed (1)**
190:24

**clarify (2)**
108:13;278:14

**Classic (104)**
108:18;109:10;

110:6;111:19,20,21,
22,23;112:1;113:21;
117:10;118:5,19;
119:8,10;120:11;
129:2;133:21;138:4;
145:13,14;146:2,3,6;
148:6,9;149:12,25;
150:17,20,23,24;
151:2,4,17,17;152:4,
7,11,15;153:15,18,21;
154:3,15;155:16;
159:9,14,16;161:24;
166:21;167:20;
174:18,23;175:11,16,
25;178:8;193:18;
209:3,6,10,13,16;
210:1,6,19,23;211:7,
12,16,22;214:3;
216:17;217:9;219:9;
222:1;223:21;224:3,
7,13;225:25;226:5,7,
11,13,16,25;227:5;
228:10;229:13;
238:21,21;239:5,8;
240:2,3,4,12;243:8;
270:1,7;271:3,7
**Classics (1)**
274:3
**Classic's (2)**
148:3;149:12
**clear (5)**
182:18;249:11;
263:4;271:25;279:8
**clearly (2)**
161:6;202:11
**client (8)**
110:6;198:5;
204:13,18;252:23,24;
273:14;276:9
**close (3)**
184:23;275:8,9
**co- (1)**
176:6
**coaching (2)**
248:9,14
**code (24)**
124:12,24;128:17;
157:13,15;158:23,24,
25;159:2;161:4;
164:8,19,25;165:3,9,
16,20,23,24;166:3;
170:12;185:2,5,6
**colleagues (1)**
268:13
**collect (2)**
216:2;217:3
**collecting (1)**
197:20
**collective (5)**
210:5,16;211:8,15;
269:21
**color (1)**
138:24

**column (3)**
227:8,13,25
**coming (4)**
139:18;194:12;
202:16;217:13
**comment (5)**
259:25;260:1,3,5,8
**comments (1)**
220:1
**COMMERCIAL (1)**
102:10
**committed (1)**
125:5
**committee (1)**
257:10
**communicate (5)**
257:18,20;258:10,
18;265:13
**communicated (1)**
157:5
**communicating (2)**
209:1,25
**communication (12)**
155:22;156:12,16;
170:16;230:6,9,10;
236:16,19;242:14;
253:1;255:4
**communications (4)**
233:22;252:21;
254:9;255:2
**commute (1)**
257:20
**companies (1)**
119:20
**company (28)**
117:20;118:21;
119:23;120:8,14,19;
129:4;134:11;135:3;
136:4,8;150:21;
152:1;153:5,10,11;
156:8;165:5;170:11;
172:8;220:7;229:21;
230:4,19;232:8;
246:19,23;247:13
**compare (2)**
182:23;192:4
**compensation (1)**
118:8
**complain (4)**
166:25;167:4,7,12
**complaint (4)**
107:21;223:2;
242:21;255:11
**complete (5)**
124:15;197:8,12;
198:16;231:17
**completed (1)**
197:23
**completely (3)**
110:6;182:19;183:2
**compliant (1)**
230:7
**compound (2)**

238:23;259:20
**computer (5)**
115:4;142:4;179:4;
195:17;196:1
**concern (3)**
161:22;257:23;
264:4
**concerning (2)**
185:17;256:5
**concession (3)**
174:7;175:1,18
**conclude (1)**
221:6
**concluded (1)**
147:11
**conditions (4)**
210:23;211:12;
238:17;269:20
**conduct (1)**
272:11
**conducted (1)**
271:17
**conference (3)**
108:14;168:9,11
**confers (1)**
198:5
**confidential (1)**
167:25
**confirmation (2)**
120:2,5
**confused (2)**
182:19;274:16
**connect (3)**
244:16;264:20;
277:9
**consider (5)**
274:23,24;275:1;
279:17,18
**considering (1)**
264:10
**consist (1)**
118:18
**constantly (1)**
246:20
**constitute (1)**
271:21
**constructed (1)**
147:5
**construction (1)**
147:1
**contact (15)**
125:8;136:7;
137:20;155:5,7,8;
183:3;216:8;230:3;
238:21;239:5,7,10,11;
267:23
**contacted (2)**
130:21;168:6
**contacting (2)**
167:19;195:24
**Containing (1)**
255:14
**contempt (2)**

206:13,13
**content (1)**
165:3
**contents (3)**
155:22;156:18;
168:19
**continue (6)**
134:11;135:10;
163:13;170:4;200:23;
274:25
**continued (2)**
138:14;174:15
**continuity (1)**
271:22
**continuously (1)**
111:25
**contract (19)**
119:10,20;120:1;
138:3;152:4,7,16;
154:15;175:16;209:1;
210:5,14,20;211:15;
216:24,25;229:14;
257:16;258:1
**contracts (1)**
211:19
**contribution (3)**
222:19,21,23
**contributions (1)**
220:2
**conversation (7)**
122:4,14;155:25;
160:18;173:3;176:11;
178:8
**conveyed (1)**
153:3
**convince (1)**
278:24
**copies (3)**
198:19;241:17;
252:11
**copy (19)**
123:19;127:15;
158:19,21;168:15;
169:11,14,16;180:10;
182:5,22;189:16;
230:25;231:1;232:12,
14,15,16;233:6
**corner (2)**
213:2,4
**corrected (1)**
254:1
**correspondence (1)**
254:24
**corresponding (4)**
115:14,20;116:11;
148:17
**cost (1)**
263:12
**Counsel (57)**
107:9;108:12;
110:16;127:14;
140:21;145:11;
162:13;164:12;

178:23;179:3,9,10;
180:15;181:15;182:1,
16;186:13,13,19,19;
189:10;191:15,23,24;
194:5;196:24;198:5;
199:12,13;201:15,21,
23;203:3,11,12,16;
204:11,12;207:17;
210:10;212:7;218:15,
15;230:12;238:2;
241:17;245:22;255:2,
5;262:4,5,9,10,10;
271:15;272:10,15
**Counsel's (17)**
107:24;108:19;
123:8;127:17;128:9;
179:7;183:7;210:13;
211:5;212:8;222:24;
230:15;237:12;
248:20;249:8;250:2;
254:8
**Counsel's (8)**
108:16;140:21;
161:22;194:5;196:22;
199:15;203:3;271:16
**count (1)**
201:15
**counts (1)**
233:20
**couple (3)**
123:5;153:5;155:5
**course (10)**
203:2,9;220:8;
229:5,7,12;242:11,13;
264:15;267:8
**courtroom (1)**
261:22
**coworker (1)**
122:5
**coworkers (9)**
121:17;122:4;
128:12;129:2,6;
135:2,23;137:17;
178:13
**create (3)**
216:1;239:18,19
**created (4)**
239:15,23,24,25
**criteria (1)**
269:10
**cross (22)**
107:7;139:13;
140:20,25;141:11;
142:9;145:8;174:2;
180:2;185:13,16;
190:22;196:24;
200:17;201:17;203:2;
206:5;261:17;262:3;
274:17;275:4;278:6
**crossed (1)**
172:17
**crosses (1)**
194:15

**crossing (1)**
  139:12
**crying (1)**
  245:7
**current (2)**
  230:19;247:15
**currently (3)**
  111:12;208:15;
  238:10
**custodian (3)**
  197:15,16,18
**customer (1)**
  116:9
**customers (2)**
  115:13;183:11

**D**

**daily (3)**
  209:1,1;239:14
**Dan (5)**
  119:4,6;246:9,9,21
**Dash (1)**
  115:6
**data (5)**
  197:21,21;221:9,
  13;223:10
**date (29)**
  117:5;156:13;
  164:6;171:1;179:14;
  189:7,9;190:23;
  199:20;217:8,18;
  219:16;221:15;
  222:18;225:16;227:9,
  12,14,15,16,19,24;
  228:1,8,20,24,25;
  231:7;249:2
**dates (2)**
  159:13;227:14
**day (26)**
  111:23;113:1;
  126:25;129:13;138:1;
  147:23;158:16;
  178:14;187:23;193:8;
  202:24;205:11,25;
  209:2;210:3;219:8;
  225:6,8;233:23,24;
  244:15,17;271:17;
  273:18;275:12,13
**days (7)**
  113:8;147:23;
  155:5;159:6;261:22;
  271:6;275:11
**day-to-Day (1)**
  279:11
**deal (4)**
  162:3;199:24,24;
  244:8
**dealing (2)**
  235:25;236:5
**dealings (2)**
  266:16;267:8
**December (29)**

**crossing (1)**
  168:3;171:1,4;
  172:18;186:2,5;
  189:10;190:9,11,19;
  213:8,8,14,15;220:24;
  226:11;227:2,3;
  238:20;239:7,15;
  247:3;248:25;249:1;
  250:4,5;255:15;
  270:22,23
**decision (1)**
  203:21
**declare (1)**
  202:5
**decline (1)**
  127:5
**declining (1)**
  136:5
**deed (1)**
  141:14
**defense (1)**
  109:24
**deficiencies (1)**
  223:19
**definite (1)**
  135:25
**Definitely (1)**
  269:2
**deflecting (3)**
  272:9,13,14
**delay (1)**
  205:25
**delegate (1)**
  264:12
**deleted (1)**
  218:25
**deliver (1)**
  216:14;245:11
**demand (1)**
  197:3;272:2,3
**demands (2)**
  258:11,18
**denied (3)**
  203:14;237:10,13
**DEPARTMENT (12)**
  102:9;117:25;
  212:19;215:7;216:3,
  15;218:13;220:9,14,
  25;221:3;226:10
**Depend (1)**
  220:6
**depending (2)**
  113:23;116:1
**depends (1)**
  275:16
**depicted (2)**
  123:15;180:16
**describe (4)**
  114:17;139:14;
  184:6;250:11
**described (1)**
  250:8
**despite (1)**
  254:21

**detailed (1)**
  270:16
**determining (2)**
  269:10;275:17
**develop (1)**
  116:25
**dial (3)**
  182:8,12,14
**dialed (3)**
  158:9,10;181:3
**difference (2)**
  131:18;139:23
**differences (1)**
  139:21
**different (41)**
  110:6;112:13,14,
  16;113:22,23;118:23;
  121:14;126:2,3,3,9,
  10,21;139:17;146:15,
  16;158:4;170:7;
  180:19,19;182:1;
  183:2;193:9;202:15,
  16;211:19,19;218:12,
  13;225:10;226:2,12;
  247:13,14;251:21;
  253:14;263:5;268:25;
  275:4,21
**difficult (1)**
  153:24
**difficulty (1)**
  136:16
**digit (1)**
  115:19
**digits (6)**
  115:20;181:3,8,9,
  11;191:12
**dire (10)**
  217:23,25;219:12;
  221:22;223:15;236:1,
  5;250:24;251:1,3
**direct (18)**
  107:6;111:6;
  116:11,22;140:1;
  151:13;169:10,22;
  170:2;179:20;180:6;
  181:1;184:10;186:23;
  203:8;208:13;262:4;
  275:18
**directing (1)**
  166:15
**direction (1)**
  275:22
**directly (4)**
  156:1;184:18;
  209:21;225:3
**Director (1)**
  107:18
**disability (1)**
  165:10
**disappointed (3)**
  245:1;277:14,15
**disappointment (1)**
  259:15

**discharged (1)**
  219:10
**discover (1)**
  228:12
**discovery (3)**
  252:9,14,15
**discriminatees (1)**
  223:2
**discriminating (1)**
  256:12
**discuss (3)**
  110:11;244:24;
  246:13
**discussed (1)**
  198:18
**discussions (1)**
  176:6
**dismissed (1)**
  217:16
**disrespect (1)**
  114:13
**distance (2)**
  121:8;153:25
**distributed (1)**
  127:14
**division (1)**
  265:8
**divisions (1)**
  279:8
**doc (1)**
  253:15
**document (57)**
  107:18;108:10,10;
  123:7,16;127:15,16;
  160:7;161:17;163:25;
  164:11,16;169:19;
  170:3;171:1;178:20;
  179:4;180:14;192:14;
  196:21;207:6;210:11,
  15,22;212:11,12;
  213:9,11;214:1,6,16;
  219:14;221:4,8,10,11;
  223:8,11,19;230:12,
  17;231:13,14,18;
  234:2,2;237:18;
  238:1;245:25;248:19;
  253:23;254:7;255:13;
  256:3,4,17;257:3
**documentation (2)**
  215:6;254:2
**documents (24)**
  107:19;108:2;
  140:22;142:12;
  160:14,17;162:19,19,
  19,20;169:23;197:7,
  15,19;198:7;211:11;
  218:6;235:15;254:22,
  23;255:5,10;256:2,3
**DOH (1)**
  227:8
**don't (2)**
  198:6;204:22
**done (9)**

**crossing (1)**
  143:18;163:11;
  175:23;176:7,15;
  205:3;272:6;276:6,8
**don'ts (1)**
  114:7
**door (7)**
  122:3;236:15,19;
  276:11,14;277:11,18
**door's (1)**
  276:16
**do's (1)**
  114:7
**dots (1)**
  277:9
**double (2)**
  212:12;230:13
**down (12)**
  133:13,16;138:11;
  139:8,10;143:14;
  198:9;216:23;217:13;
  225:19;259:22;
  275:10
**draft (1)**
  273:9
**drafted (1)**
  237:2
**drafting (3)**
  235:24;236:21,25
**dressing (1)**
  114:13
**drive (5)**
  138:4;162:13;
  173:15;183:25;184:3
**drive-by (1)**
  173:23
**driving (8)**
  138:10,11;139:8,
  18;173:22;184:4;
  194:10;249:20
**drove (3)**
  139:3;183:9,12
**due (3)**
  141:6;271:11;
  273:14
**dues (15)**
  218:23,23;219:5,6,
  24;220:4,5,7,8,11,23;
  221:5;222:18,22,22
**duly (2)**
  110:23;208:4
**duplicative (1)**
  202:3
**duration (1)**
  200:14
**during (53)**
  112:1;133:20;
  136:9,18,24;137:18;
  148:23;149:3;150:3,
  20,25;166:2;184:7;
  185:14,18;193:8;
  196:24;210:3;216:19;
  224:17;225:8,10,15,
  17,24;226:1,3,8,16;

227:4;228:12;229:13;
238:20;239:4,7,14;
240:6,13,16;243:9,12,
22;244:24;247:3,16;
248:8;257:16,22,25,
25;259:4,4;273:8
**duties (3)**
112:4;208:23;
277:13

**E**

**earlier (13)**
138:23;151:14;
155:21;163:4;172:15;
178:16;182:22;
186:21;191:6,6;
192:14;199:16;
226:13
**early (1)**
112:24
**earn (5)**
147:18;148:2;
149:20;150:9,12
**easily (1)**
138:11
**easy (3)**
251:10,10,10
**educated (1)**
220:14
**Edward (19)**
110:17,22;111:2;
162:2;169:24;240:22;
257:13,19;258:5,25;
262:16;263:4,7,15,16,
18,19,21;270:11
**E-D-W-A-R-D (1)**
111:2
**Edwin (2)**
263:4,16
**effect (3)**
206:8;210:6;242:10
**effective (2)**
227:1,2
**effectively (1)**
273:21
**effects (2)**
271:2;274:2
**effort (1)**
276:3
**eight (1)**
255:16
**either (7)**
117:7;132:16;
135:11;179:18;
195:19;270:1,7
**electronic (3)**
169:15;178:19;
241:8
**elements (1)**
269:18
**else (17)**
108:7;134:14,17;

135:1;136:1;148:11;
150:23;157:9;165:5,
16;168:13;196:12;
241:20;245:5,13;
265:14;270:15
**else's (3)**
150:3;251:5,6
**email (20)**
151:11;159:6;
162:21;163:1;167:16;
196:22;199:20;
214:16;215:7;232:15;
233:12;234:5,17;
235:19;236:21;252:2,
6,7;253:11;254:15
**emailed (3)**
232:14,16;235:17
**emails (6)**
198:1;233:8;234:3;
235:21;252:11;256:4
**embroidered (2)**
118:21;131:12
**embroidery (2)**
121:2,4
**emergency (8)**
112:21;113:13,14;
138:12;146:19;
155:11;194:9,15
**employ (3)**
226:14,17;227:6
**employed (17)**
111:12;138:16;
139:22;148:19;
159:13,16;208:15;
221:7,9,14;222:16;
223:4,21;224:3;
226:9;240:3,5
**employee (30)**
109:10;112:22;
113:16,17;114:8,19;
146:20;173:20;
175:25;211:22;214:3;
216:17,19;219:9;
224:13;226:11,14,24;
228:1,4,14,14;229:1;
239:21,23,24;243:17;
247:17;263:25;
265:17
**employees (52)**
107:21;108:18;
113:4;127:3;131:5,8,
17,20;134:18,24;
138:13,18,19;139:5,
10;148:6,9;149:25;
150:16;155:4;162:1;
163:19;174:2;176:7;
185:23;209:10,15;
210:1,23;211:12,25;
217:5;219:8;233:23;
238:11,18,21,22;
239:5,8;240:2,12;
242:20;243:8;254:10;
256:5,11;257:10,12;

264:5;265:15;271:1
**employee's (1)**
266:5
**Employer (27)**
111:18,19;165:6;
170:9;171:13,17;
174:17;186:14,25;
187:13,18;188:21;
208:17;209:3;210:16,
18;217:7;219:9;
229:17;261:24;
263:11;264:1;265:16,
17,21;266:13;275:25
**Employer's (1)**
145:4
**Employer's (1)**
261:15
**employment (21)**
111:22,23;147:10,
11,13;159:13;165:14,
17,19;166:3,3;
167:21;173:2;196:25;
210:23;211:12;
233:24;238:17;269:4;
270:7;271:6
**empty (1)**
133:15
**end (14)**
111:22;112:2;
113:6;119:14;137:8,
8;147:13,14;148:13;
152:9;179:21;199:24;
205:25;275:12
**ended (3)**
137:9;147:10;
177:21
**ending (1)**
120:6
**engaged (1)**
238:16
**engine (2)**
249:17,18
**English (2)**
136:11;214:20
**English-speaking (1)**
143:19
**enough (10)**
164:1;201:23;
223:18;236:4,6,8,11;
253:22,25,25
**enter (4)**
130:17;160:10;
216:5;237:17
**entered (5)**
130:16;133:10,12;
158:25;211:16
**enterprise (1)**
271:22
**entire (5)**
122:22;149:14;
192:20;264:18;
266:14
**entirely (1)**

108:24
**entirety (3)**
149:12;181:13,14
**entitled (2)**
203:23,24
**entrance (21)**
112:20;113:10,12;
116:8,11;130:16,23;
133:10;138:12;
145:18,20,21,24;
146:9,10,11;147:20;
155:11;194:7,9,16
**entrances (2)**
116:17,19
**equal (1)**
165:6
**ER (1)**
194:7
**Ergo (1)**
255:12
**essentially (5)**
174:16,18,21;
175:5,12
**establish (3)**
109:2;222:10,15
**establishes (1)**
213:10
**establishing (1)**
269:18
**et (1)**
217:1
**even (16)**
109:9;165:9;
179:18;182:22,23;
184:22;192:1;193:3;
256:21;263:24;
264:16;265:20;266:3,
4,17;271:19
**event (2)**
184:11;236:20
**events (7)**
170:22;172:21,25;
185:20;186:4,20;
187:2
**eventually (1)**
142:12
**everybody (15)**
128:16;134:14;
135:6,14;136:11;
137:11,13;139:13;
148:11;152:23;
156:20;163:16;
167:18;226:23;245:3
**everyone (5)**
121:12;135:15;
225:8,9,11
**evidence (13)**
157:21;160:11;
166:6;173:4,5;
179:15,15;180:15;
221:5;237:18;245:22;
257:1;263:2
**exact (3)**

156:12,12;244:19
**Exactly (5)**
109:15;151:3;
160:13;223:7;266:25
**examination (23)**
107:7;111:6;140:1;
145:8;176:20;180:2;
185:10,13,16;186:10;
190:22;195:8;196:24;
200:18;201:17;203:3,
8;208:13;261:17;
262:4,4;274:17;275:4
**examined (2)**
110:24;208:5
**example (1)**
219:6
**exchanging (1)**
183:21
**exclusively (1)**
113:20
**excuse (5)**
111:14;200:16;
214:2,22;270:20
**exercise (2)**
114:3,5
**exercised (1)**
135:8
**exhaust (1)**
197:20
**Exhibit (59)**
107:15,16,22,24;
108:12,19;123:7,8;
126:1;127:16,17;
128:4,9;158:6;160:1,
3;163:24;166:6,6,10;
179:5,7;180:15,16;
181:15;182:1,11,16;
183:7;191:15;192:9;
195:17;210:11,13;
211:1,5;212:7,8,13;
213:3;217:18;222:24;
223:1;225:25;226:4,
8;230:12,15;232:25;
233:6,18;237:12;
245:22;248:18,20;
249:8,25;250:2;254:8
**exhibits (3)**
141:8,21;142:11
**exist (1)**
239:16
**existed (1)**
138:15
**exited (1)**
130:24
**exits (1)**
130:5
**expected (1)**
115:22
**explain (3)**
129:20;134:23;
135:15
**explained (1)**
157:4

expressed (1)
259:14
exterior (1)
174:20
extra (1)
162:24
extremely (3)
245:6;246:16;
259:17

**F**

facility (1)
175:4
fact (7)
120:3;173:5;
202:18;205:10,16;
236:23;264:10
factor (1)
275:17
facts (1)
185:17
fair (9)
219:25;236:4,6,8,
11;253:25,25,25;
276:9
fairly (1)
223:22
faith (4)
259:19;260:2,10,15
familiar (5)
118:22;119:1;
209:3;211:25;224:5
far (9)
117:17,18;132:1;
180:1;181:25;194:13,
17;224:1;231:14
farewells (1)
137:14
farther (1)
279:4
fashion (1)
228:21
fast (1)
173:22
favorites (2)
135:5;173:12
Federal (1)
102:17
FedEx (1)
143:13
feedback (1)
152:1
feel (1)
153:4
feet (4)
194:17,17,19,19
fellow (1)
268:13
felt (2)
150:14;153:5
female (1)
126:18

few (9)
116:24;162:18;
173:13;177:18;
182:12;185:17;
190:14;197:5;261:22
field (2)
114:4,18
figure (1)
179:6
file (12)
201:24;204:4,8,9,9,
10;263:25;264:17;
266:3,13,14;268:8
files (5)
198:9,10,21,25;
199:6
filing (1)
189:2
fill (14)
124:8;128:16;
149:3;151:5;157:13,
15,18;176:12;184:16;
216:11,13;217:2;
229:1;241:7
filled (7)
158:24;159:8;
161:4,21;182:9;
189:11;247:9
filling (6)
127:3;150:3;159:6;
189:2;190:4,10
find (6)
123:6;167:20;
176:1;199:1,6;247:20
fine (6)
199:23;235:4;
238:4;239:1;271:15;
272:22
fingerprints (1)
206:24
finish (6)
200:25;237:20;
262:19;275:11;276:1,
4
finished (3)
107:6;147:1;274:17
firm (1)
230:22
first (44)
110:23;113:21;
116:13,24;120:17;
121:8;122:9,10;
125:24;140:21;
141:12;145:15,17;
151:10;152:14,24;
155:1,2;156:6;
178:14,23;179:18;
181:2,8,8,11;183:2,3;
187:22;189:6;196:20;
197:18;201:16,22;
203:3,22;204:7;
207:1;208:4,9;
211:15;227:23;

233:21;239:10
firsthand (1)
175:8
five (11)
135:2;139:4;141:3;
160:24;194:17;
245:15;261:8,9;
275:8,8,9
five-page (2)
140:13;141:7
flashing (1)
139:11
Floor (1)
102:18
flow (1)
269:22
focus (1)
269:25
focusing (2)
152:18;220:4
follow (3)
201:7;250:8;267:4
following (7)
128:18;134:9;
138:3;176:4,13,13;
183:9
follows (2)
110:24;208:5
fond (1)
134:2
FOOD (1)
102:10
forget (1)
276:10
forgot (1)
162:25
form (7)
114:12;159:8;
174:16,18;175:5;
218:11;243:5
former (3)
108:18;238:21;
239:8
forth (1)
155:23
forward (8)
133:23;134:1;
163:20,21;171:20;
183:13;202:5;278:23
found (1)
259:6
foundation (10)
179:14;219:14;
231:19;237:1,8,17;
253:20;264:21,23;
265:1
four (9)
113:7;135:2;183:2;
198:13,22;240:25;
255:5;256:2,3
frame (1)
262:7
Francis (67)

107:5;122:6,7,11;
123:5,18,19,21;124:1,
3,7;126:7,16;128:16,
19,24;129:9,10,16,20;
130:11,21;131:20;
132:4,24;133:4,22;
134:4,12,24;135:4,16,
22;156:12,14,19;
137:1,9;155:20;
156:12,17,19;157:9;
158:5,14,21;171:22;
172:5;177:18;182:4,
5,8,10;189:16;206:4;
231:2,3,8;232:6;
243:16,20;244:9,24;
245:5,9,23;246:13
Francisco (1)
232:20
free (1)
196:9
frequently (1)
204:24
fresh (1)
134:18
Friday (6)
113:9;118:3;164:3,
6;275:11;280:4
front (10)
108:4;130:16,24;
135:9;155:19;157:21;
173:24;191:4;192:3,4
full (3)
109:18;197:3;276:8
fully (1)
220:14
function (3)
263:13;265:12,19
functioned (1)
177:7
further (12)
139:24;140:7;
153:24;160:7;185:8;
186:8;195:6;196:3;
205:23;260:19;261:1;
273:5

**G**

gain (1)
216:3
garage (1)
120:21
gave (24)
126:6,21;157:6;
170:10,17,19;171:7;
178:17;182:10,12,14;
184:10;185:4,14;
187:9;188:20,24;
190:2,9,14;244:1;
254:24,24;255:5
GC (27)
107:15,15,22;
123:7;125:25;127:15;

128:4;158:6;179:5;
182:11;211:1;212:12;
217:18;222:3;223:1,
25;225:25;226:4,8;
232:25;233:6,17;
235:24;248:18;
249:25;257:2;262:15
GC-10 (4)
231:22;234:13;
249:4,7
GC-11 (5)
250:1,10,22;254:6;
256:25
GC-3 (1)
157:20
GC-3a (1)
188:3
GC-4 (1)
262:16
GC-5 (2)
128:8;262:12
GC-6 (2)
183:6;234:25
GC-7 (2)
210:15;211:4
GC-8 (3)
217:21;234:22;
255:12
GC-9 (7)
231:21;234:15,15,
17;236:10;237:9;
238:5
GC's (1)
236:9
GC's-8 (1)
234:1
General (56)
107:9,24;108:12,
16,19;110:16;121:16;
123:8;127:17;128:9;
140:21;161:22;
162:13;167:18;179:7,
10;180:15;181:15;
182:1,16;183:7;
186:13,19;191:14,24;
194:5;195:19;196:21,
24;199:13,14;203:3,
11;204:12;207:17;
210:10,13;211:5;
212:7,8,16;218:15;
222:24;230:11,15;
237:12;241:17;
245:22;248:20;249:8;
250:2;254:8;262:5,9;
271:15;272:15
generally (4)
118:3;154:8;180:1;
215:19
generate (4)
215:25;216:5;
218:5;220:9
generated (2)
215:19;218:14

**gentleman (2)**
131:10;179:11
**gentlemen (5)**
120:20,23;121:20;
122:10,19
**genuine (1)**
255:13
**geographical (2)**
110:5;269:21
**gets (2)**
234:22;273:6
**Gil (12)**
107:5;111:2;122:6,
7;145:10;231:3;
243:13,16;278:7,8,9,
10
**G-I-L (1)**
111:3
**Gils (2)**
231:2,2
**given (14)**
118:21;123:5,25;
125:22;127:23,24;
151:5,14;157:7;
158:2;171:13;184:15;
231:9;233:25
**giving (7)**
167:23,24;168:4;
188:9;194:22;241:5;
247:15
**glad (1)**
223:24
**goal (1)**
277:9
**goals (2)**
258:11,18
**goes (11)**
115:5,6,6;141:14;
179:19;219:13;269:8;
271:14;272:4;277:1,3
**Good (11)**
111:8;131:14;
141:14;145:10;
201:22;208:15;222:3;
243:13;244:3;261:19;
262:21
**Google (4)**
249:18,19,19;250:7
**govern (1)**
210:22
**governed (1)**
211:11
**Government (2)**
111:4;208:11
**government's (1)**
269:17
**gracias (1)**
246:15
**Great (5)**
200:21;214:20;
222:14;252:7;276:14
**greater (1)**
150:12

**greatest (1)**
223:20
**GREEN (306)**
102:16;107:3,25;
108:12,21,24;109:2,4,
7,13,16,20,23;110:2,
7,9,14,18,25;111:4;
118:11,21;124:5;
127:11;128:6,8;
140:8,15,17,25;141:2,
13,17,23,25;142:6,10,
13,17,19,22;143:1,5,
8,11,15,23;144:1,3,6,
10;145:3,7;160:5,9,
25;161:5,8,13,18,21,
25;162:3,6,9,15;
163:7,9,12,18;166:7,
9;169:15;173:5;
175:7;176:16,18;
178:22;179:2,23;
180:1,7;181:11,19,21,
23;182:24;183:5,19,
24;184:2,22;185:9;
186:9;191:18;195:5,
7;196:5,7,9,12,16,18;
199:7,10,19,23;200:2,
4,7,9,13;201:2,6,9,12;
202:8,10,15,20;203:6,
10,23;204:2,5,14,22;
205:1,5,8,10,14;
206:7,10,21,23;207:3,
8,10,13,15,19,22,24;
208:6,11;210:8;
211:2,4;215:9,13,15;
217:22,24;219:17,21;
221:19,22,25;222:3,6,
8,11,13;223:3,6,16,
18;225:16,18;231:15,
21,23;232:1,4,10;
233:19;234:6,8,11,14,
17,21;235:1,3,9,13,
25;236:3,5,7,9,12,14;
237:6,9,15,19,25;
238:4,25;239:2;
240:10;241:13,20;
242:1,5,8,12,19,23;
243:2;245:13,15,19;
247:11;248:10,15;
249:5,7;250:23,25;
251:11,13,15;252:17;
253:6,12,18,21;254:3,
5,12,14,17,19;255:23,
25;256:7,13,19,23,25;
258:15;259:9;260:17,
23,25;261:2,4,11,13,
15;264:22;266:21;
267:2,11,20,22,25;
269:7,23;270:2,4;
271:9,13,20;272:2,7,
19,21;273:2,4,7,12,
22,25;274:4,6,8,11,
14,20;275:1,7;276:1,
5,7,18,23,25;277:16,

20,25;278:3,5,10,20,
22;279:2,10,13,18,22,
24;280:2
**greet (3)**
116:1,2;121:12
**greeted (4)**
131:20;133:2;
177:6;178:6
**grounds (1)**
278:16
**group (12)**
170:6;239:15,16,
18,22,23,24;259:11,
22;260:9,12;277:23
**guess (4)**
153:5;161:10;
272:3;278:12
**Gust (18)**
126:13;158:7;
164:4;179:16;188:3;
189:22,25;190:1,9;
199:14,16;200:5,8;
201:14;205:16,21,24;
206:20
**Gust's (2)**
189:20;201:18
**guy (4)**
188:8,24;190:2,15
**guys (1)**
191:1
**guy's (1)**
189:2

## H

**half (4)**
118:15;154:18;
261:8,10
**hallway (1)**
160:18
**hand (3)**
110:20;188:1;208:1
**handed (8)**
123:23;151:5;
156:21;177:8;187:7;
188:3;194:21;212:11
**handing (4)**
157:1;210:11;
231:9;249:25
**handles (2)**
134:7;194:1
**handling (1)**
116:21
**hands (1)**
133:4
**hands-on (1)**
114:14
**hang (1)**
115:17
**hanging (2)**
200:10,12
**happen (3)**
121:25;130:2;

152:20
**happened (8)**
133:8,25;146:25;
186:4;206:3,6;
258:14,14
**happening (2)**
127:5;172:21
**happens (2)**
204:24;205:1
**happy (6)**
133:17;134:5,6;
135:13,25;136:5
**harass (2)**
204:13,15
**hard (2)**
109:20,24
**hear (16)**
120:14;122:9,13,
14;132:18;134:5;
135:25;155:21;
181:11;214:21;215:1;
237:21;243:17;245:7;
262:9;276:18
**heard (14)**
108:16,16;119:5;
120:17;121:17;127:3;
129:4;137:17;178:10;
184:7;198:6;223:18;
233:1;274:19
**hearing (3)**
102:15;204:24;
280:3
**hearsay (4)**
124:4;231:10,17;
232:9
**hello (1)**
116:1
**help (13)**
129:23;136:14;
137:3;176:22;177:1;
209:2,22;210:20;
219:25;220:1,2;
222:19,22
**helping (1)**
208:25
**here's (5)**
141:19;206:10,10;
214:25;271:20,20
**herself (2)**
135:9;246:20
**hey (3)**
176:9,18;191:3
**hide (1)**
206:6
**higher (2)**
147:6;194:1
**highly (5)**
133:20;134:7;
269:10,16;271:5
**highway (1)**
130:8
**himself (4)**
230:19;266:10;

268:11,12
**hire (26)**
108:25;134:24;
135:11,14,15,16,18,
23;136:1,2;153:12;
167:10;190:16;227:9,
12,15,19,24;228:8,8,
14,25;245:2;249:14;
271:24;272:4
**hired (14)**
108:17,22,23;
109:9;110:4;145:13;
157:14;167:2,5,7;
216:17;220:6;227:23;
240:7
**hiring (9)**
134:25;137:10;
167:12;176:2,7,9;
247:4;248:22;256:11
**history (2)**
192:5,11
**Hold (1)**
188:19
**hole (1)**
275:9
**home (2)**
159:10;228:23
**Honestly (1)**
162:18
**Honor (56)**
107:15,21;109:5,
22;110:16;127:9,14;
139:24;140:18;141:7;
142:9;143:7;160:6,
10;161:7,16;165:12;
178:19,25;179:9,19,
25;180:9;182:18;
195:6;196:11;199:5,
8,12,22;201:4,14;
202:18;207:14;222:5,
25;223:14;231:17;
240:9;241:22;242:11;
245:17;254:1,4;
260:20;261:3,12;
269:8;271:11;272:9;
273:10;275:20;
276:16;278:15,15;
279:25
**hooks (1)**
115:18
**hopeful (1)**
200:25
**hopefully (1)**
244:4
**hopes (1)**
153:12
**Hospital (40)**
112:5,15,17,21;
116:7,15,16,17;
117:19;118:1,6,24;
119:9,11,21,22;
120:21;131:11;
132:14;138:2,5,9;

147:9;149:13;170:5,
8;173:16,24;174:8,
16;175:18;176:24;
178:15;183:9,12;
188:22;210:24;
238:12,18;250:13
**hostile (2)**
202:5,8
**hotspot (1)**
141:21
**hour (8)**
139:16,18;143:3;
173:25;194:11;
202:17;203:16;
276:17
**hours (8)**
112:23;113:1,10,
14,15;148:18,20;
164:4
**How'd (6)**
119:13;125:17;
128:15;182:7;244:11;
257:20
**Huh (2)**
198:24;199:2
**hundred (2)**
171:11;172:7
**hysterical (1)**
245:7

**I**

**ID (2)**
130:17;214:9
**idea (2)**
193:15,21
**identification (12)**
107:15;127:15;
160:1;163:24;169:13,
14;179:5;210:10;
212:6;230:11;248:18;
249:24
**identified (12)**
107:24;123:8;
127:17;138:23;160:3;
179:7;210:13;212:8;
230:15;248:20;250:2;
255:11
**identify (2)**
223:2;248:18
**identities (1)**
222:12
**identity (1)**
186:13
**image (1)**
180:15
**images (1)**
230:25
**immediately (2)**
130:13;254:2
**impacts (2)**
271:2;274:2
**impeachment (1)**

169:13
**important (2)**
204:11;269:22
**inadvertent (1)**
163:5
**INC (2)**
102:5;107:4
**inclined (1)**
266:25
**include (3)**
188:16,25;190:16
**included (1)**
151:10;257:10
**including (4)**
162:2;233:8;
254:22;260:12
**income (1)**
118:10
**incomplete (2)**
197:3;241:24
**incorrect (2)**
171:14,18
**increase (1)**
257:24
**Indeed (9)**
175:20;247:22,25;
248:21;249:22,22;
250:7,7;256:18
**indeedcom (1)**
247:23
**indicate (1)**
116:6
**individual (10)**
193:19;221:6;
225:9;227:5;235:21;
257:23;259:22;260:1,
6,14
**individually (1)**
216:9
**individuals (4)**
131:23;154:16;
255:11,14
**inform (1)**
226:10
**information (40)**
124:17;125:2;
127:4;151:7;152:20;
153:3,13;158:25;
159:5,22,23;161:4;
164:8,18,20,24,25;
165:1;166:1;190:17;
214:5,6,8;215:8,17,
20;216:2,8,12;217:4,
7,9,11;226:7,20;
227:22;233:22;235:6;
244:2;245:10
**informed (19)**
114:7;119:14,16,
25;120:18;128:11,15,
16;129:9;152:6,20;
154:15;156:20;
157:12;175:15;176:3,
12;229:17;247:8

**initial (6)**
152:1;180:20,21,
22;241:24;279:21
**initialize (3)**
155:5,7,7
**initially (2)**
154:22;188:1
**initiate (1)**
124:13
**input (2)**
221:9;223:9
**inquire (1)**
266:10
**inquired (1)**
179:10
**inquiring (2)**
264:17;266:4
**inquisitive (1)**
263:24
**inside (3)**
133:9;138:9,13
**insignia (1)**
121:1
**integration (1)**
109:18
**intended (1)**
202:22
**intent (2)**
204:20;222:7
**intention (1)**
199:14
**interact (4)**
114:23;115:2;
173:20;246:7
**interacted (1)**
186:14
**interacting (1)**
246:8
**interaction (20)**
122:13;152:10,15,
19,19,24,25;154:5;
156:10,13,18,24;
170:15,20;171:12,17;
177:7,17;187:18;
190:23
**interactions (2)**
176:23;177:2
**interconnected (1)**
275:5
**interest (2)**
134:17;264:11
**interested (3)**
134:16;222:25;
245:2
**interlocutory (1)**
204:10
**Internal (3)**
212:24;213:1;253:1
**internally (3)**
174:9;175:2;212:19
**Internet (3)**
141:20;249:15,16
**interpreter (14)**

107:8,10;129:22;
136:25;141:15;
142:24;143:16;
171:25;200:17,19;
203:18;205:20,20;
279:7
**interpreter's (1)**
200:22
**interrelated (1)**
279:9
**interrupt (2)**
205:7;225:18
**interview (18)**
125:12;129:13,16,
18,21;130:2,22;133:9,
18,24;243:9,14,18,21,
25;244:6,13,14
**interviewed (1)**
128:12
**interviews (2)**
176:4,13
**into (25)**
115:5;116:17;
117:1;121:14;130:17;
141:25;156:25;166:6;
183:5;184:3;186:17;
204:22;221:10;
245:22;247:1,4;
256:12;269:19;272:5;
273:16;275:3,24;
277:3,5;279:9
**introduce (3)**
133:1;216:2,9
**introducing (1)**
230:19
**investigate (1)**
247:7
**investigation (2)**
185:14;247:4
**invite (1)**
125:11
**invited (4)**
170:11;173:2;
239:22,24
**involved (5)**
209:9,12;236:17;
258:25;259:3
**involvement (1)**
201:18
**Irene (4)**
224:5,18;228:6,10
**irrelevant (2)**
271:18;277:10
**irrespective (1)**
276:16
**Island (3)**
130:9;193:12,23
**issue (24)**
109:9,12;141:24;
160:14,21;162:7;
199:20;200:15;
202:15,16;205:16;
206:18;235:9;237:11,

13;254:6;266:21;
271:7;272:11;276:20,
22,24;277:1,2
**issued (1)**
107:18
**issues (8)**
117:23,23,25;
196:20,23;197:24;
198:14;203:13
**ITC (3)**
212:19,21;213:1
**item (1)**
220:18
**it's- (1)**
264:22

**J**

**jacket (2)**
131:9,9
**jackets (7)**
121:2,10,20;
122:10,19;131:12;
138:20
**JACKSON (159)**
107:14;108:2,8,20,
23;109:1,3;110:16;
111:7;118:13;123:10,
12,14;124:9;127:9,
13;128:4,10;132:21;
139:24;140:12;142:4;
143:17,19,25;160:4,6,
10,16;161:11,16,20,
22;162:1,5;163:14;
166:8;168:12;173:4,
6;175:6,8;176:21;
178:19,24;179:3;
180:5,10,13;181:12,
24;182:16;183:8;
184:5,24;185:8;
191:14;195:4,9;
196:3,14,17,19;
197:24;198:3,14,23,
25;199:3,5,12,22;
200:6,8,19,25;201:4,
7;204:19;207:5,12,14,
17;208:14;210:9;
211:1,6;212:6,10;
214:24;215:16;
217:21;219:11,15;
221:24;222:5,7,9,12,
25;223:14,17;224:4;
225:17,23;231:11,25;
232:5,11;233:17;
234:19,23,25;238:6;
239:1,3;240:11;
241:22;242:3,6;
243:7;245:14,17,20;
248:11,17;249:4,9;
250:22;251:8;253:15;
257:5,8;258:16;
259:10,23;260:19,24;
261:1,7;262:14,17;

266:19;267:6;269:6;
271:4;272:9,13;
274:5,16;278:8,12,14,
19,21;279:1,17,20,23

**Jacobson (1)**
262:1

**Jake (1)**
131:14

**Jake's (15)**
130:3,4,11,13,15;
131:4;132:8,13,25;
137:21;171:21;173:3;
184:7;187:11;188:8

**January (3)**
228:10,18,19

**jeans (1)**
118:20

**Jencks (4)**
140:10,12;261:6,7

**job (53)**
112:4,9;114:2,7,9;
118:16;125:11;
137:23;152:11,12;
153:6,9;155:23;
170:3,4,11,13;173:8,
13;175:17,20,24;
183:10,22;184:14;
185:23;208:23;209:9;
217:6,14;240:6,13,19;
241:4;245:3;246:7,8,
19;247:20,25;248:22;
249:12;254:10;
255:17;259:6,15;
260:16;266:5,7,11;
268:18;270:1;277:13

**jobs (5)**
135:10;177:21;
240:4;249:20;256:5

**Johnny (2)**
205:15,16

**join (1)**
239:22

**joining (2)**
111:8;134:10

**Jose (1)**
225:15

**Juan (2)**
224:25;225:1

**Judge (317)**
102:16;107:3,25;
108:12,21,24;109:2,4,
7,13,16,20,23;110:2,
7,9,14,18,25;111:4;
118:11;124:5;127:11;
128:6,8;140:8,15,17,
25;141:2,13,17,23,25;
142:6,10,13,17,19,22;
143:1,5,8,11,15,23;
144:1,3,6,10;145:3,7;
160:5,9,25;161:5,8,
13,18,21,25;162:3,6,
9,15;163:7,9,12,18;
166:7,9;169:15;

173:5;175:7;176:15,
16,18;178:22;179:2,
23;180:1,7;181:11,19,
21,23;182:24;183:5,
19,24;184:2,22;
185:9;186:9;191:18;
195:5,7;196:5,7,9,12,
16,17,18;199:7,10,19,
23;200:2,4,7,9,13;
201:2,6,9,12;202:8,
10,15,20;203:6,10,23;
204:2,5,14,22;205:1,
5,8,10,14;206:7,10,
21,23;207:3,8,10,13,
15,19,22,24;208:6,11;
210:8;211:2,4;215:9,
13,15;217:22,24;
219:17,21;221:19,22,
25;222:3,6,8,11,13;
223:3,6,16,18;225:16,
18;231:15,21,23;
232:1,4,10;233:19;
234:6,8,11,14,17,21;
235:1,3,9,13,25;
236:3,5,7,9,12,14;
237:5,6,9,15,19,21,
25;238:4,25;239:2;
240:10;241:13,20;
242:1,5,8,12,19,23;
243:2;245:13,15,19;
247:11;248:10,15;
249:5,7;250:23,25;
251:11,13,15;252:17;
253:4,4,6,12,18,21;
254:3,5,12,14,17,19;
255:23,25;256:7,13,
16,19,23,25;258:15;
259:9;260:17,21,23,
25;261:2,4,11,13,15;
262:11;264:22;
266:21;267:2,11,20,
22,25;269:7,23;270:2,
4;271:9,13,20;272:2,
7,18,19,21,24;273:2,
4,7,12,22,25;274:4,6,
8,11,14,20;275:1,7;
276:1,5,7,18,23,25;
277:9,16,20,25;278:3,
5,10,20,22;279:2,10,
13,18,22,24;280:2

**July (2)**
276:2,4

**June (6)**
102:18;107:4,6;
235:17;254:22;280:4

## K

**keep (4)**
158:17;236:7;
239:10;260:22

**keeping (3)**
108:9;117:18;

179:21

**kept (1)**
121:7

**key (3)**
194:22,25;203:12

**keys (7)**
115:7,9,12,16,18,
21;194:24

**kind (8)**
161:12;204:6;
206:17;215:24;
221:25;250:5;260:4;
266:8

**kindly (1)**
201:16

**kinds (1)**
117:16

**King (1)**
207:6

**knew (3)**
179:11;187:22;
189:20

**knock (1)**
200:9

**knowing (5)**
135:9;269:20,20,
21,21

**knowledge (26)**
116:25;118:7;
126:7;128:24;147:25;
148:4,12;149:23;
150:2;151:1;155:18;
172:6;174:7,25;
175:8;182:4;193:7,
10,11,14,17,24,25;
201:18;223:8;238:7

**known (2)**
112:20;147:8

**knows (2)**
223:8;242:9

## L

**LA (1)**
113:5

**labeled (1)**
162:25

**LABOR (6)**
102:2,17;140:4,5;
218:10;265:18

**labored (1)**
113:9

**lack (1)**
265:1

**lacks (2)**
264:21,23

**language (2)**
136:9;165:2

**laptop (1)**
179:4

**large (1)**
272:16

**last (36)**

111:19,23;112:2;
115:6,20;117:12;
132:18;137:25;
139:22;151:10;159:6;
162:18,21;167:15;
169:22;174:12,14;
177:7;195:7;206:9;
207:20;208:7,9;
210:3;215:23;218:23;
219:8,24,25;220:4;
228:8;233:23,24;
261:22;271:6,17

**late (5)**
205:11,17;231:6;
244:22;275:11

**later (4)**
155:5;158:16;
190:5;207:25

**Law (3)**
102:16;230:22;
273:10

**laws (1)**
275:2

**lawyer's (2)**
197:22;232:2

**lay (4)**
219:14;231:19;
237:7,17

**laying (1)**
253:19

**leading (2)**
184:21;248:9

**leads (1)**
241:23

**learn (5)**
229:13,16,21,24;
230:1

**learned (3)**
132:23;187:21;
229:19

**least (1)**
241:24

**leave (3)**
145:20;200:24;
217:14

**leaves (1)**
217:6

**leaving (2)**
205:17;240:18

**left (10)**
113:7;121:2;
131:13;137:15,21;
157:3;217:14;226:14,
17;227:11

**legal (2)**
237:4;270:16

**lengthy (3)**
201:17,17;277:7

**letter (19)**
232:3,12;234:18;
236:21,22,23,25;
237:1,11;238:8;
254:23;263:21;

264:17;267:15,17;
268:2,20;270:15,16

**level (1)**
114:8

**liaison (2)**
265:16,20

**light (1)**
196:23

**lights (1)**
139:11

**limit (1)**
173:25

**line (6)**
125:21;150:13,15;
220:18;278:16,25

**lines (1)**
121:5;131:16;
138:25;279:8

**link (1)**
197:6

**Linked (1)**
231:18

**list (25)**
211:22;212:18;
214:1;215:18,21;
217:15,16,17,18;
218:15,19,20;219:1;
222:9;224:2;225:20;
226:17,23;228:6,21;
229:4,7,10;234:1;
255:1

**listed (6)**
107:21;223:2;
225:25;226:4,8;
247:21

**Listen (9)**
141:2;142:23;
182:24;223:18;254:5;
273:7;277:12,25;
279:2

**listening (1)**
133:23

**listing (4)**
212:16;215:25;
216:1;218:21

**little (5)**
133:13;140:19,23;
148:4;265:2

**live (2)**
151:11;203:20

**lobby (2)**
130:18,19

**LOCAL (13)**
102:8;107:20;
112:12;118:2;208:18;
209:6;210:5,17;
211:7,22;238:14;
257:9;264:16

**located (1)**
170:7

**location (12)**
114:21;115:15;
150:21,25;153:16,21,

25;154:3;166:21;
221:18;224:21;
243:22
**locations (5)**
110:6;193:12,16,
23;194:2
**lock (1)**
146:20
**log (1)**
142:1
**logged (1)**
142:2
**logo (9)**
118:21;121:6,7;
131:12,14;138:21,22,
24;154:11
**logos (1)**
121:1
**Long (18)**
130:9;135:6;137:5;
141:11;152:24;177:7;
193:13,22;200:21;
202:25;206:4;208:21;
209:15;273:3,9;
275:13,14,18
**longer (10)**
141:3;151:18;
199:17;217:8;226:9,
11,21,21,23;227:6
**look (24)**
108:4;131:14;
160:24;161:8,14;
162:16,25;163:12;
164:11;174:11;
175:16,20;198:22;
203:11;210:12;
230:14;247:1,12;
254:16,20;256:25;
262:20;278:1,3
**looked (6)**
121:5;195:14,21;
247:14,21;248:6
**looking (14)**
119:19;133:23;
152:1;162:10;222:20;
234:23;240:6;242:20;
247:17;248:2;250:10,
12,13;263:3
**looks (1)**
251:8
**lose (3)**
135:10;152:11;
153:6
**losing (3)**
175:24;177:21;
229:13
**loss (1)**
175:16
**lost (14)**
116:12;119:10;
152:4,7,12,15;154:15;
183:10;226:20;
259:15;260:1,10,15,

15
**lot (23)**
112:22;116:12;
117:3;139:9;140:22;
149:17,17,18,21,23,
24,24;150:5,16;
155:24;161:24;184:4;
222:16;246:4;249:20;
268:25;269:18;
275:21
**loud (1)**
262:22
**love (1)**
257:1
**lunch (3)**
117:2;140:24;
198:18
**luncheon (1)**
144:11
**luxury (2)**
251:18,18

# M

**main (21)**
112:20;113:10,12;
120:21;138:4,12;
145:17,20,21,23;
146:8,10,11;147:20;
155:11;194:7,9,14,15;
201:15;203:22
**maintain (7)**
211:22;229:4,7;
238:21;239:5,7,11
**maintaining (1)**
229:10
**majority (4)**
108:22,23;177:20;
226:1
**makes (2)**
126:9;262:8
**makeup (1)**
110:5
**making (3)**
117:22;206:17;
273:15
**malicious (1)**
163:6
**managed (1)**
149:12
**management (4)**
120:12;129:15;
133:19;134:6
**manager (10)**
117:15,17;119:17;
134:20;135:19;149:7,
10;150:6;151:6,22
**managers (15)**
118:5;130:19;
131:8,17,19,24;132:8,
25;134:9,15,23;
135:12,22;136:9,19
**manages (1)**

194:2
**managing (1)**
209:12
**manner (1)**
226:17
**many (16)**
113:4;122:10,19;
131:23;139:2;160:14,
17,22;177:9;205:3;
212:2;213:10;243:11;
247:25;248:7;260:7
**March (6)**
111:21;112:2;
145:14;146:6,11;
150:17
**mark (5)**
107:15;112:19;
169:13;217:13;
248:18
**marked (8)**
127:15;159:25;
163:24;179:5;210:10;
212:6;230:11;249:24
**marking (1)**
179:15
**Matt (9)**
162:17;163:1;
168:12;230:22;
233:14;248:23;
250:19;256:21;
270:13
**Matter (11)**
102:4,15;161:14;
200:22,24;202:18;
231:12;247:17;272:7,
7;280:4
**Matthew (1)**
230:21
**Matt's (1)**
242:14
**MAURO (44)**
124:4;128:7;
132:18,20;140:10,14;
141:19,24;142:3,5,25;
143:10,13,18;145:6,9,
11;159:25;160:13;
161:3,7;162:7,10;
163:8,11,22;166:5,11;
169:10,17;173:7;
175:13;176:14,19;
178:25;182:18;
184:21;186:11;195:6;
196:8,13;254:22;
261:25;276:13
**Max (1)**
173:24
**may (9)**
109:5;129:3;
152:11;153:21;
162:17;166:21;223:5;
251:3;277:16
**maybe (4)**
153:9;214:15;

244:19;277:15
**mean (48)**
109:16,20;141:11;
161:8,9;163:15;
174:22;180:11;
182:24;183:20;200:9;
202:16,20;203:7,10;
204:5,7,23;205:10;
206:10,15,20;210:14;
215:9,10,22;222:8,19;
224:3;225:6;228:24;
235:6;237:25;241:14;
242:19,23;252:20;
253:6,12;254:9,12,21;
255:20;256:19;
266:23;271:25;275:2;
277:16
**meaning (1)**
148:10
**meantime (2)**
110:12;278:5
**medical (1)**
254:25
**meet (4)**
109:21,25;119:6;
216:22
**meeting (20)**
120:11;133:16;
136:10,18,24;137:5,6,
8,9,18,21;172:1,3;
184:7;185:17,22;
187:15,19,22;190:15
**member (14)**
212:16;215:25;
216:1,20;218:21;
229:17;254:25;
259:14,25;264:17;
266:3,13,14;268:8
**members (22)**
208:25;213:10;
224:2;230:2,2;247:8;
257:18,19,21;258:7,
11,19;264:6,12;265:4,
7,20;269:5;270:1,7;
273:16,17
**member's (1)**
216:7
**membership (2)**
224:1,2
**memory (5)**
145:12;171:4;
186:4;193:4,5
**men (3)**
132:1,2,7
**mention (4)**
117:6;179:12,24;
246:22
**mentioned (3)**
133:4;151:25;
153:11
**message (10)**
127:22;128:2,22;
129:1,6;245:11,23;

246:14;262:13,15
**messages (2)**
160:21;198:15
**met (6)**
132:13,25;133:1,7;
190:7,10
**methodical (1)**
269:15
**Michael (11)**
145:11;178:10;
179:11,12,17,24;
230:23;232:7;234:24;
240:22;242:15
**microphone (1)**
214:21
**Mid (1)**
229:25
**mid- (2)**
185:24;186:4
**middle (2)**
107:5;168:3
**mid-November (5)**
185:24;264:4;
269:4,25;270:6
**mid-October (1)**
229:20
**might (1)**
178:25
**Miguel (3)**
240:22;241:1,2
**Mike (5)**
141:25;161:15;
163:3;191:9;242:15
**mileage (1)**
275:16
**miles (4)**
139:16,18;173:25;
194:10
**MILMAN (230)**
108:1,11;109:5,8,
15,18,21,25;110:3,8,
13;123:9,11,13;
140:16,18;141:1,6,14;
142:8,11,14,18,20;
143:4,6,9,22;144:5,7;
161:15;162:17;
163:10,15;179:8,24;
180:9,11;181:7;
197:9;198:2,6,17,24;
199:2,4,8;200:1,3,16,
21;201:10,13,14;
202:9,14,18,23;203:9,
11;204:1,4,9,15,21,
25;205:3,7,9,13,15;
206:8,19,22,24;207:9;
211:3;212:5;214:17,
20;215:1,4,12;
217:23;218:1;219:13,
23;221:21;222:2;
223:5,7,12;225:22;
231:10,13,16,22,24;
232:2,9;233:20;
234:7,10,12,15,20,22,

24;235:2,4,7,15,18,
20,23;236:4,6,8,11,
13,15;237:7,13,16,21;
238:2,23;240:8;
241:11,19;242:11,13,
22;243:1;247:10;
248:9,14;249:6;
250:24;251:2,3,10,12,
14,16;252:9,18,21,24;
253:3,9,16,19,25;
254:9,13;255:4,7,9,
19,21,24;256:2,9,14,
21,24;257:7;258:13;
259:8,20;260:21;
261:5,9,12,18,21;
262:15,18;264:23,25;
265:3;267:1,3,7,14;
268:1;269:8,24;
270:3,5;271:5,11,14;
272:1,4,12,14,20,24;
273:3,5,9,13,24;
274:1,7,9,12,19,24;
275:3,16;276:3,6,8,
14,22,24;277:1,18,22;
278:2,4,9,13,18;
279:6,11,25
**Milman's (1)**
204:19
**mind (5)**
136:7;255:25;
260:21,21,23
**minds (1)**
137:13
**minute (4)**
162:3,16;176:14;
201:5
**minutes (7)**
137:7;140:14;
141:3;142:8;160:24;
245:16;261:10
**mischaracterizes (1)**
181:10
**misconduct (1)**
276:20
**misleading (2)**
181:7,9
**misrepresentation (1)**
204:20
**missed (1)**
244:12
**missing (2)**
162:6;213:25
**misstates (1)**
173:4
**mixed (2)**
115:9,10
**Mm-hmm (5)**
111:11;166:14;
188:5;207:23;221:24
**model (1)**
110:5
**modernized (1)**
147:6

**moment (10)**
123:6;127:10;
163:25;169:19;
174:11;191:21;192:2;
199:5;207:14;241:16
**moments (1)**
197:6
**Monday (2)**
113:9;118:3
**monies (1)**
223:1
**month (7)**
145:14;189:11;
190:5;212:17;220:5,
5;273:18
**monthly (1)**
118:11
**more (17)**
114:14;140:19,24;
141:4;142:8;147:6,
18;148:2,5;150:9;
161:24;174:24;202:4;
206:17,17;263:24;
275:21
**morning (7)**
111:8;199:16;
203:18,20;205:22,23;
279:7
**most (3)**
114:3;258:8;269:22
**mostly (1)**
120:24
**mother (14)**
122:7;146:2,11,14;
147:16;156:18,23;
157:2,4,11;166:16;
170:17;172:8;173:8
**motion (4)**
201:11,24;204:8,9
**move (20)**
128:4;145:19;
146:16;147:2,3;
163:20,21;165:12;
166:5;171:20;182:16;
207:10;211:1;217:14,
21;233:17;245:16;
249:4;250:22;270:4
**moved (5)**
145:22;146:14,24;
236:9,10
**movement (1)**
247:12
**moving (1)**
245:13
**Mrs (2)**
228:6;231:2
**much (13)**
110:25;111:4;
118:10;141:3;154:14;
196:9;200:15;201:25;
207:19,22;208:6;
265:1;275:16
**multiple (10)**

116:15,16,17,19;
126:12;158:4;248:8,
12,16;249:22
**myself (5)**
216:2,9;221:18;
252:23;260:12

**N**

**name (58)**
111:1;112:11;
117:12;119:5;120:10;
123:25;126:13,19,20;
132:3,5;133:5;
136:21;138:6;145:10;
151:10;159:6,6;
177:14,14,19;178:10;
179:11,16;187:1,4,5,
7,9,11,23;188:3,11,
12,14,24;189:20;
190:17;198:11,23,25;
199:2;207:20;208:7,
8,9,9;213:16,17,25;
214:1;216:7;218:13;
227:5;228:7;230:24;
240:1;273:19
**named (6)**
118:23;119:1;
225:20;228:1;229:21;
242:20
**names (15)**
132:16,22,23;
133:3,5,6;170:10;
177:12,23,24;187:1;
190:14;215:22,23;
241:2
**NATIONAL (3)**
102:2,17;140:5
**nature (2)**
114:13;151:12
**necessarily (2)**
150:6;163:19
**necessary (2)**
206:3;217:3
**need (29)**
140:18,22,23,25;
141:4,18,18,18;142:7,
8;144:3;160:16,17;
161:19;191:14;
198:23,25;207:5;
209:2;216:10;217:2;
243:3;253:7;257:4;
260:17,19;263:3;
277:4,5
**needed (5)**
129:22;147:7;
150:7;216:10;258:7
**needing (1)**
165:8
**needs (1)**
112:6
**negotiate (1)**
210:20

**negotiation (2)**
257:17;258:1
**negotiations (1)**
257:21
**nervous (2)**
243:24;244:7
**network (1)**
142:2
**New (29)**
102:18,18;119:23;
120:8,19;124:25;
129:4;130:9;146:23,
23;147:6;152:1;
156:8;170:11;174:16;
216:17,19,20,21;
227:20;228:8,14,14,
22,25;230:18;232:8;
246:19,23
**news (1)**
243:14
**next (9)**
110:15;116:7;
133:8,25;147:8;
153:10,11;205:19;
207:11
**nice (1)**
269:15
**Nichols (2)**
138:7,11
**Nick (4)**
118:23;119:1;
246:2,21
**night (5)**
162:10,18,21;
206:9;225:2
**NLRB (4)**
167:25;168:5;
188:17;215:8
**nobody (2)**
129:4;265:14
**none (1)**
135:11
**non-production (1)**
254:6
**nonresponsive (2)**
240:8;241:11
**non-responsive (1)**
241:13
**nonsense (2)**
255:20,21
**non-shop (1)**
263:25
**nor (1)**
179:18
**normal (12)**
183:13;263:10,11,
12,25;264:15;266:2,5,
8,12,15,16
**Noted (1)**
107:2
**notice (5)**
102:16;107:22;
120:23;205:14;

233:23
**noticed (5)**
108:4;138:18;
154:10;178:14;
195:23
**notified (3)**
201:15,21;203:21
**notify (5)**
226:13,16,19;227:5
**notwithstanding (1)**
110:4
**November (94)**
111:23;112:2;
113:11;119:15;120:6,
18;122:17;124:14;
128:3,13;130:3,11;
147:10;150:18;
151:14;152:9;156:14;
164:3,6;166:18,25;
167:15;170:5;171:21;
175:15;176:1;184:7,
13;185:18,25;186:5;
187:12,14,19,22;
189:8,11;190:7;
210:1,3,3,6;212:3;
214:3;217:19;218:24,
25;219:6,7,8;220:23,
24;221:5,14;222:23;
224:7,13;225:9,15,16,
17,22,24;226:1,4,8,
11,16;227:1,4;229:9;
233:16;238:20;239:4,
11,12,12;240:13,17;
243:9,12,22,25;244:9,
11;245:23;247:16;
254:23;264:4;269:4;
270:10,11,24,25
**nowhere (1)**
144:9
**number (81)**
107:17;115:8,10,
11,11;125:3,7,18,19,
22,23,23,25,25;126:2,
3,21,24;127:23,24;
151:11;158:2,7,8,9,
10;166:6,6;174:11;
181:1,3,4,5,8,13,14,
16,19,20,25;182:3,7,
8,10,21,23;191:9,17,
20,24;192:1,5,6,9,17,
19,20,21,25;193:4;
195:10,11,14,18,19,
20,21,23,25;196:2;
199:21;214:9;
227:25;233:20;
247:14;251:4,5,6,25;
252:3
**numbers (9)**
126:12,15;158:5;
180:19;182:12,14;
183:3;220:1;247:15
**number's (1)**
182:2

**numerical (1)**
115:19
**numerics (1)**
191:12

## O

**oath (1)**
234:4
**object (10)**
160:6;161:9,11,17;
182:18;204:7;264:21;
266:19;271:15;274:5
**objected (2)**
107:11;277:23
**objecting (1)**
204:6
**objection (67)**
107:25;108:11;
124:4;128:6,7;161:1,
12;166:7,8;173:4;
175:6;181:7;184:21;
195:4;203:7;211:2,3;
217:22;219:11,17,18,
19,22;231:10,16;
232:9;233:19,20;
234:13;235:7;236:12,
13;237:4;238:23;
240:8;241:11;247:10;
249:5,6;250:23;
252:12,15;253:7,7,8,
9,9,13,14,14,16,19,23;
258:13;259:8,20;
262:9,10;264:19;
267:6;269:6;271:4,
16;275:7;276:9,15;
278:16
**objectionable (1)**
234:9
**objections (2)**
234:11;254:14
**observation (1)**
194:11
**observe (9)**
121:23;122:19;
138:8;139:20;154:19,
25;183:10;240:19;
241:3
**observed (10)**
154:6,16,24;
155:12,17;156:11,16;
173:16;184:7;194:5
**observing (1)**
257:16
**obtain (3)**
215:17;216:7;
228:20
**occurred (1)**
170:23
**o'clock (6)**
198:13,22;244:13;
275:8,8,9
**October (11)**

119:14;120:7;
151:13,17;152:9;
175:14;220:23;
229:25;231:6,6,7
**off (9)**
114:12;127:9,11;
144:10;176:16;199:5,
7;222:22;261:13
**offense (1)**
276:23
**offer (15)**
136:6;137:10;
231:24;272:22,25;
273:3,6,9,11,21;
274:21;277:7;278:1,
21,23
**offered (3)**
112:8;137:23;
231:11
**offering (1)**
174:21
**offerings (1)**
247:25
**office (8)**
216:14;217:4,13;
218:8;227:22;230:18;
242:14,15
**officer (1)**
266:17
**officials (1)**
271:18
**often (2)**
205:14;227:13
**old (2)**
145:22;147:4
**once (8)**
133:14;142:1;
149:19;194:24,25;
248:4,5;260:14
**one (81)**
107:14;109:25;
110:4;111:14;115:5,
5,6,19;116:19;
119:24;121:20;122:4,
12;123:6,9,12;125:18,
19;126:15;129:6;
132:18;135:1;136:21;
140:3,12;143:7;
148:13;149:3,14;
150:2;152:10,12;
154:23;158:4;162:2;
170:10;176:14;181:1,
20;182:12;186:15;
188:3;191:25;192:11,
25;196:23;199:13;
201:4,15;207:14;
214:25;217:5;218:18,
18,19;223:5;232:8;
234:2,5,5,24;235:15;
239:2,21;244:13;
250:24;251:11,13;
255:15,16;256:3,3;
260:13;261:7;262:3;

263:7;275:17;277:24,
24;278:18,19
**ongoing (1)**
252:10
**online (5)**
161:3;170:13;
175:20;242:21
**only (24)**
108:1;113:6,19;
134:16;135:1;139:9;
140:12;141:7;147:15;
159:10;164:21;
169:13,14;177:14;
183:3;190:14;192:6,
9;193:2;195:19;
196:2;202:3;207:5;
262:2
**onto (2)**
142:2;158:24
**open (9)**
113:2,3,10;134:10;
139:9;165:25;173:24;
276:11,17
**opened (4)**
113:12;276:14;
277:11,18
**opening (5)**
108:17;110:11;
236:15,18;249:14
**operate (4)**
113:22;154:3;
174:9;175:2
**operates (2)**
174:7;175:1
**operating (6)**
131:1,3;133:20;
175:4;183:22;191:4
**operation (13)**
138:9;139:20,21;
148:3;149:14;173:17;
174:15,17;175:10;
193:6;195:3;229:22;
271:23
**operations (4)**
134:7;138:14;
139:23;183:12
**opinion (1)**
135:8
**opportunity (5)**
138:1;148:1;
149:18;165:6;273:20
**opposition (1)**
179:19
**order (8)**
107:10;109:2;
117:19;140:19;
157:14;199:1;275:10;
279:3
**orderly (1)**
236:7
**ordinary (3)**
229:4,7,12
**organization (1)**

179:13
**organize (1)**
209:22
**organized (1)**
216:1
**organizing (1)**
209:24
**ORIG (1)**
227:8
**original (11)**
198:23,25;199:2,6;
227:9,12,15,19,24;
228:8,24
**O-R-U-E (1)**
117:13
**others (3)**
135:9;147:24;
240:25
**otherwise (3)**
120:11;242:7;
258:19
**Our- (1)**
110:5
**out (65)**
107:10;115:4;
117:4;124:8;125:14,
14,17;127:4;128:16;
135:5;138:13;140:19;
144:3;149:2;151:5;
157:6,10,13,15,18;
158:24;159:6,8;
161:4,21;173:19;
176:1,8,12;179:6;
182:9;184:16;189:2,
12;190:4,10;194:21;
195:11;199:1;200:10,
12;204:12;205:21;
206:14,15,15;214:15;
216:11,13;225:11;
229:2,3,17;230:18;
241:5,7;247:9,15,19;
262:22;266:18;270:9,
9,16;279:2
**outlined (1)**
138:25
**outside (2)**
163:3;183:17
**over (29)**
115:18;134:19;
150:5;153:7;156:8;
162:20,21;163:9;
165:25;174:17;178:7;
197:11,13;201:19;
206:1,24;210:12;
216:23;229:22;
230:14;238:17;
247:21;251:6;253:3,
3;257:15;264:2;
271:7;276:17
**overload (1)**
162:19
**overly (1)**
205:11

**overrule (1)**
219:18
**overruled (11)**
124:6;219:15,22;
231:15;232:10;
240:10;247:11;
248:10,15,15;270:2
**own (5)**
115:8;148:16;
163:16,20;223:8

## P

**packet (1)**
108:3
**page (18)**
108:5,10;124:23,
25;141:3;142:1;
164:16;169:22,23;
170:3;174:12;212:9,
11;213:3;234:2;
249:11;261:8,10
**pages (2)**
160:1;230:13
**paid (5)**
220:2,5,23,23;
221:5
**paper (3)**
151:9;212:11;
216:10
**paperwork (2)**
216:2;217:3
**Paragraph (5)**
170:2;19;174:10,
12;186:24
**park (2)**
112:8;150:15
**parked (6)**
114:20,21,22;
130:15;150:16;184:2
**PARKING (141)**
102:5;107:3;
111:15,19;112:7;
113:1,16,17;115:14;
117:10;118:19;
119:11,21;120:14,17,
21;121:10;122:20,25;
125:8,11,14;129:15;
130:19;131:1,3,4,5,7,
15;132:3,8;133:7;
134:11;136:19;
137:20,23;138:9,18,
19,20,22;139:4;
145:11;149:18;154:6,
7,11,21;155:4,15,23;
156:6,7,11,17,19,22;
157:3,5,14;164:4;
166:17;167:2,5,8,12;
170:4,6,16,20;173:2,
9,13,16,20;174:7,15,
15,25;175:4,10;176:1,
23;177:2,9,25;178:7,
12,15;184:4,14,15,19;

185:1,17,23;193:6,8,
11,21,25;194:3,6;
195:3,11;196:25;
209:4;210:23;211:12;
224:20;229:14,21;
230:3;238:7,10,11,14,
16,17;240:13;241:4;
243:9;246:4,6;247:4;
248:1,22;249:20,21;
250:12,13;256:11,17;
261:24;267:23;268:2,
5,7;270:8,9
**part (25)**
108:3;109:8;114:1;
118:8,16;136:3;
177:20;199:14;
202:12;212:17;
218:18,19,19;229:7;
230:7,10;235:24;
236:21,24;237:4;
239:24;241:22;246:7;
252:9;272:16
**particular (4)**
154:24;166:15;
194:7;259:24
**parties (1)**
242:24
**Party (1)**
102:12
**pass (1)**
156:22
**passed (3)**
154:14;157:6,10
**passing (1)**
139:15
**past (2)**
130:18;133:12
**path (1)**
277:8
**paths (1)**
139:10
**patience (1)**
111:9
**patient (4)**
115:5;116:13;
117:24;147:6
**patients (8)**
112:6;114:11,23;
115:3,22;116:22;
139:10;183:18
**paycheck (1)**
118:15
**payroll (2)**
221:25;223:23
**penalty (2)**
169:7,8
**pending (1)**
214:25
**people (37)**
116:12;117:3;
121:9,17;122:12;
128:18;131:25;
132:12;154:6,10;

155:15,16;156:7,22;
157:3;170:16,21;
172:13;174:4;177:11,
13;194:21;216:21;
222:16;223:21;
225:20;226:1,2;
227:5,23;240:18;
243:11,23;257:23;
260:7,12;263:5
**per (2)**
139:16,18
**perceived (3)**
131:18,23;132:7
**percent (2)**
171:11;172:7
**Perez (10)**
240:22,22,23;
241:1,2;257:13,19;
258:5,25;259:6
**perform (1)**
250:5
**period (8)**
113:6;147:14;
150:25;151:13;226:1;
240:6;257:22;259:4
**perjury (2)**
169:7,8
**person (28)**
125:20,22;130:21;
168:7;179:13;187:3,
25;189:14;190:7,10,
15;200:10;205:2,6;
216:21;217:7,13;
218:25;220:6;225:25;
226:4,17;227:20;
228:6,21;237:22;
258:24;273:19
**personal (2)**
187:18;214:8
**Personally (14)**
119:7;122:24;
133:19;155:12;
158:18;167:6,22;
182:6;184:18;186:15;
188:18;230:24;246:3,
12
**personnel (3)**
156:11,17;157:5
**persons (2)**
132:13;189:13
**person's (3)**
133:5;177:14;
189:23
**Petruzzelli (14)**
178:10;179:11,13,
17,24;191:9,24;192:3,
6,10,14,25;230:23;
232:7
**pews (1)**
205:1
**phone (29)**
125:3,7,18,19,22;
126:12,18;127:22,24,

25;151:11;158:2,5,7;
165:25,25;167:17;
172:3;181:25;183:3;
191:20;195:12,21,22;
214:9,9;244:13;
246:13;252:5
**physically (6)**
221:18;224:10,17;
232:13;241:7;258:22
**pick (2)**
135:5;173:12
**picked (1)**
162:22
**picture (2)**
127:22;234:24
**place (4)**
142:21;147:15;
215:25;271:6
**placed (3)**
115:18;130:5;150:6
**places (1)**
159:13
**plan (3)**
142:20;275:20;
278:6
**planned (3)**
205:13,15;275:24
**planning (2)**
205:22,22
**plans (2)**
134:13,25
**playing (1)**
206:6
**Plaza (1)**
102:17
**please (13)**
110:19,25;143:11;
144:6;199:20;207:25;
208:7;214:23;236:3,
3;262:10,12,19
**ploy (1)**
206:17
**PLUS (3)**
102:5;107:4;145:12
**pm (13)**
112:25;113:12,18;
145:2;148:20;176:17;
199:9;244:14,21,22;
245:18;261:14;280:3
**pm/ (4)**
176:17;199:9;
245:18;261:14
**point (21)**
111:14,15;137:15;
145:19;152:3,5;
154:2,6;173:19;
179:21;209:7;225:24;
226:3,7;229:13,21;
237:20;273:6;274:10;
275:21;279:3
**pool (4)**
148:7,10,14;193:18
**pooled (3)**

148:12,16;193:15
**popped (1)**
248:2
**pops (3)**
165:25;248:6;
249:21
**populate (1)**
198:7
**populated (2)**
138:13;183:16
**populating (1)**
166:1
**Porsuk (18)**
207:18;208:3,10,
15;210:11;218:2;
223:10;224:5;230:12;
243:3;245:21;248:19;
249:25;251:17;
261:19;265:5;273:8;
274:16
**P-O-R-S-U-K (2)**
207:21;208:10
**portal (1)**
247:14
**portions (1)**
115:5
**position (15)**
108:22;110:4;
151:2,3;173:1;200:1;
202:25;208:19,21;
219:5,7;249:14;
257:2,5;269:16
**positions (2)**
247:5;254:10
**possession (4)**
189:15,16,18;
256:17
**possible (2)**
119:25;202:17
**possibly (2)**
140:23;221:6
**post (6)**
146:16,18;147:12;
148:19;150:6;175:24
**posted (6)**
145:20;146:8,21;
155:10,11;256:18
**poster (1)**
151:6
**posting (7)**
145:15,17,24;
146:7,15;247:20;
255:17
**postings (1)**
175:17
**posturing (1)**
204:22
**potential (1)**
165:9
**potentially (2)**
108:17;180:2
**power (1)**
206:13

**practical (3)**
161:14;202:11;
237:20
**practice (1)**
140:4
**precisely (1)**
172:21
**prefer (2)**
203:7,8
**preference (3)**
150:4,8,11
**prejudge (1)**
109:24
**premises (1)**
217:14
**prep (3)**
205:18,23;210:14
**prepare (2)**
141:16;209:1
**prepared (1)**
206:2
**preparing (2)**
142:12;206:9
**presence (1)**
199:17
**present (6)**
136:18;157:4,10,
17;168:10;255:15
**presented (1)**
230:12
**presenting (2)**
123:7;180:14
**press (1)**
124:24
**pretty (1)**
204:24
**previous (4)**
156:2;159:13;
166:20;170:14
**previously (2)**
107:5;188:9
**primarily (1)**
177:6
**primary (6)**
149:17,21,23;
150:5,13,15
**principle (2)**
161:12,12
**print (8)**
115:4;140:23,23;
141:18;144:3;213:15,
16;221:15
**printed (7)**
178:21;213:3,4,8,
11,12;219:16
**printing (3)**
142:16,18;221:16
**prior (14)**
146:2;159:13;
168:16;189:2;190:4,
9,10;209:18,19;
211:16,18,20;227:1;
257:25

**privacy (2)**
215:14;228:24
**private (2)**
168:9,10
**probably (3)**
161:10,14;261:23
**probative (1)**
221:4
**problem (8)**
141:19,22;201:13;
241:23;242:14,18;
263:2;274:9
**proceed (3)**
107:7;163:14;
196:15
**proceeded (1)**
244:3
**proceeding (3)**
140:4,5;176:4
**process (6)**
113:14;152:2;
176:7;215:24;216:4;
250:8
**produce (6)**
163:17;197:21;
237:16;256:22;257:4;
275:2
**produced (12)**
160:7,12,15,18,19,
20,22;161:15;162:1,
18;198:20;241:16
**production (15)**
196:21;197:2,4,8,
10,12,23,25;198:8;
207:7;241:23,24,25;
252:16;261:5
**professionalism (1)**
114:9
**proffer (4)**
179:9;269:11,12,14
**prohibited (1)**
273:13
**prohibiting (1)**
273:14
**projecting (1)**
179:3
**pronounced (1)**
149:8
**proof (13)**
231:11;272:22,25;
273:3,6,10,11;274:21;
277:6,7;278:1,21,23
**proper (10)**
182:20;219:14;
231:19;236:25;237:1,
7,17,23,23;264:15
**properly (1)**
272:18
**proposal (1)**
257:16
**proposals (1)**
257:21
**protect (4)**

202:1;204:17;
215:14;270:6
**protected (2)**
214:8;264:6
**prove (2)**
223:20,21
**provide (5)**
119:11;124:17;
164:8;217:3;229:14
**provided (3)**
125:2;164:13;
168:15
**providing (2)**
151:18;166:16
**public (3)**
139:9;173:24;176:8
**pull (1)**
174:12
**pulled (1)**
158:25
**purport (2)**
206:24;255:12
**purports (1)**
221:4
**purpose (2)**
124:6;223:1
**purposes (3)**
163:24;169:13;
255:3
**pursuant (2)**
102:15;254:7
**put (20)**
135:8;153:20;
154:3;165:24;166:21;
186:17;202:2,22,24,
24;203:24;221:11;
228:24;236:17;
241:21;242:6;247:15;
249:19;272:10;276:8
**puts (1)**
193:22

**Q**

**QR (27)**
124:7,12,23;
128:17;157:13,15;
158:23,24,25;159:2;
161:4;162:24;164:7,
19,25;165:3,3,9,16,
20,23,24;166:2;
170:12;185:2,5,6
**quash (1)**
201:24
**quit (2)**
218:24;219:9
**Quite (1)**
205:14

**R**

**R-1 (1)**
166:9

**raise (2)**
110:19;207:25
**raised (8)**
160:14,21;161:23;
162:8;196:20,23;
197:24;198:14
**rally (2)**
270:19,21
**Ramon (4)**
240:22;257:13;
258:5;259:6
**rank (6)**
263:25;264:17;
266:3,13,14;268:8
**rarely (1)**
163:4
**rate (2)**
159:18;250:14
**rather (3)**
201:3;279:13,14
**RC-148399 (1)**
107:17
**reach (5)**
125:14,14,17;
195:10;266:18
**reached (2)**
229:17;270:9
**reaching (1)**
230:18
**react (1)**
115:1
**read (7)**
181:21;220:21,21;
262:19,20,22,22
**reading (1)**
262:19
**reads (1)**
181:22
**ready (4)**
136:15;278:13;
279:6,6
**really (19)**
134:1;141:4;
166:25;195:2;203:6;
206:17;207:9;220:22;
221:8;222:20;223:4,
20,25;237:19;241:15;
271:9,9;276:18;279:3
**rear (2)**
130:22;133:11
**reason (3)**
163:16;213:25;
256:10
**reasons (1)**
222:16
**rebuttal (2)**
203:4;275:18
**recall (45)**
122:16;132:6,12;
134:20,21;136:22;
146:25;151:7;154:7,
12;155:15;156:12;
165:7,11;166:4,12,22;

167:23,24;168:2;
169:8;170:10;171:9;
172:9,10;173:17;
177:12;178:4,6;
190:13;191:6,20;
192:1,15,20,21;212:2;
229:19;231:5;245:5;
259:24;273:8
**receipt (1)**
194:25
**receive (22)**
118:8;120:1;
122:25;123:2,4;
127:7;149:25;180:23;
212:16,18;215:20;
216:12;226:7;227:20;
230:9,25;231:1;
232:12;233:6,11,15;
245:23
**received (48)**
108:19;115:12;
123:3,20;126:16;
128:9,22,24;129:2,6,
9,11;152:2;166:10,
17;180:4,20,21,22;
181:2;182:4;183:7;
184:18,25;197:1,5,16;
198:10;211:5;222:24;
223:1;232:15,17;
233:9;234:2,3,5;
236:22;237:10,12,14,
25;241:21;242:9;
245:21;246:14;249:8;
254:8
**receives (1)**
149:24
**receiving (1)**
216:25
**recently (1)**
195:14
**Recess (6)**
127:12;144:11;
176:17;199:9;245:18;
261:14
**recognize (9)**
123:15;127:19;
132:9;180:16;195:25;
212:12;230:4;238:10;
270:10
**recognized (4)**
187:23,25;188:9;
238:14
**recollection (7)**
151:24;164:7;
170:22;172:15;177:2;
186:17;190:19
**reconvene (2)**
278:5;280:4
**Reconvened (5)**
127:12;176:17;
199:9;245:18;261:14
**record (26)**

108:9;111:1;127:9,
11;144:10;145:3,6;
159:23;172:3,5;
176:16;199:6,7,11;
204:23;208:8;222:1;
227:22;228:5;245:19;
252:21;261:13,22;
274:22;276:12;
278:24
**recording (1)**
260:9
**records (4)**
197:15,16,19;
223:23
**record's (1)**
249:10
**recross (6)**
176:18,22;179:20;
183:6;186:9,10
**re-cross (1)**
196:7
**red (1)**
139:1
**redacted (3)**
214:5,7;234:1
**Redaction (1)**
215:11
**redactions (2)**
214:10;215:10
**redirect (7)**
176:19,20;179:1;
185:10;194:4;195:7,8
**reference (3)**
227:14,15;228:1
**referenced (1)**
227:16
**references (1)**
159:20
**referring (1)**
241:15
**Refill (1)**
229:3
**reflected (1)**
245:25
**refresh (3)**
145:12;164:7;177:1
**refusal (3)**
108:25;271:24;
272:4
**regard (7)**
119:18;122:2;
125:15;197:3;204:7;
259:18,25
**regarding (12)**
127:2,25;129:8;
159:22;184:10;
197:24;198:15;
233:22;254:6,10;
257:18,21
**regardless (2)**
279:14,15
**Region (2)**
102:17;107:19

**Regional (1)**
107:18
**regular (1)**
243:22
**regularly (1)**
118:6
**rehire (3)**
227:11,17;228:20
**rehired (8)**
227:18,21;228:2,4,
7,9,10;229:1
**reiterate (1)**
261:23
**relate (3)**
195:20;255:10,17
**related (1)**
180:1
**relating (1)**
256:4
**RELATIONS (5)**
102:2,17;140:5;
218:10;265:19
**relationship (3)**
209:6,13;268:6
**relative (1)**
139:21
**relatively (3)**
113:25;148:4;
150:14
**relevance (10)**
259:8,9;269:6,7,8;
271:4;276:10,11,15;
278:16
**relevant (14)**
202:12;204:2;
260:25;269:10,16;
271:5,10,12,16,21,25;
274:22;277:17;
278:25
**rely (3)**
108:7;222:7;258:6
**Relying (2)**
223:25;272:15
**remain (1)**
177:18
**remedy (1)**
277:2
**remember (33)**
119:18;125:2;
126:20;130:2;132:12;
134:8;135:19;146:16;
151:21,23,25;162:20,
24;163:1;171:15,19;
172:17,21,22,23;
176:23;177:5,22;
180:25;181:2;188:14;
191:19;239:25;240:1,
25;244:16;247:9;
260:4
**remits (1)**
220:7
**remittance (1)**
218:11

**remitted (4)**
218:23,23;219:6;
220:12
**remote (1)**
142:15
**remotely (1)**
168:8
**renamed (2)**
198:10,21
**renewal (2)**
120:1,7
**rep (7)**
184:16,19;188:21;
270:17;273:15;
277:11,13
**Repeat (8)**
148:8;165:18;
176:25;187:16;192:8;
214:17,23;262:7
**repeating (1)**
246:20
**rephrase (1)**
167:3
**replying (1)**
136:16
**report (1)**
247:1
**reports (2)**
265:24;267:7,9
**represent (2)**
211:23;265:4
**representation (5)**
140:4;255:11,14,
18;264:15
**representative (11)**
107:16,20;132:4;
185:18;187:13,18;
202:25;214:2;232:8;
238:11;264:11
**representatives (14)**
122:20;136:4;
154:21;170:6,9;
171:13,18;176:24;
177:3,9;178:1,13;
186:14,25
**represented (1)**
135:23
**representing (3)**
137:20;197:7;256:5
**represents (3)**
220:19;221:9;228:1
**request (5)**
201:8;215:6;230:3;
252:20;253:17
**requested (10)**
151:8;164:18;
233:21,22;252:10,21;
253:1,2;254:25;255:1
**requesting (1)**
199:11
**requests (2)**
199:13;255:16
**require (1)**

107:10
**required (3)**
114:1,23;118:16
**reserve (2)**
252:11,15
**resolve (1)**
117:24
**respect (8)**
114:10;141:6;
193:6;196:20;198:3;
233:24;271:11;
273:14
**respected (1)**
276:15
**respectfully (1)**
143:6
**respective (1)**
115:8
**respond (12)**
109:6;134:15;
135:4,12;136:4;
219:18,18,21;235:5;
237:23;238:8;245:9
**Respondent (19)**
102:6;107:11;
108:17;127:14;140:9;
145:11;160:6;161:23;
166:6;179:3;196:20;
223:24;237:10;
241:15;242:9;261:24;
272:9;277:8;278:22
**Respondent's (2)**
160:3;166:10
**Respondents (2)**
165:12;166:5
**Respondent's (7)**
160:1;163:24;
178:23;207:6;272:11;
275:14,15
**responding (2)**
115:11;201:10
**response (19)**
125:9,21;127:3,7;
128:22,24;129:3,6;
133:22;134:4;135:13;
153:2;160:8;186:12,
18;196:21;198:3;
228:18;246:25
**responses (1)**
164:13
**responsibilities (1)**
208:23
**responsible (3)**
208:25;221:1;246:6
**responsive (3)**
160:9;161:6;201:10
**rest (4)**
131:20;177:20;
203:4;216:15
**restarted (1)**
142:4
**RETAIL (1)**
102:8

**retrieved (1)**
108:8
**return (1)**
138:2
**returned (1)**
115:17
**reveal (2)**
177:23,24
**reverse (1)**
279:20
**review (12)**
140:11;163:25;
168:18,18;169:19,20;
197:10;207:6;242:3;
253:4;254:21;261:9
**reviewing (2)**
176:22;177:1
**revising (1)**
279:20
**Reyes (9)**
107:5;231:3;278:7,
8,9,10;279:5,14,16
**Richard (12)**
117:11,16;118:1;
119:17;149:7;151:6,
22;152:10,19,20;
154:15;175:16
**Richard's (1)**
117:14
**right (155)**
110:18,20;116:7,
21;126:22;128:13;
133:13;142:17,24;
143:1,10;148:14,18;
150:4,8,9;152:8,10,
24;153:7,9;157:2;
158:6,15,23;159:3,25;
160:12,16;161:18;
162:11,14,15;163:11;
164:21;165:8,23;
166:5;167:11,23;
168:4,15,21;169:18;
171:7,14,16,18;
172:22;174:1,4,10;
175:3;177:23;178:21;
180:7,10;182:24;
187:9,13;188:2,6;
189:9,20,25;190:1,4,
22;191:6,7,23;192:6,
17,19;193:3,18;194:4,
10,20,24;195:2;
198:12;200:11,23;
201:25;202:1,12;
204:11;205:9;206:7;
207:10,25;213:2,4;
218:5,6,14,24;220:2;
221:2,12;222:20,23;
226:14;227:1,4;
228:2;229:9;232:1,2;
235:22,25;236:1;
237:9;238:4;242:5;
248:2,3,6;249:21;
250:3;251:10,15,17,

17;252:4,19;254:1,2,
19;255:9;256:25;
257:9;262:12;263:1,
5,19;264:13;265:7,8,
22;266:2,9;268:22;
269:3,15;272:17;
275:7,20,22;276:7;
277:3;279:1,22,24
**rights (1)**
265:21
**road (9)**
138:4,7,11;139:8,9,
15;173:24;194:14,15
**Robert (4)**
126:13;158:7;
188:3;199:14
**ROCCO (41)**
140:2,7;185:11;
186:8;191:16,22;
196:4,6;230:21,22,22;
233:14;235:5,12,17,
19,22;237:2;248:23;
250:19;252:10,19,23,
24;253:1;254:16,18,
20;255:6,8,17,20;
256:3,16;257:3;
261:3;264:19,21,24;
270:13,15
**Rocco's (1)**
238:8
**role (2)**
117:14;209:24
**room (1)**
113:13
**rotates (1)**
193:8
**roundabout (1)**
223:22
**route (1)**
204:17
**rule (1)**
223:14
**ruled (3)**
262:11;273:6;
278:15
**rules (1)**
257:1
**ruling (6)**
271:15;273:14;
274:10;275:5;276:16;
279:20
**run (1)**
256:18
**running (5)**
155:23;175:10;
185:23;190:24;191:2
**RWDSC (1)**
208:18

**S**

**safety (1)**
114:6

**same (32)**
113:25;115:10;
121:11;126:25;131:9,
9;132:13;134:22;
135:20;138:15,22;
148:4;150:1,14;
174:16,18,21,23;
175:5,10;184:10;
187:3;191:24;192:25;
194:15;195:18;
224:22,22;250:8;
255:12;259:21;
271:23
**sanction (1)**
253:23
**sat (3)**
133:15,16;147:8
**saved (3)**
195:11,21;252:5
**saw (19)**
121:14;131:9,10;
132:14;155:1,2;
156:2,6;163:1;
164:22;170:6;183:14;
195:20;199:16;225:3,
12,20;226:4;246:3
**saying (16)**
134:1;165:23;
180:3;191:3;223:12;
226:20;237:16,18;
242:8;246:18;253:15;
260:13;266:12;
274:20;278:11;
279:12
**scan (3)**
124:8,12;184:16
**scanning (1)**
124:23
**scared (1)**
153:6
**scheduled (1)**
205:20
**scope (11)**
179:1,19,22;180:6,
8;219:11;221:20;
223:15;266:20,22;
269:21
**screen (3)**
125:5;195:17;196:1
**screenshot (15)**
247:18;248:21,23,
24;249:2;250:16,19,
20;251:4,24,25;252:1,
2;253:10,22
**screenshots (1)**
252:4
**search (6)**
247:25;249:12,15,
17,18;250:5
**searched (3)**
247:13;249:22;
250:3
**seat (1)**

110:18
**second (17)**
120:18;122:17;
152:6,8,12,18,18,25;
154:5;156:10;158:1,
4,13,14;188:19;
193:2;227:25
**section (2)**
148:16;256:12
**sections (1)**
117:19
**secure (5)**
216:4;269:4,17;
270:1,7
**security (6)**
130:17,18;133:11,
12;266:5,7
**seeing (3)**
162:24;174:4,6
**seem (2)**
136:3;222:15
**seemed (4)**
136:15;138:14;
183:13,16
**seems (1)**
206:17
**selected (2)**
119:23,24
**selfish (1)**
136:3
**send (11)**
128:2;163:9;
206:14,14;212:20;
217:7,9;252:2;267:5,
9;270:9
**sending (1)**
254:14
**sense (4)**
180:3;262:8;
266:22;275:14
**sent (17)**
126:25;127:22;
128:21;129:1,5;
162:12;214:15;
226:20;235:6,12,22;
247:19;248:23;
250:19;254:22;
270:11,13
**sentence (1)**
174:14
**separate (1)**
158:10
**sequence (1)**
198:20
**served (1)**
199:21
**service (9)**
112:8;117:25;
119:21;131:2,22;
174:21;183:22;
273:19,21
**services (6)**
119:11;131:4;

151:18;229:14;
238:11,18
**Servicing (3)**
183:21;208:25;
209:2
**set (3)**
129:12;204:12;
255:14
**sets (1)**
227:14
**setting (1)**
241:16
**several (1)**
186:18
**shall (1)**
110:14
**share (4)**
148:11,17;162:17;
164:12
**shared (2)**
214:16;215:8
**shift (6)**
112:24;122:15;
152:21,22;178:9;
225:10
**shifts (2)**
148:13;226:2
**shirt (1)**
154:11
**shoes (1)**
118:19
**shook (1)**
133:4
**shop (24)**
209:21;216:18,18;
258:2,4,6;263:7,10,
10,12,14,21;264:16;
265:10,12,13,19,24;
266:4;267:16,18,23;
273:19,21
**short (4)**
137:6;178:8;
254:12;256:13
**shot (1)**
265:18
**show (14)**
130:17;178:20,22;
204:23,24;221:4;
222:20,23;223:4;
241:5;245:21;252:3;
253:2;272:17
**showed (7)**
158:16,17;160:19;
188:21;195:16;196:1;
240:16
**shown (1)**
169:12
**shows (2)**
179:4;248:21
**sic (1)**
209:2
**side (11)**
117:7;120:21;

121:2,5;130:22;
131:13;133:13;
138:21;139:11;211:8;
262:3
**sided (2)**
212:12;230:13
**sides (2)**
131:16;138:25
**sidewalk (1)**
174:3
**sign (1)**
169:5
**signatory (1)**
219:9
**signature (3)**
169:23,24,25
**signed (2)**
167:25;169:7
**significant (1)**
139:20
**signifies (2)**
213:7;220:22
**signify (3)**
213:9;227:10;
262:20
**signing (2)**
168:16;169:8
**similar (4)**
159:8;228:20;
250:12;252:20
**simple (3)**
116:1;154:1;268:15
**simplify (1)**
265:2
**simply (1)**
174:22
**single (3)**
109:10;110:4;272:5
**sit (3)**
186:5;202:23;
216:22
**site (5)**
138:2;152:21;
188:9;225:21;248:3
**sitting (2)**
137:2;257:15
**six (1)**
230:13
**slow (1)**
269:15
**smaller (1)**
147:5
**solely (1)**
136:25
**soliciting (1)**
164:25
**somebody (13)**
149:2;150:3;
167:17;178:17;
200:10;205:1;206:14;
218:24;223:9,12;
251:4,6;266:17
**somebody's (1)**

139:12
**somehow (1)**
266:24
**someone (5)**
118:23;218:8,23;
227:18,21
**sometime (1)**
145:21;147:1;
151:17;244:21,22
**sometimes (4)**
116:5;149:22;
244:19;265:20
**somewhere (1)**
153:20
**soon (2)**
131:19;156:25
**sorry (23)**
121:24;132:18;
140:17;145:10;148:8,
24;165:18;176:25;
178:12;187:16;196:6;
205:7;214:17;219:16;
225:18;229:6;232:24;
234:6;236:3;249:10;
267:10;269:23;
276:24
**sort (3)**
114:6;218:11;
222:21
**sounds (2)**
180:3;242:23
**speak (9)**
115:22;122:23;
129:12,14;133:18;
156:3,18;244:9,11
**speaking (7)**
134:22;135:20;
136:9,11;154:19,25;
170:8
**specific (3)**
118:25;121:7;
255:16
**specifically (14)**
123:25;134:21;
135:16,20;136:2,5;
137:19;147:7;149:6;
151:23;183:1,14;
184:4;260:4
**speculation (2)**
258:13;267:6
**speed (6)**
139:8,14,16,17,17;
173:24
**spell (4)**
111:1;117:12;
207:20;208:7
**spelled (2)**
117:13;208:7
**spent (1)**
162:10
**splattered (1)**
201:19
**split (2)**

115:4;148:12
**spoke (10)**
127:25;133:20;
155:16,18;163:3;
167:18;170:9;186:24;
187:14;198:18
**spoken (5)**
133:20;134:2,5;
135:1;156:1
**spot (3)**
136:7;147:3;194:14
**spots (1)**
115:14
**stack (1)**
156:21
**staff (9)**
149:17,18,21,23;
150:5,13,15,16;
261:25
**staffing (1)**
194:2
**staircase (1)**
133:13
**stalled (1)**
274:12
**stand (6)**
194:18;197:17;
207:2;254:1;269:14;
271:19
**standards (1)**
117:21
**standing (3)**
174:24;183:17;
231:16
**stands (1)**
212:23
**start (7)**
110:9,10;116:25;
184:25;241:1,2;278:6
**started (12)**
112:24;114:18;
121:11;133:9;145:14,
15,17;146:6,8,10;
166:1,2
**starting (3)**
128:13,18;146:3
**state (8)**
111:1;119:24;
120:10;170:3;174:10;
199:11;207:15;208:7
**stated (14)**
120:7;123:23;
128:11;133:17,19;
134:16,25;135:1,17;
136:6;137:9,12;
164:9;165:5
**statement (13)**
110:11;140:11,13;
160:23;167:23,24,25;
168:5,5,6,7;261:7,10
**statements (1)**
261:5
**stating (1)**

260:14
**station (10)**
112:21;113:2,5,15,
20,22,23;115:23;
139:6;148:2
**stationed (8)**
112:19;116:2;
117:19;121:15;
146:19;147:4;148:24;
149:13
**stations (3)**
112:13,14;113:19
**status (1)**
269:11
**stay (2)**
227:11;275:10
**stayed (1)**
271:23
**step (2)**
216:23;272:5
**steps (1)**
114:20
**steward (24)**
209:21;216:18,18;
263:10,10,12,14,22,
25;264:16;265:10,13;
266:4,17;267:4,9,9,
12,13,15,16,17,18,23
**stewards (4)**
258:2,4,6;263:7
**steward's (2)**
265:12,19
**Stewart (1)**
267:7
**stick (2)**
238:2,3
**still (14)**
109:10;119:8;
122:14;136:7;138:16;
141:20;206:4;210:1;
221:6,9;256:21;
259:12;265:24;271:1
**stip (5)**
242:10,16,17,18,24
**stipulate (1)**
241:21
**stipulation (1)**
243:5
**Stony (58)**
109:10;111:15;
112:1,4;116:17;
118:24;119:2,9,11,19;
131:10;132:9,14;
133:19;134:6,11;
138:1;146:6,15;
148:3,7,10;149:15;
150:21;151:18,25;
153:25;154:7,17;
170:4;173:16;174:8,
16;175:18;176:24;
177:3;183:10;188:21;
193:13,22;210:24;
211:13;225:12;226:5,

21;229:14;238:12;
246:2,4,5,10;247:5,
18;248:1,22;249:20,
20;250:13
**stood (2)**
137:13;191:4
**stop (6)**
139:12,19;174:1;
194:12;273:18;
275:13
**STORES (1)**
102:9
**street (1)**
138:6
**strike (5)**
119:10;137:25;
146:5;149:24;243:20
**structural (1)**
141:24
**stuck (2)**
233:1,3
**students (1)**
139:9
**stuff (3)**
141:18;201:3;
254:16
**subject (2)**
203:4;275:18
**submission (1)**
188:16
**submit (4)**
124:20,24;
201:20
**submitted (7)**
124:22;125:1,20;
127:2;129:3;203:12;
242:21
**subpoena (22)**
160:8,9,11;161:6;
196:21,22;199:11,13,
19,20;201:8,21,25;
203:12;204:12;
205:11;222:2,4;
235:9;253:2;254:7,21
**subpoenaed (6)**
196:25;197:7;
222:2;223:24;233:21;
253:15
**subpoena's (1)**
202:16
**subsid (1)**
179:25
**success (1)**
276:23
**successfully (3)**
124:22,25;125:5
**successor (4)**
109:11,17;269:18,
19
**successorship (6)**
109:2;269:9,10;
271:7;277:3,5
**sufficient (1)**

169:20
**suggest (1)**
140:24
**suggesting (1)**
201:2
**suggestions (1)**
244:5
**supervisor (3)**
117:9,10;149:14
**supervisors (1)**
118:5
**supplement (1)**
243:4
**supplementary (1)**
241:24
**supplemented (1)**
211:8
**supply (2)**
163:4;273:10
**support (1)**
253:11
**suppose (2)**
197:6;278:19
**supposed (3)**
130:2;170:12;206:5
**sure (35)**
108:15;109:7;
117:20,22;148:9;
152:14;153:4;161:19;
167:4;178:24;201:14;
202:9;204:1,14,21;
207:1;212:1;215:4;
216:4;218:12;220:11,
13,16;221:13,15;
239:13;241:8,19;
249:10,12;263:9;
264:5,14;265:4;
269:25
**sustain (1)**
219:19
**Sustained (5)**
175:7;195:5;
267:11;271:13;
278:16
**sustaining (2)**
256:5;271:15
**swear (1)**
110:19
**sworn (2)**
110:23;208:4
**sympathetic (1)**
205:12
**system (6)**
108:9,9;194:1;
215:19,20;268:7
**SYSTEMS (96)**
102:5;107:3;
120:15,17;121:10;
122:20;123:1;125:8,
11,15;129:15;130:19;
131:1,3,6,7,15;132:3,
8;134:11;136:20;
137:21,23;138:20,22;

139:5;145:11;154:6,
7,11;155:4,15;156:6,
7,11,17,22;157:3,5,
14;164:5;166:17;
167:2,5,8,12;170:4,6,
16,20;173:2,9,13,17,
20;174:7,15,25;175:4,
10;176:2,23;178:7,
15;184:14;185:23;
193:6,8,12,21;194:3,
6;195:3,11;196:25;
216:5;229:22;230:3;
238:7,10,14,16;
240:13;241:4;243:9;
247:4;248:1,22;
249:21;250:12;
256:11;261:25;
267:23;268:2,5;270:9
**Systems' (11)**
154:21;156:19;
177:2,9,25;178:12;
184:16,19;185:1,18;
256:17

**T**

**table (1)**
133:15
**tactical (1)**
163:6
**tag (1)**
114:21
**tagged (1)**
115:15
**talk (5)**
176:8;216:10,23;
252:19;257:22
**talking (12)**
113:11;121:16;
132:24;154:23;
214:22;227:24,25;
231:21;232:22;234:6;
255:20,21
**tasks (1)**
117:16
**team (1)**
134:3
**Technician (3)**
213:1,1;214:15
**Technology (3)**
212:19,24;215:6
**telephone (1)**
181:8
**telling (4)**
156:23;220:13,20;
246:23
**tells (2)**
248:25;250:14
**temporary (1)**
149:1
**tend (3)**
116:12;117:3;
139:10

**term (1)**
247:10
**terminated (1)**
138:4
**terms (7)**
155:16;164:17;
210:22;211:8,11;
238:17;269:20
**territory (1)**
212:17;218:19
**test (1)**
190:1
**testificandum (1)**
199:13
**testified (39)**
110:24;140:3;
154:5,10;155:21;
158:1,24;166:16,20;
172:15,17,18;173:15;
181:1;182:22;185:12,
16,19;186:18;190:1,
22;191:25;192:2;
193:3;194:4;208:5;
218:3;223:7;226:13;
234:4;235:23;236:20;
253:10,13;256:10;
264:3,10;276:17;
277:13
**testify (9)**
191:5;201:21;
203:1,15;223:6,10;
264:7;274:21;277:22
**testifying (4)**
154:8;192:22;
253:21;277:23
**testimony (30)**
107:5;151:14,16;
157:3;166:22;170:14,
19;171:7,12,16;
172:9;173:12,17;
179:17;184:10;
186:20;187:6,10,21;
188:2,6,19;190:20;
201:18;202:4;222:10;
226:3;231:17;236:24;
237:22
**texted (3)**
125:23;246:15;
249:22
**texting (1)**
260:9
**texts (3)**
234:4;235:20;256:4
**Thanks (1)**
160:4
**that'll (1)**
274:22
**theory (6)**
109:8;110:1;
201:20;206:25;269:9,
17
**Therefore (2)**
107:11;221:6

**there'll (1)**
202:3
**third (2)**
133:5;136:21
**thorough (1)**
254:21
**though (2)**
143:12;185:22
**thought (6)**
108:16;134:6;
163:3,15;270:16;
275:22
**thousand (1)**
162:18
**three (20)**
115:5,19,20;
131:25;132:7;136:19;
177:11,25;178:12;
181:3,8,9,11;185:12;
211:18,20;212:9,11;
235:15;275:24
**threw (1)**
205:21
**throughout (3)**
112:1;122:22;170:5
**throw (1)**
203:16
**Thursday (1)**
102:18
**ticket (6)**
115:11,16,20;
183:21;194:20,21
**tickets (3)**
115:4,4,8
**tie (1)**
118:20
**till (1)**
155:5
**timeframe (2)**
151:15;166:16
**timeline (1)**
172:25
**timely (2)**
203:12;204:12
**times (12)**
122:19;136:15;
150:2;186:18;193:13;
205:3;247:25;248:7,
8,12,16;249:23
**timing (4)**
269:9,22;277:1,3
**tips (16)**
118:8,10;147:18;
148:2,7,10,11,12;
149:20,24;150:1,9,12;
193:15,18;244:5
**Tobar (1)**
224:25;225:1,12
**today (29)**
107:7;143:16;
151:15;153:23;154:2;
161:15;167:11;
170:19;171:7,13,17;

172:9,16,17;186:6,21;
188:2,19;190:20;
192:7,9,12;196:12,22;
205:17;206:2,3,5;
235:15
**together (2)**
246:11;257:15
**told (27)**
116:9;119:18,19;
124:3,7;125:23;
128:19;135:22;147:3;
151:17,21;152:3,11,
12;157:15;172:8;
182:8;184:16;206:2;
216:20;226:23;
240:16,18;243:15;
244:15;245:5,9
**tomorrow (10)**
199:17;200:17,20;
202:13,21,22;243:25;
274:14;278:6;279:4
**tonight (1)**
279:4
**took (19)**
112:7;114:19;
134:18,22;135:20;
174:17;239:14;
247:18;248:21,23;
249:2;250:19,20;
253:11,22;269:17;
271:6,7;272:5
**Top (5)**
139:16;164:3;
213:2,4;227:14
**Towards (3)**
113:6;119:14;277:2
**traffic (1)**
269:22
**training (6)**
114:1,3,6,14,15,18
**transition (1)**
120:12
**translate (2)**
171:24;217:15
**translation (2)**
129:23;136:14
**Treatment (1)**
147:12
**trial (1)**
272:10
**true (7)**
128:21;145:25;
148:6,9;220:7;256:9;
277:16
**truth (2)**
206:10,11
**truthful (1)**
169:3
**try (12)**
141:4,25;142:3;
143:11;202:10;
206:15,15;237:19;
248:12;265:2;269:4;

278:24
**trying (11)**
123:6;141:20;
142:7;176:1;201:7;
223:20,21;231:19,24;
242:6;272:10
**Tuesday (3)**
111:10;128:3;
203:17
**turn (1)**
116:5
**turns (2)**
134:22;135:20
**twice (1)**
149:19
**two (17)**
108:10;122:12;
132:12,13;154:10;
160:1,2,21;164:16;
177:11,25;178:12;
185:12;192:4;198:11;
227:14;263:5
**type (5)**
154:11;156:11;
159:23;174:21;267:5
**typically (1)**
118:1

**U**

**ULP (1)**
204:24
**ultimately (3)**
108:18;169:5;
215:21
**unacceptable (1)**
143:20
**Unbelievable (1)**
143:17
**under (3)**
169:7,8;234:4
**undergo (1)**
114:1
**underneath (1)**
219:25
**Understood (9)**
110:7;117:17,18;
122:20;151:16;
202:21;215:15;
244:14;258:17
**unfair (1)**
140:4
**uniform (3)**
114:13;118:16,18
**Uniforms (9)**
118:19;120:24;
131:6,7;138:20;
174:4,22,24;175:9
**UNION (97)**
102:9;112:9,11;
135:18,24;139:25;
166:25;167:4,7,12,19,
20;168:6;185:9;

**186:19;189:10;**
190:16;196:5;202:25;
208:19;209:9,13,19;
211:16;214:9;215:17;
216:25;220:2;222:21;
223:1,13;224:1,1,2;
230:3,4;233:21,25;
238:10,17;245:4;
246:19,20,24;252:24;
254:10;256:2,4,14;
259:15;260:2,10,10,
15;261:2;262:10;
263:11,13;264:1,2,4,
10,11,16;265:21,24;
266:2,3,4,6,12,16,17;
269:3,13,17,25;270:6,
17;271:3,16,17,18;
272:4,5,8,8,10;275:15,15,16,20;
276:10,20;277:11;
279:1
**unions (3)**
135:17;172:9;
260:14
**Union's (7)**
255:10;258:11,18;
272:1,2,2;275:6
**unit (33)**
107:20;109:14;
209:22,24;211:23,25;
212:2;214:2,3;217:6,
7,8;257:10,12;258:7,
11,19;259:14;264:5,
12,13,18;265:4,7;
266:14,18;268:6,9,10,
16;270:10;271:1;
277:14
**UNITED (1)**
102:10
**University (6)**
111:16;112:5;
118:24;131:10;
225:13;246:5
**unpunished (1)**
141:14
**unredacted (1)**
234:1
**unsure (4)**
123:2;167:9;174:9;
220:18
**unusual (2)**
266:23,24
**up (41)**
115:9,10;118:20;
122:3;129:12;131:19;
137:13;145:21;
153:23;154:2;155:5;
158:25;161:18;
166:12;167:11,24;
174:12;177:21;
188:21;200:24;201:7;
204:23,24;213:25;
217:2,18;219:7;

229:9;233:23;243:13;
248:2,6;249:21;
252:3;254:7;262:20;
267:4;271:6,17;
279:4,16
**upgrade (1)**
257:24
**uploaded (1)**
162:12
**upon (5)**
109:11,18;262:4,
11;263:13
**upset (3)**
245:1,6;246:16
**upsetting (1)**
245:8
**urgent (1)**
247:17
**use (7)**
117:1;131:21;
165:9;169:15;170:13;
185:5;249:17
**used (3)**
124:5;174:23;
249:18
**uses (1)**
193:12
**using (3)**
165:4;166:2;174:6
**usual (1)**
138:14
**usually (9)**
212:19;213:16,16,
19;215:7;216:18,20;
228:22;246:11
**utilize (1)**
165:24
**utilized (3)**
164:7;19,25
**utilizes (1)**
193:22
**utilizing (2)**
165:16,20

**V**

**valet (44)**
111:15,19,25;
112:4,13,14;113:3,15,
21;117:10;118:19;
131:1,3;146:19;
148:16;150:17,21,24,
25;151:18,18;155:9,
10,16;156:8;170:7;
174:7,15;175:18;
183:10,23;194:1,14,
18,25;209:3;210:19;
225:25;226:5,11,25;
239:12;250:13;265:7
**valeting (1)**
194:6
**Valets (8)**
157:4,17;174:5;

175:17;183:17;193:8,
12,22
**value (1)**
115:19
**varied (2)**
147:21,23
**vary (1)**
147:22
**vehicle (7)**
114:21;115:6,11,
14,15;131:21;156:19
**vehicles (3)**
114:11,20;115:10
**vehicle's (1)**
115:7
**verification (2)**
108:2,7
**verify (1)**
192:4
**version (4)**
185:19,21;186:20;
187:2
**versus (1)**
269:9
**vests (1)**
118:21
**via (6)**
167:16;168:8;
196:22;232:18;
233:12;259:11
**video (5)**
114:3,5,6;168:9,10
**Virgilio (3)**
224:11,22,22
**visit (8)**
216:19;224:17;
228:12;239:14;
240:17;243:12,22;
257:25
**visiting (3)**
116:4,7;117:7
**visitor (3)**
115:5;116:9,14
**visitors (10)**
112:6;114:11,23;
115:3,22;116:22;
117:25;139:10;174:2;
183:17
**visualizing (1)**
156:4
**voice (1)**
245:8
**voicemail (2)**
260:9,10
**voir (10)**
217:23,25;219:11;
221:22;223:15;236:1,
5;250:24;251:1,3
**volume (1)**
194:1
**voluntary (1)**
147:2

**W**

**wage (1)**
159:18
**wait (5)**
139:12;143:23;
188:19;200:11;
232:20,22,22,22;
262:10
**waiting (2)**
111:10;279:14
**walk (4)**
139:10,10;259:5;
272:18
**walked (3)**
130:25;131:19;
132:23
**walking (21)**
120:19,20;121:12,
16,18;122:21;131:10;
132:9;154:22;155:1,
3,4;156:4,25;170:7;
178:16;224:21;
243:12,23;246:3,23
**want15 (1)**
140:14
**wants (2)**
203:16;268:17
**way (12)**
110:9;141:16;
179:6;187:9;202:24;
223:22,23,24;251:22;
262:8;266:20;275:13
**ways (2)**
115:1,1
**wear (2)**
118:16,20
**wearing (9)**
120:23,24;131:5,7;
138:20;154:11;174:5,
5,22
**website (6)**
126:12;166:1;
247:13,18,20;248:3
**week (31)**
113:8;120:18;
121:11;122:17,18,22;
128:18;138:3;143:21;
147:23;153:1;154:18;
155:6;156:14;164:9;
166:18,24;167:15;
170:5;176:4,13;
178:16;183:9,12;
185:18;189:8,11,19;
195:23;225:9,10
**weekly (5)**
118:11,14,15;
239:12,14
**weeks (2)**
116:24;190:14
**Weingarten (1)**
265:21

**weren't (9)**
119:25;134:23;
135:15;142:14;
160:19,22;167:1;
189:15;195:24
**whack (1)**
205:21
**what'd (5)**
133:14;244:1;
246:25;249:19;
270:24
**what's (14)**
142:6;163:23;
170:18,24;180:16;
181:19;189:9;191:9,
17;201:12;203:6;
216:24;245:21;
265:12
**WhatsApp (2)**
239:17;259:12
**whatsoever (1)**
179:14
**whenever (1)**
226:13
**Whereupon (4)**
110:21;144:11;
208:2;280:3
**whispering (1)**
214:22
**white (2)**
180:20;138:25
**Who'd (2)**
231:1;240:21
**whole (7)**
179:21;193:4;
205:16;235:9;256:19;
269:9;277:23
**WHOLESALE (1)**
102:8
**who's (1)**
266:17
**whose (3)**
136:21;177:14;
187:4
**winter (1)**
145:21
**withdraw (3)**
239:4;259:11,24
**within (4)**
153:10;179:21;
180:6;230:19
**witness (114)**
107:9,13;110:15,
23;111:2;116:21;
123:7;132:19;140:19,
21;141:9,10,12,15;
142:9,14;143:18,19,
22,24;144:2,8;157:20,
20;169:12;178:20;
179:10,18,18;180:5,
14;181:20,22;182:19,
20;183:1,21;184:1,3;
191:14,20;196:11,14;

197:18;200:5,5,6,12,
23;201:1,16,22;202:6,
8,12;203:3,12,22,22;
204:2,15,16;205:8,19;
207:1,11,15,21,23;
208:4,9;210:11;
214:19;215:3,5,11,14;
219:14,16,20;223:7,
11;231:20;234:4;
236:2,16,20,25;237:3,
3,7,17,22,23,24;
249:25;253:10,11;
254:4;256:9;261:6;
262:12;267:24;
274:13,18;275:4,6,17;
276:10,17;277:4,6;
279:9;280:1
**witnesses (11)**
143:2,12;201:15;
202:1;203:25;206:6,
8;258:14;275:19,23,
25
**witness's (1)**
222:9
**woman (2)**
126:21;127:25
**women (1)**
132:1
**wondering (2)**
268:17,17
**word (1)**
165:14
**words (7)**
164:21;165:3,4,19;
198:7;213:3;252:4
**work (33)**
111:14,15,25;
112:14,14;113:4,8,19,
19,23;118:1;119:20;
134:7;135:3,17;
146:3;149:17,18;
150:4,20;153:15;
172:8,9;194:3;
206:15,15;209:19;
224:7;245:4;246:20,
23;259:4;268:5
**worked (18)**
111:18;112:24;
117:10;118:24;119:1;
137:25;139:21;
147:19;148:10;
149:20,25;150:2,17,
23,24;152:23;219:8;
246:9
**WORKERS (9)**
102:11;135:18;
139:2;170:8,12;
174:17;177:18,20;
209:25
**workforce (1)**
149:13
**working (45)**
111:20,21;113:6,

21;114:19;116:24;
118:6;119:8;122:15;
134:11,14;135:6,11;
136:8;137:11;138:1;
145:14,17;146:2,6,10,
11;147:11,12,14,15,
16,19,25;148:13,25;
159:14;170:4;209:10,
15;210:1;225:2,3,11,
12,21,25;226:5;
246:11;268:6
**works (2)**
179:13;246:2
**world (1)**
218:11
**worry (1)**
144:8
**worth (2)**
222:14;237:5
**write (10)**
263:10;264:1,17;
266:4,13;267:15,17;
268:2,19;270:15
**writing (4)**
272:25;273:23;
274:7,9
**written (3)**
165:2;167:25;
194:21
**wrong (4)**
117:5,5;274:19;
278:11
**wrote (3)**
169:2;263:21;
268:22

---

**Y**

**year (1)**
112:2
**yearly (1)**
118:12
**years (2)**
153:5;265:18
**yesterday (4)**
160:14;161:23;
162:8;196:22
**York (3)**
102:18,18;130:9
**young (3)**
126:18;127:25;
263:17

---

**Z**

**Zoom (1)**
168:8

---

**1**

**1 (7)**
160:1,3;163:24;
166:6,10;255:15;

276:25
**1:00 (3)**
244:14,21,22
**1:09 (1)**
145:2
**1:56 (2)**
176:17,17
**10 (9)**
139:16,18;173:25;
194:10,17;231:22;
248:18,20;249:8
**10:00 (3)**
102:19;200:20;
280:5
**10:05 (1)**
107:2
**10:39 (1)**
127:12
**101 (2)**
138:7,11
**10278 (1)**
102:18
**11 (3)**
249:25;250:2;254:8
**11/1/2023 (2)**
220:4,22
**11:02 (1)**
127:12
**11:29 (1)**
144:11
**11:30 (1)**
143:5
**1102 (13)**
102:8;107:20;
112:12;208:18;209:6;
210:5,17;211:7,22;
238:14;257:9;264:16;
265:7
**11th (2)**
202:17;203:16
**12/4/2023 (2)**
213:3,4
**12th (1)**
249:1
**13 (1)**
156:15
**13th (13)**
122:18;164:10;
166:18,24;170:5;
176:5,13;185:18;
189:8,11,19,20;190:2
**14th (6)**
171:1,4;189:10;
190:9,11,19
**15 (3)**
141:3;142:8;261:10
**15th (1)**
218:25
**16th (2)**
250:4,6
**17 (1)**
208:22
**17th (3)**

124:14;164:4,6
**1-800 (8)**
191:9,12;192:9,17,
19,21,24;193:2
**18-ish (1)**
231:6
**18th (1)**
107:6
**1st (6)**
218:24;219:6,7;
221:5;227:2,3

---

**2**

**2 (7)**
107:15,16,22,24;
108:12,19;170:3
**2:00 (1)**
244:20
**2:30 (2)**
199:9;244:20
**2:39 (1)**
199:9
**20 (6)**
128:13;137:7;
209:17,17,18;270:10
**2015 (1)**
209:18
**2017 (2)**
208:22;209:17
**2019 (9)**
111:21;112:2;
145:14,15,18;146:7,8,
11;150:17
**2020 (3)**
145:22;147:1;212:3
**2023 (52)**
111:24;113:11;
128:3;147:10;150:18;
151:14,14,17;164:4,6;
171:2,4;175:15;
176:1;184:13;185:24,
25;186:2,5,5;210:2,3,
6;213:8,14,15;214:3;
217:19;218:24,25;
219:7,7;221:5;224:7,
14;225:15,17,24;
226:4,16;228:11,18;
229:9,13;238:20;
239:4,7;240:13;
243:9;247:3;255:15;
260:11
**2024 (3)**
102:19;107:4;280:4
**2028 (1)**
164:4
**20th (2)**
102:18;107:4
**21st (2)**
128:3;280:4
**22 (1)**
260:11
**23 (2)**

226:8;260:12
**24 (2)**
113:14;243:22
**24th (1)**
243:12
**25 (6)**
130:11;184:7;
187:14,19,22;244:11
**25th (6)**
130:3;171:21;
187:11;190:7;243:25;
244:9
**26 (1)**
102:17
**27th (1)**
245:23
**29 (2)**
102:17;107:19
**29- (1)**
107:17
**29-CA-331253 (2)**
102:4;107:4
**29th (1)**
228:18
**2nd (1)**
102:18

---

**3**

**3 (8)**
123:7,8,10;126:1;
158:6;170:2,19;
186:24
**3:48 (1)**
245:18
**3:58 (1)**
245:18
**30 (5)**
137:7;194:19;
210:3;214:3;265:18
**30th (9)**
111:23;212:3;
217:19;219:8;224:7,
13;225:22;226:11;
229:9
**31st (1)**
221:14
**34 (4)**
212:4;226:2;
242:19,20
**3rd (4)**
235:17;254:22;
276:2,4

---

**4**

**4 (2)**
245:22;262:14
**4:00 (2)**
112:24;148:20
**4:23 (1)**
261:14
**4:36 (1)**

261:14
**4:57 (1)**
280:3
**40 (2)**
163:2;194:19
**45 (2)**
162:11;163:2
**495 (2)**
130:6,7
**4th (3)**
213:8,14,15

---

**5**

**5 (7)**
127:16,17;128:5,9;
169:23;262:17,19
**5:30 (1)**
113:12
**50 (1)**
194:17
**56 (1)**
130:5
**57 (1)**
130:5
**58 (16)**
130:3,4,11,14,15;
131:4,14;132:8,13,25;
137:21;171:21;173:3;
184:8;187:11;188:8

---

**6**

**6 (10)**
179:5,7;180:15;
181:15;182:1,11;
183:7;191:15;195:17;
235:1
**6:00 (1)**
113:17
**6:30 (1)**
113:3
**611c (1)**
206:12
**6's (1)**
182:17

---

**7**

**7 (5)**
210:11,13;211:1,5;
256:12
**7:00 (1)**
113:17
**7:30 (3)**
112:24;113:3;
148:20

---

**8**

**8 (9)**
212:7,8,13;217:18;
222:24;223:1;225:25;

226:4,8

**800 (8)**
181:4,20,22;182:3,
7;195:11,19;196:2

**8a (1)**
276:25

**8a1 (1)**
277:2

**8a3 (2)**
276:25;277:2

**8a3s (1)**
272:17

**8as (1)**
272:16

### 9

**9 (11)**
174:11,12;230:12,
15;231:25;232:1,25;
233:6,18;234:14;
237:12

**9:00 (1)**
113:12

**944-1424 (1)**
181:22

**9th (4)**
228:10;233:16;
254:23;270:11

# OFFICIAL REPORT OF PROCEEDINGS

# BEFORE THE

# NATIONAL LABOR RELATIONS BOARD

_____
_____

In the Matter of:                    **Case No.:** 29-CA-331253


PARKING SYSTEMS PLUS,INC.          :

             Respondent,          :

And                                :

LOCAL 1102, RETAIL, WHOLESALE &    :

DEPARTMENT STORE UNION, UNITED      :

FOOD AND COMMERICAL WORKERS,        :

            Charging Party.      :


Place:   New York, New York
Dates:   June 21, 2024
Pages:   282 through 388
Volume: 3

_____
_____

**OFFICIAL REPORTERS**

# BURKE COURT REPORTING, LLC
**64 Magnolia Place**
**Wayne, NJ 07470**
**(973) 692-0660**

```
 1                          BEFORE THE

 2                NATIONAL LABOR RELATIONS BOARD

 3    ---------------------------------: Case No.:  29-CA-331253

 4    In the Matter of:                 :

 5    PARKING SYSTEMS PLUS, INC.        :

 6                 Respondent,          :

 7    And                               :

 8    LOCAL 1102, RETAIL, WHOLESALE &   :

 9    DEPARTMENT STORE UNION, UNITED    :

10    FOOD AND COMMERICAL WORKERS,      :

11                 Charging Party.      :

12    ---------------------------------:

13

14         The above-entitled matter came on for hearing

15    Pursuant to Notice, before Administrative Law Judge BENJAMIN

16    GREEN, at the National Labor Relations Board, Region 29, 26

17    Federal Building, 2nd Floor, New York, New York, on Thursday,

18    June 21, 2024 at 10:00 a.m.

19

20

21

22

23

24

25
```

```
 1                    A P P E A R A N C E S

 2

 3   On Behalf of the General Counsel:

 4

 5        MATTHEW JACKSON, ESQ.

 6        EMILY CABRERA, ESQ.

 7        National Labor Relations Board, Region 29

 8        2 Metrotech Center, Suite 5100

 9        Brooklyn, NY 11201

10

11   On Behalf of the Respondent:

12

13        ROBERT F. MILMAN, ESQ.

14        MICHAEL MAURO, ESQ.

15        MICAEL JACOBSON, ESQ.

16        Milman Labuda Law Group, PLLC

17        3000 Marcus Avenue,Suite 3W8

18        Lake Success, NY 11042-1009

19        rob@mllaborlaw.com

20        mmauro@mllaborlaw.com

21        mjacobson@mllaborlaw.com

22        516-328-8899

23

24

25
```

1

2  On Behalf of the Charging Party:

3

4        MATTHEW P. ROCCO, ESQ.

5        Rothman Rocco LaRuffa, LLP

6        3 West Main Street, Suite 200

7        Elmsford, NY 10523

8        mrocco@rothmmanrocco.com

9        914-478-2801

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                      I N D E X

 2

 3   WITNESS          DIRECT   CROSS   REDIRECT   RECROSS   VOIR DIRE

 4

 5   Francis Gil Reyes    --     287     358       362         --

 6     (recalled)

 7   Ayse Prosuk          --     367     383        --         --

 8     (continued)

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                        E X H I B I T S

2    EXHIBITS                    IDENTIFIED          RECEIVED

3    Respondent's

4      R-3                       307                 312

5      R-4                       358                 358

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                      P R O C E E D I N G S

 2                                    (Time Noted: 10:22 a.m.)

 3             JUDGE GREEN:  Let's go back on the record.

 4             Okay.  So we are back on the record in Parking

 5    Systems Plus, Inc.  It's June 21th 2024.  29-CA-331253.

 6             We are recalling now Ms. Francis Gil Reyes.  She

 7    testified on direct examination on June 18th 2024.  And then

 8    because we didn't have an interpreter, we moved on with the

 9    Respondent's agreement to take other witnesses out of order.

10    We are now returning for the cross-examination of Ms. Gil

11    Reyes.

12             So let me just remind you that -- this for the

13    interpreter first.  Okay.  So let me remind you both, you're

14    still under oath.  And you are still under oath to just

15    interpret --

16        (Interpreter sworn to interpret Spanish into English)

17    Whereupon,

18                         FRANCIS GIL REYES

19    Having been previously duly sworn, was recalled as a witness

20    and testified herein as follows:

21             JUDGE GREEN:  Okay.  And the employer anything is

22    going to have some questions for you.

23                         CROSS-EXAMINATION

24    BY MR. MILMAN:

25    Q    Good morning, Ms. Gil Reyes.  Thank you for being patient
```

1   through the process.  I know you speak English, but you're

2   entitled to an interpreter.

3          I'd only say if you feel that you hear maybe the

4   interpreter is not interpreting what you said, please let us

5   know.  And in fact, you can indicate to the Judge that maybe it

6   wasn't interpreted.  We have an accurate record -- all we're

7   here to do is get an accurate record.

8   A    Yes.

9   Q    And if you don't understand a question, let me know that

10  you don't understand and I'll try to phrase it in a better way.

11  A    (In English) Okay.

12  Q    Okay.  And what last thing.  Just make sure that -- and

13  you have done this so far, you answer no nodding the heads,

14  because that can't get into the transcript.  Okay.

15  A    I agree.

16  Q    Okay.  Thank you.

17          MR. MILMAN:  Can you please show the witness GC-3?

18  And -- yeah, GC-3.

19          JUDGE GREEN:  Do you have it there or no?

20                      (Pause.)

21          MR. MILMAN:  There's been some testimony on GC-3 by

22  yourself and other witnesses.  And so I'm going to ask you some

23  follow up questions, but only based upon your testimony, not

24  other people's testimony.  Okay.  Do you recall testifying

25  regarding GC-3?

1          THE WITNESS:  Yes.

2    BY MR. MILMAN:

3    Q    Okay.  And do you recall what GC-3 is?

4    A    Yes.

5    Q    Okay.  So I just want to ask you a brief question on this.

6    You were physically handed this card, correct?

7    A    Yes.

8    Q    And who gave you the card?

9    A    One of my co-workers from Parking System (sic) company.

10          MR. MILMAN:  Say again.

11          THE INTERPRETER:  One of my co-workers from Parking

12    System (sic).

13    BY MR. MILMAN:

14    Q    Who is that?

15    A    I don't remember the name.

16    Q    But it's your co-worker, is that what you --

17    A    No.  With Parking System (sic).

18    Q    Um, okay.  But was it Bobby Gust?

19    A    No.

20          THE INTERPRETER:  You can -- can I direct the witness

21    to just communicate with you and not to me?

22          MR. MILMAN:  Sure.

23          JUDGE GREEN:  So this way, I, you know --

24          MR. MILMAN:  I'm actually a good guy, but yeah.

25          THE INTERPRETER:  Okay?

```
 1              THE WITNESS:  Okay.

 2              MR. MILMAN:  Yeah.  Okay.

 3   BY MR. MILMAN:

 4   Q    Was the -- was it a man or a woman who handed you the card

 5   from Parking Systems?

 6   A    A man.

 7   Q    A man?  Okay.

 8   A    Yes.

 9              MR. MILMAN:  To what?

10              THE INTERPRETER:  A man.

11              MR. MILMAN:  Okay.

12   BY MR. MILMAN:

13   Q    Was that gentleman one of the men who met with you on

14   November 25th?

15   A    I don't remember exactly.

16   Q    Okay.  Fair enough.  And where were you when the card was

17   -- or the cards were given to you?

18   A    On my work area.  In my work area.

19   Q    Is that by the cancer booth?

20   A    Yes.

21   Q    Do you recall what time of the day that was?

22   A    Not exactly.

23   Q    Was it before or after lunch?

24   A    After.

25   Q    Okay.  And where -- you were physically at the booth?
```

**Burke Court Reporting & Transcription**
**(973) 692-0660**

1    A    Yes.

2    Q    Did you have a conversation with this gentleman?

3    A    Yes.

4    Q    And what did you say and what if anything did he say?

5              MR. JACKSON:  Objection, compound.

6              JUDGE GREEN:  Overruled.

7              THE WITNESS:  He approached, say hi and introduce

8    himself.

9    BY MR. MILMAN:

10   Q    And do -- you don't recall his name?

11   A    No.

12   Q    Okay.  And what was said by you, after the initial

13   pleasantries of saying hello?

14   A    I say hi, I give my name and he let me know that I was --

15   that he was a member of Parking Systems.

16   Q    Anything said after that?

17   A    I don't remember.

18   Q    Okay.  Fair enough.  Got it.  And do you know how many

19   cards he gave you?

20   A    About this one, he gave me several.  I don't know how

21   many, but several.

22   Q    Okay.  Do you recall the date?

23   A    No.

24   Q    Okay.  Was it in November?

25   A    It's possible.

292

1    Q    Was there a meeting -- sorry, strike that.  Who is Richard

2    from Classic?

3    A    The manager.

4    Q    Was he the manager since you started working at Classic?

5    A    No.

6    Q    When he became the manager, did he work with a co-manager

7    or was he the only manager you reported to at Classic?

8    A    Only he was the manager.

9    Q    He worked day shift and night shift?

10   A    Complete shift.

11   Q    So that's a yes?  Day and night?

12   A    Yes.

13   Q    Okay.  How long was your conversation with this Parking

14   System (sic) gentleman, when he gave you the cards?  How long

15   was the conversation?  How many minutes --

16   A    No more than five minutes.

17   Q    Was that the first time that you had a Parking System

18   (sic) representative engage you in a conversation?

19   A    No.

20   Q    Was it the second time?

21   A    I believe it was the second.

22   Q    Okay.  And how many days before that meeting was the first

23   time that a Parking System (sic) representative engaged you in

24   conversation?

25   A    Some days.  With precision, I don't remember exactly how

1    many days.

2    Q    Was it less than a week?  Less than a -- was it less than

3    a full seven day week?

4    A    I don't remember exactly.

5    Q    Okay.  And do you recall who the person was who engaged

6    you from Parking Systems the first time?

7    A    No.

8    Q    Did that person give you cards?

9    A    I don't remember what.

10   Q    If you saw that person, would you be able to identify

11   them?

12   A    Could be.  I'm not sure.  It could be.

13   Q    And the second encounter that you had with a Parking

14   Systems rep, if you saw that person, would you be able to

15   recognize -- not the name, just recognize the face?

16   A    Yes.

17   Q    Okay.  And when you had this brief conversation the second

18   time, when you got the cards, do you know why he approached

19   you?

20   A    No.

21   Q    But he only approached you, is that correct?

22   A    Yes.

23   Q    Okay.  Was there a third time that you met with a Parking

24   System (sic) representative?

25   A    Yes.

1    Q    And when was that, please?

2    A    November 25th.

3    Q    And that's with Bobby Gust and two other Parking reps, is

4    that correct?

5    A    Yes, sir.

6    Q    Okay.  We'll get back to that.  Yeah.  When you were given

7    the cards on the second encounter from a Parking Systems rep,

8    did you give the cards to anybody else?

9    A    Yes.

10   Q    And how many people did you give them to?

11   A    To those working on my area in my area at that moment.

12   Q    Is that fair to say four people work at your area, at that

13   --

14   A    Yes.

15   Q    So you gave it to all three people people you --

16   A    Yes.

17   Q    And who were they?

18   A    Do I have to give their names?

19   Q    Yes, please.

20   A    So these people were Edward Arias, Juan Fernandez and

21   Ramon Perez.

22   Q    Just Edward's not -- Edward's your son?

23   A    Yes.

24   Q    And Perez is the shop steward?

25        THE INTERPRETER:  Can you repeat, please?

```
 1              MR. MILMAN:  Yes.  Mr. Perez, is he the shop steward
 2    for the Union?
 3              THE INTERPRETER:  I don't understand.
 4              MR. MILMAN:  Shop steward, like --
 5              THE INTERPRETER:  Shop, like a store?
 6              MR. MILMAN:  Union agent, a shop steward.  S-T-E-W-A-
 7    R-D, steward.
 8              THE WITNESS:  Yes.  We all were members of the Union.
 9              THE INTERPRETER:  Do you -- counsel, sorry --
10              MR. MILMAN:  It's a industry term.  So let me try to
11    say it another way.
12              THE INTERPRETER:  Uh-huh.
13    BY MR. MILMAN:
14    Q    Did Mr. Perez have some union duties at the workplace?
15    A    No.
16    Q    Mr. Perez did not?
17    A    No.
18    Q    Who was your business agent for your union 1102 at the
19    time?
20    A    Ms. Ayse.
21    Q    And was there anybody that helped Ayse in carrying out the
22    Union duties with the bargaining unit, with your co-workers?
23    A    I have no idea.
24    Q    Okay.  Have you ever heard of the term collective
25    bargaining agreement?
```

```
 1                MR. MILMAN:  Can you please show the witness GC-7?

 2                THE WITNESS:  No.

 3                MR. MILMAN:  No?  Sorry, yeah.  Got it; no.

 4                Can you please show the witness GC-7?

 5  BY MR. MILMAN:

 6  Q    Ms. Gil Reyes, I'm showing you a document that the

 7  government submitted into evidence.  Can you just please take a

 8  look at it, and when you've finished just let me know?

 9                THE INTERPRETER:  You say government?

10                MR. MILMAN:  Huh?

11                THE INTERPRETER:  You say government?

12                MR. MILMAN:  The government, NLRB.

13                     (Witness examined the document.)

14                JUDGE GREEN:  So are we waiting for another question?

15                MR. MILMAN:  I just want to make sure the witness has

16  an opportunity to review the document.

17                JUDGE GREEN:  Okay.  I mean let's not --

18                MR. MILMAN:  Okay.

19                JUDGE GREEN:  Let's not have the witness --

20                MR. MILMAN:  Okay.

21                JUDGE GREEN:  -- read the entire collective

22  bargaining agreement.

23                MR. MILMAN:  Right.

24  BY MR. MILMAN:

25  Q    Have you looked at the cover page, Ms. Gil Reyes?
```

1   A    Yes.

2   Q    Have you looked at a few pages of that document?

3   A    Not exactly, but yes.

4   Q    Can you look at the last page?  Should be a signature

5   page.

6   A    Yes.

7   Q    Have you ever seen that document or a copy of that

8   document before?

9   A    No.

10  Q    Okay.  Thank you.

11          MR. MILMAN:  Can you show the witness GC-8, please?

12          Please take a look at it.  It's front and back.  And

13  let me know when you've finished, so I can ask you questions.

14          (Witness examined the document.)

15          THE WITNESS:  Okay.

16  BY MR. MILMAN:

17  Q    Okay.  Have you ever seen that document before?

18  A    No.

19  Q    Okay.  Do you recognize the individual names on the left

20  hand margin of the document?

21  A    Yes.

22  Q    Okay.  As of November 30th, your last day at work, do you

23  recall any of these names not working for the company?  Not

24  necessarily November 30th that day, but do you know if any of

25  these employees no longer worked for the company in November of

1    2023?

2    A     No.

3    Q     To the best of your recollection, they were all working at

4    the company as of November 2023?

5    A     Yes.

6    Q     And can you tell me who on this document works the night

7    shift, as of November 2023?

8              THE INTERPRETER:  Sorry, can you repeat the question?

9              MR. MILMAN:  Yes.  Can you tell me on this document

10   which individuals worked the night shift on this document?

11             THE WITNESS:  Dublin, Jeyson.

12   BY MR. MILMAN:

13   Q     Jeyson Hernandez?

14   A     Yes.

15                 (Witness examined the document.)

16         Reye Morel.

17   Q     Got it.

18   A     Ramon Peralta.  Hernandez Jose.

19                          (Pause.)

20   Q     Thank you.  Have you ever worked the night shift?

21   A     Yes.

22   Q     What are the hours of the night shift?

23   A     From 3:00 to 11:00 at night.  9:00 to 2:00 a.m. I think.

24   11:00 until 7:00 in the morning.  Trying to remember, because

25   normally I didn't work on --

1    Q     Thank you.

2    A     -- the night shift.  I usually work in the day shift.

3    Q     Is it five days a week;  the night shift?

4    A     Seven days a week.

5    Q     Seven days a week?

6    A     Emergency seven days a week.

7    Q     Huh.  Is the day shift seven days a week too?

8    A     No.

9    Q     Why is the night shift, if you know, seven days a week?

10   A     Because emergency area never closes.

11   Q     When they -- when -- did you ever work seven days a week

12   at night?

13   A     No.

14   Q     If you know, does any employee work seven days?  Do they

15   get a day off after the seven days?  Or could it be 14 days in

16   a row?

17             THE INTERPRETER:  You say --

18             MR. JACKSON:  Objection.

19             THE INTERPRETER:  -- 14 days in a row?

20             MR. MILMAN:  Goes to business continuity, Your Honor.

21             JUDGE GREEN:  Yeah.  Okay.  Overruled.

22             THE INTERPRETER:  Your question was --

23             MR. MILMAN:  Yes.

24             THE INTERPRETER:  -- 14 years (sic) in a row?

25             MR. MILMAN:  Is -- if they work seven days, is it

1   conceivable they work -- I mean do you know -- strike that.

2   Do you know if they work 14 days a week (sic)?

3          THE WITNESS:  No, because they have several

4   employees.  Some people work at night.  Some people work in the

5   morning.  Sorry, and some people work during the day.

6   BY MR. MILMAN:

7   Q    Okay.  Now, you as of you last day on November 30th, you

8   worked at the cancer booth station, correct?

9   A    Yes, sir.

10  Q    And how long did you -- how long were you stationed at

11  that booth?  A week?  A month?  A year?

12  A    From the time they opened the shift, after the pandemic.

13  Q    So would it be fair to say around March 2000 (sic), until

14  November 30th of 2023?

15  A    Yes.

16  Q    And during that time frame, did you ever work at the staff

17  location?  Staff location --

18         THE INTERPRETER:  Can you repeat?

19         MR. MILMAN:  At that time period, that period that

20  Ms. Gil Reyes worked at the cancer booth, did you ever work at

21  the staff parking lot?

22         THE WITNESS:  Sometimes, when they need to move me to

23  different places.

24  BY MR. MILMAN:

25  Q    Is it your position that if you're stationed at the cancer

1    station, then you could be moved to the staff lot for an

2    extended period of time; more than one day?

3    A    We didn't have any particular are set.  Every time they

4    have a need, they move us.

5    Q    What would the need be?

6    A    If any station, any section becomes very busy and they

7    need extra help, they call people and move people around to

8    cover and help that area.

9    Q    They call people from home or they call people within the

10   various stations at Stony Brook Hospital?

11   A    Within the work shift.

12   Q    You sure about that?

13         MR. JACKSON:  Objection, asked and answered.

14         THE WITNESS:  Of course, yes.

15   BY MR. MILMAN:

16   Q    How many times did you work in that -- if you can recall,

17   in that three year -- let's start with -- let's start from

18   January of 2023 to November 2023 -- November 30th.  How many

19   times -- and how many times, how many days, if you can recall,

20   were you transferred out of the cancer booth station?

21   A    Several times.  I don't have the precise quantity, but

22   every time there was a need.

23   Q    One to 10?

24   A    I don't remember specific, but every time they have a need

25   they call whatever person was available.  Not necessarily me.

```
 1   Q    So sitting here today, you don't recall if it was more or
 2   less than 10 times?
 3   A    No.
 4   Q    Thank you.  Okay.
 5            MR. MILMAN:  I'm marking for identification purposes
 6   Ms. Gil Reyes -- one of Ms. Gil Reyes' affidavits, consisting
 7   of one, two, three, four, five pages.  And it's dated at
 8   12/12/2003 (sic), signed by Ms. Gil Reyes.
 9                           (Counsel confer)
10   BY MR. MILMAN:
11   Q    Ms. Gil Reyes, I'll give you the same instructions.
12   Please read it very carefully and -- there's front and back.
13   And when you finish reading it, lift your head up, so I know
14   you're ready for questions.
15                    (Witness examined the document.)
16            MR. JACKSON:  Your Honor, could counsel direct the
17   witness to a particular portion?  I don't think it's a --
18            MR. MILMAN:  It's a --
19            MR. MILMAN:  -- good use of --
20            MR. MILMAN:  I just want to --
21            MR. JACKSON:  --  time to have her read --
22            MR. MILMAN:  No, and I have no --
23            MR. JACKSON:  -- the entirety of the affidavit.
24            MR. MILMAN:  I have no problem doing that.
25            Okay.  Ms. Reyes, new instructions.  You don't need
```

1   to read the whole affidavit.  I would like you to look at

2   paragraph one.

3           So it says, in your sworn to affidavit, "I was

4   formerly employed at a Valet Attendant with Classic working

5   Stony Brook Hospital Cancer Center area."   Do you recall that

6   part of your affidavit?

7           THE WITNESS:  Yes.

8   BY MR. MILMAN:

9   Q    Why did you use the word  Cancer Center area?

10  A    Because that's where the place where I was working with.

11  Q    Well, I mean according to your testimony, you were just

12  working at Stony Brook Hospital.  You worked wherever they

13  needed you.  Didn't your testify to that?

14          THE INTERPRETER:  What was the name of the Hospital?

15          MR. MILMAN:  Stony Brook Hospital.

16          THE WITNESS:  Yes.

17  BY MR. MILMAN:

18  Q    So why would you put one of the five areas specifically in

19  this affidavit?

20  A    Because I was working there the moment that the people

21  from Parking System (sic) approached me.

22  Q    So is it your position that if you happened to be working

23  in the staff lot when they approached you, you would have put

24  staff lot in your affidavit?

25  A    No, because at that moment that was the area where I was

1   stationed working.

2   Q    And in fact that station is where could generate the most

3   tips, isn't that correct?

4   A    Not necessarily.  I don't know how much quantity generated

5   the other sections in tips.

6   Q    But you worked at the other sections when they needed you,

7   correct?

8   A    Exactly.

9   Q    So whether it was less than 10 or more than 10, do you

10  recall what tips you earned, just personally, at these other

11  stations compared to the cancer station?

12  A    No, because the tips amounts differ from customer to

13  customer.  Some customers don't leave any tips.  Some other

14  customer leave very few tips.  Those varies in days and in

15  dates.  So no.

16  Q    Is there any one lot or booth at Stony Brook that is known

17  for the least amount of tips a valet person can receive?

18           THE INTERPRETER:  Can you repeat that question,

19  please?

20           MR. MILMAN:  Sure.  Is there any one of the booth

21  stations at Stony Brook Hospital, where it's kind of known that

22  that station receives the lowest amount of tips?

23           THE WITNESS:  I can't define that.

24  BY MR. MILMAN:

25  Q    Is there a station that's known at the Hospital to

1    generate the most tips?

2            MR. JACKSON:  You know, objection, relevance.

3            JUDGE GREEN:  Okay.  I mean there was a little

4    testimony from somebody else regarding tips, but wasn't that

5    question just asked?  That's the same question that was just

6    asked.

7            MR. MILMAN:  Okay.  I'll move on, I'll move on.

8    BY MR. MILMAN:

9    Q    Since November 30th 2023, have you had an opportunity to

10   watch the new company Parking Systems perform valet services at

11   the Hospital?

12   A    Can you repeat the question?

13   Q    Let me -- since your last day of employment at Classic on

14   November 30th 2023, did you ever go back to the Hospital?

15   A    No.

16   Q    Has anybody told you, any of your co-workers that you

17   worked with, that they went to the Hospital and watched how

18   they performed services?

19   A    No.

20   Q    Okay.  All right.

21                        (Pause.)

22            MR. MILMAN:  What are we up to?  4?

23            MR. MAURO:  I think 4.

24            MR. MILMAN:  Just for identification purposes.

25            MR. JACKSON:  The last was 2.

306

```
 1              MR. MILMAN:  3?

 2              UNIDENTIFIED SPEAKER:  Well, I think he put in this

 3    and --

 4              MR. MILMAN:  No, no.  I'm going to use that, but I'm

 5    not -- I haven't moved it.

 6              UNIDENTIFIED SPEAKER:  You only have one.

 7              MR. MILMAN:  Okay.  One, thank you.  Right.

 8         Okay.  So I'm going to mark this as 3 just for

 9    identification purposes, Your Honor.

10         Ms. Gil Reyes, this is only a two page document front

11    and back.  Please take a look at it and just let me know when

12    you've ready it.

13                   (Witness examined the document.)

14         Okay.  So I know on top there's an email.  I'm not

15    going to ask you questions about the email.  I'm just going to

16    ask you questions about the information that you provided.  Do

17    you -- you recall seeing that document?  Or not -- that

18    information?

19              THE WITNESS:  Yes.

20    BY MR. MILMAN:

21    Q    And the back as well?

22    A    Yes.

23    Q    Okay.  Aside from filling that document, which you filled

24    it out online, correct?

25    A    Yes.
```

```
 1                    (Respondent's R-3 identified)

 2   Q    Okay.  Did you ever fill anything out in document form?

 3   Not online, but a physical document?

 4           MR. JACKSON:  Objection.  Objection, vague.  Has she

 5   ever filled out a document --

 6           MR. MILMAN:  I'm not --

 7           MR. JACKSON:  -- in physical form?

 8           MR. MILMAN:  -- finished yet.  I've not finished yet.

 9   And we're supposed to talk in pieces.

10           MR. JACKSON:  Okay.  I withdraw the objection.

11           MR. MILMAN:  For the purpose of apply to Parking

12   Systems?

13           THE WITNESS:  No.

14   BY MR. MILMAN:

15   Q    When was your start date at Classic?

16   A    Around March 2015.

17   Q    Is that before the Union got there or after?

18   A    It was the moment when the Union was entering the company.

19   Q    Okay.  Did you vote -- I don't want to know how you voted,

20   but did you vote in a NLRB election?

21   A    Not in the election, because they were already doing all

22   those movements.

23   Q    All right.  Thank you.  Now, if you look at the back of

24   that document, it asks you a question of how did you hear about

25   a job opening with Parking Systems.  And do you -- can you read
```

1    what you wrote?

2    A    It's in English.

3    Q    What does it say?

4    A    New company is taking over SEU Classic Valet.

5    Q    Why did you choose to write that?

6    A    What I wrote was a new company was taking possession of

7    Stony Brook.

8    Q    But the question asked you how did you learn about the job

9    opening, does it not?

10   A    Because I was working there, and I knew that another

11   company was about to take over the place.

12   Q    How did you know that?

13   A    The members of the company made themselves present at the

14   place.

15   Q    Well, at some point in time did you learn that November

16   30th 2023 would be your last day of employment?

17   A    Yes.

18   Q    And how did you learn that?

19   A    The company informed us.

20   Q    In person?  In writing?  How?

21   A    In person.

22   Q    And do you recall the date?

23   A    Not exactly.

24   Q    Okay.  And do you recall who from the company informed

25   you?

309

```
1   A    Yes.

2   Q    Who?

3   A    The President of the company.

4   Q    And what's his name?

5   A    Julian Marte.

6   Q    And before Julian, did anybody tell you that your last day

7   of employment would be November 30th?

8   A    Yes.

9   Q    And who was that?

10  A    The manager in charge.

11  Q    Who is that?

12  A    Richard Arue.

13  Q    He's the sole manager that you testified about, correct?

14  A    Yes.

15  Q    And how many more -- how many days prior to the owner

16  informing you of your last day, did Richard inform you of your

17  last day?

18  A    I don't remember exactly.

19  Q    Okay.  Do you know how many days went by, from the time

20  period you were given that QR card, until the time period that

21  you submitted the information online?

22  A    I don't remember how many days, but two days later.

23  Q    You sure about that?

24  A    It's what I remember.

25  Q    Okay.  Why didn't you do it that day?
```

310

1    A    That's the time I took to do it.

2    Q    Couldn't do it at night after work?

3    A    I was basically working, and it takes time to fill out the

4    form.

5    Q    So is it your position that you opened the form, you

6    looked at it, but you didn't fill it out at first?

7

8    A    We tried to do it several times.  Just one occasion we

9    were able to complete it.

10   Q    What happened the previous times?

11   A    Got complicated, because we were busy.

12   Q    You filled it out together as a group?

13   A    We completed separately, uh-huh.  But while we were

14   working, we were all trying to do it at the same time.

15   Q    And why couldn't anybody do it?

16   A    For the same reason; we were very busy and we have to drop

17   the phone, in order to take care of our work.

18   Q    What time -- at that time period, what what time did you

19   get off from work?

20            THE INTERPRETER:  Can you repeat?

21            MR. MILMAN:  At that time period, mid-November of

22   '23, what time was your -- what was your final hour of work?

23   What time during the day?

24            THE WITNESS:  6:30.

25   BY MR. MILMAN:

```
 1   Q    You couldn't fill out that application at 7:00 p.m., or
 2   7:30 or 8:00?
 3              MR. JACKSON:  Objection.  He's badgering the witness.
 4              MR. MILMAN:  I'm not badgering the witness.
 5              MR. JACKSON:  She testified to when she filled out --
 6              MR. MILMAN:  The witness also testified it was very -
 7   -
 8              MR. JACKSON:  This is irrelevant.
 9              MR. MILMAN:  -- important to have her job.
10              JUDGE GREEN:  Okay.  This is --
11              MR. MILMAN:  It goes --
12              JUDGE GREEN:  -- really bordering on irrelevant.
13   It's the same --
14              MR. MILMAN:  It goes to --
15              JUDGE GREEN:  -- general stuff that was --
16              MR. MILMAN:  It goes to credibility.  Now the witness
17   --
18              JUDGE GREEN:  Yeah, okay.
19              MR. MILMAN:  -- is testifying that they did it
20   together.
21              JUDGE GREEN:  That's why I'm allowing you.  That's --
22              MR. MILMAN:  Okay, thank you.
23              JUDGE GREEN:  -- why I'm allowing you.
24              MR. MILMAN:  Thank you, Your Honor.
25              JUDGE GREEN:  It's not going anywhere --
```

1           MR. MILMAN:  Okay.  So --

2           JUDGE GREEN:  -- fast, but go ahead.

3           MR. MILMAN:  Listen -- thank you.

4           Any reason why you couldn't fill it out at 7:00,

5    7:30, 8:00, 8:30 p.m.?

6           THE WITNESS:  There's many things that we needed to

7    do.  Not only that, we had to take -- go back home, take care

8    of our kids.  We had many other priorities.

9                      CONTINUED CROSS-EXAMINATION

10   BY MR. MILMAN:

11   Q    Okay.  I just want to make sure, is the witness saying she

12   or we?

13   A    I.

14          MR. MILMAN:  Thank you.  Could we go off the record

15   for a second, l

16          I'd like to move Respondent 3 into evidence, Your

17   Honor.

18          JUDGE GREEN:  Any objection?

19          MR. JACKSON:  No objection.

20          JUDGE GREEN:  R-3 is admitted.

21             (Respondent's R-3 received in evidence)

22          MR. MILMAN:  Thank you.  Can we go off the record for

23   a second, please?

24          JUDGE GREEN:  Off the record.

25             (Whereupon, a brief recess was taken)

**Burke Court Reporting & Transcription**
**(973) 692-0660**

313

```
 1                JUDGE GREEN:  On the record.

 2                MR. MILMAN:  I'd like the witness to see GC-4 --

 3                     (Counsel confer)

 4                MR. MILMAN:  Are we on GC-4?

 5                MR. JACKSON:  I don't have it in printed fashion.

 6                JUDGE GREEN:  Here.

 7                MR. JACKSON:  I gave --

 8                JUDGE GREEN:  I have it.

 9                MR. JACKSON:  -- it to the last witness.

10                MR. MILMAN:  Oh, thank you, Your Honor.

11                MR. JACKSON:  -- Never got it back.

12   BY MR. MILMAN:

13   Q    Same instructions; please read that document.  When you

14   finish, just lift you head up signifying that you're ready to

15   answer questions.

16                (Witness examined the document.)

17                Okay.  Do you recall this text?

18   A    Yes.

19   Q    And who is this text -- who did you exchange this text

20   with?

21   A    With my representative.

22   Q    Right.  Ayse?

23   A    Yes, sir.

24   Q    And do you recall testifying regarding this?

25                THE INTERPRETER:  Repeat, please.
```

1          MR. MILMAN:  Sorry.  Too fast.  Do you recall

2    testifying regarding this exhibit?

3          THE WITNESS:  Yes.

4    BY MR. MILMAN:

5    Q    Okay.  The Spanish part of the text, your referring to

6    your meeting with Mr. Bobby Gust, correct?  Right.  And that --

7    A    Yes, sir.

8    Q    That would be the meeting with you and your son on

9    November 25th, correct?

10   A    Yes.

11   Q    At Jake's 58 Hotel Casino?

12   A    Yes.

13   Q    Was this -- when was -- prior to this November 27th text

14   to your union rep, when was the last time you spoke to your

15   union rep before that?  Yeah.  I'll say it again --

16         THE INTERPRETER:  November --

17         MR. MILMAN:  This text is dated November 27th.

18         THE INTERPRETER:  Okay.

19         MR. MILMAN:  When was the previous time you could

20   recall speaking to your union rep before this date?

21         THE WITNESS:  After I had my interview with Mr.

22   Bobby.

23   BY MR. MILMAN:

24   Q    Okay.  That wasn't -- let me say the question again.  This

25   text is dated November 27th from you and your union rep,

1   referring to a meeting that you had with Bobby Gust on November

2   25th.  My question is when was the previous time you spoke to

3   the Union rep, before November 27th?

4           MR. JACKSON:  Objection, asked and answered.

5           JUDGE GREEN:  It was asked and answered --

6           MR. MILMAN:  Okay.

7           JUDGE GREEN:  -- but if you're --

8           MR. MILMAN:  Yeah.

9           JUDGE GREEN:  -- if you're confused it --

10          MR. MILMAN:  Yeah.

11          JUDGE GREEN:  -- you can get clarification.

12          THE WITNESS:  After my meeting with Mr. Bobby.

13  BY MR. MILMAN:

14  Q    And that was the 25th?

15  A    Yes, sir.

16  Q    Did you send another text on the 25th, because this is two

17  days later?

18  A    No.  I spoke through telephone to Ms. Ayse.

19  Q    Well, if you spoke to the telephone with Ms. Ayse, why did

20  you feel it necessary to send this text two days later?

21  A    I let her know the communication that I had with these two

22  people, about -- because they asked me if I would stay working

23  in this place.

24  Q    Who's they?

25  A    Dan and Nick, the two persons written on that document.

```
1   Q    Okay.  So I'm going to ask you to try your best, and

2   accurately state into the record what your Spanish text in

3   English --

4               MR. JACKSON:  Objection.

5               MR. MILMAN:  I need to know what this says.  This is

6   --

7               MR. JACKSON:  Your Honor --

8               JUDGE GREEN:  Well, we didn't get the --

9               MR. JACKSON:  -- we did this on direct.  She read it

10  into the record.  The interpreter translated it.

11              MR. MILMAN:  Okay --

12              MR. JACKSON:  Now she's (sic) asking her to try to --

13              MR. MILMAN:  The --

14              MR. JACKSON:  -- translate her own?

15              JUDGE GREEN:  No.  Yeah.

16              MR. MILMAN:  No.  The problem is --

17              JUDGE GREEN:         We're not going to have --

18              MR. MILMAN:  -- we don't have the --

19              JUDGE GREEN:  We can have the translator do it again,

20  if you would like.

21              MR. MILMAN:  Please, because I don't have the --

22              JUDGE GREEN:  Okay.

23              MR. MILMAN:  -- first part.  And we asked for

24  expedited transcripts.  We don't have them.

25              JUDGE GREEN:  Okay.
```

```
1              MR. MILMAN:  So --

2              JUDGE GREEN:  So would you -- so why don't you give

3    it --

4              MR. MILMAN:  Yeah.

5              JUDGE GREEN:  -- to him?

6              MR. MILMAN:  Yes.

7              JUDGE GREEN:  Or he can use mine.

8              MR. MILMAN:  Yeah.

9              And take your time to read it first.  Whenever you're

10   comfortable reading it in English --

11             THE INTERPRETER:  Are you instructing me to read it

12   in English?

13             JUDGE GREEN:  Yes.

14             THE INTERPRETER:  To translate --

15             JUDGE GREEN:  I am.  That's what I'm asking --

16             MR. MILMAN:  Yeah.  Yes --

17             JUDGE GREEN:  Yes.  Right.

18             MR. MILMAN:  -- the Judge -- I defer to you, Judge.

19   Please.

20             THE INTERPRETER:  All right.  "Hi, Ayse.  I am

21   Francis Gil.  Talked with -- spoke with Neck and them today in

22   the morning.  And they themselves told me that the new company

23   Parking System (sic) doesn't want to hire us, because we have

24   union, and they don't work with the Union.  It's the same what

25   baby" --
```

```
 1            THE WITNESS:  Bobby.
 2            THE INTERPRETER:  -- "Bobby, one of the supervisors
 3   of the same company, told me on Saturday.  That they summon me
 4   to make the proposal to stay with them, because some only five
 5   people they can leave from us."
 6                    CONTINUED CROSS-EXAMINATION
 7   BY MR. MILMAN:
 8   Q    So this text in part is covering some of the conversation
 9   that you had with Ayse on the 25th, after your meeting with
10   Bobby?
11   A    Could be.
12   Q    You don't know?
13   A    It's related to the same topic.
14   Q    What time did you speak to the Union rep on the 25th?
15   A    I don't remember exactly the time, but I think it was
16   after 3:00 o'clock.
17   Q    It was still light out?
18   A    In the afternoon.
19   Q    It was still light out?
20   A    I believe so.
21   Q    And do you recall did you feel it was very important for
22   you to reach out to your union rep after that meeting?
23            THE INTERPRETER:  Huh?
24            MR. MILMAN:  Did you feel it was very important for
25   you to reach out to your union rep after that meeting with
```

```
 1   Bobby on November 25th?
 2           THE WITNESS:  Of course, yes.
 3   BY MR. MILMAN:
 4   Q    So would it be fair to say that you called your union rep
 5   right after that meeting?
 6   A    Yes.
 7   Q    What time was your meeting with Bobby?
 8   A    1:00 p.m.
 9   Q    And how long was the meeting?
10   A    Around 15 minutes.
11   Q    So that ends about 1:15, 1:20?
12   A    More or less.
13   Q    And so is it still your position that you reached out to
14   her at 3:00, or was it earlier than 3:00?
15   A    After 3:00 o'clock.
16   Q    After 3:00 o'clock?  Okay.  Do you recall that
17   conversation that you had with the Union rep, right after that
18   meeting with Bobby?
19   A    I communicated what I spoke about in the interview that I
20   had.
21   Q    Let us know for the record what that conversation
22   consisted of --
23   A    It was about letting my representative know what Mr. Bobby
24   told me --
25   Q    What did specific --
```

1   A    -- about the work.

2   Q    What did you specifically say to Ayse, and what if you --

3   what did you specifically say to her in that call?  Stop,

4   please.  Can --

5   A    I said that the Mr. Bobby told me that he couldn't hire

6   more than five people.  Because we had a union, and the company

7   Parking System (sic) doesn't work with unions.

8   Q    Anything else?

9   A    That's what I told her.

10  Q    Did you tell the Union rep that he offered you a job?

11            THE INTERPRETER:  Can you repeat?

12            MR. MILMAN:  Did you tell your union rep that he

13  specifically offered you a job?

14            THE WITNESS:  Yes.

15  BY MR. MILMAN:

16  Q    And did you tell your union rep that you stated we all

17  work together as a team?

18  A    Of course.

19  Q    Right.  Did you also tell your union rep, as you said to

20  Bobby, are you hire to hire me or everybody?

21  A    Yes.

22  Q    Why did you ask Bobby that question?

23  A    Because I just wanted to know if he has interviews with

24  other people, more people, because I didn't know.

25  Q    But you're -- you just testified that you said to Bobby

**Burke Court Reporting & Transcription**
**(973) 692-0660**

1    are you here to hire me or everybody?  Not interview.  Hire.

2              THE INTERPRETER:  The last part?

3              MR. MILMAN:  Not interview.  Hire.

4              I'll say it again.  Your testimony was, after I

5    refreshed your recollection, that you said to Bobby am I here

6    for you to hire me or everyone?  And my question is, why would

7    you ask that question?

8              THE WITNESS:  Because everybody was interested in

9    that job.  And after my meeting, I wanted to know, and they

10   wanted to know, if somebody else was called for an interview.

11   BY MR. MILMAN:

12   Q    Are you a union rep?

13   A    No, sir.

14   Q    And you understood that meeting, that they wanted to

15   interview you, right?  They didn't -- it wasn't in a mass

16   email.  It wasn't -- didn't include five, six, 10, 20 people in

17   the email.  It was sent to you directly, correct?

18   A    Yes, but when they -- my co-workers learned about that

19   call, they wonder the question why they didn't call us.

20   Q    How did your co-workers learn that Bobby called you?  How

21   did your co-workers learn that Bobby called you?

22   A    Because some of my co-workers were there next to me when I

23   got the call.

24   Q    When did Bobby call you?

25   A    I think he called me during the afternoon between 2:00 and

1   4:00 in the afternoon.

2   Q    What day?

3   A    I think it was Thursday.

4   Q    Do you have the date?  If you met with him on the 25th,

5   what day was Thursday?

6   A    23.

7   Q    Two days before?

8   A    Yes.

9   Q    And did you pick up the first time he called, or did you

10  see there messages that he called you?

11  A    I answered the phone.

12  Q    So it just happened that you weren't running cars.  You

13  happened to be standing at the booth I guess, right?

14  A    That moment I was in the booth.

15  Q    Right.  And did you notify the Union rep that you got a

16  call from Bobby?  Did you notify the Union rep?

17  A    I don't know.

18  Q    You don't know or you don't remember?

19  A    I don't know.

20  Q    Is that the same thing as I don't remember?

21           MR. JACKSON:  Objection.

22           MR. ROCCO:  Objection.

23           MR. JACKSON:  Asked --

24           JUDGE GREEN:  No, overruled.

25           MR. MILMAN:  Thank you, Judge.

```
 1              THE WITNESS:  I could be the same; don't remember or
 2   not knowing.  I have no idea.
 3   BY MR. MILMAN:
 4   Q    So you remembered that Bobby called you between 2:00 and
 5   4:00 p.m. on that Thursday specifically and where you were, and
 6   you don't know if you called your union rep on that day after
 7   Bobby called you?
 8   A    So the question is if I told her?
 9   Q    The question is did you call your union rep, after Bobby
10   called you on November 23rd to set up a meeting?
11   A    Now I understood the question.  Yes.
12   Q    How soon after you got a call from Bobby on the 23rd did
13   you call your union rep?
14   A    I don't remember.
15   Q    But it was that day, the 23rd, correct?
16   A    I don't remember.
17   Q    You don't if it was the 23rd?
18   A    When I --
19   Q    I'll repeat the question.
20   A    When I advise her?
21   Q    I'll repeat.  Did you call your union rep on the same day
22   that you got the call from Bobby on November 23rd, yes or no?
23   A    I don't remember.
24   Q    Okay.  We're back to that.  Okay.  Do you recall speaking
25   to your union rep the 24th?
```

1    A    It could have been 23rd or it could have 24th.

2    Q    But you remember that you spoke to her once or more than

3    once?  After that call on the 23rd.

4    A    I don't remember.  I just know that I told her.

5    Q    Would it be in your cell phone?  Would it be in the

6    history log of your cell phone?

7    A    I don't know.  There's so many calls from then to now,

8    that I don't know if it will be there.

9    Q    Don't erase anything, because we might be asking for that

10    to confirm.  Now --

11    A    I don't have a way to delete anything.

12    Q    Oh.  Now, did you call the Union rep on the 25th, before

13    you met with Bobby?

14    A    I don't remember.

15    Q    And I believe you testified that you were nervous going

16    into that meeting to go meet with the representative from

17    Parking Systems, is that correct?

18    A    Yes.

19    Q    And who did you speak to about, you know, your being

20    nervous?  Who did you speak to about that, before going to meet

21    with Bobby?

22         MR. JACKSON:  Objection, assumes facts not in

23    evidence that she spoke with anybody.

24         MR. MILMAN:  If anybody.

25         THE WITNESS:  I don't remember.

```
 1   BY MR. MILMAN:

 2   Q    Let's go back to that conversation you had with your union

 3   rep, either the 23rd or the 24th.  Was it in person or on the

 4   phone?

 5   A    On the phone.

 6   Q    Any texts exchanged between you two?

 7   A    I don't remember that.

 8   Q    Okay.

 9   A    I don't recall.

10   Q    And what did you say to your union rep, either on the 23rd

11   or the 24th?

12   A    That Mr. Bobby communicated with me to make an interview.

13            MR. MILMAN:  To make what?

14            THE INTERPRETER:  An interview.

15            MR. MILMAN:  Okay.

16   BY MR. MILMAN:

17   Q    And -- okay.  And you tell your union rep that you were

18   nervous meeting with this new company?

19   A    Maybe I told her that, but I don't remember exactly  with

20   precision.

21   Q    And what did the Union rep tell you about going to the

22   meeting?

23            THE INTERPRETER:  What is the last part?

24            MR. MILMAN:  What did the Union rep tell you, in your

25   conversation with her?
```

```
 1              THE WITNESS:  That I should go attend to the

 2   interview.

 3   BY MR. MILMAN:

 4   Q    Anything else?

 5   A    I don't remember.

 6   Q    Did your union rep tell you that the Union has their

 7   attorneys reaching out to the company?

 8              THE INTERPRETER:  Sorry, can you repeat the question?

 9              MR. MILMAN:  Yes.  Did your union rep tell you, in

10   that conversation on November 23rd and November 24th, that the

11   Union -- union's lawyers have already reached out to Parking

12   Systems?

13              THE WITNESS:  I don't remember.

14              JUDGE GREEN:  Say again.

15              THE INTERPRETER:  I don't remember.

16   BY MR. MILMAN:

17   Q    Think about it.  Take some time.

18              MR. JACKSON:  Objection.

19              JUDGE GREEN:  Yeah.  No.

20              MR. MILMAN:  Okay.  I'd like the witness to look at

21   GC's exhibit, your November 9th letter.  The Union -- Mr.

22   Rocco's November 9th letter.

23              MR. JACKSON:  GC-9?

24              MR. MILMAN:  GC-9 --

25   BY MR. MILMAN:
```

```
 1   Q    Please read that carefully and let us know when you
 2   finish.
 3               (Witness examined the document.)
 4               JUDGE GREEN:  I really don't -- I mean unless you
 5   have -- unless there's some need for her to read through the
 6   whole --
 7               MR. MILMAN:  Okay.
 8               JUDGE GREEN:  -- document --
 9               MR. MILMAN:  That -- just look at the first page.  It
10   -- do you know who the Union attorneys are?  And I don't know
11   about any conversation you had with them.  Just do you know who
12   they are?
13               THE WITNESS:  Yes.
14   BY MR. MILMAN:
15   Q    The esteemed Mr. Rocco right here?
16   A    Yes, sir.
17   Q    Okay.  Prior to meeting with the NLRB to prep for this
18   case, which is fine, have you ever met Mr. Rocco before that?
19   A    Can you repeat that?
20   Q    Sure.  In November of 2023, did you know that Mr. Rocco
21   was the attorney for the Union?
22               THE INTERPRETER:  Sorry.  I didn't --
23               MR. MILMAN:  Yeah.  In November of 2023 while you
24   were still employed at Classic, did you know that Mr. Rocco and
25   his firm were the attorneys for the Union?
```

```
 1                THE WITNESS:  No.
 2   BY MR. MILMAN:
 3   Q    Did you even know that the Union had attorneys?
 4   A    No.
 5   Q    Did you ever see this letter in November of 2023?
 6   A    No.
 7   Q    Did you see this letter as of your last date of employment
 8   on November 30th of 2023?
 9   A    No.
10   Q    Did you ever see this letter before right now?
11   A    (In Spanish) No, señor.
12   Q    Hmm.  Oh, okay.
13                THE INTERPRETER:  They look different.
14                MR. MILMAN:  One --
15                JUDGE GREEN:  That's the letter --
16                THE INTERPRETER:  All right.  Good.
17                MR. MILMAN:  Okay.  All right.  Did --
18                THE INTERPRETER:  It's the --
19                MR. MILMAN:  -- your --
20                THE INTERPRETER:  -- same letter, by the way.  Okay.
21                MR. MILMAN:  Right.  Did your union rep ever tell
22   you, in that conversation on November 23rd and November 24th,
23   that their lawyers have already wrote -- written to Parking
24   Systems?  Yes or no?
25                THE WITNESS:  I don't remember.
```

```
 1  BY MR. MILMAN:
 2  Q   Okay.  So after you got that call from Bobby on November
 3  23rd, and before the day you actually met on November 25th, did
 4  you only have one call with your union rep during the 23rd to
 5  25th period?
 6  A   I don't remember.
 7  Q   It could be zero times?
 8  A   Could have been none.  It could have been several.
 9  Q   Thank you.  Okay.
10          MR. MILMAN:  Off the record for a second, please.
11          JUDGE GREEN:  Off the record.
12          (Whereupon, a brief recess was taken)
13          MR. MILMAN:  Ms. Gil Reyes, I'm going to ask you some
14  questions now about statements that you gave to the NLRB.  I do
15  not want to know about any conversation with the attorneys, Mr.
16  Rocco, Mr. Jackson or Ms. Cabrera.  I just want to talk about
17  your statements.  Okay?  Do you recall giving a statement or an
18  affidavit to the NLRB for this case?
19          THE INTERPRETER:  She to them, or them to her?
20          MR. MILMAN:  They would take her affidavit.
21          THE WITNESS:  Yes.
22  BY MR. MILMAN:
23  Q   Okay.  And do you recall how many affidavits you gave to
24  the -- how many affidavits were taken by the NLRB of you?
25  A   Yes.
```

```
1   Q    And -- okay.  How many affidavits did you give?

2   A    Three.

3   Q    Three?

4   A    Yes.

5            MR. MILMAN:  Can we have the third, please?

6            MR. JACKSON:  There's no third.

7            THE INTERPRETER:  What are you saying?

8            MR. MILMAN:  I said can we please have the third

9   affidavit.

10           MR. JACKSON:  There is no third.  I've given you all

11  the Jencks statements, sir.

12  BY MR. MILMAN:

13  Q    You sure you gave three affidavits?

14  A    Yes, sir.

15           MR. MILMAN:  Can we go off the record, Your Honor?

16           JUDGE GREEN:  Off the record.

17               (Whereupon, a brief recess was taken)

18           JUDGE GREEN:  On the record.

19           MR. MILMAN:  Okay.

20  BY MR. MILMAN:

21  Q    When you gave your affidavits to the NLRB, was there a

22  translator present?

23  A    Yes.

24  Q    So whatever it is, two or three, all your affidavits there

25  was a translator present?
```

```
 1              THE INTERPRETER:  Again?

 2              MR. MILMAN:  Whether you gave two or three

 3    affidavits, it's not a big deal, but those affidavits you gave,

 4    there was -- you -- there was a translator, correct?

 5              THE WITNESS:  Yes.

 6              MR. MILMAN:  Okay.  So I'm to mark Respondent's

 7    exhibit 5.  I'm going to give everybody, but I would like

 8    witness to see the affidavits that we have.  I'm not going go

 9    on to the third.  I don't care about that.  I will give

10    everybody copies.  One second.

11                          (Counsel confer)

12              MR. MILMAN:  Do you have 4?

13              JUDGE GREEN:  I do.

14              MR. MILMAN:  I know the witness has got that.  The

15    witness got both.  So I'd like the witness to look at

16    Respondent exhibit 4, please.

17    BY MR. MILMAN:

18    Q    That's five pages.  It's the with that's thicker.  And

19    please read that, Ms. Gil Reyes, and let us -- this time you're

20    going to have to read the whole thing.

21                      (Witness examined the document.)

22              And --

23    A    This is the same.

24    Q    Okay.  The -- hold on.  Yeah.

25    A    Two pages are the same.
```

1           MR. MILMAN:  May I approach the bench, Your Honor?

2           JUDGE GREEN:  Yes.

3           MR. MILMAN:  Okay.  Sorry.  This --

4                      (Counsel confer)

5           MR. MILMAN:  Your Honor, do you have both affidavits?

6           JUDGE GREEN:  I do.

7           MR. MILMAN:  Okay.

8  BY MR. MILMAN:

9  Q    So Ms. Gil Reyes, please -- the thicker one, the five

10 pages, yeah, please read that and let us know when you're done.

11          (Witness examined the document.)

12          MR. JACKSON:  Yeah.  Your Honor, I have the same

13 issue with this exercise that we had before with the collective

14 bargaining --

15          MR. MILMAN:  All right.

16          MR. JACKSON:  -- agreement.

17          MR. MILMAN:  Fine.  Okay.  I can go -- fair enough.

18 I can go -- I can break it down.  It's a lot to remember and

19 recall.  Okay.

20 BY MR. MILMAN:

21 Q    Ms. Gil Reyes, on Respondent 4 -- well, I mean Respondent

22 2.  Okay?  The thicker one.  Five pages.  I would like you to

23 please look on the second page.  One, two, three, four, five

24 lines down.

25          Now, you had testified earlier that there were two

333

1    meetings that were conducted, where the employees were
2    notified.  November 30th would the last day.  One with Richard
3    and one with the other.
4              Now, that part of the affidavit is -- it mirrors what
5    you had said.  Okay.  Now, later -- oh.
6    A    I haven't had two interview with Parking System (sic).
7    Q    No.  I said Classic had two meetings.  One with Richard
8    and one with the owner, to inform you that November 30th would
9    be the last day.
10   A    Yes.
11   Q    And later on in your affidavit the next line, you state
12   that Mr. Marte, the owner, told you that the new company coming
13   in Parking Systems, may or may not hire you as -- in this
14   meeting with the employees.  Is that what he had said?
15   A    Yes.  Exactly.
16   Q    Did he say how he knew that?
17   A    He can't confirm if another company that is not his is
18   going to hire me.  He can only speak --
19   Q    Right.
20   A    -- for his company.
21   Q    Did you know -- did you personally know -- not as of now,
22   you might know certain things now, but as of November 30th 2023
23   did you know that the valet parking services for Stony Brook
24   Hospital went out to a bid?  Went out to a bid.  Bid for other
25   contractors to bid on that work.

```
1    A    I heard that the contracting of the companies who

2    providing service were done that way.

3    Q    And when did you learn if at all that valet services, your

4    job, your co-worker jobs, went out to a bid for other companies

5    to bid on that work?

6    A    Can you repeat the question?

7    Q    Yes.  Yeah.  It's a poor question.  When did you learn, if

8    at all, when your job and your co-workers' jobs for valet

9    parking services went out for a bid for other companies to bid

10   on that work?

11   A    I didn't know the time for that.  I just only knew that

12   another company was to come in.

13   Q    Anybody tell you that the valet services went out to bid

14   in June 2023?

15   A    Those are private matters in the management that employees

16   have nothing to do with.

17   Q    And so did anybody tell you that the work was contracted

18   out by Stony Brook Hospital to Parking Systems in July of 2023?

19             MR. JACKSON:  Objection.  You know, this witness'

20   knowledge of, you know, the bid process is not --

21   =         JUDGE GREEN:  All right.  Over --

22             MR. MILMAN:  This is --

23             JUDGE GREEN:  Overruled.

24             MR. MILMAN:  -- the witness that we have that they --

25             JUDGE GREEN:  Overruled --
```

```
 1                MR. MILMAN:  -- choose.

 2                JUDGE GREEN:  -- but let's --

 3                MR. MILMAN:  Okay.  Yeah.

 4                JUDGE GREEN:  -- move through --

 5                MR. MILMAN:  Thank you.

 6                JUDGE GREEN:  -- this quick, because I think I know -

 7    -

 8                MR. MILMAN:  Okay.

 9                JUDGE GREEN:  -- she's not going to know.

10                MR. MILMAN:  Okay.  I understand.  But that's all I

11    got.

12                JUDGE GREEN:  Okay.

13                THE INTERPRETER:  Reporter, can you repeat the

14    question, please?

15                MR. MILMAN:  This goes to --

16                MR. JACKSON:  No.

17                JUDGE GREEN:  No, he can't --

18                MR. MILMAN:  -- refusal to hire.

19                MR. JACKSON:  He cannot.

20                MR. MILMAN:  It goes to refusal --

21                JUDGE GREEN:  Just it's --

22                MR. JACKSON:  He cannot --

23                MR. MILMAN:  -- refusal to hire --

24                JUDGE GREEN:  -- easier for you to --

25                MR. MILMAN:  -- Your Honor.  Yeah.  I mean --
```

336

```
1              JUDGE GREEN:  Just ask it again.

2              MR. MILMAN:  Yeah, sure.

3              Did you know that the contract Stony Brook Hospital -

4  - Stony Brook University, Stony Brook Hospital, awarded the

5  valet contract services to Parking System (sic) in July of

6  2023?

7              MR. ROCCO:  Objection.

8              MR. MILMAN:  Did anybody --

9              MR. ROCCO:  Assumes facts --

10             MR. MILMAN:  -- tell you that?

11             MR. ROCCO:  -- not in evidence.        I'm just

12 asking if she was aware of it.

13             JUDGE GREEN:  Yeah.

14             MR. ROCCO:  Awarded?

15             JUDGE GREEN:  Well, let me ask you.  I mean what's

16 the fact that it's not --

17             MR. MILMAN:  First of all --

18             JUDGE GREEN:  The fact that there -- that it

19 happened?

20             MR. MILMAN:  -- it's judicial notice.  It's public

21 bids.

22             MR. ROCCO:  I mean we have the contract.  It wasn't

23 in July.

24             JUDGE GREEN:  Okay.

25             MR. MILMAN:  That's not true.  It was awarded in
```

```
 1   July.  It was awarded in July as the lowest bid.

 2            JUDGE GREEN:  Why don't you -- then why don't you

 3   just ask --

 4            MR. MILMAN:  Yeah.

 5            JUDGE GREEN:  -- if she knew when --

 6            MR. MILMAN:  Did you know --

 7            Well, she knows that --

 8            Did you know prior to November that Parking Systems

 9   was awarded the contract for valet services?  Prior to

10   October.  How's that?  Prior to October.

11            THE INTERPRETER:  Traffic systems?

12            MR. MILMAN:  Yeah.

13            THE INTERPRETER:  The traffic system?

14            MR. MILMAN:  Parking Systems.

15            THE WITNESS:  I don't remember.

16   BY MR. MILMAN:

17   Q    So you might have known that, previous to October?

18   A    I don't remember precisely.  I can't say yes, if it is not

19   clear to me.

20   Q    Is it possible you knew in the summer months in July?

21            MR. ROCCO:  Objection to what's possible.

22            JUDGE GREEN:  Yeah.  So sustained.

23            MR. MILMAN:  Oh, okay.  Fair enough.  Withdraw --

24   BY MR. MILMAN:

25   Q    Did you have any conversations with your son about the
```

**Burke Court Reporting & Transcription**
**(973) 692-0660**

1    bidding process?

2    A    Can't talk about meetings, when that had nothing to do

3    with me.

4    Q    I'm just asking did you have any conversations, yes or no?

5    With your son about the bidding process.

6    A    No.

7    Q    How about your union rep?

8    A    I don't know anything about biddings.  I cannot speak

9    about bidding, when I don't know anything about biddings.

10    Q    You should have.  How about --

11            MR. JACKSON:  Objection, argumentative.

12            MR. MILMAN:  How about -- withdraw.  How about

13    Richard?  Did Richard -- you have any conversation with Richard

14    about the valet services going out for bids?

15            THE WITNESS:  I don't have that clear.

16    BY MR. MILMAN:

17    Q    Do you know where Richard works now?

18    A    I imagine that he is still with the company.

19    Q    Okay.  So you don't know for sure?

20    A    No.

21    Q    Have you spoke to Richard since November 30th 2023?

22    A    Yes.

23    Q    How many times?

24    A    I don't remember.

25    Q    More than one?

339

1    A    I don't remember.

2    Q    You don't know if it was more than one?

3            MR. JACKSON:  Objection, asked and answered, he's

4    badgering the witness and he's clearly trying to intimidate

5    this witness, Judge.

6            MR. MILMAN:  I am --

7            MR. JACKSON:  Would you please --

8            MR. MILMAN:  -- certainty not trying to --

9            MR. JACKSON:  -- put a stop to this?

10           MR. MILMAN:  -- intimidate --

11           JUDGE GREEN:  All right.

12           MR. MILMAN:  -- anybody.

13           JUDGE GREEN:  So sustained.  Let's just --

14           MR. MILMAN:  Okay.  I'll move on.

15           JUDGE GREEN:  Right.

16   BY MR. MILMAN:

17   Q    During your employment at Classic, did you ever work at

18   any other Classic locations?  Outside Stony Brook.

19   A    Yes.

20   Q    Where did you work?

21   A    I believe South Hampton.

22   Q    How many years ago was that?

23   A    I don't remember.

24   Q    More than one year ago?

25           MR. JACKSON:  Objection.

```
1              MR. MILMAN:  It goes to continuity of business, Your
2    Honor.  I'm sorry --
3              JUDGE GREEN:  So --
4              MR. MILMAN:  -- but you've got to prove your case.
5              JUDGE GREEN:  So overruled.
6              THE WITNESS:  I don't remember exactly.
7    BY MR. MILMAN:
8    Q    Was it more than five years ago?
9    A    No.
10   Q    How many times did you work at South Hampton?
11   A    I don't remember.
12   Q    More than one?
13   A    I don't remember.
14   Q    Where else besides South Hampton did you work?  For the
15   Classic organization.
16   A    I don't remember.
17   Q    How about your son?  Do you know if you son worked at any
18   other locations besides Stony Brook?
19             THE INTERPRETER:  Again, please.
20             MR. MILMAN:  How about your son?  Do you know if he
21   worked at any other locations besides Stony Brook?
22             THE WITNESS:  I don't remember.
23   BY MR. MILMAN:
24   Q    Okay.  Let's go back to the affidavit.  That thicker one.
25   The one consisting of five pages.  I want you to read to
```

1    yourself paragraph three, please.

2                   (Witness examined the document.)

3              Just numero three.  Three only --

4              THE INTERPRETER:  Only the number three.

5              MR. MILMAN:  Have you read that?

6              THE WITNESS:  Yes.

7    BY MR. MILMAN:

8    Q    Is that affidavit paragraph three accurate or not?

9    A    Yes.

10   Q    You sure?

11             MR. JACKSON:  Objection, Your Honor.

12             JUDGE GREEN:  Yeah.  If you have --

13             MR. MILMAN:  It --

14             JUDGE GREEN:  If there's some --

15             MR. MILMAN:  It's maybe she's not reading it

16   carefully?  I --

17             JUDGE GREEN:  All right.  No.

18             MR. JACKSON:  Objection, Your Honor.

19             MR. MILMAN:  -- want to make sure --

20             MR. JACKSON:  Again, this another example of --

21             JUDGE GREEN:  All right.

22             MR. JACKSON:  -- Mr. Milman trying to intimidate the

23   witness.

24             JUDGE GREEN:  That's not -- I wouldn't say that's

25   intimidating the witness, but it's unnecessary.

```
 1            MR. MILMAN:  Okay.
 2            JUDGE GREEN:  So just move on --
 3            MR. MILMAN:  All right.
 4   BY MR. MILMAN:
 5   Q   So let's look at paragraph three.  You state here in about
 6   early November, early November, a recruitment specialist for
 7   the employer named Bobby Gust accompanied by three other Travis
 8   (last name unknown), Andrew (last name unknown) and another
 9   person who's name I don't remember came to our jobsite.
10            Let's do it sentence by sentence.  Are you testifying
11   right now that that's an accurate statement that Bobby and two
12   other individuals came and visited you at the jobsite at the
13   Cancer Center?
14   A   They were in the area.
15   Q   Okay.  "They approached me, and another person whose name
16   I don't remember, came to our jobsite."  So were they in the
17   area or did they approach you?
18   A   They were walking just across the booth where I was
19   performing my work.
20   Q   Is this one of those two conversations that you testified,
21   where you testified that on two occasions at the cancer booth
22   at Stony Brook a representative from Parking Systems engaged
23   you?  Is that one of the two?
24   A   Yes.
25   Q   So you're saying it was Bobby that gave you the cards?
```

343

```
 1   A     No.  In that moment it wasn't Bobby who gave me the card
 2   in my hand.  It was one of the others.
 3   Q     Someone else gave you Bobby's card?  Yeah.
 4   A     I didn't -- it wasn't clear for me who Mr. Bobby was, up
 5   to the time of the interview --
 6   Q     Right.
 7   A     -- yet in the car (sic) it was Bobby's card.
 8   Q     But it was somebody else that gave it to you?
 9   A     Yes.
10   Q     All right.  Let's go to the next sentence.  "Mr. Gust gave
11   me the card with his name and contact information."
12   A     That's the idea that I had at that moment.
13   Q     So this is not accurate, is that correct?
14   A     I didn't know exactly in that moment.  I saw that a card
15   that I received says Bobby, and the people from Parking System
16   (sic) was the one who provided that; a business card.
17   Q     So I'm going to ask you again.  Very slowly.  This part of
18   your sworn to affidavit, is that correct or not correct
19   regarding when you say Bobby gave you the card?
20   A     I know, and I repeat, I know what it says in the document.
21   I didn't know the persons that were there.  I don't know -- so
22   I don't know who is whom.  I don't know who is Bobby, I don't
23   know who is Travis, but I know that the card is Bobby.
24   Q     In your sworn to affidavit the sentence said Bobby gave me
25   the card.  Is this accurate or not?
```

```
 1   A    This one, I know exactly what is there, and I just want to
 2   clarify again that up to that moment I thought that Bobby was
 3   the one giving me the card.
 4   Q    I'm going to ask you again under oath.
 5              JUDGE GREEN:  No, let's not.
 6              MR. MILMAN:  Well, I need an answer, Your Honor.
 7              JUDGE GREEN:  No, you don't --
 8              MR. MILMAN:  It's not right to --
 9              JUDGE GREEN:  That -- it becomes argument at some
10   point.  You can certainly -- you got what you wanted.  She
11   testified --
12              MR. MILMAN:  I just want --
13              JUDGE GREEN:  -- that it's not accurate.
14              MR. MILMAN:  -- the truth.  I mean I just want to
15   know which one is it?
16              JUDGE GREEN:  Right.
17              MR. MILMAN:  Your testimony --
18              JUDGE GREEN:  We've had --
19              MR. MILMAN:  -- now under oath or this --
20              JUDGE GREEN:  We've had it enough.
21              MR. MILMAN:  -- under oath?
22              JUDGE GREEN:  We've had it enough.  You're going to
23   make the argument the it was inaccurate.
24              MR. MILMAN:  All right.
25              JUDGE GREEN:  That it's inaccurate.
```

1          MR. MILMAN:  Fine.  Off the record, please.

2          JUDGE GREEN:  Off the record.

3     (Whereupon, a luncheon recess was taken at 12:34 p.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    A F T E R N O O N   S E S S I O N

 2                                        (Time Noted: 1:33 p.m.)

 3           JUDGE GREEN:  On the record.

 4           MR. MILMAN:  Okay.  I'd like the witness to see GC-8,

 5    please.

 6                          (Counsel confer)

 7                     CONTINUED CROSS-EXAMINATION

 8    BY MR. MILMAN:

 9    Q    Okay.  Ms. Gil Reyes, do you also go by just the last name

10    Gil?

11    A    Yes.

12    Q    Okay.  Has it always been that; you go by Gil Reyes or

13    Gil, or is that something new?

14    A    Those are my two last names.

15    Q    Okay.  Thank you.  Okay.  Have you ever heard of some of

16    the employees that used to work at Classic, your co-workers,

17    have a chat group going on?  Are you aware of that?

18    A    Yes.

19    Q    And is that with the Union rep?

20    A    Yes.

21    Q    Approximately how many employees -- former Classic

22    employees are part of that chat group?

23    A    10 or 15.  I don't know precisely --

24    Q    And is that chat --

25    A    -- how many --
```

1   Q    -- group going on today?

2   A    Yes.

3   Q    And when do you -- if you recall, when did that chat group

4   start?

5   A    I don't recall precisely.

6   Q    Was it before or after November 30th --

7   A    I think after.

8   Q    After, okay.  Do you know -- are you able to recall the

9   names in that chat group?

10          MR. JACKSON:  Objection.  Respondent is calling on

11   the witness to reveal the union activities of other employees.

12          JUDGE GREEN:  Okay.  I mean I don't know that it's

13   necessarily union activity, but yeah, why do we need this?

14          MR. MILMAN:  I'll withdraw the question.

15   BY MR. MILMAN:

16   Q    Are you aware if any of your former colleagues, co-workers

17   at Classic has found work elsewhere?

18   A    I don't have knowledge of that.

19   Q    Wasn't that one the issues discussed in the chat group?

20   A    There were co-workers of mine in Classic that may had have

21   other employments at the time, and they might continue.  They

22   might have continued their employment -- those employment.

23   Q    Well, so are you aware of any Classic employees that held

24   more than one job, that worked for other companies besides

25   Classic?

1    A    Can you clarify the question?

2    Q    Sure.  Are you aware of any of your former co-workers at

3    Classic that had multiple jobs at the time they worked at

4    Classic?

5    A    Yes.

6    Q    I don't want to know the individuals, but what were some

7    of the other jobs?  Do you know the locations of the employers?

8    A    No.

9         THE INTERPRETER:  But your question was what kind of

10   work?

11        MR. MILMAN:  Where.

12   BY MR. MILMAN:

13   Q    Do you know the name to the other employers that they

14   worked for?  The other companies' names.

15        THE INTERPRETER:  And where?

16        MR. MILMAN:  Not where.  Just the other companies'

17   names.

18        THE INTERPRETER:  The witness nodded in a negative

19   way and said those are their own personal business.  I have

20   nothing to do with that.

21   BY MR. MILMAN:

22   Q    But you are aware they work at another company, but just

23   you don't know the name?

24   A    Some have other works, but I don't know what companies or

25   where.

1    Q    Do you have other job?

2    A    No, sir.

3    Q    How about your son?

4    A    Either.

5    Q    Okay.  Are you aware or not that Parking Systems has hired

6    some of your former co-workers?

7    A    Yes.

8    Q    How do you know that?

9    A    I heard about it.

10   Q    How did you hear about it?

11   A    We're all informed, because sometime we talk.  So we heard

12   -- we learned that some of our co-workers had found jobs with

13   Parking System (sic).

14   Q    I know, but how specifically do you have this knowledge?

15          MR. JACKSON:  Objection, relevance.

16          JUDGE GREEN:  Sustained.

17          MR. MILMAN:  Okay.

18   BY MR. MILMAN:

19   Q    At one point did you take the position in your testimony

20   that in your opinion either they should all be returned to work

21   or not?  Did you say that to Bobby?

22          THE INTERPRETER:  Can you please repeat the question?

23          MR. MILMAN:  Did you say to Bobby that it's your

24   opinion on November 25th that either you all go back to work or

25   none of you go back to work?

```
 1              THE WITNESS:  Yes.
 2   BY MR. MILMAN:
 3   Q    Okay.  Does it surprise you, knowing that a number of
 4   employees had gone back to work?
 5   A    That's their own decision.  And that had happened a couple
 6   of months after the event.
 7   Q    Are any of those individuals part of your chat group?
 8              THE INTERPRETER:  Again.
 9              MR. MILMAN:  Are any of those individuals that are
10   working for Parking Systems now part of your chat group?
11              THE WITNESS:  Yes.
12   BY MR. MILMAN:
13   Q    How many?
14              MR. JACKSON:  Same objection, Your Honor.
15              JUDGE GREEN:  Sustained.
16                     (Counsel confer)
17   BY MR. MILMAN:
18   Q    Now, you had testified that -- and you mentioned in your
19   affidavit, that Bobby when he offered you a job, he stated that
20   he would see if he could hire about three or four more
21   employees of your own choosing.  Do you recall that?
22   A    Yes.
23   Q    And that comment was made on November 25th, correct?
24   A    Yes.
25   Q    And you were still working for Classic, correct?
```

```
 1  A    Yes.

 2  Q    And you were in a union, correct?

 3  A    Yes.

 4  Q    And those three or four employees that Bobby said, whoever

 5  you recommend, they were also working for Classic at that time,

 6  correct?

 7  A    Yes.

 8  Q    And they were in the Union, correct?

 9  A    Yes.

10  Q    And Bobby was willing to hire you and those three or four

11  employees, correct?

12  A    That was the answer he gave me; three or four people, no

13  more than that.

14  Q    And they were in a union, correct?

15  A    Yes.

16  Q    Okay.  And you rejected his offer of employment on that

17  date November 25th, correct?

18  A    Yes.

19  Q    Because you believed it was all or nothing, correct?

20  A    Yes.  That's what I said.

21  Q    Thank you.  I only have a few more questions for you.

22           MR. JACKSON:  Off the record, please.  I've just got

23  to get --

24           JUDGE GREEN:  Off the record.

25               (Whereupon, a brief recess was taken)
```

```
 1            JUDGE GREEN:  On the record.

 2            MR. MILMAN:  Do you recall when you applied for a job

 3   at Classic, you recall that process of applying for a job at

 4   Classic?

 5   A    Yes.

 6   Q    And did you fill out a paper application or did you do it

 7   online?

 8            MR. JACKSON:  Objection, asked and answered.

 9            JUDGE GREEN:  Sustained.

10            THE INTERPRETER:  Oh, sustained?  Sorry.

11            MR. MILMAN:  Okay.  Yeah.

12            JUDGE GREEN:  Yes.

13            THE INTERPRETER:  Sorry.

14            MR. MILMAN:  Okay.

15   BY MR. MILMAN:

16   Q    Did you undergo training?

17   A    Yes.

18   Q    What kind of training?

19   A    First, we have an interview at the other office to see how

20   was the driving and what was the work about.  And then onsite

21   we also have a session, which they explain to how are the

22   movement on the workplace, where we -- what we are supposed to

23   do every day.

24   Q    And that was only for Stony Brook Hospital?

25   A    Yes.
```

1    Q    And was that training done in New Rochelle?

2    A    So we have an onsite training at the hospital.  And then

3    they took us to New Rochelle to the offices, where they show us

4    a video about how everything operates.

5    Q    And that said, is -- does that -- is that training

6    continued after you're initially hired, or is that the initial

7    hiring process?

8    A    The training at the site continued, the work there.  There

9    are certain other things that we need to check.  But the one in

10   the office was with that one.

11   Q    Okay.  You had testified to some extent regarding some of

12   your job duties are greeting patients and then greeting

13   visitors.  Do you recall that?

14                THE INTERPRETER:  Patients and?

15                MR. MILMAN:  Visitors, for patients.

16                THE WITNESS:  Yes, sir.

17   BY MR. MILMAN:

18   Q    Would you speak to the patients and visitors in English or

19   Spanish?

20   A    Both languages.  Some people are Spanish, some other are

21   English speakers.  So we do that according to the person.

22   Q    Let's say it's me, and I pull up as a visitor, what would

23   you say to me in English?

24   A    (In English) Good morning, sir.  How can I help you?

25

1    Q    Thank you.

2    A    You're welcome.

3                         (Pause.)

4    Q    Okay.  I only have a couple more questions, Ms. Gil Reyes.

5    If you could look at the two affidavits?  We're still almost

6    done with the five page one.

7                JUDGE GREEN:  This is Respondent's exhibit 2.

8                MR. MILMAN:  Correct.  Thank you.

9                (Witness examined the document.)

10           When you met with Bobby on November 25th, how long

11   was that meeting again?  Bobby and the two other reps.  How

12   long?

13               THE WITNESS:  Approximately 15 minutes.

14   BY MR. MILMAN:

15   Q    Was Bobby nice in the interview, or was he mean, or

16   neutral?  I mean how was his demeanor?

17   A    Nice, agreeable.  The same behavior that a person who is

18   talking to several people should have.

19   Q    Agreed.  Okay.  Okay.  And you son Edward had accompanied

20   you to the meeting.  Did he say anything at the meeting?

21   A    Yes.  He was in the meeting.  His only comment was Mom,

22   did you hear what the mister said?  Let's go.  You just heard

23   what the sir said --

24   Q    Seems like a nice young man.  Testified for a long time.

25   That's not a question.

```
 1              Okay.  Can you look at the shorter affidavit, please?
 2              JUDGE GREEN:  Respondent's exhibit 4.
 3              MR. MILMAN:  Yeah.  This is the short one, if you
 4   want to look at it?  Do you know if anybody tape recorded that
 5   meeting on November 25th on their phone?
 6              THE WITNESS:  I have no idea.
 7   BY MR. MILMAN:
 8   Q    Okay.  And my last few questions total of you on cross is
 9   I notice in the affidavit of five pages there was a Spanish
10   interpretation.  And you testified that all your affidavits was
11   an interpreter.  How come this affidavit doesn't have an
12   interpreter?
13   A    Okay.  That there was no interpreter available on the
14   other other.  So therefore I agree to slowly communicate and
15   testify.
16   Q    Okay.
17   A    And we arrange testimony.
18   Q    Okay.  Now, the second affidavit was five months later.
19   First one is December.  This one was in April.  Did you call
20   the NLRB and say I just thought of something, I want to add
21   something, or did they call you and ask you to come in?
22   A    They called me.
23   Q    That's what I thought.  And when they called you -- I
24   don't want to know -- I just want to know when they initially
25   called you, what did they say?
```

356

```
 1   A     If I was willing and prepared to have another declaration.
 2   Q     Right.  So if you didn't call the NLRB to give this second
 3   affidavit five months later, what did they tell you was -- it
 4   was necessary to come in for?
 5              MR. JACKSON:  Objection, relevance.
 6              MR. MILMAN:  Withdrawn.
 7   BY MR. MILMAN:
 8   Q    Let's take a look at it though.  First of all --
 9              MR. JACKSON:  Your Honor, I'm going to object to the
10   continued use of the affidavits in the way that Mr. Milman has
11   been doing it.  The proper way to use an affidavit in these
12   proceedings is to identify an area of inconsistency with the
13   witness testimony, and then use the affidavit as a means of
14   impeachment.  That's not what Mr. Milman is doing.  He's just
15   basically testing the witness on her affidavit.
16              MR. MILMAN:  Oh, is that so?  Because the witness
17   testified that --
18              JUDGE GREEN:  So --
19              MR. MILMAN:  -- she had an interpreter --
20              JUDGE GREEN:  Yeah.  I don't think that's really true
21   actually.  So let's move on.
22   BY MR. MILMAN:
23   Q    Also, is there any reason why the NLRB didn't sign this
24   affidavit?  Do you know?
25              MR. JACKSON:  Objection, calls --
```

```
 1              MR. MILMAN:  Do you know why the NLRB --

 2              MR. JACKSON:  -- for speculation.

 3              MR. MILMAN:  -- didn't sign this affidavit?

 4              MR. JACKSON:  Objection, calls for speculation.

 5              JUDGE GREEN:  Sustained.

 6              MR. MILMAN:  Okay.

 7  BY MR. MILMAN:

 8  Q    Did the NLRB ever tell you that they're not signing this

 9  affidavit?

10  A    No.

11  Q    You were sworn in when you gave this affidavit, correct?

12  A    Yes, sir.

13  Q    Okay.  Under oath?  Penalty of perjury.

14  A    Yes, sir.

15  Q    Okay.

16              THE INTERPRETER:  Sorry, counsel.  I might have made

17  a mistake.  Who didn't sign the affidavit?

18              MR. MILMAN:  The NLRB.

19              THE INTERPRETER:  Oh, I was right.

20              MR. MILMAN:  She signed it.  She did --

21              THE INTERPRETER:  Okay.  Then I was right.

22              MR. MILMAN:  You've been through enough.

23              The affidavit will speak for itself.  But I would

24  like to mark this and enter this into evidence for the point

25  that it has no interpreter, and it wasn't signed, and I'd like
```

1    to introduce this one into evidence, Your Honor.

2                    (Respondent's R-4 identified)

3             JUDGE GREEN:  Any objection?

4             MR. JACKSON:  Yeah.  Relevance.

5             JUDGE GREEN:  Well, relevance, it's about the case.

6             MR. JACKSON:  All right.  You know what?  No.  It's

7    okay.  No objection.

8             JUDGE GREEN:  All right.  So R-4 is admitted.

9                    (Respondent's R-4 received)

10            MR. MILMAN:  Thank you, Your Honor.  I have no

11   further questions for Ms. Gil Reyes.  Thank you very much.

12            JUDGE GREEN:  We're not necessarily done with her.

13            MR. MILMAN:  Well, I know.  Not necessarily, but --

14            JUDGE GREEN:  So --

15            MR. MILMAN:  If I don't have to, I won't ask any more

16   questions.

17            JUDGE GREEN:  Any redirect?

18            MR. JACKSON:  One moment, Your Honor.

19            JUDGE GREEN:  Okay.

20            MR. JACKSON:  Okay.

21                    REDIRECT EXAMINATION

22   BY MR. JACKSON:

23   Q    Ms. Gil Reyes, again, thank you for your patience.  After

24   having reviewed the affidavits that Mr. Milman showed you, do

25   you remember the names of anybody who you -- anybody of the

 1    Parking Systems representatives who you saw walking around the

 2    campus?

 3                          (Pause.)

 4          Should I break that question up?

 5          THE INTERPRETER:  You are talking about people from

 6    where?

 7          MR. JACKSON:  Let me ask again.

 8          THE INTERPRETER:  From where?

 9          MR. JACKSON:  After having seen the affidavits, do

10    you now remember the names of Parking Systems representatives,

11    who you saw walking around the Hospital campus?

12          THE WITNESS:  Yes.

13    BY MR. JACKSON:

14    Q    And what were there names?

15    A    Travey (phonetic).  The other one I don't remember

16    clearly.  There were two and the other one didn't gave me his

17    name.

18    Q    Do you remember one called Andrew?

19    A    Yes.

20    Q    And how did you learn there people's names?

21    A    It's what I heard about the name of this person.

22    Q    You heard about it from whom?

23    A    I don't remember exactly who told me the name of this

24    people.

25    Q    Was it the gentlemen from Parking Systems themselves who

1  told you?

2  A    These two gentlemen introduces themselves with their

3  names.  And probably after a few days them I remembered that

4  those were the guys.  Because they also introduced themselves

5  to the other co-workers.

6  Q    What were you doing at the time that these Parking Systems

7  representatives approached you?

8  A    I was doing my work.

9  Q    Were you attending to customers?

10  A    Sometimes, yes.  Some other times I was going to pick up

11  the car, what I usually -- pick up a car, which is what I

12  usually do when I'm working.

13  Q    I just want to make sure the record is clear, did you call

14  Ayse after Bobby called you and asked for an interview?

15         MR. JACKSON:  No, that's not what I asked.

16         THE INTERPRETER:  No?

17         MR. JACKSON:  Yeah.  Let's try again.

18         Did you call Ayse, after Bobby called you and asked

19  for an interview?

20         THE WITNESS:  Yes.

21  BY MR. JACKSON:

22  Q    And that call was before you actually had the interview or

23  was that -- strike that.  Was that call before you actually had

24  the interview?

25  A    Yes.

361

```
 1   Q    And you also called her after the interview?

 2   A    Yes.

 3   Q    Do you remember whether the first -- after the interview,

 4   do you remember whether when you called Ayse she answered the

 5   call immediately?

 6   A    She didn't answer at the moment.  She called me back.

 7   Q    Okay.  And did she call you back right after you had

 8   called and she didn't answer, or was there some time in between

 9   when she called you back?

10   A    Some time passed by.

11   Q    Can you explain why you rejected Bobby's offer employment?

12   A    I consider it unfair, an injustice, that after all the

13   time all these people were working in that place, then they

14   will hire only three or four, and then the rest will be

15   unemployed.

16   Q    And when Edward told you, "you heard what the man said,

17   let's go", during the November 25 meeting what did you

18   understand he was referring to?

19   A    That he didn't like either what Bobby was saying, and he

20   probably realized that after November 30th he will be

21   unemployed too.

22              MR. JACKSON:  No further questions.

23              JUDGE GREEN:  Anything from the Union?

24              MR. ROCCO:  No, Judge.

25              JUDGE GREEN:  Okay.
```

```
 1            Any --
 2            MR. MILMAN:  Just a couple follow up.
 3                        RECROSS-EXAMINATION
 4  BY MR. MILMAN:
 5  Q   What did your son not like about what Bobby said?
 6            MR. JACKSON:  Objection, calls for speculation.
 7            MR. MILMAN:  You're the one who asked it.
 8            MR. JACKSON:  I asked him what she understood.  He's
 9  asking her what -- she's trying to get into the mind of someone
10  else.
11            JUDGE GREEN:  All right.  Overruled.
12            THE WITNESS:  Well, he just realized, because I was
13  telling him that my son here, after that day, would be
14  unemployed too.  He'd lose his job.
15  BY MR. MILMAN:
16  Q   But Bobby said look, pick three or four people and can see
17  if he can get them hired.  Obviously, you're going to your son,
18  correct?
19  A   He never offer him a job to him, and he was there present.
20  Q   You could have picked your son as one of the four, right?
21            JUDGE GREEN:  I'm sorry, I just --
22            MR. MILMAN:  I know.  Just --
23            JUDGE GREEN:  I don't -- this is -- none of this --
24            MR. MILMAN:  Okay.
25            JUDGE GREEN:  -- is relevant.
```

```
 1              MR. MILMAN:  Okay --

 2              JUDGE GREEN:  I almost -- you know, I didn't really

 3  interject when --

 4              MR. MILMAN:  Yeah.

 5              JUDGE GREEN:  -- Mr. Jackson --

 6              MR. MILMAN:  All right.

 7              JUDGE GREEN:  -- asked it.  I was --

 8              MR. MILMAN:  So -- so --

 9              JUDGE GREEN:  -- trying not to get involved sua

10  sponte --

11              MR. MILMAN:  I withdraw --

12              JUDGE GREEN:  -- but this is --

13              MR. MILMAN:  I withdraw the question.

14              JUDGE GREEN:  We're long after -- we're long into

15  this and none of this is helpful.

16              MR. MILMAN:  I apologize, Your Honor.

17  BY MR. MILMAN:

18  Q    I just would like to ask you, did you ever think it was

19  possible, Ms. Gil Reyes, that Parking System (sic) was staffing

20  up 80, 90% and they only had a few spots left, and they were

21  willing to offer you a job?

22              MR. JACKSON:  Objection to what's possible.

23              JUDGE GREEN:  Sustained.

24              MR. MILMAN:  Okay.  I withdraw the question.

25  BY MR. MILMAN:
```

1    Q    Did anybody ever say to you that Parking System (sic) is

2    not going to hire any Classic employees?

3    A    No.

4    Q    Did anybody ever tell you that Parking System (sic) is

5    going to hire all or a majority of the employees that worked at

6    Classic?

7    A    No.

8                MR. MILMAN:  No further questions.  Thank you.

9                JUDGE GREEN:  Thank you very much.  You're free to

10   go.

11               THE WITNESS:  Thank you.

12               MR. ROCCO:  Thank you.

13               JUDGE GREEN:  Okay.  So what are we going to have

14   next?

15               MR. MILMAN:  Take your time.

16               MS. CABRERA:  I'll tell you --

17                        (Counsel confer)

18               JUDGE GREEN:  Oh, we have the continued cross of Ms.

19   Prosuk.

20               MR. MILMAN:  Yeah.  And we have my evidentiary

21   proffer pending.

22               JUDGE GREEN:  Yeah.  I've read it a couple of times,

23   and no.  I'm rejection that offer of proof.  You're going to

24   have to take that up with the Board.

25               MR. MILMAN:  All right.  I'd like that to be part of

**Burke Court Reporting & Transcription**
**(973) 692-0660**

1    the record, and --

2              JUDGE GREEN:  Yes.

3              MR. MILMAN:  -- put in, I guess if there's a rejected

4    exhibit file --

5              JUDGE GREEN:  It wouldn't be a rejected --

6              MR. MILMAN:  Okay.

7              JUDGE GREEN:  -- exhibit.  It would be admitted as --

8              MR. MILMAN:  Okay.

9              JUDGE GREEN:  -- a Respondent's exhibit.

10             MR. MILMAN:  All right.  So okay.  Should we mark it

11   as Respondent --

12             JUDGE GREEN:  Yes.

13             MR. MILMAN:  Okay.  Thank you, Your Honor.  I

14   appreciate that.

15             MR. JACKSON:  I believe we're up --

16             MR. MILMAN:  Thank you for your ruling --

17             MR. JACKSON:  I believe we're --

18             MR. MILMAN:  -- but I don't like it.

19             MR. JACKSON:  -- up to five.

20             MR. MILMAN:  Okay.

21             JUDGE GREEN:  So yeah.  So you want to put it in in

22   the form of an email?  You can do that.  That's fine.

23             MR. MILMAN:  Yeah.

24             JUDGE GREEN:  Yeah.

25             MR. MILMAN:  And Your Honor, if I may?  I am just

```
 1    going to ask a question that I feel is necessary to get in.

 2    And because you've made an objection to one question I asked

 3    about impacts and effects.  And I think you made a statement

 4    regarding the Union's job duties or actions that it may or may

 5    not be relevant.  So I'm going to keep asking questions, not to

 6    in any way violate your order.  I just don't know what

 7    questions might be deemed acceptable or not.

 8              JUDGE GREEN:  Yes.  Correct.

 9              MR. MILMAN:  Okay.

10              MR. JACKSON:  So should Ms. Prosuk take the stand

11    again?

12              JUDGE GREEN:  Yes.  Please.

13              MR. ROCCO:  You good.  Do you need a bathroom break

14    or anything at all?

15              THE WITNESS:  I'm already --

16              MR. ROCCO:  Your Honor, could we take a five minute -

17    -

18              JUDGE GREEN:  Yes.

19              MR. ROCCO:  -- bathroom break?  Thanks.

20              JUDGE GREEN:  Off the record.

21                 (Whereupon, a brief recess was taken)

22              JUDGE GREEN:  Back on the record.

23              Okay.  So we previously took out of order the

24    testimony on direct examination of Ms. Prosuk.  And so now

25    we're back for the cross-examination.
```

```
 1              MR. MILMAN:  Okay.
 2                    CONTINUED CROSS-EXAMINATION
 3    BY MR. MILMAN:
 4    Q    Ms. Prosa, is that correct?  Ms. Prosa?
 5    A    Prosuk.
 6    Q    Prosuk.  Okay.  Can you please look at -- or if it's not
 7    there could someone provide you with GC-11?  You might not have
 8    it.  Yeah.  Yeah.  I didn't think that --
 9              MR. MILMAN:  May I approach the bench, Your Honor?
10              JUDGE GREEN:  Yes.
11              MR. MILMAN:  Okay.
12         Do you recall testifying the other day on that
13    document?
14              THE WITNESS:  Yes.
15    BY MR. MILMAN:
16    Q    Okay.  And that document is dated December 16th, correct?
17    A    Yes.
18    Q    And you have not produced any other document of an earlier
19    date similar to that document, correct?
20    A    I do have another one similar to that.
21    Q    My question was did you -- oh.  Okay.  Fair enough.  Would
22    that be GC-10?
23    A    12/12.
24    Q    12/12?
25              MR. MILMAN:  12/12.  May I approach the bench, Your
```

1    Honor?

2              JUDGE GREEN:  Yes.

3              MR. MILMAN:  Okay.

4              I'm showing you document GC-10 and GC-11.  Those

5    couple documents dated December 12th and December 16th.

6              THE WITNESS:  Yes.

7    BY MR. MILMAN:

8    Q    Let's start with the -- aside from those two documents,

9    have you produced any other documents of any earlier date?

10   A    Regarding this, no.

11   Q    Okay.  Thank you.  Thank you.  I'm showing you GC --

12             MR. MILMAN:  May I approach the bench, Your Honor?

13             JUDGE GREEN:  Yes.

14             MR. MILMAN:  Okay.

15             GC-5.  Do you remember that document?

16             THE WITNESS:  Yes.

17   BY MR. MILMAN:

18   Q    Okay.  Whose number is that on top?  The 631 number.

19   A    I don't know.

20   Q    Okay.  And was that text ever sent to you?

21   A    Yes.

22   Q    And who sent that text to you?

23   A    Edward Arias.

24   Q    And did you tell him to send it to you, or he did it of

25   his own volition?

```
1   A    I did not tell him to send it to me --

2   Q    Okay.

3   A    -- no.

4   Q    Did you know whether he even sent that or not?

5   A    I don't know.

6   Q    You don't know or you don't remember?

7   A    I don't remember.

8   Q    Fair enough.  By the way, would a text like this asking to

9   hire an entire workforce be something that you would remember

10  as a union rep?

11  A    Say again.

12  Q    Would a text like this from one of your members requesting

13  an employer to hire an entire workforce, would that be

14  something as a union rep you would remember?

15  A    Not necessarily.

16  Q    Okay.  Thanks.  I'm showing you GC-7, which has been

17  admitted into evidence as the Union collective bargaining

18  agreement at Stony Brook.  You testified you negotiated that

19  contract, correct?

20  A    Yes.

21  Q    Okay.  1102 represents other universities, right, like at

22  Adelphi?

23  A    Yes.

24  Q    Right?  Are you involved in those negotiations?

25  A    No.
```

1    Q    Okay.  Who is from your Local, do you know?

2            MR. JACKSON:  Objection --

3            THE WITNESS:  My other --

4            MR. JACKSON:  -- relevance.

5            MR. MILMAN:  Huh?

6            JUDGE GREEN:  Sustained.

7            MR. MILMAN:  Okay.

8    BY MR. MILMAN:

9    Q    How many collective bargaining agreements do you service

10   as a business rep for?  How many signatory contractors I think

11   is a better was of saying it.  How many signatory employers do

12   you service as a business rep?

13   A    More than 20.

14   Q    Okay.  And at those, do you participate or act as the

15   chief negotiator in those negotiations?

16   A    In my territory, I do.

17   Q    Okay.  And show me in that collective bargaining agreement

18   where there's a successor and assigns clause.  The Stony Brook

19   contract.

20            (Witness examined the document.)

21            It's not there.

22            JUDGE GREEN:  Okay.

23            MR. MILMAN:  Let me help you out.

24            THE WITNESS:  Oh yeah, I can see that.

25            MR. MILMAN:  Okay.

```
 1              THE WITNESS:  It says there is not that.  Yeah.

 2   BY MR. MILMAN:

 3   Q    Right.

 4   A    But you negotiated contracts have you not with a successor

 5   and assigns clause?

 6   Q    There are some of them.

 7   A    Right?

 8   Q    Not all of them.

 9   A    Yes?  The answer is yes then, correct?

10   Q    Repeat your question.

11   Q    You've negotiated collective bargaining agreement with

12   employers that includes successor and assigns clause, correct?

13   A    Some of them are, yes.

14   Q    Yes --

15   A    Some of them are, yes.

16   Q    Some what?

17   A    Some of them, yes.

18   Q    Right.  And why do you negotiate those clauses in

19   collective bargaining agreements?

20   A    There's vendor changes.

21   Q    Excuse me?

22   A    Vendor changes.

23   Q    When there are changes in what?

24   A    Vendor-employer --

25   Q    Changes.
```

**Burke Court Reporting & Transcription**
**(973) 692-0660**

```
 1   A     Correct.

 2   Q     And what does -- when you negotiate the successor and

 3   assigns clause, what does that mean an employer has to do?

 4   A     Assuming the contract.  And --

 5   Q     Why didn't you do it at Stony Brook?

 6   A     We didn't.

 7   Q     Why?

 8   A     Why we didn't do it?

 9   A     Why didn't you negotiate a successor and assigns clause at

10   Stony Brook?

11              MR. JACKSON:  Objection --

12              THE WITNESS:  Stony Brook --

13              JUDGE GREEN:  -- relevance.

14              JUDGE GREEN:  Sustained.

15                         (Counsel confer)

16   BY MR. MILMAN:

17   Q     Do you service the other 1102 vendors at Stony Brook?

18   Stony Brook University.

19   A     Yes.

20   Q     And tell me what those vendors are.  Who -- what is it?

21   What type of work is it?  Craft work.

22   A     All varies --

23   Q     We have valet services.

24   A     It's all varies.

25   Q     What are they, please?
```

```
 1   A    Varies.  All vary --

 2   Q    I know.  I'm asking you what are they though.  All the

 3   vary --

 4   A    Hotels --

 5   Q    Okay.

 6   A    Hotels with service workers, housekeepers, et cetera.

 7   That's more.

 8   Q    Do you have any successor and assigns clauses in those

 9   contracts?

10   A    Yes.

11   Q    Ah, but not this one at Stony Brook?

12   A    (No audible answer)

13   Q    Okay.  Got it.      Now, did yo try to find work for any

14   of your members that were let go by Classic on November 30th?

15   A    Anyone who reached out to me, yes.

16   Q    Okay.  Did you provide any training, any vocation training

17   for these employees?

18   A    No.

19   Q    Did you instruct your members that they would be entitled

20   to employment insurance benefits?

21   A    If anyone asked me, yes.

22   Q    If they didn't ask you, you didn't tell you what their

23   rights were concerning that.

24   Q    Anyone that would inquire on that particular --

25   A    I understand your answer.  But my question was you never
```

374

```
 1   went out of you want to tell them that they'd be entitled --

 2   Q    I did.

 3   Q    What?

 4   A    I did.

 5   Q    You did?

 6   A    Yes.

 7   Q    Oh, okay.  So when they inquired and also you told them

 8   they could do it.

 9   A    I remind them so --

10   Q    Right.  Do you know if anybody did that?

11   A    Yes.

12   Q    All of them?

13   A    Not all of them.  Some of them are, yes.

14   Q    Huh?

15   A    Some of them.

16   Q    Do you have any reason to know why some would not collect

17   employment when they're entitled to it?

18   A    No.

19   Q    Maybe because they're working?

20   A    I don't know.

21   Q    In fact, you do know that many of the employees sought

22   other employment, isn't that correct?

23   A    I don't know.

24   Q    Well, let's look at your affidavit then.

25                          (Pause.)
```

```
 1              Off the record, please.

 2              JUDGE GREEN:  Off the record.

 3                  (Whereupon, a brief recess was taken)

 4              JUDGE GREEN:  On the record.

 5              MR. MILMAN:  May I approach the bench, Your Honor?

 6              JUDGE GREEN:  Yeah.

 7              MR. MILMAN:  I am showing you your affidavit.  I'd

 8   like you to just read if you can -- read just the first

 9   sentence of five --

10              MR. JACKSON:  Your Honor, again I'm going to object

11   to the improper use of the affidavit.

12              MR. MILMAN:  No.  This is --

13              JUDGE GREEN:  In what regard?

14              MR. MILMAN:  No.  This is exactly the -- I'm -- I am

15   refreshing her recollection and possibly impeaching her.  I

16   asked --

17              JUDGE GREEN:  Yeah.

18              MR. MILMAN:  -- the witness --

19              JUDGE GREEN:  Okay.

20              MR. MILMAN:  Well, okay,

21              JUDGE GREEN:  Let's -- yeah.  That's what I thought -

22   -

23              MR. MILMAN:  Yeah.

24              JUDGE GREEN:  -- but let's go.

25              MR. MILMAN:  Can you read the first sentence of
```

```
 1    number five out loud, please?  Just --
 2            THE WITNESS:  "The former Classic employees who were
 3    denied continued employment at Stony Brook because of the
 4    employer anti-unionize policy have (indiscernible) moved on the
 5    other job."
 6    BY MR. MILMAN:
 7    Q    Ah.  Thanks.  So because have mostly moved on to other
 8    jobs.  Right?  So you do know that they found employment
 9    elsewhere?
10    A    Yes.
11    Q    Right.  And therefore those people wouldn't be collecting
12    employment, correct?
13    A    Can you look at the date?  Look at the date.  When was the
14    email.
15    Q    I get to ask the questions.
16    A    Well, after a while later, they should just go ahead and
17    find another job.
18    Q    Okay.  So and they found other jobs?
19    A    Yes.
20    Q    In fact, most of them found other jobs, right?
21    A    Yes.
22    Q    Right?
23    A    Yes.
24    Q    Okay.  Tell me about some of the jobs.  Do you know what
25    they were?
```

```
 1              JUDGE GREEN:  No.

 2              THE WITNESS:  I don't know.

 3              JUDGE GREEN:  We're not doing that.

 4              MR. MILMAN:  Okay.  Withdraw the question.

 5                        (Pause.)

 6   BY MR. MILMAN:

 7   Q    Who -- you hold the position of business agent at the

 8   Union, correct?

 9   A    Yes.

10   Q    And who's the President of the Union right now, of Local

11   1102?

12   A    Out Local is under the trustee right now.

13   Q    It's on trusteeship?

14   A    Yes.

15   Q    Since when?

16              MR. JACKSON:  Objection, relevance.

17              MR. JACKSON:  What's the relevance?

18              MR. MILMAN:  Well, the relevance is to see if the

19   Union was performing their duties and servicing the contract.

20              JUDGE GREEN:  Yeah.  So this is what I -- this is --

21              MR. MILMAN:  Okay.

22              JUDGE GREEN:  This is --

23              MR. MILMAN:  Fair enough.

24              JUDGE GREEN:  -- the ruling.  So --

25
```

```
1              MR. MILMAN:  And I think I have a --

2              JUDGE GREEN:  -- sustained.

3              MR. MILMAN:  -- right to ask that.

4              JUDGE GREEN:  Okay.  So it's sustained.

5              MR. MILMAN:  Okay.  Thank you, Your Honor.  I have a

6      standing objection -- proffer.

7              MR. JACKSON:  I understand.

8              MR. MILMAN:  All right.  I won't repeat it.

9                        (Pause.)

10     BY MR. MILMAN:

11     Q    I only have maybe one or two more questions on your

12     affidavit.

13                       (Pause.)

14             Is this the only affidavit you submitted to --

15     A    Yeah.

16     Q    -- the Region?

17                       (Pause.)

18             May I approach the bench, Your Honor?

19             JUDGE GREEN:  Yes.

20             MR. MILMAN:  Okay.  And in your affidavit dated

21     February 20, 2024, paragraph four.  One, two, three, four,

22     five, six, seven lines down.

23             "I recall that the interview Francis had was on

24     Saturday November 25th.  Francis texted me and told me and told

25     me she was invited to meet with the employer's representative
```

1   at Jake's 58 Long Island at 1:00 p.m."

2          Please read.  Take a look at that.  Is that an

3   accurate statement that you made in your sworn to affidavit?

4

5          THE WITNESS:  It says I recall that interview Francis

6   had was on Saturday, November 25th.  Francis text me and told

7   me that she was invited to meet with --

8   BY MR. MILMAN:

9   Q    Right.

10  A    -- employer.

11  Q    Do you have that text?

12  A    Probably.

13  Q    Did you produce it?

14  A    If I needed to, yes.

15  Q    Were you sitting in the courtroom early before, to --

16  regarding Francis' testimony?

17  A    No.

18  Q    You weren't?  You weren't sitting right there?

19  A    I was there.

20  Q    Right.  Do you recall her testifying --

21  A    Yes.

22  Q    -- that she --

23  A    She called me.

24  Q    -- called you --

25  A    Yeah --

```
 1    Q    -- before that?  I asked whether there was any emails or
 2    texts.
 3    A    It says I recall.  It's -- that mean if I remember, or she
 4    call me, or she text me.
 5    Q    That --
 6    A    What is the different?
 7    Q    That's what's your understanding of what recall is?  "I
 8    recall.  I recall that she texted me."
 9    A    If I can remember if she -- either she called me or she
10    text me.  If she called me, I call her back.
11              MR. ROCCO:  Objection, Your Honor.  I think counsel
12    is trying to impeach this witness with the testimony from a
13    prior witness, which may have been slightly different.  It's
14    not that --
15              MR. MILMAN:  Well, maybe I'm --
16              MR. ROCCO:  -- this witness testified  --
17              MR. MILMAN:  -- impeaching that witness --
18              MR. ROCCO:  -- before --
19              MR. MILMAN:  -- with this witness's --
20              MR. ROCCO:  That witness isn't on --
21              MR. MILMAN:  -- sworn to affidavit?
22              MR. ROCCO:  -- the stand.
23              JUDGE GREEN:  Yeah.  I mean listen, you can ask the
24    question.
25              MR. MILMAN:  Right.
```

```
 1              JUDGE GREEN:  I mean you can ask the question --

 2              MR. MILMAN:  Okay.

 3              JUDGE GREEN:  -- which is whether there was a text.

 4  You can ask that question.

 5  BY MR. MILMAN:

 6  Q    Was there a text?

 7  A    She called me.

 8  Q    Huh?

 9  A    She called me.

10  Q    But why does your sworn to affidavit under oath say text?

11  A    I just said that if I recall, if either call or text.

12  Q    These affidavits mean --

13  A    There is a text also.

14  Q    -- nothing these days.  Okay.

15              MR. JACKSON:  Objection.

16              JUDGE GREEN:  Sustained.

17  BY MR. MILMAN:

18  Q    You did swear under oath, right?

19  A    I did.

20  Q    Under --

21              JUDGE GREEN:  So --

22              MR. MILMAN:  -- penalty of perjury?

23              THE WITNESS:  I did.

24              JUDGE GREEN:  -- let me just be clear.  You -- you

25  know, you can make your -- what you're doing is argument.
```

382

```
 1   Right?  You've made your point.  What you're doing it argument.
 2            It doesn't matter if the witness agrees with you or
 3   not.  That's not going to help you, if she agrees with your
 4   position.  Your position you're going to make to me, that --
 5            MR. MILMAN:  I --
 6            JUDGE GREEN:  -- she doesn't have to agree with you.
 7            MR. MILMAN:  I understand --
 8            JUDGE GREEN:  You know, she gives -- whatever --
 9            MR. MILMAN:  -- Judge.  I just want --
10            JUDGE GREEN:  -- answer she gives, she gives.
11            MR. MILMAN:  -- some veracity.  I just want some real
12   testimony.  Okay.
13            JUDGE GREEN:  All right.  But let's not have it
14   deteriorate.
15            MR. MILMAN:  Okay.  Fair enough.  Understood.
16   Agreed.
17                              (Pause.)
18   BY MR. MILMAN:
19   Q    Who's the -- who is your 1102 shop stewards?
20   A    I have two.  One Ramon Perez.  The other one Edwin Arias
21   (sic).
22   Q    Right.  Do the bargaining unit members, did they even
23   known who their shop steward was?
24   A    They know.
25   Q    You sure?
```

```
 1   A     Positive.

 2   Q     One of your bargaining unit members didn't know.

 3   A     Did you ask them do they call different name?

 4   Q     Oh, they have different names.

 5   A     Well, why are you asking me?  You should ask --

 6   Q     Well, I asked --

 7   A     -- person that --

 8   Q     -- Francis.  You heard the testimony.

 9   A     Well --

10   Q     She didn't know the shop --

11   A     I said Roman Perez.  Then maybe they call him a nickname?

12   Did you ask them?

13          MR. MILMAN:  I have no further questions for you.

14          JUDGE GREEN:  Okay.  Any redirect?

15          MR. JACKSON:  Yes, Your Honor.

16                  REDIRECT EXAMINATION

17   BY MR. JACKSON:

18   Q     When did you begin looking online, to see if Parking

19   Systems was hiring?

20   A     December 1st.  I was there November 30th until 8:30.  I

21   just wanted to make sure that, you know, our members being

22   hired.  December 1st, I drove by, full staff.

23          And then after that I take another chance.  I was

24   searching.  Are they still hiring?  On or about first of the

25   December, I started search.
```

1   Q    During the first week of December?

2   A    Correct.

3   Q    Okay.  And the first time you searched, did you find any

4   job postings for Parking Systems at Stony Brook?

5   A    I did not.  I did not, you know, completely search.  I was

6   constantly looking jobs, jobs.  You know, parking.  I was

7   constantly searching.

8                        (Counsel confer)

9              MR. JACKSON:  No further questions.

10             MR. MILMAN:  The Union didn't have any questions?

11  No.

12             MR. ROCCO:  No.  I have no questions.

13             MR. MILMAN:  No recross.  No recross.

14             JUDGE GREEN:  All right.  You can resume your post.

15             THE WITNESS:  Thank you.

16             JUDGE GREEN:  So where are we now?

17                        (Counsel confer)

18             MR. MILMAN:  Your Honor, if I may?  We have received

19  -- I -- we accepted service for the subpoena ad testificandum

20  for --

21             JUDGE GREEN:  Okay.

22             MR. MILMAN:  -- Mr. Bobby Gust.  I will say this, is

23  that he will be there on the 1st.  I would request the Court

24  for just judicial economy.

25             I'm going to be calling the witness on direct.  I

```
 1   can't prevent counsel from calling Mr. Gust, in his -- as a
 2   611(c) witness.  I just think it's going to be a lot of
 3   duplicative testimony.  And you know, I would ask -- you know,
 4   if you want to move the case along, anything that's asked him,
 5   I'm going to ask my whole direct.  And I'm not going to be
 6   jeopardizing -- be jeopardize my case, by not putting on my
 7   case.
 8            I'm going to be asking every possible pertinent
 9   question that I think is relevant to the case, subject to full
10   cross-examination.  Which counsel will have the same
11   opportunity to ask leading questions, as he would, you know,
12   declaring my client as an adversarial witness.
13            I personally think calling my client to make his
14   case, when I'm calling him right after he calls is abuse of
15   process.  I defer to Your Honor.  We'll have him available.  I
16   do believe it's due process.
17            I am calling him Monday.  Assuming counsel for
18   General Counsel has rested their case in chief, subject to Mr.
19   Gust, I am calling him as my first witness.  Thank you.
20            JUDGE GREEN:  Okay.  Listen, I mean the GC can call
21   whatever witness --
22            MR. MILMAN:  Yeah.  I recognize --
23            JUDGE GREEN:  -- he wants.
24            MR. MILMAN:  -- that.
25            JUDGE GREEN:  I can't force the GC to rest.  You
```

```
 1   know, I take it Mr. Gust is not here now?  Okay.
 2            Listen, just let me explain how this works with
 3   subpoenas.  Subpoenas can be returnable less than five -- in
 4   less than five days.  That's the outer deadline for the
 5   petition to revoke, but the subpoena can be returnable the next
 6   day.  And it's valid unless revoked.  And so unless there's
 7   some reason why the person is not -- some valid reason why the
 8   --
 9            MR. MILMAN:  He's got --
10            JUDGE GREEN:  -- person --
11            MR. MILMAN:  -- to work.  He's --
12            JUDGE GREEN:  Okay --
13            MR. MILMAN:  We have -- we had --
14            JUDGE GREEN:  -- but I thought -- I guess my concern
15   is I thought that is was the Respondent's intent to put him on
16   today, if the GC --
17            MR. MILMAN:  I was never --
18            JUDGE GREEN:  -- didn't call him.
19            MR. MILMAN:  It was not to be put --
20            JUDGE GREEN:  Okay.
21            MR. MILMAN:  -- on today, because we've had Mr.
22   Johnny Barron.  He -- Bobby was there for the first three days.
23   Mr. Barron is here for the second days.
24            This was all set out way before --
25            JUDGE GREEN:  Okay.
```

```
 1              MR. MILMAN:  -- Mr. Jackson wanted to call him as a
 2    611(c) witness.  And he still had an -- two days to do it.  He
 3    just didn't do it.
 4              JUDGE GREEN:  Okay.  So do we not have anything else
 5    now?
 6              MR. JACKSON:  Our next witness is Robert Gust.
 7              JUDGE GREEN:  Okay.  And that is, as far as you know,
 8    other than perhaps subpoenaed records, it for the General
 9    Counsel?
10              MR. JACKSON:  Part of his 611(c) testimony, I intend
11    to move some of the subpoena records.
12              JUDGE GREEN:  Okay.
13              MR. MILMAN:  He'll be available first thing on next
14    hearing day July 1st.
15              JUDGE GREEN:  Okay.  So that's all we can do for
16    today?
17              MR. JACKSON:  Yes, Your Honor.
18              JUDGE GREEN:  All right.  So let's go off the record.
19    And we're going to resume July 1st.
20              (Whereupon, at 2:45 p.m. the hearing in the above
21    entitled matter was recessed to reconvene on July 1, 2024)
22
23
24
25
```

1

2                              CERTIFICATION

3           This is to certify that the attached proceedings

4    before the National Labor Relations Board (NLRB), Region (29),

5    in the matter of Parking Systems Plus, Inc. and Local 1102,

6    Retail, Wholesale & Department Store Union Limited, United Food

7    and Commercial Workers, Case No. 29-CA-331253, at New York, New

8    York, on June 21, 2024, was held according to the record, and

9    that this is the original, complete, and true and accurate

10   transcript that has been compared to the recording from the

11   hearing, that the exhibits are complete and no exhibits

12   received in evidence or in the rejected file are missing.

13

14

15

16

17
          *Barrington Moxie*
18

19        _____

20        Barrington Moxie

21

22

23

24

25

## A

**able (4)**
293:10,14;310:9;
347:8
**above (1)**
387:20
**above-entitled (1)**
282:14
**abuse (1)**
385:14
**acceptable (1)**
366:7
**accepted (1)**
384:19
**accompanied (2)**
342:7;354:19
**according (2)**
303:11;353:21
**accurate (8)**
288:6,7;341:8;
342:11;343:13,25;
344:13;379:3
**accurately (1)**
316:2
**across (1)**
342:18
**act (1)**
370:14
**actions (1)**
366:4
**activities (1)**
347:11
**activity (1)**
347:13
**actually (5)**
289:24;329:3;
356:21;360:22,23
**ad (1)**
384:19
**add (1)**
355:20
**Adelphi (1)**
369:22
**Administrative (1)**
282:15
**admitted (4)**
312:20;358:8;
365:7;369:17
**adversarial (1)**
385:12
**advise (1)**
323:20
**affidavit (39)**
302:23;303:1,3,6,
19,24;329:18,20;
330:9;333:4,11;
340:24;341:8;343:18,
24;350:19;355:1,9,11,
18;356:3,11,13,15,24;
357:3,9,11,17,23;
374:24;375:7,11;

378:12,14,20;379:3;
380:21;381:10
**affidavits (17)**
302:6;329:23,24;
330:1,13,21,24;331:3,
3,8;332:5;354:5;
355:10;356:10;
358:24;359:9;381:12
**afternoon (3)**
318:18;321:25;
322:1
**again (21)**
289:10;314:15,24;
316:19;321:4;326:14;
331:1;336:1;340:19;
341:20;343:17;344:2,
4;350:8;354:11;
358:23;359:7;360:17;
366:11;369:11;
375:10
**agent (3)**
295:6,18;377:7
**ago (3)**
339:22,24;340:8
**agree (3)**
288:15;355:14;
382:6
**agreeable (1)**
354:17
**Agreed (2)**
354:19;382:16
**agreement (7)**
287:9;295:25;
296:22;332:16;
369:18;370:17;
371:11
**agreements (2)**
370:9;371:19
**agrees (2)**
382:2,3
**Ah (2)**
373:11;376:7
**ahead (2)**
312:2;376:16
**allowing (2)**
311:21,23
**almost (2)**
354:5;363:2
**along (1)**
385:4
**always (1)**
346:12
**amount (2)**
304:17,22
**amounts (1)**
304:12
**Andrew (2)**
342:8;359:18
**answered (7)**
301:13;315:4,5;
322:11;339:3;352:8;
361:4
**anti-unionize (1)**

376:4
**apologize (1)**
363:16
**application (2)**
311:1;352:6
**applied (1)**
352:2
**apply (1)**
307:11
**applying (1)**
352:3
**appreciate (1)**
365:14
**approach (7)**
332:1;342:17;
367:9,25;368:12;
375:5;378:18
**approached (7)**
291:7;293:18,21;
303:21,23;342:15;
360:7
**Approximately (2)**
346:21;354:13
**April (1)**
355:19
**area (13)**
290:18,18;294:11,
11,12;299:10;301:8;
303:5,9,25;342:14,17;
356:12
**areas (1)**
303:18
**argument (4)**
344:9,23;381:25;
382:1
**argumentative (1)**
338:11
**Arias (3)**
294:20;368:23;
382:20
**around (6)**
300:13;301:7;
307:16;319:10;359:1,
11
**arrange (1)**
355:17
**Arue (1)**
309:12
**Aside (2)**
306:23;368:8
**assigns (6)**
370:18;371:5,12;
372:3,9;373:8
**assumes (2)**
324:22;336:9
**Assuming (2)**
372:4;385:17
**attend (1)**
326:1
**Attendant (1)**
303:4
**attending (1)**
360:9

**attorney (1)**
327:21
**attorneys (5)**
326:7;327:10,25;
328:3;329:15
**audible (1)**
373:12
**available (4)**
301:25;355:13;
385:15;387:13
**awarded (5)**
336:4,14,25;337:1,
9
**aware (7)**
336:12;346:17;
347:16,23;348:2,22;
349:5
**Ayse (11)**
295:20,21;313:22;
315:18,19;317:20;
318:9;320:2;360:14,
18;361:4

## B

**baby (1)**
317:25
**back (23)**
287:3,4;294:6;
297:12;302:12;
305:14;306:11,21;
307:23;312:7;313:11;
323:24;325:2;340:24;
349:24,25;350:4;
361:6,7,9;366:22,25;
380:10
**badgering (3)**
311:3,4;339:4
**bargaining (11)**
295:22,25;296:22;
332:14;369:17;370:9,
17;371:11,19;382:22;
383:2
**Barron (2)**
386:22,23
**based (1)**
288:23
**basically (2)**
310:3;356:15
**bathroom (2)**
366:13,19
**became (1)**
292:6
**becomes (2)**
301:6;344:9
**begin (1)**
383:18
**behavior (1)**
354:17
**bench (6)**
332:1;367:9,25;
368:12;375:5;378:18
**benefits (1)**

373:20
**BENJAMIN (1)**
282:15
**besides (4)**
340:14,18,21;
347:24
**best (2)**
298:3;316:1
**better (2)**
288:10;370:11
**Bid (11)**
333:24,24,24,25;
334:4,5,9,9,13,20;
337:1
**bidding (3)**
338:1,5,9
**biddings (2)**
338:8,9
**bids (2)**
336:21;338:14
**big (1)**
331:3
**BOARD (3)**
282:2,16;364:24
**Bobby (57)**
289:18;294:3;
314:6,22;315:1,12;
318:1,2,10;319:1,7,
18,23;320:5,20,22,25;
321:5,20,21,24;
322:16;323:4,7,9,12,
22;324:13,21;325:12;
329:2;342:7,11,25;
343:1,4,15,19,22,23,
24;344:2;349:21,23;
350:19;351:4,10;
354:10,11,15;360:14,
18;361:19;362:5,16;
384:22;386:22
**Bobby's (3)**
343:3,7;361:11
**booth (12)**
290:19,25;300:8,
11,20;301:20;304:16,
20;322:13,14;342:18,
21
**bordering (1)**
311:12
**both (4)**
287:13;331:15;
332:5;353:20
**break (4)**
332:18;359:4;
366:13,19
**brief (8)**
289:5;293:17;
312:25;329:12;
330:17;351:25;
366:21;375:3
**Brook (27)**
301:10;303:5,12,
15;304:16,21;308:7;
333:23;334:18;336:3,

4,4;339:18;340:18,
21;342:22;352:24;
369:18;370:18;372:5,
10,12,17,18;373:11;
376:3;384:4
**Building (1)**
282:17
**business (8)**
295:18;299:20;
340:1;343:16;348:19;
370:10,12;377:7
**busy (3)**
301:6;310:11,16

## C

**Cabrera (2)**
329:16;364:16
**call (36)**
301:7,9,9,25;320:3;
321:19,19,23,24;
322:16;323:9,12,13,
21,22;324:3,12;329:2,
4;355:19,21;356:2;
360:13,18,22,23;
361:5,7;380:4,10;
381:11;383:3,11;
385:20;386:18;387:1
**called (28)**
319:4;321:10,20,
21,25;322:9,10;323:4,
6,7,10;355:22,23,25;
359:18;360:14,18;
361:1,4,6,8,9;379:23,
24;380:9,10;381:7,9
**calling (7)**
347:10;384:25;
385:1,13,14,17,19
**calls (7)**
324:7;356:25;
357:4;362:6;385:14
**came (4)**
282:14;342:9,12,16
**campus (2)**
359:2,11
**can (64)**
288:5,17;289:20,
20;294:25;296:1,4,7;
297:4,11,13;298:6,8,
9;300:18;301:16,19;
304:17,18;305:12;
307:25;310:20;
312:22;315:11;
316:19;317:7;318:5;
320:4,11;326:8;
327:19;330:5,8,15;
332:17,18,18;333:18;
334:6;335:13;344:10;
348:1;349:22;353:24;
355:1;361:11;362:16,
17;365:22;367:6;
370:24;375:8,25;
376:13;380:9,23;

381:1,4,25;384:14;
385:20;386:3,5;
387:15
**cancer (10)**
290:19;300:8,20,
25;301:20;303:5,9;
304:11;342:13,21
**car (3)**
343:7;360:11,11
**card (15)**
289:6,8;290:4,16;
309:20;343:1,3,7,11,
14,16,19,23,25;344:3
**cards (8)**
290:17;291:19;
292:14;293:8,18;
294:7,8;342:25
**care (3)**
310:17;312:7;331:9
**carefully (3)**
302:12;327:1;
341:16
**carrying (1)**
295:21
**cars (1)**
322:12
**Case (11)**
282:3;327:18;
329:18;340:4;358:5;
385:4,6,7,9,14,18
**Casino (1)**
314:11
**cell (2)**
324:5,6
**Center (3)**
303:5,9;342:13
**certain (2)**
333:22;353:9
**certainly (1)**
344:10
**certainty (1)**
339:8
**cetera (1)**
373:6
**chance (1)**
383:23
**changes (4)**
371:20,22,23,25
**charge (1)**
309:10
**Charging (1)**
282:11
**chat (8)**
346:17,22,24;
347:3,9,19;350:7,10
**check (1)**
353:9
**chief (2)**
370:15;385:18
**choose (2)**
308:5;335:1
**choosing (1)**
350:21

**clarification (1)**
315:11
**clarify (2)**
344:2;348:1
**Classic (28)**
292:2,4,7;303:4;
305:13;307:15;308:4;
327:24;333:7;339:17,
18;340:15;346:16,21;
347:17,20,23,25;
348:3,4;350:25;
351:5;352:3,4;364:2,
6;373:14;376:2
**clause (5)**
370:18;371:5,12;
372:3,9
**clauses (2)**
371:18;373:8
**clear (5)**
337:19;338:15;
343:4;360:13;381:24
**clearly (2)**
339:4;359:16
**client (2)**
385:12,13
**closes (1)**
299:10
**colleagues (1)**
347:16
**collect (1)**
374:16
**collecting (1)**
376:11
**collective (8)**
295:24;296:21;
332:13;369:17;370:9,
17;371:11,19
**co-manager (1)**
292:6
**comfortable (1)**
317:10
**coming (1)**
333:12
**comment (2)**
350:23;354:21
**COMMERICAL (1)**
282:10
**communicate (2)**
289:21;355:14
**communicated (2)**
319:19;325:12
**communication (1)**
315:21
**companies (5)**
334:1,4,9;347:24;
348:24
**companies' (2)**
348:14,16
**company (24)**
289:9;297:23,25;
298:4;305:10;307:18;
308:4,6,11,13,19,24;
309:3;317:22;318:3;

320:6;325:18;326:7;
333:12,17,20;334:12;
338:18;348:22
**compared (1)**
304:11
**Complete (2)**
292:10;310:9
**completed (1)**
310:13
**completely (1)**
384:5
**complicated (1)**
310:11
**compound (1)**
291:5
**conceivable (1)**
300:1
**concern (1)**
386:14
**concerning (1)**
373:23
**conducted (1)**
333:1
**confer (10)**
302:9;313:3;
331:11;332:4;346:6;
350:16;364:17;
372:15;384:8,17
**confirm (2)**
324:10;333:17
**confused (1)**
315:9
**consider (1)**
361:12
**consisted (1)**
319:22
**consisting (2)**
302:6;340:25
**constantly (2)**
384:6,7
**contact (1)**
343:11
**continue (1)**
347:21
**CONTINUED (10)**
312:9;318:6;346:7;
347:22;353:6,8;
356:10;364:18;367:2;
376:3
**continuity (2)**
299:20;340:1
**contract (8)**
336:3,5,22;337:9;
369:19;370:19;372:4;
377:19
**contracted (1)**
334:17
**contracting (1)**
334:1
**contractors (2)**
333:25;370:10
**contracts (2)**
371:4;373:9

**conversation (16)**
291:2;292:13,15,
18,24;293:17;318:8;
319:17,21;325:2,25;
326:10;327:11;
328:22;329:15;
338:13
**conversations (3)**
337:25;338:4;
342:20
**copies (1)**
331:10
**copy (1)**
297:7
**counsel (19)**
295:9;302:9,16;
313:3;331:11;332:4;
346:6;350:16;357:16;
364:17;372:15;
380:11;384:8,17;
385:1,10,17,18;387:9
**couple (5)**
350:5;354:4;362:2;
364:22;368:5
**course (3)**
301:14;319:2;
320:18
**Court (1)**
384:23
**courtroom (1)**
379:15
**cover (2)**
296:25;301:8
**covering (1)**
318:8
**co-worker (2)**
289:16;334:4
**co-workers (15)**
289:9,11;295:22;
305:16;321:18,20,21,
22;346:16;347:16,20;
348:2;349:6,12;360:5
**co-workers' (1)**
334:8
**Craft (1)**
372:21
**credibility (1)**
311:16
**cross (2)**
355:8;364:18
**cross-examination (8)**
287:10,23;312:9;
318:6;346:7;366:25;
367:2;385:10
**customer (3)**
304:12,13,14
**customers (2)**
304:13;360:9

## D

**Dan (1)**
315:25

**date (11)**
291:22;307:15;
308:22;314:20;322:4;
328:7;351:17;367:19;
368:9;376:13,13
**dated (6)**
302:7;314:17,25;
367:16;368:5;378:20
**dates (1)**
304:15
**day (32)**
290:21;292:9,11;
293:3;297:22,24;
299:2,7,15;300:5,7;
301:2;305:13;308:16;
309:6,16,17,25;
310:23;322:2,5;
323:6,15,21;329:3;
333:2,9;352:23;
362:13;367:12;386:6;
387:14
**days (31)**
292:22,25;293:1;
299:3,4,5,6,7,9,11,14,
15,15,19,25;300:2;
301:19;304:14;
309:15,19,22,22;
315:17,20;322:7;
360:3;381:14;386:4,
22,23;387:2
**deadline (1)**
386:4
**deal (1)**
331:3
**December (8)**
355:19;367:16;
368:5,5;383:20,22,25;
384:1
**decision (1)**
350:5
**declaration (1)**
356:1
**declaring (1)**
385:12
**deemed (1)**
366:7
**defer (2)**
317:18;385:15
**define (1)**
304:23
**delete (1)**
324:11
**demeanor (1)**
354:16
**denied (1)**
376:3
**DEPARTMENT (1)**
282:9
**deteriorate (1)**
382:14
**differ (1)**
304:12
**different (6)**

300:23;328:13;
380:6,13;383:3,4
**direct (7)**
287:7;289:20;
302:16;316:9;366:24;
384:25;385:5
**directly (1)**
321:17
**discussed (1)**
347:19
**document (39)**
296:6,13,16;297:2,
7,8,14,17,20;298:6,9,
10,15;302:15;306:10,
13,17,23;307:2,3,5,
24;313:13,16;315:25;
327:3,8;331:21;
332:11;341:2;343:20;
354:9;367:13,16,18,
19;368:4,15;370:20
**documents (3)**
368:5,8,9
**done (6)**
288:13;332:10;
334:2;353:1;354:6;
358:12
**down (3)**
332:18,24;378:22
**driving (1)**
352:20
**drop (1)**
310:16
**drove (1)**
383:22
**Dublin (1)**
298:11
**due (1)**
385:16
**duly (1)**
287:19
**duplicative (1)**
385:3
**during (8)**
300:5,16;310:23;
321:25;329:4;339:17;
361:17;384:1
**duties (5)**
295:14,22;353:12;
366:4;377:19

**E**

**earlier (4)**
319:14;332:25;
367:18;368:9
**early (3)**
342:6,6;379:15
**earned (1)**
304:10
**easier (1)**
335:24
**economy (1)**
384:24

**Edward (4)**
294:20;354:19;
361:16;368:23
**Edward's (1)**
294:22,22
**Edwin (1)**
382:20
**effects (1)**
366:3
**either (8)**
325:3,10;349:4,20,
24;361:19;380:9;
381:11
**election (2)**
307:20,21
**else (10)**
294:8;305:4;320:8;
321:10;326:4;340:14;
343:3,8;362:10;387:4
**elsewhere (2)**
347:17;376:9
**email (6)**
306:14,15;321:16,
17;365:22;376:14
**emails (1)**
380:1
**Emergency (2)**
299:6,10
**employed (2)**
303:4;327:24
**employee (1)**
299:14
**employees (19)**
297:25;300:4;
333:1,14;334:15;
346:16,21,22;347:11,
23;350:4,21;351:4,
11;364:2,5;373:17;
374:21;376:2
**employer (6)**
287:21;342:7;
369:13;372:3;376:4;
379:10
**employers (4)**
348:7,13;370:11;
371:12
**employer's (1)**
378:25
**employment (15)**
305:13;308:16;
309:7;328:7;339:17;
347:22,22;351:16;
361:11;373:20;
374:17,22;376:3,8,12
**employments (1)**
347:21
**encounter (2)**
293:13;294:7
**ends (1)**
319:11
**engage (1)**
292:18
**engaged (3)**

292:23;293:5;
342:22
**English (11)**
287:16;288:1,11;
308:2;316:3;317:10,
12;353:18,21,23,24
**enough (11)**
290:16;291:18;
332:17;337:23;
344:20,22;357:22;
367:21;369:8;377:23;
382:15
**enter (1)**
357:24
**entering (1)**
307:18
**entire (3)**
296:21;369:9,13
**entirety (1)**
302:23
**entitled (5)**
288:2;373:19;
374:1,17;387:21
**erase (1)**
324:9
**esteemed (1)**
327:15
**et (1)**
373:6
**even (3)**
328:3;369:4;382:22
**event (1)**
350:6
**everybody (5)**
320:20;321:1,8;
331:7,10
**everyone (1)**
321:6
**evidence (8)**
296:7;312:16,21;
324:23;336:11;
357:24;358:1;369:17
**evidentiary (1)**
364:20
**exactly (16)**
290:15,22;292:25;
293:4;297:3;304:8;
308:23;309:18;
318:15;325:19;
333:15;340:6;343:14;
344:1;359:23;375:14
**examination (4)**
287:7;358:21;
366:24;383:16
**examined (12)**
296:13;297:14;
298:15;302:15;
306:13;313:16;327:3;
331:21;332:11;341:2;
354:9;370:20
**example (1)**
341:20
**exchange (1)**

313:19
**exchanged (1)**
325:6
**Excuse (1)**
371:21
**exercise (1)**
332:13
**exhibit (9)**
314:2;326:21;
331:7,16;354:7;
355:2;365:4,7,9
**expedited (1)**
316:24
**explain (3)**
352:21;361:11;
386:2
**extended (1)**
301:2
**extent (1)**
353:11
**extra (1)**
301:7

**F**

**face (1)**
293:15
**fact (6)**
288:5;304:2;
336:16,18;374:21;
376:20
**facts (2)**
324:22;336:9
**Fair (11)**
290:16;291:18;
294:12;300:13;319:4;
332:17;337:23;
367:21;369:8;377:23;
382:15
**far (2)**
288:13;387:7
**fashion (1)**
313:5
**fast (2)**
312:2;314:1
**February (1)**
378:21
**Federal (1)**
282:17
**feel (5)**
288:3;315:20;
318:21,24;366:1
**Fernandez (1)**
294:20
**few (6)**
297:2;304:14;
351:21;355:8;360:3;
363:20
**file (1)**
365:4
**fill (6)**
307:2;310:3,6;
311:1;312:4;352:6

**filled (4)**
306:23;307:5;
310:12;311:5
**filling (1)**
306:23
**final (1)**
310:22
**find (3)**
373:13;376:17;
384:3
**fine (4)**
327:18;332:17;
345:1;365:22
**finish (3)**
302:13;313:14;
327:2
**finished (4)**
296:8;297:13;
307:8,8
**firm (1)**
327:25
**first (22)**
287:13;292:17,22;
293:6;310:6;316:23;
317:9;322:9;327:9;
336:17;352:19;
355:19;356:8;361:3;
375:8,25;383:24;
384:1,3;385:19;
386:22;387:13
**five (24)**
292:16;299:3;
302:7;303:18;318:4;
320:6;321:16;331:18;
332:9,22,23;340:8,25;
354:6;355:9,18;
356:3;365:19;366:16;
375:9;376:1;378:22;
386:3,4
**Floor (1)**
282:17
**follow (2)**
288:23;362:2
**follows (1)**
287:20
**FOOD (1)**
282:10
**force (1)**
385:25
**form (5)**
307:2,7;310:4,5;
365:22
**former (5)**
346:21;347:16;
348:2;349:6;376:2
**formerly (1)**
303:4
**found (5)**
347:17;349:12;
376:8,18,20
**four (12)**
294:12;302:7;
332:23;350:20;351:4,

10,12;361:14;362:16,
20;378:21,21
**frame (1)**
300:16
**Francis (8)**
287:6,18;317:21;
378:23,24;379:5,6;
383:8
**Francis' (1)**
379:16
**free (1)**
364:9
**front (3)**
297:12;302:12;
306:10
**full (3)**
293:3;383:22;385:9
**further (5)**
358:11;361:22;
364:8;383:13;384:9

## G

**gave (22)**
289:8;291:19,20;
292:14;294:15;313:7;
329:14,23;330:13,21;
331:2,3;342:25;
343:1,3,8,10,19,24;
351:12;357:11;
359:16
**GC (4)**
368:11;385:20,25;
386:16
**GC-10 (2)**
367:22;368:4
**GC-11 (2)**
367:7;368:4
**GC-3 (5)**
288:17,18,21,25;
289:3
**GC-4 (2)**
313:2,4
**GC-5 (1)**
368:15
**GC-7 (3)**
296:1,4;369:16
**GC-8 (2)**
297:11;346:4
**GC-9 (2)**
326:23,24
**GC's (1)**
326:21
**general (3)**
311:15;385:18;
387:8
**generate (2)**
304:2;305:1
**generated (1)**
304:4
**gentleman (3)**
290:13;291:2;
292:14

**gentlemen (2)**
359:25;360:2
**Gil (25)**
287:6,10,18,25;
296:6,25;300:20;
302:6,6,8,11;306:10;
317:21;329:13;
331:19;332:9,21;
346:9,10,12,13;354:4;
358:11,23;363:19
**given (4)**
290:17;294:6;
309:20;330:10
**gives (3)**
382:8,10,10
**giving (2)**
329:17;344:3
**Goes (7)**
299:20;311:11,14,
16;335:15,20;340:1
**Good (6)**
287:25;289:24;
302:19;328:16;
353:24;366:13
**government (4)**
296:7,9,11,12
**GREEN (194)**
282:16;287:3,21;
288:19;289:23;291:6;
296:14,17,19,21;
299:21;305:3;311:10,
12,15,18,21,23,25;
312:2,18,20,24;313:1,
6,8;315:5,7,9,11;
316:8,15,17,19,22,25;
317:2,5,7,13,15,17;
322:24;326:14,19;
327:4,8;328:15;
329:11;330:16,18;
331:13;332:2,6;
334:21,23,25;335:2,4,
6,9,12,17,21,24;
336:1,13,15,18,24;
337:2,5,22;339:11,13,
15;340:3,5;341:12,14,
17,21,24;342:2;344:5,
7,9,13,16,18,20,22,25;
345:2;346:3;347:12;
349:16;350:15;
351:24;352:1,9,12;
354:7;355:2;356:18,
20;357:5;358:3,5,8,
12,14,17,19;361:23,
25;362:11,21,23,25;
363:2,5,7,9,12,14,23;
364:9,13,18,22;365:2,
5,7,9,12,21,24;366:8,
12,18,20,22;367:10;
368:2,13;370:6,22;
372:13,14;375:2,4,6,
13,17,19,21,24;377:1,
3,20,22,24;378:2,4,
19;380:23;381:1,3,16,

21,24;382:6,8,10,13;
383:14;384:14,16,21;
385:20,23,25;386:10,
12,14,18,20,25;387:4,
7,12,15,18
**greeting (2)**
353:12,12
**group (9)**
310:12;346:17,22;
347:1,3,9,19;350:7,10
**guess (3)**
322:13;365:3;
386:14
**Gust (11)**
289:18;294:3;
314:6;315:1;342:7;
343:10;384:22;385:1,
19;386:1;387:6
**guy (1)**
289:24
**guys (1)**
360:4

## H

**Hampton (3)**
339:21;340:10,14
**hand (2)**
297:20;343:2
**handed (2)**
289:6;290:4
**happened (6)**
303:22;310:10;
322:12,13;336:19;
350:5
**head (2)**
302:13;313:14
**heads (1)**
288:13
**hear (4)**
288:3;307:24;
349:10;354:22
**heard (10)**
295:24;334:1;
346:15;349:9,11;
354:22;359:21,22;
361:16;383:8
**hearing (3)**
282:14;387:14,20
**held (1)**
347:23
**hello (1)**
291:13
**help (5)**
301:7,8;353:24;
370:23;382:3
**helped (1)**
295:21
**helpful (1)**
363:15
**herein (1)**
287:20
**Hernandez (2)**

298:13,18
**hi (3)**
291:7,14;317:20
**himself (1)**
291:8
**hire (19)**
317:23;320:5,20,
20;321:1,1,3,6;
333:13,18;335:18,23;
350:20;351:10;
361:14;364:2,5;
369:9,13
**hired (4)**
349:5;353:6;
362:17;383:22
**hiring (3)**
353:7;383:19,24
**history (1)**
324:6
**Hmm (1)**
328:12
**hold (2)**
331:24;377:7
**home (2)**
301:9;312:7
**Honor (37)**
299:20;302:16;
306:9;311:24;312:17;
313:10;316:7;330:15;
332:1,5,12;335:25;
340:2;341:11,18;
344:6;350:14;356:9;
358:1,10,18;363:16;
365:13,25;366:16;
367:9;368:1,12;
375:5,10;378:5,18;
380:11;383:15;
384:18;385:15;
387:17
**Hospital (17)**
301:10;303:5,12,
14,15;304:21,25;
305:11,14,17;333:24;
334:18;336:3,4;
352:24;353:2;359:11
**Hotel (1)**
314:11
**Hotels (2)**
373:4,6
**hour (1)**
310:22
**hours (1)**
298:22
**housekeepers (1)**
373:6
**How's (1)**
337:10
**Huh (6)**
296:10;299:7;
318:23;370:5;374:14;
381:8

## I

**idea (4)**
295:23;323:2;
343:12;355:6
**identification (3)**
302:5;305:24;306:9
**identified (2)**
307:1;358:2
**identify (2)**
293:10;356:12
**imagine (1)**
338:18
**immediately (1)**
361:5
**impacts (1)**
366:3
**impeach (1)**
380:12
**impeaching (2)**
375:15;380:17
**impeachment (1)**
356:14
**important (3)**
311:9;318:21,24
**improper (1)**
375:11
**inaccurate (2)**
344:23,25
**INC (2)**
282:5;287:5
**include (1)**
321:16
**includes (1)**
371:12
**inconsistency (1)**
356:12
**indicate (1)**
288:5
**indiscernible (1)**
376:4
**individual (1)**
297:19
**individuals (5)**
298:10;342:12;
348:6;350:7,9
**industry (1)**
295:10
**inform (2)**
309:16;333:8
**information (4)**
306:16,18;309:21;
343:11
**informed (3)**
308:19,24;349:11
**informing (1)**
309:16
**initial (1)**
291:12;353:6
**initially (2)**
353:6;355:24
**injustice (1)**

361:12
**inquire (1)**
373:24
**inquired (1)**
374:7
**instruct (1)**
373:19
**instructing (1)**
317:11
**instructions (3)**
302:11,25;313:13
**insurance (1)**
373:20
**intend (1)**
387:10
**intent (1)**
386:15
**interested (1)**
321:8
**interject (1)**
363:3
**interpret (2)**
287:15,16
**interpretation (1)**
355:10
**interpreted (1)**
288:6
**interpreter (72)**
287:8,13,16;288:2,
4;289:11,20,25;
290:10;294:25;295:3,
5,9,12;296:9,11;
298:8;299:17,19,22,
24;300:18;303:14;
304:18;310:20;
313:25;314:16,18;
316:10;317:11,14,20;
318:2,23;320:11;
321:2;325:14,23;
326:8,15;327:22;
328:13,16,18,20;
329:19;330:7;331:1;
335:13;337:11,13;
340:19;341:4;348:9,
15,18;349:22;350:8;
352:10,13;353:14;
355:11,12,13;356:19;
357:16,19,21,25;
359:5,8;360:16
**interpreting (1)**
288:4
**interview (21)**
314:21;319:19;
321:1,3,10,15;325:12,
14;326:2;333:6;
343:5;352:19;354:15;
360:14,19,22,24;
361:1,3;378:23;379:5
**interviews (1)**
320:23
**intimidate (3)**
339:4,10;341:22
**intimidating (1)**

341:25
**into (12)**
287:16;288:14;
296:7;312:16;316:2,
10;324:16;357:24;
358:1;362:9;363:14;
369:17
**introduce (2)**
291:7;358:1
**introduced (1)**
360:4
**introduces (1)**
360:2
**invited (2)**
378:25;379:7
**involved (2)**
363:9;369:24
**irrelevant (2)**
311:8,12
**Island (1)**
379:1
**issue (1)**
332:13
**issues (1)**
347:19

## J

**JACKSON (93)**
291:5;299:18;
301:13;302:16,21,23;
305:2,25;307:4,7,10;
311:3,5,8;312:19;
313:5,7,9,11;315:4;
316:4,7,9,12,14;
322:21,23;324:22;
326:18,23;329:16;
330:6,10;332:12,16;
334:19;335:16,19,22;
338:11;339:3,7,9,25;
341:11,18,20,22;
347:10;349:15;
350:14;351:22;352:8;
356:5,9,25;357:2,4;
358:4,6,18,20,22;
359:7,9,13;360:15,17,
21;361:22;362:6,8;
363:5,22;365:15,17,
19;366:10;370:2,4;
372:11;375:10;
377:16,17;378:7;
381:15;383:15,17;
384:9;387:1,6,10,17
**Jake's (2)**
314:11;379:1
**January (1)**
301:18
**Jencks (1)**
330:11
**jeopardize (1)**
385:6
**jeopardizing (1)**
385:6

**Jeyson (2)**
298:11,13
**job (21)**
307:25;308:8;
311:9;320:10,13;
321:9;334:4,8;
347:24;349:1;350:19;
352:2,3;353:12;
362:14,19;363:21;
366:4;376:5,17;384:4
**jobs (11)**
334:4,8;348:3,7;
349:12;376:8,18,20,
24;384:6,6
**jobsite (3)**
342:9,12,16
**Johnny (1)**
386:22
**Jose (1)**
298:18
**Juan (1)**
294:20
**Judge (201)**
282:15;287:3,21;
288:5,19;289:23;
291:6;296:14,17,19,
21;299:21;305:3;
311:10,12,15,18,21,
23,25;312:2,18,20,24;
313:1,6,8;315:5,7,9,
11;316:8,15,17,19,22,
25;317:2,5,7,13,15,
17,18,18;322:24,25;
326:14,19;327:4,8;
328:15;329:11;
330:16,18;331:13;
332:2,6;334:21,23,25;
335:2,4,6,9,12,17,21,
24;336:1,13,15,18,24;
337:2,5,22;339:5,11,
13,15;340:3,5;341:12,
14,17,21,24;342:2;
344:5,7,9,13,16,18,20,
22,25;345:2;346:3;
347:12;349:16;
350:15;351:24;352:1,
9,12;354:7;355:2;
356:18,20;357:5;
358:3,5,8,12,14,17,
19;361:23,24,25;
362:11,21,23,25;
363:2,5,7,9,12,14,23;
364:9,13,18,22;365:2,
5,7,9,12,21,24;366:8,
12,18,20,22;367:10;
368:2,13;370:6,22;
372:13,14;375:2,4,6,
13,17,19,21,24;377:1,
3,20,22,24;378:2,4,
19;380:23;381:1,3,16,
21,24;382:6,8,9,10,
13;383:14;384:14,16,
21;385:20,23,25;

386:10,12,14,18,20,
25;387:4,7,12,15,18
**judicial (2)**
336:20;384:24
**Julian (2)**
309:5,6
**July (9)**
334:18;336:5,23;
337:1,1,20;387:14,19,
21
**June (2)**
282:18;287:5,7;
334:14

## K

**keep (1)**
366:5
**kids (1)**
312:8
**kind (3)**
304:21;348:9;
352:18
**knew (3)**
308:10;333:16;
334:11;337:5,20
**knowing (2)**
323:2;350:3
**knowledge (3)**
334:20;347:18;
349:14
**known (5)**
304:16,21,25;
337:17;382:23
**knows (1)**
337:7

## L

**LABOR (2)**
282:2,16
**languages (1)**
353:20
**last (22)**
288:12;297:4,22;
300:7;305:13,25;
308:16;309:6,16,17;
313:9;314:14;321:2;
325:23;328:7;333:2,
9;342:8,8;346:9,14;
355:8
**later (8)**
309:22;315:17,20;
333:5,11;355:18;
356:3;376:16
**Law (1)**
282:15
**lawyers (2)**
326:11;328:23
**leading (1)**
385:11
**learn (8)**
308:8,15,18;

321:20,21;334:3,7;
359:20
**learned (2)**
321:18;349:12
**least (1)**
304:17
**leave (3)**
304:13,14;318:5
**left (2)**
297:19;363:20
**less (8)**
293:2,2,2;302:2;
304:9;319:12;386:3,4
**letter (7)**
326:21,22;328:5,7,
10,15,20
**letting (1)**
319:23
**lift (2)**
302:13;313:14
**light (2)**
318:17,19
**line (1)**
333:11
**lines (2)**
332:24;378:22
**Listen (4)**
312:3;380:23;
385:20;386:2
**little (1)**
305:3
**LOCAL (4)**
282:8;370:1;
377:10,12
**location (2)**
300:17,17
**locations (2)**
339:18;340:18,21;
348:7
**log (1)**
324:6
**long (11)**
292:13,14;300:10,
10;319:9;354:10,12,
24;363:14,14;379:1
**longer (1)**
297:25
**look (22)**
296:8;297:4,12;
303:1;306:11;307:23;
326:20;327:9;328:13;
331:15;332:23;342:5;
354:5;355:1,4;356:8;
362:16;367:6;374:24;
376:13,13;379:2
**looked (3)**
296:25;297:2;310:6
**looking (2)**
383:18;384:6
**lose (1)**
362:14
**lot (7)**
300:21;301:1;

303:23,24;304:16;
332:18;385:2
**loud (1)**
376:1
**lowest (2)**
304:22;337:1
**lunch (1)**
290:23
**luncheon (1)**
345:3

## M

**majority (1)**
364:5
**man (1)**
290:4,6,7,10;
354:24;361:16
**management (1)**
334:15
**manager (7)**
292:3,4,6,7,8;
309:10,13
**many (30)**
291:18,21;292:15,
22;293:1;294:10;
301:16,18,19,19;
309:15,15,19,22;
312:6,8;324:7;
329:23,24;330:1;
338:23;339:22;
340:10;346:21,25;
350:13;370:9,10,11;
374:21
**March (2)**
300:13;307:16
**margin (1)**
297:20
**mark (4)**
306:8;331:6;
357:24;365:10
**marking (1)**
302:5
**Marte (2)**
309:5;333:12
**mass (1)**
321:15
**Matter (4)**
282:4,14;382:2;
387:21
**matters (1)**
334:15
**MAURO (1)**
305:23
**May (14)**
332:1;333:13,13;
347:20;365:25;366:4,
4;367:9,25;368:12;
375:5;378:18;380:13;
384:18
**maybe (8)**
288:3,5;325:19;
341:15;374:19;

378:11;380:15;
383:11
**mean (19)**
296:17;300:1;
303:11;305:3;327:4;
332:21;335:25;
336:15,22;344:14;
347:12;354:15,16;
372:3;380:3,23;
381:1,12;385:20
**means (1)**
356:13
**meet (4)**
324:16,20;378:25;
379:7
**meeting (27)**
292:1,22;314:6,8;
315:1,12;318:9,22,25;
319:5,7,9,18;321:9,
14;323:10;324:16;
325:18,22;327:17;
333:14;354:11,20,20,
21;355:5;361:17
**meetings (3)**
333:1,7;338:2
**member (1)**
291:15
**members (8)**
295:8;308:13;
369:12;373:14,19;
382:22;383:2,21
**men (1)**
290:13
**mentioned (1)**
350:18
**messages (1)**
322:10
**met (7)**
290:13;293:23;
322:4;324:13;327:18;
329:3;354:10
**mid-November (1)**
310:21
**might (8)**
324:9;333:22;
337:17;347:21,22;
357:16;366:7;367:7
**MILMAN (359)**
287:24;288:17,21;
289:2,10,13,22,24;
290:2,3,9,11,12;
291:9;295:1,4,6,10,
13;296:1,3,5,10,12,
15,18,20,23,24;
297:11,16;298:9,12;
299:20,23,25;300:6,
19,24;301:15;302:5,
10,18,19,20,22,24;
303:8,15,17;304:20,
24;305:7,8,22,24;
306:1,4,7,20;307:6,8,
11,14;310:21,25;
311:4,6,9,11,14,16,19,

22,24;312:1,3,10,14,
22;313:2,4,10,12;
314:1,4,17,19,23;
315:6,8,10,13;316:5,
11,13,16,18,21,23;
317:1,4,6,8,16,18;
318:7,24;319:3;
320:12,15;321:3,11;
322:25;323:3;324:24;
325:1,13,15,16,24;
326:3,9,16,20,24,25;
327:7,9,14,23;328:2,
14,17,19,21;329:1,10,
13,20,22;330:5,8,12,
15,19,20;331:2,6,12,
14,17;332:1,3,5,7,8,
15,17,20;334:22,24;
335:1,3,5,8,10,15,18,
20,23,25;336:2,8,10,
17,20,25;337:4,6,12,
14,16,23,24;338:12,
16;339:6,8,10,12,14,
16;340:1,4,7,20,23;
341:5,7,13,15,19,22;
342:1,3,4;344:6,8,12,
14,17,19,21,24;345:1;
346:4,8;347:14,15;
348:11,12,16,21;
349:17,18,23;350:2,9,
12,17;352:2,11,14,15;
353:15,17;354:8,14;
355:3,7;356:6,7,10,
14,16,19,22;357:1,3,
6,7,18,20,22;358:10,
13,15,24;362:2,4,7,
15,22,24;363:1,4,6,8,
11,13,16,17,24,25;
364:8,15,20,25;365:3,
6,8,10,13,16,18,20,23,
25;366:9;367:1,3,9,
11,15,25;368:3,7,12,
14,17;370:5,7,8,23,
25;371:2;372:16;
375:5,7,12,14,18,20,
23,25;376:6;377:4,6,
18,21,23;378:1,3,5,8,
10,20;379:8;380:15,
17,19,21,25;381:2,5,
17,22;382:5,7,9,11,
15,18;383:13;384:10,
13,18,22;385:22,24;
386:9,11,13,17,19,21;
387:1,13
**mind (1)**
362:9
**mine (2)**
317:7;347:20
**minute (1)**
366:16
**minutes (4)**
292:15,16;319:10;
354:13
**mirrors (1)**

333:4
**mistake (1)**
357:17
**mister (1)**
354:22
**Mom (1)**
354:21
**moment (11)**
294:11;303:20,25;
307:18;322:14;343:1,
12,14;344:2;358:18;
361:6
**Monday (1)**
385:17
**month (1)**
300:11
**months (4)**
337:20;350:6;
355:18;356:3
**more (23)**
292:16;301:2;
302:1;304:9;309:15;
319:12;320:6,24;
324:2;338:25;339:2,
24;340:8,12;347:24;
350:20;351:13,21;
354:4;358:15;370:13;
373:7;378:11
**Morel (1)**
298:16
**morning (5)**
287:25;298:24;
300:5;317:22;353:24
**most (5)**
304:2;305:1;376:20
**mostly (1)**
376:7
**move (5)**
300:22;301:4,7;
305:7,7;312:16;
335:4;339:14;342:2;
356:21;385:4;387:11
**moved (5)**
287:8;301:1;306:5;
376:4,7
**movement (1)**
352:22
**movements (1)**
307:22
**much (3)**
304:4;358:11;364:9
**multiple (1)**
348:3

## N

**name (18)**
289:15;291:10,14;
293:15;303:14;309:4;
342:8,8,9,15;343:11;
346:9;348:13,23;
359:17,21,23;383:3
**named (1)**

342:7
**names (13)**
294:18;297:19,23;
346:14;347:9;348:14,
17;358:25;359:10,14,
20;360:3;383:4
**NATIONAL (2)**
282:2,16
**necessarily (7)**
297:24;301:25;
304:4;347:13;358:12,
13;369:15
**necessary (3)**
315:20;356:4;366:1
**Neck (1)**
317:21
**need (13)**
300:22;301:4,5,7,
22,24;302:25;316:5;
327:5;344:6;347:13;
353:9;366:13
**needed (4)**
303:13;304:6;
312:6;379:14
**negative (1)**
348:18
**negotiate (3)**
371:18;372:2,9
**negotiated (3)**
369:18;371:4,11
**negotiations (2)**
369:24;370:15
**negotiator (1)**
370:15
**nervous (3)**
324:15,20;325:18
**neutral (1)**
354:16
**New (12)**
282:17,17;302:25;
305:10;308:4,6;
317:22;325:18;
333:12;346:13;353:1,
3
**next (7)**
321:22;333:11;
343:10;364:14;386:5;
387:6,13
**nice (3)**
354:15,17,24
**Nick (1)**
315:25
**nickname (1)**
383:11
**night (13)**
292:9,11;298:6,10,
20,22,23;299:2,3,9,
12;300:4;310:2
**NLRB (13)**
296:12;307:20;
327:17;329:14,18,24;
330:21;355:20;356:2,
23;357:1,8,18

**nodded (1)**
348:18
**nodding (1)**
288:13
**none (4)**
329:8;349:25;
362:23;363:15
**normally (1)**
298:25
**Noted (2)**
287:2;346:2
**Notice (3)**
282:15;336:20;
355:9
**notified (1)**
333:2
**notify (2)**
322:15,16
**November (57)**
290:14;291:24;
294:2;297:22,24,25;
298:4,7;300:7,14;
301:18,18;305:9,14;
308:15;309:7;314:9,
13,16,17,25;315:1,3;
319:1;323:10,22;
326:10,10,21,22;
327:20,23;328:5,8,22,
22;329:2,3;333:2,8,
22;337:8;338:21;
342:6,6;347:6;
349:24;350:23;
351:17;354:10;355:5;
361:17,20;373:14;
378:24;379:6;383:20
**number (5)**
341:4;350:3;
368:18,18;376:1
**numero (1)**
341:3

# O

**oath (8)**
287:14,14;344:4,
19,21;357:13;381:10,
18
**object (2)**
356:9;375:10
**Objection (42)**
291:5;299:18;
301:13;305:2;307:4,
4,10;311:3;312:18,
19;315:4;316:4;
322:21,22;324:22;
326:18;334:19;336:7;
337:21;338:11;339:3,
25;341:11,18;347:10;
349:15;350:14;352:8;
356:5,25;357:4;
358:3,7;362:6;
363:22;366:2;370:2;
372:11;377:16;378:6;

380:11;381:15
**Obviously (1)**
362:17
**occasion (1)**
310:8
**occasions (1)**
342:21
**o'clock (3)**
318:16;319:15,16
**October (3)**
337:10,10,17
**off (17)**
299:15;310:19;
312:14,22,24;329:10,
11;330:15,16;345:1,
2;351:22,24;366:20;
375:1,2;387:18
**offer (5)**
351:16;361:11;
362:19;363:21;
364:23
**offered (3)**
320:10,13;350:19
**office (2)**
352:19;353:10
**offices (1)**
353:3
**once (2)**
324:2,3
**One (64)**
289:9,11;290:13;
291:20;301:2,23;
302:6,7;303:2,18;
304:16,20;306:6,7;
310:8;318:2;328:14;
329:4;331:10;332:9,
22,23;333:2,3,7,8;
338:25;339:2,24;
340:12,24,25;342:20,
23;343:2,16;344:1,3,
15;347:19,24;349:19;
353:9,10;354:6;
355:3,19,19;358:1,18;
359:15,16,18;362:7,
20;366:2;367:20;
369:12;373:11;
378:11,21;382:20,20;
383:2
**online (5)**
306:24;307:3;
309:21;352:7;383:18
**only (22)**
288:3,23;292:7,8;
293:21;306:6,10;
312:7;318:4;329:4;
333:18;334:11;341:3,
4;351:21;352:24;
354:4,21;361:14;
363:20;378:11,14
**onsite (2)**
352:20;353:2
**opened (2)**
300:12;310:5

**opening (2)**
307:25;308:9
**operates (1)**
353:4
**opinion (2)**
349:20,24
**opportunity (3)**
296:16;305:9;
385:11
**order (4)**
287:9;310:17;
366:6,23
**organization (1)**
340:15
**others (1)**
343:2
**out (34)**
287:9;295:21;
301:20;306:24;307:2,
5;310:3,6,12;311:1,5;
312:4;318:17,19,22,
25;319:13;326:7,11;
333:24,24;334:4,9,13,
18;338:14;352:6;
366:23;370:23;
373:15;374:1;376:1;
377:12;386:24
**outer (1)**
386:4
**Outside (1)**
339:18
**over (3)**
308:4,11;334:21
**Overruled (7)**
291:6;299:21;
322:24;334:23,25;
340:5;362:11
**own (5)**
316:14;348:19;
350:5,21;368:25
**owner (3)**
309:15;333:8,12

# P

**page (7)**
296:25;297:4,5;
306:10;327:9;332:23;
354:6
**pages (8)**
297:2;302:7;
331:18,25;332:10,22;
340:25;355:9
**pandemic (1)**
300:12
**paper (1)**
352:6
**paragraph (5)**
303:2;341:1,8;
342:5;378:21
**PARKING (48)**
282:5;287:4;289:9,
11,17;290:5;291:15;

292:13,17,23;293:6,
13,23;294:3,7;
300:21;303:21;
305:10;307:11,25;
317:23;320:7;324:17;
326:11;328:23;333:6,
13,23;334:9,18;
336:5;337:8,14;
342:22;343:15;349:5,
13;350:10;359:1,10,
25;360:6;363:19;
364:1,4;383:18;
384:4,6
**part (13)**
303:6;314:5;
316:23;318:8;321:2;
325:23;333:4;343:17;
346:22;350:7,10;
364:25;387:10
**participate (1)**
370:14
**particular (3)**
301:3;302:17;
373:24
**Party (1)**
282:11
**passed (1)**
361:10
**patience (1)**
358:23
**patient (1)**
287:25
**patients (4)**
353:12,14,15,18
**Pause (11)**
288:20;298:19;
305:21;354:3;359:3;
374:25;377:5;378:9,
13,17;382:17
**Penalty (2)**
357:13;381:22
**pending (1)**
364:21
**people (28)**
294:10,12,15,15,20;
300:4,4,5;301:7,7,9,9;
303:20;315:22;318:5;
320:6,24,24;321:16;
343:15;351:12;
353:20;354:18;359:5,
24;361:13;362:16;
376:11
**people's (2)**
288:24;359:20
**Peralta (1)**
298:18
**Perez (7)**
294:21,24;295:1,
14,16;382:20;383:11
**perform (1)**
305:10
**performed (1)**
305:18

**performing (2)**
342:19;377:19
**perhaps (1)**
387:8
**period (8)**
300:19,19;301:2;
309:20,20;310:18,21;
329:5
**perjury (2)**
357:13;381:22
**person (17)**
293:5,8,10,14;
301:25;304:17;
308:20,21;325:3;
342:9,15;353:21;
354:17;359:21;383:7;
386:7,10
**personal (1)**
348:19
**personally (3)**
304:10;333:21;
385:13
**persons (2)**
315:25;343:21
**pertinent (1)**
385:8
**petition (1)**
386:5
**phone (7)**
310:17;322:11;
324:5,6;325:4,5;
355:5
**phonetic (1)**
359:15
**phrase (1)**
288:10
**physical (2)**
307:3,7
**physically (2)**
289:6;290:25
**pick (4)**
322:9;360:10,11;
362:16
**picked (1)**
362:20
**pieces (1)**
307:9
**place (5)**
303:10;308:11,14;
315:23;361:13
**places (1)**
300:23
**pleasantries (1)**
291:13
**please (43)**
288:4,17;294:1,19,
25;296:1,4,7;297:11,
12;302:12;304:19;
306:11;312:23;
313:13,25;316:21;
317:19;320:4;327:1;
329:10;330:5,8;
331:16,19;332:9,10,

23;335:14;339:7;
340:19;341:1;345:1;
346:5;349:22;351:22;
355:1;366:12;367:6;
372:25;375:1;376:1;
379:2
**PLUS (2)**
282:5;287:5
**pm (8)**
311:1;312:5;319:8;
323:5;345:3;346:2;
379:1;387:20
**point (5)**
308:15;344:10;
349:19;357:24;382:1
**policy (1)**
376:4
**poor (1)**
334:7
**portion (1)**
302:17
**position (8)**
300:25;303:22;
310:5;319:13;349:19;
377:7;382:4,4
**Positive (1)**
383:1
**possession (1)**
308:6
**possible (6)**
291:25;337:20,21;
363:19,22;385:8
**possibly (1)**
375:15
**post (1)**
384:14
**postings (1)**
384:4
**precise (1)**
301:21
**precisely (3)**
337:18;346:23;
347:5
**precision (2)**
292:25;325:20
**prep (1)**
327:17
**prepared (1)**
356:1
**present (4)**
308:13;330:22,25;
362:19
**President (2)**
309:3;377:10
**prevent (1)**
385:1
**previous (4)**
310:10;314:19;
315:2;337:17
**previously (2)**
287:19;366:23
**printed (1)**
313:5

**prior (7)**
309:15;314:13;
327:17;337:8,9,10;
380:13
**priorities (1)**
312:8
**private (1)**
334:15
**probably (3)**
360:3;361:20;
379:12
**problem (2)**
302:24;316:16
**proceedings (1)**
356:12
**process (8)**
288:1;334:20;
338:1,5;352:3;353:7;
385:15,16
**produce (1)**
379:13
**produced (2)**
367:18;368:9
**proffer (2)**
364:21;378:6
**proof (1)**
364:23
**proper (1)**
356:11
**proposal (1)**
318:4
**Prosa (2)**
367:4,4
**Prosuk (5)**
364:19;366:10,24;
367:5,6
**prove (1)**
340:4
**provide (2)**
367:7;373:16
**provided (2)**
306:16;343:16
**providing (1)**
334:2
**public (1)**
336:20
**pull (1)**
353:22
**purpose (1)**
307:11
**purposes (3)**
302:5;305:24;306:9
**Pursuant (1)**
282:15
**put (8)**
303:18,23;306:2;
339:9;365:3,21;
386:15,19
**putting (1)**
385:6

**Q**

**QR (1)**
309:20
**quantity (2)**
301:21;304:4
**quick (1)**
335:6

**R**

**R-3 (3)**
307:1;312:20,21
**R-4 (3)**
358:2,8,9
**Ramon (3)**
294:21;298:18;
382:20
**R-D (1)**
295:7
**reach (2)**
318:22,25
**reached (2)**
319:13;326:11;
373:15
**reaching (1)**
326:7
**read (21)**
296:21;302:12,21;
303:1;307:25;313:13;
316:9;317:9,11;
327:1,5;331:19,20;
332:10;340:25;341:5;
364:22;375:8,8,25;
379:2
**reading (3)**
302:13;317:10;
341:15
**ready (3)**
302:14;306:12;
313:14
**real (1)**
382:11
**realized (2)**
361:20;362:12
**really (4)**
311:12;327:4;
356:20;363:2
**reason (6)**
310:16;312:4;
356:23;374:16;386:7,
7
**recall (42)**
288:24;289:3;
290:21;291:10,22;
293:5;297:23;301:16,
19;302:1;303:5;
304:10;306:17;
308:22,24;313:17,24;
314:1,20;318:21;
319:16;323:24;325:9;
329:17,23;332:19;
347:3,5,8;350:21;
352:2,3;353:13;
367:12;378:23;379:5,

20;380:3,7,8,8;381:11
**recalled (1)**
287:19
**recalling (1)**
287:6
**receive (1)**
304:17
**received (4)**
312:21;343:15;
358:9;384:18
**receives (1)**
304:22
**recess (7)**
312:25;329:12;
330:17;345:3;351:25;
366:21;375:3
**recessed (1)**
387:21
**recognize (4)**
293:15,15;297:19;
385:22
**recollection (3)**
298:3;321:5;375:15
**recommend (1)**
351:5
**reconvene (1)**
387:21
**record (30)**
287:3,4;288:6,7;
312:14,22,24;313:1;
316:2,10;319:21;
329:10,11;330:15,16,
18;345:1,2;346:3;
351:22,24;352:1;
360:13;365:1;366:20,
22;375:1,2,4;387:18
**recorded (1)**
355:4
**records (2)**
387:8,11
**recross (2)**
384:13,13
**RECROSS-EXAMINATION (1)**
362:3
**recruitment (1)**
342:6
**redirect (4)**
358:17,21;383:14,
16
**referring (3)**
314:5;315:1;361:18
**refreshed (1)**
321:5
**refreshing (1)**
375:15
**refusal (3)**
335:18,20,23
**regard (1)**
375:13
**regarding (9)**
288:25;305:4;
313:24;314:2;343:19;
353:11;366:4;368:10;

379:16
**Region (2)**
282:16;378:16
**rejected (4)**
351:16;361:11;
365:3,5
**rejection (1)**
364:23
**related (1)**
318:13
**RELATIONS (2)**
282:2,16
**relevance (10)**
305:2;349:15;
356:5;358:4,5;370:4;
372:13;377:16,17,18
**relevant (3)**
362:25;366:5;385:9
**remember (56)**
289:15;290:15;
291:17;292:25;293:4,
9;298:24;301:24;
309:18,22,24;318:15;
322:18,20;323:1,14,
16,23;324:2,4,14,25;
325:7,19;326:5,13,15;
328:25;329:6;332:18;
337:15,18;338:24;
339:1,23;340:6,11,13,
16,22;342:9,16;
358:25;359:10,15,18,
23;361:3,4;368:15;
369:6,7,9,14;380:3,9
**remembered (2)**
323:4;360:3
**remind (3)**
287:12,13;374:9
**rep (40)**
293:14;294:7;
314:14,15,20,25;
315:3;318:14,22,25;
319:4,17;320:10,12,
16,19;321:12;322:15,
16;323:6,9,13,21,25;
324:12;325:3,10,17,
21,24;326:6,9;
328:21;329:4;338:7;
346:19;369:10,14;
370:10,12
**repeat (18)**
294:25;298:8;
300:18;304:18;
305:12;310:20;
313:25;320:11;
323:19,21;326:8;
327:19;334:6;335:13;
343:20;349:22;
371:10;378:8
**reported (1)**
292:7
**Reporter (1)**
335:13
**representative (8)**

292:18,23;293:24;
313:21;319:23;
324:16;342:22;
378:25
**representatives (3)**
359:1,10;360:7
**represents (1)**
369:21
**reps (2)**
294:3;354:11
**request (1)**
384:23
**requesting (1)**
369:12
**Respondent (7)**
282:6;312:16;
331:16;332:21,21;
347:10;365:11
**Respondent's (10)**
287:9;307:1;
312:21;331:6;354:7;
355:2;358:2,9;365:9;
386:15
**rest (2)**
361:14;385:25
**rested (1)**
385:18
**resume (2)**
384:14;387:19
**RETAIL (1)**
282:8
**returnable (2)**
386:3,5
**returned (1)**
349:20
**returning (1)**
287:10
**reveal (1)**
347:11
**review (1)**
296:16
**reviewed (1)**
358:24
**revoke (1)**
386:5
**revoked (1)**
386:6
**Reye (1)**
298:16
**Reyes (22)**
287:6,11,18,25;
296:6,25;300:20;
302:6,8,11,25;306:10;
329:13;331:19;332:9,
21;346:9,12;354:4;
358:11,23;363:19
**Reyes' (1)**
302:6
**Richard (10)**
292:1;309:12,16;
333:2,7;338:13,13,13,
17,21
**Right (69)**

296:23;305:20;
306:7;307:23;313:22;
314:6;317:17,20;
319:5,17;320:19;
321:15;322:13,15;
327:15;328:10,16,17,
21;332:15;333:19;
334:21;339:11,15;
341:17,21;342:3,11;
343:6,10;344:8,16,24;
356:2;357:19,21;
358:6,8;361:7;
362:11,20;363:6;
364:25;365:10;
369:21,24;371:3,7,18;
374:10;376:8,11,20,
22;377:10,12;378:3,
8;379:9,18,20;
380:25;381:18;382:1,
13,22;384:14;385:14;
387:18
**rights (1)**
373:23
**Robert (1)**
387:6
**ROCCO (23)**
322:22;327:15,18,
20,24;329:16;336:7,9,
11,14,22;337:21;
361:24;364:12;
366:13,16,19;380:11,
16,18,20,22;384:12
**Rocco's (1)**
326:22
**Rochelle (2)**
353:1,3
**Roman (1)**
383:11
**row (3)**
299:16,19,24
**ruling (2)**
365:16;377:24
**running (1)**
322:12

**S**

**same (19)**
302:11;305:5;
310:14,16;311:13;
313:13;317:24;318:3,
13;322:20;323:1,21;
328:20;331:23,25;
332:12;350:14;
354:17;385:10
**Saturday (3)**
318:3;378:24;379:6
**saw (5)**
293:10,14;343:14;
359:1,11
**saying (6)**
291:13;312:11;
330:7;342:25;361:19;

370:11
**search (2)**
383:25;384:5
**searched (1)**
384:3
**searching (2)**
383:24;384:7
**second (13)**
292:20,21;293:13,
17;294:7;312:15,23;
329:10;331:10;
332:23;355:18;356:2;
386:23
**section (1)**
301:6
**sections (2)**
304:5,6
**seeing (1)**
306:17
**Seems (1)**
354:24
**send (4)**
315:16,20;368:24;
369:1
**señor (1)**
328:11
**sent (4)**
321:17;368:20,22;
369:4
**sentence (6)**
342:10,10;343:10,
24;375:9,25
**separately (1)**
310:13
**service (6)**
334:2;370:9,12;
372:17;373:6;384:19
**services (10)**
305:10,18;333:23;
334:3,9,13;336:5;
337:9;338:14;372:23
**servicing (1)**
377:19
**session (1)**
352:21
**set (3)**
301:3;323:10;
386:24
**SEU (1)**
308:4
**seven (11)**
293:3;299:4,5,6,7,9,
11,14,15,25;378:22
**several (7)**
291:20,21;300:3;
301:21;310:8;329:8;
354:18
**shift (14)**
292:9,9,10;298:7,
10,20,22;299:2,2,3,7,
9;300:12;301:11
**shop (8)**
294:24;295:1,4,5,6;

382:19,23;383:10
**short (1)**
355:3
**shorter (1)**
355:1
**show (6)**
288:17;296:1,4;
297:11;353:3;370:17
**showed (1)**
358:24
**showing (5)**
296:6;368:4,11;
369:16;375:7
**sic (24)**
289:9,12,17;
292:14,18,23;293:24;
299:24;300:2,13;
302:8;303:21;316:12;
317:23;320:7;333:6;
336:5;343:7,16;
349:13;363:19;364:1,
4;382:21
**sign (3)**
356:23;357:3,17
**signatory (2)**
370:10,11
**signature (1)**
297:4
**signed (3)**
302:8;357:20,25
**signifying (1)**
313:14
**signing (1)**
357:8
**similar (2)**
367:19,20
**site (1)**
353:8
**sitting (3)**
302:1;379:15,18
**six (2)**
321:16;378:22
**slightly (1)**
380:13
**slowly (2)**
343:17;355:14
**sole (1)**
309:13
**somebody (3)**
305:4;321:10;343:8
**Someone (3)**
343:3;362:9;367:7
**sometime (1)**
349:11
**Sometimes (2)**
300:22;360:10
**son (13)**
294:22;314:8;
337:25;338:5;340:17,
17,20;349:3;354:19;
362:5,13,17,20
**soon (1)**
323:12

**sorry (14)**
292:1;295:9;296:3;
298:8;300:5;314:1;
326:8;327:22;332:3;
340:2;352:10,13;
357:16;362:21

**sought (1)**
374:21

**South (3)**
339:21;340:10,14

**Spanish (7)**
287:16;314:5;
316:2;328:11;353:19,
20;355:9

**speak (8)**
288:1;318:14;
324:19,20;333:18;
338:8;353:18;357:23

**SPEAKER (2)**
306:2,6

**speakers (1)**
353:21

**speaking (2)**
314:20;323:24

**specialist (1)**
342:6

**specific (2)**
301:24;319:25

**specifically (6)**
303:18;320:2,3,13;
323:5;349:14

**speculation (3)**
357:2,4;362:6

**spoke (9)**
314:14;315:2,18,
19;317:21;319:19;
324:2,23;338:21

**sponte (1)**
363:10

**spots (1)**
363:20

**staff (7)**
300:16,17,21;
301:1;303:23,24;
383:22

**staffing (1)**
363:19

**stand (2)**
366:10;380:22

**standing (2)**
322:13;378:6

**start (5)**
301:17,17;307:15;
347:4;368:8

**started (2)**
292:4;383:25

**state (3)**
316:2;333:11;342:5

**stated (2)**
320:16;350:19

**statement (4)**
329:17;342:11;
366:3;379:3

**statements (3)**
329:14,17;330:11

**station (8)**
300:8;301:1,6,20;
304:2,11,22,25

**stationed (3)**
300:10,25;304:1

**stations (3)**
301:10;304:11,21

**stay (2)**
315:22;318:4

**S-T-E-W-A- (1)**
295:6

**steward (6)**
294:24;295:1,4,6,7;
382:23

**stewards (1)**
382:19

**still (11)**
287:14,14;318:17,
19;319:13;327:24;
338:18;350:25;354:5;
383:24;387:2

**Stony (27)**
301:10;303:5,12,
15;304:16,21;308:7;
333:23;334:18;336:3,
4,4;339:18;340:18,
21;342:22;352:24;
369:18;370:18;372:5,
10,12,17,18;373:11;
376:3;384:4

**Stop (2)**
320:3;339:9

**STORE (2)**
282:9;295:5

**strike (3)**
292:1;300:1;360:23

**stuff (1)**
311:15

**sua (1)**
363:9

**subject (2)**
385:9,18

**submitted (3)**
296:7;309:21;
378:14

**subpoena (3)**
384:19;386:5;
387:11

**subpoenaed (1)**
387:8

**Subpoenas (2)**
386:3,3

**successor (6)**
370:18;371:4,12;
372:2,9;373:8

**summer (1)**
337:20

**summon (1)**
318:3

**supervisors (1)**
318:2

**supposed (2)**
307:9;352:22

**sure (18)**
288:12;289:22;
293:12;296:15;
301:12;304:20;
309:23;312:11;
327:20;330:13;336:2;
338:19;341:10,19;
348:2;360:13;382:25;
383:21

**surprise (1)**
350:3

**sustained (13)**
337:22;339:13;
349:16;350:15;352:9,
10;357:5;363:23;
370:6;372:14;378:2,
4;381:16

**swear (1)**
381:18

**sworn (9)**
287:16,19;303:3;
343:18,24;357:11;
379:3;380:21;381:10

**System (18)**
289:9,12,17;
292:14,17,23;293:24;
303:21;317:23;320:7;
333:6;336:5;337:13;
343:15;349:13;
363:19;364:1,4

**SYSTEMS (27)**
282:5;287:5;290:5;
291:15;293:6,14;
294:7;305:10;307:12,
25;324:17;326:12;
328:24;333:13;
334:18;337:8,11,14;
342:22;349:5;350:10;
359:1,10,25;360:6;
383:19;384:4

**T**

**talk (4)**
307:9;329:16;
338:2;349:11

**Talked (1)**
317:21

**talking (2)**
354:18;359:5

**tape (1)**
355:4

**team (1)**
320:17

**telephone (2)**
315:18,19

**telling (1)**
362:13

**term (2)**
295:10,24

**territory (1)**

**370:16**

**testificandum (1)**
384:19

**testified (18)**
287:7,20;309:13;
311:5,6;320:25;
324:15;332:25;
342:20,21;344:11;
350:18;353:11;
354:24;355:10;
356:17;369:18;
380:16

**testify (2)**
303:13;355:15

**testifying (7)**
288:24;311:19;
313:24;314:2;342:10;
367:12;379:20

**testimony (17)**
288:21,23,24;
303:11;305:4;321:4;
344:17;349:19;
355:17;356:13;
366:24;379:16;
380:12;382:12;383:8;
385:3;387:10

**testing (1)**
356:15

**texted (2)**
378:24;380:8

**texts (2)**
325:6;380:2

**Thanks (3)**
366:19;369:16;
376:7

**therefore (2)**
355:14;376:11

**thicker (4)**
331:18;332:9,22;
340:24

**third (6)**
293:23;330:5,6,8,
10;331:9

**though (2)**
356:8;373:2

**thought (6)**
344:2;355:20,23;
375:21;386:14,15

**three (24)**
294:15;301:17;
302:7;330:2,3,13,24;
331:2;332:23;341:1,
3,3,4,8;342:5,7;
350:20;351:4,10,12;
361:14;362:16;
378:21;386:22

**Thursday (4)**
282:17;322:3,5;
323:5

**times (12)**
301:16,19,19,21;
302:2;310:8,10;
329:7;338:23;340:10;

**360:10;364:22**

**tips (10)**
304:3,5,10,12,13,
14,17,22;305:1,4

**today (6)**
302:1;317:21;
347:1;386:16,21;
387:16

**together (3)**
310:12;311:20;
320:17

**told (17)**
305:16;317:22;
318:3;319:24;320:5,
9;323:8;324:4;
325:19;333:12;
359:23;360:1;361:16;
374:7;378:24,24;
379:6

**took (3)**
310:1;353:3;366:23

**top (2)**
306:14;368:18

**topic (1)**
318:13

**total (1)**
355:8

**Traffic (2)**
337:11,13

**training (8)**
352:16,18;353:1,2,
5,8;373:16,16

**transcript (1)**
288:14

**transcripts (1)**
316:24

**transferred (1)**
301:20

**translate (2)**
316:14;317:14

**translated (1)**
316:10

**translator (2)**
316:19;330:22,25;
331:4

**Travey (1)**
359:15

**Travis (2)**
342:7;343:23

**tried (1)**
310:8

**true (2)**
336:25;356:20

**trustee (1)**
377:12

**trusteeship (1)**
377:13

**truth (1)**
344:14

**try (6)**
288:10;295:10;
316:1,12;360:17;
373:13

**Trying (8)**
298:24;310:14;
339:4,8;341:22;
362:9;363:9;380:12
**two (31)**
294:3;302:7;
306:10;309:22;
315:16,20,21,25;
322:7;325:6;330:24;
331:2,25;332:23,25;
333:6,7;342:11,20,21,
23;346:14;354:5,11;
359:16;360:2;368:8;
378:11,21;382:20;
387:2
**type (1)**
372:21

## U

**Um (1)**
289:18
**under (10)**
287:14,14;344:4,
19,21;357:13;377:12;
381:10,18,20
**undergo (1)**
352:16
**understood (4)**
321:14;323:11;
362:8;382:15
**unemployed (3)**
361:15,21;362:14
**unfair (1)**
361:12
**UNIDENTIFIED (2)**
306:2,6
**UNION (66)**
282:9;295:2,6,8,14,
18,22;307:17,18;
314:14,15,20,25;
315:3;317:24,24;
318:14,22,25;319:4,
17;320:6,10,12,16,19;
321:12;322:15,16;
323:6,9,13,21,25;
324:12;325:2,10,17,
21,24;326:6,6,9,11,
21;327:10,21,25;
328:3,21;329:4;
338:7;346:19;347:11,
13;351:2,8,14;
361:23;369:10,14,17;
377:8,10,19;384:10
**unions (1)**
320:7
**union's (2)**
326:11;366:4
**unit (3)**
295:22;382:22;
383:2
**UNITED (1)**
282:9

**universities (1)**
369:21
**University (2)**
336:4;372:18
**unknown (2)**
342:8,8
**unless (4)**
327:4,5;386:6,6
**unnecessary (1)**
341:25
**up (17)**
288:23;302:13;
305:22;313:14;322:9;
323:10;343:4;344:2;
353:22;359:4;360:10,
11;362:2;363:20;
364:24;365:15,19
**upon (1)**
288:23
**use (8)**
302:19;303:9;
306:4;317:7;356:10,
11,13;375:11
**used (1)**
346:16
**usually (3)**
299:2;360:11,12

## V

**vague (1)**
307:4
**Valet (12)**
303:4;304:17;
305:10;308:4;333:23;
334:3,8,13;336:5;
337:9;338:14;372:23
**valid (2)**
386:6,7
**varies (4)**
304:14;372:22,24;
373:1
**various (1)**
301:10
**vary (2)**
373:1,3
**vendor (2)**
371:20,22
**Vendor-employer (1)**
371:24
**vendors (2)**
372:17,20
**veracity (1)**
382:11
**video (1)**
353:4
**violate (1)**
366:6
**visited (1)**
342:12
**visitor (1)**
353:22
**visitors (3)**

353:13,15,18
**vocation (1)**
373:16
**volition (1)**
368:25
**vote (2)**
307:19,20
**voted (1)**
307:19

## W

**waiting (1)**
296:14
**walking (3)**
342:18;359:1,11
**wants (1)**
385:23
**watch (1)**
305:10
**watched (1)**
305:17
**way (12)**
288:10;289:23;
295:11;324:11;
328:20;334:2;348:19;
356:10,11;366:6;
369:8;386:24
**week (12)**
293:2,3;299:3,4,5,6,
7,9,11;300:2,11;384:1
**welcome (1)**
354:2
**weren't (3)**
322:12;379:18,18
**what's (6)**
309:4;336:15;
337:21;363:22;
377:17;380:7
**Whenever (1)**
317:9
**Whereupon (9)**
287:17;312:25;
329:12;330:17;345:3;
351:25;366:21;375:3;
387:20
**wherever (1)**
303:12
**whole (4)**
303:1;327:6;
331:20;385:5
**WHOLESALE (1)**
282:8
**Who's (4)**
315:24;342:9;
377:10;382:19
**whose (2)**
342:15;368:18
**willing (3)**
351:10;356:1;
363:21
**withdraw (8)**
307:10;337:23;

338:12;347:14;
363:11,13,24;377:4
**Withdrawn (1)**
356:6
**within (2)**
301:9,11
**witness (118)**
287:19;288:17;
289:1,20;290:1;
291:7;295:8;296:1,2,
4,13,15,19;297:11,14,
15;298:11,15;300:3,
22;301:14;302:15,17;
303:7,16;304:23;
306:13,19;307:13;
310:24;311:3,4,6,16;
312:6,11;313:2,9,16;
314:3,21;315:12;
318:1;319:2;320:14;
321:8;323:1;324:25;
326:1,13,20;327:3,13;
328:1,25;329:21;
331:5,8,14,15,15,21;
332:11;334:24;
337:15;338:15;339:4,
5;340:6,22;341:2,6,
23,25;346:4;347:11;
348:18;350:1,11;
353:16;354:9,13;
355:6;356:13,15,16;
359:12;360:20;
362:12;364:11;
366:15;367:14;368:6,
16;370:3,20,24;
371:1;372:12;375:18;
376:2;377:2;379:5;
380:12,13,16,17,20;
381:23;382:2;384:15,
25;385:2,12,19,21;
387:2,6
**witness' (1)**
334:19
**witnesses (2)**
287:9;288:22
**witness's (1)**
380:19
**woman (1)**
290:4
**wonder (1)**
321:19
**word (1)**
303:9
**work (51)**
290:18,18;292:6;
294:12;297:22;
298:25;299:2,11,14,
25;300:1,2,4,4,5,16,
20;301:11,16;310:2,
17,19,22;317:24;
320:1,7,17;333:25;
334:5,10,17;339:17,
20;340:10,14;342:19;
346:16;347:17;

348:10,22;349:20,24,
25;350:4;352:20;
353:8;360:8;372:21,
21;373:13;386:11
**worked (15)**
292:9;297:25;
298:10,20;300:8,20;
303:12;304:6;305:17;
340:17,21;347:24;
348:3,14;364:5
**WORKERS (2)**
282:10;373:6
**workforce (2)**
369:9,13
**working (20)**
292:4;294:11;
297:23;298:3;303:4,
10,12,20,22;304:1;
308:10;310:3,14;
315:22;350:10,25;
351:5;360:12;361:13;
374:19
**workplace (2)**
295:14;352:22
**works (4)**
298:6;338:17;
348:24;386:2
**write (1)**
308:5
**writing (1)**
308:20
**written (2)**
315:25;328:23
**wrote (3)**
308:1,6;328:23

## Y

**year (3)**
300:11;301:17;
339:24
**years (3)**
299:24;339:22;
340:8
**yo (1)**
373:13
**York (2)**
282:17,17
**young (1)**
354:24

## Z

**zero (1)**
329:7

## 1

**1 (1)**
387:21
**1:00 (2)**
319:8;379:1
**1:15 (1)**

319:11
**1:20 (1)**
  319:11
**1:33 (1)**
  346:2
**10 (6)**
  301:23;302:2;
  304:9,9;321:16;
  346:23
**10:00 (1)**
  282:18
**10:22 (1)**
  287:2
**11:00 (2)**
  298:23,24
**1102 (6)**
  282:8;295:18;
  369:21;372:17;
  377:11;382:19
**12/12 (3)**
  367:23,24,25
**12/12/2003 (1)**
  302:8
**12:34 (1)**
  345:3
**12th (1)**
  368:5
**14 (4)**
  299:15,19,24;300:2
**15 (3)**
  319:10;346:23;
  354:13
**16th (2)**
  367:16;368:5
**18th (1)**
  287:7
**1st (5)**
  383:20,22;384:23;
  387:14,19

**2**

**2 (3)**
  305:25;332:22;
  354:7
**2:00 (3)**
  298:23;321:25;
  323:4
**2:45 (1)**
  387:20
**20 (3)**
  321:16;370:13;
  378:21
**2000 (1)**
  300:13
**2015 (1)**
  307:16
**2023 (18)**
  298:1,4,7;300:14;
  301:18,18;305:9,14;
  308:16;327:20,23;
  328:5,8;333:22;
  334:14,18;336:6;

338:21
**2024 (5)**
  282:18;287:5,7;
  378:21;387:21
**21 (1)**
  282:18
**21th (1)**
  287:5
**23 (2)**
  310:22;322:6
**23rd (13)**
  323:10,12,15,17,22;
  324:1,3;325:3,10;
  326:10;328:22;329:3,
  4
**24th (6)**
  323:25;324:1;
  325:3,11;326:10;
  328:22
**25 (1)**
  361:17
**25th (20)**
  290:14;294:2;
  314:9;315:2,14,16;
  318:9,14;319:1;
  322:4;324:12;329:3,
  5;349:24;350:23;
  351:17;354:10;355:5;
  378:24;379:6
**26 (1)**
  282:16
**27th (4)**
  314:13,17,25;315:3
**29 (1)**
  282:16
**29-CA-331253 (2)**
  282:3;287:5
**2nd (1)**
  282:17

**3**

**3 (3)**
  306:1,8;312:16
**3:00 (6)**
  298:23;318:16;
  319:14,14,15,16
**30th (18)**
  297:22,24;300:7,
  14;301:18;305:9,14;
  308:16;309:7;328:8;
  333:2,8,22;338:21;
  347:6;361:20;373:14;
  383:20

**4**

**4 (6)**
  305:22,23;331:12,
  16;332:21;355:2
**4:00 (2)**
  322:1;323:5

**5**

**5 (1)**
  331:7
**58 (2)**
  314:11;379:1

**6**

**6:30 (1)**
  310:24
**611c (3)**
  385:2;387:2,10
**631 (1)**
  368:18

**7**

**7:00 (3)**
  298:24;311:1;312:4
**7:30 (2)**
  311:2;312:5

**8**

**8:00 (2)**
  311:2;312:5
**8:30 (2)**
  312:5;383:20
**80 (1)**
  363:20

**9**

**9:00 (1)**
  298:23
**90% (1)**
  363:20
**9th (2)**
  326:21,22

# OFFICIAL REPORT OF PROCEEDINGS

# BEFORE THE

# NATIONAL LABOR RELATIONS BOARD

_____

_____

In the Matter of:                    **Case No.:**  29-CA-331253


PARKING SYSTEMS PLUS,INC.            :

              Respondent,            :

And                                  :

LOCAL 1102, RETAIL, WHOLESALE &      :

DEPARTMENT STORE UNION, UNITED       :

FOOD AND COMMERICAL WORKERS,         :

           Charging Party.        :


Place:   New York, New York
Dates:   July 1, 2024
Pages:  389 through 637
Volume: 4

_____

_____

**OFFICIAL REPORTERS**

# BURKE COURT REPORTING, LLC

**64 Magnolia Place**
**Wayne, NJ 07470**
**(973) 692-0660**

```
 1                          BEFORE THE

 2                 NATIONAL LABOR RELATIONS BOARD

 3     --------------------------------: Case Nos.: 29-CA-331253

 4     In the Matter of:              :

 5     PARKING SYSTEMS PLUS, INC.,    :

 6                                    :

 7               Respondent,          :

 8     And                            :

 9     LOCAL 1102, RETAIL WHOLESALE & :

10     DEPARTMENT STORE UNION, UNITED :

11     FOOD AND COMMERCIAL WORKERS,   :

12                                    :

13               Charging Party.      :

14     --------------------------------:

15          The above-entitled matter came on for hearing pursuant to

16     notice, before BENJAMIN GREEN, Administrative Law Judge, at the

17     National Labor Relations Board, 26 Federal Plaza, Courtroom

18     238, New York, NY 10278 on July 1, 2024, at 10:00 a.m.

19

20

21

22

23

24

25

26
```

```
 1                      A P P E A R A N C E S
 2    On Behalf of the General Counsel:
 3          MATTHEW JACKSON, ESQ.
 4          National Labor Relations Board, Region 29
 5          2 Metrotech Center, Suite 5100
 6          Brooklyn, NY 11201
 7          (718) 765-6202
 8
 9    On Behalf of the Charging Party:
10          MATTHEW P. ROCCO, ESQ.
11          Rothman Rocco LaRuffa, LLP
12          3 West Main Street, Suite 200
13          Elmsford, NY 10523
14          mrocco@rothmmanrocco.com
15          (914) 478-281
16
17    On Behalf of the Respondent:
18          ROBERT F. MILMAN, ESQ.
19          MICHAEL MAURO, ESQ.
20          Milman Labuda Law Group, PLLC
21          3000 Marcus Avenue, Suite 3W8
22          Lake Success, NY 11042-1009
23          rob@mmmlaborlaw.com
24          mmauro@mllaborlaw.com
25          (516) 328-8899
```

```
1                        I N D E X

2

3    WITNESS           DIRECT   CROSS   REDIRECT   RECROSS   VOIR DIRE

4    Robert Gust        406     479       506

5                               504

6                               480

7

8    Joshua Candiotti   530

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              E X H I B I T S

 2    EXHIBITS                    IDENTIFIED      RECIEVED

 3    General Counsel's

 4    GC-8                           393           393

 5    GC-12                          427           --

 6    GC-13                          438           440

 7    GC-14                          441           445

 8    GC-15                          445           446

 9    GC-16                          448           450

10    GC-17                          450           452

11    GC-18                          453           455

12    GC-19                          456           457

13    GC-20                          461           461

14    GC-21                          465           468

15    GC-22                          466           469

16    GC-23                          470           --

17    GC-24                          478           479

18

19    Respondent's

20    R-5                            --            396

21    R-6                            397           397

22

23    Joint

24    J-1                            395           395

25

26
```

1          P R O C E E D I N G S

2                              (Time Noted:  9:34 a.m.)

3          JUDGE GREEN:  Okay.  So we're back on the record on

4   July 1st, 2024 in Parking Systems Plus Inc., Case 29-CA-31253.

5   So what do we have?

6          MR. JACKSON:  Yes, Your Honor.  Thank you.  First,

7   for THE General Counsel, we're prepared to call our final

8   witness.  A couple of documentary issues I'd like to address.

9   The first being with respect to what's been admitted already as

10  GC Exhibit 8.  GC 8 in its current form contains redactions of

11  employee personal identifying information including address and

12  phone numbers.  I'd like to have that information in the record

13  so I would like to -- I think the best thing to do is since

14  it's already been authenticated by the witness in its redacted

15  form, to add another exhibit.  I would like to mark it for

16  identification as GC 8A.

17         JUDGE GREEN:  Well, if it's the unredacted version,

18  why don't we just swap it out and make it GC 8?

19         MR. JACKSON:  Okay.  That's fine with me.

20         MR. MILMAN:  No objection, Your Honor.

21         JUDGE GREEN:  Okay.  So the revised GC-8 is admitted.

22     (Exhibit GC 8 as revised marked for identification and

23  admitted into evidence)

24         MR. JACKSON:  Judge Green, would you like a copy?

25         JUDGE GREEN:  Sure.  Thanks.

 1           MR. JACKSON:  Now, the other documentary issue

 2  concerns a very large file.  It's a spreadsheet that was

 3  produced pursuant to the General Counsel's subpoena, by

 4  Respondent.  It's -- it appears to be a payroll list of all

 5  employees who worked for Parking Systems at Stony Brook from I

 6  believe November 30th through June 9th, and I believe that both

 7  parties, Respondent and General Counsel, intend to use that in

 8  part of their case, respectively, so --

 9           JUDGE GREEN:  This is Parking Systems' payroll?

10           MR. JACKSON:  Correct.

11           JUDGE GREEN:  Okay.

12           MR. JACKSON:  So it's a very large file.  I think if

13  you print it, it's over 300 pages.

14           JUDGE GREEN:  Okay.

15           MR. JACKSON:  I don't think it's a good use of

16  resources to print multiple copies of that document.  So I've

17  been speaking with Mr. Milman, and I think we're in agreement

18  that if we just have one copy for the courtroom, and I could

19  make sure that the court reporter has the electronic version.

20           JUDGE GREEN:  Okay.

21           MR. MILMAN:  Your Honor, I would also suggest that

22  that be marked Joint-1.

23           JUDGE GREEN:  All right.  That's fine.

24           MR. MILMAN:  Yeah.

25           JUDGE GREEN:  What period of time is that?

1       MR. JACKSON:  Correct me if I'm wrong but what's

2  sticking in my -- I know it starts on November 30th, 2023.  I

3  believe it goes through June 9, 2024.

4       JUDGE GREEN:  Yeah.  That -- okay.  So Joint Exhibit

5  1 is admitted.

6     (Joint Exhibit 1 admitted into evidence)

7       MR. JACKSON:  And I'll work on getting that paper

8  copy for the courtroom, probably not until this afternoon.

9       JUDGE GREEN:  Okay.  Anything else?

10      MR. MILMAN:  Your Honor, If I may?

11      JUDGE GREEN:  Yeah.

12      MR. MILMAN:  The Respondent Employer has exhibit --

13  I'd like to address exhibit issues as well with the Court.

14      JUDGE GREEN:  Okay.

15      MR. MILMAN:  Earlier in the proceeding, there was a

16  evidentiary proffer submitted and Your Honor said it can be

17  made part of the record.  I'd just like that marked as a

18  Respondent exhibit.

19      JUDGE GREEN:  Okay.

20      MR. MILMAN:  Adrian, do you know where we left off on

21  Respondent exhibits?

22      JUDGE GREEN:  I believe we're up to 5.

23      MR. MILMAN:  Okay.  So I would respectfully request

24  that that be entered into evidence as Respondent 5.

25      MR. JACKSON:  Actually, Your Honor, we have

1    Respondent 5 already admitted.      .

2              JUDGE GREEN:  Oh.  Was it marked?

3              MR. JACKSON:  Oh, no, no, no.  Yes.  It was marked.

4              JUDGE GREEN:  Okay.

5              MR. JACKSON:  Oh, excuse me.  Never mind.  I think

6    it's the same thing.

7              MR. MILMAN:  Okay.  So I would like to move that into

8    evidence as Respondent 5.

9              JUDGE GREEN:  Any objection?

10             MR. JACKSON:  No objection.

11             JUDGE GREEN:  Okay.  So, R-5 is admitted.

12        (Exhibit R-5 admitted into evidence)

13             MR. MILMAN:  Thank you.  And there's one more that we

14   have, Your Honor.  Counsel for the General Counsel moved into

15   evidence without any objection from the Respondent of the R

16   certification issued by Region 29.

17             JUDGE GREEN:  Right.

18             MR. MILMAN:  So I would like to add as either a A or

19   B connector with that or as Respondent exhibit, and I'd ask,

20   Your Honor, to take judicial notice of the -- our hearing

21   determination which gave rise to the certification.

22             JUDGE GREEN:  Okay.

23             MR. MILMAN:  I'd like this to be introduced as a

24   connector exhibit.

25             JUDGE GREEN:  Okay.  I mean, it can be GC if the GC

1    wants it.  Otherwise, you can mark it as R-6.

2              MR. MILMAN:  I'll mark it as R-6, but now I'll change

3    it, if Counsel would like.

4              MR. JACKSON:  No, I don't intend to move it as a GC

5    exhibit.

6              MR. MILMAN:  Okay.  R-6.

7              JUDGE GREEN:  So that's a decision and what is that

8    exactly?

9              MR. MILMAN:  Yeah, this is the -- our hearing

10   decision from the Region.

11             JUDGE GREEN:  It's a decision and direction of

12   election.

13             MR. MILMAN:  Correct.  And we feel that's connected

14   with the certification.

15             JUDGE GREEN:  Okay.  Any objection?

16             MR. JACKSON:  I mean I'd object on relevance grounds.

17             JUDGE GREEN:  All right.  I'm going to allow it.  So

18   R-6 is admitted.

19       (Exhibit R-6 marked for identification and admitted into

20   evidence)

21             MR. MILMAN:  And that's all we have insofar as

22   introducing exhibits into the record.  I defer now to Mr. Mauro

23   on outstanding subpoenas.

24             MR. MAURO:  Just a few issues on the subpoenas that

25   are out there, Your Honor.  Classic Valet, the subpoena we

1    issued, still has not responded.  I reached out to the

2    principal, spoke with him directly last week, and while he

3    maintains that he wants to comply, he hasn't, nor has his

4    attorney responded to our effort to secure a response to that

5    production.  So therefore, it's still outstanding.

6            And then, currently, we actually issued a second

7    subpoena to the Union for documents that were referenced in the

8    Union's witnesses' testimony.  I think there was a petition to

9    revoke that was filed this morning, so I haven't had an

10   opportunity to review it yet, but I'll do that during the

11   course of the day.

12           And then we have -- yeah, and then the only other

13   issue, we have issued subpoenas ad testificandum for the

14   appearance and testimony of two witnesses from Stony Brook

15   University Hospital.  I've sent them to their -- to the Stony

16   Brook's General Counsel.  I haven't received a response.  I'll

17   take a break and call shortly this morning just to see where

18   they're at.

19           JUDGE GREEN:  Okay.  Just out of curiosity, what do

20   you want from Classic?

21           MR. MAURO:  So, Classic, we -- we've issued -- in

22   fact, we have the subpoena.

23           JUDGE GREEN:  So, I mean, I -- I've said before, and

24   I guess I'll say it again, it seems to me that both parties,

25   well, at least the GC has an interest in getting Classic

1  payroll.  I know that you seem to be relying on GC 8 as

2  evidence of who worked at Classic.  I don't see that it really

3  proves that.  It's a union membership list.  It's not a Classic

4  payroll.  The Union can say what they want about oop

5  (phonetic), it's there.  It's, you know, it's really not

6  compelling as evidence of what you seem to be presenting it

7  for, so.

8           The Respondents, I take it you've asked for it.

9  You've subpoenaed the Classic subpoena.

10           MR. MAURO:  That's correct.

11           JUDGE GREEN:  Excuse me.  You've issued a subpoena to

12  Classic, including a request for the payroll records?

13           MR. MAURO:  That's correct, Your Honor.

14           JUDGE GREEN:  Okay.  So I would think that the Region

15  would have an interest in pursuing that on your own.  Am I

16  wrong?

17           MR. JACKSON:  Well, Your Honor, I'm not sure what

18  else Respondent had subpoenaed from Classic, but --

19           JUDGE GREEN:  I guess here's my point.  I guess

20  here's my point.  You shouldn't be waiting on me for some kind

21  of action on the Union's subpoena to Classic.  It seems to me

22  that the Region has an interest in enforcing it, at the very

23  least with regard to the payroll.

24           But also, I mean, it's not something that I do.  I

25  don't enforce subpoenas.  That's something that the Region has

1  to do.  And, you don't have -- I mean, I guess there are

2  limited circumstances in which you can say, no, we're not going

3  to go enforce on behalf of a Respondent.  But they're very

4  limited.  Generally, you have to do it.  The Region has to do

5  it.  So I'm a little surprised that it hasn't -- there hasn't

6  been more action on that in the interim.  Because we can't

7  close without it.

8          MR. JACKSON:  So, Your Honor, I think you're aware

9  the Region's resources are extremely limited.  We have very

10  little extra tme to --

11          JUDGE GREEN:  Okay.  I mean, listen, I --

12          MR. JACKSON:  -- enforce Respondent's subpoenas, so

13  that's probably not going to happen, Your Honor.

14          JUDGE GREEN:  So the problem is --

15          MR. JACKSON:  So I can honestly say --

16          JUDGE GREEN:  -- you can't -- right?  The Region has

17  an interest in closing a case.  You can't close.  You won't be

18  closing until the -- until this issue is resolved, the subpoena

19  issue is resolved.

20          MR. JACKSON:  Well, it's Respondent's decision on how

21  they want to present their case.

22          JUDGE GREEN:  I know.  Okay.

23          MR. JACKSON:  If they want to request a postponement

24  to pursue this issue, that's something we'll have to deal with.

25  I -- with the help of Mr. Rocco, I have obtained a copy of the

1  payroll records from Classic Valet.

2            JUDGE GREEN:  Good.

3            MR. JACKSON:  Now, we have an issue of

4  authentication, but you know, and I'm happy to share the

5  document with Respondent.

6            JUDGE GREEN:  Well, do that, yeah.  That - you should

7  definitely do that.

8            MR. JACKSON:  Okay.

9            JUDGE GREEN:  That would be helpful.

10           MR. JACKSON:  Sure.

11           JUDGE GREEN:  But I don't know what else the

12  Respondent has subpoenaed, as you say.

13           MR. JACKSON:  Right.

14           MR. MILMAN:  Your Honor, on that, if I may, we might

15  be able to shortcut the offered, to verifying whether or not

16  that is an accurate and authenticated exhibit.  I would just

17  ask Mr. Rocco if he could just make a proffer from the -- from

18  his table of how he got it, when it was produced, and under

19  what circumstances, and then we might be able to address the

20  authentication issue.

21           JUDGE GREEN:  Okay.  Would you like to do that?

22           MR. ROCCO:  No problem.  So, I know from the RC case

23  in 2015, that their attorney was a guy named Matt Persanis, so

24  after we had the hearing that kicked off about two weeks ago, I

25  called the two weeks ago, I called Mr. Persanis about three

```
 1   times.  And on the third time, I had asked him for this -- I
 2   said, can I have a payroll run from the final week of November
 3   2023?  And he said, you know, he had to ask the client.  The
 4   client had just, you know, he got back to me, and then
 5   Mr. Persanis emailed me the document.  And then he subsequently
 6   emailed me another document with some black marks at the top.
 7   And I asked him what the black -- I called him up and I asked
 8   him what the black marks were, and he -- it was, you know,
 9   sloppily redacted by him.  And he said that was the non-
10   bargaining unit personnel, I guess, that were on that run.  It
11   was about three people.
12              JUDGE GREEN:  Okay.
13              MR. ROCCO:  And that was the document he sent me.
14              MR. MILMAN:  I just have one question, Mr. Rocco, on
15   that.
16              MR. ROCCO:  Go for it.
17              MR. MILMAN:  Did Classic tell you the un -- the non-
18   bargaining unit personnel, what positions they were?
19              MR. ROCCO:  It didn't.  So the first one he sent me,
20   it like - there was a Page 1, but it was clearly like, either
21   whited out or some kind of redacting tape, I could tell.  So I
22   said, I don't know what that is.  And then he sent me another
23   one, and he said that those people aren't in the bargaining
24   unit and then he sent me the second one, which was blacked.
25   And that was all the information I had.
```

```
 1              JUDGE GREEN:  Okay.

 2              MR. MILMAN:  We received nothing.

 3              JUDGE GREEN:  So can you send them that?  Let me ask

 4    you, just let me ask you.  The payroll, I get.  Beyond the

 5    payroll, I'm not really understanding why we want so much from

 6    Classic.

 7              MR. MAURO:  I mean, for, you know, expediency's sake,

 8    we may be able to dramatically reduce the scope of what we've

 9    been seeking.  The payroll was actually probably the most

10    important thing.

11              JUDGE GREEN:  Okay.

12              MR. MAURO:  So I'll take another look at this.  I am

13    going to call Classic again at a break.

14              JUDGE GREEN:  Okay.

15              MR. MAURO:  And I'll report back to you all.

16              JUDGE GREEN:  Okay.

17              MR. ROCCO:  I might be able to join the call because

18    I was able to make the connection, so.

19              MR. MAURO:  Okay.

20              MR. ROCCO:  You know, I'd be happy to help facilitate

21    it.

22              JUDGE GREEN:  I would like the parties to be more

23    proactive in getting this resolved, because I'm not really

24    getting that you're getting that this is something that has to

25    be dealt with before we can finish.
```

```
1           MR. MAURO:  Your Honor, to that point, just so you
2    know, I mean, I've been --  I really would rather not wait for
3    the Board's process on an enforcement.  That's why I've been
4    calling the --
5           JUDGE GREEN:  Right.
6           MR. MAURO:  -- the guy directly, saying --
7           JUDGE GREEN:  Right.  No, just -- right.
8           MR. MAURO:  Just respond.  It's simple.
9           JUDGE GREEN:  Right.
10          MR. MAURO:  I even said to him, I said, look.  I'll
11   bail on a bunch of these items.  Just give me, you know, a
12   couple of key documents, and it's like the runaround I'm
13   getting, so.
14          JUDGE GREEN:  Okay.  Classic is a going concern,
15   right?  It's a --
16          MR. MAURO:  Yes, it is.  Yeah.
17          JUDGE GREEN:  Okay.  Okay.  So is that it?  Is that
18   all we have for purposes of what we're doing before the last
19   witness is called?
20          MR. JACKSON:  Yes, Your Honor.
21          MR. MILMAN:  Yes, Your Honor.
22          JUDGE GREEN:  Okay.  And, by the way, I just saw a
23   petition to revoke.  That's filed by the Union?
24          MR. ROCCO:  Yeah, they served a subpoena on us, on I
25   think it was Wednesday or Thursday of last week.
```

```
 1              JUDGE GREEN:  Okay.

 2              MR. ROCCO:  So.

 3              JUDGE GREEN:  I didn't have a chance to read it.  I,

 4    you know that during the hearing, you actually have to get

 5    authorization from the ALJ before -- where'd you get the

 6    subpoena?

 7              MR. MAURO:  These were the ones I had requested prior

 8    to the hearing.

 9              JUDGE GREEN:  Prior to the hearing?

10              MR. MAURO:  Yeah.

11              JUDGE GREEN:  Okay.  Okay.  We'll deal with that at

12    the end of the General Counsel's case.  So would the General

13    Counsel like to call your witness?

14              MR. JACKSON:  Yes.  The General Counsel calls Robert

15    Gust.

16              JUDGE GREEN:  Mr. Gust?  So you can have a seat right

17    over here.  So I'm going to swear you in, so raise your right.

18         (Oath administered)

19              THE WITNESS:  I do.

20              JUDGE GREEN:  Okay.  So please just state and spell

21    your name for the record.

22              THE WITNESS:  Robert Gust.  G-U-S-T.

23              JUDGE GREEN:  Okay.  But you go by Bobby?

24              THE WITNESS:  Yeah.

25              JUDGE GREEN:  Okay.  All right.  So, the government
```

1  attorney's going to have some questions for you.

2                          Robert Gust,

3  was called as a witness, having been duly sworn, was examined

4  and testified as follows:

5                        DIRECT EXAMINATION

6  BY MR. JACKSON:

7  Q.   Good morning, Mr. Gust.  My name is Matt Jackson.  I

8  represent the National Labor Relations Board General Counsel.

9           MR. JACKSON:  Now, before I proceed any further, Your

10  Honor, Mr. Gust is an admitted agent of Respondent under

11  Section 213 of the Act.  Accordingly, he's an adverse party

12  witness and Counsel for the General Counsel requests to

13  question Mr. Gust under FRCP Rule 611(c).

14           JUDGE GREEN:  Okay.  I mean, that's granted.

15           MR. MILMAN:  Your Honor, if I may, I just want to get

16  a ruling from the bench on, so we know ahead of time, and we

17  know for planning of witness testimony.  And I've seen it

18  applied a different way in different courts.

19           Your Honor, how do you plan on proceeding in this

20  forum with respect to redirect or recross of a 611(c) witness?

21           JUDGE GREEN:  It just works the same way it would,

22  but in reverse.

23           MR. MILMAN:  Okay.

24           JUDGE GREEN:  So, you know, I mean, technically,

25  you're limited to what the General Counsel is asking on direct,

1    quote, unquote.  But then, you know, you can call.  I assume

2    you would be calling Mr. Gust as you -- one of your witnesses,

3    if not your first witness?

4              MR. MILMAN:  That's correct.

5              JUDGE GREEN:  And then you could ask, at that point,

6    you could ask obviously whatever you'd want to ask.

7              MR. MILMAN:  Right.  I just want to make sure I'm not

8    foreclosed on asking questions.

9              JUDGE GREEN:  Correct.

10             MR. MILMAN:  Okay.  Thank you, Your Honor.

11   BY MR. JACKSON:

12   Q.   Mr. Gust, are you currently employed?

13   A.   Yes, I am.

14   Q.   Do you work for Parking Systems?

15   A.   I do.

16   Q.   What is your position with Parking Systems?

17   A.   My title is account executive.  I wear a lot of hats,

18   though.

19   Q.   Okay.  You wear a lot of hats.  What other hats do you

20   wear?

21   A.   I'm also a partner in the business.

22   Q.   Okay.  So a part owner?

23   A.   Yeah.  And technically, an account executive is an

24   operations person, but I do back office stuff as well.

25   Q.   You also serve as a recruitment specialist?

```
 1  A.    I -- yes.

 2  Q.    How long have you been working with Parking Systems?

 3  A.    October of 1987 is when I first started.

 4  Q.    Okay.  So as an account executive, can you describe what

 5  your duties and responsibilities are?

 6  A.    Hiring staff, training staff, deal with day-to-day

 7  operations in the field.  Sometimes I'm involved in collecting

 8  bills.  Really, just running the operational end of the

 9  business.  For excuse me, for the locations that I service, so

10  I'll have a group of accounts that I oversee.

11  Q.    How many accounts do you oversee?

12  A.    Approximately 30.

13  Q.    Are they all in Long Island?

14  A.    Yes.

15  Q.    Is one of those accounts the account Parking Systems

16  currently has with Stony Brook University?

17  A.    Yes.

18  Q.    And Stony Brook.  Excuse me, Parking Systems operates the

19  parking services at Stony Brook University Hospital, correct?

20  A.    That is correct.

21  Q.    And you've been doing that since December 1, 2023,

22  correct?

23  A.    That's also correct.

24  Q.    And you're doing that work pursuant to a contract you have

25  with Stony Brook University, correct?
```

1    A.    Yes.

2    Q.    Do you report to anyone in the Parking Systems

3    organization?

4    A.    We have a flat management structure.  So, but yes, I would

5    say that I have to report to Mark Baron, who would be the lead,

6    the president, the seniormost partner.

7    Q.    Okay.  And do you know who Michael Petruzzelli is?

8    A.    I do.

9    Q.    Who is Michael Petruzzelli?

10   A.    Mike Petruzzelli is also a senior lead partner.  I would

11   report to him too.

12   Q.    What about Jonathan Baron?  Do you know who he is?

13   A.    Yes, I do.

14   Q.    Who is he?

15   A.    Jonathan is Mark's son.  He handles acquisitions for us.

16   Q.    What does that mean, handling acquisitions?

17   A.    Dealing with, you know, seeking out potential new

18   business, responding to bids, putting together -- getting us

19   business.

20   Q.    Does he go by Johnny too?

21   A.    Yes.

22   Q.    And are you family with Travis Gilliland?

23   A.    I am.

24   Q.    Who's he?

25   A.    He is the recently promoted manager over at Stony Brook

1   University Hospital for -- for Parking Systems.

2   Q.   He's the current manager at Stony Brook University?

3   A.   Yes.

4   Q.   Okay.  How long has he been manager?

5   A.   Since December 1.

6   Q.   Was Travis working with Parking Systems before December 1,

7   2023?

8   A.   Yes, he was.

9   Q.   What was his position before that?

10  A.   Parking attendant.

11  Q.   And are you familiar with Andrew Goldsmith?

12  A.   I am.

13  Q.   Who's Andrew Goldsmith?

14  A.   Andrew Goldsmith is a supervisor, account representative

15  as well.

16  Q.   So you're an account executive.  He's an account

17  representative?

18  A.   Yeah.

19  Q.   Are they different roles?

20  A.   Just additional responsibility, the amount of time you are

21  with the company.

22  Q.   Okay.  Does Andrew currently work on the Stony Brook

23  account?

24  A.   He does.

25  Q.   Does anyone report to you?

1  A.   Well, I have 60 employees, 65 employees.  Some of them are

2  transient.  I have some -- I have managers that work for me.

3  Q.   Are you saying 65 employees?  Are those parking

4  attendants?

5  A.   Some would be managers.  Some would be parking attendants.

6  Q.   Can you describe what your role is with respect to Parking

7  Systems' account with Stony Brook?

8  A.   What my role is?

9  Q.   Yes.

10  A.   I would say at Stony Brook in particular, I'm more of a

11  mentor, right, in that role.  Because the majority of the --

12  the majority of the places that I oversee are really in Nassau

13  County.  But I happen to live in Suffolk County.  So, I'm

14  really mentoring them as they're coming on board, which Andrew

15  will ultimately, and has already shifted into that role of

16  overseeing the operation, whereas Travis is the on-site manager

17  at the facility.

18  Q.   So you're mentoring Andrew to help him oversee the

19  account?

20  A.   And -- and Travis as well, I think, in fairness.

21  Q.   And you understand that Parking Systems was hired by Stony

22  Brook to provide valet parking services to staff, patients, and

23  visitors to the hospital, correct?

24  A.   Well, it's a little more than that.  So, in addition, we

25  also handle the actual employee parking area.  So they have

1    some issues with inadequate parking spaces, and there's an

2    inventory issue.  So we have to deal with that as well.

3              JUDGE GREEN:  Just out of curiosity, the employee

4    parking area, is that valet or do people park themselves?

5              THE WITNESS:  So, what ends up happening is so think

6    of a typical hospital, right?  You have the shifts.  So they

7    have adequate parking.  The problem is when you have a shift

8    change.  So because the first shift hasn't left, the second

9    shift is coming in, there's no place for them to go.  So,

10   there's literally about 45 minutes or an hour where there's no

11   -- you just can't fit the cars in there.  So what ends up

12   happening is the employees will come in and we stack them all

13   up.  Right?  So, we'll stack the cars up.  There'll be blocking

14   in other employee cars.

15             Then, as the first shift starts to leave, we can then

16   unstack those cars into spots.

17             JUDGE GREEN:  Okay.

18             THE WITNESS:  So sort of valet, sort of, you know,

19   just making room, kind of.

20             JUDGE GREEN:  Okay.  Thank you.

21   BY MR. JACKSON:

22   Q.   You're aware that these kinds of services existed at the

23   hospital before December 1, 2023, correct?

24   A.   That there was another company there?

25   Q.   Yeah.

1   A.   Yes, of course.

2   Q.   Providing parking services?

3   A.   Yes.

4   Q.   And you understand that the university, the hospital, they

5   need those services for the staff, patients, and visitors,

6   regardless of who's providing it, correct?

7   A.   The -- yeah.  I would say that it's a requirement there.

8   Q.   Now, Parking Systems' operation at Stony Brook.  it

9   includes a valet booth at the main entrance of the hospital,

10  correct?

11  A.   Yes, that's correct.

12  Q.   And there have been multiple employees stationed at the

13  main entrance since December 1, correct?

14  A.   You mean on a single shift or I'm sorry?

15  Q.   Yeah, okay.  At any given time, there are multiple --

16  A.   Well, yeah, there's many --

17  Q.   At any given time, the main entrance booth is open.  Well,

18  first of all, let me ask you this.  Is it open 24 hours a day?

19  The main entrance?

20  A.   The main entrance is not.

21  Q.   The main entrance is not.  Do you know the hours offhand?

22  A.   5:30 a.m. until 9:00 p.m. for the main entrance.

23  Q.   Okay.  And during those hours where it's open, you staff

24  that booth with multiple employees?

25  A.   That is correct.

1  Q.   And employees who are stationed there, they're responsible

2  for greeting visitors, patients who arrive with their vehicles,

3  correct?

4  A.   Yes.

5  Q.   And the employees are expected to give a claim ticket to

6  the patients or visitors who arrive, correct?

7           MR. MILMAN:   Objection.   I only object as to scope

8  and time.   Is he referring from December 1st or at some time

9  prior to December 1st, including December 1st, 2023?

10           MR. JACKSON:   I'm only asking you about Parking

11  Systems employees.   So I'll clarify the question.

12  BY MR. JACKSON:

13  Q.   So I'm limiting my -- referring to what's been going on

14  since December 1, 2023.

15  A.   Okay.

16  Q.   You know, in terms of, you know, your knowledge of what

17  your company does at this setting.   So my question is employees

18  are expected to, when a customer arrives, they give a claim

19  ticket to the customer.   Is that right?

20  A.   So, at the main?   Yeah, so, we're just talking about the

21  main entrance right now?

22  Q.   Yes.

23  A.   Right.   So at the main entrance, a guest will arrive,

24  okay.   A guest, a patient, a visitor.   They would give them a

25  ticket so that we can identify, obviously, the owner of the

1    vehicle later.

2        We also charge a fee for that, okay?  So, it's we charge a

3    fee.  I think it's $8, the -- at the main entrance.  Then the

4    attendants park the car.  They use the ticket to identify the

5    car later.  Depending on where we put them, it gets a little

6    bit more complicated.

7    Q.   And the customer gives the employee the key to their

8    vehicle, right?

9    A.   They do.

10   Q.   And the employee is responsible for maintaining that key,

11   correct?

12   A.   They are.

13   Q.   And the employee's job is to park the vehicle somewhere,

14   and then return it to the customer on demand, correct?

15   A.   Yeah, and secure the keys.

16   Q.   And you require your attendants to wear a uniform,

17   correct?

18   A.   That is correct.

19   Q.   What does the uniform consist of?

20   A.   Black pants, black socks, black shoes, a black uniform

21   polo, a black uniform jacket in inclement weather.  We have

22   black fleece also in colder weather.

23   Q.   Now, your operation, well, strike that.  Excuse me.  You

24   also operate a valet booth at the emergency room?

25   A.   We do.

```
 1   Q.    And the emergency room is open 24 hours a day?

 2   A.    The emergency room is open 24 hours a day.

 3   Q.    And the parking station is also 24/7?

 4   A.    Yes.  24/7.  Just to return to your earlier question about

 5   the main.  I don't think you asked, but the main booth is only

 6   open Monday to Friday.

 7   Q.    Ah, okay.

 8   A.    Sorry.

 9   Q.    Thank you.  The emergency room --

10   A.    Emergency, yeah.

11   Q.    -- is 24 hours.  Okay.  And do you have multiple employees

12   stationed there all the time?

13   A.    Well, so we have multiple employees, of course, throughout

14   the campus.  So, depending on the volume at any given location,

15   that really dictates -- only on the weekends, because the

16   weekends, only the emergency room is open.  So, it's just

17   depending, you know, the staffing is the staffing on the

18   weekends.

19        But the number of employees at any particular location is

20   dictated by the flow of traffic.  So if the emergency room is

21   very busy, we shift employees from the main to the emergency

22   room.  It's back and forth between the different locations.

23   Q.    The employees who are stationed at the emergency room

24   area?

25   A.    Yes, sir.
```

1    Q.    Are they also responsible for greeting visitors when they

2    arrive?

3    A.    Absolutely.

4    Q.    Do they give claim tickets to visitors?

5    A.    They do that as well.

6    Q.    And visitors give them their keys?

7    A.    Indeed.  Yes, sir.

8    Q.    And the employee is responsible for maintaining the key

9    that they received?

10   A.    Yes.  They secure them inside the booth.

11   Q.    And those employees at the emergency room are also

12   expected to park the car of the visitor and return the car on

13   demand, correct?

14   A.    That is correct.

15   Q.    Are you familiar with the Cancer Center at Stony Brook

16   University Hospital?

17   A.    Yes.  Yes, I am.

18   Q.    Is there -- do you operate a valet booth there?

19   A.    We do.

20   Q.    Okay.  What are the hours of the Cancer Center valet

21   booth?

22   A.    Again, it's Monday through Friday.  That's 7:30 a.m. 'til

23   6:30 p.m., but on Tuesday nights, I believe they stay open an

24   hour later, 7:30 to 7:30.  Might be Wednesday.  Tuesday or

25   Wednesday.

1  Q.   And during the hours of operation at the Cancer Center, do

2  you station multiple employees there?

3  A.   Yes, we do.

4  Q.   Same --

5  A.   It's similar throughout the campus.  So depending on the

6  volume of traffic, we will adjust the number of staff at the

7  different locations.

8  Q.   Is it true that you assign employees primarily to work at

9  one station or another?

10  A.   Well, they start the day off there for sure.  So you have

11  to open up the facility.  So then -- then you -- so, you know,

12  a perfect example is Wednesday.  Right?

13      So Wednesday is, in the hospital world, is known as the

14  day that the doctors do rounds.  So we get tremendous amount of

15  pressure on the staff lot on Wednesday.  So we'll shift

16  employees from wherever it's a little slower to cover that.

17  But then on the other days, in, you know, we'll get situations

18  where the staff lot is not busy at all.  So, then we'll move

19  them over to the main area.

20      Well, when we originally got there, we found that the main

21  entrance would get backed up.  Right?  So you'd have situations

22  where they were, you know, you had people coming in.  They're

23  waiting for discharges and that kind of thing.  So, that's

24  something that we needed to manage.  Obviously, one way to

25  manage that is being able to increase staff, but we're working

1  within, you know, a budget.

2      So we found that staff lot in many of those cases, we had

3  staff sitting around doing nothing.  So we would shift them

4  over to increase the -- the staff in that area.  And you know,

5  similarly, there's times that the Cancer Center gets very busy.

6  So, you move, you know, you can move the staff around.  The

7  campus is not so large that, you know, you can't move -- the

8  people literally on foot can't move within a different

9  location.

10     As a matter of fact, one of the parking areas, the main

11 area, it actually sits between the main area and the Cancer

12 Center.  So the staff can very easily shift.  They share the

13 parking lot.

14 Q.  But I just want to make sure we're clear on this.  Isn't

15 it true that like any given employee would know that his or her

16 shift is supposed to start at one of these particular areas,

17 right?  So when they report to work, they know, when I start

18 work, I go to the Cancer Center, for instance?

19 A.  I think it's fair to say.  There -- there's some that are

20 actually just scheduled to come in, right?  And then they would

21 go to the main lot and then be disposed from there.  But, you

22 know, there are a core group, you know, that would report to --

23 to the different stops for sure.

24 Q.  And the employees who are stationed at the Cancer Center,

25 they are responsible for greeting visitors, patients who arrive

420

1    with their vehicles?

2    A.    Yes, that's true.

3    Q.    And they give claim tickets to the customers?

4    A.    They do indeed.  Yes, sir.

5    Q.    And the customers in turn give the employee a key to the

6    vehicle?

7    A.    They do.

8    Q.    And the employee is responsible for retaining the key at

9    the Cancer Center, right?

10    A.    Again, yeah.  They secure them inside the booth over there

11    for sure.

12    Q.    And the employee role is to park the vehicle, and return

13    the vehicle on demand to the customer, correct?

14    A.    Yes.

15    Q.    And you described a bit about the employee parking lot.  I

16    want to make sure that it's clear that it -- is the employee --

17    well, before I get into that.  Do you operate a station at the

18    employee parking area?

19    A.    We actually have multiple booths there.  But, yes.  It's

20    slightly under -- when compared to the other three, it's a

21    slightly different operation.

22    Q.    Yes.  So how many booths do you have there?

23    A.    One, two, three.

24    Q.    Okay.  And can you describe how it's different from the

25    other three areas?

1    A.    So when -- in this particular instance, you'll have, as I

2    was telling, you know, the judge, the -- the employees will

3    come in and the pressure occurs during the shift changes.  So

4    if the -- if shift one, let's say for argument's sake, is they

5    haven't left yet and shift two starts to come in, there's

6    inadequate parking for them.  But as soon as shift one leaves,

7    there will be adequate parking.

8        So we end up operating as a stop gap.  So -- so an

9    employee will come in, and if there is no more available

10   parking, we'll have them stop with their car, blocking other

11   cars.  Obviously, that's a problem because that's probably

12   somebody in the next shift that's going to leave, so they'll

13   have to move it.  So then after we do that, we get them out of

14   the car, we stack it up.  We'll take the keys out.  We'll lock

15   them up, okay.  Keeps everything that -- handled that way.

16       And then they come out.  As the staff, the shift one staff

17   comes out, then we have to jockey the cars out of the way so

18   they can get out.  And now we have adequate parking, and we'll

19   park the cars.  But we do also give them tickets.  You know,

20   it's -- in that sense, they get -- they get claim checks so

21   that we can identify the, you know, the customer of the car, in

22   this case an employee, with the actual car they own.

23   Q    Right.  Those who don't get to self-park get the claim

24   ticket?

25   A.    That is correct.

1    Q.   All right.

2              JUDGE GREEN:   I assume they don't pay?

3              THE WITNESS:   No.   They don't pay.   They actually

4    don't pay at the Cancer Center and the emergency room either in

5    most cases.   We have a validation system set up, so.

6    BY MR. JACKSON:

7    Q.   What are the hours that you operate the employee lot?

8    A.   The employee lot is Monday through Friday as well.   That's

9    from 7 a.m. until 6 p.m.

10   Q.   You're aware that a company called Classic Valet Parking

11   had operated the parking services at Stony Brook University

12   Hospital before Parking Systems took over?

13   A.   Yes, I am.

14   Q.   And you visited the hospital campus during the time that

15   Classic was still operating the services there, correct?

16   A.   I did.

17   Q.   And you got to observe their operation, right?

18   A.   I did.

19   Q.   It's true that Classic had operated the parking services

20   in essentially the same manner as what you described in terms

21   of how Parking Systems currently operates it?

22   A.   No.   That's actually not true.

23   Q.   Are you aware that the present legal case we're here for

24   today started with an investigation before the NLRB regional --

25             MR. MILMAN:   Objection.

```
1              JUDGE GREEN:  What's the objection?

2              MR. MILMAN:  Relevance.

3              JUDGE GREEN:  Overruled.

4   BY MR. JACKSON:

5   Q.   I'll repeat.  Are you aware that the case that we're here

6   for today, it began with an investigation before the National

7   Labor Relations Board Region?

8   A.    Well, what I'm aware of is that there was a complaint, and

9   I saw I was named in the complaint, that I was -- the terms

10  were intimidating and coercive, I think.

11  Q.   Okay.  Are you aware that Parking Systems attorneys

12  Submitted a position statement to the NLRB before we arrived at

13  this courtroom today?

14             MR. MILMAN:  Objection.  Calls for a legal conclusion

15  plus attorney work product, Your Honor.

16             JUDGE GREEN:  Overruled.

17  BY MR. JACKSON:

18  Q.   So are you aware that while the NLRB was looking into this

19  matter to find out whether there was any perceived unlawful

20  conduct, Parking Systems submitted a position statement to the

21  NLRB.  Do you know about this?

22  A.   I don't even know what a position statement is, sir.

23  Q.   Okay.  During December of 2023, were you consulted about

24  an NLRB case at all?

25             MR. MAURO:  Objection.  This calls for attorney-
```

1  client communication.

2          JUDGE GREEN:  Yeah.  Now we're getting too close to a

3  problem.

4          MR. JACKSON:  Close but not there yet, Your Honor.

5          JUDGE GREEN:  Right.  So, I mean, so here's the

6  thing.  We don't want you to disclose anything, what you've

7  discussed with company lawyers.  So you can say, like, yes or

8  no to I had a conversation but don't say anything about the

9  substance of the conversation.

10          THE WITNESS:  So what was -- I'm sorry.  What was the

11  question?

12  BY MR. JACKSON:

13  Q.   Yeah, do you remember Mr. Milman, or I think there was

14  someone named Robert Milman or Mr. Mauro, for that matter.  Did

15  any of them discuss with you what you knew about the situation

16  involving an NLRB case?

17          MR. MAURO:  Objection, Your Honor.  This is

18  clearly -- it would disclose communications.

19          JUDGE GREEN:  No.  Well, you're allowed to get the

20  fact that they had -- the conversation occurred.  You can't get

21  the substance of the conversation.

22          THE WITNESS:  So, I mean, I knew about, obviously, I

23  saw, excuse me, I go, jeez, obviously, I saw -- I was shown the

24  complaint.

25          MR. JACKSON:  Okay.

425

1          JUDGE GREEN:  Try to limit the responses to this

2    point.  Do we really need this?  I mean, try to limit your

3    responses to yes or no.

4          THE WITNESS:  Okay.

5          JUDGE GREEN:  Just because I don't want you to

6    disclose.

7          JUDGE GREEN:  Okay.

8    BY MR. JACKSON:

9    Q    Yeah.  I repeat again.  I'm not asking about anything in

10   particular that you said to them.  I just want to know if you

11   consulted with them about, you know, issues that the NLRB was

12   raising about your company.

13         MR. MILMAN:  Objection to the world consulted, Your

14   Honor.

15         THE WITNESS:  Yeah.  Yeah.

16         MR. MILMAN:  It's vague.

17         :   Sustained.

18         MR. JACKSON:  Okay.

19         JUDGE GREEN:  Really, if you can avoid this area,

20   we're better off.

21         MR. MILMAN:  Your Honor, just as a question on a

22   matter, I think GC is going to be submitting through this

23   witness or testifying upon a position statement.  And if that's

24   the case, we would object to any line of questioning regarding

25   any potential position statement.

1          Your Honor, it's not a -- it's not an evidentiary

2     exhibit.  In fact, I can tell you in 30 years, every position

3     statement that my firm has submitted, we specifically say this

4     is not evidence.  And I can see where this is going.  I'm going

5     to be objecting to any line of questioning.

6          JUDGE GREEN:  Okay.  So I -- listen, the position --

7     I don't know what's in this particular position statement.

8     Position statements are routinely admitted into evidence in

9     these cases.  It's not -- I don't know that this witness is in

10    a position to testify to anything that's covered in the

11    position statement.

12         MR. MILMAN:  That's correct, Your Honor.

13         JUDGE GREEN:  I mean, we haven't gotten there yet.

14    So, right.

15         MR. MILMAN:  Well, that's going to be, the

16    foundation is going to be a major problem also, Your Honor.

17    It's going to infringe upon attorney-client communication.

18    It's also going to -- it's also that this is not a -- this is

19    not the proper witness to lay a foundation.  This witness did

20    not draft the position statement.  And there isn't a question.

21    The question hasn't been reformed when I objected to the

22    vagueness whether he was consulted.  I objected to that.  You

23    sustained.  So there isn't even a foundation of any connection

24    with respect to a position with any of these witnesses.

25         JUDGE GREEN:  Let's just take things one at a time.

```
1              MR. MILMAN:  Thank you, Your Honor.
2              JUDGE GREEN:  Is that -- that's the position
3    statement?
4              THE WITNESS:  Yes, Your Honor?.
5              MR. JACKSON:  I would ask that it be marked for
6    identification as GC Exhibit 12.
7         (GC Exhibit 12 marked for identification)
8              THE WITNESS:  Should I read this?
9              JUDGE GREEN:  I know that -- you don't have to read
10   it yet.
11             MR. MILMAN:  Hold on.
12             THE WITNESS:  Oh, okay.
13             JUDGE GREEN:  Unless somebody asks you to.
14   BY MR. JACKSON:
15   Q.   Yeah, I would like you to just look over the document
16   really quickly.
17             MR. MILMAN:  Your Honor, I'd object to this.  I would
18   say what's good for the goose is good for the gander.  And I
19   would ask if, before I object, that at least direct the witness
20   to a specific sentence or paragraph.  It consists of a
21   multipage document for this witness to read it.
22             JUDGE GREEN:  Okay.  So I don't want to spend a whole
23   lot of time on this.  So here's the deal.  Position statements
24   are generally relevant because they're the Respondent's
25   position on the case, right?  So I haven't read this one, so I
```

1    don't know that it's relevant.  But generally they are because

2    they're about the case.

3              They're produced by an agent of the Respondent's, and

4    they're not necessarily marked -- they're not confidential.

5    They're not covered by work product.

6              MR. MILMAN:  Your Honor, I understand that.  But the

7    witness testified under oath that he doesn't even know what a

8    position statement is.

9              JUDGE GREEN:  That I -- that is true.  So what's the

10   plan here?  I mean, are you saying that -- I mean, let's just

11   get to it.  Are you basically trying to establish that he

12   received the document or authenticate it that way?

13   BY MR. JACKSON:

14   Q.   Have you ever seen this document before?  I mean do you

15   recognize just by seeing it --

16             MR. MILMAN:  Objection.  Relevance, Your Honor.  This

17   witness is not named as a CC on the position statement.

18             JUDGE GREEN:  That doesn't mean that he didn't see

19   it.  So just like reading the first couple of paragraphs.

20             THE WITNESS:  I haven't -- I don't -- I've never seen

21   it.

22             JUDGE GREEN:  Very good.  Okay.

23             THE WITNESS:  Can I read it?

24             JUDGE GREEN:  You know what?  You really don't have

25   to.

1          THE WITNESS:  Ok.

2   BY MR. JACKSON:

3   Q.   Did you know that your attorneys were going to submit this

4   document?

5          MR. MILMAN:  Objection, Your Honor.  Calls for

6   speculation.  It calls --

7          JUDGE GREEN:  Sustained.

8   BY MR. JACKSON:

9   Q.   I want to direct your attention to the second page, second

10  paragraph under the heading, Preliminary Statement.

11  A.   Okay.

12  Q.   Please just read that.  It starts with "Regarding the

13  allegations."  Could you please read that to yourself?

14  A.   Regarding the allegations --

15  Q.   To yourself.

16  A.   All right.

17         MR. MILMAN:  Objection, Your Honor.

18         JUDGE GREEN:  So listen, if there's something in here

19  that the GC wants to ask factual questions about, that can be

20  done.

21         MR. MILMAN:  Your Honor, I would object to that,

22  because what this does is it misleads the record.  And this is

23  a back door way of General Counsel trying to get a position

24  statement in, through directing it to this witness who's

25  testified he's never seen this document.  take it to its most

1    incredible extension of what the General Counsel may do, he

2    could theoretically ask every single paragraph and try to get

3    the entire position statement in.

4          JUDGE GREEN:  Yeah.  Well, I disagree.  He can do

5    that, but that's because probably every paragraph is wrote.

6          MR. MILMAN:  Well, Your Honor, here's the problem

7    with that.  So if the use of this document, if it's not for the

8    purpose of impeaching this witness or trying to elaborate on a

9    prior inconsistent statement, then this is not the proper use

10   of this document.

11         JUDGE GREEN:  I disagree.  So I disagree

12   respectfully.

13         MR. MILMAN:  Well, I --

14         JUDGE GREEN:  You know, again, you know, if there's a

15   factual statement, then the General Counsel can say that's not

16   true.

17         MR. MILMAN:  Well, Your Honor, then, well, first of

18   all, I don't know if he asked him to read it into the record or

19   not.

20         JUDGE GREEN:  He didn't.

21         MR. MILMAN:  Yeah, huh?

22         JUDGE GREEN:  He didn't.

23         MR. MILMAN:  He didn't.  But so the point is I have

24   is if General Counsel plans on reading that document.

25         JUDGE GREEN:  Let me ask you a question.  Let me just

1    stop you.  All right?  There's really no dispute as to the

2    authenticity of this document, right?  You can, you -- this is

3    something that you know, because I would imagine, are you the

4    one that wrote it?

5                 MR. MILMAN:  No, the esteemed Robert Milman wrote

6    that.

7                 JUDGE GREEN:  Right.  Is that your brother?

8                 MR. MILMAN:  Yes.

9                 JUDGE GREEN:  That's your brother.  So you know

10   whether this is authentic.  I mean, there's really no issue

11   regarding the authenticity.  I mean, I'm not saying it's right

12   or wrong, but you know whether it's right or wrong.

13                MR. MILMAN:  The authenticity of that document,

14   whether that document was submitted by my firm is accurate.

15   The problem is, is that there are reasons why we have rules of

16   evidence --

17                JUDGE GREEN:  It's not --

18                MR. MILMAN:  -- and I understand the various degrees

19   of sticking to and complying with rules of evidence in

20   different forms and for different reasons.  The point is, is

21   that this witness is not even remotely --

22                JUDGE GREEN:  I understand that.

23                MR. MILMAN:  -- even remotely connected to the -- to

24   laying a foundation on this document.

25                JUDGE GREEN:  All right.  So to the extent there's an

1    objection there, it's overruled.  So let's move on.

2              MR. MILMAN:  Okay.  Your Honor, then just for the

3    record, then I have a running objection on every line of

4    questioning on this document through this witness and I would

5    also state that we would want any testimony by this witness

6    stricken from the record on this document.

7              JUDGE GREEN:  Understood.

8              MR. MILMAN:  Thank you, Your Honor.

9    BY MR. JACKSON:

10   Q.   So, Mr. Gust, have you read that paragraph, the second

11   paragraph on --

12   A.   No, sir, I'll do so right now.  Sorry.  Okay.

13   Q.   Okay.  Now your attorneys here wrote that Parking Systems

14   --

15             MR. MILMAN:  Objection.  We're not Mr. Gust's

16   attorneys.  We represent a corporation, Your Honor.

17             JUDGE GREEN:  So this would be a lot less complicated

18   if you just asked the factual question.

19             MR. JACKSON:  Okay.  Fine.

20   BY MR. JACKSON:

21   Q.   Is it true again, that Parking Systems continued to

22   operate substantially the same parking services operation as

23   existed under Classic Valet, including serving the same types

24   of hospital parking needs.  Is that true?

25             MR. MILMAN:  Objection.  Asked and answered, Your

```
 1   Honor.

 2              JUDGE GREEN:  Overruled.

 3              THE WITNESS:  I --

 4              MR. MILMAN:  I object, Your Honor.  See, this is what

 5   the -- the General Counsel tried to use this document to

 6   impeach a statement -

 7              JUDGE GREEN:  I understand that.  I understand that.

 8              MR. MILMAN:  -- that this individual witness

 9   testified to.  It's an improper use.  It -- if he wants to

10   impeach this witness, he could impeach this witness of any

11   document or any action of this witness was involved in.  For

12   example, this witness is a custodian of records.  This witness

13   produced documents.  This witness is on nearly every single

14   email that goes on interoperation wise.

15              If this -- if the General Counsel wants to impeach

16   this witness, he can do it through a document or an action that

17   this witness has taken.  But to ask the question that's

18   asserted in a legal form and ask this witness to interpret a

19   legal form is A, attorney work product, B, it's misleading.

20   Three, creates an inaccurate record, Your Honor.

21              JUDGE GREEN:  I'm sorry.  I'm sorry, but I

22   fundamentally disagree.

23              MR. MILMAN:  Thank you, Your Honor.

24              JUDGE GREEN:  Right?  I fundamentally disagree.  He's

25   just -- the witness is just being asked the question.
```

1   Admittedly, it's the same question but I'm allowing it.

2               MR. MILMAN:  But then --

3               JUDGE GREEN:  If he wants to change his answer, he

4   can change his answer, and if not, he doesn't have to change

5   it.

6               MR. MILMAN:  The objection I have, Your Honor, is

7   General Counsel is reading the entire paragraph into the

8   record.  This is legalese language and --

9               JUDGE GREEN:  Listen.  The truth is that this is

10  probably going to be in evidence.  Probably.

11              MR. MILMAN:  Well, let him call the proper witness.

12              JUDGE GREEN:  That's probably you.

13              MR. MILMAN:  No, it's not me.  I didn't author that,

14  letter.

15              JUDGE GREEN:  Okay.  Do we want to drag Mr., you know

16  --

17              MR. MILMAN:  Yes, he would be more than happy to come

18  and testify on it.

19              JUDGE GREEN:  So, okay.  We have a question before

20  the witness.

21              MR. MILMAN:  Objection to form, Your Honor.

22              JUDGE GREEN:  I understand.  So what's the objection?

23              MR. MILMAN:  I objected to form.  Reading the entire

24  paragraph of the question that is drafted by an attorney --

25              JUDGE GREEN:  Okay.

1          MR. MILMAN:  -- that has legal implications.  This

2    witness --

3          JUDGE GREEN:  I'm not going to rely on that.  I'm not

4    going to rely on that unless the document is actually entered

5    into evidence.

6          MR. MILMAN:  Well, then I would object that this

7    document be used --

8          JUDGE GREEN:  It's not a jury trial.

9          MR. MILMAN:  Sorry.

10         JUDGE GREEN:  Right?  It's not a jury trial.  If this

11   doesn't -- if this document never gets into evidence, I'm not

12   going to rely on what Mr. Jackson says.

13         MR. MILMAN:  Well, I would object to form and I would

14   object to that this witness is being asked to interpret a legal

15   position.

16         JUDGE GREEN:  Overruled.

17         MR. MILMAN:  Thank you, Your Honor.

18         THE WITNESS:  So, I'm sorry, Mr. Jackson.  What was

19   your question again?

20   BY MR. JACKSON:

21   Q.   Is it true that Parking Systems has continued to operate

22   substantially the same parking service operation as existed

23   under Classic Valet, including serving the same types of

24   hospital parking needs?

25   A.   That sounds fair, yes.

1  Q.    Is it true that Parking Services (sic) has provided valet

2  parking and management and transportation services without

3  union representation for 30 years?

4  A.    No, that's not true.

5  Q.    That's not true?  Okay.

6        (Pause)

7            MR. JACKSON:  Can we go off the record for one

8  second, Your Honor?

9            JUDGE GREEN:  Off the record.

10     (Off the record from 10:58:22 a.m. to 10:58:37 a.m.)

11           MR. JACKSON:  Adrian, I need your help.  I'd like to

12 show the witness GC Exhibit 3-A.  May I approach?

13           JUDGE GREEN:  You may.

14           THE WITNESS:  Thank you.

15 BY MR. JACKSON:

16 Q.    That's a photo of your business card, correct?

17 A.    Correct.

18 Q.    And there probably ?

19 A.    There's a QR code.

20 Q.    Not sure if it's on the particular paper I gave you but

21 there's a QR code on the back of that card?

22 A.    That is correct.

23 Q.    Okay.  And that QR code, if you scan it, it'll lead you to

24 a weblink for a application for a job with Parking Systems.  Is

25 that right?

1   A.   To be clear, it seems that that -- the term is being

2   thrown around.  Being thrown around some, application.  It's

3   really a contact form, so essentially it provides -- you go to

4   that form.  It has contact information.  It has when -- it asks

5   you when you're available.  We use that to set up interviews

6   and to process -- to proceed to the next step.

7   Q.   So you don't consider it an application?

8           MR. MILMAN:  Asked and answered., Your Honor.

9           JUDGE GREEN:  Overruled.

10          THE WITNESS:  No.

11  BY MR. JACKSON:

12  Q.   So I guess what do you call them if they're not

13  applications?

14  A.   Form?

15  Q.   Form.  Contact form?

16  A.   It could be a contact form.  It could be an intake form.

17  It could be a short form.  It could be -- it's really -- it's

18  just a -- it's essentially a way to gather the information

19  necessary for an interview and then to -- then have the data

20  you need to be able to put it into -- we -- we do all of our

21  applications are through Paychex, so it's about a 8-page

22  document with all we, you know, your I-9s.  We have our

23  employee manual in there.  A great deal of the legal stuff, so.

24  Q.   Okay.  So the intake forms that get submitted through this

25  QR code, they get emailed directly to you, correct?

1  A.    This particular one does, absolutely.

2  Q.    It's true that you visited Stony Brook University Hospital

3  Parking facilities during November 2023.  Is that right?

4  A.    Yes.

5  Q.    And you gave a copy of your card to employees who were

6  working there, correct?

7  A.    I did not.

8  Q.    You're aware that other people working for Parking Systems

9  did that, correct?

10  A.    I do, yes.

11  Q.    Do you know who did this?

12  A.    Andrew Goldsmith and Travis Gilliland.

13  Q.    And you instructed Travis to distribute your cards, right?

14  A.    I did.

15        MR. JACKSON:  I would ask to have marked for

16  identification GC Exhibit 13.

17      (GC Exhibit 13 marked for identification)

18        MR. MILMAN:  13?

19        MR. JACKSON:  13.

20        MR. MILMAN:  Thanks.

21        THE WITNESS:  Thank you for that.

22  BY MR. JACKSON:

23  Q.    Mr. Gust, have you had a chance to at least initially

24  review the document?

25  A.    Yes.

1    Q.    Okay.  Do you recognize it?

2    A.    I do.

3    Q.    This is a text message exchange that you were involved

4    with, correct?

5    A.    Yes.

6    Q.    And who was included in this text message thread?

7    A.    So that would be Travis, Andrew, Travis Gilliland, Andrew

8    Goldsmith, Josh Candiotti, Mike Petruzzelli, and myself.

9    Q.    Who's Josh Candiotti?

10   A.    He's an employee of Parking Systems.

11   Q.    What is his position?

12   A.    Account Executive.

13   Q.    And you wrote the messages that appear in the darker

14   colored boxes?

15   A.    I am bringing cards, yes.

16   Q.    I am bringing cards?  Is that the one?

17   A.    Yes, that's me.

18   Q.    And then the one that begins, hand out the cards to

19   anyone?  You wrote that one as well?

20   A.    That is true.

21   Q.    And then this third box that appears a little bit darker

22   than the others.  This does two things for us.  One.  You wrote

23   that one too?

24   A.    That's correct.

25         MR. JACKSON:  Move to admit GC 13.

```
 1              JUDGE GREEN:  Any objection?

 2              MR. MILMAN:  No objection, Your Honor.

 3              JUDGE GREEN:  GC 13 is admitted.

 4         (Exhibit GC 13 admitted into evidence)

 5    BY MR. JACKSON:

 6    Q.   Now part of your job in November of last year, 2023, that

 7    included helping Parking Systems prepare to begin operations at

 8    Stony Brook, correct?

 9    A.   That's correct.

10    Q.   And that --

11    A.   What was that date?  I'm sorry.

12    Q.   In November?

13    A.   Yes, that's correct.

14    Q.   And in November, you were communicating with certain

15    members of the Stony Brook University management team, correct?

16    A.   Are we talking about Parking Systems management team, or

17    are we talking about Stony Brook?

18    Q.   I'm talking about Stony Brook.  Were you involved in

19    communicating with Stony Brook people at all in preparing for

20    the transition?

21    A.   During the time -- I'm fuzzy on the timeline, but I

22    certainly communicated with Stony Brook management, yeah.

23    Q.   Yeah, before, sometime before December 1 when you --

24    A.   Yes, absolutely.

25    Q.   Okay.  All right.  And in particular, you communicated
```

1  with Stony Brook managers who were involved in parking and

2  field operations, correct?

3  a.   That's correct.

4  Q.   And you're familiar with someone named Dan Akins or

5  Atkins?

6  A.   Dan Atkins, yes, I am, sir.

7  Q.   Right.  He's the Assistant Director of Parking and Field

8  Operations for Stony Brook, right?

9  A.   Yes, sir.

10 Q.   And you're familiar with someone named Nick Stefanelli?

11 A.   That's correct.

12 Q.   Who's Nick Stefanelli?

13 A.   They're sort of partners.  I don't know his exact title,

14 but we essentially report directly to them.

15 Q.   So Nick Stefanelli is also in Parking and Field Operations

16 for Stony Brook?

17 A.   Yes, sir.

18       MR. JACKSON:  I'd like to have marked for

19 identification GC Exhibit 14.

20     (Exhibit GC 14 marked for identification)

21 BY MR. JACKSON:

22 Q.   I'm presenting you with a copy that's been marked as GC

23 14.  And just to make sure you know, it's a two-sided document.

24 Okay.  Have you had a chance to at least initially review it?

25 A.   Yes, sir.

442

1  Q.   Okay.  This is an email -- well, the first email which

2  appears on the second page of the document, but first

3  chronologically, is an email that you received from Dan Atkins,

4  correct?

5  A.   Yes, that's correct.

6  Q.   Your email is BobbyGust@ParkingSystems.com, correct?

7  A.   Yes, that's correct.

8  Q.   Okay.  And agoldsmith@ParkingSystems.com, that's Andrew

9  Goldsmith?

10 A.   That's correct.

11 Q.   And mapetruzzelli@parkingsystems.com, that's Michael

12 Petruzzelli?

13 A.   Mike Petruzzelli, yes, sir.

14 Q.   And there's a cc on this particular email, Nicholas

15 Stefanelli.  That's Nick Stefanelli from the Parking and Field

16 Operations at --

17 A.   Yeah, medical and maps, but yes.

18 Q.   Medical and maps.  Okay.  Do you know what MAPS stands

19 for?

20 A.   Mobility and Parking Services.  That's actually on the

21 bottom in the -- in the signature.

22 Q.   Oh, yeah, correct.  Okay.  Now, did you have weekly Zoom

23 meetings with Nick and Dan during October or November?

24       MR. MILMAN:  Objection.  It's a compound question,

25 Nick and Dan, as if every meeting took place with Nick and Dan.

 1          MR. JACKSON:  All right.  I'll strike the question.

 2    BY MR. JACKSON:

 3    Q.   Did you have weekly meetings with either Nick or Dan

 4    during October and November?

 5    A.   I don't know when we started doing it.  This was -- this

 6    is very early on in the -- in the process.  We're looking at

 7    October.  So I don't remember exactly when we first started

 8    having the meetings.  It was -- I thought it was a little later

 9    in the process as we got closer to -- to opening time.

10    Q.   How many meetings did you have with them?

11    A.   I honestly don't, I don't know.  Once a week?  I think we

12    skipped some weeks, so.

13    Q.   And over what period of time, if you recall?

14    A.   I -- as I said, I don't remember when we first -- when we

15    first initiated the meetings.  After we started, after rollout,

16    we -- we were doing them, I think we arranged to do them on, it

17    was Tuesdays we were doing them.  But pre-opening, I just --

18    I'm sure we must have had -- had a meeting prior, but I -- I

19    just don't specifically remember.

20    Q.   So Dan asked you to have weekly meetings.  Is it your

21    recollection that you might not -- you might have rebuffed his

22    requests?

23          MR. MILMAN:  Objection, Your Honor.  This

24    mischaracterizes the documents.  It's evidence -- facts and

25    evidence assumed.  It says, he says, looking at a weekly Zoom

1    meeting.  It didn't say meetings.  It said meeting.

2              JUDGE GREEN:  I'm sorry.  Can you say the question

3    again?

4    BY MR. JACKSON:

5    Q.   Yeah.  I mean, so my question is, Dan asked for a weekly

6    Zoom meeting on October 23rd?  Do you recall if there was one

7    that happened after that?

8    A.   After October 23rd?

9    Q    Yeah.

10   A.   Yeah, for sure.  We had multiple meetings.  This is our --

11   part of this as well is, truthfully, where this came from,

12   this, it was based on us.  So Josh -- Josh, who was mentioned

13   in here, runs a lot of the hospital facilities for us, and he

14   has had a great deal of success, particularly at Mount Sinai,

15   with these weekly meetings.

16        So initially in our -- our get-together, I guess, when we

17   went to Stony Brook, that was brought up that that was

18   something that we, you know, we felt would be helpful.  And at

19   this point, I'm fairly sure Dan was just following up on what

20   we had suggested that would be a good idea.

21   Q.   And you recall that there was at least one of these weekly

22   transition meetings before December 1, correct?

23   A.   There was certainly at least one.

24   Q.   And the subject was the parking system, and plans to staff

25   the operation was discussed during at least one of these

1  meetings, correct?

2  A.   I -- I honestly don't remember.  I'm sure it was.  It was

3  -- obviously, transition is -- it was about transition.  So but

4  I just -- I -- I don't remember specifically.

5           MR. JACKSON:  I'll move for the admission of GC 14.

6           JUDGE GREEN:  Any objection?

7           MR. MILMAN:  No objection.

8           JUDGE GREEN:  GC 14 is admitted.

9       (Exhibit GC 14 admitted into evidence)

10          MR. JACKSON:  I would ask to have marked for

11  identification GC Exhibit 15.

12      (Exhibit GC 15 marked for identification)

13  BY MR. JACKSON:

14  Q.   So, Mr. Gust, this is a three-page document.  Again, two-

15  sided.  Okay.  Mr. Gust, I didn't identify this before but

16  Jbaron@parkingsystems.com.  That's Johnny Baron?

17  A.   That's correct.  That's correct, yes.

18  Q.   Okay.  And jcandiotti@parkingsystems.com, that is Josh

19  Candiotti?

20  A.   That's also correct.

21  Q.   And tgilli -- excuse me.  Gilliland,

22  tgilliland@parkingsystems.com.  That's Travis Gilliland?

23  A.   That's also correct.

24  Q.   I'm not sure if I'm pronouncing his name correctly.

25  A.   Yep.

1    Q.    But and I apologize if I'm not.

2    A.    I just call him Travis.

3    Q.    Makes it easier.  So GC Exhibit 14 contains a email from

4    Josh Candiotti to you, Andrew Goldsmith, Michael Petruzzelli

5    and Travis Gilliland, correct?

6    A.    That's correct, yes.

7    Q.    And you received this email, right?

8    A.    Yes.

9    Q.    On or about October 27, correct?

10   A.    Yes.

11          MR. JACKSON:  I move for the admission of GC Exhibit

12   15.

13          JUDGE GREEN:  Any objection?

14          MR. MILMAN:  One second, Your Honor.  No objection.

15          JUDGE GREEN:  Okay.  GC 15 is admitted.

16      (Exhibit GC 15 admitted into evidence)

17   BY MR. JACKSON:

18   Q.    You're aware that in November of 2023, Local 1102, RWDSU,

19   the union that was in place with Classic at Stony Brook --

20          MR. MILMAN:  Objection, Your Honor.  First of all,

21   Counsel is testifying on the record.  Secondly, it's a

22   confusing question.  It's asserting multiple alleged facts in

23   the question as opposed to asking the question.  It's basically

24   a narrative from counsel.  It could be misleading.

25          MR. JACKSON:  I'll withdraw the question.  I'll

1    withdraw the question.

2    BY MR. JACKSON:

3    Q.    You're aware that Classic employees had a union in place,

4    correct?

5    A.    When?  Like when is the -- obviously, I know now.

6    Q.    Oh, I see.  Oh, okay.  Are you familiar with Local 1102?

7    A.    Since the -- since this proceeding, yes.  But back then, I

8    had no idea what 1102 was.

9    Q.    When was the first time you heard about 1102?

10   A.    I think when I was asked to produce documents that

11   mentioned 1102.  So I don't know what date that was.  That was

12   -- I was given stuff from the attorneys that I needed to go

13   through, you know, emails and -- and texts, looking for 1102.

14   Q.    You mean in preparation for this hearing?

15   A.    Yes.  Yes, yes, sir.

16   Q.    Okay.  Sometime in 2024?

17   A.    Yes.  That's fair.

18   Q.    Okay.  You don't recall receiving a letter that the union

19   sent to Parking Systems, 1102 sent to Parking Systems in

20   November?

21          MR. MILMAN:  Objection, Your Honor.  This is a

22   misleading question.  And this also -- it asserts facts in

23   evidence.  In fact, this witness never received a letter from

24   the union.

25          JUDGE GREEN:  Overruled.

1  BY MR. JACKSON:

2  Q.   Do you remember receiving a letter that Local 1102 sent to

3  Parking Systems in November 2023?

4  A.   No.

5  Q.   So it's your testimony that before Parking Systems took

6  over on December 1, you didn't even know that there was a union

7  in place?

8  A.   Before December 1?  No, I didn't -- I know that -- about a

9  union prior to December 1, for sure.

10 Q.   When did you first learn about the union?

11 A.   It was sometime late in November.  I don't, a date I

12 couldn't pin, but it was in -- it was in November.

13 Q.   How'd you learn about it?

14 A.   That was -- I was on an email that was forwarded, and

15 there was an attorney's letter that mentioned a union.

16 Q.   Right.

17        MR. JACKSON:  I'd like to have marked for

18 identification GC Exhibit 16.

19    (Exhibit GC 16 marked for identification)

20 BY MR. JACKSON:

21 Q.   Okay.  Have you had a chance to look it over?

22 A.   Yes, yes, sir.

23 Q.   All right.  And so can you tell us whether you received

24 any of these -- first of all, these are -- this document

25 reflects emails, correct?

1    A.    Yes, yes.

2    Q.    Did you receive any of these emails, can you tell?

3    A.    Yes.

4    Q.    All right.  Did you receive the one from Michael

5    Petruzzelli on November 9th, 2023, at 10:39 p.m.?  Did he

6    forward you something at that time if you can recall?

7    A.    Is that what this says?  I just, at 10:39 p.m., I'm

8    sleeping.

9    Q.    Yeah, when you woke up the next day, do you remember

10   seeing it?

11   A.    Yeah, absolutely.

12   Q.    Do you remember what he forwarded you?

13   A.    I -- I don't.  I don't.  That's why I was looking.

14   Q.    Right.  So I'm presenting you with a copy of GC Exhibit 9.

15   Do you remember Michael Petruzzelli forwarding you that

16   document, GC 9?

17   A.    Yes, I -- yes.

18   Q.    That's what he forwarded to you on November 9th at that --

19   nighttime?

20   A.    Again, I don't -- can -- does it show that that's when he

21   forwarded it?  Because I --

22   Q.    I'm asking you if you read it.

23   A.    Yeah, I -- I wouldn't have seen it at night.  I probably

24   saw it the next night.

25   Q.    But you saw it at some time in your email?

1  A.    Yes.  Yeah.

2  Q.    Okay.  And I want to direct your attention to -- back to

3  GC 16, the previous document I had shown you.

4  A.    So that's not the one with the attachment.  That's this?

5  Q.    Yeah.

6  A.    All right.

7  Q.    It starts, it has the word, from Michael Petruzzelli at

8  the top?

9  A.    Got it.

10  Q.    Yeah.  Okay.  So you received an email from Josh Candiotti

11  that said, what are the next steps for us?

12  A.    Yes.

13  Q.    Okay.  And you received an email from Mr. Petruzzelli

14  saying let's set up a quick call to discuss, correct?

15  A.    That's correct.

16          MR. JACKSON:  All right.  I'll move for the admission

17  of GC 16.

18          JUDGE GREEN:  Any objection?

19          MR. MILMAN:  No objection, Your Honor.

20          JUDGE GREEN:  GC 16 is admitted.

21      (Exhibit GC 16 admitted into evidence)

22          MR. JACKSON:  I am asking to be marked for

23  identification, GC Exhibit 17.

24      (GC Exhibit 17 marked for identification)

25  BY MR. JACKSON:

1    Q.    Okay.  So this exhibit, GC Exhibit 17, they're additional

2    emails?

3    A.    Yes, sir.

4    Q.    Correct?  That you received?

5    A.    Yes, sir.

6    Q.    And it also includes an email that you sent, correct?

7    A.    Yes, sir.

8    Q.    The second page of the document, the first message that

9    appears on the page, that was a message that you wrote,

10   correct?

11   A.    On November 10th at 6:35 a.m.?

12   Q.    Yes.

13   A.    Yes, that is.

14   Q.    And you sent the message to respond to Josh Candiotti's

15   message in which he asked what are the next steps for us,

16   correct?

17   A.    That's correct.

18   Q.    And you understood that Mr. Candiotti was asking what the

19   next steps for Parking Systems should be following your receipt

20   of the attorney's letter for the union, correct?

21   A.    That's correct.

22   Q.    Were you also forwarded a copy of the collective

23   bargaining contract the union had with Classic?

24   A.    I'm assuming that that was part of it, especially reading

25   this.

1    Q.    Do you recall that?

2    A.    Yes.

3    Q.    And you had seen the contract before you wrote these

4    messages in GC 17?

5    A.    Yes.

6    Q.    Did you have a meeting with Mr. Candiotti and

7    Mr. Petruzzelli later on November 10th after you sent this

8    message?

9    A.    I -- I'm assuming -- I would say yes.  Yes.

10   Q.    Was it a Teams meeting?

11   A.    It would have been virtual for sure, especially at 6:30 in

12   the morning.

13   Q.    And during the meeting, you discussed the letter you had

14   received from the union's attorney?

15   A.    Yes.

16          MR. JACKSON:  I move for the admission of GC 17.

17          JUDGE GREEN:  Any objection?

18          MR. MILMAN:  No objection, Your Honor.

19          JUDGE GREEN:  GC 17 is admitted.

20       (Exhibit GC 17 admitted into evidence)

21   BY MR. JACKSON:

22   Q.    Mr. Gust, it's true that Parking Systems received intake

23   forms from Classic Valet employees who were working at Stony

24   Brook?

25   A.    Yes.

1  Q.   Yes.  And you received those during November of 2023,

2  correct?

3  A.   Yes.

4  Q.   And you received the intake forms via the QR code system

5  that was on the back of your card, correct?

6  A.   Yes.

7  Q.   All right.

8       MR. ROCCO:  Your Honor, before we go into this

9  document, would you mind if we just took a five-minute bathroom

10 recess?

11      JUDGE GREEN:  Off the record.

12      So when we go off the record, you know, you can walk

13 around, do whatever you want.

14      THE WITNESS:  Okay.

15      JUDGE GREEN:  Just don't talk about anything.  Other

16 than that, that's fine.

17      MR. MILMAN:  Thank you, Your Honor.

18      So, legal off the record, you know, you will receive

19 the intake.  Okay.  Just don't talk about it.

20  (Brief recess taken at 11:33 a.m.; Reconvened at 11:47

21 a.m.)

22      JUDGE GREEN:  Back on the record.

23      MR. JACKSON:  I'd like to have marked for

24 identification, GC Exhibit 18.

25  (Exhibit GC 18 marked for identification)

```
1   BY MR. JACKSON:
2   Q.   Mr. Gust, if you could just briefly flip through the
3   document.  It's -- I haven't thought to count them but it's a
4   pretty large stack of pages.  Do you recognize it?
5   A.   Yes, I do.
6   Q.   Okay.  Each of these pages in this exhibit reflect a email
7   you had received, notifying you of an intake form submission,
8   correct?
9   A.   Correct.
10  Q.   And the document, each page reflects an email that you
11  received, right?
12  A.   More or less.  Some of them look like --
13  Q.   Yeah, some of them are two pages.  Correct.  But yeah,
14  they're each part of an email you received, right?
15  A.   Yes.
16  Q.   Okay.  And the date you received them is accurate?  What
17  you recollected?
18  A.   It looks correct.
19  Q.   Okay.  And can you confirm that the exhibit contains
20  information submitted by individuals who used the QR code on
21  the back of your card?
22  A.   Yes, I can.
23          MR. JACKSON:  I move to admit GC 18.
24          JUDGE GREEN:  Any objection?
25          MR. MILMAN:  One second, Your Honor, please.  I just
```

1  have one question, Your Honor, on this.

2                          VOIR DIRE

3  BY MR. MILMAN:

4  Q.   Mr. Gust, did you create that subject matter line that

5  says, new form?  In the subject --

6  A.   Yeah, I see it.  No, I think that that's electronic.  Why

7  does it look different?  It's weird.

8  Q.   Is it your recollection of that new form represent what

9  this document is?

10 A.   Yes.

11          MR. MILMAN:  Okay.  No objection.

12          THE WITNESS:  New form.  It's weird.

13          JUDGE GREEN:  Okay.  So, GC 18 is admitted.

14      (Exhibit GC 18 admitted into evidence)

15          MR. MILMAN:  Thank you, Your Honor.

16                  DIRECT EXAMINATION CONTINUED

17 BY MR. JACKSON:

18 Q.   Mr. Gust, is it true that before you started running the

19 operation at Stony Brook on December 1, Parking Systems had

20 interviewed only one Classic Valet employee for a job?

21 A.   Before December 1?

22 Q.   Correct.

23 A.   That's correct.

24 Q.   And that one employee was Francis Gil Reyes, correct?

25 A.   That is also correct.

1    Q.    You recall that Johnny Baron and Josh Candiotti gave you

2    permission to hire Francis before you interviewed her, correct?

3             MR. MILMAN:  Objection, Your Honor.  That's facts

4    assumed in evidence.  There's been no testimony -- I know it's

5    -- he can treat this witness as an adversarial witness but it's

6    misleading and it creates an inaccurate record.

7             JUDGE GREEN:  Overruled.

8    BY MR. JACKSON:

9    Q.  I'll repeat the question.  Do you recall that Johnny Baron

10   and Josh Candiotti gave you permission to hire Francis before

11   you interviewed her.  Is that correct?

12   A.    That is not correct.

13            MR. JACKSON:  I'd like to make for identification GC

14   Exhibit 19, which I'm showing to the witness.

15       (Exhibit GC 19 marked for identification)

16   BY MR. JACKSON:

17   Q.    Okay.  Mr. Gust, GC Exhibit 19 reflects text messages,

18   correct?

19   A.    Correct.

20   Q.    And you received these, is that right?

21   A.    Yes, I did.

22   Q.    Okay.  And this is a text message exchange between you,

23   Josh Candiotti and Michael Petruzzelli, correct?

24   A.    From -- from this, I can't tell who was on it, but

25   certainly those three were on it, yeah.

1    Q.    There might have been more?

2    A.    Yeah, there might have been more.

3    Q.    And you received these texts on November 19, correct?

4    A.    Yes, that's correct.

5              MR. JACKSON:  I move for the admission of GC 19.

6              JUDGE GREEN:  Any objection?

7              MR. MILMAN:  Relevance.

8              JUDGE GREEN:  Overruled.  So GC 19 is admitted.

9        (Exhibit GC 19 admitted into evidence)

10   BY MR. JACKSON:

11   Q.    Okay.  You got an intake form from Francis Gil Reyes via

12   the QR code, correct?

13   A.    Yes.

14   Q.    And when you received Ms. Gil Reyes' application --

15             MR. MILMAN:  Objection, Your Honor.

16             MR. JACKSON:  Excuse me.  I'll withdraw.

17   BY MR. JACKSON:

18   Q.    When you received --

19             JUDGE GREEN:  Are we concerned about calling these

20   forms or applications?

21             MR. MILMAN:  Yes.  Yes.

22             JUDGE GREEN:  Okay.  So I don't care how you -- you

23   can call it forms.  You can call it I don't care.  I'm going to

24   consider it for what it is.

25             MR. MILMAN:  Okay.  Fair enough, Your Honor.  Fair

```
 1   enough.

 2           MR. JACKSON:  I'm trying to --

 3           MR. MILMAN:  But, Your Honor, I only make the

 4   statement -- sorry, is because from this point today until Your

 5   Honor is reading the post-trial briefs, there's many months

 6   that are going to go by.  And I just want to make sure the

 7   accurate (sic) is correct and accurate.  From our point of

 8   view, in our theory of the case.

 9           JUDGE GREEN:  Right.  I understand.  You object to

10   these -- you do not -- you're taking the position that these

11   are not applications.

12           MR. MILMAN:  They are not applications.  They're not

13   Parking Systems applications, for sure.

14           JUDGE GREEN:  I got it.

15   BY MR. JACKSON:

16   Q.   Ask you a slightly different question.  Before December 1

17   of 2023, did you receive any applications from Classic Valet

18   employees?

19   A.   Before December 1?

20   Q.   Yeah.

21   A.   Yes.

22   Q.   Okay.  Who did you receive them from?

23   A.   I received intake forms.  It --

24   Q.   Right.

25   A.   Right, okay.
```

1    Q.    I'm talking about applications as you're referring to

2    them.

3    A.    It -- well, an application -- our application has 8 pages.

4    So, I absolutely did not get any applications in that -- in

5    that sense of the -- if that's what we're talking about.

6    Q.    Yes, that was --

7    A.    Okay.  Yeah, no.  This is, I mean, for clarity's sake, the

8    -- this is all the information I need to enter into our Paychex

9    system to then get an application to a candidate.  At the -- by

10   the time they receive an application, they've been given a job

11   offer.  So, this is not -- getting this is simply a contact

12   form.

13         This is the ability -- this gives me the ability to

14   recognize an individual.  And then, after an interview, if we

15   decide we're going to offer them a position, then I can use all

16   this information or whoever else is dealing with this, to enter

17   it into Paycheck to then get them an application to then go on.

18   I mean, this is -- do all that stuff, I-9s and all that stuff.

19              JUDGE GREEN:  When you're referring to this, you're

20   referring to the --

21              THE WITNESS:  So, yes.  Yes.  Yes.  Yes, Your Honor.

22   Sorry.  I forget.

23   BY MR. JACKSON:

24   Q.    Do you consider the QR submission a short-form

25   application?

1    A.   It -- it's just semantics.  It is essentially a contact

2    form.

3    Q.   Okay.  So when you received a contact form submitted by

4    Francis Gil Reyes, you recall that you forwarded her intake

5    form to others inside Parking Systems, correct?

6    A.   Yes, I was -- so, this is a busy time.  So there was a

7    great deal going on.  I actually wasn't doing the majority of

8    the interviews because I was busy with other stuff.  I was

9    forwarding because this is -- I get these not just -- this

10   isn't specific to Stony Brook.  So, there might be other -- I'm

11   hiring other people for other things.  So any that I saw were

12   in that region, I was forwarding them to, I'm -- I'm sure

13   Travis.  I'm sure, Andrew.  Maybe Michael and Josh might have

14   been on that, too, so.

15   Q.   Your testimony is that you forwarded each to Josh --

16   forwarded to -- or someone else --

17   A.   I'm not 100 percent -

18   Q.   -- each time you received one of these intake forms?

19   A.   I'm not 100 percent sure exactly who I forwarded them to.

20   I -- I'm sure that it would have been Travis and Andrew because

21   they were on site for most of this.  There may have been other

22   people cc'd on that.

23        You're talking about managing emails, right?  So, I would

24   imagine it as they came in that I would forward them, and I

25   know I forwarded some of them.  Can I say 100 percent certain

1    that I forwarded every single one?  No, I certainly can't.

2              MR. JACKSON:  I'd like to have marked for

3    identification GC Exhibit 20.

4         (Exhibit GC 20 marked for identification)

5    BY MR. JACKSON:

6    Q.  Mr. Gust, this is a email that you sent on November 20th,

7    2023, correct?

8    A.   Correct.

9    Q.  And you sent this email to Andrew Goldsmith, Travis and

10   Michael Petruzzelli as well as Josh Candiotti, correct?

11   A.   Correct.

12   Q.   And you forwarded them the intake submission you had

13   received from Francis Gil Reyes, right?

14   A.   Also correct.

15              MR. JACKSON:  I move to admit GC 20.

16              MR. MILMAN:  No objection.

17              JUDGE GREEN:  GC 20 is admitted.

18        (Exhibit GC 20 admitted into evidence)

19   BY MR. JACKSON:

20   Q.   After you sent that email, you called Francis to request

21   an interview, correct?

22   A.   I don't know if it matters.  I don't know if I called or I

23   texted.  I definitely contacted her, yes.

24   Q.   Okay.  And you told her you would like to meet her at

25   Jake's 58 Hotel and Casino, correct?

1    A.    That's correct.

2    Q.    And in November of 2023, Parking Systems was operating the

3    parking services at Jake's 58, correct?

4    A.    That's also correct.  Yes, sir.

5    Q.    Are you still operating at Jake's 58?

6    A.    Yes, we are.

7    Q.    Do you recall how long after you sent the email to Andrew,

8    Travis, Michael, and Josh, that you reached out to Francis to

9    request the interview?

10    A.    I -- I don't.

11    Q.    Did Francis agree to meet with you?

12    A.    Yes, she did.

13    Q.    And she agreed to meet at Jake's 58, correct?

14    A.    She did.

15    Q.    And you interviewed Francis on November 25th, correct?

16    A.    Yes, I did.

17    Q.    And the interview took place at Jake's 58, correct?

18    A.    It did.

19    Q.    And it was inside the casino?

20    A.    It was.

21    Q.    Do you remember sitting down at a table in front of a

22    cafe?

23    A.    Yes, I do.

24    Q.    And you met with Francis along with two other Parking

25    Systems representatives, correct?

1    A.    I did.

2    Q.    Josh Candiotti was one of them, right?

3    A.    That's correct.

4    Q.    And Travis Gilliand was the other, right?

5    A.    That's correct, yes.

6    Q.    You're aware that a Classic employee in November of 2023

7    sent a text message to Michael Petruzzelli asking about hiring?

8    A.    I mean, I know there was a text message sent.  I don't

9    know if it was to Michael Petruzzelli.

10    Q.    Okay.

11    A.    But I -- I recall, yes.

12    Q.    You recall seeing a text message from one of the Classic

13    employees about hiring?

14    A.    Yes.

15          MR. JACKSON:  I'd like to show the witness GC Exhibit

16    5 so if I could get a moment to get it.

17          THE WITNESS:  Can I ask a ridiculous, quick question

18    off-the-record question?  Am I allowed to do that?

19          MR. MILMAN:  Bobby, you can't.  I'm sure it's all

20    honest and good intentions.

21          MR. MILMAN:  Okay.

22          MR. MILMAN:  But there's rules especially --

23          THE WITNESS:  I'm not -- I have --

24          MR. JACKSON:  The judge rules --

25          THE WITNESS:  I just -- okay.  I'm just not sure

```
 1   about -- all right.
 2          MR. JACKSON:  Your Honor, I don't have a paper copy
 3   of GC 5.
 4          JUDGE GREEN:  I don't know if anyone does in the
 5   room.
 6          JUDGE GREEN:  Here, I have one.
 7          MR. JACKSON:  Can you show it to the witness, please,
 8   Your Honor?
 9          THE WITNESS:  Yes.
10          MR. JACKSON:  Okay.
11          THE WITNESS:  Yeah, I've seen that.
12   BY MR. JACKSON:
13   Q.   This is the text message that you were -- became aware of?
14   A.   Yes.
15   Q.   Okay.  Do you recognize that number?  (631) 514-9243?  Off
16   of the top of your head?
17   A.   Yeah.
18   Q.   Okay.
19          JUDGE GREEN:  So that's a no?
20          THE WITNESS:  That's a no.  Sorry.
21   BY MR. JACKSON:
22   Q.   All right.  Thank you.  I don't have any further questions
23   about this particular document.
24       (Pause)
25          MR. JACKSON:  I'd like to have marked for
```

```
 1   identification, GC Exhibit 21.
 2        (Exhibit GC 21 marked for identification)
 3             MR. MILMAN:  Thank you.
 4   BY MR. JACKSON:
 5   Q.   So, Mr. Gust, this is a four-page document, again, double-
 6   sided.  Okay.  This document reflects emails that you received,
 7   correct?
 8   A.   Correct.
 9   Q.   And you received these emails on November 21, correct?
10   A.   Yes, that's correct.
11   Q.   So the first email that appears in the thread, if you go
12   to the third page towards the bottom, it was a message sent
13   November 21.  It states at 4:30 p.m.  Do you see that
14   particular email?
15   A.   Yes.
16   Q.   That was an email in which Michael Petruzzelli forwarded
17   you the text of a message he had received from one of the
18   Classic employees.  Is that right?
19   A.   No.
20   Q.   No?
21   A.   It -- it appears that way, but I'm fairly sure that he
22   wouldn't have received that text.  That is probably -- probably
23   was given to him by one of the others.
24   Q.   Okay.
25   A.   That would be my guess.
```

1    Q.    I don't want you to guess.

2    A.    Somebody wouldn't text Mike.  They wouldn't text Mike.

3    Q.    You don't know.  If you don't know, just tell us you don't

4    know, but is -- well, let me ask you a different question.  Is

5    this email from Mr. Petruzzelli, is that the first time you

6    learned about this text from a Classic employee or this message

7    from a Classic employee?

8    A.    I've seen that text before.  I don't know if it was

9    through this email or I saw it through a text.

10   Q.    Okay.

11   A.    But I've definitely seen that text before.

12           MR. JACKSON:  I'd like to have marked for

13   identification GC Exhibit 22.

14       (Exhibit GC 22 marked for identification)

15           MR. MILMAN:  Are you moving 21?

16           MR. JACKSON:  Yeah.

17           MR. MILMAN:  Yeah, okay.

18   BY MR. JACKSON:

19   Q.    Is the GC 22 that I just presented to you, these are the

20   text exchange you had with Andrew Goldsmith, correct?

21   A.    Correct.

22   Q.    Okay.  And do you recall approximately -- well, actually,

23   no.  Strike that.  You received this.  This text exchange

24   happened on November 21st, correct?  On or about?

25           MR. MILMAN:  Which one?

467

1    BY MR. JACKSON:

2    Q.    Okay.  It's hard to tell from the document but I'm

3    focusing particularly on the one that begins, "Good afternoon,"

4    and then going down from there.  Do you recall whether you

5    received that on or about November 21?

6    A.    Given the two documents, I would say yes.

7    Q.    Okay.  Is the text from Andrew how you learned about the

8    message that a Classic employee had sent to Parking Systems?

9    A.    I'm not sure which one came first, if it was through

10   the -- through the email, through Michael, or through the text,

11   but.

12   Q.    Okay.  And so the messages that begin, "This is a good

13   way," and then right below that, "You might want to remove

14   Jim."  Those are messages that you sent?

15   A.    Yes.

16   Q.    Okay.  And the other messages that appear on this document

17   were sent by Andrew?

18   A.    Yes.

19   Q.    You referenced in one of your texts someone named Jim.

20   Who's Jim?

21   A.    That's an employee that works at -- he worked for me at

22   Peconic.  He actually works at Stony Brook now.

23   Q.    What position?

24   A.    Depending on the date of this.  What was the date of this

25   again?

1    Q.    Well, --

2    A.    On November 21st, he would have been at Peconic right

3    then.

4    Q.    Okay.

5    A.    As a -- as a parking attendant, as a valet.

6    Q.    And why did you want Jim removed from the text?

7    A.    Well, it wasn't -- it wasn't germane to what we were

8    talking about.  He didn't need to be part of that conversation.

9    Q.    Do you recall who else was part of this group text if

10   there was anyone aside from you, Andrew, and Jim?

11   A.    I think it was just myself and Andrew and Jim.

12          MR. JACKSON:  Okay.  I'll move for the first -- the

13   admission of GC 21.

14          JUDGE GREEN:   Any objection?

15          MR. MILMAN:  One second, Your Honor.  No objection to

16   21.

17          JUDGE GREEN:  GC 21 is admitted.

18       (Exhibit GC 21 admitted into evidence)

19          MR. JACKSON:  And I'll also move for the admission of

20   GC 22.

21          MR. MILMAN:  Objection.

22          JUDGE GREEN:   What's the objection?

23          MR. MILMAN:  I don't understand how it's relevant

24   that Andrew Goldsmith's wife is going to be away for the

25   weekend.  I don't honestly see how that's relevant.

1          MR. JACKSON:  That's not --

2          MR. MILMAN:  And I don't see how relevant it is that

3  a colleague, Jim, is being asked to be removed from the email

4  (sic) chain.

5          JUDGE GREEN:  Okay.  I'm overruling that objection.

6          MR. MILMAN:  Thank you, Your Honor.

7          JUDGE GREEN:  So GC 22 is admitted.

8      (Exhibit GC 22 admitted into evidence)

9  BY MR. JACKSON:

10 Q.   I'd like to just call your attention to GC 21 once again.

11 It's the one that begins with the email dated November --

12 A.   The emails?

13 Q.   Yes.

14 A.   Okay.

15 Q.   The second page of the document, is it -- well, it begins

16 on the first page and continues on to the second page.  That's

17 an email from Michael Petruzzelli that you received, correct?

18 A.    It's the one that starts, from Michael Petruzzelli,

19 November 21st, 2023?

20 Q.   At 6:08 p.m.

21 A.   Yes.

22 Q.   Okay.  So in that email, Mr. Petruzzelli is referring to

23 the business card that we see and it has the QR code on it?

24 A.   Yes, he is.

25 Q.   And he says, "We gave out some of those cards."  He's

1    referring to Travis giving them out?

2    A.    It would have been Travis or Andrew.  Either one of them.

3    Q.    Right.

4    A.    Probably both.

5    Q.    Okay.  And he references a talk that you all had on

6    Friday, November 17th.  Do you remember that?

7    A.    Where?  Where -- where is that?

8    Q.    So, Michael wrote "We gave out some cards with Q scans

9    before we all talked last Friday on November 21."

10   A.    Okay.

11   Q.    So, that would be Friday, November 17th, right?

12   A.    Is that -- that would have been the Friday?

13   Q.    I mean, I'm - well, I'm asking.  Do you recall meeting

14   with them about the Stony Brook account?

15   A.    We --

16   Q.    On November 17th?

17   A.    Not specifically about Stony Brook.  We meet all the time.

18   It's --

19   Q.    I understand.  Okay.  All right.

20           MR. JACKSON:  I'll ask to have marked for

21   identification GC Exhibit 23.

22       (Exhibit GC 23 marked for identification)

23           THE WITNESS:  Thank you, sir.

24   BY MR. JACKSON:

25   Q.    Mr. Gust, do you recognize the document?

1   A.    It's a text exchange.

2   Q.    Were you involved in this text exchange?

3   A.    I don't remember it.

4   Q.    Okay.  Can you tell who was involved in this text

5   exchange?  Do you have any recollection?

6   A.    From the context of it, I -- I'm not sure.

7   Q.    Are you the -- do you know what a custodian of records is?

8   A.    It was explained to me.

9   Q.    Okay.  Are you the custodian of records for Parking

10  Systems?

11  A    Yes, I am.

12  Q.    In terms of this case?

13  A.    Yes, I am.

14  Q.    Okay.  Can you tell us whose cell phones were searched in

15  connection with retrieving documents?

16  A.    So what I did was I reached out to Travis, Andrew, Josh,

17  Michael Petruzzelli, Johnny, and Mark, and I told them that any

18  text related, and we had a list of keywords, so any text, what

19  I needed them to do was go through their texts and through

20  their emails, run searches, okay?  Anything that came up that

21  was a hit with those searches that I -- I wasn't also included

22  on, I needed them to forward that over to the attorneys.

23  Q.    So this message could have been from any one of their

24  phones?

25  A.    Yes.

1  Q.   Okay.  Are you familiar with the staffing levels that

2  Parking Systems maintained at Stony Brook in late December?

3  A.   Yes.

4  Q.   Is it true that Parking Systems was actively seeking new

5  employees to work at Stony Brook at that time?

6  A.   To work at Stony -- to work for Parking Systems, for sure.

7  Q.   Yeah, and to station them at Stony Brook?

8  A.   They would, sure, be stationed at Stony Brook.

9  Q.   And is it also true that Parking Systems had been playing

10 -- paying employees who worked at Stony Brook for more overtime

11 hours than the company had wanted?

12 A.   Yes.

13 Q.   And that was because you were short on staff?

14          MR. MILMAN:  Objection.

15          JUDGE GREEN:  Overruled.

16          THE WITNESS:  No.  The - the issue was -- so when

17 you're rolling out a new place, okay, you're not so much

18 concerned with, say, you know, your expenditures.  Obviously,

19 you're always concerned with expenditures.  But you -- you're

20 willing to invest the additional money that becomes necessary.

21 But at some point, you have to be conscious of it and start

22 cutting back.

23      So, I mean, this is common to everything we open.  We

24 realize that when you're, you know, you're opening and you're

25 under a lot of pressure.  You're kind of in the honeymoon

1  phase, right?  So you're going to be spending additional money.

2  Q.   All right.  Now, do you know, as the custodian of records,

3  do you know whether or not any documents were withheld from --

4           MR. MILMAN:  Objection, Your Honor.

5           JUDGE GREEN:  What's the objection?

6           MR. MILMAN:  Well, okay.  First, there is a --

7  anything that was relevant to attorney-client communication was

8  withheld.

9           JUDGE GREEN:  Okay.

10           MR. MILMAN:  So but the kind of question of, as the

11  custodian of records, almost sounds like a baiting question,

12  Your Honor.  I just want to make it clear that us, the law firm

13  representing the Employer Respondent, instructed the custodian

14  of records, Mr. Bobby Gust, to do exactly what he had

15  testified.  Any documents that were further, I actually saw one

16  that LinkedIn where it was referred to attorney, but can't pull

17  it back once it's done, and it was kind of inadvertently

18  between two texts.  But any document that had to do with

19  attorney-client communication or attorney work product, where

20  the lawyers were mentioned in the correspondence, those were

21  withheld.

22           So, aside from that, nothing else was withheld, but I

23  don't want the witness to get confused in attorney work product

24  or attorney-client communication jargon, I would say, Your

25  Honor, so.

1      JUDGE GREEN:  Okay.  Yeah, I don't think there was

2  anything objectionable about the question.

3      MR. MILMAN:  I just want to make sure that --

4      JUDGE GREEN:  He only got halfway through it.

5      MR. MILMAN:  I just wanted to make sure it just

6  didn't infringe upon that, and as custodian of documents, one

7  would not know the intricacies of attorney-client communication

8  and work.

9      MR. JACKSON:  So, Mr. Milman, I did not see in your

10  production, a privilege log.  So this is kind of the first I'm

11  hearing that some documents were withheld, so.

12      MR. MILMAN:  You don't have to get a privilege log on

13  documents that, communication that references my firm and that

14  my firm makes directions.

15      MR. JACKSON:  Your Honor --

16      MR. MILMAN:  You don't understand --

17      MR. JACKSON:  I request that Respondent be ordered to

18  produce a privilege log.

19      JUDGE GREEN:  Okay.  So does the subpoena, I assume,

20  included the standard request for a privilege log and it's

21  anticipated?

22      MR. JACKSON:  And I can move it into evidence if

23  that's helpful, Your Honor.

24      JUDGE GREEN:  So you didn't ever -- you didn't make

25  any attempt to provide a privilege log?

```
1              MR. MILMAN:  No.

2              JUDGE GREEN:  To prepare or provide a privilege log?

3              MR. MILMAN:  No.  No, we didn't, Your Honor.

4              JUDGE GREEN:  But you have documents which were

5    withheld?

6              MR. MILMAN:  Yeah, that are from our firm and

7    documents where my firm specifically suggests or documents

8    where an owner would say, Milman told us we need to get this or

9    we need, you know, or this is a strategy.  There -- you've got

10   to understand something, Your Honor.

11             The charge in this case was filed in November.  All

12   right?  So, an unfair labor practice charge was filed in

13   November.  A lot of communication in November is attorney-

14   client communication.

15             JUDGE GREEN:  Okay.  But the problem is a privilege

16   log was required.  It is required.

17             MR. MILMAN:  I'll be sure to blame Mr. Mauro for that

18   one.  No, Your Honor, it was inadvertent and I'm being

19   facetious.

20             JUDGE GREEN:  Okay.  Well --

21             MR. MILMAN:  I was being facetious.  The issue was

22   the reason why we didn't do a privilege log is that any

23   document that we weeded out, specifically referenced our firm

24   or had us on the email.  So I don't think we're obligated to

25   produce any document where we send it to the client in response
```

1    to an unfair labor practice, Your Honor.

2              JUDGE GREEN:  You're not required to produce

3    privilege.  Excuse me.  You're not required to produce

4    privileged materials.  And I'm, you know, I don't think that

5    the subpoena calls for the production of privilege materials.

6    The subpoena calls for the production of a privilege log,

7    essentially.  I don't have the subpoena in front of me but

8    generally there's a --

9              MR. MILMAN:  Nor do I.  Nor do I.

10             JUDGE GREEN:  There's a provision in the --

11             MR. MILMAN:  The point is, Your Honor, you've got to

12   understand that in November, let's say the investigation

13   started actually November, early or December.  At that point,

14   and we've produced documents all the way up through June, all

15   right, that weren't directed either by my firm or mentioned my

16   firm.  No one says we have to do this, or Norman Labuda says we

17   do or Mr. Mauro or whatever the case is.  Those -- the

18   documents that we pulled were directly related in responding to

19   a charge, NLRB charge.  I don't think we have to put a

20   privilege log because we included clients in those email

21   changes because I'm responding to them --

22             JUDGE GREEN:  So I'm going to just stop you because I

23   believe I issued an order directing the Respondents to produce

24   a privilege log before the hearing.

25             MR. MILMAN:  I don't recall that, Your Honor.  I

1  apologize.  I don't recall that.

2        JUDGE GREEN:  It was the day before the hearing

3  because we had that unusual situation.  There was some --

4        MR. MILMAN:  Then I --

5        JUDGE GREEN:  -- confusion regarding that.

6        MR. MILMAN:  Then I definitely didn't see that day

7  because I was in preparation that whole day.

8        JUDGE GREEN:  Okay.  So we need a privilege log.

9        MR. MILMAN:  Okay.  Well, with that said, Your Honor,

10  I'll just answer for direction on your privilege log.  So in

11  other words, the substance of some of the subpoenaed questions

12  were any dialogue concerning hiring at Stony Brook.  Well,

13  there was issues after the charge that emails go back and forth

14  on certain issues, such as legal criteria going into

15  successorship status.  I mean, I don't see -- that is

16  responsive to an unfair labor practice charge, not necessarily

17  related to vis-a-vis staffing, for example.

18        But if Your Honor would like, we'll give you -- we'll

19  produce an entire privilege log.  If that's what you like,

20  including all documents concerning responding to this

21  litigation.  If that's what Your Honor would like, we'll

22  produce it.  I just have never done that to that extent.

23        JUDGE GREEN:  Any -- okay.  Yeah, any documents that

24  were withheld on the grounds of privilege need to go in a

25  privilege log within, you know, it's described in the subpoena

1    but --

2            MR. MILMAN:  That's not a problem.  That's not a

3    problem.

4            JUDGE GREEN:  You know, I believe it's Federal Rule

5    of Civil Procedure Rule 26.

6            MR. MILMAN:  Any documents that were withheld either

7    stated direction by our firm or was correspondence from my firm

8    or to my firm.  So that won't be a problem.

9            JUDGE GREEN:  Okay.

10           MR. JACKSON:  Just for the record, I'm going to have

11   marked for identification GC Exhibit 24.

12       (Exhibit GC 24 marked for identification)

13           MR. JACKSON: I represent that this is a subpoena that

14   had been served before the hearing on the custodian of records

15   for Parking Systems Plus, Inc.  It's become relevant in the

16   hearing, so I'll move for its submission.

17           JUDGE GREEN:  Any objection?

18           MR. MILMAN:  I didn't hear what he said honestly.  I

19   couldn't hear a word he said at the end.

20           MR. JACKSON:  I said it was -- I represent that this

21   is the subpoena duces tecum that Counsel for the General

22   Counsel served on the custodian of records for Parking Systems

23   Plus, Inc. prior to the opening of the hearing in this case.

24   It has become relevant in the hearing, so I'm moving for its

25   submission.

```
 1              MR. MILMAN:  How do you -- objection.  What part of
 2    this subpoena became relevant to the hearing?
 3              MR. JACKSON:  We've been discussing it on the record
 4    at length for the past 10 minutes.
 5              MR. MILMAN:  Well, we haven't discussed it at length.
 6              JUDGE GREEN:  Okay.  So I agree that it's relevant,
 7    so is there any objection, other than relevance?
 8              MR. MILMAN:  I need to look, Your Honor.
 9         (Pause)
10              MR. MILMAN:  I would say, Your Honor, no objection.
11              JUDGE GREEN:  Okay.  So GC 24 is admitted.
12         (Exhibit GC 24 admitted into evidence)
13              MR. JACKSON:  I have no further questions for
14    Mr. Gust.
15              JUDGE GREEN:  Okay.  So do you have any questions?
16              MR. MILMAN:  Yeah, a couple.
17              JUDGE GREEN:  At this time?
18              MR. MILMAN:  Just a couple.  I'd like the witness to
19    see the formal record, please, the complaint and answer of the
20    formal record.  I have copies of -- if, Your Honor, if it's
21    easier, I could approach the bench with --
22              JUDGE GREEN:  Okay..
23                            CROSS-EXAMINATION
24    BY MR. MILMAN:
25    Q.   Mr. Gust, good afternoon.
```

480

1          MR. JACKSON:  Your Honor, I just -- Mr. Rocco took --

2    just notified me that he had some questions for Mr. Gust.

3          MR. MILMAN:  I'm sorry.

4          MR. JACKSON:  I just wanted to know how procedurally,

5    you wanted to work it.

6          JUDGE GREEN:  I didn't -- I'm sorry.  Yeah, I

7    thought --

8          MR. MILMAN:  Yeah.  I can tell you he's never

9    testified in an NLRB hearing before.

10         JUDGE GREEN:  Okay.  So if the union has questions,

11   you can go.  I'm sorry.

12         MR. ROCCO:  Yeah.  I'm sorry.  Could I just have two

13   or three minutes just to get some documents in order?

14         JUDGE GREEN:  Okay.  So --

15         MR. ROCCO:  -- that are in the record already?

16         JUDGE GREEN:  Off the record.

17      (Brief recess taken at 12:32 p.m.; Reconvened at 12:34

18   p.m.)

19         JUDGE GREEN:  On the record.

20

21                    CROSS-EXAMINATION

22   BY MR. ROCCO:

23   Q.   All right.  Good afternoon, Mr. Gust.  I'm just going to

24   ask you a few questions.  Mr. Gust, you testified that you've

25   been working with Parking Systems since 1987?

1   A.    That's correct.

2   Q.    And you're currently a part owner of the company?

3   A.    That's correct.

4   Q.    And you're the person that Parking Systems is primarily

5   responsible for hiring staff at the various locations you're

6   assigned to service?

7   A.    Our model isn't really that way.  We -- we essentially --

8   so you'll have what we would describe as account executives,

9   and each account executive is responsible for hiring a staff

10  that -- and within that staff, they use that staff to fill the

11  roles required of the accounts that they service.  So each

12  account executive does their own interviews.

13  Q.    And those account executives, they report to you?

14              MR. JACKSON:  Objection.

15              JUDGE GREEN:  Overruled.

16              THE WITNESS:  No.

17  MR. ROCCO:

18  Q.    They don't report to you?

19  A.    No.

20  Q.    They report to whom?

21  A.    It would depend on where they are geographically.

22  Q.    So within the corporate hierarchy, within the corporate

23  structure, you are -- you're above those account executives on

24  the corporate system -- structure, right?

25  a.    Earlier, I tried to explain this to you.  It's kind of a

1    flat management structure.  It depends on -- I have -- I

2    started in 1987, so therefore, by virtue of how long I've been

3    working, I have certain seniority, I guess you would describe

4    it as.  In some roles, you know, I'm equivalent.  In others, I

5    would say I'm probably a superior.

6    Q.   And those account executives, they only handle the one

7    location for the account to which they are assigned, right?

8    A.   No, they would handle multiple locations.

9    Q.   But it's specific to an account?

10   A.   I'm not following you.

11   Q.   So if there's multiple locations within one account, they

12   handle all the locations for that account?

13   A.   Well, an account executive -- yeah, well, an account

14   executive oversees multiple -- when I say locations, I mean,

15   you know, like, as an example, Jake's 58, Stony Brook

16   University, MatHer Hospital.  So you have one person that

17   oversees both.  Of course, if they oversee a particular

18   location, the subset of those that they would oversee as well,

19   yes.

20   Q.   And part of your job is not only as a part owner, but

21   you're also a recruitment specialist?

22   A.   Yeah, I assist -- I assist in -- in that regard, for sure.

23   Q.   And the business card you give out to the public says

24   recruitment specialist?

25   A.   It does.

1    Q.   And as a part owner and somebody that's been with the

2    company since 1987, you assist the company in making bids for

3    new contracts, right?

4    A.   I do not.

5    Q.   You don't.  So you have no knowledge of the bid that went

6    into the parking account for Stony Brook University Hospital?

7    A.   I did have knowledge of it, yes.

8    Q.   But you weren't involved in the bidding process?

9    A.   The actual formulation of the bid, no.

10   Q.   Okay.  And you're aware that Stony Brook University

11   Hospital, that's a public entity?

12            MR. MILMAN:  Objection.  Relevance.

13            JUDGE GREEN:  What's the relevance?

14            MR. ROCCO:  I'll get to the relevance in my next

15   question.  The relevance is that Stony Brook University

16   Hospital is required by law to accept the lowest bid.

17            JUDGE GREEN:  Okay.  Okay.  Overruled.

18   BY MR. ROCCO:

19   Q.   Are you aware as to -- are you aware that Stony Brook

20   University Hospital is a public entity?

21            MR. MILMAN:  Objection.  Same objection.

22            JUDGE GREEN:  Overruled.

23            THE WITNESS:  I -- there -- it's a state-owned

24   facility.  Is that what you mean by that?  Yes.

25   BY MR. ROCCO:

484

1    Q.    It's run and operated by the state.

2    A.    Yes.

3    Q.    And are you aware that any entity run and operated by the

4    state, they're required to accept the bidder who bids the

5    lowest amount, who meets the other qualifications?

6    A.    I don't.  I don't get involved in that.

7    Q.    So as a part owner of Parking Systems, you don't -- are

8    you aware as to whether the bid that was put on for Stony Brook

9    Medical Center, whether they're required by law to accept your

10   bid?

11          MR. MILMAN:  Asked and answered..  Same question,

12   asked a little bit differently.

13          JUDGE GREEN:  Yeah.  Sustained.

14   BY MR. ROCCO:

15   Q.    And to your knowledge, was Parking System the lowest

16   bidder for the Stony Brook University Hospital account?

17   A.    I mean, I know we got the bid.  So I know we got the bid.

18   Q.    So you don't know whether Stony Brook University, whether

19   Parking Systems was the low bidder for Stony Brook University

20   Hospital?

21          MR. MILMAN:  Asked and answered..

22          JUDGE GREEN:  Overruled.

23   BY MR. ROCCO:

24   Q     Let me ask you this.

25   A.    I'm just trying to remember.

1  Q.   Are you familiar with the other bids other than Parking

2  Systems' bid?

3  A.   No, not at all.

4  Q.   I'm just asking if you know.

5  A.    I don't.

6  Q.   Just say no if he doesn't know.

7           MR. MILMAN:  Your Honor, it's a little hard for a

8  witness that knows after the fact and preparing for trial as to

9  whether or not someone was the lowest bidder or not.

10          THE WITNESS:  That was the off-the-record question.

11  I just -- that was what I wanted to ask.

12          MR. MILMAN:  Yeah.

13          THE WITNESS:  Because I -- because I've looked at all

14  these records, when you're asking me questions, I just, I

15  don't, okay.  Am I answering as Bobby in November, or am I

16  answering because I've seen a piece of paper?  I just --

17          JUDGE GREEN:  If you're asked a question and if you

18  have any confusion regarding it, including the timeframe that

19  you're being asked about, you can ask for clarification.

20          THE WITNESS:  Okay.  Thank you, Your Honor.

21          MR. MILMAN:  Thank you, Your Honor.

22  BY MR. ROCCO:

23  Q.   And how is Parking Systems paid for -- does Parking

24  Systems receive an hourly rate from the medical center for each

25  hour it provides parking services?

1    A.    Yes, I believe that's the structure of the bill.

2    Q.    And so you received a, you just testified you receive a

3    hourly rate per employee from Stony Brook University, right?

4    A.    Yes.

5    Q.    And based on your knowledge, training, and experience and

6    ownership in the company, does Parking Systems make more profit

7    on the account by keeping its employee costs as low as

8    possible?

9              MR. MILMAN:  Objection.  Relevance.

10             JUDGE GREEN:  Overruled.

11             THE WITNESS:  Keeping its expenses in general as low

12   as possible, for sure.

13   BY MR. ROCCO:

14   Q.    And you testified earlier that you first heard about the

15   union, Local 1102's representation of the Classic Valet

16   employees after receiving the attorney letter on November 9th,

17   2023?

18             MR. MILMAN:  Objection, Your Honor.  And I'd like to

19   tell you why.  First of all, it seems like a normal question.

20   I know that.

21             JUDGE GREEN:  Honestly, I'm not 100 percent sure that

22   that was intentional.

23             MR. MILMAN:  No, but let me -- if I can, Your Honor.

24             JUDGE GREEN:  Okay.

25             MR. MILMAN:  There was a question initially posed by

1    the Counsel for the General Counsel.  When was the first time

2    you heard about 1102?  Then there was a follow-up question, I

3    presume for trying to impeach purposes.  When was the first

4    time you heard about the union?

5            Now, for those people that are lifers in the

6    industry, we know a difference between a local, but somebody

7    who is not in the industry, they don't know the locals.  They

8    know a union, the union, not Local 1102.

9            JUDGE GREEN:  He's aware of that distinction.

10           MR. MILMAN:  Okay.  Thank you, Your Honor.

11           JUDGE GREEN:  Okay.  Go ahead.  Okay.  I mean, my

12   point was that, I'm sorry.  My point was, I'm not sure that

13   that was exactly the testimony, but go ahead.

14   BY MR. ROCCO:

15   Q.  Was the first time you heard about the Local 1102 and

16   Classic Valet collective bargaining agreement on or around the

17   time you received the letter from my office in November 2023?

18   A.  So based on the entire conversation that just occurred,

19   Okay.  To me Local 1102, you could call it 9745.  I -- I don't

20   -- I know that I remember Local 1102 because that was one of

21   the things that I was asked to look up when I was searching

22   texts and emails.  So that -- that's, I remember it from that.

23   I certainly know that the email that was sent to Michael

24   Petruzzelli, and I imagine -- I think it was from the 11 -- was

25   from you, was related to a union, a union representation.

1    Q.    When?

2    A.    It was November.  It was actually November 9th based on

3    the pieces of paper here.

4    Q.    Okay.  And, sorry, one second.  And on November 10th, you

5    stated that you needed to run -- rerun the numbers, and you had

6    been led to believe we were pretty close to the bone from the

7    outset.  Is that correct?

8    A.    That's something I wrote for sure.

9    Q.    And when you said close to the bone, you meant your profit

10   margin was close to the bone?

11   A.    Correct.

12   Q.    And that profit margin related to the Stony Brook account?

13   A.    That is also correct.

14   Q.    And at that point, you had received the collective bargain

15   -- on November 10th, 2023, you had received a copy of the

16   existing union collective bargaining agreement?

17   A.    I -- it's not clear, but I know obviously from looking at

18   that, I went through.  So I was going through the numbers and

19   just seeing what the costs were.

20   Q.    Okay.  And you learned at that point in time there was a

21   shoe allowance in the collective bargaining agreement?

22   A.    I did.

23   Q.    And that shoe allowance you calculated was going to cost

24   approximately $16,80?

25              MR. MILMAN:  Objection.  The document speaks for

489

```
 1  itself.

 2          JUDGE GREEN:  Overruled.

 3          THE WITNESS:  If that's what is in the document, for

 4  sure.

 5  BY MR. ROCCO:

 6  Q.  And that was not an expense you were -- that was not an

 7  expense you had anticipated paying up until the time you wrote

 8  that email?

 9  A.  No, that -- that's inaccurate.  So that's inaccurate

10  because I went through the bid.  So this -- this email that

11  you're looking at there, that was, I forwarded, I think, is

12  Johnny on that email?  I'm sure he is.

13  Q.  I'll just show --

14          MR. ROCCO:  Can we just show the witness GC 17?

15  isolated.

16          THE WITNESS:  I don't have these marked.  I don't --

17          JUDGE GREEN:  Adrian, do you have GC 17?

18          THE WITNESS:  Thank you.

19  BY MR. ROCCO:

20  Q.  It's on Page 2 of the document.

21  A.  It looks like they were all on it.  But the point being is

22  that I saw that and I was highlighting that, that that's what

23  needed to be done.  Because at this point, I -- you know, we

24  received this letter.  I don't know what that means.  What --

25  what does that mean for us?
```

1    Q.   And you performed, as part of this response, you performed

2    a calculation as to what it would cost to pay out six unused,

3    paid, time-off days?

4              MR. MILMAN:   Objection.  Document speaks for itself.

5              THE WITNESS:  Actually --

6              JUDGE GREEN:  No.

7              THE WITNESS:  I didn't.  I just said, I just wrote in

8    there, which it says it's six-day PTO for all staff.

9              JUDGE GREEN:  So just so you know, so if you -- if

10   your attorney, the employer's attorney objects, just wait until

11   I rule on the objection.

12             THE WITNESS:  Okay.  Sorry.

13             JUDGE GREEN:  If I sustain the objection, you don't

14   have to answer.

15             THE WITNESS:  Okay.

16             JUDGE GREEN:  If I overrule the objection, then you

17   do.

18             THE WITNESS:  Thank you, Your Honor.  Sorry.

19   BY MR. ROCCO:

20   Q.   So, Mr. Gust, what was the $27,300 figure?  What was --

21   what were you calculating that as the cost of?

22   A.   Oh, I --.

23             JUDGE GREEN:  Now, you can answer because there's no

24   objection.

25             THE WITNESS:  That -- oh, okay.  Yes, I actually did

1  perform the calculation.  I'm sorry.

2  BY MR. ROCCO:

3  Q.   And --

4        MR. MILMAN:  Your Honor, are these real questions?  I

5  mean, all he's asking is to repeat what he wrote in the

6  document.  It's already been admitted into evidence.  I mean,

7  are these additional questions or just something as filler-in,

8  to get questions in?  I don't understand.  What is --

9        JUDGE GREEN:  To the extent there's objection, it's

10 overruled.  I think he's clarifying what's in the document.

11       MR. MILMAN:  He's reading the document verbatim, Your

12 Honor.

13       JUDGE GREEN:  The question is not what's in the

14 document.  The question is what he actually did.

15       MR. MILMAN:  And it specifies what he did in the

16 document.  I crossed it out.  For sure --

17       JUDGE GREEN:  Okay.

18       MR. MILMAN:  Shoe -- what allowance is this?

19       JUDGE GREEN:  All right.  So to the extent there's an

20 objection, it's overruled.

21       MR. MILMAN:  Are these real questions?  Thank you,

22 Your Honor.

23 BY MR. ROCCO:

24 Q.   And paying the shoe allowance as you calculated in this

25 email, and paying six PTO days out at the end of the year,

1    would that reduce Parking Systems' profit margin on the Stony

2    Brook University hospital?

3            MR. MILMAN:  Objection.  Asked and answered.  On the

4    budget, he's not involved in the budget.  He's just simply

5    costing out what the union contract -- okay.

6            JUDGE GREEN:  Overruled.  If you know.

7            MR. ROCCO:  Your Honor, I'm objecting to the speaking

8    objections.  He's coaching the witness.

9            JUDGE GREEN:  Okay.

10           MR. MILMAN:  He's already answered on the whole

11   document.  So how am I coaching him?

12           JUDGE GREEN:  So, all right.  So, it's overruled.

13           MR. ROCCO:  Okay.

14           THE WITNESS:  I'm sorry.

15   BY MR. ROCCO:

16   Q.  Okay.  Yeah.  Paying -- if the company paid -- if the

17   company is paying $27,300 for paid time off and $16,80 for a

18   shoe allowance, that would reduce the company's profit margin

19   at the Stony Brook University Hospital account, right?

20   A.  All things being equal, if that's the only change, yes.

21           MR. ROCCO:  Okay.  Can we show the witness GC 15?

22           THE WITNESS:  Thank you, Your Honor.

23   BY MR. ROCCO:

24   Q.  Okay.  Mr. Gust, I'm showing you what's in evidence as

25   General Counsel's 15.  It's an email from Josh Candiotti, sent

1  Friday, October 27th, 2023, addressed to yourself and others,

2  subject:  regarding the weekly meeting.  You received this

3  email, right?

4  A.    Yes.

5  Q.    And do you see in paragraph 1 where it states, when we are

6  allowed to contact member -- when are we allowed to contact

7  members of the other valet company staff?  I feel like this is

8  the biggest domino right now.

9  A.    Yes.

10 Q.    And was the reason that you understood it that the biggest

11 domino was that that would -- that contacting the previous --

12        MR. MILMAN:  Objection, Your Honor.  This witness

13 didn't author that letter.  Calls for speculation of what

14 somebody else thought, who authored that letter.

15        MR. ROCCO:  I'm not done asking the question yet.

16        MR. MILMAN:  I know.  You're trying to read it into

17 the record.  I get it, but --

18        JUDGE GREEN:  Overruled.

19        MR. MILMAN:  Okay.

20

21 BY MR. ROCCO:

22 Q.    Was the reason -- isn't it true that the biggest domino

23 right now, that the biggest domino was contacting Classic

24 Valet's prior employees, was because you needed to staff the

25 location effective December 1st?

1          MR. MILMAN:  Objection.  The question could have been

2    asked, Your Honor, with all due respect.  Just ask a separate

3    question.  He's referring to the question that the author

4    wrote.  Isn't it true this is what he meant?

5          JUDGE GREEN:  Overruled.

6          MR. MILMAN:  Otherwise ask --

7          JUDGE GREEN:  It's overruled.

8          MR. MILMAN:  Thank you, Your Honor.

9          JUDGE GREEN:  If you know.  Mr. Gust, if you know,

10   you can answer.

11         THE WITNESS:  Okay.  So this is the -- the email --

12   this is a email that you're looking at here is from Josh.  He's

13   addressing some of the things that were sent by Andrew.  Right?

14   So if you go --

15         MR. MILMAN:  Sorry.  It's double hearsay.  Double

16   speculation.

17         THE WITNESS:  All right.  So if you go further down

18   the document, you see the original document?

19         MR. ROCCO:  Right.  Is that --

20         THE WITNESS:  Is that -- you're talking -- you're

21   referring to the first one or the second one?

22         MR. ROCCO:  GC -- the part I just quoted, yeah.

23         JUDGE GREEN:  So to be clear, the question is

24   basically what you understood that to mean, if anything.

25         THE WITNESS:  So this is October 24th.  The person

1    who wrote this, Andrew, is responsible.  He's the account

2    executive.  He's responsible for staffing.  He's asking

3    questions of us.  That's what it is.

4    BY MR. ROCCO:

5    Q.   So is it your understanding that the biggest domino was

6    talking to Classic Valet staff because the company needed to

7    staff the location as of December 1st, 2023?

8             MR. ROCCO:  Objection, Your Honor.  Objection to the

9    form of the biggest domino.  Now, if he was the author, maybe

10   he could explain what the biggest domino is.

11            JUDGE GREEN:  I understand the objection.  We've been

12   through it a couple of times.  Nobody's asking him to speculate

13   as to what he thought.  The question is, you got this email.

14   You read it.  Do you have any recollection of thinking, you

15   know, what this means, what the biggest domino means?

16            THE WITNESS:  Reading it now, this is what he

17   believed to be the biggest domino.  That's what it is.

18   BY MR. ROCCO:

19   Q.   Mr. Candiotti -- what Mr. Candiotti believed?

20   A.   No.  You're -- you're --

21   Q.   I'm sorry.  Mr. Goldsmith.

22   A.   That's correct.

23   Q.   And Mr. Goldsmith was?

24   A.   Mr. Goldsmith is an account executive.

25   Q.   An account executive.

496

1    A.    Yeah.  Account -- account representative.  Sorry.

2    Q.    So someone who's on an evil playing field - or evil --

3    A.    Even?

4    Q.    Even plane or corporate structure.

5    A.    He did say evil, right?

6          JUDGE GREEN:  Yeah.

7          MR. ROCCO:  Freudian slip, maybe, I don't know.  So

8    it's somebody -- as an account executive, he's on the email.

9          MR. MILMAN:  Objection.  He didn't say account

10   executive.  He said account representative.  It's lower than

11   account executive.

12         JUDGE GREEN:  Okay.  Overruled.

13         MR. ROCCO:  Objection to the speaking objection but.

14   BY MR. ROCCO:

15   Q.    And let me ask you, when Mr. Goldsmith writes, we need a

16   targeted number we need to hire to go along with the staff we

17   have already -- we already have in place to move over once we

18   start.  Do you see that on the third sentence?

19   A.    Hold on one second.  I'm sorry.

20   Q.    Of paragraph 1?

21   A.    Hold on.  Okay.  I got it.  What -- so what was your

22   question?

23   Q.    It's where it says in the third paragraph, we need a

24   targeted number we need to hire to go along with the staff we

25   have -- we already have in place to move over once we start.

1    Is that a fair and accurate representation of Parking Systems'

2    strategy at the date of this hiring, to staff the location?

3    A.    No, absolutely not.

4    Q.    Okay.  It's not?

5    A.    No.

6    Q.    Okay.  So Mr. Gold -- so what Mr. Goldsmith wrote in this

7    email was not a fair and accurate representation?

8    A.    It is not.

9    Q.    Okay.  And it's a fact, wasn't it, that as of December

10   1st, 2023, Parking Systems had hired zero of the previous

11   Classic Valet employees?

12           MR. MILMAN:  Asked and answered, Your Honor.

13           JUDGE GREEN:  Overruled.

14           THE WITNESS:  We had made one offer and it was

15   refused.

16   BY MR. ROCCO:

17   Q.    So you did make an offer.

18   A.    Essentially.  So I'm always concerned about the legal

19   ramifications of things I say at this point.  But I -- I

20   interviewed Francis.  I told her she was there because we would

21   be interested in bringing her on board.  So if that's

22   considered an offer, then.

23   Q.    And multiple Classic Valet employees had filled out the

24   inquiry from the QR code prior to December 1st, 2023.  Is that

25   your understanding?

```
1    A.    December?  Yes, that's correct.

2    Q.    And you made one offer?

3    A.    That's also correct.

4    Q.    And after -- on and after December 1st, 2023, isn't it

5    true that Parking Systems was still hiring new employees for

6    the Stony Brook location?

7    A.    Yes, that's true.  But, again, it needed -- I can't stress

8    it enough that we're Parking Systems.  We're not Stony Brook.

9    So we hire employees to work for Parking Systems.  And there's

10   a distinct difference.  There's almost nothing more frustrating

11   than for every single account representative, executive that

12   you talk to, than an employee who is tied down and refuses to

13   move around.  We can't fill -- we can't fill our shifts then.

14   We need that flexibility.

15   Q.    So of all the employees from Classic Valet that submitted

16   inquiries from the QR code, you only followed up with one

17   employee, right?

18   A.    Me personally, I only followed up with one.  That's right.

19   Q.    And you're not aware of anyone else at Parking Systems

20   that's followed up with any of the other employees either?

21   A.    So I forwarded those to Andrew and Travis who -- who were

22   on site during that time.  They were doing some interviewing

23   and hiring.  But do I -- since we didn't hire anybody else that

24   I'm aware of until later on, no, that was -- it was later than

25   that.
```

1   Q.   So it is true that Parking Systems continued to hire for

2   the Stony Brook location after December 1st, 2023?

3             MR. MILMAN:  Asked and answered, Your Honor.

4   Twice.  Three times.

5             JUDGE GREEN:  Okay.  Overruled.

6             THE WITNESS:  Did we continue to hire for Parking

7   Systems?  Absolutely.

8   BY MR. ROCCO:

9   Q.   Okay.  And, in fact, the company was urgently hiring for

10  that location?

11            MR. MILMAN:  Objection.

12            THE WITNESS:  I didn't.

13            JUDGE GREEN:  Okay.  I mean, you want to define

14  urgently a little bit.

15            MR. ROCCO:  Can we show the witness GC 10 and GC 11?

16            JUDGE GREEN:  Do you have those?

17  BY MR. ROCCO:

18  Q.   Mr. Gust, please just take a look at GC 10 and GC 11 and

19  let me know when you're done reviewing the documents.

20  A.   Okay.

21  Q.   So on GC 10, which is in evidence, the witness is

22  reviewing a screenshot where it says:  Parking Systems jobs in

23  Stony Brook.  New York,  One job near Stony Brook.  New York.

24  Urgently hiring.  Parking lot attendant, hospital of Suffolk

25  County, posted 22 days ago as of the screenshot date, December

1    12th, 2023.  Do you see that?

2    A.    Yes, I do.

3    Q.    Mr. Gust, where it says urgently hiring, parking lot

4    attendant, hospital in Suffolk County.  Is that a fair and

5    accurate representation of Stony Brook -- of Parking Systems'

6    hiring needs as of the date of this screenshot?

7    A.    What's the date of this?  Well --

8    Q.    December 12th, 2023.

9    A.    No, it isn't.

10   Q.    So what Parking Systems put on Indeed is not a fair and

11   accurate representation of its hiring status as of that date?

12   A.    If you're referring specifically to urgently hiring?

13   Q.    Yes.

14   A.    It -- it isn't.  It's not.

15   Q.    Okay.  So that's not accurate.

16   A.    It is not accurate.

17   Q.    Okay.  Same questions for GC 11, where it says, on the top

18   screenshot, December 16th, 2023, parking lot attendant,

19   hospital, Suffolk County, Stony Brook.  Urgently hiring.  Do

20   you see where it says that?

21   A.    I do.

22   Q.    Okay.  Where it says, urgently hiring, is that a fair and

23   accurate representation of Parking Systems' need or hiring need

24   at Stony Brook University at that time?

25   A.    It is not.

1  Q.   Okay.  You mentioned before that you made a -- an

2  employment offer to -- strike that.  The QR code, did you

3  testify earlier that that is an inquiry for employees to seek

4  employment through Parking Systems?

5  A.   I did.

6  Q.   Okay.  And once the inquiry is received, does the employee

7  then fill out a longer application?

8  A.   When the inquiry is received?  No.

9  Q.   If the inquiry is received, if the employer is interested,

10  is the employee (sic) then sent a loan form application?

11  A.   No.

12  Q.   Okay.  What comes after the inquiry is received if the

13  employer is interested?

14  A.   They would be contacted to set up an interview.

15  Q.   Okay.  And after the interview, there's a long form

16  application?

17  A.   If they are offered a position, yes.

18  Q.   And you made Francis an offer at the meeting at Jake's 58

19  at the end of November 2023?

20          MR. MILMAN:  Asked and answered three or four times.

21          JUDGE GREEN:  Okay.  I think we went into that.

22  BY MR. ROCCO:

23  Q.   You referred to the QR code as leading to a short form --

24  as being a short form application, right?

25  A.   I think I saw it -- yes, I did, at one point.

1    Q.   Okay.  So in your text messages, you had said that the

2    short -- that the QR code leads to a short-form application.

3              MR. MILMAN:  Asked and answered, Your Honor.

4              JUDGE GREEN:  Overruled.

5              THE WITNESS:  Either -- either in my text messages or

6    email that I did refer to it that way.

7    BY MR. ROCCO:

8    Q.   And that short-form application gets directly emailed to

9    you?

10   A.   The QR code?  Yes.

11   Q.   And Parking Systems has other hospital locations, correct?

12   A.   We do.

13   Q.   Okay.  And employees who work at hospital -- at a hospital

14   location, is there a heightened sense of training that's

15   required because it's a hospital location?

16   A.   Yes, we have a individual packet for that.

17   Q.   And what's in the individual packet that differs from the

18   standard training packet?

19   A.   It's specific to hospital facilities.

20   Q.   And is there HIPPA training that's required as part of

21   that?

22             MR. MILMAN:  Objection, Your Honor.

23             JUDGE GREEN:  What's the objection?

24             MR. MILMAN:  It's a judgment?  Well, first of all,

25   well he's already asked.  He has a right to ask questions.  I

1    don't know what the relevance is.  And I would also -- I know

2    the witness is trying to accommodate and answer every question,

3    obviously as diligently as he can.  But I think it's -- it

4    calls for speculation that this witness really knows what HIPPA

5    is.

6               JUDGE GREEN:  Okay.  Listen, if you don't know part

7    of the -- if you don't understand the question, ask for

8    clarification.  Otherwise, the objection is overruled.

9               MR. MILMAN:  Thank you, Your Honor.

10   BY MR. ROCCO:

11   Q.  Is it your understanding that as part of Parking Systems'

12   obligations at Stony Brook Hospital that you're -- that the

13   company is required to submit documentation showing that all

14   employees have been trained in HIPPA compliance?

15   A.  I -- I don't know that.

16   Q.  You don't know that?

17   A.  No.

18   Q.  Do you provide HIPPA training to the current employees

19   working at Stony Brook University Medical Center?

20               MR. MILMAN:  Objection, Your Honor, to the form, you.

21   Is it referring to Mr. Gust or the corporation?

22   BY MR. ROCCO:

23   Q.  Does the corporation provide HIPPA training to employees

24   currently posted at Stony Brook University Medical Center?

25   A.  We have a specific -- a medical-specific training package

 1  that we use for Northwell, Mount Sinai, Stony Brook.  I -- I'm

 2  not sure if HIPPA was something -- it was something J-PO or I

 3  forget exactly what the term.

 4          MR. ROCCO:  I have no further questions.

 5          JUDGE GREEN:  Okay.  So I mean, if you have a few.

 6          MR. MILMAN:  Just one question before we break.

 7          JUDGE GREEN:  Okay.

 8          MR. MILMAN:  Okay.  May I approach the bench, Your

 9  Honor?

10          JUDGE GREEN:  Yes.

11                      CROSS-EXAMINATION

12  BY MR. MILMAN:

13  Q.   Mr. Gust, I'm showing you two documents that are in the

14  formal record, also known as the formal evidence record.  You

15  had testified that you became aware of this litigation when you

16  saw the complaint.  Is that your testimony?

17  A.   Yes.

18  Q.   Okay.  So I'm showing you the complaint.  Before I do

19  that, when you were initially asked a question by Counsel from

20  General Counsel, he asked you that the operations of Classic

21  were substantially equivalent to the operations of Parking

22  Systems as Parking Systems took over.  Your answer was no, it

23  was not.  Do you recall saying that?

24  A.   I did.

25  Q.   Okay.  Now, I'm showing you the complaint.  Not a position

1  statement, but the formal complaint.  It states 12, 12, B.

2  Since December 1, complaint allegation, 2023.  Respondent has

3  continued to operate the business of Classic at Stony Brook

4  University, essentially unchanged form.  You see that that's

5  the complaint allegation?  12-12-B.

6  A.    Okay.  Yes.  That's true.

7  Q.    Now, we have a complaint.  Formal complaint.  This is a

8  formal answer.  Are you aware of that?

9  A.    I was not.

10 Q.    Okay.  That's fair enough.  I see.  Well, in the legal

11 world, there's a complaint, like those allegations alleging you

12 said things or did things, and then there's a legal answer,

13 response, they call it.  And there's also affirmative defenses,

14 but I'm not going to ask you questions about that.

15      So, I'd like you to look at number 16 of the formal

16 answer, the formal complaint.  Number 16.  Can you read that

17 into the record?

18              MR. ROCCO:  Objection.

19              JUDGE GREEN:  It's in the record.

20              MR. MILMAN:  Okay.  It is in the record.

21 BY MR. MILMAN:

22 Q.    So I read to you the complaint allegations, right?  The

23 Respondent, the employer responds, denies the allegations of

24 12-A and 12-B, the complaint.  Do you see that?

25 A.    Yes, sir.

1  Q.   See that?

2  A.   Yeah, 16.

3  Q.   In the formal record?

4  A.   Yes.

5  Q.   Okay.  Thank you.

6         MR. MILMAN:  No further questions.

7         JUDGE GREEN:  Okay.  Very good.  So, I take it

8  there's no follow-up on that, or is there?

9         MR. JACKSON:  Just one question following up on

10 something that Mr. Rocco asked.

11                    REDIRECT EXAMINATION

12 BY MR. JACKSON:

13 Q.   What does the training packet for hospitals have?  What

14 does that consist of?

15        MR. MILMAN:  Asked and answered..

16        JUDGE GREEN:  Yeah.  So --

17        MR. MILMAN:  You're just asking it again in a more

18 inquisitive --

19        JUDGE GREEN:  I don't think we actually got an answer

20 to that.

21        MR. MILMAN:  Thank you, Your Honor.

22        JUDGE GREEN:  So overruled.

23 BY MR. JACKSON:

24 Q.   So what does the special training packet you provide to

25 hospitals look like?

1    A.    We can -- I can get that for you.  I -- it's just a --

2    it's essentially, so we have a -- how do you describe those

3    things?  So it's a training, it's an interactive training

4    module that you take online that you -- it -- it's electronic.

5    It goes through various different requirements, and then at the

6    very end of it, it's a quiz.

7         We have some -- we have one for sexual harassment.  We

8    have one for claims reduction.  We have one for hospitality.

9    We also have a specific one for working in a hospital setting,

10   in a healthcare setting.

11   Q.    And do you know what that consists of?

12   A.    I don't know that.

13            MR. JACKSON:  Okay.  No further questions.

14            JUDGE GREEN:  Mr. Rocco?

15            MR. ROCCO:  Nothing.

16            MR. MILMAN:  Your Honor,  just one procedural issue.

17            JUDGE GREEN:  Okay.

18            MR. MILMAN:  I know we're going to break, but there

19   are -- there is -- the information requested subject to our

20   subpoena, that's referenced in our subpoena to the Union, is

21   going to be important for me to see these documents, because

22   the information that we requested, we believe, goes to the

23   direct questions that I'd be asking Mr. Gust around certain

24   communications he had, as we know, with GC's two witnesses.  We

25   really need -- we need to see -- we need to review the motion

1    to quash.  But these questions were directly related to

2    specific answers that GC's witness, including the union

3    witness, testified to, regarding issues regarding Mr. Gust.

4              JUDGE GREEN:  We're done with Mr. Gust, right?

5              MR. MILMAN:  Yes, we are.  Yes.

6              JUDGE GREEN:  Okay.  So you can see --

7              THE WITNESS:  All set?

8              JUDGE GREEN:  -- take a seat somewhere --

9              THE WITNESS:  leave these behind?

10             MR. MILMAN:  No.  No, Bobby.  Leave them there.

11             JUDGE GREEN:  I think those are the reporter's.

12             So I've only been able to review the petition to

13    revoke very briefly.

14             MR. MILMAN:  They're all directly related to specific

15    answers that the union representative provided on direct and

16    cross.  Also, Your Honor, at lunch, we'll get start working on

17    the privilege log.

18             JUDGE GREEN:  Okay.  So just -- I'd like to deal with

19    the petition to a revoke some, now a little bit at least.  Has

20    any -- have any documents been produced in response to the

21    subpoena?  No?

22             MR. ROCCO:  No.

23             JUDGE GREEN:  Okay.

24             MR. ROCCO:  But we don't believe that what the union

25    told its members, I mean, one of them goes to mitigation, which

509

1   is not at issue here.

2           JUDGE GREEN:  So that's four.

3           MR. ROCCO:  That's number four, right?

4           JUDGE GREEN:  Okay.  And is that, it looks like

5   that's what it's being sought for.

6           MR. ROCCO:  Hold on a second, Your Honor.

7           MR. MILMAN:  And myself nor Mr. Mauro had an

8   opportunity to read the motion with the petition to revoke, or

9   to quash.  Neither of us have read it yet, nor Mr. Jacobson

10  (phonetic).

11          MR. MAURO:  Well, it's also going to tell us exactly

12  who was employed on the last day prior to Parking Systems

13  taking over, which is -- we all need to know that.

14          JUDGE GREEN:  You're talking about the dues checkoff?

15          MR. MAURO:  Yep.

16          MR. ROCCO:  Well, that's already been produced.

17          JUDGE GREEN:  Okay.  So that's 8.  That's GC 8?

18          MR. ROCCO:  I don't know.  But pursuant to the first

19  subpoena I reproduced, yes, I gave them the redacted version of

20  that.  Right.  Yeah, that's' the most recent dues run.

21          JUDGE GREEN:  Okay.  So that's what that is.  It's

22  union membership and the last dues.

23          MR. ROCCO:  It's just from their program called ISSI,

24  yeah.

25          MR. MILMAN:  Well, no.  See, the reason we ask this

1  is because although the -- that's for the dues.  Yeah, although

2  the dues checkoff has a date of November 1, we wanted to

3  ascertain whether how -- whether they had information of who

4  was actually working on November 5th, November 10th.

5          JUDGE GREEN:  Agreed.

6          MR. MILMAN:  Okay.

7          JUDGE GREEN:  That's why.  Agreed.  That's why we

8  want the Classic employees.

9          MR. MILMAN:  Yeah.  But also, the GC 8 that was

10  produced, it was a little confusing because each one of the

11  employees had a -- according to the witness' testimony, that

12  they had a hire date and a last change date, meaning that they

13  were -- something happened in their status and they came back

14  to work.  So if you look on GC 8, every single member had that,

15  which is a representation according to the witness' testimony

16  that they were hired, they left, and then they came back to

17  work.

18          JUDGE GREEN:  All right.  I mean, I'm not sure I

19  understand that.

20          MR. MILMAN:  Nor did I.  Nor did we.

21          JUDGE GREEN:  But, I mean, are we all agreed that

22  we're going to be trying to get the Classic payroll?  Maybe we

23  already have the Classic payroll?  For that purpose, we

24  probably -- the Classic payroll is going to be better, right?

25          MR. MAURO:  To show who was employed on --

1          JUDGE GREEN:  Correct.

2          MR. MAURO:  -- within this time period.  Yes.

3          MR. MILMAN:  Right.  And Your Honor, just to give you

4    an example.  On the GC 8, it has an employee, Mr. Estevez.  It

5    says date of hire, 1/17/23.  The last change date, January --

6    July 15 of '23, but then it has a dues date of November 1, '23.

7          And each one of these employees, here, there's one

8    employee that has a hire date 10/18, let go 10/18.

9          JUDGE GREEN:  Yeah, okay.  I mean, okay.  All I'm

10   saying is the unemployment insurance fund issues, that's a

11   request -- that's for purposes of finding out whether people

12   were employed after the fact.

13         MR. MILMAN:  Yes, but we, I mean --

14         JUDGE GREEN:  Okay.

15         MR. MILMAN:  We would have ulterior reasons for

16   asking for that, that generally we don't have to have that

17   gleaned out right now.  But as a proffer, we needed to know

18   this because it goes into distinguishing operational staffing.

19   All right?  So and this is a document they produced, and this

20   is -- the testimony was that each person, I mean, that's the

21   date of hire, there was a change.  That means either they came

22   back, all right, and that goes directly to staffing needs.

23   That was the reason why we wanted to see it.

24         JUDGE GREEN:  All right.  So I'm not understanding

25   it.

```
 1              MR. MILMAN:  Okay.

 2              JUDGE GREEN:  But, okay.

 3              MR. ROCCO:  I would also point out the Union's

 4    neither the employer or the individual receiving unemployment,

 5    so they don't have those records, you know, of unemployment

 6    insurance.

 7              MR. MILMAN:  Okay.  Well, I'm not up to that yet, but

 8    I was still focusing on --

 9              JUDGE GREEN:  Okay.  So, starting, just starting with

10    subpoena request 1, regarding, relating to, or referring or

11    referencing the provision of valet services at Stony Brook

12    Hospital.  They were employed by Classic Valet.

13              Are you trying to determine the operation at Classic?

14    Is that what you're?

15              MR. MAURO:  Which request, Your Honor?  I'm sorry.

16              JUDGE GREEN:  1.  Number 1.

17              MR. MAURO:  Yeah, so this request, and it's similar

18    to really number 2, is, you know, look.  We have very serious

19    allegations here that there's union animus by the Parking

20    Systems, they didn't want to hire Classic's employees, and that

21    also that there's a substantially same operation in there for

22    the successor.  So when the, you know, we believe based on the

23    testimony, it's our position that a lot of this is going --

24    it's just been manufactured, at least with respect to the union

25    animus requirements.
```

```
1            So based on the impeachment of this union witness
2    about this text chain and conversations that were being had
3    internally, we want to understand what exactly was the
4    discussion internally at the union going on regarding the
5    services that were being provided by Classic as it relates to
6    Parking Systems winning that award.  So if they're in the
7    process of talking internally about, hey, wait a second, this
8    award was in August, clearly from their own testimony, they --
9    the union didn't know anything until at least the end of
10   October, okay?  Then we start hearing about a flurry of
11   conversations happening between the union and the their -- and
12   the two witnesses that came on the stand and potentially other
13   union members in that very critical period of November.  And
14   then we hear this accusation that, oh, by the way, there's
15   this, you know, November 25th conversation where Bobby Gust
16   says, you know, whatever, we don't want unions or something to
17   that effect.
18           We -- in our -- it's our position that it's entirely
19   manufactured, this union animus situation.  And that,
20   therefore, if they're having discussions, which they've already
21   admitted they had discussions regarding Classic Valet,
22   regarding Parking Systems and the provision of valet services,
23   we have every right to obtain those documents because they're
24   highly relevant to the 8(a)(3) allegation.
25           JUDGE GREEN:  Okay.
```

1       MR. MILMAN:  And Your Honor, if I may just expand on

2   that, please, is that we were caught with a interesting

3   quandary at the time and it was based upon a kind of, call it a

4   stalemate between the General Counsel and the General Counsel's

5   own witness.  All right?  I've been dealing with the General

6   Counsel for 30 years.  I wasn't going to get bogged down on a

7   situation.

8       But, for example, when the General Counsel witness

9   testified, adamantly, repeatedly, that she gave three

10  affidavits to GC, GC produced two.  I let it go, Your Honor.

11  I've been dealing with the General Counsel for over 30 years.

12  But there's an issue, and I didn't want to push the issue and

13  make a deal of it.  If Mr. Jackson said there was two, I've got

14  to believe Mr. Jackson.

15      But in the context of the Union speaking with the

16  witness, and there is testimony that she gave three affidavits,

17  I think that's imperative to our case, to defend our case.

18      JUDGE GREEN:  Okay.  So two.  So similar request

19  number 2, but documents relating to or referencing Parking

20  Systems.  Are you looking for, to the extent that they talk

21  about working for or being hired by Parking Systems?

22      MR. MAURO:  Yes.  And anything that relates to the

23  theory of the General Counsel and the Union's case.  Again, as

24  you said the last time we were here, Your Honor, it's actually

25  pretty straightforward.  It's an 8(a)(3) and 8(a)(5) case.

1    Right?  Did Parking Systems have union animus in not hiring a

2    majority complement of Classic's employees?  Was this an anti-

3    union animus statement in fact said?  Why did the union not

4    know what was going on until the end of October?  And then it

5    goes into, you know, high gear.

6            And as the union's own representative testified,

7    there's this big WhatsApp chain.  And then we go into the issue

8    of, you know, they -- their alleged efforts to get hired at

9    Parking Systems.  So, you know, as it relates to getting hired

10   by Parking Systems and, you know.

11           JUDGE GREEN:  Okay.  So was it your plan to put

12   Mr. Gust on -- is the General Counsel done with your case?

13           MR. JACKSON:  Yes, Your Honor, but, you know, there's

14   still the issue with the privilege log.

15           JUDGE GREEN:  Okay.

16           MR. JACKSON:  But otherwise, yes.

17           JUDGE GREEN:  And did the Union intend to put on any

18   evidence other than that of the General Counsel?

19           MR. ROCCO:  No.

20           JUDGE GREEN:  Okay.  So the next thing we were up to

21   would be the Respondent's case.  And it was your intention to

22   put Mr. Gust on?

23           MR. MILMAN:  Not right away.

24           JUDGE GREEN:  Okay.

25           MR. MILMAN:  Very soon, but not next.

1        JUDGE GREEN:  Okay.  I mean, my point is, you know,

2   we just got this petition to revoke.  There's been no response

3   to it other than the questions that I've been asking you here.

4   Are we in a position to go forward?

5        MR. MILMAN:  Yeah, of course.  Yes.  We're in a

6   position to go forward, but we would need -- look.  There were

7   questions asked of the union representative, the business agent

8   for the union.  And questions concerning discussions with

9   General Counsel's witness regarding the November 25th, 2023

10  meeting.  With the General Counsel's witness, the alleged

11  discriminatee testified within a meeting prior to the meeting

12  and a meeting subsequent to the meeting.  She might have had

13  zero calls, one call, three calls, no texts with the union

14  representative.

15       The union representative takes the position that

16  there was a text and a call.  I don't remember how many calls.

17  And the reason why we say that is because there are allegations

18  made in the complaint of certain things that were specifically

19  said on November 25th, 2023, allegedly by Mr. Gust.  Yet on

20  some of those allegations, very specific allegations, there's

21  been absolutely no testimony on -- directly related to the

22  allegation in the complaint.

23       Mr. Mauro stated that we believe that those 8(a)(3)

24  allegations were manufactured on that November 25th, 2023

25  conversation.  We feel that we made an effort to impeach the

 1  witnesses, and we feel that there's additional evidence in our

 2  opinion that can further impeach the witnesses and go directly

 3  to the heart of those 8(a)(3) communications.

 4          Our position is that we felt it very odd when

 5  somebody's offered a job, they say, well, are you hiring me or

 6  are you hiring everybody?  We believe that certain statements

 7  were manufactured by the union when a simple job offer was

 8  taking place.  We have a right to get into those issues,

 9  especially we feel that the company was being set up with these

10  falsified claims.

11          JUDGE GREEN:  Understood.  I'm just trying to --

12          MR. MILMAN:  So the only way to get into it is

13  further attack, the state (sic) legitimately attacked, not on a

14  wild goose chase or on a fishing expedition.  But there were

15  certain statements that were made by union counsel and alleged

16  discriminatee, which are in conflict.  There is a potential

17  third affidavit out there.  There's a second affidavit that

18  wasn't signed --

19          JUDGE GREEN:  Yeah.  I'm not saying no.  I'm not

20  saying no.

21          MR. MILMAN:  Yeah.

22          JUDGE GREEN:  You're basically responding to the

23  petition to revoke.  And that's fine.

24          MR. MILMAN:  Yeah.

25          JUDGE GREEN:  I'm not saying no to that.  But I just

1    got the petition to revoke.  It was just filed today.  Right?

2              MR. MILMAN:  Right.

3              MR. ROCCO:  Thursday.

4              JUDGE GREEN:  Right.  So, you know, the question is,

5    you know, can we go forward?  I need to look at it more.

6              MR. MILMAN:  Yeah.  I have one witness that is going

7    to last for -- I plan on calling Mr. Josh Candiotti next.

8    You've heard his name a few times.

9              JUDGE GREEN:  Okay.  So let's take a lunch break.

10             MR. MILMAN:  I think it should be at least an hour

11   and a half.

12             JUDGE GREEN:  Okay.  So let's take a lunch break.

13   Come back at 2:30 and we'll resume.

14             MR. MILMAN:  Thank you, Your Honor.

15             MR. MAURO:  Sorry, Judge.  What time did you say?

16             JUDGE GREEN:  2:30.

17             MR. MILMAN:  We're still working on the privilege log

18   as well, Your Honor.

19        (Recess taken at 1:27 p.m./Reconvened at 2:36 p.m.)

20

21

22

23

24

25

```
 1              A F T E R N O O N   S E S S I O N

 2                                              (2:36 p.m.)

 3              JUDGE GREEN:  Okay.  So in an off the record

 4    conversation, we discussed that essentially the General Counsel

 5    is resting, subject to the production of the privilege log and

 6    anything that transpires as a result of that.  There's also an

 7    issue regarding, I guess, what we think are the payroll records

 8    of Classic and those might ultimately go into evidence.  It's

 9    sounding like both parties want that and want it in evidence.

10    Am I right about that?

11              MR. MAURO:  Correct.

12              JUDGE GREEN:  Okay.  So with that, and the Union's

13    not putting on a case of its own, which brings us to the

14    Respondent's case.  So would the Respondent like to call a

15    witness?

16              MR. MILMAN:  I'd like to do a brief opening

17    statement.

18              JUDGE GREEN:  okay.

19              MR. MILMAN:  Okay.  I just need a couple of minutes

20    to gather my thoughts, Your Honor.

21         (Brief recess taken at 2:37 p.m./Reconvened at 2:40 p.m.)

22              JUDGE GREEN:  Okay.  On the record.

23              MR. MILMAN:  Okay.  Your Honor.

24                  OPENING STATEMENT BY THE RESPONDENT

25              MR. MILMAN:  I thank you for this opportunity to
```

1    provide a brief supplemental opening statement.  Your Honor, it

2    is the Employer-Respondent's decision that Counsel for the

3    General Counsel, even thus far in this litigation, in this

4    court trial, in this NLRB trial, has fallen short of meeting

5    its burden of proof in both respects as to 8(a)(3) and Section

6    8(a)(5) of the Act, in addition to the catch-all that Counsel

7    for the General Counsel has stated in its opening statement

8    under the case of Love's Barbeque.

9         In our opinion, Love's Barbeque is a expedited way

10   that General Counsel is trying to usurp all of the governing

11   laws and the progeny case law regarding successorship into a

12   quick way of saying, well, you know what?  These 8(a)(3)s were

13   committed in this, and therefore, we really don't have to touch

14   much on the 8(a)(5).  Because had the 8(a)(3)s not been

15   committed, the 8(a)(5), in GC's opinion, would be a given,

16   notwithstanding all of the elements and criteria under the

17   successor of law.

18        So, on behalf of the Respondent, Your Honor, we

19   respectfully assert that the witnesses that General Counsel has

20   provided thus far to establish its 8(a)(3) burden of proof and

21   the documentary evidence that General Counsel has offered to

22   try to establish an 8(a)(5) violation don't even remotely meet

23   the burden of proof.  And I'll tell you why.  All the witnesses

24   that have been provided by General Counsel, and that would be

25   the two alleged discriminatees and the business agent from

1    1102, have been severely impeached.  They've impeached each

2    other, Your Honor.

3              In fact, there are allegations that are asserted in

4    the complaint that haven't even been addressed on direct

5    examination.  And to give you, for an example, you know,

6    there's only two alleged statements in the complaint with

7    respect to the 8(a)(3) violations, and it all boils down to a

8    November 25, 2023 meeting, which lasted approximately 10

9    minutes.

10             Now, in the complaint, Counsel for the General

11   Counsel asserts that Mr. Gust had stated, the company doesn't

12   deal with unions.  Second, the complaint states, again, this is

13   the whole purview of their 8(a)(3) violation, is that Mr. Gust

14   said you have to abandon your union affiliation if you want to

15   come to work for Parking Systems.  Well, guess what?  The

16   latter, there's been no evidence, no testimony on the record

17   whatsoever on that.  Zero.  In the rest of their case-in-chief,

18   zero.

19             With respect to the allegation that alleged

20   discriminatee and her son, the only two witnesses, the only two

21   witnesses to that alleged statement, have thus far been

22   impeached as to credibility, and in our opinion will be

23   severely impeached, when you hear it from the Employer's

24   witness and corroborating witnesses.

25             What else is interesting is that what's not in any of

 1    the affidavits submitted, nor in the ULP charge, nor in the

 2    complaint, is this afterthought theory and alleged statement

 3    that Nick and Dan from Stony Brook stated in a meeting that

 4    Parking Systems doesn't want to deal with the union.  Well,

 5    we're going to call Nick and Dan, and we believe that they're

 6    going to state completely the opposite.

 7            Now, with that said, let's look at the case law.

 8    Okay.  Yeah.  So if you look at the case law, Your Honor, the

 9    Board law, with respect to winning bids under the subcontract

10    situation that we have, okay.  I refer your attention to

11    Control Services.  It's well established that an employer who

12    submits a winning bid to the services contract is not under any

13    legal obligation to hire employees under the predecessor of

14    Control Services, 319 N.L.R.B. 1195, December 18th, 1995,

15    citing Burns' Successor (phonetic), 272 -- 472 (1972), as you

16    know.

17            The Board has never held that the National Labor

18    Relations Act itself requires that an employer who submits the

19    winning bid for services who purchases the assets of a business

20    be obligated to hire all the employees.  Well, again, we're a

21    winning bid.  We're not a successful employer.  We didn't

22    purchase the assets.  We didn't -- this wasn't a stock sale.

23    This was a bid.

24            Now, you'll hear testimony, and I'm trying -- you'll

25    hear testimony that when the bid is submitted, it was

1    specifically requested a pre-bid from three other contractors,

2    not Parking Systems, they have to take the union.  You have to

3    recognize the CBA.  Answer?  By submitting, you have to accept

4    a union?  You don't have to take the CBA.

5              As far as union concerns, the only concern was not

6    from us, and that was addressed.  The Union is not an issue.

7    It never was an issue for us.

8              Now, similarly, there's no legal obligation of the

9    employer to initiate the employment relationship in a

10   subcontract bid situation, as you might have to do in a Burns

11   Successor or in a clear and concise successor situation.  The

12   employer is entitled to consider all applicants on equal, non-

13   discriminatory basis without giving any preference to the

14   former employees, citing text on 8(a)(3), 2 N.L.R.B. 660

15   (1991), and Montfort of Colorado (1990)

16             With respect to the 8(a)(3) violations, Your Honor,

17   and those address the 8(a)(5) violations, but the 8(a)(3)

18   violations, just as a brief supplement, when the General

19   Counsel alleges a refusal to hire by successor employer, the

20   following factors are among those that would establish the new

21   owner violated 8(a)(3) of refusing to hire employees of the

22   predecessor.

23             And it goes into the evidentiary burden.  Substantial

24   evidence of union animus, lack of convincing rationale for

25   refusal to hire the predecessor employees, inconsistent hiring

1    practice over acts or conduct evidentiary -- evidencing its

2    concurrent motive, the evidence supporting reasonable

3    inference, the norm of conducting and staffing a matter

4    precluding for those employees to be hired if a new employer,

5    and overall workforce of the Board's (indiscernible).  And it

6    cites the Baron's Bus Inc., 2021 NLRB Lexis 296 (NLRB July 26,

7    2021).

8            What we have here, and what you will hear in the

9    record, is that this was a bid that was awarded as a low

10   bidder, yes, a low bidder, in July of 2023.  From July to

11   November, Parking Systems was preparing for the start-up with

12   Stony Brook.  Now, Parking Systems had no intent on hiring a

13   predecessor's employees.  They all say that.  Why?  For very

14   salient reasons.

15           You'll hear testimony, Parking Systems does not hire

16   the employer that lost the account's employees.  We expect that

17   they do what we do.  We absorb our employees and move them

18   around our operation.

19           Number two, we don't poach.  We don't look to hire

20   employees that are trained by other employers and have

21   different methodologies and different habits and different

22   customs on how to do their operation.

23           And three is it would be impossible for us to hire

24   any Classic employees to be ready by December 1 when they're

25   working until November 30th.  We had to come into the

1    operation, boots hitting the ground.  Not only that, the
2    application process, you will hear convincing testimony, it
3    takes a two-to-three-week process.  One person was offered a
4    job from Classic, not because we needed that person, because we
5    bring in our most experienced, and we're going to show you
6    records and statistics and data to show you everybody who
7    started on December 1st, when they were hired, and not only
8    that, what other locations they integrated into.
9           You're going to hear testimony the only reason why we
10   made one offer, and we've been hearing only one offer, one
11   offer, is because Stony Brook said, look, there's one person we
12   think that you really should take a look at, and it's this
13   Francis who works at the Cancer Center Division.  She's very,
14   very good.  So the offer was extended to her.
15          On November 25, 2023, the last thing that the
16   representative of the Parking Systems thought that she was
17   going to say is, why are you offering me a job?  Why not offer
18   everybody a job?  Excuse me.  That's why there's one offer.
19          Lastly, is you will hear testimony on this continuing
20   operations.  You will hear approximately seven or eight
21   different identifiable critical reasons why it's not a
22   continuing operation, one of which I'll tell you right now,
23   which is glaring.  In Parking Systems, the owner, and
24   especially the chief owner, Mark Baron, you'll hear Johnny
25   Baron, Mr. Gust, Mr. Petruzzelli, Mr. Candiotti, everybody,

1    they all park cars.  They all work side by side with the

2    employees, parking cars.  Nobody escapes that.  Not even the

3    owners.

4            They all are parking 40 to 50 cars adjacent to every

5    single rank-and-file employee parking attendant.  How is that

6    going to fit into the norm of managerial employees doing

7    bargaining unit work side by side with bargaining unit members?

8            Lastly, Your Honor, that we feel that we will

9    convincingly show the factors that also apply to an integrated

10   accretion operation under the Dattco case.  And you will hear

11   testimony that we have over 250 locations on Long Island that

12   are integrated.  Employee -- you will see evidence, that we

13   will show documentary evidence, that employees that work for

14   Stony Brook have worked at 15 other locations on Long Island

15   and rotate.

16           That's the nature of our business.  We are constantly

17   moving employees around.  Not only intra, within a location,

18   like at Stony Brook Hospital, but throughout Long Island.

19   Unlike Classic, where I don't know, maybe they have two or

20   three locations.  They never even integrated.  You'll hear

21   testimony that one person worked at Southampton one time in

22   seven years.  These employees are constantly moving around,

23   Your Honor.

24           So with respect to the last legal analysis, we feel

25   convincingly we're going to show, in addition to them not

1  proving their Loves Barbeque theory, not proving any of the

2  8(a)(5) refusals and bargaining cases, not proving their

3  8(a)(3) cases, the 8(a)(3) obligations under the case law I

4  cited, but lastly, is that we're a fully integrated operation

5  with hundreds and hundreds of employees that are absorbing

6  Stony Brook into one of its many, many 250-plus locations on

7  Long Island.

8        Thank you, Your Honor.

9        JUDGE GREEN:  Okay.  Thank you.  Okay.  So are we

10 ready to call a witness?

11       MR. MILMAN:  Yes, we'd like to call Josh Candiotti to

12 the stand, please.

13       JUDGE GREEN:  Okay.  So step this way and just take a

14 seat right here.

15       MR. JACKSON:  Your Honor, Before we go any further

16 with Mr. Candiotti, I'd like to object to his testimony on the

17 grounds that Mr. Candiotti was present during Mr. Gust's

18 testimony earlier today --

19       MR. MILMAN:  He wasn't a 611(c) witness.

20       MR. JACKSON:  -- in violation of the sequestration

21 order Your Honor issued at the outset of this hearing.

22       JUDGE GREEN:  Okay.  So -- okay.  So Mr. Candiotti

23 was here during the what?  Today.  Right?

24       MR. JACKSON:  Correct, Your Honor.

25       MR. MILMAN:  He was present during the 611(c)

```
 1   testimony.
 2             JUDGE GREEN:  Okay.  I mean, listen, you know, I'm
 3   not going to preclude his testimony.  It's something that
 4   we'll, you know, we'll have on the record if you want to go
 5   into it on cross to a certain extent, and I'll consider it for
 6   purposes of credibility determinations.
 7             MR. MAURO:  Your Honor, also, for just for record
 8   purposes, it's our position that that was waived since there
 9   was no prior objection or indication that the sequestration
10   order was going to be violated, so just for the record.  I
11   mean, that's all.  I understand.  We're moving forward.
12             JUDGE GREEN:  Right.  Okay.  I mean, I don't think
13   that's the case.  Listen, it's not, you know, it's not a great
14   practice to have -- I mean, regardless of there being a
15   sequestration order, it's not a great practice to have, you
16   know, one witness testifying and then another witness be
17   listening and seek to corroborate that previous witness.  It's
18   an element -- it would be an element in the credibility
19   determination even if there wasn't a sequestration order in
20   effect.
21             MR. JACKSON:  I'll note for the record that Jon Baron
22   and Mr. Gust are both present.  I'm not sure who the
23   representative from the company is.  I would like to note that
24   they're both present.
25             JUDGE GREEN:  Well, I think we have the
```

1  representative, right?  It's Mr. Gust.  Am I correct?  I'm

2  looking back at my notes.

3          MR. MILMAN:  Well, Mr. Gust has to be here under 611

4  -- a 611 and Johnny was --- Johnny Baron was our

5  representative.

6          JUDGE GREEN:  Okay.  I mean, yes.

7          MR. MILMAN:  They -- he had to -- yes, Johnny Baron.

8          JUDGE GREEN:  So right now we have -- I have Mr. Gust

9  as being the representative for the Respondent.  So if you have

10  other witnesses, they should really be out of the room.

11         MR. MILMAN:  Okay.  Can we go off the record?

12         JUDGE GREEN:  Yes.  Off the record.

13     (Brief recess taken from 2:56 p.m./Reconvened at 2:57

14  p.m.)

15         JUDGE GREEN:  Okay.

16         MR. MILMAN:  Mr. --

17         JUDGE GREEN:  I'm sorry, I'm sorry.  So let me swear

18  you in.  So raise your right hand.

19     (Oath administered)

20         THE WITNESS:  I do.

21         JUDGE GREEN:  Okay.  And so could you state and spell

22  your name for the record?

23         THE WITNESS:  Sure.  Joshua Candiotti.  That's

24  spelled C-A-N-D-I-O-T-T-I.

25         JUDGE GREEN:  And the spelling of the first name?

1           THE WITNESS:  J-O-S-H-U-A.

2           JUDGE GREEN:  Thank you.

3

4                     Joshua Candiotti,

5      was called as a witness on behalf of the Respondent, having

6        been duly sworn, was examined and testified as follows:

7                     DIRECT EXAMINATION

8  BY MR. MILMAN:

9  Q.    Mr. Candiotti, good afternoon.

10  A.    Good afternoon.

11  Q.    Who's your current employer?

12  A.    Parking Systems.

13  Q.    And what title do you hold with Parking Systems?

14  A.    Account Executive.

15  Q.    Okay.  And as Account Executive, what are some of your

16  specific job duties, day to day?

17  A.    So under Account Executive, I host a variety of tasks.

18  That includes interviewing, maintaining a schedule for

19  employees day-to-day, hosting staff training for our employees

20  that we're recruiting, client relations, quality control of

21  day-to-day operations in the parking lot.  I process payroll on

22  a weekly basis, and I am always inspecting parking lots to

23  ensure that we are mitigating risk.

24  Q.    Okay.  And when -- sorry about that.  When did you start

25  working with Parking Systems?

1    A.    June of 2010.

2    Q.    Okay.  So that's '10, so that's 14 years ago?

3    A.    That's right.

4    Q.    And when you were hired at Parking Systems, what position

5    did you hold?

6    A.    So I was a seasonal parking attendant.

7    Q.    What does that mean?

8    A.    So I took a role at a beach club, which operates from

9    Memorial Day to Labor Day in Atlantic Beach.  At that time, the

10   club was called New Plaza Beach Club, no longer in business,

11   and I was a parking attendant for that summer season.

12   Q.    Were you in high school?  College?

13   A.    So I was actually just starting my college career at

14   Nassau Community College, studying interior design.

15   Q.    Okay.  And in -- did you work steady, either seasonal or

16   full-time through Parking Systems for the last 14 or so years?

17   A.    Yes.

18   Q.    Okay.  So at some point, you got promoted to Account

19   Executive, correct?

20   A.    That is right.

21   Q.    All right.  So tell us about kind of your migration as a

22   parking attendant rising through the ranks to Account

23   Executive.

24   A.    Sure.  So I became an Account Executive about seven years

25   ago, from day one starting those beach clubs to about halfway

1    through, seven years.  I worked up the rankings slowly.

2         So, I started as a seasonal parking attendant, and I soon

3    got very passionate about the -- the work we do.  We -- we are

4    active.  We're not at a work desk fellows, which excited me

5    especially as a young college student, and I fell in love with

6    customer service.  I truly do think that day-to-day, the

7    greetings, the door openings, and the mobility, especially that

8    we support in the medical setting, is just an area that I'm

9    passionate about.

10        After that first summer, I actually withdrew from interior

11   design, 201 at that point at Nassau, and pursued a full-time

12   role with Parking Systems.  At that point, I was appointed the

13   full-time, over 40-hour, position, but it was toggling between

14   site manager at -- one was a car dealership that was running on

15   a Monday through Friday basis, and then I was doing restaurant

16   and catering work in that.  So, restaurant, I would have been

17   an attendant.  Catering hall, I would have been a catering hall

18   site manager.

19   Q.   Okay.  And when you were working as a park -- as a parking

20   attendant, what geographical zones did you work in?

21   A.   So primary hub was Nassau based on where I lived.

22   However, we toggle around.  We -- we have so many different

23   facilities and variety of spot events.

24   Q.   So what type of industries did you work in as a parking

25   lot attendant?

1    A.    So I started at the beach clubs.

2    Q.    Right.

3    A.    Moved soon along to catering and restaurants with full-

4    time during the day at a car dealership.  We also service

5    sporting centers such as the Nassau Events Center.  We do

6    events like in the past two weeks, Cricket Long Island, so a

7    spot job in a sporting arena setting.  We service everything

8    from funeral homes to hospitals, off-premise medical centers,

9    which is kind of my passion and joy.  We also service --

10   Q.    We'll get to that.

11   A.    -- house parties.

12   Q.    Okay.

13   A.    Really, anything that has a parking lot has a variety of

14   service needs.

15   Q.    So would - is it fair to say that you have, as a parking

16   lot attendant, you know, over the 15 years, you worked in

17   almost every industry that Parking Systems provides valet

18   services for?

19   A.    Absolutely.

20            MR. JACKSON:  Objection.  Leading.

21            JUDGE GREEN:  Overruled.

22   BY MR. MILMAN:

23   Q.    Okay.  Let's get back to the cricket event.  So tell us

24   about what that was.

25   A.    It was an incredible event.  We were hired by T20 to --

1    which is the cricket organization that operates worldwide.

2    They were hosting New York's first showing of cricket, bringing

3    that event to the New York region.

4    Q.    Is that in Eisenhower Park, where the golf courses are?

5    A.    Yes.

6    Q.    Okay.

7    A.    Quite the operation.  They converted a, you know, I guess,

8    a Nassau Park into a 100,000-person arena.  It was 40,000

9    people, but it was incredible.  They built up, in 90 days, this

10   -- this facility.  And naturally, when you're converting a park

11   that might have the square footage for -- for the structure, it

12   doesn't have the capacity for that kind of vehicular volume.

13   We -- we were experiencing somewhere between five to seven cars

14   per event.  Eisenhower Park does not have that kind of parking

15   capacity.

16   Q.    Now, was this an international event?

17   A     Yes.

18   Q.    High security?

19   A.    Yes.  Never seen anything quite like it.  The police

20   special ops of Nassau County, the FBI had a presence.  They had

21   over 110 Nassau County officers recruited.  It was pretty

22   impressive to watch.

23   Q.    And was this like a one-off event, like a one-time every

24   four years, or like the Copa International, or, you know, a

25   soccer tournament at this facility?

```
 1              MR. JACKSON:  Objection.  Relevance.
 2              MR. MILMAN:  Goes to the operations, Your Honor.
 3   Goes to integration, as you will see.
 4              JUDGE GREEN:  Okay.  I mean, we don't -- okay.
 5              MR. MILMAN:  Okay.
 6              JUDGE GREEN:  I mean, they're -- you're going to have
 7   a certain amount of leeway on that, but really, let's try to
 8   reign it in a little bit.
 9              MR. MILMAN:  Okay.  Thank you.  Just a few more
10   questions on the cricket event.
11   BY MR. MILMAN:
12   Q.   How many lot attendants worked at that event, if you know?
13   A.   95 per day?  It was 95 or 97 per day.
14   Q.   Okay.  And how did you get the parking lot attendants to
15   work there?  Where did you find them?
16   A.   So it was an all-hands-on-deck operation.  We pulled from
17   every region that we have at our disposal.  We integrated the
18   Queens division, myself out of Nassau County.  We asked Suffolk
19   County for support.  We have different regions, and we pulled
20   every supervisor, boots on the ground, and pulled together 15
21   from this region, 12 from this region, 17 from this region.  We
22   have multiple supervisors, sometimes within a geographical
23   region, so sometimes, you know, two supervisors in Nassau,
24   maybe 15 each, and we were able to get up to that total county-
25   wide.
```

1    Q.    How many supervisors and management staff would you say

2    worked on that project?

3    A.    It was roughly 12.

4    Q.    Okay.  And you hold an -- and all from Long Island?

5    A.    No, multiple regions.  The -- the New York region.

6    Q.    Okay.

7    A.    It would be.

8    Q.    And you had stated -- so you're an account executive now,

9    right?

10   A.    That's right.

11   Q.    Okay.  So let's -- we've heard some questions on like

12   corporate hierarchy.  Let's nail it down.  Okay?  Who's Mark

13   Baron?

14   A.    President of Parking Systems.

15   Q.    He's an owner?

16   A.    Yes.

17   Q.    How about Johnny Baron?  Who's he?

18   A.    I believe by title, Vice President of Acquisitions.

19   Q.    Okay.

20   A.    He is an owner.

21   Q.    Okay.  And how about Mike Petruzzelli?  Who's he?

22   A.    He is definitely an owner.  I think, vice president of

23   field operations.

24   Q.    Okay.  And under Petruzzelli, are there -- what -- what's

25   kind of like the next managerial hierarchy?

1   A.   So under Michael Petruzzelli, there would be two we --

2   well, on Long Island, two.  A Suffolk County regional rep,

3   Jeffrey Gluck, and a Nassau County regional rep, would be

4   Matthew Killary (phonetic).

5   Q.   Okay.  And then there are account executives?

6   A.   Correct.  Underneath those regionals.

7   Q.   Okay.  How many account executives work at Parking

8   Systems?

9   A.   I believe eight.

10  Q.   You're one of them, correct?

11  A.   I am.

12  Q.   Okay.  And there's been, the account executives, do each

13  one of the eight, you said eight, eight account executives

14  perform the same functions in the same locations?  How do --

15  tell me how they differentiate from each other.

16  A.   So the roles, yeah, the roles are mimicked, but there's

17  different areas of specialty.  So in my case, I'm medical-

18  specific.  I was part of the integration to our healthcare

19  division, and I take a lot of pride in that -- that realm and

20  region.

21  Q.   Okay.

22  A.   A lot of detail and intricacies within that, but there are

23  different traits that an account executive, even, might need to

24  have to really fit that model and mold.  There's other realms

25  like our -- our car dealerships.  There's certain training

1    that, frankly, I don't have.  I'm not special, you know, I'm

2    not specialized in that area.  There's equipment like CDK,

3    which happens to be in the news lately because of its, you

4    know, hacking and whatnot.

5    Q.    Right.

6    A.    But those are the automotive programs that actually run

7    the back end of the dealership.  So there's a variety of --

8    Q.    So let me just kind of hone in.  What -- your -- you're an

9    -- what is -- so is it solely done by location, or is it

10   location and type of industry that the account executive is

11   determined?

12   A.    It qualifies under both.  So there would be a region,

13   while we -- we always integrate.  We have regions that

14   geographically make sense.

15   Q.    Okay.  So how about you?  You're the account executive.

16   What is your region, and what are your industry locations?

17   A.    Sure.  So my region is western Nassau, and I cover

18   everything from our seasonal beach work as a specialty.  Very,

19   very tough industry.  A certain level of clientele that is --

20   that requires a level of patience of a saint.  So I have been

21   tasked for just shy of 15 years with a thousand projects in

22   that category.

23         I also bring a lot of those similar qualities, but with a

24   different level of training for medical-specific.  Those are

25   not only hospitals, but law firms.  Doctors offices that are

539

1    doing outpatient care are really challenging.  They present a

2    level of mobility struggle that is very different than you

3    would get at an average restaurant with, you know, a family of

4    four going out for dinner.  It's -- it's a different struggle.

5    Q.    Now, how about your specific industries that you work?  Is

6    it medical, you said?  Medical, hospital, beach clubs?

7    A.    Correct.

8    Q.    Okay.  Now, there are seven other account executives.  Is

9    that in Long Island, or is that in all of the Parking Systems

10   operations?

11   A.    That -- that eight, the total, including myself, should

12   cover our New York region.

13   Q.    Okay.  Do you know who those other seven are?

14   A.    Sure.

15   Q.    Okay.  Let's go.  Give me the next one.

16   A.    Seth Blutner.

17   Q.    Okay.  So let me just write this down.  How do you spell

18   his last name?

19   A.    B-L-U-T-N-E-R.

20   Q.    And what region is he responsible for?

21   A.    He is eastern Nassau.

22   Q.    Okay.  And what industries, if you know, is he responsible

23   for as an account executive?

24   A.    Automotive dealerships.

25   Q.    So it would be anything else or just auto?

540

1    A.    That -- he - he services other areas, but that's -- that's

2    his core.

3    Q.    Got it.  Okay.  So we have you, Josh Candiotti.  We have

4    Seth Blotner -- Butner.

5    A.    Blutner.

6    Q.    Blutner.  Give me a third.

7    A.    Brendon Cody.

8    Q.    How do you spell his last name?

9    A.    C-O-D-Y.

10   Q.    And what region is he responsible for as an account

11   executive?

12   A.    His focus area is restaurants and catering roles.

13   Q.    What region?

14   A.    Oh, I'm sorry.  That would be central Nassau.

15   Q.    Central Nassau.  And what industries?

16   A.    Catering.

17   Q.    Okay.

18   A.    And restaurants.

19   Q.    All right.  Catering as in catering halls or also catering

20   private events like?

21   A.    It -- it has a little overlap, but in his specific case,

22   catering halls.

23   Q.    Okay.  So that's three.  Is there a fourth?  We've got

24   Seth.  We have Brendan Cody.  Yourself.  Who else?  Four.

25   A.    Ray Upton.

1    Q.    Okay.  Ray Upton.  What region is he responsible for as an

2    account executive?

3    A.    He covers the Brooklyn region.

4    Q.    And what is his industry responsibilities?

5    A.    Medical specific and as well as event centers.

6    Q.    Give me an example of an event.  Like the Barclays Center?

7    A.    Barclays Center, yeah, well, similar, but a specific

8    example is the Coney Island Stadium.

9    Q.    Oh, okay.  Okay.  So that's four.  How about five?

10   Brendon, Seth, yourself, Rudy.

11   A.    We have James Lozada.

12   Q.    Okay.  James Lozada.  And what region is he responsible

13   for?

14   A.    Queens.

15   Q.    And what industry types?

16   A.    Medical and private house parties.

17   Q.    Medical and private house?  Okay.  That's five.  Got three

18   more.  James, Rudy, Cody, Seth.

19   A.    Bobby Gust.

20   Q.    Bobby Gust.  And what is Bobby Gust's region as an account

21   executive?

22   A.    Eastern Nassau and --

23   Q.    Yeah.

24   A.    And western Suffolk.

25   Q.    And western Suffolk.  And what are his industry types?

1    A.    Medical, restaurants, and car dealerships.

2    Q.    Okay.  So we're at six now.  Two more.  We've got Bobby,

3    James, Rudy, Cody, Seth, yourself.

4    A.    You would have Donald Shute (phonetic).

5    Q.    Okay.  And what location is Donald responsible for as an

6    account executive?

7    A.    So east New York.

8    Q.    And what industry types?

9    A.    Generally going to be the garage setting.

10   Q.    Got it.

11   A.    And that could be anything from Staten Island Garage to --

12   so to be clear, it covers Manhattan.  Really the boroughs.

13   Remove Queens from that.

14   Q.    Okay.

15   A.    But mostly Manhattan, Brooklyn, and East Elmhurst.  I'm

16   not sure of the exact --

17   Q.    Right.

18   Q.    And who's the final account executive?  $64,000 question.

19   A.    Andrew Goldsmith.

20   Q.    Okay.  And what location is Andrew responsible for?

21   A.    So Andrew Goldsmith has Stony Brook University.

22   Q.    Okay.

23   A.    As well as restaurants.

24   Q.    Okay.  What location -- what geographical?

25   A.    Oh, sorry.  Suffolk.

1    Q.    Okay.  How do you know all of this?  How do you know what

2    each account executive, what region, what is -- how do you know

3    that?

4    A.    A lot of collaboration and work together day to day as a

5    team.

6    Q.    Thank you.  Okay.  Does Parking Systems have a contract

7    with any unions?

8    A.    Yes.

9    Q.    Okay.  Where at?

10   A.    I know that Nassau Events Center, which is in east Meadow,

11   Uniondale.

12   Q.    Okay.  Do you know which union or do you know the trade

13   name of the union?

14   A.    Not specifically.

15   Q.    Okay.  But you know it's union?

16   A.    Right.

17   Q.    Okay.

18   A.    That's a union location for us.

19   Q.    How long has that union been there?

20   A.    I think maybe six years.

21   Q.    Okay.  Now let's look at that, the event center.  Is the

22   event center a normal type of Parking Systems, valet service

23   type, or is it not?

24   A.    No, it -- it differs.  It certainly is, by definition,

25   falls into the category of a sports center as far as labeling

1  it as a location, but it's sporadic and -- and high volume with

2  regards to its staffing.  So it's -- it's going to have large-

3  scale events on a pre-scheduled basis, you know, seasonal, back

4  when the Islanders were playing there.  Now it's for concerts,

5  and it's also not a valet location.  It's going to be

6  cashiering and traffic control.  So it's certainly a little

7  different.

8  Q.    Got it.  And is it steady every day?  Is something going

9  on, or is there only when there are events?

10 A.    No.  No, it's an event calendar.

11 Q.    Right.  So like if Billy Joel is playing there, for

12 example, a few nights, that would be --

13 A.    Gear up because it's going to be a busy night.

14 Q.    Busy night, I'm sure.  Okay.  Were you involved in the

15 start-up of the Stony Brook operation?

16 A.    Yes.

17 Q.    Okay.  We'll get back to that.  Now, in your

18 preparation -- well, strike that.  You were involved, I think

19 you said, in the preparation for the start-up.  When I said I

20 asked you were you involved in the start-up, might -- I want to

21 be more specific.  Were you involved in the preparation for the

22 start-up of Stony Brook?

23 A.    Yes.  I would be considered to be on the implementation

24 team.

25 Q.    Okay.  And would that be because your specialty is in

1  medical and hospitals?

2  A.    Partly.

3  Q.    Okay.  Now, during -- prior to December 1 of 2023, did you

4  have an opportunity to review the Classic operation?

5  A.    Yes.

6  Q.    Okay.  How many -- were you -- did you actually do site

7  visits there?

8  A.    I did.

9  Q.    Okay.  How many site visits did you do?

10  A.    I believe it was a total of three.

11  Q.    Okay.  And after all your experience in the last 15 years

12  as a parking lot attendant and serving in management, were you

13  able to view Classic and Parking Systems and see the

14  similarities or the differences?

15  A.    Yes.

16          MR. JACKSON:  Objection.  Leading.

17          JUDGE GREEN:  Overruled.

18  BY MR. MILMAN:

19  Q.    Let's look at some.  Does Classic and Parking Systems have

20  the same uniform policy, if you know?

21  A.    We do not.

22  Q.    What, if anything, did you notice about Classic's uniform

23  policy or uniform type?

24  A.    I would say that I didn't read written policy, but my

25  observations were that either their policy was not adequate or

1    not enforced.

2    Q.   Well, what did you notice about any uniforms at Classic

3    when you were servicing Stony Brook valet?

4    A.   So I was always taught that we're the first and last

5    impression at any doorway of a facility.  We're an extension,

6    and that our visual presence is noted of us.  I was always

7    groomed to hyper-focus on presentation, and the first

8    observation from my visual was that there was no uniformity.

9    There was anything from an attendant that either wasn't issued

10   or just didn't care to -- didn't have a jacket, a shirt that

11   was branded in a Classic or a valet identifying uniform.

12        There was no consistency with pants.  Whatever their pants

13   might be, there should be a uniform.  There was gray

14   sweatpants.  There was blue jeans.  There was dark gray jeans.

15   There was just a variety of what was worn.

16   Q.   Fair enough.  Did that make an impression on you?

17   A.   Yes.

18   Q.   What is -- what, if anything, is Parking Systems' uniform

19   policy?

20   A.   So we logo everything, waist up.

21   Q.   Is that what you're wearing right now?

22   A.   It is.

23   Q.   Can you stand up?

24   A.   I can.  Sure.

25            JUDGE GREEN:  Go ahead.

1    BY MR. MILMAN:

2    Q.    Okay.

3    A.    Can I go on?

4    Q.    Yeah, please.

5    A.    So everything waist up is going to be provided with a

6    logo.  It's going to be provided in the correct size at the

7    request of the attendant.  It's going to be a black dress

8    shirt.  In colder weather, it's going to be a zip-up fleece,

9    waterproof jacket.  We provide hats as well.

10         Waist down, you're going to need four items.  It's going

11   to be a black belt, black dress slacks.  To be very clear, they

12   can't be black jeans, dress pants.  They need to be dress

13   slacks.

14         As far as footwear, we're going to do a black shoe, a

15   running shoe.  Recommend something comfortable with a rubber

16   sole.  And socks should be black socks that run about halfway

17   up your leg.

18   Q.    Everybody wears that uniform you're wearing right now?

19   A.    Every single attendant in our -- in our entire company is

20   in this uniform.

21   Q.    Now, you had mentioned about a jacket or a fleece.  Is

22   that also company insignia?

23   A.    It is.

24   Q.    What does that look like?  Is there any way that you have

25   -- do you have to wear it?

1    A.    I have one in this room that I wore to -- to work today.

2    Q.    Can I see it?  Is this it?

3    A.    That is it.

4          MR. MILMAN:  May I approach the bench, Your Honor?

5          JUDGE GREEN:  Yes.

6    BY MR. MILMAN:

7    Q.    So, company pays for that?

8    A.    Yes.

9    Q.    Okay.  Company -- okay.  So hold that jacket up.  Explain

10   to us.  I mean, it looks like an expensive, heavy jacket.

11   A.    It is, yeah.  And the price of it keeps going up.  But

12   with this, we have reflectors.  So visibility is high.  So we

13   have this evaluated by our risk management team, and they

14   suggested that all outerwear that goes beyond the polo should

15   have a reflector.  So our fleeces, which I don't have present,

16   are identical to this, just a cotton material.

17   Q.    Right.

18   A.    This is fully waterproof.  It's the same, actual same

19   jacket that you'll see at a airport with the traffic directors

20   out there for JFK and LaGuardia.  And everything, of course,

21   will have, sorry, a company logo.  It's important that when the

22   customer hands you the key to the most expensive item that

23   they've ever bought in their life, that they know they're

24   handing it to an attendant.

25   Q.    You're like a commercial.

549

1    A.    That's good.  It's what we do.  I'm passionate about it.

2    Q.    The -- thank you for that.  Now, okay.  So how does

3    Parking Systems coordinate its -- well, strike that.  As a

4    parking lot attendant, how -- are they paid an hourly wage?

5    A.    Yes.

6    Q.    Do they receive tips?

7    A.    Yes.

8    Q.    When you were a parking lot attendant, you received an

9    hourly wage and you received tips?

10   A.    That's correct.

11   Q.    Okay.  And how does -- what is Parking Systems' policy

12   regarding tips, if anything?

13   A.    So at each site, we do a pooling system.  It was always

14   expressed to me, and it's so, so true.  You can -- you can get

15   greater camaraderie around that, and you can also ensure that

16   people, attendants, don't get shorted, as an example.

17   Q.    You said camaraderie, like joint effort?

18   A.    Yeah.  Volume, you know, team -- team morale.

19   Q.    Right.

20   A.    With, as an example, if there's two attendants, myself,

21   Bobby Gust, and we do 20 total cars, and Bobby's a hard worker.

22   He can --

23   Q.    Hold up.  You park cars?

24   A.    Yes, day to day.

25   Q.    Bobby parks cars day to day?

550

1    A.    Absolutely.

2    Q.    So you're working side-by-side with the lot attendants?

3    A.    Yes.  Leadership by example.

4    Q.    You do exactly what they're doing?  The same functions?

5    A.    Exactly the same functions, and I would say that, I know

6    the pace I move.  I try to set the tone of a well-oiled

7    efficient machine.

8    Q.    Right.  So you're in the trenches with the rank and file,

9    so to speak?

10   A.    4:30 in the morning for two weeks straight at Cricket.

11   Q.    Okay.  And is that true for Mike Petruzzelli?

12   A.    Yes.

13   Q.    Is that true for Andrew Goldstein (sic)?

14   A.    Goldsmith, yes.

15   Q.    Goldsmith, yeah, sorry.  Well, let's go down your list of

16   account executives.

17   A.    Okay.

18   Q.    Is that true for Seth?

19   A.    It is.

20   Q.    Okay.  Is that true for Ray?

21   A.    It is.

22   Q.    How about Cody?

23   A.    It is.

24   Q.    James?

25   A.    It is.

1   Q.   And the other account executives you had mentioned?  Same?

2   A.   Yes.

3   Q.   How about Johnny Baron?  Does he park cars?

4   A.   Absolutely.

5   Q.   Same way that you do and Bobby does it and all the rank-

6   and-file parking lot attendants?

7   A.   Everybody's hands on.

8   Q.   Same way you did the volume when you were a parking

9   attendant yourself?

10  A.   Yes.

11  Q.   How about Mark Baron, the patriarch?  Does he park cars?

12  A.   Seventy years old.  We still watched him throughout

13  Cricket.

14  Q.   Old man Baron still parked cars.

15  A.   It was quite impressive.

16  Q.   Okay.  Did you notice management of Classic parking cars?

17  A.   I can't say that I observed that specifically.

18  Q.   Did you notify -- did you notice any management at Classic

19  when you were there on your site visits?

20  A.   Yes.

21           MR. JACKSON:  Objection.  How does the witness know

22  who's management or not?

23           JUDGE GREEN:  Okay.

24           MR. MILMAN:  Oh, I'm glad you asked that question for

25  me.

552

1  BY MR. MILMAN:

2  Q.   Was there anybody at Classic -- anybody at Classic have

3  any designation as management?

4  A.   No.

5  Q.   How about Parking Systems?  Parking Systems have a

6  designation as management?

7  A.   We do.

8  Q.   What do you have?

9  A.   We do ID badges for all employees.

10  Q.   And what do the ID badges say?

11  A.   So for a parking attendant, cashier, traffic director,

12  it'll be listed as attendant.

13  Q.   Right.

14  A.   For a management, it'll say their title.  So that might

15  be --

16  Q.   So like at Stony Brook Hospital, right?  A visitor comes

17  in.  They can see someone who's management, someone who's not.

18  Same uniform, but a designee for management, a designee for not

19  management, right?

20  A.   Correct.

21  Q.   Okay.  And is that how you do it?  All the operations in

22  the whole organization?

23  A.   We do.

24  Q.   Okay.

25  A.   Part of training is you get issued an ID.

1  Q.   Got it.   Okay.   So let's go back to some of the other

2  criteria comparing the two organizations that you have

3  firsthand knowledge of.   Okay.   We talked about uniforms,

4  talked about tips.

5       So hold on.   Back to tips.   Sorry.   I don't think I let

6  you finish.   I jumped in.   I apologize.

7       So you were saying about how you're talking about your

8  Parking Systems' tip policy.   What, if anything, is that again?

9  A.   So each site has a pooling system.   And the example I was

10  going with was on a simple level, Bobby Gust and myself are

11  working together.   We park 20 cars.   Josh turns out to be, a

12  hypothetical example, lazy.   I park three.   Bobby parks 17.   By

13  pooling it, we -- we protect, well, someone might have done the

14  lesser work, me in this case.   Someone gives a very generous

15  high gratuity, a $20 gratuity.   I only park three cars.   I made

16  out like a bandit when Bobby parked 17 and five didn't tip, 12

17  tipped.

18  Q.   Right.

19  A.   And he walked away with $15.   All right.   So by pooling

20  it, you can control the team morale because your -- everybody's

21  getting an equivalent share of that overall grouping.   And it

22  makes interchanging positions throughout the day functional.

23       As an example, park the Jewish facility, park the Jewish

24  Institute, which is a facility that I operate directly in

25  western Nassau.

1   Q.   I know the hospital well.

2   A.   Yes, big facility.  There's a cashier provided by Parking

3   Systems.  That cashier is not necessarily parking cars.

4   They're not one of the four attendants in the lot.  But they're

5   very much a core part of getting that operation to function.

6   They're the first communication point when a customer pulls in.

7   They actually run the transaction, greet the customer.  I'd

8   argue that they're a very important part of that role.

9   Q.   Right.

10  A.   They shouldn't be excluded from that by them not being,

11  you know, a part of the team.  It's a team pool.

12  Q.   Understood.  Now, did you have an opportunity to witness

13  how tip -- tips -- well, strike that.  So at Stony Brook right

14  now under Parking Systems, is it just like, let's say, the

15  four-person, let's say there's four-person allocated initially

16  at the Cancer Center.  Okay?  It's just those four pool of tips

17  or is it everybody at Stony Brook at all different locations

18  within the Stony Brook Hospital pool?

19  A.   It's the entire campus of Stony Brook.

20  Q.   That's what I thought you said.  Okay.  So did you have an

21  opportunity to know how Classic did their tip allocation or

22  anything of that nature regarding tips when you had your three

23  site visits?

24  A.   Yes.  So to elaborate, pretty sure Richard was the name of

25  the prior manager figure for -- for Classic.  He had provided

1    quite a bit of information upon transition and tips were

2    discussed in that and it was hub-by-hub, not campus-wide.

3    Q.    Got it.  Okay.  Now, there's been some testimony on the

4    record on both sides about how at Stony Brook, how inter --

5    Sorry.  How employees shifts within Stony Brook, the various

6    hubs and how employees are either designated a certain shift or

7    how they might move to another shift intra Stony Brook.  Does

8    Parking Systems have a policy on how you shift all the various

9    hubs at Stony Brook?

10   A.    We do.

11   Q.    And what is that, if anything?

12   A.    So each, let's call them valet posts --

13   Q.    Okay.

14   A.    -- has a lot manager and that lot manager is equipped with

15   a radio to communicate with all of the posts on that campus.

16   We would ebb and flow based on the request and the defaulting

17   to the expertise or, you know, pressure that that lot manager

18   was getting at a given point in time, to dispatch the

19   appropriate amount of help.  And that's two-way.

20        So, that's even things like saying on the radio, hey,

21   we've had a 15-minute lull.  Is anybody busy?  You know, we

22   could spare some time.  Is anybody feeling a little bit of

23   pressure?  We want to use the labor efficiently and we instruct

24   our lot managers that that is an important responsibility that

25   they hold to run the campus effectively.

1   Q.   Okay.  And did you -- would you have an opportunity to

2   witness how Classic addressed intra-issues at the various hubs

3   when you did your site visits?

4   A.   I observed on my site visit.

5   Q.   What did you notice, if anything?

6   A.   Each post stayed on their post and there was no

7   communication via radio from post to post.

8   Q.   How many radios does Parking Systems have at Stony Brook?

9   A.   I believe it's about 36.  They come in sets of 12 and we

10  put three on.

11  Q.   Did you notice any radios at Stony Brook when Classic was

12  operating?

13  A.   Yes.  One.

14  Q.   One.

15  A.   Richard.

16  Q.   One radio?

17  A.   Richard, Classic manager to MAPS Team.

18  Q.   MAPS team as in the Stony Brook people?

19  A.   Yes, Mobility and Parking Services.

20  Q.   Okay.  That's a big difference, no?

21          MR. JACKSON:  Objection.

22          THE WITNESS:  I think so.

23          JUDGE GREEN:  Sustained.

24          MR. MILMAN:  Yeah.

25  BY MR. MILMAN:

Q.    Okay.  Now, does -- in -- I know I talked about intra-

staffing.  Is there ever a time that Stony Brook parking lot

attendants would work someplace else besides Stony Brook in

Parking Systems?

A.    Yes.

Q.    How often does that happen?

A.    Weekly basis.

Q.    And is there ever parking lot attendants that work outside

of Stony Brook that have an opportunity to work at Stony Brook?

A.    Yes.

Q.    And, in fact, do they work at Stony Brook?

A.    Yes.

Q.    Now, who makes the determination whether a outside parking

lot attendant working outside of Stony Brook, wherever they're

working or whatever locations they're working, who makes the

determination, if it's done, when and which employees will work

at Stony Brook if they need it?

A.    So that would be on an account executive level.  And as

far as why -- why they would be making, you know, or requesting

or communicating amongst account executive to account

executive, would be either trend of service flow.  So, that

could be holiday weeks.  I know that this week is July 4th

week.  I can vouch that I have somewhere in the 25 day off

request range for this week alone.  So a supervisor might have

a, in my case, beach clubs.  Well, you have staff that's at the

1   prime of asking for days off.  It's a holiday, I understand.

2   And I also have equivalently high pressure on workflow.

3        So, for me, this week is a very tough week, and I would

4   reach out to another account executive expressing who might

5   have a medical center that's closed, an off-premise, not a

6   hospital, but an off-premise, and we would support each other

7   and vice versa.

8   Q.   So exactly, when I asked you the question, how do you know

9   when every account executive location and industry-wise service

10  is because of these weekly meetings you refer to?

11  A.   Yeah, so, it's -- it's being, well, there are -- there are

12  weekly meetings that we -- we do host.

13  Q.   We'll focus on that first.

14  A.   Okay.  So who's, tell me -- what -- tell us about the

15  weekly meetings.

16  Q.   So the weekly meetings are on Tuesday, and they consist of

17  our account executives.  They are often what I kind of refer to

18  as being current events.  They touch on topics that are going

19  on in the real world, in our parking lots, that need to be

20  addressed.  It could be good, bad, ugly.  You know, and in

21  recent months, unfortunately, as I think we all read about in

22  the paper, there are a tremendous rise in vehicular thefts on

23  the western side of Long Island, or western Nassau.  So we're

24  communicating the import -- importance of being aware of that

25  and getting that messaging out from the account executives down

1  to the site supervisors, down to the lot managers, down to the

2  parking attendants.  That's important information that needs to

3  get relayed.

4      We also touch upon events.  There is a cricket event

5  coming up.  There is a 45-person house party.  There is, two

6  weeks ago, we did a large event in Far Rockaway that was a

7  temple hosting like a grand opening, and there was like 47

8  parking attendants.  So we have to do quite a bit of

9  collaboration, so staff-wise.

10 Q.    So are these meetings held team, Zoom, in person?

11 A.    Zoom would be the platform used.

12 Q.    And is it always done at a certain time, or is it just

13 wherever you schedule time?

14 A.    So it is scheduled on a weekly basis for 9:15 a.m.

15 Q.    Okay.

16 A.    In addition to that, it's -- it's on a like on an as-

17 needed basis.  So just because we met Tuesday at 9:15 and went

18 over our standard agenda doesn't mean that a problem doesn't

19 occur Wednesday night at a restaurant that needs, you know,

20 Thursday morning or Wednesday night, immediate attention.

21 Q.    Well, it sounds like there's a lot of communication so

22 let's say I am -- I'm an account executive and I have the beach

23 clubs.  And I say, look.  I've got July 4th coming up.  Jones

24 Beach, the private -- Atlantic Beach, Long Beach.  Going to be

25 basically, how do I -- what do I say?  Hey, anybody else have

1    six extra guys?  Like, is it done in that?  How is it

2    coordinated?

3    A.    So, we -- we try to be a little more organized than that.

4    Q.    Right.

5    A.    We -- we'll snap a capture of our own individual schedule.

6    Q.    Yep.

7    A.    And since we all are using a standardized platform

8    company-wide, I can send that to either all supervisors --

9    Q.    Right.

10   A.    -- or potentially supervisors specifically that I -- I

11   know has a little bit of a lull.  That might have just come up

12   in conversation earlier in the week.

13   Q.    Right.

14   A.    And I know that they -- they didn't seem to be screaming

15   in pain about getting the schedule done, and I know that they

16   might have some leeway.  So I can produce and -- and send out

17   that schedule to them and they can then populate that.

18   Q.    Okay.  So let's go back.  Let's jump around a little bit.

19   Let's go back to the corporate hierarchy.  So you talked about

20   the regional managers, right?  You talked about the eight

21   account executives, and then we left off there and I asked you

22   some other questions.  Let's continue back under that theory.

23   So what would be the line supervision under account executives?

24   A.    So then you would have a site or facility supervisor.

25   Q.    How many, approximately, does Parking System have, if you

1    know, Long Island or total operation?

2    A.    About 18 to 20 for the New York region.

3    Q.    Okay.

4    A.    Site supervisors.

5    Q.    These are site supervisors.  Now is there anything under

6    site supervisors?

7    A.    Yes.

8    Q.    What's that?

9    A.    There are a lot manager.

10   Q.    How many lot managers would you say you have?  I'm not

11   going to ask you their names, I promise, but.

12   A.    60, 70.

13   Q.    60 or 70?

14   A.    Yeah.  And if I could define just to distinguish.

15   Q.    Yeah, yeah.

16   A.    So -- so site manager would be, or facility manager,

17   supervisor, would be referring to a project large enough that

18   there needs to be supervision actually above the lot manager.

19   As an example, 410 Lakeville Road.  It's not a hospital, but

20   it's a New Hyde Park.  It's Northwell's highest outpatient

21   treatment center, medical center.

22        So they see several hundred patients a morning.  We have

23   two valet stands, and each stand has a lot manager, but it also

24   has a facility manager, someone that is checking the whole

25   property to make sure that the left is talking to the right.

1   So that way, one stand isn't, you know, operating in a

2   different scope than the other stand.

3        So, when you have a facility manager, it would be at

4   facilities that are large enough, which is why I said about 18

5   to 20 would dictate that.

6   Q.   Right.  And then, what about account representative?  Is

7   account representative a title?

8   A.   So I think that -- that might be verbiage that mimics

9   account executive.

10  Q.   Okay.  Okay.

11  A.   Yeah.

12  Q.   And then there would be account executive, for example,

13  that location and a bunch of other locations within that

14  account -- account executive's purview.  Is that right?

15  A.   Say that one more time, please.

16  Q.   So, in other words, right.  So you said, you know, you

17  have a facility manager, you have a site manager.  Then you

18  have an account executive that has that location and other

19  locations under his or her --

20  A.   Yes.

21  Q.   -- control, purview, you know, direction.

22  A.   Correct.

23  Q.   Okay.  And how does a regional manager work under that?

24  A.   So a regional manager is going to be less involved in

25  staffing.

563

1    Q.    Right.

2    A.    There, so in my case of Western NASA, I report to Matt

3    Killary, who is the Nassau County Regional Manager.

4    Q.    Right.

5    A.    The support I'm getting from Matt is really pertaining to

6    on-site, real-time problems that stump myself, right?  Despite

7    doing this for 15 years, this industry genuinely throws new

8    challenges at you every day.

9    Q.    Okay.

10   A.    There are times when I don't know the answer, and I'm

11   going to my supervisor, Matt, for that.  That could be -- can I

12   provide an example?

13   Q.    Sure, please, yes.

14   A.    So that might be a missing key at a wedding where we find

15   out that the person whose vehicle it is, actually lives in

16   Delaware.  Not a standard Uber ride home for a manager like

17   myself, account executive, getting in a car and taking that

18   customer home and first-hand trying to rectify it.  We go above

19   and beyond, but I'm not really authorized to start driving a

20   customer to Delaware over state lines, right?  So that's

21   something that I would reach out to Matt Killary for guidance

22   and support on.

23         The other realms of support that, or tasks that that

24   individual would have would be high-level meetings with a

25   current account.  So maybe not a small issue about a hiccup

1    that occurred last Tuesday that needs to be addressed, but

2    maybe a change in scope of work with the facility.  Maybe some

3    place is undergoing construction.  It's going to be a six-month

4    project, and we have 40 spots, and now it's going to be 12.

5    And we have to have a site meeting.  Matt Killary with Western

6    Nassau, Jeffrey Gluck with Suffolk.  I'm sorry, Matt Killary,

7    Nassau, Jeffrey Gluck, Suffolk, would be covering those realms.

8    Q.    Got it.  Now, you had mentioned earlier about some of the

9    current event, like the current event -- what the weekly

10   current event means, and some of the topics of the most recent

11   day is theft of cars.

12   A.    Yes.

13   Q.    Okay.  So what is this, if anything, what kind of security

14   does Parking Systems have at Stony Brook or if it's applied

15   throughout the organization on security for vehicles?

16   A.    So two dynamics when it comes to security as a topic.  One

17   is going to be, I guess let's start with key safety.

18   Q.    Right.

19   A.    That's where the key resides when it's inactive, out of

20   use, right, in our possession.  We've taken bailment of the

21   vehicle, and now we're responsible to safeguard it, its

22   contents, and its keys.  So where that key sits and how it's

23   secured is what we'll refer to as key safety.  We generally

24   will operate with Valet Spot or Parking Pro Shop boards.

25        Those are two companies that create boards that are metal,

1    or depending on circumstances, they have a kind of like a

2    carbon fiber composite, and they are really, really good at

3    deterring break-ins, and they also work with slam lock hinges.

4    So those slam lock hinges will actually be on a pulley, and if

5    the board's left open, within three seconds, it actually slams,

6    and the slam lock closes and activates it.  So in order to open

7    that board, you'd actually have to have a key, or potentially,

8    depending on our locations, we even have digital keypads.  So,

9    we can have a rotating code.  Monday might be 0001, onward.

10        Key handling would be --

11   Q.   Let's hold off on key handling right now.  Did you have an

12   opportunity to witness, did Classic have these high-end boards

13   that you're talking about?  Just --

14   A.   No.

15   Q.   What did they have for security, if you noticed, if

16   anything?

17   A.   Well, as far as boards, they had open-paneled wood boards.

18   So they were -- they did have a keyboard in their main and

19   Cancer Center.  They did not have the same door slam and lock

20   mechanism that Parking Systems uses.

21   Q.   Okay.  And the second area of the key maintenance or

22   security you were about to testify, please continue.

23   A.   So key handling would be part two, and key handling is

24   referring to the process while we're actually moving the key,

25   while it's in transit.  So naturally, the car gets parked, and

1    then the attendant will get out, lock the car, and secure it.

2    But then they're in possession of a singular key.

3         Two parts to this.  One, where it goes.  We have a firm

4    policy, and we strongly reiterate, we handle one key at a time,

5    and it never leaves the palm of the hand.  It stays in the hand

6    from transit -- from the vehicle to the key board.  It seems

7    insignificant, maybe, based on what I say, but I'm vouching

8    from living this and having a lot of pressure around this.

9         One, you don't want to lose the key.  You want the

10   customer to be able to leave and go home, especially in a

11   hospital setting where they're coming out at a sensitive time.

12   Two, you don't want to misplace or leave that key vulnerable.

13        So you don't want to put the key down on the hood or tire

14   of the car or leave it simply five, six, and then piling of the

15   -- you know, the chair of the room until you get a moment to

16   hang the key.  That's a shortcut that, to us, is just simply

17   unacceptable.  It results in theft.  It results in potentially

18   just misplacing a key that leaves the customer in a vulnerable

19   place.  And it's, for me as an operator and Parking Systems as

20   the company, it's an area that we really do focus a lot of

21   training and attention on.

22   Q.    Okay.  And you have an opportunity in your three site

23   visits to witness how Classic perform their key maintenance?

24   A.    I did.

25   Q.    And -- or handling, sorry.  And what did you notice?

1  A.   So as far as key handling, they were -- parking attendants

2  under Classic were handling multiple keys at a time.  Now

3  usually that stems from taking less steps, shortcuts, trying to

4  expedite.  But that's a shortcut that can result in

5  vulnerability, an expense of a missing key, and a patient or a

6  guest of some sort having an experience that I consider

7  unacceptable.  So that was witnessed.

8       Then key security, their equipment wasn't adequate.  They

9  didn't have the technology and the locking mechanisms that we

10  would install and that we did install at Stony Brook when we

11  took over the site.

12  Q.   Okay.  Now, let's go by -- let's go booth-by-booth.  Were

13  there any differences that you noticed between how Classic

14  performed its services to the hospital versus Parking Systems

15  at the main entrance?

16  A.   Can you say that again, please?

17  Q.   Yeah.  Did you notice any differences in how Classic

18  performed the services, versus how Parking Systems performed

19  the services at the main entrance?

20  A.   Yes.

21  Q.   What are they?

22  A.   So cashiering, there is a revenue collection.  That is the

23  hospital's money.  It's state money.

24  Q.   We collect for them?

25  A.   Correct.  So Parking Systems is tasked with the collection

1  of that.  We're tasked with reporting, but it's -- it's tax

2  dollars.  It's our public state money --

3  Q.   Right.

4  A. -- how, whatever channel that properly be stated.  So it was

5  stressed out by the MAPPS team that this was an area of --

6  Q.   It doesn't come to Parking Systems.  It's the hospital's

7  money?

8  A.   Correct.

9  Q.   Right.  Okay.

10 A.   It gets actually delivered nightly into the inside of the

11 hospital to management, and it's -- it goes directly -- I

12 assume, they're depositing it into the Stony Brook account.

13 Q.   Right.  So, what, if anything, did you notice the

14 difference between how Classic handles the main entrance and

15 how Parking Systems does?

16 A.   So we changed that ticketing system to avoid, for auditing

17 purposes and for just kind of what I would consider, you know,

18 bleeded revenue.  So we wanted to ensure that we could go into

19 a parking lot, go through each vehicle.  I mean, this should be

20 efficient and easy when you're doing it at volume that we do.

21 You want to run a lot.  Right.  You go down from car 1 to car

22 12, and you work zigzagging back through that line.  And you

23 want to know that every vehicle has a ticket, because a ticket

24 results in a cash transaction.  You want to then be able to

25 check the register and match that.

1          We found that tickets weren't always being issued.  There

2     was a lot of consistency.  People knew the attendants, the

3     attendants knew them, and that's -- that's fine.  That's great.

4     But when it comes to auditing, there's still a process that

5     needs to be upheld so we can, with honesty and integrity, say

6     that we are doing what we were signed up to do in the contract

7     to protect and ensure clarity and -- and honesty of the

8     revenue.

9          So we changed our ticketing procedures to make sure that

10    there was always an audit proof on it.  In addition to that, we

11    changed, actually, the drop safe policy.  There was some

12    confusion if it was actually, there was quite an uproar if it

13    was ever being deposited or not. So we actually came up with a

14    new dynamic with the MAPS team to do a very crystal clear

15    checking at the end of the night.  We don't want to leave with

16    any concern that there was no --

17    Q.   And the MAPS team, just again, who -- what is MAPS team

18    acronym for?

19    A.   So, Stony Brook has a delegated administration team called

20    MAPS.  It stands for Mobility and Parking Services.

21    Q.   Okay.  And who are the employees that work in that MAPS

22    division, if you know, from Stony Brook?

23    A.   So there are a pretty long list of probably the whole

24    department, but on the senior level, Kendra Sutherland, I

25    believe, was the highest.  I don't know, maybe VP of

1  Operations.  There was Akram (phonetic), don't know the last
2  name, who was definitely a lead administrator.  And then Dan
3  Atkins and Nick Serapino (phonetic), who I think are both --
4  they're both admins.  They're -- they're -- I think Dan might
5  be senior admin, Nick is maybe just admin.
6  Q.    Oh, okay.  And so tell us about your collaboration with
7  MAPS that you were stating.
8  A.    So, and pertaining to our initial meetings with them or --
9  Q.    Yeah, well, you know, to the main entrance.  There were
10  issues at the main entrance.
11  A.    Sure.  So one of the concerns at the main entrance was
12  that naturally it's the front door to a hospital.  It was
13  designed in, so that, actually, historically very interesting.
14  So the drive aisle had actually not been updated other than
15  resurfacing in over 25 years from what we were expressed.
16      The hospital has grown quite a bit.  Nassau County and
17  Sutton County population has boomed, and this hospital is --
18  it's incredible, the infrastructure that they've added.
19      But one thing that's remained unchanged is it's a two-lane
20  drive aisle still.  So you have 15X volume that you might have
21  had in 1985, but you have, you know, a drive aisle that's the
22  same.
23      So one of the suggestions that we -- we stated was our
24  attendants' activity and our layout for -- for the drive aisle
25  would need to be completely changed.  Just completely different

1  from what they were.  So those changes were the problem.

2      One, a drive aisle should have delegation, delineation,

3  and that should break down through traffic from valet traffic.

4  There's no reason -- we've all been stuck in a red light or an

5  intersection.  Who drives down the road without traffic, you

6  know.  If -- if things are labeled and delegated for the

7  appropriate parties, so a through traffic car wouldn't be

8  sitting behind, for 15 minutes, a valet vehicle, that is, a

9  discharged patient coming out of the walker.  That through

10  traffic vehicle should have come and gone.

11  Q.  In other words, in the car, ready to get out versus people

12  that are dropping their car off?

13  A.  Absolutely.

14  Q.  Right.

15  A.  So there -- there could be a valet vehicle that's' staged,

16  right?

17  Q.  Right.

18  A.  And the customer is there.  They have a wheelchair and

19  they just got discharged.  You know, husband's picking up wife.

20  And whatever, the --

21  Q.  Yeah.  of course.

22  A.  It could take them a while.  I mean, it could take 7, 10,

23  12 minutes to load up.  I mean, we have, you know, I think of

24  loved ones that are mobility struggling, right?  So now the car

25  behind them that was just a through traffic vehicle and should

1    have left, well, they're angry.  They're honking.

2    Q.    Right.

3    A.    Gets the staff frantic.  It's not a good look for the

4    front of the hospital.  So we created a valet lane that was

5    distinguished with signage and cones.

6    Q.    Right.

7    A.    And we created a through traffic lane.  We also were very

8    clear when we -- we were creating procedures for the front of

9    Stony Brook that part of the scope of work, while it had not

10   been in the past, was that the attendants working the front

11   were going to be responsible and accountable for facilitating

12   traffic flow.  So that means, despite maybe some -- some

13   pushback, that the attendant's job does not start and end with

14   a customer pulling up and saying, please park my car.  The

15   attendant's job is to go 40 feet down that aisle when they see

16   that there's two cars hanging in the back, up to something, and

17   find out what their needs are.  Are you dropping off?  Are you

18   at the right entrance?  Facilitate that.  Put some pressure,

19   politely, to move them along.

20        So that -- that front drive aisle was a -- was a major

21   one.  We changed procedures.

22   Q.    And after the change of procedures, did you get any

23   feedback from MAPS after you implemented your new measures?

24   A.    They told us on -- on our -- we do a weekly touch base.

25   They told us, it was exciting to hear, that they were no longer

1    getting paged, that they were needed in the front circle.

2    Q.    Okay.  Now, let's go to the cancer booth.  Any -- do you

3    know any differences, or did you witness any difference how

4    Classic performed their services at the cancer booth versus how

5    Parking Systems does?

6    A.    So there was signage and key board upgrades.  I would say

7    that was an area that the integration of the operation on a

8    campus-wide level probably had the most impact.  Well, there

9    and staff lot A, but if we talk about --

10   Q.    We'll get to that next.

11   A.    If we talk about Cancer Center, I think the biggest impact

12   was they -- they have an interesting schedule when it comes to

13   appointments.  They truly do have a, I guess, if I understand

14   it right, more doctors are in on certain days, so more

15   treatments are given.  I assume that, you know, vouch that it's

16   not, you know, it's not an ER, right?  It's not an emergency,

17   so I would imagine that it's based on bookings, if I understood

18   it right.

19   Q.    Okay.

20   A.    So treatments for -- for reoccurring patients needing the

21   services would be booked, and they seem to come in clusters,

22   but we wouldn't always be privy to those -- those details.  And

23   even still, despite all the technology and information we have,

24   we can't always get a great window from Stony Brook, whether it

25   be MAPS or probably their -- their, really, the clinical

1    department would be more responsible for divulging that info.

2    And it's just not getting to us.

3    Q.    Right.

4    A.    So we need the ability to immediately provide support.  So

5    besides some cone upgrades and some signage changes, which were

6    campus-wide, I think the biggest Cancer Center improvement was

7    the ability to bring front staff from main in real time as that

8    line in Cancer Center was building up.  There could be well

9    over 200 cars per day at that facility.  It's only a three-lane

10   road.

11        It's a preset kind of starting schedule.  I believe, has

12   two attendants in the morning, and then it ramps up, but

13   truthfully, if you're talking three- to four-minute turnaround,

14   and you have 30, 40 cars pull in, you're talking well over an

15   hour of -- of task work that needs to get completed.  You --

16   you're not doing that with two attendants.  You can do it

17   really quick with six.  So the push and pull from the post, to

18   me, was the biggest change at -- at the Cancer Center.

19   Q.    Okay.  How about the emergency center?

20   A.    So the emergency center's interesting because it ties more

21   into revenue.  MAPS had pointed out that there was an absolute

22   bleed of revenue there.  Worse than at the front.

23   Q.    You mean when Classic was there?

24   A.    Correct.

25   Q.    Okay.

1    A.    And this, I'm sorry, to be very clear, these were the

2    concerns that I'm referring to right now, from MAPS, were the

3    pretransition -- the transition meeting, right?  Pre-

4    operational.

5    Q.    Right.

6    A.    And their concern was that they were looking into -- they

7    were getting -- transparently, they were getting questioned by

8    their superiors about the revenue control process.

9    Q.    Right.

10    A.    So they started doing some digging.  It turned out that

11    nobody paid for ER services for like well over a year at the

12    ER.

13    Q.    Under Classic?

14    A.    Under Classic.  That's not how it's built out to -- to

15    roll.  It's -- it's supposed to be validated for ER patients.

16    Now, if you come on a Saturday and you decide you'd like valet

17    service and you're going in the main entrance because it's

18    right there and adjacent, you're not supposed to get free valet

19    service.  Meanwhile, that was what was occurring.

20         So, you know, I understand their point of view.  They're

21    stating they're getting pressure from the top.  We need this

22    fixed.  So we changed the signage and the validation process

23    with the MAPS team to ensure that there was an actual

24    validation, that there could be someone inside that could

25    validate that this person walking out with a valet ticket came

576

1    from the ER.  They weren't just a patient or a visitor that

2    came through the front that knew that they could have this

3    loophole of getting free services.

4    Q.    Right.  And did the revenue increase?

5    A.    It did.

6    Q.    Under Parking Systems?

7    A.    It did.

8    Q.    Okay.  How about the staff lot?  What are the differences

9    you noticed, if any?

10   A.    So the staff lot was -- was a neat project because we

11   actually run the lot onsite.  We had a plan that we worked on

12   for months leading up to it, and I think we made, I would say,

13   like a 48-hour pivot.  I remember working with Bobby Gust

14   pretty directly on some of those changes.

15         Part of it was because the flow of that was -- was

16   changing.  The -- it -- the campus was experiencing and is

17   still undergoing a construction project.  They're truly trying

18   to improve Stony Brook's parking and just overall ability to

19   provide clinical support to -- to the region.

20         So there was actually a 400-spot reduction.  There were

21   400 spots within the garage on the campus that were basically

22   not usable.  I think they were waiting for like --

23   Q.    That's an indoor garage or like an outdoor garage?

24   A.    It's -- it -- so the roof is exposed.

25   Q.    Or an outdoor/indoor and over lot.

1    A.    Yeah.  So the roof is exposed.  Yeah, the roof's exposed.

2    Q.    Right.

3    A.    Open side panels, but I think it's three floors of

4    covering.

5    Q.    Right.

6    A.    Either two or three floors of covering.  Maybe two to

7    three floors, I think.

8    Q.    Right.

9    A.    And that wasn't where we actually parked, but it was a

10   campus-wide project that had pushed some of the employees who

11   maybe have closer parking, to actually go into the further lot

12   which is staff lot A..

13   Q.    Right.

14   A.    So we -- we were learning the trend of that flow, and what

15   we had realized was there was really one window of time, shift

16   change, that was truly the pinch point and pain area where

17   there was an overlap.  So we learned that actually in order for

18   shift one to leave, they had to do, pardon me, I don't know the

19   official medical word, but basically like a sign-off.  So, like

20   nurse one handing follow up to nurse two has to do like a

21   debrief.  I'm not sure what that medical term is.

22   Q.    Okay.

23   A.    It's just not my scope.  But in order for that to happen,

24   it's about 15 to 20 minutes of joint work together.  So, car

25   one would be parked in that stall, and car two would be there,

1  but car one was not ready to leave for 30, 40 minutes by the

2  time they walked out.

3  Q.    Right.

4  A.    So the other thing that took us, you know, so that took us

5  for a spin as far as volume-wise.  I think that we were maybe

6  not privy to what we were actually going to see when we walked

7  into that.

8  Q.    Right.

9  A.    Systematically, we were debriefed from the MAPS team that

10  part of -- so Stony Brook had a couple of hiccups when it came

11  to parking.  There was a petition --

12  Q.    Under Classic?  When Classic was there?

13  A.    Actually, yes.  So, to be very clear, part of it under

14  Classic and part of it an internal Stony Brook problem.

15  Q.    Okay.

16  A.    So, there was a parking fee of some sort.  You have to

17  like register your car completely independent of Classic,

18  completely independent of Parking Systems.  This was for like

19  the student body as well as doctors and admin.  You'd have to

20  register your vehicle, and there was some form of cost.  So,

21  there was a lot of commentary on the board panel.  I guess, it

22  was a forum through the school, a board.

23  Q.    Okay.

24  A.    And there was pushback about the cost.  There were

25  students and employees that were not happy about paying for

1  parking.  In addition to that, there was a forum that was

2  getting a lot of attention.  It probably -- probably ramped up,

3  but definitely was at its peak when we were in that transition.

4  So I know that summer of '23 was a really challenging time with

5  vehicle thefts.  We had dealt with it firsthand.

6      And there was a blog, a forum going on that people were

7  concerned that the way that their keys were being handled in

8  the staff lot A, was going to lead to a theft of the vehicle.

9  We did a site evaluation and found that vehicle keys were left

10 on the tire or the hood of the vehicle.  We do not do that at

11 Parking Systems.

12     We spend a lot of time, money, resources on training to

13 avoid that.  That was a very high concern for the MAPS team

14 because they were getting questioned.  Much like the revenue,

15 what are you waiting for?  Like, when does this become a

16 problem?

17     I can only imagine it.  I know how it happens from the

18 top.  I can envision that they were in a room and someone's

19 asking, well, at what point do you actually wake up and like

20 get on this?  Someone's going to steal a car.

21     So, we -- we knew that that was an area of sensitivity.

22 We had planned out an entire format for key handling and key

23 security to ensure no keys were left on the car.

24 Q.   Okay.  Now, you have testified that yourself, all the way

25 up and down the ranks, management is in the foxhole with the

1  lot attendants, doing the same exact work side by side.  Do you
2  recall that?
3  A.   I do.
4  Q.   Okay.  Do you know any specific supervisors or managers at
5  Parking Systems that actually park at Stony Brook with the lot
6  attendants?
7  A.   Yes.
8  Q.   Who?
9  A.   So I'll break that list down to include myself.
10 Q.   Yep.
11 A.   I actually was stationed because I'm west of Nassau,
12 geographically a little tough to get there for 18-hour opening
13 days, which is what it took to get the place running.  I
14 actually stayed on the Stony Brook.  I believe it was the
15 Hilton.  They have a, like a student and visitor hotel.  I was
16 registered for there, to be there for a week.  I stayed on
17 campus.  I opened and closed four days consecutively and stayed
18 on the implementation team for the first few weeks.  On a
19 current basis --
20 Q.   What divisions did you work in the hospital?  Which
21 booths?
22 A.   I covered everything.
23 Q.   Okay.  You moved around?
24 A.   So I opened two mornings at Cancer Center.  I opened one
25 morning at C-Mart and I closed one day at the emergency room.

1    So those first four days where it was like crash course,

2    learning like A to Z.

3    Q.    Is that December 1, 2, 3, and 4?

4    A.    Correct.

5    Q.    Okay.  Okay.  Continue.

6    A.    And from -- so those were opening and closings.  But from

7    within the day, we -- we dispatch and rotate.

8    Q.    Right.

9    A.    So I remember zigzagging to this area and then all of a

10   sudden, the radio's ringing, that we're getting, you know, 20

11   car backups at the front door.  Okay.  Josh.  You know, head

12   over that way.  And it works.

13   Q.    How -- what other managers were parking like you were?

14   A.    So, for opening, Michael Petruzzelli, Matt Killary.

15   Q.    Who was Matt Killary?

16   A.    He was --

17   Q.    He's a regional?

18   A.    Yes.

19   Q.    He was parking?  Okay.

20   A.    Yes.  Yes.

21   Q.    Okay.  Who else?

22   A.    He was there for a day and a half.  Jeffrey Gluck.

23   Q.    Another regional?

24   A.    Regional.  Andrew Goldsmith.

25   Q.    Site manager?

1    A.    Yes.

2    Q.    Right.

3    A.    Ray Upton.

4    Q.    Account executive?

5    A.    Was -- was Brooklyn actually.

6    Q.    Right.  Oh, okay.  He's account executive like you?

7    A.    Chuck -- yes, correct.

8    Q.    Okay.  From Brooklyn.  Okay.  Who else?

9    A.    Bobby Dust for opening and still currently.

10   Q.    Right.

11   A.    He's still on the reoccurring manager list there.

12   Q.    Travis.

13   A.    Travis, yeah, I was going through.  I was going up on

14   that.  So he was a site supervisor.

15   Q.    Right.

16   A.    But yes, at that time as well.  Parking cars.

17   Q.    Okay.

18   A.    Cashiering, traffic directing.

19   Q.    Who else can you recall?

20   A.    So, I went through, just to --

21   Q.    Let me ask you this.  Was it multiple managers working on

22   given days also?

23   A.    Yes.

24   Q.    Okay.  Could three managers work in one day at Stony Brook

25   in --

1    A.    More than that.  That -- that list.

2    Q.    Yeah.

3    A.    There was overlap in those days.

4    Q.    Oh, okay.

5    A.    Because so could have been if that list was six, those six

6    were pushing cars through those lines.

7    Q.    Now, you had mentioned that the start-up at Stony Brook

8    operation was an 18-day operation.  Is that what you said?  18-

9    day like transition?  I thought that's what you said.

10   A.    I don't recall.

11   Q.    18-day opening?

12   A.    I don't remember if I said that exact term.

13   Q.    Oh, okay.

14   A.    If that's what I aid.  But the implementation process --

15   Q.    That's okay.  I withdraw the question.  I just -- I

16   thought I heard that.

17         Okay.  So we went over a lot of your witnessing -- the

18   litany of differences that you've witnessed between Classic and

19   Parking Systems servicing the Stony Brook Hospital valet.  Is

20   there anything else you want to add that you can recall of any

21   differences between Classic or Parking Systems, if any?  That

22   you didn't touch?

23              MR. JACKSON:  Objection.  Question calls for a

24   narrative, testimony in the narrative.

25              JUDGE GREEN:  Overruled.

1    BY MR. MILMAN:

2    Q.    Is there any specific issues that you can recall besides

3    everything else you touched?

4    A.    Yeah, let me -- is it okay if I actually read out the list

5    that we kind of went through?

6    Q.    Yeah, I mean, there might not be anything.  Just, you

7    know.

8    A.    So we touched on key security, key handling.  Well, I

9    don't think we talked about training and onboarding.

10    Q.    We did not.  Okay.  So let's look at that.  Okay.

11           MR. MILMAN:  Okay.  You know, Your Honor, could we

12    take a little break?  Just restroom break.

13           JUDGE GREEN:  Yeah.

14           MR. MILMAN:  Okay.  Because I'm going into another

15    long segment of testimony.

16           JUDGE GREEN:  Okay.  So let's go off the record for

17    five or so minutes.

18           So during these breaks, you can do whatever you want.

19    You can stay there, get up.  But just don't talk to anybody

20    about the case or your testimony.

21           THE WITNESS:  Okay.

22           JUDGE GREEN:  All right.  Thank you.

23           MR. MILMAN:  Okay.

24    (Brief recess taken at 4:07 p.m./Reconvened at 4:15 p.m.)

25           JUDGE GREEN:  Back on the record.

1          MR. MILMAN:  Thank you.

2   BY MR. MILMAN:

3   Q.    Okay.  Mr. Candiotti, what were those two subjects that

4   you just referenced to?

5   A.    Training and onboarding.

6   Q.    Okay.  So let's -- all right.  Please explain to us the

7   training process.  Is this for new hires you're referring to?

8   A.    Correct.

9   Q.    Please explain.

10  A.    So I'll start with training, as you asked.

11  Q.    Yeah.

12  A.    Worth noting onboarding will take -- chronologically, be

13  first.

14  Q.    Okay.

15  A.    But training will follow.  And training is an area that

16  I'm pretty familiar with.  I actually spent a few years helping

17  to develop the company platform for it.  So, an on-service, an

18  outside look at things, parking can be simple.

19      But there's a lot of situations and circumstances that we

20  run into, and it's hard to process them on the fly with an end-

21  user customer in front of you, as an attendant.  So we really

22  do strive, and we run a thorough in-house training program that

23  exceeds the length of over two hours long in a classroom

24  setting, where we cover all the material and content that we

25  expect our staff to be dealing with on a day-to-day basis.

1          With that, there's a couple of different avenues, or -- or

2    chapters, rather, sorry.  So the first thing that we do is we

3    actually are going to help enable a Paychex Flex account.  So

4    what that means is once you have been in the system, processed,

5    you're an active employee, we have to still activate your

6    account so you have access on the portal to view pay stubs,

7    time off, all those -- those tools and mechanisms.

8    Q.   You have to explain how to do that, right?

9    A.   So not only do we have to explain it, but we actually have

10   to set them up with an account.  So we have to set, in the

11   training session, we'll send out an invitation that's going to

12   be an email link that says, welcome to Paychecks Flex, please

13   enroll.  And then, based on Social, it actually links up with

14   their application.

15   Q.   Okay.  So, oh, I see where you're going.  So it's like the

16   onboarding, training, hiring, it's kind of a interlinked

17   process.

18   A.   Correct.

19   Q.   All right.  So let's try to break it down.  Let me ask you

20   this.  Have you been through other situations, like Stony

21   Brook, where Parking Systems is -- goes through the bidding

22   process and wins the bid?

23   A.   Yes.

24   Q.   Okay.  So let me ask you it this way.  After Stony --

25   after the Parking Systems won the bid, all right, you take over

1    the Stony Brook valet services.  Why not just hire all the

2    Classic employees that are working there?  They know the job,

3    apparently.  They've done it for years.  Wouldn't this be an

4    entre for you just to hire their employees?

5    A.    No.

6    Q.    Well, why not?

7    A.    Variety of reasons.  So at the core, it's not our model.

8    We don't take staff from prior projects.  Statistically

9    speaking, it has not worked out well for us.  We've done it

10   many, many moons ago.  Before my time, even.

11        But there's reoccurring data that, even in my time, that

12   pertains to other realms that statistically the data concretely

13   shows that it's not a recipe for success and does not --

14   doesn't match our model.  Don't --

15   Q.    Let's look at that.  What is the -- what is Parking

16   Systems' model when they take over new work in a subcontract in

17   the relationship that you had?

18   A.    So because we work on a rotational basis and we're

19   integrated from supervisor or account executive to account

20   executive, we often, it's your first impression.  You've got to

21   go out there with a bang, right?  So you take seasoned,

22   experienced staff members from other locations.  You bring them

23   in because if you have another location with ten, you can let

24   three really experienced ones go.  Now you've just made room

25   for a new wave of growth at that existing site, and you use all

1    of those hubs to bring in a concretely sound team that has

2    experience.

3    Q.    Okay.  So --

4    A.    And may I --

5    Q.    Please.

6    A.    I should rephrase, has Parking Systems procedural

7    experience.

8    Q.    Okay.  So has Parking Systems ever lost an account, you

9    know, ever lost an account at any of its locations to a

10   competitor?

11   A.    Sure.

12   Q.    What does Parking Systems do with anything with their lot

13   attendants or management team that serves that account?

14   A.    So we'll always repurpose and reschedule those staff

15   members.  But if you -- if you're asking at a very, like,

16   layman's term, simple level, have a conversation with your

17   staff.  They've been working for you for X amount of time.

18   They've done the right thing, which is why they're still on the

19   roster.

20        If you get news, I get news that I've lost an account,

21   after I get upset and a little depressed about it because I

22   take a lot of pride in my day, you call the staff and you

23   discuss what real options might be available for repurposing.

24   Q.    So let's look at Stony Brook.  Do you know when Stony

25   Brook (sic) was notified that it was the lowest bidder and they

589

1    were going to be awarded the contract?  Do you know when that

2    was?

3    A.    Could you say that again?

4    Q.    Do you know when Parking Systems, I'm sorry, do you know

5    when Parking Systems was notified by Stony Brook it was amongst

6    the lowest and most responsible bidder?

7    A.    I believe it was summer of '23.

8    Q.    Let's say July, '23?

9    A.    Sure.

10   Q.    Okay.  So if that was Parking Systems, who lost that

11   account and they were notified that they weren't the lowest,

12   most responsible bidder.  In your previous testimony, what

13   would you have done?  What does Parking Systems do in July, if

14   anything?  Do they wait, July, August, September, October,

15   November?  What does Parking Systems do?  When?  When and what

16   did they say to the employees?

17   A.    So there's two realms of handling that.  One, there would

18   have been an internal conversation amongst the supervisors or

19   account executives at Parking Systems.  We would have

20   collaborated to figure out what -- what best options were

21   available for repurposing.  Once the team had decided that, and

22   that's -- that's probably the next weekly Tuesday Teams call

23   that you discuss that.

24        Then after that, you'd have a conversation probably, at a

25   site of that size, as a team.  You'd probably do it lot by lot

1  potentially, just so you wouldn't be completely halting the

2  entire operation or asking them to come on, on total off hours.

3  But the way I would do it is lot by lot, discussing with them

4  the reality of, hey, this contract has come to an end, and we

5  should have an individual discussion after.

6  Q.   If you're coming to an end or is coming to an end.

7          MR. JACKSON:  You know, I'm going to object here.

8  This entire line of questioning and responses are

9  inappropriate.  It's speculative.  It's just -- it's a

10  hypothetical.

11          JUDGE GREEN:  Sustained.

12  BY MR. MILMAN:

13  Q.   Okay.  Yeah.  I want you to focus on what you've done,

14  what you do.  So has there ever been a situation where Parking

15  Systems has lost an account?

16  A.   Yes.

17  Q.   Okay.  And how soon would you notify, if at all, the lot

18  attendants and supervision that you lost the account?

19          MR. JACKSON:  Again, same objection.  It's vague.

20  It's speculative.

21          MR. MILMAN:  Vague?  Speculative?

22          JUDGE GREEN:  Well -- I asked him what he'd -- what

23  he's done?

24          MR. MILMAN:  Right, yeah.

25          MR. JACKSON:  Are you asking him in reference to the

1    account he lost?

2              JUDGE GREEN:  Yeah.  Yes, if you want to --

3              MR. MILMAN:  That's a fair objection.  That's a fair

4    objection.  Okay.

5              THE WITNESS:  So, Regency Condominiums, which is 260

6    Central Avenue and Lawrence, that location was a 24-hour, very

7    high-end Orthodox community building.  So, they -- the reason I

8    even state Orthodox is because it has to do with some of the

9    calendaring that pertains to that, because there's certain

10   holidays and restrictions.  So it was a very, very intricate

11   location to handle.

12             They had redefined the scope of work.  So, they

13   actually had cut out two overnight shifts, seven days a week,

14   and they had removed a midday shift.  So to be clear, the

15   account continued on, but the project had remained.  They

16   absolutely cut staff members out of their scope of work, and

17   those staff members had actually been there over three years.

18   I've been servicing that location for about a decade.

19             Budget issue or whatever was going on, but we,

20   myself, and actually Bobby brought the attendants in on

21   their -- to our corporate office in Valley Stream and we had a

22   discussion about the next steps.  And we redeployed them, and

23   frankly, I think even though it was a little bitter and sour in

24   the moment, I think they ended up being very happy with the

25   situation.

1    BY MR. MILMAN:

2    Q.    Okay.  So let's get back to when Parking Systems wins an

3    account from a competiting (sic) contractor.  Does Parking

4    System poach their employees?

5    A.    No.

6    Q.    Why not?

7    A.    Well, two reasons.  One, from an operational standpoint,

8    it's statistically proven, time and time again, to us that it's

9    not effective to take staff that has practices, routines, and

10   cultures of their own over a long period of time and try to

11   rework them.  You're trying to rebrand someone that, frankly,

12   has more time on the pavement in that lot than I.

13         Who am I?  Right?  I have the title.  I won the contract.

14   But you're looking this person in the eye and they're --

15   they're what?  900 labor hours in after five, six years?  So

16   that is challenging, and we stay away from it.  Statistically,

17   we have not had success.

18         Number two, we have our own provisions and -- and employee

19   agreements, and we have an expectation based on following law

20   and our -- and our onboarding, or our application agreement,

21   employee agreement, that we don't allow the staff to go to the

22   competitor.  We have a repurpose clause, forgive me on the

23   term, but we would have to offer them first something fair and

24   reasonable in the scope of work.  If they're a parking

25   attendant, we're not offering them a job that, you know, being

1   a nurse, you know.

2   Q.   Okay.

3   A.   But we would offer them a comparable work site, and if we

4   did not make good on that offer, then we lose the ability to

5   retain them.  So --

6   Q.   Okay.

7   A.   -- we respect them to stay and we would not poach on the

8   reverse end.

9   Q.   Okay.  So let's look at that.  Now, I'm going to focus the

10  questions now on Stony Brook.  This is why we're here today.

11  They -- this is the trial, focusing on Stony Brook and Parking

12  Systems taking over that valet work.  You were involved in the

13  start-up procedure, correct?

14  A.   I was.

15  Q.   Okay.  And do you know when -- you had testified that

16  Parking Systems got knowledge that it was the lowest

17  responsible bidder in July, roughly the summer of 2023,

18  correct?

19  A.   Correct.  To be very clear, my -- my knowledge was from

20  our team saying we were awarded the bid.

21  Q.   Okay.  Fair enough.  And who notified you of that?

22  A.   I believe it was a team's call with Jonathan Baron, who

23  oversees acquisitions, had relayed to the operations team, the

24  account executives, that the bid was secured.  Parking Systems

25  was excited to take -- take it over.

1  Q.   Okay.  Now, when you heard this, as a hospital specialist,
2  medical specialist, what was your reaction to taking the --
3  hearing that Stony Brook was being taken over?
4  A.   Genuinely, two things.  One, excited, as someone who's a
5  proud employee of the company for a long time.  It was nice to
6  see the locations build.  But, two, just knowing from like
7  somewhat local, I mean, it's Long Island.
8  Q.   Yeah.
9  A.   We had a big project ahead of us.
10  Q.   Did you even know who Classic was?
11  A.   I actually heard the name in years prior because they were
12  in -- they were in a few car dealerships.
13  Q.   Okay.
14  A.   So I've heard of the company name before.
15  Q.   Fair enough.  So in this Teams meeting, or sometime
16  thereafter, was a group of Parking Systems manager/supervisors
17  put on the task of preparing for the opening of Stony Brook
18  Valet Services?
19  A.   Yes.
20  Q.   Okay.  Who made the decision, or who or how many people
21  made the decision of who's going to be part of that team?
22  A.   So, I believe it would have been like high-level ownership
23  and Jeffrey Gluck, who would be, you know, overseeing Suffolk,
24  that chose the account executives and site supervisor to -- to
25  collaborate on.

1  Q.   So would that be Mark Baron and Johnny Baron?  As high-end

2  ownership?

3  A.   Yes.  I -- I would -- that would be my assumption, with

4  collaboration with Jeff Gluck, because that would be his

5  region.

6  Q.   And Jeff is the two -- one of the two regional direct

7  managers?

8  A.   Correct.

9  Q.   Okay.  And, at some point, did you get notified that you

10 were going to be on this preparation start-up team?

11 A.   I did.

12 Q.   Okay.  And when did you get notified of that?

13 A.   I -- if I recall, it was the end of the summer season.  So

14 my beach clubs were just tapering down, and I was looking

15 forward to a little breather and --

16 Q.   Right.

17 A.   -- foreseeing that that wasn't going to be the case.

18 Q.   So that's -- we're talking about July, August of 2023?

19 A.   Yeah.

20 Q.   Okay.  And you had testified that, you know, some of your

21 specialties is training, and you're involved in hiring staff,

22 correct?

23 A.   That's correct.

24 Q.   All right.  So let's look at that.  I'm going to ask you a

25 question again.  Here you are, July and August, right?  You're

1    getting ready to start the work at Stony Brook.  You've got a

2    big pool of employees.  Hey, who are you working there??  Who

3    do you know?  It could be years.  What an entree.  What a waste

4    of an employee pool.  Why don't you go in there and hire them?

5    A.   It's not our company model.  We don't operate that way.

6    We don't take staff from existing projects and I'd also further

7    say that

8    Q.   And do --

9    A.   -- while that sounds lovely on the surface, the path of

10   least resistance doesn't usually yield the most pristine

11   result.

12   Q.   Did you treat taking over the valet services at Stony

13   Brook like you would treat any other contract that you won a

14   bid for?  Did you use the same Parking Systems methodology?

15   A.   Yes.

16   Q.   Was the fact that Classic was a union come into your

17   decisionmaking?

18   A.   No.

19   Q.   Are you sure about that?

20   A.   I'm sure.

21   Q.   Well, explain to -- then explain to us why you wouldn't

22   take those employees?  Give us the specific reasons that you

23   say make up this model that does not lead to success.  What are

24   the reasons -- what are the specifics?

25   A.   Sure.  So we're all creatures of habit.  It's human

1  nature.  That runs with almost anything in life.

2      You're -- you're asking, frankly, if you onboard staff

3  from an existing project.  And we're not talking a bizarre

4  moment where someone started last week and it happened to

5  change.  You're talking long-term projects, long-term

6  employees.

7      You're doing them a disservice, and it's unfair to them to

8  expect them to succeed when you're turning their entire world

9  upside down.  You're not just changing a logo or -- or a

10 company name on a paycheck.  You're changing the day-in and

11 day-out processes and expectations.

12     So another example from what we were told from the MAPS

13 team.  Again, firsthand, can't per se, you know, verify it.  I

14 don't have payroll information.  But we were -- we were

15 expressed that it seemed that the amount of people weren't

16 always matching what it was supposed to be.  You know, someone

17 would come in and then potentially clock in however that was

18 being done, and leave.

19     We have a different system.  We use a geographic -- a

20 geofencing, facial recognition profile called ClockInEasy.

21 You're placing a level of control and constriction on -- on

22 team members that are not used to that.  It's -- it's not easy.

23 It -- it -- just saying, oh, just onboard them, it -- it

24 culturally, it will not be easy.  It's also a little bit

25 unreasonable.

1      In -- in addition to that, it's -- it's not realistic.

2    Our onboarding process takes about two to three weeks.  The

3    timeframe, at least in this specific project and most

4    transitions, don't give you a gap of, you know, 30 days, a

5    month, off.  That transition is usually not possible to

6    actually go with.  It just -- the timeline doesn't' work.  In

7    the Stony Brook situation, it was one day.

8    Q.   It was less?

9    A.   Services, there was -- there was no gap.  Services are 24

10   hours there.  We took over at 12:01 a.m., so it bled right

11   through.  It wasn't even a day.  It was a direct transition.

12   Q.   We'll get back to that whole onboarding process and

13   situation and options for Parking Systems.  So, well, if you're

14   not going to hire the -- if you're not going to hire these good

15   ladies and gentlemen who worked at Classic, where are you going

16   to get the employees from to service the start up at Stony

17   Brook?

18   A.   So, we have them.  They exist.  They're on current

19   rosters.  They're shifted around, as we do on a day-to-day

20   basis with our general scheduling.  And that's where you, --

21   that's the constant puzzle that we do at Parking Systems,

22   right?  And what it allows is it allows you to always continue

23   to grow the team.  So you're pulling experienced people.

24   You're giving them the opportunity to grow.  There's no doubt

25   that even if you get the same wage at, let's say, Stony Brook

1    as Joe's Restaurant, that going to a place that has higher

2    volume and has potentially a nicer work -- work hour dynamic,

3    it -- it's a move.  It's an upward move in quality and -- and

4    financial growth for even undetermined parking attendant.  So

5    as those experienced people move from, let's say, easier

6    places, you're opening up a new role now at an easier place to

7    work a new hire.  So it's just a constant cycle of moving staff

8    and collaborating them through the entire roster, not on an

9    individual basis, but the account executive's repertoire of the

10   whole region.

11   Q.   At any given time, when you were appointed in the mid to

12   late summer, July, August of 2023, to be part of this

13   operations team for the start-up at Stony Brook, which your

14   specialty is hospitals and such and training, did anybody in

15   Stony, anybody in Parking Systems, anybody mention to you or

16   have discussions with you about avoiding union employees?

17   A.   No.

18   Q.   When was the first time you even heard of an issue of a

19   union being, you know, in the discussion, if at all?

20   A.   On an email letter where we were involved in a lawsuit

21   which I think we're here today.

22   Q.   Okay.  Do you recall when that -- the date of that email?

23   A.   No.

24   Q.   Okay.

25           MR. MILMAN:  Can the witness be shown, Adrian,

1  please, GC 7, if you have it?  Thank you, Michael.  The

2  November 9th letter.

3          MR. MAURO:  GC 9?

4          MR. MILMAN:  Is it GC9?

5          MR. MAURO:  The November 9th letter?  Mr. Rocco?

6          MR. MILMAN:  Yeah.  GC 9.  Sorry.

7          MR. MAURO:  It's 9.

8          MR. MILMAN:  I know.  Do we have GC 9?  Anybody?

9          Off the record, Your Honor, please.

10         JUDGE GREEN:  Off the record.

11     (Off the record)

12         JUDGE GREEN:  We're back on the record.

13 BY MR. MILMAN:

14 Q.  Mr. Candiotti, I'm putting before you what's been marked

15 and entered into evidence as General Counsel Exhibit 9.  It

16 should be a letter dated November 9th.

17 A.  Yes.

18 Q.  Okay.  Okay.  So I'd like you to take a look at that

19 exhibit, and when you finish looking at it, let us know when

20 you're ready to answer a few questions.

21 A.  Just a quick moment to review, please.

22 Q.  Sure.  Is that the document you were referring to?  Well,

23 strike that.  Does this exhibit refresh your recollection of

24 when you learned about a union issue in -- concerning Stony

25 Brook valet?

1  A.    Yes.

2  Q.    Okay.  Can you please hand that back to the judge?

3  A.    Yes.

4            MR. MILMAN:  Thank you, Your Honor.

5  BY MR. MILMAN:

6  Q.    So prior to this receipt of this November 9th letter,

7  okay?  Did any issue regarding unions come to any of your

8  decisionmaking process for the start-up at Stony Brook?

9  A.    No.

10  Q.    Have union issues ever become a part of your

11  decisionmaking at any other start-up in your experience?

12  A.    No.

13  Q.    And have you dealt with the union that the Stony -- sorry,

14  the union that you had testified that Parking Systems deals

15  with, have you dealt with that union?

16  A.    Yes.

17  Q.    How is your relationship with that union?

18  A.    It's been long-term and standing strong.

19  Q.    Has that union interfered with your operations at all that

20  you deal with?

21  A.    No.

22  Q.    Okay.  There was some dialogue, an email that went on

23  after the November -- after that November 9th letter.  We'll

24  get to that in a little bit.  But I want to get back to the

25  staffing at Stony Brook, okay?  For the valet services.

1          To the best of your recollection -- strike that.  As of

2    December 1, were you staffed to operate the valet services at

3    Stony Brook Hospital?

4    A.    Yes.

5    Q.    Okay.  At what time, if any time before December 1, were

6    you ready to perform service?  Was it just that day?  You just

7    got ready that day?  Or were you ready before December 1 to

8    start up?

9    A.    We were ready, prior.  We had been working months on the

10   implementation process as a team.

11   Q.    Right.  And so do you recall, now, you had testified that

12   as of December 1, it was all-hands-on-board, correct?

13   A.    Yes.

14   Q.    You stayed, you got a hotel, I think, at the Hilton, you

15   said, right?

16   A.    I did.

17   Q.    Okay.  I think you said Bobby was there, managing and

18   parking cars.  You were there managing, parking cars.  I think

19   you said Petruzzelli was there, managing, parking cars and

20   whoever else you said.

21   A.    Correct.

22   Q.    Plus you had lot attendants.  Is that correct?

23   A.    Yes.

24   Q.    Okay.  Now, you also had testified that you bring in to

25   these new locations your most experienced lot attendants or

1  very experienced lot attendants.

2  A.    Correct.

3  Q.    Did you do that here at Stony Brook?

4  A.    We did.

5  Q.    Okay.  Why do you bring in very experienced lot attendants

6  to a new location?

7  A.    Well, first impression, you -- you want to -- you want to

8  make a strong first impression.  And there's no better way to

9  do that than having an experienced team that -- that works

10  well, --

11  Q.    Right.

12  A.    -- that knows the procedures, knows the policies,

13  understands the expectations that we are trying to fulfill.

14  Q.    Right.

15  A.    -- and can run with that.

16  Q.    Now, did you know at any time during, when you were

17  prepared to start December 1, you said, or whatever time it was

18  before December 1, it could be two days, three days, or

19  whatever.  Did you know for a fact that the Classic employees

20  weren't going to be reabsorbed?  Did you know that for a fact?

21  A.    No.

22  Q.    Is it your business to know whether they're going to be

23  reabsorbed or not?

24  A.    Absolutely not.  We don't employ them.

25  Q.    But you knew they would be working for Classic until

604

1    November 30th at 11:59 p.m., correct?

2    A.    Yes.

3    Q.    Do you think it would be a risk if you waited until

4    December 1 to see if they're going to -- would work for Parking

5    Systems if you so desired to hire them?

6    A.    Yeah, I don't think that would be a very efficient way to

7    go about any form of onboarding, sure.

8    Q.    Let me ask you this.  Were you concerned at all, with all

9    the visuals that you testified to that took place at Classic,

10   hiring the Classic employees?

11   A.    Yeah, we -- there was no interest or desire to do so.

12   Q.    Now, who determines in Parking Systems, which of those

13   experienced employees you're going to bring over to start a new

14   operation?

15   A.    It's a company policy that we don't transition staff over.

16   So it's not an individual.

17   Q.    I get that, Mr. Candiotti, but which managers or

18   supervisors at Parking Systems made the decision at Stony Brook

19   to pick those employees -- experienced employees to start?

20   A.    I -- I'm not sure I understand that question.

21   Q.    Okay.  You had experienced employees to start at the

22   hospital.

23   A.    Yes.

24   Q.    Which managers made the decision which employees are going

25   to start?

1  A.    Oh, so it's a collaboration.  So, we -- we, myself

2  included.

3  Q.    I want to know the guts.  I want to know -- give me names.

4  I want to know --

5  A.    So it was many weeks of planning.  Specifically, the group

6  was Michael Petruzzelli, Travis Gilliland, Andrew Goldsmith,

7  Bobby Gust, and myself.

8  Q.    Okay.

9  A.    We were doing two things.  One, we were trying to

10 formulate the firmed-up schedule of work, and schedule of work

11 is referring to the client's orders.  There was some confusion

12 around this.  The bid power play, because I found this out as

13 the project approached, the bid was one for X amount of labor

14 hours.  The MAPS team was ordering half X or whatever the X

15 was.  It was -- there was not a match.

16      So we were tasked with two things.  One, filling,

17 populating the correct names, right?  Experienced, quality

18 employees into that schedule.  And also try to find out what

19 the schedule was.

20      We went back and forth with Dan, Nick, and Ephraim quite a

21 bit, because the contract procured, I think, was upwards of

22 2,000 hours, but meanwhile, they were ordering 1,500.  So,

23 somewhere in their -- their admin team, they had -- something

24 went a little awry.  So we had two tasks when it came to

25 scheduling.  We spent a lot of time going through it.

1   Q.   Okay.  And so there were a number of experienced employees

2   that you brought to Stony Brook.  Were there any employees that

3   didn't have that much experience that you brought there as

4   well?

5   A.   Yes, there was definitely different levels of experience.

6   Q.   Okay.  Now, every -- of all the employees that you and

7   your start-up team decided to transition over to Stony Brook

8   Hospital, did they all go through the training process at Stony

9   Brook before they started December 1?  I mean, for the Parking

10  Systems?

11  A.   So they -- yes.  To be very clear, they went through a

12  Parking Systems process.

13  Q.   Yeah, process.  Did they all go through the onboarding

14  process that Parking Systems had before December 1?

15  A.   Yes.

16  Q.   Did they all fill out that lengthy eight-page application

17  that we're going to get to eventually through another witness,

18  but did they all fill that out?

19  A.   Yes.

20  Q.   Okay.  Were they all interviewed?

21  A.   They were.

22  Q.   Okay.  Were they all available to be interviewed before

23  December 1st?

24  A.   They were.

25  Q.   And they were all in fact interviewed?

1    A.    Correct.

2    Q.    Did you do any of the interviewing?

3    A.    On this project?  No.

4    Q.    Okay.  Who did do the interviewing on this project?

5    A.    I believe the two primary leads were Travis and Andrew.

6    Q.    Okay.

7    A.    So, what I'm stating as per fact is based on the

8    background data collected of not -- not a first-hand interview.

9    Q.    Okay.  So prior to December 1, all the employees that

10    started at the Stony Brook valet were either in-house,

11    experienced employees you brought over, right, for the first

12    impression, right?

13    A.    Correct.

14    Q.    Bring the best of the best.  Or they were employees that

15    might have less experience than the more that you know, you

16    brought over, but they were all hired, correct, already?

17    A.    Correct.

18    Q.    They were all interviewed?

19    A.    Yes.

20    Q.    Correct?  They were all processed through the on-boarding,

21    correct?

22    A.    Correct.

23    Q.    They were all trained, correct?

24    A.    Yes.

25    Q.    They all filled out the 8-page application?

1    A.    Yes.

2    Q.    Was there background checks on all of them?

3    A.    Yes.

4    Q.    Was -- how about uniforms?  Do you have to measure

5    uniforms?  Do you have to measure sizes and stuff?

6    A.    Yes.

7    Q.    Was that done?

8    A.    That was.

9    Q.    Were they processed through Paychex and how long that

10   could take?  Was that done?

11   A.    Correct.  That was done.

12   Q.    How about I-9s?  Was that all done for everybody you

13   brought over by December 1?

14   A.    They -- it has to be done before they could even get

15   invited to training.  Yes.

16   Q.    Okay.  Now let's look -- let's look.  Did you ever use the

17   term "poor souls," referring to Classic employees?

18   A.    It wasn't that -- that term, per se.  Something similar.

19   Q.    Okay.  What was it?  Do you recall, sir?

20   A.    I used the term quite a bit.  It was lost souls.

21   Q.    Lost souls.  Were you degrading them by making that

22   statement?

23   A.    No.

24   Q.    What did you mean by that?

25   A.    So our team at Parking Systems was doing a lot of recon,

1    and recon was site visits and watching and observing, and we

2    immediately were faced with some significant pressure.  And it

3    was a very, very valid point.

4         The existing staff was making it clear from Classic that

5    they were not sure what their fate of work was ahead.  And it

6    was unfair, and frankly, they were lost souls.  They were

7    not -- they -- they were hard-working people at the job site

8    who had been there for a long time, who had neglected to get

9    information from their superiors about what tomorrow was going

10   to bring.

11            And they were coming to us for any, in genuine pure

12   spirit, coming to us for guidance.  They kept asking if --

13   Andrew couldn't take five steps to go check a sign measurement

14   for me when we were trying to print up signage, without getting

15   bombarded about how do we -- how do we continue to work?  How

16   do we continue to work?

17        And Andrew was saying, you need to speak to Classic.

18   Q.   Your employer?  Your employer?  Correct?

19   A.   Yes.

20   Q.   We didn't buy Classic, did we?

21   A.   No.

22   Q.   There was no stock purchase of the Classic organization,

23   was there?

24   A.   No.

25   Q.   There wasn't an asset purchase of the Classic

1  organization, was there?

2  A.    No.

3  Q.    We just won a bid, right?

4  A.    Correct.

5  Q.    Okay.  So, again, let's get back to what you were saying.

6  So  and I also mean it kind of the way that you mean it,

7  empathetically.  These Classic lost soul employees, Classic is

8  not informing them of what their fate is, right?

9  A.    Correct.

10  Q.    Okay.  How do you know that?

11  A.    Because they've expressed it to us multiple times.  They

12  kept telling Andrew they weren't getting feedback or clarity or

13  communication from their -- from their actual company.

14  Q.    Right.

15  A.    They were trying to find out where are they going next.

16  Q.    Was it your obligation to hire them?

17  A.    No.  But they were --

18  Q.    Okay.

19  A.    They were trying to get answers to a very understandable

20  question.

21  Q.    Right.  And did you have any communication with Classic

22  about notifying the employees?

23  A.    No.

24  Q.    Do you know anybody in the Parking Systems organization

25  who had any communication with Classic about notifying their

1    employees what's going to happen?

2    A.    No.

3    Q.    After November 30th?

4    A.    No.

5    Q.    Honestly, is it any of your business what happens to them

6    after November 30th?

7    A.    It's not, and it's definitely not protocol for us to go

8    and reach out to an existing vendor.  There's already tension,

9    right?  There's -- there's this stigma that Parking Systems,

10   you know, you took our work.  We're not going to try to provoke

11   or initiate conversation.  They're going to run their

12   organization and their procedures and policies.

13   Q.    Right.

14   A.    And we're going to start with the crew that we have

15   planned on our effective start date.

16   Q.    And that model works for you, correct?

17   A.    Yes.  And if I could just add?

18   Q.    Yes.

19   A.    Genuinely, if there was any concern, I never said lost

20   souls in a derogatory term.  It's the -- it's the term I say to

21   my dad all the time because he's a puppy dog.

22   Q.    No, we'll get back -- we'll get back to the exact

23   document.

24   A.    Okay.

25   Q.    But the reason why I ask you that now is, were you aware

1  of anybody in Parking Systems that had any communication in the

2  month of November, okay, of 2023, with Classic, to determine

3  what's going to happen with their employees?

4  A.    No.

5  Q.    Is there really any concern in Parking Systems what they

6  do with their employees?  Okay.

7          JUDGE GREEN:  Okay.

8          MR. MILMAN:  Next.  I'll move on.  I'll move on.

9  BY MR. MILMAN:

10  Q.    Now, how about Stony Brook?  Did Parking Systems have any

11  communications with Stony Brook about the fate of these lost

12  souls that aren't being told by Classic what's going to happen?

13  A.    So we were placed, we, Parking Systems, were placed in an

14  uncomfortable predicament.

15  Q.    Why?

16  A.    Stony Brook had reached out to us, the MAPS team,

17  specifically Dan and Nick, towards the end of the expiring

18  contract.  As it grew more volatile and it was clear that there

19  was no communication from Classic to their staff, Dan and Nick,

20  from one channel or another, had gotten some word or just

21  general concern that they were going to -- they were going to

22  walk off or leave.  They weren't going to fulfill their work

23  shifts, and that Classic wouldn't have motivation or reason,

24  since they're ending their terms, to make like a strong effort

25  and pull the puzzle together.

```
 1    `So they had expressed to us that, you know, just kind of

 2    chitter-chatter and -- and brush things along.  Knew we weren't

 3    hiring them, but put us in an uncomfortable position to kind of

 4    say, oh, you know, give us some information of yours and we'll

 5    see what we can do, which they should never have asked us to

 6    do, but they did.

 7    Q.   When was this that they asked you to stream along, as you

 8    say?

 9    A.   I believe it was right before Thanksgiving.  I think the

10    concern was after Thanksgiving, that last week of service was

11    going to be potentially not provided.

12    Q.   Okay.  You had testified regarding the November 9th letter

13    from Mr. Rocco, okay?  From Mr. Rocco, you know, notifying of

14    the union issues, as you said, why we're here today.  You

15    recall that testimony?

16    A.   Yes.

17    Q.   Okay.  What, if anything, did you or Parking Systems do in

18    reaction to that, Mr. Rocco's union, threatening letter?

19              MR. ROCCO:  Objection.

20              MR. MILMAN:  I withdraw threatening, but it is

21    threatening.  Okay.  I withdraw threatening.

22    BY MR. MILMAN:

23    Q.   As you received that November 9th letter, what, if

24    anything, did you do regarding that?

25    A.   Forwarded it to legal.
```

614

1   Q.   Legal being who?  My firm?

2   A.   Correct.

3   Q.   Okay.  Now, as of November 9th, before you got Mr. Rocco's

4   letter, do you recall how close to you -- do you know how you

5   were at staffing for Stony Brook?  Were you fully staffed?  90

6   percent staffed?  80 percent staffed?  50 percent?  20 percent

7   staffed?  Do you recall what your staffing level was?

8   A.   Prior to the 9th, was the date?

9   Q.   Prior to November 9th, to get ready to start up.

10  A.   We would have been ready to -- we would have been staffed

11  ready to proceed forward, because we need three weeks.  Was

12  that Thanksgiving week?

13  Q.   Yeah.

14  A.   By the 9th, we would have been -- we must have been ready

15  to start.

16  Q.   So you were ready to go to Stony Brook, start work as of

17  the -- before -- as of November 9th, before Mr. Rocco's letter.

18  Is that your testimony?

19  A.   Correct.

20  Q.   Okay.

21  A.   And we would always need, generally, a two-week minimum

22  runway, but this was also Thanksgiving week.  And that week,

23  let's face it, nothing gets done, so.

24  Q.   And how long was you and your team that was allocated to

25  the preparation to start up?  How long was that whole

1  preparation before December 1?

2  A.   We started at the end of summer, right before the beach

3  clubs had actually come to a conclusion.  So I'm thinking, my

4  recollection would be mid to late August.

5  Q.   Did Classic ever send you notice after you were aware that

6  you were the lowest possible bidder?  Any notice at all, from

7  the time the bid was awarded to the time you started?  Has it

8  sent any notice to Parking Systems about their employees?

9  A.   No.

10  Q.   How about the union?  You received a letter on November

11  9th from Union counsel.  Did you receive anything from Union

12  counsel in July?

13  A.   No.

14  Q.   How about August?

15  A.   No.

16  Q.   September?  How about October?

17  A.   No.

18  Q.   No, right?  Okay.  Stony Brook knew, obviously, in July,

19  that the Classic employees were going to -- their last day was

20  going to be November 30th.  Isn't that correct?

21  A.   Yes.

22  Q.   Are you aware that Stony Brook notified their employees in

23  July that they may not have a job after November 30th?

24  A.   I wouldn't be aware of that.

25        MR. JACKSON:  Objection.  Calls for speculation.

1  BY MR. MILMAN:

2  Q.   How about August?  September?  October?

3            JUDGE GREEN:  Yeah.  Okay.  So I'm not really seeing

4  the relevance of that.

5            MR. MILMAN:  Well, we think it is, Your Honor, with

6  all due respect.  We think we're going to bring it all

7  together.

8            JUDGE GREEN:  Okay.

9            MR. MILMAN:  Right.

10           JUDGE GREEN:  But so I can kind of see the relevance

11  of some of this, Stony Brook knowing and --

12           MR. MILMAN:  I'll give you the relevance.  The union

13  knew since July that their employees could possibly lose a job.

14  They waited until November to give a notice on November 9th.

15           JUDGE GREEN:  That's not relevance.

16           MR. MILMAN:  Well, okay.  Your Honor, thank you.

17  BY MR. MILMAN:

18  Q.   Now, let's go to some documents.  Hold on.  Before we do

19  that, if you were ready November 9th, before you got

20  Mr. Rocco's late letter in November to stop the Stony Brook

21  valet operations, why is there ads for Stony Brook work after

22  November 9th?

23  A.   So we often run, at Parking Systems, site-specific ads.

24  There's -- there's a couple of reasons we do that.  One,

25  there's brand recognition, right?  It's -- it's a real, nice,

1    concrete structure that people can relate to and may have

2    visited or have family members.  So there's some validity

3    behind it.  You know, valet often can get a little bit of a

4    loose term, so when we tie it to a specific site that's

5    relatable, we can recruit from that.

6        Now, based on our model, that doesn't mean that they end

7    up working there.  That might be where the posting

8    geographically draws attention or where the recognition, that

9    brand recognition, might be won over from that, but that

10   doesn't mean that that job is specifically taking place.  So --

11   Q.   So let me give you an example.  Let's say that three

12   people, well, strike that.  Did any other locations in the

13   Parking Systems organization do site-specific ads?

14   A.   Yes.

15   Q.   Is it done frequently?

16   A.   Yes.

17   Q.   You mean not just Stony Brook Hospital as the General

18   Counsel would have everybody believe?

19            MR. JACKSON:  Objection, Your Honor.

20            MR. MILMAN:  Withdrawn.  Withdrawn.

21            JUDGE GREEN:  Stop.

22            MR. MILMAN:  Withdrawn.  Withdrawn.

23            JUDGE GREEN:  Stop, Mr. Milman.

24            MR. ROCCO:  You're acting entirely immature.  Please

25   continue with your examination.

```
 1              MR. MILMAN:  All right.  Thanks, Matt.
 2              JUDGE GREEN:  That's about enough.
 3              MR. ROCCO:  That's good.
 4              MR. MILMAN:  Have a little respect for your seniors,
 5    Matthew, okay?  When you're giggling, I'll continue.  When you
 6    stop giggling, I mean when you stop giggling.  You're stopped?
 7    Okay.  Let's continue.
 8    BY MR. MILMAN:
 9    Q.   Now, does Stony Brook organization do site-specific ads at
10    other locations in this entire organization?
11    A.   Say that again?
12    Q.   Does Parking Systems do site-specific ads, other than
13    Stony Brook Hospital, in its entire organization?
14              MR. JACKSON:  Objection.  Asked and answered..
15              JUDGE GREEN:  Sustained.
16              MR. MILMAN:  What was the answer?  Was it yes?
17              THE WITNESS:  Yes.
18              MR. MILMAN:  I thought so, okay.
19    BY MR. MILMAN:
20    Q.   All right.  Now, did -- are you aware that Parking Systems
21    ran a site-specific ad at Stony Brook to circumvent the union
22    and hire non-union employees?
23    A.   No.
24    Q.   You sure?
25    A.   I'm sure.
```

1  Q.   Did you have conversations with your team members about

2  doing that?

3  A.   Absolutely not.

4  Q.   Okay.  Now, let's say three people at Stony Brook come

5  down with a stomach virus and can't report for work.  What are

6  you going to do to staff that facility?

7  A.   That's a typical day.

8  Q.   Okay.

9  A.   I mean, we -- we're looking at sick parking attendants.

10 It's tremendous.  We pull.  We -- we coordinate.  Either that

11 supervisor himself, the account executive, might have someone

12 that is not scheduled that day.  That happen -- the schedules

13 might vary.  They're not all -- not every shift is, let's say,

14 9 to 5 Monday through Friday, whereas some of them, there are

15 20 shifts, 20 employees, you know, you're down one.  There's no

16 flexibility.

17      So you can pull from a restaurant location that maybe

18 operates on Friday.  This is Thursday morning.  You take an

19 attendant that's scheduled for Friday and Saturday night, but

20 they're off.  So they can be rotated through.

21      And if, in that supervisor's scope, they truly are out of

22 options, then there's a management team, whether that be the

23 full-thread or, you know, a one-to-one direct, where we're

24 going to pull in labor from.  It happens on a day-to-day basis.

25 Q.   I'm going to show you a document, GC 10.  Do you know what

1   that document is?

2   A.   Yes.

3   Q.   What is it?

4   A.   It -- a job posting.

5   Q.   You mean, if you have three people go down sick with a

6   virus, you're not going to do an emergency job posting to look

7   for help?

8   A.   No.

9   Q.   Again, why would Parking Systems run an ad like this?

10  A.   Well, again, we -- we run ads consistently, and we even

11  reboot them, right?  So Indeed's an interesting platform.  It's

12  costly, but there's some ways you can actually work around with

13  that.  So when you put in a new ad, there's a premium for that.

14  If you deactivate and reactivate an existing ad, there's a lot

15  of cost, but it brings it back to the top.  So you'll see --

16  Q.   Brings it back to the top like a --

17  A.   Like a search filter.

18  Q.   Priority search filter?

19  A.   Yeah.  So if I, you know, if I search for hospitality

20  work, and it's been rebooted within, let's say, 72 hours, it's

21  going to populate to the top.  And then, you know, the next

22  wave kind of drowns it out, and then it deactivates, reactivate

23  it.  It's a cost-effective way to keep rerunning the ad.

24  Q.   Understood.  Now, here's a good one.  Let's look at GC 19.

25  Do you recall that?

1   A.   I do.

2   Q.   Okay.  Did you give Bobby Gust the permission to hire --

3   offer a job offer to Francis?

4   A.   Josh Candiotti, myself?

5   Q.   Yeah, Josh Candiotti.

6   A.   No.

7   Q.   Did you?

8   A.   I didn't authorize that.

9   Q.   I didn't think so.  But who did authorize it, if you know?

10  A.   Johnathan Baron.

11  Q.   Right.  But only Johnny.  Not you and Johnny, right?

12  A.   No.  I -- I'm not at that authority level.  Johnny and

13  Johnny alone.

14  Q.   Okay.  While we're on that topic and let's just see GC 19

15  again.  There's a bunch of documents that refer to the one or

16  the hiring or job offer.  Who is the one?

17  A.   Francis.

18  Q.   Okay.  Did -- Francis is a Classic employee, right?

19  A.   Correct, who was the valet manager of Stony Brook.

20  Q.   The young lady sitting right here?

21  A.   Yes, correct.

22  Q.   Sitting right here?  Okay.  And did Parking Systems ever

23  go to Classic and say, who should we hire?  Anybody good?  Do

24  you recommend anybody?

25  A.   No.

```
 1    Q.    Why not?
 2    A.    We do not onboard current staff.  That's not our business
 3    model.
 4    Q.    Did Parking -- did Stony Brook ever come to you and say,
 5    look, you should hire this person or these people?
 6    A.    Yes.
 7    Q.    What, if anything, did they say?  And who said it, if you
 8    know?
 9    A.    So Nick and Dan from the MAPS division had expressed,
10    honestly, some of the most sound and high praises of employee,
11    you know, performance of Francis at the Cancer Center.  They
12    ranted and raved that she was on a name-to-name basis with what
13    they said was hundreds of patients and that she really ran that
14    department and ran it with a lot of care and integrity and that
15    they thought it might match the style of Parking Systems.  And
16    that they really recommended her presence to continue to stock
17    -- beyond the Classic contract coming to -- to termination.
18    Q.    Okay.  Okay.  And do you know when this was?  Roughly?  Or
19    -- or as accurate as you can.
20    A.    Around Thanksgiving.
21    Q.    Okay.  Fine.  Now we'll get back to that.  Did you get any
22    feedback from any of the hospital staff or employees about
23    parking services compared to Classic's?
24    A.    Yes.
25    Q.    What, if anything, did -- were you informed of?
```

1    A.    So from -- to be clear, you asked about staff?

2    Q.    Staff, yes.  Like hospital employees.

3    A.    So staff --

4    Q.    Not Matthew but actual hospital employees.  Thank you.

5    A.    So staff actually will kind of interact with our team

6    on -- in two regions.  So the primary one that comes to mind,

7    of course, is going to be staff lot A.  So staff clearly had

8    genuinely been the ones to push the issue on this -- this forum

9    or blog because they had -- we had a handful of encounters

10   where it was noticeable that while it might have taken an extra

11   minute or two because of the process to get someone's car, that

12   that tradeoff was worth it because key security and key

13   handling was being delivered to the end user properly.  So it

14   was noticed that keys were not left in or with the vehicle

15   anymore.  So that was feedback from staff lot A.  We had a few

16   people that mentioned that.

17   Q.    Okay.

18   a.    We had a couple of petty remarks that I don't think are

19   worth going too in depth with.  You know, whenever there's

20   noticeable changes, I was like, you know, I'm glad that there's

21   a change.  But --

22   Q.    Okay.

23   A.    -- of substance, the key handling was what I actually

24   would care about as an operator.

25   Q.    Right.

1    A.   So the other area that we function with staff is -- is the

2    front door.  And while it's a paid service at almost all of our

3    hospitals, we average about 30 percent of vehicles being staff

4    vehicles.  So it seems that, you know, in a hospital setting

5    where you have a doctor or a senior admin that, you know, has a

6    nice income, that the $6 a day or 7, whatever it is at each

7    site, it's worth it.  At Stony Brook, that seemed to be right

8    in line.

9        We had a lot of feedback that the lane was moving more

10   efficiently.  They, you know, they obviously see a different

11   colored uniform and appearance, but really as far as an

12   excitable operations compliment, I would say the lane being a

13   win was -- was nice feedback to get.

14   Q.   Right.  Okay.  Any feedback from visitors or patients on

15   any issues comparable from Parking Systems or Classic?

16   A.   Yes.  But can I actually give one more example with just

17   staff?

18   Q.   Sure.

19           MR. JACKSON:  Just before you do, I'm going to

20   object.  I don't see the relevance of this.

21           JUDGE GREEN:  Me neither.

22           MR. MILMAN:  Well, because relevance in his cited

23   case.  Loves Barbeque.

24           JUDGE GREEN:  No, I don't think it does.  Sustained.

25           MR. MILMAN:  Okay.  Thank you, Your Honor.  So you

1  sustained the objection, Your Honor?

2          JUDGE GREEN:  Yes.

3          MR. MILMAN:  I withdraw the question then.

4

5  BY MR. MILMAN:

6  Q.  Okay.  Let's get back to the one.  Okay.  So let's inform

7  the Court of how this -- first of all, was there a meeting that

8  took place with the alleged discriminatee, Francis?

9  A.  Yes.

10  Q.  Do you recall when that meeting was?

11  A.  November 25th.

12  Q.  2023?

13  A.  Of 2023, sorry.

14  Q.  Well, at some point, some time before November 25th, 2023,

15  there was discussion about having the meeting on November 25,

16  2023, correct?

17  A.  Yes.

18  Q.  So tell us about what took place leading up to the

19  meeting.

20  A.  Sure.  So internally on Parking Systems' end, we -- we had

21  gotten this suggestion or feedback of -- of praise from the

22  MAPS team, Dan and Nick, that we should go forward with doing

23  everything we can to keep this one individual.  It's not

24  something that Bobby and I were in that discussion, and we

25  expressed to them that while we love good feedback and that's

1  nice to hear, that this is something that has to go to senior

2  leadership.  You are asking us to perform a task that defies

3  our company policy.  We do not onboard current staff from an

4  existing project.

5      So there was a text thread.  I don't know all parties on

6  it.  This pertains to it, but I'm not sure.  I know, looking at

7  this, Michael Petruzzelli, myself, Josh Candiotti, and Jonathan

8  Baron are on here, but I'm sure there are some others.  In that

9  thread, Jonathan Baron had given authorization for us to move

10 forward with that one -- one hire.

11 Q.   Did Mr. Johnny Baron ever have a discussion with you

12 regarding the one or regarding any, regarding union issues?

13 A.   No.

14 Q.   Okay.  So once you got authorization from Johnny Baron to

15 go forward and make a job offer to the alleged discriminatee

16 and GC's witness, Francis, what happened next when you got to

17 the meeting?

18 A.   Bobby Gust had communicated the details of that interview,

19 so time and date.

20 Q.   Okay.

21 A.   I don't know format.  It was either call, text, email,

22 whatever it might have been, but it was scheduled, and we,

23 being Bobby Gust, Travis Gilliland, and myself, Josh Candiotti,

24 all were scheduled to attend that interview.

25 Q.   For November 25?

1    A.    Yes, of 2023.

2    Q.    And for the purpose of having Ms. Francis work December

3    1st?

4    A.    Yeah, there was struggles with that, but this was last-

5    moment info, and we ran with the lead time we had to try to

6    evaluate Francis.

7    Q.    Fair enough.  Great candidate, right?  To be --

8    A.    Yeah, I mean, I think I've worked about 10 years in the

9    medical space.  I know how hard it is to shine in those

10   settings.  You're talking vulnerable dynamics.  You're talking

11   a Cancer Center.

12        I mean, this is almost identical in ways to a site I

13   serve, a St. Mary's Children's Hospital on Bayside.  You're

14   talking autoimmune and cancer patients.  Most -- most of them

15   are children, too, at least in that center.  So to be able to

16   stand out that much that the administration team is putting

17   your name out there, kudos.  That's great.

18   Q.    Okay.  Now, I understand how valuable it is to get a

19   valuable employee like Francis, but how do you overcome your

20   testimony where it takes two to three weeks to onboard

21   somebody?  How can you possibly get Francis ready for December

22   1st if you're making an offer on November 25th, 2023?

23   A.    Exactly.  So that was part of the discussion that Bobby

24   and I had.  We've had much more long-term years of experience

25   as opposed to Travis, and we were talking about a couple of

1    kind of circumvented systems that might allow us to make that

2    deadline.  We knew it was not going to be easy, and we knew it

3    was going to be potentially impossible, but we had discussed a

4    couple of options that might have worked.

5    Q.    Let's get to the specifics, as much as you can remember,

6    of that discussion with Mr. Gust regarding that.

7    A.    So one of the things was the I-9 signature.  You have to

8    keep in mind the magnitude of hiring that we get.  We have

9    signatures for I-9s that could be 50, 60, 70 candidates deep,

10   so we were going to have to speak to our HR department and ask

11   them if they could, frankly, shift the stack.  Right?  We

12   didn't -- we've never done that before.  That's not standard

13   protocol.  We were basically going to request that candidate,

14   let's say, 71 in the hiring queue, would be put into one of the

15   top 10, to at least get processed.

16   Q.    Right.

17   A.    We also understood that while Francis was still working,

18   we were going to have to figure out a way to get Francis

19   through staff training.  Staff training is an in-office, half-

20   day training program.  So scheduling that was complex.  We

21   didn't know exactly at that moment what the -- what the

22   solution to that would be.  And that was going to be after

23   getting that time allotted to actually host the interview,

24   which, Thanksgiving week, I know most people know that it's the

25   week that's not productive, but for us in the parking world and

1  any other, you know, catering industry, it's the week that we

2  have some of the littlest labor count and some of the highest

3  venue count orders coming in.

4  Q.    Right.

5  A.    So we're busy.  Jake's 58 has events.  You know, our --

6  the point is it was a hectic time and we were tasked with a

7  challenging issue.  So we had the I-9 that we were going to try

8  to get expedited.  We had to get this interview hosted and

9  fulfilled, and then we had to have the candidate to actually

10  complete the application.

11  Q.    How about uniform?

12  A.    Uniform would have been in addition to that training day,

13  to get an order for the size of uniform proper for Francis,

14  yes.

15  Q.    Did you discuss what you were going to do about that?

16  A.    We were going to pull from potential inventory that we had

17  at an alternate site.  Sometimes we stock on site, so we're

18  going to have to make a trip over to a location.

19  Q.    How about doing the background check?

20  A.    We were very in tune with the reality that chances of that

21  clearing was not going to be before 12/1.  We understood that

22  we would potentially be tasked with almost a unfair placement,

23  which our contract in any medical space says they must go

24  through a background check.  We were basically going to hope

25  that the original employer did it and up to date and that we

630

1    weren't going to get burned in that week.

2    Q.    Okay.  So November 25th came, right?  The day finally

3    came?

4    A.    Yes.

5    Q.    Did the meeting take place on that day?

6    A.    It did.

7    Q.    Okay.  And who was present at that meeting on behalf of

8    Parking Systems?

9    A.    Myself, Josh Candiotti, Bobby Gust, and Travis Gilliland.

10   Q.    And what was Travis's title at the time?

11   A.    On-site -- site supervisor at Stony Brook.

12   Q.    All of these managers to interview one person?

13   A.    Yes.

14   Q    Why?  Because it wasn't a standard interview.  It was an

15   interview that breaks all protocols.

16         So there's two routes.  One, on the surface, the, you

17   know, reality is that if we're going to break protocol, we all

18   want to make sure that we're actually hiring a candidate that

19   was really going back on company protocol.  But the other

20   reality, too, from a transparent setting, is no one wanted to

21   be told they made the wrong choice.  You broke protocol, you

22   did the wrong thing, and we all know what it's like to break

23   company rules and then, you know, the Monday morning

24   quarterbacking.

25   Q.    Okay.  So what time during the day did this meeting take

1   place?

2   A.   I believe 1 p.m.

3   Q.   Okay.  And where did it take place?

4   A.   So it was hosted at Jake's 58.  That's in Islandia.

5   Q.   Okay.

6   A.   It's an account we service.

7   Q.   And where did it take place?  Where did the meeting take

8   place at Jake's 58?

9   A.   There is a lower level lounge, which is also a workspace.

10  We've conducted some various interviews and internal meetings

11  there.

12  Q.   Now, Jake's 58 is a casino, right?

13  A.   It is.

14  Q.   Were you able to hear each other in this area and have a

15  conversation?

16  A.   Yes, it's a secluded part of the facility.

17  Q.   Okay.  You sit at a round table?

18  A.   It was.  We --

19  Q.   How close were you, let's say, were you closer to -- to

20  each other than you and the distance between you and the judge?

21  A.   Yes.

22  Q.   Well, between where you are and the judge right now, how

23  close were you all sitting at a round table?

24  A.   I'd say about the yellow pad, which is maybe two feet, two

25  and a half feet.

```
1    Q.   So a little beyond shoulder to shoulder?
2    A.   Yes.  That is correct.
3    Q.   All right.  How long did the meeting last?
4    A.   Ten minutes.
5    Q.   Did Travis say anything in this meeting?
6    A.   Travis did not speak.
7    Q.   Okay.  And who was there?  Was just Francis there?
8    A.   No.  Another individual was there.
9    Q.   Okay.  Now, did you know who the individual was when
10   Francis appeared at the meeting?
11   A.   No.
12   Q.   Did you come to learn who the individual was at some time
13   in the meeting?
14   A.   Yes.
15   Q.   And who would -- who did you come to learn that individual
16   was?
17   A.   It was expressed by Francis that it was her son.
18   Q.   In fact, Francis has her son sitting here right now?
19   A.   That's correct.
20   Q.   Patiently?
21   A.   Yes.
22   Q.   Why was the son at the meeting?  Do you know?
23   A.   No, I'm not aware.
24   Q.   Okay.  So here we are.  You're meeting inside Jake's 58.
25   The meeting lasted ten minutes.  Travis didn't say anything?
```

1    Did the son say anything?

2    A.    Not directly to myself, Bobby, or Travis.  It was some

3    kind of side bar, short conversation between Francis and her

4    son.

5    Q.    And her son, okay.  And aside from that, did he say

6    anything?

7    A.    No.

8    Q.    Okay.  So we're left with three.  Did Francis say

9    anything?

10   A.    Yes.

11   Q.    Did she speak English or Spanish?

12   A.    English.

13   Q.    Did you say anything?

14   A.    I did.

15   Q.    Did you speak English or Spanish?

16   A.    I spoke English.

17   Q.    Did the son interpret anything for Francis?

18   A.    No.

19   Q.    Did Bobby speak?

20   A.    Yes.

21   Q.    English or Spanish?

22   A.    English.

23   Q.    Did the son have to interpret anything?

24   A.    No.

25   Q.    Okay.  Who led off the meeting?

634

1    A.   I did.

2    Q.   And what did they say?

3    A.   So I expressed exactly what Dan and Nick had extended to

4    us from the MAPS team.  I said that we were here to hire you

5    because you have obviously made an impression on this

6    organization to the point where they said you're a must-keep.

7        Despite us not taking on other staff, we are extending a

8    singular offer to you.  We've heard the rants and raves about

9    how great a service you provided a really sensitive region of

10   the hospital, and we'd like you to come on board.

11   Q.   Okay.  Did Francis say anything in response?

12   A.   Yes.

13   Q.   What did she say?

14   A.   She responded with the question, why me?

15   Q.   And did either you or Bobby respond to that?

16   A.   I responded.

17   Q.   What did you say?

18   A.   I really repeated the initial statement.  I said the

19   reason we're here interviewing with you is because you've been

20   specifically requested as a standout employee by the MAPS.

21   Q.   And did Francis respond to that?

22   A.   Yes.

23   Q.   What did she say?

24   A.   Same response the second time as well, which was, why me?

25   Q.   Okay.  Did Bobby speak at any time?

1   A.   Yes.

2   Q.   Okay.  Well, let me get back to that.  Did you respond to

3   Francis the second time, or did Bobby respond?

4   A.   Bobby.

5   Q.   What, if anything, did Bobby say?

6   A.   So Bobby came in and kind of continued to facilitate that

7   conversation along and -- and reiterated what I said.  He said,

8   look, you're -- this is a one-off situation where you've been

9   specifically recommended for the role.  And at that point --

10  can I proceed with the background?

11  Q.   Yeah.  Yeah, please.

12  A.   Okay.  So that's what Bobby had said, and then Francis had

13  responded with a genuine concern that her team was like her

14  family.  They've worked together for a long time, and then it

15  was introduced that the individual with her was actually her

16  son.  And her son worked.  Where, I don't know, to what extent.

17  Q.   Worked at Classic?

18  A.   Correct, as a parking attendant for Classic at Stony

19  Brook.

20  Q.   Okay.  So what, if anything, was said next?

21  A.   So Bobby responded with what I think was a -- a genuine

22  care and response, concern to that statement.  I think we both

23  sat there with empathy and felt bad.  And Bobby said, what he

24  said was, give me the names, please, if you can compile a list

25  of people that are your family or really stand out people.  I

1  am not promising -- we've only been authorized specifically for

2  your hiring, but if you give me that information, I will -- I

3  will pass it along and put it in a fight if I can.

4  Q.    Did Francis respond?

5  A.    Yes.

6  Q.    What did she say?

7  A.    Francis said that she would not be joining if the rest of

8  the team was not coming on.

9  Q.    Did you or Bobby comment to that?

10  A.    I think we -- well, I think we actually looked at each

11  other, puzzled, and then responded, thank you for the time,

12  shook hands, and departed.

13  Q.    Okay.  At any time during that meeting, did anybody,

14  yourself, Bobby, Travis, Francis, or a son, ever mention the

15  word union?

16  A.    No.

17  Q.    Are you sure?

18  A.    I'm positive.

19          MR. MILMAN:  Your Honor, off the record.

20          JUDGE GREEN:  Off the record.

21      (Whereupon, at 5:25 p.m. the hearing was recessed to

22  reconvene on Tuesday, July 12, 2024 at 10:00 a.m.)

23

24

25

```
 1                         CERTIFICATION

 2        This is to certify that the attached proceedings before

 3   the National Labor Relations Board (NLRB), Region 29, in the

 4   matter of Parking Systems Plus, Inc. and Local 1102, Retail

 5   Wholesale & Department Stores Union, United Food and Commercial

 6   Workers, Case No. 29-CA-331253, at 26 Federal Plaza, 2nd Floor,

 7   New York, New York 10278, on July 1, 2024, was held according

 8   to the record, and that this is the original, complete, and

 9   true and accurate transcript that has been compared to the

10   recording from the hearing, that the exhibits are complete and

11   no exhibits received in evidence or in the rejected file are

12   missing.

13

14

15

16   _____

17        Adrian Morris

18

19

20

21

22

23

24

25
```

**—**

**-- (1)**
    426:18

**$**

**$15 (1)**
    553:19
**$16,80 (2)**
    488:24;492:17
**$20 (1)**
    553:15
**$27,300 (2)**
    490:20;492:17
**$6 (1)**
    624:6
**$64,000 (1)**
    542:18
**$8 (1)**
    415:3

**`**

**`So (1)**
    613:1

**A**

**abandon (1)**
    521:14
**ability (6)**
    459:13,13;574:4,7;
    576:18;593:4
**able (14)**
    401:15,19;403:8,
    17,18;418:25;437:20;
    508:12;535:24;
    545:13;566:10;
    568:24;627:15;
    631:14
**above (3)**
    481:23;561:18;
    563:18
**above-entitled (1)**
    389:15
**absolute (1)**
    574:21
**Absolutely (15)**
    417:3;438:1;
    440:24;449:11;459:4;
    497:3;499:7;516:21;
    533:19;550:1;551:4;
    571:13;591:16;
    603:24;619:3
**absorb (1)**
    524:17
**absorbing (1)**
    527:5
**accept (4)**
    483:16;484:4,9;
    523:3

**access (1)**
    586:6
**accommodate (1)**
    503:2
**according (2)**
    510:11,15
**Accordingly (1)**
    406:11
**account (106)**
    407:17,23;408:4,
    15;410:14,16,16,23;
    411:7,19;439:12;
    470:14;481:8,9,12,13,
    23;482:6,7,9,11,12,
    13,13;483:6;484:16;
    486:7;488:12;492:19;
    495:1,24,25;496:1,1,
    8,9,10,11;498:11;
    530:14,15,17;531:18,
    22,24;536:8;537:5,7,
    12,13,23;538:10,15;
    539:8,23;540:10;
    541:2,20;542:6,18;
    543:2;550:16;551:1;
    557:18,20,20;558:4,9,
    17,25;559:22;560:21,
    23;562:6,7,9,12,14,
    14,18;563:17,25;
    568:12;582:4,6;
    586:3,6,10;587:19,19;
    588:8,9,13,20;589:11,
    19;590:15,18;591:1,
    15;592:3;593:24;
    594:24;599:9;619:11;
    631:6
**accountable (1)**
    572:11
**accounts (4)**
    408:10,11,15;
    481:11
**account's (1)**
    524:16
**accretion (1)**
    526:10
**accurate (13)**
    401:16;431:14;
    454:16;458:7,7;
    497:1,7;500:5,11,15,
    16,23;622:19
**accusation (1)**
    513:14
**acquisitions (4)**
    409:15,16;536:18;
    593:23
**acronym (1)**
    569:18
**Act (3)**
    406:11;520:6;
    522:18
**acting (1)**
    617:24
**action (4)**
    399:21;400:6;

**433:11,16**
**activate (1)**
    586:5
**activates (1)**
    565:6
**active (2)**
    532:4;586:5
**actively (1)**
    472:4
**activity (1)**
    570:24
**acts (1)**
    524:1
**actual (7)**
    411:25;421:22;
    483:9;548:18;575:23;
    610:13;623:4
**Actually (72)**
    395:25;398:6;
    403:9;405:4;419:11,
    20;420:19;422:3,22;
    435:4;442:20;460:7;
    466:22;467:22;
    473:15;476:13;488:2;
    490:5,25;491:14;
    506:19;510:4;514:24;
    531:13;532:10;538:6;
    545:6;554:7;561:18;
    563:15;565:4,5,7,24;
    568:10;569:11,12,13;
    570:13,14;576:11,20;
    577:9,11,17;578:6,13;
    579:19;580:5,11,14;
    582:5;584:4;585:16;
    586:3,9,13;591:13,17,
    20;594:11;598:6;
    615:3;620:12;623:5,
    23;624:16;628:23;
    629:9;630:18;635:15;
    636:10
**ad (6)**
    398:13;618:21;
    620:9,13,14,23
**adamantly (1)**
    514:9
**add (4)**
    393:15;396:18;
    583:20;611:17
**added (1)**
    570:18
**addition (8)**
    411:24;520:6;
    526:25;559:16;
    569:10;579:1;598:1;
    629:12
**additional (4)**
    410:20;451:1;
    472:20;473:1;491:7;
    517:1
**address (5)**
    393:8,11;395:13;
    401:19;523:17
**addressed (6)**

**493:1;521:4;523:6;**
    556:2;558:20;564:1
**addressing (1)**
    494:13
**adequate (5)**
    412:7;421:7,18;
    545:25;567:8
**adjacent (2)**
    526:4;575:18
**adjust (1)**
    418:6
**admin (5)**
    570:5,5;578:19;
    605:23;624:5
**administered (2)**
    405:18;529:19
**administration (2)**
    569:19;627:16
**Administrative (1)**
    389:16
**administrator (1)**
    570:2
**admins (1)**
    570:4
**admission (7)**
    445:5;446:11;
    450:16;452:16;457:5;
    468:13,19
**admit (3)**
    439:25;454:23;
    461:15
**admitted (36)**
    393:9,21,23;395:5,
    6;396:1,11,12;397:18,
    19;406:10;426:8;
    440:3,4;445:8,9;
    446:15,16;450:20,21;
    452:19,20;455:13,14;
    457:8,9;461:17,18;
    468:17,18;469:7,8;
    479:11,12;491:6;
    513:21
**Admittedly (1)**
    434:1
**Adrian (4)**
    395:20;436:11;
    489:17;599:25
**ads (6)**
    616:21,23;617:13;
    618:9,12;620:10
**adversarial (1)**
    456:5
**adverse (1)**
    406:11
**affidavit (2)**
    517:17,17
**affidavits (3)**
    514:10,16;522:1
**affiliation (1)**
    521:14
**affirmative (1)**
    505:13
**afternoon (6)**

**395:8;467:3;**
    479:25;480:23;530:9,
    10
**afterthought (1)**
    522:2
**again (32)**
    398:24;403:13;
    417:22;420:10;425:9;
    430:14;432:21;
    435:19;444:3;445:14;
    449:20;465:5;467:25;
    469:10;498:7;506:17;
    514:23;521:12;
    522:20;553:8;567:16;
    569:17;589:3;590:19;
    592:8;595:25;597:13;
    610:5;618:11;620:9,
    10;621:15
**agenda (1)**
    559:18
**agent (4)**
    406:10;428:3;
    516:7;520:25
**ago (7)**
    401:24,25;499:25;
    531:2,25;559:6;
    587:10
**agoldsmith@ParkingSystemscom (1)**
    442:8
**agree (2)**
    462:11;479:6
**agreed (4)**
    462:13;510:5,7,21
**agreement (6)**
    394:17;487:16;
    488:16,21;592:20,21
**agreements (1)**
    592:19
**Ah (1)**
    416:7
**ahead (6)**
    406:16;487:11,13;
    546:25;594:9;609:5
**aid (1)**
    583:14
**airport (1)**
    548:19
**aisle (7)**
    570:14,20,21,24;
    571:2;572:15,20
**Akins (1)**
    441:4
**Akram (1)**
    570:1
**ALJ (1)**
    405:5
**allegation (5)**
    505:2,5;513:24;
    516:22;521:19
**allegations (11)**
    429:13,14;505:11,
    22,23;512:19;516:17,
    20,20,24;521:3

**alleged (11)**
446:22;515:8;
516:10;517:15;
520:25;521:6,19,21;
522:2;625:8;626:15
**allegedly (1)**
516:19
**alleges (1)**
523:19
**alleging (1)**
505:11
**all-hands-on-board (1)**
602:12
**all-hands-on-deck (1)**
535:16
**allocated (2)**
554:15;614:24
**allocation (1)**
554:21
**allotted (1)**
628:23
**allow (3)**
397:17;592:21;
628:1
**allowance (5)**
488:21,23;491:18,
24;492:18
**allowed (4)**
424:19;463:18;
493:6,6
**allowing (1)**
434:1
**allows (2)**
598:22,22
**almost (7)**
473:11;498:10;
533:17;597:1;624:2;
627:12;629:22
**alone (2)**
557:24;621:13
**along (9)**
462:24;496:16,24;
533:3;572:19;613:2,
7;635:7;636:3
**alternate (1)**
629:17
**although (2)**
510:1,1
**always (16)**
472:19;497:18;
530:22;538:13;546:4,
6;549:13;559:12;
569:1,10;573:22,24;
588:14;597:16;
598:22;614:21
**among (1)**
523:20
**amongst (3)**
557:20;589:5,18
**amount (8)**
410:20;418:14;
484:5;535:7;555:19;
588:17;597:15;

605:13
**analysis (1)**
526:24
**and-file (1)**
551:6
**Andrew (36)**
410:11,13,14,22;
411:14,18;438:12;
439:7,7;442:8;446:4;
460:13,20;461:9;
462:7;466:20;467:7,
17;468:10,11,24;
470:2;471:16;494:13;
495:1;498:21;542:19,
20,21;550:13;581:24;
605:6;607:5;609:13,
17;610:12
**angry (1)**
572:1
**animus (6)**
512:19,25;513:19;
515:1,3;523:24
**answered (12)**
432:25;437:8;
484:11,21;492:3,10;
497:12;499:3;501:20;
502:3;506:15;618:14
**anti- (1)**
515:2
**anticipated (2)**
474:21;489:7
**anymore (1)**
623:15
**apologize (3)**
446:1;477:1;553:6
**apparently (1)**
587:3
**appear (2)**
439:13;467:16
**appearance (2)**
398:14;624:11
**appeared (1)**
632:10
**appears (6)**
394:4;439:21;
442:2;451:9;465:11,
21
**applicants (1)**
523:12
**application (22)**
436:24;437:2,7;
457:14;459:3,3,9,10,
17,25;501:7,10,16,24;
502:2,8;525:2;
586:14;592:20;
606:16;607:25;
629:10
**applications (9)**
437:13,21;457:20;
458:11,12,13,17;
459:1,4
**applied (2)**
406:18;564:14

**apply (1)**
526:9
**appointed (2)**
532:12;599:11
**appointments (1)**
573:13
**approach (4)**
436:12;479:21;
504:8;548:4
**approached (1)**
605:13
**appropriate (2)**
555:19;571:7
**Approximately (6)**
408:12;466:22;
488:24;521:8;525:20;
560:25
**area (22)**
411:25;412:4;
416:24;418:19;419:4,
11,11;420:18;425:19;
532:8;538:2;540:12;
565:21;566:20;568:5;
573:7;577:16;579:21;
581:9;585:15;624:1;
631:14
**areas (5)**
419:10,16;420:25;
537:17;540:1
**arena (2)**
533:7;534:8
**argue (1)**
554:8
**argument's (1)**
421:4
**around (20)**
419:3,6;437:2,2;
453:13;487:16;
498:13;507:23;
524:18;526:17,22;
532:22;549:15;
560:18;566:8;580:23;
598:19;605:12;
620:12;622:20
**arranged (1)**
443:16
**arrive (5)**
414:2,6,23;417:2;
419:25
**arrived (1)**
423:12
**arrives (1)**
414:18
**as- (1)**
559:16
**ascertain (1)**
510:3
**aside (3)**
468:10;473:22;
633:5
**assert (1)**
520:19
**asserted (2)**

433:18;521:3
**asserting (1)**
446:22
**asserts (2)**
447:22;521:11
**asset (1)**
609:25
**assets (2)**
522:19,22
**assign (1)**
418:8
**assigned (2)**
481:6;482:7
**assist (3)**
482:22,22;483:2
**Assistant (1)**
441:7
**assume (5)**
407:1;422:2;
474:19;568:12;
573:15
**assumed (2)**
443:25;456:4
**assuming (2)**
451:24;452:9
**assumption (1)**
595:3
**Atkins (5)**
441:5,6;442:3;
570:3
**Atlantic (2)**
531:9;559:24
**attachment (1)**
450:4
**attack (1)**
517:13
**attacked (1)**
517:13
**attempt (1)**
474:25
**attend (1)**
626:24
**attendant (31)**
410:10;468:5;
499:24;500:4,18;
526:5;531:6,11,22;
532:2,17,20,25;
533:16;545:12;546:9;
547:7,19;548:24;
549:4,8;551:9;
552:11,12;557:14;
566:1;585:21;592:25;
599:4;619:19;635:18
**attendants (31)**
411:4,5;415:4,16;
535:12,14;549:16,20;
550:2;551:6;554:4;
557:3,8;559:2,8;
567:1;569:2,3;
572:10;574:12,16;
580:1,6;588:13;
590:18;591:20;
602:22,25;603:1,5;

619:9
**attendants' (1)**
570:24
**attendant's (2)**
572:13,15
**attention (8)**
429:9;450:2;
469:10;522:10;
559:20;566:21;579:2;
617:8
**attorney (7)**
398:4;401:23;
423:15;433:19;
434:24;452:14;
473:16,19,23;486:16;
490:10,10
**attorney- (2)**
423:25;475:13
**attorney-client (5)**
426:17;473:7,19,
24;474:7
**attorneys (6)**
423:11;429:3;
432:13,16;447:12;
471:22
**attorney's (3)**
406:1;448:15;
451:20
**audit (1)**
569:10
**auditing (2)**
568:16;569:4
**August (8)**
513:8;589:14;
595:18,25;599:12;
615:4,14;616:2
**authentic (1)**
431:10
**authenticate (1)**
428:12
**authenticated (2)**
393:14;401:16
**authentication (2)**
401:4,20
**authenticity (3)**
431:2,11,13
**author (4)**
434:13;493:13;
494:3;495:9
**authored (1)**
493:14
**authority (1)**
621:12
**authorization (3)**
405:5;626:9,14
**authorize (2)**
621:8,9
**authorized (2)**
563:19;636:1
**auto (1)**
539:25
**autoimmune (1)**
627:14

**automotive (2)**
538:6;539:24
**available (5)**
421:9;437:5;
588:23;589:21;
606:22
**Avenue (1)**
591:6
**avenues (1)**
586:1
**average (2)**
539:3;624:3
**avoid (3)**
425:19;568:16;
579:13
**avoiding (1)**
599:16
**award (2)**
513:6,8
**awarded (4)**
524:9;589:1;
593:20;615:7
**aware (30)**
400:8;412:22;
422:10,23;423:5,8,11,
18;438:8;446:18;
447:3;463:6;464:13;
483:10,19,19;484:3,8;
487:9;498:19,24;
504:15;505:8;558:24;
611:25;615:5,22,24;
618:20;632:23
**away (4)**
468:24;515:23;
553:19;592:16
**awry (1)**
605:24

**B**

**back (47)**
393:3;402:4;
403:15;407:24;
416:22;429:23;
436:21;447:7;450:2;
453:5,22;454:21;
472:22;473:17;
477:13;510:13,16;
511:22;518:13;529:2;
533:23;538:7;544:3,
17;553:1,5;560:18,19,
22;568:22;572:16;
584:25;592:2;598:12;
600:12;601:2,24;
605:20;610:5;611:22,
22;620:15,16;622:21;
625:6;630:19;635:2
**backed (1)**
418:21
**background (5)**
607:8;608:2;
629:19,24;635:10
**backups (1)**

581:11
**bad (2)**
558:20;635:23
**badges (2)**
552:9,10
**bail (1)**
404:11
**bailment (1)**
564:20
**baiting (1)**
473:11
**bandit (1)**
553:16
**bang (1)**
587:21
**bar (1)**
633:3
**Barbeque (4)**
520:8,9;527:1;
624:23
**Barclays (2)**
541:6,7
**bargain (1)**
488:14
**bargaining (10)**
402:10,18,23;
451:23;487:16;
488:16,21;526:7,7;
527:2
**Baron (23)**
409:5,12;445:16;
456:1,9;525:24,25;
528:21;529:4,7;
536:13,17;551:3,11,
14;593:22;595:1,1;
621:10;626:8,9,11,14
**Baron's (1)**
524:6
**base (1)**
572:24
**based (15)**
444:12;486:5;
487:18;488:2;512:22;
513:1;514:3;532:21;
555:16;566:7;573:17;
586:13;592:19;607:7;
617:6
**basically (9)**
428:11;446:23;
494:24;517:22;
559:25;576:21;
577:19;628:13;
629:24
**basis (14)**
523:13;530:22;
532:15;544:3;557:7;
559:14,17;580:19;
585:25;587:18;
598:20;599:9;619:24;
622:12
**bathroom (1)**
453:9
**Bayside (1)**

627:13
**beach (14)**
531:8,9,10,25;
533:1;538:18;539:6;
557:25;559:22,24,24,
24;595:14;615:2
**became (4)**
464:13;479:2;
504:15;531:24
**become (4)**
478:15,24;579:15;
601:10
**becomes (1)**
472:20
**began (1)**
423:6
**begin (2)**
440:7;467:12
**begins (4)**
439:18;467:3;
469:11,15
**behalf (4)**
400:3;520:18;
530:5;630:7
**behind (4)**
508:9;571:8,25;
617:3
**below (1)**
467:13
**belt (1)**
547:11
**bench (4)**
406:16;479:21;
504:8;548:4
**BENJAMIN (1)**
389:16
**besides (3)**
557:3;574:5;584:2
**best (5)**
393:13;589:20;
602:1;607:14,14
**better (3)**
425:20;510:24;
603:8
**Beyond (5)**
403:4;548:14;
563:19;622:17;632:1
**bid (25)**
483:5,9,16;484:8,
10,17,17;485:2;
489:10;522:12,19,21,
23,25;523:10;524:9;
586:22,25;593:20,24;
596:14;605:12,13;
610:3;615:7
**bidder (11)**
484:4,16,19;485:9;
524:10,10;588:25;
589:6,12;593:17;
615:6
**bidding (2)**
483:8;586:21
**bids (5)**

409:18;483:2;
484:4;485:1;522:9
**big (5)**
515:7;554:2;
556:20;594:9;596:2
**biggest (12)**
493:8,10,22,23;
495:5,9,10,15,17;
573:11;574:6,18
**bill (1)**
486:1
**bills (1)**
408:8
**Billy (1)**
544:11
**bit (18)**
415:6;420:15;
439:21;484:12;
499:14;508:19;535:8;
555:1,22;559:8;
560:11,18;570:16;
597:24;601:24;
605:21;608:20;617:3
**bitter (1)**
591:23
**bizarre (1)**
597:3
**black (15)**
402:6,7,8;415:20,
20,20,20,21,22;547:7,
11,11,12,14,16
**blacked (1)**
402:24
**blame (1)**
475:17
**bled (1)**
598:10
**bleed (1)**
574:22
**bleeded (1)**
568:18
**blocking (2)**
412:13;421:10
**blog (2)**
579:6;623:9
**Blotner (1)**
540:4
**blue (1)**
546:14
**Blutner (3)**
539:16;540:5,6
**B-L-U-T-N-E-R (1)**
539:19
**BOARD (14)**
389:2,17;406:8;
411:14;423:7;497:21;
522:9,17;565:7;
566:6;573:6;578:21,
22;634:10
**boards (5)**
564:24,25;565:12,
17,17
**Board's (3)**

404:3;524:5;565:5
**Bobby (40)**
405:23;463:19;
473:14;485:15;
508:10;513:15;
541:19,20,20;542:2;
549:21,25;551:5;
553:10,12,16;576:13;
582:9;591:20;602:17;
605:7;621:2;625:24;
626:18,23;627:23;
630:9;633:2,19;
634:15,25;635:3,4,5,
6,12,21,23;636:9,14
BobbyGust@ParkingSystemscom (1)
442:6
**Bobby's (1)**
549:21
**body (1)**
578:19
**bogged (1)**
514:6
**boils (1)**
521:7
**bombarded (1)**
609:15
**bone (3)**
488:6,9,10
**booked (1)**
573:21
**bookings (1)**
573:17
**boomed (1)**
570:17
**booth (11)**
413:9,17,24;
415:24;416:5;417:10,
18,21;420:10;573:2,4
**booth-by-booth (1)**
567:12
**booths (3)**
420:19,22;580:21
**boots (2)**
525:1;535:20
**boroughs (1)**
542:12
**both (13)**
394:6;398:24;
470:4;482:17;519:9;
520:5;528:22,24;
538:12;555:4;570:3,
4;635:22
**bottom (2)**
442:21;465:12
**bought (1)**
548:23
**box (1)**
439:21
**boxes (1)**
439:14
**brand (2)**
616:25;617:9
**branded (1)**

546:11
**break (13)**
398:17;403:13;
504:6;507:18;518:9,
12;571:3;580:9;
584:12,12;586:19;
630:17,22
**break-ins (1)**
565:3
**breaks (2)**
584:18;630:15
**breather (1)**
595:15
**Brendan (1)**
540:24
**Brendon (2)**
540:7;541:10
**Brief (8)**
453:20;480:17;
519:16,21;520:1;
523:18;529:13;
584:24
**briefly (2)**
454:2;508:13
**briefs (1)**
458:5
**bring (11)**
525:5;538:23;
574:7;587:22;588:1;
602:24;603:5;604:13;
607:14;609:10;616:6
**bringing (4)**
439:15,16;497:21;
534:2
**brings (3)**
519:13;620:15,16
**broke (1)**
630:21
**Brook (154)**
394:5;398:14;
408:16,18,19,25;
409:25;410:2,22;
411:7,10,22;413:8;
417:15;422:11;438:2;
440:8,15,17,18,19,22;
441:1,8,16;444:17;
446:19;452:24;
455:19;460:10;
467:22;470:14,17;
472:2,5,7,8,10;
477:12;482:15;483:6,
10,15,19;484:8,16,18,
19;486:3;488:12;
492:2,19;498:6,8;
499:2,23,23;500:5,19,
24;503:12,19,24;
504:1;505:3;512:11;
522:3;524:12;525:11;
526:14,18;527:6;
542:21;544:15,22;
546:3;552:16;554:13,
17,18,19;555:4,5,7,9;
556:8,11,18;557:2,3,

9,9,11,14,17;564:14;
567:10;568:12;
569:19,22;572:9;
573:24;578:10,14;
580:5,14;582:24;
583:7,19;586:21;
587:1;588:24,25;
589:5;593:10,11;
594:3,17;596:1,13;
598:7,17,25;599:13;
600:25;601:8,25;
602:3;603:3;604:18;
606:2,7,9;607:10;
612:10,11,16;614:5,
16;615:18,22;616:11,
20,21;617:17;618:9,
13,21;619:4;621:19;
622:4;624:7;630:11;
635:19
**Brooklyn (4)**
541:3;542:15;
582:5,8
**Brook's (2)**
398:16;576:18
**brother (2)**
431:7,9
**brought (7)**
444:17;591:20;
606:2,3;607:11,16;
608:13
**brush (1)**
613:2
**budget (4)**
419:1;492:4,4;
591:19
**build (1)**
594:6
**building (2)**
574:8;591:7
**built (2)**
534:9;575:14
**bunch (3)**
404:11;562:13;
621:15
**burden (4)**
520:5,20,23;523:23
**burned (1)**
630:1
**Burns (1)**
523:10
**Burns' (1)**
522:15
**Bus (1)**
524:6
**business (16)**
407:21;408:9;
409:18,19;436:16;
469:23;482:23;505:3;
516:7;520:25;522:19;
526:16;531:10;
603:22;611:5;622:2
**busy (9)**
416:21;418:18;

419:5;460:6,8;
544:13,14;555:21;
629:5
**Butner (1)**
540:4
**buy (1)**
609:20

## C

**cafe (1)**
462:22
**calculated (2)**
488:23;491:24
**calculating (1)**
490:21
**calculation (2)**
490:2;491:1
**calendar (1)**
544:10
**calendaring (1)**
591:9
**call (27)**
393:7;398:17;
403:13,17;405:13;
407:1;434:11;437:12;
446:2;450:14;457:23,
23;469:10;487:19;
505:13;514:3;516:13,
16;519:14;522:5;
527:10,11;555:12;
588:22;589:22;
593:22;626:21
**called (13)**
401:25,25;402:7;
404:19;406:3;422:10;
461:20,22;509:23;
530:5;531:10;569:19;
597:20
**calling (4)**
404:4;407:2;
457:19;518:7
**calls (14)**
405:14;423:14,25;
429:5,6;476:5,6;
493:13;503:4;516:13,
13,16;583:23;615:25
**camaraderie (2)**
549:15,17
**came (17)**
389:15;444:11;
460:24;467:9;471:20;
510:13,16;511:21;
513:12;569:13;
575:25;576:2;578:10;
605:24;630:2,3;635:6
**campus (10)**
416:14;418:5;
419:7;422:14;554:19;
555:15,25;576:16,21;
580:17
**campus-wide (4)**
555:2;573:8;574:6;

577:10
**can (115)**
395:16;396:25;
397:1;399:4;400:2,
15;402:2;403:3,25;
405:16;407:1;408:4;
411:6;412:15;414:25;
419:6,12;420:24;
421:18,21;424:7;
425:19;426:2,4;
428:23;429:19;430:4,
15;431:2;433:16;
434:4;436:7;444:2;
448:23;449:2,6,20;
453:12;454:19,22;
456:5;457:23,23;
459:15;460:25;
463:17;464:7;471:4,
14;474:22;480:8,11;
485:19;486:23;
489:14;490:23;
492:21;494:10;
499:15;503:3;505:16;
507:1,1;508:6;517:2;
518:5;529:11;546:23,
24;547:3;548:2;
549:14,14,15,22;
552:17;553:20;
557:23;560:8,16,17;
563:11;565:9;567:4,
16;569:5;574:16;
579:17,18;582:19;
583:20;584:2,18,19;
585:18;587:23;
599:25;601:2;603:15;
613:5;616:10;617:1,
3,5;619:17,20;
620:12;622:19;
624:16;625:23;
627:21;628:5;635:10,
24;636:3
**Cancer (22)**
417:15,20;418:1;
419:5,11,18,24;420:9;
422:4;525:13;554:16;
565:19;573:2,4,11;
574:6,8,18;580:24;
622:11;627:11,14
**candidate (5)**
459:9;627:7;
628:13;629:9;630:18
**candidates (1)**
628:9
**Candiotti (33)**
439:8,9;445:19;
446:4;450:10;451:18;
452:6;456:1,10,23;
461:10;463:2;492:25;
495:19,19;518:7;
525:25;527:11,16,17,
22;529:23;530:4,9;
540:3;585:3;600:14;
604:17;621:4,5;

626:7,23;630:9
**C-A-N-D-I-O-T-T-I (1)**
529:24
**Candiotti's (1)**
451:14
**capacity (2)**
534:12,15
**capture (1)**
560:5
**car (32)**
415:4,5;417:12,12;
421:10,14,21,22;
532:14;533:4;537:25;
542:1;563:17;565:25;
566:1,14;568:21,21;
571:7,11,12,24;
572:14;577:24,25;
578:1,17;579:20,23;
581:11;594:12;
623:11
**carbon (1)**
565:2
**card (7)**
436:16,21;438:5;
453:5;454:21;469:23;
482:23
**cards (6)**
438:13;439:15,16,
18;469:25;470:8
**care (7)**
457:22,23;539:1;
546:10;622:14;
623:24;635:22
**career (1)**
531:13
**cars (30)**
412:11,13,14,16;
421:11,17,19;526:1,2,
4;534:13;549:21,23,
25;551:3,11,14,16;
553:11,15;554:3;
564:11;572:16;574:9,
14;582:16;583:6;
602:18,18,19
**Case (43)**
389:3;394:3;394:8;
400:17,21;401:22;
405:12;421:22;
422:23;423:5,24;
424:16;425:24;
427:25;428:2;458:8;
471:12;475:11;
476:17;478:23;
514:17,17,23,25;
515:12,21;519:13,14;
520:8,11;522:7,8;
526:10;527:3;528:13;
537:17;540:21;
553:14;557:25;563:2;
584:20;595:17;
624:23
**case-in-chief (1)**
521:17

**cases (5)**
419:2;422:5;426:9;
527:2,3
**cash (1)**
568:24
**cashier (3)**
552:11;554:2,3
**cashiering (3)**
544:6;567:22;
582:18
**Casino (3)**
461:25;462:19;
631:12
**catch-all (1)**
520:6
**category (2)**
538:22;543:25
**catering (3)**
532:16,17,17;
533:3;540:12,16,19,
19,19,22;629:1
**caught (1)**
514:2
**CBA (2)**
523:3,4
**CC (2)**
428:17;442:14
**cc'd (1)**
460:22
**CDK (1)**
538:2
**cell (1)**
471:14
**Center (35)**
417:15,20;418:1;
419:5,12,18,24;420:9;
422:4;484:9;485:24;
503:19,24;525:13;
533:5;541:6,7;
543:10,21,22,25;
554:16;558:5;561:21,
21;565:19;573:11;
574:6,8,18,19;580:24;
622:11;627:11,15
**centers (3)**
533:5,8;541:5
**center's (1)**
574:20
**central (3)**
540:14,15;591:6
**certain (16)**
440:14;460:25;
477:14;482:3;507:23;
516:18;517:6,15;
528:5;535:7;537:25;
538:19;555:6;559:12;
573:14;591:9
**certainly (7)**
440:22;444:23;
456:25;461:1;487:23;
543:24;544:6
**certification (3)**
396:16,21;397:14

**chain (3)**
469:4;513:2;515:7
**chair (1)**
566:15
**challenges (1)**
563:8
**challenging (4)**
539:1;579:4;
592:16;629:7
**chance (4)**
405:3;438:23;
441:24;448:21
**chances (1)**
629:20
**change (15)**
397:2;412:8;434:3,
4,4;492:20;510:12;
511:5,21;564:2;
572:22;574:18;
577:16;597:5;623:21
**changed (6)**
568:16;569:9,11;
570:25;572:21;
575:22
**changes (6)**
421:3;476:21;
571:1;574:5;576:14;
623:20
**changing (3)**
576:16;597:9,10
**channel (2)**
568:4;612:20
**chapters (1)**
586:2
**charge (9)**
415:2,2;475:11,12;
476:19,19;477:13,16;
522:1
**Charging (1)**
389:13
**chase (1)**
517:14
**check (4)**
568:25;609:13;
629:19,24
**checking (2)**
561:24;569:15
**checkoff (2)**
509:14;510:2
**checks (2)**
421:20;608:2
**chief (1)**
525:24
**children (1)**
627:15
**Children's (1)**
627:13
**chitter-chatter (1)**
613:2
**choice (1)**
630:21
**chose (1)**
594:24

**chronologically (2)**
442:3;585:12
**Chuck (1)**
582:7
**circle (1)**
573:1
**circumstances (4)**
400:2;401:19;
565:1;585:19
**circumvent (1)**
618:21
**circumvented (1)**
628:1
**cited (2)**
527:4;624:22
**cites (1)**
524:6
**citing (2)**
522:15;523:14
**Civil (1)**
478:5
**claim (6)**
414:5,18;417:4;
420:3;421:20,23
**claims (2)**
507:8;517:10
**clarification (2)**
485:19;503:8
**clarify (1)**
414:11
**clarifying (1)**
491:10
**clarity (2)**
569:7;610:12
**clarity's (1)**
459:7
**Classic (113)**
397:25;398:20,21,
25;399:2,3,9,12,18,
21;401:1;402:17;
403:6,13;404:14;
422:10,15,19;432:23;
435:23;446:19;447:3;
451:23;452:23;
455:20;458:17;463:6,
12;465:18;466:6,7;
467:8;486:15;487:16;
493:23;495:6;497:11,
23;498:15;504:20;
505:3;510:8,22,23,24;
512:12,13;513:5,21;
519:8;524:24;525:4;
526:19;545:4,13,19;
546:2,11;551:16,18;
552:2,2;554:21,25;
556:2,11,17;565:12;
566:23;567:2,13,17;
568:14;573:4;574:23;
575:13,14;578:12,12,
14,17;583:18,21;
587:2;594:10;596:16;
598:15;603:19,25;
604:9,10;608:17;

609:4,17,20,22,25;
610:7,7,21,25;612:2,
12,19,23;615:5,19;
621:18,23;622:17;
624:15;635:17,18
**Classic's (4)**
512:20;515:2;
545:22;622:23
**classroom (1)**
585:23
**clause (1)**
592:22
**clear (19)**
419:14;420:16;
437:1;473:12;488:17;
494:23;523:11;
542:12;547:11;
569:14;572:8;575:1;
578:13;591:14;
593:19;606:11;609:4;
612:18;623:1
**clearing (1)**
629:21
**clearly (4)**
402:20;424:18;
513:8;623:7
**client (6)**
402:3,4;424:1;
475:14,25;530:20
**clientele (1)**
538:19
**clients (1)**
476:20
**client's (1)**
605:11
**clinical (2)**
573:25;576:19
**clock (1)**
597:17
**ClockInEasy (1)**
597:20
**close (10)**
400:7,17;424:2,4;
488:6,9,10;614:4;
631:19,23
**closed (1)**
558:5;580:17,25
**closer (3)**
443:9;577:11;
631:19
**closes (1)**
565:6
**closing (2)**
400:17,18
**closings (1)**
581:6
**club (3)**
531:8,10,10
**clubs (7)**
531:25;533:1;
539:6;557:25;559:23;
595:14;615:3
**clusters (1)**

573:21
**C-Mart (1)**
580:25
**coaching (2)**
492:8,11
**code (15)**
436:19,21,23;
437:25;453:4;454:20;
457:12;469:23;
497:24;498:16;501:2,
23;502:2,10;565:9
**Cody (5)**
540:7,24;541:18;
542:3;550:22
**C-O-D-Y (1)**
540:9
**coercive (1)**
423:10
**colder (2)**
415:22;547:8
**collaborate (1)**
594:25
**collaborated (1)**
589:20
**collaborating (1)**
599:8
**collaboration (5)**
543:4;559:9;570:6;
595:4;605:1
**colleague (1)**
469:3
**collect (1)**
567:24
**collected (1)**
607:8
**collecting (1)**
408:7
**collection (2)**
567:22,25
**collective (5)**
451:22;487:16;
488:14,16,21
**College (4)**
531:12,13,14;532:5
**Colorado (1)**
523:15
**colored (2)**
439:14;624:11
**comfortable (1)**
547:15
**coming (14)**
411:14;412:9;
418:22;559:5,23;
566:11;571:9;590:6,
6;609:11,12;622:17;
629:3;636:8
**comment (1)**
636:9
**commentary (1)**
578:21
**COMMERCIAL (2)**
389:11;548:25
**committed (2)**

520:13,15
**common (1)**
  472:23
**communicate (1)**
  555:15
**communicated (3)**
  440:22,25;626:18
**communicating (4)**
  440:14,19;557:20;
  558:24
**communication (17)**
  424:1;426:17;
  473:7,19,24;474:7,13;
  475:13,14;554:6;
  556:7;559:21;610:13,
  21,25;612:1,19
**communications (4)**
  424:18;507:24;
  517:3;612:11
**Community (2)**
  531:14;591:7
**companies (1)**
  564:25
**company (36)**
  410:21;412:24;
  414:17;422:10;424:7;
  425:12;472:11;481:2;
  483:2,2;486:6;
  492:16,17;493:7;
  495:6;499:9;503:13;
  517:9;521:11;528:23;
  547:19,22;548:7,9,21;
  566:20;585:17;594:5,
  14;596:5;597:10;
  604:15;610:13;626:3;
  630:19,23
**company's (1)**
  492:18
**company-wide (1)**
  560:8
**comparable (2)**
  593:3;624:15
**compared (2)**
  420:20;622:23
**comparing (1)**
  553:2
**compelling (1)**
  399:6
**competiting (1)**
  592:3
**competitor (2)**
  588:10;592:22
**compile (1)**
  635:24
**complaint (23)**
  423:8,9;424:24;
  479:19;504:16,18,25;
  505:1,2,5,7,7,11,16,
  22,24;516:18,22;
  521:4,6,10,12;522:2
**complement (1)**
  515:2
**complete (1)**

629:10
**completed (1)**
  574:15
**completely (6)**
  522:6;570:25,25;
  578:17,18;590:1
**complex (1)**
  628:20
**compliance (1)**
  503:14
**complicated (2)**
  415:6;432:17
**compliment (1)**
  624:12
**comply (1)**
  398:3
**complying (1)**
  431:19
**composite (1)**
  565:2
**compound (1)**
  442:24
**concern (11)**
  404:14;523:5;
  569:16;575:6;579:13;
  611:19;612:5,21;
  613:10;635:13,22
**concerned (5)**
  457:19;472:18,19;
  497:18;579:7;604:8
**concerning (4)**
  477:12,20;516:8;
  600:24
**concerns (4)**
  394:2;523:5;
  570:11;575:2
**concerts (1)**
  544:4
**concise (1)**
  523:11
**conclusion (2)**
  423:14;615:3
**concrete (1)**
  617:1
**concretely (2)**
  587:12;588:1
**concurrent (1)**
  524:2
**Condominiums (1)**
  591:5
**conduct (2)**
  423:20;524:1
**conducted (1)**
  631:10
**conducting (1)**
  524:3
**cone (1)**
  574:5
**cones (1)**
  572:5
**Coney (1)**
  541:8
**confidential (1)**

428:4
**confirm (1)**
  454:19
**conflict (1)**
  517:16
**confused (1)**
  473:23
**confusing (2)**
  446:22;510:10
**confusion (4)**
  477:5;485:18;
  569:12;605:11
**connected (2)**
  397:13;431:23
**connection (3)**
  403:18;426:23;
  471:15
**connector (2)**
  396:19,24
**conscious (1)**
  472:21
**consecutively (1)**
  580:17
**consider (7)**
  437:7;457:24;
  459:24;523:12;528:5;
  567:6;568:17
**considered (2)**
  497:22;544:23
**consist (3)**
  415:19;506:14;
  558:16
**consistency (2)**
  546:12;569:2
**consistently (1)**
  620:10
**consists (2)**
  427:20;507:11
**constant (2)**
  598:21;599:7
**constantly (2)**
  526:16,22
**constriction (1)**
  597:21
**construction (2)**
  564:3;576:17
**consulted (4)**
  423:23;425:11,13;
  426:22
**contact (9)**
  437:3,4,15,16;
  459:11;460:1,3;
  493:6,6
**contacted (2)**
  461:23;501:14
**contacting (2)**
  493:11,23
**contains (3)**
  393:10;446:3;
  454:19
**content (1)**
  585:24
**contents (1)**

564:22
**context (2)**
  471:6;514:15
**continue (11)**
  499:6;560:22;
  565:22;581:5;598:22;
  609:15,16;617:25;
  618:5,7;622:16
**continued (7)**
  432:21;435:21;
  455:16;499:1;505:3;
  591:15;635:6
**continues (1)**
  469:16
**continuing (2)**
  525:19,22
**contract (15)**
  408:24;451:23;
  452:3;492:5;522:12;
  543:6;569:6;589:1;
  590:4;592:13;596:13;
  605:21;612:18;
  622:17;629:23
**contractor (1)**
  592:3
**contractors (1)**
  523:1
**contracts (1)**
  483:3
**Control (8)**
  522:11,14;530:20;
  544:6;553:20;562:21;
  575:8;597:21
**conversation (17)**
  424:8,9,20,21;
  468:8;487:18;513:15;
  516:25;519:4;560:12;
  588:16;589:18,24;
  611:11;631:15;633:3;
  635:7
**conversations (3)**
  513:2,11;619:1
**converted (1)**
  534:7
**converting (1)**
  534:10
**convincing (2)**
  523:24;525:2
**convincingly (1)**
  526:9,25
**coordinate (2)**
  549:3;619:10
**coordinated (1)**
  560:2
**Copa (1)**
  534:24
**copies (2)**
  394:16;479:20
**copy (10)**
  393:24;394:18;
  395:8;400:25;438:5;
  441:22;449:14;
  451:22;464:2;488:15

**core (4)**
  419:22;540:2;
  554:5;587:7
**corporate (7)**
  481:22,22,24;
  496:4;536:12;560:19;
  591:21
**corporation (3)**
  432:16;503:21,23
**correctly (1)**
  445:24
**correspondence (2)**
  473:20;478:7
**corroborate (1)**
  528:17
**corroborating (1)**
  521:24
**cost (6)**
  488:23;490:2,21;
  578:20,24;620:15
**cost-effective (1)**
  620:23
**costing (1)**
  492:5
**costly (1)**
  620:12
**costs (2)**
  486:7;488:19
**cotton (1)**
  548:16
**Counsel (51)**
  393:7;394:7;
  396:14,14;397:3;
  398:16;405:13,14;
  406:8,12,12,25;
  429:23;430:1,15,24;
  433:5,15;434:7;
  446:21,24;478:21,22;
  487:1,1;504:19,20;
  514:4,6,8,11,23;
  515:12,18;517:15;
  519:4;520:2,3,6,7,10,
  19,21,24;521:10,11;
  523:19;600:15;
  615:11,12;617:18
**Counsel's (6)**
  394:3;405:12;
  492:25;514:4;516:9,
  10
**count (3)**
  454:3;629:2,3
**County (14)**
  411:13,13;499:25;
  500:4,19;534:20,21;
  535:18,19;537:2,3;
  563:3;570:16,17
**county- (1)**
  535:24
**couple (13)**
  393:8;404:12;
  428:19;479:16,18;
  495:12;519:19;
  578:10;586:1;616:24;

623:18;627:25;628:4
**course (9)**
   398:11;413:1;
   416:13;482:17;516:5;
   548:20;571:21;581:1;
   623:7
**courses (1)**
   534:4
**court (4)**
   394:19;395:13;
   520:4;625:7
**Courtroom (4)**
   389:17;394:18;
   395:8;423:13
**courts (1)**
   406:18
**cover (4)**
   418:16;538:17;
   539:12;585:24
**covered (3)**
   426:10;428:5;
   580:22
**covering (3)**
   564:7;577:4,6
**covers (2)**
   541:3;542:12
**crash (1)**
   581:1
**create (2)**
   455:4;564:25
**created (2)**
   572:4,7
**creates (2)**
   433:20;456:6
**creating (1)**
   572:8
**creatures (1)**
   596:25
**credibility (3)**
   521:22;528:6,18
**crew (1)**
   611:14
**Cricket (8)**
   533:6,23;534:1,2;
   535:10;550:10;
   551:13;559:4
**criteria (3)**
   477:14;520:16;
   553:2
**critical (2)**
   513:13;525:21
**cross (2)**
   508:16;528:5
**crossed (1)**
   491:16
**CROSS-EXAMINATION (3)**
   479:23;480:21;
   504:11
**crystal (1)**
   569:14
**culturally (1)**
   597:24
**cultures (1)**

592:10
**curiosity (2)**
   398:19;412:3
**current (13)**
   393:10;410:2;
   503:18;530:11;
   558:18;563:25;564:9,
   9,10;580:19;598:18;
   622:2;626:3
**currently (8)**
   398:6;407:12;
   408:16;410:22;
   422:21;481:2;503:24;
   582:9
**custodian (9)**
   433:12;471:7,9;
   473:2,11,13;474:6;
   478:14,22
**customer (17)**
   414:18,19;415:7,
   14;420:13;421:21;
   532:6;548:22;554:6,
   7;563:18,20;566:10,
   18;571:18;572:14;
   585:21
**customers (2)**
   420:3,5
**customs (1)**
   524:22
**cut (2)**
   591:13,16
**cutting (1)**
   472:22
**cycle (1)**
   599:7

## D

**dad (1)**
   611:21
**Dan (20)**
   441:4,6;442:3,23,
   25,25;443:3,20;444:5,
   19;522:3,5;570:2,4;
   605:20;612:17,19;
   622:9;625:22;634:3
**dark (1)**
   546:14
**darker (2)**
   439:13,21
**data (5)**
   437:19;525:6;
   587:11,12;607:8
**date (24)**
   440:11;447:11;
   448:11;454:16;
   467:24,24;497:2;
   499:25;500:6,7,11;
   510:2,12,12;511:5,5,
   6,8,21;599:22;
   611:15;614:8;626:19;
   629:25
**dated (2)**

469:11;600:16
**Dattco (1)**
   526:10
**day (50)**
   398:11;413:18;
   416:1,2;418:10,14;
   449:9;477:2,6,7;
   509:12;530:16,16;
   531:9,9,25;533:4;
   535:13,13;543:4,4;
   544:8;549:24,24,25,
   25;553:22;557:23;
   563:8;564:11;574:9;
   580:25;581:7,22;
   582:24;583:9;588:22;
   598:7,11;602:6,7;
   615:19;619:7,12;
   624:6;628:20;629:12;
   630:2,5,25
**day-in (1)**
   597:10
**day-out (1)**
   597:11
**days (16)**
   418:17;490:3;
   491:25;499:25;534:9;
   558:1;573:14;580:13,
   17;581:1;582:22;
   583:3;591:13;598:4;
   603:18,18
**day-to-day (7)**
   408:6;530:19,21;
   532:6;585:25;598:19;
   619:24
**deactivate (1)**
   620:14
**deactivates (1)**
   620:22
**deadline (1)**
   628:2
**deal (13)**
   400:24;405:11;
   408:6;412:2;427:23;
   437:23;444:14;460:7;
   508:18;514:13;
   521:12;522:4;601:20
**dealership (3)**
   532:14;533:4;538:7
**dealerships (4)**
   537:25;539:24;
   542:1;594:12
**Dealing (5)**
   409:17;459:16;
   514:5,11;585:25
**deals (1)**
   601:14
**dealt (4)**
   403:25;579:5;
   601:13,15
**debrief (1)**
   577:21
**debriefed (1)**
   578:9

**decade (1)**
   591:18
**December (52)**
   408:21;410:5,6;
   412:23;413:13;414:8,
   9,9,14;423:23;
   440:23;444:22;448:6,
   8,9;455:19,21;458:16,
   19;472:2;476:13;
   493:25;495:7;497:9,
   24;498:1,4;499:2,25;
   500:8,18;505:2;
   522:14;524:24;525:7;
   545:3;581:3;602:2,5,
   7,12;603:17,18;
   604:4;606:9,14,23;
   607:9;608:13;615:1;
   627:2,21
**decide (2)**
   459:15;575:16
**decided (1)**
   589:21;606:7
**decision (9)**
   397:7,10,11;
   400:20;520:2;594:20,
   21;604:18,24
**decisionmaking (3)**
   596:17;601:8,11
**deep (1)**
   628:9
**defaulting (1)**
   555:16
**defend (1)**
   514:17
**defenses (1)**
   505:13
**defer (1)**
   397:22
**defies (1)**
   626:2
**define (2)**
   499:13;561:14
**definitely (9)**
   401:7;461:23;
   466:11;477:6;536:22;
   570:2;579:3;606:5;
   611:7
**definition (1)**
   543:24
**degrading (1)**
   608:21
**degrees (1)**
   431:18
**Delaware (2)**
   563:16,20
**delegated (2)**
   569:19;571:6
**delegation (1)**
   571:2
**delineation (1)**
   571:2
**delivered (2)**
   568:10;623:13

**demand (3)**
   415:14;417:13;
   420:13
**denies (1)**
   505:23
**departed (1)**
   636:12
**DEPARTMENT (5)**
   389:10;569:24;
   574:1;622:14;628:10
**depend (2)**
   481:21
**Depending (7)**
   415:5;416:14,17;
   418:5;467:24;565:1,8
**depends (1)**
   482:1
**deposited (1)**
   569:13
**depositing (1)**
   568:12
**depressed (1)**
   588:21
**depth (1)**
   623:19
**derogatory (1)**
   611:20
**describe (6)**
   408:4;411:6;
   420:24;481:8;482:3;
   507:2
**described (3)**
   420:15;422:20;
   477:25
**design (2)**
   531:14;532:11
**designated (1)**
   555:6
**designation (2)**
   552:3,6
**designed (1)**
   570:13
**designee (2)**
   552:18,18
**desire (1)**
   604:11
**desired (1)**
   604:5
**desk (1)**
   532:4
**Despite (4)**
   563:6;572:12;
   573:23;634:7
**detail (1)**
   537:22
**details (2)**
   573:22;626:18
**determination (4)**
   396:21;528:19;
   557:13,16
**determinations (1)**
   528:6
**determine (2)**

512:13;612:2
**determined (1)**
538:11
**determines (1)**
604:12
**deterring (1)**
565:3
**develop (1)**
585:17
**dialogue (2)**
477:12;601:22
**dictate (1)**
562:5
**dictated (1)**
416:20
**dictates (1)**
416:15
**difference (5)**
487:6;498:10;
556:20;568:14;573:3
**differences (7)**
545:14;567:13,17;
573:3;576:8;583:18,
21
**different (34)**
406:18,18;410:19;
416:22;418:7;419:8,
23;420:21,24;431:20,
20;455:7;458:16;
466:4;507:5;524:21,
21,21;525:21;532:22;
535:19;537:17,23;
538:24;539:2,4;
544:7;554:17;562:2;
570:25;586:1;597:19;
606:5;624:10
**differentiate (1)**
537:15
**differently (1)**
484:12
**differs (2)**
502:17;543:24
**digging (1)**
575:10
**digital (1)**
565:8
**diligently (1)**
503:3
**dinner (1)**
539:4
**DIRE (1)**
455:2
**DIRECT (13)**
406:5,25;427:19;
429:9;450:2;455:16;
507:23;508:15;521:4;
530:7;595:6;598:11;
619:23
**directed (1)**
476:15
**directing (3)**
429:24;476:23;
582:18

498:10
**direction (4)**
397:11;477:10;
478:7;562:21
**directions (1)**
474:14
**directly (15)**
398:2;404:6;
437:25;441:14;
476:18;502:8;508:1,
14;511:22;516:21;
517:2;553:24;568:11;
576:14;633:2
**Director (2)**
441:7;552:11
**directors (1)**
548:19
**disagree (5)**
430:4,11,11;
433:22,24
**discharged (2)**
571:9,19
**discharges (1)**
418:23
**disclose (3)**
424:6,18;425:6
**discriminate (5)**
516:11;517:16;
521:20;625:8;626:15
**discriminatees (1)**
520:25
**discriminatory (1)**
523:13
**discuss (5)**
424:15;450:14;
588:23;589:23;
629:15
**discussed (7)**
424:7;444:25;
452:13;479:5;519:4;
555:2;628:3
**discussing (2)**
479:3;590:3
**discussion (9)**
513:4;590:5;
591:22;599:19;
625:15,24;626:11;
627:23;628:6
**discussions (4)**
513:20,21;516:8;
599:16
**dispatch (2)**
555:18;581:7
**disposal (1)**
535:17
**disposed (1)**
419:21
**dispute (1)**
431:1
**disservice (1)**
597:7
**distance (1)**
631:20
**distinct (1)**

**distinction (1)**
487:9
**distinguish (1)**
561:14
**distinguished (1)**
572:5
**distinguishing (1)**
511:18
**distribute (1)**
438:13
**Division (5)**
525:13;535:18;
537:19;569:22;622:9
**divisions (1)**
580:20
**divulging (1)**
574:1
**doctor (1)**
624:5
**doctors (4)**
418:14;538:25;
573:14;578:19
**document (66)**
394:16;401:5;
402:5,6,13;427:15,21;
428:12,14;429:4,25;
430:7,10,24;431:2,13,
14,24;432:4,6;433:5,
11,16;435:4,7,11;
437:22;438:24;
441:23;442:2;445:14;
448:24;449:16;450:3;
451:8;453:9;454:3,
10;455:9;464:23;
465:5,6;467:2,16;
469:15;470:25;
473:18;475:23,25;
488:25;489:3,20;
490:4;491:6,10,11,14,
16;492:11;494:18,18;
511:19;600:22;
611:23;619:25;620:1
**documentary (1)**
393:8;394:1;
520:21;526:13
**documentation (1)**
503:13
**documents (29)**
398:7;404:12;
433:13;443:24;
447:10;467:6;471:15;
473:3,15;474:6,11,13;
475:4,7,7;476:14,18;
477:20,23;478:6;
480:13;499:19;
504:13;507:21;
508:20;513:23;
514:19;616:18;
621:15
**doesn't' (1)**
598:6
**dog (1)**

611:21
**dollars (1)**
568:2
**domino (9)**
493:8,11,22,23;
495:5,9,10,15,17
**Donald (2)**
542:4,5
**done (29)**
429:20;473:17;
477:22;489:23;
493:15;499:19;508:4;
515:12;538:9;553:13;
557:16;559:12;560:1,
15;587:3,9;588:18;
589:13;590:13,23;
597:18;608:7,10,11,
12,14;614:23;617:15;
628:12
**door (6)**
429:23;532:7;
565:19;570:12;
581:11;624:2
**doorway (1)**
546:5
**Double (2)**
494:15,15
**double- (1)**
465:5
**doubt (1)**
598:24
**down (26)**
462:21;467:4;
494:17;498:12;514:6;
521:7;536:12;539:17;
547:10;550:15;
558:25;559:1,1;
566:13;568:21;571:3,
5;572:15;579:25;
580:9;586:19;595:14;
597:9;619:5,15;620:5
**draft (1)**
426:20
**drafted (1)**
434:24
**drag (1)**
434:15
**dramatically (1)**
403:8
**draws (1)**
617:8
**dress (4)**
547:7,11,12,12
**drive (6)**
570:14,20,21,24;
571:2;572:20
**drives (1)**
571:5
**driving (1)**
563:19
**drop (1)**
569:11
**dropping (2)**

571:12;572:17
**drowns (1)**
620:22
**duces (1)**
478:21
**due (2)**
494:2;616:6
**dues (6)**
509:14,20,22;
510:1,2;511:6
**duly (2)**
406:3;530:6
**during (24)**
398:10;405:4;
413:23;418:1;421:3;
422:14;423:23;438:3;
440:21;442:23;443:4;
444:25;452:13;453:1;
498:22;527:17,23,25;
533:4;545:3;584:18;
603:16;630:25;
636:13
**Dust (1)**
582:9
**duties (2)**
408:5;530:16
**dynamic (2)**
569:14;599:2
**dynamics (2)**
564:16;627:10

### E

**Earlier (8)**
395:15;416:4;
481:25;486:14;501:3;
527:18;560:12;564:8
**early (2)**
443:6;476:13
**easier (4)**
446:3;479:21;
599:5,6
**easily (1)**
419:12
**east (3)**
542:7,15;543:10
**eastern (2)**
539:21;541:22
**easy (4)**
568:20;597:22,24;
628:2
**ebb (1)**
555:16
**effect (2)**
513:17;528:20
**effective (3)**
493:25;592:9;
611:15
**effectively (1)**
555:25
**efficient (3)**
550:7;568:20;604:6
**efficiently (2)**

555:23;624:10
**effort (4)**
398:4;516:25;
549:17;612:24
**efforts (1)**
515:8
**eight (7)**
525:20;537:9,13,
13,13;539:11;560:20
**eight-page (1)**
606:16
**Eisenhower (2)**
534:4,14
**either (22)**
396:18;402:20;
422:4;443:3;470:2;
476:15;478:6;498:20;
502:5,5;511:21;
531:15;545:25;546:9;
555:6;557:21;560:8;
577:6;607:10;619:10;
626:21;634:15
**elaborate (2)**
430:8;554:24
**election (1)**
397:12
**electronic (3)**
394:19;455:6;507:4
**element (2)**
528:18,18
**elements (1)**
520:16
**Elmhurst (1)**
542:15
**else (21)**
395:9;399:18;
401:11;459:16;
460:16;468:9;473:22;
493:14;498:19,23;
521:25;539:25;
540:24;557:3;559:25;
581:21;582:8,19;
583:20;584:3;602:20
**email (50)**
433:14;442:1,1,3,6,
14;446:3,7;448:14;
449:25;450:10,13;
451:6;454:6,10,14;
461:6,9,20;462:7;
465:11,14,16;466:5,9;
467:10;469:3,11,17,
22;475:24;476:20;
487:23;489:8,10,12;
491:25;492:25;493:3;
494:11,12;495:13;
496:8;497:7;502:6;
586:12;599:20,22;
601:22;626:21
**emailed (4)**
402:5,6;437:25;
502:8
**emails (11)**
447:13;448:25;

449:2;451:2;460:23;
465:6,9;469:12;
471:20;477:13;
487:22
**emergency (16)**
415:24;416:1,2,9,
10,16,20,21,23;
417:11;422:4;573:16;
574:19,20;580:25;
620:6
**empathetically (1)**
610:7
**empathy (1)**
635:23
**employ (1)**
603:24
**employed (5)**
407:12;509:12;
510:25;511:12;
512:12
**employee (46)**
393:11;411:25;
412:3,14;415:7,10;
417:8;419:15;420:5,
8,12,15,16,18;421:9,
22;422:7,8;437:23;
439:10;455:20,24;
463:6;466:6,7;467:8,
21;486:3,7;498:12,
17;501:6,10;511:4,8;
526:5,12;586:5;
592:18,21;594:5;
596:4;621:18;622:10;
627:19;634:20
**employees (112)**
394:5;411:1,1,3;
412:12;413:12,24;
414:1,5,11,17;416:11,
13,19,21,23;417:11;
418:2,8,16;419:24;
421:2;438:5;447:3;
452:23;458:18;
463:13;465:18;472:5,
10;486:16;493:24;
497:11,23;498:5,9,15,
20;501:3;502:13;
503:14,18,23;510:8,
11;511:7;512:20;
515:2;522:13,20;
523:14,21,25;524:4,
13,16,17,20,24;526:2,
6,13,17,22;527:5;
530:19,19;552:9;
555:5,6;557:16;
569:21;577:10;
578:25;587:2,4;
589:16;592:4;596:2,
22;597:6;598:16;
599:16;603:19;
604:10,13,19,19,21,
24;605:18;606:1,2,6;
607:9,11,14;608:17;
610:7,22;611:1;

612:3,6;615:8,19,22;
616:13;618:22;
619:15;622:22;623:2,
4
**employee's (1)**
415:13
**Employer (18)**
395:12;473:13;
501:9,13;505:23;
512:4;522:11,18,21;
523:9,12,19;524:4,16;
530:11;609:18,18;
629:25
**Employer-Respondent's (1)**
520:2
**employers (1)**
524:20
**employer's (2)**
490:10;521:23
**employment (3)**
501:2,4;523:9
**enable (1)**
586:3
**encounters (1)**
623:9
**end (22)**
405:12;408:8;
421:8;478:19;491:25;
501:19;507:6;513:9;
515:4;538:7;569:15;
572:13;590:4,6,6;
593:8;595:13;612:17;
615:2;617:6;623:13;
625:20
**end- (1)**
585:20
**ended (1)**
591:24
**ending (1)**
612:24
**ends (2)**
412:5,11
**enforce (3)**
399:25;400:3,12
**enforced (1)**
546:1
**enforcement (1)**
404:3
**enforcing (1)**
399:22
**English (6)**
633:11,12,15,16,21,
22
**enough (11)**
457:25;458:1;
498:8;505:10;546:16;
561:17;562:4;593:21;
594:15;618:2;627:7
**enroll (1)**
586:13
**ensure (6)**
530:23;549:15;
568:18;569:7;575:23;

579:23
**enter (2)**
459:8,16
**entered (3)**
395:24;435:4;
600:15
**entire (14)**
430:3;434:7,23;
477:19;487:18;
547:19;554:19;
579:22;590:2,8;
597:8;599:8;618:10,
13
**entirely (2)**
513:18;617:24
**entitled (1)**
523:12
**entity (3)**
483:11,20;484:3
**entrance (19)**
413:9,13,17,19,20,
21,22;414:21,23;
415:3;418:21;567:15,
19;568:14;570:9,10,
11;572:18;575:17
**entre (1)**
587:4
**entree (1)**
596:3
**envision (1)**
579:18
**Ephraim (1)**
605:20
**equal (2)**
492:20;523:12
**equipment (2)**
538:2;567:8
**equipped (1)**
555:14
**equivalent (3)**
482:4;504:21;
553:21
**equivalently (1)**
558:2
**ER (5)**
573:16;575:11,12,
15;576:1
**escapes (1)**
526:2
**especially (8)**
451:24;452:11;
463:22;517:9;525:24;
532:5,7;566:10
**essentially (11)**
422:20;437:3,18;
441:14;460:1;476:7;
481:7;497:18;505:4;
507:2;519:4
**establish (1)**
428:11;520:20,22;
523:20
**established (1)**
522:11

**esteemed (1)**
431:5
**Estevez (1)**
511:4
**evaluate (1)**
627:6
**evaluated (1)**
548:13
**evaluation (1)**
579:9
**even (30)**
404:10;423:22;
426:23;428:7;431:21,
23;448:6;496:3,4;
520:3,22;521:4;
526:2,20;528:19;
537:23;555:20;565:8;
573:23;587:10,11;
591:8,23;594:10;
598:11,25;599:4,18;
608:14;620:10
**event (18)**
533:23,25;534:3,
14,16,23;535:10,12;
541:5,6;543:21,22;
544:10;559:4,6;
564:9,9,10
**events (10)**
532:23;533:5,6;
540:20;543:10;544:3,
9;558:18;559:4;629:5
**eventually (1)**
606:17
**everybody (8)**
517:6;525:6,18,25;
547:18;554:17;
608:12;617:18
**Everybody's (2)**
551:7;553:20
**evidence (47)**
393:23;395:6,24;
396:8,12,15;397:20;
399:2,6;426:4,8;
431:16,19;434:10;
435:5,11;440:4;
443:24,25;445:9;
446:16;447:23;
450:21;452:20;
455:14;456:4;457:9;
461:18;468:18;469:8;
474:22;479:12;491:6;
492:24;499:21;
504:14;515:18;517:1;
519:8,9;520:21;
521:16;523:24;524:2;
526:12,13;600:15
**evidencing (1)**
524:1
**evidentiary (4)**
395:16;426:1;
523:23;524:1
**evil (3)**
496:2,2,5

**exact (5)**
441:13;542:16;
580:1;583:12;611:22
**exactly (14)**
397:8;443:7;
460:19;473:14;
487:13;504:3;509:11;
513:3;550:4,5;558:8;
627:23;628:21;634:3
**EXAMINATION (6)**
406:5;455:16;
506:11;521:5;530:7;
617:25
**examined (2)**
406:3;530:6
**example (22)**
418:12;433:12;
477:17;482:15;511:4;
514:8;521:5;541:6,8;
544:12;549:16,20;
550:3;553:9,12,23;
561:19;562:12;
563:12;597:12;
617:11;624:16
**exceeds (1)**
585:23
**exchange (7)**
439:3;456:22;
466:20,23;471:1,2,5
**excitable (1)**
624:12
**excited (3)**
532:4;593:25;594:4
**exciting (1)**
572:25
**excluded (1)**
554:10
**excuse (10)**
396:5;399:11;
408:9,18;415:23;
424:23;445:21;
457:16;476:3;525:18
**executive (48)**
407:17,23;408:4;
410:16;439:12;481:9,
12;482:13,14;495:2,
24,25;496:8,10,11;
498:11;530:14,15,17;
531:19,23,24;536:8;
537:23;538:10,15;
539:23;540:11;541:2,
21;542:6,18;543:2;
557:18,20,21;558:4,9;
559:22;562:9,12,18;
563:17;582:4,6;
587:19,20;619:11
**executives (18)**
481:8,13,23;482:6;
537:5,7,12,13;539:8;
550:16;551:1;558:17,
25;560:21,23;589:19;
593:24;594:24
**executive's (2)**

562:14;599:9
**Exhibit (65)**
393:10,15,22;
395:4,6,12,13,18;
396:12,19,24;397:5,
19;401:16;426:2;
427:6,7;436:12;
438:16,17;440:4;
441:19,20;445:9,11,
12;446:3,11,16;
448:18,19;449:14;
450:21,23,24;451:1,1;
452:20;453:24,25;
454:6,19;455:14;
456:14,15,17;457:9;
461:3,4,18;463:15;
465:1,2;466:13,14;
468:18;469:8;470:21,
22;478:11,12;479:12;
600:15,19,23
**exhibits (2)**
395:21;397:22
**exist (1)**
598:18
**existed (3)**
412:22;432:23;
435:22
**existing (8)**
488:16;587:25;
596:6;597:3;609:4;
611:8;620:14;626:4
**expand (1)**
514:1
**expect (3)**
524:16;585:25;
597:8
**expectation (1)**
592:19
**expectations (2)**
597:11;603:13
**expected (3)**
414:5,18;417:12
**expediency's (1)**
403:7
**expedite (1)**
567:4
**expedited (2)**
520:9;629:8
**expedition (1)**
517:14
**expenditures (2)**
472:18,19
**expense (3)**
489:6,7;567:5
**expenses (1)**
486:11
**expensive (2)**
548:10,22
**experience (10)**
486:5;545:11;
567:6;588:2,7;
601:11;606:3,5;
607:15;627:24

**experienced (15)**
525:5;587:22,24;
598:23;599:5;602:25;
603:1,5,9;604:13,19,
21;605:17;606:1;
607:11
**experiencing (2)**
534:13;576:16
**expertise (1)**
555:17
**expiring (1)**
612:17
**explain (9)**
481:25;495:10;
548:9;585:6,9;586:8,
9;596:21,21
**explained (1)**
471:8
**exposed (3)**
576:24;577:1,1
**expressed (9)**
549:14;570:15;
597:15;610:11;613:1;
622:9;625:25;632:17;
634:3
**expressing (1)**
558:4
**extended (2)**
525:14;634:3
**extending (1)**
634:7
**extension (2)**
430:1;546:5
**extent (7)**
431:25;477:22;
491:9,19;514:20;
528:5;635:16
**extra (3)**
400:10;560:1;
623:10
**extremely (1)**
400:9
**eye (1)**
592:14

**F**

**face (1)**
614:23
**faced (1)**
609:2
**facetious (2)**
475:19,21
**facial (1)**
597:20
**facilitate (3)**
403:20;572:18;
635:6
**facilitating (1)**
572:11
**facilities (5)**
438:3;444:13;
502:19;532:23;562:4

**facility (18)**
411:17;418:11;
483:24;534:10,25;
546:5;553:23,24;
554:2;560:24;561:16,
24;562:3,17;564:2;
574:9;619:6;631:16
**fact (18)**
398:22;419:10;
424:20;426:2;447:23;
485:8;497:9;499:9;
511:12;515:3;521:3;
557:11;596:16;
603:19,20;606:25;
607:7;632:18
**factors (2)**
523:20;526:9
**facts (4)**
443:24;446:22;
447:22;456:3
**factual (3)**
429:19;430:15;
432:18
**fair (19)**
419:19;435:25;
447:17;457:25,25;
497:1,7;500:4,10,12;
505:10;533:15;
546:16;591:3,3;
592:23;593:21;
594:15;627:7
**fairly (2)**
444:19;465:21
**fairness (1)**
411:20
**fallen (1)**
520:4
**falls (1)**
543:25
**falsified (1)**
517:10
**familiar (8)**
410:11;417:15;
441:4,10;447:6;
472:1;485:1;585:16
**family (5)**
409:22;539:3;
617:2;635:14,25
**far (12)**
520:3,20;521:21;
523:5;543:25;547:14;
557:19;559:6;565:17;
567:1;578:5;624:11
**fate (3)**
609:5;610:8;612:11
**FBI (1)**
534:20
**Federal (2)**
389:17;478:4
**fee (3)**
415:2,3;578:16
**feedback (9)**
572:23;610:12;

622:22;623:15;624:9,
13,14;625:21,25
**feel (4)**
397:13;493:7;
516:25;517:1,9;
526:8,24
**feeling (1)**
555:22
**feet (3)**
572:15;631:24,25
**fell (1)**
532:5
**fellows (1)**
532:4
**felt (3)**
444:18;517:4;
635:23
**few (11)**
397:24;480:24;
504:5;518:8;535:9;
544:12;580:18;
585:16;594:12;
600:20;623:15
**fiber (1)**
565:2
**field (7)**
408:7;441:2,7,15;
442:15;496:2;536:23
**fight (1)**
636:3
**figure (4)**
490:20;554:25;
589:20;628:18
**file (3)**
394:2,12;550:8
**filed (5)**
398:9;404:23;
475:11,12;518:1
**fill (6)**
481:10;498:13,13;
501:7;606:16,18
**filled (2)**
497:23;607:25
**filler-in (1)**
491:7
**filling (1)**
605:16
**filter (2)**
620:17,18
**final (3)**
393:7;402:2;542:18
**finally (1)**
630:2
**financial (1)**
599:4
**find (6)**
423:19;535:15;
563:14;572:17;
605:18;610:15
**finding (1)**
511:11
**fine (7)**
393:19;394:23;

432:19;453:16;
517:23;569:3;622:21
**finish (3)**
403:25;553:6;
600:19
**firm (15)**
426:3;431:14;
473:12;474:13,14;
475:6,7,23;476:15,16;
478:7,7,8;566:3;
614:1
**firmed-up (1)**
605:10
**firms (1)**
538:25
**First (53)**
393:6,9;402:19;
407:3;408:3;412:8,
15;413:18;428:19;
430:17;442:1,2;
443:7,14,15;446:20;
447:9;448:10,24;
451:8;465:11;466:5;
467:9;468:12;469:16;
473:6;474:10;486:14,
19;487:1,3,15;
494:21;502:24;
509:18;529:25;
532:10;534:2;546:4,
7;554:6;558:13;
580:18;581:1;585:13;
586:2;587:20;592:23;
599:18;603:7,8;
607:11;625:7
**firsthand (3)**
553:3;579:5;597:13
**first-hand (2)**
563:18;607:8
**fishing (1)**
517:14
**fit (3)**
412:11;526:6;
537:24
**five (8)**
534:13;541:9,17;
553:16;566:14;
584:17;592:15;
609:13
**five-minute (1)**
453:9
**fixed (1)**
575:22
**flat (2)**
409:4;482:1
**fleece (3)**
415:22;547:8,21
**fleeces (1)**
548:15
**Flex (2)**
586:3,12
**flexibility (2)**
498:14;619:16
**flip (1)**

454:2
**floors (3)**
577:3,6,7
**flow (6)**
416:20;555:16;
557:21;572:12;
576:15;577:14
**flurry (1)**
513:10
**fly (1)**
585:20
**focus (5)**
540:12;558:13;
566:20;590:13;593:9
**focusing (3)**
467:3;512:8;593:11
**follow (2)**
577:20;585:15
**followed (3)**
498:16,18,20
**following (6)**
444:19;451:19;
482:10;506:9;523:20;
592:19
**follows (2)**
406:4;530:6
**follow-up (2)**
487:2;506:8
**FOOD (1)**
389:11
**foot (1)**
419:8
**footage (1)**
534:11
**footwear (1)**
547:14
**foreclosed (1)**
407:8
**foreseeing (1)**
595:17
**forget (2)**
459:22;504:3
**forgive (1)**
592:22
**form (33)**
393:10,15;433:18,
19;434:21,23;435:13;
437:3,4,14,15,15,16,
16,17;454:7;455:5,8,
12;457:11;459:12;
460:2,3,5;495:9;
501:10,15,23,24;
503:20;505:4;578:20;
604:7
**formal (10)**
479:19,20;504:14,
14;505:1,7,8,15,16;
506:3
**format (2)**
579:22;626:21
**former (1)**
523:14
**forms (8)**

431:20;437:24;
452:23;453:4;457:20,
23;458:23;460:18
**formulate (1)**
605:10
**formulation (1)**
483:9
**forth (3)**
416:22;477:13;
605:20
**forum (5)**
406:20;578:22;
579:1,6;623:8
**forward (12)**
449:6;460:24;
471:22;516:4,6;
518:5;528:11;595:15;
614:11;625:22;
626:10,15
**forwarded (16)**
448:14;449:12,18,
21;451:22;460:4,15,
16,19,25;461:1,12;
465:16;489:11;
498:21;613:25
**forwarding (3)**
449:15;460:9,12
**found (5)**
418:20;419:2;
569:1;579:9;605:12
**foundation (4)**
426:16,19,23;
431:24
**four (12)**
501:20;509:2,3;
534:24;539:4;540:24;
541:9;547:10;554:4,
16;580:17;581:1
**four-minute (1)**
574:13
**four-page (1)**
465:5
**four-person (2)**
554:15,15
**fourth (1)**
540:23
**foxhole (1)**
579:25
**Francis (41)**
455:24;456:2,10;
457:11;460:4;461:13,
20;462:8,11,15,24;
497:20;501:18;
525:13;621:3,17,18;
622:11;625:8;626:16;
627:2,6,19,21;628:17,
18;629:13;632:7,10,
17,18;633:3,8,17;
634:11,21;635:3,12;
636:4,7,14
**frankly (6)**
538:1;591:23;
592:11;597:2;609:6;

628:11
**frantic (1)**
572:3
**FRCP (1)**
406:13
**free (2)**
575:18;576:3
**frequently (1)**
617:15
**Freudian (1)**
496:7
**Friday (12)**
416:6;417:22;
422:8;470:6,9,11,12;
493:1;532:15;619:14,
18,19
**front (14)**
462:21;476:7;
570:12;572:4,8,10,20;
573:1;574:7,22;
576:2;581:11;585:21;
624:2
**frustrating (1)**
498:10
**fulfill (2)**
603:13;612:22
**fulfilled (1)**
629:9
**full- (1)**
533:3
**full-thread (1)**
619:23
**full-time (3)**
531:16;532:11,13
**fully (3)**
527:4;548:18;614:5
**function (2)**
554:5;624:1
**functional (1)**
553:22
**functions (3)**
537:14;550:4,5
**fund (1)**
511:10
**fundamentally (2)**
433:22,24
**funeral (1)**
533:8
**further (13)**
406:9;464:22;
473:15;479:13;
494:17;504:4;506:6;
507:13;517:2,13;
525:15;577:11;596:6
**fuzzy (1)**
440:21

## G

**gander (1)**
427:18
**gap (3)**
421:8;598:4,9

**garage (5)**
542:9,11;576:21,
23,23
**gather (2)**
437:18;519:20
**gave (10)**
396:21;436:20;
438:5;456:1,10;
469:25;470:8;509:19;
514:9,16
**GC (106)**
393:10,10,16,18,22;
396:25,25;397:4;
398:25;399:1;425:22;
427:6,7;429:19;
436:12;438:16,17;
439:25;440:3,4;
441:19,20,22;445:5,8,
9,11,12;446:3,11,15,
16;448:18,19;449:14,
15;450:3,17,20,21,23,
24;451:1;452:4,16,19,
20;453:24,25;454:23;
455:13,14;456:13,15,
17;457:5,8,9;461:3,4,
15,17,18;463:15;
464:3;465:1,2;
466:13,14,19;468:13,
17,18,20;469:7,8,10;
470:21,22;478:11,12;
479:11,12;489:14,17;
492:21;494:22;
499:15,15,18,18,21;
500:17;509:17;510:9,
14;511:4;514:10,10;
600:1,3,6,8;619:25;
620:24;621:14
**GC-8 (1)**
393:21
**GC9 (1)**
600:4
**GC's (4)**
507:24;508:2;
520:15;626:16
**gear (2)**
515:5;544:13
**General (46)**
393:7;394:3,7;
396:14;398:16;
405:12,12,14;406:8,
12,25;429:23;430:1,
15,24;433:5,15;
434:7;478:21;486:11;
487:1;492:25;504:20;
514:4,4,5,8,11,23;
515:12,18;516:9,10;
519:4;520:3,7,10,19,
21,24;521:10;523:18;
598:20;600:15;
612:21;617:17
**Generally (8)**
400:4;427:24;
428:1;476:8;511:16;

542:9;564:23;614:21
**generous (1)**
  553:14
**gentlemen (1)**
  598:15
**genuine (3)**
  609:11;635:13,21
**genuinely (4)**
  563:7;594:4;
  611:19;623:8
**geofencing (1)**
  597:20
**geographic (1)**
  597:19
**geographical (3)**
  532:20;535:22;
  542:24
**geographically (4)**
  481:21;538:14;
  580:12;617:8
**germane (1)**
  468:7
**gets (8)**
  415:5;419:5;
  435:11;502:8;565:25;
  568:10;572:3;614:23
**get-together (1)**
  444:16
**giggling (3)**
  618:5,6,6
**Gil (5)**
  455:24;457:11,14;
  460:4;461:13
**Gilliland (1)**
  463:4
**Gilliland (9)**
  409:22;438:12;
  439:7;445:21,22;
  446:5;605:6;626:23;
  630:9
**given (14)**
  413:15,17;416:14;
  419:15;447:12;
  459:10;465:23;467:6;
  520:15;555:18;
  573:15;582:22;
  599:11;626:9
**gives (3)**
  415:7;459:13;
  553:14
**giving (3)**
  470:1;523:13;
  598:24
**glad (2)**
  551:24;623:20
**glaring (1)**
  525:23
**gleaned (1)**
  511:17
**Gluck (6)**
  537:3;564:6,7;
  581:22;594:23;595:4
**goes (15)**

395:3;433:14;
507:5,22;508:25;
511:18,22;515:5;
523:23;535:2,3;
548:14;566:3;568:11;
586:21
**Gold (1)**
  497:6
**Goldsmith (20)**
  410:11,13,14;
  438:12;439:8;442:9;
  446:4;461:9;466:20;
  495:21,23,24;496:15;
  497:6;542:19,21;
  550:14,15;581:24;
  605:6
**Goldsmith's (1)**
  468:24
**Goldstein (1)**
  550:13
**golf (1)**
  534:4
**good (26)**
  394:15;401:2;
  406:7;427:18,18;
  428:22;444:20;
  463:20;467:3,12;
  479:25;480:23;506:7;
  525:14;530:9,10;
  549:1;558:20;565:2;
  572:3;593:4;598:14;
  618:3;620:24;621:23;
  625:25
**goose (2)**
  427:18;517:14
**governing (1)**
  520:10
**government (1)**
  405:25
**grand (1)**
  559:7
**granted (1)**
  406:14
**gratuity (2)**
  553:15,15
**gray (2)**
  546:13,14
**great (10)**
  437:23;444:14;
  460:7;528:13,15;
  569:3;573:24;627:7,
  17;634:9
**greater (1)**
  549:15
**GREEN (331)**
  389:16;393:3,17,
  21,24,25;394:9,11,14,
  20,23,25;395:4,9,11,
  14,19,22;396:2,4,9,
  11,17,22,25;397:7,11,
  15,17;398:19,23;
  399:11,14,19;400:11,
  14,16,22;401:2,6,9,

11,21;402:12;403:1,3,
11,14,16,22;404:5,7,
9,14,17,22;405:1,3,9,
11,16,20,23,25;
406:14,21,24;407:5,9;
412:3,17,20;422:2;
423:1,3,16;424:2,5,
19;425:1,5,7,19;
426:6,13,25;427:2,9,
13,22;428:9,18,22,24;
429:7,18;430:4,11,14,
20,22,25;431:7,9,17,
22,25;432:7,17;433:2,
7,21,24;434:3,9,12,
15,19,22,25;435:3,8,
10,16;436:9,13;
437:9;440:1,3;444:2;
445:6,8;446:13,15;
447:25;450:18,20;
452:17,19;453:11,15,
22;454:24;455:13;
456:7;457:6,8,19,22;
458:9,14;459:19;
461:17;464:4,6,19;
468:14,17,22;469:5,7;
472:15;473:5,9;
474:1,4,19,24;475:2,
4,15,20;476:2,10,22;
477:2,5,8,23;478:4,9,
17;479:6,11,15,17,22;
480:6,10,14,16,19;
481:15;483:13,17,22;
484:13,22;485:17;
486:10,21,24;487:9,
11;489:2,17;490:6,9,
13,16,23;491:9,13,17,
19;492:6,9,12;
493:18;494:5,7,9,23;
495:11;496:6,12;
497:13;499:5,13,16;
501:21;502:4,23;
503:6;504:5,7,10;
505:19;506:7,16,19,
22;507:14,17;508:4,6,
8,11,18,23;509:2,4,
14,17,21;510:5,7,18,
21;511:1,9,14,24;
512:2,9,16;513:25;
514:18;515:11,15,17,
20,24;516:1;517:11,
19,22,25;518:4,9,12,
16;519:3,12,18,22;
527:9,13,22;528:2,12,
25;529:6,8,12,15,17,
21,25;530:2;533:21;
535:4,6;545:17;
546:25;548:5;551:23;
556:23;583:25;
584:13,16,22,25;
590:11,22;591:2;
600:10,12;612:7;
616:3,8,10,15;617:21,
23;618:2,15;624:21,

24;625:2;636:20
**greet (1)**
  554:7
**greeting (3)**
  414:2;417:1;419:25
**greetings (1)**
  532:7
**grew (1)**
  612:18
**groomed (1)**
  546:7
**ground (2)**
  525:1;535:20
**grounds (3)**
  397:16;477:24;
  527:17
**group (5)**
  408:10;419:22;
  468:9;594:16;605:5
**grouping (1)**
  553:21
**grow (2)**
  598:23,24
**grown (1)**
  570:16
**growth (2)**
  587:25;599:4
**guess (16)**
  398:24;399:19,19;
  400:1;402:10;437:12;
  444:16;465:25;466:1;
  482:3;519:7;521:15;
  534:7;564:17;573:13;
  578:21
**guest (3)**
  414:23,24;567:6
**guidance (2)**
  563:21;609:12
**Gust (59)**
  405:15,16,22;
  406:2,7,10,13;407:2,
  12;432:10;438:23;
  445:14,15;452:22;
  454:2;455:4,18;
  456:17;461:6;465:5;
  470:25;473:14;
  479:14,25;480:2,23,
  24;490:20;492:24;
  494:9;499:18;500:3;
  503:21;504:13;
  507:23;508:3,4;
  513:15;515:12,22;
  516:19;521:11,13;
  525:25;528:22;529:1,
  3,8;541:19,20;
  549:21;553:10;
  576:13;605:7;621:2;
  626:18,23;628:6;
  630:9
**G-U-S-T (1)**
  405:22
**Gust's (3)**
  432:15;527:17;

541:20
**guts (1)**
  605:3
**guy (2)**
  401:23;404:6
**guys (1)**
  560:1

---

**H**

---

**habit (1)**
  596:25
**habits (1)**
  524:21
**hacking (1)**
  538:4
**half (4)**
  518:11;581:22;
  605:14;631:25
**half- (1)**
  628:19
**halfway (3)**
  474:4;531:25;
  547:16
**hall (2)**
  532:17,17
**halls (2)**
  540:19,22
**halting (1)**
  590:1
**hand (5)**
  439:18;529:18;
  566:5,5;601:2
**handful (1)**
  623:9
**handing (2)**
  548:24;577:20
**handle (6)**
  411:25;482:6,8,12;
  566:4;591:11
**handled (2)**
  421:15;579:7
**handles (2)**
  409:15;568:14
**handling (13)**
  409:16;565:10,11,
  13,23;566:25;567:1,
  2;579:22;584:8;
  589:17;623:13,23
**hands (3)**
  548:22;551:7;
  636:12
**hang (1)**
  566:16
**hanging (1)**
  572:16
**happen (8)**
  400:13;411:13;
  557:6;577:23;611:1;
  612:3,12;619:12
**happened (5)**
  444:7;466:24;
  510:13;597:4;626:16

**happening (3)**
412:5,12;513:11
**happens (4)**
538:3;579:17;
611:5;619:24
**happy (5)**
401:4;403:20;
434:17;578:25;
591:24
**harassment (1)**
507:7
**hard (5)**
467:2;485:7;
549:21;585:20;627:9
**hard-working (1)**
609:7
**hats (4)**
407:17,19,19;547:9
**head (2)**
464:16;581:11
**heading (1)**
429:10
**healthcare (2)**
507:10;537:18
**hear (18)**
478:18,19;513:14;
521:23;522:24,25;
524:8,15;525:2,9,19,
20,24;526:10,20;
572:25;626:1;631:14
**heard (13)**
447:9;486:14;
487:2,4,15;518:8;
536:11;583:16;594:1,
11,14;599:18;634:8
**hearing (22)**
389:15;396:20;
397:9;401:24;405:4,
8,9;447:14;474:11;
476:24;477:2;478:14,
16,23,24;479:2;
480:9;513:10;525:10;
527:21;594:3;636:21
**hearsay (1)**
494:15
**heart (1)**
517:3
**heavy (1)**
548:10
**hectic (1)**
629:6
**heightened (1)**
502:14
**held (2)**
522:17;559:10
**help (7)**
400:25;403:20;
411:18;436:11;
555:19;586:3;620:7
**helpful (3)**
401:9;444:18;
474:23
**helping (2)**

**440:7;585:16**
**here's (6)**
399:19,20;424:5;
427:23;430:6;620:24
**hey (5)**
513:7;555:20;
559:25;590:4;596:2
**hiccup (1)**
563:25
**hiccups (1)**
578:10
**hierarchy (4)**
481:22;536:12,25;
560:19
**high (9)**
515:5;531:12;
534:18;544:1;548:12;
553:15;558:2;579:13;
622:10
**high-end (3)**
565:12;591:7;595:1
**higher (1)**
599:1
**highest (3)**
561:20;569:25;
629:2
**high-level (2)**
563:24;594:22
**highlighting (1)**
489:22
**highly (1)**
513:24
**Hilton (2)**
580:15;602:14
**himself (1)**
619:11
**hinges (2)**
565:3,4
**HIPPA (6)**
502:20;503:4,14,
18,23;504:2
**hire (35)**
456:2,10;496:16,
24;498:9,23;499:1,6;
510:12;511:5,8,21;
512:20;522:13,20;
523:19,21,25;524:15,
19,23;587:1,4;596:4;
598:14,14;599:7;
604:5;610:16;618:22;
621:2,23;622:5;
626:10;634:4
**hired (11)**
411:21;497:10;
510:16;514:21;515:8,
9;524:4;525:7;531:4;
533:25;607:16
**hires (1)**
585:7
**Hiring (33)**
408:6;460:11;
463:7,13;477:12;
481:5,9;497:2;498:5,

**23;499:9,24;500:3,6,**
11,12,19,22,23;515:1;
517:5,6;523:25;
524:12;586:16;
595:21;604:10;613:3;
621:16;628:8,14;
630:18;636:2
**historically (1)**
570:13
**hit (1)**
471:21
**hitting (1)**
525:1
**Hold (13)**
427:11;496:19,21;
509:6;530:13;531:5;
536:4;548:9;549:23;
553:5;555:25;565:11;
616:18
**holiday (2)**
557:22;558:1
**holidays (1)**
591:10
**home (3)**
563:16,18;566:10
**homes (1)**
533:8
**hone (1)**
538:8
**honest (1)**
463:20
**honestly (8)**
400:15;443:11;
445:2;468:25;478:18;
486:21;611:5;622:10
**honesty (2)**
569:5,7
**honeymoon (1)**
472:25
**honking (1)**
572:1
**Honor (151)**
393:6,20;394:21;
395:10,16,25;396:14,
20;397:25;399:13,17;
400:8,13;401:14;
404:1,20,21;406:10,
15,19;407:10;423:15;
424:4,17;425:14,21;
426:1,12,16;427:1,4,
17;428:6,16;429:5,17,
21;430:6,17;432:2,8,
16;433:1,4,20,23;
434:6,21;435:17;
436:8;437:8;440:2;
443:23;446:14,20;
447:21;450:19;
452:18;453:8,17;
454:25;455:1,15;
456:3;457:15,25;
458:3,5;459:21;
464:2,8;468:15;
469:6;473:4,12,25;

**474:15,23;475:3,10,**
18;476:1,11,25;477:9,
18,21;479:8,10,20;
480:1;485:7,20,21;
486:18,23;487:10;
490:18;491:4,12,22;
492:7,22;493:12;
494:2,8;495:8;
497:12;499:3;502:3,
22;503:9,20;504:9;
506:21;507:16;
508:16;509:6;511:3;
512:15;514:1,10,24;
515:13;518:14,18;
519:20,23;520:1,18;
521:2;522:8;523:16;
526:8,23;527:8,15,21,
24;528:7;535:2;
548:4;584:11;600:9;
601:4;616:5,16;
617:19;624:25;625:1;
636:19
**hood (2)**
566:13;579:10
**hope (1)**
629:24
**Hospital (64)**
398:15;408:19;
410:1;411:23;412:6,
23;413:4,9;417:16;
418:13;422:12,14;
432:24;435:24;438:2;
444:13;482:16;483:6,
11,16,20;484:16,20;
492:2,19;499:24;
500:4,19;502:11,13,
13,15,19;503:12;
507:9;512:12;526:18;
539:6;552:16;554:1,
18;558:6;561:19;
566:11;567:14;
568:11;570:12,16,17;
572:4;580:20;583:19;
594:1;602:3;604:22;
606:8;617:17;618:13;
622:22;623:2,4;
624:4;627:13;634:10
**hospitality (2)**
507:8;620:19
**hospitals (7)**
506:13,25;533:8;
538:25;545:1;599:14;
624:3
**hospital's (2)**
567:23;568:6
**host (3)**
530:17;558:12;
628:23
**hosted (2)**
629:8;631:4
**hosting (3)**
530:19;534:2;559:7
**Hotel (3)**

**461:25;580:15;**
602:14
**hour (6)**
412:10;417:24;
485:25;518:10;
574:15;599:2
**hourly (4)**
485:24;486:3;
549:4,9
**hours (17)**
413:18,21,23;
416:1,2,11;417:20;
418:1;422:7;472:11;
585:23;590:2;592:15;
598:10;605:14,22;
620:20
**house (4)**
533:11;541:16,17;
559:5
**How'd (1)**
448:13
**HR (1)**
628:10
**hub (1)**
532:21
**hub-by-hub (1)**
555:2
**hubs (4)**
555:6,9;556:2;
588:1
**huh (1)**
430:21
**human (1)**
596:25
**hundred (1)**
561:22
**hundreds (3)**
527:5,5;622:13
**husband's (1)**
571:19
**Hyde (1)**
561:20
**hyper-focus (1)**
546:7
**hypothetical (2)**
553:12;590:10

**I**

**I-9 (2)**
628:7;629:7
**I-9s (4)**
437:22;459:18;
608:12;628:9
**ID (3)**
552:9,10,25
**idea (2)**
444:20;447:8
**identical (2)**
548:16;627:12
**identifiable (1)**
525:21
**identification (29)**

393:16,22;397:19;
427:6,7;438:16,17;
441:19,20;445:11,12;
448:18,19;450:23,24;
453:24,25;456:13,15;
461:3,4;465:1,2;
466:13,14;470:21,22;
478:11,12
**identify (4)**
414:25;415:4;
421:21;445:15
**identifying (2)**
393:11;546:11
**imagine (5)**
431:3;460:24;
487:24;573:17;
579:17
**immature (1)**
617:24
**immediate (1)**
559:20
**immediately (2)**
574:4;609:2
**impact (2)**
573:8,11
**impeach (7)**
433:6,10,10,15;
487:3;516:25;517:2
**impeached (4)**
521:1,1,22,23
**impeaching (1)**
430:8
**impeachment (1)**
513:1
**imperative (1)**
514:17
**implementation (4)**
544:23;580:18;
583:14;602:10
**implemented (1)**
572:23
**implications (1)**
435:1
**import (1)**
558:24
**importance (1)**
558:24
**important (6)**
403:10;507:21;
548:21;554:8;555:24;
559:2
**impossible (2)**
524:23;628:3
**impression (7)**
546:5,16;587:20;
603:7,8;607:12;634:5
**impressive (2)**
534:22;551:15
**improper (1)**
433:9
**improve (1)**
576:18
**improvement (1)**

574:6
**inaccurate (4)**
433:20;456:6;
489:9,9
**inactive (1)**
564:19
**inadequate (2)**
412:1;421:6
**inadvertent (1)**
475:18
**inadvertently (1)**
473:17
**inappropriate (1)**
590:9
**INC (5)**
389:5;393:4;
478:15,23;524:6
**inclement (1)**
415:21
**include (1)**
580:9
**included (6)**
439:6;440:7;
471:21;474:20;
476:20;605:2
**includes (3)**
413:9;451:6;530:18
**including (9)**
393:11;399:12;
414:9;432:23;435:23;
477:20;485:18;508:2;
539:11
**income (1)**
624:6
**inconsistent (2)**
430:9;523:25
**increase (3)**
418:25;419:4;576:4
**incredible (4)**
430:1;533:25;
534:9;570:18
**Indeed (3)**
417:7;420:4;500:10
**Indeed's (1)**
620:11
**independent (2)**
578:17,18
**indication (1)**
528:9
**indiscernible (1)**
524:5
**individual (16)**
433:8;459:14;
502:16,17;512:4;
560:5;563:24;590:5;
599:9;604:16;625:23;
632:8,9,12,15;635:15
**individuals (1)**
454:20
**indoor (1)**
576:23
**industries (4)**
532:24;539:5,22;

540:15
**industry (12)**
487:6,7;533:17;
538:10,16,19;541:4,
15,25;542:8;563:7;
629:1
**industry-wise (1)**
558:9
**inference (1)**
524:3
**info (2)**
574:1;627:5
**inform (1)**
625:6
**information (18)**
393:11,12;402:25;
437:4,18;454:20;
459:8,16;507:19,22;
510:3;555:1;559:2;
573:23;597:14;609:9;
613:4;636:2
**informed (1)**
622:25
**informing (1)**
610:8
**infrastructure (1)**
570:18
**infringe (2)**
426:17;474:6
**in-house (2)**
585:22;607:10
**initial (2)**
570:8;634:18
**initially (6)**
438:23;441:24;
444:16;486:25;
504:19;554:15
**initiate (2)**
523:9;611:11
**initiated (1)**
443:15
**in-office (1)**
628:19
**inquiries (1)**
498:16
**inquiry (6)**
497:24;501:3,6,8,9,
12
**inquisitive (1)**
506:18
**inside (7)**
417:10;420:10;
460:5;462:19;568:10;
575:24;632:24
**insignia (1)**
547:22
**insignificant (1)**
566:7
**insofar (1)**
397:21
**inspecting (1)**
530:22
**install (2)**

567:10,10
**instance (2)**
419:18;421:1
**Institute (1)**
553:24
**instruct (1)**
555:23
**instructed (2)**
438:13;473:13
**insurance (2)**
511:10;512:6
**intake (11)**
437:16,24;452:22;
453:4,19;454:7;
457:11;458:23;460:4,
18;461:12
**integrate (1)**
538:13
**integrated (7)**
525:8;526:9,12,20;
527:4;535:17;587:19
**integration (3)**
535:3;537:18;573:7
**integrity (2)**
569:5;622:14
**intend (3)**
394:7;397:4;515:17
**intent (1)**
524:12
**intention (1)**
515:21
**intentional (1)**
486:22
**intentions (1)**
463:20
**inter (1)**
555:4
**interact (2)**
623:5
**interactive (1)**
507:3
**interchanging (1)**
553:22
**interest (5)**
398:25;399:15,22;
400:17;604:11
**interested (3)**
497:21;501:9,13
**interesting (6)**
514:2;521:25;
570:13;573:12;
574:20;620:11
**interfered (1)**
601:19
**interim (1)**
400:6
**interior (2)**
531:14;532:10
**interlinked (1)**
586:16
**internal (3)**
578:14;589:18;
631:10

**internally (4)**
513:3,4,7;625:20
**international (2)**
534:16,24
**interoperation (1)**
433:14
**interpret (4)**
433:18;435:14;
633:17,23
**intersection (1)**
571:5
**interview (15)**
437:19;459:14;
461:21;462:9,17;
501:14,15;607:8;
626:18,24;628:23;
629:8;630:12,14,15
**interviewed (9)**
455:20;456:2,11;
462:15;497:20;
606:20,22,25;607:18
**interviewing (5)**
498:22;530:18;
607:2,4;634:19
**interviews (4)**
437:5;460:8;
481:12;631:10
**intimidating (1)**
423:10
**into (67)**
393:23;395:6,24;
396:7,12,14;397:19,
22;411:15;412:16;
420:17;423:18;426:8;
430:18;434:7;435:5,
11;437:20;440:4;
445:9;446:16;450:21;
452:20;453:8;455:14;
457:9;459:8,17;
461:18;468:18;469:8;
474:22;477:14;
479:12;483:6;491:6;
493:16;501:21;
505:17;511:18;515:5,
7;517:8,12;519:8;
520:11;523:23;
524:25;525:8;526:6;
527:6;528:5;534:8;
543:25;568:10,12,18;
574:21;575:6;577:11;
578:7;584:14;585:20;
596:16;600:15;
605:18;628:14
**intra (2)**
526:17;555:7
**intra- (1)**
557:1
**intra-issues (1)**
556:2
**intricacies (2)**
474:7;537:22
**intricate (1)**
591:10

**introduced (2)**
396:23;635:15
**introducing (1)**
397:22
**inventory (2)**
412:2;629:16
**invest (1)**
472:20
**investigation (3)**
422:24;423:6;
476:12
**invitation (1)**
586:11
**invited (1)**
608:15
**involved (18)**
408:7;433:11;
439:3;440:18;441:1;
471:2,4;483:8;484:6;
492:4;544:14,18,20,
21;562:24;593:12;
595:21;599:20
**involving (1)**
424:16
**Island (14)**
408:13;526:11,14,
18;527:7;533:6;
536:4;537:2;539:9;
541:8;542:11;558:23;
561:1;594:7
**Islanders (1)**
544:4
**Islandia (1)**
631:4
**isolated (1)**
489:15
**ISSI (1)**
509:23
**issue (27)**
394:1;398:13;
400:18,19,24;401:3,
20;412:2;431:10;
472:16;475:21;
507:16;509:1;514:12,
12;515:7,14;519:7;
523:6,7;563:25;
591:19;599:18;
600:24;601:7;623:8;
629:7
**issued (11)**
396:16;398:1,6,13,
21;399:11;476:23;
527:21;546:9;552:25;
569:1
**issues (16)**
393:8;395:13;
397:24;412:1;425:11;
477:13,14;508:3;
511:10;517:8;570:10;
584:2;601:10;613:14;
624:15;626:12
**It's (1)**
496:23

**item (1)**
548:22
**items (2)**
404:11;547:10

## J

**jacket (7)**
415:21;546:10;
547:9,21;548:9,10,19
**JACKSON (156)**
393:6,19,24;394:1,
10,12,15;395:1,7,25;
396:3,5,10;397:4,16;
399:17;400:8,12,15,
20,23;401:3,8,10,13;
404:20;405:14;406:6,
7,9;407:11;412:21;
414:10,12;422:6;
423:4,17;424:4,12,25;
425:8,18;427:5,14;
428:13;429:2,8;
432:9,19,20;435:12,
18,20;436:7,11,15;
437:11;438:15,19,22;
439:25;440:5;441:18,
21;443:1,2;444:4;
445:5,10,13;446:11,
17,25;447:2;448:1,17,
20;450:16,22,25;
452:16,21;453:23;
454:1,23;455:17;
456:8,13,16;457:5,10,
16,17;458:2,15;
459:23;461:2,5,15,19;
463:15,24;464:2,7,10,
12,21,25;465:4;
466:12,16,18;467:1;
468:12,19;469:1,9;
470:20,24;474:9,15,
17,22;478:10,13,20;
479:3,13;480:1,4;
481:14;506:9,12,23;
507:13;514:13,14;
515:13,16;527:15,20,
24;528:21;533:20;
535:1;545:16;551:21;
556:21;583:23;590:7,
19,25;615:25;617:19;
618:14;624:19
**Jacobson (1)**
509:9
**Jake's (12)**
461:25;462:3,5,13,
17;482:15;501:18;
629:5;631:4,8,12;
632:24
**James (5)**
541:11,12,18;
542:3;550:24
**January (1)**
511:5
**jargon (1)**

473:24
Jbaron@parkingsystemscom (1)
445:16
jcandiotti@parkingsystemscom (1)
445:18
**jeans (3)**
546:14,14;547:12
**jeez (1)**
424:23
**Jeff (2)**
595:4,6
**Jeffrey (5)**
537:3;564:6,7;
581:22;594:23
**Jewish (2)**
553:23,23
**JFK (1)**
548:20
**Jim (7)**
467:14,19,20;
468:6,10,11;469:3
**job (27)**
415:13;436:24;
440:6;455:20;459:10;
482:20;499:23;517:5,
7;525:4,17,18;
530:16;533:7;572:13,
15;587:2;592:25;
609:7;615:23;616:13;
617:10;620:4,6;
621:3,16;626:15
**jobs (1)**
499:22
**jockey (1)**
421:17
**Joel (1)**
544:11
**Joe's (1)**
599:1
**Johnathan (1)**
621:10
**Johnny (19)**
409:20;445:16;
456:1,9;471:17;
489:12;525:24;529:4,
4,7;536:17;551:3;
595:1;621:11,11,12,
13;626:11,14
**join (1)**
403:17
**joining (1)**
636:7
**Joint (4)**
395:4,6;549:17;
577:24
**Joint-1 (1)**
394:22
**Jon (1)**
528:21
**Jonathan (5)**
409:12,15;593:22;
626:7,9
**Jones (1)**

559:23
**Josh (29)**
439:8;444:12,12;
445:18;446:4;450:10;
451:14;456:1,10,23;
460:13,15;461:10;
462:8;463:2;471:16;
492:25;494:12;518:7;
527:11;540:3;553:11;
581:11;621:4,5;
626:7,23;630:9
**Joshua (2)**
529:23;530:4
**J-O-S-H-U-A (1)**
530:1
**joy (1)**
533:9
**J-PO (1)**
504:2
**Judge (337)**
389:16;393:3,17,
21,24,25;394:9,11,14,
20,23,25;395:4,9,11,
14,19,22;396:2,4,9,
11,17,22,25;397:7,11,
15,17;398:19,23;
399:11,14,19;400:11,
14,16,22;401:2,6,9,
11,21;402:12;403:1,3,
11,14,16,22;404:5,7,
9,14,17,22;405:1,3,9,
11,16,20,23,25;
406:14,21,24;407:5,9;
412:3,17,20;421:2;
422:2;423:1,3,16;
424:2,5,19;425:1,5,7,
19;426:6,13,25;427:2,
9,13,22;428:9,18,22,
24;429:7,18;430:4,11,
14,20,22,25;431:7,9,
17,22,25;432:7,17;
433:2,7,21,24;434:3,
9,12,15,19,22,25;
435:3,8,10,16;436:9,
13;437:9;440:1,3;
444:2;445:6,8;
446:13,15;447:25;
450:18,20;452:17,19;
453:11,15,22;454:24;
455:13;456:7;457:6,
8,19,22;458:9,14;
459:19;461:17;
463:24;464:4,6,19;
468:14,17,22;469:5,7;
472:15;473:5,9;
474:1,4,19,24;475:2,
4,15,20;476:2,10,22;
477:2,5,8,23;478:4,9,
17;479:6,11,15,17,22;
480:6,10,14,16,19;
481:15;483:13,17,22;
484:13,22;485:17;
486:10,21,24;487:9,

11;489:2,17;490:6,9,
13,16,23;491:9,13,17,
19;492:6,9,12;
493:18;494:5,7,9,23;
495:11;496:6,12;
497:13;499:5,13,16;
501:21;502:4,23;
503:6;504:5,7,10;
505:19;506:7,16,19,
22;507:14,17;508:4,6,
8,11,18,23;509:2,4,
14,17,21;510:5,7,18,
21;511:1,9,14,24;
512:2,9,16;513:25;
514:18;515:11,15,17,
20,24;516:1;517:11,
19,22,25;518:4,9,12,
15,16;519:3,12,18,22;
527:9,13,22;528:2,12,
25;529:6,8,12,15,17,
21,25;530:2;533:21;
535:4,6;545:17;
546:25;548:5;551:23;
556:23;583:25;
584:13,16,22,25;
590:11,22;591:2;
600:10,12;601:2;
612:7;616:3,8,10,15;
617:21,23;618:2,15;
624:21,24;625:2;
631:20,22;636:20
**judgment (1)**
502:24
**judicial (1)**
396:20
**July (20)**
389:18;393:4;
511:6;524:6,10,10;
557:22;559:23;589:8,
13,14;593:17;595:18,
25;599:12;615:12,18,
23;616:13;636:22
**jump (1)**
560:18
**jumped (1)**
553:6
**June (4)**
394:6;395:3;
476:14;531:1
**jury (2)**
435:8,10

## K

**keep (3)**
620:23;625:23;
628:8
**keeping (2)**
486:7,11
**Keeps (2)**
421:15;548:11
**Kendra (1)**
569:24

**kept (2)**
609:12;610:12
**key (39)**
404:12;415:7,10;
417:8;420:5,8;
548:22;563:14;
564:17,19,22,23;
565:7,10,11,21,23,23,
24;566:2,4,6,9,12,13,
16,18,23;567:1,5,8;
573:6;579:22,22;
584:8,8;623:12,12,23
**keyboard (1)**
565:18
**keypads (1)**
565:8
**keys (9)**
415:15;417:6;
421:14;564:22;567:2;
579:7,9,23;623:14
**keywords (1)**
471:18
**kicked (1)**
401:24
**Killary (7)**
537:4;563:3,21;
564:5,6;581:14,15
**kind (32)**
399:20;402:21;
412:19;418:23;
472:25;473:10,17;
474:10;481:25;514:3;
531:21;533:9;534:12,
14;536:25;538:8;
558:17;564:13;565:1;
568:17;574:11;584:5;
586:16;610:6;613:1,
3;616:10;620:22;
623:5;628:1;633:3;
635:6
**kinds (1)**
412:22
**knew (12)**
424:15,22;569:2,3;
576:2;579:21;603:25;
613:2;615:18;616:13;
628:2,2
**knowing (2)**
594:6;616:11
**knowledge (8)**
414:16;483:5,7;
484:15;486:5;553:3;
593:16,19
**known (2)**
418:13;504:14
**knows (4)**
485:8;503:4;
603:12,12
**kudos (1)**
627:17

**L**

**labeled (1)**
571:6
**labeling (1)**
543:25
**LABOR (14)**
389:2,17;406:8;
423:7;475:12;476:1;
477:16;522:17;531:9;
555:23;592:15;
605:13;619:24;629:2
**Labuda (1)**
476:16
**lack (1)**
523:24
**ladies (1)**
598:15
**lady (1)**
621:20
**LaGuardia (1)**
548:20
**Lakeville (1)**
561:19
**lane (4)**
572:4,7;624:9,12
**language (1)**
434:8
**large (7)**
394:2,12;419:7;
454:4;559:6;561:17;
562:4
**large- (1)**
544:2
**last (24)**
398:2;404:18,25;
440:6;470:9;509:12,
22;510:12;511:5;
514:24;518:7;525:15;
526:24;531:16;
539:18;540:8;545:11;
546:4;564:1;570:1;
597:4;613:10;615:19;
632:3
**last- (1)**
627:4
**lasted (2)**
521:8;632:25
**Lastly (3)**
525:19;526:8;527:4
**late (5)**
448:11;472:2;
599:12;615:4;616:20
**lately (1)**
538:3
**later (7)**
415:1,5;417:24;
443:8;452:7;498:24,
24
**latter (1)**
521:16
**Law (12)**
389:16;473:12;
483:16;484:9;520:11,
17;522:7,8,9;527:3;

538:25;592:19
**Lawrence (1)**
591:6
**laws (1)**
520:11
**lawsuit (1)**
599:20
**lawyers (2)**
424:7;473:20
**lay (1)**
426:19
**laying (1)**
431:24
**layman's (1)**
588:16
**layout (1)**
570:24
**lazy (1)**
553:12
**lead (7)**
409:5,10;436:23;
570:2;579:8;596:23;
627:5
**Leadership (2)**
550:3;626:2
**leading (5)**
501:23;533:20;
545:16;576:12;
625:18
**leads (2)**
502:2;607:5
**learn (4)**
448:10,13;632:12,
15
**learned (5)**
466:6;467:7;
488:20;577:17;
600:24
**learning (2)**
577:14;581:2
**least (16)**
398:25;399:23;
427:19;438:23;
441:24;444:21,23,25;
508:19;512:24;513:9;
518:10;596:10;598:3;
627:15;628:15
**leave (12)**
412:15;421:12;
508:9,10;566:10,12,
14;569:15;577:18;
578:1;597:18;612:22
**leaves (3)**
421:6;566:5,18
**led (2)**
488:6;633:25
**leeway (2)**
535:7;560:16
**left (12)**
395:20;412:8;
421:5;510:16;560:21;
561:25;565:5;572:1;
579:9,23;623:14;

633:8
**leg (1)**
547:17
**legal (17)**
422:23;423:14;
433:18,19;435:1,14;
437:23;453:18;
477:14;497:18;
505:10,12;522:13;
523:8;526:24;613:25;
614:1
**legalese (1)**
434:8
**legitimately (1)**
517:13
**length (3)**
479:4,5;585:23
**lengthy (1)**
606:16
**less (6)**
432:17;454:12;
562:24;567:3;598:8;
607:15
**lesser (1)**
553:14
**letter (25)**
434:14;447:18,23;
448:2,15;451:20;
452:13;486:16;
487:17;489:24;
493:13,14;599:20;
600:2,5,16;601:6,23;
613:12,18,23;614:4,
17;615:10;616:20
**level (13)**
538:19,20,24;
539:2;553:10;557:18;
569:24;573:8;588:16;
597:21;614:7;621:12;
631:9
**levels (2)**
472:1;606:5
**Lexis (1)**
524:6
**life (2)**
548:23;597:1
**lifers (1)**
487:5
**light (1)**
571:4
**limit (2)**
425:1,2
**limited (4)**
400:2,4,9;406:25
**limiting (1)**
414:13
**line (9)**
425:24;426:5;
432:3;455:4;560:23;
568:22;574:8;590:8;
624:8
**lines (2)**
563:20;583:6

**link (1)**
586:12
**LinkedIn (1)**
473:16
**links (1)**
586:13
**list (11)**
394:4;399:3;
471:18;550:15;
569:23;580:9;582:11;
583:1,5;584:4;635:24
**listed (1)**
552:12
**listen (7)**
400:11;426:6;
429:18;434:9;503:6;
528:2,13
**listening (1)**
528:17
**litany (1)**
583:18
**literally (2)**
412:10;419:8
**litigation (3)**
477:21;504:15;
520:3
**little (30)**
400:5,10;411:24;
415:5;418:16;439:21;
443:8;484:12;485:7;
499:14;508:19;
510:10;535:8;540:21;
544:6;555:22;560:3,
11,18;580:12;584:12;
588:21;591:23;
595:15;597:24;
601:24;605:24;617:3;
618:4;632:1
**littlest (1)**
629:2
**live (1)**
411:13
**lived (1)**
532:21
**lives (1)**
563:15
**living (1)**
566:8
**load (1)**
571:23
**loan (1)**
501:10
**LOCAL (11)**
389:9;446:18;
447:6;448:2;486:15;
487:6,8,15,19,20;
594:7
**locals (1)**
487:7
**location (32)**
416:14,19;419:9;
482:7,18;493:25;
495:7;497:2;498:6;

499:2,10;502:14,15;
526:17;538:9,10;
542:5,20,24;543:18;
544:1,5;558:9;
562:13,18;587:23;
591:6,11,18;603:6;
619:17;629:18

**locations (27)**
408:9;416:22;
418:7;481:5;482:8,
11,12,14;502:11;
525:8;526:11,14,20;
527:6;537:14;538:16;
554:17;557:15;
562:13,19;565:8;
587:22;588:9;594:6;
602:25;617:12;
618:10

**lock (6)**
421:14;565:3,4,6,
19;566:1

**locking (1)**
567:9

**log (19)**
474:10,12,18,20,25;
475:2,16,22;476:6,20,
24;477:8,10,19,25;
508:17;515:14;
518:17;519:5

**logo (4)**
546:20;547:6;
548:21;597:9

**long (30)**
408:2,13;410:4;
462:7;482:2;501:15;
526:11,14,18;527:7;
533:6;536:4;537:2;
539:9;543:19;558:23;
559:24;561:1;569:23;
584:15;585:23;
592:10;594:5,7;
608:9;609:8;614:24,
25;632:3;635:14

**longer (3)**
501:7;531:10;
572:25

**long-term (4)**
597:5,5;601:18;
627:24

**look (38)**
403:12;404:10;
427:15;448:21;
454:12;455:7;479:8;
487:21;499:18;
505:15;506:25;
510:14;512:18;516:6;
518:5;522:7,8;
524:19;525:11,12;
543:21;545:19;
547:24;559:23;572:3;
584:10;585:18;
587:15;588:24;593:9;
595:24;600:18;

608:16,16;620:6,24;
622:5;635:8

**looked (2)**
485:13;636:10

**looking (16)**
423:18;443:6,25;
447:13;449:13;
488:17;489:11;
494:12;514:20;529:2;
575:6;592:14;595:14;
600:19;619:9;626:6

**looks (4)**
454:18;489:21;
509:4;548:10

**loophole (1)**
576:3

**loose (1)**
617:4

**lose (3)**
566:9;593:4;616:13

**lost (14)**
524:16;588:8,9,20;
589:10;590:15,18;
591:1;608:20,21;
609:6;610:7;611:19;
612:11

**lot (87)**
407:17,19;418:15,
18;419:2,13,21;
420:15;422:7,8;
427:23;432:17;
444:13;472:25;
475:13;499:24;500:3,
18;512:23;530:21;
532:25;533:13,16;
535:12,14;537:19,22;
538:23;543:4;545:12;
549:4,8;550:2;551:6;
553:18;554:14,14,17,
24;557:2,8,14;559:1,
21;561:9,10,18,23;
566:8,20;568:19,21;
569:2;573:9;576:8,
10,11,25;577:11,12;
578:21;579:2,8,12;
580:1,5;583:17;
585:19;588:12,22;
589:25,25;590:3,3,17;
592:12;602:22,25;
603:1,5;605:25;
608:25;620:14;
622:14;623:7,15;
624:9

**lots (2)**
530:22;558:19

**lounge (1)**
631:9

**love (2)**
532:5;625:25

**loved (1)**
571:24

**lovely (1)**
596:9

**Loves (2)**
527:1;624:23

**Love's (2)**
520:8,9

**low (5)**
484:19;486:7,11;
524:9,10

**lower (2)**
496:10;631:9

**lowest (9)**
483:16;484:5,15;
485:9;588:25;589:6,
11;593:16;615:6

**Lozada (2)**
541:11,12

**lull (2)**
555:21;560:11

**lunch (3)**
508:16;518:9,12

# M

**machine (1)**
550:7

**magnitude (1)**
628:8

**main (28)**
413:9,13,17,19,20,
21,22;414:20,21,23;
415:3;416:5,5,21;
418:19,20;419:10,11,
21;565:18;567:15,19;
568:14;570:9,10,11;
574:7;575:17

**maintained (1)**
472:2

**maintaining (3)**
415:10;417:8;
530:18

**maintains (1)**
398:3

**maintenance (2)**
565:21;566:23

**major (2)**
426:16;572:20

**majority (4)**
411:11,12;460:7;
515:2

**Makes (5)**
446:3;474:14;
553:22;557:13,15

**making (6)**
412:19;483:2;
557:19;608:21;609:4;
627:22

**man (1)**
551:14

**manage (2)**
418:24,25

**management (22)**
409:4;436:2;
440:15,16,22;482:1;
536:1;545:12;548:13;

551:16,18,22;552:3,6,
14,17,18,19;568:11;
579:25;588:13;
619:22

**manager (27)**
409:25;410:2,4;
411:16;532:14,18;
554:25;555:14,14,17;
556:17;561:9,16,16,
18,23,24;562:3,17,17,
23,24;563:3,16;
581:25;582:11;
621:19

**manager/supervisors (1)**
594:16

**managerial (2)**
526:6;536:25

**managers (15)**
411:2,5;441:1;
555:24;559:1;560:20;
561:10;580:4;581:13;
582:21,24;595:7;
604:17,24;630:12

**managing (4)**
460:23;602:17,18,
19

**Manhattan (2)**
542:12,15

**manner (1)**
422:20

**manual (1)**
437:23

**manufactured (4)**
512:24;513:19;
516:24;517:7

**many (22)**
408:11;413:16;
419:2;420:22;443:10;
458:5;516:16;527:6,
6;532:22;535:12;
536:1;537:7;545:6,9;
556:8;560:25;561:10;
587:10,10;594:20;
605:5

mapetruzzelli@parkingsystemscom (1)
442:11

**MAPPS (1)**
568:5

**maps (25)**
442:17,18,18;
556:17,18;569:14,17,
17,20,21;570:7;
572:23;573:25;
574:21;575:2,2,23;
578:9;579:13;597:12;
605:14;612:16;622:9;
625:22;634:4,20

**margin (4)**
488:10,12;492:1,18

**mark (9)**
393:15;397:1,2;
409:5;471:17;525:24;
536:12;551:11;595:1

**marked (35)**
393:22;394:22;
395:17;396:2,3;
397:19;427:5,7;
428:4;438:15,17;
441:18,20,22;445:10,
12;448:17,19;450:22,
24;453:23,25;456:15;
461:2,4;464:25;
465:2;466:12,14;
470:20,22;478:11,12;
489:16;600:14

**marks (2)**
402:6,8

**Mark's (1)**
409:15

**Mary's (1)**
627:13

**match (4)**
568:25;587:14;
605:15;622:15

**matching (1)**
597:16

**material (2)**
548:16;585:24

**materials (2)**
476:4,5

**MatHer (1)**
482:16

**Matt (11)**
401:23;406:7;
563:2,5,11,21;564:5,
6;581:14,15;618:1

**Matter (8)**
389:4,15;419:10;
423:19;424:14;
425:22;455:4;524:3

**matters (1)**
461:22

**Matthew (3)**
537:4;618:5;623:4

**Mauro (36)**
397:22,24;398:21;
399:10,13;403:7,12,
15,19;404:1,6,8,10,
16;405:7,10;423:25;
424:14,17;475:17;
476:17;509:7,11,15;
510:25;511:2;512:15,
17;514:22;516:23;
518:15;519:11;528:7;
600:3,5,7

**may (14)**
395:10;401:14;
403:8;406:15;430:1;
436:12,13;460:21;
504:8;514:1;548:4;
588:4;615:23;617:1

**Maybe (19)**
460:13;495:9;
496:7;510:22;526:19;
535:24;543:20;
563:25;564:2,2;

566:7;569:25;570:5;
572:12;577:6,11;
578:5;619:17;631:24
**Meadow (1)**
543:10
**mean (75)**
396:25;397:16;
398:23;399:24;400:1,
11;403:7;404:2;
406:14,24;409:16;
413:14;424:5,22;
425:2;426:13;428:10,
10,14,18;431:10,11;
444:5;447:14;459:7,
18;463:8;470:13;
472:23;477:15;
482:14;483:24;
484:17;487:11;
489:25;491:5,6;
494:24;499:13;504:5;
508:25;510:18,21;
511:9,13,20;516:1;
528:2,11,12,14;529:6;
531:7;535:4,6;
548:10;559:18;
568:19;571:22,23;
574:23;584:6;594:7;
606:9;608:24;610:6,
6;617:6,10,17;618:6;
619:9;620:5;627:8,12
**meaning (1)**
510:12
**means (7)**
489:24;495:15,15;
511:21;564:10;
572:12;586:4
**meant (2)**
488:9;494:4
**Meanwhile (2)**
575:19;605:22
**measure (2)**
608:4,5
**measurement (1)**
609:13
**measures (1)**
572:23
**mechanism (1)**
565:20
**mechanisms (2)**
567:9;586:7
**medical (22)**
442:17,18;484:9;
485:24;503:19,24;
532:8;533:8;539:6,6;
541:5,16,17;542:1;
545:1;558:5;561:21;
577:19,21;594:2;
627:9;629:23
**medical- (1)**
537:17
**medical-specific (2)**
503:25;538:24
**meet (5)**

461:24;462:11,13;
470:17;520:22
**meeting (40)**
442:25;443:18;
444:1,1,6;452:6,10,
13;470:13;493:2;
501:18;516:10,11,11,
12,12;520:4;521:8;
522:3;564:5;575:3;
594:15;625:7,10,15,
19;626:17;630:5,7,
25;631:7;632:3,5,10,
13,22,24,25;633:25;
636:13
**meetings (19)**
442:23;443:3,8,10,
15,20;444:1,10,15,22;
445:1;558:10,12,15,
16;559:10;563:24;
570:8;631:10
**meets (1)**
484:5
**member (2)**
493:6;510:14
**members (12)**
440:15;493:7;
508:25;513:13;526:7;
587:22;588:15;
591:16,17;597:22;
617:2;619:1
**membership (2)**
399:3;509:22
**Memorial (1)**
531:9
**mention (2)**
599:15;636:14
**mentioned (11)**
444:12;447:11;
448:15;473:20;
476:15;501:1;547:21;
551:1;564:8;583:7;
623:16
**mentor (1)**
411:11
**mentoring (2)**
411:14,18
**message (17)**
439:3,6;451:8,9,14,
15;452:8;456:22;
463:7,8,12;464:13;
465:12,17;466:6;
467:8;471:23
**messages (8)**
439:13;452:4;
456:17;467:12,14,16;
502:1,5
**messaging (1)**
558:25
**met (2)**
462:24;559:17
**metal (1)**
564:25
**methodologies (1)**

524:21
**methodology (1)**
596:14
**Michael (25)**
409:7,9;442:11;
446:4;449:4,15;
450:7;456:23;460:13;
461:10;462:8;463:7,
9;465:16;467:10;
469:17,18;470:8;
471:17;487:23;537:1;
581:14;600:1;605:6;
626:7
**mid (2)**
599:11;615:4
**midday (1)**
591:14
**might (42)**
401:14,19;403:17;
417:24;443:21,21;
457:1,2;460:10,13;
467:13;516:12;519:8;
523:10;534:11;
537:23;544:20;
546:13;552:14;
553:13;555:7;557:24;
558:4;560:11,16;
562:8;563:14;565:9;
570:4,20;584:6;
588:23;607:15;617:7,
9;619:11,13;622:15;
623:10;626:22;628:1,
4
**migration (1)**
531:21
**Mike (7)**
409:10;439:8;
442:13;466:2,2;
536:21;550:11
**MILMAN (288)**
393:20;394:17,21,
24;395:10,12,15,20,
23;396:7,13,18,23;
397:2,6,9,13,21;
401:14;402:14,17;
403:2;404:21;406:15,
23;407:4,7,10;414:7;
422:25;423:2,14;
424:13,14;425:13,16,
21;426:12,15;427:1,
11,17;428:6,16;429:5,
17,21;430:6,13,17,21,
23;431:5,5,8,13,18,
23;432:2,8,15,25;
433:4,8,23;434:2,6,
11,13,17,21,23;435:1,
6,9,13,17;437:8;
438:18,20;440:2;
442:24;443:23;445:7;
446:14,20;447:21;
450:19;452:18;
453:17;454:25;455:3,
11,15;456:3;457:7,15,

21,25;458:3,12;
461:16;463:19,21,22;
465:3;466:15,17,25;
468:15,21,23;469:2,6;
472:14;473:4,6,10;
474:3,5,9,12,16;
475:1,3,6,8,17,21;
476:9,11,25;477:4,6,
9;478:2,6,18;479:1,5,
8,10,16,18,24;480:3,
8;483:12,21;484:11,
21;485:7,12,21;486:9,
18,23,25;487:10;
488:25;490:4;491:4,
11,15,18,21;492:3,10;
493:12,16,19;494:1,6,
8,15;496:9;497:12;
499:3,11;501:20;
502:3,22,24;503:9,20;
504:6,8,12;505:20,21;
506:6,15,17,21;
507:16,18;508:5,10,
14;509:7,25;510:6,9,
20;511:3,13,15;512:1,
7;514:1;515:23,25;
516:5;517:12,21,24;
518:2,6,10,14,17;
519:16,19,23,25;
527:11,19,25;529:3,7,
11,16;530:8;533:22;
535:2,5,9,11;545:18;
547:1;548:4,6;
551:24;552:1;556:24,
25;584:1,11,14,23;
585:1,2;590:12,21,24;
591:3;592:1;599:25;
600:4,6,8,13;601:4,5;
612:8,9;613:20,22;
616:1,5,9,12,16,17;
617:20,22,23;618:1,4,
8,16,18,19;624:22,25;
625:3,5;636:19
**mimicked (1)**
537:16
**mimics (1)**
562:8
**mind (4)**
396:5;453:9;623:6;
628:8
**minimum (1)**
614:21
**minute (1)**
623:11
**minutes (12)**
412:10;479:4;
480:13;519:19;521:9;
571:8,23;577:24;
578:1;584:17;632:4,
25
**mischaracterizes (1)**
443:24
**misleading (4)**
433:19;446:24;

447:22;456:6
**misleads (1)**
429:22
**misplace (1)**
566:12
**misplacing (1)**
566:18
**missing (2)**
563:14;567:5
**mitigating (1)**
530:23
**mitigation (1)**
508:25
**Mobility (6)**
442:20;532:7;
539:2;556:19;569:20;
571:24
**model (10)**
481:7;537:24;
587:7,14,16;596:5,23;
611:16;617:6;622:3
**module (1)**
507:4
**mold (1)**
537:24
**moment (7)**
463:16;566:15;
591:24;597:4;600:21;
627:5;628:21
**Monday (7)**
416:6;417:22;
422:8;532:15;565:9;
619:14;630:23
**money (7)**
472:20;473:1;
567:23,23;568:2,7;
579:12
**Montfort (1)**
523:15
**month (2)**
598:5;612:2
**months (4)**
458:5;558:21;
576:12;602:9
**moons (1)**
587:10
**morale (2)**
549:18;553:20
**more (33)**
396:13;400:6;
403:22;411:10,24;
415:6;421:9;434:17;
454:12;457:1,2;
472:10;486:6;498:10;
506:17;518:5;535:9;
541:18;542:2;544:21;
560:3;562:15;573:14,
14;574:1,20;583:1;
592:12;607:15;
612:18;624:9,16;
627:24
**morning (11)**
398:9,17;406:7;

452:12;550:10;
559:20;561:22;
574:12;580:25;
619:18;630:23
**mornings (1)**
580:24
**most (18)**
403:9;422:5;
429:25;460:21;
509:20;525:5;548:22;
564:10;573:8;589:6,
12;596:10;598:3;
602:25;622:10;
627:14,14;628:24
**mostly (1)**
542:15
**motion (2)**
507:25;509:8
**motivation (1)**
612:23
**motive (1)**
524:2
**Mount (2)**
444:14;504:1
**move (34)**
396:7;397:4;
418:18;419:6,6,7,8;
421:13;432:1;439:25;
445:5;446:11;450:16;
452:16;454:23;457:5;
461:15;468:12,19;
474:22;478:16;
496:17,25;498:13;
524:17;550:6;555:7;
572:19;599:3,3,5;
612:8,8;626:9
**moved (3)**
396:14;533:3;
580:23
**moving (8)**
466:15;478:24;
526:17,22;528:11;
565:24;599:7;624:9
**much (9)**
403:5;472:17;
520:14;554:5;579:14;
606:3;627:16,24;
628:5
**multipage (1)**
427:21
**multiple (19)**
394:16;413:12,15,
24;416:11,13;418:2;
420:19;444:10;
446:22;482:8,11,14;
497:23;535:22;536:5;
567:2;582:21;610:11
**must (3)**
443:18;614:14;
629:23
**must-keep (1)**
634:6
**myself (18)**

439:8;468:11;
509:7;535:18;539:11;
549:20;553:10;563:6,
17;580:9;591:20;
605:1,7;621:4;626:7,
23;630:9;633:2

**N**

**nail (1)**
536:12
**name (15)**
405:21;406:7;
445:24;518:8;529:22,
25;539:18;540:8;
543:13;554:24;570:2;
594:11,14;597:10;
627:17
**named (7)**
401:23;423:9;
424:14;428:17;441:4,
10;467:19
**names (4)**
561:11;605:3,17;
635:24
**name-to-name (1)**
622:12
**narrative (3)**
446:24;583:24,24
**NASA (1)**
563:2
**Nassau (24)**
411:12;531:14;
532:11,21;533:5;
534:8,20,21;535:18,
23;537:3;538:17;
539:21;540:14,15;
541:22;543:10;
553:25;558:23;563:3;
564:6,7;570:16;
580:11
**NATIONAL (5)**
389:2,17;406:8;
423:6;522:17
**naturally (3)**
510:10;565:25;
570:12
**nature (3)**
526:16;554:22;
597:1
**near (1)**
499:23
**nearly (1)**
433:13
**neat (1)**
576:10
**necessarily (3)**
428:4;477:16;554:3
**necessary (2)**
437:19;472:20
**need (36)**
413:5;425:2;
436:11;437:20;459:8;

468:8;475:8,9;477:8,
24;479:8;496:15,16,
23,24;498:14;500:23,
23;507:25,25,25;
509:13;516:6;518:5;
519:19;537:23;
547:10,12;557:17;
558:19;570:25;574:4;
575:21;609:17;
614:11,21
**needed (13)**
418:24;447:12;
471:19,22;488:5;
489:23;493:24;495:6;
498:7;511:17;525:4;
559:17;573:1
**needing (1)**
573:20
**needs (12)**
432:24;435:24;
500:6;511:22;533:14;
559:2,19;561:18;
564:1;569:5;572:17;
574:15
**neglected (1)**
609:8
**Neither (3)**
509:9;512:4;624:21
**New (33)**
389:18;409:17;
455:5,8,12;472:4,17;
483:3;498:5;499:23,
23;523:20;524:4;
531:10;534:2,3;
536:5;539:12;542:7;
561:2,20;563:7;
569:14;572:23;585:7;
587:16,25;599:6,7;
602:25;603:6;604:13;
620:13
**news (3)**
538:3;588:20,20
**next (21)**
421:12;437:6;
449:9,24;450:11;
451:15,19;483:14;
515:20,25;518:7;
536:25;539:15;
573:10;589:22;
591:22;610:15;612:8;
620:21;626:16;
635:20
**nice (5)**
594:5;616:25;
624:6,13;626:1
**nicer (1)**
599:2
**Nicholas (1)**
442:14
**Nick (18)**
441:10,12,15;
442:15,23,25,25;
443:3;522:3,5;570:3,

5;605:20;612:17,19;
622:9;625:22;634:3
**night (8)**
449:23,24;544:13,
14;559:19,20;569:15;
619:19
**nightly (1)**
568:10
**nights (2)**
417:23;544:12
**nighttime (1)**
449:19
**NLRB (14)**
422:24;423:12,18,
21,24;424:16;425:11;
476:19;480:9;520:4;
522:14;523:14;524:6,
6
**Nobody (2)**
526:2;575:11
**Nobody's (1)**
495:12
**non- (3)**
402:9,17;523:12
**non-union (1)**
618:22
**nor (9)**
398:3;476:9,9;
509:7,9;510:20,20;
522:1,1
**norm (2)**
524:3;526:6
**normal (2)**
486:19;543:22
**Norman (1)**
476:16
**Northwell (1)**
504:1
**Northwell's (1)**
561:20
**Nos (1)**
389:3
**note (2)**
528:21,23
**Noted (2)**
393:2;546:6
**notes (1)**
529:2
**notice (15)**
389:16;396:20;
545:22;546:2;551:16,
18;556:5,11;566:25;
567:17;568:13;615:5,
6,8;616:14
**noticeable (2)**
623:10,20
**noticed (4)**
565:15;567:13;
576:9;623:14
**notified (8)**
480:2;588:25;
589:5,11;593:21;
595:9,12;615:22

5;605:20;612:17,19;
622:9;625:22;634:3
**notify (2)**
551:18;590:17
**notifying (4)**
454:7;610:22,25;
613:13
**noting (1)**
585:12
**notwithstanding (1)**
520:16
**November (91)**
394:6;395:2;402:2;
438:3;440:6,12,14;
442:23;443:4;446:18;
447:20;448:3,11,12;
449:5,18;451:11;
452:7;453:1;457:3;
461:6;462:2,15;
463:6;465:9,13;
466:24;467:5;468:2;
469:11,19;470:6,9,11,
16;475:11,13,13;
476:12,13;485:15;
486:16;487:17;488:2,
2,4,15;501:19;510:2,
4,4;511:6;513:13,15;
516:9,19,24;521:8;
524:11,25;525:15;
589:15;600:2,5,16;
601:6,23,23;604:1;
611:3,6;612:2;
613:12,23;614:3,9,17;
615:10,20,23;616:14,
14,19,20,22;625:11,
14,15;626:25;627:22;
630:2
**number (14)**
416:19;418:6;
464:15;496:16,24;
505:15,16;509:3;
512:16,18;514:19;
524:19;592:18;606:1
**numbers (3)**
393:12;488:5,18
**nurse (3)**
577:20,20;593:1
**NY (1)**
389:18

**O**

**Oath (3)**
405:18;428:7;
529:19
**object (14)**
397:16;414:7;
425:24;427:17,19;
429:21;433:4;435:6,
13,14;458:9;527:16;
590:7;624:20
**objected (3)**
426:21,22;434:23
**objecting (2)**
426:5;492:7

**objection (98)**
393:20;396:9,10,
15;397:15;414:7;
422:25;423:1,14,25;
424:17;425:13;
428:16;429:5,17;
432:1,3,15,25;434:6,
21,22;440:1,2;
442:24;443:23;445:6,
7;446:13,14,20;
447:21;450:18,19;
452:17,18;454:24;
455:11;456:3;457:6,
15;461:16;468:14,15,
21,22;469:5;472:14;
473:4,5;478:17;
479:1,7,10;481:14;
483:12,21,21;486:9,
18;488:25;490:4,11,
13,16,24;491:9,20;
492:3;493:12;494:1;
495:8,8,11;496:9,13,
13;499:11;502:22,23;
503:8,20;505:18;
528:9;533:20;535:1;
545:16;551:21;
556:21;583:23;
590:19;591:3,4;
613:19;615:25;
617:19;618:14;625:1

**objectionable (1)**
474:2

**objections (1)**
492:8

**objects (1)**
490:10

**obligated (2)**
475:24;522:20

**obligation (3)**
522:13;523:8;
610:16

**obligations (2)**
503:12;527:3

**observation (1)**
546:8

**observations (1)**
545:25

**observe (1)**
422:17

**observed (2)**
551:17;556:4

**observing (1)**
609:1

**obtain (1)**
513:23

**obtained (1)**
400:25

**obviously (14)**
407:6;414:25;
418:24;421:11;
424:22,23;445:3;
447:5;472:18;488:17;
503:3;615:18;624:10;

634:5
**occur (1)**
559:19
**occurred (3)**
424:20;487:18;
564:1
**occurring (1)**
575:19
**occurs (1)**
421:3
**October (14)**
408:3;442:23;
443:4,7;444:6,8;
446:9;493:1;494:25;
513:10;515:4;589:14;
615:16;616:2
**odd (1)**
517:4
**off (34)**
395:20;401:24;
418:10;425:20;436:7,
9,10;453:11,12,18;
464:15;480:16;
492:17;519:3;529:11,
12;557:23;558:1;
560:21;565:11;
571:12;572:17;
584:16;586:7;590:2;
598:5;600:9,10,11;
612:22;619:20;
633:25;636:19,20
**offer (24)**
459:11,15;497:14,
17,22;498:2;501:2,
18;517:7;525:10,10,
11,14,17,18;592:23;
593:3,4;621:3,3,16;
626:15;627:22;634:8
**offered (5)**
401:15;501:17;
517:5;520:21;525:3
**offering (2)**
525:17;592:25
**offhand (1)**
413:21
**office (3)**
407:24;487:17;
591:21
**officers (1)**
534:21
**offices (1)**
538:25
**official (1)**
577:19
**off-premise (3)**
533:8;558:5,6
**off-the-record (2)**
463:18;485:10
**often (5)**
557:6;558:17;
587:20;616:23;617:3
**Ok (1)**
429:1

**old (2)**
551:12,14
**onboard (5)**
597:2,23;622:2;
626:3;627:20
**onboarding (9)**
584:9;585:5,12;
586:16;592:20;598:2,
12;604:7;606:13
**on-boarding (1)**
607:20
**Once (9)**
443:11;469:10;
473:17;496:17,25;
501:6;586:4;589:21;
626:14
**one (150)**
394:18;396:13;
402:14,19,23,24;
407:2;408:15;418:9,
24;419:10,16;420:23;
421:4,6,16;426:25;
427:25;431:4;436:7;
438:1;439:16,18,19,
22,23;444:6,21,23,25;
446:14;449:4;450:4;
454:25;455:1,20,24;
460:18;461:1;463:2,
12;464:6;465:17,23;
466:25;467:3,9,19;
468:15;469:11,18;
470:2;471:23;473:15;
474:6;475:18;476:16;
482:6,11,16;487:20;
488:4;494:21,21;
496:19;497:14;498:2,
16,18;499:23;501:25;
504:6;506:9;507:7,8,
8,9,16;508:25;
510:10;511:7,7;
516:13;518:6;525:3,
10,10,10,11,18,22;
526:21,21;527:6;
528:16;531:25;
532:14;537:10,13;
539:15;548:1;554:4;
556:13,14,16;562:1,
15;564:16;566:3,4,9;
570:11,19,23;571:2;
572:21;577:15,18,20,
25;578:1;580:24,25;
582:24;589:17;592:7;
594:4;595:6;598:7;
605:9,13,16;612:20;
616:24;619:15;
620:24;621:15,16;
623:6;624:16;625:6,
23;626:10,10,12;
628:7,14;630:12,16,
20
**one-off (2)**
534:23;635:8
**ones (4)**

405:7;571:24;
587:24;623:8
**one-time (1)**
534:23
**one-to-one (1)**
619:23
**online (1)**
507:4
**only (33)**
398:12;414:7,10;
416:5,15,16;455:20;
458:3;474:4;482:6,
20;492:20;498:16,18;
508:12;517:12;521:6,
20,20;523:5;525:1,7,
9,10;526:17;538:25;
544:9;553:15;574:9;
579:17;586:9;621:11;
636:1
**on-service (1)**
585:17
**onsite (1)**
576:11
**on-site (3)**
411:16;563:6;
630:11
**onward (1)**
565:9
**oop (1)**
399:4
**open (13)**
413:17,18,23;
416:1,2,6,16;417:23;
418:11;472:23;565:5,
6;577:3
**opened (3)**
580:17,24,24
**opening (15)**
443:9;472:24;
478:23;519:16,24;
520:1,7;559:7;
580:12;581:6,14;
582:9;583:11;594:17;
599:6
**openings (1)**
532:7
**open-paneled (1)**
565:17
**operate (11)**
415:24;417:18;
420:17;422:7;432:22;
435:21;505:3;553:24;
564:24;596:5;602:2
**operated (4)**
422:11,19;484:1,3
**operates (5)**
408:18;422:21;
531:8;534:1;619:18
**operating (6)**
421:8;422:15;
462:2,5;556:12;562:1
**operation (29)**
411:16;413:8;

415:23;418:1;420:21;
422:17;432:22;
435:22;444:25;
455:19;512:13,21;
524:18,22;525:1,22;
526:10;527:4;534:7;
535:16;544:15;545:4;
554:5;561:1;573:7;
583:8,8;590:2;604:14
**operational (4)**
408:8;511:18;
575:4;592:7
**operations (21)**
407:24;408:7;
440:7;441:2,8,15;
442:16;504:20,21;
525:20;530:21;535:2;
536:23;539:10;
552:21;570:1;593:23;
599:13;601:19;
616:21;624:12
**operator (2)**
566:19;623:24
**opinion (4)**
517:2;520:9,15;
521:22
**opportunity (11)**
398:10;509:8;
519:25;545:4;554:12,
21;556:1;557:9;
565:12;566:22;
598:24
**opposed (2)**
446:23;627:25
**opposite (1)**
522:6
**ops (1)**
534:20
**options (5)**
588:23;589:20;
598:13;619:22;628:4
**order (10)**
476:23;480:13;
527:21;528:10,15,19;
565:6;577:17,23;
629:13
**ordered (1)**
474:17
**ordering (2)**
605:14,22
**orders (2)**
605:11;629:3
**organization (13)**
409:3;534:1;
552:22;564:15;
609:22;610:1,24;
611:12;617:13;618:9,
10,13;634:6
**organizations (1)**
553:2
**organized (1)**
560:3
**original (2)**

494:18;629:25

**originally (1)**
418:20
**Orthodox (2)**
591:7,8
**others (6)**
439:22;460:5;
465:23;482:4;493:1;
626:8
**Otherwise (4)**
397:1;494:6;503:8;
515:16
**out (78)**
393:18;397:25;
398:1,19;402:21;
409:17;412:3;421:13,
14,16,17,17,18;
423:19;439:18;462:8;
469:25;470:1,8;
471:16;472:17;
475:23;482:23;490:2;
491:16,25;492:5;
497:23;501:7;511:11,
17;512:3;517:17;
529:10;535:18;539:4;
548:20;553:11,16;
558:4,25;560:16;
563:15,21;564:19;
566:1,11;568:5;
571:9,11;572:17;
574:21;575:10,14,25;
578:2;579:22;584:4;
586:11;587:9,21;
589:20;591:13,16;
605:12,18;606:16,18;
607:25;610:15;611:8;
612:16;619:21;
620:22;627:16,17;
628:18;635:25
**outdoor (1)**
576:23
**outdoor/indoor (1)**
576:25
**outerwear (1)**
548:14
**outpatient (2)**
539:1;561:20
**outset (2)**
488:7;527:21
**outside (4)**
557:8,13,14;585:18
**outstanding (2)**
397:23;398:5
**over (50)**
394:13;405:17;
409:25;418:19;419:4;
420:10;422:12;
427:15;443:13;448:6,
21;471:22;496:17,25;
504:22;509:13;
514:11;524:1;526:11;
532:13;533:16;
534:21;559:18;

563:20;567:11;
570:15;574:9,14;
575:11;576:25;
581:12;583:17;
585:23;586:25;
587:16;591:17;
592:10;593:12,25;
594:3;596:12;598:10;
604:13,15;606:7;
607:11,16;608:13;
617:9;629:18
**overall (3)**
524:5;553:21;
576:18
**overcome (1)**
627:19
**overlap (3)**
540:21;577:17;
583:3
**overnight (1)**
591:13
**overrule (1)**
490:16
**Overruled (32)**
423:3,16;432:1;
433:2;435:16;437:9;
447:25;456:7;457:8;
472:15;481:15;
483:17,22;484:22;
486:10;489:2;491:10,
20;492:6,12;493:18;
494:5,7;496:12;
497:13;499:5;502:4;
503:8;506:22;533:21;
545:17;583:25
**overruling (1)**
469:5
**oversee (6)**
408:10,11;411:12,
18;482:17,18
**overseeing (2)**
411:16;594:23
**oversees (3)**
482:14,17;593:23
**overtime (1)**
472:10
**own (10)**
399:15;421:22;
481:12;513:8;514:5;
515:6;519:13;560:5;
592:10,18
**owner (13)**
407:22;414:25;
475:8;481:2;482:20;
483:1;484:7;523:21;
525:23,24;536:15,20,
22
**owners (1)**
526:3
**ownership (3)**
486:6;594:22;595:2

### P

**pace (1)**
550:6
**package (1)**
503:25
**packet (5)**
502:16,17,18;
506:13,24
**pad (1)**
631:24
**Page (11)**
402:20;429:9;
442:2;451:8,9;
454:10;465:12;
469:15,16,16;489:20
**paged (1)**
573:1
**pages (5)**
394:13;454:4,6,13;
459:3
**paid (7)**
485:23;490:3;
492:16,17;549:4;
575:11;624:2
**pain (2)**
560:15;577:16
**palm (1)**
566:5
**panel (1)**
578:21
**panels (1)**
577:3
**pants (4)**
415:20;546:12,12;
547:12
**paper (6)**
395:7;436:20;
464:2;485:16;488:3;
558:22
**paragraph (11)**
427:20;429:10;
430:2,5;432:10,11;
434:7,24;493:5;
496:20,23
**paragraphs (1)**
428:19
**pardon (1)**
577:18
**park (23)**
412:4;415:4,13;
417:12;420:12;
421:19;526:1;532:19;
534:4,8,10,14;549:23;
551:3,11;553:11,12,
15,23,23;561:20;
572:14;580:5
**parked (5)**
551:14;553:16;
565:25;577:9,25
**PARKING (276)**
389:5;393:4;394:5,

9;407:14,16;408:2,15,
18,19;409:2;410:1,6,
10;411:3,5,6,21,22,
25;412:1,4,7;413:2,8;
414:10;416:3;419:10,
13;420:15,18;421:6,7,
10,18;422:10,11,12,
19,21;423:11,20;
432:13,21,22,24;
435:21,22,24;436:1,2,
24;438:3,8;439:10;
440:7,16;441:1,7,15;
442:15,20;444:24;
447:19,19;448:3,5;
451:19;452:22;
455:19;458:13;460:5;
462:2,3,24;467:8;
468:5;471:9;472:2,4,
6,9;478:15,22;
480:25;481:4;483:6;
484:7,15,19;485:1,23,
23,25;486:6;492:1;
497:1,10;498:5,8,9,
19;499:1,6,22,24;
500:3,5,10,18,23;
501:4;502:11;503:11;
504:21,22;509:12;
512:19;513:6,22;
514:19,21;515:1,9,10;
521:15;522:4;523:2;
524:11,12,15;525:16,
23;526:2,4,5;530:12,
13,21,22,25;531:4,6,
11,16,22;532:2,12,19,
24;533:13,15,17;
534:14;535:14;
536:14;537:7;539:9;
543:6,22;545:12,13,
19;546:18;549:3,4,8,
11;551:6,8,16;552:5,
5,11;553:8;554:2,3,
14;555:8;556:8,19;
557:2,4,8,13;558:19;
559:2,8;560:25;
564:14,24;565:20;
566:19;567:1,14,18,
25;568:6,15,19;
569:20;573:5;576:6,
18;577:11;578:11,16,
18;579:1,11;580:5;
581:13,19;582:16;
583:19,21;585:18;
586:21,25;587:15;
588:6,8,12;589:4,5,
10,13,15,19;590:14;
592:2,3,24;593:11,16,
24;594:16;596:14;
598:13,21;599:4,15;
601:14;602:18,18,19;
604:4,12,18;606:9,12,
14;608:25;610:24;
611:9;612:1,5,10,13;
613:17;615:8;616:23;

617:13;618:12,20;
619:9;620:9;621:22;
622:4,15,23;624:15;
625:20;628:25;630:8;
635:18
**parks (2)**
549:25;553:12
**part (36)**
394:8;395:17;
407:22;440:6;444:11;
451:24;454:14;468:8,
9;479:1;481:2;
482:20,20;483:1;
484:7;490:1;494:22;
502:20;503:6,11;
537:18;552:25;554:5,
8,11;565:23;572:9;
576:15;578:10,13,14;
594:21;599:12;
601:10;627:23;
631:16
**particular (13)**
411:10;416:19;
419:16;421:1;425:10;
426:7;436:20;438:1;
440:25;442:14;
464:23;465:14;
482:17
**particularly (2)**
444:14;467:3
**parties (8)**
394:7;398:24;
403:22;519:9;533:11;
541:16;571:7;626:5
**Partly (1)**
545:2
**partner (3)**
407:21;409:6,10
**partners (1)**
441:13
**parts (1)**
566:3
**Party (3)**
389:13;406:11;
559:5
**pass (1)**
636:3
**passion (1)**
533:9
**passionate (3)**
532:3,9;549:1
**past (3)**
479:4;533:6;572:10
**path (1)**
596:9
**patience (1)**
538:20
**patient (4)**
414:24;567:5;
571:9;576:1
**Patiently (1)**
632:20
**patients (11)**

411:22;413:5;
414:2,6;419:25;
561:22;573:20;
575:15;622:13;
624:14;627:14

**patriarch (1)**
551:11

**Pause (3)**
436:6;464:24;479:9

**pavement (1)**
592:12

**pay (5)**
422:2,3,4;490:2;
586:6

**Paycheck (2)**
459:17;597:10

**Paychecks (1)**
586:12

**Paychex (4)**
437:21;459:8;
586:3;608:9

**paying (7)**
472:10;489:7;
491:24,25;492:16,17;
578:25

**payroll (17)**
394:4,9;399:1,4,12,
23;401:1;402:2;
403:4,5,9;510:22,23,
24;519:7;530:21;
597:14

**pays (1)**
548:7

**peak (1)**
579:3

**Peconic (2)**
467:22;468:2

**people (31)**
402:11,23;412:4;
418:22;419:8;438:8;
440:19;460:11,22;
487:5;511:11;534:9;
549:16;556:18;569:2;
571:11;579:6;594:20;
597:15;598:23;599:5;
609:7;617:1,12;
619:4;620:5;622:5;
623:16;628:24;
635:25,25

**per (8)**
486:3;534:14;
535:13,13;574:9;
597:13;607:7;608:18

**perceived (1)**
423:19

**percent (9)**
460:17,19,25;
486:21;614:6,6,6,6;
624:3

**perfect (1)**
418:12

**perform (5)**
491:1;537:14;

566:23;602:6;626:2

**performance (1)**
622:11

**performed (6)**
490:1,1;567:14,18,
18;573:4

**period (5)**
394:25;443:13;
511:2;513:13;592:10

**permission (3)**
456:2,10;621:2

**Persanis (3)**
401:23,25;402:5

**person (15)**
407:24;481:4;
482:16;494:25;
511:20;525:3,4,11;
526:21;559:10;
563:15;575:25;
592:14;622:5;630:12

**personal (1)**
393:11

**personally (1)**
498:18

**personnel (2)**
402:10,18

**pertaining (2)**
563:5;570:8

**pertains (3)**
587:12;591:9;626:6

**petition (9)**
398:8;404:23;
508:12,19;509:8;
516:2;517:23;518:1;
578:11

**Petruzzelli (32)**
409:7,9,10;439:8;
442:12,13;446:4;
449:5,15;450:7,13;
452:7;456:23;461:10;
463:7,9;465:16;
466:5;469:17,18,22;
471:17;487:24;
525:25;536:21,24;
537:1;550:11;581:14;
602:19;605:6;626:7

**petty (1)**
623:18

**phase (1)**
473:1

**phone (1)**
393:12

**phones (2)**
471:14,24

**phonetic (7)**
399:5;509:10;
522:15;537:4;542:4;
570:1,3

**photo (1)**
436:16

**pick (1)**
604:19

**picking (1)**

571:19

**piece (1)**
485:16

**pieces (1)**
488:3

**piling (1)**
566:14

**pin (1)**
448:12

**pinch (1)**
577:16

**pivot (1)**
576:13

**place (24)**
412:9;442:25;
446:19;447:3;448:7;
462:17;472:17;
496:17,25;517:8;
564:3;566:19;580:13;
599:1,6;604:9;
617:10;625:8,18;
630:5;631:1,3,7,8

**placed (2)**
612:13,13

**placement (1)**
629:22

**places (2)**
411:12;599:6

**placing (1)**
597:21

**plan (5)**
406:19;428:10;
515:11;518:7;576:11

**plane (1)**
496:4

**planned (2)**
579:22;611:15

**planning (2)**
406:17;605:5

**plans (2)**
430:24;444:24

**platform (4)**
559:11;560:7;
585:17;620:11

**play (1)**
605:12

**playing (4)**
472:9;496:2;544:4,
11

**Plaza (2)**
389:17;531:10

**please (26)**
405:20;429:12,13;
454:25;464:7;479:19;
499:18;514:2;527:12;
547:4;562:15;563:13;
565:22;567:16;
572:14;585:6,9;
586:12;588:5;600:1,
9,21;601:2;617:24;
635:11,24

**PLUS (6)**
389:5;393:4;

423:15;478:15,23;
602:22

**pm (17)**
413:22;417:23;
422:9;449:5,7;
465:13;469:20;
480:17,18;518:19;
519:2,21;529:14;
584:24;604:1;631:2;
636:21

**pm/Reconvened (4)**
518:19;519:21;
529:13;584:24

**poach (3)**
524:19;592:4;593:7

**point (37)**
399:19,20;404:1;
407:5;425:2;430:23;
431:20;444:19;458:4,
7;472:21;476:11,13;
487:12,12;488:14,20;
489:21,23;497:19;
501:25;512:3;516:1;
531:18;532:11,12;
554:6;555:18;575:20;
577:16;579:19;595:9;
609:3;625:14;629:6;
634:6;635:9

**pointed (1)**
574:21

**police (1)**
534:19

**policies (2)**
603:12;611:12

**policy (12)**
545:20,23,24,25;
546:19;549:11;553:8;
555:8;566:4;569:11;
604:15;626:3

**politely (1)**
572:19

**polo (2)**
415:21;548:14

**pool (5)**
554:11,16,18;
596:2,4

**pooling (4)**
549:13;553:9,13,19

**poor (1)**
608:17

**populate (2)**
560:17;620:21

**populating (1)**
605:17

**population (1)**
570:17

**portal (1)**
586:6

**posed (1)**
486:25

**position (39)**
407:16;410:9;
423:12,20,22;425:23,

25;426:2,6,7,8,10,11,
20,24;427:2,23,25;
428:8,17;429:23;
430:3;435:15;439:11;
458:10;459:15;
467:23;501:17;
504:25;512:23;
513:18;516:4,6,15;
517:4;528:8;531:4;
532:13;613:3

**positions (2)**
402:18;553:22

**positive (1)**
636:18

**possession (2)**
564:20;566:2

**possible (4)**
486:8,12;598:5;
615:6

**possibly (2)**
616:13;627:21

**post (5)**
556:6,6,7,7;574:17

**posted (2)**
499:25;503:24

**posting (3)**
617:7;620:4,6

**postponement (1)**
400:23

**posts (2)**
555:12,15

**post-trial (1)**
458:5

**potential (4)**
409:17;425:25;
517:16;629:16

**potentially (10)**
513:12;560:10;
565:7;566:17;590:1;
597:17;599:2;613:11;
628:3;629:22

**power (1)**
605:12

**practice (6)**
475:12;476:1;
477:16;524:1;528:14,
15

**practices (1)**
592:9

**praise (1)**
625:21

**praises (1)**
622:10

**Pre- (1)**
575:3

**pre-bid (1)**
523:1

**preclude (1)**
528:3

**precluding (1)**
524:4

**predecessor (3)**
522:13;523:22,25

**predecessor's (1)**
524:13
**predicament (1)**
612:14
**preference (1)**
523:13
**Preliminary (1)**
429:10
**premium (1)**
620:13
**pre-opening (1)**
443:17
**preparation (8)**
447:14;477:7;
544:18,19,21;595:10;
614:25;615:1
**prepare (2)**
440:7;475:2
**prepared (2)**
393:7;603:17
**preparing (4)**
440:19;485:8;
524:11;594:17
**pre-scheduled (1)**
544:3
**presence (3)**
534:20;546:6;
622:16
**present (9)**
400:21;422:23;
527:17,25;528:22,24;
539:1;548:15;630:7
**presentation (1)**
546:7
**presented (1)**
466:19
**presenting (3)**
399:6;441:22;
449:14
**preset (1)**
574:11
**president (4)**
409:6;536:14,18,22
**pressure (10)**
418:15;421:3;
472:25;555:17,23;
558:2;566:8;572:18;
575:21;609:2
**presume (1)**
487:3
**pretransition (1)**
575:3
**pretty (8)**
454:4;488:6;
514:25;534:21;
554:24;569:23;
576:14;585:16
**previous (5)**
450:3;493:11;
497:10;528:17;
589:12
**price (1)**
548:11

**pride (2)**
537:19;588:22
**primarily (2)**
418:8;481:4
**primary (3)**
532:21;607:5;623:6
**prime (1)**
558:1
**principal (1)**
398:2
**print (1)**
394:13,16;609:14
**prior (8)**
405:7,9;414:9;
430:9;443:18;448:9;
478:23;493:24;
497:24;509:12;
516:11;528:9;545:3;
554:25;587:8;594:11;
601:6;602:9;607:9;
614:8,9
**Priority (1)**
620:18
**pristine (1)**
596:10
**private (4)**
540:20;541:16,17;
559:24
**privilege (22)**
474:10,12,18,20,25;
475:2,15,22;476:3,5,
6,20,24;477:8,10,19,
24,25;508:17;515:14;
518:17;519:5
**privileged (1)**
476:4
**privy (2)**
573:22;578:6
**Pro (1)**
564:24
**proactive (1)**
403:23
**probably (23)**
395:8;400:13;
403:9;421:11;430:5;
434:10,10,12;436:18;
449:23;465:22,22;
470:4;482:5;510:24;
569:23;573:8,25;
579:2,2;589:22,24,25
**problem (16)**
400:14;401:22;
412:7;421:11;424:3;
426:16;430:6;431:15;
475:15;478:2,3,8;
559:18;571:1;578:14;
579:16
**problems (1)**
563:6
**procedural (2)**
507:16;588:6
**procedurally (1)**
480:4

**Procedure (2)**
478:5;593:13
**procedures (6)**
569:9;572:8,21,22;
603:12;611:12
**proceed (4)**
406:9;437:6;
614:11;635:10
**proceeding (3)**
395:15;406:19;
447:7
**process (27)**
404:3;437:6;443:6,
9;483:8;513:7;525:2,
3;530:21;565:24;
569:4;575:8,22;
583:14;585:7,20;
586:17,22;598:2,12;
601:8;602:10;606:8,
12,13,14;623:11
**processed (4)**
586:4;607:20;
608:9;628:15
**processes (1)**
597:11
**procured (1)**
605:21
**produce (9)**
447:10;474:18;
475:25;476:2,3,23;
477:19,22;560:16
**produced (10)**
394:3;401:18;
428:3;433:13;476:14;
508:20;509:16;
510:10;511:19;
514:10
**product (5)**
423:15;428:5;
433:19;473:19,23
**production (5)**
398:5;474:10;
476:5,6;519:5
**productive (1)**
628:25
**proffer (3)**
395:16;401:17;
511:17
**profile (1)**
597:20
**profit (5)**
486:6;488:9,12;
492:1,18
**progeny (1)**
520:11
**program (3)**
509:23;585:22;
628:20
**programs (1)**
538:6
**project (14)**
536:2;561:17;
564:4;576:10,17;

577:10;591:15;594:9;
597:3;598:3;605:13;
607:3,4;626:4
**projects (4)**
538:21;587:8;
596:6;597:5
**promise (1)**
561:11
**promising (1)**
636:1
**promoted (2)**
409:25;531:18
**pronouncing (1)**
445:24
**proof (4)**
520:5,20,23;569:10
**proper (4)**
426:19;430:9;
434:11;629:13
**properly (2)**
568:4;623:13
**property (1)**
561:25
**protect (2)**
553:13;569:7
**protocol (5)**
611:7;628:13;
630:17,19,21
**protocols (1)**
630:15
**proud (1)**
594:5
**proven (1)**
592:8
**proves (1)**
399:3
**provide (11)**
411:22;474:25;
475:2;503:18,23;
506:24;520:1;547:9;
563:12;574:4;576:19
**provided (11)**
436:1;508:15;
513:5;520:20,24;
547:5,6;554:2,25;
613:11;634:9
**provides (3)**
437:3;485:25;
533:17
**Providing (2)**
413:2,6
**proving (3)**
527:1,1,2
**provision (3)**
476:10;512:11;
513:22
**provisions (1)**
592:18
**provoke (1)**
611:10
**PTO (2)**
490:8;491:25
**public (4)**

482:23;483:11,20;
568:2
**pull (8)**
473:16;574:14,17;
612:25;619:10,17,24;
629:16
**pulled (4)**
476:18;535:16,19,
20
**pulley (1)**
565:4
**pulling (2)**
572:14;598:23
**pulls (1)**
554:6
**puppy (1)**
611:21
**purchase (3)**
522:22;609:22,25
**purchases (1)**
522:19
**pure (1)**
609:11
**purpose (3)**
430:8;510:23;627:2
**purposes (6)**
404:18;487:3;
511:11;528:6,8;
568:17
**pursuant (3)**
389:15;394:3;
408:24;509:18
**pursue (1)**
400:24
**pursued (1)**
532:11
**pursuing (1)**
399:15
**purview (3)**
521:13;562:14,21
**push (3)**
514:12;574:17;
623:8
**pushback (2)**
572:13;578:24
**pushed (1)**
577:10
**pushing (1)**
583:6
**put (16)**
415:5;437:20;
476:19;484:8;500:10;
515:11,17,22;556:10;
566:13;572:18;
594:17;613:3;620:13;
628:14;636:3
**putting (4)**
409:18;519:13;
600:14;627:16
**puzzle (2)**
598:21;612:25
**puzzled (1)**
636:11

## Q

**QR (15)**
436:19,21,23;
437:25;453:4;454:20;
457:12;459:24;
469:23;497:24;
498:16;501:2,23;
502:2,10
**qualifications (1)**
484:5
**qualifies (1)**
538:12
**qualities (1)**
538:23
**quality (3)**
530:20;599:3;
605:17
**quandary (1)**
514:3
**quarterbacking (1)**
630:24
**quash (2)**
508:1;509:9
**Queens (3)**
535:18;541:14;
542:13
**queue (1)**
628:14
**quick (5)**
450:14;463:17;
520:12;574:17;
600:21
**quickly (1)**
427:16
**Quite (9)**
534:7,19;551:15;
555:1;559:8;569:12;
570:16;605:20;
608:20
**quiz (1)**
507:6
**quote (1)**
407:1
**quoted (1)**
494:22

## R

**R-5 (2)**
396:11,12
**R-6 (5)**
397:1,2,6,18,19
**radio (4)**
555:15,20;556:7,16
**radios (2)**
556:8,11
**radio's (1)**
581:10
**raise (2)**
405:17;529:18
**raising (1)**

425:12
**ramifications (1)**
497:19
**ramped (1)**
579:2
**ramps (1)**
574:12
**ran (4)**
618:21;622:13,14;
627:5
**range (1)**
557:24
**rank (1)**
550:8
**rank- (1)**
551:5
**rank-and-file (1)**
526:5
**rankings (1)**
532:1
**ranks (2)**
531:22;579:25
**ranted (1)**
622:12
**rants (1)**
634:8
**rate (2)**
485:24;486:3
**rather (2)**
404:2;586:2
**rationale (1)**
523:24
**raved (1)**
622:12
**raves (1)**
634:8
**Ray (4)**
540:25;541:1;
550:20;582:3
**RC (1)**
401:22
**reabsorbed (2)**
603:20,23
**reach (3)**
558:4;563:21;611:8
**reached (4)**
398:1;462:8;
471:16;612:16
**reaction (2)**
594:2;613:18
**reactivate (2)**
620:14,22
**read (20)**
405:3;427:8,9,21,
25;428:23;429:12,13;
430:18;432:10;
449:22;493:16;
495:14;505:16,22;
509:8,9;545:24;
558:21;584:4
**reading (8)**
428:19;430:24;
434:7,23;451:24;

458:5;491:11;495:16
**ready (17)**
524:24;527:10;
571:11;578:1;596:1;
600:20;602:6,7,7,9;
614:9,10,11,14,16;
616:19;627:21
**real (6)**
491:4,21;558:19;
574:7;588:23;616:25
**realistic (1)**
598:1
**reality (4)**
590:4;629:20;
630:17,20
**realize (1)**
472:24
**realized (1)**
577:15
**really (49)**
399:2,5;403:5,23;
404:2;408:8;411:12,
14;416:15;425:2,19;
427:16;428:24;431:1,
10;437:3,17;481:7;
503:4;507:25;512:18;
520:13;525:12;
529:10;533:13;535:7;
537:24;539:1;542:12;
563:5,19;565:2,2;
566:20;573:25;
574:17;577:15;579:4;
585:21;587:24;612:5;
616:3;622:13,16;
624:11;630:19;634:9,
18;635:25
**realm (1)**
537:19
**realms (5)**
537:24;563:23;
564:7;587:12;589:17
**real-time (1)**
563:6
**reason (12)**
475:22;493:10,22;
509:25;511:23;
516:17;525:9;571:4;
591:7;611:25;612:23;
634:19
**reasonable (2)**
524:2;592:24
**reasons (10)**
431:15,20;511:15;
524:14;525:21;587:7;
592:7;596:22,24;
616:24
**reboot (1)**
620:11
**rebooted (1)**
620:20
**rebrand (1)**
592:11
**rebuffed (1)**

443:21
**recall (33)**
443:13;444:6,21;
447:18;449:6;452:1;
456:1,9;460:4;462:7;
463:11,12;466:22;
467:4;468:9;470:13;
476:25;477:1;504:23;
580:2;582:19;583:10,
20;584:2;595:13;
599:22;602:11;
608:19;613:15;614:4,
7;620:25;625:10
**receipt (2)**
451:19;601:6
**receive (10)**
449:2,4;453:18;
458:17,22;459:10;
485:24;486:2;549:6;
615:11
**received (48)**
398:16;403:2;
417:9;428:12;442:3;
446:7;447:23;448:23;
450:10,13;451:4;
452:14,22;453:1,4;
454:7,11,14,16;
456:20;457:3,14,18;
458:23;460:3,18;
461:13;465:6,9,17,22;
466:23;467:5;469:17;
486:2;487:17;488:14,
15;489:24;493:2;
501:6,8,9,12;549:8,9;
613:23;615:10
**receiving (4)**
447:18;448:2;
486:16;512:4
**recent (3)**
509:20;558:21;
564:10
**recently (1)**
409:25
**recess (7)**
453:10,20;480:17;
518:19;519:21;
529:13;584:24
**recessed (1)**
636:21
**recipe (1)**
587:13
**recognition (4)**
597:20;616:25;
617:8,9
**recognize (7)**
428:15;439:1;
454:4;459:14;464:15;
470:25;523:3
**recollected (1)**
454:17
**recollection (7)**
443:21;455:8;
471:5;495:14;600:23;

602:1;615:4
**Recommend (2)**
547:15;621:24
**recommended (2)**
622:16;635:9
**recon (2)**
608:25;609:1
**reconvene (1)**
636:22
**Reconvened (2)**
453:20;480:17
**record (54)**
393:3,12;395:17;
397:22;405:21;
429:22;430:18;432:3,
6;433:20;434:8;
436:7,9,10;446:21;
453:11,12,18,22;
456:6;478:10;479:3,
19,20;480:15,16,19;
493:17;504:14,14;
505:17,19,20;506:3;
519:3,22;521:16;
524:9;528:4,7,10,21;
529:11,12,22;555:4;
584:16,25;600:9,10,
11,12;636:19,20
**records (14)**
399:12;401:1;
433:12;471:7,9;
473:2,11,14;478:14,
22;485:14;512:5;
519:7;525:6
**recross (1)**
406:20
**recruit (1)**
617:5
**recruited (1)**
534:21
**recruiting (1)**
530:20
**recruitment (3)**
407:25;482:21,24
**rectify (1)**
563:18
**red (1)**
571:4
**redacted (3)**
393:14;402:9;
509:19
**redacting (1)**
402:21
**redactions (1)**
393:10
**redefined (1)**
591:12
**redeployed (1)**
591:22
**redirect (2)**
406:20;506:11
**reduce (3)**
403:8;492:1,18
**reduction (2)**

507:8;576:20

**refer (6)**
502:6;522:10;
558:10,17;564:23;
621:15

**reference (1)**
590:25

**referenced (5)**
398:7;467:19;
475:23;507:20;585:4

**references (2)**
470:5;474:13

**referencing (2)**
512:11;514:19

**referred (2)**
473:16;501:23

**referring (19)**
414:8,13;459:1,19,
20;469:22;470:1;
494:3,21;500:12;
503:21;512:10;
561:17;565:24;575:2;
585:7;600:22;605:11;
608:17

**reflect (1)**
454:6

**reflector (1)**
548:15

**reflectors (1)**
548:12

**reflects (4)**
448:25;454:10;
456:17;465:6

**reformed (1)**
426:21

**refresh (1)**
600:23

**refusal (2)**
523:19,25

**refusals (1)**
527:2

**refused (1)**
497:15

**refuses (1)**
498:12

**refusing (1)**
523:21

**regard (2)**
399:23;482:22

**regarding (25)**
425:24;429:12,14;
431:11;477:5;485:18;
493:2;508:3,3;
512:10;513:4,21,22;
516:9;519:7;520:11;
549:12;554:22;601:7;
613:12,24;626:12,12,
12;628:6

**regardless (2)**
413:6;528:14

**regards (1)**
544:2

**Regency (1)**

591:5

**Region (34)**
396:16;397:10;
399:14,22,25;400:4,
16;423:7;460:12;
534:3;535:17,21,21,
21,23;536:5;537:20;
538:12,16,17;539:12,
20;540:10,13;541:1,3,
12,20;543:2;561:2;
576:19;595:5;599:10;
634:9

**regional (11)**
422:24;537:2,3;
560:20;562:23,24;
563:3;581:17,23,24;
595:6

**regionals (1)**
537:6

**regions (4)**
535:19;536:5;
538:13;623:6

**Region's (1)**
400:9

**register (3)**
568:25;578:17,20

**registered (1)**
580:16

**reign (1)**
535:8

**reiterate (1)**
566:4

**reiterated (1)**
635:7

**relatable (1)**
617:5

**relate (1)**
617:1

**related (8)**
471:18;476:18;
477:17;487:25;
488:12;508:1,14;
516:21

**relates (3)**
513:5;514:22;515:9

**relating (2)**
512:10;514:19

**RELATIONS (6)**
389:2,17;406:8;
423:7;522:18;530:20

**relationship (3)**
523:9;587:17;
601:17

**relayed (2)**
559:3;593:23

**relevance (18)**
397:16;423:2;
428:16;457:7;479:7;
483:12,13,14,15;
486:9;503:1;535:1;
616:4,10,12,15;
624:20,22

**relevant (11)**

427:24;428:1;
468:23,25;469:2;
473:7;478:15,24;
479:2,6;513:24

**rely (3)**
435:3,4,12

**relying (1)**
399:1

**remained (2)**
570:19;591:15

**remarks (1)**
623:18

**remember (21)**
424:13;443:7,14,
19;445:2,4;448:2;
449:9,12,15;462:21;
470:6;471:3;484:25;
487:20;22;516:16;
576:13;581:9;583:12;
628:5

**remotely (3)**
431:21,23;520:22

**remove (2)**
467:13;542:13

**removed (3)**
468:6;469:3;591:14

**reoccurring (3)**
573:20;582:11;
587:11

**rep (2)**
537:2,3

**repeat (4)**
423:5;425:9;456:9;
491:5

**repeated (1)**
634:18

**repeatedly (1)**
514:9

**repertoire (1)**
599:9

**rephrase (1)**
588:6

**report (13)**
403:15;409:2,5,11;
410:25;419:17,22;
441:14;481:13,18,20;
563:2;619:5

**reporter (1)**
394:19

**reporter's (1)**
508:11

**reporting (1)**
568:1

**represent (5)**
406:8;432:16;
455:8;478:13,20

**representation (9)**
436:3;486:15;
487:25;497:1,7;
500:5,11,23;510:15

**representative (17)**
410:14,17;496:1,
10;498:11;508:15;

515:6;516:7,14,15;
525:16;528:23;529:1,
5,9;562:6,7

**representatives (1)**
462:25

**representing (1)**
473:13

**reproduced (1)**
509:19

**repurpose (2)**
588:14;592:22

**repurposing (2)**
588:23;589:21

**request (16)**
395:23;399:12;
400:23;461:20;462:9;
474:17,20;511:11;
512:10,15,17;514:18;
547:7;555:16;557:24;
628:13

**requested (5)**
405:7;507:19,22;
523:1;634:20

**requesting (1)**
557:19

**requests (2)**
406:12;443:22

**require (1)**
415:16

**required (11)**
475:16,16;476:2,3;
481:11;483:16;484:4,
9;502:15,20;503:13

**requirement (1)**
413:7

**requirements (2)**
507:5;512:25

**requires (2)**
522:18;538:20

**rerun (1)**
488:5

**rerunning (1)**
620:23

**reschedule (1)**
588:14

**resides (1)**
564:19

**resistance (1)**
596:10

**resolved (3)**
400:18,19;403:23

**resources (3)**
394:16;400:9;
579:12

**respect (14)**
393:9;406:20;
411:6;426:24;494:2;
512:24;521:7,19;
522:9;523:16;526:24;
593:7;616:6;618:4

**respectfully (1)**
395:23;430:12;
520:19

**respectively (1)**
394:8

**respects (1)**
520:5

**respond (7)**
404:8;451:14;
634:15,21;635:2,3;
636:4

**responded (7)**
398:1,4;634:14,16;
635:13,21;636:11

**Respondent (25)**
389:7;394:4,7;
395:12,18,21,24;
396:1,8,15,19;399:18;
400:3;401:5,12;
406:10;473:13;
474:17;505:2,23;
519:14,24;520:18;
529:9;530:5

**Respondents (2)**
399:8;476:23

**Respondent's (6)**
400:12,20;427:24;
428:3;515:21;519:14

**responding (5)**
409:18;476:18,21;
477:20;517:22

**responds (1)**
505:23

**response (10)**
398:4,16;475:25;
490:1;505:13;508:20;
516:2;634:11,24;
635:22

**responses (3)**
425:1,3;590:8

**responsibilities (2)**
408:5;541:4

**responsibility (2)**
410:20;555:24

**responsible (23)**
414:1;415:10;
417:1,8;419:25;
420:8;481:5,9;495:1,
2;539:20,22;540:10;
541:1,12;542:5,20;
564:21;572:11;574:1;
589:6,12;593:17

**responsive (1)**
477:16

**rest (2)**
521:17;636:7

**restaurant (6)**
532:15,16;539:3;
559:19;599:1;619:17

**restaurants (5)**
533:3;540:12,18;
542:1,23

**resting (1)**
519:5

**restrictions (1)**
591:10

**restroom (1)**
584:12
**result (3)**
519:6;567:4;596:11
**results (3)**
566:17,17;568:24
**resume (1)**
518:13
**resurfacing (1)**
570:15
**RETAIL (1)**
389:9
**retain (1)**
593:5
**retaining (1)**
420:8
**retrieving (1)**
471:15
**return (4)**
415:14;416:4;
417:12;420:12
**revenue (8)**
567:22;568:18;
569:8;574:21,22;
575:8;576:4;579:14
**reverse (2)**
406:22;593:8
**review (7)**
398:10;438:24;
441:24;507:25;
508:12;545:4;600:21
**reviewing (2)**
499:19,22
**revised (2)**
393:21,22
**revoke (6)**
398:9;404:23;
508:13,19;509:8;
516:2;517:23;518:1
**rework (1)**
592:11
**Reyes (4)**
455:24;457:11;
460:4;461:13
**Reyes' (1)**
457:14
**Richard (3)**
554:24;556:15,17
**ride (1)**
563:16
**ridiculous (1)**
463:17
**right (247)**
394:23;396:17;
397:17;400:16;
401:13;404:5,7,7,9,
15;405:16,17,25;
407:7;411:11;412:6,
13;414:19,21,23;
415:8;418:12,21;
419:17,20;420:9;
421:23;422:1,17;
424:5;426:14;427:25;

429:16;431:1,2,7,11,
12,25;432:12;433:24;
435:10;436:25;438:3,
13;440:25;441:7,8;
443:1;446:7;448:16,
23;449:4,14;450:6,
16;453:7;454:11,14;
456:20;458:9,24,25;
460:23;461:13;463:2,
4;464:1,22;465:18;
467:13;468:2;470:3,
11,19;473:1,2;
475:12;476:15;
480:23;481:24;482:7;
483:3;486:3;491:19;
492:12,19;493:3,8,23;
494:13,17,19;496:5;
498:17,18;501:24;
502:25;505:22;508:4;
509:3,20;510:18,24;
511:3,17,19,22,24;
513:23;514:5;515:1,
23;517:8;518:1,2,4;
519:10;525:22;
527:14,23;528:12;
529:1,8,18;531:3,20,
21;533:2;536:9,10;
538:5;540:19;542:17;
543:16;544:11;
546:21;547:18;
548:17;549:19;550:8;
552:13,16,19;553:18,
19;554:9,13;560:4,9,
13,20;561:25;562:6,
14,16;563:1,4,6,20;
564:18,20;565:11;
568:3,9,13,21;571:14,
16,17,24;572:2,6,18;
573:14,16,18;574:3;
575:2,3,5,9,18;576:4;
577:2,5,8,13;578:3,8;
581:8;582:2,6,10,15;
584:22;585:6;586:8,
19,25;587:21;588:18;
590:24;592:13;
595:16,24,25;598:10,
22;602:11,15;603:11,
14;605:17;607:11,12;
610:3,8,14,21;611:9,
13;613:9;615:2,18;
616:9,25;618:1,20;
620:11;621:11,11,18,
20,22;623:25;624:7,
14;627:7;628:11,16;
629:4;630:2;631:12,
22;632:3,18
**ringing (1)**
581:10
**rise (2)**
396:21;558:22
**rising (1)**
531:22
**risk (3)**

530:23;548:13;
604:3
**Road (3)**
561:19;571:5;
574:10
**Robert (5)**
405:14,22;406:2;
424:14;431:5
**Rocco (75)**
400:25;401:17,22;
402:13,14,16,19;
403:17,20;404:24;
405:2;453:8;480:1,
12,15,22;481:17;
483:14,18,25;484:14,
23;485:22;486:13;
487:14;489:5,14,19;
490:19;491:2,23;
492:7,13,15,21,23;
493:15,21;494:19,22;
495:4,8,18;496:7,13,
14;497:16;499:8,15,
17;501:22;502:7;
503:10,22;504:4;
505:18;506:10;
507:14,15;508:22,24;
509:3,6,16,18,23;
512:3;515:19;518:3;
600:5;613:13,13,19;
617:24;618:3
**Rocco's (4)**
613:18;614:3,17;
616:20
**Rockaway (1)**
559:6
**role (10)**
411:6,8,11,15;
420:12;531:8;532:12;
554:8;599:6;635:9
**roles (6)**
410:19;481:11;
482:4;537:16,16;
540:12
**roll (1)**
575:15
**rolling (1)**
472:17
**rollout (1)**
443:15
**roof (2)**
576:24;577:1
**roof's (1)**
577:1
**room (18)**
412:19;415:24;
416:1,2,9,16,20,22,
23;417:11;422:4;
464:5;529:10;548:1;
566:15;579:18;
580:25;587:24
**roster (2)**
588:19;599:8
**rosters (1)**

598:19
**rotate (2)**
526:15;581:7
**rotated (1)**
619:20
**rotating (1)**
565:9
**rotational (1)**
587:18
**roughly (3)**
536:3;593:17;
622:18
**round (2)**
631:17,23
**rounds (1)**
418:14
**routes (1)**
630:16
**routinely (1)**
426:8
**routines (1)**
592:9
**rubber (1)**
547:15
**Rudy (3)**
541:10,18;542:3
**Rule (4)**
406:13;478:4,5;
490:11
**rules (5)**
431:15,19;463:22,
24;630:23
**ruling (1)**
406:16
**run (20)**
402:2,10;471:20;
484:1,3;488:5;
509:20;538:6;547:16;
554:7;555:25;568:21;
576:11;585:20,22;
603:15;611:11;
616:23;620:9,10
**runaround (1)**
404:12
**running (6)**
408:8;432:3;
455:18;532:14;
547:15;580:13
**runs (2)**
444:13;597:1
**runway (1)**
614:22
**RWDSU (1)**
446:18

# S

**safe (1)**
569:11
**safeguard (1)**
564:21
**safety (2)**
564:17,23

**saint (1)**
538:20
**sake (3)**
403:7;421:4;459:7
**sale (1)**
522:22
**salient (1)**
524:14
**same (31)**
396:6;406:21;
418:4;422:20;432:22,
23;434:1;435:22,23;
483:21;484:11;
500:17;512:21;
537:14,14;545:20;
548:18,18;550:4,5;
551:1,5,8;552:18;
565:19;570:22;580:1;
590:19;596:14;
598:25;634:24
**sat (1)**
635:23
**Saturday (2)**
575:16;619:19
**saw (12)**
404:22;423:9;
424:23,23;449:24,25;
460:11;466:9;473:15;
489:22;501:25;
504:16
**saying (18)**
404:6;411:3;
428:10;431:11;
450:14;504:23;
511:10;517:19,20,25;
520:12;553:7;555:20;
572:14;593:20;
597:23;609:17;610:5
**scale (1)**
544:3
**scan (1)**
436:23
**scans (1)**
470:8
**schedule (11)**
530:18;559:13;
560:5,15,17;573:12;
574:11;605:10,10,18,
19
**scheduled (6)**
419:20;559:14;
619:12,19;626:22,24
**schedules (1)**
619:12
**scheduling (3)**
598:20;605:25;
628:20
**school (2)**
531:12;578:22
**scope (10)**
403:8;414:7;562:2;
564:2;572:9;577:23;
591:12,16;592:24;

619:21
**screaming (1)**
560:14
**screenshot (4)**
499:22,25;500:6,18
**se (2)**
597:13;608:18
**search (3)**
620:17,18,19
**searched (1)**
471:14
**searches (2)**
471:20,21
**searching (1)**
487:21
**season (2)**
531:11;595:13
**seasonal (5)**
531:6,15;532:2;
538:18;544:3
**seasoned (1)**
587:21
**seat (3)**
405:16;508:8;
527:14
**secluded (1)**
631:16
**second (24)**
398:6;402:24;
412:8;429:9,9;
432:10;436:8;442:2;
446:14;451:8;454:25;
468:15;469:15,16;
488:4;494:21;496:19;
509:6;513:7;517:17;
521:12;565:21;
634:24;635:3
**Secondly (1)**
446:21
**seconds (1)**
565:5
**Section (2)**
406:11;520:5
**secure (5)**
398:4;415:15;
417:10;420:10;566:1
**secured (2)**
564:23;593:24
**security (10)**
534:18;564:13,15,
16;565:15,22;567:8;
579:23;584:8;623:12
**seeing (5)**
428:15;449:10;
463:12;488:19;616:3
**seek (2)**
501:3;528:17
**seeking (3)**
403:9;409:17;472:4
**seem (4)**
399:1,6;560:14;
573:21
**seemed (2)**

597:15;624:7
**seems (6)**
398:24;399:21;
437:1;486:19;566:6;
624:4
**segment (1)**
584:15
**self-park (1)**
421:23
**semantics (1)**
460:1
**send (6)**
403:3;475:25;
560:8,16;586:11;
615:5
**senior (5)**
409:10;569:24;
570:5;624:5;626:1
**seniority (1)**
482:3
**seniormost (1)**
409:6
**seniors (1)**
618:4
**sense (4)**
421:20;459:5;
502:14;538:14
**sensitive (2)**
566:11;634:9
**sensitivity (1)**
579:21
**sent (26)**
398:15;402:13,19,
22,24;447:19,19;
448:2;451:6,14;
452:7;461:6,9,20;
462:7;463:7,8;
465:12;467:8,14,17;
487:23;492:25;
494:13;501:10;615:8
**sentence (2)**
427:20;496:18
**separate (1)**
494:2
**September (3)**
589:14;615:16;
616:2
**sequestration (4)**
527:20;528:9,15,19
**Serapino (1)**
570:3
**serious (1)**
512:18
**serve (2)**
407:25;627:13
**served (3)**
404:24;478:14,22
**serves (1)**
588:13
**service (20)**
408:9;435:22;
481:6,11;532:6;
533:4,7,9,14;543:22;

557:21;558:9;575:17,
19;598:16;602:6;
613:10;624:2;631:6;
634:9
**services (40)**
408:19;411:22;
412:22;413:2,5;
422:11,15,19;432:22;
436:1,2;442:20;
462:3;485:25;512:11;
513:5,22;522:11,12,
14,19;533:18;540:1;
556:19;567:14,18,19;
569:20;573:4,21;
575:11;576:3;587:1;
594:18;596:12;598:9,
9;601:25;602:2;
622:23
**servicing (3)**
546:3;583:19;
591:18
**serving (3)**
432:23;435:23;
545:12
**session (1)**
586:11
**set (9)**
422:5;437:5;
450:14;501:14;508:7;
517:9;550:6;586:10,
10
**Seth (7)**
539:16;540:4,24;
541:10,18;542:3;
550:18
**sets (1)**
556:9
**setting (10)**
414:17;507:9,10;
532:8;533:7;542:9;
566:11;585:24;624:4;
630:20
**settings (1)**
627:10
**seven (8)**
525:20;526:22;
531:24;532:1;534:13;
539:8,13;591:13
**Seventy (1)**
551:12
**several (1)**
561:22
**severely (2)**
521:1,23
**sexual (1)**
507:7
**share (3)**
401:4;419:12;
553:21
**shift (24)**
412:7,8,9,15;
413:14;416:21;
418:15;419:3,12,16;

421:3,4,5,6,12,16;
555:6,7,8;577:15,18;
591:14;619:13;
628:11
**shifted (2)**
411:15;598:19
**shifts (6)**
412:6;498:13;
555:5;591:13;612:23;
619:15
**shine (1)**
627:9
**shirt (2)**
546:10;547:8
**shoe (7)**
488:21,23;491:18,
24;492:18;547:14,15
**shoes (1)**
415:20
**shook (1)**
636:12
**Shop (1)**
564:24
**short (7)**
437:17;472:13;
501:23,24;502:2;
520:4;633:3
**shortcut (3)**
401:15;566:16;
567:4
**shortcuts (1)**
567:3
**shorted (1)**
549:16
**short-form (3)**
459:24;502:2,8
**shortly (1)**
398:17
**shoulder (2)**
632:1,1
**show (15)**
436:12;449:20;
463:15;464:7;489:13,
14;492:21;499:15;
510:25;525:5,6;
526:9,13,25;619:25
**showing (7)**
456:14;492:24;
503:13;504:13,18,25;
534:2
**shown (3)**
424:23;450:3;
599:25
**shows (1)**
587:13
**Shute (1)**
542:4
**shy (1)**
538:21
**sic (8)**
436:1;458:7;469:4;
501:10;517:13;
550:13;588:25;592:3

**sick (2)**
619:9;620:5
**side (9)**
526:1,1,7,7;558:23;
577:3;580:1,1;633:3
**side-by-side (1)**
550:2
**sided (2)**
445:15;465:6
**sides (1)**
555:4
**sign (1)**
609:13
**signage (5)**
572:5;573:6;574:5;
575:22;609:14
**signature (2)**
442:21;628:7
**signatures (1)**
628:9
**signed (2)**
517:18;569:6
**significant (1)**
609:2
**sign-off (1)**
577:19
**similar (6)**
418:5;512:17;
514:18;538:23;541:7;
608:18
**similarities (1)**
545:14
**similarly (2)**
419:5;523:8
**simple (5)**
404:8;517:7;
553:10;585:18;
588:16
**simply (4)**
459:11;492:4;
566:14,16
**Sinai (2)**
444:14;504:1
**single (8)**
413:14;430:2;
433:13;461:1;498:11;
510:14;526:5;547:19
**singular (2)**
566:2;634:8
**sit (1)**
631:17
**site (37)**
460:21;498:22;
532:14,18;545:6,9;
549:13;551:19;553:9;
554:23;556:3,4;
559:1;560:24;561:4,
5,6,16;562:17;564:5;
566:22;567:11;579:9;
581:25;582:14;
587:25;589:23;593:3;
594:24;609:1,7;
617:4;624:7;627:12;

629:17,17;630:11

**site-specific (5)**
616:23;617:13;
618:9,12,21

**sits (2)**
419:11;564:22

**sitting (7)**
419:3;462:21;
571:8;621:20,22;
631:23;632:18

**situation (12)**
424:15;477:3;
513:19;514:7;522:10;
523:10,11;590:14;
591:25;598:7,13;
635:8

**situations (4)**
418:17,21;585:19;
586:20

**six (10)**
490:2;491:25;
542:2;543:20;560:1;
566:14;574:17;583:5,
5;592:15

**six-day (1)**
490:8

**six-month (1)**
564:3

**size (3)**
547:6;589:25;
629:13

**sizes (1)**
608:5

**skipped (1)**
443:12

**slacks (2)**
547:11,13

**slam (4)**
565:3,4,6,19

**slams (1)**
565:5

**sleeping (1)**
449:8

**slightly (3)**
420:20,21;458:16

**slip (1)**
496:7

**sloppily (1)**
402:9

**slower (1)**
418:16

**slowly (1)**
532:1

**small (1)**
563:25

**snap (1)**
560:5

**soccer (1)**
534:25

**Social (1)**
586:13

**socks (3)**
415:20;547:16,16

**sole (1)**
547:16

**solely (1)**
538:9

**solution (1)**
628:22

**somebody (8)**
421:12;427:13;
466:2;483:1;487:6;
493:14;496:8;627:21

**somebody's (1)**
517:5

**someone (18)**
424:14;441:4,10;
460:16;467:19;485:9;
496:2;552:17,17;
553:13,14;561:24;
575:24;592:11;594:4;
597:4,16;619:11

**someone's (3)**
579:18,20;623:11

**someplace (1)**
557:3

**sometime (4)**
440:23;447:16;
448:11;594:15

**Sometimes (4)**
408:7;535:22,23;
629:17

**somewhat (1)**
594:7

**somewhere (5)**
415:13;508:8;
534:13;557:23;
605:23

**son (13)**
409:15;521:20;
632:17,18,22;633:1,4,
5,17,23;635:16,16;
636:14

**soon (5)**
421:6;515:25;
532:2;533:3;590:17

**sorry (46)**
413:14;416:8;
424:10;432:12;
433:21,21;435:9,18;
440:11;444:2;458:4;
459:22;464:20;480:3,
6,11,12;487:12;
488:4;490:12,18;
491:1;492:14;494:15;
495:21;496:1,19;
512:15;518:15;
529:17,17;530:24;
540:14;542:25;
548:21;550:15;553:5;
555:5;564:6;566:25;
575:1;586:2;589:4;
600:6;601:13;625:13

**sort (5)**
412:18,18;441:13;
567:6;578:16

**sought (1)**
509:5

**soul (1)**
610:7

**souls (6)**
608:17,20,21;
609:6;611:20;612:12

**sound (2)**
588:1;622:10

**sounding (1)**
519:9

**sounds (4)**
435:25;473:11;
559:21;596:9

**sour (1)**
591:23

**Southampton (1)**
526:21

**space (2)**
627:9;629:23

**spaces (1)**
412:1

**Spanish (3)**
633:11,15,21

**spare (1)**
555:22

**speak (8)**
550:9;609:17;
628:10;632:6;633:11,
15,19;634:25

**speaking (5)**
394:17;492:7;
496:13;514:15;587:9

**speaks (2)**
488:25;490:4

**special (3)**
506:24;534:20;
538:1

**specialist (5)**
407:25;482:21,24;
594:1,2

**specialized (1)**
538:2

**specialties (1)**
595:21

**specialty (4)**
537:17;538:18;
544:25;599:14

**specific (21)**
427:20;460:10;
482:9;502:19;503:25;
507:9;508:2,14;
516:20;530:16;
537:18;539:5;540:21;
541:5,7;544:21;
580:4;584:2;596:22;
598:3;617:4

**specifically (18)**
426:3;443:19;
445:4;470:17;475:7,
23;500:12;516:18;
523:1;543:14;551:17;
560:10;605:5;612:17;

617:10;634:20;635:9;
636:1

**specifics (2)**
596:24;628:5

**specifies (1)**
491:15

**speculate (1)**
495:12

**speculation (5)**
429:6;493:13;
494:16;503:4;615:25

**speculative (3)**
590:9,20,21

**spell (4)**
405:20;529:21;
539:17;540:8

**spelled (1)**
529:24

**spelling (1)**
529:25

**spend (2)**
427:22;579:12

**spending (1)**
473:1

**spent (2)**
585:16;605:25

**spin (1)**
578:5

**spirit (1)**
609:12

**spoke (2)**
398:2;633:16

**sporadic (1)**
544:1

**sporting (2)**
533:5,7

**sports (1)**
543:25

**spot (3)**
532:23;533:7;
564:24

**spots (3)**
412:16;564:4;
576:21

**spreadsheet (1)**
394:2

**square (1)**
534:11

**St (1)**
627:13

**stack (5)**
412:12,13;421:14;
454:4;628:11

**Stadium (1)**
541:8

**staff (74)**
408:6,6;411:22;
413:5,23;418:6,15,18,
25;419:2,3,4,6,12;
421:16,16;444:24;
472:13;481:5,9,10,10;
490:8;493:7,24;
495:6,7;496:16,24;

497:2;530:19;536:1;
557:25;572:3;573:9;
574:7;576:8,10;
577:12;579:8;585:25;
587:8,22;588:14,17,
22;591:16,17;592:9,
21;595:21;596:6;
597:2;599:7;604:15;
609:4;612:19;619:6;
622:2,22;623:1,2,3,5,
7,7,15;624:1,3,17;
626:3;628:19,19;
634:7

**staffed (6)**
602:2;614:5,6,6,7,
10

**staffing (14)**
416:17,17;472:1;
477:17;495:2;511:18,
22;524:3;544:2;
557:2;562:25;601:25;
614:5,7

**staff-wise (1)**
559:9

**staged (1)**
571:15

**stalemate (1)**
514:4

**stall (1)**
577:25

**stand (8)**
513:12;527:12;
546:23;561:23;562:1,
2;627:16;635:25

**standard (6)**
474:20;502:18;
559:18;563:16;
628:12;630:14

**standardized (1)**
560:7

**standing (1)**
601:18

**standout (1)**
634:20

**standpoint (1)**
592:7

**stands (3)**
442:18;561:23;
569:20

**start (27)**
418:10;419:16,17;
472:21;496:18,25;
508:16;513:10;
530:24;563:19;
564:17;572:13;
585:10;596:1;598:16;
602:8;603:17;604:13,
19,21,25;611:14,15;
614:9,15,16,25

**started (17)**
408:3;422:24;
443:5,7,15;455:18;
476:13;482:2;525:7;

532:2;533:1;575:10;
597:4;606:9;607:10;
615:2,7
**starting (5)**
512:9,9;531:13,25;
574:11
**starts (6)**
395:2;412:15;
421:5;429:12;450:7;
469:18
**start-up (12)**
524:11;544:15,19,
20,22;583:7;593:13;
595:10;599:13;601:8,
11;606:7
**state (11)**
405:20;432:5;
484:1,4;517:13;
522:6;529:21;563:20;
567:23;568:2;591:8
**stated (9)**
478:7;488:5;
516:23;520:7;521:11;
522:3;536:8;568:4;
570:23
**statement (30)**
423:12,20,22;
425:23,25;426:3,7,11,
20;427:3;428:8,17;
429:10,24;430:3,9,15;
433:6;458:4;505:1;
515:3;519:17,24;
520:1,7;521:21;
522:2;608:22;634:18;
635:22
**statements (5)**
426:8;427:23;
517:6,15;521:6
**Staten (1)**
542:11
**state-owned (1)**
483:23
**states (4)**
465:13;493:5;
505:1;521:12
**stating (3)**
570:7;575:21;607:7
**station (5)**
416:3;418:2,9;
420:17;472:7
**stationed (7)**
413:12;414:1;
416:12,23;419:24;
472:8;580:11
**Statistically (4)**
587:8,12;592:8,16
**statistics (1)**
525:6
**status (3)**
477:15;500:11;
510:13
**stay (4)**
417:23;584:19;

592:16;593:7
**stayed (5)**
556:6;580:14,16,
17;602:14
**stays (1)**
566:5
**steady (2)**
531:15;544:8
**steal (1)**
579:20
**Stefanelli (5)**
441:10,12,15;
442:15,15
**stems (1)**
567:3
**step (2)**
437:6;527:13
**steps (6)**
450:11;451:15,19;
567:3;591:22;609:13
**sticking (2)**
395:2;431:19
**stigma (1)**
611:9
**still (19)**
398:1,5;422:15;
462:5;498:5;512:8;
515:14;518:17;
551:12,14;569:4;
570:20;573:23;
576:17;582:9,11;
586:5;588:18;628:17
**stock (4)**
522:22;609:22;
622:16;629:17
**stomach (1)**
619:5
**Stony (160)**
394:5;398:14,15;
408:16,18,19,25;
409:25;410:2,22;
411:7,10,21;413:8;
417:15;422:11;438:2;
440:8,15,17,18,19,22;
441:1,8,16;444:17;
446:19;452:23;
455:19;460:10;
467:22;470:14,17;
472:2,5,6,7,8,10;
477:12;482:15;483:6,
10,15,19;484:8,16,18,
19;486:3;488:12;
492:1,19;498:6,8;
499:2,23,23;500:5,19,
24;503:12,19,24;
504:1;505:3;512:11;
522:3;524:12;525:11;
526:14,18;527:6;
542:21;544:15,22;
546:3;552:16;554:13,
17,18,19;555:4,5,7,9;
556:8,11,18;557:2,3,
9,9,11,14,17;564:14;

567:10;568:12;
569:19,22;572:9;
573:24;576:18;
578:10,14;580:5,14;
582:24;583:7,19;
586:20,24;587:1;
588:24,24;589:5;
593:10,11;594:3,17;
596:1,12;598:7,16,25;
599:13,15;600:24;
601:8,13,25;602:3;
603:3;604:18;606:2,
7,8;607:10;612:10,11,
16;614:5,16;615:18,
22;616:11,20,21;
617:17;618:9,13,21;
619:4;621:19;622:4;
624:7;630:11;635:18
**stop (9)**
421:8,10;431:1;
476:22;616:20;
617:21,23;618:6,6
**stopped (1)**
618:6
**stops (1)**
419:23
**STORE (1)**
389:10
**straight (1)**
550:10
**straightforward (1)**
514:25
**strategy (2)**
475:9;497:2
**Stream (2)**
591:21;613:7
**stress (1)**
498:7
**stressed (1)**
568:5
**stricken (1)**
432:6
**strike (10)**
415:23;443:1;
466:23;501:2;544:18;
549:3;554:13;600:23;
602:1;617:12
**strive (1)**
585:22
**strong (3)**
601:18;603:8;
612:24
**strongly (1)**
566:4
**structure (8)**
409:4;481:23,24;
482:1;486:1;496:4;
534:11;617:1
**struggle (2)**
539:2,4
**struggles (1)**
627:4
**struggling (1)**

571:24
**stubs (1)**
586:6
**stuck (1)**
571:4
**student (3)**
532:5;578:19;
580:15
**students (1)**
578:25
**studying (1)**
531:14
**stuff (7)**
407:24;437:23;
447:12;459:18,18;
460:8;608:5
**stump (1)**
563:6
**style (1)**
622:15
**subcontract (3)**
522:9;523:10;
587:16
**subject (6)**
444:24;455:4,5;
493:2;507:19;519:5
**subjects (1)**
585:3
**submission (5)**
454:7;459:24;
467:12;478:16,25
**submit (2)**
429:3;503:13
**submits (2)**
522:12,18
**submitted (11)**
395:16;423:12,20;
426:3;431:14;437:24;
454:20;460:3;498:15;
522:1,25
**submitting (2)**
425:22;523:3
**subpoena (23)**
394:3;397:25;
398:7,22;399:9,11,21;
400:18;404:24;405:6;
474:19;476:5,6,7;
477:25;478:13,21;
479:2;507:20,20;
508:21;509:19;
512:10
**subpoenaed (4)**
399:9,18;401:12;
477:11
**subpoenas (5)**
397:23,24;398:13;
399:25;400:12
**subsequent (1)**
516:12
**subsequently (1)**
402:5
**subset (1)**
482:18

**substance (4)**
424:9,21;477:11;
623:23
**Substantial (1)**
523:23
**substantially (4)**
432:22;435:22;
504:21;512:21
**succeed (1)**
597:8
**success (6)**
444:14;587:13;
592:17;596:23
**successful (1)**
522:21
**successor (6)**
512:22;520:17;
522:15;523:11,11,19
**successorship (2)**
477:15;520:11
**sudden (1)**
581:10
**Suffolk (12)**
411:13;499:24;
500:4,19;535:18;
537:2;541:24,25;
542:25;564:6,7;
594:23
**suggest (1)**
394:21
**suggested (2)**
444:20;548:14
**suggestion (1)**
625:21
**suggestions (1)**
570:23
**suggests (1)**
475:7
**summer (8)**
531:11;532:10;
579:4;589:7;593:17;
595:13;599:12;615:2
**superior (1)**
482:5
**superiors (2)**
575:8;609:9
**supervision (3)**
560:23;561:18;
590:18
**supervisor (11)**
410:14;535:20;
557:24;560:24;
561:17;563:11;
582:14;587:19;
594:24;619:11;
630:11
**supervisors (12)**
535:22,23;536:1;
559:1;560:8,10;
561:4,5,6;580:4;
589:18;604:18
**supervisor's (1)**
619:21

**supplement (1)**
523:18
**supplemental (1)**
520:1
**support (8)**
532:8;535:19;
558:6;563:5,22,23;
574:4;576:19
**supporting (1)**
524:2
**supposed (4)**
419:16;575:15,18;
597:16
**Sure (76)**
393:25;394:19;
399:17;401:10;407:7;
418:10;419:14,23;
420:11,16;436:20;
441:23;443:18;
444:10,19;445:2,24;
448:9;452:11;458:6,
13;460:12,13,19,20;
463:19,25;465:21;
467:9;471:6;472:6,8;
474:3,5;475:17;
482:22;486:12,21;
487:12;488:8;489:4,
12;491:16;504:2;
510:18;528:22;
529:23;531:24;
538:17;539:14;
542:16;544:14;
546:24;554:24;
561:25;563:13;569:9;
570:11;577:21;
588:11;589:9;596:19,
20,25;600:22;604:7,
20;609:5;618:24,25;
624:18;625:20;626:6,
8;630:18;636:17
**surface (2)**
596:9;630:16
**surprised (1)**
400:5
**sustain (1)**
490:13
**Sustained (9)**
425:17;426:23;
429:7;484:13;556:23;
590:11;618:15;
624:24;625:1
**Sutherland (1)**
569:24
**Sutton (1)**
570:17
**swap (1)**
393:18
**swear (2)**
405:17;529:17
**sweatpants (1)**
546:14
**sworn (2)**
406:3;530:6

**system (13)**
422:5;444:24;
453:4;459:9;481:24;
484:15;549:13;553:9;
560:25;568:16;586:4;
592:4;597:19
**Systematically (1)**
578:9
**SYSTEMS (165)**
389:5;393:4;394:5;
407:14,16;408:2,15,
18;409:2;410:1,6;
411:21;414:11;
422:12,21;423:11,20;
432:13,21;435:21;
436:24;438:8;439:10;
440:7,16;447:19,19;
448:3,5;451:19;
452:22;455:19;
458:13;460:5;462:2,
25;467:8;471:10;
472:2,4,6,9;478:15,
22;480:25;481:4;
484:7,19;485:23,24;
486:6;497:10;498:5,
8,9,19;499:1,7,22;
500:10;501:4;502:11;
504:22,22;509:12;
512:20;513:6,22;
514:20,21;515:1,9,10;
521:15;522:4;523:2;
524:11,12,15;525:16,
23;530:12,13,25;
531:4,16;532:12;
533:17;536:14;537:8;
539:9;543:6,22;
545:13,19;549:3;
552:5,5;554:3,14;
555:8;556:8;557:4;
564:14;565:20;
566:19;567:14,18,25;
568:6,15;573:5;
576:6;578:18;579:11;
580:5;583:19,21;
586:21,25;588:6,8,12;
589:4,5,10,13,15,19;
590:15;592:2;593:12,
16,24;594:16;596:14;
598:13,21;599:15;
601:14;604:5,12,18;
606:10,12,14;608:25;
610:24;611:9;612:1,
5,10,13;613:17;
615:8;616:23;617:13;
618:12,20;620:9;
621:22;622:15;
624:15;628:1;630:8
**Systems' (14)**
394:9;411:7;413:8;
485:2;492:1;497:1;
500:5,23;503:11;
546:18;549:11;553:8;
587:16;625:20

**T**

**T20 (1)**
533:25
**table (4)**
401:18;462:21;
631:17,23
**talk (8)**
453:15,19;470:5;
498:12;514:20;573:9,
11;584:19
**talked (7)**
470:9;553:3,4;
557:1;560:19,20;
584:9
**talking (24)**
414:20;440:16,17,
18;459:1,5;460:23;
468:8;494:20;495:6;
509:14;513:7;553:7;
561:25;565:13;
574:13,14;595:18;
597:3,5;627:10,10,14,
25
**tape (1)**
402:21
**tapering (1)**
595:14
**targeted (2)**
496:16,24
**task (3)**
574:15;594:17;
626:2
**tasked (6)**
538:21;567:25;
568:1;605:16;629:6,
22
**tasks (3)**
530:17;563:23;
605:24
**taught (1)**
546:4
**tax (1)**
568:1
**team (50)**
440:15,16;543:5;
544:24;548:13;
549:18,18;553:20;
554:11,11;556:17,18;
559:10;568:5;569:14,
17,17,19;575:23;
578:9;579:13;580:18;
588:1,13;589:21,25;
593:20,23;594:21;
595:10;597:13,22;
598:23;599:13;
602:10;603:9;605:14,
23;606:7;608:25;
612:16;614:24;619:1,
22;623:5;625:22;
627:16;634:4;635:13;
636:8

**Teams (3)**
452:10;589:22;
594:15
**team's (1)**
593:22
**technically (2)**
406:24;407:23
**technology (2)**
567:9;573:23
**tecum (1)**
478:21
**telling (2)**
421:2;610:12
**temple (1)**
559:7
**ten (3)**
587:23;632:4,25
**tension (1)**
611:8
**term (12)**
437:1;504:3;
577:21;583:12;
588:16;592:23;
608:17,18,20;611:20,
20;617:4
**termination (1)**
622:17
**terms (5)**
414:16;422:20;
423:9;471:12;612:24
**testificandum (1)**
398:13
**testified (23)**
406:4;428:7;
429:25;433:9;473:15;
480:9,24;486:2,14;
504:15;508:3;514:9;
515:6;516:11;530:6;
579:24;593:15;
595:20;601:14;
602:11,24;604:9;
613:12
**testify (4)**
426:10;434:18;
501:3;565:22
**testifying (3)**
425:23;446:21;
528:16
**testimony (37)**
398:8,14;406:17;
432:5;448:5;456:4;
460:15;487:13;
504:16;510:11,15;
511:20;512:23;513:8;
514:16;516:21;
521:16;522:24,25;
524:15;525:2,9,19;
526:11,21;527:16,18;
528:1,3;555:3;
583:24;584:15,20;
589:12;613:15;
614:18;627:20
**texted (1)**

461:23
**texts (7)**
447:13;457:3;
467:19;471:19;
473:18;487:22;
516:13
**tgilli (1)**
445:21
**tgilliland@parkingsystemscom (1)**
445:22
**Thanks (3)**
393:25;438:20;
618:1
**Thanksgiving (6)**
613:9,10;614:12,
22;622:20;628:24
**that's' (2)**
509:20;571:15
**theft (3)**
564:11;566:17;
579:8
**thefts (2)**
558:22;579:5
**theoretically (1)**
430:2
**theory (5)**
458:8;514:23;
522:2;527:1;560:22
**thereafter (1)**
594:16
**therefore (4)**
398:5;482:2;
513:20;520:13
**There'll (1)**
412:13
**thinking (2)**
495:14;615:3
**third (7)**
402:1;439:21;
465:12;496:18,23;
517:17;540:6
**thorough (1)**
585:22
**though (2)**
407:18;591:23
**thought (11)**
443:8;454:3;480:7;
493:14;495:13;
525:16;554:20;583:9,
16;618:18;622:15
**thoughts (1)**
519:20
**thousand (1)**
538:21
**thread (4)**
439:6;465:11;
626:5,9
**threatening (4)**
613:18,20,21,21
**three (39)**
401:25;402:11;
420:20,23,25;433:20;
456:25;480:13;499:4;

501:20;514:9,16;
516:13;523:1;524:23;
526:20;540:23;
541:17;545:10;
553:12,15;554:22;
556:10;565:5;566:22;
577:3,6,7;582:24;
587:24;591:17;598:2;
603:18;614:11;
617:11;619:4;620:5;
627:20;633:8
**three- (1)**
    574:13
**three-lane (1)**
    574:9
**three-page (1)**
    445:14
**throughout (6)**
    416:13;418:5;
    526:18;551:12;
    553:22;564:15
**thrown (2)**
    437:2,2
**throws (1)**
    563:7
**Thursday (4)**
    404:25;518:3;
    559:20;619:18
**thus (3)**
    520:3,20;521:21
**ticket (8)**
    414:5,19,25;415:4;
    421:24;568:23,23;
    575:25
**ticketing (2)**
    568:16;569:9
**tickets (4)**
    417:4;420:3;
    421:19;569:1
**tie (1)**
    617:4
**tied (1)**
    498:12
**ties (1)**
    574:20
**til (1)**
    417:22
**timeframe (2)**
    485:18;598:3
**timeline (2)**
    440:21;598:6
**time-off (1)**
    490:3
**times (8)**
    402:1;419:5;
    495:12;499:4;501:20;
    518:8;563:10;610:11
**tip (4)**
    553:8,16;554:13,21
**tipped (1)**
    553:17
**tips (9)**
    549:6,9,12;553:4,5;

554:13,16,22;555:1
**tire (2)**
    566:13;579:10
**title (8)**
    407:17;441:13;
    530:13;536:18;
    552:14;562:7;592:13;
    630:10
**tme (1)**
    400:10
**today (11)**
    422:24;423:6,13;
    458:4;518:1;527:18,
    23;548:1;593:10;
    599:21;613:14
**together (8)**
    409:18;535:20;
    543:4;553:11;577:24;
    612:25;616:7;635:14
**toggle (1)**
    532:22
**toggling (1)**
    532:13
**told (10)**
    461:24;471:17;
    475:8;497:20;508:25;
    572:24,25;597:12;
    612:12;630:21
**tomorrow (1)**
    609:9
**tone (1)**
    550:6
**took (17)**
    422:12;442:25;
    448:5;453:9;462:17;
    480:1;504:22;531:8;
    567:11;578:4,4;
    580:13;598:10;604:9;
    611:10;625:8,18
**tools (1)**
    586:7
**top (10)**
    402:6;450:8;
    464:16;500:17;
    575:21;579:18;
    620:15,16,21;628:15
**topic (2)**
    564:16;621:14
**topics (2)**
    558:18;564:10
**total (6)**
    535:24;539:11;
    545:10;549:21;561:1;
    590:2
**touch (5)**
    523:13;558:18;
    559:4;572:24;583:22
**touched (2)**
    584:3,8
**tough (3)**
    538:19;558:3;
    580:12
**tournament (1)**

534:25
**towards (2)**
    465:12;612:17
**trade (1)**
    543:12
**tradeoff (1)**
    623:12
**traffic (14)**
    416:20;418:6;
    544:6;548:19;552:11;
    571:3,3,5,7,10,25;
    572:7,12;582:18
**trained (3)**
    503:14;524:20;
    607:23
**training (35)**
    408:6;486:5;
    502:14,18,20;503:18,
    23,25;506:13,24;
    507:3,3;530:19;
    537:25;538:24;
    552:25;566:21;
    579:12;584:9;585:5,
    7,10,15,15,22;586:11,
    16;595:21;599:14;
    606:8;608:15;628:19,
    19,20;629:12
**traits (1)**
    537:23
**transaction (2)**
    554:7;568:24
**transient (1)**
    411:2
**transit (2)**
    565:25;566:6
**transition (12)**
    440:20;444:22;
    445:3,3;555:1;575:3;
    579:3;583:9;598:5,
    11;604:15;606:7
**transitions (1)**
    598:4
**transparent (1)**
    630:20
**transparently (1)**
    575:7
**transpires (1)**
    519:6
**transportation (1)**
    436:2
**Travis (32)**
    409:22;410:6;
    411:16,20;438:12,13;
    439:7,7;445:22;
    446:2,5;460:13,20;
    461:9;462:8;463:4;
    470:1,2;471:16;
    498:21;582:12,13;
    605:6;607:5;626:23;
    627:25;630:9;632:5,
    6,25;633:2;636:14
**Travis's (1)**
    630:10

**treat (3)**
    456:5;596:12,13
**treatment (1)**
    561:21
**treatments (2)**
    573:15,20
**tremendous (3)**
    418:14;558:22;
    619:10
**trenches (1)**
    550:8
**trend (2)**
    557:21;577:14
**trial (9)**
    435:8,10;485:8;
    520:4,4;593:11
**tried (2)**
    433:5;481:25
**trip (1)**
    629:18
**true (30)**
    418:8;419:15;
    420:2;422:19,22;
    428:9;430:16;432:21,
    24;435:21;436:1,4,5;
    438:2;439:20;452:22;
    455:18;472:4,9;
    493:22;494:4;498:5,
    7;499:1;505:6;
    549:14;550:11,13,18,
    20
**truly (5)**
    532:6;573:13;
    576:17;577:16;
    619:21
**truth (1)**
    434:9
**truthfully (2)**
    444:11;574:13
**Try (13)**
    425:1,2;430:2;
    520:22;535:7;550:6;
    560:3;586:19;592:10;
    605:18;611:10;627:5;
    629:7
**trying (22)**
    428:11;429:23;
    430:8;458:2;484:25;
    487:3;493:16;503:2;
    510:22;512:13;
    517:11;520:10;
    522:24;563:18;567:3;
    576:17;592:11;
    603:13;605:9;609:14;
    610:15,19
**Tuesday (7)**
    417:23,24;558:16;
    559:17;564:1;589:22;
    636:22
**Tuesdays (1)**
    443:17
**tune (1)**
    629:20

**turn (1)**
    420:5
**turnaround (1)**
    574:13
**turned (1)**
    575:10
**turning (1)**
    597:8
**turns (1)**
    553:11
**Twice (1)**
    499:4
**two (68)**
    398:14;401:24,25;
    420:23;421:5;439:22;
    454:13;462:24;467:6;
    473:18;480:12;
    504:13;507:24;
    513:12;514:10,13,18;
    520:25;521:6,20,20;
    524:19;526:19;533:6;
    535:23;537:1,2;
    542:2;549:20;550:10;
    553:2;559:5;561:23;
    564:16,25;565:23;
    566:3,12;572:16;
    574:12,16;577:6,6,20,
    25;580:24;585:3,23;
    589:17;591:13;592:7,
    18;594:4,6;595:6,6;
    598:2;603:18;605:9,
    16,24;607:5;623:6,
    11;627:20;630:16;
    631:24,24
**two- (1)**
    445:14
**two-lane (1)**
    570:19
**two-sided (1)**
    441:23
**two-to-three-week (1)**
    525:3
**two-way (1)**
    555:19
**two-week (1)**
    614:21
**type (5)**
    532:24;538:10;
    543:22,23;545:23
**types (5)**
    432:23;435:23;
    541:15,25;542:8
**typical (2)**
    412:6;619:7

## U

**Uber (1)**
    563:16
**ugly (1)**
    558:20
**ULP (1)**
    522:1

**ulterior (1)**
511:15
**ultimately (2)**
411:15;519:8
**un (1)**
402:17
**unacceptable (2)**
566:17;567:7
**unchanged (2)**
505:4;570:19
**uncomfortable (2)**
612:14;613:3
**under (33)**
401:18;406:10,13;
420:20;428:7;429:10;
432:23;435:23;
472:25;520:8,16;
522:9,12,13;526:10;
527:3;529:3;530:17;
536:24;537:1;538:12;
554:14;560:22,23;
561:5;562:19,23;
567:2;575:13,14;
576:6;578:12,13
**undergoing (2)**
564:3;576:17
**Underneath (1)**
537:6
**understandable (1)**
610:19
**understands (1)**
603:13
**Understood (10)**
432:7;451:18;
493:10;494:24;
517:11;554:12;
573:17;620:24;
628:17;629:21
**undetermined (1)**
599:4
**unemployment (3)**
511:10;512:4,5
**unfair (6)**
475:12;476:1;
477:16;597:7;609:6;
629:22
**unfortunately (1)**
558:21
**uniform (17)**
415:16,19,20,21;
545:20,22,23;546:11,
13,18;547:18,20;
552:18;624:11;
629:11,12,13
**uniformity (1)**
546:8
**uniforms (4)**
546:2;553:3;608:4,
5
**UNION (80)**
389:10;398:7;
399:3,4;404:23;
436:3;446:19;447:3,

18,24;448:6,9,10,15;
451:20,23;480:10;
486:15;487:4,8,8,25,
25;488:16;492:5;
507:20;508:2,15,24;
509:22;512:19,24;
513:1,4,9,11,13,19;
514:15;515:1,3,3,17;
516:7,8,13,15;517:7,
15;521:14;522:4;
523:2,4,5,6,24;
543:12,13,15,18,19;
596:16;599:16,19;
600:24;601:10,13,14,
15,17,19;613:14,18;
615:10,11,11;616:12;
618:21;626:12;
636:15
**Uniondale (1)**
543:11
**unions (4)**
513:16;521:12;
543:7;601:7
**Union's (7)**
398:8;399:21;
452:14;512:3;514:23;
515:6;519:12
**unit (5)**
402:10,18,24;
526:7,7
**UNITED (1)**
389:10
**University (27)**
398:15;408:16,19,
25;410:1,2;413:4;
417:16;422:11;438:2;
440:15;482:16;483:6,
10,15,20;484:16,18,
19;486:3;492:2,19;
500:24;503:19,24;
505:4;542:21
**unlawful (1)**
423:19
**Unless (2)**
427:13;435:4
**Unlike (1)**
526:19
**unquote (1)**
407:1
**unreasonable (1)**
597:25
**unredacted (1)**
393:17
**unstack (1)**
412:16
**unused (1)**
490:2
**unusual (1)**
477:3
**up (71)**
395:22;402:7;
412:5,11,13,13;
418:11,21;421:8,14,

15;422:5;437:5;
444:17,19;449:9;
450:14;471:20;
476:14;487:21;489:7;
498:16,18,20;501:14;
506:9;512:7;515:20;
517:9;532:1;534:9;
535:24;544:13;
546:20,23;547:5,17;
548:9,11;549:23;
559:5,23;560:11;
569:6,13;571:19,23;
572:14,16;574:8,12;
576:12;577:20;579:2,
19,25;582:13;584:19;
586:10,13;591:24;
596:23;598:16;599:6;
602:8;609:14;614:9,
25;617:7;625:18;
629:25
**updated (1)**
570:14
**upgrades (2)**
573:6;574:5
**upheld (1)**
569:5
**upon (6)**
425:23;426:17;
474:6;514:3;555:1;
559:4
**uproar (1)**
569:12
**upset (1)**
588:21
**upside (1)**
597:9
**Upton (3)**
540:25;541:1;582:3
**upward (1)**
599:3
**upwards (1)**
605:21
**urgently (7)**
499:9,14,24;500:3,
12,19,22
**usable (1)**
576:22
**use (17)**
394:7,15;415:4;
430:7,9;433:5,9;
437:5;459:15;481:10;
504:1;555:23;564:20;
587:25;596:14;
597:19;608:16
**used (5)**
435:7;454:20;
559:11;597:22;
608:20
**user (2)**
585:21;623:13
**uses (1)**
565:20
**using (1)**

560:7
**usually (3)**
567:3;596:10;598:5
**usurp (1)**
520:10

**V**

**vague (3)**
425:16;590:19,21
**vagueness (1)**
426:22
**Valet (55)**
397:25;401:1;
411:22;412:4,18;
413:9;415:24;417:18,
20;422:10;432:23;
435:23;436:1;452:23;
455:20;458:17;468:5;
486:15;487:16;493:7;
495:6;497:11,23;
498:15;512:11,12;
513:21,22;533:17;
543:22;544:5;546:3,
11;555:12;561:23;
564:24;571:3,8,15;
572:4;575:16,18,25;
583:19;587:1;593:12;
594:18;596:12;
600:25;601:25;602:2;
607:10;616:21;617:3;
621:19
**Valet's (1)**
493:24
**valid (1)**
609:3
**validate (1)**
575:25
**validated (1)**
575:15
**validation (3)**
422:5;575:22,24
**validity (1)**
617:2
**Valley (1)**
591:21
**valuable (2)**
627:18,19
**variety (6)**
530:17;532:23;
533:13;538:7;546:15;
587:7
**various (7)**
431:18;481:5;
507:5;555:5,8;556:2;
631:10
**vary (1)**
619:13
**vehicle (21)**
415:1,8,13;420:6,
12,13;563:15;564:21;
566:6;568:19,23;
571:8,10,15,25;

578:20;579:5,8,9,10;
623:14
**vehicles (5)**
414:2;420:1;
564:15;624:3,4
**vehicular (2)**
534:12;558:22
**vendor (1)**
611:8
**venue (1)**
629:3
**verbatim (1)**
491:11
**verbiage (1)**
562:8
**verify (1)**
597:13
**verifying (1)**
401:15
**versa (1)**
558:7
**version (3)**
393:17;394:19;
509:19
**versus (4)**
567:14,18;571:11;
573:4
**via (3)**
453:4;457:11;556:7
**Vice (3)**
536:18,22;558:7
**view (4)**
458:8;545:13;
575:20;586:6
**violated (2)**
523:21;528:10
**violation (3)**
520:22;521:13;
527:20
**violations (4)**
521:7;523:16,17,18
**virtual (1)**
452:11
**virtue (1)**
482:2
**virus (2)**
619:5;620:6
**vis-a-vis (1)**
477:17
**visibility (1)**
548:12
**visit (1)**
556:4
**visited (3)**
422:14;438:2;617:2
**visitor (5)**
414:24;417:12;
552:16;576:1;580:15
**visitors (9)**
411:23;413:5;
414:2,6;417:1,4,6;
419:25;624:14
**visits (7)**

545:7,9;551:19;
554:23;556:3;566:23;
609:1
**visual (2)**
546:6,8
**visuals (1)**
604:9
**VOIR (1)**
455:2
**volatile (1)**
612:18
**volume (9)**
416:14;418:6;
534:12;544:1;549:18;
551:8;568:20;570:20;
599:2
**volume-wise (1)**
578:5
**vouch (2)**
557:23;573:15
**vouching (1)**
566:7
**VP (1)**
569:25
**vulnerability (1)**
567:5
**vulnerable (3)**
566:12,18;627:10

**W**

**wage (3)**
549:4,9;598:25
**waist (3)**
546:20;547:5,10
**wait (4)**
404:2;490:10;
513:7;589:14
**waited (2)**
604:3;616:14
**waiting (4)**
399:20;418:23;
576:22;579:15
**waived (1)**
528:8
**wake (1)**
579:19
**walk (2)**
453:12;612:22
**walked (3)**
553:19;578:2,6
**walker (1)**
571:9
**walking (1)**
575:25
**wants (6)**
397:1;398:3;
429:19;433:9,15;
434:3
**wasn't (3)**
517:18;522:22;
527:19
**waste (1)**

596:3
**watch (1)**
534:22
**watched (1)**
551:12
**watching (1)**
609:1
**waterproof (2)**
547:9;548:18
**wave (2)**
587:25;620:22
**way (34)**
404:22;406:18,21;
418:24;421:15,17;
428:12;429:23;
437:18;465:21;
467:13;476:14;481:7;
502:6;513:14;517:12;
520:9,12;527:13;
547:24;551:5,8;
562:1;579:7,24;
581:12;586:24;590:3;
596:5;603:8;604:6;
610:6;620:23;628:18
**ways (2)**
620:12;627:12
**wear (5)**
407:17,19,20;
415:16;547:25
**wearing (2)**
546:21;547:18
**wears (1)**
547:18
**weather (3)**
415:21,22;547:8
**weblink (1)**
436:24
**wedding (1)**
563:14
**Wednesday (8)**
404:25;417:24,25;
418:12,13,15;559:19,
20
**weeded (1)**
475:23
**week (21)**
398:2;402:2;
404:25;443:11;
557:22,23,24;558:3,3;
560:12;580:16;
591:13;597:4;613:10;
614:12,22,22;628:24,
25;629:1;630:1
**weekend (1)**
468:25
**weekends (3)**
416:15,16,18
**weekly (18)**
442:22;443:3,20,
25;444:5,15,21;
493:2;530:22;557:7;
558:10,12,15,16;
559:14;564:9;572:24;

589:22
**weeks (12)**
401:24,25;443:12;
533:6;550:10;557:22;
559:6;580:18;598:2;
605:5;614:11;627:20
**weird (2)**
455:7,12
**welcome (1)**
586:12
**well-oiled (1)**
550:6
**weren't (11)**
476:15;483:8;
569:1;576:1;589:11;
597:15;603:20;
610:12;612:22;613:2;
630:1
**west (1)**
580:11
**western (8)**
538:17;541:24,25;
553:25;558:23,23;
563:2;564:5
**whatnot (1)**
538:4
**what's (24)**
393:9;395:1;
414:13;423:1;426:7;
427:18;428:9;434:22;
468:22;473:5;483:13;
491:10,13;492:24;
500:7;502:17,23;
521:25;536:24;561:8;
600:14;611:1;612:3,
12
**WhatsApp (1)**
515:7
**whatsoever (1)**
521:17
**wheelchair (1)**
571:18
**whenever (1)**
623:19
**whereas (2)**
411:16;619:14
**where'd (1)**
405:5
**Whereupon (1)**
636:21
**wherever (3)**
418:16;557:14;
559:13
**whited (1)**
402:21
**whole (10)**
427:22;477:7;
492:10;521:13;
552:22;561:24;
569:23;598:12;
599:10;614:25
**WHOLESALE (1)**
389:9

**Who's (19)**
409:24;410:13;
413:6;429:24;439:9;
441:12;467:20;496:2;
530:11;536:12,17,21;
542:18;551:22;
552:17,17;558:14;
594:4,21
**whose (2)**
471:14;563:15
**wide (1)**
535:25
**wife (2)**
468:24;571:19
**wild (1)**
517:14
**willing (1)**
472:20
**win (1)**
624:13
**window (2)**
573:24;577:15
**winning (5)**
513:6;522:9,12,19,
21
**wins (2)**
586:22;592:2
**wise (1)**
433:14
**withdraw (7)**
446:25;447:1;
457:16;583:15;
613:20,21;625:3
**Withdrawn (4)**
617:20,20,22,22
**withdrew (1)**
532:10
**withheld (8)**
473:3,8,21,22;
474:11;475:5;477:24;
478:6
**within (19)**
419:1,8;477:25;
481:10,22,22;482:11;
511:2;516:11;526:17;
535:22;537:22;
554:18;555:5;562:13;
565:5;576:21;581:7;
620:20
**without (6)**
396:15;400:7;
436:2;523:13;571:5;
609:14
**witness (148)**
393:8,14;404:19;
405:13,19,22,24;
406:3,12,17,20;407:3;
412:5,18;422:3;
424:10,22;425:4,15,
23;426:9,19,19;427:4,
8,12,19,21;428:7,17,
20,23;429:1,24;
430:8;431:21;432:4,

5;433:3,8,10,10,11,
12,12,13,16,17,18,25;
434:11,20;435:2,14,
18;436:12,14;437:10;
438:21;447:23;
453:14;455:12;456:5,
5,14;459:21;463:15,
17,23,25;464:7,9,11,
20;470:23;472:16;
473:23;479:18;
481:16;483:23;485:8,
10,13,20;486:11;
489:3,14,16,18;490:5,
7,12,15,18,25;492:8,
14,21,22;493:12;
494:11,17,20,25;
495:16;497:14;499:6,
12,15,21;502:5;503:2,
4;508:2,3,7,9;513:1;
514:5,8,16;516:9,10;
518:6;519:15;521:24;
527:10,19;528:16,16,
17;529:20,23;530:1,
5;551:21;554:12;
556:2,22;565:12;
566:23;573:3;584:21;
591:5;599:25;606:17;
618:17;626:16
**witness' (1)**
510:11,15
**witnessed (2)**
567:7;583:18
**witnesses (13)**
398:14;407:2;
426:24;507:24;
513:12;517:1,2;
520:19,23;521:20,21,
24;529:10
**witnesses' (1)**
398:8
**witnessing (1)**
583:17
**woke (1)**
449:9
**won (5)**
586:25;592:13;
596:13;610:3;617:9
**wood (1)**
565:17
**word (5)**
450:7;478:19;
577:19;612:20;
636:15
**words (3)**
477:11;562:16;
571:11
**wore (1)**
548:1
**work (81)**
395:7;407:14;
408:24;410:22;411:2;
418:8;419:17,18;
423:15;428:5;433:19;

472:5,6,6;473:19,23;
474:8;480:5;498:9;
502:13;510:14,17;
521:15;526:1,7,13;
531:15;532:3,4,16,20,
24;535:15;537:7;
538:18;539:5;543:4;
548:1;553:14;557:3,
8,9,11,16;562:23;
564:2;565:3;568:22;
569:21;572:9;574:15;
577:24;580:1,20;
582:24;587:16,18;
591:12,16;592:24;
593:3,12;596:1;
598:6;599:2,2,7;
604:4;605:10,10;
609:5,15,16;611:10;
612:22;614:16;
616:21;619:5;620:12,
20;627:2
**worked (18)**
394:5;399:2;
467:21;472:10;
526:14,21;532:1;
533:16;535:12;536:2;
576:11;587:9;598:15;
627:8;628:4;635:14,
16,17
**worker (1)**
549:21
**WORKERS (1)**
389:11
**workflow (1)**
558:2
**workforce (1)**
524:5
**working (32)**
408:2;410:6;
418:25;438:6,8;
452:23;480:25;482:3;
503:19;507:9;508:16;
510:4;514:21;518:17;
524:25;530:25;
532:19;550:2;553:11;
557:14,15,15;572:10;
576:13;582:21;587:2;
588:17;596:2;602:9;
603:25;617:7;628:17
**works (7)**
406:21;467:21,22;
525:13;581:12;603:9;
611:16
**workspace (1)**
631:9
**world (6)**
418:13;425:13;
505:11;558:19;597:8;
628:25
**worldwide (1)**
534:1
**worn (1)**
546:15

**Worse (1)**
574:22
**Worth (4)**
585:12;623:12,19;
624:7
**write (1)**
539:17
**writes (1)**
496:15
**written (1)**
545:24
**wrong (6)**
395:1;399:16;
431:12,12;630:21,22
**wrote (17)**
430:5;431:4,5;
432:13;439:13,19,22;
451:9;452:3;470:8;
488:8;489:7;490:7;
491:5;494:4;495:1;
497:6

## Y

**year (3)**
440:6;491:25;
575:11
**years (25)**
426:2;436:3;514:6,
11;526:22;531:2,16,
24;532:1;533:16;
534:24;538:21;
543:20;545:11;
551:12;563:7;570:15;
585:16;587:3;591:17;
592:15;594:11;596:3;
627:8,24
**yellow (1)**
631:24
**Yep (4)**
445:25;509:15;
560:6;580:10
**yield (1)**
596:10
**York (8)**
389:18;499:23,23;
534:3;536:5;539:12;
542:7;561:2
**York's (1)**
534:2
**You're (1)**
597:7
**young (2)**
532:5;621:20

## Z

**zero (4)**
497:10;516:13;
521:17,18
**zigzagging (2)**
568:22;581:9
**zip-up (1)**

547:8
**zones (1)**
532:20
**Zoom (5)**
442:22;443:25;
444:6;559:10,11

---

## 0

**0001 (1)**
565:9

---

## 1

**1 (44)**
389:18;395:5,6;
402:20;408:21;410:5,
6;412:23;413:13;
414:14;440:23;
444:22;448:6,8,9;
455:19,21;458:16,19;
493:5;496:20;505:2;
510:2;511:6;512:10,
16,16;524:24;545:3;
568:21;581:3;602:2,
5,7,12;603:17,18;
604:4;606:9,14;
607:9;608:13;615:1;
631:2
**1,500 (1)**
605:22
**1/17/23 (1)**
511:5
**1:27 (1)**
518:19
**10 (10)**
479:4;499:15,18,
21;521:8;531:2;
571:22;619:25;627:8;
628:15
**10/18 (2)**
511:8,8
**10:00 (2)**
389:18;636:22
**10:39 (2)**
449:5,7
**10:58:22 (1)**
436:10
**10:58:37 (1)**
436:10
**100 (4)**
460:17,19,25;
486:21
**100,000-person (1)**
534:8
**10278 (1)**
389:18
**10th (5)**
451:11;452:7;
488:4,15;510:4
**11 (4)**
487:24;499:15,18;
500:17

**11:33 (1)**
453:20
**11:47 (1)**
453:20
**11:59 (1)**
604:1
**110 (1)**
534:21
**1102 (15)**
389:9;446:18;
447:6,8,9,11,13,19;
448:2;487:2,8,15,19,
20;521:1
**1102's (1)**
486:15
**1195 (1)**
522:14
**12 (12)**
427:6,7;505:1,1;
535:21;536:3;553:16;
556:9;564:4;568:22;
571:23;636:22
**12/1 (1)**
629:21
**12:01 (1)**
598:10
**12:32 (1)**
480:17
**12:34 (1)**
480:17
**12-12-B (1)**
505:5
**12-A (1)**
505:24
**12-B (1)**
505:24
**12th (2)**
500:1,8
**13 (7)**
438:16,17,18,19;
439:25;440:3,4
**14 (9)**
441:19,20,23;
445:5,8,9;446:3;
531:2,16
**15 (17)**
445:11,12;446:12,
15,16;492:21,25;
511:6;526:14;533:16;
535:20,24;538:21;
545:11;563:7;571:8;
577:24
**15-minute (1)**
555:21
**15X (1)**
570:20
**16 (9)**
448:18,19;450:3,
17,20,21;505:15,16;
506:2
**16th (1)**
500:18
**17 (12)**

**450:23,24;451:1;**
452:4,16,19,20;
489:14,17;535:21;
553:12,16
**17th (3)**
470:6,11,16
**18 (7)**
453:24,25;454:23;
455:13,14;561:2;
562:4
**18- (1)**
583:8
**18-day (2)**
583:8,11
**18-hour (1)**
580:12
**18th (1)**
522:14
**19 (9)**
456:14,15,17;
457:3,5,8,9;620:24;
621:14
**1972 (1)**
522:15
**1985 (1)**
570:21
**1987 (4)**
408:3;480:25;
482:2;483:2
**1990 (1)**
523:15
**1991 (1)**
523:15
**1995 (1)**
522:14
**1st (14)**
393:4;414:8,9,9;
493:25;495:7;497:10,
24;498:4;499:2;
525:7;606:23;627:3,
22

---

## 2

**2 (5)**
489:20;512:18;
514:19;523:14;581:3
**2,000 (1)**
605:22
**2:30 (2)**
518:13,16
**2:36 (2)**
518:19;519:2
**2:37 (1)**
519:21
**2:40 (1)**
519:21
**2:56 (1)**
529:13
**2:57 (1)**
529:13
**20 (14)**
461:3,4,15,17,18;

549:21;553:11;561:2;
562:5;577:24;581:10;
614:6;619:15,15
**200 (1)**
574:9
**201 (1)**
532:11
**2010 (1)**
531:1
**2015 (1)**
401:23
**2021 (2)**
524:6,7
**2023 (50)**
395:2;402:3;
408:21;410:7;412:23;
414:9,14;423:23;
438:3;440:6;446:18;
448:3;449:5;453:1;
458:17;461:7;462:2;
463:6;469:19;486:17;
487:17;488:15;493:1;
495:7;497:10,24;
498:4;499:2;500:1,8,
18;501:19;505:2;
516:9,19,24;521:8;
524:10;525:15;545:3;
593:17;595:18;
599:12;612:2;625:12,
13,14,16;627:1,22
**2024 (5)**
389:18;393:4;
395:3;447:16;636:22
**20th (1)**
461:6
**21 (12)**
465:1,2,9,13;
466:15;467:5;468:13,
16,17,18;469:10;
470:9
**213 (1)**
406:11
**21st (3)**
466:24;468:2;
469:19
**22 (7)**
466:6,13,14,19;
468:20;469:7,8;
499:25
**23 (7)**
470:21,22;511:6,6;
579:4;589:7,8
**238 (1)**
389:18
**23rd (2)**
444:6,8
**24 (9)**
413:18;416:1,2,11;
478:11,12;479:11,12;
598:9
**24/7 (2)**
416:3,4
**24-hour (1)**

591:6
**24th (1)**
494:25
**25 (6)**
521:8;525:15;
557:23;570:15;
625:15;626:25
**250 (1)**
526:11
**250-plus (1)**
527:6
**25th (9)**
462:15;513:15;
516:9,19,24;625:11,
14;627:22;630:2
**26 (3)**
389:17;478:5;524:6
**260 (1)**
591:5
**27 (1)**
446:9
**272 (1)**
522:15
**27th (1)**
493:1
**29 (1)**
396:16
**296 (1)**
524:6
**29-CA-31253 (1)**
393:4
**29-CA-331253 (1)**
389:3

**3**

**3 (1)**
581:3
**30 (9)**
408:12;426:2;
436:3;514:6,11;
574:14;578:1;598:4;
624:3
**300 (1)**
394:13
**30th (8)**
394:6;395:2;
524:25;604:1;611:3,
6;615:20,23
**319 (1)**
522:14
**36 (1)**
556:9
**3-A (1)**
436:12

**4**

**4 (1)**
581:3
**4:07 (1)**
584:24
**4:15 (1)**

584:24
**4:30 (2)**
465:13;550:10
**40 (5)**
526:4;564:4;
572:15;574:14;578:1
**40,000 (1)**
534:8
**400 (1)**
576:21
**400-spot (1)**
576:20
**40-hour (1)**
532:13
**410 (1)**
561:19
**45 (1)**
412:10
**45-person (1)**
559:5
**47 (1)**
559:7
**472 (1)**
522:15
**48-hour (1)**
576:13
**4th (2)**
557:22;559:23

**5**

**5 (7)**
395:22,24;396:1,8;
463:16;464:3;619:14
**5:25 (1)**
636:21
**5:30 (1)**
413:22
**50 (3)**
526:4;614:6;628:9
**514-9243 (1)**
464:15
**58 (12)**
461:25;462:3,5,13,
17;482:15;501:18;
629:5;631:4,8,12;
632:24
**5th (1)**
510:4

**6**

**6 (1)**
422:9
**6:08 (1)**
469:20
**6:30 (2)**
417:23;452:11
**6:35 (1)**
451:11
**60 (4)**
411:1;561:12,13;
628:9

**611 (2)**
529:3,4
**611c (4)**
406:13,20;527:19,
25
**631 (1)**
464:15
**65 (2)**
411:1,3
**660 (1)**
523:14

**7**

**7 (4)**
422:9;571:22;
600:1;624:6
**7:30 (3)**
417:22,24,24
**70 (3)**
561:12,13;628:9
**71 (1)**
628:14
**72 (1)**
620:20

**8**

**8 (11)**
393:10,10,18,22;
399:1;459:3;509:17,
17;510:9,14;511:4
**80 (1)**
614:6
**8A (1)**
393:16
**8a3 (14)**
513:24;514:25;
516:23;517:3;520:5,
20;521:7,13;523:14,
16,17,21;527:3,3
**8a3s (2)**
520:12,14
**8a5 (7)**
514:25;520:6,14,
15,22;523:17;527:2
**8-page (2)**
437:21;607:25

**9**

**9 (9)**
395:3;449:14,16;
600:3,6,7,8,15;619:14
**9:00 (1)**
413:22
**9:15 (2)**
559:14,17
**9:34 (1)**
393:2
**90 (2)**
534:9;614:5
**900 (1)**

592:15
**95 (2)**
535:13,13
**97 (1)**
535:13
**9745 (1)**
487:19
**9th (21)**
394:6;449:5,18;
486:16;488:2;600:2,
5,16;601:6,23;613:12,
23;614:3,8,9,14,17;
615:11;616:14,19,22

# OFFICIAL REPORT OF PROCEEDINGS

# BEFORE THE

# NATIONAL LABOR RELATIONS BOARD

_____

_____

In the Matter of:                          **Case No.:**  29-CA-331253


PARKING SYSTEMS PLUS,INC.            :

              Respondent,            :

And                                  :

LOCAL 1102, RETAIL, WHOLESALE &      :

DEPARTMENT STORE UNION, UNITED       :

FOOD AND COMMERICAL WORKERS,         :

           Charging Party.            :


Place:   New York, New York
Dates:   July 2, 2024
Pages:   638 through 862
Volume: 5

_____

_____

### OFFICIAL REPORTERS

# BURKE COURT REPORTING, LLC
### 64 Magnolia Place
### Wayne, NJ 07470
### (973) 692-0660

```
1                           BEFORE THE

2                  NATIONAL LABOR RELATIONS BOARD

3    ---------------------------------: Case No.:

4    In the Matter of:              : 29-CA-331253

5    PARKING SYSTEMS PLUS, INC.,    :

6                 Respondent,        :

7    And                            :

8    LOCAL 1102, RETAIL WHOLESALE & :

9    DEPARTMENT STORES UNION,       :

10   UNITED FOOD AND COMMERCIAL     :

11   WORKERS,                       :

12                Charging Party.   :

13   ---------------------------------:

14

15        The above-entitled matter came on for hearing pursuant to

16   notice, before BENJAMIN GREEN, Administrative Law Judge, at the

17   National Labor Relations Board, Region 29, at 26 Federal Plaza,

18   2nd Floor, New York, New York 10278, on Tuesday, July 2, 2024,

19   at 10:00 a.m.

20

21

22

23

24

25

26
```

```
 1              A P P E A R A N C E S

 2    On Behalf of the General Counsel:

 3        MATTHEW JACKSON, ESQ.

 4        EMILY CABRERA, ESQ.

 5        The National Labor Relations Board, Region 29

 6        One Metro Tech Center, 20th Floor

 7        Brooklyn, New York 11201

 8        matthew.jackson@nlrb.gov

 9        emily.cabrera@nlrb.gov

10

11    On Behalf of the Respondent:

12        ROBERT F. MILMAN, ESQ.

13        MICHAEL MAURO, ESQ.

14        MICHAEL JACOBSON, ESQ.

15        Milman Labuda Law Group, PLLC.

16        3000 Marcus Avenue, Suite 3W8

17        Lake Success, New York 11041-1009

18        rob@mmlaborlaw.com

19        mmaura@mmlaborlaw.com

20        mjacobson@mmlaborlaw.com

21

22

23

24

25
```

1          A P P E A R A N C E S (continued)

2    On Behalf of the Charging Party:

3          MATTHEW P. ROCCO, ESQ.

4          Rothman Rocco Laruffa, LLP

5          3 West Main Street, Suite 200

6          Elmsford, New York 10523

7          mrocco@rothmanrocco.com

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                          I N D E X
 2    WITNESS            DIRECT   CROSS   REDIRECT   RECROSS   VOIR DIRE
 3    Joshua Candiotti     --      651      713        753       --
 4                         --      681      760        758       --
 5                         --      --       --         --        --
 6    Robert Gust         762     850      --         --        815
 7                         --      --       --         --        827
 8                         --      --       --         --        833
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1                    E X H I B I T S

2   EXHIBITS                  IDENTIFIED              RECEIVED

3   General Counsel's

4   GC-25                     855                     861

5   GC-26                     855                     861

6

7   Respondent's

8   R-7                       722                     749

9   R-8                       813                     821

10  R-9(a-c)                  822                     828

11  R-10                      830                     843

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

```
 1                  P R O C E E D I N G S

 2                             (Time Noted:  10:07 a.m.)

 3          JUDGE GREEN:  So we are back on the record.  It's

 4    July 2nd, 2024, in Parking Systems Plus, Inc.  29-CA-331253.

 5    We're in the middle of the Respondent's case, but I do want to

 6    address the outstanding issue of the petition to revoke the

 7    subpoena which issued to the Union from the Respondent.

 8          I take it the parties haven't had any discussions

 9    since we last broke.

10          MR. ROCCO:  No.

11          JUDGE GREEN:  Okay.  So listen, in my opinion, first

12    of all, there's an issue with this subpoena having not been --

13    having not been authorized by the Administrative Law Judge,

14    which is the requirement once the record opens.

15          But I'd rather not get caught up in that as a

16    technicality because the, you know, the remedy to that is to

17    reissue it, which just would take more time.  So if the Union

18    wants to raise that objection, you can and will deal with it,

19    but it's really more of a technical deficiency that is just

20    going to waste time if we reissue it.

21          We're not in discovery, we're at the hearing.  I'm

22    not a magistrate.  You know, I think when you end up going to a

23    magistrate on discovery disputes, they often, you know, they

24    often deal with discovery disputes with a hatchet rather than a

25    scalpel anyway, and we're in a -- we're in a more difficult
```

1 situation.

2            So in my opinion, the subpoena was significantly

3 overbroad.  However, I believe it touched upon -- potentially

4 touches upon certain materials, and, you know, in -- under --

5 in best case scenario, if this, you know, if this was happening

6 at a different time, I would leave it to the parties to try and

7 confirm the matter, but we don't have that time.

8            So in terms of just relevance, setting aside the

9 issue of whether this would result in the production of

10 protected information, which is another issue which we might

11 have to deal with.

12            But in my opinion, what would be relevant is

13 communications between former Classic employees and the Union

14 discussing an unfair labor practice charge and evidence and

15 support charge, including WhatsApp messages regarding potential

16 testimony.

17            Also communications between former Classic employees

18 in the Union regarding their hire and employment by Parking

19 Systems.  That's what I think is relevant here for the period

20 October 1st, 2023 to December 31st, 2023.

21            I think that gets to the heart of what the Respondent

22 is trying to obtain, and it significantly narrows the subpoena

23 hopefully to the point where it doesn't touch upon too much

24 protected conversations.

25            If it does, then we might need to redact those

1  conversations or somehow deal with them in a way that's not

2  coercive.

3          MR. ROCCO:  Mm-hmm.  Yeah.  So I mean, I asked Ms.

4  Porsuk to -- this morning, I met with her outside and asked her

5  to take a look, you know, at the text messages and other

6  communications she's had.

7          She was able to identify a couple voicemails that

8  were left to her by Ms. Gill and some other text messages she

9  had had with Ms. Gill and hearing Parking Systems concerns

10 yesterday -- well, first off I looked at the text message and I

11 think there was just a slight mischaracterization of what it

12 was yesterday.

13         It was some discussion that it was texting Ms. Porsuk

14 about her meeting at Jake's 58, or excuse me, it was Gil's

15 meeting at Jake's 58.

16         The text was actually about another comment that she

17 alleges that Dan and the other guy from Stony Brook said to

18 her, but there wasn't anything about Jake's 58.  Be that as it

19 may --

20         JUDGE GREEN:  So I don't have --

21         MR. ROCCO:  Yeah.

22         JUDGE GREEN:  I have all of the exhibits except that

23 one, but I thought it referenced -- it was primarily about the

24 Nick and Dan.

25         MR. ROCCO:  Yeah.  Nick and Dan.  Right.

```
 1              JUDGE GREEN:  But I thought there was a reference
 2    later on in the text that referenced the conversation with Mr.
 3    Gust at Jake's 58.
 4              MR. ROCCO:  Right.  So I mean, I can share -- I mean,
 5    I'm going to have her send me those voicemails and --
 6              JUDGE GREEN:  Okay.
 7              MR. ROCCO:  -- screenshots.  I can share those with
 8    Counsel.
 9              JUDGE GREEN:  Okay.
10              MR. ROCCO:  You know, I mean, if their concern was
11    it's a setup, obviously that's their --
12              JUDGE GREEN:  That's their theory in the case, yeah.
13              MR. ROCCO:  -- theory.  Then, you know, I could
14    share, you know, those -- that information through, you know,
15    through the end date of their employment if it was to really
16    show that, you know whether Ms. Porsuk was with them or not
17    about how they would approach the meeting.
18              JUDGE GREEN:  By the way, I think I pronounced
19    Porsuk, Porsuk.  How is your name pronounced?
20              MR. PORSUK:  Porsuk.
21              JUDGE GREEN:  Is that right?  More or less?  Okay.
22              MR. PORSUK:  You got it right.
23              JUDGE GREEN:  Okay.
24              MR. MAURO:  Judge, if I just may.
25              JUDGE GREEN:  Yeah.
```

1          MR. MAURO:  I appreciate Counsel's efforts.
2  Certainly, I appreciate.  Just to be clear, I think there was
3  testimony that there was electronic communications prior to the
4  20 -- meeting on November 25th.
5          So we're looking at that and also the testimony
6  regarding this WhatsApp, you know, text chain that was going
7  on.  It sounds like it's -- that's not going to be produced or
8  it doesn't exist or something to that effect, but that's
9  precisely what I was referencing and alluding to yesterday,
10  with the testimony about this WhatsApp chain because it was in
11  the affidavit that she testified about.
12          So to the extent that it exists, you think that falls
13  within your --
14          JUDGE GREEN:  Right.
15          MR. MAURO:  -- your ruling.
16          MR. ROCCO:  So I'll just return -- yeah.  I'm
17  obviously going to give you the emails, the texts prior to the
18  meeting.
19          Yeah.  No question.  The WhatsApp chain is a little
20  trickier, I think, because there's like definitely double
21  digits of employees on there and they're talking -- I haven't
22  asked her to look through that stuff yet.  So that might bring
23  in more, you know, Section 7 issues that --
24          JUDGE GREEN:  Okay.
25          MR. ROCCO:  -- you've discussed and I haven't seen

1  them, so maybe I'll be proven a fool, but it seems kind of like

2  if you're going to have a conspiracy, you wouldn't, you know,

3  do it to 15 or 20 people on a wide basis, but maybe I'm wrong,

4  but --

5          JUDGE GREEN:  Yeah.  I mean, we have the -- I might

6  have to review it in camera.  We'll see.

7          MR. ROCCO:  Okay.

8          JUDGE GREEN:  We will see what it is.

9          MR. ROCCO:  Okay.  All right.  Yeah.  And she's

10  showing me now, I mean that the WhatsApp group was created in,

11  it was created on November 25th, 2023.

12          JUDGE GREEN:  Okay.  Okay.

13          MR. PORSUK:  They add me on.

14          MR. ROCCO:  Okay.  Okay.  I will take a look at it a

15  little later.

16          JUDGE GREEN:  All right.  So I mean, listen, what I'd

17  like to do is move forward with the Respondent's case.  You

18  know, we're doing this on the fly with the subpoena, the

19  records, the subpoena was issued during the hearing.

20          I'd like -- we're already on Day 5 and this matter is

21  not moving all that quickly.  You know, to the extent you would

22  recall, a witness who might testify to subpoenaed records could

23  always recall a witness.  Which brings us to your witnesses.

24          MR. MILMAN:  Yeah.  Your Honor, just another

25  housekeeping issue.  With respect to the sequestration order,

1  we -- these are our three witnesses that are going to be

2  handled today.

3          Johnny Baron is an owner.  Bobby Gust is an owner.

4  Josh is an account executive.  Josh is going to be testifying,

5  finishing up his testimony.

6          JUDGE GREEN:  Right.

7          MR. MILMAN:  And then I'd be calling Mr. Gust.  After

8  Josh finishes, he will be leaving, he's got to go back to work.

9          JUDGE GREEN:  Right.

10         MR. MILMAN:  Which leaves us with no representative

11 at the table.  So I respectfully request, although Mr. Baron

12 will be testifying after Mr. Gust, his testimony is going to be

13 on different issues or that we're going to be asking questions

14 on our direct case of chief.

15         But while Mr. Gust's on the stand, we would ask that

16 we'd have one representative here, Mr. Baron, sit at the table.

17         JUDGE GREEN:  Okay.  Listen, I admittedly am probably

18 less rigid than other ALJs regarding the sequestration order

19 simply because I think it's largely self-defeating to -- it's

20 largely, yeah.

21         You are just the mouthpiece, so you need a

22 representative, but it's self-defeating for a party if you have

23 one -- I've said this before, if you have one employee, excuse

24 me, one person testifying and then the second person who's been

25 there just gets up in parrots the first person's testimony,

1  it's just not compelling as credible evidence.  But if, you

2  know, that's what you want, I'll allow it for that purpose.

3            MR. MILMAN:  Thank you, Your Honor.

4            JUDGE GREEN:  Okay.

5            JUDGE GREEN:  So do you have -- do you have a

6  witness?

7            MR. ROCCO:  We do, but I think there's some

8  additional housekeeping issues.

9            JUDGE GREEN:  Okay.

10           MR. ROCCO:  I'll defer to Mr. Mauro.

11           MR. MAURO:  Oh Yeah.  Sorry.  Might as well just

12 handle real quickly.  With respect to -- oh, I saw Matt

13 responded to us, Matt, so we can lock up and Matt's if you try

14 to catch a call with him maybe at a break.  He said he is free

15 until noon, so maybe we can catch him.

16           MR. ROCCO:  I'll just do it now.

17           JUDGE GREEN:  Did you want to do it now?  Yeah.  Do

18 it now.  If you want, you can -- if you want can go -- there's

19 a conference room right in there.

20      (Whereupon, a short recess was taken)

21           MR. MILMAN:  Okay.  Yeah.  We have no further

22 questions for Mr. Candiotti, he's ready to cross.

23           JUDGE GREEN:  Okay.  So just recall, you're still

24 under oath?

25           THE WITNESS:  Yes.

```
 1              JUDGE GREEN:  Thank you.  So will there be any cross?
 2   Whereupon,
 3                         JOSHUA CANDIOTTI,
 4   was called as a witness having been previously duly sworn, was
 5   examined and testified as follows:
 6                         CROSS EXAMINATION
 7   BY MR. JACKSON:
 8   Q.   Yes, Your Honor.  What exactly is -- oh, excuse me.  Let
 9   me introduce myself.  My name is Matt Jackson.
10              I am the attorney representing the National Labor
11   Relations Board General Counsel.  What exactly is your role for
12   Parking Systems at Stony Brook University Hospital?
13   A.   Was part of the organization division.
14   Q.   Okay.  And you don't have any current role anymore?
15   A.   Not on a day-to-day basis.
16   Q.   Okay.  And what is your role other than on a day-to-day
17   basis?
18   A.   So I do attend some of the touch base meetings on about a
19   monthly basis.  So those weekly calls that the course
20   supervisory group attend, I don't attend them weekly anymore.
21   Q.   Okay.  So your role now is limited to monthly meetings?
22   A.   Correct.
23   Q.   And who are those meetings with?
24   A.   So that would be the MAPS team, which is Dan Atkins.
25   Nick, I always get his last name wrong.
```

1    Q.    Stefanelli.

2    A.    Stefanelli, Bobby Gust, Michael Petruzzelli, Travis

3    Gilliland, Andrew Goldsmith.

4    Q.    Now, correct me if I'm wrong, but I recall that you

5    testified that during the initial startup period at the

6    beginning of December, 2023, you were working continuously at

7    the Stony Brook site?

8    A.    Correct.

9    Q.    Do you recall how many times you worked there?

10   A.    For the first week, it was a three to four day consecutive

11   run, which would've been workable, billable, and then it was --

12   I think bi -- well twice a week, spot checks for about the

13   first six weeks.

14   Q.    Okay.  So when you say workable, billable, what does that

15   mean?

16   A.    As a paid employee within that scope of schedule of work.

17   Q.    Okay.  Okay.  So --

18          JUDGE GREEN:  I'm sorry, when you say billable, do

19   you mean billable to Parking Systems or billable to Stony

20   Brook?

21          THE WITNESS:  Sorry, that would be Stony Brook.

22          JUDGE GREEN:  Okay.

23          THE WITNESS:  Can I elaborate?

24   BY MR. JACKSON:

25   Q.    Sure.  So I guess worth noting as a supervisor, an account

1    executive, if I go to Joe's restaurant at 6:30 on a Saturday

2    night to check the facility, I wouldn't per se be clocking in

3    extensible to that client.

4            That would fall under my account executive role.  So

5    in this case, to be clear, that first week I was a billable

6    parking attendant, billable to Stony Brook.

7    Q.   You stayed at the Stony Brook at a hotel nearby?

8    A.   I did.  On campus.

9    Q.   Okay.

10   A.   The drive is extensive coming from Western Nassau.

11   Q.   Right.  It is true though that you only worked on the

12   clock at Stony Brook three times, correct?

13   A.   Not particularly.  I'd ask that we define, just so I

14   understand the question --

15   Q.   I'm talking about the billables that you refer to.

16   A.   Correct.

17   Q.   Okay.  And that was in the first week of December, right?

18   A.   Correct.

19   Q.   And then what was your role after that?  Well, first of

20   all, do you recall what exactly that was that you worked

21   billable hours for parking assistance at Stony Brook?

22   A.   Well, yeah.  So if we backtracked based on start date

23   December 1, it'd be 1st, 2nd, 3rd.

24   Q.   Okay.  And you testified that there were other managers

25   who were working there at the time, right?

654

```
 1   A.   That is correct.

 2   Q.   Is Jeff Gluck one of them?

 3   A.   Yes.

 4   Q.   You mentioned somebody by the name of Matt, one of the

 5   managers.

 6   A.   Matt Callari.

 7   Q.   How do you spell the last name?

 8   A.   C-A-L-L-A-R-I.

 9   Q.   Okay.  And then Ray Upton, right?

10   A.   Correct.

11   Q.   You also mentioned Andrew Goldsmith, Bobby Gust and Travis

12   Gilliland, but they worked there regularly, right?

13   A.   Correct.  They continued past that implementation date of

14   my work scope.

15   Q.   Any other managers who worked at the site during the

16   transition period?

17   A.   Yes.  Michael Petruzzelli.  Can we just repeat that active

18   list?

19   Q.   Yeah.  I said we had Matt Callari, Jeff Gluck, Ray Upton.

20   Now, Michael Petruzzelli in addition to Andrew Goldsmith, Bobby

21   Gust and Travis Gilliland.

22   A.   And you said Bobby Gust was on that list, right?

23   Q.   Yes.

24   A.   Okay.  I believe that sounds accurate.

25   Q.   Okay.  So bear with me for one moment.
```

1    A.    Sure.

2    Q.    Do you know whether Matt Callari did any billable work at

3    Stony Brook?

4    A.    I would say likely not.  He's regional.  Jeffrey --

5    Q.    What was his role there?

6    A.    He was helping to implement the initial procedures as

7    support.

8    Q.    He wasn't parking cars?

9    A.    He got in and out vehicles, but that wouldn't per se tie

10   to him being billable to the client.  To be clear, if there's a

11   line of cars and ownership or a regional manager watches that

12   line back up, I would be confident the answer is that he got in

13   the car and helped.

14   Q.    Are you aware that Jeff Gluck only worked at the site from

15   12/1 until 12/11, excuse me, till December 1 until December 15?

16         MR. MILMAN:  Objection.

17   BY MR. JACKSON:

18   Q.    Are you aware of that?

19         JUDGE GREEN:  What's the objection for?

20         MR. MILMAN:  Calls for speculation.  Asking them,

21   were you aware they worked a specific time nearly a year ago?

22         JUDGE GREEN:  Overruled.  If you know.

23   A.    If I wasn't on site, I wouldn't have knowledge of that.

24   BY MR. JACKSON:

25   Q.    Okay.  Were you on site at any time when you saw Jeff

1    Gluck working?

2    A.    On the 1st, 2nd and 3rd?  You're asking a very specific

3    question.  I wouldn't know the answer to that.

4    Q.    You don't recall?

5    A.    I do not recall.

6    Q.    Okay.  And then Mr. Andrew, what do you recall about

7    seeing him working there?

8    A.    So I could verify from my recollection that he was not

9    there 1st, 2nd or 3rd.  And he was brought in, I believe after

10   the opening first three days because I don't recall crossing

11   paths, but I know it was part of the rollout.

12   Q.    And Michael Petruzzelli, how many times did you see him

13   working there?

14   A.    I think he was there two of the three days that I was

15   there.

16   Q.    So correct me if I'm misunderstanding it, but is it your

17   testimony yesterday that you were -- Parking Systems was not

18   actively seeking employees to work at the Stony Brook site in

19   early December?

20              MR. MILMAN:  Objection.  Mischaracterizes the

21   witness' statement.

22              JUDGE GREEN:  Overruled.

23              MR. MILMAN:  It is misleading and it mischaracterizes

24   the record.

25              JUDGE GREEN:  If there's something that's wrong about

657

1    the question, let us know.

2    A.   Can you just repeat that, please?  Thank you.

3    BY MR. JACKSON:

4    Q.   Did you testify yesterday that Parking Systems was not

5    actively hiring employees to work at the Stony Brooks site in

6    early December?

7    A.   I don't believe that was the words that I had used.

8    Q.   Okay.  Is that true?  Was your company actively seeking to

9    hire people to work at the site in early December?

10   A.   Not early December.  Wave 2 hiring.

11   Q.   I'm sorry?

12   A.   Wave 2 hiring.  So beyond the initial rollout, we were

13   fully and adequately scheduled for Wave 1 for opening day

14   December 1st.

15   Q.   Including the managers that you said were working there on

16   a temporary basis, correct?

17   A.   Correct.

18   Q.   When did Wave 2 begin?

19   A.   Wave 2 would've been a loose --

20          JUDGE GREEN:  Sorry, there's a problem with the tape.

21          THE WITNESS:  Oh, sure.

22          JUDGE GREEN:  Okay.

23   BY MR. JACKSON:

24   Q.   Two to three weeks after you began operating?

25   A.   So about three to four.

1    Q.    Three to four weeks.   I'm presenting the witness with GC

2    Exhibit 10 and 11.

3    A.    Thank you.

4    Q.    These are job postings that Parking Systems posted on

5    Indeed, correct?

6    A.    That is correct.

7    Q.    And they're posted December 12th and December 16th, right?

8    A.    Correct.   Say those two dates again, just want to --

9    Q.    12 and 16, is it?

10   A.    That's correct, yes.

11   Q.    And your testimony is that Parking Systems was not

12   urgently hiring for these positions despite what's in the

13   document?

14   A.    I'm testifying that.

15   Q.    When did you first start advertising jobs at Stony Brook

16   University Hospital?

17   A.    I wouldn't be aware of that.

18   Q.    Do you know who would?

19   A.    Not particularly.

20   Q.    Who's in charge of soliciting job applicants at Parking

21   Systems?

22   A.    It would fall in the hands of a few potential individuals.

23   Should I list those out?

24   Q.    Please.

25   A.    So potentially Jeff Gluck, Matt Callari.   Depending on the

1  perspective regions, those two would be taking feedback from

2  account executives as to what the job posting needs would be.

3         MR. JACKSON:  Your Honor, I think we need to go off

4  the record to retrieve some documents.

5         JUDGE GREEN:  Off the record.

6     (Whereupon, a short recess was taken)

7  BY MR. JACKSON:

8  Q.  Mr. Candiotti, so you don't have any role in posting of

9  ads for job solicitation?

10 A.  No.  I do not.

11 Q.  So you're familiar with how the company does it?

12 A.  I know the process that I would use as an account

13 executive to request one.

14 Q.  Okay.  What's that process?

15 A.  So if I am going to request an ad to be opened in any

16 capacity, I report that to the Nassau Regional manager, Matt

17 Callari.  And then one would be activated.

18 Q.  Do you tell them what to post in the ad?

19 A.  Sometimes standardized, sometimes specific.  So yes and

20 no.

21 Q.  Okay.  Did you do that with respect to Stony Brooking

22 University Hospital?

23 A.  No.  I did not.

24 Q.  But other than that, just going to your regional manager

25 and telling them that an ad needs to be posted and perhaps

1    saying what should be in the ad.  You don't have any other role

2    in soliciting job applicants?

3    A.   No.  Not from an Indeed or job posting platform.

4    Q.   How did you know about deactivating and reactivating it?

5    A.   Because when discussed with Matt over the years of doing

6    this, he had a conversation at one point with one of the Indeed

7    reps because Indeed costs are tremendous.  It's wild what the

8    amounts accumulate to and running hundreds of locations

9    throughout many regions, it was something that was discussed to

10   evaluate how to handle those costs.

11          That's dating back 2020, 2021, and it was brought to

12   our attention that there were some ways instead of new ads to

13   do recycling of ads, that it would reduce costs.  So I do

14   remember that conversation many years ago.

15   Q.   Okay.  So your testimony yesterday about deactivating and

16   reactivating, that was based on a conversation you had with

17   Matt Callari?

18   A.   Correct.

19   Q.   So you don't know whether the company is actually doing

20   that on any particular instance?

21          MR. MILMAN:  Objection.

22          JUDGE GREEN:  Overruled.

23   A.   I -- no.  I wouldn't have direct knowledge of that.

24   BY MR. JACKSON:

25   Q.   Do you know whether there's still an ad, Parking Systems,

1    still has an ad posted on Indeed or any other platform for a

2    job at Stony Brook Hospital?

3    A.   I'm not aware if they do.

4    Q.   And again, you don't know when the company started

5    soliciting job applicants for the Stony Brook job?

6    A.   I'm not sure I understand what you mean by soliciting

7    Q.   You know, posting job applications, posting job

8    solicitations on Indeed or another platform.

9    A.   I'm not positive of that.

10   Q.   Is it true that Parking Systems continue to operate

11   substantially the same parking services as existed under

12   Classic, including serving the same types of hospital parking

13   needs?

14           MR. MILMAN:  Objection.  That's a compound question

15   on three factors.  I know what he's doing.  He's reading.  He's

16   reading into the record his --

17           JUDGE GREEN:  We've been through that.  We're not

18   going to do that again.  It's not -- I don't care.  I'm not

19   going to rely on something --

20           MR. MILMAN:  I object to form of the question.  I

21   mean, the question is a multipart question.

22           JUDGE GREEN:  So --A all right.  So can I hear it

23   again?

24   BY MR. JACKSON:

25   Q.   I'll withdraw the question and ask it in separate parts.

1    Is it true that Parking Systems continue to operate

2    substantially the same parking services operation as existed

3    under Classic Valet?

4    A.    No.  That would not be a true statement.

5    Q.    Is it true that you serve the same types of hospital

6    parking needs?

7                   MR. MILMAN:  Objection.  Needs is vague.

8                   JUDGE GREEN:  Overruled.  If you need clarification,

9    you could ask.

10                  THE WITNESS:  Yeah.  Can I get a little -- can that

11    be detailed?

12    BY MR. JACKSON:

13    Q.    Okay.  Do you serve the same types of customers?

14    A.    We would serve the same party of customers, yes.

15    Q.    Okay.  And you provided the same services in terms of

16    receiving customer's cars and returning them when the customers

17    were ready to leave, correct?

18    A.    No.  Completely different fashion, different ticketing

19    procedures, different documenting of damages, different

20    cashiering procedures, different car handling.  The entire --

21    that core would be completely different parties serviced, the

22    same operationally, completely different.

23    Q.    Okay.  So you -- okay.  You mentioned yesterday that you

24    improved or you changed the signage at certain of the valet

25    stations at the hospital, right?

1   A.    Yes.

2   Q.    Okay.  And you changed the way that cars are organized in

3   the lanes that are available, correct?

4   A.    Correct.

5   Q.    And those changes were designed to improve the customer

6   experience, correct?

7   A.    That's right.

8   Q.    And to your knowledge, are Parking Systems employees who

9   work at the hospital required to have a Stony Brook University

10  issued ID?

11  A.    Not an ID.  That's actually - yeah.  Interesting topic.

12  There is a challenging process to navigate that.  So they need

13  access cards.  Access cards have multiple formats.  So -- and

14  the reason, I know the depth of this is we had a hard time

15  acquiring them.

16        So what was expressed to us as being a simple form

17  document that would be submitted to HR approved by Dan or Nick

18  at the MAPS team was far from that.  Turns out that there's

19  roughly a two week turnaround for those tags.

20        The reason that difficulty came to light was our

21  model of integration means that if Josh is sick and doesn't

22  show up to work, that Billy comes in, but Billy is being pulled

23  from another location, so they would be arriving with a Parking

24  Systems ID, but they wouldn't have actual access to the

25  hospital.

1          So there's multiple IDs that get issued.  There's

2    photographic ones, which are potentially for the -- generally

3    they're going to get issued to the lot managers, so the ones

4    that are going to be potentially five, six days a week on site.

5          Then there was the SCADA RFID access cards, which are

6    actually a -- they're a five, so they'll get you into access to

7    use the restrooms coffee break room as well as the gate arms

8    that are -- it's private lots, so gate arms, and then there is

9    a non-photo -- it looks -- it is a plastic card.

10         It works with SCADA RFID data and it's an access

11   card, but it's not an employee badge to be clear.

12   Q.   Okay.  So in that situation that you referenced,

13   hypothetically when Billy has to sub for Josh, how does Billy

14   get the access?

15   A.   Using one of the non-specific non-photo fobs.  We sign

16   them in and out.  So at the beginning of the shift, Fob Number

17   3 would get issued to Joe.

18         Joe would sign in at 6:01 a.m.,he took or she took or

19   they took that fob and they would've to sign that back in at

20   the end, handing that back into management.

21   Q.   What process do you have to follow?  Well, first of all,

22   let me withdraw that.  Did you have to notify the hospital

23   about who you were bringing into their campus?

24   A.   No.  Based on the contract, we were told that as long as

25   they met the provisions of whatever was in that contract.  So

1  background checks, authorized licenses, trained and registered

2  on all the medical specific needs that would be required that

3  they were allowed to be employed.

4  Q.   Okay.  You said you visited the hospital site three times

5  before December 1; is that right?

6  A.   That's correct.

7  Q.   Do you remember when those times were?

8  A.   Not specific days.

9  Q.   Was it in November?

10 A.   Yeah.  That sounds accurate.

11 Q.   Did you ever see Travis passing out cards to employees

12 there?

13 A.   No.

14 Q.   You're aware he did that though, right?

15 A.   I believe he did that.

16 Q.   Had you --

17 A.   But I did witness that first time, to be clear.

18 Q.   And Bobby Gust told you that he was going to instruct

19 Travis to do that, right?

20       MR. MILMAN:  Sorry, Your Honor, I couldn't hear the

21 question.

22 BY MR. JACKSON:

23 Q.   Okay.  I'll speak louder.  Bobby Gust told you that he was

24 instructing Travis to distribute the cards, right?

25 A.   I don't know if that was my recollection of it.  I'm not

1    saying that that's not the case, but I think I was -- my

2    recollection now is that we were getting QR submissions, so

3    somehow that QR was distributed.  I don't know if that was the

4    specific sequence that you're referring to now.

5    Q.    Okay.  Well, Bobby Gust told you that he was going to send

6    Travis to distribute cars to Classic employees, and you said

7    thank you, Bobby.  Do you remember that?

8    A.    Not particularly, not saying that it did not occur, but as

9    you're asking on top of my head, if I remember a conversation

10   of that, the answer would be no.  I don't recall that.

11   Q.    I'm going to present the witness with GC-13.

12          MR. MAURO:  It's an email text.

13   BY MR. JACKSON:

14   Q.    Refresh your recollection about the communications you had

15   with Mr. Gust about the QR cards.

16   A.    Yes, this is correct.

17   Q.    Do you recall when this was approximately?

18   A.    It only has a current date, so no.

19   Q.    You don't recall?

20   A.    No.  I wouldn't know what date for this specific

21   conversation.

22   Q.    Okay.  Do you know who Richard is referred to in the first

23   text that appears in the document?

24   A.    Yes.  Richard would be the former Classic operations

25   manager at Stony Brook University.  Correct.

1    Q.    Okay.  When you visited the campus, did you follow Richard

2    around?

3    A.    I did not.

4    Q.    Okay.

5    A.    I met him.  I didn't do a full day tour.

6    Q.    Okay.  What were your observations?  Well, how did you

7    observe -- did you -- well, strike that.  Did you observe

8    Richard in the performance of his duties?

9    A.    Yes.  I watched him for a small window of time at the

10   front door.  I saw him operating at the front main entrance.

11   Q.    Okay.  What'd you see him doing?

12   A.    He was facilitating cars through the drive while he was

13   speaking to a few customers.  Fulfilling is what I guess his

14   general day to day duties would've been at that time.

15   Q.    Okay.  And how long did you spend observing him at the

16   main entrance, if you could estimate?

17   A.    45 minutes, I think.

18   Q.    And how do you know who he was radioing?

19          MR. MILMAN:  Judge, I can't hear the question.

20   BY MR. JACKSON:

21   Q.    How do you know who he was radioing?

22   A.    Because you heard the communication.

23   Q.    What'd you hear?

24   A.    So there was -- I believe there was car that maybe did not

25   have a key left with the vehicle.  He communicated to inside

1    about something in the drive aisle.  I believe someone took

2    that key fob, not entirely sure.

3           But we knew the communication was towards the MAPS

4    team who's speaking to Dan, Nick and Dan and Nick had mentioned

5    in the MAPS meetings that there was communication to him as the

6    facility manager on the track – I did not witness it going out,

7    but I vaguely remember it coming in meaning in from Richard

8    into MAPS.

9    Q.    So you recall hearing Richard radioing into the MAPS team?

10   A.    Yes.

11   Q.    That was during the time you were observing him in the

12   main entrance?

13   A.    Yes.

14   Q.    Okay.  Did you observe him using the radio otherwise

15   during that -- did you observe him using the radio otherwise

16   during that 45-minute period?

17   A.    No.

18   Q.    It is your testimony that Parking Systems does not hire

19   employees of a predecessor employer after taking over the

20   operation; is that correct?

21          MR. MILMAN:  Objection.  That oversimplifies his

22   answer.

23          JUDGE GREEN:  Overruled.

24   A.    That would not be my statement.  My statement would be

25   that we don't do a migration on a transition taking over.  So

1    if I understand your question right, you're asking if we ever

2    employ someone after the point that they worked at a previous

3    company or facility?

4    BY MR. JACKSON:

5    Q.    Oh, no I thought you emphasized repeatedly yesterday that

6    that is not your business model.  Parking Systems does not hire

7    predecessor employees to start new operation; is that correct?

8    A.    No.  That is incorrect.  Not as a mass migration onboard.

9    So to be clear, if you have worked -- if you come in today

10   applying for a job, and it's mentioned that you have worked at

11   Stony Brook under Classic, we would not exclude you from an

12   opportunity to work for the company.

13         You would not start Day 1 though with a migration of

14   existing staff and just take over.  Our model is not just

15   replacing the person, we replace the entire operation and

16   procedures.  So it's best to do that on a clean slate with

17   experienced Parking Systems attendants.

18   Q.    So you're -- so Parking Systems policy is to -- when

19   you're starting a new operation, you don't consider any of the

20   predecessor employees.  That's a matter of policy?

21   A.    That is correct.

22   Q.    And that's always been the policy

23   A.    As far as long as I can recall, 14 years, yes.

24   Q.    It was the policy in October of 2023?

25   A.    It was, yes.  Yeah.

1   Q.   Okay.

2              JUDGE GREEN:  Can I just get a little clarification

3   on that?

4              MR. JACKSON:  Yeah.

5              JUDGE GREEN:  Because I'm a little confused on that?

6              MR. JACKSON:  Sure.

7              JUDGE GREEN:  So did you say that Parking Systems

8   does not exclude predecessor contractor employees from joining?

9              THE WITNESS:  Yes.  That would be a correct

10  statement.  We wouldn't do that.  So an Indeed application

11  comes in, it says Classic Valet.

12             JUDGE GREEN:  Right.

13             THE WITNESS:  We wouldn't say, oh, they weren't for

14  another company, we're not interested.  That wouldn't exclude

15  them from coming in for an entity.

16             JUDGE GREEN:  So you wouldn't say they worked for

17  Classic at Stony Brook, so we're not considering them?

18             THE WITNESS:  Correct.  Not in a post

19  operationalizing state.  If candidates were coming in, let's

20  say a short window in, probably not.  But after we've rolled

21  out our operation, we would not have any hesitation to take

22  processors.

23             JUDGE GREEN:  Okay.

24  BY MR. JACKSON:

25  Q.   How much time has to pass before you would consider a

1  predecessor employee?

2  A.   It is -- great question.  It would definitely vary site to

3  site.  It depends if it's a two-person -- o as an example, if

4  it's a two-person restaurant, that window potentially needs to

5  be longer because you're working with a small group.

6           So that could be more challenging.  If you're working

7  with a large scale operation, there's a potential that you can

8  dwindle in at a shorter period of time.

9           It would depend on the requirements of the location.

10 I don't think we actually have a set date in place that I can

11 say for that.

12 Q.   Isn't it true that in October, 2023 you were looking to

13 retain some of parking -- some of the Classic employees?

14 A.   No.

15 Q.   I going to present the witness with GC-15.

16 A.   Thank you.

17 Q.   Isn't it true that Andrew Goldsmith in October 27th was

18 contacting you about communicating with Classic employees about

19 jobs?

20 A.   Yes.  This email came to me, correct?

21 Q.   Right.  And that's what Andrew was talking about, reaching

22 out to Classic employees about job opportunities.

23 A.   He asked that question.  Correct.

24 Q.   And your response is reflected in GC-15?

25 A.   I -- yes.  My response --

1  Q.    In this, it's highlighted in the original.

2  A.    Yes.

3  Q.    This is a black and white copy, but you can still see the

4  highlights.  That's your responses in the highlight, right?

5  A.    Have we confirmed the schedule yet?  We should mock it up

6  and see how many staff members we need.  That was my response.

7  Q.    And it's your understanding that Parking System doesn't

8  hire predecessor employees to start an operation.  It's

9  imperative because it's not a -- right?

10  A.    Correct.

11        MR. MILMAN:   Objection.  Oversimplifies the witness'

12  answer.  You went through a litany reasons over an hour of

13  testimony.

14        JUDGE GREEN:   It's overruled.  These are questions

15  the witness can correct --

16        MR. JACKSON:   And again, Your Honor, I'm going to

17  object to Mr. Milman's speaking objections.  He's coaching his

18  witness.

19        MR. MILMAN:   I'm not coaching my witness.

20        JUDGE GREEN:   That's not -- that was not coaching.

21  Here's what I don't want, right?  So objections, relevance,

22  authenticity, hearsay, those are appropriate objections and

23  even some additional explanation.

24        If there is an objection and then an explanation as

25  to what the answer should be, that we do not want.  That's

1    inappropriate and it's not good for the witness because if they

2    then end up parroting the attorney, then it's a problem with

3    credibility.

4                MR. MILMAN:  I understand.  That's not what happened

5    there.

6                JUDGE GREEN:  That's not what happened.  I'm just

7    telling you.

8                MR. MILMAN:  I agree.  My only concern, Your Honor,

9    is I understand if you on cross examination, if any attorney

10   needs clarification understood.  I understand they want to

11   impeach the witness.  Understood.  But mischaracterizing what

12   the witnesses said is a different story, Your Honor.

13               JUDGE GREEN:  No, no.  On cross, the attorney is

14   allowed to ask leading questions and if the witness does not

15   agree with the fairness, they can say so as long as it doesn't

16   assume a fact not in evidence.

17               MR. MILMAN:  It's going to lead to a longer redirect.

18               JUDGE GREEN:  Okay.  So go back to the question.  The

19   objection's overruled.

20   BY MR. JACKSON:

21   Q.   Right.  And your answer was that you understand the policy

22   to not hire predecessor employees is in place because hiring

23   them would be ineffective?

24   A.   Yes.

25   Q.   And you referenced some statistics that bear that out.

1    A.    Correct.

2    Q.    Okay.  What statistics are those?

3    A.    So you'd be looking at a window of many years of doing

4    that and having poor results.  So not being able to -- without

5    a lot of strain and confrontation and frankly turnover of

6    changing habits and culture.

7            If you -- even on a more general level, you're a --

8    simple level, you're asking people who have done the same habit

9    or task for years to now do it completely differently.  It's

10   not easy.  I know on a personal level for a variety of just

11   general training techniques in triathlon, that that's not easy.

12           Habits are very difficult to break.  You know, you

13   could look on all the scientific and clinical trials of all

14   that, but I mean the reality is we're talking on a much simpler

15   level.  Your question pertaining to the parking lot would be

16   that yes, breaking key handling issues, breaking time and

17   attendance concerns that weren't monitored in the past.

18           Changing tip procedures, which might not benefit them

19   depending on what facility they were working.  It might be good

20   for the other three posts, but if they were at the holy grail

21   post and now they're divvying up the way that their gratuities

22   get handled, it's a really, really hard transition to

23   effectively execute.  I will give an example too, if I may.

24           JUDGE GREEN:  So really the question is about the

25   statistics.  So when you were referring to statistics, what are

1   your statistics?  What were you referring to?

2          THE WITNESS:  Accounts that were before my time of 14

3   years ago coming to this company that were migrated over --

4   with existing staff and resulted in failed operations.

5   BY MR. JACKSON:

6   Q.   And how many times did that occur?

7   A.   I wouldn't be party to that.

8   Q.   Can you name one example of that happening?

9   A.   No.  It was prior to my joining.  I was never party to

10  that policy.  That policy has been in place for a very long

11  time.

12  Q.   You said you have some kind of involvement in payroll,

13  it's probably your account executive duties, correct?

14  A.   That's correct.

15  Q.   Okay.  And Parking Systems keeps records of who's working

16  what hours at each of its site, correct?

17  A.   That's correct.

18  Q.   So if an employee -- well, let me ask you this.  Do you

19  know whether employees are regularly stationed to work at Stony

20  Brook University Hospital on a regular and recurring basis?

21  A.   Are you asking attendance scheduled?

22  Q.   Yeah.  Are they scheduled to work on a regular and

23  recurring basis?  You know, like employee Joe Smith, where it's

24  Monday, Tuesday, and Thursday at Stony Brook University

25  Hospital?

1   A.   No.  Generally that's not scheduled.

2   Q.   That's not how your schedule works?

3   A.   No.  Wednesday, we generally send out the weekly schedule

4   for the week ahead.

5   Q.   Okay.  So would you be surprised to learn that there are

6   several employees who work regularly, consistently every week

7   at Stony Brook University Hospital for Parking Systems?

8   A.   No.  But it's not by default.  Are you asking the process,

9   are you saying that, does someone have a month where they're

10  working the same schedule?

11  Q.   Not a month.

12  A.   A year?

13  Q.   Yeah.  A year, six months.

14  A.   So you have standard availability.  You might be scheduled

15  weekly for that schedule to be the same the following week.  We

16  don't intentionally try to -- if someone's comfortable with the

17  schedule and it fits their mix of their lifestyle, they may be

18  reoccurring it, but it's not by default.

19        I'd love to see a day where my staff just

20  reoccurringly goes in, no days off.  No -- there's a weekly

21  schedule.

22  Q.   So you're saying that you reinvent the weekly schedule

23  every week?

24  A.   Yes.

25  Q.   It's not like there are --

```
 1   A.    Every Wednesday.

 2   Q.    Okay.

 3   A.    I tried to find a little more automation for it.  I

 4   haven't found the solution yet.

 5   Q.    So if an employee who frequently works at Stony Brook was

 6   assigned to work at other locations, the company would have

 7   records to show that, right?

 8   A.    Yes.

 9   Q.    Okay.  I just have one other thing I think I need to ask

10   you, Mr. Candiotti.  When you attended the meeting with Francis

11   Gil Reyes at Jake's 58, you heard Bobby Gust tell her that she

12   could give her a list of people who Francis would recommend?

13   A.    Yes, I did.

14   Q.    Yes.  And you understood that Bobby was telling her that

15   he would hire -- he would consider hiring those people in

16   addition to Francis, correct?

17   A.    That is not what I understood that offered.

18   Q.    Okay.

19   A.    To be clear on what my understanding was, it was a

20   sympathetic gesture of someone that was clearly on the other

21   end of the table and had some concern about what she considered

22   to be a family.  And it was a very, very nice false hope

23   gesture that we would collect those names and actually have

24   success to follow.

25   Q.    What's a false hope gesture?
```

1  A.   It was the request to collect those names, frankly,

2  knowing that we don't operate and that we don't onboard those

3  staff members and that we were already fighting very, very hard

4  just to get the approval for one.

5  Q.   Okay.  So you told her to give her names for job

6  applicants, knowing that you wouldn't consider them?

7  A.   Bobby had asked that if there was family members of her,

8  that she was very, very, very concerned about that he would

9  collect those names and give it back to the office.  He was not

10  able to make any promises and that was very, very clear.

11  Q.   I was mistaken.  I have one more thing I want to ask you

12  about.  Are you aware that that Parking Systems trained

13  employees to work at Stony Brook at Jake's 58?

14  A.   Yes.

15  Q.   Yeah.  Okay.  And is the operation at Jake's 58 the same

16  as the operation at Stony Brook you intended to?

17  A.   No.

18  Q.   Okay.  So how is training them at Jake's 58 going to be

19  effective for Stony Brook if you have all these unique

20  procedures at Stony Brook?

21  A.   So our training processes are generally not on site.

22  There's two types of training.  There's corporate training,

23  which takes place in a remote setting.  Might be at our Valley

24  Stream headquarters, might be at any of our facilities that

25  have office space.

1           We don't want to bring everybody to the furthest

2     distance.  We use our facilities and leverage part of our

3     abilities to use their workspaces.

4           So that's all corporate training policies and

5     procedures that a Parking System specific.  Onsite training for

6     that specific parking lot pales in comparison to the training

7     that we would do on the company level.

8     Q.    Why were you training employees at Jake's 58 to go work at

9     Stony Brook?

10    A.    Because that would've been a hub for our corporate

11    training.  It wouldn't have been lot specific.  It would've

12    been corporate specific Parking Systems policies and

13    procedures.

14    Q.    Okay.

15    A.    But --

16    Q.    I mean, did you have something to add?

17    A.    Yeah.  Our corporate training takes place often for

18    Western Nassau at our Valley Stream office.  It's not a parking

19    lot.  That's corporate training.  So Jake's 58 is a hub where

20    we host that corporate training.

21    Q.    Oh, you have an office in Jake's 58?

22    A.    We do.  We have office space.

23    Q.    Okay.  Do you have access to that office space anytime.

24    A.    We'd usually have to pre-schedule it have to verify that

25    it wasn't double book.  It's not a rented space bars.

680

1    Q.    But it's not dedicated for you?

2    A.    Correct.  It's common space that upon availability, we can

3    schedule our trainings to be active there.  Yeah.

4    Q.    And is the corporate training the primary training that

5    you did for employees to work at Stony Brook?

6    A.    Correct.

7    Q.    No onsite hands-on training?

8    A.    There would've been supplemental training.  But that

9    onsite --

10   Q.    Onsite at the hospital campus?

11   A.    Correct.  That would take place after they've been brought

12   through corporate training.  Corporate training is also going

13   to help cover a lot of the New York state requirements such as

14   harassment training, and even just sick, paid leave provisions.

15         We go through that on the corporate training.  It's

16   not parking lot specific and we wouldn't need to be on the

17   pavement in 95 degree heat to go through those provisions.

18         And you sometimes, depending on the mechanism you're

19   using, are often going to need a desktop.

20   Q.    Do you know how many people you trained at Jake's 58 to

21   prepare them for Stony Brook?

22   A.    I would not know that.

23   Q.    Do you know who did that work?

24   A.    I would not know who executed those specific trainings.

25   Q.    Do you know who is in charge of training people to get

1    ready for Stony Brook?

2    A.    Generally, it's going to fall on the account executive to

3    host the company training platforms for their locations.

4    Q.    That was Andrew?

5    A.    Yeah.  In this case for Stony Brook should have been

6    Andrew, yes.

7              MR. JACKSON:  No further questions, Judge.

8              JUDGE GREEN:  Thank you.  Anything from the Union?

9              MR. ROCCO:  Yes, Your Honor.  Can I just get a quick

10    restroom break?

11             JUDGE GREEN:  Yes.  You can take a restroom break as

12    well.

13             THE WITNESS:  Thank you.

14        (Whereupon, a short recess was taken)

15             JUDGE GREEN:  Back on the record.  And the Union

16    attorney is going to have some questions for you.

17                           CROSS EXAMINATION

18    BY MR. ROCCO:

19    Q.    Okay.  Good afternoon, Mr. Candiotti.  I just have some

20    questions for you.  Did you begin working for Parking Systems

21    in 2011?

22             MR. MILMAN:  Objection.

23             JUDGE GREEN:  Overruled.  I think it was --

24    A.    Yeah.  June, 2011, I believe.

25    BY MR. ROCCO:

1    Q.    And that was at a beach club?

2    A.    That's correct.

3    Q.    Okay.  And when you started working for Parking Systems,

4    did you only work at the Beach Club location?

5    A.    No.  For the first two or three weeks, I think by the

6    third week I had taken an extra shift down the block at a

7    nighttime catering hall.

8    Q.    Okay.  And how'd you get the job?

9    A.    Actually was -- didn't make Wave 1 cut and about four

10    weeks into the summer, which is why I didn't get to start from

11    Memorial Day.

12            There were a handful of attendance that didn't keep

13    up pace.  And I actually got a call back.  So I had applied for

14    the job, did not get the initial summer position, and then

15    started in June as opposed to Memorial Day.

16    Q.    Okay.  And do you remember how you applied for the job?

17    A.    So I believe it was through the -- I think -- I believe

18    through Hewlett High School.  Actually had like a summer work

19    program for the students that were leaving high school,

20    graduating and moving on to college.

21            I had stayed locally, so I actually explored that.

22    And one of them was a local parking company that was one town

23    over.

24    Q.    Okay.  And at the time you got the job at Parking Systems

25    in 2011, were you -- you were graduating high school at that

1    point?

2    A.    Yes.  I was beginning my work career at Nassau Community

3    College.

4    Q.    Okay.  And eventually you left Nassau Community College to

5    pursue a full-time job with Parking Systems?

6    A.    That is accurate.

7    Q.    And since that time, you've only worked for Parking

8    Systems as a full-time employee?

9    A.    Correct.

10   Q.    Okay.  And do you currently work with an individual named

11   Andrew Goldsmith?

12   A.    I do.

13   Q.    Okay.  And is Andrew Goldsmith part of Parking Systems

14   management team?

15   A.    He is.

16   Q.    Okay.  And is Andrew aware of Parking Systems policies and

17   procedures?

18   A.    Yes.

19   Q.    And has Andrew Goldsmith dealt with situations where he's

20   helped get a new account up and running?

21   A.    Yes.

22   Q.    And the Stony Brook account is an important account for

23   Parking Systems?

24   A.    I'd say so, yes.

25   Q.    And would you consider the Stony Brook account to be a

684

1   prestigious account?

2              MR. MILMAN:  Objection.  I think important is enough.

3              JUDGE GREEN:  Overruled.

4   A.   I would say yes.

5   BY MR. ROCCO:

6   Q.   And Andrew Goldsmith was -- is responsible for the Stony

7   Brook account?

8              MR. MILMAN:  Objection.  Responsible is vague.

9   There's been testimony of numerous layers and individuals.

10             JUDGE GREEN:  Okay.  Objection is --

11             MR. MILMAN:  It's vague.  It's vague.  I had -- it's

12  a vague question.  That's my objection.

13             JUDGE GREEN:  Overruled.

14  A.   He's one of the managers, yes.  He's an account executive

15  and has accountability.

16  BY MR. ROCCO:

17  Q.   And as an account executive is part of -- is art of Mr.

18  Goldsmith's responsibilities for the Stony Brook account?

19  A.   Yes.  That is one of.

20  Q.   And Andrew Goldsmith was part of the Stony Brook

21  implementation team?

22  A.   That's correct.

23  Q.   And you were part of the Stony Brook implementation team?

24  A.   That is correct.

25  Q.   And you were working with Andrew Goldsmith to successfully

1  get Parking Systems up and running by December 1st, 2023 at

2  Stony Brook Hospital?

3  A.   Correct.

4  Q.   Okay.  And as part of the implementation prior to December

5  1st, 2023, you exchanged several emails with Andrew Goldsmith?

6  A.   Yes.

7           MR. ROCCO:  Okay.  Can we show the witness GC-15?

8           MR. JACKSON:  I think it's up there before you,

9  Q.   Yeah.  Okay.  If you have GC-15, let the record show that

10  the witness is reviewing what's in evidence is GC-15.  It's an

11  email printed from Bobby Gust Parking Systems.com.  The top

12  says from Josh Candiotti Friday, October 27th, 2023.

13           And below it there's an email from Andrew Goldsmith,

14  sent Tuesday, October 24th, 2023 to among others of Michael

15  Petruzzelli, CC, Josh Candiotti.  Do you have the document in

16  front of you, Mr. Candiotti?

17  A.   I do.

18  Q.   Can I focus your attention on the October 24th, 2023 email

19  from Andrew Goldsmith that begins on the second half of Page 4?

20  A.   Okay.  Sorry.  So Yeah.  Which would be to be clear in

21  this document labeled Page 2?

22  Q.   Yes.

23  A.   Okay.  Okay.

24  Q.   And you testified that Mr. Goldsmith was a member of the

25  implementation team?

1    A.    That is correct.

2    Q.    And you testified that Mr. Goldsmith is proficient in

3    Parking Systems policies and procedures?

4    A.    Yes.

5    Q.    Okay.  Does Mr. Goldsmith write, when are we allowed to

6    contact members of the other valet company's staff?  I feel

7    like this is the biggest domino right now.  Once we figure out

8    how many we're retaining, we can then hyper-focus on hiring.

9          We've been continuously interviewing and hiring over

10   the last few weeks.  We need a targeted number we need to hire

11   to go along with the staff we already have in place to move

12   over once we start.  Talking to Richard, he has 32 staff

13   members.  Is that what Mr. Goldsmith wrote?

14         MR. MILMAN:  Objection.  You read it to the record.

15   Obviously, it's what he wrote.

16         JUDGE GREEN:  Okay.  It's -- yeah.  Let's just move

17   on.  You don't need them to confirm it.

18   BY MR. ROCCO:

19   Q.    And focusing your attention on the top half the -- of GC-

20   27, you -- GC-15, did you respond to Mr. Goldsmith's email on

21   October 27th, 2023?

22   A.    I did.

23   Q.    And is your response contained in the highlighted portion

24   at the end?

25   A.    Yes.  That's correct.

1    Q.    Okay.  And this -- and in response to Mr. Goldsmith's

2    point in number one, did you write, we confirmed the schedule,

3    yet we should mock it up and see how many staff members are

4    needed?

5    A.    I did.

6    Q.    And one reason you don't like to immediately or Parking

7    System doesn't like to immediately retain new employees is that

8    old habits are hard to break?

9    A.    That's correct.

10    Q.    And you prefer to implement Parking Systems culture?

11    A.    That's correct.

12    Q.    And is the culture in the workplace influenced heavily in

13    your view by the manager?

14    A.    I would say so.  I think it extends to hierarchy.

15    Everything's leadership on top, right?  So that comes from the

16    president of any organization.  If you look at successful,

17    impressive businesses, anything small from Parking Systems up

18    to Fortune 500, that's leadership from the top.

19            So a manager is definitely part of that, but it

20    extends much beyond that, I would say.

21    Q.    Okay.  And Mr. Goldsmith wrote to you in Bullet Point

22    Number 2, are we entertaining the idea of retaining Richard,

23    the supervising manager from Classic?

24    A.    You said up?  Correct.

25    Q.    Okay.  And you responded in the parentheses and highlight

1  next to that, that's your response, right?

2  A.    That's correct.

3  Q.    And you responded to Andrew Goldsmith should put him in

4  through staff training in our office, right?

5  A.    That is correct.

6  Q.    Okay.  So you agreed that Richard could be trained and

7  retained?

8  A.    No.  I would not say that I agreed to that.

9  Q.    Did you testify earlier that the first time you became

10 aware that Classic Valet staff was unionized was around

11 November 9th, 2023?

12 A.    Yes.

13 Q.    Can the witness be shown, please, GC-17?  Okay.  Let the

14 record reflect that the witness is reviewing what's in evidence

15 as General Counsel 17.  It's a four page document beginning

16 with an email from Matt Rocco beginning on Page 3, and then a

17 series of responses on Page 2 from Josh Candiotti, Bobby Gust.

18         And then on Page 1, Jonathan Baron and Josh

19 Candiotti.  Mr. Candiotti, did you -- through this email, did

20 you instruct Travis and Andrew to please halt any

21 conversations?

22 A.    Yes.

23 Q.    Okay.  And does this email demonstrate to you that

24 Jonathan Baron suggested a Teams meeting on November 10th,

25 2023?

1    A.    Yes.

2    Q.    And did you in fact have a Teams meeting on November 10th,

3    2023?

4    A.    I would assume so.

5    Q.    And that team's meeting was in response to receiving the

6    Union's request for recognition on November 9th, 2023?

7    A.    I would assume so.

8    Q.    And are you aware that the same day that Parking Systems

9    had this Teams meeting, it put up its first ad on Indeed for

10   soliciting hires for the Stony Brook University location?

11   A.    I'm not particularly aware of that.

12   Q.    You testified in your direct examination about processes

13   for Indeed, right?  Do you recall that?

14   A.    I do.

15   Q.    And you don't recall whether the first ad was put up on

16   November 10th, '23?

17              MR. MILMAN:  Asked and answered, Your Honor.

18              JUDGE GREEN:  Overruled.

19   A.    I do not recall that.

20   BY MR. ROCCO:

21   Q.    But you were on the implementation team for Stony Brook,

22   right?

23   A.    I was.

24   Q.    And part of it -- being on the implementation team was

25   hiring and staffing the location for December 1st, 2023 start?

1    A.    Not particularly for myself.  I was tasked with processes

2    and training.

3    Q.    Okay.

4    A.    I was actually not one of the specific interviewers and

5    recruitments for that.

6    Q.    Well -- and is it a fact that an ad that's reposted on

7    Indeed in your professional opinion gets more applicants than

8    an older ad?

9    A.    If -- are you saying one that's been posted recently

10   versus one that's become stale?

11   Q.    Correct.

12   A.    Yes.  Generally speaking, it's a cost effective way to get

13   you traction.

14   Q.    And is Parking Systems frequently used?  Did you testify

15   and direct that Parking Systems frequently uses a marquee

16   account like Stony Brook as an ad to attract applicants even

17   though you're actually hiring for somewhere else?

18   A.    Yes.

19   Q.    Okay.  And is this done all the time?

20   A.    It is.  It's standard procedure that we would get some

21   flagship recognition out of --

22   Q.    Okay.

23   A.    -- a large organization names.

24   Q.    Okay.  Other than any ads put up for Stony Brook -- hiring

25   for Stony Brook University in November, 2023, are you aware of

1  any other ads the Parking Systems has ever run on Indeed

2  advertising work at Stony Brook University?

3  A.    Just say that again, please.

4  Q.    I said other than ads that Parking Systems put on Indeed

5  in November, 2023, are you aware of any other times that

6  Parking System has run an ad on an Indeed referencing that they

7  were hiring at Stony Brook University?

8  A.    I would not be aware of that.

9  Q.    Okay.  You testified earlier that when Parking System

10  takes over an account, they don't hire the predecessor

11  employees right away.

12        MR. MILMAN:  Objection.  Ask and answered at least a

13  half a dozen times, Your Honor.

14        JUDGE GREEN:  Overruled.

15  A.    Can you restate that, please?

16  BY MR. ROCCO:

17  Q.    You testified previously that when Parking Systems takes

18  over an account, they never hire -- they never immediately hire

19  the predecessor employees.

20  A.    That is correct.

21  Q.    And that's because it's not a recipe for success?

22  A.    That's correct.

23  Q.    And you have data that shows it's not a recipe for

24  success?

25        MR. MILMAN:  Objection.

```
 1                 JUDGE GREEN:  Overruled.
 2    A.    Yes.  We have long-term data showing that that is not an
 3    effective method.
 4    BY MR. ROCCO:
 5    Q.    Okay.  And if I could just ask you to take a look on -- at
 6    GC-15 again.  On Page 1 when response to Andrew Goldsmith's
 7    suggestion that contacting members of the valet staff is the
 8    biggest domino, figuring out how many we're retaining targeted
 9    number to hire.
10                 When you wrote back to Mr. Goldsmith, you didn't push
11    back on his suggestion about hiring or retaining any of the
12    employees, right?
13                 MR. MILMAN:  Objection.  Goes to form push back,
14    could be more clear on the question.
15                 JUDGE GREEN:  Overruled.
16    A.    So I gave a brief answer that was asking about the
17    schedule.  It was in my evaluation of this that what he was
18    mentioning was a non-issue.
19                 We had no intention of hiring those people.  He was
20    asking a question that was irrelevant and a mistake.  And
21    despite being a manager for a long time, he did make a mistake.
22                 This was not what we were going to actually do.
23    There was no relevance in even getting it.
24    Q.    Well, how do you know he made a mistake?
25    A.    Because that's not company procedure.
```

1  Q.   But you didn't write any -- you didn't give any written

2  pushback in this email, right?

3  A.   That would be a correct sir.

4  Q.   And in Paragraph 2, when Mr. Goldsmith suggested that he

5  was entertaining the idea of Richard, your response was should

6  put him in through staff training in our office, right?

7  A.   That's correct.

8  Q.   Okay.

9  A.   Richard was applying to be working at another site.  He'd

10 actually been a customer at Jake's 58.  We had a relationship

11 with him at that site and he had requested with Classic,

12 apparently to him potentially not getting in touch with him

13 that he'd be seeking an alternate opportunity.

14 Q.   And eventually you Parking Systems, not you, but Parking

15 Systems did hire former Classic employees at Stony Brook

16 University?

17 A.   I am not positive if that did or did not occur.

18 Q.   Okay.  So you don't know whether, as we sit here today,

19 there's any Parking Systems employees or any former Classic

20 Valet employees currently working for Parking Systems at Stony

21 Brook?

22         MR. MILMAN:  Objection.  Asked and answered.  The

23 only difference of the question he said that you're sitting

24 here today.  It was the exact same question except ad libbed by

25 as you're sitting here today.  Asked and answered, Your Honor.

```
1              JUDGE GREEN:  All right.  Sustained.
2    BY MR. ROCCO:
3    Q.   Is Stony Brook University Hospital -- would you
4    characterize that as a large account for Parking Systems?
5              MR. MILMAN:  Objection, form.
6              JUDGE GREEN:  Overruled.
7              MR. MILMAN:  Large account.
8    A.   I -- not particularly.  And frankly probably -- I'd say
9    probably not.  Depends on how you'd be analyzing large, right?
10   So how are you -- how are you examining that data?  It's a
11   little too broad to make that statement.
12   BY MR. ROCCO:
13   Q.   I'm just asking for your characterization based on your
14   many years working for Parking Systems, whether you view it as
15   a large account in your business.
16   A.   I'd say it's a midsize account.
17   Q.   Okay.  Larger than, say a typical restaurant that Parking
18   Systems would handle in your jurisdiction?
19   A.   Comparable to some.
20   Q.   Most?
21   A.   Yeah.  Comparable to most.
22   Q.   And when Parking Systems hires employees, they -- when
23   they post for jobs, if you're aware, they ask about prior valet
24   experience, right?
25   A.   That's not particularly correct.
```

1   Q.   No?

2   A.   No.

3   Q.   So even on the inquiries that are part of the scan QR code

4   from some of the cards, they don't ask about prior valet

5   experience?

6   A.   Actually, that'd be right.  It might not be a question

7   that we particularly ask in the interview.  It might be an

8   intake form.

9   Q.   Okay.  And you -- does Parking Systems consider prior

10  valet experience positive when hiring new employees?

11  A.   I think it would depend on their experience.  I think it

12  would be on a case to case basis.

13  Q.   You testified on direct examination about Parking Systems

14  account at Nassau Coliseum.  Do you recall that testimony?

15  A.   Yes.  Yeah.

16  Q.   And is the account at Nassau Coliseum within your

17  jurisdiction as the manager for Western Nassau County?

18  A.   No.  Actually that is not an account that I'm listed as an

19  account executive for.

20  Q.   Okay.  Was it ever an account you were listed as the

21  account executive for?

22  A.   No.

23  Q.   And the employees who work at the Nassau Coliseum do

24  parking and traffic flow for events at the Coliseum, right?

25  A.   That is correct.

1    Q.    Okay.  And when these employees are not working for

2    Parking Systems at Nassau Coliseum, they work for Parking

3    Systems at other locations?

4    A.    That would be accurate.

5    Q.    So in some cases the employees who work for Parking

6    Systems at Nassau Policy work for Parking Systems at more than

7    one other location?

8    A.    That could be correct.

9    Q.    So in that instance, Parking Systems -- you testified

10   earlier that Parking Systems has a union at the Nassau Coliseum

11   account.

12   A.    Correct.

13   Q.    So Parking Systems has a contract with a labor union in an

14   account where their employees work at other locations in

15   addition to Nassau Coliseum?

16   A.    That would be correct.

17   Q.    And you testified that you've dealt with the Union at the

18   Nassau Coliseum many times?

19   A.    Yes.

20   Q.    Okay.  Even though it's not -- the account is not your

21   responsibility?

22   A.    That is correct.

23   Q.    And do you -- does Parking Systems have a long-term

24   relationship with this union?

25   A.    Could we define long term?

1   Q.   But you got the account in 2017, right?  At Nassau

2   Coliseum?

3   A.   Correct.

4   Q.   And has the union been there the entire time to your

5   knowledge?

6   A.   Yeah.  To my knowledge, yes.

7   Q.   Do you even know the Union's name?

8   A.   I don't.  Not on a specific numerical basis.

9   Q.   Do you know if there was ever a union election held?

10          MR. MILMAN:  Actually, it goes beyond scope far

11  afield at this point, Your Honor.

12          JUDGE GREEN:  Overruled.

13  A.   I'm not aware.

14  BY MR. ROCCO:

15  Q.   Okay.  Have you ever seen a collective bargaining

16  agreement with the other union?

17          MR. MILMAN:  Same objection, Your Honor.

18          JUDGE GREEN:  Overruled.

19          MR. MILMAN:  Thank you.

20  A.   I probably was probably to it on the initiation, but have

21  I seen one recently or reviewed it?  No.

22  BY MR. ROCCO:

23  Q.   Was the bid at Nassau Coliseum, the bidding for the

24  parking work and traffic flow work, was that issued by Nassau

25  County?

```
 1              MR. MILMAN:  Objection, Your Honor.  Now, it really
 2    goes beyond.  The witness testified he didn't do
 3    implementation, it's not his account.  Getting into bid and now
 4    whether it's a state, county, or private bid.  It goes way
 5    beyond the scope goes beyond --
 6              JUDGE GREEN:  No.  Overruled.
 7    A.   Can't answer clearly.  I didn't even know that was a bid.
 8    BY MR. ROCCO:
 9    Q.   Okay.
10    A.   I thought it was a direct contract.
11    Q.   So you wouldn't be aware of any of the specific
12    requirements in the bid?
13    A.   No.
14    Q.   Okay.
15    A.   If it didn't pertain to day-to-day services on an account
16    that I was an account executive for, I would know no realm of
17    that branch.
18    Q.   Okay.  And do you recall on -- that on your direct
19    testimony, you stated that Parking Systems would've been ready
20    to start work at Stony Brook University Hospital as of November
21    9th, 2023?
22    A.   As of November 9th?
23    Q.   Yes.
24    A.   For a rollout date of the 9th?
25    Q.   Had it needed to Parking Systems would've been able to
```

1   start work November 9th, 2023?

2   A.   Yes.

3   Q.   And the reason it would've been able to was it was going

4   to bring in existing Parking System staff from other locations

5   to work at the hospital?

6   A.   That's correct.  I believe that statement pertained to the

7   potential of there being a bailout of the original company and

8   us needing to start prior to the contract effective date.

9   Q.   And the primary location where you were going to -- where

10  Parking Systems was going to bring employees into work at the

11  hospital was from Jake's 58?

12              MR. MILMAN:  Objection.

13              JUDGE GREEN:  Overruled.

14  A.   I think there would've been a large pool that had at least

15  worked there.

16  BY MR. ROCCO:

17  Q.   And based on your knowledge working on the transition

18  team, isn't it true that the medical center requires -- working

19  at a medical center requires special training that other

20  accounts do not?  Accounts do not.

21  A.   That is correct.

22  Q.   Okay.  And isn't it also true that none of the employees

23  who ultimately started work on December 1st, 2023 have been

24  trained in Stony Brook University Hospital procedures as of

25  November 9th, 2023?

1    A.    That would've -- yeah.  That would've been correct.

2    Q.    Okay.  And when you -- Stony Brooks -- when you started

3    operations at Stony Brook Hospital on December 1st, 2023, you

4    had about eight to 10 fewer employees than Classic valet had

5    the week before, right?

6    A.    I'm not sure that that's actually correct.

7    Q.    At some point, did you become aware as to whether the

8    company was concerned that it was paying too much overtime?

9    A.    Yes.

10   Q.    Can we ask to show the witness GC-23?  Can the witness

11   please be shown?  GC 23?  I'm sorry.  Thank you.  Okay.  I am

12   showing the witness what's in evidence as General Counsel 23.

13   It's a text -- a screenshot of a text message, one of the dates

14   listed as Friday, December 22nd, 10:57 a.m.

15          Question for the witness.  On the large bubble

16   paragraph where it says filter them to Travis.  I was filtering

17   everyone to Stony Brook because Andrew says he doesn't need

18   anybody for his account.

19          I told Travis Andrew that we will be needing more

20   hours at Stony Brook, thus needing more staff.  I told Travis

21   we have to cut back on overtime, which he knows.  Did you

22   receive that text message?

23   A.    Genuinely unsure.  I mean, I see the message in the

24   document.  I'm not sure if I was a party on this specific

25   thread.

701

1   Q.   Okay.  And you testified earlier that Parking Systems
2   employees need a Stony Brook ID to access parts of the campus.
3   A.   They -- need would be incorrect.  They can get one to have
4   access, but they can fully function as long as they have their
5   Parking Systems, IDs and access fobs.
6   Q.   Okay.  So the -- and the access fob, you have to request
7   that from Stony Brook University itself?
8   A.   No.  No.
9   Q.   So can an employee with no Stony Brook ID go into the
10  hospital and use the restroom?
11  A.   Yes.  As a guest.
12  Q.   Okay.  And how do you get them the guest fob?
13  A.   There's no fob.  You have to go in as a guest, no
14  different than if you were visiting a loved one.  So the
15  process would be going on the left side of the dividend is
16  employees and there's a visitor's line.
17          So even in my experience firsthand Day 1, 2 and 3,
18  they had not been able to roll out the access cards within --
19  under a two week period.  Some sort of backup.  Turns out that
20  the process takes far longer than it should, but for security
21  purposes, it did.
22          Every time I went to the restroom, which is frequent
23  as a higher volume water drinker, I'd have to go to the guest
24  table, explain my affiliation and actually log in as a guest.
25  Not practical, but ultimately functional.

1  Q.   Had Parking Systems begun the process as of November 9th,

2  2023 to request Stony Brook IDs for any of the -- its current

3  employees that had eventually posted at Stony Brook?

4  A.   Yes.  Yes.

5  Q.   Did any of those employees have IDs as of that date?

6  Stony Brook IDs?

7  A.   No.  I don't think the first ID was issued until maybe

8  first for staff like Day 9 or 10.

9  Q.   You testified earlier about you had a meeting at Jake's 58

10 with Francis Gill, right?

11 A.   That's correct.

12 Q.   And the company -- Parking Systems wanted to hire Francis,

13 right?

14 A.   That's correct.

15 Q.   And the reason Parking -- that you testified that Parking

16 Systems wanted to hire Francis was she came highly recommended

17 by your customers?

18        MR. MILMAN:  Objection.  Asked and answered a number

19 of times, Your Honor.

20        JUDGE GREEN:  Overruled.

21 A.   So to be clear on that, we should be very clear.  We were

22 asked and we were following a request to fulfill a specific

23 customer request.

24        It was not that we -- to your question a moment ago,

25 it was not that we specifically wanted to hire Francis.  We

1    were asked and recommended that it would be in the hospital's

2    best interest and in conjunction Parking System's best interest

3    to have this stand out.

4    BY MR. ROCCO:

5    Q.   And Parking Systems they're dealing with -- you testified

6    earlier about it's a position of trust, right?  When you're

7    employee.

8              MR. MILMAN:  Objection, relevance.

9              JUDGE GREEN:  Overruled.

10   A.   I'm not sure I understand that question.

11   BY MR. ROCCO:

12   Q.   Well, a customer comes, they -- you give them -- the

13   customer gives you a bailment your car, right?

14   A.   Correct.

15   Q.   Right.  A good use of that term.  By the way, it took me

16   back to law school you used.

17   A.   I haven't heard that in ages.

18   Q.   So they give you the key and in some cases, it could be

19   nice cars, right?

20   A.   Sure.

21   Q.   Okay.  And I believe you testified that in some cases,

22   cars are the most expensive items that people own, right?

23   A.   That is correct.

24   Q.   Okay.  So it's important that Parking Systems hire staff

25   that's honest and trustworthy?

704

1   A.    Yes.  I would say so.

2   Q.    Okay.  And you made an employment offer to Francis Gill?

3   A.    Correct.

4   Q.    So you viewed Francis Gill as honest and trustworthy?

5           MR. MILMAN:  Objection, witness answer that.  It was

6   asked by Stony Brook to him to --

7           JUDGE GREEN:  It's overruled.  It's overruled.  This

8   line of questioning is appropriate.

9           MR. MILMAN:  Mischaracterizes for the record.

10  A.    Just to verify the question again.

11  BY MR. ROCCO:

12  Q.    So Parking Systems made an offer of employment to Francis

13  Gil?

14  A.    That's correct.

15  Q.    And Parking Systems likes to hire people who are honest

16  and trustworthy?

17          MR. MILMAN:  Objection.

18          JUDGE GREEN:  Overruled.

19  A.    We do.

20  BY MR. ROCCO:

21  Q.    Okay.  So Francis Gil, in the estimation of Parking

22  Systems, was honest and trustworthy?

23  A.    Correct.

24  Q.    Okay.  Would you say the typical valet starting wage at

25  Parking Systems is approximately $16 to $20 an hour?

1   A.   Would I say that?

2   Q.   Yeah.

3   A.   That'd be correct.

4   Q.   Okay.  And before you hire somebody, there's several

5   things that Parking Systems needs to do to make sure that

6   person is qualified, right?

7   A.   That is correct.

8   Q.   Okay.  And you need to obtain a driving abstract?

9   A.   A license?

10  Q.   You need to find out if the person has a driver's license,

11  right?

12  A.   That is correct.

13  Q.   Okay.  And you need to obtain an abstract of the person's

14  driving record from the DMV?

15  A.   I'll just ask for clarification of that term.  I don't

16  know what an abstract is.

17  Q.   Okay.  Whether a person has any license suspended or

18  anything like that?

19  A.   Yes.  That's correct.

20  Q.   Okay.  And you obtain that from a third party service?

21  A.   That is correct.

22  Q.   Okay.  And you do a criminal background check?

23  A.   That is correct.

24  Q.   And that's all done through a third party service?

25  A.   That is correct.

1   Q.   And you give the service the person's information and --

2   vital information and they give you back the answers to your

3   questions?

4          MR. MILMAN:  Objection.  I think the question was

5   vital information.

6          JUDGE GREEN:  Okay.  Information?

7          MR. ROCCO:  Yeah.

8          THE WITNESS:  Not trying to dodge it, but am I

9   genuinely allowed to answer HR related questions here?

10          JUDGE GREEN:  Yeah.  If that answers the question.

11          THE WITNESS:  Okay.  So, yes, we would submit

12   documents to -- through paychecks and Hire Right for that.

13   BY MR. ROCCO:

14   Q.   And how fast do they get back to you?

15   A.   Depends.  Average response time is about seven to 10

16   business days for Hire Right.  However, depending on the

17   issuing state of the license, they often get the delayed.  New

18   York is about seven to 10 days.

19   Q.   Mm-hmm.

20   A.   Could be upwards to 90, specifically Florida and DC for

21   some reason have very extensive for that.

22   Q.   And all valets of Parking Systems need to wear a uniform?

23   A.   Correct.

24   Q.   And the uniform is specific to Parking Systems?

25   A.   Correct.

1  Q.   And the uniform is not tailor made for each employee,

2  right?

3  A.   Like custom tailor?

4  Q.   Right.  It's not a custom uniform?

5  A.   No.

6  Q.   You have certain sizes?

7  A.   Correct.

8  Q.   And you order T-shirts in advance?

9  A.   We try to maintain stock.  It's not always so.

10  Q.   And you have sizes that you maintain stock of?

11  A.   We try.  There's still quite a toggle with supply chain

12  that we deal with.  Just this week we're actually waiting on a

13  sea container right now.

14  Q.   Okay.  And when an employee starts work, you ask them what

15  size gear they want?

16  A.   That's correct.  We ask them what would be most

17  comfortable fitting for them.

18  Q.   Okay.  And you have stock of those uniforms that you can

19  give the employees?

20  A.   Not always.  Not as of last week, we do run out.

21  Q.   Okay.  And when you took over the Stony Brook account,

22  that was pursuant to a request for proposal?

23  A.   I actually don't -- I don't know.  I was told that we were

24  awarded the account.  I truly would not know the processes.

25  Q.   Okay.  So you don't know --

1    A.    That's not my expertise.

2    Q.    Okay.  So you were on the transition team, right?

3    A.    Yes.

4    Q.    And you don't know whether the -- whether you were awarded

5    the proposal based on certain specifications --

6              MR. MILMAN:  Asked and answered.

7              JUDGE GREEN:  Overruled.

8    BY MR. ROCCO:

9    Q.    -- of services that bidders would provide?

10   A.    I wouldn't know.  No, I don't know.

11   Q.    That.  But you just know that Parking Systems won, you

12   know, was awarded the account?

13   A.    Yes.

14   Q.    Okay.  And Parking Systems began operations on December

15   1st, 2023?

16   A.    That is correct.

17   Q.    And those operations included valet parking of cars for

18   patients, visitors and staff of the hospital?

19             MR. MILMAN:  Objection answered.  Answered dozen

20   times now.

21             JUDGE GREEN:  Overruled.  Can you just ask that

22   again, please?

23   BY MR. ROCCO:

24   Q.    And those operations included valet parking of cars for

25   patients, visitors, and staff of the hospital.

1    A.    It included, not limited to.

2    Q.    Okay.  And Parking Systems currently operates a valet

3    booth at the cancer center at the hospital?

4              MR. MILMAN:  Objection, Your Honor.

5              JUDGE GREEN:  Overruled.

6    A.    Yes.

7    BY MR. ROCCO:

8    Q.    Okay.  And Classic Valet prior to you coming in, operated

9    a booth at the cancer center at the hospital?

10   A.    Correct.

11   Q.    And Parking Systems currently operates a valet booth at

12   the hospital's emergency area?

13   A.    Correct.

14   Q.    And Classic valet previously operated a valet booth at the

15   hospital's emergency area?

16   A.    Correct.

17   Q.    And Parking Systems currently operates a valet booth at

18   the main entrance of the hospital?

19   A.    Correct.

20   Q.    And Classic valet previously operated a parking booth at

21   the main entrance of the hospital?

22   A.    Correct.

23   Q.    And Parking Systems currently operates a valet area at the

24   staff lot?

25   A.    That's correct.

1  Q.   And Classic valet previously operated a parking area at

2  the staff lot?

3  A.   Correct.

4           MR. ROCCO:  No further questions.

5           JUDGE GREEN:  Okay.  I just have a few questions for

6  you.

7           THE WITNESS:  Sure.

8           JUDGE GREEN:  So do you know, does Parking Systems

9  have a written policy regarding hiring of a predecessor

10 contractor's employees?

11          THE WITNESS:  I'm -- I would assume it would be in

12 our corporate handbooks somewhere.

13          JUDGE GREEN:  That's something you have a handbook of

14 policies and procedures?

15          THE WITNESS:  Yes.  I'm sure we could --

16          JUDGE GREEN:  Okay.  And this statistics and data

17 that has come up a couple of times, again, is that something

18 that you've seen in writing or is that something that you've

19 heard about verbally?

20          THE WITNESS:  Heard about verbally.

21          JUDGE GREEN:  Okay.  So to the extent there were some

22 experienced people previously by Parking Systems who went to

23 work at Stony Brook, would that be considered a transfer?

24          THE WITNESS:  No.  Not particularly.

25          JUDGE GREEN:  Do you mean Classic?  Did you mean

1  Classic?

2          THE WITNESS:  No.

3          JUDGE GREEN:  Okay.

4          THE WITNESS:  No.  Because we do a blended integrated

5  schedule, so it is constantly varying, so it wouldn't be -- you

6  wouldn't be changing.  It wouldn't be A to B, it would just be

7  this week's schedule, next week's schedule.  So it'd be varying

8  on a week to week basis.

9          If I pulled the log of my average employee like on a

10 six week run, maybe in a perfect world it'd be nice if they

11 actually worked, you know, it just changes so frequently.

12 Their availability there.

13         JUDGE GREEN:  Okay.  So I just want to try to be

14 clear.  So were there some experienced people from Jake's 58

15 who went to work at Stony Brook after December 1st, 2023?

16         THE WITNESS:  Yes.

17         JUDGE GREEN:  And so were they permanently employed

18 there or did they work elsewhere?

19         THE WITNESS:  I'm not sure what their current status

20 is, but I would be confident in stating that they probably

21 continued to maintain work at Jake's 58 and devoted time and

22 attention to Stony Brook.  I don't think we'd per se switched A

23 to B but rather incorporated this facility into their schedule.

24         JUDGE GREEN:  Okay.  We're getting the payroll for

25 Parking Systems.  Is that something we're getting?

1          MR. MILMAN:  Yes.  We have Your Honor.

2          JUDGE GREEN:  Okay.  But that would just be the Stony

3    Brook facility, right?  That's just going to be the Stony Brook

4    facility.

5          MR. MILMAN:  Your Honor, we will be -- to answer your

6    question, we will be introducing a record on our direct or one

7    of our witnesses, which will show any individual who worked at

8    Stony Brook -- worked at Stony Brook and whatever they worked

9    at.

10          JUDGE GREEN:  Okay.  Okay.  I see.  So I'm right that

11    there wouldn't be anything in -- there wouldn't be anything in

12    writing like an application for -- by a Jake's 58 person to go

13    to work at Stony Brook?

14          THE WITNESS:  No, no.  That wouldn't be the process

15    that we would -- it would just reflect --be reflected in the

16    schedule and it would be a pretty typical and familiar notion

17    that their schedule would have next week, something different

18    than this week, different the next week different than the week

19    after.

20          JUDGE GREEN:  Okay.  And so Francis Gil Reyes, I'm a

21    little confused regarding the plan for her employment if she

22    had been hired.  Was it her -- was it your intention that she

23    would start work for Parking Systems on December 1st, 2023?

24          THE WITNESS:  We were trying to facilitate that.

25          JUDGE GREEN:  Okay.  Was she going to replace

1    somebody or was she going to be just an additional person?

2            THE WITNESS:  So we -- our actual discussion of that

3    would be that she would maintain the primary manager role of

4    the C MAP, which is where she thrived and was complimented on

5    and that we would actually have an additional attendant, kind

6    of now take a background role and learn and just kind of blend

7    them into the rotation and if needed to be moved away or to

8    another department later, we would.  Our intention was to

9    prioritize the request and actually let Francis do what Francis

10   excels in.

11           JUDGE GREEN:  So it would be an extra person?

12           THE WITNESS:  No.  Actually, we would pull back our

13   original scheduled person.  Not an extra.

14           JUDGE GREEN:  Okay.  Okay.  Okay.  So thank you very

15   much.  Any redirect?

16           MR. MILMAN:  Yeah.  It's going to be a long one, but

17   do we want to take a break now?  I'm sorry.

18           JUDGE GREEN:  Okay.  No.  We can take a break now.

19   You want to take a break until 1:30?

20           MR. MILMAN:  Okay.  That's good Your Honor.  That's

21   good.

22           JUDGE GREEN:  Okay.  Off the record.

23        (Whereupon, at 12:46 p.m., a luncheon recess was taken)

24

25

26

```
 1                A F T E R N O O N   S E S S I O N

 2                                            (1:52 p.m.)

 3                    REDIRECT EXAMINATION

 4   BY MR. MILMAN:

 5   Q.   Okay Mr. Candiotti, I am going to ask you a question, you

 6   who I am.  I'm going to ask you questions on redirect.  You

 7   have testified as to your knowledge and your adoption of

 8   company policy concerning hiring predecessor contracted

 9   employers for account to take over.  You remember testifying a

10   few times?

11   A.   Yes.

12   Q.   Okay.  Have you ever seen anything in 15 years in writing

13   on this?  Have you ever seen that?

14   A.   Firsthand?  No.

15   Q.   Okay.  And so again, aside from your -- how were you aware

16   this is the company practice and procedure in taking over a new

17   account, so not poaching previous contractors employees.  How

18   do you know that?

19   A.   I've been through the process where we've taken over

20   contracts that have expired or voided, canceled and we've

21   consistently never onboarded.  It's always been expressed to me

22   as a team that we don't bring that staff over.

23   Q.   Right.  And you had also testified that there is an

24   extensive collaboration between yourself and other managers and

25   corporate people, correct?
```

715

1    A.    That's correct.

2    Q.    Okay.  And what are some of the things, if any, that the

3    corporation or other managers, colleagues have told you why

4    it's not effective to take on previous -- or poach previous

5    accounts employees?

6    A.    So some of the details would be the lack of knowledge

7    potentially of what their current pay rates might be.  So we go

8    into facilities and potentially are at minimum wage or slightly

9    above.  It is an entry level parking role unless you're a lot

10   manager.

11          So that can be challenging if potentially you're

12   taking someone that is above that right now, giving them a pay

13   cut.  Tip distribution systems are different, so it might not

14   be hub wide, but rather if we do facility wide, it's hard to

15   revert the current cultures that they've been accustomed to.

16          And those, you know, those might be everything from

17   key handling to schedule expectations to the scheduling dynamic

18   of interchanging site to site, right?

19          So if there is potentially a client in the -- or a

20   company in the past that doesn't interchange labor throughout a

21   region, that would be a new request for an employee and they

22   might not adapt well to that.

23   Q.    How about day PTO days, is that an issue?

24   A.    Certainly could.  I'm not sure what their prior employer

25   package might've looked like.  Vacation schedules would be a

1   similar concern.

2   Q.   And at some -- and you had testified that you became aware

3   that Class had anion on about November 9th, November 10th,

4   correct?

5   A.   That's correct.

6   Q.   Okay.  And in fact, you were a recipient on a email or

7   text from -- and sorry, discussion of record that Mr. Gust did

8   some calculations on the Union contract.  One was sent to us

9   from -- sent to Parking Systems from Mr. Rocco; is that

10  correct?

11  A.   That's correct.

12  Q.   Okay.  Prior to November 9th, did you even have -- did you

13  know what Classic paid its employees, how much PTO days it gave

14  off, vacations, and other terms conditions of employment?

15  A.   No.

16  Q.   Okay.  And you had also testified that as of November 9th

17  you were ready to roll it if you had to at Stony Brook you

18  performed the valet services, correct?

19  A.   That's correct.

20  Q.   Okay.  I'd like you to look at the formal papers in front

21  of you.  It's the first staple documents, it's the formal

22  papers, Judge's formal papers in this trial.  And like you to

23  look at that page you're looking at, the first page, you turn

24  over, do you see a document dated December 4th?

25  A.   Yes.

1    Q.    Okay.  And do you see who issued that document?

2    A.    It is listed -- I would say yes.  It is a person making

3    charge.

4    Q.    A charge?

5    A.    A charge.

6    Q.    Does that say NLRB charge?  Was the document --

7    A.    Full -- yeah.  Full party filing charge Local 1102 -- I'm

8    not super familiar, I can read.

9    Q.    Okay.  Now, on 11 -- on or about November 9th and November

10   10th, did you know that that union contract was 1102?

11   A.    No.

12   Q.    Okay.  And have you ever seen -- I think you testified you

13   haven't seen -- you basically recall seeing a union contract

14   with the Union Parking System, but that was many years ago; is

15   that correct?

16   A.    I'm sorry, say that one more --

17   Q.    Yeah.  I think you testified that the Union that's present

18   at Parking Systems, you saw the Union contract many years ago?

19   A.    Yes.

20   Q.    Okay.  And you don't recall the local on that, do you?

21   A.    No.

22   Q.    Okay.  Now, when the allocation team was created by

23   Parking Systems for the startup of Stony Brook valet services,

24   various issues were discussed in getting ready for the startup,

25   correct?

718

1   A.    Yes.

2   Q.    Just give some of the issues that were discussed as a team

3   collectively.

4   A.    So one of the things we were strongly considering was the

5   ticketing process as well as shifting to a digital ticket

6   system.

7   Q.    Okay.

8   A.    So technology moves quick, right?  Most of our sites are

9   operating with digital ticket systems, so we were working with

10  the MAPS crew to incorporate that.

11  Q.    And -- sorry, go ahead.  Continue.

12  A.    Part of that was a concern about -- two part concern about

13  cash collection.  One was being executed properly and two, it

14  became a cashless world to a degree during the pandemic and

15  Stony Brook was not actually able to accept a credit card.

16  Q.    Okay.

17  A.    For valet parking to be --

18  Q.    Okay.  Who was part of that -- who was part of that

19  startup team?

20  A.    On the Parking Systems and that --

21  Q.    For Parking Systems.

22  A.    That startup team would've been Michael Petruzzelli, Bobby

23  Gust, myself, Andrew Goldsmith and Travis Gilliland.

24  Q.    Okay.  Have you done startups before?

25  A.    Yes.

1    Q.    Have you done the whole staffing and migration of

2    startups?

3    A.    No.  We don't migrate staff over.

4    Q.    Okay.  I mean -- I'm talking about from integrating from

5    other locations of ours for the startup.

6    A.    Oh, sure.  Shifting team members around from Parking

7    Systems --

8    Q.    Yes.

9    A.    -- to begin a new -- yeah.  That I have absolutely been

10   involved.

11   Q.    Right.  And have you been involved in that in medical

12   centers and hospitals?

13   A.    Yes.

14   Q.    Okay.  How about Andrew Goldsmith, has he ever done that

15   before?

16   A.    No.

17   Q.    This was his first time?

18   A.    Yes.

19   Q.    Okay.  How about Michael Petruzzelli?  Has he been

20   involved in -- has he done that before?

21   A.    Yes.

22   Q.    How about Bobby Gust, has he done that before?

23   A.    Yes.

24   Q.    Okay.  And was Johnny Baron involved in that start team?

25   A.    Not from a boots on the ground side, but from some

1    questions of schedule of work and parameters, yes.

2    Q.    Okay.  And who a part of -- in the-- in that startup up

3    preparation, would you get involved in direct budget numbers

4    and pricing issues like that?

5    A.    No.

6    Q.    Would Bobby Gust?

7    A.    No.

8    Q.    Would Johnny Barron be involved in that?

9    A.    Yes.

10   Q.    Okay.  Now, where did Andrew Goldsmith work before the

11   implementation of the Stony Brook valet services at the

12   hospital?  Where did he work before that, if you know?

13   A.    He was -- most of the time, but on a rotating basis, he

14   was often primarily at Jake's 58.

15   Q.    And what position did he hold at Jake's 58?

16   A.    He might've been listed as site supervisor, but I don't

17   know for certain.

18   Q.    And you had testified regarding site supervision in the

19   previous direct testimony, correct?

20   A.    Correct.

21   Q.    As it relates with corporate hierarchy?

22   A.    Yes.

23   Q.    Okay.  Did Andrew Goldsmith have a lot of questions

24   concerning this was his first startup?

25   A.    Very much so.

```
1   Q.   Okay.  And would he ask you a lot of questions?
2   A.   He would.
3              MR. MILMAN:  What he -- okay.  You could put the --
4   you could give me back Formal 1, Judge may I approach the
5   stand, please?
6              JUDGE GREEN:  Yeah.
7              MR. MILMAN:  Okay.  Thank you.
8              JUDGE GREEN:  Thank you.
9              MR. MILMAN:  Off the record one second, Judge,
10  please.
11             JUDGE GREEN:  Off the record.
12      (Whereupon, a short recess was taken)
13             JUDGE GREEN:  Back on the record.
14             MR. MILMAN:  Okay.  Oh, okay.  Good.  Thank you.
15  Adrian, what do we have to Respondent exhibits, please?
16             JUDGE GREEN:  I have 7.
17             COURT REPORTER:  6.
18             JUDGE GREEN:  6 being the decision and direction of
19  election.
20             MR. MILMAN:  Okay.  So 7.  Okay.  Got it.
21             JUDGE GREEN:  So 6 is this one, you can keep that.
22  BY MR. MILMAN:
23  Q.   Thank you.  Okay.  Your Honor -- Mr. Candiotti, I'm
24  showing you a document consisting of two pages, it's marked as
25  Respondent Exhibit Number 7.  I'd like you to take a look at
```

722

1  that document.  Oh, thanks.  And when you finish, let us know

2  that you've read it and you're ready to answer questions.

3      (Respondent's Exhibit 7 identified)

4  A.   Okay.  Just give me a moment.

5  Q.   Sorry.  It's a four page document.

6          JUDGE GREEN:  Okay.  Do we have specific questions

7  about it?  I don't want him to sit here and while he reads it

8  if --

9  BY MR. MILMAN:

10 Q.   Okay.  I'll just say go ahead.  I want you to look at the

11 first page.

12 A.   Okay.

13 Q.   Do you know what this document is?

14 A.   Procedures for hiring.  All right.  Are you -- you've

15 testified that means procedures?

16 Q.   Yes.  Okay.  And does -- do these procedures coincide with

17 your testimony concerning the hiring process?

18 A.   Yes.

19 Q.   All right.  Let's get into that a little further, okay?

20 So you've testified that primarily prospective employees or

21 let's just focus on lot attendants, they submit a job

22 application on Indeed or some other job posting; is that

23 correct?

24 A.   Sure.

25 Q.   Okay.  And then I believe -- and they fill out an initial

1    intake form, whether it be a QR form on Mr. Gust's card or some

2    other preliminary Indeed initial information, correct?

3    A.    Correct.

4    Q.    And that intake information is for the purpose of Parking

5    Systems to contact them to schedule an interview, correct?

6    A.    Correct.

7    Q.    All right.  So now what is the timeframe and everybody's

8    busy schedule by the time -- well, let me ask you this.  Who

9    collects the intake form at Parking Systems from Indeed?

10    A.    There's a couple different formats that could be handled.

11    So if it is a specific region ad it might be filtered to a

12    specific account executive.

13            There's also a way through our website to put in a

14    generic job request form, so as this called and then that would

15    go to -- I think it goes to HR and then might be distributed

16    based on region from there.

17    Q.    Okay.  So stop there.  This takes more than 24 hours to

18    filter through that initial process?

19    A.    Yes.

20    Q.    Okay.  On average, I know things change by day, but on

21    average, how long is the process when somebody fills out an

22    intake and somebody gets back to them just to schedule an

23    interview?

24    A.    Five to seven business days is usually what I'm logging as

25    account executive from getting that form.  If it lines up well

1    --

2    Q.   But it's staggered, right?  Because people are constantly

3    doing it.  So five to seven days, one individual might be, you

4    know, the first day for one and sixth day for somebody else.

5              MR. JACKSON:  Objection.

6              JUDGE GREEN:  Sustained.

7    BY MR. MILMAN:

8    Q.   Do you know what staggered means?

9    A.   I do.

10   Q.   Okay.  So please explain how the application staggered

11   methodology works.  So as far as staggering interviews, it's

12   truly based on availability.  I don't generally have windows of

13   five, six hours to block off an entire day or half day to do a

14   block of interviews.

15   A.   So you do a Tuesday, 8:45 a.m., you do a Wednesday, 10:15

16   a.m., you do a Friday --

17   Q.   So while this staggered methodology of just try to

18   schedule initial interview, you testified regarding the whole

19   integration process at Parking Systems, is that what fills in

20   positions in the interim?

21   A.   Correct.

22   Q.   Okay.  So let's go to the next stage, right?  So a meeting

23   is scheduled, the interview meeting, right?

24   A.   Correct.

25   Q.   What takes place at an interview meeting?

A.   So --

          MR. JACKSON:  I'm going to object, Your Honor.  This

is beyond scope of anything that came out in cross examination.

          JUDGE GREEN:  Overruled.

          MR. MILMAN:  Thank you.

A.   So our interview is, part of it is informational and part

of it's experience questions.  So as far as informational,

we're going to review, rate of pay, we're going to review our

scheduling procedures, what expectations of, you know, us as a

company would expect four schedules to look like, our process

as far as going to multiple sites.

          We're also going to discuss uniform expectations,

which part we provide and which part staff is expected to have

in the correct proper sizes for themselves.  At that point,

we'll discuss experience, we'll have to understand do they

have, and maybe not particularly parking, but what is their

customer service experience?

          You know, have they only worked in staff rooms in the

past where there's no end user?  Had they worked at a hospital

at the front desk doing greeting services?  Have they been a,

you know, cashier at a shoe store?

          There's a lot of similar overlap, but we want to

usually ensure that there's some form of experience with the

general public.

Q.   Now, at this point you have the initial intake in front of

1  you, so you know their contact information, their availability;

2  is that accurate?

3  A.    Depending on the form, yes.

4  Q.    Okay.  And have you conducted these very interviews that

5  you're testifying about?

6  A.    Yes.

7  Q.    Okay.  Now, how long does the interview process usually

8  take?

9  A.    The process --

10  Q.    The actual --

11  A.    -- itself is about a 15 minute run.

12  Q.    Okay.  And then at the conclusion of the interview, what

13  are your options with this potential applicant?

14  A.    You either are going to proceed with hiring or you are not

15  going to give

16  Q.    the job offer.  Okay.  And let's say you make a decision

17  to proceed with hiring.  Is there any way that you could tell

18  from the intake information and this 15-minute interview with

19  whether somebody is truly an honest person?

20  A.    It'd be hard to make that full 100% percent certainty

21  conclusion.

22  Q.    Right.  And how long was your interview with Francis?

23  A.    10 minutes.

24  Q.    Okay.  And she rejected the job offer, correct?

25  A.    Yes.

1  Q.   All right.  Okay.  Now, you've offered somebody a job,

2  right?  What happens next with this applicant?

3  A.   So the next stage is the request from HR to trigger their

4  status from job request.  I think title is job request form to

5  send region application.  So in New York, send New York

6  application, that's going to trigger an email to go out to that

7  candidate.

8  Q.   And that email will state what?

9  A.   It will be a portal to a roughly an 80-page document that

10 also requires social security card and driver's license.

11 Q.   But that's the application?

12 A.   That would be, yes.

13 Q.   We'll get to that actually.  Now, how long, many days or

14 hours does it take from when you have your 10, 15 minute

15 interview, you make decision to offer the applicant a job

16 position with Parking Systems to when that email goes out to

17 the applicant?

18 A.   It's about three to four days until they would receive

19 that email.  All right.  So we're at 11/12 --

20 Q.   Day -- business days or --

21 A.   Business days, yes.  The HR is not going to operate on --

22 Q.   So now we're at 12 business days so far I think, right?

23 Okay.  Now, the applicant gets this job offer, right?  And then

24 you said along with that is this 80-page application, correct?

25 A.   Correct.

1    Q.   All right.  And is there anything in the email that says

2    when they have to return that application?

3    A.   No.  There's no -- no.  There's not a deadline.  It

4    doesn't expire.

5    Q.   Okay.  And if you know, what is the usual turnaround, if

6    you know from when a job applicant is given a job offer and

7    they receive this 80 page application and they return the

8    application, do you know how many days or hours that usually

9    takes?

10   A.   To be clear on your question, the question is from

11   receiving the email to when it's -- the application email to

12   when the application email is -- application's complete?

13   Q.   Complete and received by Parking Systems.

14   A.   So when it is completed, we get an electronic

15   notification, usually three to four -- I would say three to

16   four actual days, not business days.

17   Q.   So on average, your experience is that an applicant when

18   they're given a job offer, they return it's 80 page application

19   about three, four days later?

20   A.   That's correct.

21   Q.   Okay.  So now, we're pushing on about three weeks of

22   actual days, correct?

23   A.   That's accurate.

24   Q.   All right.  Now partner systems gets this application

25   filled out, somebody has to review the application, correct?

1  A.    That's correct.  It goes through a portal it -- well, it

2  runs through another third party software, which is Paychex.

3  Q.    Right.

4  A.    They have to give verification that it's been completed in

5  entirety and then it triggers the next step.

6  Q.    Okay.  So what's the -- what happens if says it hasn't

7  been completed correctly?

8  A.    notification goes back to the employee and it sits in the

9  queue until further action.

10  Q.    That could take a whole bunch of days, right?

11  A.    Yes.

12  Q.    All right.

13  A.    We do not -- we don't poach the -- or try to facilitate

14  along the employee.  We we're sending them the application.  We

15  assume if they're interested, they're going to complete the

16  documents.

17        Generally, you will not see me calling and saying,

18  hey, your application's not done.

19  Q.    Right.

20  A.    That's not right.

21  Q.    Now, let's be hopeful that the person submitted the

22  application correctly as far as Paychex's concerned, the first

23  level, right?

24  A.    Yes.

25  Q.    So tell me about the Paychex process.

1    A.   So once Paychex, we'll get an electronic notification to

2    that HR Department that will say that they've completed the

3    application.

4            So as per Paychex, qualifications or necessities,

5    their application for Parking Systems complete.

6    Q.   What does that constitute?  That means that they have

7    enough information to process payroll for those people.  And

8    then is the next step payroll or --

9    A.   So then -- we have an internal process through another

10   third party.

11   Q.   Okay.

12   A.   We send it out, which is a part of the Paychex, but it's

13   an additional step and additional cost.  We promise in our

14   contracts that we are running a background check on every

15   single candidate and we fulfill that.  So that's through higher

16   tech?  Sorry, Hire Right.

17   Q.   Okay.  And what are their internal processes, if you know?

18   A.   Not actually -- oddly enough for a background check, not

19   all that complicated, just time consuming.  So it's a lot of

20   redundant data entry, let's say 15 minutes of internal Parking

21   Systems data entry to pull that over.

22           And then as far as turnaround time, I think it's

23   roughly seven to 10 business days for New York State licenses.

24   Q.   So now, we're pushing a month, right?

25   A.   Yes.

1  Q.   Okay.  And what's the third phase of the hiring process?

2  A.   So once that's out, they're now considered an active

3  employee.  An account executive will receive an email from HR

4  with an employee number signifying that --

5  Q.   Every -- all eight account executives or one -- or more

6  than one?

7  A.   Yeah.  So to be clear, it would be one and it would be

8  whoever conducted the interview.

9  Q.   Okay.  And who -- and is the -- whoever conducts the

10 interview, is that just by circumstance?  Is that by whoever's

11 available or is that --

12 A.   No.  It's usually -- well, it's usually based on generally

13 geographical or specific hiring needs.  So the account

14 executive will correspond to the potential job request form

15 that might make sense for them.

16 Q.   Okay.  So when you Josh Candiotti receive a -- would you

17 receive this notice of an active employee, does it go to your

18 email?

19 A.   It does.

20 Q.   Okay.  And let's focus on what you do, okay?  And by the

21 way, I think you testified that each account executives have

22 multiple locations that they're responsible for, correct?

23 A.   Correct.

24 Q.   All right.  And multiple employees that service those

25 locations, right?

1    A.    Yeah.

2    Q.    And even other employees that aren't in your locations

3    that might be transferred for any given day, correct?

4    A.    Correct.

5    Q.    All right.  Organized chaos, something like that?  Okay.

6    And so now what do you do when you get this active notice email

7    from corporate?

8    A.    So at that point I'll reach out to the candidate, let them

9    know that they've been on boarded.

10   Q.    Stop right there.  What's the usual turnaround time from

11   when you receive the email to notify the candidate?

12   A.    I try to move on and do it the following business day.

13   Q.    Okay.

14   A.    I make my best effort for that.

15   Q.    Do you call, email, text?

16   A.    Generally, text.

17   Q.    Okay.  Do you usually get a quick turnaround?

18   A.    70% of the time.

19   Q.    Okay.  Sometimes they may have found another job in that

20   interim.

21   A.    Yeah.  Sometimes -- right.

22   Q.    Sometimes they are no longer pursuing it and sometimes,

23   the response is just two or three days later.  So now you

24   contact them and what happens?

25   A.    So they're going to respond via text generally is the way

1    I do it.  We prefer to have things written.  So the response is

2    that, you know, you would -- the message out would be that

3    you've been -- your onboarding has been completed and they

4    would respond.

5           Great.  Thank you.  And then immediately a preset

6    message goes out about staff training.  These are the staff

7    training details.

8    Q.    Right.

9    A.    And these are the next available sessions, which one works

10   best for you?  And we confirm a staff training day.

11   Q.    And who does the training?

12   A.    A variety of different people host it.  It's -- the

13   training was established a couple of years back.  I helped

14   develop it, but it's been created to be mobile.  It can be done

15   in -- we've.

16   Q.    So it's not account executive specific?

17   A.    No.

18   Q.    Right.  Okay.  And the training can be done in Valley

19   Stream at the corporate office, it can be done at Jake's 58 at

20   the casino.

21   A.    Right.

22   Q.    What are the rules, what if anything happens next?

23   A.    At that point, they complete staff training and then the

24   discussion about, you know, building out a schedule with that

25   employee is now --

1    Q.    Okay.  Now, I'm going to stop right there.  What about

2    getting a uniform?

3    A.    Generally, that's something that we would include in that

4    staff training process.

5    Q.    Okay.  And what about -- how about the I-9 form?  Is that

6    part of Paychex's role?

7    A.    Yes.  Yeah.  That's part.

8    Q.    And is the training -- I think you said also covers PTO

9    days or New York State, which is New York State's Sick Leave

10   Act, correct?

11   A.    Yes.

12   Q.    Does it go into issues like Family Medical Leave Act?

13   A.    It does, right.

14   Q.    You have more than 50 employees?

15   A.    Yes.

16   Q.    Okay.  And those, I think you said harassment training and

17   --

18   A.    It does.

19   Q.    -- and probably code of conduct.  Is the company handbook

20   included in there?

21   A.    Yes.

22   Q.    Do they have to sign the handbook?

23   A.    I actually believe they -- so the answer is yes, and I

24   think that is done as a file link in the actual onboarding

25   agreement.

1    Q.    Was that handbook drafted by my firm or somebody else or

2    do you know?

3    A.    I believe your firm did that.

4    Q.    Okay.  And is there an acknowledgement page in that

5    handbook that they have to acknowledge the rules and comply

6    with the rules?

7    A.    There is.

8    Q.    They have to read the rules?

9    A.    That is correct.

10   Q.    Okay.  And so now, here you have a new applicant, your --

11   you contact them, they're active, everything's good, everything

12   that you just testified to, my questioning has been complied

13   with, they're ready to go.  How do you determine that -- the

14   applicant is still kind of fresh in the Parking Systems

15   organization, right?

16   A.    Yes.

17   Q.    Do you make a decision whether they should work on a

18   specific supervisor or a manager or perform an easy task at

19   first or just throw them into the mix as it were?

20   A.    Yeah.  Generally, we're going to try to schedule, I would

21   try to schedule them at a location and that's what I consider

22   to be less pressure.

23          I would not send my attendant to a restaurant where

24   they're working by themselves doing about 90 cars in a four-

25   hour window.  That would be unfair to them and frankly unfair

736

1    to the client.

2    Q.   Got it.  Now, does that complete the whole onboarding

3    process?

4    A.   I believe we covered it.

5    Q.   Okay.  And is that same onboarding process conducted the

6    same way if somebody applies from the outside or if somebody,

7    let's say worked at a previous contract but not immediately

8    right after he took the -- he worked for another parking valet

9    company before, same process?

10   A.   Yeah.  Any new employee has to go --

11   Q.   Any new employee?

12   A.   Absolutely.

13   Q.   All right.  But Francis's consideration, you are going to

14   try to circumvent that entire process to get her ready for the

15   same parts?

16   A.   That is correct.

17   Q.   Okay.  Now, what did -- I assume it would be less pressure

18   on you if Stony Brook notified you this back in August,

19   correct?

20   A.   Yes.

21   Q.   Because you could have gone through this whole process?

22   A.   That's correct.

23   Q.   All right.  Thank you for that, Mr. Candiotti.  Okay.  I'd

24   like you to look at GC-10 and 11.  It's the next in those

25   documents I have in sequence order for you.

1    A.    Thank you.

2    Q.    So you can look at 10 and 11 together.  There are the job

3    ads that we've heard so much testimony about.  One is dated

4    December 12th, one's dated December 16th, correct?

5    A.    Yes.

6    Q.    Okay.  And this is for Stony Brook?

7    A.    Yes.

8    Q.    Okay.  Sort of a site specific ad as we've heard testimony

9    on?

10   A.    Yes.

11   Q.    Right.  But she would also testify that you use somebody's

12   primary locations to -- as marketing to get employees in and

13   then move them around, correct?

14   A.    Yes, correct.  Right.

15   Q.    So if you ran the ad, you would move them within your

16   various 10, 20, 30 accounts, something like that?

17   A.    That's correct.

18           MR. JACKSON:  Objection, leading.

19           JUDGE GREEN:  Sustained.

20           MR. JACKSON:  I also object to lack of foundation.

21   The witness already testified that he had no involvement

22   running the ads in question.

23           MR. MILMAN:  That wasn't my question.  My question

24   was when they got somebody that answered the ad, right?  And it

25   was given to you, you would make the determination where you,

738

1   you'd move within your account.

2              JUDGE GREEN:  Okay.  Yeah.  Try to be careful with

3   the leading questions.

4              MR. MILMAN:  Okay.

5              JUDGE GREEN:  But I just was addressing the improper

6   objection.

7   BY MR. MILMAN:

8   Q.   Okay.  Mr. Candiotti.  So let's say that -- strike that.

9   Now, at some point you became aware that these ads were

10  conducted, correct?

11             MR. JACKSON:  Objection, leading.

12             MR. MILMAN:  At some point you became aware -- he's

13  already testified he was aware of that.

14             JUDGE GREEN:  Yeah.  Overruled.

15  BY MR. MILMAN:

16  Q.   You testified by both counsel.  Okay.  So Mr. Candiotti,

17  you had also testified something about a second wave or a

18  second phase.  Do you recall that?

19  A.   I do.

20  Q.   What does that mean?

21  A.   So pertaining to a second wave, two components take place.

22  We do what's called a sun setting phased rollout.  And that is

23  going to mean that we're --

24  Q.   It's for new operations?

25  A.   Yes.

1  Q.   Okay.

2  A.   Anytime we are taking on a new client, whether that be a

3  brand new valet service being incorporated into a facility or

4  we are taking over a prior operation and coming on as a new

5  vendor.

6  Q.   Right.

7  A.   So there's two components to sun setting.  We're -- and

8  this was something that the management team taught me a long

9  time ago.  You know, you're basically arching the crescent

10 crest of the sun, right?

11        So you're loading up on management, management,

12 management and staff, even super saturating above the scheduled

13 work at times.  And then you're sizzling that down.

14        So you are ultimately trying to now bring in your

15 second tier of hires to move some of those potentially more

16 experienced candidates out that have now established protocol,

17 procedures, culture, and lower overtime to make sure it's a

18 sustainable operation.

19 Q.   Okay.  And management phase is up too, to some extent?

20 A.   Yes, absolutely.  I mean, realistically you're talking

21 several hundred accounts, a dozen managers, right?  So you

22 can't sustainably continue to be on site every single day from

23 an account executive level.

24 Q.   Right.  And that's a specific methodology for as you just

25 testified, for startups, correct?

1   A.   Correct.

2   Q.   Stony Brook being one of those startups?

3   A.   Yes.

4   Q.   Okay.  Now, is there any significance to those dates in

5   correlation to this Phase 2 or second wave?

6   A.   Well, if I understand the dates to be the 12th and can we

7   --

8   Q.   Let me rephrase the question.

9   A.   It's not really --

10  Q.   Let me rephrase the question because you -- is there any

11  target dates that are looked at in the -- in correlation to a

12  startup and this second wave of hiring that you testified to?

13  A.   So generally, we'll start sun setting around Week 3 or 4.

14  Q.   Week 3 or 4 of the startup of operation?

15  A.   Correct.  That -- the day of initiation of that account.

16  Q.   And did those ads correlate to the second wave or that

17  Phase 2 process?

18  A.   If I could just kindly ask again, I don't actually see

19  dates here.  They're screenshot dates, but they're not dates of

20  the ads.

21  Q.   Okay.  So -- okay.

22  A.   Well, it says -- if I may, it says this is the 16th of

23  December is this screen capture and it says it was posted 25

24  days ago.  This one is saying that it's the 12th of December

25  posted 22 days ago.

1          I also think these are the same documents in

2   different formats, but assuming that brings us back to mid --

3   is that mid-November?

4   Q.   Okay.

5   A.   Then mid-November, we would ramp up for our Phase 2.

6   Q.   Okay.  And if you did it in mid-November after you had

7   just testified the whole process, so when would you expect,

8   let's say kind of the -- if needed, the first phase of kind of

9   -- strike that.

10          You had testified again in the whole process, how

11   long, okay?  On average does that whole process -- I lost track

12   of the dates, but how long does that whole process last from

13   again, job offer, everything you testified to, all meats -- all

14   the guts in between that to when you call and they're an active

15   employee and they have a schedule?

16          Usually, what does that take your experience?

17   A.   With no complication on background check, just shy of a

18   month.

19   Q.   Okay.  And now, that -- what happens if, let's say that

20   Phase 2 is starting, okay?  But you just don't have enough

21   applicants to move in there yet, what would you do?

22   A.   Could you repeat that?

23   Q.   Yeah.  Let's say you were trying to enter this Phase 2

24   where you are eliminating overtime fast or whatever the case

25   is, but you don't have enough applicants in that are ready to

1  be put into a Phase 2 of a new operation.

2          They're busy at some other new operations or other,

3  what would you do to fill in place?

4  A.   There's two routes as an account executive, if leadership

5  was asking about why that isn't being executed.  Either one

6  potentially try to coordinate and pull from other realms.  If

7  that wasn't an option, then I guess in theory this Wave 2 might

8  be slightly delayed.

9  Q.   Would you as the account executive start jumping in and

10 parking cars?  You don't --

11 A.   I absolutely would.

12 Q.   All right.  Okay.  Do you go to work in that uniform every

13 day?

14 A.   Seven days a week.

15 Q.   And if you didn't wear that uniform, would you be parking

16 cars?

17 A.   Yeah.

18 Q.   Okay.  On that November 25th, 2023 meeting with Francis,

19 did you make in that 10 minutes, any evaluation whether she was

20 trustworthy or not?

21         MR. JACKSON:  Objection.  Asked and answered already

22 on this.

23         MR. MILMAN:  Not to this witness.  Not to this

24 specific Francis, as in general.  This goes directly to the

25 scope.

```
 1            JUDGE GREEN:  I'm sorry, say the question again.
 2   BY MR. MILMAN:
 3   Q.   I said on your November 25th -- 23rd meeting, did you make
 4   specific inference or judgment whether Francis was trustworthy?
 5            JUDGE GREEN:  Okay.  Overruled.  You can answer.
 6            THE WITNESS:  I can answer?  Okay.  Yeah.  My
 7   interpretation was she was honest.
 8   BY MR. MILMAN:
 9   Q.   But did you have any experience on that to know whether
10   she was honest?
11   A.   No.  Not -- outside of the scope of an interview and
12   referrals?
13   Q.   Yeah.
14   A.   No.
15   Q.   Out of all the applicants that you interviewed and that
16   you offer a job in that brief interview, in your opinion, did
17   they seem honest that you -- is that one of the reasons why you
18   offer a job?
19   A.   Yes.  That -- yeah.  That's the prerogative.
20   Q.   But as you said, you never know, correct?
21   A.   You can't be 100% certain.
22   Q.   Okay.
23   A.   I try to be the best Judge of character I can.
24   Q.   Right.  Now, let's look at next in line GC-13, I think at
25   GC-13.  Okay.  Is that -- yeah.  The QR codes.  Okay.  So
```

1    you've seen the Bobby Gust QR code, right?  Before you

2    testifying today, correct?

3    A.    Yes.

4    Q.    All right.  The testimony that he gave it to Travis to

5    hand down, correct?

6    A.    Correct.

7    Q.    Now, you've also testified that as of November 9th you

8    were ready to roll if you had to at Stony Brook?

9    A.    Yes.

10   Q.    And these QR codes were given out in mid-November; isn't

11   that correct?

12   A.    I believe -- yes.  That's correct.

13   Q.    So why would these QR codes be given out to Classic

14   employees to fill out the form if you were, you know, ready to

15   go.  You were staffed up, your preparation has been a success,

16   you ready to go?  Why would you do that?

17   A.    So we -- as I mentioned, I believe, we were put in a very

18   uncomfortable position by Stony Brook.  And as a result of

19   Classic's lack of communication to their staff, Stony Brook had

20   asked us to delicately start having some conversation with the

21   existing staff.

22          They were fearful that right before the -- throughout

23   the Thanksgiving holiday week that they weren't going to get to

24   December 1 for us to start.  They thought there was going to be

25   a walk-off prior.

1        There was a lot of intercommunication apparently

2   taking place.  It was getting back to the MAPS team.  The MAPS

3   team told us they were fearful.  They asked us to try to get it

4   to mitigate.

5        There's not many great options.  And still reading

6   these, not per se a great option other than at least giving

7   them an ear to vent and get some information from them.

8   Q.   Now, were these -- were the Classic employees precluded

9   from another working at Parking Systems?

10  A.   Can you --

11  Q.   You know, were the Classic employees, the lost souls we

12  heard testimony about, were they precluded from ever working in

13  Parking Systems?

14  A.   I just want to be sure on definition of precluded.

15  Q.   Oh, forbidden.  We weren't going to hire them ever at

16  Parking Systems --

17  A.   As a potential Parking Systems employee --

18  Q.   Yeah.

19  A.   -- in general?  That was not the case.  They weren't

20  forbidden from being an employee.

21  Q.   Right.  But if they did go to work for Parking Systems

22  down the road, whether it be at Stony Brook or another location

23  or integrated throughout, wouldn't they have the same culture

24  that you talked about that they had at Classic if they worked

25  there for years?

1    A.   It's a fair point.  The notion of giving an individual

2    applicant a chance to come to a functioning campus in the

3    future would potentially have success rate.

4            So if there is a ratio of now 25 candidates in

5    Parking Systems, procedures, and compliance, and now one is

6    plopped in, it's a very different transition than one site

7    manager trying to uproot 25 staff members with embedded

8    culture.

9    Q.   And as you said, old habits are hard to break.

10   A.   That's correct.

11   Q.   Okay.  And as you also testified, they come in with

12   different policies and economic structures and stuff -- and the

13   such, correct?

14   A.   Yeah.  It's a different employer.

15   Q.   PTO days, vacations, all that kind of stuff?

16   A.   Yes.

17           JUDGE GREEN:  Okay.  So it is redirect and we are

18   rehashing at this point.

19           MR. MILMAN:  But I have to go -- they each got a

20   chance to repeat what the other one asked.

21           JUDGE GREEN:  I understand.  But it's a three-party -

22   - it's a three-party process.  This is different.  This is

23   redirect.  It's not cross.

24   BY MR. MILMAN:

25   Q.   I'll move on, Your Honor.  I'll be respectful to your

1    decision.  I just want to be given the same rights to protect

2    my client that's facing a very large potential damage remedy.

3            So I'm doing my best to protect them, Your Honor.  I

4    have that right.  Now, let's go to GC 15 next in the sequence.

5    This would be the big domino testimony.

6    A.    Okay.

7    Q.    Okay.  So by the way, is Andrew Goldsmith involved in the

8    -- is he involved in the interchange with Stony Brook on

9    pricing and economics?

10   A.    Absolutely not.

11   Q.    Are you?

12   A.    No.

13   Q.    Now Goldsmith's questions are directed to you in this big

14   domino, right?  Email that we've heard so many questions on,

15   right?

16   A.    It's on it.  I don't know if it's specific questions, but

17   Josh, I would say it's directed to the group.

18   Q.    But you responded?

19   A.    I did respond.

20   Q.    Okay.  And why did you respond?

21   A.    Because Andrew was looking for support.

22   Q.    Okay.  And you said Andrew's had a lot of questions on his

23   first startup for him, correct?

24   A.    Absolutely.

25   Q.    Okay.  Now, how did you interpret Andrew's comment?  And

1  tell us about what your response means.

2  A.   Sure.   In that question in the big domino.   So in the

3  statement, I feel like this is the biggest domino right now.

4  This email was after a conversation that I had with Andrew

5  after a site visit.

6        Andrew was getting bombarded and I understand why.

7  He would step on site as the new parking company and he was not

8  able to step five feet without being bombarded with questions

9  about future employment opportunities for the staff.

10        They mentioned they heard -- to be clear, Classic

11  staff, they had not heard from their employer.   They were

12  desperate to understand where their -- and rightfully so, where

13  their job stood, what was going on.

14        Do I have a position?   And Andrew was likely feeling

15  the bone of it, right?   Even though he is -- not  his place to

16  say, it's not Parking Systems' problem.

17        You know, semantics aside, you have someone that's

18  stepping on site and can't do anything he's supposed to do

19  during recon, because the primary question again and again is,

20  are you hiring me?

21  Q.   Okay.

22        MR. JACKSON:   Objection, hearsay.

23        JUDGE GREEN:   Overruled.

24        MR. MILMAN:   Your Honor, at this point I'd like to

25  move in and just move on the testimony.   I like to move --

```
 1              JUDGE GREEN:  Any objections to Respondent's R-7?
 2    It's the policy.
 3              MR. JACKSON:  No objection.
 4              JUDGE GREEN:  Okay.  From the Union?
 5              MR. ROCCO:  No.
 6              JUDGE GREEN:  So R-7 is admitted.
 7        (Respondent's Exhibit 7 received)
 8    BY MR. MILMAN:
 9    Q.   Thank you, Your Honor.  Mr. Candiotti, in your experience
10    in startup operations, have you ever seen a group like the
11    Classic employees that were less so in the dark about their
12    employment status as you did with Classic?
13              MR. JACKSON:  Objection, relevance?
14              MR. MILMAN:  It goes to the refusal to hire because -
15    - I mean, what happened -- if your refusal to hire allegation
16    is not relevant, I withdraw the question.
17              JUDGE GREEN:  Okay.  Ask the question again.
18    BY MR. MILMAN:
19    Q.   Yeah.  Have you ever seen in your experience doing
20    startups, as you testify you have a lot of experience in the
21    startup operations, have you ever seen a group of employees who
22    worked for the outgoing company that was so in the darkness to
23    their status?
24    A.   I have not.
25              JUDGE GREEN:  Overruled.
```

1          MR. MILMAN:  Thank you, Your Honor.  Your Honor, may

2     I approach?

3          JUDGE GREEN:  Off the record, please.

4          COURT REPORTER:  Off the record.

5     (Whereupon, a short recess was taken)

6          JUDGE GREEN:  Back on the record.

7     BY MR. MILMAN:

8     Q.   Okay.  Mr. Candiotti, can you look at GC-17, please.

9     A.   Yes.

10    Q.   Okay.  Got it.  Okay.  Now, you've testified about the

11    November 9th letter from Mr. Rocco and Bobby Gust's

12    calculations of that attached CBA.  Was this the first time

13    that -- this was the first time you became aware that Classic

14    was a union, correct?

15    A.   That is correct.

16    Q.   This is the first time, or is it not, that this union

17    issue became a discussion in the startup operations?

18    A.   That is correct.  We did not speak about that prior.

19    Q.   What, if anything, if you know yourself or the startup

20    team did next concerning this union issue that was raised for

21    the first time -- raised to you for the first time?

22    A.   So our team followed it to legal representatives.

23    Q.   Okay.  And that would be Robert Milman?

24    A.   That is correct.

25    Q.   Okay.  Okay.  Can you look at -- well, there's been

1  testimony -- actually, look at GC-23, please.  Actually, before

2  you do that, look at GC-20 in sequence.  This is the one with

3  the one regarding Francis.

4  A.    Okay.

5  Q.    Okay.  And I know there's been -- there would've been

6  dialogue back and forth with you, Bobby and Johnny Baron.

7  Johnny Baron gave permission to go make a job offer to Francis,

8  correct?

9  A.    Correct.

10  Q.    Was that because she was in a union?

11  A.    No.

12  Q.    Why would you need Johnny Baron's authority to take on one

13  individual?

14  A.    Because we'd be breaking protocol.

15  Q.    Okay.  And what is that -- the protocol on predecessor

16  employees or --

17  A.    We do not onboard company staff at an account that we're

18  taking over in a contract acquisition.

19  Q.    As far as you're involved on the accounts that you've been

20  involved in, has that always been the case?

21  A.    Yes.

22  Q.    Okay.  Have you ran other site specific ads?  I mean, not

23  you, I know you don't do the ads, but have you -- in your

24  account portfolio of locations, have there been other site

25  specific ads run?

```
 1   A.   Yes.
 2   Q.   Okay.  And do you know if at the time that you were
 3   running a site specific ad for -- not you, the part of running
 4   a site specific ad for Stony Brook, whether there were other
 5   site specific ads being run in the other 250 plus locations?
 6   A.   I'm not certain.
 7   Q.   Right.  In your -- his -- in your tenure with Parking
 8   Systems, has more than one site specific ad run for what --
 9   different locations at the same time?
10   A.   Yeah.  There would be overlap.
11   Q.   Okay.  I only have a few more questions, Your Honor.
12        You had testified that you have -- you -- currently, do
13   you have communications with Maps (phonetic)?
14   A.   I do.
15   Q.   Okay.  And at the time of the startup, did you have
16   communications with MAPS ?
17   A.   Yes.
18   Q.   Was it steady communications?
19   A.   On startup, yes.
20   Q.   Okay.
21   A.   Less frequent now.
22   Q.   In any of your conversations with MAPS or Nick or Dan --
23   Nick Stefanelli and Dan Atkins, did the word union ever come up
24   in your conversations?
25             MR. JACKSON:  Objection.  Beyond the scope,
```

```
 1  repetitive testimony,
 2           MR. MILMAN:  I guess to beyond this whole case then.
 3           JUDGE GREEN:  Okay.  I mean, we've heard this many,
 4  many times, but go ahead.  Let's --
 5  BY MR. MILMAN:
 6  Q.   Have you ever heard -- did the word union ever come up in
 7  your conversations with Dan Atkins or Nick Stefanelli?
 8  A.   No.
 9  Q.   You sure about that?
10  A.   Yes.
11           MR. MILMAN:  Okay.  Thank you.  No further questions.
12           JUDGE GREEN:  Okay.  Any recross?
13                          RECROSS EXAMINATION
14  BY MR. JACKSON:
15  Q.   Yes, Your Honor.  Is part of your job to like supervise
16  other employees at Parking Systems?
17           MR. MILMAN:  Objection to form, other employees.
18  BY MR. JACKSON:
19  Q.   Do you supervise --
20  A.   Yes.
21           JUDGE GREEN:  Sorry, there's an objection.
22           MR. MILMAN:  Yeah.  He says, is it your job to
23  supervise other employees?  I said object to form, other
24  employees.
25           JUDGE GREEN:  Okay.  Overruled.  I think it's
```

1   understandable.

2   A.   Yes.

3   BY MR. JACKSON:

4   Q.   Right.  So if someone -- if an employee's not doing

5   something right, it's your job to instruct them and handle the

6   problem, right?

7   A.   That'd be correct

8   Q.   If you saw somebody doing something wrong or not following

9   policy, you're supposed to correct them, correct?

10  A.   Depends on the circumstances, but if it's in the purview

11  of my supervision, yeah.  It would be my responsibility, yeah.

12  Q.   Okay.  And that's what you typically do when you see

13  someone like not following --

14         MR. MILMAN:  Objection.  Asked and answered.

15         JUDGE GREEN:  Overruled.

16  BY MR. JACKSON:

17  Q.   That's what you typically do when you see someone not

18  following policy, correct?

19  A.   Correct.

20  Q.   Okay.  During your interview with Francis Gil Reyes, you

21  did not ask her rate of pay, correct?

22  A.   No.

23  Q.   You did not ask her about -- or you did not talk to her

24  about the processes that Parking Systems would implement,

25  correct?

1  A.   We did not.

2  Q.   And you did not talk to her about the potential of

3  interchanging between Stony Brook and other Parking Systems

4  websites, correct?

5  A.   No.  We did not talk about that.

6  Q.   You did not talk to her about anything about uniforms,

7  correct?  Is that correct?

8  A.   Correct.

9  Q.   And you didn't ask her about her experience, correct?

10 A.   Correct.

11 Q.   Okay.  The -- there's a testimony about a sunset.  Is --

12 were you saying that at the beginning of that sunset arc, the

13 staffing at the site -- at the new site ramps up above the

14 level that you need?

15 A.   Yes.  Correct.

16 Q.   And that happened at Stony Brook?

17 A.   Correct.

18 Q.   And you said Phase 2 began in mid-November?

19 A.   It -- we didn't operate in -- we started December 1.

20 Q.   Oh, okay.  So when did Phase 2 for Stony Brook begin as

21 far as you understand?

22 A.   I'm not sure I understand the question.  Are you saying

23 Phase 2 hiring?

24 Q.   Yeah.  I mean to -- you testified very confidently on

25 direct about this Phase 2 of this new onboarding and whenever

1    you get a new shop.

2            So I think you have some kind of understanding of the

3    Phase 2.  Do you understand what I'm mean by Phase 2?

4    A.   Yes.  But I'm not sure what part you're asking about.  Are

5    you asking when we started hiring for Phase 2 or when Phase 2

6    took place on site?

7    Q.   What's the difference?

8    A.   Comparatively, we would start hirings October and November

9    and start operating December 1.  As an example for this project

10   we're talking about, we would -- one's doing the work and one's

11   hiring for the work.

12   Q.   Okay.  So let me just understand.  When did you begin

13   hiring to staff up?

14   A.   We worked on that for a while.  Then I think the initial

15   first crack of it might have been end of August.

16   Q.   End of August?  Okay.  And that was the beginning of your

17   Phase 1, I suppose?

18   A.   Correct.  That was when we were dealing with our

19   integration, logistic planning, and the initial hiring.

20   Q.   So you're doing initial hiring, then new hires?

21   A.   Combination of new hires, as well as figuring out the plan

22   to reschedule so that first wave of Stony Brook implementation.

23   Q.   And if you're doing new hires, you would expect the

24   regional manager to have put out ads for new hires for that

25   site, right?  In late August or maybe even early September?

757

1    A.    Not likely.   The reason I would say not likely is usually

2    we'd have to be careful about branding ourselves about a

3    location too early before taking over that contract.   Contract

4    would've to likely be at least known to the public.

5           So generally we'll start -- starting to put out the

6    word or an Instagram post or some sort of social media info

7    once the actual institution puts it on their public forums.   So

8    when we took over Mount Sinai, they announced about two weeks

9    before our start date that we were going to be their parking

10   vendor.

11          They did not have parking services.   We come in there

12   and then at that point, it'd be appropriate to utilize their

13   branding.   We have to be careful how early we do that.

14   Q.    So you have to get authorization from the client before

15   you start advertising that you their parking vendor?

16   A.    Yeah.

17   Q.    Okay.   When did you get authorization from SBU, Stony

18   Brook University?

19   A.    I wasn't on that party of that conversation, but I would

20   assume it would be within that timeline.   But to be clear, I

21   don't know.

22   Q.    So you don't really know?

23   A.    Yes.

24   Q.    Okay.   Did you say that Phase 2 in some fashion began in

25   mid-November?

1    A.    Phase 2 hiring.

2    Q.    Okay.  And that included solicitations for site specific

3    to Stony Brook, right?

4    A.    That'd be accurate.

5    Q.    And the intention was to get the people who were included

6    in then Phase 2 round of hiring to go work at Stony Brook and

7    sometimes up there, correct?

8    A.    Potentially they're in other locations, but using that for

9    end recognition was important.

10            MR. JACKSON:  Okay.  No further question.

11            JUDGE GREEN:  Union?

12                        RECROSS EXAMINATION

13    BY MR. ROCCO:

14    Q.    Mr. Candiotti, did you discuss your testimony with anybody

15    during lunch break?

16    A.    No.

17    Q.    And you were asked about a question -- you were asked a

18    question about a text message where there was -- where the

19    company where you sought permission from Johnny Baron to hire

20    one employee.  Do you recall that question?

21    A.    I do.

22    Q.    Okay.  And this text seeking permission to hire the one

23    employee, that text was sent after Parking Systems learned

24    about the Union?

25            MR. MILMAN:  Objection.  Asked and answered.

1          JUDGE GREEN:  Overruled.

2    A.   That text was Sunday, November 19th, so, yes.

3    BY MR. ROCCO:

4    Q.   Okay.  And you interviewed Francis Gil Reyes on November

5    25th, 2023, right?

6          MR. MILMAN:  Asked and answered.

7          JUDGE GREEN:  Yeah.  I assume this is just

8    preliminary, right?

9          MR. ROCCO:  Yes.

10          JUDGE GREEN:  Right.  So let's just move through it.

11   You can just -- yeah.

12   BY MR. ROCCO:

13   Q.   You were expecting Francis Gil Reyes to begin work on or

14   around December 1st, 2023?

15   A.   Yes.

16          MR. ROCCO:  Okay.  No further questions.

17          JUDGE GREEN:  Okay.  I just have a couple of

18   questions about the sun setting --

19          THE WITNESS:  Sure.

20          JUDGE GREEN:  -- thing.  Did I hear correctly that

21   you said at some point the experienced people who started --

22   who basically opened up the new project might start going back

23   to where they came from?

24          THE WITNESS:  Yeah.  Not portraying the entire group,

25   but absolutely.

```
 1            JUDGE GREEN:  Okay.  And so who replaces those

 2   people?  Or maybe you're overstaffed, so you don't need to

 3   replace those people?

 4            THE WITNESS:  So it could be a combination.  So by

 5   sun setting, you are to a degree overstaffed, but you may

 6   displace some of the veteran or seasoned staff beyond that, and

 7   then bring in some additional new hires, which would be the

 8   Phase 2 hiring.

 9            JUDGE GREEN:  Got you.  Okay.

10            MR. MILMAN:  One question, Your Honor?

11            JUDGE GREEN:  Yeah.

12                      REDIRECT EXAMINATION

13   BY MR. MILMAN:

14   Q.   Those experienced employees, in-house Parking Systems

15   employees that you bring to a new operation and they go -- when

16   the judge asks you, they go back to their place, but -- they

17   don't go back to a set location, they go within the whole

18   integration; is that correct?

19   A.   That's correct.  And I would also just --

20            JUDGE GREEN:  Okay.  Overruled.

21            THE WITNESS:  I would just say -- oh, sorry.

22            JUDGE GREEN:  It's okay.  We've heard this numerous

23   times, so go ahead.

24   A.   I would just say that it doesn't particularly mean that

25   they return to even a place they worked prior.  They may be now
```

```
 1   going to the next startup or a facility that just seems to
 2   match their current scheduling.
 3   BY MR. MILMAN:
 4   Q.   Thank you.
 5             JUDGE GREEN:  Okay.  Lastly, any recross?
 6             MR. JACKSON:  No recross.
 7             JUDGE GREEN:  Thank you very much.  You're free to
 8   go.
 9             THE WITNESS:  Thank you, Your Honor.
10             JUDGE GREEN:  Bobby, you and I just keep walking.
11             MR. MILMAN:  Back to the bathroom.  Get out of the
12   courtroom.
13             JUDGE GREEN:  Okay.  So what do we have next?
14             MR. MILMAN:  Yes.  We have Bobby Gust.
15             JUDGE GREEN:  Okay.
16             MR. MILMAN:  I just need that -- just a few minutes
17   to go over documents and make sure --
18             JUDGE GREEN:  Okay.
19             MR. MILMAN:  -- we have enough copies because
20   somebody's going to considerable in length stamping documents.
21             JUDGE GREEN:  Okay.  So off the record.
22        (Whereupon, a short recess was taken)
23             JUDGE GREEN:  On the record.  Okay.  So, Mr. Gust,
24   you were already sworn in, so just -- you're still sworn in.
25             THE WITNESS:  I understand.  Thank you.
```

762

```
 1   Whereupon,
 2                         ROBERT GUST,
 3   was called as a witness having been previously duly sworn, was
 4   examined and testified as follows:
 5                       DIRECT EXAMINATION
 6   BY MR. MILMAN:
 7   Q.   Mr. Gust, you have your glasses up there?
 8   A.   Yes, sir.
 9   Q.   Okay.  Just wanted to make sure.  Who's your current
10   employer?
11   A.   Parking Systems.
12   Q.   And what titles do you hold at Parking Systems?
13   A.   I'm a partner, so -- but I serve as an account executive.
14   I serve as a recruitment specialist.  I also do backend work.
15   I have experience in computers, so --
16   Q.   And how long have you been working at Parking Systems?
17   A.   I started in October of 1987.
18   Q.   And when you started, were you in management or did you
19   start as a -- an attendant?
20   A.   I started as a parking attendant.
21   Q.   Do you recall where you started?
22   A.   Coco's Water Cafe in Babylon.
23   Q.   Have you always worked in Long Island primarily?
24   A.   I might have done one off jobs outside of Long Island, but
25   yeah.  Just primarily Long Island
```

763

1    Q.    Coco's Water is a restaurant?

2    A.    Yes, it is.

3    Q.    Okay.  And who are the other owners of Parking Systems

4    aside from yourself?

5    A.    Mark Baron, Michael Petruzzelli, Johnny Baron, Michael

6    Flynn, Matt Callari, myself, Josh Candiotti, Jimmy Alexopoulos

7    -- oh, somebody.

8    Q.    They're all ownership?

9    A.    Jason -- yeah.  Hold on.  Ownership.  Jason Baron,

10   probably missed one.

11   Q.    Okay.  And with all the different hats that you wear, on a

12   day-to-day basis, what are your core duties?

13   A.    Oh, so a typical week, during the week, I'm doing a lot of

14   back office stuff.  So I end up dealing with some of the

15   payroll.  So we have some sort of unusual issues with payroll.

16          Because of the way we separate our -- the way our

17   business model works, you have what we've been describing as

18   account executives and account representatives, oversee a group

19   of accounts.  They have a labor pool --

20   Q.    Right.

21   A.    -- so anywhere from -- on the small end, 20 or 30

22   employees work directly to them -- for them, to -- on the

23   higher ends, upwards of 60 or 70, I'd say, you know, roughly.

24   Q.    Okay.

25   A.    They operate their individual accounts through their labor

1    pool.  However, if they have -- if they face challenges

2    staffing their own locations, they will reach out to other

3    members, other account executives.

4         Why that becomes an issue?  Because everyone

5    processes their own payroll.  So just as a way of example,

6    let's say myself and another supervisor or use Josh as an

7    example.  Josh takes John Doe and puts him to work for 25

8    hours, right?

9         But Jimmy Alexopoulos also happens to use John Doe.

10   John Doe works for Jamil Alexopoulos for 25 hours.

11   Individually they don't realize that they have an overtime

12   consideration, right?

13        That they need to take into consideration.  So -- but

14   obviously the employees do overtime.  Every -- after they

15   finish all their time and attendance work, that gets forwarded

16   to me.  I then run it through a script that captures all that

17   data and then expenses it accordingly.

18   Q.   That's also a good way for you to know the various labor

19   pools within each account executive?

20   A.   Yeah.  In many ways I see a lot of that stuff.  Like I'm

21   kind of the choke point.  Not all of it goes through me, but a

22   fairly high percentage.

23   Q.   Okay.  And do you report to work in that uniform?  The

24   Parking Systems uniform?

25   A.   Work is a -- told you I wear many hats.

1   Q.   Yeah.  So do you wear that uniform every day?

2   A.   Not at my desk, but when I'm out in the field, most

3   certainly.

4   Q.   Okay.  And do you actually park cars?

5   A.   Absolutely.

6   Q.   Okay.

7   A.   I'm probably the best parking attendant you've ever seen.

8   Q.   I don't doubt.  And Mr. Candiotti parks cars?

9   A.   Yes.

10  Q.   Mr. Johnny Baron parks cars?

11  A.   He does.

12  Q.   You've seen Johnny Baron park cars?

13  A.   Yes, I have.

14  Q.   You've seen Mr. Candiotti park cars?

15  A.   Yes, I have.

16  Q.   You've seen Mr. Baron park cars?

17  A.   Occasionally.

18  Q.   How old is he?

19  A.   He's older.

20  Q.   Okay.

21  A.   I -- 75.

22  Q.   Older than us?  Older than us?

23  A.   Yes.

24  Q.   Okay.  And he -- did he park cars to the --

25  A.   Yes, he did.

```
 1              MR. JACKSON:  Objection, relevance.

 2              MR. MILMAN:  It goes to --

 3              JUDGE GREEN:  Where does it go to?

 4              MR. MILMAN:  Yeah.  It goes to the -- it goes to

 5    operational standard.

 6              JUDGE GREEN:  Yeah.  Okay.  Overruled.

 7    BY MR. MILMAN:

 8    Q.   And those other owners that you mentioned, did they

 9    actually physically park cars too?

10    A.   I can't think of one that doesn't, so yes.

11    Q.   Okay.  You had an opportunity to view some of the

12    operations at -- that -- strike that.  Did you ever have an

13    opportunity to review Classic performing job duties for Stony

14    Brook?

15    A.   I did.

16    Q.   Do you know who owns Classic?

17    A.   I do not.

18    Q.   Okay.  Do you know if there was ever an owner on-site

19    parking cars?  Classic owner parking cars?

20    A.   I don't know who the owner is.

21    Q.   Do you know Richard?  You heard the name Richard?

22    A.   I do know Richard.

23    Q.   Who was Richard?

24    A.   Richard, it was described to me as the operational

25    manager, the site manager for --
```

1  Q.   Did you ever meet him when you were actually on the site

2  prior to December 1 viewing operations?

3  A.   Yes, I did.

4  Q.   Did you ever see him park in cars?

5  A.   I did not.

6  Q.   Okay.  What was Richard wearing when you met him?

7  A.   He was wear -- I believe he was wearing a Classic jacket,

8  but I'm not entirely sure.

9  Q.   Did you see other managers at the site besides Richard?

10 A.   Nobody identified themselves as the manager, no.

11 Q.   Up until the time that Parking Systems took over

12 operations on December 1, did you meet any other managers at

13 Classic?

14 A.   No.

15 Q.   Okay.  Did you see anybody else wearing jackets at the

16 facility?

17 A.   So they had some uniform jackets.  I wouldn't say that

18 everyone wore the same.  It seemed like that you had some

19 legacy stuff, you know, that just hadn't been updated to be

20 exactly the same.

21 Q.   Okay.  No one was wearing a standard uniform the way

22 Public Systems does?

23 A.   No.  It wasn't uniform across the entire staff.

24 Q.   Okay.  So let me just back up a little bit.  Are you aware

25 of how Parking Systems became the approved contractor to

768

1    perform valet services at Stony Brook Hospital?

2    A.    I don't -- I assume you -- we won the bid.

3    Q.    Okay.  And was that an RFP or an RFB or --

4    A.    RFP.

5    Q.    Okay.  And when did you learn that Parking Systems was

6    awarded the contract form valet services at Stony Brook

7    Hospital?

8    A.    Prior to our opening date, obviously, sometime in -- I'd

9    say the summer of 2023.

10   Q.    Okay.  Who notified you?

11   A.    Specifically, I don't know.

12   Q.    Okay.  But would it -- had it been Johnny or Mark Baron or

13   Petruzzelli or you?

14   A.    I'm sure I would've, yeah.

15   Q.    Okay.  And at that time that they notified you, did they

16   mention anything about unions?

17   A.    No.  They did not.

18   Q.    Does Parking Systems deal with the Union?

19   A.    Yes, we do.

20   Q.    Do you know which union it is?

21   A.    I do not.

22   Q.    You don't know the number, correct?

23   A.    I do not.

24   Q.    Right.  And have you ever seen the collective bargaining

25   agreement?

1    A.    I have not.

2    Q.    Okay.  You don't do the negotiations for the contract,

3    correct?

4    A.    I do not.

5    Q.    Okay.  Do you know who does?

6    A.    I would say Johnny Baron.  That's --

7    Q.    Okay.  Okay.  And do you know if he does it with legal or

8    he does it by himself?

9    A.    I do not know.

10   Q.    Okay.  But you don't do it?

11        JUDGE GREEN:  I'm sorry, can we go off the record for

12   a moment?

13        MR. MILMAN:  Of course.

14        JUDGE GREEN:  Sorry, I have to take this.

15   (Whereupon, a short recess was taken)

16        JUDGE GREEN:  -- the record.

17   BY MR. MILMAN:

18   Q.    Okay.  So my next question, upon you being noticed that

19   Parking Systems want to Stony Brook Hospital contract, did --

20   at some point in time, did you get involved in the preparation

21   and startup for Stony Brook operations?

22   A.    Yes, I did.

23   Q.    And were you part of a team that was put together?

24   A.    Yes.  That's fair.

25   Q.    Okay.  And at some point in time after this team was

1    created, did you have an opportunity to actually, you know,

2    view Classic performing its parking services at Stony Brook

3    before December 1?

4    A.    I did.

5    Q.    And how many times would you say you went down there to

6    basically -- the view of operations?

7    A.    I -- maybe half a dozen, maybe a little less.

8    Q.    Okay.  So roughly five or six.

9    A.    That's fair.

10   Q.    Okay.  And have you ever done that before at any other

11   locations that you took over?

12   A.    Yes, I have.

13   Q.    All right.  And so between -- okay.  I -- more than 10

14   times have you done that in -- since 1987?

15   A.    Yes.

16   Q.    Okay.  And -- well, let me ask you something.  On the

17   converse end, have you -- strike that.  One of your titles is

18   an account executive; is that correct?

19   A.    That is correct.

20   Q.    One of the eight account executives at Parking Systems?

21   A.    I actually think there's more than that, but yes.  That's

22   correct.

23   Q.    Okay.  In addition to being an auditor?

24   A.    That's correct.

25   Q.    Okay.  And so you have a portfolio of locations that are

1  within your portfolio, right?  You have other locations with
2  your portfolio, correct?
3  A.    Yeah.
4  Q.    And what's your geographical zone?  I -- and I know when I
5  say that you wear many hats, so you transcend many different
6  lines, but just to keep it as tight as we can for testimony,
7  what geographical location is -- are you primarily allocated?
8  A.    Northern Nassau County.
9  Q.    Okay.  And how many different locations, you know, do you
10 -- fall under your portfolio?
11 A.    In 25 to 30 I oversee.
12 Q.    Okay.  And what type of -- what type of industry
13 facilities are they?
14 A.    Kind of covered the gambit.  So I have catering halls,
15 restaurants.  I service two medical facilities.  Actually, go
16 back.  Up until recently I was actually also overseeing
17 accounts in Suffolk County because I used to oversee County
18 Medical Center as well, which that was kind of a one off thing.
19          I'm trying to think of some other examples of
20 industries.  I have an office building that kind of goes --
21 Q.    If you had to break down a number of employees to meet the
22 staffing shifts and hours in your portfolio, how many Parking
23 Systems employees on a given day would work to cover these
24 shifts in your portfolio?
25 A.    Well, I handle about 350, 360 shifts a week, in that

1  range.  40, 50 -- I think last count I had like somewhere

2  between 40 and 50 active employees.

3  Q.   Okay.  Are these 40 and 50 active employees only dedicated

4  to cover your shift hours at your portfolio locations?

5  A.   So the best way to answer that is they're Parking Systems

6  employees, right?  So they work for the entire company.

7  Obviously, they report directly to me.  I mean, a perfect

8  example is while we're sitting here today, I was speaking to

9  Josh because tomorrow's holiday.

10  Q.   Right.

11  A.   So -- and we're -- and I know he's stuck, so I asked him,

12  where are you stuck?  You know, I'm reaching out to my people

13  now.  If I have anybody look -- have anybody that can cover any

14  shifts, I'll let you know --

15  Q.   Okay.

16  A.   -- who's available.

17  Q.   Now --

18  A.   Thanks.

19  Q.   -- there's been some testimony today regarding document

20  production.  For example, Stony Brook payroll.  Let's start

21  with Classic payroll in December.

22        So that payroll states, for example, when Classic was

23  there, Stony Brook payroll.  Does Parking Systems have payroll

24  classification broken down by location or some other method?

25  A.   Well, the final product, Paychex wouldn't have that at

1   all.  Kind of prior to the -- like if you go downstream where

2   that comes up, admittedly, some supervisors submit that --

3   submit their payroll as individual things.

4        But the reality is that there's no easy way to break

5   it up because most of the, you know, most of your staff will --

6   you'll see a, you know, it's kind of they work here on Monday

7   and Tuesday, and so it's -- it you -- I couldn't pull that out.

8        Like I didn't produce 300 pages because I just --

9   like it was the only way to do it.

10  Q.   Okay.  So let's back up.  Let's back up so the record is

11  clear.  You had testified that you are involved in payroll for

12  the staffing for Parking Systems to some extent?

13  A.   That's correct, yes.

14  Q.   So you have access to the systematic procedures of

15  payroll?  You've actually seen payroll, correct?

16  A.   I do, yes.

17  Q.   Okay.  And in fact, you had just testified regarding how

18  there are some nuances with staffing and payroll because you

19  could have, as you said, 40 -- 25 hours at this location, 25 at

20  that location, but it's still overtime because it's part of one

21  company, correct?

22  A.   That's correct.

23  Q.   Right.  So if I and Rich Milman worked 25 hours as an

24  attendant at Stony Brook and then I worked 25 hours at Jake's

25  58, right?  I get 10 hours of overtime for that?

1    A.    That is correct.

2              MR. JACKSON:  Objection, leading.  Counsel's is

3    testifying.

4              JUDGE GREEN:  No.  Overruled.  Just -- let's --

5              MR. MILMAN:  Just to clarify, I'm using it as a segue

6    --

7              JUDGE GREEN:  I understand.

8              MR. MILMAN:  -- to get into payroll.

9              JUDGE GREEN:  So let's move along.

10   BY MR. MILMAN:

11   Q.    Right.  So have you ever seen a Parking Systems payroll

12   journal?

13   A.    The final product?  Yeah.  On occasion, yes.

14   Q.    Okay.  And am I correct that that payroll journal covers

15   the entire Parking Systems organization?

16   A.    It does.

17   Q.    Right.  So all the employees that work on any given week,

18   it would be Parking Systems payroll, correct?

19   A.    That's correct.

20   Q.    All right.  And would you be able to look at that payroll

21   journal and have a -- how would you know if you want -- if you

22   looked at that payroll journal, all right?

23              For a given week at Parking Systems, how many

24   employees would be working in a given payroll rate -- week

25   covering the hours that we have to cover for a client --

1    Parking Systems' cover for clients?

2    A.    That one's beyond.  I don't -- a lot, but yeah.  I

3    couldn't answer that.

4    Q.    On a given week, how employees work?

5    A.    Yeah.  I --

6    Q.    Okay.  Well, would it be more or less than a hundred if

7    you know?

8    A.    Well, more than a hundred.

9    Q.    More than 500?

10    A.    Yes.

11    Q.    More than a thousand?

12    A.    I don't think it's that many.

13    Q.    Okay.  So between 500 and a thousand employees given for

14    the parking system?

15    A.    Yes.

16    Q.    Okay.  And that would include lot attendants, management

17    office, everybody, or just lot tenants?

18    A.    Well, if you're talking about the payroll journal, that's

19    the final product, that's everything.

20    Q.    Okay.

21    A.    So -- and that's the reason I can't answer the question

22    because there's stuff that gets fed in there that doesn't --

23    Q.    So let's just say lot of attendants.  Would it still

24    between -- be between that 500 and 1,000 lot attendants work on

25    a given week?

1    A.    Yes.

2    Q.    And they're paid on a given week?

3    A.    Yes.

4    Q.    Okay.  Now, you are the custodian of records for

5    production of subpoenas to the government, NLRB, and the Union,

6    correct?

7    A.    That's correct.

8    Q.    My firm designated you as the custodian of documents?

9    A.    Yes, sir.

10   Q.    All right.  And as part of that responsibility of

11   producing documents, one of the requests that you -- was to

12   produce certain payroll documents, do you recall that?

13   A.    Yes, I do.

14   Q.    Okay.  And I believe one of the requests was the payroll

15   at Stony Brook Hospital, correct?

16   A.    Yes.  Yes, it was.

17   Q.    Right.  So when you pull up the payroll at Stony Brook

18   Hospital, isn't it easy -- don't you just see X amount of

19   dedicated employees that always work at Stony Brook?

20   A.    No.

21           MR. MILMAN:  So -- well, I -- what do we have to

22   submit?

23           MR. MAURO:  1.

24           MR. MILMAN:  1.  Okay.

25           MR. MAURO:  I just want to make clear for the record,

1  has Joint 1 been received?

2          JUDGE GREEN:  I don't think so.  I have it as Parking

3  Systems payroll, but I don't have it as being admitted.

4          MR. MILMAN:  I see.

5          JUDGE GREEN:  Okay.  You have an electronic copy of

6  that?  You can get it.

7          MR. MAURO:  Yeah.  I'll do that right away.

8          COURT REPORTER:  Yeah.  I got it.

9          JUDGE GREEN:  Oh, you got it?  Okay.

10          COURT REPORTER:  No.  I have it admitted.

11          JUDGE GREEN:  You have it as admitted already.  Oh,

12  okay.  Then I might have just failed to notice the initial -- I

13  mean, if not it's obviously admitted as it's a joint exhibit.

14          MR. MILMAN:  Thanks.  Are we on the record?

15          COURT REPORTER:  Yeah.

16          JUDGE GREEN:  Yes.

17  BY MR. MILMAN:

18  Q.   All right.  Mr. Gust, I'm showing you a document which has

19  been marked and entered into evidence as Joint Exhibit 1.  Is

20  that the production that you produced to my firm to produce to

21  counsel for General Counsel?

22  A.   Yes, it is.

23  Q.   And what is that document?

24  A.   So that -- that's a -- this is what's fed into the --

25  well, it's the easiest way to describe it.  It's essentially an

1  aggregate of the weekly schedules where all the time and

2  attendance was recorded in addition to the pay rates, et

3  cetera.  So this is what's fed into the system to generate.

4  Q.    Okay.  Now, is that a document that's kept in the ordinary

5  course of business and payroll as we, you know, or is that a

6  document that you had to create to comply with the counsel for

7  General Counsel's request?

8  A.    No.  I had to create this.

9  Q.    Okay.  Because there isn't a dedicated payroll system just

10  for Stony Brook, correct?

11  A.    That's correct.

12  Q.    All right.  So what were the -- what were the steps that

13  you took to create that document, Joint Exhibit 1, to comply

14  with counsel for General Counsel's request for payroll

15  documents for any employee that worked for Stony Brook?

16  A.    So I wrote a script to grab the -- all these -- to

17  aggregate all the schedules for that time period and then I

18  deleted everything out that wasn't Stony Brook.

19  Q.    Okay.

20  A.    So -- because any -- I just kept in the Stony Brook

21  payroll.

22  Q.    And after you created that script, you reviewed that

23  document to make sure it's accurate?

24  A.    Yes, I did.

25  Q.    Okay.  So I am not sure how many pages this is, but I see,

1    Mr. Gust, that the payroll -- the period -- the day of week

2    states November 29th, 2023.  And the day of week it ends, it is

3    June 9th, 2024.  Do you see that?

4    A.    Yes.

5    Q.    Okay.  So these few hundred pages of documents, this would

6    include what -- it's done on a daily basis.  Is that how you

7    did the script?  On a daily basis?

8    A.    Well, it's actually -- the schedules are kept weekly.

9    Q.    Oh, okay.

10   A.    So -- but the shifts, each one of these shifts is

11   certainly represented.

12   Q.    Okay.  Got it.  Got it, got it.  So there would be -- so

13   if you worked at Stony Brook, let's say during the startup, it

14   would've your down here too?

15   A.    Theoretically.  If I was actually on payroll for that day.

16   Q.    Right.  Okay.

17   A.    If I was on payroll, but I -- there could be -- so

18   certainly any of the time that I was doing supervisory duties.

19   Q.    Yeah.

20   A.    So I wasn't actually working on, you know, as a shift even

21   like when you were talking about --

22   Q.    Is this what's called billable?

23   A.    No.  That's actually payroll.

24   Q.    Okay.

25   A.    So some of those -- some of those don't fall into a

1    billable category, but --

2    Q.    Fair enough.  So it is -- but this is payroll?

3    A.    That is payroll.

4    Q.    Okay.  Is there a difference between billable and payroll?

5    A.    Yeah.

6    Q.    What's the difference?

7    A.    Well, we -- sometimes we had run into situations where we

8    put additional people on that go beyond the scope of work.  So

9    if a client -- if a client requests for argument's sake, five

10   attendants from 9:00 a.m. to 5:00 p.m., just, you know,

11   theoretically and based on experience of employees, concerns

12   that a supervisor may have, we may end up putting on a sixth.

13   Q.    So would it be -- would it be akin to clientele like my

14   firm, I can't bill for an associate, only the partners, but I

15   bring Mr. Jacobson here, he'd be on my payroll, but he wouldn't

16   be billable with this client, okay?

17   A.    That sounds --

18   Q.    Okay.

19   A.    Yeah.

20   Q.    Okay.  So you draft -- you created the script and did you

21   review that document production to make sure it was accurate

22   with the script that you created?

23   A.    Yes, I did.  I certainly didn't go line by line, but I,

24   you know, I tested the last lines, I tested the front lines.  I

25   did summations to --

1  Q.   And you recognize the names that are on that list?  Is

2  that --

3  A.   I do.

4  Q.   Does that coincide with, you know, your knowledge of the

5  employees that would work at that location?

6  A.   Yes.  It does.

7  Q.   Right.  Now, interesting enough, it starts on -- that

8  payday is November 29th and November 30th.  You see that?

9  A.   Yes.

10  Q.   All right.  Why would that date be included if Parking

11  Systems didn't start till December 1st?

12  A.   Well, the manager and the account exec were on site

13  earlier, just again, addressed there was some concerns that

14  maps had given to us about the handover about potentially the

15  Classic staff leaving prematurely, et cetera.

16  Q.   And who's the account exec and the account manager you

17  mentioned?

18  A.   Andrew Goldsmith.

19  Q.   Is what?

20  A.   That that would be -- I said exact account representative,

21  and Travis is the site manager.

22  Q.   Okay.  Got it.  Got it.  Who's the account executive?

23  A.   There really isn't an account executive there, per se, who

24  can handle it.

25  Q.   Would you perform -- would you perform those duties as

1  account executive?

2  A.   The account representative, account executive titles are -

3  - it is less formal.  It's just that -- it's a seniority

4  situation, right?  So you've been at the job so long, you are

5  now an account executive.

6  Q.   Okay.

7  A.   They basically perform the same duties, but just less --

8  they have less experience.

9  Q.   Okay.  Now, let's get back -- well, are you involved in

10  the bidding process for procurement or new work?

11  A.   No, I'm not.

12  Q.   Who is from the Parking Systems?

13  A.   Jonathan Baron.

14  Q.   Okay.  And you had testified that you learned of the

15  acquisition of the award -- strike that.  You learned of the

16  award of the account at Stony Brook in or about the summer of

17  2023, correct?

18  A.   December of '20?

19  Q.   The summer --

20  A.   The summer?

21  Q.   -- 2023.

22  A.   Yeah.  Yes.  I -- yeah.  That's correct.

23  Q.   Okay.  You also testified just before that when you were

24  informed of this new work, no one mentioned the word union to

25  you, correct?

783

1    A.    That is correct.

2    Q.    All right.  So let's go back to when you did site visits

3    at Stony Brook to view the Classic operation in transition to

4    you for parts of the takeover.  You testified that you've been

5    there approximately six times, right?  Site visits?

6    A.    Yes.

7    Q.    Did you ever -- okay.  Can the witness -- I'll show it to

8    you.  I'm showing you counsel for the General counsel's Exhibit

9    3.  Take a look at that.  Let me know when you have and I'll

10   ask some questions.

11   A.    Got it.

12   Q.    Okay.  What is that, Mr. Gust?

13   A.    That is a business card that I had made up.

14   Q.    How long would you make that card up?

15   A.    I want to say 2020.  It was during -- it was during the

16   COVID situation.

17   Q.    Was it created just for the Classic transition work,

18   correct?

19   A.    No.  No.  It was actually done because of COVID.  So I

20   wanted to have a -- it was just a fast way.  I wanted to have

21   cards that it was very easy for me if I saw a prospective

22   candidate, somebody that might -- so the impetus for the whole

23   thing was I was at a Taco Bell.

24         I was at the drive through and the Taco Bell employee

25   was absolutely phenomenal.  Like real -- like just phenomenal.

784

```
 1   And I thought to myself that, you know, I can give this person
 2   a job.
 3            I know they'll make more money, they'd be attracted
 4   to it.  And so then I actually reached out and I wanted to have
 5   something to be able to just, rather than pitching somebody on
 6   a line, to be able to say, listen, you know, if you're
 7   interested in a position, that's where it came from.
 8   Q.   Okay.  And it had the QR code on the back of the card back
 9   then too?
10   A.   Yes.
11   Q.   Okay.  And did you hand out those cards at Stony Brook
12   facility, you physically?
13   A.   No.  I did not.
14   Q.   And did anybody -- are you aware from Parking Systems hand
15   out those cards at, at Stony Brook facility?
16   A.   Yeah.  Yeah.  I instructed Andrew and Travis that it -- I
17   gave them, I said, listen, I'll drop off these cards.  If you
18   need to give them out, you can give them out if you're getting
19   pressure from the staff over that.
20            So give it out and let them know if they wanted an
21   interview, just, you know, to click on the QR code.
22   Q.   I'm showing you GC-13.  Take a look at it and finish, let
23   me know.  I'll ask you some questions.
24   A.   Okay.
25   Q.   You recall being involved in that text chain?
```

```
 1    A.    Yes, I do.

 2    Q.    Tell us about what took place there?

 3    A.    Okay.  So Andrew -- I think it was Andrew actually, was

 4    expressing concerns because the staff had -- now we were -- at

 5    this stage, we were more -- really have had identified

 6    ourselves, right?  So prior, we -- initially in the --

 7    Q.    What's -- what date is that?  I'm sorry.

 8    A.    It just -- I just show the print date.  I don't know.

 9    Q.    Yeah.  Print date.

10    A.    Yeah.  I just have the print date.

11    Q.    All right.  If there's no date on it, do you recall when

12    that date would be roughly?

13    A.    I really don't.

14    Q.    Was it in November?

15    A.    It would be -- certainly not October.  Yeah.  I would say

16    middle November.

17    Q.    Okay.  Continue.

18    A.    So he was getting pressure.

19    Q.    Who's he?

20    A.    That would be Andrew.

21    Q.    Okay.  Stop right there.  What -- who is Andrew Goldsmith,

22    again?

23    A.    He's the account rep or was going to be the account rep

24    for Stony Brook once we took it over.

25    Q.    Okay.  He was part of the operations team for the center
```

1    of operations team?

2    A.    Yes, he was.

3    Q.    Okay.  The startup?

4    A.    Yes, he was.

5    Q.    Where did he -- Mr. Goldsmith work before being involved

6    the startup?

7    A.    Well, he had been an account rep.  He runs the east end of

8    Long Island, which is very seasonal.

9    Q.    Okay.

10   A.    So in November, at that time, he's actually very quiet.

11   So he doesn't have a lot of work between -- prior to this.  He

12   didn't have a lot of work between like September and March.

13   Q.    Right.

14   A.    Because of the seasonal work in the east end there.  He

15   would work in the field at Jake's 58 mostly.

16   Q.    Okay.  And he worked at Jake's 58 as what?  A site

17   supervisor?

18   A.    He was a -- an assistant manager.  He worked underneath

19   Chris Wolf.

20   Q.    Right.  But at that time for Stony Brook, he wasn't

21   running an -- a portfolio, like an account executive would run

22   a portfolio, but --

23   A.    Right.  He didn't have anything going.  He did have some -

24   - he had accounts that were seasonal and so at that time, no.

25   He didn't have -- he didn't have work.

1    Q.    Okay.  And had you ever been involved in start --

2    preparation for startup operations before?

3    A.    Sure.

4    Q.    Right.  And actually done and implemented the startup as

5    well?

6    A.    Yeah.  Of course.

7    Q.    And you had mentioned that Mr. Candiotti was part of that

8    startup team for Stony Brook, correct?

9    A.    That's correct.

10   Q.    Do you know if he -- if Mr. Candiotti has ever done

11   startup operation before?

12   A.    Josh?  Yeah.

13   Q.    Yeah.

14   A.    He has.

15   Q.    Okay.  And how many operations did Mr. Goldsmith do?  Has

16   he ever done startup operation before?

17   A.    Of that scale?  No.  So, you know, obviously he's an

18   account rep, so he opens a, you know, a new restaurant or, you

19   know, open a -- out east you do a lot of spot work, like house

20   parties, one-offs, catering, that kind of thing.

21   Q.    Right.  And this was kind of like a promotion.  Is that

22   fair to say for Andrew Goldsmith?  Like this Stony Brook or a

23   higher degree of responsibility?

24   A.    Yes.  I think I'd describe it as a stepping stone.

25   Q.    Okay.  Fair enough.  Explain that.

1    A.    So one of the things with Stony Brook is that it is --

2    because it's a year, it's going to be a year round account, all

3    right?   It would give him the opportunity to, you know, be busy

4    and also to hold onto his labor, right?

5            So one of the challenges that Andrew always faces is

6    that he ramps up in the beginning of that season and needs all

7    the staff, right?  He has --

8    Q.    The Hamptons and the like?

9    A.    Right.  Right.  And so you end up with this sort of weird

10    -- like he has a lot of college students, he has a lot of

11    people that go back and forth, but you end up in a little bit

12    of a limbo before he can go full speed.

13            It was -- it's always was a challenge for him to hold

14    on to staff year round.  This actually would give him an

15    opportunity to do that.

16    Q.    Right.  Oh, say -- so in addition to being the account rep

17    at Stony Brook park -- parking at Stony Brook Hospital, he

18    still kept his East End portfolio.

19    A.    Oh, yeah.  This is just added.

20    Q.    Oh, okay.

21    A.    Yeah.

22    Q.    Okay.  And how would it help him to retain labor?

23    A.    Because now on the slow season, he can put them over here.

24    Q.    The one who worked in the Hamptons and --

25    A.    Correct.

1    Q.    -- and stuff like that?

2    A.    Correct.

3    Q.    Okay.

4    A.    And vice versa.

5    Q.    Right.  Okay.  Great.  Now, let's get back to -- let's get

6    back to those site visits that you did at Stony Brook prior to

7    December.  Now, you had just testified that you authorized

8    Travis and Andrew to hand out your QR codes, correct?

9    A.    I did.

10   Q.    And you had testified that was on or about mid-November

11   2023?

12   A.    Yes.

13   Q.    Okay.  How -- in -- as of mid-November 2023, how was the

14   startup preparation going for Parking Systems to get ready for

15   this December 1 startup?

16   A.    well, we'd had some challenges related to like logistical

17   stuff, like keyboards and signs and that kind of thing.  If

18   you're asking specifically, staffing?

19   Q.    Staffing.  That's -- I want you to just tell us the whole

20   thing, but staffing.

21   A.    The reality is staffing is always an unknown, right?  So

22   you can never be a hundred percent sure that you're going to be

23   fully staffed.  So there's always going to be a little bit of,

24   you know, angst so to speak.

25   Q.    Right.

1    A.    Based on the size of the -- of Stony Brook and the number

2    of staff required for it, it was never really in my mind going

3    to be a concern at all.

4    Q.    Okay.  So -- all right.  Well, let's get back to this QR

5    cards that you have.  Aside from the QR cards that you

6    authorized Travis and Andrew to hand out, do other managers

7    traditionally hand out your cards or just you?

8          Aside from Classic employees, put that aside.  Do

9    managers hand out your cards to other potential applicants or,

10   you know, or it's just you?

11   A.    So this is sort of a one off, all right?  So my great idea

12   to have this recruitment specialist and be able to hand them

13   out, I didn't hand out very many of them.

14         They were -- they're essentially sitting on my desk,

15   you know, at my home office.

16   Q.    Right.

17   A.    However, the landing page for the QR code was a very

18   convenient way for me to get the contact information I needed

19   for employees.

20         So, for instance, if, you know, somebody called me

21   and their son wanted a job or they, you know, their spouse or

22   they wanted a job, typically what I would do is I would send

23   them the URL code.

24         Because the QR code, right, translates to a URL code

25   which then goes to this landing page.  I could just as easily

1  send them that via text, which for the most part is the way

2  that I did it.

3  Q.    Okay.  Well, let me ask you something, right?  Get right

4  through.  I understand that you felt confident about staffing

5  as in November, but you were aware that Parking Systems was

6  taking over this work in mid -- the summer of 2023, you've

7  testified.

8        You had a pool of employees that are working at the

9  hospital for a previous -- for another contractor.  Seemingly

10  to predict that they know how to do the job, they know the kind

11  of the people there, they know the visitors, they know the

12  patients, they know the staff.

13        I mean, would this be, at your oyster, all this pool

14  of employees, why wouldn't you go after them in July, August,

15  September, October, November?  Why?

16        MR. JACKSON:  You asked him a leading question.

17        JUDGE GREEN:  Overruled.

18  BY MR. MILMAN:

19  Q.    Why weren't you going for all these employees?

20  A.    So aside from that, it's just something that we don't do,

21  all right?  So --

22  Q.    What is it that you don't do specifically?

23  A.    We don't solicit other company's employees.  We just don't

24  do that, all right?  So the first part of the question is, in

25  July or whenever it was, late August, why wouldn't that be the

1    plan to take over?

2          Because I -- we just don't solicit the other -- our

3    competitor's employee.  There is nothing more frustrating,

4    okay?  Than losing an account to a competitor, to then have

5    them fleece all your staff.

6          You spend a lot of time training people, you spend a

7    lot of time getting to know them, okay?  It -- it's the -- it's

8    one of the single most frustrating things in the world.  I lost

9    the account and I lose my staff too?

10          But what was I doing wrong that you're stealing all

11    my staff?  It's insane.  So at that point we wouldn't, you

12    know, and truthfully that early in the process, obviously now,

13    you know, hearing everything that's going on, they were

14    available.

15          But at that point I had no idea that they were

16    available.  I would never expect them to be.  I can assure you

17    that if I lost that account, there is no chance, none, that

18    Classic would have the oddity of my people.

19          None.  I would literally put them at places that I

20    lost money to ensure that Classic couldn't fleece my people.

21    No chance.

22    Q.   Okay.  And have you ever experienced that?

23    A.   Absolutely.

24    Q.   Give me an example.

25    A.   So I'll, you know, I mean, we move accounts back and forth

```
 1  frequently.  It happens.  I'd love to say that every account I
 2  ever got, I kept until, you know, the place went out of
 3  business, but it doesn't happen.
 4           You lose places.  If we're going to try to find
 5  something comparatively that hurt.  I had Roosevelt Field Mall
 6  for a long time.  I ran Roosevelt Field Mall for 25 years.  And
 7  when we lost that, I relocated all my staff, okay?  Ameri Park
 8  got nobody.
 9  Q.   Roosevelt Field's busy place.
10  A.   It is.  It is.
11  Q.   And so what is that called?  It's called reabsorbing
12  reallocating, what --
13  A.   I call it doing the right thing by my people.
14  Q.   Exactly.  And would you have this -- would you have a
15  conversation with your people?  Like when you got notice that
16  you were losing work, how did -- what -- give me the nuts and
17  bolts of how -- what -- how you would communicate this and
18  effectuate keeping your employees.  So --
19  A.   So the way we operate is we do scheduling every week.  So
20  if you were to come down and I would hire you, I would sort of
21  give you the same spiel, right?
22           Look, you're going to -- you're going to reach out to
23  me on Thursday for your schedule.  But the reality is that I
24  will probably reach out to you prior to Thursday for the next
25  week's schedule.
```

1          I just have to wait till my clients get in all the

2    orders, you know, that's specific because of, you know, I have

3    a lot of catering as well.  So that being said -- I lost my

4    train of thought there.

5    Q.   So you do a lot of catering also.  So, you know, that

6    being said, you know, in the perfect world, you know, you'd be

7    able tell me you're got to be working here tomorrow.

8    A.   Okay.  Yeah.  Sorry.

9    Q.   Trying get --

10   A.   Sorry.  I lost -- yeah.

11   Q.   I have --

12   A.   So the way I -- that's the way you deal with the schedule.

13          JUDGE GREEN:  Okay.  I mean, listen, does it matter -

14   - does it matter how Parking Systems would've handled the

15   situation if they were Classic?

16          MR. MILMAN:  No, no, no.  The witness is testifying

17   what our operation -- how we handle this situation.  How we

18   handle -- how Parking Systems handles the situation where they

19   lose work, right?

20          JUDGE GREEN:  But that's not what happened here.

21          MR. MILMAN:  But it goes to the methodology, goes to

22   credibility of why they don't reach out to predecessor's

23   employees.  It goes to refusal to hire, Your Honor.

24          JUDGE GREEN:  Okay.

25   BY MR. MILMAN:

1    Q.    So -- thank you.  So -- okay.  So I had asked you, Mr.

2    Gust, have we -- you have experienced directly a situation

3    where you lost an account and you testified how you do your

4    earnest to keep your employees?

5    A.    Yes.

6    Q.    And then you said, for example, you do weekly scheduling?

7    A.    Yes.  We do weekly scheduling.  So what ends up happening

8    is when you find that's -- find out that's coming, you have to

9    speak to your staff, you know?

10   Q.    Right.

11   A.    You'd let them know, listen, you know, this is coming down

12   the pipe.  These are some options I have available, what would

13   you be interested in, et cetera.

14   Q.    And that's what you did?

15   A.    Yeah.  Absolutely.  Absolutely.

16   Q.    Thank you.  By the way, before I go back to my

17   continuation questions on your onsite visits at Stony Brook,

18   what are these weekly meetings you just testified to?  You said

19   you do weekly staff meetings?

20   A.    No.  None of that.  That's scheduling.

21   Q.    Scheduling, yeah.

22   A.    I have my employees reach out to me every week for a

23   schedule.

24   Q.    That's -- now, those are employees that work within your

25   portfolio, right?

1    A.    Yeah.  Those are all the ones that report directly to me.

2    Q.    Okay.  Are you involved in any corporate meetings that are

3    done, for the most part, systematically, weekly, monthly,

4    quarterly?

5    A.    Yes.

6    Q.    Okay.  Well let's get -- let's do one at a time.

7    A.    All right.  So every Tuesday we have a shareholders'

8    meeting.

9    Q.    Who's we?

10   A.    The shareholders.

11   Q.    Shareholders.  Okay.  And is that done remotely?  Is that

12   done in person?

13   A.    That's done remotely through a Zoom call.

14   Q.    And it's every Tuesday?

15   A.    Every Tuesday.

16   Q.    Is it a set time or is it --

17   A.    9:15.

18   Q.    Okay.  And how long does usually that weekly meeting take

19   place?

20   A.    I'd like to say 45 minutes, but it ends up sometimes two

21   hours.

22   Q.    Yeah.  Right.  And what are some of the issues you discuss

23   in the field?

24   A.    Everything.

25   Q.    Okay.

1    A.    You know, planning, policy, everything.

2    Q.    Okay.  Fair enough.  Are there any other set -- regularly

3    scheduled meetings that you're involved in the corporation?

4    A.    I mean, we have the -- since we took over Stony Brook, we

5    set that one as well.

6    Q.    What's that?

7    A.    We have a weekly meeting with the Maps team, but that's

8    kind of been brought back a little bit.  We're doing it every

9    like two weeks now.

10    Q.    Okay.  When you were part of the startup team in

11    preparation to start up at Stony Brook valet in December 1, did

12    you have any set meetings in the startup operation?

13    A.    So we were laying that out in the beginning.  I don't know

14    exactly when we started them, but yes.

15    Q.    Okay.  And who was involved in those meetings?

16    A.    Certainly Dan and Nick, myself, Mike, Josh initially.

17    Josh was actually involved in them up until January.

18    Q.    Mm-hmm.

19    A.    Andrew would be on it, Travis is on it.  The early one,

20    there might have been other -- Johnny might have even been on

21    it earlier.

22    Q.    Does Andrew Goldsmith sit in a weekly shareholder meeting?

23    A.    He does not.

24    Q.    Does Josh?

25    A.    Josh does, yes.

1   Q.   Okay.  Okay.  So there's been some testimony in this trial

2   about staffing of employees at locations.

3           Are there any locations that have a persistent every

4   day as counsel for General Counsel asked one of the witnesses

5   previously, is there any a persistent day-to-day schedule at

6   any location?

7           And that's this schedule, they're not integrated out

8   or anything like that?

9   A.   Any?  Of course.

10  Q.   Yeah.

11  A.   Yeah.  Well, not -- I wouldn't say a facility has that.

12  Q.   Mm-hmm.

13  A.   But there are certainly individuals that work for Parking

14  Systems that have what would -- I could describe as a set or

15  static schedule?  Does that mean that they only do that?  No.

16  Q.   Okay.

17  A.   So for instance, let's -- as an -- and as an example, I

18  don't know, let's say I have a restaurant that goes Friday,

19  Saturday, you know, and after a while a employee works there

20  several times.

21          They seem capable and I tell them, okay.  This is

22  going to be your set schedule every week.  That doesn't mean

23  that's the only thing they do, however.

24  Q.   Right.  Okay.

25  A.   So you could have it at a -- even, you know, at a Stony

1  Brook but certainly that they would work, you know, whatever,

2  three days or four days.

3  Q.   Right.  And the Joint 1 payroll document would reflect at

4  least as far as December 1 till June 9th, those employees that

5  were at Stony Brook.  And if those employees worked at May,

6  tell you other locations, correct?

7  A.   So the -- this -- I don't want to confuse everything.

8  This joint payroll thing.

9  Q.   Let me back.

10  A.   Okay.

11        MR. JACKSON:  Objection, Your Honor.  You ask the

12  question and we'll let the answer response.

13  BY MR. MILMAN:

14  Q.   Fine.  I know what the answer's going to be.  No.  But

15  that document, does it show where they work at any other

16  locations, Joint --

17  A.   Other?

18  Q.   Yeah.

19  A.   This one doesn't.

20  Q.   Right.  Right.  Right.  I'll be producing another document

21  that will --

22        JUDGE GREEN:  And then you'll get all those answers.

23  So we all want to hear.

24  BY MR. MILMAN:

25  Q.   Okay.  So in your position as custodian of documents,

1  right?  Strike that.  I'll get to that later.  Let's go back to

2  your on-site visits.

3           So you had -- were just testifying just recently in

4  your testimony that you had authorized Travis and Andrew to

5  hand out these QR codes at Stony Brook prior December 1.  Do

6  you recall that?

7  A.    I do.

8  Q.    In fact, you said it was mid-November of 2023.  Now, if

9  you were confident that you admit the staffing challenge to

10  start up on time, why give it those QR codes to Classic

11  employees?

12  A.    Because people were asking questions and they had

13  concerns.  It just -- look -- I'm in the service industry,

14  right?  The Number 1 no-no in what you do is ignore people,

15  okay?  When you ignore people, bad things happen, okay?

16           It is better to just -- if somebody has a problem,

17  look them in the eye and say, I'll be right with you.  As

18  opposed to moving around and not doing it.

19           That is the guaranteed way to settle down a

20  situation.  I -- okay.  I hear you.  That -- and that's

21  basically it.  That's what needed to be done at this point.

22  Q.    But you testified that you weren't -- you had no intention

23  of hiring them for the startup because you don't poach

24  employees.

25  A.    Indeed.  That's true.

1  Q.    So why give the cards?

2  A.    Well, the alternative is to turn your back.  I don't --

3  that's just that it needed to be able -- it -- something needed

4  to be able to -- you -- we needed to react somehow.

5          You needed to do something, okay?  To let these

6  people know they're being heard.

7  Q.    Did you have discussions with Andrew Goldsmith on that

8  issue?

9  A.    Did I explain to him my motivation?  No.

10 Q.    Okay.

11 A.    Well, I actually said, and I think it -- it's in here.  I

12 told them --

13 Q.    Where?

14 A.    I'm sorry.  This GC-13.

15 Q.    Okay.

16 A.    Right.  I told him at the time that it did two things for

17 us, right?  So it answers the people that want to work so they

18 don't feel in limbo, which is basically they're not being

19 ignored, right?

20         But the other thing which certainly has a nefarious

21 sound to it is that it gave -- if we did interview them, we

22 could get information.

23 Q.    What kind of information?

24 A.    So one of the challenges that we were facing there is a

25 complete lack of information from Stony Brook.  The initial

802

1   staffing requirements were incomplete, didn't make sense.

2          We actually came across some analogies that there

3   were literally in the original document gaps in like the

4   emergency room where emergency room was 24 hours if I remember

5   correctly.

6          We saw that there was a literal staffing gap in the

7   document we were given between like 1:00 and 2:00 in the

8   morning, which obviously was just a typo or a mistake.

9   Q.   Right.

10  A.   But, you know, when you see things like that, you become

11  nervous when you are asking, you know, you're asking questions

12  because you're trying to plan, you become nervous.  So -- and

13  information is king, right?

14         You know, you needed in order to be able to plan.  So

15  this would've been an opportunity to be able to confirm the

16  data that we were getting from the client.  And --

17  Q.   Was it your intent never to open the door to hire any

18  Classic employees ever in the office system organization?

19  A.   No.  No.  I absolutely wouldn't.  I wouldn't do that.

20  Q.   And are you aware if there are any actually former Classic

21  employees that actually work in the Parking Systems

22  organization now?

23  A.   There are.  As a matter of fact, I just -- when I was

24  checking our dashboard, I saw that they had hired another one

25  of their employees.  I recognized him.

1    Q.    Another one of the Classic?

2    A.    Yes.  Yes.  As of, I think, this week.

3    Q.    Okay.  Okay.  And do you know how that employee -- did

4    that employee enter QR code or did it go through Indeed?  Do

5    you know?

6    A.    Well, I didn't see -- I don't recall seeing that come

7    through to me.  It might have because like if I see them in a -

8    - like if I see a region -- like Stony Brook or anything in

9    Suffolk County, I would just forward them through.

10            I don't remember seeing that one.  Actually, I think

11   Travis mentioned to me that she was coming down.  So, you know,

12   I've been here, so it's a little bit -- a lot.

13   Q.    Okay.  So this -- so this former Classic employee went

14   through the interview process?

15   A.    Oh, of course.

16   Q.    Went through -- okay.  Went through the whole application

17   onboarding process.

18   A.    I'm answering that as an assumption.  So that's not fair.

19   I don't know is a better answer.

20   Q.    Because you didn't conduct it.

21   A.    Because I didn't do it, right.

22   Q.    Right.  But if that applicant came through -- came to you

23   in your zone, would they have been interviewed by you?

24   A.    Yes.

25   Q.    Would they have gone through the whole application

1    process?

2    A.    Of course.

3    Q.    Okay.  The background check, the uniform?

4    A.    Yes.

5    Q.    Everything needed, right?

6    A.    Yes.

7    Q.    Right?  Okay.  Payroll, all that.  Okay.  By the way, that

8    individual that used to work at Classic, is that in Travis'

9    zone or is that in Goldsmith's zone?

10   A.    So that's -- Travis essentially sits under Andrew.

11   Q.    Right.

12   A.    So Travis is a site manager.  The distinct -- the

13   distinguishing factor --

14   Q.    Right.

15   A.    Okay.  Is, does the onsite manager actually schedule the

16   staff?

17   Q.    Okay.

18   A.    So typically the account executive account representative

19   is scheduling the staff as well, okay?  In this particular

20   case, the site manager for a larger location like that

21   schedules the staff.

22         And that really is because Travis is in line to be

23   moving into an account representative role.  We're going to be

24   getting him some more accounts.

25   Q.    Got it.

805

1  A.   But in order to do that, you have to build a base of

2  employees.

3  Q.   Right.  So right now it's a summer month, so there's work

4  going on the east end, correct?

5  A.   Correct.

6  Q.   So that individual, because I know it's been testimony

7  that applicants are allocated to the region that account

8  executive has his portfolio, correct?  Where -- I guess where

9  this applicant resides, kind of?

10 A.   Right.  Yes.  Like everything, there's a lot of crossover.

11 Q.   Right.  Okay.  I understand.  So this former Classic

12 complaint might be working, you know, at Gurney's in the

13 Hamptons, right?  Or it might be --

14 A.   We haven't gotten that one yet, but yeah.

15 Q.   Or it'd be starting at the hospital, right?

16 A.   Yes.

17 Q.   If that individual will only go right to Stony Brook

18 Hospital, correct?

19 A.   In theory.

20 Q.   In theory they might not ever work at Stony Brook

21 Hospital, right?

22 A.   No.

23 Q.   Sure.

24 Okay.  Now, in also theory, am I correct or -- that that

25 individual, the former Classic employee might work at Stony

1    Brook and might work at -- under another account executive's

2    portfolio account if need be, correct?

3    A.    Correct.

4    Q.    So let me ask you something.  How does this integration of

5    employees to work at multiple account executive portfolios,

6    okay?  On any given day, some -- maybe any given weeks, who

7    determines that?

8    A.    So each -- this can get dicey, right?  So it's very

9    important that the -- anyone -- any supervisor who is

10   responsible for staff, okay?  Communicates very clearly to the

11   other account representatives, account executives, right?

12          Because what ends up happening at times is you will

13   get, if you're not very careful about it, employees -- you're

14   basically bidding for employees, right?

15          So I have this fantastic restaurant where you're

16   going to make $300 a night and he's working for --

17   Q.    The other supervisor?

18   A.    Yeah.  Yeah.  And he's working for another supervisor

19   that, you know, maybe they make $150 a night.  So he gets the

20   opportunity, she gets the opportunity to work here, and now all

21   of a sudden, you know, they're only calling this person.  So

22   that's one of the reasons that they're assigned to an

23   individual.

24          Now, one -- at that point you would then reach out,

25   right?  So if I can't fill my shifts with my existing staff, I

1  reach out.

2          I may reach out to a single individual.  I actually

3  have a group chat called Beg For Help List.  Right.  So that's

4  when I'm running out of staff and I need help.

5  Q.   And Josh would come and beg for help?

6  A.   Yeah.  Well, Josh is on my beg for help list.

7  Q.   Okay.

8  A.   I'm more of a taker than a giver.

9  Q.   Okay.  So with that said -- so there is collaboration

10 obviously between the cap -- between Parking Systems management

11 to determine --

12 A.   It is critical to the operation.

13 Q.   Okay.  So let's get back to when you did these site visits

14 at, you know, prior to Step 1 startup at the hospital.  Did you

15 notice or not whether there was any integration in an entry

16 level between the various booths at Stony Brook Hospital?

17 A.   I did not observe that.  I actually observed the opposite,

18 which I -- they mentioned.

19 Q.   Okay.  Now, is -- we've had a lot of discussion about

20 integration within the whole organization and within Long

21 Island, but is it a big part of Stony Brook's operation to have

22 the flexibility and access to integrate intra booths at Stony

23 Brook Hospital?

24 A.   Are we talking pre-December 1st or post-December 1st?

25 Q.   For your operation?

1    A.    For my operation, yes.  Absolutely.  It's very important.

2    Q.    Okay.  Why?

3    A.    Because it allows you to flex the staff to the busiest

4    spots.  So look, if I can give an example?

5    Q.    Please.

6    A.    It's not Stony Brook.

7    Q.    Yeah.

8    A.    Right.  So I have experience with this.  It's -- and I

9    brought up Roosevelt Field move -- more before.  It's not a

10   hospital setting, but logistically it's very similar.  We had

11   five different valet stops, okay?

12         And this is going back 10 plus years.  And I always

13   had a challenge there because the quality of the tipping, the

14   amount of money that individuals would make, that my staff

15   would make varied from location to location.

16         So I would run into situations where, you know, I

17   don't want to work at Bloomingdale's.  I only will work at

18   Nordstrom, right?

19         I'm not going to go over to Nordstrom when -- and,

20   you know, at that location is now completely bogged down and

21   the staff doesn't want to move because -- well, I work over

22   here and I make, you know, average $18 an hour in tips.

23         But over there, you know, I will make $6 an hour in

24   tips.  So I don't want to go over there.

25   Q.    Mm-hmm.

1   A.   Ultimately -- and it was a situation I never resolved.  I

2   lived with that for a long time.  When I lost the account to

3   Americorp, I discovered later that they actually did a campus

4   wide tipping situation, pooling situation, which truthfully led

5   to a better operation.  I learned like, this is -- you learn

6   these things.

7   Q.   Let me ask you this, did you ever learn the hard way, like

8   with the tipping situation with hiring predecessor employees

9   from accounts that you took over?  Do you have that situation?

10  A.   I actually did not, but I could certainly foresee that.

11  So, you know, and again, it speaks to the -- this idea of, of

12  hiring, you know, these Classic employees en mass, right?

13  Q.   Mm-hmm.

14  A.   You know, policy notwithstanding the -- you have an issue

15  if I bring in -- so let's just -- I mean, let's do -- let's do

16  Stony Brook specific, right?  Cancer Center, emergency room,

17  main area, and staff lot, right

18          From my experience, okay?  And I have worked at the

19  staff lot since Day 1 that we took the place over.  There is no

20  tipping whatsoever in staff lot.  None, right?  They do not

21  receive any money.

22          So whatever they receive from the company, that is

23  their pay.  So somebody that is stationed typically at the

24  Cancer Center, why would they want to go work at staff lot?

25          So you're going to go work at staff lot and make less

1    money, even more importantly, you know, and that's from a

2    standpoint of trying to cover shifts.

3            Even more importantly, when you work -- when you have

4    the entire operation running, if one location is -- so let's

5    say let's take those staff lot employees, why should they go

6    over and help out over an emergency that's extremely busy at

7    the moment when they're not sharing in any of that money?

8            It just isn't fair, you know?  And I had pushback

9    from my staff on this, so, you know, because the emergency room

10   people were making more money, they were pushing back on me

11   that, well, how come we can't, you know, why do we have to

12   share it?  Why do we have to share it?

13           Excuse me.  And my argument was absolutely that it

14   was a team.  So one of the things we do with the -- might as

15   well just get site specific, okay?

16           One of the things we do that I'm 90% confident wasn't

17   being done based on my observations of Classic, is that the way

18   the staff lot works is that -- I explained the shift change

19   before, if everybody remembers.

20   Q.   Yes.

21   A.   But there's really a very small window where that staff is

22   busy and it's just during that shift change.  So you literally

23   have six employees that work from 7:00 a.m. to 6:00 p.m. at

24   night, and they bust their behinds for about two hours.

25           The rest of that time they sit around and do nothing

1  if they're not helping anywhere else.  What we have done, which

2  is different, okay?

3          Is that early in the mornings, that entire staff lot

4  team moves over to the main lot.  It also is the reason that

5  Josh had testified that, you know, you could see that there was

6  less of less congestion in the main entrance.

7          The reason there's less congestion is because I'm

8  taking half the team that's doing something else and putting

9  them right in the front there, and now they're able to move

10 those cars.

11         So that is wonderful to be able to do, but to be able

12 to do that and dealing with the monetary situation is a

13 challenge.  So --

14 Q.  Well, do you, do you believe that taking over -- I forget

15 it, I understand you poach and you don't poach, but do you

16 believe that taking over a competitor's company employees, you

17 inherit bad habits?

18 A.   All right.  So there's been a lot of the inherent bad

19 habits, you know, and stuff.  So the problem, aside all from --

20 forget about that.  You -- I explained before that I am in this

21 role in many ways as a mentor, okay?

22         The putting a new manager at a location and that new

23 manager has to oversee 25 or so employees that have been there

24 for a long time.  That's a challenge.  Is it a challenge that

25 can be overcome?

1         Yes.  I'm sure it can.  It happens in the, you know,

2    in other businesses all the time.  But it certainly is a larger

3    challenge and it raises the bar and makes things more difficult

4    to train a new manager to be able to do the things that I want

5    them to do.

6         So if in order to be able to do that properly and be

7    able to roll out and be able to have, you know, do the best job

8    we can for me, okay?  Aside from policy, okay?  I would rather

9    not -- I would rather deal with my own team that I know who

10   they are, okay?

11        Get them in there, get the operation rolling.

12   Moreover, along the same lines, when you're moving into a

13   situation like that, you don't know everything.  There's no way

14   you can know everything.

15        I can't go to a facility six times and completely

16   understand everything that's going on.  I can't, it's

17   impossible.  But if I have my team in there, okay?  I now have

18   the opportunity to learn the entire operation, the things that

19   I don't know.

20   Q.   Okay.  Did it -- do you know if the Classic employees were

21   inquiring from the Parking System management team while they

22   were at Stony Brook, you know, viewing the operation?

23        Whether those Classic employees asked, you know, are

24   you going to hire us?  Do you know if those questions were

25   asked?

1    A.   So I don't know exactly what the questions were that that

2    was the impetus for Andrew's, you know, frustrations there.

3    I'm assuming that's what it was.

4            Okay.  It was, you know, are we going to get a job?

5    Are we going to, get a job.  That's what I'm assuming.

6    Q.   Right.  Is it your obligation to notify those employees of

7    their future?

8    A.   No.  This is a hot button source of frustration, so --

9    Q.   Right.  I understand.  Okay.  Okay.

10           Mr. Gust, I'm showing you a document which has been marked

11   for identification purposes as Respondent's 8.

12           (Respondent's Exhibit 8 identified)

13   A.   Yeah.

14   Q.   So take a look at that and when you finish reviewing, let

15   me know and I'll ask you a few questions,

16   A.   Okay.

17   Q.   Okay.  Do you know what that document is, Mr. Gust?

18   A.   Yes.

19   Q.   What is it?

20   A.   That's a list of Classic employees who are working at

21   Stony Brook as of the date that this was done.

22   Q.   Right.  And do you know roughly when that date -- when

23   that list was done?

24   A.   Yeah, you know --

25   Q.   Within the last 30 days?

814

1    A.    Yeah.    Absolutely.

2    Q.    Okay.    And did you create that document while you were

3    creating the documents to produce, to counsel for the General

4    Counsel?

5    A.    I did.

6    Q.    Okay.    That wasn't one of the requests from counsel for

7    the General Counsel, was it?

8    A.    I don't know.    I created a lot of documents.

9          MR. JACKSON:  Do you have another copy of the

10   document?

11   BY MR. MILMAN:

12   Q.    Please continue.

13          MR. JACKSON:  We're sharing one.

14          MR. MILMAN:  I don't have any more.

15          MR. JACKSON:  Okay.

16   BY MR. MILMAN:

17   Q.    My -- yeah.    Sorry.    Okay.    You created that list?

18   A.    Yes.    I dis.

19   Q.    Okay.    And where'd you get the information to create that

20   list?

21   A.    It would've been from the schedules.

22   Q.    Okay.    And that doesn't include the one that you just

23   enforced yesterday, right?

24   A.    Correct.

25   Q.    That's an additional individual?

1    A.    Yes.

2    Q.    So what does that document show about the former Classic

3    employees that are now working for our organization?  Not -- I

4    mean, Parking Systems organization.

5    A.    It actually shows some of the places that they've worked

6    so --

7    Q.    You mean while working for Parking Systems?

8    A.    Yeah.  That is correct.

9    Q.    While they're being transferred around?

10   A.    Correct.

11         MR. MILMAN:  Okay.  Your Honor, I'd like to move this

12   into evidence.

13         JUDGE GREEN:  Any objection?

14         MR. JACKSON:  Just a bit of voir dire.

15         JUDGE GREEN:  Okay.

16                          VOIR DIRE

17   BY MR. JACKSON:

18   Q.    The first thing that appears in the left hand column in

19   parentheses, what does that signify?

20   A.    TG and then there's an AG.

21   Q.    What does that signify?

22   A.    Is that -- I'm sorry is that the name?

23   Q.    Yes.

24   A.    Oh, sorry.  The -- TG.

25   Q.    Mm-hmm?

816

```
 1   A.   Oh, Travis Gilliland.

 2   Q.   Travis Gilliland.

 3   A.   Yes.  Those are initials of the account representative.

 4   Account supervisor.

 5   Q.   Okay.

 6   A.   In this case, site supervisor.

 7   Q.   Okay.  So the TG is site supervisor for Stony Brook, which

 8   is Travis Gilliland.

 9   A.   That's correct.

10   Q.   And then AG is the -- so you said site supervisor?

11   A.   It is basically the account rep, site supervisor.  In this

12   -- so as I testified before, our ultimate -- the plan for

13   Travis is actually, he's moving up, right?  He's going to be

14   running accounts.

15          Right now, he's running accounts, he's running one.

16   Right.  He's just running one account.  So that's what that --

17   that's what that signifies.

18   Q.   Okay.  So you kind of use site supervisor and account

19   representative interchangeably?

20   A.   No.  He's a site supervisor at the moment, but theory is

21   he's going to become -- it's just the title.  I -- so -- yeah.

22   Q.   Okay.  And AG is Andrew Goldsmith?

23   A.   That is correct.

24   Q.   And he's the site supervisor, or --

25   A.   He's the account representative.
```

1    Q.    Account representative for Tap and Gos, right?

2    A.    Correct.

3    Q.    And for Smithtown Landing?

4    A.    Right.  That's -- yeah.  That's -- the next one's Mather

5    Hospital.

6    Q.    Okay.  Bull Smith Tavern.

7    A.    Bull Smith Tavern is restaurant, lounge.

8    Q.    Okay.  And then Three Village Inn as well?

9    A.    Yes.  Correct.

10   Q.    Okay.  And the Mather Hospital is the William Freudenberg?

11   A.    Yeah.  That was -- I'm assuming that was a -- like a one-

12   off.  So it was a spot job for Mather House -- Mather Hospital,

13   perhaps on property, perhaps at somebody's home.  So maybe a

14   fundraiser or something.

15   Q.    Oh, it has the same job site though?  The NW Mather and

16   the William Freudenberg Mather Hospital.

17            MR. MILMAN:  Your Honor, I think this goes beyond

18   voir dire.

19   A.    No.  I don't know, to be honest.

20            JUDGE GREEN:  No.  I mean, so let me just add for

21   purposes of admission, where does this come from?

22            MR. JACKSON:  Yeah.  It's my next line of

23   questioning.

24            THE WITNESS:  Where does this come from?

25            JUDGE GREEN:  Yeah.

1              THE WITNESS:  This is just a -- so this is basically

2    the schedule, right?  So it comes from -- I'm pretty sure you'd

3    be able to -- oh no.  This is only the Stony Brook one.  So

4    this is synthesized from all the schedules of -- for all the

5    people, right?

6              So prior to pulling all this out, I just filtered on

7    those employees.  So I knew the other places they worked

8    besides Stony Brook.  Because obviously if I just have this,

9    it's just Stony Brook.  So they worked at these places.

10             MR. MILMAN:  Your Honor, we could produce payroll.

11   It'd be about 11,000 pages.

12             JUDGE GREEN:  Yeah.  So, but I mean, my question is,

13   it's -- you can sort through payroll to get this.

14             THE WITNESS:  Okay.  Tricky, right?  So each one of

15   these -- so this is aggregated from the schedules of all the

16   supervisors.

17             JUDGE GREEN:  Okay.

18             THE WITNESS:  So the supervisors, after they put

19   their time and attendance data in, so they maintain a schedule.

20   It's all in Excel spreadsheets.  Some, we use Google Sheets.

21   They keep their schedule.

22             We then use our time and attendance data that we

23   gather from our Clock-in Easy, which is a, you know, remote

24   punch thing.  They have to synthesize all that, put that in,

25   put in the rates, take care of all that.

1          They then forward that all to me.  I aggregate all

2    the schedules for the week.  Then I run a script against that

3    so that it captures the data and we make sure we capture all

4    the overtime.  When I took -- I actually think I gave -- I

5    think I gave you that.

6          It was -- I took all the schedules that I had from

7    whatever, the beginning of this December 1st, until that June

8    date.  Took them all, put them all together.

9          I deleted out anything that wasn't Stony Brook, but

10   at this point, I had all this data.  Right.  I literally had,

11   it was like 75,000 shifts, right?  For that.

12          JUDGE GREEN:  So once you deleted out all the stuff

13   that wasn't Stony Brook, that's how you ended up with Joint

14   Exhibit 1?  That's this?

15          THE WITNESS:  Prior to that.  Oh, yes.  Yes.  Yes.  I

16   deleted all the stuff out.  And then this is -- right.  This is

17   Stony Brook.

18          JUDGE GREEN:  All right.  So then you can run some

19   kind of sort or search where --

20          THE WITNESS:  On the full -- on the full data set,

21   yes.

22          JUDGE GREEN:  Okay.  For where certain people work?

23          THE WITNESS:  Yeah.  It's -- I mean, it's simply just

24   -- you actually can look.  You see that the filter sign?

25          JUDGE GREEN:  Yeah.

```
 1              THE WITNESS:  So think of an Excel spreadsheet.  The
 2   filter's turned on there.  I just turned on the filter.  But
 3   this was filtered off of, you know, four -- a document with
 4   40,000 rows.
 5              JUDGE GREEN:  Right.  But the filter is ultimately
 6   defined --
 7              THE WITNESS:  Those are names.
 8              JUDGE GREEN:  -- as former Classic employees?
 9              THE WITNESS:  Well, Yes.  I recognize the names.  I
10   know the names, yes.
11              JUDGE GREEN:  Okay.  So you did a search for those
12   particular -- or those particular names?
13              THE WITNESS:  Yes.
14              JUDGE GREEN:  Okay.  Got it.  So -- but let's -- I
15   mean,
16              MR. MILMAN:  I mean, I can do it.  Yes.
17              JUDGE GREEN:  So -- but the question is, this has
18   been offered, so is there an objection to it?
19   BY MR. JACKSON:
20   Q.   Just one other question.  So you took the data from the
21   search you ran based on the names and then isolated two columns
22   from that data?
23   A.   Yes.
24   Q.   Okay.
25   A.   And just so you know --
```

1    Q.    And I have another question.  Did you filter out repeats?

2    Like if --

3    A.    Oh, yeah.

4    Q.    I mean, gears?

5    A.    Yeah.  Yeah.

6    Q.    Or just Stony Brook --

7    A.    Yes.

8    Q.    -- or multiple times?

9    A.    Yes.

10   Q.    You filtered out --

11   A.    Yeah.  Of course.

12   Q.    Okay.

13   A.    All right.  So you -- actually, you can actually see it in

14   the document, right?  So you have the -- if you're familiar

15   with Excel, you see the two arrow on the side.  So it was just

16   filtered out for all that.

17          MR. JACKSON:  Okay.  All right.  I have no objection.

18   BY MR. MILMAN:

19   Q.    Mr. Gust, I'm also showing you --

20          JUDGE GREEN:  Just from the Union?

21          MR. ROCCO:  No.  We don't have objection.

22          JUDGE GREEN:  Okay.  So R-8 is admitted.

23       (Respondent's Exhibit 8 received)

24   BY MR. MILMAN:

25   Q.    Thank you, Your Honor.  Mr. Gust, I'm showing you a copy

822

1   of the formal trial exhibit.  And I'm going directly to Page 4

2   of the complaint.  Did you review those names of the complaint

3   to figure out -- to create that list?  Is that how you knew who

4   the employees were?

5            MR. JACKSON:  Objection, leading.

6            JUDGE GREEN:  Overruled.  I -- well, okay.  How'd you

7   know what names --

8            THE WITNESS:  Yeah.  I -- truthfully, I've gotten so

9   many of these lists that I don't -- you -- I don't know which

10  one I use.  It's been sent to me a bunch of times.  There's not

11  always the same names on it, so I just --

12           MR. MILMAN:  I can make an offer of proof that that's

13  what happened.

14           JUDGE GREEN:  Okay.  Well, you're not the witness.

15           MR. MILMAN:  I understand.

16           MR. JACKSON:  I object to the offer.

17  BY MR. MILMAN:

18  Q.   I just -- fine.  Okay.  Thanks.  Okay.  It is A, B and C.

19  Mr. Gust, showing you a trial part exhibit it's marked as not -

20  - Respondent 9(a), 9(b), and 9(c).  I'd like you to take a look

21  at those and let me know if you're ready to answer some

22  questions.

23       (Respondent's Exhibit 9(a) through 9(c) identified)

24  A.   Yes.  I'm ready.

25  Q.   Okay.  9(a), 9(b), 9(c), please put them side by side.

1   A.    Okay.  All three.  Okay.

2   Q.    What are -- what is this exhibit?

3   A.    Okay.  This is the dashboard for Clock-in Easy, the time

4   and attendance application that I referenced earlier.

5   Q.    Okay.  So I -- let's, let's focus on 9(a), okay?  So this

6   is the color one.  It's easy to read.  We ran color.  So what

7   are those green dots designate?  What are those -- what do they

8   represent, those green dots?

9   A.    That is whenever this snapshot was taken, that would be

10  the real time active accounts.  In other words, locations that

11  we had staff working at.

12  Q.    So let's say there was -- let's say it's a restaurant and

13  the restaurant hadn't opened yet.  Would it still be green?

14  A.    No.

15  Q.    I mean, like, it was open for business, but like, it opens

16  for dinner at 8:00.  It's only 7:00 p.m.  Would it still be

17  green?

18  A.    It would only be green if there was staff there.

19  Q.    Got it.  Okay.  So now on the top left, it has a number

20  employees blanket 1039.

21  A.    Correct.

22  Q.    So what does that represent?

23  A.    That represents 1,039 employees that are registered in the

24  Clock-in Easy system.

25  Q.    Okay.  And is this just from Long Island?

824

1    A.    Primarily it -- we -- likely.  And if you look at B,

2    you'll see the sum in New York.

3    Q.    Oh, okay.

4    A.    Yeah.

5    Q.    And then it shows projects 32263.

6    A.    Yes.

7    Q.    What does that represent?

8    A.    That's -- at that particular time, and that snapshot was

9    taken, 32263 projects were actively being serviced.

10   Q.    Now, these projects primarily in Long Island?

11   A.    80 plus percent, I would say.

12   Q.    Okay.  And the integration of transferring of employees

13   have heard so much testimony on, could go from, depending on

14   logistics, any of those locations, correct?

15   A.    There's a practical consideration of how far you're going

16   to ask an employee to drive.  I mean --

17   Q.    Right.

18   A.    Based on their wage, et cetera.  That's a very important

19   part of the, you know, identifying.

20   Q.    And what is 260926 to regular 2602.92?

21   A.    That was the amount of hours that we had service

22   locations, again, when this snapshot was taken.

23   Q.    Right.  Now, if you take the same time on a different day,

24   it might be different, right?  Because some days are also busy,

25   right?

825

1   A.   Same time, different days, different times different --

2   Q.   Right.  Let's say the Stony Brook, for example.  We start

3   on a Friday, right?  Stony Brook was a Friday?

4   A.   Yeah.

5   Q.   Forget about the exhibit, right?

6   A.   Okay.

7   Q.   The Stony Brook was a Friday, right?

8   A.   Right.

9   Q.   Is that -- is a Friday at Stony Brook the equivalent in

10  the requirement staffing of hours as any other day, week?

11  A.   No.  It's not.

12  Q.   Oh, explain to us how the different staffing hours.

13  A.   At Stony Brook --

14  Q.   Yeah.

15  A.   -- specifically?

16  Q.   Stony Brook.

17  A.   We only have --

18  Q.   And I'm done with these exhibits right now.

19  A.   We only have one of the valet spots open on Project -- I'm

20  sorry.  On Saturday and Sunday, you only have the emergency

21  room open.  The other locations are Monday through Friday.

22  Q.   So let -- so how about Monday at Stony Brook?  Is it fully

23  staffed?

24  A.   Yeah.

25  Q.   All right.  And the emergency room is -- that's 24/7

826

1   always, right?

2   A.    That is.

3   Q.    How about the cancer center?  How --

4   A.    That's -- what is it?  7:00 a.m. to 6:30, I think.

5   Q.    Is that Monday through Sunday?

6   A.    Monday through Friday.

7   Q.    Monday through Friday.  And is Monday, Tuesday, Wednesday,

8   Thursday, Friday the same staffing for all the booth, all the

9   locations in?

10  A.    No.  It's not.

11  Q.    Tell us the differences.

12  A.    Well, it depends on the particular location, right?  I

13  think it is Tuesday Cancer Center is open later.  We also have

14  to change the staffing sometimes, depending on if there's

15  events, et cetera.

16  Q.    Okay.

17  A.    Wednesdays and staff lot, that's the busiest day.  So we

18  end up having some extra staff there at that peak time.

19  Q.    Right.  So -- but so almost every day is a little

20  different in staffing requirements even at the hospital,

21  correct?

22  A.    Yes.

23  Q.    Right.  So those individuals that might be working in a

24  given work week at the hospital, let's say, and the staff room

25  requirement diminishes on a -- on one of those days in a week

1  at their various locations in the hospital.

2          Do those employees not work?  Are they transferred

3  out to another facility?  What happens?

4  A.   Well, you -- we give them an opportunity.  Again, we do

5  schedule them weekly, and then that's not to say that every

6  single week --

7  Q.   Right.

8  A.   -- if John Doe works Monday, Tuesday, Wednesday at the

9  hospital, you know, he doesn't have to confirm his schedule

10 every single week.  But John Doe will probably be calling in

11 for a schedule because, you know, he'll be picking up a shift

12 on Friday and Saturday as well.

13         And some of that, particularly the catering stuff, is

14 very dynamic.  It changes from week to week, which is the

15 reason that we, do, you know, it the way we do.

16 Q.   Oh.

17 A.   If that answers your question.

18         MR. MILMAN:  I think so.  Your Honor, I'd like to

19 move 9(a), 9(b), and 9(c) into evidence.

20         JUDGE GREEN:  Any objection?

21                     VOIR DIRE

22 BY MR. JACKSON:

23 Q.   Mr. Gust, do you know when these snapshots were taken?

24 A.   I -- this -- it was within the last week or so.  I know

25 one of these -- one of these I forwarded in the -- I think it

1   was -- well, can I ask, did they print that one?

2   Q.   Let's see.  Oh, well, maybe, maybe I can answer that

3   question.  Could you look at 9(c)?  Was it printed on June 30th

4   at 11:14 p.m.?

5   A.   9(c), sorry, sorry, sorry.  I'm trying to -- I can't read

6   the handwriting.  9(b), 9(c).  Is there a timestamp on it?  I

7   don't see it.

8           JUDGE GREEN:  On the right side.

9   A.   Oh, oh, yes.  Absolutely.  That's what I -- that's right.

10  I did that.  Yeah.

11  BY MR. JACKSON:

12  Q.   Did you take the snaps?

13  A.   Yeah.  I actually did that.

14          MR. JACKSON:  Did -- you did that?  Okay.  I have no

15  objection.

16          THE WITNESS:  Yeah.  Yeah.

17          MR. JACKSON:  And the Union?

18          MR. ROCCO:  No objection.

19          JUDGE GREEN:  Okay.  9(a) through (c) is admitted.

20      (Respondent's Exhibit 9(a) through 9(c) received)

21          THE WITNESS:  They were asking me how to get the time

22  on there.  And --

23  BY MR. MILMAN:

24  Q.   Mr. Gust, you testified on direct that you are aware that

25  in the government's complaint against you, counsel for General

1    Counsel, there were certain allegations alleged against you.

2    Do you remember that?

3    A.    Yes.

4    Q.    Okay.  Well, I want to get your answer -- I want to get

5    your testimony on the record on these specific allegations

6    filed against you.

7    A.    Thank you.

8    Q.    Page 3 of counsel General Counsel's complaint, Paragraph 9

9    states as follows.  On or about November 25th, 2023.

10   Responded, Bobby Gust, you, at Jake's 58 Hotel a Casino located

11   at Islandia, New York stated following.  A, you, Mr. Gust told

12   employees that Respondent would not hire them because they were

13   represented by the Union.  Did you make that statement?

14   A.    I absolutely did not.  Absolutely did not.

15   Q.    Secondly, counsel for General Counsel states in their

16   complaint, Paragraph 9, Section B, Mr. Gust, you, Bobby, halt

17   the employees employment on the condition of them abandoning

18   the Union.  Did you make that statement?

19   A.    I 100% no chance -- look I got to say this, okay?  I did

20   not say that.  I did not imply that.  I did not suggest that I

21   -- there's no wink, wink, nod, nod or anything that never, ever

22   happened.  Never.  Thank you.

23   Q.    Thank you, Bobby.  Okay.  Mr. Gust, I'm showing you now a

24   document which has been marked for identification purposes as

25   Respondent's 10.  It is two pages.  I think it's -- I think we

830

```
 1  call this eight and half by 17.  Please take a look at it and
 2  let me know when you're finished.
 3        (Respondent's Exhibit 10 identified)
 4  A.   Okay.
 5  Q.   Do you recall -- do you recall seeing this document
 6  before?
 7  A.   Yes, I do.
 8  Q.   Do you know what this document is?
 9  A.   Yes, I do.
10  Q.   And did you generate this document?
11  A.   Yes, I did.
12  Q.   Did you generate this document during the same timeframe
13  that you generated Respondent 9?
14        MR. JACKSON:  Objection, leading.
15  BY MR. MILMAN:
16  Q.   Do you know when you generated this document?
17  A.   I don't know what the response is.  Whatever, when I was
18  putting together the payroll information.
19  Q.   Okay.  So if you look at the left hand margin of the
20  document, it has names, correct?
21  A.   It does.
22  Q.   And when you look to its proceeding, right?  If you're
23  looking at it has dates, what are those dates?
24  A.   Those represent the hire dates of those employees.
25  Q.   And then the next line we see that TG again.  And then it
```

1  says SBUH.  What is that?  That --

2  A.    That represents a location where that employee were.

3  Q.    Okay.

4  A.    At least once.

5  Q.    Okay.  At least once.  Got it.  And then next to it'll

6  show, like, this one says CD Casa Cipriani.  What does that

7  mean?

8  A.    That's another location with that individual work other

9  than SBUH.

10  Q.    And what does CD represent?

11  A.    Criterion.  Who's another account --

12  Q.    It's another account.  Is that --

13  A.    Yeah.

14  Q.    Right.  So it said TG, it's a CD, correct?

15  A.    Correct.

16  Q.    And that's Manhattan, correct?  Casa Cipriani is in

17  Manhattan?

18  A.    Yes.  That's Manhattan.

19  Q.    That's Manhattan.  Okay.  And then when you go next to the

20  right, it says IA Bourne Mansion.

21  A.    JA.  JA.

22  Q.    Oh, JA Bourne Mansion?

23  A.    Correct.

24  Q.    And then, then JA Captain whatever, JA Sorrelles

25  (honetic).  And on and on and on, right?

1    A.    Correct.

2    Q.    Now, these names on the left, who are these individuals?

3    A.    Those are people that work at Stony Brook specifically.

4    Is that the first -- just double check.

5    Q.    Is that all the people dispatch all the people that were

6    in payroll that you produced?

7    A.    Just -- yes.  Just double checking.  I think this is

8    actually just December.

9    Q.    Okay.  December of 2023, correct?

10   A.    Correct.

11          MR. MILMAN:  Okay.  Your Honor, I'd like to move this

12   into evidence, please.

13          JUDGE GREEN:  Any objection.

14          MR. MILMAN:  This goes to further answer your,

15   question to Mr. Gust that show the implications they worked.

16          JUDGE GREEN:  Okay.

17          MR. JACKSON:  One moment, Your Honor.  Just bear with

18   me one moment, Your Honor.  Because I have some concerns about

19   compliance with the subpoena in light of this document.  So

20   just give me a moment to review the subpoena.  Okay.

21          JUDGE GREEN:  You know, by the way, I'm looking at

22   Exhibit 24, which is the subpoena, and it looks like it's

23   missing a page.

24          MR. JACKSON:  Yeah.  I just realized that, Your

25   Honor, too.  I'll --

833

```
 1          MR. MILMAN:  Exhibit what?

 2          JUDGE GREEN:  What, 24?

 3          MR. JACKSON:  I'll make sure to substitute that

 4          JUDGE GREEN:  Okay.

 5          MR. MILMAN:  Oh.

 6          JUDGE GREEN:  It's missing.  It's an incomplete --

 7    the second to the last page.

 8          MR. MILMAN:  Exhibit 24, last page.

 9                    VOIR DIRE

10    BY MR. JACKSON:

11    Q.  All right.  So Mr. Gust, you are familiar --

12          MR. MILMAN:  What?  This voir dire or --

13          JUDGE GREEN:  Is this voir dire?

14          MR. JACKSON:  Yes.

15          JUDGE GREEN:  Okay.

16          MR. MILMAN:  Okay.

17    BY MR. JACKSON:

18    Q.  Mr. Gust, you're -- you understand that counsel for

19    General Counsel in my office, the government issued a subpoena

20    to Parking Systems --

21          MR. MILMAN:  This is not voir dire, Your Honor.

22          MR. JACKSON:  Well, it goes to the admissibility --

23          MR. MILMAN:  It's not voir dire.

24          JUDGE GREEN:  Yeah.  Well --

25          MR. MILMAN:  It goes to the --
```

834

1              JUDGE GREEN:  -- that's okay because I'm allowing it.

2    BY MR. JACKSON:

3    Q.   It goes to the admissibility of the document.  And you are

4    aware -- are you aware of the subpoena as custodian records?

5    A.   Yes.

6    Q.   And you looked over and you saw what we were asking for?

7    A.   I actually didn't.  I -- what we did is we discussed it.

8    I discussed it with the attorneys.

9    Q.   Did you understand that you were supposed to produce

10   documents showing the name and start date of employment and the

11   start date working at Stony Brook for every person who works at

12   Stony Brook for you?

13   A.   Is that one ends on the list?

14              MR. MILMAN:  I thought it was been December.

15              MR. JACKSON:  December 1 through the present.

16              JUDGE GREEN:  So, let me just ask -- I'm sorry.  Let

17   me -- I just -- I don't want to spend a whole lot of time.

18   What's -- what subpoena number are we looking at?

19              MR. JACKSON:  14.

20              MR. MILMAN:  So let me address that as supposed to

21   asking this witness and trying to bait him.  We had -- we -- if

22   we produce payroll, it would be 11,000 documents for payroll.

23   I think how about a lot -- yeah.

24              It would be -- and it would -- there is 11,000 pages,

25   if not more, for payroll.  These dates of hire were gleaned off

1  by Bobby systematically, as he did to get 11,000 pages of

2  payroll -- the date of hire.

3           JUDGE GREEN:  I'm sorry.

4           MR. MILMAN:  We'd still not be starting trial.

5           JUDGE GREEN:  Let me just look -- let me just look at

6  it.

7           MR. MILMAN:  For a thousand employees.

8           MR. JACKSON:  And, Your Honor, I'll just represent

9  for the record.

10          JUDGE GREEN:  Okay.  But -- so was this -- this isn't

11 calling for everything that reflects this information.

12          This looks like it's calling for sufficient documents

13 to describe the name and start date of employment, start date

14 working at Respondent Stony Brook University facility and the

15 position to help for each employee.  So, did you receive that?

16          MR. JACKSON:  No, Your Honor, we have -- this is the

17 first time we're seeing any information regarding the start

18 date of employment for these employees.

19          MR. MILMAN:  That's right.  Because we can't -- to

20 get the Stony Brook employees, our payroll doesn't work like

21 that, Your Honor.

22          JUDGE GREEN:  That's not an excuse with all due

23 respect.  What you have -- what you really have to do is you

24 have to tell the General Counsel, listen, it's too voluminous.

25 Here's what we can give you.  We can you this --

 1          MR. MILMAN:  That's on me, Your Honor.  I don't know

 2    why -- I don't know why the dates weren't on here.  We'll give

 3    -- we're just give them the 11,000 pages.  It's easy for us to

 4    do that way.

 5          JUDGE GREEN:  I mean, what was given?  What was

 6    actually given?

 7          MR. MILMAN:  Everything but the date -- everything

 8    but their date of hire.  But what you'll see --

 9          JUDGE GREEN:  Okay.

10          MR. MILMAN:  What you'll see in the payroll is every

11    single -- how about this?  Well, we don't know the dates of

12    hire of everybody.  What you'll see in the payrolls, every day

13    somebody worked at Stony Brook.

14          Their dates of hire for those employees would have to

15    be pulled out of 11,000 pages of documents.  Because the

16    payroll doesn't have that information, so, Your Honor, if we

17    had to respond --

18          MR. ROCCO:  Respondent didn't --

19          MR. MILMAN:  I'm not finished.  We had to respond,

20    Your Honor, we had to respond with documents that we have in

21    the ordinary course of business.  That would be zero documents

22    responsive to General Counsel's request.

23          We don't have an itemized, sorted out document of

24    Stony Brook employees in a dates of hire.  Because that's not

25    how they go on our payroll records.  So there has to be picked

1  out, picked out, picked out, picked out.  It -- right.

2          JUDGE GREEN:  So you -- okay.  So --

3          MR. MILMAN:  We don't have any documents that are

4  responsive to his request.  We would have to make the document,

5  which we're not obligated to do under the rules of evidence or

6  under document production.

7          JUDGE GREEN:  So just let me understand this.  So you

8  got employees working --

9          MR. MILMAN:  The accusation that we're doing

10  something remiss.

11          JUDGE GREEN:  But you know -- but you know who was

12  working at Stony Brook, right?  You know who has worked at

13  Stony Brook?

14          MR. MILMAN:  No.  We don't.  We -- because there's

15  employees on listed working 20 plus other different locations,

16  Your Honor.

17          JUDGE GREEN:  I understand that.  But they -- you

18  know, who has worked at Stony Brook.

19          MR. MILMAN:  We knew as of December because we were

20  preparing as of December to do the responses for the

21  litigation.  But January, February, March, April, May, it --

22  they -- you have employees that work two hours only, Your

23  Honor, in a whole week.

24          We have to -- for us to figure out an employee works

25  two hours in the whole week the date of hire.

1           JUDGE GREEN:  All right.  Listen, it's not --

2           MR. MILMAN:  We don't have a document that is

3    answerable to that.  We don't have to make a document that's

4    asked --

5           JUDGE GREEN:  Yeah.  All right.  I mean, listen, the

6    truth is that 14 is not a model of clarity.  Like I've read it

7    now a few times and it's a little -- it's a little confusing

8    the way it's drafted.

9           I take it what you were asking for is for people for

10   -- basically beginning December 1st, 2023, for anybody who

11   worked at Stony Brook, their date of hire.

12          MR. JACKSON:  Correct.  As well as some other

13   information that's listed there.

14          JUDGE GREEN:  Okay.  And what you ended -- you didn't

15   get that?

16          MR. JACKSON:  Got nothing on that regard.

17          JUDGE GREEN:  Okay.  And you're saying that you would

18   have to pluck that out of --

19          MR. MILMAN:  That's correct, Your Honor.  We don't

20   have a document record, sorry.

21          JUDGE GREEN:  Okay.  I'm not sure that that's true.

22   But listen, I'll take it under advisement.  I, you know, I

23   mean, I'm going to preliminarily admit Respondent's 10.

24          You could argue it in your briefs to what extent you

25   -- you're going to rely on it.  I'm not seeing that this is the

839

1    most critical to the case.  Maybe I'm missing something.

2              MR. MILMAN:  I'm doing -- Your Honor, the purpose of

3    our evidence is a two-fold is one is that General Counsel pays

4    our -- my client out as this individual brick and mortar

5    business like Classic that has 30 employees that work at 30

6    locations, just like a warehouse.

7              This is a very, very unique operation, Your Honor.

8    They have over 260 locations just in Long Island.  There is

9    constant, constant interchange, overflow, overlap of management

10   and employees.

11             Payroll is kept as one entire document.  It's not

12   broken out as a warehouse.  Warehouse and Northern New Jersey

13   warehouse in Central New Jersey, warehouse in southern New

14   Jersey.

15             That's not how we work.  The government would like us

16   to be like that, but that's not us.

17             JUDGE GREEN:  But I'm not saying that this really --

18   I mean, okay.  It says that -- it says --

19             MR. MILMAN:  All this does is to show that we're not

20   what government is trying to make us out to be the NLRB.  That

21   what is one location where everybody is located at one location

22   and that's it.

23             To understand that you need to understand the

24   intricacies of this very unique special organization.

25             JUDGE GREEN:  What I'm saying is -- right.  What I'm

```
 1  saying is, is that this really doesn't say who worked where or

 2  when.  So you have Stony Brook employees on what day --

 3            MR. MILMAN:  Correct.

 4            JUDGE GREEN:  Okay.  It just as that at some point,

 5  somebody who worked at Stony Brook worked at some other

 6  location.  That's what this document says --

 7            MR. MILMAN:  I understand.  But what the importance

 8  of that document also shows, Your Honor, is that those

 9  employees hired -- that worked in the entire month of December,

10  what their dates of hire work for the entire month of December.

11            Now, that is also on that document, because that

12  document was prepared months ago in responding to the complaint

13  that was filed, that was the document.

14            January -- as more employees are -- as the operation

15  is now -- before a month from November, December, you got

16  employees that work there for one shift.  They might work a few

17  hours, they might work just a weekend.

18            But what this document shows, Your Honor, it is

19  responsive to the request.  I think there was a specific

20  request on this also as to those employees working in the month

21  of December, which means the first month of operations, who

22  they are and what their date of hire is.

23            JUDGE GREEN:  I mean, the second column is the date

24  of hire.

25            MR. MILMAN:  The point that your, Your Honor, is that
```

 1   as a proper --

 2              JUDGE GREEN:  This -- well -- the second --

 3              MR. MILMAN:  This will show basically as of October

 4   27th, we were set to go.

 5              JUDGE GREEN:  Okay.  Well, the second column is the

 6   date of hire.

 7              MR. MILMAN:  Yes.

 8              JUDGE GREEN:  Okay.  It seems to me that that could

 9   have been provided.  The information -- you had the

10   information.

11              MR. MILMAN:  The --

12              JUDGE GREEN:  I mean, it was an electronic form.

13   Okay.  But --

14              MR. MILMAN:  Your Honor, we will supplement it

15   immediately if that's your order.

16              MR. JACKSON:  Your Honor, that's not how this works.

17              MR. MILMAN:  I said --

18              MR. JACKSON:  Mr. Milman, please stop.

19              JUDGE GREEN:  Do not really -- just --

20              MR. JACKSON:  He's yelling at me and I can't respond

21   to him?

22              JUDGE GREEN:  You shouldn't be yelling at each other.

23   It's just --

24              MR. JACKSON:  I mean, it's really frustrating to have

25   this inappropriate behavior by Counsel.

1          JUDGE GREEN:  All right.

2          MR. JACKSON:  Under Bannon Mills, as you know, Your

3    Honor, Respondent cannot deprive the General Counsel of

4    critical information that was subpoenaed during its case in

5    chief.  And then during Respondent's case introduced that same

6    information to bolster it's defense.

7          JUDGE GREEN:  I --

8          MR. JACKSON:  As a sanction --

9          JUDGE GREEN:  I understand.

10         MR. JACKSON:  As a sanction for Respondent's failure

11   to properly comply with the subpoena, I would move that this

12   Respondent 10 be excluded from --

13         MR. MILMAN:  All right.  May I respond, please?

14         JUDGE GREEN:  Yes.

15         MR. MILMAN:  Okay.  The interpretation of that is

16   wrong.  We don't have to create a document, Your Honor, to

17   respond to the request.  In fact, we didn't even have to create

18   that payroll.

19         We could have produced 11,000 documents and we're

20   more than happy to do so.

21         JUDGE GREEN:  Okay.  I mean --

22         MR. MILMAN:  We're more than happy to do so.  We'll

23   send a zip drive to him tonight.

24         JUDGE GREEN:  Listen, we knew that -- we knew in a

25   successor case that the hire dates were going to be relevant.

1          MR. MILMAN:  As of the date of hire, the state of the

2    operation.  In fact, we gave the whole month of the operation

3    in our report.  We don't have -- we could give him the 11,000

4    documents.

5          We have no problem.  We will send it to him this

6    evening.

7          JUDGE GREEN:  Okay.  I mean -- all right.  What he's

8    saying is it's too late.  Listen, I'm going to take it under

9    consideration.

10         You can argue in the brief to the extent you want

11   what -- to what extent I should rely on this document or not as

12   the case may be.  I'm going to preliminary -- preliminarily

13   accept it.  So R-10 is admitted.

14     (Respondent's Exhibit 10 received)

15         MR. MILMAN:  Thank you, Your Honor.  And I will -- I

16   would just like to reiterate it one more time that we do not

17   have to create a document to comply with this subpoena request.

18         JUDGE GREEN:  I'm not entirely certain that that's --

19   yes.  That's true.  But you had the hire dates in your

20   possession.  I mean --

21         MR. MILMAN:  Not in a document, Your Honor.  And --

22         JUDGE GREEN:  Well, you had it in the payroll

23   records.  You could have produced the payroll records

24   reflecting the hiring dates.

25         MR. MILMAN:  We're saying that.

844

1              JUDGE GREEN:  Look, so you did have --

2              MR. MILMAN:  We produced the payroll records -- we

3    produced the payroll records, Your Honor, just for Stony Brook

4    and Counsel just made a copy of it.  How long do you think it

5    would take to make a copy of 11,000 pages?

6              JUDGE GREEN:  I understand, but that's --

7              MR. MILMAN:  That's not front and back.

8              JUDGE GREEN:  That's a different issue.

9              MR. MILMAN:  That's not something at issue.

10             JUDGE GREEN:  You know, whether it was -- whether it

11   was voluminous and how we would've dealt with that is a

12   different -- it's a different issue.  The point is, is that,

13   you know, the information was in your possession.

14             It could have either been produced or, you know, the

15   General Counsel could been notified that it was -- it was

16   voluminous and we could have taken --

17             MR. JACKSON:  Yeah.

18             JUDGE GREEN:  We could've taken measures accordingly.

19   And that's not what happened.

20             MR. JACKSON:  Yeah.

21             JUDGE GREEN:  Now, we're on day five of the hearing

22   and we're arguing over a document --

23             MR. MILMAN:  I look, I just -- Your Honor, I respect

24   it.  But I've been practicing for the NLRB for 30 plus years,

25   and I've never been cited once for any type of malfeasance or

1  anything in treated with the General Counsel, with Your Honor,

2  or alleged discriminatee.  The accusation that we've done

3  something surreptitiously --

4         JUDGE GREEN:  No.  That's not -- it's --

5         MR. MILMAN:  Okay.

6         JUDGE GREEN:  It's not that it was surreptitious,

7  it's just that it wasn't produced.

8  BY MR. MILMAN:

9  Q.   And my response was as well.  Okay.  Thank you.  Mr. Gust

10  -- okay.  So Mr. Gust, what does that document represent to you

11  generated?

12  A.   Okay.  So that's -- these are the unique employees that

13  worked at Stony Brook for the month of December, 2023.

14  Q.   And does that document show their dates of hire?

15  A.   It does.

16  Q.   And can you read down the names and the dates of hire,

17  please?

18         MR. JACKSON:  Objection.  It's, unnecessary.  The

19  document speaks for itself.

20         JUDGE GREEN:  Okay.  Yeah.  We're not going to read

21  through these.  You don't want them to do that, right?  You

22  don't want him to read out loud the --

23  BY MR. MILMAN:

24  Q.   No.  I withdraw the question.  Your Honor, I accept your

25  admission under your condition into evidence.  I have no

1   further questions on that document, Mr. Gust.  I'd like you to

2   look at this document, Mr. Gust.

3           Okay.  This is GC-22.  Please take a look at that.

4   When you finish, let me know.  No.  It's not.  I'm sorry.  Hold

5   on, Your Honor.

6           Okay.  Mr. Gust, have you reviewed that reviewed that

7   document for you?

8   A.   Yes, sir.

9   Q.   Okay.  Now, your responses are the shade, right?

10  A.   That's correct.

11  Q.   Okay.  And this is communication -- you've testified on

12  this before, this is between Mr. Goldsmith and yourself?

13  A.   That is correct.

14  Q.   Right.  And the -- before the first shade on that document

15  lower down in your response, it's talking about a letter that a

16  Classic employee or text I believe to Andrew Goldsmith

17  basically saying, hey, when are you going to interview us?

18          So we could, you know, receive job offers?  And what

19  is your response say?  Can you read it?

20  A.   This is --

21          MR. JACKSON:  Objection.  Document speaks for itself.

22  BY MR. MILMAN:

23  Q.   Okay.  What did you say in response to that, Mr. Gust?

24  A.   I said, this is a good way to weed out the pain the asses.

25  Q.   Okay.  What did you mean by that?

1   A.   I meant that if you read the text, it is just -- this is

2   somebody that it is not suited for customer service.

3   Q.   Right.  Who's not suited?

4   A.   The gentleman who wrote that?  Oh, Edward Arias.

5   Q.   Okay.

6   A.   If you -- the conclusion of it, the last line is all that

7   really matters, which is, I expect to hear from you soon.  So

8   he's essentially demanding from somebody whose responsibility

9   is to basically hire him, review his qualifications, decide if

10  he's --

11  Q.   Did you know who -- did you know who this Arias was?

12  A.   No.  I did not.

13  Q.   Did Goldsmith know who this Arias was?

14  A.   I don't know.

15  Q.   Okay.  But he was employee looking for a job, correct?

16  A.   That is correct.

17  Q.   This is -- he -- this is not from the Union, is it?

18  A.   I don't know.

19  Q.   Not from an attorney, is it?

20  A.   Well -- okay.  So we put that back, right?  It says that

21  he's from Classic Valet Services.

22  Q.   Okay.  So --

23  A.   I could presume, I could obviously assume.

24  Q.   So he's -- he is an individual that's looking for a job,

25  correct?

1  A.  Correct.

2  Q.  Just like any other individual will be looking through

3  Indeed or a job placement position, correct?

4  A.  Yes.  Of course.

5  Q.  Or just like somebody that's responding to one of your

6  Bobby Gust QR codes.

7  A.  Yes.  That's correct.

8  Q.  Right?

9  A.  Yes.

10  Q.  Okay.  How many times have you seen an employee or a

11  potential employee job advocate submit for a job position at

12  Parking Systems and say to you, aside from that time.

13        Well, to go -- to say to you, I expect you to get

14  back to me.  Have you ever seen that?

15  A.  No.  That --

16  Q.  Since 1987, have you ever seen job applicant say that to

17  you?

18  A.  Aside from that it's -- it isn't even necessarily the

19  particular words.  It's just that that sort of expectation, the

20  -- that -- the sense of demanding, it's just not that

21  demanding.  Like that is not suitable for customer service,

22  that's a problem.

23  Q.  Oh, I see what you're saying.  Okay.  Thanks for that

24  explanation.

25  A.  Yeah.

1    Q.    Okay.  All right.  Were you involved in a meeting with any

2    Classic employees on November 25th, 2023?

3    A.    Yes.  I was.

4    Q.    Okay.  And that would be the meeting with you, Mr.

5    Candiotti and Mr. Gilliland?

6    A.    Gilliland.

7    Q.    Gilliland?

8    A.    Yeah.

9    Q.    That --

10   A.    That's correct.

11   Q.    Okay.  And on the other -- and the other parties were

12   Francis and her son, Ms. Gil Reyes and her son?

13   A.    That's correct.

14   Q.    All right.  And we notice the place is Jake's.  So I'm

15   just going to ask you, Mr. Gust, did you ever say in that

16   conversation the word union?

17   A.    No.

18   Q.    Are you sure?

19   A.    I'm positive.

20          MR. MILMAN:  I have no further questions.  Thank you,

21   Bobby.

22          JUDGE GREEN:  There going to be any cross?

23          MR. JACKSON:  Yes, Your Honor.  Do we intend to

24   finish with this witness this evening?

25          JUDGE GREEN:  I don't know.

1          MR. JACKSON:  Let's see how it goes.

2          JUDGE GREEN:  Depends.

3          MR. JACKSON:  Let's see how it goes.

4          JUDGE GREEN:  How long do you think you have?

5          MR. JACKSON:  I'm honestly not sure.  Probably not

6    more than a half hour.

7          JUDGE GREEN:  Okay.  I mean, if you want to take a

8    crack at it.

9                         CROSS EXAMINATION

10   BY MR. JACKSON:

11   Q.   Okay.  Mr. Gust first of all can you look at R-10?

12   A.   Okay.

13   Q.   So I understand what the first two columns mean.  What's

14   the third column reflect?

15   A.   That's -- everything to the right of that, every one of

16   those columns is locations where that individual worked, at

17   least one shift.

18   Q.   Okay.  But we don't know when?

19   A.   I didn't include that.  No.

20   Q.   And this document doesn't contain that information, right?

21   A.   This is -- no.  This is just a synthesized.

22   Q.   Okay.  And these employees worked at these locations at

23   some point during their employment?

24   A.   Correct.

25   Q.   And Respondent Exhibit 8, R-8, the other list you compiled

1  from your payroll records?  This one?

2  A.    No.  I'm getting there.  Oh yeah.  I know it.

3  Q.    Okay.  And --

4  A.    Just give me a sec.  Let me pull that up.

5  Q.    Yeah.

6  A.    Yeah.  Go ahead.

7  Q.    This document does not reflect when any of these employees

8  worked at any particular location, correct?

9  A.    It just reflects that they worked at least one shift at

10  each one of those locations.  It does not show the date of.

11  Q.    At some point during the entirety of their employment,

12  correct?

13  A.    Correct.

14  Q.    You mentioned a unionized facility that Parking Systems

15  has, right?

16  A.    Yes.

17  Q.    That's at -- is that a Nassau Coliseum.

18  A.    Nassau Veterans Memorial Coliseum.

19  Q.    Right.  Is that the only unionized shop you have?

20  A.    The only one I'm aware of, yes.

21  Q.    Okay.  Andrew Goldsmith is not a shareholder of Parking

22  Systems, correct?

23  A.    He is not.  He's not.

24  Q.    And Travis Gilliland is not a shareholder of your company,

25  correct?

852

1   A.    He is not.  Correct.

2   Q.    As a shareholder in the company, you have a financial

3   state in the company, correct?

4   A.    Of course.

5   Q.    Of course.  And we've heard your attorney say repeatedly

6   that there's a lot of money on the line in this case for you.

7   You understand that, right?

8   A.    I do understand that.

9   Q.    So it is very important to you that Parking Systems

10  prevails on this --

11          MR. MILMAN:  Objection.

12  BY MR. JACKSON:

13  Q.    -- correct?

14          MR. MILMAN:  Objection.

15          JUDGE GREEN:  Overruled.

16  A.    Is it very important to me that we prevail?  Absolutely.

17  BY MR. JACKSON:

18  Q.    And if you don't prevail, that could hurt your personal

19  bottom line, correct?

20  A.    If we don't prevail, it could.  Absolutely.

21  Q.    And the same with all the other shareholders of the

22  company, right?

23          MR. MILMAN:  Objection calls for speculation.

24          JUDGE GREEN:  Sustained.

25  BY MR. JACKSON:

853

1    Q.   Well, the other shareholders of the company would be

2    adversely affected financially if Parking Systems does not

3    prevail in this case, correct?

4    A.   I think that's fair to say.  Sure.

5    Q.   Okay.  How do you know the names of former Classic

6    employees?

7    A.   I've seen documents a few times that that listed early on

8    in the process.  I think I received something from my attorney

9    that listed some -- listed names of some of the employees that

10   might have come initially from the Union, but there's been a

11   bunch of times even during this document production phase.  I

12   see the names.

13   Q.   You also knew the names because you received their

14   applications from the QR code, right?

15   A.   I certainly could glean that information, yes.

16   Q.   Now, you mentioned during your testimony today that part

17   of your role in the company is mentoring others; is that right?

18   A.   For sure.  I've been with company since 1987.  Is it an

19   official job title?  No.  But when you have that kind of

20   scenario, that's what you do.

21   Q.   Mm-hmm.  And what does mentoring involved

22   A.   It means teaching people the ropes, like helping them

23   along, being there to support them if they have problems,

24   questions, things that go beyond the scope of their experience.

25   Q.   And teaching them the ropes means helping them to follow

1    the company's policies and procedures, right?

2    A.    For sure.

3    Q.    So if you see someone who is not in compliance with the

4    company's policies or procedures, they're doing something

5    that's out of line with that, you're -- as a mentor, you're

6    going to tell them that they're out of line, right?

7    A.    Do you have a specific example?

8    Q.    Generally speak.

9    A.    I think that's fair.

10   Q.    Okay.  So I have some questions for you about the

11   testimony you gave on direct concerning your role as custodian

12   of records.

13           MR. MILMAN:  So my direct or your director, Mr. Mr.

14   Jackson?  It just goes to whether I'm assert objection or not,

15   Your Honor.

16           MR. JACKSON:  I'm asking to be marked for

17   identification --

18           JUDGE GREEN:  What was the question?  I don't think

19   there was a question.

20           MR. JACKSON:  I wasn't asking a question on --

21           MR. MILMAN:  No.  I didn't ask you a question.  I'm

22   asking the Judge a question.  Thank you, Mr. Jackson.  The

23   question.

24           I have, Your Honor, is the Counsel said, I've asked

25   you questions further of your direct, I said, was it the 6(11)

1  direct or was it my direct?  Okay.  Because it goes to -- it

2  goes to my -- whether I could object or not.  And if so --

3          JUDGE GREEN:  We'll see when we get the -- when we

4  get the question.

5          MR. MILMAN:  Well, I did not ask any questions on

6  this, so it wasn't my direct.  And if that's the question, Your

7  Honor, which I thought it would be, is that Counsel is now

8  trying to produce a document in on my cross -- on cross of my

9  questions that go -- not question I have before him, but the

10  questions he had before him that he never submitted exhibit.

11          JUDGE GREEN:  Okay.  But we don't have a question yet

12  right now.

13          MR. MILMAN:  I understand.  I'm looking at the

14  document and that's why I asked the question.

15          JUDGE GREEN:  Okay.  So when we get a -- when we get

16  a question or when we get a document that's offered into

17  evidence, we'll --

18          MR. MILMAN:  Okay.  It's been marked --

19          JUDGE GREEN:  -- potentially get an objection.

20          MR. JACKSON:  Okay.  So I've distributed a document

21  that has to be marked for identification as GC Exhibit 25.  I

22  have another one that I will distribute that I'm asking to be

23  marked for identification as GC Exhibit 26.

24      (General Counsel's Exhibit 25 and 26 identified)

25          JUDGE GREEN:  Okay.

1    BY MR. JACKSON:

2    Q.   So Mr. Gust, as custodian of records, you understand that

3    you were supposed to produce all documents showing the

4    company's job solicitations, job postings for positions at

5    Stony Brook, right?

6    A.   That among other things, that was a big list.

7    Q.   Right.  That was one of the things that you were supposed

8    to find, right?

9    A.   As I said, there was a long list.

10   Q.   And do you remember that that was one of them?

11   A.   Say it again?

12   Q.   All documents showing job postings solicitations for

13   positions at Stony Brook.  I can read specifically.

14           MR. MILMAN:  Objection, Your Honor.  Just as I

15   thought.  So my point is, is that I had not asked this witness

16   one question whatsoever with respect to job advertisements at

17   all.  Now, that --

18           JUDGE GREEN:  That there were.  There were some

19   questions about job --

20           MR. MILMAN:  No, Your Honor, but hear me out if I

21   just little time to make my objection.  When you -- when

22   government decides to call a 6(11)(c) witness, that doesn't

23   mean that they get a free for all and get 1, 2, 3, 4, 5, 6

24   shots at this witness.

25           They -- the doc -- the witness was called as the

1    custodian of documents and to make their case in chief.  I knew

2    when he said direct that this was something like this was

3    coming in.  These job advertisements.

4           There was not one question posed to this witness, not

5    one on job advertisements at Stony Brook, nor anyone else.  Not

6    one.

7           General Counsel neglected to get these documents in

8    for whatever reason when they called him as a 6(11)(c) witness,

9    had I asked them questions, they would perhaps had an

10   opportunity to get.

11          I had not asked them one question.  They move at

12   their peril for trying to get documents in.  If I don't ask

13   those questions on my direct.

14          JUDGE GREEN:  Okay.  I mean, listen, I, you know, I

15   don't have a transcript yet of what was asked.  I actually

16   thought I recalled some questions being asked about the job

17   descriptions.

18          MR. MILMAN:  Mr. Candiotti.  Not Mr. Gust.

19          JUDGE GREEN:  Okay.  I mean, to the extent that

20   there's an objection, it's overruled.

21   BY MR. JACKSON:

22   Q.   Thank you, Your Honor.  So do you recall that part of your

23   search involves looking for job postings?  Job advertisements?

24   A.   So -- yes.

25   Q.   Okay.  And do you recall that you produced two documents?

1    A.    I -- there was so many documents that was produced.  So

2    can I discuss the talk about the process or --

3              JUDGE GREEN:  Let's not.  Really -- let's not, and

4    let's try to -- it is, you know, we're five days in, it's 5:00

5    -- it's 5:20.  Is there some relevance to whether this was

6    produced pursuant to the subpoena, or are we just looking to

7    authenticate them?

8              MR. JACKSON:  I'm looking to authenticate them and to

9    get the date on which -- I want to ask some questions about

10   these documents.

11             JUDGE GREEN:  Okay.  So ask about this --

12   BY MR. JACKSON:

13   Q.    Okay.  Do you -- okay.  GC-25, the first one, I mean, it

14   looked very similar, but the --

15   A.    34 or 291?

16   Q.    The one that says 291.

17   A.    Got it.

18   Q.    That document -- this was a job posting that was first up

19   on or around November 10th, 2023; is that right?

20   A.    There's literally nothing on here that says that.  And so,

21   I don't know.

22             MR. JACKSON:  Okay.  So, Your Honor, I just want to -

23   - there's some electronic data that goes to this issue but I

24   can't print it.

25             Am I permitted to show the witness?  This is

859

1    something that I discussed with counsel this morning about, you

2    know, how these documents appear in the production.  So may I

3    approach the bench with the computer to show what I'm referring

4    to?

5                    JUDGE GREEN:  Yes.  But show it to the Respondents

6    first.

7                    MR. MILMAN:  Oh, this.  I think you're talking about

8    other document.  Is that what you went over this morning with

9    Mr. Jackson?

10                   MR. MAURO:  Yeah.

11                   MR. MILMAN:  Okay.  Thank you.

12   BY MR. JACKSON:

13   Q.   I'm showing the witness my computer screen that shows some

14   electronic data that was submitted that counsel for General

15   Counsel received in response to the subpoena, GC-24.  And you

16   see that the document is titled Parking Lot Attendant

17   (No.10/20/23)

18   A.   Parking lot.

19   Q.   Parking lot attendant.

20   A.   Oh, oh, oh, oh, okay.  I'm sorry.  Yes.  Yes.  I see that.

21   Q.   Do you remember when -- okay.  This document was -- when

22   did the job posting was first put up?

23   A.   So I didn't put this in, so I don't, you know, I, didn't I

24   post this, but I guess yes.  November 10th.

25   Q.   Okay.  Is this from Indeed?

1    A.    It looks that way, yeah.

2    Q.    Okay.  And how did you get the document from Indeed to

3    produce to General Counsel?

4    A.    This looks like one that Johnny probably had the document

5    produced.

6    Q.    Okay.

7    A.    Because it's not something that I was included on.

8    Q.    Okay.  And then the 26th, same questions.  Do you --

9    A.    Same.  Same.

10   Q.    Do you know when it -- by looking at the paper, do you

11   know when it was first posted?

12   A.    I have no idea.

13          MR. JACKSON:  Okay.  Right.  Presenting Counsel with

14   computer screen.

15          MR. MILMAN:  Mm-hmm.  I'm sorry.

16   BY MR. JACKSON:

17   Q.    And now the witness I'm presenting a computer screen shows

18   electronic data

19   A.    In November 20th.

20   Q.    Right.

21   A.    2022.

22   Q.    Does that information help you determine or be able to

23   surmise when this ad was first posted on Indeed?

24   A.    Yeah.  Presumably November 20th.  Based on that.

25   Q.    And to your knowledge, were there any other documents

1  produced?  Were there any other postings that you found on

2  Indeed or otherwise?

3  A.    No.

4         MR. JACKSON:  I move for the admission of GC-25 and

5  26.

6         JUDGE GREEN:  So I already have the objection

7  regarding it being beyond the scope.  Anything else?

8         MR. MILMAN:  No, Your Honor.

9         JUDGE GREEN:  Okay.  So I'm admit GC-25 and 26.  Off

10 the record.

11     (General Counsel's Exhibit 25 and 26 received)

12  (Whereupon, at 5:32 p.m., the hearing in the above-entitled

13 matter was adjourned to reconvene on Wednesday, July 3, 2024 at

14 10:00 a.m.)

15

16

17

18

19

20

21

22

23

24

25

```
 1                        CERTIFICATION

 2        This is to certify that the attached proceedings before

 3   the National Labor Relations Board (NLRB), Region 29, in the

 4   matter of Parking Systems Plus, Inc. and Local 1102, Retail

 5   Wholesale & Department Stores Union, United Food and Commercial

 6   Workers, Case No. 29-CA-331253, at 26 Federal Plaza, 2nd Floor,

 7   New York, New York 10278, on July 2, 2024, was held according

 8   to the record, and that this is the original, complete, and

 9   true and accurate transcript that has been compared to the

10   recording from the hearing, that the exhibits are complete and

11   no exhibits received in evidence or in the rejected file are

12   missing.

13

14

15

16   _____

17   Adrian Morris

18

19

20

21

22

23

24

25
```

## $

**$150 (1)**
806:19
**$16 (1)**
704:25
**$18 (1)**
808:22
**$20 (1)**
704:25
**$300 (1)**
806:16
**$6 (1)**
808:23

## A

**abandoning (1)**
829:17
**abilities (1)**
679:3
**able (26)**
645:7;674:4;
678:10;698:25;699:3;
701:18;718:15;748:8;
774:20;784:5,6;
790:12;794:7;801:3,
4;802:14,15;811:9,11,
11;812:4,6,7,7;818:3;
860:22
**above (4)**
715:9,12;739:12;
755:13
**above-entitled (2)**
638:15;861:12
**absolutely (21)**
719:9;736:12;
739:20;742:11;
747:10,24;759:25;
765:5;783:25;792:23;
795:15,15;802:19;
808:1;810:13;814:1;
828:9;829:14,14;
852:16,20
**abstract (2)**
705:8,13,16
**accept (3)**
718:15;843:13;
845:24
**access (15)**
663:13,13,24;
664:5,6,10,14;679:23;
701:2,4,5,6,18;
773:14;807:22
**accordingly (2)**
764:17;844:18
**account (105)**
649:4;652:25;
653:4;659:2,12;
675:13;681:2;683:20,
22,22,25;684:1,7,14,
17,18;690:16;691:10,

18;694:4,7,15,16;
695:14,16,18,19,20,
21;696:11,14,20;
697:1;698:3,15,16;
700:18;707:21,24;
708:12;714:9,17;
723:12,25;731:3,5,13,
21;733:16;738:1;
739:23;740:15;742:4,
9;751:17,24;762:13;
763:18,18;764:3,19;
770:18,20;781:12,16,
16,20,22,23;782:1,2,
2,5,16;785:23,23;
786:7,21;787:18;
788:2,16;792:4,9,17;
793:1;795:3;804:18,
18,23;805:7;806:1,2,
5,11,11;809:2;816:3,
4,11,16,18,25;817:1;
831:11,12
**accountability (1)**
684:15
**Accounts (17)**
675:2;699:20,20;
715:5;737:16;739:21;
751:19;763:19,25;
771:17;786:24;
792:25;804:24;809:9;
816:14,15;823:10
**accumulate (1)**
660:8
**accurate (9)**
654:24;665:10;
683:6;696:4;726:2;
728:23;758:4;778:23;
780:21
**accusation (2)**
837:9;845:2
**accustomed (1)**
715:15
**acknowledge (1)**
735:5
**acknowledgement (1)**
735:4
**acquiring (1)**
663:15
**acquisition (2)**
751:18;782:15
**across (2)**
767:23;802:2
**Act (2)**
734:10,12
**action (1)**
729:9
**activated (1)**
659:17
**active (10)**
654:17;680:3;
731:2,17;732:6;
735:11;741:14;772:2,
3;823:10
**actively (4)**

656:18;657:5,8;
824:9
**actual (7)**
663:24;713:2;
726:10;728:16,22;
734:24;757:7
**actually (72)**
645:16;660:19;
663:11;664:6;671:10;
677:23;682:9,13,18,
21;690:4,17;692:22;
693:10;695:6,18;
697:10;700:6;701:24;
707:12,23;711:11;
713:5,9,12;718:15;
727:13;730:18;
734:23;740:18;751:1,
1;765:4;766:9;767:1;
770:1,21;771:15,16;
773:15;779:8,15,20,
23;783:19;784:4;
785:3;786:10;787:4;
788:14;797:17;
801:11;802:2,20,21;
803:10;804:15;807:2,
17;809:3,10;815:5;
816:13;819:4,24;
821:13,13;828:13;
832:8;834:7;836:6;
857:15
**ad (21)**
659:15,18,25;
660:1,25;661:1;
689:9,15;690:6,8,16;
691:6;693:24;723:11;
737:8,15,24;752:3,4,
8;860:23
**adapt (1)**
715:22
**add (3)**
648:13;679:16;
817:20
**added (1)**
788:19
**addition (6)**
654:20;677:16;
696:15;770:23;778:2;
788:16
**additional (9)**
650:8;672:23;
713:1,5;730:13,13;
760:7;780:8;814:25
**address (2)**
643:6;834:20
**addressed (1)**
781:13
**addressing (1)**
738:5
**adequately (1)**
657:13
**adjourned (1)**
861:13
**Administrative (2)**

638:16;643:13
**admissibility (2)**
833:22;834:3
**admission (3)**
817:21;845:25;
861:4
**admit (3)**
800:9;838:23;861:9
**admitted (8)**
749:6;777:3,10,11,
13;821:22;828:19;
843:13
**admittedly (2)**
649:17;773:2
**adoption (1)**
714:7
**Adrian (1)**
721:15
**ads (16)**
659:9;660:12,13;
690:24;691:1,4;
737:3,22;738:9;
740:16,20;751:22,23,
25;752:5;756:24
**advance (1)**
707:8
**adversely (1)**
853:2
**advertisements (4)**
856:16;857:3,5,23
**advertising (3)**
658:15;691:2;
757:15
**advisement (1)**
838:22
**advocate (1)**
848:11
**affected (1)**
853:2
**affidavit (1)**
647:11
**affiliation (1)**
701:24
**afield (1)**
697:11
**afternoon (1)**
681:19
**AG (3)**
815:20;816:10,22
**again (25)**
658:8;661:4,18,23;
672:16;691:3;692:6;
704:10;708:22;
710:17;714:15;
740:18;741:10,13;
743:1;748:19,19;
749:17;781:13;
785:22;809:11;
824:22;827:4;830:25;
856:11
**against (4)**
819:2;828:25;
829:1,6

**ages (1)**
703:17
**aggregate (3)**
778:1,17;819:1
**aggregated (1)**
818:15
**ago (10)**
655:21;660:14;
675:3;702:24;717:14,
18;739:9;740:24,25;
840:12
**agree (2)**
673:8,15
**agreed (2)**
688:6,8
**agreement (3)**
697:16;734:25;
768:25
**ahead (6)**
676:4;718:11;
722:10;753:4;760:23;
851:6
**aisle (1)**
668:1
**akin (1)**
780:13
**Alexopoulos (3)**
763:6;764:9,10
**ALJs (1)**
649:18
**allegation (1)**
749:15
**allegations (2)**
829:1,5
**alleged (2)**
829:1;845:2
**alleges (1)**
645:17
**allocated (2)**
771:7;805:7
**allocation (1)**
717:22
**allow (1)**
650:2
**allowed (4)**
665:3;673:14;
686:5;706:9
**allowing (1)**
834:1
**allows (1)**
808:3
**alluding (1)**
647:9
**almost (1)**
826:19
**along (6)**
686:11;727:24;
729:14;774:9;812:12;
853:23
**alternate (1)**
693:13
**alternative (1)**
801:2

**although (1)**
649:11
**always (16)**
648:23;651:25;
669:22;707:9,20;
714:21;751:20;
762:23;776:19;788:5,
13;789:21,23;808:12;
822:11;826:1
**Ameri (1)**
793:7
**Americorp (1)**
809:3
**amhe (1)**
664:18
**among (2)**
685:14;856:6
**amount (3)**
776:18;808:14;
824:21
**amounts (1)**
660:8
**analogies (1)**
802:2
**analyzing (1)**
694:9
**Andrew (50)**
652:3;654:11,20;
656:6;671:17,21;
681:4,6;683:11,13,16,
19;684:6,20,25;685:5,
13,19;688:3,20;
692:6;700:17,19;
718:23;719:14;
720:10,23;747:7,21;
748:4,6,14;781:18;
784:16;785:3,3,20,21;
787:22;788:5;789:8;
790:6;797:19,22;
800:4;801:7;804:10;
816:22;846:16;
851:21
**Andrew's (3)**
747:22,25;813:2
**angst (1)**
789:24
**anion (1)**
716:3
**announced (1)**
757:8
**answerable (1)**
838:3
**answered (13)**
689:17;691:12;
693:22,25;702:18;
708:6,19,19;737:24;
742:21;754:14;
758:25;759:6
**answer's (1)**
799:14
**anymore (2)**
651:14,20
**apparently (2)**

**appear (1)**
859:2
**appears (2)**
666:23;815:18
**applicant (13)**
726:13;727:2,15,
17,23;728:6,17;
735:10,14;746:2;
803:22;805:9;848:16
**applicants (11)**
658:20;660:2;
661:5;678:6;690:7,
16;741:21,25;743:15;
790:9;805:7
**application (23)**
670:10;712:12;
722:22;724:10;727:5,
6,11,24;728:2,7,8,11,
12,18,24,25;729:14,
22;730:3,5;803:16,
25;823:4
**applications (2)**
661:7;853:14
**application's (2)**
728:12;729:18
**applied (2)**
682:13,16
**applies (1)**
736:6
**applying (2)**
669:10;693:9
**appreciate (2)**
647:1,2
**approach (4)**
646:17;721:4;
750:2;859:3
**appropriate (3)**
672:22;704:8;
757:12
**approval (1)**
678:4
**approved (2)**
663:17;767:25
**approximately (3)**
666:17;704:25;
783:5
**April (1)**
837:21
**arc (1)**
755:12
**arching (1)**
739:9
**area (5)**
709:12,15,23;
710:1;809:17
**argue (2)**
838:24;843:10
**arguing (1)**
844:22
**argument (1)**
810:13
**argument's (1)**

780:9
**Arias (3)**
847:4,11,13
**arms (2)**
664:7,8
**around (10)**
667:2;688:10;
719:6;737:13;740:13;
759:14;800:18;
810:25;815:9;858:19
**arriving (1)**
663:23
**arrow (1)**
821:15
**art (1)**
684:17
**aside (12)**
644:8;714:15;
748:17;763:4;790:5,
8,8;791:20;811:19;
812:8;848:12,18
**assert (1)**
854:14
**asses (1)**
846:24
**assigned (2)**
677:6;806:22
**assistance (1)**
653:21
**assistant (1)**
786:18
**associate (1)**
780:14
**assume (10)**
673:16;689:4,7;
710:11;729:15;
736:17;757:20;759:7;
768:2;847:23
**assuming (4)**
741:2;813:3,5;
817:11
**assumption (1)**
803:18
**assure (1)**
792:16
**Atkins (3)**
651:24;752:23;
753:7
**attached (1)**
750:12
**attend (3)**
651:18,20,20
**attendance (8)**
674:17;675:21;
682:12;764:15;778:2;
818:19,22;823:4
**attendant (9)**
653:6;713:5;
735:23;762:19,20;
765:7;773:24;859:16,
19
**attendants (6)**
669:17;722:21;

775:16,23,24;780:10
**attended (1)**
677:10
**attention (4)**
660:12;685:18;
686:19;711:22
**attorney (8)**
651:10;673:2,9,13;
681:16;847:19;852:5;
853:8
**attorneys (1)**
834:8
**attract (1)**
690:16
**attracted (1)**
784:3
**auditor (1)**
770:23
**August (6)**
736:18;756:15,16,
25;791:14,25
**authenticate (2)**
858:7,8
**authenticity (1)**
672:22
**authority (1)**
751:12
**authorization (2)**
757:14,17
**authorized (5)**
643:13;665:1;
789:7;790:6;800:4
**automation (1)**
677:3
**availability (5)**
676:14;680:2;
711:12;724:12;726:1
**available (7)**
663:3;731:11;
733:9;772:16;792:14,
16;795:12
**Average (7)**
706:15;711:9;
723:20,21;728:17;
741:11;808:22
**award (2)**
782:15,16
**awarded (4)**
707:24;708:4,12;
768:6
**aware (32)**
655:14,18,21;
658:17;661:3;665:14;
678:12;683:16;
688:10;689:8,11;
690:25;691:5,8;
694:23;697:13;
698:11;700:7;714:15;
716:2;738:9,12,13;
750:13;767:24;
784:14;791:5;802:20;
828:24;834:4,4;
851:20

**away (3)**
691:11;713:7;777:7

**B**

**Babylon (1)**
762:22
**back (57)**
643:3;649:8;
655:12;660:11;
664:19,20;673:18;
678:9;681:15;682:13;
692:10,11,13;700:21;
703:16;706:2,14;
713:12;721:4,13;
723:22;729:8;733:13;
736:18;741:2;745:2;
750:6;751:6;759:22;
760:16,17;761:11;
763:14;767:24;
771:16;773:10,10;
782:9;783:2;784:8,8;
788:11;789:5,6;
790:4;792:25;795:16;
797:8;799:9;800:1;
801:2;807:13;808:12;
810:10;844:7;847:20;
848:14
**backend (1)**
762:14
**background (7)**
665:1;705:22;
713:6;730:14,18;
741:17;804:3
**backtracked (1)**
653:22
**backup (1)**
701:19
**bad (3)**
800:15;811:17,18
**badge (1)**
664:11
**bailment (1)**
703:13
**bailout (1)**
699:7
**bait (1)**
834:21
**Bannon (1)**
842:2
**bar (1)**
812:3
**bargaining (2)**
697:15;768:24
**Baron (18)**
649:3,11,16;
688:18,24;719:24;
751:6,7;758:19;
763:5,5,9;765:10,12,
16;768:12;769:6;
782:13
**Baron's (1)**
751:12

**Barron (1)**
720:8
**bars (1)**
679:25
**base (2)**
651:18;805:1
**based (15)**
653:22;660:16;
664:24;694:13;
699:17;708:5;723:16;
724:12;731:12;
780:11;790:1;810:17;
820:21;824:18;
860:24
**basically (14)**
717:13;739:9;
759:22;770:6;782:7;
800:21;801:18;
806:14;816:11;818:1;
838:10;841:3;846:17;
847:9
**basis (14)**
648:3;651:15,17,
19;657:16;675:20,23;
695:12;697:8;711:8;
720:13;763:12;779:6,
7
**bathroom (1)**
761:11
**beach (2)**
682:1,4
**bear (3)**
654:25;673:25;
832:17
**became (8)**
688:9;716:2;
718:14;738:9,12;
750:13,17;767:25
**become (5)**
690:10;700:7;
802:10,12;816:21
**becomes (1)**
764:4
**Beg (3)**
807:3,5,6
**began (4)**
657:24;708:14;
755:18;757:24
**begin (6)**
657:18;681:20;
719:9;755:20;756:12;
759:13
**beginning (11)**
652:6;664:16;
683:2;688:15,16;
755:12;756:16;788:6;
797:13;819:7;838:10
**begins (1)**
685:19
**begun (1)**
702:1
**behavior (1)**
841:25

**behinds (1)**
810:24
**Bell (2)**
783:23,24
**below (1)**
685:13
**bench (1)**
859:3
**benefit (1)**
674:18
**BENJAMIN (1)**
638:16
**besides (2)**
767:9;818:8
**best (11)**
644:5;669:16;
703:2,2;732:14;
733:10;743:23;747:3;
765:7;772:5;812:7
**better (3)**
800:16;803:19;
809:5
**beyond (15)**
657:12;687:20;
697:10;698:2,5,5;
725:3;752:25;753:2;
760:6;775:2;780:8;
817:17;853:24;861:7
**bi (1)**
652:12
**bid (6)**
697:23;698:3,4,7,
12;768:2
**bidders (1)**
708:9
**bidding (3)**
697:23;782:10;
806:14
**big (5)**
747:5,13;748:2;
807:21;856:6
**biggest (3)**
686:7;692:8;748:3
**bill (1)**
780:14
**billable (14)**
652:11,14,18,19,19;
653:5,6,21;655:2,10;
779:22;780:1,4,16
**billables (1)**
653:15
**Billy (4)**
663:22,22;664:13,
13
**bit (6)**
767:24;788:11;
789:23;797:8;803:12;
815:14
**black (1)**
672:3
**blanket (1)**
823:20
**blend (1)**

**713:6**
**blended (1)**
711:4
**block (3)**
682:6;724:13,14
**Bloomingdale's (1)**
808:17
**BOARD (3)**
638:2,17;651:11
**boarded (1)**
732:9
**Bobby (28)**
649:3;652:2;
654:11,20,22;665:18,
23;666:5,7;677:11,
14;678:7;685:11;
688:17;718:22;
719:22;720:6;744:1;
750:11;751:6;761:10,
14;829:10,16,23;
835:1;848:6;849:21
**bogged (1)**
808:20
**bolster (1)**
842:6
**bolts (1)**
793:17
**bombarded (2)**
748:6,8
**bone (1)**
748:15
**book (1)**
679:25
**booth (7)**
709:3,9,11,14,17,
20;826:8
**booths (1)**
807:16,22
**boots (1)**
719:25
**both (1)**
738:16
**bottom (1)**
852:19
**Bourne (2)**
831:20,22
**branch (1)**
698:17
**brand (1)**
739:3
**branding (2)**
757:2,13
**break (13)**
650:14;664:7;
674:12;681:10,11;
687:8;713:17,18,19;
746:9;758:15;771:21;
773:4
**breaking (3)**
674:16,16;751:14
**brick (1)**
839:4
**brief (3)**

**692:16;743:16;**
843:10
**briefs (1)**
838:24
**bring (10)**
647:22;679:1;
699:4,10;714:22;
739:14;760:7,15;
780:15;809:15
**bringing (1)**
664:23
**brings (2)**
648:23;741:2
**broad (1)**
694:11
**broke (1)**
643:9
**broken (2)**
772:24;839:12
**Brook (169)**
645:17;651:12;
652:7,20,21;653:6,7,
12,21;655:3;656:18;
658:15;661:2,5;
663:9;666:25;669:11;
670:17;675:20,24;
676:7;677:5;678:13,
16,19,20;679:9;680:5,
21;681:1,5;683:22,
25;684:7,18,20,23;
685:2;689:10,21;
690:16,24,25;691:2,7;
693:15,21;694:3;
698:20;699:24;700:3,
17,20;701:2,7,9;
702:2,3,6;704:6;
707:21;710:23;
711:15,22;712:3,3,8,
8,13;716:17;717:23;
718:15;720:11;
736:18;737:6;740:2;
744:8,18,19;745:22;
747:8;752:4;755:3,
16,20;756:22;757:18;
758:3,6;766:14;
768:1,6;769:19,21;
770:2;772:20,23;
773:24;776:15,17,19;
778:10,15,18,20;
779:13;782:16;783:3;
784:11,15;785:24;
786:20;787:8,22;
788:1,17,17;789:6;
790:1;795:17;797:4,
11;799:1,5;800:5;
801:25;803:8;805:17,
20;806:1;807:16,23;
808:6;809:16;812:22;
821:8;816:7;818:3,
8,9;819:9,13,17;
821:6;825:2,3,7,9,13,
16,22;832:3;834:11,
12;835:14,20;836:13,

**24;837:12,13,18;**
838:11;840:2,5;
844:3;845:13;856:5,
13;857:5
**Brooking (1)**
659:21
**Brooks (2)**
657:5;700:2
**Brook's (1)**
807:21
**brought (5)**
656:9;660:11;
680:11;797:8;808:9
**bubble (1)**
700:15
**budget (1)**
720:3
**build (1)**
805:1
**building (2)**
733:24;771:20
**Bull (2)**
817:6,7
**Bullet (1)**
687:21
**bunch (3)**
729:10;822:10;
853:11
**busiest (2)**
808:3;826:17
**business (17)**
669:6;694:15;
706:16;723:24;
727:20,21,22;728:16;
730:23;732:12;
763:17;778:5;783:13;
793:3;823:15;836:21;
839:5
**businesses (2)**
687:17;812:2
**bust (1)**
810:24
**busy (7)**
723:8;742:2;788:3;
793:9;810:6,22;
824:24
**button (1)**
813:8

**C**

**Cafe (1)**
762:22
**calculations (2)**
716:8;750:12
**call (8)**
650:14;682:13;
732:15;741:14;
793:13;796:13;830:1;
856:22
**Callari (7)**
654:6,19;655:2;
658:25;659:17;

660:17;763:6
**C-A-L-L-A-R-I (1)**
  654:8
**called (11)**
  651:4;723:14;
  738:22;762:3;779:22;
  790:20;793:11,11;
  807:3;856:25;857:8
**calling (6)**
  649:7;729:17;
  806:21;827:10;
  835:11,12
**calls (3)**
  651:19;655:20;
  852:23
**came (10)**
  638:15;663:20;
  671:20;702:16;725:3;
  759:23;784:7;802:2;
  803:22,22
**camera (1)**
  648:6
**campus (7)**
  653:8;664:23;
  667:1;680:10;701:2;
  746:2;809:3
**can (86)**
  643:18;646:4,7;
  650:13,15,18,18;
  652:23;654:17;657:2;
  661:22;662:10,10;
  669:23;670:2;671:7,
  10;672:3,15;673:15;
  675:8;680:2;681:9,
  11;685:7,18;686:8;
  688:13;691:15;
  700:10,10;701:3,4,9;
  707:18;708:21;
  713:18;715:11;717:8;
  721:21;733:14,18,19;
  737:2;740:6;743:5,6,
  23;745:10;750:8,25;
  759:11;769:11;771:6;
  772:13;777:6;781:24;
  783:7;784:1,18;
  788:12,23;789:22;
  792:16;806:8;808:4;
  811:25;812:1,8,14;
  818:13;819:18,24;
  820:16;821:13;
  822:12;828:1,2;
  835:25,25;843:10;
  845:16;846:19;
  850:11;856:13;858:2
**canceled (1)**
  714:20
**cancer (6)**
  709:3,9;809:16,24;
  826:3,13
**candidate (5)**
  727:7;730:15;
  732:8,11;783:22
**candidates (3)**

670:19;739:16;
  746:4
**Candiotti (27)**
  650:22;651:3;
  659:8;677:10;681:19;
  685:12,15,16;688:17,
  19,19;714:5;721:23;
  731:16;736:23;738:8,
  16;749:9;750:8;
  758:14;763:6;765:8,
  14;787:7,10;849:5;
  857:18
**cap (1)**
  807:10
**capable (1)**
  798:21
**capacity (1)**
  659:16
**Captain (1)**
  831:24
**capture (1)**
  740:23;819:3
**captures (2)**
  764:16;819:3
**car (4)**
  655:13;662:20;
  667:24;703:13
**card (8)**
  664:9,11;718:15;
  723:1;727:10;783:13,
  14;784:8
**cards (17)**
  663:13,13;664:5;
  665:11,24;666:15;
  695:4;701:18;783:21;
  784:11,15,17;790:5,5,
  7,9;801:1
**care (2)**
  661:18;818:25
**career (1)**
  683:2
**careful (4)**
  738:2;757:2,13;
  806:13
**cars (25)**
  655:8,11;662:16;
  663:2;666:6;667:12;
  703:19,22;708:17,24;
  735:24;742:10,16;
  765:4,8,10,12,14,16,
  24;766:9,19,19;
  767:4;811:10
**Casa (2)**
  831:6,16
**Case (25)**
  638:3;643:5;644:5;
  646:12;648:17;
  649:14;653:5;666:1;
  681:5;695:12,12;
  741:24;745:19;
  751:20;753:2;804:20;
  816:6;839:1;842:4,5,
  25;843:12;852:6;

853:3;857:1
**cases (3)**
  696:5;703:18,21
**cash (1)**
  718:13
**cashier (1)**
  725:21
**cashiering (1)**
  662:20
**cashless (1)**
  718:14
**casino (2)**
  733:20;829:10
**catch (2)**
  650:14,15
**category (1)**
  780:1
**catering (6)**
  682:7;771:14;
  787:20;794:3,5;
  827:13
**caught (1)**
  643:15
**CBA (1)**
  750:12
**CC (1)**
  685:15
**CD (3)**
  831:6,10,14
**center (10)**
  699:18,19;709:3,9;
  771:18;785:25;
  809:16,24;826:3,13
**centers (1)**
  719:12
**Central (1)**
  839:13
**certain (11)**
  644:4;662:24;
  707:6;708:5;720:17;
  743:21;752:6;776:12;
  819:22;829:1;843:18
**Certainly (14)**
  647:2;715:24;
  765:3;779:11,18;
  780:23;785:15;
  797:16;798:13;799:1;
  801:20;809:10;812:2;
  853:15
**certainty (1)**
  726:20
**cetera (5)**
  778:3;781:15;
  795:13;824:18;
  826:15
**chain (5)**
  647:6,10,19;
  707:11;784:25
**challenge (7)**
  788:13;800:9;
  808:13;811:13,24,24;
  812:3
**challenges (4)**

764:1;788:5;
  789:16;801:24
**challenging (3)**
  663:12;671:6;
  715:11
**chance (5)**
  746:2,20;792:17,
  21;829:19
**change (4)**
  723:20;810:18,22;
  826:14
**changed (2)**
  662:24;663:2
**changes (3)**
  663:5;711:11;
  827:14
**changing (3)**
  674:6,18;711:6
**chaos (1)**
  732:5
**character (1)**
  743:23
**characterization (1)**
  694:13
**characterize (1)**
  694:4
**charge (9)**
  644:14,15;658:20;
  680:25;717:3,4,5,6,7
**Charging (1)**
  638:12
**chat (1)**
  807:3
**check (7)**
  653:2;705:22;
  730:14,18;741:17;
  804:3;832:4
**checking (2)**
  802:24;832:7
**checks (2)**
  652:12;665:1
**chief (3)**
  649:14;842:5;857:1
**choke (1)**
  764:21
**Chris (1)**
  786:19
**Cipriani (2)**
  831:6,16
**circumstance (1)**
  731:10
**circumstances (1)**
  754:10
**circumvent (1)**
  736:14
**cited (1)**
  844:25
**clarification (4)**
  662:8;670:2;
  673:10;705:15
**clarify (1)**
  774:5
**clarity (1)**

838:6
**Class (1)**
  716:3
**Classic (68)**
  644:13,17;661:12;
  662:3;666:6,24;
  669:11;670:11,17;
  671:13,18,22;687:23;
  688:10;693:11,15,19;
  700:4;709:8,14,20;
  710:1,25;711:1;
  716:13;744:13;745:8,
  11,24;748:10;749:11,
  12;750:13;766:13,16,
  19;767:7,13;770:2;
  772:21,22;781:15;
  783:3,17;790:8;
  792:18,20;794:15;
  800:10;802:18,20;
  803:1,13;804:8;
  805:11,25;809:12;
  810:17;812:20,23;
  813:20;815:2;820:8;
  839:5;846:16;847:21;
  849:2;853:5
**Classic's (1)**
  744:19
**classification (1)**
  772:24
**clean (1)**
  669:16
**clear (19)**
  647:2;653:5;
  655:10;664:11;
  665:17;669:9;677:19;
  678:10;685:20;
  692:14;702:21,21;
  711:14;728:10;731:7;
  748:10;757:20;
  773:11;776:25
**clearly (3)**
  677:20;698:7;
  806:10
**click (1)**
  784:21
**client (13)**
  653:3;655:10;
  715:19;736:1;739:2;
  747:2;757:14;774:25;
  780:9,9,16;802:16;
  839:4
**clientele (1)**
  780:13
**clients (2)**
  775:1;794:1
**clinical (1)**
  674:13
**clock (1)**
  653:12
**Clock-in (3)**
  818:23;823:3,24
**clocking (1)**
  653:2

**club (2)**
682:1,4
**coaching (3)**
672:17,19,20
**Coco's (2)**
762:22;763:1
**code (11)**
695:3;734:19;
744:1;784:8,21;
790:17,23,24,24;
803:4;853:14
**codes (7)**
743:25;744:10,13;
789:8;800:5,10;848:6
**coercive (1)**
645:2
**coffee (1)**
664:7
**coincide (2)**
722:16;781:4
**Coliseum (12)**
695:14,16,23,24;
696:2,10,15,18;697:2,
23;851:17,18
**collaboration (2)**
714:24;807:9
**colleagues (1)**
715:3
**collect (3)**
677:23;678:1,9
**collection (1)**
718:13
**collective (2)**
697:15;768:24
**collectively (1)**
718:3
**collects (1)**
723:9
**college (4)**
682:20;683:3,4;
788:10
**color (2)**
823:6,6
**column (4)**
815:18;840:23;
841:5;850:14
**columns (3)**
820:21;850:13,16
**Combination (2)**
756:21;760:4
**comfortable (2)**
676:16;707:17
**coming (11)**
653:10;668:7;
670:15,19;675:3;
709:8;739:4;795:8,
11;803:11;857:3
**comment (2)**
645:16;747:25
**COMMERCIAL (1)**
638:10
**common (1)**
680:2

**communicate (1)**
793:17
**communicated (1)**
667:25
**Communicates (1)**
806:10
**communicating (1)**
671:18
**communication (5)**
667:22;668:3,5;
744:19;846:11
**communications (8)**
644:13,17;645:6;
647:3;666:14;752:13,
16,18
**Community (2)**
683:2,4
**company (37)**
657:8;659:11;
660:19;661:4;669:3,
12;670:14;675:3;
677:6;679:7;681:3;
682:22;692:25;699:7;
700:8;702:12;714:8,
16;715:20;725:10;
734:19;736:9;748:7;
749:22;751:17;
758:19;772:6;773:21;
809:22;811:16;
851:24;852:2,3,22;
853:1,17,18
**company's (5)**
686:6;791:23;
854:1,4;856:4
**Comparable (2)**
694:19,21
**Comparatively (2)**
756:8;793:5
**comparison (1)**
679:6
**compelling (1)**
650:1
**competitor (1)**
792:4
**competitor's (2)**
792:3;811:16
**compiled (1)**
850:25
**complaint (7)**
805:12;822:2,2;
828:25;829:8,16;
840:12
**complete (7)**
728:12,13;729:15;
730:5;733:23;736:2;
801:25
**completed (5)**
728:14;729:4,7;
730:2;733:3
**Completely (6)**
662:18,21,22;
674:9;808:20;812:15
**compliance (3)**

746:5;832:19;854:3
**complicated (1)**
730:19
**complication (1)**
741:17
**complied (1)**
735:12
**complimented (1)**
713:4
**comply (5)**
735:5;778:6,13;
842:11;843:17
**components (2)**
738:21;739:7
**compound (1)**
661:14
**computer (4)**
859:3,13;860:14,17
**computers (1)**
762:15
**concern (7)**
646:10;673:8;
677:21;716:1;718:12,
12;790:3
**concerned (3)**
678:8;700:8;729:22
**concerning (5)**
714:8;720:24;
722:17;750:20;
854:11
**concerns (7)**
645:9;674:17;
780:11;781:13;785:4;
800:13;832:18
**conclusion (3)**
726:12,21;847:6
**condition (2)**
829:17;845:25
**conditions (1)**
716:14
**conduct (2)**
734:19;803:20
**conducted (4)**
726:4;731:8;736:5;
738:10
**conducts (1)**
731:9
**conference (1)**
650:19
**confident (5)**
655:12;711:20;
791:4;800:9;810:16
**confidently (1)**
755:24
**confirm (5)**
644:7;686:17;
733:10;802:15;827:9
**confirmed (2)**
672:5;687:2
**confrontation (1)**
674:5
**confuse (1)**
799:7

**confused (2)**
670:5;712:21
**confusing (1)**
838:7
**congestion (2)**
811:6,7
**conjunction (1)**
703:2
**consecutive (1)**
652:10
**consider (7)**
669:19;670:25;
677:15;678:6;683:25;
695:9;735:21
**considerable (1)**
761:20
**consideration (5)**
736:13;764:12,13;
824:15;843:9
**considered (3)**
677:21;710:23;
731:2
**considering (2)**
670:17;718:4
**consistently (2)**
676:6;714:21
**consisting (1)**
721:24
**conspiracy (1)**
648:2
**constant (2)**
839:9,9
**constantly (2)**
711:5;724:2
**constitute (1)**
730:6
**consuming (1)**
730:19
**contact (6)**
686:6;723:5;726:1;
732:24;735:11;
790:18
**contacting (2)**
671:18;692:7
**contain (1)**
850:20
**contained (1)**
686:23
**container (1)**
707:13
**continuation (1)**
795:17
**continue (6)**
661:10;662:1;
718:11;739:22;
785:17;814:12
**continued (2)**
654:13;711:21
**continuously (2)**
652:6;686:9
**contract (16)**
664:24,25;696:13;
698:10;699:8;716:8;

717:10,13,18;736:7;
751:18;757:3,3;
768:6;769:2,19
**contracted (1)**
714:8
**contractor (3)**
670:8;767:25;791:9
**contractors (1)**
714:17
**contractor's (1)**
710:10
**contracts (2)**
714:20;730:14
**convenient (1)**
790:18
**conversation (11)**
646:2;660:6,14,16;
666:9,21;744:20;
748:4;757:19;793:15;
849:16
**conversations (6)**
644:24;645:1;
688:21;752:22,24;
753:7
**converse (1)**
770:17
**coordinate (1)**
742:6
**copies (1)**
761:19
**copy (3)**
672:3;777:5;814:9;
821:25;844:4,5
**core (2)**
662:21;763:12
**corporate (17)**
678:22;679:4,10,
12,17,19,20;680:4,12,
12,15;710:12;714:25;
720:21;732:7;733:19;
796:2
**corporation (2)**
715:3;797:3
**correctly (4)**
729:7,22;759:20;
802:5
**correlate (1)**
740:16
**correlation (2)**
740:5,11
**correspond (1)**
731:14
**cost (2)**
690:12;730:13
**costs (3)**
660:7,10,13
**couldn't (1)**
665:20
**Counsel (38)**
646:8;651:11;
688:15;700:12;
738:16;777:21,21;
778:6,14;783:8;

798:4,4;814:3,4,6,7;
828:25;829:1,8,15,15;
833:18,19;835:24;
839:3;841:25;842:3;
844:4,15;845:1;
854:24;855:7;857:7;
859:1,14,15;860:3,13
**Counsel's (2)**
  855:24;861:11
**Counsel's (7)**
  647:1;774:2;778:7,
  14;783:8;829:8;
  836:22
**count (1)**
  772:1
**County (7)**
  695:17;697:25;
  698:4;771:8,17,17;
  803:9
**couple (5)**
  645:7;710:17;
  723:10;733:13;
  759:17
**course (12)**
  651:19;769:13;
  778:5;787:6;798:9;
  803:15;804:2;821:11;
  836:21;848:4;852:4,5
**COURT (5)**
  721:17;750:4;
  777:8,10,15
**courtroom (1)**
  761:12
**cover (7)**
  680:13;771:23;
  772:4,13;774:25;
  775:1;810:2
**covered (2)**
  736:4;771:14
**covering (1)**
  774:25
**covers (2)**
  734:8;774:14
**COVID (2)**
  783:16,19
**crack (2)**
  756:15;850:8
**create (9)**
  778:6,8,13;814:2,
  19;822:3;842:16,17;
  843:17
**created (11)**
  648:10,11;717:22;
  733:14;770:1;778:22;
  780:20,22;783:17;
  814:8,17
**creating (1)**
  814:3
**credibility (2)**
  673:3;794:22
**credible (1)**
  650:1
**credit (1)**

718:15
**crescent (1)**
  739:9
**crest (1)**
  739:10
**crew (1)**
  718:10
**criminal (1)**
  705:22
**Criterion (1)**
  831:11
**critical (3)**
  807:12;839:1;842:4
**cross (12)**
  650:22;651:1,6;
  673:9,13;681:17;
  725:3;746:23;849:22;
  850:9;855:8,8
**crossing (1)**
  656:10
**crossover (1)**
  805:10
**culture (2)**
  674:6;687:10,12;
  739:17;745:23;746:8
**cultures (1)**
  715:15
**current (8)**
  651:14;666:18;
  702:2;711:19;715:7,
  15;761:2;762:9
**currently (7)**
  683:10;693:20;
  709:2,11,17,23;
  752:12
**custodian (7)**
  776:4,8;799:25;
  834:4;854:11;856:2;
  857:1
**custom (2)**
  707:3,4
**customer (8)**
  663:5;693:10;
  702:23;703:12,13;
  725:17;847:2;848:21
**customer's (1)**
  662:16
**customers (5)**
  662:13,14,16;
  667:13;702:17
**cut (3)**
  682:9;700:21;
  715:13

**D**

**daily (2)**
  779:6,7
**damage (1)**
  747:2
**damages (1)**
  662:19
**Dan (11)**

645:17,24,25;
651:24;663:17;668:4,
4;752:22,23;753:7;
797:16
**dark (1)**
  749:11
**darkness (1)**
  749:22
**dashboard (2)**
  802:24;823:3
**data (19)**
  664:10;691:23;
  692:2;694:10;710:16;
  730:20,21;764:17;
  802:16;818:19,22;
  819:3,10,20;820:20,
  22;858:23;859:14;
  860:18
**date (37)**
  646:15;653:22;
  654:13;666:18,20;
  671:10;698:24;699:8;
  702:5;757:9;768:8;
  781:10;785:7,8,9,10,
  11,12;813:21,22;
  819:8;834:10,11;
  835:2,13,13,18;836:7,
  8;837:25;838:11;
  840:22,23;841:6;
  843:1;851:10;858:9
**dated (3)**
  716:24;737:3,4
**dates (23)**
  658:8;700:13;
  740:4,6,11,19,19,19;
  741:12;830:23,23,24;
  834:25;836:2,11,14,
  24;840:10;842:25;
  843:19,24;845:14,16
**dating (1)**
  660:11
**Day (41)**
  648:20;652:10;
  657:13;667:5,14,14;
  669:13;676:19;
  682:11,15;689:8;
  701:17;702:8;715:23;
  723:20;724:4,4,13,13;
  727:20;732:3,12;
  733:10;739:22;
  740:15;742:13;765:1;
  771:23;779:1,2,15;
  798:4;806:6;809:19;
  824:23;825:10;
  826:17,19;836:12;
  840:2;844:21
**days (36)**
  656:10,14;664:4;
  665:8;676:20;706:16,
  18;715:23;716:13;
  723:24;724:3;727:13,
  18,20,21,22;728:8,16,
  16,19,22;729:10;

730:23;732:23;734:9;
740:24,25;742:14;
746:15;799:2,2;
813:25;824:24;825:1;
826:25;858:4
**day-to-day (5)**
  651:15,16;698:15;
  763:12;798:5
**DC (1)**
  706:20
**deactivating (2)**
  660:4,15
**deadline (1)**
  728:3
**deal (8)**
  643:18,24;644:11;
  645:1;707:12;768:18;
  794:12;812:9
**dealing (4)**
  703:5;756:18;
  763:14;811:12
**dealt (3)**
  683:19;696:17;
  844:11
**December (56)**
  644:20;652:6;
  653:17,23;655:15,15;
  656:19;657:6,9,10,14;
  658:7,7;665:5;685:1,
  4;689:25;699:23;
  700:3,14;708:14;
  711:15;712:23;
  716:24;737:4,4;
  740:23,24;744:24;
  755:19;756:9;759:14;
  767:2,12;770:3;
  772:21;781:11;
  782:18;789:7,15;
  797:11;799:4;800:5;
  819:7;832:8,9;
  834:14,15;837:19,20;
  838:10;840:9,10,15,
  21;845:13
**decide (1)**
  847:9
**decides (1)**
  856:22
**decision (5)**
  721:18;726:16;
  727:15;735:17;747:1
**dedicated (4)**
  680:1;772:3;
  776:19;778:9
**default (2)**
  676:8,18
**defense (1)**
  842:6
**defer (1)**
  650:10
**deficiency (1)**
  643:19
**define (2)**
  653:13;696:25

730:23;732:23;734:9;
740:24,25;742:14;
746:15;799:2,2;
813:25;824:24;825:1;
826:25;858:4
**defined (1)**
  820:6
**definitely (3)**
  647:20;671:2;
  687:19
**definition (1)**
  745:14
**degree (4)**
  680:17;718:14;
  760:5;787:23
**delayed (2)**
  706:17;742:8
**deleted (4)**
  778:18;819:9,12,16
**delicately (1)**
  744:20
**demanding (3)**
  847:8;848:20,21
**demonstrate (1)**
  688:23
**DEPARTMENT (3)**
  638:9;713:8;730:2
**depend (2)**
  671:9;695:11
**Depending (7)**
  658:25;674:19;
  680:18;706:16;726:3;
  824:13;826:14
**depends (6)**
  671:3;694:9;
  706:15;716:10;
  826:12;850:2
**deprive (1)**
  842:3
**depth (1)**
  663:14
**describe (4)**
  777:25;787:24;
  798:14;835:13
**described (1)**
  766:24
**describing (1)**
  763:17
**descriptions (1)**
  857:17
**designate (1)**
  823:7
**designated (1)**
  776:8
**designed (1)**
  663:5
**desk (3)**
  725:20;765:2;
  790:14
**desktop (1)**
  680:19
**desperate (1)**
  748:12
**despite (2)**
  658:12;692:21
**detailed (1)**
  662:11
**details (2)**

715:6;733:7
**determination (1)**
737:25
**determine (3)**
735:13;807:11;
860:22
**determines (1)**
806:7
**develop (1)**
733:14
**devoted (1)**
711:21
**dialogue (1)**
751:6
**dicey (1)**
806:8
**difference (4)**
693:23;756:7;
780:4,6
**differences (1)**
826:11
**different (39)**
644:6;649:13;
662:18,18,19,19,20,
21,22;673:12;701:14;
712:17,18,18;715:13;
723:10;733:12;741:2;
746:6,12,14,22;752:9;
763:11;771:5,9;
808:11;811:2;824:23,
24;825:1,1,1,12;
826:20;837:15;844:8,
12,12
**differently (1)**
674:9
**difficult (3)**
643:25;674:12;
812:3
**difficulty (1)**
663:20
**digital (2)**
718:5,9
**digits (1)**
647:21
**diminishes (1)**
826:25
**dinner (1)**
823:16
**dire (9)**
815:14,16;817:18;
827:21;833:9,12,13,
21,23
**direct (21)**
649:14;660:23;
689:12;690:15;
695:13;698:10,18;
712:6;720:3,19;
755:25;762:5;828:24;
854:11,13,25;855:1,1,
6;857:2,13
**directed (2)**
747:13,17
**direction (1)**

721:18
**directly (6)**
742:24;763:22;
772:7;795:2;796:1;
822:1
**director (1)**
854:13
**dis (1)**
814:18
**discovered (1)**
809:3
**discovery (3)**
643:21,23,24
**discriminatee (1)**
845:2
**discuss (5)**
725:12,15;758:14;
796:22;858:2
**discussed (8)**
647:25;660:5,9;
717:24;718:2;834:7,
8;859:1
**discussing (1)**
644:14
**discussion (6)**
645:13;713:2;
716:7;733:24;750:17;
807:19
**discussions (2)**
643:8;801:7
**dispatch (1)**
832:5
**displace (1)**
760:6
**disputes (2)**
643:23,24
**distance (1)**
679:2
**distinct (1)**
804:12
**distinguishing (1)**
804:13
**distribute (3)**
665:24;666:6;
855:22
**distributed (3)**
666:3;723:15;
855:20
**distribution (1)**
715:13
**dividend (1)**
701:15
**division (1)**
651:13
**divvying (1)**
674:21
**DMV (1)**
705:14
**doc (1)**
856:25
**document (83)**
658:13;663:17;
666:23;685:15,21;

688:15;700:24;
716:24;717:1,6;
721:24;722:1,5,13;
727:9;772:19;777:18,
23;778:4,6,13,23;
780:21;799:3,15,20;
802:3,7;813:10,17;
814:2,10;815:2;
820:3;821:14;829:24;
830:5,8,10,12,16,20;
832:19;834:3;836:23;
837:4,6;838:2,3,20;
839:11;840:6,8,11,12,
13,18;842:16;843:11,
17,21;844:22;845:10,
14,19;846:1,2,7,14,
21;850:20;851:7;
853:11;855:8,14,16,
20;858:18;859:8,16,
21;860:2,4
**documenting (1)**
662:19
**documents (36)**
659:4;706:12;
716:21;729:16;
736:25;741:1;761:17,
20;776:8,11,12;
778:15;779:5;799:25;
814:3,8;834:10,22;
835:12;836:15,20,21;
837:3;842:19;843:4;
853:7;856:3,12;
857:1,7,12,25;858:1,
10;859:2;860:25
**dodge (1)**
706:8
**Doe (5)**
764:7,9,10;827:8,
10
**domino (6)**
686:7;692:8;747:5,
14;748:2,3
**done (32)**
674:8;690:19;
705:24;718:24;719:1,
14,20,22;729:18;
733:14,18,19;734:24;
762:24;770:10,14;
779:6;783:19;787:4,
10,16;796:3,11,12,13;
800:21;810:17;811:1;
813:21,23;825:18;
845:2
**door (2)**
667:10;802:17
**dots (2)**
823:7,8
**double (4)**
647:20;679:25;
832:4,7
**doubt (1)**
765:8
**down (15)**

682:6;739:13;
744:5;745:22;770:5;
771:21;772:24;
779:14;793:20;
795:11;800:19;
803:11;808:20;
845:16;846:15
**downstream (1)**
773:1
**dozen (4)**
691:13;708:19;
739:21;770:7
**draft (1)**
780:20
**drafted (2)**
735:1;838:8
**drinker (1)**
701:23
**drive (6)**
653:10;667:12;
668:1;783:24;824:16;
842:23
**driver's (2)**
705:10;727:10
**driving (2)**
705:8,14
**drop (1)**
784:17
**due (1)**
835:22
**duly (2)**
651:4;762:3
**during (22)**
648:19;652:5;
654:15;668:11,15,16;
718:14;748:19;
754:20;758:15;
763:13;779:13;
783:15,15;810:22;
830:12;842:4,5;
850:23;851:11;
853:11,16
**duties (8)**
667:8,14;675:13;
763:12;766:13;
779:18;781:25;782:7
**dwindle (1)**
671:8
**dynamic (2)**
715:17;827:14

**E**

**ear (1)**
745:7
**earlier (9)**
688:9;691:9;
696:10;701:1;702:9;
703:6;781:13;797:21;
823:4
**early (11)**
656:19;657:6,9,10;
756:25;757:3,13;

792:12;797:19;811:3;
853:7
**earnest (1)**
795:4
**easiest (1)**
777:25
**easily (1)**
790:25
**east (5)**
786:7,14;787:19;
788:18;805:4
**easy (11)**
674:10,11;735:18;
773:4;776:18;783:21;
818:23;823:3,6,24;
836:3
**economic (1)**
746:12
**economics (1)**
747:9
**Edward (1)**
847:4
**effect (1)**
647:8
**effective (5)**
678:19;690:12;
692:3;699:8;715:4
**effectively (1)**
674:23
**effectuate (1)**
793:18
**effort (1)**
732:14
**efforts (1)**
647:1
**eight (4)**
700:4;731:5;
770:20;830:1
**either (3)**
726:14;742:5;
844:14
**elaborate (1)**
652:23
**election (2)**
697:9;721:19
**electronic (8)**
647:3;728:14;
730:1;777:5;841:12;
858:23;859:14;
860:18
**eliminating (1)**
741:24
**else (8)**
690:17;724:4;
735:1;767:15;811:1,
8;857:5;861:7
**elsewhere (1)**
711:18
**email (26)**
666:12;671:20;
685:11,13,18;686:20;
688:16,19,23;693:2;
716:6;727:6,8,16,19;

728:1,11,11,12;731:3,
18;732:6,11,15;
747:14;748:4
**emails (2)**
647:17;685:5
**embedded (1)**
746:7
**emergency (9)**
709:12,15;802:4,4;
809:16;810:6,9;
825:20,25
**emphasized (1)**
669:5
**employ (1)**
669:2
**employed (2)**
665:3;711:17
**employee (43)**
649:23;652:16;
664:11;671:1;675:18,
23;677:5;683:8;
701:9;703:7;707:1,
14;711:9;715:21;
729:8,14;731:3,4,17;
733:25;736:10,11;
741:15;745:17,20;
758:20,23;778:15;
783:24;792:3;798:19;
803:3,4,13;805:25;
824:16;831:2;835:15;
837:24;846:16;
847:15;848:10,11
**employees (143)**
644:13,17;647:21;
656:18;657:5;663:8;
665:11;666:6;668:19;
669:7,20;670:8;
671:13,18,22;672:8;
673:22;675:19;676:6;
678:13;679:8;680:5;
687:7;691:11,19;
692:12;693:15,19,20;
694:22;695:10,23;
696:1,5,14;699:10,22;
700:4;701:2,16;
702:3,5;707:19;
710:10;714:17;715:5;
716:13;722:20;
731:24;732:2;734:14;
737:12;744:14;745:8,
11;749:11,21;751:16;
753:16,17,23,24;
760:14,15;763:22;
764:14;771:21,23;
772:2,3,6;774:17,24;
775:4,13;776:19;
780:11;781:5;790:8,
19;791:8,14,19,23;
793:18;794:23;795:4,
22,24;798:2;799:4,5;
800:11,24;802:18,21,
25;805:2;806:5,13,
14;809:8,12;810:5,

23;811:16,23;812:20,
23;813:6,20;815:3;
818:7;820:8;822:4;
823:20,23;824:12;
827:2;829:12,17;
830:24;835:7,18,20;
836:14,24;837:8,15,
22;839:5,10;840:2,9,
14,16,20;845:12;
849:2;850:22;851:7;
853:6,9
**employee's (1)**
754:4
**employer (5)**
668:19;715:24;
746:14;748:11;
762:10
**employers (1)**
714:9
**employment (14)**
644:18;646:15;
704:2,12;712:21;
716:14;748:9;749:12;
829:17;834:10;
835:13,18;850:23;
851:11
**en (1)**
809:12
**end (21)**
643:22;646:15;
664:20;673:2;677:21;
686:24;725:19;
756:15,16;758:9;
763:14,21;770:17;
780:12;786:7,14;
788:9,11,18;805:4;
826:18
**ended (2)**
819:13;838:14
**ends (6)**
763:23;779:2;
795:7;796:20;806:12;
834:13
**enforced (1)**
814:23
**enough (10)**
684:2;730:7,18;
741:20,25;761:19;
780:2;781:7;787:25;
797:2
**ensure (2)**
725:23;792:20
**enter (2)**
741:23;803:4
**entered (1)**
777:19
**entertaining (2)**
687:22;693:5
**entire (15)**
662:20;669:15;
697:4;724:13;736:14;
759:24;767:23;772:6;
774:15;810:4;811:3;

812:18;839:11;840:9,
10
**entirely (3)**
668:2;767:8;843:18
**entirety (2)**
729:5;851:11
**entity (1)**
670:15
**entrance (6)**
667:10,16;668:12;
709:18,21;811:6
**entry (4)**
715:9;730:20,21;
807:15
**equivalent (1)**
825:9
**essentially (4)**
777:25;790:14;
804:10;847:8
**established (2)**
733:13;739:16
**estimate (1)**
667:16
**estimation (1)**
704:21
**et (5)**
778:2;781:15;
795:13;824:18;
826:15
**evaluate (1)**
660:10
**evaluation (2)**
692:17;742:19
**even (25)**
672:23;674:7;
680:14;690:16;
692:23;695:3;696:20;
697:7;698:7;701:17;
716:12;732:2;739:12;
748:15;756:25;
760:25;779:20;
797:20;798:25;810:1,
3;826:20;842:17;
848:18;853:11
**evening (2)**
843:6;849:24
**events (2)**
695:24;826:15
**eventually (3)**
683:4;693:14;702:3
**everybody (5)**
679:1;775:17;
810:19;836:12;
839:21
**everybody's (1)**
723:7
**everyone (3)**
700:17;764:4;
767:18
**Everything's (2)**
687:15;735:11
**evidence (14)**
644:14;650:1;

673:16;685:10;
688:14;700:12;
777:19;815:12;
827:19;832:12;837:5;
839:3;845:25;855:17
**exact (2)**
693:24;781:20
**exactly (7)**
651:8,11;653:20;
767:20;793:14;
797:14;813:1
**EXAMINATION (12)**
651:6;673:9;
681:17;689:12;
695:13;714:3;725:3;
753:13;758:12;
760:12;762:5;850:9
**examined (2)**
651:5;762:4
**examining (1)**
694:10
**example (15)**
671:3;674:23;
675:8;756:9;764:5,7;
772:8,20,22;792:24;
795:6;798:17;808:4;
825:2;854:7
**examples (1)**
771:19
**Excel (3)**
818:20;820:1;
821:15
**excels (1)**
713:10
**except (2)**
645:22;693:24
**exchanged (1)**
685:5
**exclude (3)**
669:11;670:8,14
**excluded (1)**
842:12
**excuse (6)**
645:14;649:23;
651:8;655:15;810:13;
835:22
**exec (2)**
781:12,16
**execute (1)**
674:23
**executed (3)**
680:24;718:13;
742:5
**executive (31)**
649:4;653:1,4;
659:13;675:13;681:2;
684:14,17;695:19,21;
698:16;723:12,25;
731:3,14;733:16;
739:23;742:4,9;
762:13;764:19;
770:18;781:22,23;
782:1,2,5;786:21;

804:18;805:8;806:5
**executives (7)**
659:2;731:5,21;
763:18;764:3;770:20;
806:11
**executive's (1)**
806:1
**Exhibit (28)**
658:2;721:25;
722:3;749:7;777:13,
19;778:13;783:8;
813:12;819:14;
821:23;822:1,19,23;
823:2;825:5;828:20;
830:3;832:22;833:1,
8;843:14;850:25;
855:10,21,23,24;
861:11
**exhibits (3)**
645:22;721:15;
825:18
**exist (1)**
647:8
**existed (2)**
661:11;662:2
**existing (5)**
669:14;675:4;
699:4;744:21;806:25
**exists (1)**
647:12
**expect (6)**
725:10;741:7;
756:23;792:16;847:7;
848:13
**expectation (1)**
848:19
**expectations (3)**
715:17;725:9,12
**expected (1)**
725:13
**expecting (1)**
759:13
**expenses (1)**
764:17
**expensive (1)**
703:22
**experience (23)**
663:6;694:24;
695:5,10,11;701:17;
725:7,15,17,23;
728:17;741:16;743:9;
749:9,19,20;755:9;
762:15;780:11;782:8;
808:8;809:18;853:24
**experienced (8)**
669:17;710:22;
711:14;739:16;
759:21;760:14;
792:22;795:2
**expertise (1)**
708:1
**expire (1)**
728:4

**expired (1)**
714:20

**explain (5)**
701:24;724:10;
787:25;801:9;825:12

**explained (2)**
810:18;811:20

**explanation (3)**
672:23,24;848:24

**explored (1)**
682:21

**expressed (2)**
663:16;714:21

**expressing (1)**
785:4

**extends (2)**
687:14,20

**extensible (1)**
653:3

**extensive (3)**
653:10;706:21;
714:24

**extent (9)**
647:12;648:21;
710:21;739:19;
773:12;838:24;
843:10,11;857:19

**extra (4)**
682:6;713:11,13;
826:18

**extremely (1)**
810:6

**eye (1)**
800:17

**F**

**face (1)**
764:1

**faces (1)**
788:5

**facilitate (2)**
712:24;729:13

**facilitating (1)**
667:12

**facilities (5)**
678:24;679:2;
715:8;771:13,15

**facility (18)**
653:2;668:6;669:3;
674:19;711:23;712:3,
4;715:14;739:3;
761:1;767:16;784:12,
15;798:11;812:15;
827:3;835:14;851:14

**facing (2)**
747:2;801:24

**fact (9)**
673:16;689:2;
690:6;716:6;773:17;
800:8;802:23;842:17;
843:2

**factor (1)**

**factors (1)**
661:15

**failed (2)**
675:4;777:12

**failure (1)**
842:10

**fair (11)**
746:1;769:24;
770:9;780:2;787:22,
25;797:2;803:18;
810:8;853:4;854:9

**fairly (1)**
764:22

**fairness (1)**
673:15

**fall (5)**
653:4;658:22;
681:2;771:10;779:25

**falls (1)**
647:12

**false (2)**
677:22,25

**familiar (5)**
659:11;712:16;
717:8;821:14;833:11

**family (3)**
677:22;678:7;
734:12

**fantastic (1)**
806:15

**far (14)**
663:18;669:23;
697:10;701:20;
724:11;725:7,11;
727:22;729:22;
730:22;751:19;
755:21;799:4;824:15

**fashion (2)**
662:18;757:24

**fast (3)**
706:14;741:24;
783:20

**fearful (2)**
744:22;745:3

**February (1)**
837:21

**fed (3)**
775:22;777:24;
778:3

**Federal (1)**
638:17

**feedback (1)**
659:1

**feel (3)**
686:6;748:3;801:18

**feeling (1)**
748:14

**feet (1)**
748:8

**felt (1)**
791:4

**few (12)**

658:22;667:13;
686:10;710:5;714:10;
752:11;761:16;779:5;
813:15;838:7;840:16;
853:7

**fewer (1)**
700:4

**field (6)**
765:2;786:15;
793:5,6;796:23;808:9

**Field's (1)**
793:9

**fighting (1)**
678:3

**figure (3)**
686:7;822:3;837:24

**figuring (2)**
692:8;756:21

**file (1)**
734:24

**filed (2)**
829:6;840:13

**filing (1)**
717:7

**fill (4)**
722:25;742:3;
744:14;806:25

**filled (1)**
728:25

**fills (2)**
723:21;724:19

**filter (6)**
700:16;723:18;
819:24;820:2,5;821:1

**filtered (5)**
723:11;818:6;
820:3;821:10,16

**filtering (1)**
700:16

**filter's (1)**
820:2

**final (3)**
772:25;774:13;
775:19

**financial (1)**
852:2

**financially (1)**
853:2

**find (6)**
677:3;705:10;
793:4;795:8,8;856:8

**Fine (2)**
799:14;822:18

**finish (6)**
722:1;764:15;
784:22;813:14;846:4;
849:24

**finished (2)**
830:2;836:19

**finishes (1)**
649:8

**finishing (1)**
649:5

**firm (5)**
735:1,3;776:8;
777:20;780:14

**first (50)**
643:11;645:10;
649:25;652:10,13;
653:5,17,19;656:10;
658:15;664:21;
665:17;666:22;682:5;
688:9;689:9,15;
702:7,8;716:21,23;
719:17;720:24;
722:11;724:4;729:22;
735:19;741:8;747:23;
750:12,13,16,21,21;
756:15,22;791:24;
815:18;832:4;835:17;
840:21;846:14;
850:11,13;858:13,18;
859:6,22;860:11,23

**firsthand (2)**
701:17;714:14

**fits (1)**
676:17

**fitting (1)**
707:17

**five (11)**
664:4,6;723:24;
724:3,13;748:8;
770:8;780:9;808:11;
844:21;858:4

**flagship (1)**
690:21

**fleece (2)**
792:5,20

**flex (1)**
808:3

**flexibility (1)**
807:22

**Floor (1)**
638:18

**Florida (1)**
706:20

**flow (2)**
695:24;697:24

**fly (1)**
648:18

**Flynn (1)**
763:6

**Fob (6)**
664:16,19;668:2;
701:6,12,13

**fobs (2)**
664:15;701:5

**focus (4)**
685:18;722:21;
731:20;823:5

**focusing (1)**
686:19

**follow (4)**
664:21;667:1;
677:24;853:25

**followed (1)**

**750:22**

**following (7)**
676:15;702:22;
732:12;754:8,13,18;
829:11

**follows (3)**
651:5;762:4;829:9

**FOOD (1)**
638:10

**fool (1)**
648:1

**forbidden (2)**
745:15,20

**foresee (1)**
809:10

**forget (3)**
811:14,20;825:5

**form (20)**
661:20;663:16;
692:13;694:5;695:8;
723:1,1,9,14,25;
725:23;726:3;727:4;
731:14;734:5;744:14;
753:17,23;768:6;
841:12

**formal (6)**
716:20,21,22;
721:4;782:3;822:1

**formats (3)**
663:13;723:10;
741:2

**former (12)**
644:13,17;666:24;
693:15,19;802:20;
803:13;805:11,25;
815:2;820:8;853:5

**forth (3)**
751:6;788:11;
792:25

**Fortune (1)**
687:18

**forums (1)**
757:7

**forward (3)**
648:17;803:9;819:1

**forwarded (2)**
764:15;827:25

**found (3)**
677:4;732:19;861:1

**foundation (1)**
737:20

**four (13)**
652:10;657:25;
658:1;682:9;688:15;
722:5;725:10;727:18;
728:15,16,19;799:2;
820:3

**four- (1)**
735:24

**Francis (24)**
677:10,12,16;
702:10,12,16,25;
704:2,4,12,21;712:20;

713:9,9;726:22;
742:18,24;743:4;
751:3,7;754:20;
759:4,13;849:12
**Francis's (1)**
736:13
**frankly (4)**
674:5;678:1;694:8;
735:25
**free (3)**
650:14;761:7;
856:23
**frequent (2)**
701:22;752:21
**frequently (5)**
677:5;690:14,15;
711:11;793:1
**fresh (1)**
735:14
**Freudenberg (2)**
817:10,16
**Friday (13)**
685:12;700:14;
724:16;798:18;825:3,
3,7,9,21;826:6,7,8;
827:12
**front (9)**
667:10,10;685:16;
716:20;725:20,25;
780:24;811:9;844:7
**frustrating (3)**
792:3,8;841:24
**frustration (1)**
813:8
**frustrations (1)**
813:2
**fulfill (2)**
702:22;730:15
**Fulfilling (1)**
667:13
**full (7)**
667:5;717:7,7;
726:20;788:12;
819:20,20
**full-time (2)**
683:5,8
**fully (4)**
657:13;701:4;
789:23;825:22
**function (1)**
701:4
**functional (1)**
701:25
**functioning (1)**
746:2
**fundraiser (1)**
817:14
**further (12)**
650:21;681:7;
710:4;722:19;729:9;
753:11;758:10;
759:16;832:14;846:1;
849:20;854:25

**furthest (1)**
679:1
**future (3)**
746:3;748:9;813:7

## G

**gambit (1)**
771:14
**gap (1)**
802:6
**gaps (1)**
802:3
**gate (2)**
664:7,8
**gather (1)**
818:23
**gave (10)**
692:16;716:13;
744:4;751:7;784:17;
801:21;819:4,5;
843:2;854:11
**GC (5)**
658:1;700:11;
747:4;855:21,23
**GC- (1)**
686:19
**GC-10 (1)**
736:24
**GC-13 (5)**
666:11;743:24,25;
784:22;801:14
**GC-15 (7)**
671:15,24;685:7,9,
10;686:20;692:6
**GC-17 (2)**
688:13;750:8
**GC-20 (1)**
751:2
**GC-22 (1)**
846:3
**GC-23 (2)**
700:10;751:1
**GC-24 (1)**
859:15
**GC-25 (3)**
858:13;861:4,9
**gear (1)**
707:15
**gears (1)**
821:4
**General (31)**
651:11;667:14;
674:7,11;688:15;
700:12;725:24;
742:24;745:19;
777:21;778:7,14;
783:8;798:4;814:3,7;
828:25;829:8,15;
833:19;835:24;
836:22;839:3;842:3;
844:15;845:1;855:24;
857:7;859:14;860:3;

861:11
**generally (16)**
664:2;676:1,3;
678:21;681:2;690:12;
724:12;729:17;
731:12;732:16,25;
734:3;735:20;740:13;
757:5;854:8
**generate (3)**
778:3;830:10,12
**generated (3)**
830:13,16;845:11
**generic (1)**
723:14
**gentleman (1)**
847:4
**Genuinely (2)**
700:23;706:9
**geographical (3)**
731:13;771:4,7
**gesture (3)**
677:20,23,25
**gets (10)**
644:21;649:25;
690:7;723:22;727:23;
728:24;764:15;
775:22;806:19,20
**Gil (8)**
677:11;704:13,21;
712:20;754:20;759:4,
13;849:12
**Gill (5)**
645:8,9;702:10;
704:2,4
**Gilliland (11)**
652:3;654:12,21;
718:23;816:1,2,8;
849:5,6,7;851:24
**Gil's (1)**
645:14
**given (22)**
728:6,18;732:3;
737:25;744:10,13;
747:1;771:23;774:17,
23,24;775:4,13,25;
776:2;781:14;802:7;
806:6,6;826:24;
836:5,6
**giver (1)**
807:8
**gives (1)**
703:13
**giving (3)**
715:12;745:6;746:1
**glasses (1)**
762:7
**glean (1)**
853:15
**gleaned (1)**
834:25
**Gluck (5)**
654:2,19;655:14;
656:1;658:25

**goes (34)**
676:20;692:13;
697:10;698:2,4,5;
723:15;727:16;729:1,
8;733:6;742:24;
749:14;764:21;766:2,
4,4;771:20;790:25;
794:21,21,23;798:18;
817:17;832:14;
833:22,25;834:3;
850:1,3;854:14;
855:1,2;858:23
**Goldsmith (38)**
652:3;654:11,20;
671:17;683:11,13,19;
684:6,20,25;685:5,13,
19,24;686:2,5,13;
687:21;688:3;692:10;
693:4;718:23;719:14;
720:10,23;747:7;
781:18;785:21;786:5;
787:15,22;797:22;
801:7;816:22;846:12,
16;847:13;851:21
**Goldsmith's (6)**
684:18;686:20;
687:1;692:6;747:13;
804:9
**good (10)**
673:1;674:19;
681:19;703:15;
713:20,21;721:14;
735:11;764:18;
846:24
**Google (1)**
818:20
**Gos (1)**
817:1
**government (3)**
776:5;833:19;
839:15,20;856:22
**government's (1)**
828:25
**grab (1)**
778:16
**graduating (2)**
682:20,25
**grail (1)**
674:20
**gratuities (1)**
674:21
**great (6)**
671:2;733:5;745:5,
6;789:5;790:11
**GREEN (269)**
638:16;643:3,11;
645:20,22;646:1,6,9,
12,18,21,23,25;
647:14,24;648:5,8,12,
16;649:6,9,17;650:4,
5,9,17,23;651:1;
652:18,22;655:19,22;
656:22,25;657:20,22;

659:5;660:22;661:17,
22;662:8;668:23;
670:2,5,7,12,16,23;
672:14,20;673:6,13,
18;674:24;681:8,11,
15,23;684:3,10,13;
686:16;689:18;
691:14;692:1,15;
694:1,6;697:12,18;
698:6;699:13;702:20;
703:9;704:7,18;
706:6,10;708:7,21;
709:5;710:5,8,13,16,
21,25;711:3,13,17,24;
712:2,10,20,25;
713:11,14,18,22;
721:6,8,11,13,16,18,
21;722:6;724:6;
725:4;737:19;738:2,
5,14;743:1,5;746:17,
21;748:23;749:1,4,6,
17,25;750:3,6;753:3,
12,21,25;754:15;
758:11;759:1,7,10,17,
20;760:1,9,11,20,22;
761:5,7,10,13,15,18,
21,23;766:3,6;769:11,
14,16;774:4,7,9;
777:2,5,9,11,16;
791:17;794:13,20,24;
799:22;815:13,15;
817:20,25;818:12,17;
819:12,18,22,25;
820:5,8,11,14,17;
821:20,22;822:6,14;
823:7,8,13,17,18;
827:20;828:8,19;
832:13,16,21;833:2,4,
6,13,15,24;834:1,16;
835:3,5,10,22;836:5,
9;837:2,7,11,17;
838:1,5,14,17,21;
839:17,25;840:4,23;
841:2,5,8,12,19,22;
842:1,7,9,14,21,24;
843:7,18,22;844:1,6,
8,10,18,21;845:4,6,
20;849:22,25;850:2,4,
7;852:15,24;854:18;
855:3,11,15,19,25;
856:18;857:14,19;
858:3,11;859:5;
861:6,9
**greeting (1)**
725:20
**ground (1)**
719:25
**group (9)**
648:10;651:20;
671:5;747:17;749:10,
21;759:24;763:18;
807:3
**guaranteed (1)**

800:19
**guess (6)**
652:25;667:13;
742:7;753:2;805:8;
859:24
**guest (5)**
701:11,12,13,23,24
**Gurney's (1)**
805:12
**Gust (53)**
646:3;649:3,7,12;
652:2;654:11,21,22;
665:18,23;666:5,15;
677:11;685:11;
688:17;716:7;718:23;
719:22;720:6;744:1;
761:14,23;762:2,7;
777:18;779:1;783:12;
795:2;813:10,17;
821:19,25;822:19;
827:23;828:24;
829:10,11,16,23;
832:15;833:11,18;
845:9,10;846:1,2,6,
23;848:6;849:15;
850:11;856:2;857:18
**Gust's (3)**
649:15;723:1;
750:11
**guts (1)**
741:14
**guy (1)**
645:17

**H**

**habit (1)**
674:8
**habits (6)**
674:6,12;687:8;
746:9;811:17,19
**half (8)**
685:19;686:19;
691:13;724:13;770:7;
811:8;830:1;850:6
**hall (1)**
682:7
**halls (1)**
771:14
**halt (2)**
688:20;829:16
**Hamptons (3)**
788:8,24;805:13
**hand (12)**
744:5;784:11,14;
789:8;790:6,7,9,12,
13;800:5;815:18;
830:19
**handbook (5)**
710:13;734:19,22;
735:1,5
**handbooks (1)**
710:12

**handful (1)**
682:12
**handing (1)**
664:20
**handle (8)**
650:12;660:10;
694:18;754:5;771:25;
781:24;794:17,18
**handled (4)**
649:2;674:22;
723:10;794:14
**handles (1)**
794:18
**handling (3)**
662:20;674:16;
715:17
**handover (1)**
781:14
**hands (1)**
658:22
**hands-on (1)**
680:7
**handwriting (1)**
828:6
**happen (2)**
793:3;800:15
**happened (8)**
673:4,6;749:15;
755:16;794:20;
822:13;829:22;
844:19
**happening (4)**
644:5;675:8;795:7;
806:12
**happens (9)**
727:2;729:6;
732:24;733:22;
741:19;764:9;793:1;
812:1;827:3
**happy (2)**
842:20,22
**harassment (2)**
680:14;734:16
**hard (8)**
663:14;674:22;
678:3;687:8;715:14;
726:20;746:9;809:7
**hatchet (1)**
643:24
**hats (3)**
763:11;764:25;
771:5
**head (1)**
666:9
**headquarters (1)**
678:24
**hear (9)**
661:22;665:20;
667:19,23;759:20;
799:23;800:20;847:7;
856:20
**heard (18)**
667:22;677:11;

703:17;710:19,20;
737:3,8;745:12;
747:14;748:10,11;
753:3,6;760:22;
766:21;801:6;824:13;
852:5
**hearing (8)**
638:15;643:21;
645:9;648:19;668:9;
792:13;844:21;
861:12
**hearsay (2)**
672:22;748:22
**heart (1)**
644:21
**heat (1)**
680:17
**heavily (1)**
687:12
**held (1)**
697:9
**help (9)**
680:13;788:22;
807:3,4,5,6;810:6;
835:15;860:22
**helped (3)**
655:13;683:20;
733:13
**helping (4)**
655:6;811:1;
853:22,25
**Here's (2)**
672:21;835:25
**hesitation (1)**
670:21
**Hewlett (1)**
682:18
**hey (2)**
729:18;846:17
**hierarchy (2)**
687:14;720:21
**High (4)**
682:18,19,25;
764:22
**higher (4)**
701:23;730:15;
763:23;787:23
**highlight (2)**
672:4;687:25
**highlighted (2)**
672:1;686:23
**highlights (1)**
672:4
**highly (1)**
702:16
**himself (1)**
769:8
**hire (51)**
644:18;657:9;
668:18;669:6;672:8;
673:22;677:15;
686:10;691:10,18,18;
692:9;693:15;702:12,

16,25;703:24;704:15;
705:4;706:12,16;
730:16;745:15;
749:14,15;758:19,22;
793:20;794:23;
802:17;812:24;
829:12;830:24;
834:25;835:2;836:8,
12,14,24;837:25;
838:11;840:10,22,24;
841:6;842:25;843:1,
19;845:14,16;847:9
**hired (3)**
712:22;802:24;
840:9
**hires (8)**
689:10;694:22;
739:15;756:20,21,23,
24;760:7
**hiring (38)**
657:5,10,12;
658:12;673:22;
677:15;686:8,9;
689:25;690:17,24;
691:7;692:11,19;
695:10;710:9;714:8;
722:14,17;726:14,17;
731:1,13;740:12;
748:20;755:23;756:5,
11,13,19,20;758:1,6;
760:8;800:23;809:8,
12;843:24
**hirings (1)**
756:8
**hold (6)**
720:15;762:12;
763:9;788:4,13;846:4
**holiday (2)**
744:23;772:9
**holy (1)**
674:20
**home (2)**
790:15;817:13
**honest (9)**
703:25;704:4,15,
22;726:19;743:7,10,
17;817:19
**honestly (1)**
850:5
**honetic (1)**
831:25
**Honor (78)**
648:24;650:3;
651:8;659:3;665:20;
672:16;673:8,12;
681:9;689:17;691:13;
693:25;697:11,17;
698:1;702:19;709:4;
712:1,5,713:20;
721:23;725:2;746:25;
747:3;748:24;749:9;
750:1,1;752:11;
753:15;760:10;761:9;

16,25;703:24;704:15;
794:23;799:11;
815:11;817:17;
818:10;821:25;
827:18;832:11,17,18,
25;833:21;835:8,16,
21;836:1,16,20;
837:16,23;838:19;
839:2,7;840:8,18,25;
841:14,16;842:3,16;
843:15,21;844:3,23;
845:1,24;846:5;
849:23;854:15,24;
855:7;856:14,20;
857:22;858:22;861:8
**hope (2)**
677:22,25
**hopeful (1)**
729:21
**hopefully (1)**
644:23
**Hospital (53)**
651:12;658:16;
659:22;661:2,12;
662:5,25;663:9,25;
664:22;665:4;675:20,
25;676:7;680:10;
685:2;694:3;698:20;
699:5,11,24;700:3;
701:10;708:18,25;
709:3,9,18,21;720:12;
725:19;768:1,7;
769:19;776:15,18;
788:17;791:9;805:15,
18,21;807:14,16,23;
808:10;817:5,10,12,
16;826:20,24;827:1,9
**hospitals (1)**
719:12
**hospital's (3)**
703:1;709:12,15
**host (3)**
679:20;681:3;
733:12
**hot (1)**
813:8
**hotel (2)**
653:7;829:10
**hour (6)**
672:12;704:25;
735:25;808:22,23;
850:6
**hours (25)**
653:21;675:16;
700:20;723:17;
724:13;727:14;728:8;
764:8,10;771:22;
772:4;773:19,23,24,
25;774:25;796:21;
802:4;810:24;824:21;
825:10,12;837:22,25;
840:17
**house (2)**
787:19;817:12

**housekeeping (2)**
  648:25;650:8
**how'd (2)**
  682:8;822:6
**HR (7)**
  663:17;706:9;
  723:15;727:3,21;
  730:2;731:3
**hub (3)**
  679:10,19;715:14
**hundred (5)**
  739:21;775:6,8;
  779:5;789:22
**hundreds (1)**
  660:8
**hurt (2)**
  793:5;852:18
**hyper-focus (1)**
  686:8
**hypothetically (1)**
  664:13

# I

**I-9 (1)**
  734:5
**IA (1)**
  831:20
**ID (6)**
  663:10,11,24;
  701:2,9;702:7
**idea (6)**
  687:22;693:5;
  790:11;792:15;
  809:11;860:12
**identification (3)**
  813:11;829:24;
  854:17;855:21,23
**identified (7)**
  722:3;767:10;
  785:5;813:12;822:23;
  830:3;855:24
**identify (1)**
  645:7
**identifying (1)**
  824:19
**IDs (5)**
  664:1;701:5;702:2,
  5,6
**ignore (2)**
  800:14,15
**ignored (1)**
  801:19
**immediately (6)**
  687:6,7;691:18;
  733:5;736:7;841:15
**impeach (1)**
  673:11
**imperative (1)**
  672:9
**impetus (2)**
  783:22;813:2
**implement (3)**

**655:6;687:10;**
  754:24
**implementation (10)**
  654:13;684:21,23;
  685:4,25;689:21,24;
  698:3;720:11;756:22
**implemented (1)**
  787:4
**implications (1)**
  832:15
**imply (1)**
  829:20
**importance (1)**
  840:7
**important (9)**
  683:22;684:2;
  703:24;758:9;806:9;
  808:1;824:18;852:9,
  16
**importantly (2)**
  810:1,3
**impossible (1)**
  812:17
**impressive (1)**
  687:17
**improper (1)**
  738:5
**improve (1)**
  663:5
**improved (1)**
  662:24
**inappropriate (2)**
  673:1;841:25
**INC (2)**
  638:5;643:4
**include (5)**
  734:3;775:16;
  779:6;814:22;850:19
**included (8)**
  708:17,24;709:1;
  734:20;758:2,5;
  781:10;860:7
**including (3)**
  644:15;657:15;
  661:12
**incomplete (1)**
  802:1;833:6
**incorporate (1)**
  718:10
**incorporated (2)**
  711:23;739:3
**incorrect (2)**
  669:8;701:3
**Indeed (23)**
  658:5;660:3,6,7;
  661:1,8;670:10;
  689:9,13;690:7;
  691:1,4,6;722:22;
  723:2,9;800:25;
  803:4;848:3;859:25;
  860:2,23;861:2
**individual (19)**
  683:10;712:7;

**724:3;746:1;751:13;**
  763:25;773:3;804:8;
  805:6,17,25;806:23;
  807:2;814:25;831:8;
  839:4;847:24;848:2;
  850:16
**Individually (1)**
  764:11
**individuals (6)**
  658:22;684:9;
  798:13;808:14;
  826:23;832:2
**industries (1)**
  771:20
**industry (2)**
  771:12;800:13
**ineffective (1)**
  673:23
**inference (1)**
  743:4
**influenced (1)**
  687:12
**info (1)**
  757:6
**information (31)**
  644:10;646:14;
  706:1,2,5,6;723:2,4;
  726:1,18;730:7;
  745:7;790:18;801:22,
  23,25;802:13;814:19;
  830:18;835:11,17;
  836:16;838:13;841:9,
  10;842:4,6;844:13;
  850:20;853:15;
  860:22
**informational (2)**
  725:6,7
**informed (1)**
  782:24
**inherent (1)**
  811:18
**inherit (1)**
  811:17
**in-house (1)**
  760:14
**initial (14)**
  652:5;655:6;
  657:12;682:14;
  722:25;723:2,18;
  724:18;725:25;
  756:14,19,20;777:12;
  801:25
**initially (3)**
  785:6;797:16;
  853:10
**initials (1)**
  816:3
**initiation (2)**
  697:20;740:15
**Inn (1)**
  817:8
**inquiries (1)**
  695:3

**inquiring (1)**
  812:21
**insane (1)**
  792:11
**inside (1)**
  667:25
**Instagram (1)**
  757:6
**instance (4)**
  660:20;696:9;
  790:20;798:17
**instead (1)**
  660:12
**institution (1)**
  757:7
**instruct (3)**
  665:18;688:20;
  754:5
**instructed (1)**
  784:16
**instructing (1)**
  665:24
**intake (7)**
  695:8;723:1,4,9,22;
  725:25;726:18
**integrate (1)**
  807:22
**integrated (3)**
  711:4;745:23;798:7
**integrating (1)**
  719:4
**integration (8)**
  663:21;724:19;
  756:19;760:18;806:4;
  807:15,20;824:12
**intend (1)**
  849:23
**intended (1)**
  678:16
**intent (1)**
  802:17
**intention (5)**
  692:19;712:22;
  713:8;758:5;800:22
**intentionally (1)**
  676:16
**interchange (3)**
  715:20;747:8;839:9
**interchangeably (1)**
  816:19
**interchanging (2)**
  715:18;755:3
**intercommunication (1)**
  745:1
**interest (2)**
  703:2,2
**interested (4)**
  670:14;729:15;
  784:7;795:13
**Interesting (2)**
  663:11;781:7
**interim (2)**
  724:20;732:20

**internal (3)**
  730:9,17,20
**interpret (1)**
  747:25
**interpretation (2)**
  743:7;842:15
**interview (21)**
  695:7;723:5,23;
  724:18,23,25;725:6;
  726:7,12,18,22;
  727:15;731:8,10;
  743:11,16;754:20;
  784:21;801:21;
  803:14;846:17
**interviewed (3)**
  743:15;759:4;
  803:23
**interviewers (1)**
  690:4
**interviewing (1)**
  686:9
**interviews (3)**
  724:11,14;726:4
**into (33)**
  661:16;664:6,20,
  23;668:8,9;682:10;
  698:3;699:10;701:9;
  711:23;713:7;715:8;
  722:19;734:12;
  735:19;739:3;742:1;
  764:13;774:8;777:19,
  24;778:3;779:25;
  780:7;804:23;808:16;
  812:12;815:12;
  827:19;832:12;
  845:25;855:16
**intra (1)**
  807:22
**intricacies (1)**
  839:24
**introduce (1)**
  651:9
**introduced (1)**
  842:5
**introducing (1)**
  712:6
**involved (22)**
  719:10,11,20,24;
  720:3,8;747:7,8;
  751:19,20;769:20;
  773:11;782:9;784:25;
  786:5;787:1;796:2;
  797:3,15,17;849:1;
  853:21
**involvement (2)**
  675:12;737:21
**involves (1)**
  857:23
**irrelevant (1)**
  692:20
**Island (8)**
  762:23,24,25;
  786:8;807:21;823:25;

824:10;839:8
**Islandia (1)**
  829:11
**isolated (1)**
  820:21
**issue (15)**
  643:6,12;644:9,10;
  648:25;715:23;
  750:17,20;764:4;
  801:8;809:14;844:8,
  9,12;858:23
**issued (10)**
  643:7;648:19;
  663:10;664:1,3,17;
  697:24;702:7;717:1;
  833:19
**issues (10)**
  647:23;649:13;
  650:8;674:16;717:24;
  718:2;720:4;734:12;
  763:15;796:22
**issuing (1)**
  706:17
**itemized (1)**
  836:23
**items (1)**
  703:22

**J**

**JA (5)**
  831:21,21,22,24,24
**jacket (1)**
  767:7
**jackets (2)**
  767:15,17
**JACKSON (107)**
  651:7,9;652:24;
  655:17,24;657:3,23;
  659:3,7;660:24;
  661:24;662:12;
  665:22;666:13;
  667:20;669:4;670:4,
  6,24;672:16;673:20;
  675:5;681:7;685:8;
  724:5;725:2;737:18,
  20;738:11;742:21;
  748:22;749:3,13;
  752:25;753:14,18;
  754:3,16;758:10;
  761:6;766:1;774:2;
  791:16;799:11;814:9,
  13,15;815:14,17;
  817:22;820:19;
  821:17;822:5,16;
  827:22;828:11,14,17;
  830:14;832:17,24;
  833:3,10,14,17,22;
  834:2,15,19;835:8,16;
  838:12,16;841:16,18,
  20,24;842:2,8,10;
  844:17,20;845:18;
  846:21;849:23;850:1,

3,5,10;852:12,17,25;
854:14,16,20,22;
855:20;856:1;857:21;
858:8,12,22;859:9,12;
860:13,16;861:4
**Jacobson (1)**
  780:15
**Jake's (26)**
  645:14,15,18;
  646:3;677:11;678:13,
  15,18;679:8,19,21;
  680:20;693:10;
  699:11;702:9;711:14,
  21;712:12;720:14,15;
  733:19;773:24;
  786:15,16;829:10;
  849:14
**Jamil (1)**
  764:10
**January (3)**
  797:17;837:21;
  840:14
**Jason (2)**
  763:9,9
**Jeff (5)**
  654:2,19;655:14,
  25;658:25
**Jeffrey (1)**
  655:4
**Jersey (3)**
  839:12,13,14
**Jimmy (2)**
  763:6;764:9
**job (74)**
  658:4,20;659:2,9;
  660:2,3;661:2,5,5,7,7;
  669:10;671:22;678:5;
  682:8,14,16,24;683:5;
  722:21,22;723:14;
  726:16,24;727:1,4,4,
  15,23;728:6,6,18;
  731:14;732:19;737:2;
  741:13;743:16,18;
  748:13;751:7;753:15,
  22;754:5;766:13;
  782:4;784:2;790:21,
  22;791:10;812:7;
  813:4,5;817:12,15;
  846:18;847:15,24;
  848:3,11,11,16;
  853:19;856:4,4,12,16,
  19;857:3,5,16,23,23;
  858:18;859:22
**jobs (4)**
  658:15;671:19;
  694:23;762:24
**Joe (3)**
  664:17,18;675:23
**Joe's (1)**
  653:1
**John (5)**
  764:7,9,10;827:8,
  10

**Johnny (14)**
  649:3;719:24;
  720:8;751:6,7,12;
  758:19;763:5;765:10,
  12;768:12;769:6;
  797:20;860:4
**joining (2)**
  670:8;675:9
**Joint (8)**
  777:1,13,19;
  778:13;799:3,8,16;
  819:13
**Jonathan (3)**
  688:18,24;782:13
**Josh (23)**
  649:4,4,8;663:21;
  664:13;685:12,15;
  688:17,18;731:16;
  747:17;763:6;764:6,
  7;772:9;787:12;
  797:16,17,24,25;
  807:5,6;811:5
**JOSHUA (1)**
  651:3
**journal (5)**
  774:12,14,21,22;
  775:18
**Judge (273)**
  638:16;643:3,11,
  13;645:20,22;646:1,6,
  9,12,18,21,23,24,25;
  647:14,24;648:5,8,12,
  16;649:6,9,17;650:4,
  5,9,17,23;651:1;
  652:18,22;655:19,22;
  656:22,25;657:20,22;
  659:5;660:22;661:17,
  22;662:8;667:19;
  668:23;670:2,5,7,12,
  16,23;672:14,20;
  673:6,13,18;674:24;
  681:7,8,11,15,23;
  684:3,10,13;686:16;
  689:18;691:14;692:1,
  15;694:1,6;697:12,
  18;698:6;699:13;
  702:20;703:9;704:7,
  18;706:6,10;708:7,
  21;709:5;710:5,8,13,
  16,21,25;711:3,13,17,
  24;712:2,10,20,25;
  713:11,14,18,22;
  721:4,6,8,9,11,13,16,
  18,21;722:6;724:6;
  725:4;737:19;738:2,
  5,14;743:1,5,23;
  746:17,21;748:23;
  749:1,4,6,17,25;
  750:3,6;753:3,12,21,
  25;754:15;758:11;
  759:1,7,10,17,20;
  760:1,9,11,16,20,22;
  761:5,7,10,13,15,18,

21,23;766:3,6;769:11,
14,16;774:4,7,9;
777:2,5,9,11,16;
791:17;794:13,20,24;
799:22;815:13,15;
817:20,25;818:12,17;
819:12,18,22,25;
820:5,8,11,14,17;
821:20,22;822:6,14;
827:20;828:8,19;
832:13,16,21;833:2,4,
6,13,15,24;834:1,16;
835:3,5,10,22;836:5,
9;837:2,7,11,17;
838:1,5,14,17,21;
839:17,25;840:4,23;
841:2,5,8,12,19,22;
842:1,7,9,14,21,24;
843:7,18,22;844:1,6,
8,10,18,21;845:4,6,
20;849:22,25;850:2,4,
7;852:15,24;854:18,
22;855:3,11,15,19,25;
856:18;857:14,19;
858:3,11;859:5;
861:6,9
**Judge's (1)**
  716:22
**judgment (1)**
  743:4
**July (5)**
  638:18;643:4;
  791:14,25;861:13
**jumping (1)**
  742:9
**June (6)**
  681:24;682:15;
  779:3;799:4;819:7;
  828:3
**jurisdiction (2)**
  694:18;695:17

**K**

**keep (6)**
  682:12;721:21;
  761:10;771:6;795:4;
  818:21
**keeping (1)**
  793:18
**keeps (1)**
  675:15
**kept (6)**
  778:4,20;779:8;
  788:18;793:2;839:11
**key (5)**
  667:25;668:2;
  674:16;703:18;
  715:17
**keyboards (1)**
  789:17
**kind (25)**
  648:1;675:12;

713:5,6;735:14;
741:8,8;746:15;
756:2;764:21;771:14,
18,20;773:1,6;787:20,
21;789:17;791:10;
797:8;801:23;805:9;
816:18;819:19;
823:13
**kindly (1)**
  740:18
**king (1)**
  802:13
**knew (8)**
  668:3;818:7;822:3;
  837:19;842:24,24;
  853:13;857:1
**knowing (2)**
  678:2,6
**knowledge (10)**
  655:23;660:23;
  663:8;697:5,6;
  699:17;714:7;715:6;
  781:4;860:25
**known (1)**
  757:4
**knows (1)**
  700:21

**L**

**labeled (1)**
  685:21
**LABOR (11)**
  638:2,17;644:14;
  651:10;696:13;
  715:20;763:19,25;
  764:18;788:4,22
**lack (4)**
  715:6;737:20;
  744:19;801:25
**landing (3)**
  790:17,25;817:3
**lanes (1)**
  663:3
**large (9)**
  671:7;690:23;
  694:4,7,9,15;699:14;
  700:15;747:2
**largely (2)**
  649:19,20
**Larger (3)**
  694:17;804:20;
  812:2
**last (13)**
  643:9;651:25;
  654:7;686:10;707:20;
  741:12;772:1;780:24;
  813:25;827:24;833:7,
  8;847:6
**Lastly (1)**
  761:5
**late (3)**
  756:25;791:25;

843:8

**later (8)**
646:2;648:15;
713:8;728:19;732:23;
800:1;809:3;826:13

**Law (3)**
638:16;643:13;
703:16

**layers (1)**
684:9

**laying (1)**
797:13

**lead (1)**
673:17

**leadership (3)**
687:15,18;742:4

**leading (8)**
673:14;737:18;
738:3,11;774:2;
791:16;822:5;830:14

**learn (6)**
676:5;713:6;768:5;
809:5,7;812:18

**learned (4)**
758:23;782:14,15;
809:5

**least (9)**
691:12;699:14;
745:6;757:4;799:4;
831:4,5;850:17;851:9

**leave (5)**
644:6;662:17;
680:14;734:9,12

**leaves (1)**
649:10

**leaving (3)**
649:8;682:19;
781:15

**led (1)**
809:4

**left (8)**
645:8;667:25;
683:4;701:15;815:18;
823:19;830:19;832:2

**legacy (1)**
767:19

**legal (2)**
750:22;769:7

**length (1)**
761:20

**less (15)**
646:21;649:18;
735:22;736:17;
749:11;752:21;770:7;
775:6;782:3,7,8;
809:25;811:6,6,7

**letter (2)**
750:11;846:15

**level (10)**
674:7,8,10,15;
679:7;715:9;729:23;
739:23;755:14;
807:16

**leverage (1)**
679:2

**libbed (1)**
693:24

**license (5)**
705:9,10,17;
706:17;727:10

**licenses (2)**
665:1;730:23

**lifestyle (1)**
676:17

**light (2)**
663:20;832:19

**likely (6)**
655:4;748:14;
757:1,1,4;824:1

**likes (1)**
704:15

**limbo (2)**
788:12;801:18

**limited (2)**
651:21;709:1

**line (16)**
655:11,12;701:16;
704:8;743:24;780:23,
23;784:6;804:22;
817:22;830:25;847:6;
852:6,19;854:5,6

**lines (5)**
723:25;771:6;
780:24,24;812:12

**link (1)**
734:24

**list (16)**
654:18,22;658:23;
677:12;781:1;807:3,
6;813:20,23;814:17,
20;822:3;834:13;
850:25;856:6,9

**listed (10)**
695:18,20;700:14;
717:2;720:16;837:15;
838:13;853:7,9,9

**listen (14)**
643:11;648:16;
649:17;784:6,17;
794:13;795:11;
835:24;838:1,5,22;
842:24;843:8;857:14

**lists (1)**
822:9

**litany (1)**
672:12

**literal (1)**
802:6

**literally (5)**
792:19;802:3;
810:22;819:10;
858:20

**litigation (1)**
837:21

**little (19)**
647:19;648:15;

662:10;670:2,5;
677:3;694:11;712:21;
722:19;767:24;770:7;
788:11;789:23;797:8;
803:12;826:19;838:7,
7;856:21

**lived (1)**
809:2

**loading (1)**
739:11

**LOCAL (4)**
638:8;682:22;
717:7,20

**locally (1)**
682:21

**located (2)**
829:10;839:21

**location (30)**
663:23;671:9;
682:4;689:10,25;
696:7;699:9;735:21;
745:22;757:3;760:17;
771:7;772:24;773:19,
20;781:5;798:6;
804:20;808:15,15,20;
810:4;811:22;826:12;
831:2,8;839:21,21;
840:6;851:8

**locations (37)**
660:8;677:6;681:3;
696:3,14;699:4;
719:5;731:22,25;
732:2;737:12;751:24;
752:5,9;758:8;764:2;
770:11,25;771:1,9;
772:4;798:2,3;799:6,
16;823:10;824:14,22;
825:21;826:9;827:1;
837:15;839:6,8;
850:16,22;851:10

**lock (1)**
650:13

**log (2)**
701:24;711:9

**logging (1)**
723:24

**logistic (1)**
756:19

**logistical (1)**
789:16

**logistically (1)**
808:10

**logistics (1)**
824:14

**long (34)**
664:24;667:15;
669:23;673:15;
675:10;692:21;
696:25;701:4;713:16;
723:21;726:7,22;
727:13;739:8;741:11,
12;762:16,23,24,25;
782:4;783:14;786:8;

793:6;796:18;807:20;
809:2;811:24;823:25;
824:10;839:8;844:4;
850:4;856:9

**longer (4)**
671:5;673:17;
701:20;732:22

**long-term (2)**
692:2;696:23

**look (42)**
645:5;647:22;
648:14;674:13;
687:16;692:5;716:20,
23;721:25;722:10;
725:10;736:24;737:2;
743:24;750:8,25;
751:1,2;772:13;
774:20;783:9;784:22;
793:22;800:13,17;
808:4;813:14;819:24;
822:20;824:1;828:3;
829:19;830:1,19,22;
835:5,5;844:1,23;
846:2,3;850:11

**looked (6)**
645:10;715:25;
740:11;774:22;834:6;
858:14

**looking (16)**
647:5;671:12;
674:3;716:23;747:21;
830:23;832:21;
834:18;847:15,24;
848:2;855:13;857:23;
858:6,8;860:10

**looks (5)**
664:9;832:22;
835:12;860:1,4

**loose (1)**
657:19

**lose (3)**
792:9;793:4;794:19

**losing (2)**
792:4;793:16

**lost (10)**
741:11;745:11;
792:8,17,20;793:7;
794:3,10;795:3;809:2

**lot (56)**
664:3;674:5,15;
679:6,11,19;680:13,
16;709:24;710:2;
715:9;720:23;721:1;
722:21;725:22;
730:19;745:1;747:22;
749:20;763:13;
764:20;775:2,16,17,
23,24;786:11,12;
787:19;788:10,10;
792:6,7;794:3,5;
803:12;805:10;
807:19;809:17,19,20,
24,25;810:5,18;811:3,

4,18;814:8;826:17;
834:17,23;852:6;
859:16,18,19

**lots (1)**
664:8

**loud (1)**
845:22

**louder (1)**
665:23

**lounge (1)**
817:7

**love (2)**
676:19;793:1

**loved (1)**
701:14

**lower (2)**
739:17;846:15

**lunch (1)**
758:15

**luncheon (1)**
713:23

---

## M

**magistrate (2)**
643:22,23

**main (8)**
667:10,16;668:12;
709:18,21;809:17;
811:4,6

**maintain (5)**
707:9,10;711:21;
713:3;818:19

**makes (1)**
812:3

**making (2)**
717:2;810:10

**malfeasance (1)**
844:25

**Mall (2)**
793:5,6

**management (12)**
664:20;683:14;
739:8,11,11,12,19;
762:18;775:16;
807:10;812:21;839:9

**manager (28)**
655:11;659:16,24;
666:25;668:6;687:13,
19,23;692:21;695:17;
713:3;715:10;735:18;
746:7;756:24;766:25,
25;767:10;781:12,16,
21;786:18;804:12,15,
20;811:22,23;812:4

**managers (13)**
653:24;654:5,15;
657:15;664:3;684:14;
714:24;715:3;739:21;
767:9,12;790:6,9

**Manhattan (4)**
831:16,17,18,19

**Mansion (2)**

831:20,22
**many (37)**
652:9;656:12;
660:9,14;672:6;
674:3;675:6;680:20;
686:8;687:3;692:8;
694:14;696:18;
717:14,18;727:13;
728:8;745:5;747:14;
753:3,4;764:20,25;
770:5;771:5,5,9,22;
774:23;775:12;
778:25;787:15;
790:13;811:21;822:9;
848:10;858:1
**MAP (1)**
713:4
**MAPS (14)**
651:24;663:18;
668:3,5,8,9;718:10;
745:2,2;752:13,16,22;
781:14;797:7
**March (2)**
786:12;837:21
**margin (1)**
830:19
**Mark (2)**
763:5;768:12
**marked (9)**
721:24;777:19;
813:10;822:19;
829:24;854:16;
855:18,21,23
**marketing (1)**
737:12
**marquee (1)**
690:15
**mass (2)**
669:8;809:12
**match (1)**
761:2
**materials (1)**
644:4
**Mather (6)**
817:4,10,12,12,15,
16
**Matt (13)**
650:12,13;651:9;
654:4,6,19;655:2;
658:25;659:16;660:5,
17;688:16;763:6
**Matter (9)**
638:4,15;644:7;
648:20;669:20;
794:13,14;802:23;
861:13
**matters (1)**
847:7
**Matt's (1)**
650:13
**MAURO (10)**
646:24;647:1,15;
650:10,11;666:12;

776:23,25;777:7;
859:10
**may (18)**
645:19;646:24;
674:23;676:17;721:4;
732:19;740:22;750:1;
760:5,25;780:12,12;
799:5;807:2;837:21;
842:13;843:12;859:2
**maybe (18)**
648:1,3;650:14,15;
667:24;702:7;711:10;
725:16;756:25;760:2;
770:7,7;806:6,19;
817:13;828:2,2;839:1
**mean (63)**
645:3;646:4,4,10;
648:5,10,16;652:15,
19;661:6,21;674:14;
679:16;700:23;
710:25,25;719:4;
738:20,23;739:20;
749:15;751:22;753:3;
755:24;756:3;760:24;
772:7;777:13;791:13;
792:25;794:13;797:4;
798:15,22;809:15;
815:4,7;817:20;
818:12;819:23;
820:15,16;821:4;
823:15;824:16;831:7;
836:5;838:5,23;
839:18;840:23;
841:12,24;842:21;
843:7,20;846:25;
850:7,13;856:23;
857:14,19;858:13
**meaning (1)**
668:7
**means (8)**
663:21;722:15;
724:8;730:6;748:1;
840:21;853:22,25
**meant (1)**
847:1
**measures (1)**
844:18
**meats (1)**
741:13
**mechanism (1)**
680:18
**media (1)**
757:6
**medical (7)**
665:2;699:18,19;
719:11;734:12;
771:15,18
**meet (3)**
767:1,12;771:21
**meeting (22)**
645:14,15;646:17;
647:4,18;677:10;
688:24;689:2,5,9;

702:9;724:22,23,25;
742:18;743:3;796:8,
18;797:7,22;849:1,4
**meetings (10)**
651:18,21,23;
668:5;795:18,19;
796:2;797:3,12,15
**member (1)**
685:24
**members (10)**
672:6;678:3,7;
686:6,13;687:3;
692:7;719:6;746:7;
764:3
**Memorial (3)**
682:11,15;851:18
**mention (1)**
768:16
**mentioned (15)**
654:4,11;662:23;
668:4;669:10;744:17;
748:10;766:8;781:17;
782:24;787:7;803:11;
807:18;851:14;
853:16
**mentioning (1)**
692:18
**mentor (2)**
811:21;854:5
**mentoring (2)**
853:17,21
**message (7)**
645:10;700:13,22,
23;733:2,6;758:18
**messages (3)**
644:15;645:5,8
**met (4)**
645:4;664:25;
667:5;767:6
**method (2)**
692:3;772:24
**methodology (4)**
724:11,17;739:24;
794:21
**Michael (9)**
652:2;654:17,20;
656:12;685:14;
718:22;719:19;763:5,
5
**mid (2)**
741:2;791:6
**middle (2)**
643:5;785:16
**mid-November (9)**
741:3,5,6;744:10;
755:18;757:25;
789:10,13;800:8
**midsize (1)**
694:16
**might (42)**
644:10,25;647:22;
648:5,22;650:11;
674:18,19;676:14;

678:23,24;695:6,7;
715:7,13,16,22;
723:11,15;724:3;
731:15;732:3;742:7;
756:15;759:22;
762:24;777:12;
783:22;797:20,20;
803:7;805:12,13,20,
25;806:1;810:14;
824:24;826:23;
840:16,17;853:10
**might've (2)**
715:25;720:16
**migrate (1)**
719:3
**migrated (1)**
675:3
**migration (2)**
668:25;669:8,13;
719:1
**Mike (1)**
797:16
**Mills (1)**
842:2
**MILMAN (196)**
648:24;649:7,10;
650:3,21;655:16,20;
656:20,23;660:21;
661:14,20;662:7;
665:20;667:19;
668:21;672:11,19;
673:4,8,17;681:22;
684:2,8,11;686:14;
689:17;691:12,25;
692:13;693:22;694:5,
7;697:10,17,19;
698:1;699:12;702:18;
703:8;704:5,9,17;
706:4;708:6,19;
709:4;712:1,5;
713:16,20;714:4;
721:3,7,9,14,20,22;
722:9;724:7;725:5;
737:23;738:4,7,12,15;
742:23;743:2,8;
746:19,24;748:24;
749:8,14,18;750:1,7,
23;753:2,5,11,17,22;
754:14;758:25;759:6;
760:10,13;761:3,11,
14,16,19;762:6;766:2,
4,7;769:13,17;
773:23;774:5,8,10;
776:21,24;777:4,14,
17;791:18;794:16,21,
25;799:13,24;814:11,
14,16;815:11;817:17;
818:10;820:16;
821:18,24;822:12,15,
17;827:18;828:23;
830:15;832:11,14;
833:1,5,8,12,16,21,23,
25;834:14,20;835:4,7,

19;836:1,7,10,19;
837:3,9,14,19;838:2,
19;839:2,19;840:3,7,
25;841:3,7,11,14,17,
18;842:13,15,22;
843:1,15,21,25;844:2,
7,9,23;845:5,8,23;
846:22;849:20;
852:11,14,23;854:13,
21;855:5,13,18;
856:14,20;857:18;
859:7,11;860:15;
861:8
**Milman's (1)**
672:17
**mind (1)**
790:2
**minimum (1)**
715:8
**minute (2)**
726:11;727:14
**minutes (6)**
667:17;726:23;
730:20;742:19;
761:16;796:20
**mischaracterization (1)**
645:11
**Mischaracterizes (3)**
656:20,23;704:9
**mischaracterizing (1)**
673:11
**misleading (1)**
656:23
**missed (1)**
763:10
**missing (3)**
832:23;833:6;839:1
**mistake (4)**
692:20,21,24;802:8
**mistaken (1)**
678:11
**misunderstanding (1)**
656:16
**mitigate (1)**
745:4
**mix (2)**
676:17;735:19
**Mm-hmm (9)**
645:3;706:19;
797:18;798:12;
808:25;809:13;
815:25;853:21;
860:15
**mobile (1)**
733:14
**mock (2)**
672:5;687:3
**model (5)**
663:21;669:6,14;
763:17;838:6
**moment (4)**
654:25;702:24;
722:4;769:12;810:7;

816:20;832:17,18,20
**Monday (9)**
675:24;773:6;
825:21,22;826:5,6,7,
7;827:8
**monetary (1)**
811:12
**money (8)**
784:3;792:20;
808:14;809:21;810:1,
7,10;852:6
**monitored (1)**
674:17
**month (12)**
676:9,11;730:24;
741:18;805:3;840:9,
10,15,20,21;843:2;
845:13
**monthly (3)**
651:19,21;796:3
**months (2)**
676:13;840:12
**more (44)**
643:17,19,25;
646:21;647:23;671:6;
674:7;677:3;678:11;
690:7;692:14;696:6;
700:19,20;717:16;
723:17;731:5;734:14;
739:15;752:8,11;
770:13,21;775:6,8,9,
11;784:3;785:5;
792:3;804:24;807:8;
808:9;810:1,3,10;
812:3;814:14;834:25;
840:14;842:20,22;
843:16;850:6
**Moreover (1)**
812:12
**morning (4)**
645:4;802:8;859:1,
8
**mornings (1)**
811:3
**mortar (1)**
839:4
**Most (13)**
694:20,21;703:22;
707:16;718:8;720:13;
765:2;773:5,5;791:1;
792:8;796:3;839:1
**mostly (1)**
786:15
**motivation (1)**
801:9
**Mount (1)**
757:8
**mouthpiece (1)**
649:21
**move (25)**
648:17;686:11,16;
732:12;737:13,15;
738:1;739:15;741:21;

746:25;748:25,25,25;
759:10;774:9;792:25;
808:9,21;811:9;
815:11;827:19;
832:11;842:11;
857:11;861:4
**moved (1)**
713:7
**moves (2)**
718:8;811:4
**moving (6)**
648:21;682:20;
800:18;804:23;
812:12;816:13
**much (11)**
644:23;670:25;
674:14;687:20;700:8;
713:15;716:13;
720:25;737:3;761:7;
824:13
**multipart (1)**
661:21
**multiple (7)**
663:13;664:1;
725:11;731:22,24;
806:5;821:8
**myself (7)**
651:9;690:1;
718:23;763:6;764:6;
784:1;797:16

## N

**name (11)**
646:19;651:9,25;
654:4,7;675:8;697:7;
766:21;815:22;
834:10;835:13
**named (1)**
683:10
**names (21)**
677:23;678:1,5,9;
690:23;781:1;820:7,
9,10,12,21;822:2,7,
11;830:20;832:2;
845:16;853:5,9,12,13
**narrows (1)**
644:22
**Nassau (20)**
653:10;659:16;
679:18;683:2,4;
695:14,16,17,23;
696:2,6,10,15,18;
697:1,23,24;771:8;
851:17,18
**NATIONAL (3)**
638:2,17;651:10
**navigate (1)**
663:12
**nearby (1)**
653:7
**nearly (1)**
655:21

**necessarily (1)**
848:18
**necessities (1)**
730:4
**need (28)**
644:25;649:21;
659:3;662:8;663:12;
672:6;677:9;680:16,
19;686:10,10,17;
700:17;701:2,3;
705:8,10,13;706:22;
751:12;755:14;760:2;
761:16;764:13;
784:18;806:2;807:4;
839:23
**needed (12)**
687:4;698:25;
713:7;741:8;790:18;
800:21;801:3,3,4,5;
802:14;804:5
**needing (3)**
699:8;700:19,20
**needs (11)**
659:2,25;661:13;
662:6,7;665:2;671:4;
673:10;705:5;731:13;
788:6
**nefarious (1)**
801:20
**neglected (1)**
857:7
**negotiations (1)**
769:2
**nervous (2)**
802:11,12
**New (49)**
638:18,18;660:12;
669:7,19;680:13;
683:20;687:7;695:10;
706:17;714:16;
715:21;719:9;727:5,
5;730:23;734:9,9;
735:10;736:10,11;
738:24;739:2,3,4;
742:1,2;748:7;
755:13,25;756:1,20,
21,23,24;759:22;
760:7,15;782:10,24;
787:18;811:22,22;
812:4;824:2;829:11;
839:12,13,13
**next (24)**
688:1;711:7;
712:17,18;724:22;
727:2,3;729:5;730:8;
733:9,22;736:24;
743:24;747:4;750:20;
761:1,13;769:18;
793:24;817:4,22;
830:25;831:5,19
**nice (3)**
677:22;703:19;
711:10

**Nick (10)**
645:24,25;651:25;
663:17;668:4,4;
752:22,23;753:7;
797:16
**night (4)**
653:2;806:16,19;
810:24
**nighttime (1)**
682:7
**NLRB (4)**
717:6;776:5;
839:20;844:24
**No10/20/23 (1)**
859:17
**Nobody (2)**
767:10;793:8
**nod (2)**
829:21,21
**none (5)**
699:22;792:17,19;
795:20;809:20
**non-issue (1)**
692:18
**no-no (1)**
800:14
**non-photo (2)**
664:9,15
**non-specific (1)**
664:15
**noon (1)**
650:15
**nor (1)**
857:5
**Nordstrom (2)**
808:18,19
**Northern (2)**
771:8;839:12
**Noted (1)**
643:2
**notice (7)**
638:16;731:17;
732:6;777:12;793:15;
807:15;849:14
**noticed (1)**
769:18
**notification (3)**
728:15;729:8;730:1
**notified (4)**
736:18;768:10,15;
844:15
**notify (3)**
664:22;732:11;
813:6
**noting (1)**
652:25
**notion (2)**
712:16;746:1
**notwithstanding (1)**
809:14
**November (43)**
647:4;648:11;
665:9;688:11,24;

689:2,6,16;690:25;
691:5;698:20,22;
699:1,25;702:1;
716:3,3,12,16;717:9,
9;742:18;743:3;
744:7;750:11;756:8;
759:2,4;779:2;781:8,
8;785:14,16;786:10;
791:5,15;829:9;
840:15;849:2;858:19;
859:24;860:19,24
**nuances (1)**
773:18
**Number (14)**
664:16;686:10;
687:2,22;692:9;
702:18;721:25;731:4;
768:22;771:21;790:1;
800:14;823:19;
834:18
**numbers (1)**
720:3
**numerical (1)**
697:8
**numerous (2)**
684:9;760:22
**nuts (1)**
793:16
**NW (1)**
817:15

## O

**oath (1)**
650:24
**object (7)**
661:20;672:17;
725:2;737:20;753:23;
822:16;855:2
**objection (68)**
643:18;655:16,19;
656:20;660:21;
661:14;662:7;668:21;
672:11,24;681:22;
684:2,8,10,12;686:14;
691:12,25;692:13;
693:22;694:5;697:17;
698:1;699:12;702:18;
703:8;704:5,17;
706:4;708:19;709:4;
724:5;737:18;738:6,
11;742:21;748:22;
749:3,13;752:25;
753:17,21;754:14;
758:25;766:1;774:2;
799:11;815:13;
820:18;821:17,21;
822:5;827:20;828:15,
18;830:14;832:13;
845:18;846:21;
852:11,14,23;854:14;
855:19;856:14,21;
857:20;861:6

**objections (4)**
672:17,21,22;749:1
**objection's (1)**
673:19
**obligated (1)**
837:5
**obligation (1)**
813:6
**observations (2)**
667:6;810:17
**observe (5)**
667:7,7;668:14,15;
807:17
**observed (1)**
807:17
**observing (2)**
667:15;668:11
**obtain (4)**
644:22;705:8,13,20
**obviously (13)**
646:11;647:17;
686:15;764:14;768:8;
772:7;777:13;787:17;
792:12;802:8;807:10;
818:8;847:23
**occasion (1)**
774:13
**Occasionally (1)**
765:17
**occur (3)**
666:8;675:6;693:17
**October (13)**
644:20;669:24;
671:12,17;685:12,14,
18;686:21;756:8;
762:17;785:15;
791:15;841:3
**oddity (1)**
792:18
**oddly (1)**
730:18
**off (21)**
645:10;659:3,5;
676:20;713:22;
716:14;721:9,11;
724:13;750:3,4;
761:21;762:24;
769:11;771:18;
784:17;790:11;
817:12;820:3;834:25;
861:9
**offer (14)**
704:2,12;726:16,
24;727:15,23;728:6,
18;741:13;743:16,18;
751:7;822:12,16
**offered (4)**
677:17;727:1;
820:18;855:16
**offers (1)**
846:18
**office (15)**
678:9,25;679:18,

21,22,23;688:4;
693:6;733:19;763:14;
771:20;775:17;
790:15;802:18;
833:19
**official (1)**
853:19
**often (6)**
643:23,24;679:17;
680:19;706:17;
720:14
**old (3)**
687:8;746:9;765:18
**older (4)**
690:8;765:19,22,22
**onboard (3)**
669:8;678:2;751:17
**onboarded (1)**
714:21
**onboarding (6)**
733:3;734:24;
736:2,5;755:25;
803:17
**once (11)**
643:14;686:7,12;
730:1;731:2;757:7;
785:24;819:12;831:4,
5;844:25
**one (135)**
645:23;649:16,23,
23,24;654:2,4,25;
659:13,17;660:6,6;
664:15;675:8;677:9;
678:4,11;682:22,22;
684:14,19;687:2,6;
690:4,9,10;696:7;
697:21;700:13;701:3,
14;712:6;713:16;
716:8;717:16;718:4,
13;721:9,21;724:3,4;
731:5,6,7;733:9;
737:3;740:2,24;
742:5;743:17;746:5,
6,20;751:2,3,12;
752:8;758:20,22;
760:10;762:24;
763:10;766:10;
767:21;770:17,20;
771:18;773:20;
776:11,14;779:10;
782:24;788:1,5,24;
790:11;792:8;796:6;
797:5,19;798:4;
799:19;801:24;
802:24;803:1,10;
805:14;806:22,24;
810:4,14,16;814:6,13,
22;816:15,16;818:3,
14;820:20;822:10;
823:6;825:19;826:25;
827:25,25;828:1;
831:6;832:17,18;
834:13;839:3,11,21,

21;840:16;843:16;
848:5;850:15,17;
851:1,9,10,20;855:22;
856:7,10,16;857:4,5,
6,11;858:13,16;860:4
**one- (1)**
817:11
**one-offs (1)**
787:20
**ones (3)**
664:2,3;796:1
**one's (5)**
737:4;756:10,10;
775:2;817:4
**only (26)**
653:11;655:14;
666:18;673:8;682:4;
683:7;693:23;725:18;
752:11;772:3;773:9;
780:14;798:15,23;
805:17;806:21;
808:17;818:3;823:16,
18;825:17,19,20;
837:22;851:19,20
**Onsite (6)**
679:5;680:7,9,10;
795:17;804:15
**on-site (2)**
766:18;800:2
**onto (1)**
788:4
**open (6)**
787:19;802:17;
823:15;825:19,21;
826:13
**opened (3)**
659:15;759:22;
823:13
**opening (3)**
656:10;657:13;
768:8
**opens (3)**
643:14;787:18;
823:15
**operate (7)**
661:10;662:1;
678:2;727:21;755:19;
763:25;793:19
**operated (4)**
709:8,14,20;710:1
**operates (4)**
709:2,11,17,23
**operating (4)**
657:24;667:10;
718:9;756:9
**operation (33)**
662:2;668:20;
669:7,15,19;670:21;
671:7;672:8;678:15,
16;739:4,18;740:14;
742:1;760:15;783:3;
787:11,16;794:17;
797:12;807:12,21,25;

808:1;809:5;810:4;
812:11,18,22;839:7;
840:14;843:2,2
**operational (2)**
766:5,24
**operationalizing (1)**
670:19
**operationally (1)**
662:22
**operations (21)**
666:24;675:4;
700:3;708:14,17,24;
738:24;742:2;749:10,
21;750:17;766:12;
767:2,12;769:21;
770:6;785:25;786:1;
787:2,15;840:21
**opinion (5)**
643:11;644:2,12;
690:7;743:16
**opportunities (2)**
671:22;748:9
**opportunity (13)**
669:12;693:13;
766:11,13;770:1;
788:3,15;802:15;
806:20,20;812:18;
827:4;857:10
**opposed (2)**
682:15;800:18
**opposite (1)**
807:17
**option (2)**
742:7;745:6
**options (3)**
726:13;745:5;
795:12
**order (8)**
648:25;649:18;
707:8;736:25;802:14;
805:1;812:6;841:15
**orders (1)**
794:2
**ordinary (2)**
778:4;836:21
**organization (11)**
651:13;687:16;
690:23;735:15;
774:15;802:18,22;
807:20;815:3,4;
839:24
**organized (2)**
663:2;732:5
**original (4)**
672:1;699:7;
713:13;802:3
**others (2)**
685:14;853:17
**otherwise (3)**
668:14,15;861:2
**ours (1)**
719:5
**ourselves (2)**

757:2;785:6
**out (97)**
655:9;658:23;
663:18;664:16;
665:11;668:6;670:21;
671:22;673:25;676:3;
686:7;690:21;692:8;
701:18,19;703:3;
705:10;707:20;
722:25;723:21;725:3;
727:6,16;728:25;
730:12;731:2;732:8;
733:2,6,24;739:16;
743:15;744:10,13,14;
756:21,24;757:5;
761:11;764:2;765:2;
772:12;773:7;778:18;
784:4,11,15,18,18,20;
787:19;789:8;790:6,
7,9,13,13;793:2,22,
24;794:22;795:8,22;
797:13;798:7;800:5;
806:24;807:1,2,4;
810:6;812:7;818:6;
819:9,12,16;821:1,10,
16;822:3;827:3;
836:15,23;837:1,1,1,
1,24;838:18;839:4,12,
20;845:22;846:24;
854:5,6;856:20
**outgoing (1)**
749:22
**outside (4)**
645:4;736:6;
743:11;762:24
**outstanding (1)**
643:6
**over (47)**
660:5;668:19,25;
669:14;672:12;675:3;
682:23;686:9,12;
691:10,18;707:21;
714:9,16,19,22;
716:24;719:3;730:21;
739:4;751:18;757:3,
8;761:17;767:11;
770:11;784:19;
785:24;788:23;791:6;
792:1;797:4;808:19,
21,23,24;809:9,19;
810:6,6;811:4,14,16;
834:6;839:8;844:22;
859:8
**overbroad (1)**
644:3
**overcome (1)**
811:25
**overflow (1)**
839:9
**overlap (3)**
725:22;752:10;
839:9
**Overruled (42)**

655:22;656:22;
660:22;662:8;668:23;
672:14;673:19;
681:23;684:3,13;
689:18;691:14;692:1,
15;694:6;697:12,18;
698:6;699:13;702:20;
703:9;704:7,7,18;
708:7,21;709:5;
725:4;738:14;743:5;
748:23;749:25;
753:25;754:15;759:1;
760:20;766:6;774:4;
791:17;822:6;852:15;
857:20
**oversee (4)**
   763:18;771:11,17;
   811:23
**overseeing (1)**
   771:16
**oversimplifies (2)**
   668:21;672:11
**overstaffed (2)**
   760:2,5
**overtime (9)**
   700:8,21;739:17;
   741:24;764:11,14;
   773:20,25;819:4
**own (4)**
   703:22;764:2,5;
   812:9
**owner (5)**
   649:3,3;766:18,19,
   20
**owners (2)**
   763:3;766:8
**ownership (3)**
   655:11;763:8,9
**owns (1)**
   766:16
**oyster (1)**
   791:13

**P**

**pace (1)**
   682:13
**package (1)**
   715:25
**Page (21)**
   685:19,21;688:15,
   16,17,18;692:6;
   716:23,23;722:5,11;
   728:7,18;735:4;
   790:17,25;822:1;
   829:8;832:23;833:7,8
**pages (11)**
   721:24;773:8;
   778:25;779:5;818:11;
   829:25;834:24;835:1;
   836:3,15;844:5
**paid (4)**
   652:16;680:14;

716:13;776:2
**pain (1)**
   846:24
**pales (1)**
   679:6
**pandemic (1)**
   718:14
**paper (2)**
   860:10
**papers (3)**
   716:20,22,22
**Paragraph (4)**
   693:4;700:16;
   829:8,16
**parameters (1)**
   720:1
**parentheses (2)**
   687:25;815:19
**park (9)**
   765:4,12,14,16,24;
   766:9;767:4;788:17;
   793:7
**PARKING (204)**
   638:5;643:4;
   644:18;645:9;651:12;
   652:19;653:6,21;
   655:8;656:17;657:4;
   658:4,11,20;660:25;
   661:10,11,12;662:1,2,
   6;663:8,23;668:18;
   669:6,17,18;670:7;
   671:13;672:7;674:15;
   675:15;676:7;678:12;
   679:5,6,12,18;680:16;
   681:20;682:3,22,24;
   683:5,7,13,16,23;
   685:1,11;686:3;
   687:6,10,17;689:8;
   690:14,15;691:1,4,6,
   9,17;693:14,14,19,20;
   694:4,14,17,22;695:9,
   13,24;696:2,2,5,6,9,
   10,13,23;697:24;
   698:19,25;699:4,10;
   701:1,5;702:1,12,15,
   15;703:2,5,24;704:12,
   15,21,25;705:5;
   706:22,24;708:11,14,
   17,24;709:2,11,17,20,
   23;710:1,8,22;
   711:25;712:23;715:9;
   716:9;717:14,18,23;
   718:17,20,21;719:6;
   723:4,9;724:19;
   725:16;727:16;
   728:13;730:5,20;
   735:14;736:8;742:10,
   15;745:9,13,16,17,21;
   746:5;748:7,16;
   752:7;753:16;754:24;
   755:3;757:9,11,15;
   758:23;760:14;
   762:11,12,16,20;

763:3;764:24;765:7;
766:19,19;767:11,25;
768:5,18;769:19;
770:2,20;771:22;
772:5,23;773:12;
774:11,15,18,23;
775:1,14;777:2;
781:10;782:12;
784:14;788:17;
789:14;791:5;794:14,
18;798:13;802:21;
807:10;812:21;815:4,
7;833:20;848:12;
851:14,21;852:9;
853:2;859:16,18,19
**parks (2)**
   765:8,10
**parroting (1)**
   673:2
**parrots (1)**
   649:25
**part (40)**
   651:13;656:11;
   679:2;683:13;684:17,
   20,23;685:4;687:19;
   689:24;695:3;718:12,
   12,18,18;720:2;725:6,
   6,13,13;730:12;734:6,
   7;752:3;753:15;
   756:4;769:23;773:20;
   776:10;785:25;787:7;
   791:1,24;796:3;
   797:10;807:21;
   822:19;824:19;
   853:16;857:22
**particular (8)**
   660:20;804:19;
   820:12,12;824:8;
   826:12;848:19;851:8
**particularly (12)**
   653:13;658:19;
   666:8;689:11;690:1;
   694:8,25;695:7;
   710:24;725:16;
   760:24;827:13
**parties (5)**
   643:8;644:6;
   662:21;787:20;
   849:11
**partner (2)**
   728:24;762:13
**partners (1)**
   780:14
**parts (4)**
   661:25;701:2;
   736:15;783:4
**Party (12)**
   638:12;649:22;
   662:14;675:7,9;
   700:24;705:20,24;
   717:7;729:2;730:10;
   757:19
**pass (1)**

670:25
**passing (1)**
   665:11
**past (4)**
   654:13;674:17;
   715:20;725:19
**paths (1)**
   656:11
**patients (3)**
   708:18,25;791:12
**pavement (1)**
   680:17
**pay (6)**
   715:7,12;725:8;
   754:21;778:2;809:23
**paychecks (1)**
   706:12
**Paychex (6)**
   729:2,25;730:1,4,
   12;772:25
**Paychex's (2)**
   729:22;734:6
**payday (1)**
   781:8
**paying (1)**
   700:8
**payroll (63)**
   675:12;711:24;
   730:7,8;763:15,15;
   764:5;772:20,21,22,
   23,23;773:3,11,15,15,
   18;774:8,11,14,18,20,
   22,24;775:18;776:12,
   14,17;777:3;778:5,9,
   14,21;779:1,15,17,23;
   780:2,3,4,15;799:3,8;
   804:7;818:10,13;
   830:18;832:6;834:22,
   22,25;835:2,20;
   836:10,16,25;839:11;
   842:18;843:22,23;
   844:2,3;851:1
**payrolls (1)**
   836:12
**pays (1)**
   839:3
**peak (1)**
   826:18
**people (42)**
   648:3;657:9;674:8;
   677:12,15;680:20,25;
   692:19;703:22;
   704:15;710:22;
   711:14;714:25;724:2;
   730:7;733:12;758:5;
   759:21;760:2,3;
   772:12;780:8;788:11;
   791:11;792:6,18,20;
   793:13,15;800:12,14,
   15;801:6,17;810:10;
   818:5;819:22;832:3,
   5,5;838:9;853:22
**per (6)**

653:2;655:9;
711:22;730:4;745:6;
781:23
**percent (3)**
   726:20;789:22;
   824:11
**percentage (1)**
   764:22
**perfect (3)**
   711:10;772:7;794:6
**perform (5)**
   735:18;768:1;
   781:25,25;782:7
**performance (1)**
   667:8
**performed (1)**
   716:18
**performing (2)**
   766:13;770:2
**perhaps (4)**
   659:25;817:13,13;
   857:9
**peril (1)**
   857:12
**period (8)**
   644:19;652:5;
   654:16;668:16;671:8;
   701:19;778:17;779:1
**permanently (1)**
   711:17
**permission (2)**
   751:7;758:19,22
**permitted (1)**
   858:25
**persistent (2)**
   798:3,5
**person (17)**
   649:24,24;669:15;
   705:6,10,17;712:12;
   713:1,11,13;717:2;
   726:19;729:21;784:1;
   796:12;806:21;
   834:11
**personal (2)**
   674:10;852:18
**person's (3)**
   649:25;705:13;
   706:1
**perspective (1)**
   659:1
**pertain (1)**
   698:15
**pertained (1)**
   699:6
**pertaining (2)**
   674:15;738:21
**petition (1)**
   643:6
**Petruzzelli (9)**
   652:2;654:17,20;
   656:12;685:15;
   718:22;719:19;763:5;
   768:13

**phase (24)**
731:1;738:18;
739:19;740:5,17;
741:5,8,20,23;742:1;
755:18,20,23,25;
756:3,3,5,5,17;
757:24;758:1,6;
760:8;853:11
**phased (1)**
738:22
**phenomenal (2)**
783:25,25
**phonetic (1)**
752:13
**photographic (1)**
664:2
**physically (2)**
766:9;784:12
**picked (4)**
836:25;837:1,1,1
**picking (1)**
827:11
**pipe (1)**
795:12
**pitching (1)**
784:5
**place (21)**
671:10;673:22;
675:10;678:23;
679:17;680:11;
686:11;724:25;
738:21;742:3;745:2;
748:15;756:6;760:16,
25;785:2;793:2,9;
796:19;809:19;
849:14
**placement (1)**
848:3
**places (5)**
792:19;793:4;
815:5;818:7,9
**plan (6)**
712:21;756:21;
792:1;802:12,14;
816:12
**planning (2)**
756:19;797:1
**plastic (1)**
664:9
**platform (3)**
660:3;661:1,8
**platforms (1)**
681:3
**Plaza (1)**
638:17
**please (24)**
657:2;658:24;
688:13,20;691:3,15;
700:11;708:22;721:5,
10,15;724:10;750:3,
8;751:1;808:5;
814:12;822:25;830:1;
832:12;841:18;

842:13;845:17;846:3
**plopped (1)**
746:6
**pluck (1)**
838:18
**PLUS (7)**
638:5;643:4;752:5;
808:12;824:11;
837:15;844:24
**pm (7)**
713:23;714:2;
780:10;810:23;
823:16;828:4;861:12
**poach (5)**
715:4;729:13;
800:23;811:15,15
**poaching (1)**
714:17
**point (33)**
644:23;660:6;
669:2;683:1;687:2,
21;697:11;700:7;
725:14,25;732:8;
733:23;738:9,12;
746:1,18;748:24;
757:12;759:21;
764:21;769:20,25;
792:11,15;800:21;
806:24;819:10;840:4,
25;844:12;850:23;
851:11;856:15
**policies (8)**
679:4,12;683:16;
686:3;710:14;746:12;
854:1,4
**policy (16)**
669:18,20,22,24;
673:21;675:10,10;
696:6;710:9;714:8;
749:2;754:9,18;
797:1;809:14;812:8
**pool (5)**
699:14;763:19;
764:1;791:8,13
**pooling (1)**
809:4
**pools (1)**
764:19
**poor (1)**
674:4
**Porsuk (9)**
645:4,13;646:16,
19,19,20,20,22;
648:13
**portal (2)**
727:9;729:1
**portfolio (14)**
751:24;770:25;
771:1,2,10,22,24;
772:4;786:21,22;
788:18;795:25;805:8;
806:2
**portfolios (1)**

806:5
**portion (1)**
686:23
**portraying (1)**
759:24
**posed (1)**
857:4
**position (11)**
682:14;703:6;
720:15;727:16;
744:18;748:14;784:7;
799:25;835:15;848:3,
11
**positions (4)**
658:12;724:20;
856:4,13
**positive (4)**
661:9;693:17;
695:10;849:19
**possession (2)**
843:20;844:13
**post (6)**
659:18;670:18;
674:21;694:23;757:6;
859:24
**post-December (1)**
807:24
**posted (10)**
658:4,7;659:25;
661:1;690:9;702:3;
740:23,25;860:11,23
**posting (8)**
659:2,8;660:3;
661:7,7;722:22;
858:18;859:22
**postings (16)**
658:4;856:4,12;
857:23;861:1
**posts (1)**
674:20
**potential (11)**
644:15;658:22;
671:7;699:7;726:13;
731:14;745:17;747:2;
755:2;790:9;848:11
**potentially (16)**
644:3;658:25;
664:2,4;671:4;
693:12;715:7,8,11,19;
739:15;742:6;746:3;
758:8;781:14;855:19
**practical (2)**
701:25;824:15
**practice (2)**
644:14;714:16
**practicing (1)**
844:24
**precisely (1)**
647:9
**precluded (3)**
745:8,12,14
**pre-December (1)**
807:24

**predecessor (13)**
668:19;669:7,20;
670:8;671:1;672:8;
673:22;691:10,19;
710:9;714:8;751:15;
809:8
**predecessor's (1)**
794:22
**predict (1)**
791:10
**prefer (2)**
687:10;733:1
**preliminarily (2)**
838:23;843:12
**preliminary (3)**
723:2;759:8;843:12
**prematurely (1)**
781:15
**preparation (6)**
720:3;744:15;
769:20;787:2;789:14;
797:11
**prepare (1)**
680:21
**prepared (1)**
840:12
**preparing (1)**
837:20
**prerogative (1)**
743:19
**pre-schedule (1)**
679:24
**present (4)**
666:11;671:15;
717:17;834:15
**presenting (3)**
658:1;860:13,17
**preset (1)**
733:5
**president (1)**
687:16
**pressure (4)**
735:22;736:17;
784:19;785:18
**prestigious (1)**
684:1
**Presumably (1)**
860:24
**presume (1)**
847:23
**pretty (2)**
712:16;818:2
**prevail (4)**
852:16,18,20;853:3
**prevails (1)**
852:10
**previous (7)**
669:2;714:17;
715:4,4;720:19;
736:7;791:9
**previously (8)**
651:4;691:17;
709:14,20;710:1,22;

762:3;798:5
**pricing (2)**
720:4;747:9
**primarily (8)**
645:23;720:14;
722:20;762:23,25;
771:7;824:1,10
**primary (5)**
680:4;699:9;713:3;
737:12;748:19
**print (5)**
785:8,9,10;828:1;
858:24
**printed (2)**
685:11;828:3
**prior (26)**
647:3,17;675:9;
685:4;694:23;695:4,
9;699:8;709:8;
715:24;716:12;739:4;
744:25;750:18;
760:25;767:2;768:8;
773:1;785:6;786:11;
789:6;793:24;800:5;
807:14;818:6;819:15
**prioritize (1)**
713:9
**private (2)**
664:8;698:4
**probably (15)**
649:17;670:20;
675:13;694:8,9;
697:20,20;711:20;
734:19;763:10;765:7;
793:24;827:10;850:5;
860:4
**problem (8)**
657:20;673:2;
748:16;754:6;800:16;
811:19;843:5;848:22
**problems (1)**
853:23
**procedure (3)**
690:20;692:25;
714:16
**procedures (26)**
655:6;662:19,20;
669:16;674:18;
678:20;679:5,13;
683:17;686:3;699:24;
710:14;722:14,15,16;
725:9;739:17;746:5;
773:14;854:1,4
**proceed (2)**
726:14,17
**proceeding (1)**
830:22
**process (41)**
659:12,14;663:12;
664:21;676:8;701:15,
20;702:1;712:14;
714:19;718:5;722:17;
723:18,21;724:19;

725:10;726:7,9;
729:25;730:7,9;
731:1;734:4;736:3,5,
9,14,21;740:17;741:7,
10,11,12;746:22;
782:10;792:12;
803:14,17;804:1;
853:8;858:2
**processes (7)**
678:21;689:12;
690:1;707:24;730:17;
754:24;764:5
**processors (1)**
670:22
**procurement (1)**
782:10
**produce (10)**
773:8;776:12;
777:20;814:3;818:10;
834:9,22;855:8;
856:3;860:3
**produced (14)**
647:7;777:20;
832:6;842:19;843:23;
844:2,3,14;845:7;
857:25;858:1,6;
860:5;861:1
**producing (2)**
776:11;799:20
**product (3)**
772:25;774:13;
775:19
**production (8)**
644:9;772:20;
776:5;777:20;780:21;
837:6;853:11;859:2
**professional (1)**
690:7
**proficient (1)**
686:2
**program (1)**
682:19
**project (3)**
756:9;759:22;
825:19
**projects (3)**
824:5,9,10
**promise (1)**
730:13
**promises (1)**
678:10
**promotion (1)**
787:21
**pronounced (2)**
646:18,19
**proof (1)**
822:12
**proper (2)**
725:14;841:1
**properly (3)**
718:13;812:6;
842:11
**property (1)**

817:13
**proposal (2)**
707:22;708:5
**prospective (2)**
722:20;783:21
**protect (2)**
747:1,3
**protected (2)**
644:10,24
**protocol (3)**
739:16;751:14,15
**proven (1)**
648:1
**provide (2)**
708:9;725:13
**provided (2)**
662:15;841:9
**provisions (3)**
664:25;680:14,17
**PTO (4)**
715:23;716:13;
734:8;746:15
**public (4)**
725:24;757:4,7;
767:22
**pull (6)**
713:12;730:21;
742:6;773:7;776:17;
851:4
**pulled (3)**
663:22;711:9;
836:15
**pulling (1)**
818:6
**punch (1)**
818:24
**purpose (3)**
650:2;723:4;839:2
**purposes (4)**
701:21;813:11;
817:21;829:24
**pursuant (3)**
638:15;707:22;
858:6
**pursue (1)**
683:5
**pursuing (1)**
732:22
**purview (1)**
754:10
**push (2)**
692:10,13
**pushback (2)**
693:2;810:8
**pushing (3)**
728:21;730:24;
810:10
**put (25)**
688:3;689:9,15;
690:24;691:4;693:6;
721:3;723:13;742:1;
744:17;756:24;757:5;
769:23;780:8;788:23;

790:8;792:19;818:18,
24,25;819:8;822:25;
847:20;859:22,23
**puts (2)**
757:7;764:7
**putting (4)**
780:12;811:8,22;
830:18

## Q

**QR (21)**
666:2,3,15;695:3;
723:1;743:25;744:1,
10,13;784:8,21;
789:8;790:4,5,17,24;
800:5,10;803:4;
848:6;853:14
**qualifications (2)**
730:4;847:9
**qualified (1)**
705:6
**quality (1)**
808:13
**quarterly (1)**
796:4
**queue (1)**
729:9
**quick (3)**
681:9;718:8;732:17
**quickly (2)**
648:21;650:12
**quiet (1)**
786:10
**quite (1)**
707:11

## R

**R-10 (2)**
843:13;850:11
**R-7 (2)**
749:1,6
**R-8 (2)**
821:22;850:25
**radio (2)**
668:14,15
**radioing (3)**
667:18,21;668:9
**raise (1)**
643:18
**raised (2)**
750:20,21
**raises (1)**
812:3
**ramp (1)**
741:5
**ramps (2)**
755:13;788:6
**ran (5)**
737:15;751:22;
793:6;820:21;823:6
**range (1)**

772:1
**rate (4)**
725:8;746:3;
754:21;774:24
**rates (3)**
715:7;778:2;818:25
**rather (7)**
643:15,24;711:23;
715:14;784:5;812:8,9
**ratio (1)**
746:4
**Ray (2)**
654:9,19
**reabsorbing (1)**
793:11
**reach (9)**
732:8;764:2;
793:22,24;794:22;
795:22;806:24;807:1,
2
**reached (1)**
784:4
**reaching (2)**
671:21;772:12
**react (1)**
801:4
**reactivating (2)**
660:4,16
**read (13)**
686:14;717:8;
722:2;735:8;823:6;
828:5;838:6;845:16,
20,22;846:19;847:1;
856:13
**reading (3)**
661:15,16;745:5
**reads (1)**
722:7
**ready (16)**
650:22;662:17;
681:1;698:19;716:17;
717:24;722:2;735:13;
736:14;741:25;744:8,
14,16;789:14;822:21,
24
**real (3)**
650:12;783:25;
823:10
**realistically (1)**
739:20
**reality (4)**
674:14;773:4;
789:21;793:23
**realize (1)**
764:11
**realized (1)**
832:24
**reallocating (1)**
793:12
**really (21)**
643:19;646:15;
674:22,22,24;698:1;
740:9;757:22;781:23;

785:5,13;790:2;
804:22;810:21;
835:23;839:17;840:1;
841:19,24;847:7;
858:3
**realm (1)**
698:16
**realms (1)**
742:6
**reason (12)**
663:14,20;687:6;
699:3;702:15;706:21;
757:1;775:21;811:4,
7;827:15;857:8
**reasons (3)**
672:12;743:17;
806:22
**recall (34)**
648:22,23;650:23;
652:4,9;653:20;
656:4,5,6,10;666:10,
17,19;668:9;669:23;
689:13,15,19;695:14;
698:18;717:13,20;
738:18;758:20;
762:21;776:12;
784:25;785:11;800:6;
803:6;830:5,5;
857:22,25
**recalled (1)**
857:16
**receive (11)**
700:22;727:18;
728:7;731:3,16,17;
732:11;809:21,22;
835:15;846:18
**received (10)**
728:13;749:7;
777:1;821:23;828:20;
843:14;853:8,13;
859:15;861:11
**receiving (3)**
662:16;689:5;
728:11
**recently (4)**
690:9;697:21;
771:16;800:3
**recess (8)**
650:20;659:6;
681:14;713:23;
721:12;750:5;761:22;
769:15
**recipe (2)**
691:21,23
**recipient (1)**
716:6
**recognition (3)**
689:6;690:21;758:9
**recognize (2)**
781:1;820:9
**recognized (1)**
802:25
**recollection (4)**

656:8;665:25;
666:2,14
**recommend (1)**
677:12
**recommended (2)**
702:16;703:1
**recon (1)**
748:19
**reconvene (1)**
861:13
**record (32)**
643:3,14;656:24;
659:4,5;661:16;
681:15;685:9;686:14;
688:14;704:9;705:14;
712:6;713:22;716:7;
721:9,11,13;750:3,4,
6;761:21,23;769:11,
16;773:10;776:25;
777:14;829:5;835:9;
838:20;861:10
**recorded (1)**
778:2
**records (14)**
648:19,22;675:15;
677:7;776:4;834:4;
836:25;843:23,23;
844:2,3;851:1;
854:12;856:2
**recross (5)**
753:12,13;758:12;
761:5,6
**recruitment (2)**
762:14;790:12
**recruitments (1)**
690:5
**recurring (2)**
675:20,23
**recycling (1)**
660:13
**redact (1)**
644:25
**redirect (7)**
673:17;713:15;
714:3,6;746:17,23;
760:12
**reduce (1)**
660:13
**redundant (1)**
730:20
**refer (1)**
653:15
**reference (1)**
646:1
**referenced (5)**
645:23;646:2;
664:12;673:25;823:4
**referencing (2)**
647:9;691:6
**referrals (1)**
743:12
**referred (1)**
666:22

**referring (4)**
666:4;674:25;
675:1;859:3
**reflect (5)**
688:14;712:15;
799:3;850:14;851:7
**reflected (2)**
671:24;712:15
**reflecting (1)**
843:24
**reflects (2)**
835:11;851:9
**Refresh (1)**
666:14
**refusal (3)**
749:14,15;794:23
**regard (1)**
838:16
**regarding (13)**
644:15,18;647:6;
649:18;710:9;712:21;
720:18;724:18;751:3;
772:19;773:17;
835:17;861:7
**Region (7)**
638:17;715:21;
723:11,16;727:5;
803:8;805:7
**regional (5)**
655:4,11;659:16,
24;756:24
**regions (2)**
659:1;660:9
**registered (2)**
665:1;823:23
**regular (3)**
675:20,22;824:20
**regularly (4)**
654:12;675:19;
676:6;797:2
**rehashing (1)**
746:18
**reinvent (1)**
676:22
**reissue (2)**
643:17,20
**reiterate (1)**
843:16
**rejected (1)**
726:24
**related (2)**
706:9;789:16
**relates (1)**
720:21
**RELATIONS (3)**
638:2,17;651:11
**relationship (1)**
693:10;696:24
**relevance (7)**
644:8;672:21;
692:23;703:8;749:13;
766:1;858:5
**relevant (4)**

644:12,19;749:16;
842:25
**relocated (1)**
793:7
**rely (3)**
661:19;838:25;
843:11
**remedy (2)**
643:16;747:2
**remember (12)**
660:14;665:7;
666:7,9;668:7;
682:16;714:9;802:4;
803:10;829:2;856:10;
859:21
**remembers (1)**
810:19
**remiss (1)**
837:10
**remote (2)**
678:23;818:23
**remotely (2)**
796:11,13
**rented (1)**
679:25
**reoccurring (1)**
676:18
**reoccurringly (1)**
676:20
**rep (6)**
785:23,23;786:7;
787:18;788:16;
816:11
**repeat (4)**
654:17;657:2;
741:22;746:20
**repeatedly (1)**
669:5;852:5
**repeats (1)**
821:1
**repetitive (1)**
753:1
**rephrase (2)**
740:8,10
**replace (3)**
669:15;712:25;
760:3
**replaces (1)**
760:1
**replacing (1)**
669:15
**report (5)**
659:16;764:23;
772:7;796:1;843:3
**REPORTER (5)**
721:17;750:4;
777:8,10,15
**reposted (1)**
690:6
**represent (7)**
823:8,22;824:7;
830:24;831:10;835:8;
845:10

**representative (11)**
649:10,16,22;
781:20;782:2;804:18,
23;816:3,19,25;817:1
**representatives (3)**
750:22;763:18;
806:11
**represented (2)**
779:11;829:13
**representing (1)**
651:10
**represents (2)**
823:23;831:2
**reps (1)**
660:7
**request (25)**
649:11;659:13,15;
678:1;689:6;701:6;
702:2,22,23;707:22;
713:9;715:21;723:14;
727:3,4,4;731:14;
778:7,14;836:22;
837:4;840:19,20;
842:17;843:17
**requested (1)**
693:11
**requests (4)**
776:11,14;780:9;
814:6
**required (3)**
663:9;665:2;790:2
**requirement (3)**
643:14;825:10;
826:25
**requirements (5)**
671:9;680:13;
698:12;802:1;826:20
**requires (3)**
699:18,19;727:10
**reschedule (1)**
756:22
**resides (1)**
805:9
**resolved (1)**
809:1
**respect (6)**
648:25;650:12;
659:21;835:23;
844:23;856:16
**respectful (1)**
746:25
**respectfully (1)**
649:11
**respond (11)**
686:20;732:25;
733:4;747:19,20;
836:17,19,20;841:20;
842:13,17
**responded (5)**
650:13;687:25;
688:3;747:18;829:10
**Respondent (13)**
638:6;643:7;

644:21;721:15,25;
822:20;829:12;
830:13;835:14;
836:18;842:3,12;
850:25
**Respondent's (8)**
722:3;749:7;
813:12;821:23;
822:23;828:20;830:3;
843:14
**Respondents (1)**
859:5
**Respondent's (8)**
643:5;648:17;
749:1;813:11;829:25;
838:23;842:5,10
**responding (2)**
840:12;848:5
**response (20)**
671:24,25;672:6;
686:23;687:1;688:1;
689:5;692:6;693:5;
706:15;732:23;733:1;
748:1;799:12;830:17;
845:9;846:15,19,23;
859:15
**responses (4)**
672:4;688:17;
837:20;846:9
**responsibilities (1)**
684:18
**responsibility (5)**
696:21;754:11;
776:10;787:23;847:8
**responsible (4)**
684:6,8;731:22;
806:10
**responsive (3)**
836:22;837:4;
840:19
**rest (1)**
810:25
**restate (1)**
691:15
**restaurant (11)**
653:1;671:4;
694:17;735:23;763:1;
787:18;798:18;
806:15;817:7;823:12,
13
**restaurants (1)**
771:15
**restroom (4)**
681:10,11;701:10,
22
**restrooms (1)**
664:7
**result (2)**
644:9;744:18
**resulted (1)**
675:4
**results (1)**
674:4

**RETAIL (1)**
638:8
**retain (3)**
671:13;687:7;
788:22
**retained (1)**
688:7
**retaining (4)**
686:8;687:22;
692:8,11
**retrieve (1)**
659:4
**return (5)**
647:16;728:2,7,18;
760:25
**returning (1)**
662:16
**revert (1)**
715:15
**review (9)**
648:6;725:8,8;
728:25;766:13;
780:21;822:2;832:20;
847:9
**reviewed (4)**
697:21;778:22;
846:6,6
**reviewing (3)**
685:10;688:14;
813:14
**revoke (1)**
643:6
**Reyes (6)**
677:11;712:20;
754:20;759:4,13;
849:12
**RFB (1)**
768:3
**RFID (2)**
664:5,10
**RFP (2)**
768:3,4
**Rich (1)**
773:23
**Richard (18)**
666:22,24;667:1,8;
668:7,9;686:12;
687:22;688:6;693:5,
9;766:21,21,22,23,24;
767:6,9
**Right (308)**
645:25;646:4,21,
22;647:14;648:9,16;
649:6,9;650:19;
653:11,17,25;654:9,
12,22;658:7;661:22;
662:25;663:7;665:5,
14,19,24;669:1;
670:12;671:21;672:4,
9,21;673:21;677:7;
686:7;687:15;688:1,
4;689:13,22;691:11;
692:12;693:2,6;

694:1,9,24;695:6,24;
697:1;700:5;702:10,
13;703:6,13,15,19,22;
705:6,11;706:12,16;
707:2,4,13;708:2;
712:3,10;714:23;
715:12,18;718:8;
719:11;722:14,19;
723:7;724:2,22,23;
726:22;727:1,2,19,22,
23;728:1,24;729:3,10,
12,19,20,23;730:16,
24;731:24,25;732:5,
10,21;733:8,18,21;
734:1,13;735:15;
736:8,13,23;737:11,
14,24;739:6,10,21,24;
742:12;743:24;744:1,
4,22;745:21;747:4,14,
15;748:3,15;752:7;
754:4,5,6;756:25;
758:3;759:5,8,10;
763:20;764:8,12;
768:24;770:13;771:1;
772:6,10;773:23,25;
774:11,17,20,22;
776:10,17;777:7,18;
778:12;779:16;781:7,
10;782:4;783:2,5;
785:6,11,21;786:13,
20,23;787:4,21;788:3,
4,7,9,9,16;789:5,21,
25;790:4,11,16,24;
791:3,3,21,24;793:13,
21;794:19;795:10,25;
796:7,22;798:24;
799:3,20,20,20;800:1,
14,17;801:16,17,19;
802:9,13;803:21,22;
804:5,7,11,14;805:3,
3,10,11,13,15,17,21;
806:8,11,14,25;807:3;
808:8,18;809:12,16,
17,20;811:9,18;813:6,
9,22;814:23;816:13,
15,16;817:1,4;818:2,
5,14;819:10,11,16,18;
820:5;821:13,14,17;
824:17,23,24,25;
825:2,3,5,7,8,18,25;
826:1,12,19,23;827:7;
828:8,9;830:22;
831:14,20,25;833:11;
835:19;837:1,12;
838:1,5;839:25;
842:1,13;843:7;
845:21;846:9,14;
847:3,20;848:8;
849:1,14;850:15,20;
851:15,19;852:7,22;
853:14,17;854:1,6;
855:12;856:5,7,8;
858:19;860:13,20

**rightfully (1)**
748:12
**rights (1)**
747:1
**rigid (1)**
649:18
**road (1)**
745:22
**Robert (2)**
750:23;762:2
**ROCCO (54)**
643:10;645:3,21,
25;646:4,7,10,13;
647:16,25;648:7,9,14;
650:7,10,16;681:9,18,
25;684:5,16;685:7;
686:18;688:16;
689:20;691:16;692:4;
694:2,12;697:14,22;
698:8;699:16;703:4,
11;704:11,20;706:7,
13;708:8,23;709:7;
710:4;716:9;749:5;
750:11;758:13;759:3,
9,12,16;821:21;
828:18;836:18
**role (17)**
651:11,14,16,21;
653:4,19;655:5;
659:8;660:1;713:3,6;
715:9;734:6;804:23;
811:21;853:17;
854:11
**roll (4)**
701:18;716:17;
744:8;812:7
**rolled (1)**
670:20
**rolling (1)**
812:11
**rollout (4)**
656:11;657:12;
698:24;738:22
**room (9)**
650:19;664:7;
802:4,4;809:16;
810:9;825:21,25;
826:24
**rooms (1)**
725:18
**Roosevelt (4)**
793:5,6,9;808:9
**ropes (2)**
853:22,25
**rotating (1)**
720:13
**rotation (1)**
713:7
**roughly (7)**
663:19;727:9;
730:23;763:23;770:8;
785:12;813:22
**round (3)**

758:6;788:2,14
**routes (1)**
742:4
**rows (1)**
820:4
**rules (2)**
733:22;735:5,6,8;
837:5
**ruling (1)**
647:15
**run (15)**
652:11;691:1,6;
707:20;711:10;
726:11;751:25;752:5,
8;764:16;780:7;
786:21;808:16;819:2,
18
**running (14)**
660:8;683:20;
685:1;730:14;737:22;
752:3,3;786:21;
807:4;810:4;816:14,
15,15,16
**runs (2)**
729:2;786:7

---

**S**

**sake (1)**
780:9
**same (39)**
661:11,12;662:2,5,
13,14,15,22;674:8;
676:10,15;678:15;
689:8;693:24;697:17;
736:5,6,9,15;741:1;
745:23;747:1;752:9;
767:18,20;782:7;
793:21;812:12;
817:15;822:11;
824:23;825:1;826:8;
830:12;842:5;852:21;
860:8,9,9
**sanction (2)**
842:8,10
**saturating (1)**
739:12
**Saturday (4)**
653:1;798:19;
825:20;827:12
**saw (9)**
650:12;655:25;
667:10;717:18;754:8;
783:21;802:6,24;
834:6
**saying (18)**
660:1;666:1,8;
676:9,22;690:9;
729:17;740:24;
755:12,22;838:17;
839:17,25;840:1;
843:8,25;846:17;
848:23

**SBU (1)**
757:17
**SBUH (2)**
831:1,9
**SCADA (2)**
664:5,10
**scale (2)**
671:7;787:17
**scalpel (1)**
643:25
**scan (1)**
695:3
**scenario (2)**
644:5;853:20
**schedule (43)**
652:16;672:5;
676:2,3,10,15,17,21,
22;680:3;687:2;
692:17;711:5,7,7,23;
712:16,17;715:17;
720:1;723:5,8,22;
724:18;733:24;
735:20,21;741:15;
793:23,25;794:12;
795:23;798:5,7,15,22;
804:15;818:2,19,21;
827:5,9,11
**scheduled (9)**
657:13;675:21,22;
676:1,14;713:13;
724:23;739:12;797:3
**schedules (11)**
715:25;725:10;
778:1,17;779:8;
804:21;814:21;818:4,
15;819:2,6
**scheduling (9)**
715:17;725:9;
761:2;793:19;795:6,
7,20,21;804:19
**School (4)**
682:18,19,25;
703:16
**scientific (1)**
674:13
**scope (11)**
652:16;654:14;
697:10;698:5;725:3;
742:25;743:11;
752:25;780:8;853:24;
861:7
**screen (4)**
740:23;859:13;
860:14,17
**screenshot (2)**
700:13;740:19
**screenshots (1)**
646:7
**script (7)**
764:16;778:16,22;
779:7;780:20,22;
819:2
**se (5)**

653:2;655:9;
711:22;745:6;781:23
**sea (1)**
707:13
**search (4)**
819:19;820:11,21;
857:23
**season (2)**
788:6,23
**seasonal (3)**
786:8,14,24
**seasoned (1)**
760:6
**sec (1)**
851:4
**second (14)**
649:24;685:19;
721:9;738:17,18,21;
739:15;740:5,12,16;
833:7;840:23;841:2,5
**Secondly (1)**
829:15
**Section (2)**
647:23;829:16
**security (2)**
701:20;727:10
**seeing (7)**
656:7;717:13;
803:6,10;830:5;
835:17;838:25
**seeking (4)**
656:18;657:8;
693:13;758:22
**seem (2)**
743:17;798:21
**seemed (1)**
767:18
**Seemingly (1)**
791:9
**seems (3)**
648:1;761:1;841:8
**segue (1)**
774:5
**self-defeating (2)**
649:19,22
**semantics (1)**
748:17
**send (11)**
646:5;666:5;676:3;
727:5,5;730:12;
735:23;790:22;791:1;
842:23;843:5
**sending (1)**
729:14
**seniority (1)**
782:3
**sense (3)**
731:15;802:1;
848:20
**sent (5)**
685:14;716:8,9;
758:23;822:10
**separate (2)**

661:25;763:16
**September (3)**
756:25;786:12;
791:15
**sequence (4)**
666:4;736:25;
747:4;751:2
**sequestration (2)**
648:25;649:18
**series (1)**
688:17
**serve (5)**
662:5,13,14;
762:13,14
**service (11)**
705:20,24;706:1;
725:17;731:24;739:3;
771:15;800:13;
824:21;847:2;848:21
**serviced (2)**
662:21;824:9
**services (14)**
661:11;662:2,15;
698:15;708:9;716:18;
717:23;720:11;
725:20;757:11;768:1,
6;770:2;847:21
**serving (1)**
661:12
**sessions (1)**
733:9
**set (10)**
671:10;760:17;
796:16;797:2,5,12;
798:14,22;819:20;
841:4
**setting (8)**
644:8;678:23;
738:22;739:7;740:13;
759:18;760:5;808:10
**settle (1)**
800:19
**setup (1)**
646:11
**seven (6)**
706:15,18;723:24;
724:3;730:23;742:14
**several (5)**
676:6;685:5;705:4;
739:21;798:20
**shade (2)**
846:9,14
**share (5)**
646:4,7,14;810:12,
12
**shareholder (4)**
797:22;851:21,24;
852:2
**shareholders (4)**
796:10,11;852:21;
853:1
**shareholders' (1)**
796:7

sharing (2)
810:7;814:13
**Sheets (1)**
818:20
**shift (10)**
664:16;682:6;
772:4;779:20;810:18,
22;827:11;840:16;
850:17;851:9
**shifting (2)**
718:5;719:6
**shifts (9)**
771:22,24,25;
772:14;779:10,10;
806:25;810:2;819:11
**shoe (1)**
725:21
**shop (2)**
756:1;851:19
**short (8)**
650:20;659:6;
670:20;681:14;
721:12;750:5;761:22;
769:15
**shorter (1)**
671:8
**shots (1)**
856:24
**show (20)**
646:16;663:22;
677:7;685:7,9;
700:10;712:7;783:7;
785:8;799:15;815:2;
831:6;832:15;839:19;
841:3;845:14;851:10;
858:25;859:3,5
**showing (16)**
648:10;692:2;
700:12;721:24;
777:18;783:8;784:22;
813:10;821:19,25;
822:19;829:23;
834:10;856:3,12;
859:13
**shown (2)**
688:13;700:11
**shows (7)**
691:23;815:5;
824:5;840:8,18;
859:13;860:17
**shy (1)**
741:17
**sick (3)**
663:21;680:14;
734:9
**side (6)**
701:15;719:25;
821:15;822:25,25;
828:8
**sign (5)**
664:15,18,19;
734:22;819:24
**signage (1)**

662:24
**significance (1)**
740:4
**significantly (2)**
644:2,22
**signifies (1)**
816:17
**signify (2)**
815:19,21
**signifying (1)**
731:4
**signs (1)**
789:17
**similar (4)**
716:1;725:22;
808:10;858:14
**simple (2)**
663:16;674:8
**simpler (1)**
674:14
**simply (2)**
649:19;819:23
**Sinai (1)**
757:8
**single (7)**
730:15;739:22;
792:8;807:2;827:6,
10;836:11
**sit (5)**
649:16;693:18;
722:7;797:22;810:25
**site (58)**
652:7;654:15;
655:14,23,25;656:18;
657:5,9;664:4;665:4;
671:2,3;675:16;
678:21;693:9,11;
715:18,18;720:16,18;
737:8;739:22;746:6;
748:5,7,18;751:22,24;
752:3,4,5,8;755:13,
13;756:6,25;758:2;
766:25;767:1,9;
781:12,21;783:2,5;
786:16;789:6;804:12,
20;807:13;810:15;
816:6,7,10,11,18,20,
24;817:15
**sites (2)**
718:8;725:11
**sits (2)**
729:8;804:10
**sitting (4)**
693:23,25;772:8;
790:14
**situation (16)**
644:1;664:12;
782:4;783:16;794:15,
17,18;795:2;800:20;
809:1,4,4,8,9;811:12;
812:13
**situations (3)**
683:19;780:7;

808:16
**six (9)**
652:13;664:4;
676:13;711:10;
724:13;770:8;783:5;
810:23;812:15
**sixth (2)**
724:4;780:12
**size (2)**
707:15;790:1
**sizes (3)**
707:6,10;725:14
**sizzling (1)**
739:13
**slate (1)**
669:16
**slight (1)**
645:11
**slightly (2)**
715:8;742:8
**slow (1)**
788:23
**small (5)**
667:9;671:5;
687:17;763:21;
810:21
**Smith (3)**
675:23;817:6,7
**Smithtown (1)**
817:3
**snaps (1)**
828:12
**snapshot (2)**
823:9;824:8,22
**snapshots (1)**
827:23
**social (2)**
727:10;757:6
**software (1)**
729:2
**solicit (2)**
791:23;792:2
**solicitation (1)**
659:9
**solicitations (4)**
661:8;758:2;856:4,
12
**soliciting (5)**
658:20;660:2;
661:5,6;689:10
**solution (1)**
677:4
**somebody (25)**
654:4;705:4;713:1;
723:21,22;724:4;
726:19;727:1;728:25;
735:1;736:6,6;
737:24;754:8;763:7;
783:22;784:5;790:20;
800:16;809:23;
836:13;840:5;847:2,
8;848:5
**somebody's (3)**

737:11;761:20;
817:13
**somehow (3)**
645:1;666:3;801:4
**someone (10)**
668:1;669:2;676:9;
677:20;715:12;
748:17;754:4,13,17;
854:3
**someone's (1)**
676:16
**sometime (1)**
768:8
**sometimes (11)**
659:19,19;680:18;
732:19,21,22,22;
758:7;780:7;796:20;
826:14
**somewhere (3)**
690:17;710:12;
772:1
**son (3)**
790:21;849:12,12
**soon (1)**
847:7
**Sorrelles (1)**
831:24
**Sorry (36)**
650:11;652:18,21;
657:11,20;665:20;
685:20;700:11;
713:17;716:7;717:16;
718:11;722:5;730:16;
743:1;753:21;760:21;
769:11,14;785:7;
794:8,10;801:14;
814:17;815:22,24;
825:20;828:5,5,5;
834:16;835:3;838:20;
846:4;859:20;860:15
**sort (10)**
701:19;737:8;
757:6;763:15;788:9;
790:11;793:20;
818:13;819:19;
848:19
**sorted (1)**
836:23
**sought (1)**
758:19
**souls (1)**
745:11
**sound (1)**
801:21
**sounds (4)**
647:7;654:24;
665:10;780:17
**source (1)**
813:8
**southern (1)**
839:13
**space (5)**
678:25;679:22,23,

25;680:2
**speak (5)**
665:23;750:18;
789:24;795:9;854:8
**speaking (5)**
667:13;668:4;
672:17;690:12;772:8
**speaks (3)**
809:11;845:19;
846:21
**special (2)**
699:19;839:24
**specialist (2)**
762:14;790:12
**specific (43)**
655:21;656:2;
659:19;665:2,8;
666:4,20;679:5,6,11,
12;680:16,24;690:4;
697:8;698:11;700:24;
702:22;706:24;722:6;
723:11,12;731:13;
733:16;735:18;737:8;
739:24;742:24;743:4;
747:16;751:22,25;
752:3,4,5,8;758:2;
794:2;809:16;810:15;
829:5;840:19;854:7
**specifically (8)**
702:25;706:20;
768:11;789:18;
791:22;825:15;832:3;
856:13
**specifications (1)**
708:5
**speculation (2)**
655:20;852:23
**speed (1)**
788:12
**spell (1)**
654:7
**spend (4)**
667:15;792:6,6;
834:17
**spiel (1)**
793:21
**spot (3)**
652:12;787:19;
817:12
**spots (2)**
808:4;825:19
**spouse (1)**
790:21
**spreadsheet (1)**
820:1
**spreadsheets (1)**
818:20
**staff (78)**
669:14;672:6;
675:4;676:19;678:3;
686:6,11,12;687:3;
688:4,10;692:7;
693:6;699:4;700:20;

702:8;703:24;708:18,
25;709:24;710:2;
714:22;719:3;725:13,
18;733:6,6,10,23;
734:4;739:12;744:19,
21;746:7;748:9,11;
751:17;756:13;760:6;
767:23;773:5;781:15;
784:19;785:4;788:7,
14;790:2;791:12;
792:5,9,11;793:7;
795:9,19;804:16,19,
21;806:10,25;807:4;
808:3,14,21;809:17,
19,20,24,25;810:5,9,
18,21;811:3;823:11,
18;826:17,18,24
**staffed (3)**
744:15;789:23;
825:23
**staffing (21)**
689:25;719:1;
755:13;764:2;771:22;
773:12,18;789:18,19,
20,21;791:4;798:2;
800:9;802:1,6;
825:10,12;826:8,14,
20
**stage (3)**
724:22;727:3;785:5
**staggered (4)**
724:2,8,10,17
**staggering (1)**
724:11
**stale (1)**
690:10
**stamping (1)**
761:20
**stand (3)**
649:15;703:3;721:5
**standard (4)**
676:14;690:20;
766:5;767:21
**standardized (1)**
659:19
**standpoint (1)**
810:2
**staple (1)**
716:21
**start (35)**
653:22;658:15;
669:7,13;672:8;
682:10;686:12;
689:25;698:20;699:1,
8;712:23;719:24;
740:13;742:9;744:20,
24;756:8,9;757:5,9,
15;759:22;762:19;
772:20;781:11;787:1;
797:11;800:10;825:2;
834:10,11;835:13,13,
17
**started (13)**

661:4;682:3,15;
699:23;700:2;755:19;
756:5;759:21;762:17,
18,20,21;797:14
**starting (6)**
669:19;704:24;
741:20;757:5;805:15;
835:4
**starts (2)**
707:14;781:7
**startup (33)**
652:5;717:23,24;
718:19,22;719:5;
720:2,24;740:12,14;
747:23;749:10,21;
750:17,19;752:15,19;
761:1;769:21;779:13;
786:3,6;787:2,4,8,11,
16;789:14,15;797:10,
12;800:23;807:14
**startups (5)**
718:24;719:2;
739:25;740:2;749:20
**state (9)**
670:19;680:13;
698:4;706:17;727:8;
730:23;734:9;843:1;
852:3
**stated (2)**
698:19;829:11
**statement (10)**
656:21;662:4;
668:24,24;670:10;
694:11;699:6;748:3;
829:13,18
**states (4)**
772:22;779:2;
829:9,15
**State's (1)**
734:9
**static (1)**
798:15
**stating (1)**
711:20
**stationed (2)**
675:19;809:23
**stations (1)**
662:25
**statistics (6)**
673:25;674:2,25,
25;675:1;710:16
**status (4)**
711:19;727:4;
749:12,23
**stayed (2)**
653:7;682:21
**steady (1)**
752:18
**stealing (1)**
792:10
**Stefanelli (4)**
652:1,2;752:23;
753:7

**step (6)**
729:5;730:8,13;
748:7,8;807:14
**stepping (2)**
748:18;787:24
**steps (1)**
778:12
**still (14)**
650:23;660:25;
661:1;672:3;707:11;
735:14;745:5;761:24;
773:20;775:23;
788:18;823:13,16;
835:4
**stock (3)**
707:9,10,18
**stone (1)**
787:24
**Stony (173)**
645:17;651:12;
652:7,19,21;653:6,7,
12,21;655:3;656:18;
657:5;658:15;659:21;
661:2,5;663:9;
666:25;669:11;
670:17;675:19,24;
676:7;677:5;678:13,
16,19,20;679:9;680:5,
21;681:1,5;683:22,
25;684:6,18,20,23;
685:2;689:10,21;
690:16,24,25;691:2,7;
693:15,20;694:3;
698:20;699:24;700:2,
3,17,20;701:2,7,9;
702:2,3,6;704:6;
707:21;710:23;
711:15,22;712:2,3,8,
8,13;716:17;717:23;
718:15;720:11;
736:18;737:6;740:2;
744:8,18,19;745:22;
747:8;752:4;755:3,
16,20;756:22;757:17;
758:3,6;766:13;
768:1,6;769:19,21;
770:2;772:20,23;
773:24;776:15,17,19;
778:10,15,18,20;
779:13;782:16;783:3;
784:11,15;785:24;
786:20;787:8,22;
788:1,17,17;789:6;
790:1;795:17;797:4,
11;798:25;799:5;
800:5;801:25;803:8;
805:17,20,25;807:16,
21,22;808:6;809:16;
812:22;813:21;816:7;
818:3,8,9;819:9,13,
17;821:6;825:2,3,7,9,
13,16,22;832:3;
834:11,12;835:14,20;

836:13,24;837:12,13,
18;838:11;840:2,5;
844:3;845:13;856:5,
13;857:5
**stood (1)**
748:13
**stop (5)**
723:17;732:10;
734:1;785:21;841:18
**stops (1)**
808:11
**store (1)**
725:21
**STORES (1)**
638:9
**story (1)**
673:12
**strain (1)**
674:5
**Stream (3)**
678:24;679:18;
733:19
**strike (7)**
667:7;738:8;741:9;
766:12;770:17;
782:15;800:1
**strongly (1)**
718:4
**structures (1)**
746:12
**stuck (2)**
772:11,12
**students (2)**
682:19;788:10
**stuff (13)**
647:22;746:12,15;
763:14;764:20;
767:19;775:22;789:1,
17;811:19;819:12,16;
827:13
**sub (1)**
664:13
**submissions (1)**
666:2
**submit (6)**
706:11;722:21;
773:2,3;776:22;
848:11
**submitted (4)**
663:17;729:21;
855:10;859:14
**subpoena (16)**
643:7,12;644:2,22;
648:18,19;832:19,20,
22;833:19;834:4,18;
842:11;843:17;858:6;
859:15
**subpoenaed (2)**
648:22;842:4
**subpoenas (1)**
776:5
**substantially (2)**
661:11;662:2

**substitute (1)**
833:3
**success (5)**
677:24;691:21,24;
744:15;746:3
**successful (1)**
687:16
**successfully (1)**
684:25
**successor (1)**
842:25
**sudden (1)**
806:21
**sufficient (1)**
835:12
**Suffolk (2)**
771:17;803:9
**suggest (1)**
829:20
**suggested (2)**
688:24;693:4
**suggestion (2)**
692:7,11
**suitable (1)**
848:21
**suited (2)**
847:2,3
**sum (1)**
824:2
**summations (1)**
780:25
**summer (9)**
682:10,14,18;
768:9;782:16,19,20;
791:6;805:3
**sun (6)**
738:22;739:7,10;
740:13;759:18;760:5
**Sunday (3)**
759:2;825:20;826:5
**sunset (2)**
755:11,12
**super (2)**
717:8;739:12
**supervise (3)**
753:15,19,23
**supervising (1)**
687:23
**supervision (2)**
720:18;754:11
**supervisor (17)**
652:25;720:16;
735:18;764:6;780:12;
786:17;806:9,17,18;
816:4,6,7,10,11,18,20,
24
**supervisors (3)**
773:2;818:16,18
**supervisory (2)**
651:20;779:18
**supplement (1)**
841:14
**supplemental (1)**

680:8
**supply (1)**
707:11
**support (4)**
644:15;655:7;
747:21;853:23
**suppose (1)**
756:17
**supposed (6)**
748:18;754:9;
834:9,20;856:3,7
**Sure (44)**
652:25;655:1;
657:21;661:6;668:2;
670:6;700:6,24;
703:10,20;705:5;
710:7,15;711:19;
715:24;719:6;722:24;
739:17;745:14;748:2;
753:9;755:22;756:4;
759:19;761:17;762:9;
767:8;768:14;778:23,
25;780:21;787:3;
789:22;805:23;812:1;
818:2;819:3;833:3;
838:21;849:18;850:5;
853:4,18;854:2
**surmise (1)**
860:23
**surprised (1)**
676:5
**surreptitious (1)**
845:6
**surreptitiously (1)**
845:3
**suspended (1)**
705:17
**sustainable (1)**
739:18
**sustainably (1)**
739:22
**Sustained (4)**
694:1;724:6;
737:19;852:24
**switched (1)**
711:22
**sworn (4)**
651:4;761:24,24;
762:3
**sympathetic (1)**
677:20
**synthesize (1)**
818:24
**synthesized (2)**
818:4;850:21
**System (14)**
672:7;679:5;687:7;
691:6,9;699:4;
717:14;718:6;775:14;
778:3,9;802:18;
812:21;823:24
**systematic (1)**
773:14

**systematically (2)**
796:3;835:1
**SYSTEMS (156)**
638:5;643:4;
644:19;645:9;651:12;
652:19;656:17;657:4;
658:4,11,21;660:25;
661:10;662:1;663:8,
24;668:18;669:6,17,
18;670:7;675:15;
676:7;678:12;679:12;
681:20;682:3,24;
683:5,8,13,16,23;
685:1;686:3;687:10,
17;689:8;690:14,15;
691:1,4,17;693:14,15,
19,20;694:4,14,18,22;
695:9,13;696:2,3,6,6,
9,10,13,23;698:19,25;
699:10;701:1,5;
702:1,12,16;703:5,24;
704:12,15,22,25;
705:5;706:22,24;
708:11,14;709:2,11,
17,23;710:8,22;
711:25;712:23;
715:13;716:9;717:18,
23;718:9,20,21;
719:7;723:5,9;
724:19;727:16;
728:13,24;730:5,21;
735:14;745:9,13,16,
17,21;746:5;752:8;
753:16;754:24;755:3;
758:23;760:14;
762:11,12,16;763:3;
764:24;767:11,22,25;
768:5,18;769:19;
770:20;771:23;772:5,
23;773:12;774:11,15,
18,23;777:3;781:11;
782:12;784:14;
789:14;791:5;794:14,
18;798:14;802:21;
807:10;815:4,7;
833:20;848:12;
851:14,22;852:9;
853:2
**Systems' (2)**
748:16;775:1
**System's (1)**
703:2
**Systemscom (1)**
685:11

**table (4)**
649:11,16;677:21;
701:24
**Taco (2)**
783:23,24
**tags (1)**

663:19
**tailor (2)**
707:1,3
**takeover (1)**
783:4
**taker (1)**
807:8
**talk (5)**
754:23;755:2,5,6;
858:2
**talked (1)**
745:24
**talking (13)**
647:21;653:15;
671:21;674:14;
686:12;719:4;739:20;
756:10;775:18;
779:21;807:24;
846:15;859:7
**Tap (1)**
817:1
**tape (1)**
657:20
**target (1)**
740:11
**targeted (1)**
686:10;692:8
**task (2)**
674:9;735:18
**tasked (1)**
690:1
**taught (1)**
739:8
**Tavern (2)**
817:6,7
**teaching (2)**
853:22,25
**team (37)**
651:24;663:18;
668:4,9;683:14;
684:21,23;685:25;
689:21,24;699:18;
708:2;714:22;717:22;
718:2,19,22;719:6,24;
739:8;745:2,3;
750:20,22;769:23,25;
785:25;786:1;787:8;
797:7,10;810:14;
811:4,8;812:9,17,21
**Teams (3)**
688:24;689:2,9
**team's (1)**
689:5
**tech (1)**
730:16
**technical (1)**
643:19
**technicality (1)**
643:16
**techniques (1)**
674:11
**technology (1)**
718:8

**T**

telling (3)
659:25;673:7;
677:14
temporary (1)
657:16
tenants (1)
775:17
tenure (1)
752:7
term (3)
696:25;703:15;
705:15
terms (3)
644:8;662:15;
716:14
tested (2)
780:24,24
testified (60)
647:11;651:5;
652:5;653:24;685:24;
686:2;689:12;691:9,
17;695:13;696:9,17;
698:2;701:1;702:9,
15;703:5,21;714:7,
23;716:2,16;717:12,
17;720:18;722:15,20;
724:18;731:21;
735:12;737:21;
738:13,16,17;739:25;
740:12;741:7,10,13;
744:7;746:11;750:10;
752:12;755:24;762:4;
773:11,17;782:14,23;
783:4;789:7,10;
791:7;795:3,18;
800:22;811:5;816:12;
828:24;846:11
testify (6)
648:22;657:4;
688:9;690:14;737:11;
749:20
testifying (10)
649:4,12,24;
658:14;714:9;726:5;
744:2;774:3;794:16;
800:3
testimony (36)
644:16;647:3,5,10;
649:5,12,25;656:17;
658:11;660:15;
668:18;672:13;684:9;
695:14;698:19;
720:19;722:17;737:3,
8;744:4;745:12;
747:5;748:25;751:1;
753:1;755:11;758:14;
771:6;772:19;798:1;
800:4;805:6;824:13;
829:5;853:16;854:11
texting (1)
645:13
texts (1)
647:17

TG (5)
815:20,24;816:7;
830:25;831:14
thanks (5)
722:1;772:18;
777:14;822:18;
848:23
Thanksgiving (1)
744:23
That's (1)
672:4
that'd (4)
695:6;705:3;754:7;
758:4
the- (1)
720:2
Theoretically (2)
779:15;780:11
theory (7)
646:12,13;742:7;
805:19,20,24;816:20
third (7)
682:6;705:20,24;
729:2;730:10;731:1;
850:14
though (7)
653:11;665:14;
669:13;690:17;
696:20;748:15;
817:15
thought (11)
645:23;646:1;
669:5;698:10;744:24;
784:1;794:4;834:14;
855:7;856:15;857:16
thousand (3)
775:11,13;835:7
thread (1)
700:25
three (21)
649:1;652:10;
653:12;656:10,14;
657:24,25;658:1;
661:15;665:4;674:20;
682:5;727:18;728:15,
15,19,21;732:23;
799:2;817:8;823:1
three-party (2)
746:21,22
thrived (1)
713:4
throughout (4)
660:9;715:20;
744:22;745:23
throw (1)
735:19
Thursday (4)
675:24;793:23,24;
826:8
thus (1)
700:20
ticket (2)
718:5,9

ticketing (2)
662:18;718:5
tie (1)
655:9
tier (1)
739:15
tight (1)
771:6
till (4)
655:15;781:11;
794:1;799:4
timeframe (2)
723:7;830:12
timeline (1)
757:20
times (29)
652:9;653:12;
656:12;665:4,7;
675:6;691:5,13;
696:18;702:19;
708:20;710:17;
714:10;739:13;753:4;
760:23;770:5,14;
783:5;798:20;806:12;
812:15;821:8;822:10;
825:1;838:7;848:10;
853:7,11
timestamp (1)
828:6
tip (2)
674:18;715:13
tipping (4)
808:13;809:4,8,20
tips (2)
808:22,24
title (3)
727:4;816:21;
853:19
titled (1)
859:16
titles (3)
762:12;770:17;
782:2
today (9)
649:2;669:9;
693:18,24,25;744:2;
772:8,19;853:16
together (4)
737:2;769:23;
819:8;830:18
toggle (1)
707:11
told (14)
664:24;665:18,23;
666:5;678:5;700:19,
20;707:23;715:3;
745:3;764:25;801:12,
16;829:11
tomorrow (1)
794:7
tomorrow's (1)
772:9
tonight (1)

842:23
took (21)
664:18,18,19;
668:1;703:15;707:21;
736:8;756:6;757:8;
767:11;770:11;
778:13;785:2,24;
797:4;809:9,19;
819:4,6,8;820:20
top (6)
666:9;685:11;
686:19;687:15,18;
823:19
topic (1)
663:11
touch (3)
644:23;651:18;
693:12
touched (1)
644:3
touches (1)
644:4
tour (1)
667:5
towards (1)
668:3
town (1)
682:22
track (2)
668:6;741:11
traction (1)
690:13
traditionally (1)
790:7
traffic (2)
695:24;697:24
train (2)
794:4;812:4
trained (5)
665:1;678:12;
680:20;688:6;699:24
training (38)
674:11;678:18,21,
22,22;679:4,5,6,8,11,
17,19,20;680:4,4,7,8,
12,12,14,15,25;681:3;
688:4;690:2;693:6;
699:19;733:6,7,10,11,
13,18,23;734:4,8,16;
792:6
trainings (2)
680:3,24
transcend (1)
771:5
transcript (1)
857:15
transfer (1)
710:23
transferred (3)
732:3;815:9;827:2
transferring (1)
824:12
transition (8)

654:16;668:25;
674:22;699:17;708:2;
746:6;783:3,17
translates (1)
790:24
Travis (28)
652:2;654:11,21;
665:11,19,24;666:6;
688:20;700:16,19,20;
718:23;744:4;781:21;
784:16;789:8;790:6;
797:19;800:4;803:11;
804:10,12,22;816:1,2,
8,13;851:24
Travis' (1)
804:8
treated (1)
845:1
tremendous (1)
660:7
trial (5)
716:22;798:1;
822:1,19;835:4
trials (1)
674:13
triathlon (1)
674:11
trickier (1)
647:20
Tricky (1)
818:14
tried (1)
677:3
trigger (2)
727:3,6
triggers (1)
729:5
true (13)
653:11;657:8;
661:10;662:1,4,5;
671:12,17;699:18,22;
800:25;838:21;
843:19
truly (3)
707:24;724:12;
726:19
trust (1)
703:6
trustworthy (6)
703:25;704:4,16,
22;742:20;743:4
truth (1)
838:6
truthfully (3)
792:12;809:4;822:8
try (18)
644:6;650:13;
676:16;707:9,11;
711:13;724:17;
729:13;732:12;
735:20,21;736:14;
738:2;742:6;743:23;
745:3;793:4;858:4

**trying (15)**
644:22;706:8;
712:24;739:14;
741:23;746:7;771:19;
794:9;802:12;810:2;
828:5;834:21;839:20;
855:8;857:12
**T-shirts (1)**
707:8
**Tuesday (11)**
638:18;675:24;
685:14;724:15;773:7;
796:7,14,15;826:7,13;
827:8
**turn (2)**
716:23;801:2
**turnaround (5)**
663:19;728:5;
730:22;732:10,17
**turned (2)**
820:2,2
**turnover (1)**
674:5
**Turns (2)**
663:18;701:19
**twice (1)**
652:12
**two (28)**
656:14;657:24;
658:8;659:1;663:19;
678:22;682:5;701:19;
718:12,13;721:24;
732:23;738:21;739:7;
742:4;757:8;771:15;
796:20;797:9;801:16;
810:24;820:21;
821:15;829:25;
837:22,25;850:13;
857:25
**two-fold (1)**
839:3
**two-person (2)**
671:3,4
**type (3)**
771:12,12;844:25
**types (4)**
661:12;662:5,13;
678:22
**typical (4)**
694:17;704:24;
712:16;763:13
**typically (5)**
754:12,17;790:22;
804:18;809:23
**typo (1)**
802:8

**U**

**ultimate (1)**
816:12
**ultimately (5)**
699:23;701:25;

739:14;809:1;820:5
**uncomfortable (1)**
744:18
**under (16)**
644:4;650:24;
653:4;661:11;662:3;
669:11;701:19;
771:10;804:10;806:1;
837:5,6;838:22;
842:2;843:8;845:25
**underneath (1)**
786:18
**understandable (1)**
754:1
**understood (4)**
673:10,11;677:14,
17
**unfair (3)**
644:14;735:25,25
**uniform (15)**
706:22,24;707:1,4;
725:12;734:2;742:12,
15;764:23,24;765:1;
767:17,21,23;804:3
**uniforms (2)**
707:18;755:6
**UNION (40)**
638:9;643:7,17;
644:13,18;681:8,15;
696:10,13,17,24;
697:4,9,16;716:8;
717:10,13,14,17,18;
749:4;750:14,16,20;
751:10;752:23;753:6;
758:11,24;768:18,20;
776:5;782:24;821:20;
828:17;829:13,18;
847:17;849:16;
853:10
**unionized (3)**
688:10;851:14,19
**unions (1)**
768:16
**Union's (2)**
689:6;697:7
**unique (4)**
678:19;839:7,24;
845:12
**UNITED (1)**
638:10
**University (19)**
651:12;658:16;
659:22;663:9;666:25;
675:20,24;676:7;
689:10;690:25;691:2,
7;693:16;694:3;
698:20;699:24;701:7;
757:18;835:14
**unknown (1)**
789:21
**unless (1)**
715:9
**unnecessary (1)**

845:18
**unsure (1)**
700:23
**unusual (1)**
763:15
**up (63)**
643:15,22;649:5,
25;650:13;655:12;
663:22;672:5;673:2;
674:21;682:13;
683:20;685:1,8;
687:3,17,24;689:9,15;
690:24;710:17;720:2;
723:25;739:11,19;
741:5;744:15;752:23;
753:6;755:13;756:13;
758:7;759:22;762:7;
763:14;767:11,24;
771:16;773:2,5,10,10;
776:17;780:12;
783:13,14;788:6,9,11;
795:7;796:20;797:11,
17;800:10;806:12;
808:9;816:13;819:13;
826:18;827:11;851:4;
858:18;859:22
**updated (1)**
767:19
**upon (5)**
644:3,4,23;680:2;
769:18
**uproot (1)**
746:7
**Upton (2)**
654:9,19
**upwards (2)**
706:20;763:23
**urgently (1)**
658:12
**URL (2)**
790:23,24
**use (13)**
659:12;664:7;
679:2,3;701:10;
703:15;737:11;764:6,
9;816:18;818:20,22;
822:10
**used (5)**
657:7;690:14;
703:16;771:17;804:8
**user (1)**
725:19
**uses (1)**
690:15
**Using (6)**
664:15;668:14,15;
680:19;758:8;774:5
**usual (2)**
728:5;732:10
**usually (12)**
679:24;723:24;
725:23;726:7;728:8,
15;731:12,12;732:17;

741:16;757:1;796:18
**utilize (1)**
757:12

**V**

**Vacation (1)**
715:25
**vacations (2)**
716:14;746:15
**vague (5)**
662:7;684:8,11,11,
12
**vaguely (1)**
668:7
**Valet (35)**
662:3,24;670:11;
686:6;688:10;692:7;
693:20;694:23;695:4,
10;700:4;704:24;
708:17,24;709:2,8,11,
14,14,17,20,23;710:1;
716:18;717:23;
718:17;720:11;736:8;
739:3;768:1,6;
797:11;808:11;
825:19;847:21
**valets (1)**
706:22
**Valley (3)**
678:23;679:18;
733:18
**varied (1)**
808:15
**variety (2)**
674:10;733:12
**various (5)**
717:24;737:16;
764:18;807:16;827:1
**vary (1)**
671:2
**varying (2)**
711:5,7
**vehicle (1)**
667:25
**vehicles (1)**
655:9
**vendor (3)**
739:5;757:10,15
**vent (1)**
745:7
**verbally (2)**
710:19,20
**verification (1)**
729:4
**verify (3)**
656:8;679:24;
704:10
**versa (1)**
789:4
**versus (1)**
690:10
**veteran (1)**

760:6
**Veterans (1)**
851:18
**via (2)**
732:25;791:1
**vice (1)**
789:4
**view (6)**
687:13;694:14;
766:11;770:2,6;783:3
**viewed (1)**
704:4
**viewing (2)**
767:2;812:22
**Village (1)**
817:8
**visit (1)**
748:5
**visited (2)**
665:4;667:1
**visiting (1)**
701:14
**visitors (3)**
708:18,25;791:11
**visitor's (1)**
701:16
**visits (6)**
783:2,5;789:6;
795:17;800:2;807:13
**vital (2)**
706:2,5
**voicemails (2)**
645:7;646:5
**voided (1)**
714:20
**voir (9)**
815:14,16;817:18;
827:21;833:9,12,13,
21,23
**volume (1)**
701:23
**voluminous (3)**
835:24;844:11,16

**W**

**wage (3)**
704:24;715:8;
824:18
**wait (1)**
794:1
**waiting (1)**
707:12
**walking (1)**
761:10
**walk-off (1)**
744:25
**wants (1)**
643:18
**warehouse (5)**
839:6,12,12,13,13
**waste (1)**
643:20

**watched (1)**
667:9
**watches (1)**
655:11
**water (3)**
701:23;762:22;
763:1
**Wave (13)**
657:10,12,13,18,19;
682:9;738:17,21;
740:5,12,16;742:7;
756:22
**way (40)**
645:1;646:18;
663:2;674:21;690:12;
698:4;703:15;723:13;
726:17;731:21;
732:25;736:6;747:7;
763:16,16;764:5,18;
767:21;772:5;773:4,
9;777:25;783:20;
790:18;791:1;793:19;
794:12,12;795:16;
800:19;804:7;809:7;
810:17;812:13;
827:15;832:21;836:4;
838:8;846:24;860:1
**ways (3)**
660:12;764:20;
811:21
**wear (7)**
706:22;742:15;
763:11;764:25;765:1;
767:7;771:5
**wearing (4)**
767:6,7,15,21
**website (1)**
723:13
**websites (1)**
755:4
**Wednesday (6)**
676:3;677:1;
724:15;826:7;827:8;
861:13
**Wednesdays (1)**
826:17
**weed (1)**
846:24
**week (52)**
652:10,12;653:5,
17;663:19;664:4;
676:4,6,15,23;682:6;
700:5;701:19;707:12,
20;711:8,8,10;712:17,
18,18,18;740:13,14;
742:14;744:23;
763:13,13;771:25;
774:17,23,24;775:4,
25;776:2;779:1,2;
793:19;795:22;
798:22;803:2;819:2;
825:10;826:24,25;
827:6,10,14,14,24;

837:23,25
**weekend (1)**
840:17
**weekly (17)**
651:19,20;676:3,
15,20,22;778:1;
779:8;795:6,7,18,19;
796:3,18;797:7,22;
827:5
**weeks (10)**
652:13;657:24;
658:1;682:5,10;
686:10;728:21;757:8;
797:9;806:6
**week's (3)**
711:7,7;793:25
**weird (1)**
788:9
**weren't (8)**
670:13;674:17;
744:23;745:15,19;
791:19;800:22;836:2
**Western (3)**
653:10;679:18;
695:17
**What'd (2)**
667:11,23
**What's (21)**
655:19;658:12;
659:14;677:25;
685:10;688:14;
700:12;729:6;731:1;
732:10;738:22;756:7;
771:4;777:24;778:3;
779:22;780:6;785:7;
797:6;834:18;850:13
**WhatsApp (5)**
644:15;647:6,10,
19;648:10
**whatsoever (2)**
809:20;856:16
**whenever (2)**
755:25;791:25;
823:9
**where'd (1)**
814:19
**Whereupon (11)**
650:20;651:2;
659:6;681:14;713:23;
721:12;750:5;761:22;
762:1;769:15;861:12
**white (1)**
672:3
**whoever's (1)**
731:10
**whole (20)**
719:1;724:18;
729:10;736:2,21;
741:7,10,11,12;753:2;
760:17;783:22;
789:19;803:16,25;
807:20;834:17;
837:23,25;843:2

**WHOLESALE (1)**
638:8
**who's (12)**
649:24;658:20;
668:4;675:15;762:9;
772:16;781:16,22;
785:19;796:9;831:11;
847:3
**whose (1)**
847:8
**wide (4)**
648:3;715:14,14;
809:4
**wild (1)**
660:7
**William (2)**
817:10,16
**window (6)**
667:9;670:20;
671:4;674:3;735:25;
810:21
**windows (1)**
724:12
**wink (2)**
829:21,21
**withdraw (4)**
661:25;664:22;
749:16;845:24
**within (15)**
647:13;652:16;
695:16;701:18;
737:15;738:1;757:20;
760:17;764:19;771:1;
795:24;807:20,20;
813:25;827:24
**without (2)**
674:4;748:8
**witness (88)**
648:22,23;650:6,
25;651:4;652:21,23;
657:21;658:1;662:10;
665:17;666:11;668:6;
670:9,13,18;671:15;
672:15,18,19;673:1,
11,14;675:2;681:13;
685:7,10;688:13,14;
698:2;700:10,10,12,
15;704:5;706:8,11;
710:7,11,15,20,24;
711:2,4,16,19;712:14,
24;713:2,12;737:21;
742:23;743:6;759:19,
24;760:4,21;761:9,
25;762:3;783:7;
794:16;817:24;818:1,
14,18;819:15,20,23;
820:1,7,9,13;822:8,
14;828:16,21;834:21;
849:24;856:15,22,24,
25;857:4,8;858:25;
859:13;860:17
**witness' (2)**
656:21;672:11

**witnesses (5)**
648:23;649:1;
673:12;712:7;798:4
**Wolf (1)**
786:19
**won (2)**
708:11;768:2
**wonderful (1)**
811:11
**word (5)**
752:23;753:6;
757:6;782:24;849:16
**words (3)**
657:7;823:10;
848:19
**wore (1)**
767:18
**work (114)**
649:8;652:16;
654:14;655:2;656:18;
657:5,9;663:9,22;
669:12;675:19,22;
676:6;677:6;678:13;
679:8;680:5,23;
682:4,18;683:2,10;
691:2;695:23;696:2,
5,6,14;697:24,24;
698:20;699:1,5,10,23;
707:14;710:23;
711:15,18,21;712:13,
23;720:1,10,12;
735:17;739:13;
742:12;745:21;
756:10,11;758:6;
759:13;762:14;
763:22;764:7,15,23,
25;771:23;772:6;
773:6;774:17;775:4,
24;776:19;780:8;
781:5;782:10,24;
783:17;786:5,11,12,
14,15,25;787:19;
791:6;793:16;794:19;
795:24;798:13;799:1,
15;801:17;802:21;
804:8;805:3,20,25;
806:1,5,20;808:17,17,
21;809:24,25;810:3,
23;819:22;826:24;
827:2;831:8;832:3;
835:20;837:22;839:5,
15;840:10,16,16,17
**workable (2)**
652:11,14
**worked (52)**
652:9;653:11,20;
654:12,15;655:14,21;
669:2,9,10;670:16;
683:7;699:15;711:11;
712:7,8,8;725:18,19;
736:7,8;745:24;
749:22;756:14;
760:25;762:23;

773:23,24;778:15;
779:13;786:16,18;
788:24;799:5;809:18;
815:5;818:7,9;
832:15;836:13;
837:12,18;838:11;
840:1,5,5,9;845:13;
850:16,22;851:8,9
**WORKERS (1)**
638:11
**working (43)**
652:6;653:25;
656:1,7,13;657:15;
671:5,6;674:19;
675:15;676:10;
681:20;682:3;684:25;
693:9,20;694:14;
696:1;699:17,18;
718:9;735:24;745:9,
12;762:16;774:24;
779:20;791:8;794:7;
805:12;806:16,18;
813:20;815:3,7;
823:11;826:23;
834:11;835:14;837:8,
12,15;840:20
**workplace (1)**
687:12
**works (3)**
664:10;676:2;
677:5;724:11;733:9;
763:17;764:10;
798:19;810:18;827:8;
834:11;837:24;
841:16
**workspaces (1)**
679:3
**world (4)**
711:10;718:14;
792:8;794:6
**worth (1)**
652:25
**write (3)**
686:5;687:2;693:1
**writing (3)**
710:18;712:12;
714:12
**written (3)**
693:1;710:9;733:1
**wrong (7)**
648:3;651:25;
652:4;656:25;754:8;
792:10;842:16
**wrote (6)**
686:13,15;687:21;
692:10;778:16;847:4

**Y**

**year (6)**
655:21;676:12,13;
788:2,2,14
**years (15)**

660:5,14;669:23;
674:3,9;675:3;
694:14;714:12;
717:14,18;733:13;
745:25;793:6;808:12;
844:24

**yelling (2)**
841:20,22

**yesterday (9)**
645:10,12;647:9;
656:17;657:4;660:15;
662:23;669:5;814:23

**York (11)**
638:18,18;680:13;
706:18;727:5,5;
730:23;734:9,9;
824:2;829:11

## Z

**zero (1)**
836:21

**zip (1)**
842:23

**zone (4)**
771:4;803:23;
804:9,9

**Zoom (1)**
796:13

## 1

**1 (33)**
653:23;655:15;
657:13;665:5;669:13;
682:9;688:18;692:6;
701:17;721:4;744:24;
755:19;756:9,17;
767:2,12;770:3;
776:23,24;777:1,19;
778:13;789:15;
797:11;799:3,4;
800:5,14;807:14;
809:19;819:14;
834:15;856:23

**1,000 (1)**
775:24

**1,039 (1)**
823:23

**1:00 (1)**
802:7

**1:30 (1)**
713:19

**1:52 (1)**
714:2

**10 (19)**
658:2;700:4;702:8;
706:15,18;726:23;
727:14;730:23;737:2,
16;742:19;770:13;
773:25;808:12;
829:25;830:3;838:23;
842:12;843:14

**10:00 (2)**
638:19;861:14

**10:07 (1)**
643:2

**10:15 (1)**
724:15

**10:57 (1)**
700:14

**100% (3)**
726:20;743:21;
829:19

**10278 (1)**
638:18

**1039 (1)**
823:20

**10th (7)**
688:24;689:2,16;
716:3;717:10;858:19;
859:24

**11 (4)**
658:2;717:9;
736:24;737:2

**11,000 (9)**
818:11;834:22,24;
835:1;836:3,15;
842:19;843:3;844:5

**11/12 (1)**
727:19

**11:14 (1)**
828:4

**1102 (3)**
638:8;717:7,10

**12 (2)**
658:9;727:22

**12/1 (1)**
655:15

**12/11 (1)**
655:15

**12:46 (1)**
713:23

**12th (4)**
658:7;737:4;740:6,
24

**14 (4)**
669:23;675:2;
834:19;838:6

**15 (7)**
648:3;655:15;
714:12;726:11;
727:14;730:20;747:4

**15-minute (1)**
726:18

**16 (1)**
658:9

**16th (3)**
658:7;737:4;740:22

**17 (2)**
688:15;830:1

**1987 (4)**
762:17;770:14;
848:16;853:18

**19th (1)**
759:2

**1st (19)**
644:20;653:23;
656:2,9;657:14;
685:1,5;689:25;
699:23;700:3;708:15;
711:15;712:23;
759:14;781:11;
807:24,24;819:7;
838:10

## 2

**2 (30)**
638:18;657:10,12,
18,19;685:21;687:22;
688:17;693:4;701:17;
740:5,17;741:5,20,23;
742:1,7;755:18,20,23,
25;756:3,3,5,5;
757:24;758:1,6;
760:8;856:23

**2:00 (1)**
802:7

**20 (6)**
647:4;648:3;
737:16;763:21;
782:18;837:15

**2011 (3)**
681:21,24;682:25

**2017 (1)**
697:1

**2020 (2)**
660:11;783:15

**2021 (1)**
660:11

**2022 (1)**
860:21

**2023 (45)**
644:20,20;648:11;
652:6;669:24;671:12;
685:1,5,12,14,18;
686:21;688:11,25;
689:3,6,25;690:25;
691:5;698:21;699:1,
23,25;700:3;702:2;
708:15;711:15;
712:23;742:18;759:5,
14;768:9;779:2;
782:17,21;789:11,13;
791:6;800:8;829:9;
832:9;838:10;845:13;
849:2;858:19

**2024 (4)**
638:18;643:4;
779:3;861:13

**20th (2)**
860:19,24

**22 (1)**
740:25

**22nd (1)**
700:14

**23 (3)**
689:16;700:11,12

**23rd (1)**
743:3

**24 (5)**
723:17;802:4;
832:22;833:2,8

**24/7 (1)**
825:25

**24th (2)**
685:14,18

**25 (15)**
740:23;746:4,7;
764:7,10;771:11;
773:19,19,23,24;
793:6;811:23;855:21,
24;861:11

**250 (1)**
752:5

**25th (7)**
647:4;648:11;
742:18;743:3;759:5;
829:9;849:2

**26 (6)**
638:17;855:23,24;
861:5,9,11

**260 (1)**
839:8

**2602.92 (1)**
824:20

**260926 (1)**
824:20

**26th (1)**
860:8

**27 (1)**
686:20

**27th (4)**
671:17;685:12;
686:21;841:4

**29 (1)**
638:17

**291 (2)**
858:15,16

**29-CA-331253 (2)**
638:4;643:4

**29th (2)**
779:2;781:8

**2nd (5)**
638:18;643:4;
653:23;656:2,9

## 3

**3 (9)**
664:17;688:16;
701:17;740:13,14;
783:9;829:8;856:23;
861:13

**30 (7)**
737:16;763:21;
771:11;813:25;839:5,
5;844:24

**300 (1)**
773:8

**30th (2)**

781:8;828:3

**31st (1)**
644:20

**32 (1)**
686:12

**32263 (2)**
824:5,9

**34 (1)**
858:15

**350 (1)**
771:25

**360 (1)**
771:25

**3rd (2)**
653:23;656:2,9

## 4

**4 (5)**
685:19;740:13,14;
822:1;856:23

**40 (4)**
772:1,2,3;773:19

**40,000 (1)**
820:4

**45 (2)**
667:17;796:20

**45-minute (1)**
668:16

**4th (1)**
716:24

## 5

**5 (2)**
648:20;856:23

**5:00 (2)**
780:10;858:4

**5:20 (1)**
858:5

**5:32 (1)**
861:12

**50 (4)**
734:14;772:1,2,3

**500 (4)**
687:18;775:9,13,24

**58 (25)**
645:14,15,18;
646:3;677:11;678:13,
15,18;679:8,19,21;
680:20;693:10;
699:11;702:9;711:14,
21;712:12;720:14,15;
733:19;773:25;
786:15,16;829:10

## 6

**6 (4)**
721:17,18,21;
856:23

**6:00 (1)**
810:23

**6:01 (1)**
  664:18
**6:30 (2)**
  653:1;826:4
**60 (1)**
  763:23
**611 (1)**
  854:25
**611c (2)**
  856:22;857:8

---

### 7

**7 (6)**
  647:23;721:16,20,
  25;722:3;749:7
**7:00 (3)**
  810:23;823:16;
  826:4
**70 (1)**
  763:23
**70% (1)**
  732:18
**75 (1)**
  765:21
**75,000 (1)**
  819:11

---

### 8

**8 (4)**
  813:11,12;821:23;
  850:25
**8:00 (1)**
  823:16
**8:45 (1)**
  724:15
**80 (3)**
  728:7,18;824:11
**80-page (2)**
  727:9,24

---

### 9

**9 (4)**
  702:8;829:8,16;
  830:13
**9:00 (1)**
  780:10
**9:15 (1)**
  796:17
**90 (2)**
  706:20;735:24
**90% (1)**
  810:16
**95 (1)**
  680:17
**9a (7)**
  822:20,23,25;
  823:5;827:19;828:19,
  20
**9b (4)**
  822:20,25;827:19;

828:6
**9c (8)**
  822:20,23,25;
  827:19;828:3,5,6,20
**9th (16)**
  688:11;689:6;
  698:21,22,24;699:1,
  25;702:1;716:3,12,
  16;717:9;744:7;
  750:11;779:3;799:4

# OFFICIAL REPORT OF PROCEEDINGS

# BEFORE THE

# NATIONAL LABOR RELATIONS BOARD

_____
_____

In the Matter of:                              **Case No.:**  29-CA-331253


PARKING SYSTEMS PLUS,INC.              :

             Respondent,              :

And                                            :

LOCAL 1102, RETAIL, WHOLESALE &        :

DEPARTMENT STORE UNION, UNITED         :

FOOD AND COMMERICAL WORKERS,           :

             Charging Party.          :


Place:   New York, New York
Dates:   July 3, 2024
Pages:   863 through 958
Volume: 6

_____
_____

**OFFICIAL REPORTERS**

## BURKE COURT REPORTING, LLC
**64 Magnolia Place**
**Wayne, NJ 07470**
**(973) 692-0660**

```
 1                        BEFORE THE

 2              NATIONAL LABOR RELATIONS BOARD

 3    --------------------------------: Case No.:

 4    In the Matter of:              : 29-CA-331253

 5    PARKING SYSTEMS PLUS, INC.,    :

 6                 Respondent,        :

 7    And                            :

 8    LOCAL 1102, RETAIL WHOLESALE &  :

 9    DEPARTMENT STORES UNION,        :

10    UNITED FOOD AND COMMERCIAL      :

11    WORKERS,                        :

12                 Charging Party.    :

13    --------------------------------:

14

15        The above-entitled matter came on for hearing pursuant to

16    notice, before BENJAMIN GREEN, Administrative Law Judge, at the

17    National Labor Relations Board, Region 29, at 26 Federal Plaza,

18    2nd Floor, New York, New York 10278, on Wednesday, July 3,

19    2024, at 10:00 a.m.

20

21

22

23

24

25

26
```

```
 1                    A P P E A R A N C E S
 2    On Behalf of the General Counsel:
 3         MATTHEW JACKSON, ESQ.
 4         EMILY CABRERA, ESQ.
 5         The National Labor Relations Board, Region 29
 6         One Metro Tech Center, 20th Floor
 7         Brooklyn, New York 11201
 8         matthew.jackson@nlrb.gov
 9         emily.cabrera@nlrb.gov
10
11    On Behalf of the Respondent:
12         ROBERT F. MILMAN, ESQ.
13         MICHAEL MAURO, ESQ.
14         MICHAEL JACOBSON, ESQ.
15         Milman Labuda Law Group, PLLC.
16         3000 Marcus Avenue, Suite 3W8
17         Lake Success, New York 11041-1009
18         rob@mmlaborlaw.com
19         mmaura@mmlaborlaw.com
20         mjacobson@mmlaborlaw.com
21
22
23
24
25
```

```
 1              A P P E A R A N C E S (continued)
 2    On Behalf of the Charging Party:
 3         MATTHEW P. ROCCO, ESQ.
 4         Rothman Rocco Laruffa, LLP
 5         3 West Main Street, Suite 200
 6         Elmsford, New York 10523
 7         mrocco@rothmanrocco.com
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1                       I N D E X

 2   WITNESS          DIRECT   CROSS  REDIRECT  RECROSS  VOIR DIRE

 3   Robert Gust        --      872     878      879       --

 4                      --      874     --       --        --

 5   Jonathan Baron    881      919     947      948       --

 6                      --      933     950      951       --

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    E X H I B I T S

 2     EXHIBITS                  IDENTIFIED          RECEIVED

 3     Joint

 4     J-2                       868                 953

 5     J-3                       869                 953

 6     J-4                       953                 953

 7

 8     Respondent's

 9     R-11                      888                 890

10     R-12                      893                 906

11     R-13                      906                 907

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26
```

```
 1                    P R O C E E D I N G S
 2                                 (Time Noted:  10:21 a.m.)
 3              JUDGE GREEN:  Okay.  Just let me know when you're
 4    ready.
 5              MR. JACKSON:  Okay.  As to the Classic Valet subpoena
 6    if we had some good progress chatting with their counsel he's
 7    provided a business certification on the payroll, so we're
 8    prepared to just accept that --
 9              JUDGE GREEN:  Okay.
10              MR. JACKSON:  -- document as authenticated for the
11    record, I don't know if it's been marked or --
12              MR. MAURO:  We haven't done that.  Would you want to
13    move as a joint?
14              MR. JACKSON:  That's fine.  Yeah.  Absolutely.
15              MR. MAURO:  Do you want to move the certification
16    too?
17              MR. JACKSON:  That would be great.  Yeah.  Yeah.
18              MR. MAURO:  Okay.
19              MR. JACKSON:  So we'll just clean that --
20              MR. MAURO:  Maybe I can mark them as Joint 2 and
21    2(a).
22          (Joint Exhibit 2(a) identified)
23              MR. JACKSON:  Perfect.  Thank you.  And then --
24              JUDGE GREEN:  You know what?  Just do one, just do 2
25    and 3.
```

```
 1              MR. JACKSON:  2 and 3?  Fine.  Okay.  Just make note.

 2              JUDGE GREEN:  I'm not a huge fan of the --

 3              MR. JACKSON:  Not a fan of the A's and --

 4              JUDGE GREEN:  Yeah.  The A's and B's screws up my --

 5              MR. JACKSON:  Understood.  Yeah.  We'll --

 6              MR. MAURO:  Okay.  Let's see.  You want the

 7    certification as 2 and then 3, the payroll.  That's fine by me.

 8         (Joint Exhibit 3 identified)

 9              MR. JACKSON:  Okay.

10              JUDGE GREEN:  So certification is going to be 2,

11    Joint 2, and the actual payroll is going to be Joint 3.

12              MR. MAURO:  Right.

13              JUDGE GREEN:  Okay.

14              MR. MAURO:  And then just with the balance of that

15    subpoena, I've narrowed down what we were looking for is to

16    kind of keep things tight.  Now, there'll be some additional I

17    guess limited production.  I'm anticipating hopefully today via

18    email.

19              JUDGE GREEN:  Okay.

20              MR. MAURO:  So at least this way, we don't have to

21    delay, worry about enforcement, petitions, and all that stuff.

22    So essentially we've been -- work that out.

23              MR. JACKSON:  Thank you.

24              MR. MAURO:  So that's -- I guess, resolved that.  We

25    did receive production from Union counsel regarding your most
```

1    recent order.  So appreciate the expeditious work on that.  So

2    we're just taking a look at that and that subpoena's been

3    complied with.  So that's it.

4              JUDGE GREEN:  Okay.  Do -- is any of that coming into

5    evidence or you don't know?

6              MR. MAURO:  We're just having that discussion this

7    morning, but we've really only just received it.  But we do

8    appreciate the quick effort on that.

9              JUDGE GREEN:  Okay.

10             MR. MAURO:  And then, oh, we did produce a privilege

11   log and whether there's any issues with it, I don't know, but

12   that was produced to the --

13             JUDGE GREEN:  Okay.

14             MR. MAURO:  Counsel for General Counsel and Union

15   counsel.  And then I don't think there's really anything else

16   right now, but at least those small issues are --

17             JUDGE GREEN:  Okay.

18             MR. MAURO:  -- resolved.  And as soon as Mr. Milman

19   gets here, he's in the cab.  He's only a couple -- a minute or

20   two out, so I apologize for that.

21             JUDGE GREEN:  Okay.

22             MR. MAURO:  And we'll get Mr. Gust right back.

23             JUDGE GREEN:  All right.  So off the record.

24       (Whereupon, a short recess was taken)

25             MR. JACKSON:  So I did want to raise an issue with

1    effective privilege log, but I think we could wait for Riche to

2    get here.

3                JUDGE GREEN:  So which -- I'm sorry, which entry is

4    it?

5                MR. JACKSON:  Are we on the record?

6                JUDGE GREEN:  We are on the record.

7                MR. JACKSON:  Okay.  So we're discussing the

8    privilege log that I had received from Respondent counsel this

9    morning.  It contains five entries.  And I have concerns about

10   the first entry insofar as neither the author nor the

11   recipients are attorneys.

12               JUDGE GREEN:  Okay.  But that's not really, so --

13               MR. MILMAN:  I can address that, Your Honor.

14   Correct.  The attorney-client communications and the attorney

15   work product will comply with this.  This is a client --

16   representative client speaking to another representative and

17   client informing him what Milman told him.

18               JUDGE GREEN:  That's privileged, I mean, that's what

19   it looks like from the description, correspondence relaying

20   legal advice given by counsel.  That's a -- that's sufficient.

21   It doesn't have to be between it doesn't have to be between

22   counsel if the -- it's a client's --

23               MR. MILMAN:  If Union attorney wants to review in

24   camera, we'd have it for you.

25               JUDGE GREEN:  I'd rather not, frankly.

1          MR. MILMAN:  Okay.  Thank you.

2          JUDGE GREEN:  You know, once you see it, you can't

3    unsee it.

4          MR. MILMAN:  Thanks, Michael.

5          JUDGE GREEN:  Anything else?

6          MR. JACKSON:  Nothing from the GC.

7          JUDGE GREEN:  So where we left off was in the middle

8    of the General Counsel's cross examination.  So you're still

9    under oath, Mr. Gust.

10          THE WITNESS:  I understand.  Thank you, Your Honor.

11          JUDGE GREEN:  Is there going to be additional cross

12    examination from the General Counsel?

13          MR. JACKSON:  Excuse me one moment, Your Honor.

14          JUDGE GREEN:  Okay.

15    Whereupon,

16                         ROBERT GUST,

17    was called as a witness having been previously duly sworn, was

18    examined and testified as follows:

19                    CROSS EXAMINATION

20    BY MR. JACKSON:

21    Q.   Just one more question to make sure I understood what you

22    testified yesterday.  Is it true that you directed Andrew

23    and/or Travis to distribute your business cards with the QR

24    code because you didn't know what to tell employees who were

25    asking for jobs?

1    A.    Yeah.   Well, it -- not so much we didn't know what to tell

2    employees.  The issue was the employees were looking for an

3    answer and they hadn't gotten anything yet.  So at that point,

4    we needed to do something, okay?

5          We needed to do something.   It's more of an

6    acknowledgement, right?  So if you are -- if you're a customer

7    waiting for something, okay?  And I turn your back on you,

8    that's -- even if I don't have an answer, okay?

9          That's literally the worst thing that I can do.   All

10   I have to do is acknowledge you and that, that's essentially an

11   acknowledgement.

12   Q.   And you -- that's the only thing that you could think of

13   doing, is to give them the business card and ask them to --

14   A.   Well, like I told them to set -- to tell them that we

15   would set up interviews and I think I also said that it would

16   be an opportunity to get information from them.

17   Q.   And again, you only had one interview, right?  One of

18   them?

19   A.   I only had one interview?

20   Q.   You only set up one such interview, correct?

21   A.   Well, I -- that was a special case that I did an

22   interview.

23   Q.   Right.

24   A.   I wasn't -- I didn't tell them to set me up to do

25   interviews.  They would be doing those interviews.   I

1    specifically interviewed Ms. Gil.

2    Q.    Right.  And no other Classic employee?

3    A.    Myself?  Absolutely not.

4    Q.    And to your knowledge, again, no other Parking System

5    representative --

6    A.    That I'm aware of, no.

7    Q.    -- interviewed a Classic employee before December?

8    A.    That I'm aware of, no.

9              MR. JACKSON:  I have no further questions.

10             JUDGE GREEN:  Okay.  Anything from the Union?

11                       CROSS EXAMINATION

12   BY MR. ROCCO:

13   Q.    Yeah.  Just a few.  Mr. Gust, Andrew Goldsmith, is he the

14   -- is he the area manager for Eastern Long Island?

15   A.    Yes.

16   Q.    And Stony Brook Hospital job was -- account was not Andrew

17   Goldsmith's first startup, right?

18   A.    It was not his first start -- well, not -- that -- that's

19   fair.  How -- if you're going to describe a startup as starting

20   a new place, of course not.

21   Q.    Okay.

22   A.    Was it a -- of that size?  That would've been the first

23   one of that size.

24   Q.    Okay.  And Andrew Goldsmith still works for Parking

25   Systems?

```
1    A.    He does.

2              MR. ROCCO:  Okay.  No further questions.

3              JUDGE GREEN:  Okay.  Well, let me ask you about this

4    November 25th conversation --

5              THE WITNESS:  Sure.

6              JUDGE GREEN:  -- interview.  Can you tell me what

7    happened?

8              THE WITNESS:  Absolutely.  So I went to Jake's --

9    well, I initially set up an interview.  I reached out to Ms.

10   Gil.  Did I do a text?  Do I do it by a phone call?  I don't

11   remember.

12             I know I set it -- I told, I set it up.  Because it

13   was Thanksgiving weekend, I recall, you know, asking her if it

14   was all right.  If we could, you know, if she'd be willing to

15   do that, I would go down and meet her.  So we set that up.  We

16   met over there.

17             When we arrived, I received the text that she was

18   there, but I didn't see her.  I either called or texted her and

19   told her that she was properly in the front of the facility and

20   that the valet parking was in the back, which was where we

21   were.

22             We went -- we proceeded inside.  We went down through

23   security down the stairs.  To the right of the stairs, there

24   was -- there's like coffee tables there.  It's kind of

25   separated away from all the action.
```

876

1          We sat down, I sat on the right Josh Candiotti sat to

2     my left.  Travis Gilliland sat just behind me to the left.

3     Francis was across.  And the person I now know as her son sat

4     to her left right in front of me.

5          I or Josh, I think it was actually Josh opened up and

6     said, you know, hi, how are you?  You know, we glad you could

7     come down.  We'd be in -- we're interested in bringing you on

8     board.

9          So and I think Josh kind of -- we were kind of going

10    back and switching back and forth between that.  Basically the

11    introduction.  After the introduction, the first thing that she

12    said was, why me?

13         And so then we proceeded to explain to her, you know,

14    it was an honor.  Like, I was confused.  It was, it's obviously

15    you're here because you were recommended by Stony Brook.  They

16    put very highly of you.  They wanted, you know, they asked us

17    to reach out to you.

18         So we did.  So then we sat down.  Oh, actually we

19    were already sitting at that point.  Then we were kind of

20    exchanging pleasantry still.  And then she continued to ask

21    that question.  It was, well, why me?  Then it was well, why

22    not everybody else?  And then it kind of went back to why me.

23         Her son at one point, I think actually interjected

24    and said, you know what?  Why aren't you, you know, talking to

25    everybody else?  And I was at that point, I know there was

1  somewhere in the conversation that I sort of, I started to

2  think, well, maybe she doesn't understand.

3          And so, you know, I directed to her.  I said, you

4  know, do you understand like you, and she nodded.  She said she

5  understood everything.  And so then I think he said it that you

6  need to understand, or something to that effect that the --

7  that some of the employees that work there are, you know,

8  Francis' family.

9          So that's when I said to her, I was like, well, look,

10 I said, you know, I don't want to put you in this position.  I

11 realize it's awkward, but if there are a few people that you're

12 interested in, you know, maybe I can -- I could get them in for

13 an interview.

14         We could see what we could do.  We'd love to have you

15 on board.  So at that point, she said -- the term she used was

16 comfortable.  She said she wasn't comfortable with that, which,

17 you know, comfortable is a tricky word, right?  When people

18 tell you they're not comfortable you -- that's when you kind of

19 like, okay.

20         You know, I told her, all right I said, look, I guess

21 that, you know, you don't want to do this.  Like it's fine.  If

22 you change your mind, please reach out to us.  You know, you

23 have my number, you know, we'd be more than interested in

24 talking to you again.

25         And that's where it ended up.  Never really had an

1  opportunity to talk about anything related to the job.  So as

2  we left, I actually turned around to Josh and Travis, and I

3  said, like do you guys have any idea what just happened?  Like

4  I did -- and I remember what I said specifically.

5          I said, did she just fall on her sword?  Like, what

6  was that all about?  Like, I don't get it.  And then that's, we

7  kind of left it off, and that was it.  We never revisited.

8          JUDGE GREEN:  Okay.  Thank you.  Any redirect?

9                    REDIRECT EXAMINATION

10  BY MR. MILMAN:

11  Q.   Yes.  Around that time that you instructed Andrew and/or

12  Travis to give out your QR codes to the class employees, were

13  you having any communications with Max at that time?

14  A.   Well, certainly that it was ongoing -- that -- sort of,

15  the end use for this is that we were -- they were concerned.

16  This was late, this was late.  It was getting very close to

17  opening.

18          And they were concerned that -- I can't say it's

19  justified or not, but they, they expressed the concern that the

20  Classic team wasn't going to stay.  Like they were going to

21  walk off on them, and they were nervous about, and, you know,

22  they said they were getting rumblings.

23          That was the -- that was pretty much it.  It's

24  justified.  I have no idea.  But that was what we -- that was

25  the feedback we were getting.  It was just, you know, we felt

1  like -- I certainly felt like the Classic staff didn't have

2  information, you know, is that my fault because we weren't

3  communicating?  Maybe.  I don't know.  But I just didn't know.

4  Q.   Around that same time in your communications with MAPS,

5  did anybody from MAPS say anything to you about talking to the

6  Classic of employees or not talking to the Classic of

7  employees?

8  A.   Well, prior to that, that was a concern.  We were

9  requesting information when we could start basically shadowing

10 and move -- and communicating with the people.  So, you know,

11 when you're taking over a new location, it's -- it -- it's

12 sensitive, right?

13         It's a sensitive situation.  You don't want to

14 interrupt ongoing operation.  So you, you just don't barrel

15 into a place and start, you know, walking around asking

16 questions and getting in the way, basically.

17         MR. MILMAN:  Okay.  I have no further questions.

18 Thank you, Your Honor.

19         JUDGE GREEN:  Any recross?

20                      RECROSS EXAMINATION

21 BY MR. JACKSON:

22 Q.   Just one thing, based on what the Judge asked you, Mr.

23 Gust.  So in your recollection on November 25th during the

24 meeting at Jake's 58, Edward Arias spoke up and asked, you

25 know, why --

1    A.    I thought he did.  I thought he was the one who said that

2    -- asked or expressed that the -- some of the employees were

3    her family, because that -- that's actually the point when I

4    discovered that he was her son, because that was never in the

5    introduction.

6          She came with somebody.  And to be honest with you, I

7    thought initially that it was, you know, her significant other,

8    like a boyfriend or something.  I had no idea.

9          The assumption was that, you know, this -- whoever

10   this was -- I -- first, I didn't expect that it would be a

11   translation issue because she was described to me as the lead

12   or manager of the cancer area.  So I, you know, I wasn't

13   expecting that.

14         So that's who I thought it was.  But, you know, I

15   been doing this a long time.  Sometimes people feel

16   uncomfortable.  I don't, you know, if they brought a person to

17   the interview, it wasn't that much of an issue.

18   Q.    You didn't ask who it was at first?

19   A.    I did not.  They actually offered that up.  I never asked.

20         MR. JACKSON:  Okay.  No further questions.

21         JUDGE GREEN:  Anything from the Union?

22         MR. ROCCO:  No.

23         JUDGE GREEN:  Thank you very much.

24         MR. MILMAN:  No, you're good.  Thank you, Bobby.

25         JUDGE GREEN:  Okay.  So what do we have next?

```
 1          MR. MAURO:  Okay.  We have -- the next witness is

 2   Jonathan Baron.

 3          JUDGE GREEN:  So, yeah.  Just right there.  Okay.

 4   I'm going to swear you in.  So raise your right hand.

 5   Whereupon,

 6                         JONATHAN BARON,

 7   was called as a witness having been first duly sworn, was

 8   examined and testified as follows:

 9          JUDGE GREEN:  Okay.  So thank you very much.  So

10   please just state and spell your name for the record.

11          THE WITNESS:  Jonathan Baron.  Last name is B as in

12   boy, A-R-O-N.

13          JUDGE GREEN:  Okay.

14                       DIRECT EXAMINATION

15   BY MR. MAURO:

16   Q.   Good morning, Mr. Baron.  Thank you for being here.  Are

17   you currently employed?

18   A.   I am.

19   Q.   Okay.  And who is your employer?

20   A.   Parking Systems.

21   Q.   What is your title there?

22   A.   Vice President of Business Development.

23   Q.   How long have you held that position?

24   A.   I've held that position -- I guess, started full time

25   there in 2010, but I've been around the business my whole life
```

1  with my father being, you know, the founding partner.

2  Q.   So in 2010, is that when you took the -- that title you

3  just described, vice president of operations?

4  A.   Correct.  Yes.

5  Q.   Okay.  And prior to taking on taking that title, what was

6  your position?

7  A.   I mean, for me, the, you know, I started with sitting next

8  to my dad trying to learn every aspect of the business.  So I

9  actually sat in a, you know, small desk in his office next to

10 him for, you know, three, four years trying to learn everything

11 from working out in the field to really learning the, you know,

12 back office and how to run the business.

13        From there, I moved into, you know, this business

14 development role to take over for another partner that was

15 actually retiring.  So I was able to transition, learn from

16 him, and then now build out you know, the business further.

17 Q.   Okay.  And do you have an ownership interest in the -- in

18 Parking Systems?

19 A.   I do.

20 Q.   Okay.  And the title that you're currently holding, if you

21 just briefly describe what your job duties are?

22 A.   Sure.  I mean, my main duties at this point are acquiring

23 new business.  So everything from the actual bid process, you

24 know, sales, marketing, to, you know, I'm in the corporate

25 office every day, so also overseeing, you know, administration

1  pass daily for the office.

2  Q.   Okay.  Are you still currently valet cars at all?

3  A.   Sure.

4  Q.   Okay.

5  A.   Absolutely.

6  Q.   What occasion you actually have to do that as an owner of

7  the company?

8  A.   On what occasion?

9  Q.   On any occasion.  Why --

10  A.   On any occasion.  I'm actually going to go tonight and

11  help Josh, just so we have fireworks event.  So --

12  Q.   Okay.  He needs some help and I'll be there.

13  Right.  And when you talk about business development, can you

14  briefly describe how Parking Systems develops business?

15  A.   Sure.  I mean, there's a few ways.  We're signed up for

16  all different bid portals.  So there's public bids, there's

17  private bids I mean, we have, you know, word of mouth and

18  referrals.

19       I mean, that's kind of the greatest thing for, you

20  know, building long standing relationships.  So we have cold

21  calling.  So, you know, a few different avenues to see more

22  business.

23  Q.   With respect to the bids that you've just described or

24  referenced --

25  A.   Mm-hmm.

884

1    Q.    -- if you could just briefly describe the process of how

2    you determine whether there's a bid that Parking Systems wants

3    to bid on.

4    A.    Sure.  I mean, mainly we are informed.  I get, you know,

5    email notifications or signed up for a lot of portals.  And

6    then we will evaluate the bid, you know, where it is, you know,

7    what it entails, the timeframe.  It's me mainly putting the

8    bids together.

9              So a lot of it has to do with, you know, what else is

10   going on.  And if it's something I can handle if we, if we

11   believe we have an opportunity to actually get it.  You know,

12   I'm not going to bid on something that, you know, I don't know

13   if we can get, so there's a bunch of different factors to

14   evaluate.

15   Q.    Right.  And currently, how many employees does Parking

16   Systems have?

17   A.    I would say actively working each week, about a thousand.

18   You know, it peaks during, you know, seasonally, we're in a

19   busy season right now, so it could peak a little higher.

20   Q.    And how many different locations this Parking System's

21   currently operating in?

22   A.    I would say at this point, and then some, you know,

23   special events and things, I mean, 250 to 300 locations on a

24   typical week.

25   Q.    And of that 250 to 350, how many of them are on Long

1    Island?

2    A.    I would say, -- I mean, we span all the way from Long

3    Island to Pennsylvania.  Some other, you know, some others in

4    the Tri-state area, I know 70%, I mean, our core business is on

5    Long Island.

6    Q.    Right.  And with the -- with respect to Long Island

7    operations, are there, is their staff dedicated to each one of

8    those locations, or do they interchangeably --

9    A.    No.  I mean, they have to interchange.  I mean, it's been

10   a business model since you know, the 70s.

11   Q.    Okay.  Focusing on the period -- well, let me back up.

12   With respect to the thousand or so employees in these 250 to

13   350 locations, if -- can you just briefly describe whether --

14   with respect to payroll, do you categorize the -- are they

15   categorized by location or how does -- how is payroll kind of

16   organized?

17   A.    No.  I mean, once you, you know, actually -- the actual

18   payroll within, so we use Paychex for payroll processing.

19           So if you're within Paychex and you, for example, try

20   to pull like a payroll journal, it's going to actually be the

21   departments or the separators between everything would be more

22   of like, I guess department ID, I think it is, or company ID

23   would be more of a breakdown of supervisors.

24           So there within that, as opposed to a location,

25   because it would be impossible to tap into a location based on,

1   you know, the actual payroll report.

2   Q.   Right.  And with respect to -- is there, does there come a

3   time when an employee at Parking Systems will work overtime?

4   A.   Sure.

5   Q.   So let's just use me as an example.  Say I worked at three

6   different locations --

7   A.   Mm-hmm.

8   Q.   -- on Long Island this past week, right?  And I worked 60

9   hours.  Are you going to -- does Parking Systems allocate my

10  time per location or is it aggregated and

11  A.   It's aggregated and blended.

12  Q.   It's blended?

13  A.   Yeah.

14  Q.   So once I hit my 40, no matter where I worked, I'm getting

15  time and a half over that 40 hours?

16  A.   Correct.

17  Q.   Okay.  Irrespective of where I worked?

18  A.   Correct.  All right.  In focusing on the period of 2023.

19  Did there come a time where you learned that Stony Brook

20  Hospital was looking to potentially change their valet vendor?

21  Q.   Yeah.

22  A.   Okay.

23  Q.   And how did you become aware?

24  A.   So I signed up on, you know, their, I guess, vendor

25  registration.  So I received an email the beginning of June

1  that, that it was out for bid.

2  Q.   Okay.  And just as a kind of a general description, did --

3  what was the scope of services that Stony Brook was looking for

4  in that, we'll call it an RFP?

5  A.   Sure.  Valet parking greeting services throughout, you

6  know, multiple valet stands on their campus.

7  Q.   Okay.  And was the RFP in writing like a written document?

8  A.   Yeah.

9  Q.   Okay.  And when you say you became aware of it through

10  some type of a notification, was the notification the actual

11  RFP or does it say, hey, there's an RFP click?

12  A.   No.  Simply an email from the system that'll say, you

13  know, what the bid is and then you would obviously click log

14  into the portal.  I think you even have to select if you intend

15  to bid or not.

16          And then from there's, I mean, everything's online

17  for this bid.  So there's then, you know, 40 items with within

18  there, exhibits, things of that nature.  And then one being

19  the, you know, the formal written --

20  Q.   Got it.

21  A.   -- bid.

22  Q.   Okay.  And with respect to this RFP that you were looking

23  at, did you actually download the RFP itself?

24  A.   Sure.

25  Q.   Okay.  All right.  So what's marked for identification

1    Respondent's Exhibit 10.

2              MR. MILMAN:  11?

3              MR. MAURO:  Yeah.  11.

4        (Respondent's Exhibit 11 identified)

5    BY MR. MAURO:

6    Q.   Mr. Baron, while doing that, prior to reviewing this --

7    the bid that you say you testified that you downloaded, did you

8    have any knowledge of who the valet company was that was

9    providing services to -- valet services to Stony Brook at that

10   time?

11   A.   When it initially came out?  No.

12   Q.   Okay.

13   A.   I know, so I know there may have been a chance, because I

14   know they've operated it before Classic.  But I didn't know at

15   that time who would done it.

16   Q.   And I guess a follow up question.  Follow up question is,

17   did you know anything about -- irrespective of knowing the name

18   of the valet company acquired services, do you know anything

19   about the services that he provided to Stony Brook?

20   A.   No.

21   Q.   Okay.  Okay.  So if you take a moment to review Respondent

22   Exhibit 11, let know when you're done.  I've already

23   distributed it of the parties.  All right.

24   A.   Well -- okay.

25   Q.   Okay.  So Mr. Baron, having looked at what's been marked

1  as Respondent's Exhibit 11, can you just briefly describe what

2  this document is?

3  A.    Yes.  So this is actually an export.  It includes the

4  written portion of the bid, scope of work, you know,

5  qualifications.  And this is an export from the system, which I

6  guess acknowledges our response.

7  Q.    Okay.  So if I can understand it, this is the RFP and also

8  --

9  A.    Yeah.  So this includes -- so this is a full export from

10  their system.  So it has the documents on their end as far as

11  the written RFP that we were bidding on.  And then once you get

12  to the bid back, it just -- it shows our, you know, response.

13  Q.    Okay.  Fine.  And if you does this document of

14  Respondent's Exhibit 11, discuss any timeframe in which Sony

15  Brook anticipated the new vendor commencing operation?

16  A.    Yeah.  It was on or about November 1st.

17  Q.    Right.  So if I direct your attention to the second page

18  of this exhibit, did you see at the top it says description,

19  second page of the exhibit.  See description?

20  A.    Yeah.

21  Q.    And you see it says overview?

22  A.    Yeah.

23  Q.    And then that word background.  Above background, you see

24  the sentence there?

25  A.    Yeah.

1    Q.    Just say -- what does it say?

2    A.    Need to begin on or about November 1st, 2023.

3                MR. MAURO:  Okay.  And in reviewing this -- well

4    actually I'd moved for the admission of Respondent's Exhibit

5    11.

6                JUDGE GREEN:  Any objection?

7                MR. JACKSON:  No objection.

8                MR. MAURO:  Thank you.

9                JUDGE GREEN:  Union?

10               MR. ROCCO:  No.

11               JUDGE GREEN:  Okay.

12               MR. MAURO:  Thank you.

13               JUDGE GREEN:  R-11 is admitted.

14        (Respondent's Exhibit 11 received)

15   BY MR. MAURO:

16   Q.    So again, at the time of obtaining this RFP, were you

17   aware whether the current provider of valet services was -- had

18   -- its employees were members of the Union?

19   A.    No.  Definitely not.

20   Q.    Okay.  And in this -- with respect to this document,

21   Respondent's Exhibit 11, is there any indication that the Stony

22   Brook would require the new vendor to recognize a union?

23   A.    No.  Definitely not.

24   Q.    Is there any information in this document, Respondent's

25   Exhibit 11, discussing the wage rates that, that Stony Brook

891

1    would want paid to those employees?

2    A.    No.

3    Q.    Same question.  Anything about any fringe benefits that

4    would be required?

5    A.    No.

6    Q.    Now this document, Respondent's Exhibit 11, if I

7    understand your testimony also con includes the actual bid that

8    Parking System submitted, correct?

9    A.    Yes, correct.

10   Q.    Okay.  And do you recall when Parking System submitted the

11   bid?

12   A.    I believe the exact -- well, I think actually submission -

13   - yes.  7/6

14   Q.    In July, Parking Systems submitted the bid?

15   A.    Correct.

16   Q.    Okay.  Did you learn -- did you come to learn -- would you

17   say during -- from the point this RFP was issued, that you

18   became aware of to the time in which Parking Systems submitted

19   bid, that there were other companies bidding on project as

20   well?

21   A.    Yeah.

22   Q.    Okay.  Did you come to learn the name -- again, I'm

23   talking about that timeframe, not what you've learned

24   subsequently, but during that time period, we'll just call it,

25   say, summer of 2023.

1    A.    Sure.

2    Q.    Did you learn the names of those other entities?

3    A.    The other entities?  Well, there was a site visit, so

4    typical with, you know, a formal bid, there'd be a site visit,

5    there's Q and A, so we saw other vendors at the site visit.

6    Q.    Okay.  Did you personally attend the site visit?

7    A.    I did, yes.

8    Q.    What were the types of things you were looking to observe

9    there?  Let me back up.  Why did you attend that site visit?

10   A.    So in this case, I don't know if it's required.  In a lot

11   of cases it's required to be able to actually submit the bid.

12   But anything I'm bidding on, I go on, you know, I need to see

13   the operation, I need to know what I'm bidding on.

14   Q.    Right.  And so when -- with particular respect to this

15   site visit, what was your mental calculus?  What was going

16   through your mind as you were kind of touring the site?

17   A.    Yeah.  I mean, just getting, getting an overall feel for

18   the different stands.  You know, what the operation looks like,

19   you know, volume, exposure things like that.

20   Q.    Okay.  And did there come a time -- well strike that.

21   Other than the site visit, was there any other process in which

22   you were allowed to utilize to gain any additional information

23   from Stony Brook?

24   A.    Sure.  It's a formal Q and A.  So submit questions, they

25   respond, it comes out in an addendum for all parties to see.

1    Q.    Okay.  And did you -- did Parking System submit any such

2    questions?

3    A.    Sure.

4    Q.    Yeah.  I did.  Okay.  Do you know of any other entities

5    submitted any questions?

6    A.    Yeah.  There were certainly more questions than just mine.

7    Q.    Okay.  And were those questions responded to?

8    A.    Yeah.

9    Q.    And who responded to them?  Meaning like, Stony Brook

10   issued a response?

11   A.    Stony Brook, yes.

12   Q.    Okay.  And -- all right.  So we'll mark for identification

13   Respondent's Exhibit 12.  Mr. Baron, please take a moment to

14   review the Respondent's Exhibit 12.

15          If you have a moment when you're done, let me know.

16   So I have a few specific questions, so you don't need to read

17   the whole thing.

18          (Respondent's Exhibit 12 identified)

19   A.    Okay.

20   Q.    All right.  Okay.  Okay.  Can you tell me what this

21   document is?

22   A.    This is the addendum, which would include the answers to

23   all of the, you know, interested parties' questions.

24   Q.    Okay.  So again, just for the record, it's dated June

25   22nd, 2023.  It says to all prospective bidders from Carol

```
 1   Mahar contract officer.
 2           Okay.  And on this document, it looks like it's a
 3   five page document.  Can you identify for everyone the
 4   questions you submitted --
 5   A.    Sure.
 6   Q.    -- for Parking Systems?
 7   A.    So looks like on this document, if you refer to Page 2 of
 8   5 --
 9   Q.    Mm-hmm.
10   A.    -- a there's a Q10.
11   Q.    Yes.
12   A.    Within that there are 11 questions, those are mine.
13   Q.    Okay.  And do you know from this document if the -- any
14   other bidder had asked any questions about a union?
15   A.    I do see that, yes.
16   Q.    Okay.  Can you direct the -- our attention to that?
17   A.    Page 1, the first question.  Q1.
18   Q.    Okay.  So I'm sorry, you -- was that on Page 3?
19   A.    No.  Well, I see one -- you're saying if someone asked
20   that?
21   Q.    Yeah.  Did anyone ask?
22   A.    I see one, yeah.  On page 1.
23   Q.    Okay.  Page 1 and --
24   A.    Q1.
25   Q.    Q1.  Okay.  The question is the current team unionized?
```

1    It says yes, however, this is based on the vendor's

2    relationship with their employees and it's not determined by

3    the University.  Okay.  Did Stony Brook ever provide to park --

4    to you at any point in time a union contract?

5    A.    No.

6    Q.    Okay.  And -- okay.  All right.  So if I direct the

7    attention to Page 3 of 5.  If you look at page the Question 5

8    that appears there, are the employee's union and has a sub A,

9    if so, please provide a copy of the CDA and any MOAs.

10           Can you locate and identify the answer to that

11   question on the right column?

12   A.    Yes.  So top of that, right top.  You want me to read the

13   answer?

14   Q.    Yes.

15   A.    Okay.  The valets are employees of the vendor, therefore,

16   if they're unionized or not, it is based on the employee's

17   arrangements with the vendor, not the University.

18   Q.    All right.  And that's not your question, right?

19   A.    That is not my question.

20   Q.    And then finally, Page 4 of 5, I'll direct your attention

21   of Q14.

22   A.    Okay.

23   Q.    Question being, can you confirm if this location is

24   operating under a union agreement?  If so, can you provide the

25   CBA and what is the answer there?

1    A.    The contract is with the vendor and therefore should their

2    employees be unionized is an -- is the agreement with the

3    vendor and it's respective employees.

4    Q.    Okay.  And again, is that -- was that a question you

5    posed?

6    A.    No.  Mine were only, only that box of Q10.

7    Q.    All right.  And so I'm clear Mr. Baron, the -- just in the

8    entirety of this document, so does it appear at least to you

9    that the questions submitted by the respective bidders seem to

10   be kind of cordoned off in this document?  Is that at least

11   apparent to you?

12   A.    Yeah.  Typically, I mean, that's how you kind of see them

13   in the response.  Because someone will send their grouping,

14   kind of keep them together.  So these are probably all separate

15   companies and their questions.

16   Q.    All right.  So there came a point in time that Parking

17   Systems did submit the bid, that's correct?

18   A.    Correct.

19   Q.    Okay.  And can you explain your process for determining

20   the bid amount that Parking Systems -- well you submitted on

21   behalf of Parking Systems?

22   A.    Sure.  So -- I mean, for me it's, you know, utilizing

23   many, you know, pricing templates, but it's going, reviewing

24   our business model and analyzing all of our expenses.  So a lot

25   of, you know, questions I have are tied to that.

1              So we need to understand, you know, inventory of
2  equipment.  We need to understand what, you know, speak to
3  someone like Michael Petruzzelli to understand, you know, pay
4  rates he's expecting.
5              So I'll kind of compile all expenses based on how,
6  you know, Parking Systems operates.  And then in this case it
7  happens to be an hourly rate.  So I'll break that down and put
8  it into an hourly rate.
9  Q.   Okay.  And ultimately, what was the actual bid price that
10 you submitted, if you recall?
11 A.   I believe the total bid -- so there's an hourly rate, but
12 it's ultimately determined on, like, everyone uses the same
13 pricing template, so it'll just -- you'll plug in that hourly
14 rate.  It'll give you a total, I want to say we're like 11.7
15 million.
16 Q.   Okay.
17 A.   Over a five year period, I believe it was.
18 Q.   And then in determining that, you know, account may --
19 strike that.  In formulating the bid amount, did you take into
20 consideration any knowledge you may have had if you had any
21 regarding a potential unionized wage rate?
22 A.   No.  I mean, I -- there's nothing in the process that
23 would, you know, would tell me to do that.  So all I can do is
24 figure, you know, expenses that I'm aware of and, you know,
25 Parking Systems-related expenses.

1          I mean, typically if that was a requirement in a bid,

2     you know, we do prevailing wage work, we have a union you know,

3     it would be within the bid.  I've seen CBAs included in bids,

4     I've seen requirements for union.

5          So that's something I would expect to see in bid or

6     even prevailing wage, living wage, things of that nature I

7     would look for within a bid.

8     Q.    Right.  So I'm clear Parking Systems has bid on and been

9     awarded a contract that require prevailing wage?

10    A.    Yeah.  Yeah.  We work with the city of New York.

11    Q.    Okay.  And is that current?  Do you have like a current

12    contract that you're paying prevailing wage?

13    A.    Yeah.  Absolutely.

14    Q.    So just so I understand, on a prevailing wage bid

15    formulation, just briefly explain calculating in the prevailing

16    wage as you are determining your bid amount?

17    A.    Yeah.  I mean, in that case, included in the bid would be,

18    you know, based on our job category of what it would be in that

19    case you'd have the prevailing wage rates.  So I'd have to

20    include that in my expense estimates.

21    Q.    Okay.  And you also testified about, you know bidding, on

22    work that you were aware that there was a union there.  Have

23    you bid on such work before?

24    A.    Yeah.

25    Q.    Of course.  Okay.  And again, just briefly, how do you

1    formulate that bid knowing that there's a union that have to be

2    recognized?

3    A.    I mean, if that -- if they're looking to do that, they

4    would have, you know, in -- at least in any recent case, I

5    remember the CBA would be included in it.

6    Q.    Okay.  And with the CBA being included, what exactly are

7    you looking at?  I understand this may seem elemental question.

8    A.    Yeah.  Yeah.  I mean it would show the required hourly

9    rate, any, you know, benefits, vacation, holiday, whatever, you

10   know, whatever benefits and whatever wage rates are required to

11   be paid and dues I guess.

12   Q.    Okay.  Have you -- has parking -- have you submitted a bid

13   on behalf of Parking System in a scenario where the collective

14   bargaining agreement was provided and was not awarded the bid?

15   A.    Yeah.  I mean, I bid on -- I bid on, you know, different

16   things all the time.  So we're fortunate to win some and some,

17   we don't.

18   Q.    Right.  And you testified about that -- well, let me

19   strike that.  Does Parking System -- is Parking Systems

20   currently signatory to a collective bargaining agreement with

21   any union?

22   A.    Yeah.

23   Q.    What is the Union that it's a signatory of?

24   A.    Local 621.

25   Q.    All right.  And is there a specific location that is

1   covering those employees?

2   A.   Yes.  So that is, I guess, an event based agreement.  So

3   that's at Nassau Coliseum.  And there's dues based on, you

4   know, event based dues.

5   Q.   Okay.  So -- and just very briefly, when -- how does that

6   work in terms of it's event based, right?  So give me a -- a

7   for example, in the past that you're aware of where you came,

8   learned that there's an event you need to staff it get moving

9   very briefly, what is that process?

10  A.   Yeah.  I mean there's -- I guess, you know, some court,

11  you know, there's regular events going on.  When the Coliseum

12  was busier, there's, you know, employees that I guess would be

13  brought in that, you know, come to most of the events.

14          You know, if there's three to five a month you know,

15  while they're working elsewhere, they come into events though

16  and be part of the, I guess the first team looked at for the

17  Coliseum.

18          I think there's a waiting period and then initially

19  to become part of the Union.  And then from there, every time

20  they're coming they would, you know, they'd pay due for working

21  at that event, not, you know, when to work anywhere else.

22  Q.   Okay.  All right.  So did there come a time where you

23  became aware that Parking Systems was awarded this contract

24  with Stony Brook?

25  A.   I was aware that we were the low bid, I think the

1    following week, so middle of July.  And I think everyone was

2    made aware, so there results, you know, being a public bid, the

3    results get released at that point.

4          So there was an email from Carol that middle of July

5    that, you know, here's unaudited you know, results.  At that

6    point, you know, they'll talk to you about your qualifications.

7    I think it's the lowest qualified bidder.

8          And then in July it was -- I mean, not in July

9    August, it was formally awarded beginning -- in the beginning

10   of August.

11   Q.   Okay.  And did you become aware of the identities of the

12   other entities that bid for that work?

13   A.   That actually bid?  Yeah.  At that point in July when

14   Carol from Stony Brook released the, you know, the numbers of

15   everyone and who they were.

16   Q.   Okay.  And are -- can you recall the names of those other

17   entities that bid?

18   A.   Offhand, let's see.  I mean, look, I guess overall the

19   parking industry was pretty small.  I see a lot of the same

20   names.

21         So Classic being one, if it was company Park Med, I'm

22   not too familiar with them.  I think they're outside of New

23   York.  There was Pro Park, there was Laz and SP Plus Standard,

24   I think.

25   Q.   Do you -- from your recollection, do you know -- well, let

1    me strike that.  When they -- at this particular time that

2    you're describing were the -- did Stony Brook release the bid

3    amounts from each of those entities?

4    A.    Yes.

5    Q.    You saw the actual dollar amounts?

6    A.    Yeah.

7    Q.    Do you recall the dollar amount of Classics bid by any

8    chance?

9    A.    Not offhand.  Maybe, maybe just over 12 million.

10   Q.    Okay.  And I'm sorry.  And what was Parking Systems' --

11   A.    We were about 11.7 and change over the five year period.

12   Q.    Right.  Okay.  And subsequent to being awarded the bid

13   what -- just moving forward, what was your understanding of

14   when Stony Brook expected the start, like the actual takeover?

15   I mean --

16   A.    For me, I was expecting November 1st.

17   Q.    Right.  Okay.  And --

18   A.    I mean, I haven't been told otherwise at that point.

19   Q.    Right.  And just briefly describe your knowledge of --

20   we'll just call like the ramp up to start, just November 1.  To

21   the extent that, you know, you personally participated, what

22   was the discussion operationally to sort of get the pieces

23   together to ramp up?

24   A.    For on our side or with -- yeah.  I mean, look, for us

25   it's figuring out supervisory team, you know, implementation,

1   how we're going to go about training.  We're going to review

2   the operations, see what we're going to recommend for changes.

3          We're going to understand the equipment we need to

4   have in place.  Everything from uniforms to -- I mean, we

5   changed all of the equipment going into, you know, Day 1.

6          So signage, keyboards, podiums, you know, all these

7   things that, you know, either take time to get or, you know,

8   take time to plan.

9   Q.   Yeah.  And with respect to this -- again, we'll call the

10  ramp up period.  What considerations did you have regarding the

11  actual staffing of the site and who was going to be utilized to

12  provide the valet services?

13         I understand the supervisor piece of it, but the, you

14  know, the people who are essentially jockeying cars around,

15  where was -- what -- again, was your consideration?

16  A.   I mean, as we always do, we look to our labor pool we

17  have, which, you know, is, is fairly large, certainly the

18  largest in, you know, in that area.

19  Q.   And was there a consideration again at that time to do a

20  general call, you know, posting for employees, you know, to the

21  why general public?

22  A.   Yeah.  I'm sure there was a general posting.  I mean,

23  look, we're getting just from general, you know, marketing and

24  our website, I mean, we get hits all the time.

25         We get referral, you know, recommendations from

1    friends and we get things coming in all the time of interested

2    parties and working.  So it doesn't necessarily be, you know,

3    have to be tied to an ad.

4    Q.   Okay.  And well, so does Parking Systems get unsolicited -

5    -

6    A.   Yeah.  Absolutely.

7              MR. MAURO:  -- interest in employment, yeah.  Okay.

8    All right.  Just give me one second off the record.

9         (Whereupon, a short recess was taken)

10   BY MR. MAURO:

11   Q.   Back on record.  With respect to the employment and the

12   employment hiring process, are you knowledgeable of that

13   process of Parking Systems?

14   A.   Yeah.  The overall process of getting someone onboarded?

15   Q.   Yes.

16   A.   Yeah.

17   Q.   Can you just very briefly describe what that is and I'll

18   have a few specific questions.

19   A.   Yeah.  I mean, it's everything from first the interest

20   coming in.  So you'd have that form.  Supervisors would

21   typically be done, you know, by supervisors.  So even if

22   something comes into -- let's go through a process for me, I

23   guess I end up seeing a lot of just general inquiries.

24             So if they come into, you know info@parkinsons.com, I

25   may capture that based on where they say they live or area of

```
 1   interest.  I'll send that to a supervisor.  So let's use Josh
 2   Candiotti in this example, Josh would call the candidate, speak
 3   to them, set up an interview.
 4           From there, kind of the ball's in Josh's court.  So
 5   if everything goes well in the interview based on that
 6   information he has, he can enter it into Paychex, simple, you
 7   know, name, email, whatever else.
 8           That'll send out an invitation for an application.
 9   From there and the ball's kind of in the applicant's court,
10   they would have to fill out the application.  Application is
11   rather lengthy.
12           It's has everything from, you know, acknowledgements,
13   general information, W-4, I-9, you know, some training modules
14   actually within it.  So some written exams.  Once that's
15   completed, I guess we'd be alerted, I think Josh or maybe
16   someone in HR.
17           From there, they would set up the -- a training
18   session.  So assuming everything looks good I think they -- HR
19   would be responsible for submitting for MVR and background
20   check.
21           Supervisor would be responsible for setting up, you
22   know, training for the individual.
23           MR. MAURO:  Okay.  By the way, I don't think I moved
24   Respondent's Exhibit 12 into evidence, which is the
25   questionnaire from Stony Brook.  So the Respondent makes that
```

1  motion to have this admitted.

2              JUDGE GREEN:  Any objection?

3              MR. JACKSON:  No objection.

4              MR. ROCCO:  No objection.

5              JUDGE GREEN:  R-12 is admitted.

6       (Respondent's Exhibit 12 received)

7  BY MR. MAURO:

8  Q.    I'm going to mark for identification Respondent's Exhibit

9  13.  Well, Mr. Baron, just take a moment to review this.  It is

10 lengthy, so just when you're sufficient to know what the

11 document is, let me know.

12      (Respondent's Exhibit 13 identified)

13 A.    Yeah.  This is this --

14 Q.    Well, hold on.  So, Mr. Baron have you had an opportunity

15 to look at this document?

16 A.    Yeah.

17 Q.    Okay.  And can you tell us what this document is?

18 A.    Yeah.  This is a printed version of our online

19 application.

20 Q.    Okay.  And in -- are all applicants required to fill this

21 form out in order to obtain employment at --

22 A.    Absolutely.

23 Q.    Parking Systems?

24 A.    That's the only way to get an employee ID to get entered

25 into -- in Paychex.

1   Q.   All right.  Is there any other application other than this

2   one that's required by Parking Systems?

3   A.   Application?  No.

4          MR. MAURO:  Okay.  Respondent move Exhibit 13 into

5   evidence, R-13.

6          JUDGE GREEN:  Any objection?

7          MR. JACKSON:  No objection.

8          MR. ROCCO:  No objection.

9          MR. MAURO:  Thank you.

10          JUDGE GREEN:  R-13 is admitted.

11      (Respondent's Exhibit 13 received)

12   BY MR. MAURO:

13   Q.   Okay.  Mr. Baron again, focusing on this period of time,

14   which again, I call the ramp up period in September and October

15   time, did you have any discussions about hiring Classic Valet -

16   - people who were employed at Classic Valet?

17   A.   Any discussions with who?

18   Q.   Well, good question.  Let's start with internally.

19   A.   No.

20   Q.   Okay.  And again, speaking just to your knowledge, was

21   there any desire or interest on your part to go and solicit

22   Classic Valet employees for employment at Parking Systems?

23   Again, at that time,

24   A.   I mean, it's never a thought at any time to solicit

25   someone else's employees.  I mean, as I said, the parking

1    industry is fairly, you know, small.  I see the same operators,

2    same people.  I wouldn't want someone to do that to my

3    employees.

4    Q.   That's -- so that's a good point.  So when putting Stony

5    Brook aside, when you testified about submitting bids you know,

6    competitive -- participating in competitive bidding and other

7    and is it fair to say that you've won a certain amount of those

8    bids over time?

9    A.   Yeah.

10   Q.   Okay.  In those instances where you took the -- were

11   awarded the contract, did you hire like immediately look to

12   hire the people of those other entities of the other entity

13   that you were supplanting?

14   A.   No.  It's never my thought going into a --

15   Q.   And has there been a time where you -- Parking Systems has

16   lost a contract to another vendor?

17   A.   Unfortunately, yes.

18   Q.   Okay.

19   A.   I mean, contracts ended or we've lost it.  So, you know,

20   that's why we always try to handle transitions delicately.

21   Because you never know when you'll be transferring, you know,

22   something over to another company, you know, and then they'll

23   be transferring to you.  So you just want to make sure that

24   process is smooth.

25   Q.   Okay.  And has there been an occasion where Parking

1    Systems lost a bid and essentially the new company tried to

2    raid your employees and actually successful?

3    A.   I can't remember time.  There were -- I mean, I can't

4    remember an example where, you know, it's really happened

5    recently.  You know, we usually have, you know, great workforce

6    that we can move elsewhere.  We have other opportunities for

7    them.  So --

8    Q.   So was this -- again, focused on this ramp up period, were

9    there any did you have any discussions with Classic Valet?

10   A.   No.  I mean, I'm not too familiar with them as a company.

11   I don't bid against them often.  I guess I wouldn't consider

12   them, you know, our typical competition.  So I never spoke to

13   them throughout the, you know, transition process.

14   Q.   Right.

15   A.   Never actually transitioned anything from them before or

16   to them that I'm aware of.

17   Q.   Okay.  And during, again, this ramp up period, have there

18   been any contact to you by any representative of the employees

19   of Valet?  Like a union representative at all?

20   A.   No.  Definitely not.

21   Q.   Okay.  And the process that you participated in a ramp up

22   for this -- what you believe to be a November one start date,

23   was this a consistent practice?

24            Was this practice consistent with how Parking Systems

25   would up staff and ramp up in other contract that it was

```
 1  awarded?
 2  A.   Yeah.  Absolutely.  I mean, we have a pretty standard
 3  template for transition day, you know, transition plan, which
 4  starts even, I mean, in some cases, if you're fortunate enough
 5  to have 90 days, but we look for at least, you know, 60 days
 6  and there's steps, you know, every step of the way there.
 7  Q.   Okay.  And just so I understand, so other than Stony Brook
 8  and focusing in the 2023 time period, did Parking Systems
 9  submit any other bids for any -- to any other RFPs?
10  A.   Prior to -- you're saying prior to 2023?  Any RFPs at all?
11  Q.   Well, it's -- no.  Just 2023 I'm talking about.  Other
12  than Stony Brook, did it submit any RFPs for -- a bid to an
13  RFP?
14  A.   Yeah.  Sure.
15  Q.   Okay.  Did any of those bids that you submitted on behalf
16  of Parking Systems include recognizing a union?
17  A.   Did any of the bids in 2023 -- specifically in 2023, I'm
18  not positive.
19  Q.   Okay.
20  A.   I don't know.
21        MR. MAURO:  All right.  If I could just get two
22  minutes off the record.
23        JUDGE GREEN:  Off the record.
24     (Whereupon, a short recess was taken)
25  BY MR. MAURO:
```

1   Q.   Okay.  Mr. Baron, so I just want to drill a little bit

2   deeper, again, into this ramp up period.  You know, you've

3   testified about not poaching these employees from Classic.  Is

4   that consistent with Parking Systems practice over time, or is

5   this a newer kind of a policy, so to speak?

6   A.   No.  I mean, it's never really been a practice of ours.  I

7   mean, look, as I said, my, my father started the business in

8   1978, I think it was -- it was his first year.

9        At that point, from what I'm told, there were

10  situations where, you know, transitioning over from another

11  facility and, you know, taking over a restaurant, car

12  dealership, you know, they would just catering to temples and

13  like employees would stay on.

14       And it's -- it was always, it was always a headache

15  to try to, you know, to try to change that process and kind of

16  instill the culture that you're building.

17  Q.   So on that point, you just testified about the culture

18  that you're building.  So I think what -- if you could just

19  briefly describe what you believe Parking -- how Parking

20  Systems, operation is unique.

21  A.   Yeah.  I mean, look, I think the biggest factor -- look, I

22  treat it like a family business that take a lot of pride.  I

23  get to still work next to, you know, my dad daily.  The biggest

24  thing for us is really, you know, the personal attention from,

25  you know, from ownership down.

```
1            I mean, we have open door policy and the corporate
2    office.  I mean, we're -- there are people, you know, our
3    supervisors are walking through, we're discussing, you know,
4    topics daily.
5            You know, and then we're the ones boots on the ground
6    that are, that are truly overseeing the operation.  You know,
7    and with our expertise, we're making sure we're one, providing,
8    you know, the most cost effective budget to our clients.
9            So I mean, I could give examples in this case, you
10   know, regarding Stony Brook, but, you know, we look to -- we
11   look to create a cost effective budget for them.  We look to
12   create, you know, customer enhancing, you know, features in the
13   operation.
14           So, I mean, that's, you know, if you're not there
15   doing it, you know, it's tough to make that happen.
16   Q.   Right.  So when Parking Systems does hire an applicant, is
17   the applicant or the new hire trained on how Parking Systems
18   operates.
19   A.   Yeah.  Of course.
20   Q.   Okay.  And just briefly describe, like what is the
21   training process and, you know, when is their confidence enough
22   to, you know, deploy this person out into the field?
23   A.   Sure.  I mean, there's test exams, there's training videos
24   about different things.  So we have, you know, presentations
25   which will have different features.  Then we have videos
```

1    specific to -- depending on the operation they're going to be

2    working at.

3              So we may have a video related to a healthcare

4    facility.  We have something simple as far as how you use our

5    handheld valet system.

6              So we'll go through all these different things and

7    some, you know, and I guess once the supervisor's comfortable

8    with that, then they'll kind of work them into, you know, to a

9    location where, you know, maybe they have a strong manager

10   that'll oversee them, or it's a slower location, or look, our

11   supervisors are in the field, so they're able to actively kind

12   of oversee these people.

13             You know, they'll typically -- even if they're on

14   working as, you know, an extra more so shadowing, and that's at

15   our expense where, you know, we don't bill that to the client,

16   but that at least gets them out working in the field.

17   Q.   And typically, this process you've described, how long

18   does it take from, you know, submission of employment

19   application to going through this process you've just

20   described?

21   A.   I mean, it's assuming all goes, you know, smoothly as far

22   as them turning around application and, you know, the

23   background check and MVR and time, I mean, at least 30 days.

24   Q.   Okay.  So focusing again on the ramp up period, you know,

25   that September October timeframe, was it possible for Parking

1    Systems to have, you know hired basically people from outside

2    Parking Systems and run them through this process to be

3    confident enough to start, you know, turn the lights on

4    November one at Stony Brook?

5    A.   No.  I mean, I would need to have more information.  I

6    would need to speak to, you know, one, you'd need to speak to,

7    I guess in this case, Classic Valet.  You know, we just

8    wouldn't go openly talk to employees and expect them to come

9    work for us when they're working for, you know, another

10   company.

11         At that point, I wouldn't, you know, be able to speak

12   to them until November 1.

13   Q.   All right.  And with respect to, again, with Stony Brook

14   particularly and this ramp up period, how do you determine what

15   managers would staff that location?

16   A.   So typically by -- so in this case, you know, corporate

17   team, we analyze and in most cases it's, you know, geographic

18   region and type of facility.  So someone like Josh Candiotti

19   was brought into this project because of his healthcare

20   expertise, Bobby, because of his, you know, scheduling

21   expertise and overall experience.

22         Andrew, based on, you know, the territory.  And, you

23   know, I guess up until that time, Andrew worked on -- at places

24   like Jake's and was a part-time, you know, account rep mainly

25   doing work out east.

1        He's expressed -- he expressed interest in, you know,

2    wanting to grow, be more of a full-time, you know account exec.

3    So we gave him that opportunity to move in and kind of create

4    this to be his own and work from there.

5        And someone like Travis was, was a great attendant at

6    Jake's 58, and we thought this would be a nice transition for

7    him to now manage a site and then, you know, hopefully move up

8    into you know, a top rep account exec role.

9    Q.   So in the constellation of the 250 to 350 locations that

10   Parking Systems had, and let's use the timeframe of late 2023,

11   where would Stony Brook fit in terms of, you know, profile

12   factor of clients for Parking Systems in the lower end, the

13   middle end?  You know, how would you describe them?

14   A.   Well, I guess it depends how you look at it.  I mean, we

15   have a, you know, a nice amount of healthcare clients in this

16   case, based on where it was geographically in Suffolk County.

17   It was a good size location to -- for us, you know, in our --

18   in the bidding process to create really like a Suffolk hub for

19   us.

20   Q.   Okay.  And with respect to the valets that were working

21   for Classic in that September, October time, I mean, what --

22   were there any -- well, let me strike that.  I mean, would've

23   been possible based on your testimony here, that -- to have

24   been able to staff the Stony Brook facility with the Classic

25   employees to be trained on Parking Systems' procedures, and

1   protocols, by, I guess, ultimately what December 1st was when

2   the actual start date was, right?

3   A.   Well, the actual start date was December 1st.  I -- up

4   until October -- second week in October.  That's when we

5   learned that it could be December 1st.

6                MR. MAURO:  Right.  Okay.  Off the record, one

7   minute, Judge.

8                JUDGE GREEN:  Off the record.

9        (Whereupon, a short recess was taken)

10  BY MR. MAURO:

11  Q.   So Mr. Baron -- oh, sorry.  Back on record.  So, Mr.

12  Baron, again --

13               JUDGE GREEN:  Back to the record.

14  BY MR. MAURO:

15  Q.   -- in staffing the Stony Brook facility, you've testified

16  about the managers that were detailed there and the reasons

17  why.

18  A.   Yeah.

19  Q.   It -- so with respect to employees being brought to that

20  particular location who were not trained on Parking Systems

21  protocols, I mean, is that something that was of a concern for

22  you?

23  A.   Employees that would've been brought there?  Yeah.  Of

24  course.

25  Q.   Right.  And why is that?  I mean, why would Parking

1  Systems not want an -- someone from outside of the

2  organization, at least in the initial matter staffing what

3  you've described as a kind of a larger client for Parking

4  System at that time?

5  A.    I mean, they don't know anything about our processes or

6  culture or, you know, management style.  I mean, it'd be very

7  difficult for that to b -- I mean, you know, we've had so much,

8  I guess, longevity with our staff.

9           I mean, even look at, you know, Bobby and Josh, these

10 are guys that started as valet attendants, and we want them to

11 know that they have the ability to grow with us.  So --

12 Q.    So is a key consider, or was a key consideration for

13 Parking Systems and staffing that location at that time, you

14 know, an experience level of Parking Systems operations?

15 A.    Yeah.  Absolutely.  I mean, you're taking on, you know, an

16 operation that has, you know, whatever it is, 20 plus

17 attendance that need to be managed.  I mean, that's a good

18 amount of labor on one on one property.

19 Q.    And again, in your position, in the role that you hold,

20 was there, was there going to be any tolerance level for

21 bringing in personnel from outside the organization that were

22 unfamiliar with your Parking Systems process?

23 A.    No.  I mean, it's not, it's just not a process of, you

24 know, at least in my experience of transitioning or taking over

25 facilities, it's just not -- I mean, it's not a thought that I

1  have.  I mean, we have enough labor and trained labor and, you
2  know, that's the process we've been fortunate to have.
3        We just ramped up for, you know, in the enormous
4  event for the World Cup Cricket where we had a hundred
5  dependents on staff for, you know, 10 days straight.  That's,
6  you know, we don't hesitate being able to fill something like
7  that with, you know, our labor.
8  Q.   And just in your, you know, personal mind at the time of
9  this ramp up period, I mean, what were -- did you feel, you
10  know, any degree of pressure to really, what I would just, you
11  know, kind of informally say like, knock it out of the park for
12  Stony Brook as the new valet company?
13  A.   Yeah.  Absolutely.  I mean, that's -- look we pride
14  ourselves on, you know, building longstanding relationships.  I
15  mean, if we're just going to move into an operation and
16  essentially do the same thing, then, you know, why are we
17  needed?
18        So for us, it's bringing a new culture, bringing a
19  new operation, you know, that's the reason we're so active in
20  the day-to-day operations.
21        Because we're trying to deliver a, you know, a better
22  product that matches, you know, our brand for all these years.
23  I mean, it's important to us.
24        MR. MAURO:  Great.  Thank you, Mr. Baron.  No further
25  questions.

1          JUDGE GREEN:  Okay.  Is there going to be any cross

2    examination?

3                         CROSS EXAMINATION

4    BY MR. JACKSON:

5    Q.   Yes, Your Honor.  Just briefly.  Were you responsible for

6    soliciting applicants for employment at Stony Brook?

7    A.   At Stony Brook specifically?  No.  I mean, I'm part of

8    kind of a lot of processes based on my role.  So I would

9    oversee it or be aware of it, but as far as it being my

10   responsibility, no.

11   Q.   It wasn't your responsibility to post to ads?

12   A.   No, not necessarily.

13   Q.   Whose responsibility was it?

14   A.   There was a couple people.  So, you know, we're talking

15   about Suffolk County specific.  It could be Michael

16   Petruzzelli, we have someone like Matt Callari, or someone like

17   Jeffrey Gluck.

18          I'm an admin on the Indeed account.  So I'm aware of

19   what's going on.  I'm typically involved in conversations, but

20   it's not -- it definitely wasn't my sole role.  No.

21   Q.   Are you aware that Parking Systems solicited job

22   applicants specifically for Stony Brook University Hospital?

23   A.   Yeah.  I would definitely be aware of that.

24   Q.   And you did that through Indeed, correct?

25   A.   Correct.

```
1   Q.    Any other platforms you use other than Indeed?

2   A.    No.  I don't think so.

3   Q.    Okay.

4   A.    Do you remember when you first started soliciting via

5   Indeed for Stony Brook University Hospital jobs?

6   Specific to Stony Brook?

7   Q.    Correct.

8   A.    I would say based on our, I guess, typical practice,

9   probably middle -- well, at that point, learning that it's

10  going to be December 1, it would've lined up with middle of

11  November.

12  Q.    Middle of November when you first started?

13  A.    Correct.

14  Q.    Okay.  Is it true that you no longer have Stony Brooks

15  specific ads posted on your Indeed?

16  A.    As of right now?

17  Q.    Correct.

18  A.    Like, like today or in -- I don't know specifically, but

19  we would definitely put more ads in.  I mean, as I said, that's

20  a hub for us.  I mean, that's, there's two reasons why we would

21  do a specific ad for a location.

22          So one being, you know, a marketing type of tool to

23  bring in general labor for, you know, so it's a marketing tool

24  to bring in general labor for us in Suffolk County, which, you

25  know, is a little more spread out territory.
```

1          You're going all the way to the Hamptons.  So -- and

2    for a special event type of work.  So for us, it's important,

3    you know, those are like part-time jobs, so for us it's

4    important to have a labor pool, so you bring them in for a

5    location like Stony Brook.

6          I mean, that's going to draw attention and just a

7    general, you know, valet ad so for us, it's a marketing tool

8    that allows us to just grow our Suffolk County, you know, labor

9    pool.

10   Q.   So you market for Stony Brook, even though you don't

11   intend to employ them in Stony Brook?

12   A.   Well, there's -- well, so like I said, so if the person is

13   working out east, they may very well work, you know, three days

14   at Stony Brook.  So of course we bring them in.  So it is a hub

15   and kind of training area.

16          So that person gets hired, they get to now work at

17   Stony Brook, whether they stay on and work there two days and

18   then work on the weekends out east, or they're on for 30 days

19   as, you know, training, shadowing and moving on to another

20   location.

21          I mean, that's why it's such a, you know, important

22   reason to advertise for that specific location.  It's not like,

23   hey, I need employees to work at Stony Brook every day.  I

24   mean, it's not our model.

25   Q.   Not you were present in this courtroom when Josh Candiotti

1    out testified; is that correct?

2    A.    Was present in the courtroom?  I was, yes.

3    Q.    Okay.  Do you agree with Mr. Candiotti that on November

4    9th, 2023 Parking Systems was ready to roll and operate at

5    Stony Brook University Hospital?

6    A.    Yeah.  Before November 9th, because up until middle of

7    October, I thought it was starting based on the RFP November

8    1st.  So we were, you know, we were ready by the end of

9    October.

10    Q.    What'd you learn in the second week of October that --

11    A.    So we had -- so based on -- this goes into the transition,

12    so this was a very different transition process than I'm used

13    to.  Typically, we have 30 -- 60-day transition at a minimum,

14    where we will have the client involved.

15            In many cases, I would say in almost all cases, the

16    previous employers involved that's going to be transferring

17    over everyone's on the same page as to what's going on.  That's

18    when we would learn even about the current, you know, workforce

19    and what the intentions were with them.

20            And then, so at that point we're -- I'm expecting

21    November 1st.  So we get to middle -- we get to the first week

22    in October, I reach out to procurement, I believe it was Carol.

23    I go, Carol, hey, we're, you know, 30 days out or whatever it

24    is, can we discuss the transition?

25            She tells me to reach out to Ephraim (phonetic),

1    reach out to Ephraim.  So I think this is a Wednesday or

2    Thursday.  He responds, we have our first meeting on Friday to

3    discuss.  So this is -- I don't know, the day, October 6th,

4    October 5th, whatever that Friday is.

5            We have our first meeting, very general meeting, I

6    was on site at Stony Brook to go through some basic things.

7    From there -- at that point, I'm still -- they're still

8    informing us it's November 1.  From there, we have another

9    meeting.  This is a virtual meeting the next week.

10           So this is the 11th or 12th.  At that point, there

11   was a little confusion from procurement and MAPS as to December

12   1st or November 1st, but that's when we actually confirmed that

13   it's a December 1 start.

14   Q.   Do you know what accounted for the difference between the

15   start date?

16   A.   Do I know what accounted for it?  Yeah.  The contract with

17   Classic, that there was an addendum at some point from what

18   they said, and that got them through November 30th.

19           So I don't know if one of the parties was not aware

20   of that.  I guess, I don't know when it was -- the addendum was

21   put into place, but someone forgot about it, I guess.

22   Q.   So essentially, Stony Brook learned that their contract

23   with Classic was running through November.

24   A.   Correct.  At that point, yeah.

25   Q.   And they notified you of that?

1  A.   Yeah.  That was discussed on the call and confirmed.

2  Q.   When you get a new operation, you ultimately have to add

3  staff to fulfill the needs of that new operation, correct?

4  A.   Ultimately, have to add staff not necessarily like add

5  general labor, not necessarily.  Because I mean, there's

6  different schedules, different shifts you can move, this person

7  might work this place Monday, Tuesday, they can now pick up

8  this shift.  So depending on the size of it, not necessarily,

9  Q.   But in order to do what you're describing, you'd have to

10 ask your employees to work more hours, correct?

11 A.   No.  It's honestly, I mean, that's what the supervisors

12 get paid for is to -- they set a schedule every week.  So it's

13 just about moving the schedule around.  They could work the

14 same hours, but now they're working one day here, two days

15 here.

16 Q.   Right.  When you add --

17 A.   Or they may want to pick up more hours.

18 Q.   When -- yeah.  Right.  They have to pick up new hours is

19 the --

20 A.   They may want to.  I'm saying.

21 Q.   Okay.  So when you add a -- an account like Stony Brook,

22 it adds hundreds of new man hours per week, correct?

23 A.   Yeah.

24 Q.   Right.  And in order to get employees to work those hours,

25 you have to divert them from other job sites that you have,

1  correct?

2  A.   Sure.  It's possible.  Yeah.

3  Q.   And then you would have to fill that other job site,

4  correct?

5  A.   Well, as I said, no.  Not necessarily, because I mean, we

6  have a thousand employees, we have 200, you know, 50 plus

7  locations.  They're not all working at the same time.  And we -

8  - you're moving around staff, so it's not, I understand what

9  you're saying, but not necessarily.

10  Q.   Are you aware that by late December, Parking Systems was

11  accrue -- Parking Systems employees were accruing excessive

12  overtime on the Stony Brook account?

13  A.   In late November?  Yeah.  I mean, that's --

14  Q.   In late December.

15  A.   Late December?

16  Q.   Yeah.

17  A.   Yeah.  I mean, I would definitely be aware of that.  I

18  would be the one to be aware of that, yes.

19  Q.   So you are aware of that?

20  A.   At that time?  Yeah.  Well -- yeah.  Of course.

21  Q.   Okay.  And why were they accruing excessively?

22  A.   It could be various reasons.  We're still, so end of

23  December would still be our transition.  We started December

24  1st, so we're still within our 30 day transition.  So it's

25  just, you know, extra labor on site, extra hours.

1          I mean, we could be, you know, we most likely had --

2    so we have probably extra staff on, which would coincide with

3    what we do.  And we have people working more hours.

4    Q.   What do you mean, extra staff on --

5    A.   So they're seeing also different times.  So for example,

6    someone you know, could work morning shift.  We also want them

7    to see, you know, afternoon shift, evening shift.  I mean, the

8    whole point is to kind of have everyone cross trained to

9    understand every aspect of the operation.

10   Q.   I'm going to show you a copy of what's been identified as

11   GC Exhibit 23.  Did you send or receive any of these messages?

12   A.   Did I send -- I don't believe so.  No.  I'm not even sure

13   I was on this chat.

14   Q.   Do you know who sent or receive any of these?

15   A.   No.  I wouldn't be able to.  I mean, I see Travis's name

16   mentioned, but I wouldn't be able to speak to who, who's on it.

17   I'm --

18   Q.   Okay.

19   A.   It's not one that I remember.

20   Q.   But it is true that Parking Systems needed more staff at

21   Stony Brook as of December 22nd; is that correct?

22   A.   Needed more staff as of December.  So yes, this does sound

23   familiar because if -- which now, you know, so I believe John's

24   intention, I'm going to assume that's me, is to try to get two

25   to 300 more hours.

927

1          So that's probably 200 to 300 more hours.  So in this

2     case, we're now handling -- so it's identified in the first 30

3     days that we're now handling.  So the schedule that was put

4     into place on December 1 was kind of their pandemic level

5     schedule.

6          So we saw, even in the Q & A, there's some data

7     related to the pre-pandemic levels versus pandemic levels.

8     Obviously, the volume dropped drastically.  At this point,

9     we're now seeing volume increase to pre pandemic levels all

10    within this 30 days that we're new to the operation.

11         So at this point, I'm speaking to procurement about

12    adding more hours, not anything to do with our schedule about

13    the actual operation.  So the volume was heavy.

14    Q.   You mean the volume of customers?

15    A.   Volume of customers, yes.  So that's why we need 200 to

16    300 more labor hours.  So that's the reason for needing more

17    attendance.

18    Q.   Was the Indeed ad cut off in late December?

19    A.   I wouldn't know that if it was cut off.  No.  I don't

20    know.  It said, so I cut off the Indeed, I don't know if that

21    was specific to Stony Brook, if that was a general ad.  I don't

22    know.

23    Q.   I thought you monitored your Indeed email.

24    A.   Yeah.  But to remember a specific ad from December is -- I

25    mean --

1    Q.    How many ads do you run on there?

2    A.    I mean, I -- there could be -- depending on what's going

3    on, I'm sure there could be 10 running.  I'm sure there could

4    be 20 running.  I mean, it's different.  I mean, remember a lot

5    of the ads are specific to territories, so it's not like

6    they're -- so, I mean, you have to put in a region for an

7    Indeed.

8          So you either put in a location or you're putting in,

9    you know, Garden City, New York.  So, you know, we have

10   locations in Westchester, you're putting in Westchester.  So,

11   you know, that's the reason for multiple ads.

12   Q.    Did you ever work at Stony Brook University Hospital?

13   A.    Yeah.  I've been on site as far as -- I mean --

14   Q.    I mean, like park cars.

15   A.    Yeah.

16   Q.    Okay.  Did you do that on like billable?

17   A.    No, I wouldn't.  I would do that typically clock into a

18   location.  The only -- I mean, I guess clarify, the only time

19   we're billable is -- so we're following the scope of work, so

20   I'm not billing a client for more than they order.  If they

21   order, you know, if there's 40 hours and we put 50 because we

22   need to put 50, they're only going to be billed for 40.

23         So if I'm filling, you know, a position, so if an

24   attendances not there and I'm actually working that role, I'd

25   be billable in that case.  But for me, that's typically not the

1  case.

2  Q.   So the way it works between your relationship with Stony

3  Brook is that you have a set rate of pay that they pay you per

4  minute hour?

5  A.   They pay an hourly rate per hour, correct?

6  Q.   Right.  Which is established --

7  A.   Whether a manager rate like a MOD manager on duty rate

8  versus a valet rate.

9  Q.   And that's established by your bid, right?

10  A.   That's established by the bid, correct.

11  Q.   Okay.  And your company makes money by paying employees

12  lower than the rate that you pay Stony Brook for their man

13  hours?

14  A.   Well, Yeah.  Of course.

15  Q.   Okay.

16        JUDGE GREEN:  I'm just -- sorry.  While we're on

17  that, what does the $11.7 million represent?

18        THE WITNESS:  So there was I guess a template that

19  everyone had that amounted to the total weekly hours.  So

20  everyone was working off of the same platform.  From there, you

21  fill in, you know, based on the schedule, maybe there's 20 rows

22  or -- and you would put in your hourly rate and it computes an

23  annual total.  So each year, and then there were five years, I

24  believe.  So --

25        JUDGE GREEN:  Does everybody assume the same number

1  of employees in the same --

2          THE WITNESS:  Yeah.  The -- exactly.  The hours and

3  the schedule are the same.  You're just filling in your rank

4  based on, you know, your expenses.

5          JUDGE GREEN:  Got it.  Okay.  Thank you.  Yeah.

6          THE WITNESS:  At least in this bid.  I mean, other

7  bids, different formats, but this one is done like that.

8  BY MR. JACKSON:

9  Q.   Bear with me one moment, Your Honor.  Mr. Baron, are you

10 aware that Stony Brook was especially satisfied with the

11 staffing levels that Classic had at the operation?

12 A.   Am I aware that they were satisfied with it?

13 Q.   Especially satisfied.

14 A.   No.  Not something I would be aware of.

15 Q.   Did you review their -- the responses to the Q & A's

16 question --

17 A.   Yeah.

18 Q.   -- carefully?

19 A.   Yeah.

20 Q.   Yeah?

21 A.   At the time, absolutely.

22 Q.   At the time.  Okay.  Can you look at Respondent 12?

23 A.   Sure.

24 Q.   And I'm going to direct your attention to Q7.  In the

25 first page.

```
 1    A.    First page.
 2    Q.    And A7 in particular.  After you received this Q & A
 3    response, you were aware that the client, Stony Brook, was
 4    especially satisfied with the existing staffing level, correct?
 5              MR. MILMAN:  Objection.
 6    A.    At that time?
 7              MR. MILMAN:  Objection.
 8              JUDGE GREEN:  What's the objection?
 9              MR. MILMAN:  It just doesn't say -- that's
10    mischaracterizing in this response.
11              THE WITNESS:  Correct.  Does -- the especially.
12              MR. MILMAN:  It speaks for -- it says something very
13    different.
14              THE WITNESS:  In this case.  It says, overall the
15    current program meets the contract requirements and
16    expectations, and then it says, especially in staffing and
17    patient interactions.
18              JUDGE GREEN:  Okay.
19    BY MR. JACKSON:
20    Q.    I'm asking the same question.
21    A.    No.  That's fine.  That's fine.  I mean, at that time?
22    Q.    Sure.
23    A.    Yeah.  I mean --
24    Q.    You thought that they were happy with the set?  They were
25    --
```

1  A.    Were with the schedule?  Yeah.

2  Q.    With the staffing levels.

3  A.    Yeah.  Sure.

4  Q.    Okay.  And are you aware that you increased staffing at

5  Stony Brook University over time from December relative to the

6  present?

7  A.    Yeah.  I -- as I said, the volume's increased.  So that's

8  -- I mean, that's based -- so that's something we have data.

9  We know how many cars, and that's something we review and get

10 permission from Stony Brook.

11 Q.    Do you have data about the volume?

12 A.    Yeah.  Of course.  I -- we wouldn't just add it to add it.

13 Q.    Okay.

14 A.    I think it's also --

15 Q.    Objection, there's no question pending.  Respondent

16 Exhibit 13, we've heard some of your colleagues testify about

17 this form document, but is it true that this is something that

18 a prospective employee would fill out only after he or she got

19 an offer of employment following an interview?

20 A.    Just when you filled out, yes.  After an interview and

21 offer for employment, correct.

22 Q.    And your solicitations via Indeed, that's one of the

23 primary ways that you go about getting people in the door for

24 an interview, correct?

25             MR. MILMAN:  Asked and answer, Your Honor.

1          JUDGE GREEN:  Okay.  I mean, is that a preliminary

2   question that was asked before, right?

3          MR. JACKSON:  I don't believe so, but if you believe

4   it was I'll --

5          JUDGE GREEN:  Okay.  Overruled.  Let's just do it

6   quick

7   A.   That would be a way.

8   BY MR. JACKSON:

9   Q.   Okay.  Are you aware that Mr. Gust also uses a business

10  card to solicit applicants?

11  A.   Sure.  I mean, all of the -- so, Mr. Gust, yes.  And all

12  the supervisors have the landing page.

13  Q.   Oh, so not only Mr. Gust has a QR code.

14  A.   I don't know if -- I don't know who else has a -- who has

15  turned it into a QR code, but everyone has the ability to

16  collect that data, obviously.  Because that's what turns into

17  being able to put that into Paychex.

18          MR. JACKSON:  No further questions, Your Honor.

19          JUDGE GREEN:  Anything from the Union?

20                    CROSS EXAMINATRION

21  BY MR. ROCCO:

22  Q.   Yes, Your Honor.  Oh, good afternoon now, Mr. Baron.

23  Parking Systems is a family business, right?

24  A.   Yeah.  You can consider that based on my father's role.

25  Q.   And your father is a primary owner?

1    A.    The primary owner, yes.

2    Q.    Okay.  And you graduated from college?

3    A.    I did.

4    Q.    And you went to Binghamton University?

5              MR. MILMAN:  Objection, Your Honor.

6              JUDGE GREEN:  What's the objection?

7              MR. MILMAN:  What's the relevance to going to

8    Binghamton University?

9              JUDGE GREEN:  Yeah.  All right.  I actually allowed

10   some of this.  It doesn't take too long.

11             MR. ROCCO:  That's the last one.

12             JUDGE GREEN:  Okay.

13   A.    Yes, I did.

14   BY MR. ROCCO:

15   Q.    Okay.  And a few years after you graduated Bingington you

16   went into the family business in 2010?

17   A.    Yeah.  I mean, I've had -- as I said, exposure to the

18   business my whole life.  So working full time, yeah.

19   Q.    Okay.  And you, you have been around the business your

20   entire life?

21   A.    Mm-hmm.

22   Q.    And you learned how to run the business from your father?

23   A.    I did.

24   Q.    Okay.  And your father started the business in the 1970s?

25   A.    Correct.

1    Q.    Okay.  And now you are a part owner of the company?

2    A.    I am, yes.  And your main duty is acquiring new accounts?

3    Q.    Correct.

4    A.    Okay.

5    Q.    And once an account is acquired, your job continues to

6    make sure that account gets up and running?

7    A.    Yeah.  I'm art of the transition, typically.  Because I

8    mean, everything from contract to actually getting, like

9    building out processes, that's all something I'm a part of.

10   Q.    So with respect to a new account, is it fair to say that

11   your role does not end with the successful awarding of a bid to

12   Parking Systems?

13   A.    Correct.

14   Q.    Okay.  And you're the vice president of operations?

15   A.    Not of operations, no.

16   Q.    You're the vice president -- what is the title?

17   A.    Business development.

18   Q.    Vice president of business development.  Okay.  I'm sorry,

19   I didn't mean to speak over you.  And in your role as a vice

20   president of business development, it's true that you viewed

21   Stony Brook University Medical center as an important account

22   to win?

23   A.    Yeah.  I mean, I bid on lots of opportunities.  As I said

24   previously, that was important based on its geographic, you

25   know, region for us to build a hub in Suffolk County.

1    Q.   When you bid on hospitals, part of the bidding

2    requirements is you have to have other hospitals under contract

3    already, right?

4    A.   I mean, could be, not necessarily.

5    Q.   Okay.  In your experience, does having an account in a

6    place like Stony Brook make it more or less -- or does it make

7    it easier to win accounts at hospitals in the future?

8    A.   I mean, I guess you could say yes, but we have many, many

9    healthcare facilities, so we qualify for lots of healthcare

10   work.

11   Q.   And the account of Stony Brook University Medical Center,

12   that's going to gross the company over $11 million over the

13   life of the contract?

14   A.   Based on the -- well assuming we work that scope of work.

15   Right now, we're still below the bid hours.

16   Q.   Okay.  And you were heavily invested in making sure that

17   the Stony Brook University Medical Center account got up and

18   running on December 1st, 2023?

19        MR. MILMAN:  Objection, Your Honor.  It's misleading

20   is in testimony as to a two part process.  The witness --

21        JUDGE GREEN:  Let's not get behind.  Let's not get

22   that.  It's overruled.

23   A.   So once it was determined December 1st, of course.

24   BY MR. ROCCO:

25   Q.   And you were part of the transition team at Stony for

1    Parking Systems for the Stony Brook University Medical Center?

2    A.    Yeah.  I would be the main liaison typically with

3    procurement and even involved on conversations with MAPS.

4    Q.    And through your ownership, your job as a vice president

5    and the fact that you've been around the business your entire

6    life, you're knowledgeable of Parking Systems, policies, and

7    procedures?

8    A.    Yeah.

9    Q.    Okay.  Can we show the witness General Counsel 15, please?

10    I'm sorry, is it up here?  Okay.  I'm showing the witness

11    what's in evidence in General Counsel Exhibit 15.  It's three-

12    page document.  First page is an email from Josh Candiotti to

13    Jonathan Baron, CC'ing others re weekly meeting.

14              And the email beginning on the bottom of page two is

15    from Andrew Goldsmith to Jonathan Baron and others.  Jonathan,

16    if you would just review the document and please just let me

17    know -- take your time and let me know when you're finished.

18    A.    Both emails or --

19    Q.    Yes, please.

20    A.    -- one specific.  Is it the same email?  I guess just with

21    comments on it.  Okay.

22    Q.    Yeah.  Just focusing your attention on the second email,

23    the one from Andrew Goldsmith to yourself and Michael

24    Petruzzelli dated Tuesday, October 24th, 2023 at 9:13 in the

25    morning.  Do you see that one?

1   A.   I do.  It starts on the bottom of Page 1.

2   Q.   Right.

3   A.   Okay.  Yeah.

4   Q.   Okay.  Could you please flip to the top of Page 2?  First

5   off, you know who Andrew Goldsmith is, right?

6   A.   Sure.

7   Q.   And he's an employee of Parking Systems.

8   A.   He's an employee, yes.

9   Q.   And he was the -- and he's responsible for the eastern

10  portion of Suffolk County for Parking Systems?

11  A.   The Hampton, I mean, not eastern portion, I guess.  I

12  don't know exactly how you want to define it, but he --

13  typically, his work is in the Hamptons.  We have other

14  supervisors that operate in Eastern Suffolk as well.

15  Q.   And he was the personal -- person who was primarily who

16  was leading the transition team for Parking Systems at Stony

17  Brook Medical Center?

18  A.   He -- I wouldn't say he was leading the transition team

19  because he's never done a transition to this scale or from

20  another operator, I would say.  So he would definitely not be

21  leading.

22  Q.   Okay.  But part of his -- of Mr. Goldsmith's

23  responsibilities was to begin the Parking System's operations

24  on December.

25  A.   Yeah.  He was certainly -- he's part of that transition

1    team.  Yeah.

2    Q.    Okay.  And did you receive the email that the second one

3    dated Tuesday, October 24th, 2023?

4    A.    Yeah.  I'm sure.  I mean, I'm -- can't -- specifically

5    say, but I'm on it.

6    Q.    Okay.  And at the -- on the top line on Page 2 where it

7    says here are a few questions I have that maybe Johnny can shed

8    some light on if he possesses this information.

9    A.    Mm-hmm.

10   Q.    Do you see where it says that?

11   A.    I do.

12   Q.    Was it your understanding in this email that Andrew

13   Goldsmith was asking you to shed light on the questions he was

14   posing below?

15   A.    Yeah.  It doesn't seem I ever answered the email though.

16   Q.    And you are -- you testified earlier it's correct that you

17   are in Parking Systems corporate office almost every day?

18   A.    Yeah.

19   Q.    And you understood that this email related to the Parking

20   System startup at Stony Brook Hospital?

21   A.    Sure.

22   Q.    Yeah.  And in Paragraph 1, it does -- does the paragraph

23   specifically ask you to shed some light on the questions he's

24   asking below?  Or excuse me, at the top -- I withdraw the

25   question, I'm sorry.  In the first paragraph was Mr. Goldsmith

1   asking you when he was allowed to contact members of the other

2   valet company staff?

3   A.   Simply put, yeah.

4   Q.   Okay.  And he was -- was he asking you that once we figure

5   out how many we're retaining, we can hyper-focus on hiring?

6          MR. MAURO:  Objection, Your Honor.  Only -- the

7   document speaks for itself.

8          JUDGE GREEN:  Okay.  I mean, I'm assuming these are

9   preliminary questions that are going somewhere else.

10         MR. MAURO:  Okay.

11         JUDGE GREEN:  Overruled.

12  BY MR. ROCCO:

13  Q.   And you never responded to Mr. Goldsmith's email of

14  October 24th, 2023, right?

15  A.   Not that I'm aware of.  I'm sure one of the, you know, the

16  operations guys --

17  Q.   Okay.  Thank you.  You can put the document away.  And we

18  discussed previously that you won the Stony Brook account

19  pursuant to an RFP?

20  A.   Correct.

21  Q.   And based on your knowledge, training, experience, what --

22  was the Stony Brook RFP required to be given to the lowest

23  responsible bidder?

24  A.   From my understanding, as a bid -- public bid, yeah.

25  Lowest qualified bidder.

1   Q.   Okay.  Can we show the witness what's in evidence as GC-

2   17?

3          JUDGE GREEN:  What are you looking for, 17?

4          MR. JACKSON:  GC-17.  Yeah.  I don't -- thank you.

5   Thank you.  Sorry about that.

6   BY MR. ROCCO:

7   Q.   Okay.  Let the record show that the witness is reviewing

8   what's in evidence of General Counsel 17.  It's a four-page

9   document and a series of emails.

10          I'd ask the witness to please review the email on

11  Page 2 from bobbygust@parkingsystems.com.  And let -- and you -

12  - please take your time, review it, and let me know when you're

13  finished.

14  A.   Ready.

15  Q.   Okay.  Do you agree with Bobby Gust's statement or

16  characterization of Parking Systems account of Stony Brook as

17  being, "pretty close to the bone from the onset -- outset"?

18  A.   I mean, I know how we bid it and obviously the profit we

19  considered.

20  Q.   But do you agree with Mr. Gust's characterization that the

21  account was pretty close to the bone from the outset?

22  A.   I mean, I can't say what he defines as close bone.  He

23  wouldn't know the profit that we determined for it.  No.  So,

24  you know, did I read him to believe we were maybe, you know,

25  how would -- but he wouldn't know the numbers.  No.

1    Q.    Okay.  And do you agree with Bobby Gust's statement in his

2    email that that paying a shoe allowance would cost the company

3    approximately $16,800 per year

4    A.    As far as how the contract reads?  If that's how he

5    calculated it, and that's what the numbers are, then yes.  I

6    agree at this point.

7    Q.    And do you agree with Bobby Gust's characterization that

8    it would cost Parking Systems approximately $27,300 a year for

9    -- to pay accrued paid time off?

10            MR. MILMAN:  Objection, Your Honor.  There's been no

11    testimony in the record that this witness reviewed the

12    collective bargaining agreement.

13            JUDGE GREEN:  Yeah.

14            MR. MILMAN:  So he couldn't agree.

15            JUDGE GREEN:  So it's a question.  Overruled.

16    A.    Am I aware based on the CBA, that that's how it's turned?

17    BY MR. ROCCO:

18    Q.    Do you agree with his assessment that that would be an --

19    A.    I mean, I agree with his math, yes.  48 constant.  Yeah.

20    Q.    Okay.  Thank you.  You can put the document away.  I just

21    have a few more questions for you.  And it relates to your

22    testimony regarding Parking Systems interactions with another

23    labor union.  Just Parking Systems only has one collective

24    bargaining agreement currently, correct?

25    A.    With prevailing wage and one collective bargaining

1    agreement.  Yeah.

2    Q.    Okay.  So prevailing wage -- let's get into that.

3    Prevailing wage, that's set by the comptroller's office, right?

4    A.    Sure.

5    Q.    Okay.  And you don't have to have a union to --

6    necessarily to perform prevailing wage work?

7    A.    No.

8    Q.    Okay.  You just have to pay the prevailing rate as set by

9    the comptroller's office?

10   A.    Correct.

11   Q.    Okay.  And currently, Parking Systems has one collective

12   bargaining agreement with a labor union?

13   A.    Correct.

14   Q.    Okay.  And that labor union's Local 621?

15   A.    Yes.

16   Q.    Okay.  And do you know if Local 621 is affiliated with any

17   parent organization?

18          MR. MILMAN:  Objection, relevance.

19          JUDGE GREEN:  Overruled.

20          THE WITNESS: No.

21   BY MR. ROCCO:

22   Q.    Who's the individual you deal with at Local 621, if

23   anyone?

24          MR. MILMAN:  Objection, relevance.

25          JUDGE GREEN:  Overruled.

```
 1              THE WITNESS: Steve Sombrada (phonetic).
 2    BY MR. ROCCO:
 3    Q.   And the Local 621 represents the workers at the Nassau
 4    Coliseum?
 5    A.   Correct.
 6    Q.   Okay.  And Parking Systems acquired the Nassau Coliseum
 7    account in 2017?
 8              MR. MILMAN:  Objection, form.  Acquired.  It's vague,
 9    misleading.
10              JUDGE GREEN:  Overruled.
11    A.   Acquired 2017, sounds right.
12    BY MR. ROCCO:
13    Q.   And that -- was that also pursuant to an RFP?
14    A.   That was an RFP, yes.
15    Q.   Okay.  And in the specifications for the RFP, it required
16    Parking Systems to have neutrality with a labor union as a
17    condition of winning the bid?
18              MR. MAURO:  Objection.  Two things.  One, beyond the
19    scope, and two is, was this really relevant to the allegations
20    in the complaint?
21              JUDGE GREEN:  It's overruled.
22    A.   Can you repeat again?  Sorry.
23    BY MR. ROCCO:
24    Q.   As a condition of bidding on the RFP for the Nassau
25    Coliseum, Parking Systems was required to have neutrality with
```

1  a labor union, right?

2  A.    I would assume so.  Yeah.  It was -- that would be in the

3  RFP, yes.

4            MR. ROCCO:  Thank you.  No further questions.

5            MR. MAURO:  If I could have a couple minutes off the

6  record, Judge.

7            JUDGE GREEN:  Yeah.  Let me just -- do -- I just have

8  a question ahead, please.  Actually on the same issue.  Do you

9  -- did you have any involvement in dealing with Local 621?

10           THE WITNESS:  Yeah.

11           JUDGE GREEN:  What was your involvement?

12           THE WITNESS:  I guess, coordinating the original

13  agreement.

14           JUDGE GREEN:  You were involved in the negotiation?

15           THE WITNESS:  I would know about it with our

16  attorneys.  Yeah.

17           JUDGE GREEN:  Okay.  Anything else?

18           THE WITNESS:  No, I guess -- no.

19           JUDGE GREEN:  Okay.  Does having a union represent

20  the employees at the Nassau Coliseum, does that impact how you

21  run that operation any differently than how you run a different

22  operation that's not unionized?

23           THE WITNESS:  A different operation?  I mean, it's --

24  I guess it's a different operation.  It's only a few events

25  per, you know, per month at most.  So -- and dues are only

1    based on at that point.  So an event.

2              JUDGE GREEN:  I'm talking about --

3              THE WITNESS:  As far as moving staff around?

4              JUDGE GREEN:  Yeah.  Anything about the operation

5    being impacted by the presence of the Union or the presence of

6    a collective bargaining agreement?

7              THE WITNESS:  No.

8              JUDGE GREEN:  Okay.  And I -- there's this been this

9    talk of, you know, taking over the operation of a previous

10   contractor.  Now, in the instances where Parking Systems has

11   lost the contract, do you have a conversation with the

12   employees about what they want to do?

13             THE WITNESS:  Yeah.  Of course.  Look, I mean, our

14   goal is -- I mean, we've trained them, hopefully they enjoy

15   working with us, so we'll inform them what's going on and we'll

16   obviously offer them other work.

17             If there's a situation where, you know, this location

18   works for them, they want to do that, like, you know, we would

19   then talk to the, you know, incoming company and, you know,

20   have a conversation or a firm.

21             I'm not going to hold someone back from, you know,

22   doing something.  But that's, you know, it's kind of our

23   decision, I guess at that point.  We would inform the employer.

24             JUDGE GREEN:  Okay.  Thank you.  Any redirect?

25             MR. MAURO:  I do, Your Honor.  Can we just get a

1  couple minutes if you wouldn't mind?

2          JUDGE GREEN:  Yes.

3          MR. MAURO:  Thank you.

4          JUDGE GREEN:  Off the record.

5          MR. MAURO:  We'll take just 10.  Oh, if you wouldn't

6  mind.  10 minutes.  Thank you.

7          JUDGE GREEN:  Okay.  Off the record.

8       (Whereupon, a short recess was taken)

9                    REDIRECT EXAMINATION

10 BY MR. MAURO:

11 Q.   Mr. Baron, so I am clear from the period of -- well, quite

12 honestly, when you first got the bid through November 9th, did

13 you have any knowledge of the wage rate Classic Valet was

14 paying its employees?

15 A.   No.

16 Q.   Did you have any knowledge of their vacation policy?

17 A.   No.

18 Q.   Did you have any knowledge of any paid time off policy?

19 A.   No.

20 Q.   Did you have any knowledge of whether there was a cap on

21 the amount of hours the employees could work?

22 A.   Nothing.

23 Q.   Did you have any knowledge of whether the employees had a

24 pension benefit through --

25 A.   No.

1    Q.    Did you have any knowledge that the employees had any
2    health insurance through the Union?
3    A.    No.
4    Q.    Okay.  Did you have any knowledge of any of the -- any
5    compensation benefits that the employees of Classic Valet
6    received?
7    A.    No.
8          MR. MAURO:  Okay.  That's it, we have no further
9    questions.
10         JUDGE GREEN:  Any recross?
11                    RECROSS EXAMINATION
12   BY MR. JACKSON:
13   Q.    Yes, Your Honor.  At some point during November of 2023,
14   you learned about the contract that Classic had entered with
15   Local 1102 covering employees, correct?
16   A.    November 9th or 10th.  Yeah.
17   Q.    All right.  And you saw the collective bargaining
18   agreement that their union's attorney forwarded.
19   A.    Yeah.  I would've seen it if it was included in that
20   attachment I that's on the --
21   Q.    Right.  And Parking Systems does not provide a shoe
22   allowance to employees of Stony Brook currently, correct?
23   A.    Shoe allowance to employees currently at Stony Brook?  No.
24   Q.    Never have?
25   A.    Never have at Stony Brook, no.

```
 1   Q.   All right.  And you do not give six PTO days?
 2             MR. MILMAN:  Objection, Your Honor.  Beyond the
 3   scope.
 4             JUDGE GREEN:  Overruled.
 5   BY MR. JACKSON:
 6   Q.   You do not give six mandated -- you do not provide six
 7   PTO, paid time off, days to employees who work at Stony Brook,
 8   correct?
 9   A.   I don't think that is correct.  No.
10   Q.   You do provide six days.
11   A.   We certainly have PTO days.  Yeah.  Do you know how many
12   you provide to Stony Brook?
13   10?  No.  No, but yeah.  I mean, that's incorrect.
14   Q.   Okay.  Do you pay out for unused days?
15   A.   Yeah.  Whatever the, you know, requirement.  There's also
16   state -- there's requirements, so of course.
17   Q.   So you just -- for employees of Stony Brook, you only
18   comply with the state requirements?
19   A.   I can't speak to what that specific supervisor does, but
20   at a minimum, of course.  Yeah.
21   Q.   So you're unaware?
22   A.   Of the exact structure of every employee there and their
23   PTO, I'm not aware.  Yes.
24   Q.   So the supervisor determines how many PTO days?  The site
25   supervisors.
```

950

1  A.    Sure.  It could be different for employees, longevity,

2  different things, different roles.  Of course.

3  Q.    That's entirely within the discretion of the site

4  supervisor?

5  A.    For the most part, yeah.  They run their operation.

6  Q.    Okay.

7          MR. JACKSON:  No further questions.

8          MR. ROCCO:  Nothing from the Union.

9                  REDIRECT EXAMINATION

10  BY MR. MAURO:

11  Q.    Yeah.  I just have a quick follow up there.  So when you

12  were being asked about the site supervisor.

13  A.    Site supervisor, yeah.

14  Q.    Right.  What do you understand that to mean?

15  A.    The site supervisor and that -- a site supervisor would be

16  Travis.  Is that what you're saying?

17  Q.    Yeah.  I'm just -- like, what did you understand the term

18  site supervisor to mean?

19  A.    Can you tell me --

20  Q.    Well, you were asked a question on cross about, you know,

21  does the super -- site supervisor have the discretion to

22  essentially issue a policy about what paid time off --

23  A.    Correct.  That would -- typically, I didn't understand it

24  as site supervisor.  It would be more of -- because account

25  executive is interchangeable with supervisor.  So it's someone

1    more of a account executive level, not specifically site

2    supervisor.  Site supervisor.  I don't know what he was

3    referring to, but in this case would be the like manager on

4    duty at the location.

5    Q.   Right.  And just so I'm clear, when you were asked a

6    question about Stony Brook employees, is it accurate that there

7    are Stony Brook employees or just employees of Parking Systems?

8    A.   Well, I mean, they're employees of the entire company,

9    obviously.  I mean, they're not dedicated to one place.

10   Q.   Right.  And if the policy --

11   A.   So it would fall under -- so the policies would fall under

12   their general account executive who overseas their, you know,

13   territory.

14           That's how our payroll, that's how, you know,

15   benefits would be determined.  That's -- it's all under the

16   scope of the account executive, account representative, not a

17   site.

18           MR. MAURO:  Right.  Okay.  No further questions.

19                      RECROSS EXAMINATION

20   BY MR. JACKSON:

21   Q.   Just one -- two questions.  Your site supervisor today at

22   Stony Brook is Travis Gilliland?

23   A.   Site supervisor at Stony Brook is Travis, correct?

24   Q.   And the account manager is Andrew Goldsmith?

25   A.   Representative would be Andrew.

1          MR. JACKSON:  Okay.  No further question.

2          MR. ROCCO:  Nothing from the Union.

3          JUDGE GREEN:  Okay.  Let me just ask you, I don't

4    think this is for this witness.  I guess, let me just ask --

5          MR. MILMAN:  Sure.

6          JUDGE GREEN:  I had a question about R-10.  Am I

7    right that this document concern -- it shows the employees who

8    at some point worked at Stony Brook --

9          MR. MILMAN:  For the month of December, 2023, Your

10   Honor.  Correct.

11         JUDGE GREEN:  Okay.  And it doesn't -- it -- not --

12   it doesn't specifically indicate when, so they might have

13   worked somewhere else before and then going to Stony Brook?

14         MR. MILMAN:  Yeah.  In fact, most of them, if you

15   look at the hire dates of employees that been with the

16   organization, 10, 15 --

17         JUDGE GREEN:  Those would be --

18         MR. MILMAN:  -- 17 years.  Yeah.

19         JUDGE GREEN:  Okay.  All right.  Thank you very much.

20   Yes.  You're free to go.  Do we have anything else?

21         MR. MILMAN:  Could we go off the record?

22         JUDGE GREEN:  Off the record.

23      (Whereupon, a short recess was taken)

24   During off the record conversation, the parties agreed to enter

25    into evidence as an electronic exhibit, Joint Exhibit 4, which

1    will reflect the dates -- the hiring dates of certain Parking

2    Systems employees who at one point or another worked at Stony

3    Brook University Hospital.

4            Am I wrong about that?  Okay.  Why don't you say what

5    it is?

6        (Joint Exhibit 4 identified)

7            MR. MILMAN:  Yeah.  Your Honor, thank you.  The most

8    recent Joint 4 will show all the employees and hire dates.

9            JUDGE GREEN:  Oh, okay.

10           MR. JACKSON:  All employees of Parking Systems?

11           MR. MILMAN:  And the hire dates, yes.

12           MR. JACKSON:  Currently?

13           MR. MILMAN:  Yeah.  And the hire dates.

14           JUDGE GREEN:  Okay.

15           MR. MILMAN:  Because best we can do, and you'll have

16   to mix and match.  You'll have to match.

17           MR. JACKSON:  Okay.

18           JUDGE GREEN:  Okay.  So Joint Exhibits 2 through 4

19   are admitted.  So do we have anything else from the Respondent

20   or are you resting?

21       (Joint Exhibit 2 through 4 received)

22           MR. MAURO:  Well, so we have -- well a couple of

23   things.  One, we still are waiting on Classic Valet subpoena

24   response, and we'll want to enter some of their records into

25   the record.

1              We do anticipate having the two more witnesses from

2    Stony Brook, this Dan, and Nick, we keep hearing those names.

3    So I've been in contact with the General Counsel for Stony

4    Brook, who's accepted service and we're coordinating their

5    availability.

6              But they're not available today.  So we'll have to

7    probably come back for one day at some point as soon as I get

8    their availability.  But -- so --

9              MR. MILMAN:  And -- yeah.  Sorry, Mike.

10             MR. MAURO:  Go ahead.

11             MR. MILMAN:  And our offer is that we suggest, Your

12   Honor, if you -- defer to your ruling, is that we should keep

13   the record open for three weeks for the purpose of calling

14   these witnesses in.

15             JUDGE GREEN:  Okay.

16             MR. MILMAN:  We're not looking to enter anything else

17   at the record in three weeks, just for the purpose of calling

18   these individuals.

19             And another suggestion could be if it's, if it's

20   amenable to counsel for General Counsel and Mr. Rocco and Your

21   Honor, is that maybe these witness or witnesses can testify

22   remotely.

23             JUDGE GREEN:  Okay.  I mean, that's -- so basically

24   when it comes to Zoom testimony these days, it's basically we

25   do it in person unless it's consensual.  If it's consensual,

1    I'm always happy to do it.

2              So that's something that the parties should discuss.

3    So what are you -- what are you waiting for from Classic?

4              MR. MAURO:  Some limited payroll information from

5    them, that's basically it.

6              JUDGE GREEN:  Okay.  I thought we -- it's different

7    than what was entered into evidence as --

8              MR. MAURO:  A little bit different.

9              JUDGE GREEN:  -- Joint Exhibit 2 and 3?

10             MR. MAURO:  Yeah.  Just some limited -- very limited

11   information.

12             JUDGE GREEN:  Okay.  I was supposed to have it

13   yesterday.  I don't --

14   And we don't -- we really don't know what the availability of

15   Nick and Dan are.  Do we know what their last names are?

16             MR. MILMAN:  Yeah.  Nick -- Dan Atkins and Nick

17   Stefanelli.

18             JUDGE GREEN:  Okay.  We don't currently know what's

19   their availability.

20             MR. MAURO:  The General Counsel indicated to me that

21   they'd have some availability probably either mid next week at

22   least one of them.  And then the other one they have no -- it's

23   definitely not available through the 12th.  I know that.  So

24   one could be don --

25             JUDGE GREEN:  So listen, I mean, next week is

1  difficult for me and I'd rather not do this in two shots.

2          MR. MAURO:  Right.

3          JUDGE GREEN:  I'd rather do it one and get both

4  dates.  I'd like it to be this month.

5          MR. MAURO:  Of course.

6          JUDGE GREEN:  How are we all for vacation time?  Is

7  there any, you know, it's July.  Once you hit July and August,

8  it's like lawyers disappear.

9          MR. MILMAN:  Not me.

10          MR. JACKSON:  Yeah.  No.  I'm generally good.

11          MR. ROCCO:  Give -- I'll be happy to look at whatever

12  date you give me, but I'm not I'm not out until the end of

13  August.

14          JUDGE GREEN:  Okay.  All right.  So we'll wait to

15  hear from you.  And the record will be -- remain open.  We'll

16  wait to hear from you.  I'd like this to be, you know, to be

17  resolved and done this month.

18          MR. MAURO:  Yes.

19          MR. JACKSON:  I would just say it would be difficult

20  for me to do either July 18 or July 23.

21          JUDGE GREEN:  Okay.

22          MR. JACKSON:  But not impossible.  I'll be away on

23  those dates.  I -- so --

24          MR. MAURO:  The other thing just so I know, has the

25  General Counsel rested?  Because you got the privilege log, or

1  is that still out there?

2          MR. JACKSON:  Yes.  Oh yes.  General Counsel rests.

3          MR. MILMAN:  Are you okay with remote testifying

4  either of -- Counsel?

5          MR. JACKSON:  Yes.

6          MR. MILMAN:  I don't have a -- I think you either.

7          MR. JACKSON:  Yeah.  I think we would approach it.

8          MR. MILMAN:  Okay.  Fair enough.  We'll be in person.

9          JUDGE GREEN:  Okay.  Okay.  Very good.  So off the

10  record.

11  (Whereupon, at 12:52 p.m., the hearing in the above-entitled

12  matter was adjourned to reconvene on a date to be determined)

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                        CERTIFICATION

 2        This is to certify that the attached proceedings before

 3   the National Labor Relations Board (NLRB), Region 29, in the

 4   matter of Parking Systems Plus, Inc. and Local 1102, Retail

 5   Wholesale & Department Stores Union, United Food and Commercial

 6   Workers, Case No. 29-CA-331253, at 26 Federal Plaza, 2nd Floor,

 7   New York, New York 10278, on July 3, 2024, was held according

 8   to the record, and that this is the original, complete, and

 9   true and accurate transcript that has been compared to the

10   recording from the hearing, that the exhibits are complete and

11   no exhibits received in evidence or in the rejected file are

12   missing.

13

14

15

16   _____

17   Adrian Morris

18

19

20

21

22

23

24

25
```

## $

**$11 (1)**
936:12

**$11.7 (1)**
929:17

**$16,800 (1)**
942:3

**$27,300 (1)**
942:8

## A

**A7 (1)**
931:2

**ability (2)**
917:11;933:15

**able (9)**
882:15;892:11;
913:11;914:11;
915:24;918:6;926:15,
16;933:17

**Above (1)**
889:23

**above-entitled (2)**
863:15;957:11

**Absolutely (11)**
868:14;874:3;
875:8;883:5;898:13;
904:6;906:22;910:2;
917:15;918:13;
930:21

**accept (1)**
868:8

**accepted (1)**
954:4

**account (25)**
874:16;897:18;
914:24;915:2,8;
919:18;924:21;
925:12;935:5,6,10,21;
936:5,11,17;940:18;
941:16,21;944:7;
950:24;951:1,12,16,
16,24

**accounted (2)**
923:14,16

**accounts (2)**
935:2;936:7

**accrue (1)**
925:11

**accrued (1)**
942:9

**accruing (2)**
925:11,21

**accurate (1)**
951:6

**acknowledge (1)**
873:10

**acknowledgement (2)**
873:6,11

**acknowledgements (1)**

905:12

**acknowledges (1)**
889:6

**acquired (5)**
888:18;935:5;
944:6,8,11

**acquiring (2)**
882:22;935:2

**across (1)**
876:3

**action (1)**
875:25

**active (1)**
918:19

**actively (2)**
884:17;913:11

**actual (13)**
869:11;882:23;
885:17;886:1;887:10;
891:7;897:9;902:5,
14;903:11;916:2,3;
927:13

**actually (27)**
876:5,18,23;878:2;
880:3,19;882:9,15;
883:6,10;884:11;
885:17,20;887:23;
889:3;890:4;891:12;
892:11;901:13;
905:14;909:2,15;
923:12;928:24;934:9;
935:8;945:8

**ad (6)**
904:3;920:21;
921:7;927:18,21,24

**add (7)**
924:2,4,4,16,21;
932:12,12

**addendum (4)**
892:25;893:22;
923:17,20

**adding (1)**
927:12

**additional (3)**
869:16;872:11;
892:22

**address (1)**
871:13

**adds (1)**
924:22

**adjourned (1)**
957:12

**admin (1)**
919:18

**administration (1)**
882:25

**Administrative (1)**
863:16

**admission (1)**
890:4

**admitted (5)**
890:13;906:1,5;
907:10;953:19

**ads (6)**
919:11;920:15,19;
928:1,5,11

**advertise (1)**
921:22

**advice (1)**
871:20

**affiliated (1)**
943:16

**afternoon (2)**
926:7;933:22

**again (23)**
873:17;874:4;
877:24;890:16;
891:22;893:24;896:4;
898:25;903:9,15,19;
907:13,14,20,23;
909:8,17;911:2;
913:24;914:13;
916:12;917:19;
944:22

**against (1)**
909:11

**aggregated (2)**
886:10,11

**agree (9)**
922:3;941:15,20;
942:1,6,7,14,18,19

**agreed (1)**
952:24

**agreement (12)**
895:24;896:2;
899:14,20;900:2;
942:12,24;943:1,12;
945:13;946:6;948:18

**ahead (7)**
945:8;954:10

**alerted (1)**
905:15

**allegations (1)**
944:19

**allocate (1)**
886:9

**allowance (3)**
942:2;948:22,23

**allowed (3)**
892:22;934:9;940:1

**allows (1)**
921:8

**almost (2)**
922:15;939:17

**always (5)**
903:16;908:20;
911:14,14;955:1

**amenable (1)**
954:20

**amount (8)**
896:20;897:19;
898:16;902:7;908:7;
915:15;917:18;
947:21

**amounted (1)**
929:19

**amounts (2)**
902:3,5

**analyze (1)**
914:17

**analyzing (1)**
896:24

**and/or (2)**
872:23;878:11

**Andrew (13)**
872:22;874:13,16,
24;878:11;914:22,23;
937:15,23;938:5;
939:12;951:24,25

**annual (1)**
929:23

**answered (1)**
939:15

**anticipate (1)**
954:1

**anticipated (1)**
889:15

**anticipating (1)**
869:17

**apologize (1)**
870:20

**apparent (1)**
896:11

**appear (1)**
896:8

**appears (1)**
895:8

**applicant (2)**
912:16,17

**applicants (4)**
906:20;919:6,22;
933:10

**applicant's (1)**
905:9

**application (8)**
905:8,10,10;
906:19;907:1,3;
913:19,22

**appreciate (2)**
870:1,8

**approach (1)**
957:7

**approximately (2)**
942:3,8

**area (6)**
874:14;880:12;
885:4;903:18;904:25;
921:15

**Arias (1)**
879:24

**A-R-O-N (1)**
881:12

**around (12)**
878:2,11;879:4,15;
881:25;903:14;
913:22;924:13;925:8;
934:19;937:5;946:3

**arrangements (1)**
895:17

**arrived (1)**
875:17

**art (1)**
935:7

**A's (3)**
869:3,4;930:15

**aside (1)**
908:5

**aspect (2)**
882:8;926:9

**assessment (1)**
942:18

**assume (3)**
926:24;929:25;
945:2

**assuming (4)**
905:18;913:21;
936:14;940:8

**assumption (1)**
880:9

**Atkins (1)**
955:16

**attachment (1)**
948:20

**attend (2)**
892:6,9

**attendance (2)**
917:17;927:17

**attendances (1)**
928:24

**attendant (1)**
915:5

**attendants (1)**
917:10

**attention (8)**
889:17;894:16;
895:7,20;911:24;
921:6;930:24;937:22

**attorney (3)**
871:14,23;948:18

**attorney-client (1)**
871:14

**attorneys (2)**
871:11;945:16

**August (4)**
901:9,10;956:7,13

**authenticated (1)**
868:10

**author (1)**
871:10

**availability (5)**
954:5,8;955:14,19,
21

**available (2)**
954:6;955:23

**avenues (1)**
883:21

**awarded (7)**
898:9;899:14;
900:23;901:9;902:12;
908:11;910:1

**awarding (1)**
935:11

**aware (32)**
874:6,8;886:23;
887:9;890:17;891:18;
897:24;898:22;900:7,
23,25;901:2,11;
909:16;919:9,18,21,
23;923:19;925:10,17,
18,19;930:10,12,14;
931:3;932:4;933:9;
940:15;942:16;
949:23
**away (4)**
875:25;940:17;
942:20;956:22
**awkward (1)**
877:11

## B

**back (15)**
870:22;873:7;
875:20;876:10,10,22;
882:12;885:11;
889:12;892:9;904:11;
916:11,13;946:21;
954:7
**background (4)**
889:23,23;905:19;
913:23
**balance (1)**
869:14
**ball's (2)**
905:4,9
**bargaining (8)**
899:14,20;942:12,
24,25;943:12;946:6;
948:17
**Baron (20)**
881:2,6,11,16;
888:6,25;893:13;
896:7;906:9,14;
907:13;911:1;916:11,
12;918:24;930:9;
933:22;937:13,15;
947:11
**barrel (1)**
879:14
**based (28)**
879:22;885:25;
895:1,16;897:5;
898:18;900:2,3,4,6;
904:25;905:5;914:22;
915:16,23;919:8;
920:8;922:7,11;
929:21;930:4;932:8;
933:24;935:24;
936:14;940:21;
942:16;946:1
**basic (1)**
923:6
**Basically (7)**
876:10;879:9,16;
914:1;954:23,24;

955:5
**Bear (1)**
930:9
**became (3)**
887:9;891:18;
900:23
**become (3)**
886:23;900:19;
901:11
**begin (2)**
890:2;938:23
**beginning (4)**
886:25;901:9,9;
937:14
**behalf (3)**
896:21;899:13;
910:15
**behind (2)**
876:2;936:21
**below (3)**
936:15;939:14,24
**benefit (1)**
947:24
**benefits (5)**
891:3;899:9,10;
948:5;951:15
**BENJAMIN (1)**
863:16
**best (1)**
953:15
**better (1)**
918:21
**beyond (2)**
944:18;949:2
**bid (62)**
882:23;883:16;
884:2,3,6,12;887:1,
13,15,17,21;888:7;
889:4,12;891:7,11,14,
19;892:4,11;896:17,
20;897:9,11,19;898:1,
3,5,7,8,14,16,17,23;
899:1,12,14,15,15;
900:25;901:2,12,13,
17;902:2,7,12;909:1,
11;910:12;929:9,10;
930:6;935:11,23;
936:1,15;940:24,24;
941:18;944:17;
947:12
**bidder (1)**
894:14;901:7;
940:23,25
**bidders (2)**
893:25;896:9
**bidding (9)**
889:11;891:19;
892:12,13;898:21;
908:6;915:18;936:1;
944:24
**bids (11)**
883:16,17,23;
884:8;898:3;908:5,8;

910:9,15,17;930:7
**biggest (2)**
911:21,23
**bill (1)**
913:15
**billable (3)**
928:16,19,25
**billed (1)**
928:22
**billing (1)**
928:20
**Binghamton (2)**
934:4,8
**Bingington (1)**
934:15
**bit (2)**
911:1;955:8
**blended (2)**
886:11,12
**BOARD (4)**
863:2,17;876:8;
877:15
**Bobby (6)**
880:24;914:20;
917:9;941:15;942:1,7
bobbygust@parkingsystemscom (1)
941:11
**bone (3)**
941:17,21,22
**boots (1)**
912:5
**Both (2)**
937:18;956:3
**bottom (2)**
937:14;938:1
**box (1)**
896:6
**boy (1)**
881:12
**boyfriend (1)**
880:8
**brand (1)**
918:22
**break (1)**
897:7
**breakdown (1)**
885:23
**briefly (14)**
882:21;883:14;
884:1;885:13;889:1;
898:15,25;900:5,9;
902:19;904:17;
911:19;912:20;919:5
**bring (4)**
920:23,24;921:4,14
**bringing (4)**
876:7;917:21;
918:18,18
**Brook (78)**
874:16;876:15;
886:19;887:3;888:9,
19;889:15;890:22,25;
892:23;893:9,11;

895:3;900:24;901:14;
902:2,14;905:25;
908:5;910:7,12;
912:10;914:4,13;
915:11,24;916:15;
918:12;919:6,7,22;
920:5,6;921:5,10,11,
14,17,23;922:5;923:6,
22;924:21;925:12;
926:21;927:21;
928:12;929:3,12;
930:10;931:3;932:5,
10;935:21;936:6,11,
17;937:1;938:17;
939:20;940:18,22;
941:16;948:22,23,25;
949:7,12,17;951:6,7,
22,23;952:8,13;
953:3;954:2,4
**Brooks (1)**
920:14
**brought (5)**
880:16;900:13;
914:19;916:19,23
**B's (1)**
869:4
**budget (2)**
912:8,11
**build (2)**
882:16;935:25
**building (5)**
883:20;911:16,18;
918:14;935:9
**bunch (1)**
884:13
**busier (1)**
900:12
**business (29)**
868:7;872:23;
873:13;881:22,25;
882:8,12,13,16,23;
883:13,14,22;885:4,
10;896:24;911:7,22;
933:9,23;934:16,18,
19,22,24;935:17,18,
20;937:5
**busy (1)**
884:19

## C

**cab (1)**
870:19
**calculated (1)**
942:5
**calculating (1)**
898:15
**calculus (1)**
892:15
**call (9)**
875:10;887:4;
891:24;902:20;903:9,
20;905:2;907:14;

895:3;900:24;901:14;
924:1
**Callari (1)**
919:16
**called (3)**
872:17;875:18;
881:7
**calling (3)**
883:21;954:13,17
**came (5)**
863:15;880:6;
888:11;896:16;900:7
**camera (1)**
871:24
**campus (1)**
887:6
**can (40)**
868:20;871:13;
873:9;875:6;877:12;
883:13;884:10,13;
885:13;889:1,7;
893:20;894:3,16;
895:10,23,24;896:19;
897:23;901:16;
904:17;905:6;906:17;
909:6;922:24;924:6,
7;930:22;933:24;
937:9;939:7;940:5,
17;941:1;942:20;
944:22;946:25;
950:19;953:15;
954:21
**cancer (1)**
880:12
**candidate (1)**
905:2
**Candiotti (6)**
876:1;905:2;
914:18;921:25;922:3;
937:12
**cap (1)**
947:20
**capture (1)**
904:25
**car (1)**
911:11
**card (2)**
873:13;933:10
**cards (1)**
872:23
**carefully (1)**
930:18
**Carol (5)**
893:25;901:4,14;
922:22,23
**cars (4)**
883:2;903:14;
928:14;932:9
**Case (16)**
863:3;873:21;
892:10;897:6;898:17,
19;899:4;912:9;
914:7,16;915:16;
927:2;928:25;929:1;

931:14;951:3

**cases (5)**
892:11;910:4;
914:17;922:15,15

**categorize (1)**
885:14

**categorized (1)**
885:15

**category (1)**
898:18

**catering (1)**
911:12

**CBA (4)**
895:25;899:5,6;
942:16

**CBAs (1)**
898:3

**CC'ing (1)**
937:13

**CDA (1)**
895:9

**center (5)**
935:21;936:11,17;
937:1;938:17

**certain (2)**
908:7;953:1

**certainly (6)**
878:14;879:1;
893:6;903:17;938:25;
949:11

**certification (4)**
868:7,15;869:7,10

**chance (2)**
888:13;902:8

**change (4)**
877:22;886:20;
902:11;911:15

**changed (1)**
903:5

**changes (1)**
903:2

**characterization (3)**
941:16,20;942:7

**Charging (1)**
863:12

**chat (1)**
926:13

**chatting (1)**
868:6

**check (2)**
905:20;913:23

**city (2)**
898:10;928:9

**clarify (1)**
928:18

**class (1)**
878:12

**Classic (25)**
868:5;874:2,7;
878:20;879:1,6,6;
888:14;901:21;
907:15,16,22;909:9;
911:3;914:7;915:21,

24;923:17,23;930:11;
947:13;948:5,14;
953:23;955:3

**Classics (1)**
902:7

**clean (1)**
868:19

**clear (4)**
896:7;898:8;
947:11;951:5

**click (2)**
887:11,13

**client (8)**
871:15,16,17;
913:15;917:3;922:14;
928:20;931:3

**clients (3)**
912:8;915:12,15

**client's (1)**
871:22

**clock (1)**
928:17

**close (4)**
878:16;941:17,21,
22

**code (3)**
872:24;933:13,15

**codes (1)**
878:12

**coffee (1)**
875:24

**coincide (1)**
926:2

**cold (1)**
883:20

**Coliseum (7)**
900:3,11,17;944:4,
6,25;945:20

**colleagues (1)**
932:16

**collect (1)**
933:16

**collective (8)**
899:13,20;942:12,
23,25;943:11;946:6;
948:17

**college (1)**
934:2

**column (1)**
895:11

**comfortable (5)**
877:16,16,17,18;
913:7

**coming (4)**
870:4;900:20;
904:1,20

**commencing (1)**
889:15

**comments (1)**
937:21

**COMMERCIAL (1)**
863:10

**communicating (2)**

879:3,10

**communications (3)**
871:14;878:13;
879:4

**companies (2)**
891:19;896:15

**company (17)**
883:7;885:22;
888:8,18;901:21;
908:22;909:1,10;
914:10;918:12;
929:11;935:1;936:12;
940:2;942:2;946:19;
951:8

**compensation (1)**
948:5

**competition (1)**
909:12

**competitive (2)**
908:6,6

**compile (1)**
897:5

**complaint (1)**
944:20

**completed (1)**
905:15

**complied (1)**
870:3

**comply (2)**
871:15;949:18

**comptroller's (2)**
943:3,9

**computes (1)**
929:22

**con (1)**
891:7

**concern (4)**
878:19;879:8;
916:21;952:7

**concerned (2)**
878:15,18

**concerns (1)**
871:9

**condition (2)**
944:17,24

**confidence (1)**
912:21

**confident (1)**
914:3

**confirm (1)**
895:23

**confirmed (2)**
923:12;924:1

**confused (1)**
876:14

**confusion (1)**
923:11

**consensual (2)**
954:25,25

**consider (3)**
909:11;917:12;
933:24

**consideration (4)**

897:20;903:15,19;
917:12

**considerations (1)**
903:10

**considered (1)**
941:19

**consistent (3)**
909:23,24;911:4

**constant (1)**
942:19

**constellation (1)**
915:9

**contact (3)**
909:18;940:1;954:3

**contains (1)**
871:9

**continued (1)**
876:20

**continues (1)**
935:5

**contract (18)**
894:1;895:4;896:1;
898:9,12;900:23;
908:11,16;909:25;
923:16,22;931:15;
935:8;936:2,13;
942:4;946:11;948:14

**contractor (1)**
946:10

**contracts (1)**
908:19

**conversation (5)**
875:4;877:1;
946:11,20;952:24

**conversations (2)**
919:19;937:3

**coordinating (2)**
945:12;954:4

**copy (2)**
895:9;926:10

**cordoned (1)**
896:10

**core (1)**
885:4

**corporate (4)**
882:24;912:1;
914:16;939:17

**correspondence (1)**
871:19

**cost (4)**
912:8,11;942:2,8

**counsel (19)**
868:6;869:25;
870:14,14,15;871:8,
20,22;872:12;937:9,
11;941:8;954:3,20,
20;955:20;956:25;
957:2,4

**Counsel's (1)**
872:8

**County (3)**
915:16;919:15;
920:24;921:8;935:25;

938:10

**couple (5)**
870:19;919:14;
945:5;947:1;953:22

**course (14)**
874:20;898:25;
912:19;916:24;
921:14;925:20;
929:14;932:12;
936:23;946:13;
949:16,20;950:2;
956:5

**court (3)**
900:10;905:4,9

**courtroom (2)**
921:25;922:2

**covering (1)**
900:1;948:15

**create (2)**
912:11,12;915:3,18

**Cricket (1)**
918:4

**cross (5)**
872:8,11,19;
874:11;919:1,3;
926:8;933:20;950:20

**culture (4)**
911:16,17;917:6;
918:18

**Cup (1)**
918:4

**current (6)**
890:17;894:25;
898:11,11;922:18;
931:15

**currently (6)**
881:17;882:20;
883:2;884:15,21;
899:20;942:24;
943:11;948:22,23;
953:12;955:18

**customer (2)**
873:6;912:12

**customers (2)**
927:14,15

**cut (3)**
927:18,19,20

---

## D

**dad (2)**
882:8;911:23

**daily (3)**
883:1;911:23;912:4

**Dan (3)**
954:2;955:15,16

**data (4)**
927:6;932:8,11;
933:16

**date (6)**
909:22;916:2,3;
923:15;956:12;
957:12

**dated (3)**
893:24;937:24;
939:3
**dates (8)**
952:15;953:1,1,8,
11,13;956:4,23
**day (9)**
882:25;903:5;
910:3;921:23;923:3;
924:14;925:24;
939:17;954:7
**days (18)**
910:5,5,913:23;
918:5;921:13,17,18;
922:23;924:14;927:3,
10;949:1,7,10,11,14,
24;954:24
**day-to-day (1)**
918:20
**deal (1)**
943:22
**dealership (1)**
911:12
**dealing (1)**
945:9
**December (22)**
874:7;916:1,3,5;
920:10;923:11,13;
925:10,14,15,23,23;
926:21,22;927:4,18,
24;932:5;936:18,23;
938:24;952:9
**decision (1)**
946:23
**dedicated (2)**
885:7;951:9
**deeper (1)**
911:2
**defer (1)**
954:12
**define (1)**
938:12
**defines (1)**
941:22
**Definitely (9)**
890:19,23;909:20;
919:20,23;920:19;
925:17;938:20;
955:23
**degree (1)**
918:10
**delay (1)**
869:21
**delicately (1)**
908:20
**deliver (1)**
918:21
**DEPARTMENT (2)**
863:9;885:22
**departments (1)**
885:21
**dependents (1)**
918:5

**depending (3)**
913:1;924:8;928:2
**depends (1)**
915:14
**deploy (1)**
912:22
**describe (11)**
874:19;882:21;
883:14;884:1;885:13;
889:1;902:19;904:17;
911:19;912:20;
915:13
**described (6)**
880:11;882:3;
883:23;913:17,20;
917:3
**describing (2)**
902:2;924:9
**description (4)**
871:19;887:2;
889:18,19
**desire (1)**
907:21
**desk (1)**
882:9
**detailed (1)**
916:16
**determine (2)**
884:2;914:14
**determined (6)**
895:2;897:12;
936:23;941:23;
951:15;957:12
**determines (1)**
949:24
**determining (3)**
896:19;897:18;
898:16
**Development (6)**
881:22;882:14;
883:13;935:17,18,20
**develops (1)**
883:14
**difference (1)**
923:14
**different (25)**
883:16,21;884:13,
20;886:6;892:18;
899:15;912:24,25;
913:6;922:12;924:6,
6;926:5;928:4;930:7;
931:13;945:21,23,24;
950:1,2,2;955:6,8
**differently (1)**
945:21
**difficult (3)**
917:7;956:1,19
**DIRECT (6)**
881:14;889:17;
894:16;895:6,20;
930:24
**directed (2)**
872:22;877:3

**disappear (1)**
956:8
**discovered (1)**
880:4
**discretion (2)**
950:3,21
**discuss (3)**
889:14;922:24;
923:3;955:2
**discussed (2)**
924:1;940:18
**discussing (3)**
871:7;890:25;912:3
**discussion (2)**
870:6;902:22
**discussions (3)**
907:15,17;909:9
**distribute (1)**
872:23
**distributed (1)**
888:23
**divert (1)**
924:25
**document (25)**
868:10;887:7;
889:2,13;890:20,24;
891:6;893:21;894:2,
3,7,13;896:8,10;
906:11,15,17;932:17;
937:12,16;940:7,17;
941:9;942:20;952:7
**documents (1)**
889:10
**dollar (2)**
902:5,7
**don (1)**
955:24
**done (8)**
868:12;888:15,22;
893:15;904:21;930:7;
938:19;956:17
**door (2)**
912:1;932:23
**down (9)**
869:15;875:15,22,
23;876:1,7,18;897:7;
911:25
**download (1)**
887:23
**downloaded (1)**
888:7
**drastically (1)**
927:8
**draw (1)**
921:6
**drill (1)**
911:1
**dropped (1)**
927:8
**due (1)**
900:20
**dues (4)**
899:11;900:3,4;

945:25
**duly (2)**
872:17;881:7
**during (7)**
879:23;884:18;
891:17,24;909:17;
948:13;952:24
**duties (2)**
882:21,22
**duty (3)**
929:7;935:2;951:4

**E**

**earlier (1)**
939:16
**easier (1)**
936:7
**east (3)**
914:25;921:13,18
**Eastern (4)**
874:14;938:9,11,14
**Edward (1)**
879:24
**effect (1)**
877:6
**effective (3)**
871:1;912:8,11
**effort (1)**
870:8
**either (7)**
875:18;903:7;
928:8;955:21;956:20;
957:4,6
**electronic (1)**
952:25
**elemental (1)**
899:7
**else (14)**
870:15;872:5;
876:22,25;884:9;
900:21;905:7;933:14;
940:9;945:17;952:13,
20;953:19;954:16
**else's (1)**
907:25
**elsewhere (2)**
900:15;909:6
**email (18)**
869:18;884:5;
886:25;887:12;901:4;
905:7;927:23;937:12,
14,20,22;939:2,12,15,
19;940:13;941:10;
942:2
**emails (2)**
937:18;941:9
**employ (1)**
921:11
**employed (2)**
881:17;907:16
**employee (8)**
874:2,7;886:3;

**906:24;932:18;938:7,**
8;949:22
**employees (59)**
872:24;873:2,2;
877:7;878:12;879:6,
7;880:2;884:15;
885:12;890:18;891:1;
895:2,15;896:2,3;
900:1,12;903:20;
907:22,25;908:3;
909:2,18;911:3,13;
914:8;915:25;916:19,
23;921:23;924:10,24;
925:6,11;929:11;
930:1;945:20;946:12;
947:14,21,23;948:1,5,
15,22,23;949:7,17;
950:1;951:6,7,7,8;
952:7,15;953:2,8,10
**employee's (2)**
895:8,16
**employer (2)**
881:19;946:23
**employers (1)**
922:16
**employment (9)**
904:7,11,12;
906:21;907:22;
913:18;919:6;932:19,
21
**end (9)**
878:15;889:10;
904:23;915:12,13;
922:8;925:22;935:11;
956:12
**ended (2)**
877:25;908:19
**enforcement (1)**
869:21
**enhancing (1)**
912:12
**enjoy (1)**
946:14
**enormous (1)**
918:3
**enough (5)**
910:4;912:21;
914:3;918:1;957:8
**entails (1)**
884:7
**enter (4)**
905:6;952:24;
953:24;954:16
**entered (3)**
906:24;948:14;
955:7
**entire (3)**
934:20;937:5;951:8
**entirely (1)**
950:3
**entirety (1)**
896:8
**entities (7)**

892:2,3;893:4;
901:12,17;902:3;
908:12
**entity (1)**
908:12
**entries (1)**
871:9
**entry (2)**
871:3,10
**Ephraim (2)**
922:25;923:1
**equipment (3)**
897:2;903:3,5
**especially (5)**
930:10,13;931:4,
11,16
**essentially (7)**
869:22;873:10;
903:14;909:1;918:16;
923:22;950:22
**established (3)**
929:6,9,10
**estimates (1)**
898:20
**evaluate (2)**
884:6,14
**even (12)**
873:8;887:14;
898:6;904:21;910:4;
913:13;917:9;921:10;
922:18;926:12;927:6;
937:3
**evening (1)**
926:7
**event (9)**
883:11;900:2,4,6,8,
21;918:4;921:2;946:1
**events (5)**
884:23;900:11,13,
15;945:24
**everybody (3)**
876:22,25;929:25
**everyone (8)**
894:3;897:12;
901:1,15;926:8;
929:19,20;933:15
**everyone's (1)**
922:17
**everything's (1)**
887:16
**evidence (8)**
870:5;905:24;
907:5;937:11;941:1,
8;952:25;955:7
**exact (2)**
891:12;949:22
**exactly (3)**
899:6;930:2;938:12
**examination (13)**
872:8,12,19;
874:11;878:9;879:20;
881:14;919:2,3;
947:9;948:11;950:9;

951:19
**EXAMINATRION (1)**
933:20
**examined (2)**
872:18;881:8
**example (6)**
885:19;886:5;
900:7;905:2;909:4;
926:5
**examples (1)**
912:9
**exams (2)**
905:14;912:23
**excessive (1)**
925:11
**excessively (1)**
925:21
**exchanging (1)**
876:20
**Excuse (2)**
872:13;939:24
**exec (2)**
915:2,8
**executive (4)**
950:25;951:1,12,16
**Exhibit (31)**
868:22;869:8;
888:1,4,22;889:1,14,
18,19;890:4,14,21,25;
891:6;893:13,14,18;
905:24;906:6,8,12;
907:4,11;926:11;
932:16;937:11;
952:25,25;953:6,21;
955:9
**exhibits (2)**
887:18;953:18
**existing (1)**
931:4
**expect (3)**
880:10;898:5;914:8
**expectations (1)**
931:16
**expected (1)**
902:14
**expecting (4)**
880:13;897:4;
902:16;922:20
**expeditious (1)**
870:1
**expense (2)**
898:20;913:15
**expenses (5)**
896:24;897:5,24,
25;930:4
**experience (3)**
914:21;917:14,24;
936:5;940:21
**expertise (3)**
912:7;914:20,21
**explain (3)**
876:13;896:19;
898:15

**export (3)**
889:3,5,9
**exposure (1)**
892:19;934:17
**expressed (4)**
878:19;880:2;
915:1,1
**extent (1)**
902:21
**extra (5)**
913:14;925:25,25;
926:2,4

---

## F

**facilities (2)**
917:25;936:9
**facility (6)**
875:19;911:11;
913:4;914:18;915:24;
916:15
**fact (2)**
937:5;952:14
**factor (2)**
911:21;915:12
**factors (1)**
884:13
**fair (4)**
874:19;908:7;
935:10;957:8
**fairly (2)**
903:17;908:1
**fall (3)**
878:5;951:11,11
**familiar (3)**
901:22;909:10;
926:23
**family (5)**
877:8;880:3;
911:22;933:23;
934:16
**fan (2)**
869:2,3
**far (7)**
889:10;913:4,21;
919:9;928:13;942:4;
946:3
**father (5)**
882:1;911:7;
933:25;934:22,24
**father's (1)**
933:24
**fault (1)**
879:2
**features (2)**
912:12,25
**Federal (1)**
863:17
**feedback (1)**
878:25
**feel (3)**
880:15;892:17;
918:9

**felt (2)**
878:25;879:1
**few (10)**
874:13;877:11;
883:15,21;893:16;
904:18;934:15;939:7;
942:21;945:24
**field (4)**
882:11;912:22;
913:11,16
**figure (2)**
897:24;940:4
**figuring (1)**
902:25
**fill (6)**
905:10;906:20;
918:6;925:3;929:21;
932:18
**filled (1)**
932:20
**filling (2)**
928:23;930:3
**finally (1)**
895:20
**fine (7)**
868:14;869:1,7;
877:21;889:13;
931:21,21
**finished (2)**
937:17;941:13
**fireworks (1)**
883:11
**firm (1)**
946:20
**first (24)**
871:10;874:17,18,
22;876:11;880:10,18;
881:7;894:17;900:16;
904:19;911:8;920:4,
12;922:21;923:2,5;
927:2;930:25;931:1;
937:12;938:4;939:25;
947:12
**fit (1)**
915:11
**five (5)**
871:9;894:3;
897:17;900:14;
902:11;929:23
**flip (1)**
938:4
**Floor (1)**
863:18
**focused (1)**
909:8
**Focusing (6)**
885:11;886:18;
907:13;910:8;913:24;
937:22
**Follow (3)**
888:16,16;950:11
**following (3)**
901:1;928:19;

932:19
**follows (2)**
872:18;881:8
**FOOD (1)**
863:10
**forgot (1)**
923:21
**form (4)**
904:20;906:21;
932:17;944:8
**formal (3)**
887:19;892:4,24
**formally (1)**
901:9
**formats (1)**
930:7
**formulate (1)**
899:1
**formulating (1)**
897:19
**formulation (1)**
898:15
**forth (1)**
876:10
**fortunate (3)**
899:16;910:4;918:2
**forward (1)**
902:13
**forwarded (1)**
948:18
**founding (1)**
882:1
**four (1)**
882:10
**four-page (1)**
941:8
**Francis (1)**
876:3
**Francis' (1)**
877:8
**frankly (1)**
871:25
**free (1)**
952:20
**Friday (2)**
923:2,4
**friends (1)**
904:1
**fringe (1)**
891:3
**front (2)**
875:19;876:4
**fulfill (1)**
924:3
**full (3)**
881:24;889:9;
934:18
**full-time (1)**
915:2
**further (12)**
874:9;875:2;
879:17;880:20;
882:16;918:24;

933:18;945:4;948:8;
950:7;951:18;952:1
**future (1)**
936:7

## G

**gain (1)**
892:22
**Garden (1)**
928:9
**gave (1)**
915:3
**GC (2)**
872:6;926:11
**GC- (1)**
941:1
**GC-17 (1)**
941:4
**General (25)**
870:14;872:8,12;
887:2;903:20,21,22,
23;904:23;905:13;
920:23,24;921:7;
923:5;924:5;927:21;
937:9,11;941:8;
951:12;954:3,20;
955:20;956:25;957:2
**generally (1)**
956:10
**geographic (2)**
914:17;935:24
**geographically (1)**
915:16
**gets (4)**
870:19;913:16;
921:16;935:6
**Gil (2)**
874:1;875:10
**Gilliland (2)**
876:2;951:22
**given (2)**
871:20;940:22
**glad (1)**
876:6
**Gluck (1)**
919:17
**goal (1)**
946:14
**goes (3)**
905:5;913:21;
922:11
**Goldsmith (8)**
874:13,24;937:15,
23;938:5;939:13,25;
951:24
**Goldsmith's (3)**
874:17;938:22;
940:13
**good (11)**
868:6;880:24;
881:16;905:18;
907:18;908:4;915:17;

917:17;933:22;
956:10;957:9
**graduated (2)**
934:2,15
**great (4)**
868:17;909:5;
915:5;918:24
**greatest (1)**
883:19
**GREEN (104)**
863:16;868:3,9,24;
869:2,4,10,13,19;
870:4,9,13,17,21,23;
871:3,6,12,18,25;
872:2,5,7,11,14;
874:10;875:3,6;
878:8;879:19;880:21,
23,25;881:3,9,13;
890:6,9,11,13;906:2,
5;907:6,10;910:23;
916:8,13;919:1;
929:16,25;930:5;
931:8,18;933:1,5,19;
934:6,9,12;936:21;
940:8,11;941:3;
942:13,15;943:19,25;
944:10,21;945:7,11,
14,17,19;946:2,4,8,
24;947:2,4,7;948:10;
949:4;952:3,6,11,17,
19,22;953:9,14,18;
954:15,23;955:6,9,12,
18,25;956:3,6,14,21;
957:9
**greeting (1)**
887:5
**gross (1)**
936:12
**ground (1)**
912:5
**grouping (1)**
896:13
**grow (3)**
915:2;917:11;921:8
**guess (36)**
869:17,24;877:20;
881:24;885:22;
886:24;888:16;889:6;
899:11;900:2,10,12,
16;901:18;904:23;
905:15;909:11;913:7;
914:7,23;915:14;
916:1;917:8;920:8;
923:20,21;928:18;
929:18;936:8;937:20;
938:11;945:12,18,24;
946:23;952:4
**Gust (8)**
870:22;872:9,16;
874:13;879:23;933:9,
11,13
**Gust's (4)**
941:15,20;942:1,7

**guys (3)**
878:3;917:10;
940:16

## H

**half (1)**
886:15
**Hampton (1)**
938:11
**Hamptons (2)**
921:1;938:13
**hand (1)**
881:4
**handheld (1)**
913:5
**handle (2)**
884:10;908:20
**handling (2)**
927:2,3
**happen (1)**
912:15
**happened (3)**
875:7;878:3;909:4
**happens (1)**
897:7
**happy (3)**
931:24;955:1;
956:11
**headache (1)**
911:14
**health (1)**
948:2
**healthcare (5)**
913:3;914:19;
915:15;936:9,9
**hear (2)**
956:15,16
**heard (1)**
932:16
**hearing (3)**
863:15;954:2;
957:11
**heavily (1)**
936:16
**heavy (1)**
927:13
**held (2)**
881:23,24
**help (2)**
883:11,12
**here's (1)**
901:5
**hesitate (1)**
918:6
**hey (3)**
887:11;921:23;
922:23
**hi (1)**
876:6
**higher (1)**
884:19
**highly (1)**

876:16
**hire (8)**
908:11,12;912:16,
17;952:15;953:8,11,
13
**hired (2)**
914:1;921:16
**hiring (4)**
904:12;907:15;
940:5;953:1
**hit (2)**
886:14;956:7
**hits (1)**
903:24
**hold (3)**
906:14;917:19;
946:21
**holding (1)**
882:20
**holiday (1)**
899:9
**honest (1)**
880:6
**honestly (2)**
924:11;947:12
**Honor (21)**
871:13;872:10,13;
876:14;879:18;919:5;
930:9;932:25;933:18,
22;934:5;936:19;
940:6;942:10;946:25;
948:13;949:2;952:10;
953:7;954:12,21
**hopefully (3)**
869:17;915:7;
946:14
**Hospital (8)**
874:16;886:20;
919:22;920:5;922:5;
928:12;939:20;953:3
**hospitals (3)**
936:1,2,7
**hour (2)**
929:4,5
**hourly (7)**
897:7,8,11,13;
899:8;929:5,22
**hours (20)**
886:9,15;924:10,
14,17,18,22,24;
925:25;926:3,25;
927:1,12,16;928:21;
929:13,19;930:2;
936:15;947:21
**HR (2)**
905:16,18
**hub (4)**
915:18;920:20;
921:14;935:25
**huge (1)**
869:2
**hundred (1)**
918:4

**hundreds (1)**
924:22
**hyper-focus (1)**
940:5

## I

**I-9 (1)**
905:13
**ID (3)**
885:22,22;906:24
**idea (3)**
878:3,24;880:8
**identification (3)**
887:25;893:12;
906:8
**identified (8)**
868:22;869:8;
888:4;893:18;906:12;
926:10;927:2;953:6
**identify (2)**
894:3;895:10
**identities (1)**
901:11
**immediately (1)**
908:11
**impact (2)**
945:20
**impacted (1)**
946:5
**implementation (1)**
902:25
**important (6)**
918:23;921:2,4,21;
935:21,24
**impossible (2)**
885:25;956:22
**INC (1)**
863:5
**include (3)**
893:22;898:20;
910:16
**included (5)**
898:3,17;899:5,6;
948:19
**includes (3)**
889:3,9;891:7
**incoming (1)**
946:19
**incorrect (1)**
949:13
**increase (1)**
927:9
**increased (2)**
932:4,7
**Indeed (10)**
919:18,24;920:1,5,
15;927:18,20,23;
928:7;932:22
**indicate (1)**
952:12
**indicated (1)**
955:20

**indication (1)**
890:21
**individual (2)**
905:22;943:22
**individuals (1)**
954:18
**industry (2)**
901:19;908:1
**info@parkinsonscom (1)**
904:24
**inform (2)**
946:15,23
**informally (1)**
918:11
**information (11)**
873:16;879:2,9;
890:24;892:22;905:6,
13;914:5;939:8;
955:4,11
**informed (1)**
884:4
**informing (2)**
871:17;923:8
**initial (1)**
917:2
**initially (4)**
875:9;880:7;
888:11;900:18
**inquiries (1)**
904:23
**inside (1)**
875:22
**insofar (1)**
871:10
**instances (2)**
908:10;946:10
**instill (1)**
911:16
**instructed (1)**
878:11
**insurance (1)**
948:2
**intend (2)**
887:14;921:11
**intention (1)**
926:24
**intentions (1)**
922:19
**interactions (2)**
931:17;942:22
**interchange (1)**
885:9
**interchangeable (1)**
950:25
**interchangeably (1)**
885:8
**interest (6)**
882:17;904:7,19;
905:1;907:21;915:1
**interested (5)**
876:7;877:12,23;
893:23;904:1
**interjected (1)**

876:23
**internally (1)**
907:18
**interrupt (1)**
879:14
**interview (13)**
873:17,19,20,22;
875:6,9;877:13;
880:17;905:3,5;
932:19,20,24
**interviewed (2)**
874:1,7
**interviews (3)**
873:15,25,25
**into (34)**
870:4;879:15;
882:13;885:25;
887:14;897:8,19;
900:15;903:5;904:22,
24;905:6,24;906:25;
907:4;908:14;911:2;
912:22;913:8;914:19;
915:8;918:15;922:11;
923:21;927:4;928:17;
933:15,16,17;934:16;
943:2;952:25;953:24;
955:7
**introduction (3)**
876:11,11;880:5
**inventory (1)**
897:1
**invested (1)**
936:16
**invitation (1)**
905:8
**involved (5)**
919:19;922:14,16;
937:3;945:14
**involvement (2)**
945:9,11
**Irrespective (2)**
886:17;888:17
**Island (6)**
874:14;885:1,3,5,6;
886:8
**issue (6)**
870:25;873:2;
880:11,17;945:8;
950:22
**issued (2)**
891:17;893:10
**issues (2)**
870:11,16
**items (1)**
887:17

**J**

**JACKSON (44)**
868:5,10,14,17,19,
23;869:1,3,5,9,23;
870:25;871:5,7;
872:6,13,20;874:9;

879:21;880:20;890:7;
906:3;907:7;919:4;
930:8;931:19;933:3,
8,18;941:4;948:12;
949:5;950:7;951:20;
952:1;953:10,12,17;
956:10,19,22;957:2,5,
7
**Jake's (4)**
875:8;879:24;
914:24;915:6
**Jeffrey (1)**
919:17
**job (9)**
874:16;878:1;
882:21;898:18;
919:21;924:25;925:3;
935:5;937:4
**jobs (3)**
872:25;920:5;921:3
**jockeying (1)**
903:14
**Johnny (1)**
939:7
**John's (1)**
926:23
**joint (12)**
868:13,20,22;
869:8,11,11;952:25;
953:6,8,18,21;955:9
**Jonathan (6)**
881:2,6,11;937:13,
15,15
**Josh (13)**
876:1,5,5,9;878:2;
883:11;905:1,2,15;
914:18;917:9;921:25;
937:12
**Josh's (1)**
905:4
**journal (1)**
885:20
**Judge (107)**
863:16;868:3,9,24;
869:2,4,10,13,19;
870:4,9,13,17,21,23;
871:3,6,12,18,25;
872:2,5,7,11,14;
874:10;875:3,6;
878:8;879:19,22;
880:21,23,25;881:3,9,
13;890:6,9,11,13;
906:2,5;907:6,10;
910:23;916:7,8,13;
919:1;929:16,25;
930:5;931:8,18;
933:1,5,19;934:6,9,
12;936:21;940:8,11;
941:3;942:13,15;
943:19,25;944:10,21;
945:6,7,11,14,17,19;
946:2,4,8,24;947:2,4,
7;948:10;949:4;

952:3,6,11,17,19,22;
953:9,14,18;954:15,
23;955:6,9,12,18,25;
956:3,6,14,21;957:9
**July (11)**
863:18;891:14;
901:1,4,8,8,13;956:7,
7,20,20
**June (2)**
886:25;893:24
**justified (2)**
878:19,24

**K**

**keep (4)**
869:16;896:14;
954:2,12
**key (2)**
917:12,12
**keyboards (1)**
903:6
**kind (30)**
869:16;875:24;
876:9,9,19,22;877:18;
878:7;883:19;885:15;
887:2;892:16;896:10,
12,14;897:5;905:4,9;
911:5,15;913:8,11;
915:3;917:3;918:11;
919:8;921:15;926:8;
927:4;946:22
**knock (1)**
918:11
**knowing (2)**
888:17;899:1
**knowledge (13)**
874:4;888:8;
897:20;902:19;
907:20;940:21;
947:13,16,18,20,23;
948:1,4
**knowledgeable (2)**
904:12;937:6

**L**

**LABOR (19)**
863:2,17;903:16;
917:18;918:1,1,7;
920:23,24;921:4,8;
924:5;925:25;927:16;
942:23;943:12,14;
944:16;945:1
**landing (1)**
933:12
**large (1)**
903:17
**larger (1)**
917:3
**largest (1)**
903:18
**Last (3)**

881:11;934:11;
955:15
**late (8)**
878:16,16;915:10;
925:10,13,14,15;
927:18
**Law (1)**
863:16
**lawyers (1)**
956:8
**Laz (1)**
901:23
**lead (1)**
880:11
**leading (3)**
938:16,18,21
**learn (9)**
882:8,10,15;
891:16,16,22;892:2;
922:10,18
**learned (7)**
886:19;891:23;
900:8;916:5;923:22;
934:22;948:14
**learning (2)**
882:11;920:9
**least (12)**
869:20;870:16;
896:8,10;899:4;
910:5;913:16,23;
917:2,24;930:6;
955:22
**left (6)**
872:7;876:2,2,4;
878:2,7
**legal (1)**
871:20
**lengthy (2)**
905:11;906:10
**less (1)**
936:6
**level (5)**
917:14,20;927:4;
931:4;951:1
**levels (5)**
927:7,7,9;930:11;
932:2
**liaison (1)**
937:2
**life (5)**
881:25;934:18,20;
936:13;937:6
**light (3)**
939:8,13,23
**lights (1)**
914:3
**likely (1)**
926:1
**limited (4)**
869:17;955:4,10,10
**line (1)**
939:6
**lined (1)**

920:10
**listen (1)**
  955:25
**literally (1)**
  873:9
**little (5)**
  884:19;911:1;
  920:25;923:11;955:8
**live (1)**
  904:25
**living (1)**
  898:6
**LOCAL (8)**
  863:8;899:24;
  943:14,16,22;944:3;
  945:9;948:15
**locate (1)**
  895:10
**location (21)**
  879:11;885:15,24,
  25;886:10;895:23;
  899:25;913:9,10;
  914:15;915:17;
  916:20;917:13;
  920:21;921:5,20,22;
  928:8,18;946:17;
  951:4
**locations (8)**
  884:20,23;885:8,
  13;886:6;915:9;
  925:7;928:10
**log (5)**
  870:11;871:1,8;
  887:13;956:25
**Long (11)**
  874:14;880:15;
  881:23;883:20;
  884:25;885:2,5,6;
  886:8;913:17;934:10
**longer (1)**
  920:14
**longevity (2)**
  917:8;950:1
**longstanding (1)**
  918:14
**look (26)**
  870:2;877:9,20;
  895:7;898:7;901:18;
  902:24;903:16,23;
  906:15;908:11;910:5;
  911:7,21,21;912:10,
  11,11;913:10;915:14;
  917:9;918:13;930:22;
  946:13;952:15;
  956:11
**looked (2)**
  888:25;900:16
**looking (10)**
  869:15;873:2;
  886:20;887:3,22;
  892:8;899:3,7;941:3;
  954:16
**looks (5)**

871:19;892:18;
  894:2,7;905:18
**lost (4)**
  908:16,19;909:1;
  946:11
**lot (9)**
  884:5,9;892:10;
  896:24;901:19;
  904:23;911:22;919:8;
  928:4
**lots (2)**
  935:23;936:9
**love (1)**
  877:14
**low (1)**
  900:25
**lower (2)**
  915:12;929:12
**lowest (3)**
  901:7;940:22,25

## M

**Mahar (1)**
  894:1
**main (3)**
  882:22;935:2;937:2
**mainly (3)**
  884:4,7;914:24
**makes (2)**
  905:25;929:11
**making (2)**
  912:7;936:16
**man (2)**
  924:22;929:12
**manage (1)**
  915:7
**managed (1)**
  917:17
**management (1)**
  917:6
**manager (7)**
  874:14;880:12;
  913:9;929:7,7;951:3,
  24
**managers (2)**
  914:15;916:16
**mandated (1)**
  949:6
**many (12)**
  884:15,20,25;
  896:23;922:15;928:1;
  932:9;936:8,8;940:5;
  949:11,24
**MAPS (4)**
  879:4,5;923:11;
  937:3
**mark (3)**
  868:20;893:12;
  906:8
**marked (3)**
  868:11;887:25;
  888:25

**market (1)**
  921:10
**marketing (5)**
  882:24;903:23;
  920:22,23;921:7
**match (2)**
  953:16,16
**matches (1)**
  918:22
**math (1)**
  942:19
**Matt (1)**
  919:16
**Matter (5)**
  863:4,15;886:14;
  917:2;957:12
**MAURO (56)**
  868:12,15,18,20;
  869:6,12,14,20,24;
  870:6,10,14,18,22;
  881:1,15;888:3,5;
  890:3,8,12,15;904:7,
  10;905:23;906:7;
  907:4,9,12;910:21,25;
  916:6,10,14;918:24;
  940:6,10;944:18;
  945:5;946:25;947:3,
  5,10;948:8;950:10;
  951:18;953:22;
  954:10;955:4,8,10,20;
  956:2,5,18,24
**Max (1)**
  878:13
**may (9)**
  888:13;897:18,20;
  899:7;904:25;913:3;
  921:13;924:17,20
**Maybe (12)**
  868:20;877:2,12;
  879:3;902:9,9;
  905:15;913:9;929:21;
  939:7;941:24;954:21
**mean (122)**
  871:18;882:7,22;
  883:15,17,19;884:4,
  23;885:2,4,9,9,17;
  887:16;892:17;
  896:12,22;897:22;
  898:1,17;899:3,8,15;
  900:10;901:8,18;
  902:15,18,24;903:4,
  16,22,24;904:19;
  907:24,25;908:19;
  909:3,10;910:2,4;
  911:6,7,21;912:1,2,9,
  14,23;913:21,23;
  914:5;915:14,21,22;
  916:21,25;917:5,6,7,
  9,15,17,23,25;918:1,
  9,13,15,23;919:7;
  920:19,20;921:6,21,
  24;924:5,11;925:5,13,
  17;926:1,4,7,15;

927:14,25;928:2,4,4,
  6,13,14,18;930:6;
  931:21,23;932:8;
  933:1,11;934:17;
  935:8,19,23;936:4,8;
  938:11;939:4;940:8;
  941:18,22;942:19;
  945:23;946:13,14;
  949:13;950:14,18;
  951:8,9;954:23;
  955:25
**Meaning (1)**
  893:9
**Med (1)**
  901:21
**Medical (5)**
  935:21;936:11,17;
  937:1;938:17
**meet (1)**
  875:15
**meeting (7)**
  879:24;923:2,5,5,9,
  9;937:13
**meets (1)**
  931:15
**members (2)**
  890:18;940:1
**mental (1)**
  892:15
**mentioned (1)**
  926:16
**messages (1)**
  926:11
**met (1)**
  875:16
**Michael (4)**
  872:4;897:3;
  919:15;937:23
**mid (1)**
  955:21
**middle (9)**
  872:7;901:1,4;
  915:13;920:9,10,12;
  922:6,21
**might (2)**
  924:7;952:12
**Mike (1)**
  954:9
**million (4)**
  897:15;902:9;
  929:17;936:12
**Milman (41)**
  870:18;871:13,17,
  23;872:1,4;878:10;
  879:17;880:24;888:2;
  931:5,7,9,12;932:25;
  934:5,7;936:19;
  942:10,14;943:18,24;
  944:8;949:2;952:5,9,
  14,18,21;953:7,11,13,
  15;954:9,11,16;
  955:16;956:9;957:3,
  6,8

**mind (5)**
  877:22;892:16;
  918:8;947:1,6
**mine (5)**
  893:6;894:12;896:6
**minimum (2)**
  922:13;949:20
**minute (3)**
  870:19;916:7;929:4
**minutes (4)**
  910:22;945:5;
  947:1,6
**mischaracterizing (1)**
  931:10
**misleading (2)**
  936:19;944:9
**mix (1)**
  953:16
**Mm-hmm (5)**
  883:25;886:7;
  894:9;934:21;939:9
**MOAs (1)**
  895:9
**MOD (1)**
  929:7
**model (3)**
  885:10;896:24;
  921:24
**modules (1)**
  905:13
**moment (6)**
  872:13;888:21;
  893:13,15;906:9;
  930:9
**Monday (1)**
  924:7
**money (1)**
  929:11
**monitored (1)**
  927:23
**month (5)**
  900:14;945:25;
  952:9;956:4,17
**more (28)**
  872:21;873:5;
  877:23;883:21;
  885:21,23;893:6;
  913:14;914:5;915:2;
  920:19,25;924:10,17;
  926:3,20,22,25;927:1,
  12,16,16;928:20;
  936:6;942:21;950:24;
  951:1;954:1
**morning (5)**
  870:7;871:9;
  881:16;926:6;937:25
**most (9)**
  869:25;900:13;
  912:8;914:17;926:1;
  945:25;950:5;952:14;
  953:7
**motion (1)**
  906:1

**mouth (1)**
883:17
**move (7)**
868:13,15;879:10;
907:4;909:6;915:3,7;
918:15;924:6
**moved (3)**
882:13;890:4;
905:23
**moving (6)**
900:8;902:13;
921:19;924:13;925:8;
946:3
**much (7)**
873:1;878:23;
880:17,23;881:9;
917:7;952:19
**multiple (2)**
887:6;928:11
**MVR (2)**
905:19;913:23
**Myself (1)**
874:3

**N**

**name (6)**
881:10,11;888:17;
891:22;905:7;926:15
**names (5)**
892:2;901:16,20;
954:2;955:15
**narrowed (1)**
869:15
**Nassau (5)**
900:3;944:3,6,24;
945:20
**NATIONAL (2)**
863:2,17
**nature (2)**
887:18;898:6
**necessarily (9)**
904:2;919:12;
924:4,5,8;925:5,9;
936:4;943:6
**need (16)**
877:6;890:2;
892:12,13;893:16;
897:1,2;900:8;903:3;
914:5,6,6;917:17;
921:23;927:15;
928:22
**needed (5)**
873:4,5;918:17;
926:20,22
**needing (1)**
927:16
**needs (2)**
883:12;924:3
**negotiation (1)**
945:14
**neither (1)**
871:10

**nervous (1)**
878:21
**neutrality (2)**
944:16,25
**New (22)**
863:18,18;874:20;
879:11;882:23;
889:15;890:22;
898:10;901:22;909:1;
912:17;918:12,18,19;
924:2,3,18,22;927:10;
928:9;935:2,10
**newer (1)**
911:5
**next (8)**
880:25;881:1;
882:7,9;911:23;
923:9;955:21,25
**nice (2)**
915:6,15
**Nick (4)**
954:2;955:15,16,16
**nodded (1)**
877:4
**nor (1)**
871:10
**note (1)**
869:1
**Noted (1)**
868:2
**notice (1)**
863:16
**notification (2)**
887:10,10
**notifications (1)**
884:5
**notified (1)**
923:25
**November (23)**
875:4;879:23;
889:16;890:2;902:16,
20;909:22;914:4,12;
920:11,12;922:3,6,7,
21;923:8,12,18,23;
925:13;947:12;
948:13,16
**number (2)**
877:23;929:25
**numbers (3)**
901:14;941:25;
942:5

**O**

**oath (1)**
872:9
**objection (22)**
890:6,7;906:2,3,4;
907:6,7,8;931:5,7,8;
932:15;934:5,6;
936:19;940:6;942:10;
943:18,24;944:8,18;
949:2

**observe (1)**
892:8
**obtain (1)**
906:21
**obtaining (1)**
890:16
**obviously (7)**
876:14;887:13;
927:8;933:16;941:18;
946:16;951:9
**occasion (5)**
883:6,8,9,10;
908:25
**October (14)**
907:14;913:25;
915:21;916:4,4;
922:7,9,10,22;923:3,
4;937:24;939:3;
940:14
**off (26)**
870:23;872:7;
878:7,21;896:10;
904:8;910:22,23;
916:6,8;927:18,19,20;
929:20;938:5;942:9;
945:5;947:4,7,18;
949:7;950:22;952:21,
22,24;957:9
**offer (4)**
932:19,21;946:16;
954:11
**offered (1)**
880:19
**Offhand (2)**
901:18;902:9
**office (8)**
882:9,12,25;883:1;
912:2;939:17;943:3,9
**officer (1)**
894:1
**often (1)**
909:11
**onboarded (1)**
904:14
**once (10)**
872:2;885:17;
886:14;889:11;
905:14;913:7;935:5;
936:23;940:4;956:7
**one (52)**
868:24;872:13,21;
873:17,17,19,20;
874:23;876:23;
879:22;880:1;885:7;
887:18;894:19,22;
901:21;904:8;907:2;
909:22;912:7;914:4,
6;916:6;917:18,18;
920:22;923:19;
924:14;925:18;
926:19;930:7,9;
932:22;934:11;
937:20,23,25;939:2;

940:15;942:23,25;
943:11;944:18;951:9,
21;953:2,23;954:7;
955:22,22,24;956:3
**ones (1)**
912:5
**ongoing (2)**
878:14;879:14
**online (2)**
887:16;906:18
**only (19)**
870:7,19;873:12,
17,19,20;896:6,6;
906:24;928:18,18,22;
932:18;933:13;940:6;
942:23;945:24,25;
949:17
**onset (1)**
941:17
**open (3)**
912:1;954:13;
956:15
**opened (1)**
876:5
**opening (1)**
878:17
**openly (1)**
914:8
**operate (2)**
922:4;938:14
**operated (1)**
888:14
**operates (2)**
897:6;912:18
**operating (2)**
884:21;895:24
**operation (24)**
879:14;889:15;
892:13,18;911:20;
912:6,13;913:1;
917:16;918:15,19;
924:2,3;926:9;
927:10,13;930:11;
945:21,22,23,24;
946:4,9;950:5
**operationally (1)**
902:22
**operations (9)**
882:3;885:7;903:2;
917:14;918:20;
935:14,15;938:23;
940:16
**operator (1)**
938:20
**operators (1)**
908:1
**opportunities (2)**
909:6;935:23
**opportunity (5)**
873:16;878:1;
884:11;906:14;915:3
**opposed (1)**
885:24

**order (6)**
870:1;906:21;
924:9,24;928:20,21
**organization (4)**
917:2,21;943:17;
952:16
**organized (1)**
885:16
**original (1)**
945:12
**others (3)**
885:3;937:13,15
**otherwise (1)**
902:18
**ours (1)**
911:6
**ourselves (1)**
918:14
**out (34)**
869:22;870:20;
875:9;876:17;877:22;
878:12;882:11,16;
887:1;888:11;892:25;
902:25;905:8,10;
906:21;912:22;
913:16;914:25;
918:11;920:25;
921:13,18;922:1,22,
23,25;923:1;932:18,
20;935:9;940:5;
949:14;956:12;957:1
**outset (2)**
941:17,21
**outside (4)**
901:22;914:1;
917:1,21
**over (19)**
875:16;879:11;
882:14;886:15;
897:17;902:9,11;
908:8,22;911:4,10,11;
917:24;922:17;932:5;
935:19;936:12,12;
946:9
**overall (5)**
892:17;901:18;
904:14;914:21;
931:14
**Overruled (9)**
933:5;936:22;
940:11;942:15;
943:19,25;944:10,21;
949:4
**overseas (1)**
951:12
**oversee (3)**
913:10,12;919:9
**overseeing (2)**
882:25;912:6
**overtime (2)**
886:3;925:12
**overview (1)**
889:21

own (1)
915:4

owner (4)
883:6;933:25;
934:1;935:1

ownership (3)
882:17;911:25;
937:4

## P

page (22)
889:17,19;894:3,7,
17,18,22,23;895:7,7,
20;922:17;930:25;
931:1;933:12;937:12,
12,14;938:1,4;939:6;
941:11

paid (7)
891:1;899:11;
924:12;942:9;947:18;
949:7;950:22

pandemic (3)
927:4,7,9

paragraph (3)
939:22,22,25

parent (1)
943:17

park (5)
895:3;901:21,23;
918:11;928:14

PARKING (87)
863:5;874:4,24;
875:20;881:20;
882:18;883:14;884:2,
15,20;886:3,9;887:5;
891:8,10,14,18;893:1;
894:6;896:16,20,21;
897:6,25;898:8;
899:12,13,19,19;
900:23;901:19;
902:10;904:4,13;
906:23;907:2,22,25;
908:15,25;909:24;
910:8,16;911:4,19,19;
912:16,17;913:25;
914:2;915:10,12,25;
916:20,25;917:3,13,
14,22;919:21;922:4;
925:10,11;926:20;
933:23;935:12;937:1,
6;938:7,10,16,23;
939:17,19;941:16;
942:8,22,23;943:11;
944:6,16,25;946:10;
948:21;951:7;953:1,
10

part (12)
900:16,19;907:21;
919:7;935:1,9;936:1,
20,25;938:22,25;
950:5

participated (2)

902:21;909:21

participating (1)
908:6

particular (4)
892:14;902:1;
916:20;931:2

particularly (1)
914:14

parties (6)
888:23;892:25;
904:2;923:19;952:24;
955:2

parties' (1)
893:23

partner (2)
882:1,14

part-time (2)
914:24;921:3

Party (1)
863:12

pass (1)
883:1

past (2)
886:8;900:7

patient (1)
931:17

pay (9)
897:3;900:20;
929:3,3,5,12;942:9;
943:8;949:14

Paychex (2)
885:18,19;905:6;
906:25;933:17

paying (4)
898:12;929:11;
942:2;947:14

payroll (11)
868:7;869:7,11;
885:14,15,18,18,20;
886:1;951:14;955:4

peak (1)
884:19

peaks (1)
884:18

pending (1)
932:15

Pennsylvania (1)
885:3

pension (1)
947:24

people (14)
877:11,17;879:10;
880:15;903:14;
907:16;908:2,12;
912:2;913:12;914:1;
919:14;926:3;932:23

per (7)
886:10;924:22;
929:3,5;942:3;
945:25,25

Perfect (1)
868:23

perform (1)

943:6

period (17)
885:11;886:18;
891:24;897:17;
900:18;902:11;
903:10;907:13,14;
909:8,17;910:8;
911:2;913:24;914:14;
918:9;947:11

permission (1)
932:10

person (9)
876:3;880:16;
912:22;921:12,16;
924:6;938:15;954:25;
957:8

personal (3)
911:24;918:8;
938:15

personally (2)
892:6;902:21

personnel (1)
917:21

petitions (1)
869:21

Petruzzelli (3)
897:3;919:16;
937:24

phone (1)
875:10

phonetic (2)
922:25;944:1

pick (3)
924:7,17,18

piece (1)
903:13

pieces (1)
902:22

place (8)
874:20;879:15;
903:4;923:21;924:7;
927:4;936:6;951:9

places (1)
914:23

plan (2)
903:8;910:3

platform (1)
929:20

platforms (1)
920:1

Plaza (1)
863:17

pleasantry (1)
876:20

please (11)
877:22;881:10;
893:13;895:9;937:9,
16,19;938:4;941:10,
12;945:8

plug (1)
897:13

PLUS (4)
863:5;901:23;

pm (1)
957:11

poaching (1)
911:3

podiums (1)
903:6

point (35)
873:3;876:19,23,
25;877:15;880:3;
882:22;884:22;
891:17;895:4;896:16;
901:3,6,13;902:18;
908:4;911:9,17;
914:11;920:9;922:20;
923:7,10,17,24;926:8;
927:8,11;942:6;
946:1,23;948:13;
952:8;953:2;954:7

policies (2)
937:6;951:11

policy (6)
911:5;912:1;
947:16,18;950:22;
951:10

pool (3)
903:16;921:4,9

portal (1)
887:14

portals (2)
883:16;884:5

portion (3)
889:4;938:10,11

posed (1)
896:5

posing (1)
939:14

position (6)
877:10;881:23,24;
882:6;917:19;928:23

positive (1)
910:18

possesses (1)
939:8

possible (3)
913:25;915:23;
925:2

post (1)
919:11

posted (1)
920:15

posting (2)
903:20,22

potential (1)
897:21

potentially (1)
886:20

practice (5)
909:23,24;911:4,6;
920:8

pre (1)
927:9

preliminary (2)

933:1;940:9

pre-pandemic (1)
927:7

prepared (1)
868:8

presence (2)
946:5,5

present (3)
921:25;922:2;932:6

presentations (1)
912:24

President (7)
881:22;882:3;
935:14,16,18,20;
937:4

pressure (1)
918:10

pretty (3)
878:23;901:19;
910:2;941:17,21

prevailing (1)
898:2,6,9,12,14,15,
19;942:25;943:2,3,6,8

previous (2)
922:16;946:9

previously (2)
872:17;935:24;
940:18

price (1)
897:9

pricing (2)
896:23;897:13

pride (2)
911:22;918:13

primarily (1)
938:15

primary (3)
932:23;933:25;
934:1

printed (1)
906:18

prior (5)
879:8;882:5;888:6;
910:10,10

private (1)
883:17

privilege (4)
870:10;871:1,8;
956:25

privileged (1)
871:18

Pro (1)
901:23

probably (6)
896:14;920:9;
926:2;927:1;954:7;
955:21

procedures (2)
915:25;937:7

proceeded (2)
875:22;876:13

process (24)
882:23;884:1;

892:21;896:19;
897:22;900:9;904:12,
13,14,22;908:24;
909:13,21;911:15;
912:21;913:17,19;
914:2;915:18;917:22,
23;918:2;922:12;
936:20
**processes (3)**
917:5;919:8;935:9
**processing (1)**
885:18
**procurement (4)**
922:22;923:11;
927:11;937:3
**produce (1)**
870:10
**produced (1)**
870:12
**product (2)**
871:15;918:22
**production (2)**
869:17,25
**profile (1)**
915:11
**profit (2)**
941:18,23
**program (1)**
931:15
**progress (1)**
868:6
**project (2)**
891:19;914:19
**properly (1)**
875:19
**property (1)**
917:18
**prospective (1)**
893:25;932:18
**protocols (2)**
916:1,21
**provide (8)**
895:3,9,24;903:12;
948:21;949:6,10,12
**provided (3)**
868:7;888:19;
899:14
**provider (1)**
890:17
**providing (2)**
888:9;912:7
**PTO (5)**
949:1,7,11,23,24
**public (4)**
883:16;901:2;
903:21;940:24
**pull (1)**
885:20
**purpose (2)**
954:13,17
**pursuant (3)**
863:15;940:19;
944:13

**put (15)**
876:16;877:10;
897:7;920:19;923:21;
927:3;928:6,8,21,22;
929:22;933:17;940:3,
17;942:20
**putting (4)**
884:7;908:4;928:8,
10

# Q

**Q1 (3)**
894:17,24,25
**Q10 (2)**
894:10;896:6
**Q14 (1)**
895:21
**Q7 (1)**
930:24
**QR (4)**
872:23;878:12;
933:13,15
**qualifications (2)**
889:5;901:6
**qualified (1)**
901:7;940:25
**qualify (1)**
936:9
**questionnaire (1)**
905:25
**quick (3)**
870:8;933:6;950:11
**quite (1)**
947:11

# R

**R-10 (1)**
952:6
**R-11 (1)**
890:13
**R-12 (1)**
906:5
**R-13 (2)**
907:5,10
**raid (1)**
909:2
**raise (2)**
870:25;881:4
**ramp (12)**
902:20,23;903:10;
907:14;909:8,17,21,
25;911:2;913:24;
914:14;918:9
**ramped (1)**
918:3
**rank (1)**
930:3
**rate (15)**
897:7,8,11,14,21;
899:9;929:3,5,7,7,8,
12,22;943:8;947:13

**rates (4)**
890:25;897:4;
898:19;899:10
**rather (4)**
871:25;905:11;
956:1,3
**re (1)**
937:13
**reach (5)**
876:17;877:22;
922:22,25;923:1
**reached (1)**
875:9
**read (3)**
893:16;895:12;
941:24
**reads (1)**
942:4
**ready (4)**
868:4;922:4,8;
941:14
**realize (1)**
877:11
**really (12)**
870:7,15;871:12;
877:25;882:11;909:4;
911:6,24;915:18;
918:10;944:19;
955:14
**reason (4)**
918:19;921:22;
927:16;928:11
**reasons (3)**
916:16;920:20;
925:22
**recall (5)**
875:13;891:10;
897:10;901:16;902:7
**receive (4)**
869:25;926:11,14;
939:2
**received (10)**
870:7;871:8;
875:17;886:25;
890:14;906:6;907:11;
931:2;948:6;953:21
**recent (3)**
870:1;899:4;953:8
**recently (1)**
909:5
**recess (6)**
870:24;904:9;
910:24;916:9;947:8;
952:23
**recipients (1)**
871:11
**recognize (1)**
890:22
**recognized (1)**
899:2
**recognizing (1)**
910:16
**recollection (2)**

879:23;901:25
**recommend (1)**
903:2
**recommendations (1)**
903:25
**recommended (1)**
876:15
**reconvene (1)**
957:12
**record (27)**
868:11;870:23;
871:5,6;881:10;
893:24;904:8,11;
910:22,23;916:6,8,11,
13;941:7;942:11;
945:6;947:4,7;
952:21,22,24;953:25;
954:13,17;956:15;
957:10
**records (1)**
953:24
**recross (5)**
879:19,20;948:10,
11;951:19
**redirect (5)**
878:8,9;946:24;
947:9;950:9
**refer (1)**
894:7
**referenced (1)**
883:24
**referral (1)**
903:25
**referrals (1)**
883:18
**referring (1)**
951:3
**reflect (1)**
953:1
**regarding (5)**
869:25;897:21;
903:10;912:10;
942:22
**Region (4)**
863:17;914:18;
928:6;935:25
**registration (1)**
886:25
**regular (1)**
900:11
**related (4)**
878:1;913:3;927:7;
939:19
**relates (1)**
942:21
**RELATIONS (2)**
863:2,17
**relationship (2)**
895:2;929:2
**relationships (2)**
883:20;918:14
**relative (1)**
932:5

**relaying (1)**
871:19
**release (1)**
902:2
**released (2)**
901:3,14
**relevance (3)**
934:7;943:18,24
**relevant (1)**
944:19
**remain (1)**
956:15
**remember (9)**
875:11;878:4;
899:5;909:3,4;920:4;
926:19;927:24;928:4
**remote (1)**
957:3
**remotely (1)**
954:22
**rep (2)**
914:24;915:8
**repeat (1)**
944:22
**report (1)**
886:1
**represent (2)**
929:17;945:19
**representative (7)**
871:16,16;874:5;
909:18,19;951:16,25
**represents (1)**
944:3
**requesting (1)**
879:9
**require (2)**
890:22;898:9
**required (9)**
891:4;892:10,11;
899:8,10;906:20;
907:2;940:22;944:15,
25
**requirement (2)**
898:1;949:15
**requirements (5)**
898:4;931:15;
936:2;949:16,18
**resolved (3)**
869:24;870:18;
956:17
**respect (14)**
883:23;885:6,12,
14;886:2;887:22;
890:20;892:14;903:9;
904:11;914:13;
915:20;916:19;
935:10
**respective (2)**
896:3,9
**respond (1)**
892:25
**responded (3)**
893:7,9;940:13

**Respondent (8)**
863:6;871:8;
888:21;905:25;907:4;
930:22;932:15;
953:19
**Respondent's (6)**
888:4;890:14;
893:18;906:6,12;
907:11
**Respondent's (11)**
888:1;889:1,14;
890:4,21,24;891:6;
893:13,14;905:24;
906:8
**responds (1)**
923:2
**response (7)**
889:6,12;893:10;
896:13;931:3,10;
953:24
**responses (1)**
930:15
**responsibilities (1)**
938:23
**responsibility (3)**
919:10,11,13
**responsible (5)**
905:19,21;919:5;
938:9;940:23
**restaurant (1)**
911:11
**rested (1)**
956:25
**resting (1)**
953:20
**rests (1)**
957:2
**results (3)**
901:2,3,5
**RETAIL (1)**
863:8
**retaining (1)**
940:5
**retiring (1)**
882:15
**review (10)**
871:23;888:21;
893:14;903:1;906:9;
930:15;932:9;937:16;
941:10,12
**reviewed (1)**
942:11
**reviewing (4)**
888:6;890:3;
896:23;941:7
**revisited (1)**
878:7
**RFP (19)**
887:4,7,11,11,22,
23;889:7,11;890:16;
891:17;910:13;922:7;
940:19,22;944:13,14,
15,24;945:3

**RFPs (3)**
910:9,10,12
**Riche (1)**
871:1
**Right (83)**
869:12;870:16,22,
23;873:6,17,23;874:2,
17;875:14,23;876:1,
4;877:17,20;879:12;
881:3,4;883:13;
884:15,19;885:6;
886:2,8,18;887:25;
888:23;889:17;
892:14;893:12,20;
895:6,11,12,18,18;
896:7,16;898:8;
899:18,25;900:6,22;
902:12,17,19;904:8;
907:1;909:14;910:21;
912:16;914:13;916:2,
6,25;920:16;924:16,
18,24;929:6,9;933:2,
23;934:9;936:3,15;
938:2,5;940:14;
943:3;944:11;945:1;
948:17,21;949:1;
950:14;951:5,10,18;
952:7,19;956:2,14
**ROBERT (1)**
872:16
**ROCCO (22)**
874:12;875:2;
880:22;890:10;906:4;
907:8;933:21;934:11,
14;936:24;940:12;
941:6;942:17;943:21;
944:2,12,23;945:4;
950:8;952:2;954:20;
956:11
**role (9)**
882:14;915:8;
917:19;919:8,20;
928:24;933:24;
935:11,19
**roles (1)**
950:2
**roll (1)**
922:4
**rows (1)**
929:21
**ruling (1)**
954:12
**rumblings (1)**
878:22
**run (7)**
882:12;914:2;
928:1;934:22;945:21,
21;950:5
**running (5)**
923:23;928:3,4;
935:6;936:18

**S**

**sales (1)**
882:24
**same (17)**
879:4;891:3;
897:12;901:19;908:1,
2;918:16;922:17;
924:14;925:7;929:20,
25;930:1,3;931:20;
937:20;945:8
**sat (7)**
876:1,1,1,2,3,18;
882:9
**satisfied (4)**
930:10,12,13;931:4
**saw (4)**
892:5;902:5;927:6;
948:17
**saying (5)**
894:19;910:10;
924:20;925:9;950:16
**scale (1)**
938:19
**scenario (1)**
899:13
**schedule (8)**
924:12,13;927:3,5,
12;929:21;930:3;
932:1
**schedules (1)**
924:6
**scheduling (1)**
914:20
**scope (7)**
887:3;889:4;
928:19;936:14;
944:19;949:3;951:16
**screws (1)**
869:4
**season (1)**
884:19
**seasonally (1)**
884:18
**second (7)**
889:17,19;904:8;
916:4;922:10;937:22;
939:2
**security (1)**
875:23
**seeing (3)**
904:23;926:5;927:9
**seem (3)**
896:9;899:7;939:15
**select (1)**
887:14
**send (5)**
896:13;905:1,8;
926:11,12
**sensitive (2)**
879:12,13
**sent (1)**

926:14
**sentence (1)**
889:24
**separate (1)**
896:14
**separated (1)**
875:25
**separators (1)**
885:21
**September (3)**
907:14;913:25;
915:21
**series (1)**
941:9
**service (1)**
954:4
**services (8)**
887:3,5;888:9,9,18,
19;890:17;903:12
**session (1)**
905:18
**set (15)**
873:14,15,20,24;
875:9,12,12,15;905:3,
17;924:12;929:3;
931:24;943:3,8
**setting (1)**
905:21
**shadowing (3)**
879:9;913:14;
921:19
**shed (3)**
939:7,13,23
**shift (4)**
924:8;926:6,7,7
**shifts (1)**
924:6
**shoe (3)**
942:2;948:21,23
**short (6)**
870:24;904:9;
910:24;916:9;947:8;
952:23
**shots (1)**
956:1
**show (6)**
899:8;926:10;
937:9;941:1,7;953:8
**showing (1)**
937:10
**shows (2)**
889:12;952:7
**side (1)**
902:24
**signage (1)**
903:6
**signatory (2)**
899:20,23
**signed (3)**
883:15;884:5;
886:24
**significant (1)**
880:7

**simple (2)**
905:6;913:4
**Simply (2)**
887:12;940:3
**site (28)**
892:3,4,5,6,9,15,16,
21;903:11;915:7;
923:6;925:3,25;
928:13;949:24;950:3,
12,13,15,18,18,21,24;
951:1,2,17,21,23
**sites (1)**
924:25
**sitting (2)**
876:19;882:7
**situation (2)**
879:13;946:17
**situations (1)**
911:10
**six (4)**
949:1,6,6,10
**size (4)**
874:22,23;915:17;
924:8
**slower (1)**
913:10
**small (4)**
870:16;882:9;
901:19;908:1
**smooth (1)**
908:24
**smoothly (1)**
913:21
**sole (1)**
919:20
**solicit (3)**
907:21,24;933:10
**solicitations (1)**
932:22
**solicited (1)**
919:21
**soliciting (2)**
919:6;920:4
**Sombrada (1)**
944:1
**somebody (1)**
880:6
**someone (16)**
894:19;896:13;
897:3;904:14;905:16;
907:25;908:2;914:18;
915:5;917:1;919:16,
16;923:21;926:6;
946:21;950:25
**Sometimes (1)**
880:15
**somewhere (3)**
877:1;940:9;952:13
**son (3)**
876:3,23;880:4
**Sony (1)**
889:14
**soon (2)**

870:18;954:7
**sorry (11)**
  871:3;894:18;
  902:10;916:11;
  929:16;935:18;
  937:10;939:25;941:5;
  944:22;954:9
**sort (3)**
  877:1;878:14;
  902:22
**sound (1)**
  926:22
**sounds (1)**
  944:11
**SP (1)**
  901:23
**span (1)**
  885:2
**speak (9)**
  897:2;905:2;911:5;
  914:6,6,11;926:16;
  935:19;949:19
**speaking (3)**
  871:16;907:20;
  927:11
**speaks (2)**
  931:12;940:7
**special (3)**
  873:21;884:23;
  921:2
**specific (14)**
  893:16;899:25;
  904:18;913:1;919:15;
  920:6,15,21;921:22;
  927:21,24;928:5;
  937:20;949:19
**specifically (10)**
  874:1;878:4;
  910:17;919:7,22;
  920:18;939:4,23;
  951:1;952:12
**specifications (1)**
  944:15
**spell (1)**
  881:10
**spoke (2)**
  879:24;909:12
**spread (1)**
  920:25
**staff (17)**
  879:1;885:7;900:8;
  909:25;914:15;
  915:24;917:8;918:5;
  924:3,4;925:8;926:2,
  4,20,22;940:2;946:3
**staffing (9)**
  903:11;916:15;
  917:2,13;930:11;
  931:4,16;932:2,4
**stairs (2)**
  875:23,23
**Standard (2)**
  901:23;910:2

**standing (1)**
  883:20
**stands (2)**
  887:6;892:18
**start (12)**
  874:18;879:9,15;
  902:14,20;907:18;
  909:22;914:3;916:2,
  3;923:13,15
**started (9)**
  877:1;881:24;
  882:7;911:7;917:10;
  920:4,12;925:23;
  934:24
**starting (2)**
  874:19;922:7
**starts (2)**
  910:4;938:1
**startup (3)**
  874:17,19;939:20
**state (3)**
  881:10;949:16,18
**statement (2)**
  941:15;942:1
**stay (3)**
  878:20;911:13;
  921:17
**Stefanelli (1)**
  955:17
**step (1)**
  910:6
**steps (1)**
  910:6
**Steve (1)**
  944:1
**still (13)**
  872:8;874:24;
  876:20;883:2;911:23;
  923:7,7;925:22,23,24;
  936:15;953:23;957:1
**Stony (79)**
  874:16;876:15;
  886:19;887:3;888:9,
  19;890:21,25;892:23;
  893:9,11;895:3;
  900:24;901:14;902:2,
  14;905:25;908:4;
  910:7,12;912:10;
  914:4,13;915:11,24;
  916:15;918:12;919:6,
  7,22;920:5,6,14;
  921:5,10,11,14,17,23;
  922:5;923:6,22;
  924:21;925:12;
  926:21;927:21;
  928:12;929:2,12;
  930:10;931:3;932:5,
  10;935:21;936:6,11,
  17,25;937:1;938:16;
  939:20;940:18,22;
  941:16;948:22,23,25;
  949:7,12,17;951:6,7,
  22,23;952:8,13;

953:2;954:2,3
**STORES (1)**
  863:9
**straight (1)**
  918:5
**strike (5)**
  892:20;897:19;
  899:19;902:1;915:22
**strong (1)**
  913:9
**structure (1)**
  949:22
**stuff (1)**
  869:21
**style (1)**
  917:6
**sub (1)**
  895:8
**submission (2)**
  891:12;913:18
**submit (6)**
  892:11,24;893:1;
  896:17;910:9,12
**submitted (11)**
  891:8,10,14,18;
  893:5;894:4;896:9,
  20;897:10;899:12;
  910:15
**submitting (2)**
  905:19;908:5
**subpoena (3)**
  868:5;869:15;
  953:23
**subpoena's (1)**
  870:2
**subsequent (1)**
  902:12
**subsequently (1)**
  891:24
**successful (2)**
  909:2;935:11
**sufficient (2)**
  871:20;906:10
**Suffolk (8)**
  915:16,18;919:15;
  920:24;921:8;935:25;
  938:10,14
**suggest (1)**
  954:11
**suggestion (1)**
  954:19
**summer (1)**
  891:25
**super (1)**
  950:21
**supervisor (18)**
  903:13;905:1,21;
  949:19,24;950:4,12,
  13,15,15,18,21,24,25;
  951:2,2,21,23
**supervisors (9)**
  885:23;904:20,21;
  912:3;913:11;924:11;

933:12;938:14;
949:25
**supervisor's (1)**
  913:7
**supervisory (1)**
  902:25
**supplanting (1)**
  908:13
**supposed (1)**
  955:12
**sure (36)**
  872:21;875:5;
  882:22;883:3,15;
  884:4;886:4;887:5,
  24;892:1,24;893:3;
  894:5;896:22;903:22;
  908:23;910:14;912:7,
  23;925:2;926:12;
  928:3,3;930:23;
  931:22;932:3;933:11;
  935:6;936:16;938:6;
  939:4,21;940:15;
  943:4;950:1;952:5
**swear (1)**
  881:4
**switching (1)**
  876:10
**sword (1)**
  878:5
**sworn (2)**
  872:17;881:7
**System (12)**
  874:4;887:12;
  889:5,10;891:8,10;
  893:1;899:13,19;
  913:5;917:4;939:20
**SYSTEMS (68)**
  863:5;874:25;
  881:20;882:18;
  883:14;884:2,16;
  886:3,9;891:14,18;
  894:6;896:17,20,21;
  897:6;898:8;899:19;
  900:23;904:4,13;
  906:23;907:2,22;
  908:15;909:1,24;
  910:8,16;911:4,20;
  912:16,17;914:1,2;
  915:10,12;916:20;
  917:1,13,14,22;
  919:21;922:4;925:10,
  11;926:20;933:23;
  935:12;937:1,6;
  938:7,10,16;939:17;
  941:16;942:8,22,23;
  943:11;944:6,16,25;
  946:10;948:21;951:7;
  953:2,10
**Systems' (2)**
  902:10;915:25
**System's (2)**
  884:20;938:23
**Systems-related (1)**

897:25

——————————————
**T**
——————————————

**tables (1)**
  875:24
**takeover (1)**
  902:14
**talk (6)**
  878:1;883:13;
  901:6;914:8;946:9,19
**talking (8)**
  876:24;877:24;
  879:5,6;891:23;
  910:11;919:14;946:2
**tap (1)**
  885:25
**team (9)**
  878:20;894:25;
  900:16;902:25;
  914:17;936:25;
  938:16,18;939:1
**tells (1)**
  922:25
**template (3)**
  897:13;910:3;
  929:18
**templates (1)**
  896:23
**temples (1)**
  911:12
**term (2)**
  877:15;950:17
**terms (2)**
  900:6;915:11
**territories (1)**
  928:5
**territory (3)**
  914:22;920:25;
  951:13
**test (1)**
  912:23
**testified (12)**
  872:18,22;881:8;
  888:7;898:21;899:18;
  908:5;911:3,17;
  916:15;922:1;939:16
**testify (2)**
  932:16;954:21
**testifying (1)**
  957:3
**testimony (6)**
  891:7;915:23;
  936:20;942:11,22;
  954:24
**texted (1)**
  875:18
**Thanks (1)**
  872:4
**Thanksgiving (1)**
  875:13
**that'll (3)**
  887:12;905:8;

913:10
**there'd (1)**
892:4
**therefore (2)**
895:15;896:1
**there'll (1)**
869:16
**though (3)**
900:15;921:10;
939:15
**thought (12)**
880:1,1,7,14;
907:24;908:14;915:6;
917:25;922:7;927:23;
931:24;955:6
**thousand (3)**
884:17;885:12;
925:6
**three (6)**
882:10;886:5;
900:14;921:13;
954:13,17
**three- (1)**
937:11
**throughout (2)**
887:5;909:13
**Thursday (1)**
923:2
**tied (2)**
896:25;904:3
**tight (1)**
869:16
**timeframe (5)**
884:7;889:14;
891:23;913:25;
915:10
**times (1)**
926:5
**title (5)**
881:21;882:2,5,20;
935:16
**today (4)**
869:17;920:18;
951:21;954:6
**together (3)**
884:8;896:14;
902:23
**told (7)**
871:17;873:14;
875:12,19;877:20;
902:18;911:9
**tolerance (1)**
917:20
**tonight (1)**
883:10
**took (2)**
882:2;908:10
**tool (3)**
920:22,23;921:7
**top (7)**
889:18;895:12,12;
915:8;938:4;939:6,24
**topics (1)**

912:4
**total (4)**
897:11,14;929:19,
23
**tough (1)**
912:15
**touring (1)**
892:16
**trained (6)**
912:17;915:25;
916:20;918:1;926:8;
946:14
**training (9)**
903:1;905:13,17,
22;912:21,23;921:15,
19;940:21
**transferring (3)**
908:21,23;922:16
**transition (17)**
882:15;909:13;
910:3,3;915:6;
922:11,12,13,24;
925:23,24;935:7;
936:25;938:16,18,19,
25
**transitioned (1)**
909:15
**transitioning (2)**
911:10;917:24
**transitions (1)**
908:20
**translation (1)**
880:11
**Travis (8)**
872:23;876:2;
878:2,12;915:5;
950:16;951:22,23
**Travis's (1)**
926:15
**treat (1)**
911:22
**tricky (1)**
877:17
**tried (1)**
909:1
**Tri-state (1)**
885:4
**true (5)**
872:22;920:14;
926:20;932:17;
935:20
**truly (1)**
912:6
**try (5)**
885:19;908:20;
911:15,15;926:24
**trying (3)**
882:8,10;918:21
**Tuesday (3)**
924:7;937:24;939:3
**turn (2)**
873:7;914:3
**turned (3)**

878:2;933:15;
942:16
**turning (1)**
913:22
**turns (1)**
933:16
**two (13)**
870:20;910:21;
920:20;921:17;
924:14;926:24;
936:20;937:14;
944:18,19;951:21;
954:1;956:1
**type (4)**
887:10;914:18;
920:22;921:2
**types (1)**
892:8
**typical (4)**
884:24;892:4;
909:12;920:8
**Typically (14)**
896:12;898:1;
904:21;913:13,17;
914:16;919:19;
922:13;928:17,25;
935:7;937:2;938:13;
950:23

---

### U

**ultimately (5)**
897:9,12;916:1;
924:2,4
**unaudited (1)**
901:5
**unaware (1)**
949:21
**uncomfortable (1)**
880:16
**under (6)**
872:9;895:24;
936:2;951:11,11,15
**Understood (4)**
869:5;872:21;
877:5;939:19
**unfamiliar (1)**
917:22
**Unfortunately (1)**
908:17
**uniforms (1)**
903:4
**UNION (33)**
863:9;869:25;
870:14;871:23;
874:10;880:21;890:9,
18,22;894:14;895:4,8,
24;898:2,4,22;899:1,
21,23;900:19;909:19;
910:16;933:19;
942:23;943:5,12;
944:16;945:1,19;
946:5;948:2;950:8;

952:2
**unionized (5)**
894:25;895:16;
896:2;897:21;945:22
**union's (2)**
943:14;948:18
**unique (1)**
911:20
**UNITED (1)**
863:10
**University (14)**
895:3,17;919:22;
920:5;922:5;928:12;
932:5;934:4,8;
935:21;936:11,17;
937:1;953:3
**unless (1)**
954:25
**unsee (1)**
872:3
**unsolicited (1)**
904:4
**unused (1)**
949:14
**up (48)**
869:4;873:15,20,
24;875:9,12,15;
876:5;877:25;879:24;
880:19;883:15;884:5;
885:11;886:24;
888:16,16;892:9;
902:20,23;903:10;
904:23;905:3,17,21;
907:14;909:8,17,21,
25,25;911:2;913:24;
914:14,23;915:7;
916:3;918:3,9;
920:10;922:6;924:7,
17,18;935:6;936:17;
937:10;950:11
**use (7)**
878:15;885:18;
886:5;905:1;913:4;
915:10;920:1
**used (2)**
877:15;922:12
**uses (2)**
897:12;933:9
**usually (1)**
909:5
**utilize (1)**
892:22
**utilized (1)**
903:11
**utilizing (1)**
896:22

---

### V

**vacation (3)**
899:9;947:16;956:6
**vague (1)**
944:8

**Valet (26)**
868:5;875:20;
883:2;886:20;887:5,
6;888:8,9,18;890:17;
903:12;907:15,16,22;
909:9,19;913:5;
914:7;917:10;918:12;
921:7;929:8;940:2;
947:13;948:5;953:23
**valets (2)**
895:15;915:20
**various (1)**
925:22
**vendor (9)**
886:20,24;889:15;
890:22;895:15,17;
896:1,3;908:16
**vendors (1)**
892:5
**vendor's (1)**
895:1
**version (1)**
906:18
**versus (2)**
927:7;929:8
**via (3)**
869:17;920:4;
932:22
**Vice (7)**
881:22;882:3;
935:14,16,18,19;
937:4
**video (1)**
913:3
**videos (2)**
912:23,25
**viewed (1)**
935:20
**virtual (1)**
923:9
**visit (7)**
892:3,4,5,6,9,15,21
**volume (7)**
892:19;927:8,9,13,
14,15;932:11
**volume's (1)**
932:7

---

### W

**W-4 (1)**
905:13
**wage (16)**
890:25;897:21;
898:2,6,6,9,12,14,16,
19;899:10;942:25;
943:2,3,6;947:13
**wait (3)**
871:1;956:14,16
**waiting (4)**
873:7;900:18;
953:23;955:3
**walk (1)**

878:21
**walking (2)**
  879:15;912:3
**wants (2)**
  871:23;884:2
**way (9)**
  869:20;879:16;
  885:2;905:23;906:24;
  910:6;921:1;929:2;
  933:7
**ways (2)**
  883:15;932:23
**website (1)**
  903:24
**Wednesday (2)**
  863:18;923:1
**week (12)**
  884:17,24;886:8;
  901:1;916:4;922:10,
  21;923:9;924:12,22;
  955:21,25
**weekend (1)**
  875:13
**weekends (1)**
  921:18
**weekly (2)**
  929:19;937:13
**weeks (2)**
  954:13,17
**weren't (1)**
  879:2
**Westchester (2)**
  928:10,10
**what's (1)**
  955:18
**What'd (1)**
  922:10
**what's (13)**
  887:25;888:25;
  919:19;922:17;
  926:10;928:2;931:8;
  934:6,7;937:11;
  941:1,8;946:15
**Whereupon (9)**
  870:24;872:15;
  881:5;904:9;910:24;
  916:9;947:8;952:23;
  957:11
**whole (4)**
  881:25;893:17;
  926:8;934:18
**WHOLESALE (1)**
  863:8
**who's (3)**
  926:16;943:22;
  954:4
**Whose (1)**
  919:13
**willing (1)**
  875:14
**win (3)**
  899:16;935:22;
  936:7

**winning (1)**
  944:17
**withdraw (1)**
  939:24
**within (11)**
  885:18,19,24;
  887:17;894:12;898:3,
  7;905:14;925:24;
  927:10;950:3
**WITNESS (31)**
  872:10,17;875:5,8;
  881:1,7,11;929:18;
  930:2,6;931:11,14;
  936:20;937:9,10;
  941:1,7,10;942:11;
  943:20;944:1;945:10,
  12,15,18,23;946:3,7,
  13;952:4;954:21
**witnesses (1)**
  954:1,14,21
**won (2)**
  908:7;940:18
**word (3)**
  877:17;883:17;
  889:23
**work (39)**
  869:22;870:1;
  871:15;877:7;886:3;
  889:4;898:2,10,22,23;
  900:6,21;901:12;
  911:23;913:8;914:9,
  25;915:4;921:2,13,16,
  17,18,23;924:7,10,13,
  24;926:6;928:12,19;
  936:10,14,14;938:13;
  943:6;946:16;947:21;
  949:7
**worked (8)**
  886:5,8,14,17;
  914:23;952:8,13;
  953:2
**WORKERS (2)**
  863:11;944:3
**workforce (2)**
  909:5;922:18
**working (18)**
  882:11;884:17;
  900:15,20;904:2;
  913:2,14,16;914:9;
  915:20;921:13;
  924:14;925:7;926:3;
  928:24;929:20;
  934:18;946:15
**works (3)**
  874:24;929:2;
  946:18
**World (1)**
  918:4
**worry (1)**
  869:21
**worst (1)**
  873:9
**writing (1)**

887:7
**written (5)**
  887:7,19;889:4,11;
  905:14
**wrong (1)**
  953:4

**Y**

**year (6)**
  897:17;902:11;
  911:8;929:23;942:3,8
**years (5)**
  882:10;918:22;
  929:23;934:15;
  952:18
**yesterday (2)**
  872:22;955:13
**York (5)**
  863:18,18;898:10;
  901:23;928:9

**Z**

**Zoom (1)**
  954:24

**1**

**1 (12)**
  894:17,22,23;
  902:20;903:5;914:12;
  920:10;923:8,13;
  927:4;938:1;939:22
**10 (7)**
  888:1;918:5;928:3;
  947:5,6;949:13;
  952:16
**10:00 (1)**
  863:19
**10:21 (1)**
  868:2
**10278 (1)**
  863:18
**10th (1)**
  948:16
**11 (12)**
  888:2,3,4,22;889:1,
  14;890:5,14,21,25;
  891:6;894:12
**11.7 (2)**
  897:14;902:11
**1102 (2)**
  863:8;948:15
**11th (1)**
  923:10
**12 (7)**
  893:13,14,18;
  902:9;905:24;906:6;
  930:22
**12:52 (1)**
  957:11
**12th (2)**

923:10;955:23
**13 (5)**
  906:9,12;907:4,11;
  932:16
**15 (3)**
  937:9,11;952:16
**17 (4)**
  941:2,3,8;952:18
**18 (1)**
  956:20
**1970s (1)**
  934:24
**1978 (1)**
  911:8
**1st (13)**
  889:16;890:2;
  902:16;916:1,3,5;
  922:8,21;923:12,12;
  925:24;936:18,23

**2**

**2 (13)**
  868:20,24;869:1,7,
  10,11;894:7;938:4;
  939:6;941:11;953:18,
  21;955:9
**20 (3)**
  917:16;928:4;
  929:21
**200 (3)**
  925:6;927:1,15
**2010 (3)**
  881:25;882:2;
  934:16
**2017 (2)**
  944:7,11
**2023 (17)**
  886:18;890:2;
  891:25;893:25;910:8,
  10,11,17,17;915:10;
  922:4;936:18;937:24;
  939:3;940:14;948:13;
  952:9
**2024 (1)**
  863:19
**22nd (2)**
  893:25;926:21
**23 (2)**
  926:11;956:20
**24th (3)**
  937:24;939:3;
  940:14
**250 (4)**
  884:23,25;885:12;
  915:9
**25th (2)**
  875:4;879:23
**26 (1)**
  863:17
**29 (1)**
  863:17
**29-CA-331253 (1)**

863:4
**2a (2)**
  868:21,22
**2nd (1)**
  863:18

**3**

**3 (9)**
  863:18;868:25;
  869:1,7,8,11;894:18;
  895:7;955:9
**30 (7)**
  913:23;921:18;
  922:13,23;925:24;
  927:2,10
**300 (4)**
  884:23;926:25;
  927:1,16
**30th (1)**
  923:18
**350 (3)**
  884:25;885:13;
  915:9

**4**

**4 (6)**
  895:20;952:25;
  953:6,8,18,21
**40 (5)**
  886:14,15;887:17;
  928:21,22
**48 (1)**
  942:19

**5**

**5 (4)**
  894:8;895:7,7,20
**50 (3)**
  925:6;928:21,22
**58 (2)**
  879:24;915:6
**5th (1)**
  923:4

**6**

**60 (2)**
  886:8;910:5
**60-day (1)**
  922:13
**621 (6)**
  899:24;943:14,16,
  22;944:3;945:9
**6th (1)**
  923:3

**7**

**7/6 (1)**
  891:13

**PARKING SYSTEMS PLUS,INC**

**70% (1)**
    885:4
**70s (1)**
    885:10

---

**9**

---

**9:13 (1)**
    937:24
**90 (1)**
    910:5
**9th (4)**
    922:4,6;947:12;
    948:16

# OFFICIAL REPORT OF PROCEEDINGS

# BEFORE THE

# NATIONAL LABOR RELATIONS BOARD

In the Matter of:                     **Case No.:** 29-CA-331253

PARKING SYSTEMS PLUS,INC.          :

        Respondent,          :

And                                :

LOCAL 1102, RETAIL, WHOLESALE &    :

DEPARTMENT STORE UNION, UNITED     :

FOOD AND COMMERICAL WORKERS,       :

        Charging Party.      :

Place:   New York, New York
Dates:   July 24, 2024
Pages:   959 through 1016
Volume: 7

### OFFICIAL REPORTERS

# BURKE COURT REPORTING, LLC
### 64 Magnolia Place
### Wayne, NJ 07470
### (973) 692-0660

```
 1                          BEFORE THE

 2                NATIONAL LABOR RELATIONS BOARD

 3    --------------------------------: Case No.:

 4    In the Matter of:                : 29-CA-331253

 5    PARKING SYSTEMS PLUS, INC.,      :

 6                 Respondent,         :

 7    And                              :

 8    LOCAL 1102, RETAIL WHOLESALE &   :

 9    DEPARTMENT STORES UNION,         :

10    UNITED FOOD AND COMMERCIAL       :

11    WORKERS,                         :

12                 Charging Party.     :

13    --------------------------------:

14

15         The above-entitled matter came on for hearing pursuant to

16    notice, before BENJAMIN GREEN, Administrative Law Judge, at the

17    National Labor Relations Board, Region 29, at 26 Federal Plaza,

18    2nd Floor, New York, New York 10278, on Wednesday, July 24,

19    2024, at 10:00 a.m.

20

21

22

23

24

25
```

960

```
 1                    A P P E A R A N C E S
 2   On Behalf of the General Counsel:
 3         MATTHEW JACKSON, ESQ.
 4         EMILY CABRERA, ESQ.
 5         The National Labor Relations Board, Region 29
 6         One Metro Tech Center, 20th Floor
 7         Brooklyn, New York 11201
 8         matthew.jackson@nlrb.gov
 9         emily.cabrera@nlrb.gov
10
11   On Behalf of the Respondent:
12         ROBERT F. MILMAN, ESQ.
13         MICHAEL JACOBSON, ESQ.
14         Milman Labuda Law Group, PLLC.
15         3000 Marcus Avenue, Suite 3W8
16         Lake Success, New York 11041-1009
17         rob@mmlaborlaw.com
18         mmaura@mllaborlaw.com
19         mjacobson@mllaborlaw.com
20
21
22
23
24
25
```

961

```
 1              A P P E A R A N C E S (continued)

 2   On Behalf of the Charging Party:

 3        MATTHEW P. ROCCO, ESQ.

 4        Rothman Rocco Laruffa, LLP

 5        3 West Main Street, Suite 200

 6        Elmsford, New York 10523

 7        mrocco@rothmanrocco.com

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                      I N D E X

2   WITNESS            DIRECT   CROSS   REDIRECT   RECROSS   VOIR DIRE

3   Nick Stefanelli     967      972      --         --         --

4   Dan Akins           984      990      992        --         --

5   Angelo Cione        995     1011      --         --

6   1001

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1
 2                            E X H I B I T S
 3    EXHIBITS                    IDENTIFIED          RECEIVED
 4    General Counsel s
 5    GC-12                       1014                1015
 6    Respondent s
 7    R-14                        996                 996
 8    Charging Party/Union s
 9    U-1                         999                 1005
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
```

```
 1                        P R O C E E D I N G S
 2                                      (Time Noted:  9:37 a.m.)
 3            JUDGE GREEN:  Okay.  So why don't we go on the
 4   record?
 5            COURT REPORTER:  On record.
 6            JUDGE GREEN:  Okay.  So is there anything else we
 7   have to do on the record?
 8            MR. JACKSON:  Yes, Your Honor.  Respondent counsel
 9   submitted the email during our break since the last hearing
10   date, a list that shows or purports to show the date of hire
11   for each Parking System's employee, regardless of where they
12   might work.  I think the proposal is that it be entered as a
13   Joint exhibit, so I move the admission of that document as a
14   joint exhibit.
15            JUDGE GREEN:  Okay.  So --
16            MR. MILMAN:  Your Honor, may I be heard?
17            JUDGE GREEN:  Yes, sure.
18            MR. MILMAN:  There's been no discussion as a joint
19   exhibit, Your Honor.  This is the Employer's exhibit.  This is
20   an exhibit that we produced pursuant to Your Honor's suggestion
21   that we decipher a way to produce a hiring list with dates of
22   hire.  This is not a joint exhibit for the record, it's
23   Employer's exhibit.  Thank you.
24            MR. JACKSON:  That's fine.
25            JUDGE GREEN:  Okay.  So this is Respondent's Exhibit
```

1    14.

2              MR. MILMAN:  Thank you, Your Honor.

3              JUDGE GREEN:  And it's hiring dates?

4              MR. MILMAN:  Correct.

5              JUDGE GREEN:  Of all employees?

6              MR. MILMAN:  Correct.

7              JUDGE GREEN:  For Parking Systems?

8              MR. MILMAN:  Correct.  For the purpose of being able

9    to compare other exhibits to discern which was the hiring date

10   of those employees that were working at Stony Brook.

11             JUDGE GREEN:  Okay.

12             MR. MILMAN:  There was no other -- more convenient

13   way to just pull out and, you know, to determine the exact hire

14   dates.  Parking Systems -- because our payroll is not broken

15   down by location.  It's one overall payroll at all locations.

16             JUDGE GREEN:  This was the -- it was an Excel file,

17   right?

18             MR. MILMAN:  I don't think so, Your Honor.  I think -

19   - hold on.  Yeah.  It was, Your Honor.

20             JUDGE GREEN:  Yeah.  Okay.  I have it here.  So it's

21   pretty long.  What do you -- how do you want to get it to the

22   court reporter?

23             MR. MILMAN:  We'll email it to him.

24             JUDGE GREEN:  Okay.

25             MR. ROCCO:  I have a couple copies printed if you

966

1  want.

2          JUDGE GREEN:  Oh, okay.  Oh, double slide.  That's

3  not as big as I thought it was.

4          MR. JACKSON:  No.  It's double side.  That's okay.

5          MR. MILMAN:  We might have emailed it already, but if

6  not, we'll email it.

7          JUDGE GREEN:  Okay.  I mean, I got a copy of it --

8          MR. MILMAN:  Right.

9          JUDGE GREEN:  -- by email.  Okay.  Anything else?

10         MR. MILMAN:  That's it from Mauro, Your Honor.

11         JUDGE GREEN:  Okay.  This is R-14.  R-14.  Okay.  So

12  do you want to call your first witness?

13      (Respondent Exhibit R-14 identified and received)

14         MR. MILMAN:  Yes.  Thank you, Your Honor.  Our first

15  witness will be Mr. Nick Stefanelli.  Yeah.

16         JUDGE GREEN:  So just have a seat.  I'm going to

17  swear you in.  So raise your right hand.

18  Whereupon,

19                        NICK STEFANELLI,

20  was called as a witness having been first duly sworn, was

21  examined and testified as follows:

22         THE WITNESS:  Yes.

23         JUDGE GREEN:  Okay.  So please just state and spell

24  your name for the record.

25         THE WITNESS:  Nicholas Stefanelli, N-I-C-H-O-L-A-S S-

1    T-E-F-A-N-E-L-L-I.

2              JUDGE GREEN:  Thank you.  Anytime you're --

3                     DIRECT EXAMINATION

4    BY MR. MILMAN:

5    Q.    Thank you, Your Honor.  Thank you Mr. Stefanelli for

6    appearing today.  Who's your current Employer?

7    A.    Stony Brook University.

8    Q.    And when -- what was your date of hire?

9    A.    April 11th, 2023.

10   Q.    Okay.  And what's your title?

11   A.    Field Operations Coordinator.

12   Q.    Okay.  And do you know the contract of Parking Systems?

13   A.    Do I --

14   Q.    Do you know who they are?

15   A.    Oh, yes.

16   Q.    Okay.  Who are they in relation to Stony Brook?

17   A.    They are a valet operator at the hospital side.

18   Q.    Okay.  And have you had any opportunity during your tenure

19   to speak to any of the -- strike that.  Do you know who the

20   predecessor contractor performing valet services for Stony

21   Brook Hospital was?

22   A.    Yes.

23   Q.    And who was that?

24   A.    It s escaping me.

25   Q.    Do you know any manager's names or owner's names?

1    A.    Yeah, Richard.

2    Q.    And is that the owner or the manager?

3    A.    He's the manager.

4    Q.    And do you know the Employer?

5    A.    Yes.

6    Q.    Okay.  Who was that Employer?

7              JUDGE GREEN:  You might want to just say --

8    BY MR. MILMAN:

9    Q.    It -- would Classic --

10   A.    That's the name.

11   Q.    Okay.  Thank you.  Thank you, Your Honor.  Okay.  And

12   during your tenure in your position as field operations, did

13   you have any conversations with any Classic employees while

14   they were performing services for Stony Brook?

15   A.    Yeah.  I spoke to Richard daily and I had a conversations

16   with Francis.

17   Q.    And who is Francis, do you know her last name?

18   A.    I don't know her last name.  She was in the Cancer Center.

19   Q.    Okay.  While Classic was performing services?

20   A.    Correct.

21   Q.    Okay.  And how conversations did you have with Francis, if

22   you recall?

23   A.    One.

24   Q.    Okay.  And when on or about was that conversation?

25   A.    The week before December 1st.

```
1    Q.    Okay.  And where was this conversation?
2    A.    Starbucks.  In the hospital lobby.
3    Q.    And who was present during this conversation?
4    A.    It was myself, Dan Akins, Richard, the manager, and
5    Francis.
6    Q.    And who's Dan Akins?
7    A.    My boss.  He's the assistant director of Parking.
8    Q.    Okay.  And how long did this meeting take place?
9    A.    Maybe about 15 minutes.
10   Q.    Okay.  What was the purpose of this meeting?
11   A.    The purpose was to talk about the job offer from Parking
12   Systems to Francis.
13   Q.    Okay.  And how did you know about the job offer?
14   A.    Richard let us know.
15   Q.    Okay.  And do you know why, if at all, a job offer was
16   forwarded to Francis?
17   A.    Dan and myself let Bobby at Parking Systems know that she
18   was a very good employee and a good fit for the Cancer Center
19   and would be smart to retain her.
20   Q.    Okay.  And do you know if that meeting ever took place?
21   A.    It did take place, yes.
22   Q.    Okay.  And how do you know that meeting took place?
23   A.    Bobby and we -- Josh let us know that they offered her the
24   job.
25   Q.    Okay.  All right.  Let's get back to the meeting in
```

1    Starbucks with Francis.  Did you talk during the meeting?

2    A.    Yes.

3    Q.    Did Dan talk during the meeting?

4    A.    Yes.

5    Q.    Did Richard talk?

6    A.    Yes, briefly.  Then he left for a phone call.

7    Q.    And how about Francis, did she talk in the meeting?

8    A.    Yes.

9    Q.    Okay.  So please tell us what was said in that meeting.

10   A.    We basically let Francis know that she was valued in the

11   position and it would be a great opportunity for her to stay

12   with Parking Systems.  Francis was asking why the rest of the

13   people weren't being hired.  And that's really the conversation

14   we had.

15   Q.    And was any response given to Francis?

16   A.    We told her we didn't have any -- we weren't able to

17   decide that factor.

18   Q.    Did you have any conversations regarding employment with

19   any other Classic employees?

20   A.    No.

21   Q.    Okay.  During that meeting that you had at Starbucks with

22   Francis, you said that was the only meeting you had with her?

23   A.    Correct.

24   Q.    Okay.  Is that the only opportunity you had to talk to her

25   regarding employment?

1    A.    Yeah.

2    Q.    Okay.  During that conversation, did you or anybody ever

3    say that Classic -- that Parking Systems would not hire union

4    employees?

5    A.    No.

6    Q.    Did anybody in that conversation at Starbucks ever say

7    that Parking Systems does not hire union employees?

8    A.    No.

9    Q.    Did you mention, or did anybody mention the word union at

10   all in that meeting?

11   A.    The only even mentioned about Union was Stony Brook put

12   out a contract that did not require a union.  But that was

13   Stony Brook's contract.

14   Q.    Okay.  And did Francis tell you whether she accepted the

15   offer or not?

16   A.    She was still on the edge when we talked to her at that

17   time.

18   Q.    What does that mean?  If you could --

19   A.    She was deciding still, but she was leaning towards no.

20   when she an application.

21   Q.    Did you ever tell Classic that Parking Systems would not

22   hire union employees?

23   A.    No.

24   Q.    Did you ever tell Classic that Parking Systems is against

25   the Union in any way, shape, or form?

1   A.    No.

2   Q.    Did you tell anybody that Parking Systems would not hire

3   union employees?

4   A.    No.

5   Q.    Did you ever tell anybody that Parking Systems would not

6   be a union company?

7   A.    No.

8              MR. MILMAN:  No further questions.  Thank you.

9              JUDGE GREEN:  Okay.  Thank you.  Any cross?

10                        CROSS EXAMINATION

11  BY MR. JACKSON:

12  Q.    Yes, Your Honor.  Good morning, Mr. Stefanelli.  My name

13  is Matt Jackson.  I'm representing the National Labor Relations

14  Board General Counsel.  Did you review any documents to prepare

15  for your testimony today?

16  A.    No.

17  Q.    Did you meet with anyone to prepare for your testimony

18  today?

19  A.    Just Rich.

20  Q.    You met with Richard Milman, the attorney for Parking

21  Systems?

22  A.    Just a phone -- well, not meeting about it, just a phone

23  call, where to go.

24  Q.    Okay.  And when was that phone call?

25  A.    Last week, I believe it was Thursday.

1    Q.    Okay.  He called you?

2              MR. MILMAN:  Objection, Your Honor.

3              JUDGE GREEN:  What's the objection?

4              MR. MILMAN:  Relevance

5              MR. JACKSON:  Goes to the credibility of the witness.

6              MR. MILMAN:  It's one way to show up.  It's

7    credibility.

8              JUDGE GREEN:  Overruled.

9    BY MR. JACKSON:

10   Q.    What -- so did he call you?

11   A.    I don't recall.  I think there was a meeting set up or

12   email.  I don't recall who called.

13   Q.    Was it just you and Mr. Milman on the phone?

14   A.    I don't recall.  There was other people.  I don't recall

15   who it was.

16   Q.    Okay.  Was Dan on the call?

17   A.    No.

18   Q.    And any attorneys Stony Brook on the call?

19   A.    No.

20   Q.    What did you discuss with Mr. Milman?

21             MR. MILMAN:  Objection, Your Honor.

22             JUDGE GREEN:  What's the objection?

23             MR. MILMAN:  How far are you going to get into this

24   questioning?  Is this a way to try to impeach the witness as

25   his testimony, what he told me or what he testified today?

1          JUDGE GREEN:  I mean, you know, I take it there's no

2    attorney client privilege.

3          MR. MILMAN:  Well, this meeting was conducted through

4    counsel, through Stony Brook.  So I wanted to be clear that

5    this wasn't a call directly to the witness.  It was conducted

6    through counsel, through Stony Brook.

7          JUDGE GREEN:  Listen, I'm going to allow it.  It's,

8    you know, it's not helpful.  There's prep, everybody does prep,

9    but you know, if you want to spend our time doing this today,

10   you can do a little of it.

11   BY MR. JACKSON:

12   Q.   What'd you discuss with Mr. Milman?

13   A.   Just what to prepare for the case and where to be?

14   Q.   I'm sorry, where to be?

15   A.   Yes.

16   Q.   Okay.  So you discussed what to prepare for.  What do you

17   mean by that?

18   A.   Just going over questions.

19   Q.   So your recollection is that you only had one conversation

20   with Francis Gil Reyes?

21          MR. MILMAN:  Objection.  Facts not in evidence.  The

22   witness testified one conversation regarding employment with

23   Francis.

24          JUDGE GREEN:  Okay.  Overruled.

25   BY MR. JACKSON:

1    Q.    Is it your recollection that you only had one conversation

2    with Francis Gil Reyes?

3    A.    Regarding employment?  Yes.

4    Q.    Okay.  Did you have other conversations with her?

5    A.    Other than saying, hi, how are you?  Do you need anything?

6    And her daily job functions, no.

7    Q.    Okay.  And how did you know that she was such an

8    outstanding employee that you needed to refer her?

9    A.    From Richard, the manager.  And we ve seen it, we had

10   compliments about her from the Cancer Center management.

11   Q.    Okay.  When did you first learn that Francis was going to

12   be offered a job with Park Systems?

13   A.    The week prior to December 1st.  I don't recall the exact

14   day, but before they took over.

15   Q.    Do you recall whether they -- well, who told you that?

16   A.    Bobby.

17   Q.    Did you recall whether Bobby Gust told you that they had

18   made an offer or that they were preparing to make an offer?

19   Was it before --

20   A.    That they had made an offer.

21   Q.    They had -- this was after the interview you spoke with

22   Bobby --

23   A.    Correct.

24   Q.    -- about it?

25   A.    Correct.

1    Q.    Okay.  And did Mr. Gust tell you that she rejected the

2    offer?

3    A.    I don't recall if an answer was made that day.  I just

4    know what Richard told us was she was on the edge as she didn't

5    accept or deny it at that point when we met with her.

6    Q.    I thought you were speaking with Bobby about this.

7    A.    Bobby told us he made the offer.  He didn't tell us about

8    the decision.

9    Q.    Okay.  So how did Bobby talk to you about the offer?

10   A.    I believe it was in the field meeting when they came to

11   look at the property, he let us know they extended an offer.

12   Q.    Okay.  What's a field meeting?

13   A.    We met in staff Lot A on Stony Brook campus.  The -- just

14   look at the valet booths, look at the lots.  That's really it.

15   Just look at the campus.

16   Q.    And that was you -- you were present.  Was Dan present?

17   A.    Yes.

18   Q.    Was Bobby Gust present?

19   A.    Yes.

20   Q.    What about Johnny Baron?  Was he present?

21   A.    No.

22   Q.    What about Andrew Goldsmith?  Do you know who that is?

23   A.    Yes.  I --

24           MR. MILMAN:  Objection, Your Honor.

25           JUDGE GREEN:  Overruled.

1           THE WITNESS:  Yeah.  I know who he was.  I don't

2    believe he was present at that.  I believe it was just Bobby

3    and Josh Candiotti.

4    BY MR. JACKSON:

5    Q.   Okay.  How many of those field meetings did you have with

6    Parking Systems?

7           MR. MILMAN:  Objection, Your Honor.  Goes beyond the

8    scope.  This is about informing of a job offer, not regarding

9    field meetings.

10          JUDGE GREEN:  Overruled.

11   BY MR. JACKSON:

12   Q.   How many of those field meetings did you have with Parking

13   Systems?

14   A.   Just one, I believe.

15   Q.   So during that meeting, Bobby just spoke with you about

16   Francis.  Do you remember how that conversation came about?

17   A.   Yeah.  He just let us know they had a meeting at the hotel

18   across the street.  He offered a job and didn't get an answer

19   yet.

20   Q.   And Richard was present during this meeting?

21   A.   No.

22   Q.   Okay.  You spoke separately about Francis's job also with

23   Richard?

24   A.   Yes.

25   Q.   When was that?

1    A.    I don't recall the date.  As part of our duty we speak to

2    -- we spoke to Richard regularly, every day, and he brought it

3    up a conversation.

4    Q.    And what did he say?

5    A.    That she was offered a job but was undecided.

6    Q.    And during -- so was this meeting at the Starbucks?  This

7    is a Starbucks on campus at Stony Brook --

8    A.    Correct.  In Hospital lobby.

9    Q.    Okay.  Was this like a scheduled meeting?

10   A.    Scheduled as in like we set it up?

11   Q.    Yes.

12   A.    Yeah.  Yes.

13   Q.    Okay.  How did you -- let -- notify Francis that she was

14   supposed to be in the Starbucks at whatever time you met that

15   day?

16   A.    Through Richard.

17   Q.    And why does he want meet with Francis?

18   A.    Well, we -- like -- we wanted her to stay.  Like I said,

19   she was a great employee at the Cancer Center.  Good manager,

20   very personable, takes a special person to run that type of

21   sensitive area.  So we just let her know that it was a good

22   opportunity and that Dan and I wanted her to stay.

23   Q.    Okay.  So you heard that she was undecided about the job

24   offer?

25   A.    Correct.

1   Q.   And you wanted to encourage her to stay so you asked to

2   meet with her?

3   A.   Correct.

4   Q.   And during this meeting, you spoke about the Stony Brook

5   contract not requiring the contractor to have a union?

6   A.   Correct.

7   Q.   How did that come up?

8   A.   Francis or Richard, I forget which one said something

9   about the Union and Dan and I just said that the contract was

10  lowest bid wins and did not require a Union.  But we did know

11  that we wanted her to accept the job.

12  Q.   So the topic of the Union did come up during this meeting,

13  correct?

14  A.   Only that one time.

15  Q.   And this came up in the context of speaking about why

16  other employees were not being hired, correct?

17  A.   I don't recall.

18  Q.   Did Mr. Milman tell you that Parking Systems is facing a

19  substantial financial burden?

20            MR. MILMAN:  Objection.

21            JUDGE GREEN:  Overruled.

22  BY MR. JACKSON:

23  Q.   Did Mr. Millman tell you that Parking Systems is facing a

24  substantial financial burden if they do not prevail against

25  litigation?

1   A.   No.

2   Q.   As -- what is your job as parking -- field -- well, strike

3   that.  Field Operations Coordinator, is that part of something

4   called MAPS?

5   A.   Correct.

6   Q.   Can you tell us what MAPS is again?

7            MR. MILMAN:  Objection.

8   BY MR. JACKSON:

9   Q.   Remind me.

10           MR. MILMAN:  Objection.

11           JUDGE GREEN:  What's the objection?

12           MR. MILMAN:  Beyond the scope of direct.

13           JUDGE GREEN:  Overruled

14           THE WITNESS:  MAPS has been building park services.

15  In my role, I help oversee the contrast under our department.

16  I oversee capital improvements, general conditions of parking

17  lot, signage on both the university and hospital side, stuff

18  like that.

19  BY MR. JACKSON:

20  Q.   Isn't it true that Stony Brook wants to contract with

21  companies that are in good financial health?

22           MR. MILMAN:  Objection.

23           JUDGE GREEN:  Overruled.

24           THE WITNESS:  I don't have anything to do with

25  contracts or what determines them.  All I do is help oversee

1    them.

2    BY MR. JACKSON:

3    Q.   Right.  But if your contractor is out of money --

4           MR. MILMAN:  Asked and answered, Your Honor.

5    BY MR. JACKSON:

6    Q.   It's going to pose a problem, right?

7    A.   I have nothing to do with that.

8           JUDGE GREEN:  Overruled.

9    BY MR. JACKSON:

10   Q.   You have nothing to do with that?

11   A.   I just oversee the field operations day-to-day aspects of

12   the company.  I don't know what requirements are for contracts.

13   Q.   What would happen if one your contractor went bankrupt?

14          MR. MILMAN:  Objection, speculation.

15          JUDGE GREEN:  Okay.  Sustained.

16   BY MR. JACKSON:

17   Q.   Has a contractor ever become bankrupt?

18          MR. MILMAN:  Objection, relevance.

19          JUDGE GREEN:  Overruled.

20          THE WITNESS:  I don't know.

21          MR. JACKSON:  No further questions.

22          JUDGE GREEN:  Anything from the Union?

23          MR. ROCCO:  No, Your Honor.

24          JUDGE GREEN:  I do have a few questions, just a

25   couple of questions for you.  You've testified a couple of

 1  times about the mention of the Union in this Starbucks

 2  conversation with Francis.  Do you know who specifically spoke

 3  about it for -- I guess it would be somebody for --

 4            THE WITNESS:  About the contract?

 5            JUDGE GREEN:  Right.  It was you and -- both you and

 6  Dan were present, correct?

 7            THE WITNESS:  Correct.  Correct.

 8            JUDGE GREEN:  So do you recall who said what about

 9  that?

10            THE WITNESS:  I believe it was Dan.

11            JUDGE GREEN:  Okay.

12            THE WITNESS:  Yeah.

13            JUDGE GREEN:  And you indicated that it takes a

14  sensitive person to work or run --

15            THE WITNESS:  Yes.

16            JUDGE GREEN:  -- the cancer parking valet?

17            THE WITNESS:  Correct.

18            JUDGE GREEN:  Could you just explain that to me a

19  little bit, why that would be the case?

20            THE WITNESS:  So the Cancer Center is basically where

21  cancer patients go for a diagnosis, infusions, chemo, all that

22  stuff.  So people who come there generally are not in the best

23  of health.  You have, you know, children with cancer and all

24  different, you know, sensitive people.  So it takes some, a

25  certain personality to make their day a little bit better when

1    they're valet.

2           JUDGE GREEN:  Okay.  And just what was your

3    understanding about -- if at all, about what the role was going

4    to be, if any, of the Union, if Parking Systems took over the

5    contract?

6           THE WITNESS:  I'm sorry, could you explain that a

7    little more?

8           JUDGE GREEN:  Did you know -- I guess the question

9    would be you -- did you understand that for Classic, the Union

10   was the representative of Classic employees?

11          THE WITNESS:  I knew they were union, yes.

12          JUDGE GREEN:  Okay.  Did you have any sense of where

13   the Parking Systems was going to be union or not?

14          THE WITNESS:  Not at the time.  They accepted the

15   contract.

16          JUDGE GREEN:  Okay.  So you didn't know one way or

17   another?

18          THE WITNESS:  I -- yeah.  I didn't know.

19          JUDGE GREEN:  Okay.  All right.  Any redirect?

20          MR. MILMAN:  No, Your Honor.

21   BY MR. JACKSON:

22   Q.   Just one question.  Judge Green asked you, you said not at

23   the time that they accepted the contract to his last question.

24   A.   Mm-hmm.

25   Q.   Was there any a time afterward when you had a realization

1    on that point?
2    A.    When they started and staff wasn't pertained.
3              MR. JACKSON:  No further questions.
4              JUDGE GREEN:  Anything from the Union?
5              MR. ROCCO:  No.
6              JUDGE GREEN:  Thank you Mr. Stefanelli.  Appreciate
7    your time today.
8              THE WITNESS:  Thank you.
9              JUDGE GREEN:  You're free to go.  So you could have a
10   seat right there.  Thank you.  So I'm going to swear you in.
11   So raise your right hand.
12   Whereupon,
13                        DAN AKINS,
14   was called as a witness having been first duly sworn, was
15   examined and testified as follows:
16             JUDGE GREEN:  Okay.  Thank you.  So please just spell
17   -- state and spell your name for the record.
18             THE WITNESS:  Dan Akins, A-K-I-N-S.
19             JUDGE GREEN:  And the first name?
20             THE WITNESS:  Daniel.
21             JUDGE GREEN:  Spell that.
22             THE WITNESS:  D-A-N-I-E-L.
23             JUDGE GREEN:  Thank you.
24                        DIRECT EXAMINATION
25   BY MR. MILMAN:

1  Q.   Mr. Akins, good morning.  As you know, I'm the Employer

2  for the -- Employer.  I'm the attorney for the Employer,

3  Parking Systems, who's the charged party in this matter.  And

4  I'm going to ask you a few questions regarding the valet

5  services performed at Stony Brook Hospital under the tenure of

6  Parking Systems.  What is your -- who's your Employer?

7  A.   Stony Brook University.

8  Q.   And what is your title?

9  A.   I'm the Assistant Director for Parking and Field

10 Operations.

11 Q.   Okay.  And when were you employed?

12 A.   September of 2019.

13 Q.   Okay.  And do you know who Parking Systems is?

14 A.   Yes.

15 Q.   And is -- they the current valet operator at Stony Brook

16 Hospital?

17 A.   Yes, they are.

18 Q.   Do you know when they started?

19 A.   December of 2023.

20 Q.   Okay.  And do you know who the previous Employer

21 performing those contract services was?

22 A.   Yes.

23 Q.   And who was it?

24 A.   Classic Valet.

25 Q.   Do you know how Parking Systems became the new Employer at

```
 1   --
 2   A.   There was an RFP submitted that any parking company could
 3   -- if they were interested, could apply for, and they went
 4   through a process and they were the selected company to with a
 5   new contract.
 6   Q.   And do you know if Classic -- what -- submitted had been
 7   under that?
 8   A.   Honestly, I do not.  I had nothing to do with the RFP
 9   process and the selection process, so I don't know what -- I'm
10   assuming they did.
11   Q.   Right.
12   A.   They had -- I had heard comments that they had, but I
13   could -- can't say that 100% because I didn't see --
14   Q.   But you were aware -- oh, sorry.
15   A.   I just didn't see any of the applicants under -- until
16   when I was told that it was awarded to a different company.
17   Q.   And you were -- it was awarded to Parking Systems?
18   A.   Correct.
19   Q.   The lowest bidder of the RFP?
20   A.   Yes.
21   Q.   Okay.  Did you have any conversations with any Classic
22   employees about employment?
23   A.   We had a brief meeting with Francis.  I don't know her
24   last name, but she was kind of the supervisor for the Cancer
25   Center valet.  And she had always gotten great reviews and
```

1    comments from the people in the Cancer Center.

2            So we had spoke with her to see if there was a

3    possibility, you know, told her that we'd love for her to stay

4    on for her experience.  But again, we told her that we weren't

5    the valet company and that we didn't have, you know, the

6    authority or the right to hire or say who or who wasn't coming

7    on board.

8    Q.   Okay.  And aside from Francis, did you have any other

9    communications with any Classic employee regarding employment?

10   A.   No.

11   Q.   This meeting you referred to, do you know where it took

12   place?

13   A.   It was in the lobby of the Starbucks coffee at the

14   hospital.

15   Q.   Do you know when it took place?

16   A.   It would've been late November I think it was because it

17   was just before the transition or shortly thereafter.  I

18   honestly don't recall the exact date.

19   Q.   And who was present at that meeting?

20   A.   Myself, Nick Stefanelli, Richard Auru (phonetic) I believe

21   that's how his last name was pronounced.  He was the manager

22   for it and Francis.

23   Q.   Okay.  Do you know how long the meeting took place?

24   A.   Just a few moment -- minutes.  I mean, it was -- we sat,

25   had coffee, and chatted about a few things.  Richard excused

1   himself for the majority because he had a phone call, I
2   believe.  And we just kind of talked and then it was just, you
3   know, just a few minutes, actually.  It didn't last that long.
4   Q.   Do you know who David is?
5   A.   Who?
6   Q.   Strike that.  Sorry.  Do you know who David Nidia
7   (phonetic) is?
8   A.   Isn't that the Stony Brooks legal counsel?
9   Q.   Yes.
10  A.   I've heard the name.  I don't know who he is.
11  Q.   Right.  And -- okay.  So -- we'll get back to that.  So in
12  this meeting at Starbucks that took place, why did the meeting
13  take place?
14  A.   Because we had talked and we were hoping that she would
15  stay on board just because of her experience and the stuff that
16  she had at the Cancer Center.
17          But like I said, we couldn't guarantee her that
18  employment.  She'd have to talk with Parking Systems about
19  that.  But we were hoping that she would decide to stay on.
20  Q.   And were you ever informed at any time that a job offer
21  was offered to Francis from Parking Systems?
22  A.   I believe they spoke with her or interviewed with her and
23  I don't know whether they extended an offer.  I'm assuming they
24  may have.  But I was not part of that, so I don't know.
25  Q.   Right.  And in that meeting that you had with Francis, did

1    Richard talk at all?

2    A.    Just a very short period of time.  Because like I said, he

3    -- I believe he got a phone call because he excused himself

4    from the meeting.  And we just -- it was very -- I mean, it was

5    very casual.

6              We just talked, said, you know, we've -- the short

7    period of time that we had worked with her while Classic was

8    still the contract, we had heard great things about her from

9    the folks at the Cancer Center and we were impressed with her

10   work ethic and stuff.

11             So we asked, you know, we told her we were hoping

12   that, you know, she would stay on board.

13   Q.    And did Francis talk in that meeting?

14   A.    She did.  She said she, you know, appreciated the comments

15   and she said that she would, you know, hope to have the

16   opportunity to speak with Parking Systems and see where it went

17   from there.

18   Q.    Was she -- did she tell you she was offered a position?

19   A.    I honestly can't -- I don't recall.  At that time, I don't

20   believe so.  Because I don't know if she had spoken with them

21   or not.  So I honestly, I don't -- do not recall whether at

22   that time she had said, yes, they'd offered me or I don't think

23   she'd even spoken with them --

24   Q.    Right.

25   A.    -- at that point.

1    Q.   Okay.  And did you speak to any other Classic employees

2    about employment?

3    A.   No.

4    Q.   Okay.  And at any time in that meeting, did you say that

5    Parking Systems doesn't hire union employees?

6    A.   No.

7    Q.   Did you ever say in that meeting that Parking Systems

8    doesn't deal with unions?

9    A.   No.

10    Q.   Did you ever say in your employment to anybody that

11    Parking Systems doesn't hire union employees?

12    A.   No.

13    Q.   Any time in your tenure with Stony Brook, did you ever say

14    that Parking Systems will not deal with unions?

15    A.   No.

16              MR. MILMAN:  No further questions.  Thank you.

17              JUDGE GREEN:  Thank you.  You any cross?

18                         CROSS EXAMINATION

19    BY MR. JACKSON:

20    Q.   Yeah.  Very limited cross, Your Honor.  My name is Matt

21    Jackson.  I represent the National Labor Relations Board

22    General Counsel.  This meeting at the Starbucks in November

23    with Francis, Richard, and Dan -- excuse me, Nick.  Do you

24    remember whether the subject of union came up or not?

25    A.   It may have, but it wasn't like a big part of the

1  discussion.  It was basically just talking to her saying how,

2  you know, we've heard great things about her work in the short

3  period of time that we had overseen it.  Because we just took

4  over the valets, I believe it was in September of that same

5  year.

6         So we'd only worked with them for a couple of months

7  and we had told her, you know, we've been impressed by what

8  we've seen and we would hope that she would consider staying on

9  board if there was a position offered to her because of her

10  experience and working at the Cancer Center.

11  Q.  So do you remember one way or another whether the Union

12  came up?

13         MR. MILMAN:  Asked and answered, Your Honor.

14         JUDGE GREEN:  No, it wasn't.  Do -- so the question

15  was, do you recall the issue of the Union or a union coming up

16  during the conversation?

17         THE WITNESS:  Not that I can recollect, no.

18         JUDGE GREEN:  Okay.

19         MR. JACKSON:  No further questions.

20         JUDGE GREEN:  Anything from the Union?

21         MR. ROCCO:  No.

22         JUDGE GREEN:  So I just have a couple of questions

23  for you.  Did you know that the Classic employees were

24  unionized?

25         THE WITNESS:  Yes, sir.

```
 1              JUDGE GREEN:  Did you know whether the Parking System
 2   employees, if they took over, would be unionized?
 3              THE WITNESS:  I had heard as the negotiation, or not
 4   negotiations, but as it -- the time for them, the transition
 5   was nearing that they were a non-union organization.
 6              JUDGE GREEN:  Okay.  Did you know whether there was
 7   any process for Parking Systems to become unionized?
 8              THE WITNESS:  I -- not to my knowledge, no.  I don't
 9   know.
10              JUDGE GREEN:  Okay.  Thank you very much.  Any
11   redirect?
12                        REDIRECT EXAMINATION
13   BY MR. MILMAN:
14   Q.   Yeah.  Do you have any opinion or concern whether a
15   contractor is union or non-union?
16   A.   No.  Not at all.
17              MR. MILMAN:  Okay.  No further questions.
18              JUDGE GREEN:  Any recross?
19              MR. JACKSON:  No.  Nothing, Your Honor.
20              JUDGE GREEN:  Thank you very much.  You're free to
21   go.
22              MR. MILMAN:  Thank you Ms. Akins.  Appreciate it.
23              JUDGE GREEN:  Is that it?
24              MR. MILMAN:  Thank you.  Appreciate it.
25              JUDGE GREEN:  Is that all?
```

```
 1              MR. MILMAN:  Your Honor, with that last witness the
 2    Employer, the charged party, rests its case of chief.
 3              JUDGE GREEN:  Thank you.  Is there going to be any
 4    rebuttal?
 5              MR. JACKSON:  None from the General Counsel, but I
 6    believe the Union might.
 7              MR. ROCCO:  The Union has one very short rebuttal
 8    witness.
 9              JUDGE GREEN:  Okay.
10              MR. MILMAN:  Your Honor, the -- in light of that
11    recent statement on the record, the Employer does not rest
12    subject to --
13              MR. JACKSON:  Objection.
14              MR. MILMAN:  Subject to rebuttal witnesses.
15              JUDGE GREEN:  There's no -- that does, that's not how
16    it works.  I mean, you can request that --
17              MR. MILMAN:  Yeah.
18              JUDGE GREEN:  There's still rebuttal.
19              MR. MILMAN:  Yeah.  I understand.  What -- I just
20    want the record to be clear, I know how the procedure works.  I
21    want the record to be clear that it might not be over after
22    this.
23              JUDGE GREEN:  I mean -- okay.  We'll see how it goes.
24    It's not -- it doesn't go on endlessly.
25              MR. MILMAN:  I understand.  But it's also not trial
```

1    by ambush.

2            JUDGE GREEN:  If there's new material -- basically,

3    if there's new material that comes up in rebuttal and I allow

4    it, then yeah.  You basically get an opportunity to --

5            MR. MILMAN:  I understood, Your Honor.  I'm all about

6    fairness.  Just want to make sure fairness --

7            JUDGE GREEN:  Okay.

8            MR. MILMAN:  -- is in the record throughout.  Thank

9    you.

10           MR. ROCCO:  Okay.  I'm just going to go get the

11   witness.

12           JUDGE GREEN:  Okay.

13           MR. ROCCO:  And use the restroom.

14           JUDGE GREEN:  Okay.

15           MR. ROCCO:  We go off the record?

16           JUDGE GREEN:  Off the record.

17           COURT REPORTER:  Off the record.

18        (Whereupon, a brief recess was taken)

19           JUDGE GREEN:  So back on the record.  And if we could

20   just have Mr. Jacobson state's appearance for the record.

21           MR. JACOBSON:  My name is Michael Jacobson.  I am

22   appearing as representative or attorney rather for the

23   Employer.  I'm with Milman Labuda.

24           JUDGE GREEN:  Thank you.  All right.  So let me swear

25   you in.  Raise your right hand.

```
 1   Whereupon,

 2                            ANGELO CIONE,

 3   was called as a witness having been previously duly sworn, was

 4   examined and testified as follows:

 5                  JUDGE GREEN:  Okay.  Thank you very much.  So could

 6   you please just state and spell your name for the record?

 7                  THE WITNESS:  My name is Angelo Cione, A-N-G-E-L-O C-

 8   I-O-N-E.  Oops, sorry.  Bear with me one second.  Okay.  Very

 9   good.

10                  JUDGE GREEN:  Okay.  Thank you very much.  Anytime

11   you're ready.

12                            DIRECT EXAMINATION

13   BY MR. ROCCO:

14   Q.   Thank you, Mr. Cione.  What is your current occupation?

15   A.   I'm the Director of internal Operations at Local 1102.

16   Q.   How long have you held this position?

17   A.   I've held a position for about two and a half years.

18   Q.   And before the last two and a half years, did you hold any

19   other positions with Local 1102?

20   A.   Yes.  I was the comptroller for Local 1102 and Affiliate

21   Benefit Fund since August, 2007.

22   Q.   And can you please describe your duties -- your job duties

23   as the director of Internal Operations of Local 1102?

24   A.   As the Director of Internal Operations, I oversee the

25   administration and finances of the day to day for the Union and
```

1  the affiliated benefit funds.

2  Q.   Okay.  As an employee since August, 2007, the former

3  comptroller and the current Director of Internal Operations for

4  the Union, do you serve as a custodian of records for the

5  Union?

6  A.   Yes, I do.

7  Q.   Could you briefly describe your duties as a custodian of

8  records?

9  A.   As the custodian of records, I oversee the Union

10 membership dues reports, employment information reported by all

11 the contributed -- all the Employers for the Union.

12 Q.   And how is the information concerning dues, employment

13 information and the like reported to the Union?

14 A.   Membership cards are signed by union members and they're

15 entered into our system database, and we generate monthly

16 invoices to our Employers.

17 Q.   And what is the name of the Union's database?

18 A.   ISSI.

19 Q.   And you referenced in your testimony reports contributed

20 to the Employers what -- reports submitted by Employers.  What

21 are those reports?

22 A.   Those would be reports from Employers listing union

23 members' names, dates are hire, dues that are paid for a

24 specific month.

25 Q.   And how often, if at all, are those reports received by

1  the Union?

2  A.    Monthly.

3  Q.    Mr. Cione, are you familiar with the membership list for

4  Local 1102 members who work for a company called Pro Park?

5            MR. MILMAN:  Objection, Your Honor.  How is this

6  rebuttal?

7            JUDGE GREEN:  Okay.  So what we're doing here, it's

8  not rebuttal.  What we're doing here is -- right?  What --

9  you're basically trying to authenticate the exhibit that was --

10           MR. MILMAN:  No, Your Honor.  Sorry.  He mentioned

11 Pro Park, another Employer, not Classic nor Parking Systems.

12           JUDGE GREEN:  Okay.

13           MR. ROCCO:  Right.  Exactly.

14           JUDGE GREEN:  And why do we need that?

15           MR. ROCCO:  The reason we need it is there was

16 extensive --

17           MR. JACKSON:  Your Honor, I think maybe it might be

18 beneficial for the witness to be excluded.

19           JUDGE GREEN:  No.  I don't think that's necessary.

20           MR. ROCCO:  There was extensive testimony about --

21 from Parking Systems representatives that employees of the

22 predecessor, Employer are essentially ineligible for hiring

23 when an account turns over from the incumbent Employer to

24 Parking Systems.

25           The Union's records indicate that at this Skyline

998

1   Garage, based on the evidence produced by Parking Systems

2   approximately two weeks ago, that Parking Systems actually

3   hired a majority of the existing bargaining unit.

4           JUDGE GREEN:  Oh, okay.  All right.

5           MR. MILMAN:  Now, may I be heard on that?

6           JUDGE GREEN:  That that is --

7           MR. MILMAN:  May I be heard on that?

8           JUDGE GREEN:  Yes, sure.

9           MR. MILMAN:  All right.  So I object to Counsel's

10  characterization that they're ineligible.  That was not the

11  testimony.  Multiple witnesses.

12          JUDGE GREEN:  That's argument.

13          MR. MILMAN:  Yeah -- no.  That's fact, Your Honor.

14          JUDGE GREEN:  No, it's not.

15          MR. MILMAN:  And not only that, it's the transcripts,

16  which I have read never is the word ineligible stated.

17          JUDGE GREEN:  Okay.

18          MR. MILMAN:  Now, the witnesses also testified, Your

19  Honor, that they -- that employees that have worked for

20  predecessor employers, previous employers, union or not union,

21  okay?  Can apply and have in fact been hired.

22          JUDGE GREEN:  And you can put all that in the brief.

23          MR. MILMAN:  Okay.  But my -- Your Honor, I

24  understand that, but an opportunity to cross examine --

25          JUDGE GREEN:  No.

```
 1           MR. MILMAN:  Thank you.  Thank you, Your Honor.
 2   Thank you, Your Honor.  I withdraw the objection except as to
 3   the matter of characterizing the testimony.
 4           JUDGE GREEN:  Okay.  That's fine.
 5           MR. MILMAN:  As ineligible, which is inaccurate.
 6   Thank you, Your Honor.
 7           JUDGE GREEN:  Okay.
 8   BY MR. ROCCO:
 9   Q.   I'll ask a question.  Mr. Cione, are you familiar with the
10   membership list for Local 1102 members working for Pro Park for
11   posted at the Skyline Garage in Queens, New York?
12   A.   Yes, I am.
13           MR. MILMAN:  Thanks.  Okay.
14   BY MR. ROCCO:
15   Q.   Mr. Cione, let the record reflect I've distributed to you
16   and other parties in the room, a document marked for
17   identification as Union Exhibit 1, which is a two-page
18   document.  The first of which is a screen print shot purporting
19   to be from the ISSI software, showing a pull for the Skyline
20   Garage.
21           And Page 2 purports to be the membership list for
22   Local 1102 bargaining unit workers at the Pro Park at the
23   Skyline Garage from April, 2024.  Please take a moment and
24   review the list on Page 1.
25           (Union Exhibit 1 identified)
```

1000

```
1   A.   Okay.

2   Q.   Okay.  Do you recognize this document?

3   A.   Yes, I do.

4   Q.   And how do you recognize it?

5   A.   The first document is a screenshot of the Employer master,

6   which lists the Employer, their address, you know contract

7   effective dates, et cetera.

8        Specifically this one also has that it's out of

9   business 4/30/2024.  And the second page is a listing of all

10  the Local 1102 members that worked at this location through

11  April 30th, 2024.

12  Q.   And is this a list that you maintain in your role as a

13  custodian of records for Local 1102?

14  A.   Yes, I do.

15  Q.   Can you please explain how this list was created and

16  maintained?

17  A.   The list was created based off union membership cards that

18  were signed and then entered into our system.  And then it's a

19  monthly invoices are sent to the Employer and resubmitted it

20  back to us with the dues paid for the month and we reconcile it

21  to the membership.

22  Q.   And on those monthly reports that the Employers sent in,

23  do the Employers indicate whether an individual is newly

24  employed or remains employed?

25        MR. MILMAN:  Objection, Your Honor.  I object to any
```

1001

1  testimony what the Employers indicate.  It's hearsay, Your

2  Honor.

3          JUDGE GREEN:  Overruled.

4          THE WITNESS:  Yes.  It will show that if someone's

5  terminated, they'll put a term date, or if it's -- there's a

6  new hire, they'll have a new hire on -- added on.

7          MR. MILMAN:  Objection.  This witness is not

8  testifying as to an individual Employer's policy.  That

9  Employer could be subpoenaed to get accurate information.

10          JUDGE GREEN:  Overruled.  I'm taking -- you're --

11  first of all, we're taking this as a business record.

12          MR. ROCCO:  That's right.

13          JUDGE GREEN:  Okay.

14  BY MR. ROCCO:

15  Q.   I'm going to ask, was this list kept in the ordinary

16  course of business?

17  A.   Yes, it was.

18          MR. ROCCO:  Okay.  I move Union Exhibit 1 into

19  evidence.

20          MR. MILMAN:  Voir dire, Your Honor.

21          JUDGE GREEN:  Yes.

22                         VOIR DIRE

23  BY MR. MILMAN:

24  Q.   Do you know what a business record is?

25  A.   Something that we maintain.  A business record is anything

1002

1   I maintain in my office.

2   Q.   How do you know that?

3   A.   Because we we're in business.  So that's a record that I

4   keep as a business -- what I would deem as a business record

5   from my office.

6   Q.   Show me where on the second part of this Excel spread

7   sheet, anywhere it mentions Local 1102 documents.  See, I look

8   at the first page, right?  There's 1102 health and benefit --

9   by the way, are you hired by the fund?

10             MR. ROCCO:  Objection.  This is beyond the scope.

11             MR. MILMAN:  No, it's not.  This is -- I mean --

12             JUDGE GREEN:  It's not exactly, but go ahead.

13   BY MR. MILMAN:

14   Q.   Are you hired by the fund?

15   A.   I'm hired by the Union.

16   Q.   You're not hired by -- right.  And the Union is separate

17   from the fund, correct?

18   A.   The Union and the funds -- let me take this off.  The

19   Union and funds operate together in the same office.  And we're

20   allocated across all the entities based off of the time study

21   that's completed in our office.

22   Q.   That wasn't my question.  My question was, are you paid by

23   the fund?

24   A.   No.

25   Q.   Right.  And the fund and the Union are separate entities;

1003

```
 1   isn't that correct?

 2   A.   Correct.

 3   Q.   Right.  Every union official I ever ask that question

 4   answer the same way.  They are separate.  Now, this document is

 5   titled 1102 Health and Benefit, correct?  Health and Benefits

 6   are provided by the fund, correct?

 7   A.   Correct.

 8             MR. MILMAN:  Okay.  Your Honor, first of all, I would

 9   object to that this witness testifying anything regarding this

10   document.  It is longstanding policy and testimony that the

11   fund and the Union is separate.

12             For this document to be admitted into evidence of

13   proper foundation, is to have a fund representative here, not a

14   union representative who's not employed by the fund.

15             JUDGE GREEN:  He testified to his role in creating

16   the document.  It's -- that's overruled.

17   BY MR. MILMAN:

18   Q.   You created this document in health and Benefit fund?

19   A.   I printed it out of the system.

20   Q.   Right, but you didn't create it, did you?

21   A.   No.  It's out of the document.

22             MR. MILMAN:  Right.  I -- again, I reinstate my

23   objection.  This is not a document that was created by this

24   individual.  It was printed just like I could print it off the

25   Internet, Your Honor.
```

```
 1              JUDGE GREEN:  I understand.  But he's in a position
 2    to testify to this being a business record.
 3              MR. MILMAN:  Well, then I would agree --
 4              JUDGE GREEN:  In the meaning of the hearsay rules.
 5              MR. MILMAN:  Well, I don't think it is a hearsay
 6    rule.
 7              JUDGE GREEN:  Okay.
 8              MR. MILMAN:  Because he's not, he's not a witness of
 9    the fund, even though -- if he was a fund representative, a
10    fund witness --
11              JUDGE GREEN:  No.
12              MR. MILMAN:  -- that was testifying as to the fund's
13    policy.
14              JUDGE GREEN:  No.  It's overruled.  I've heard you
15    the first five times --
16              MR. MILMAN:  Thank you, Your Honor.
17              JUDGE GREEN:  -- you said it.
18              MR. MILMAN:  Thank you, Your Honor.  I have a
19    standing objection as to --
20              JUDGE GREEN:  Fine.
21              MR. MILMAN:  And I'm not finished on whether I have
22    standing objection to any testimony by this witness regarding
23    this document, which was produced by Counsel.  That is a fund-
24    generated document.  This witness is not employed by the fund.
25    Now --
```

```
 1              JUDGE GREEN:  I heard you.  So --

 2              MR. MILMAN:  Thank you, Your Honor.

 3              JUDGE GREEN:  -- Union 1 is admitted.

 4         (Union Exhibit 1 received)

 5    BY MR. ROCCO:

 6    Q.   Mr. Cione, let me just ask you a quick cleanup question.

 7    The ISSI database you mentioned, is that a software database

 8    that's shared by the Union and the health fund?

 9    A.   Yes, it is.

10    Q.   Okay.  Thank you.  Okay.  Mr. Cione, I would like to focus

11    your attention on the period around the end of April, 2024.

12    What, if anything, to your knowledge happened to the bargaining

13    unit members working for Pro Park at the Skyline --

14              MR. MILMAN:  Objection, leading, Your Honor.

15    BY MR. ROCCO:

16    Q.   -- at the end of April --

17              MR. MILMAN:  Leading Your Honor.

18    BY MR. ROCCO:

19    Q.   --2024?

20              MR. MILMAN:  Leading.

21              JUDGE GREEN:  Listen, I got cut off halfway through.

22    You want to say it again?

23    BY MR. ROCCO:

24    Q.   Mr. Cione, I'd like to focus your attention on the period

25    around the end of April, 2024.  What, if anything happened to
```

1006

1  the bargaining unit members working for Pro Park at the Skyline

2  --

3          MR. MILMAN:  Objection, leading.

4  BY MR. ROCCO:

5  Q.   -- at the end --

6          MR. MILMAN:  Leading.

7          JUDGE GREEN:  Overruled.

8  BY MR. ROCCO:

9  Q.   -- of April, 2024?

10 A.   I received an email from our union rep that the Pro Pro

11 Park lost the contract to at Skyline Garage.

12         MR. MILMAN:  Objection, hearsay.

13         JUDGE GREEN:  Overruled.

14 BY MR. ROCCO:

15 Q.   And did this email indicate who was taking over the

16 account at the Skyline Garage?

17 A.   Yes, it did.

18 Q.   And who was that entity?

19 A.   Parking Systems.

20 Q.   Mr. Cione, I'm now handing you another exhibit, which is

21 already in evidence as Respondent's 14.

22         MR. MILMAN:  Thanks.  Let me check it.

23 BY MR. ROCCO:

24 Q.   Mr. Cione -- I'm showing the witness what's in evidence of

25 Respondent's 14, which is a list of employees presently

1007

1  employed at Parking Systems as of July 2nd, 2024 and the dates

2  of hire for each of these employees.  Mr. Cione, have you ever

3  seen this document before?

4            MR. MILMAN:  Objection, Your Honor.

5            JUDGE GREEN:  What's the objection?

6            MR. MILMAN:  The objection -- to relevance.  Whether

7  this witness has seen an Employer's exhibit.  It goes to

8  relevance as to this witness.  Not only that, Your Honor, if

9  Counsel is trying to compare what's on our exhibit to what's on

10 this list, the documents speak for itself.

11           JUDGE GREEN:  Let me just ask you, are you denying

12 that Parking Systems hired people from Pro Park in this --

13           MR. MILMAN:  I don't know, Your Honor.  This is the

14 first time --

15           JUDGE GREEN:  Okay.

16           MR. MILMAN:  No, no, hold on.  Your Honor, this is

17 the first time I'm seeing this document.  This is the first

18 time I'm aware of this witness.

19           JUDGE GREEN:  Okay.  I mean, you're objecting to this

20 line of questioning.  I get it that you have an objection to

21 this entire line of question.

22           MR. MILMAN:  It's improper, Your Honor.

23           JUDGE GREEN:  It's not.  I don't think it's improper.

24           MR. MILMAN:  It's improper for a rebuttal witness,

25 Your Honor.

1        JUDGE GREEN:  It's a proper rebuttal witness.  You

2    could -- you made the defense that -- however you want to

3    characterize it, right?

4        MR. MILMAN:  All I'm saying is --

5        JUDGE GREEN:  However you want to characterize that

6    it was difficult or inconvenient or somehow not within the

7    business interest of Parking Systems to immediately hire,

8    right?  Classic employees.  That's your --

9        MR. MILMAN:  Classic employee, correct.

10       JUDGE GREEN:  Right.  That's your argument.

11       MR. MILMAN:  But why does this witness have to read

12   our Exhibit 14 into the record?

13       JUDGE GREEN:  Okay.  And I'm -- am I right that

14   that's what you're addressing?  You're basically saying, well,

15   they've done it before.

16       MR. ROCCO:  Yeah.  And we're going to show the dates

17   of hire are right after they took over.

18       JUDGE GREEN:  Okay.

19       MR. MILMAN:  But why does this witness have to read

20   our record?  Why does the rebuttal witness have to read our --

21       JUDGE GREEN:  Okay.  I just wanted to make sure I'm

22   on the same page.  It's in evidence.  We'll see how it goes.

23   It's -- I don't think there's anything inappropriate.

24       MR. MILMAN:  But what -- so this is a rebuttal

25   witness to testify as to our exhibit that we produced?

1    JUDGE GREEN:  Yeah.  You -- yeah.  What's wrong with

2    that?

3    MR. MILMAN:  For what purpose?  If the document

4    speaks for itself.

5    JUDGE GREEN:  We'll find out.  I think I know what

6    the purpose is, but go ahead.

7    BY MR. ROCCO:

8    Q.    Okay.  Mr. Cione, where was I?  Have you ever seen this?

9    Do you recognize this document?

10   A.    Yes, I do.

11   Q.    And how was it that you recognize this document?

12   A.    It was a document that you had requested from Parking

13   Systems of list of employees hired that you had sent it to me

14   to review.

15   Q.    Okay.  And have you had the opportunity to compare the

16   names on the April 2024 membership list from Union Exhibit 1 of

17   the Skyline Garage employees with the employee list provided by

18   Parking Systems?

19   A.    Yes, I have.

20   Q.    Okay.  And what, if anything, did you find from this

21   comparison?

22   A.    I found that Parking Systems hired the majority of Pro

23   Park's employees one week later after they -- after Pro Park

24   was the contract.

25   Q.    Okay.  Can you provide specifics to illustrate this

1  finding?

2  A.  Yes, I can.

3  Q.  Okay.  Please provide those specifics.

4  A.  So there's -- I believe there's 10 members that were

5  listed in -- that we had at Local 1102 at Pro Park, and there's

6  six names that are on Parking Systems.  The first one is Juan

7  Campoverde.  He's on the list.

8  Q.  And what page of the list is he on based on the exhibit?

9  A.  Oh, Parking Systems list, Page 6.

10 Q.  Okay.  And what is the date of hire from Mr. Campa Verde?

11 A.  May 8th, 2024.

12 Q.  Okay.

13 A.  The next one was Gustavo Gonzalez, also Page 6 and the

14 hire date of May 8th, 2024.  Jayro Gonzalez, he was Page 6 on -

15 - also hired May 8th, 2024.  Cesar Narvaez, he was hired May

16 8th, 2024.

17      Edgar Sanan was hired May 8th, 2024.  And Patricio

18 Freire was hired also May 8th, 2024.  So there's six names that

19 were on Parking Systems that were in our database.  I think I

20 listed them all.

21 Q.  And based on the Union's records and your testimony, what

22 was the date on which -- what was the date on which Pro Park

23 operating at the Skyline Garage ceased to have that account?

24      MR. MILMAN:  Objection, Your Honor.  There's been no

25 document in evidence establishing as a union record when they

1  lost the contract, Your Honor,

2          MR. ROCCO:  Based on the first page of Union Exhibit

3  1.

4          MR. MILMAN:  Objection.  This is a fund exhibit, Your

5  Honor.

6          JUDGE GREEN:  Overruled.

7  BY MR. ROCCO:

8  Q.   April 30th, 2024.  Okay.  And Mr. Cone based on your

9  experience and your role as a custodian of records, is it fair

10 to say that the employment and membership records you maintain

11 are accurate and reliable?

12 A.   Yes.

13         MR. ROCCO:  No further questions.

14         JUDGE GREEN:  Is there anything from the General

15 Counsel?

16         MR. JACKSON:  No, Your Honor.

17         JUDGE GREEN:  Cross?

18                    CROSS EXAMINATION

19 BY MR. MILMAN:

20 Q.   Yeah.  I'm ready.  Mr. Cione, I'm the counsel for Parking

21 System.  I'm going to ask you a few questions in furtherance of

22 your direct testimony as a rebuttal witness.  You had stated

23 that at some time, Parking Systems hired six out of the 11

24 employees that were members of 1102?

25 A.   Yes.

1012

1   Q.   Right.  So when you say they have --

2          MR. ROCCO:  Objection.  The testimony was 10

3   employees.

4   BY MR. MILMAN:

5   Q.   Excuse me, 10.  So when you were referring to a majority,

6   you were referring at six, out of the 10 were hired?

7   A.   Correct.

8   Q.   Okay.  And these were members at 1102 that worked for Pro

9   Park?

10  A.   Correct.

11  Q.   And then your testimony is Parking Systems took over that

12  Skyline Hotel?

13  A.   Skyline Garage, correct.

14  Q.   The Valet Services.  And they hired six out of the 10,

15  right?

16  A.   Correct.

17  Q.   And it was sometime after April 30th when the contract was

18  lost, correct?

19  A.   Correct.

20  Q.   By Pro Park, right?  So how many people were hired on May

21  1st?

22  A.   I don't know.

23  Q.   Oh, you are the -- you are the custodian of records that

24  reviewed this.

25  A.   You are hired -- according to this, none on May 1st.

1013

```
 1              MR. MILMAN:  Thank you very much.  No further
 2    questions.  Thank you.
 3              JUDGE GREEN:  Any redirect?
 4              MR. ROCCO:  No.
 5              JUDGE GREEN:  Thank you very much.  You're free to
 6    go.
 7              THE WITNESS:  Thank you.  Do I leave this here?
 8              MR. ROCCO:  Yes.
 9              THE WITNESS:  Okay.  Thank you.
10              MR. ROCCO:  We have no further witnesses.
11              JUDGE GREEN:  Okay.  Okay.
12              MR. MILMAN:  I have no rebuttal witnesses.
13              JUDGE GREEN:  Okay.
14              MR. MILMAN:  We rest, Your Honor.  Thank you very
15    much.
16              JUDGE GREEN:  All right.  Very good.  So I will set
17    the deadline for filing briefs.  I can give a maximum of 35
18    days, which is August 28th 2024.  If the parties would like --
19    if any of the parties would like a postponement of that date,
20    please make the request to Arthur Amchan, who is the Deputy
21    Chief Administrative Law Judge in Washington DC.
22              And please include in that request the position of
23    the other parties regarding it.  As I tell all parties in all
24    cases, it's never too late to settle.  Sometimes you see the --
25    you have the hearing, you start thinking about the case, and
```

1014

1     it's -- some are different way.

2              There's still money to be saved as a result of

3     settlement as NLRB cases are very lengthy.  There's obviously -

4     - there's briefing, there's then potential exceptions, then you

5     have enforcement.

6              And if there's a violation found, you have

7     potentially a compliance proceeding, all of which can be very

8     expensive and time consuming.  So even though you've had the

9     trial, there can be still an interest in resolving the matter.

10    And unless anybody has anything else they need to say.

11             MR. MILMAN:  August 28th, Your Honor?

12             JUDGE GREEN:  Yes.

13             MR. MILMAN:  Okay.  Thank you.

14             JUDGE GREEN:  We will close the record.

15             MR. JACKSON:  Your Honor, one question.

16             JUDGE GREEN:  Oh, sorry.

17             MR. JACKSON:  I just wanted to see if General Counsel

18    Exhibit 12 was admitted.  That is the position statement that

19    was offered  - that was identified.

20         (General Counsel s Exhibit 12 identified)

21             JUDGE GREEN:  So I do not have that as being

22    admitted.

23             MR. JACKSON:  I'd like to move for it's admission.

24             MR. MILMAN:  Can I see that, please?  So this is the

25    Employer's position statement, Your Honor?

1          JUDGE GREEN:  Yes.

2          MR. MILMAN:  Yeah.  So I have a standing objection to

3   the admission of it, subject to your ruling, obviously.

4          JUDGE GREEN:  Okay.  I'm going to admit GC-12 for

5   what it's worth.  Anything else?

6      (General Counsel s Exhibit 12 received)

7          MR. JACKSON:  No, Your Honor.

8          JUDGE GREEN:  Okay.  Off the record.

9    (Whereupon, at 11:07 a.m., the hearing in the above-entitled

10  matter was closed)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1

 2

 3

 4                          CERTIFICATION

 5        This is to certify that the attached proceedings before

 6   the National Labor Relations Board (NLRB), Region 29, in the

 7   matter of Parking Systems Plus, Inc. and Local 1102, Retail

 8   Wholesale & Department Stores Union, United Food and Commercial

 9   Workers, Case No. 29-CA-331253, at 26 Federal Plaza, 2nd Floor,

10   New York, New York 10278, on July 24, 2024, was held according

11   to the record, and that this is the original, complete, and

12   true and accurate transcript that has been compared to the

13   recording from the hearing, that the exhibits are complete and

14   no exhibits received in evidence or in the rejected file are

15   missing.

16

17

18

19        _____

20        Bradley E. Weirich

21

22

23

24

25
```

**PARKING SYSTEMS PLUS,INC**

## A

**able (2)**
965:8;970:16
**above-entitled (2)**
959:15;1015:9
**accept (2)**
976:5;979:11
**accepted (3)**
971:14;983:14,23
**according (1)**
1012:25
**account (3)**
997:23;1006:16;
1010:23
**accurate (2)**
1001:9;1011:11
**across (2)**
977:18;1002:20
**actually (2)**
988:3;998:2
**added (1)**
1001:6
**address (1)**
1000:6
**addressing (1)**
1008:14
**administration (1)**
995:25
**Administrative (1)**
959:16;1013:21
**admission (3)**
964:13;1014:23;
1015:3
**admit (1)**
1015:4
**admitted (4)**
1003:12;1005:3;
1014:18,22
**Affiliate (1)**
995:20
**affiliated (1)**
996:1
**afterward (1)**
983:25
**again (4)**
980:6;987:4;
1003:22;1005:22
**against (2)**
971:24;979:24
**ago (1)**
998:2
**agree (1)**
1004:3
**ahead (2)**
1002:12;1009:6
**Akins (6)**
969:4,6;984:13,18;
985:1;992:22
**A-K-I-N-S (1)**
984:18
**allocated (1)**

1002:20
**allow (2)**
974:7;994:3
**always (1)**
986:25
**ambush (1)**
994:1
**Amchan (1)**
1013:20
**Andrew (1)**
976:22
**ANGELO (2)**
995:2,7
**A-N-G-E-L-O (1)**
995:7
**answered (2)**
981:4;991:13
**appearance (1)**
994:20
**appearing (2)**
967:6;994:22
**applicants (1)**
986:15
**application (1)**
971:20
**apply (2)**
986:3;998:21
**Appreciate (2)**
984:6;992:22,24
**appreciated (1)**
989:14
**approximately (1)**
998:2
**April (10)**
967:9;999:23;
1000:11;1005:11,16,
25;1006:9;1009:16;
1011:8;1012:17
**area (1)**
978:21
**argument (2)**
998:12;1008:10
**around (2)**
1005:11,25
**Arthur (1)**
1013:20
**aside (1)**
987:8
**aspects (1)**
981:11
**assistant (1)**
969:7;985:9
**assuming (2)**
986:10;988:23
**attention (2)**
1005:11,24
**attorney (4)**
972:20;974:2;
985:2;994:22
**attorneys (1)**
973:18
**August (4)**
995:21;996:2;

1013:18;1014:11
**Auru (1)**
987:20
**authenticate (1)**
997:9
**authority (1)**
987:6
**awarded (2)**
986:16,17
**aware (2)**
986:14;1007:18

## B

**back (4)**
969:25;988:11;
994:19;1000:20
**bankrupt (2)**
981:13,17
**bargaining (4)**
998:3;999:22;
1005:12;1006:1
**Baron (1)**
976:20
**based (7)**
998:1;1000:17;
1002:20;1010:8,21;
1011:2,8
**basically (7)**
970:10;982:20;
991:1;994:2,4;997:9;
1008:14
**Bear (1)**
995:8
**became (1)**
985:25
**become (2)**
981:17;992:7
**beneficial (1)**
997:18
**Benefit (5)**
995:21;996:1;
1002:8;1003:5,18
**Benefits (1)**
1003:5
**BENJAMIN (1)**
959:16
**best (1)**
982:22
**better (1)**
982:25
**beyond (3)**
977:7;980:12;
1002:10
**bid (1)**
979:10
**bidder (1)**
986:19
**big (2)**
966:3;990:25
**bit (2)**
982:19,25
**BOARD (8)**

959:2;17;972:14;
987:7;988:15;989:12;
990:21;991:9
**Bobby (11)**
969:17,23;975:16,
17,22;976:6,7,9,18;
977:2,15
**booths (1)**
976:14
**boss (1)**
969:7
**both (2)**
980:17;982:5
**break (1)**
964:9
**brief (3)**
986:23;994:18;
998:22
**briefing (1)**
1014:4
**briefly (2)**
970:6;996:7
**briefs (1)**
1013:17
**broken (1)**
965:14
**Brook (17)**
965:10;967:7,16,
21;968:14;971:11;
973:18;974:4,6;
976:13;978:7;979:4;
980:20;985:5,7,15;
990:13
**Brooks (1)**
988:8
**Brook's (1)**
971:13
**brought (1)**
978:2
**building (1)**
980:14
**burden (2)**
979:19,24
**business (10)**
1000:9;1001:11,16,
24,25;1002:3,4,4;
1004:2;1008:7

## C

**C- (1)**
995:7
**call (10)**
966:12;970:6;
972:23,24;973:10,16,
18;974:5;988:1;989:3
**called (7)**
966:20;973:1,12;
980:4;984:14;995:3;
997:4
**came (6)**
959:15;976:10;
977:16;979:15;

959:2;17;972:14;
987:7;988:15;989:12;
990:21;991:9
**Campa (1)**
1010:10
**Campoverde (1)**
1010:7
**campus (3)**
976:13,15;978:7
**can (14)**
974:10;980:6;
991:17;993:16;
995:22;998:21,22;
1000:15;1009:25;
1010:2;1013:17;
1014:7,9,24
**Cancer (13)**
968:18;969:18;
975:10;978:19;
982:16,20,21,23;
986:24;987:1;988:16;
989:9;991:10
**Candiotti (1)**
977:3
**capital (1)**
980:16
**cards (2)**
996:14;1000:17
**Case (5)**
959:3;974:13;
982:19;993:2;
1013:25
**cases (2)**
1013:24;1014:3
**casual (1)**
989:5
**ceased (1)**
1010:23
**Center (10)**
968:18;969:18;
975:10;978:19;
982:20;986:25;987:1;
988:16;989:9;991:10
**certain (1)**
982:25
**Cesar (1)**
1010:15
**cetera (1)**
1000:7
**characterization (1)**
998:10
**characterize (2)**
1008:3,5
**characterizing (1)**
999:3
**charged (2)**
985:3;993:2
**Charging (1)**
959:12
**chatted (1)**
987:25
**check (1)**
1006:22
**chemo (1)**
982:21

**chief (2)**
993:2;1013:21
**children (1)**
982:23
**CIONE (14)**
995:2,7,14;997:3;
999:9,15;1005:6,10,
24;1006:20,24;
1007:2;1009:8;
1011:20
**Classic (19)**
968:9,13,19;
970:19;971:3,21,24;
983:9,10;985:24;
986:6,21;987:9;
989:7;990:1;991:23;
997:11;1008:8,9
**cleanup (1)**
1005:6
**clear (3)**
974:4;993:20,21
**client (1)**
974:2
**close (1)**
1014:14
**closed (1)**
1015:10
**coffee (2)**
987:13,25
**coming (2)**
987:6;991:15
**comments (3)**
986:12;987:1;
989:14
**COMMERCIAL (1)**
959:10
**communications (1)**
987:9
**companies (1)**
980:21
**company (7)**
972:6;981:12;
986:2,4,16;987:5;
997:4
**compare (3)**
965:9;1007:9;
1009:15
**comparison (1)**
1009:21
**completed (1)**
1002:21
**compliance (1)**
1014:7
**compliments (1)**
975:10
**comptroller (2)**
995:20;996:3
**concern (1)**
992:14
**concerning (1)**
996:12
**conditions (1)**
980:16

**conducted (2)**
974:3,5
**Cone (1)**
1011:8
**consider (1)**
991:8
**consuming (1)**
1014:8
**context (1)**
979:15
**contract (18)**
967:12;971:12,13;
979:5;980:20;
982:4;983:5,15,23;
985:21;986:5;989:8;
1000:6;1006:11;
1009:24;1011:1;
1012:17
**contractor (6)**
967:20;979:5;
981:3,13,17;992:15
**contracts (2)**
980:25;981:12
**contrast (1)**
980:15
**contributed (2)**
996:11,19
**convenient (1)**
965:12
**conversation (13)**
968:24;969:1,3;
970:13;971:2,6;
974:19,22;975:1;
977:16;978:3;982:2;
991:16
**conversations (6)**
968:13,15,21;
970:18;975:4;986:21
**Coordinator (2)**
967:11;980:3
**copies (1)**
965:25
**copy (1)**
966:7
**counsel (14)**
964:8;972:14;
974:4,6;988:8;
990:22;993:5;
1004:23;1007:9;
1011:15,20;1014:17,
20;1015:6
**Counsel's (1)**
998:9
**couple (5)**
965:25;981:25,25;
991:6,22
**course (1)**
1001:16
**COURT (3)**
964:5;965:22;
994:17
**create (1)**
1003:20

**created (4)**
1000:15,17;
1003:18,23
**creating (1)**
1003:15
**credibility (2)**
973:5,7
**cross (8)**
972:9,10;990:17,
18,20;998:24;
1011:17,18
**current (4)**
967:6;985:15;
995:14;996:3
**custodian (6)**
996:4,7,9;1000:13;
1011:9;1012:23
**cut (1)**
1005:21

**D**

**daily (2)**
968:15;975:6
**Dan (13)**
969:4,6,17;970:3;
973:16;976:16;
978:22;979:9;982:6,
10;984:13,18;990:23
**Daniel (1)**
984:20
**D-A-N-I-E-L (1)**
984:22
**database (5)**
996:15,17;1005:7,
7;1010:19
**date (12)**
964:10,10;965:9;
967:8;978:1;987:18;
1001:5;1010:10,14,
22,22;1013:19
**dates (7)**
964:21;965:3,14;
996:23;1000:7;
1007:1;1008:16
**David (2)**
988:4,6
**day (7)**
975:14;976:3;
978:2,15;982:25;
995:25,25
**days (1)**
1013:18
**day-to-day (1)**
981:11
**DC (1)**
1013:21
**deadline (1)**
1013:17
**deal (2)**
990:8,14
**December (3)**
968:25;975:13;

**created** 985:19
**decide (2)**
970:17;988:19
**deciding (1)**
971:19
**decipher (1)**
964:21
**decision (1)**
976:8
**deem (1)**
1002:4
**defense (1)**
1008:2
**deny (1)**
976:5
**denying (1)**
1007:11
**DEPARTMENT (2)**
959:9;980:15
**Deputy (1)**
1013:20
**describe (2)**
995:22;996:7
**determine (1)**
965:13
**determines (1)**
980:25
**diagnosis (1)**
982:21
**different (3)**
982:24;986:16;
1014:1
**difficult (1)**
1008:6
**dire (2)**
1001:20,22
**DIRECT (5)**
967:3;980:12;
984:24;995:12;
1011:22
**directly (1)**
974:5
**director (6)**
969:7;985:9;
995:15,23,24;996:3
**discern (1)**
965:9
**discuss (2)**
973:20;974:12
**discussed (1)**
974:16
**discussion (2)**
964:18;991:1
**distributed (1)**
999:15
**document (21)**
964:13;999:16,18;
1000:2,5;1003:4,10,
12,16,18,21,23;
1004:23,24;1007:3,
17;1009:3,9,11,12;
1010:25
**documents (3)**

**created** 972:14;1002:7;
1007:10
**done (1)**
1008:15
**double (2)**
966:2,4
**down (1)**
965:15
**dues (4)**
996:10,12,23;
1000:20
**duly (3)**
966:20;984:14;
995:3
**during (14)**
964:9;967:18;
968:12;969:3;970:1,
3,21;971:2;977:15,
20;978:6;979:4,12;
991:16
**duties (3)**
995:22,22;996:7
**duty (1)**
978:1

**E**

**Edgar (1)**
1010:17
**edge (2)**
971:16;976:4
**effective (1)**
1000:7
**else (4)**
964:6;966:9;
1014:10;1015:5
**email (7)**
964:9;965:23;
966:6,9;973:12;
1006:10,15
**emailed (1)**
966:5
**employed (6)**
985:11;1000:24,24;
1003:14;1004:24;
1007:1
**employee (8)**
964:11;969:18;
975:8;978:19;987:9;
996:2;1008:9;
1009:17
**employees (26)**
965:5,10;968:13;
970:19;971:4,7,22;
972:3;979:16;983:10;
986:22;990:1,5,11;
991:23;992:2;997:21;
998:19;1006:25;
1007:2;1008:8;
1009:13,17,23;
1011:24;1012:3
**Employer (19)**
967:6;968:4,6;

985:1,2,2,6,20,25;
993:2,11;994:23;
997:11,22,23;1000:5,
6,19;1001:9
**Employers (10)**
996:11,16,20,20,22;
998:20,20;1000:22,
23;1001:1
**Employer's (5)**
964:19,23;1001:8;
1007:7;1014:25
**employment (12)**
970:18,25;974:22;
975:3;986:22;987:9;
988:18;990:2,10;
996:10,12;1011:10
**encourage (1)**
979:1
**end (4)**
1005:11,16,25;
1006:5
**endlessly (1)**
993:24
**enforcement (1)**
1014:5
**entered (3)**
964:12;996:15;
1000:18
**entire (1)**
1007:21
**entities (2)**
1002:20,25
**entity (1)**
1006:18
**escaping (1)**
967:24
**essentially (1)**
997:22
**establishing (1)**
1010:25
**et (1)**
1000:7
**ethic (1)**
989:10
**even (4)**
971:11;989:23;
1004:9;1014:8
**everybody (1)**
974:8
**evidence (8)**
974:21;998:1;
1001:19;1003:12;
1006:21,24;1008:22;
1010:25
**exact (3)**
965:13;975:13;
987:18
**Exactly (2)**
997:13;1002:12
**EXAMINATION (7)**
967:3;972:10;
984:24;990:18;
992:12;995:12;

1011:18
**examine (1)**
998:24
**examined (3)**
966:21;984:15;
995:4
**Excel (2)**
965:16;1002:6
**except (1)**
999:2
**exceptions (1)**
1014:4
**excluded (1)**
997:18
**excuse (2)**
990:23;1012:5
**excused (2)**
987:25;989:3
**exhibit (26)**
964:13,14,19,19,20,
22,23,25;966:13;
997:9;999:17,25;
1001:18;1005:4;
1006:20;1007:7,9;
1008:12,25;1009:16;
1010:8;1011:2,4;
1014:18,20;1015:6
**exhibits (1)**
965:9
**existing (1)**
998:3
**expensive (1)**
1014:8
**experience (4)**
987:4;988:15;
991:10;1011:9
**explain (3)**
982:18;983:6;
1000:15
**extended (2)**
976:11;988:23
**extensive (2)**
997:16,20

**F**

**facing (2)**
979:18,23
**fact (2)**
998:13,21
**factor (1)**
970:17
**Facts (1)**
974:21
**fair (1)**
1011:9
**fairness (2)**
994:6,6
**familiar (2)**
997:3;999:9
**far (1)**
973:23
**Federal (1)**

959:17
**few (6)**
981:24;985:4;
987:24,25;988:3;
1011:21
**Field (11)**
967:11;968:12;
976:10,12;977:5,9,12;
980:2,3;981:11;985:9
**file (1)**
965:16
**filing (1)**
1013:17
**finances (1)**
995:25
**financial (3)**
979:19,24;980:21
**find (2)**
1009:5,20
**finding (1)**
1010:1
**fine (3)**
964:24;999:4;
1004:20
**finished (1)**
1004:21
**first (17)**
966:12,14,20;
975:11;984:14,19;
999:18;1000:5;
1001:11;1002:8;
1003:8;1004:15;
1007:14,17,17;
1010:6;1011:2
**fit (1)**
969:18
**five (1)**
1004:15
**Floor (1)**
959:18
**focus (2)**
1005:10,24
**folks (1)**
989:9
**follows (3)**
966:21;984:15;
995:4
**FOOD (1)**
959:10
**forget (1)**
979:8
**form (1)**
971:25
**former (1)**
996:2
**forwarded (1)**
969:16
**found (2)**
1009:22;1014:6
**foundation (1)**
1003:13
**Francis (29)**
968:16,17,21;

969:5,12,16;970:1,7,
10,12,15,22;971:14;
974:20,23;975:2,11;
977:16;978:13,17;
979:8;982:2;986:23;
987:8,22;988:21,25;
989:13;990:23
**Francis's (1)**
977:22
**free (3)**
984:9;992:20;
1013:5
**Freire (1)**
1010:18
**functions (1)**
975:6
**Fund (17)**
995:21;1002:9,14,
17,23,25;1003:6,11,
13,14,18;1004:9,9,10,
24;1005:8;1011:4
**fund- (1)**
1004:23
**funds (3)**
996:1;1002:18,19
**fund's (1)**
1004:12
**further (9)**
972:8;981:21;
984:3;990:16;991:19;
992:17;1011:13;
1013:1,10
**furtherance (1)**
1011:21

**G**

**Garage (9)**
998:1;999:11,20,
23;1006:11,16;
1009:17;1010:23;
1012:13
**GC-12 (1)**
1015:4
**General (8)**
972:14;980:16;
990:22;993:5;
1011:14;1014:17,20;
1015:6
**generally (1)**
982:22
**generate (1)**
996:15
**generated (1)**
1004:24
**Gil (2)**
974:20;975:2
**given (1)**
970:15
**Goes (5)**
973:5;977:7;
993:23;1007:7;
1008:22

969:5,12,16;970:1,7,
10,12,15,22;971:14;
**Goldsmith (1)**
976:22
**Gonzalez (2)**
1010:13,14
**good (9)**
969:18,18;972:12;
978:19,21;980:21;
985:1;995:9;1013:16
**great (5)**
970:11;978:19;
986:25;989:8;991:2
**GREEN (144)**
959:16;964:3,6,15,
17,25;965:3,5,7,11,
16,20,24;966:2,7,9,
11,16,23;967:2;
968:7;972:9;973:3,8,
22;974:1,7,24;
976:25;977:10;
979:21;980:11,13,23;
981:8,15,19,22,24;
982:5,8,11,13,16,18;
983:2,8,12,16,19,22;
984:4,6,9,16,19,21,
23;990:17;991:14,18,
20,22;992:1,6,10,18,
20,23,25;993:3,9,15,
18,23;994:2,7,12,14,
16,19,24;995:5,10;
997:7,12,14,19;998:4,
6,8,12,14,17,22,25;
999:4,7;1001:3,10,13,
21;1002:12;1003:15;
1004:1,4,7,11,14,17,
20;1005:1,3,21;
1006:7,13;1007:5,11,
15,19,23;1008:1,5,10,
13,18,21;1009:1,5;
1011:6,14,17;1013:3,
5,11,13,16;1014:12,
14,16,21;1015:1,4,8
**guarantee (1)**
988:17
**guess (2)**
982:3;983:8
**Gust (3)**
975:17;976:1,18
**Gustavo (1)**
1010:13

**H**

**half (2)**
995:17,18
**halfway (1)**
1005:21
**hand (3)**
966:17;984:11;
994:25
**handing (1)**
1006:20
**happen (1)**
981:13

**happened (2)**
1005:12,25
**health (7)**
980:21;982:23;
1002:8;1003:5,5,18;
1005:8
**heard (11)**
964:16;978:23;
986:12;988:10;989:8;
991:2;992:3;998:5,7;
1004:14;1005:1
**hearing (4)**
959:15;964:9;
1013:25;1015:9
**hearsay (4)**
1001:1;1004:4,5;
1006:12
**held (2)**
995:16,17
**help (2)**
980:15,25
**helpful (1)**
974:8
**hi (1)**
975:5
**himself (2)**
988:1;989:3
**hire (19)**
964:10,22;965:13;
967:8;971:3,7,22;
972:2;987:6;990:5,
11;996:23;1001:6,6;
1007:2;1008:7,17;
1010:10,14
**hired (20)**
970:13;979:16;
998:3,21;1002:9,14,
15,16;1007:12;
1009:13,22;1010:15,
15,17,18;1011:23;
1012:6,14,20,25
**hiring (4)**
964:21;965:3,9;
997:22
**hold (3)**
965:19;995:18;
1007:16
**Honestly (4)**
986:8;987:18;
989:19,21
**Honor (58)**
964:8,16,19;965:2,
18,19;966:10,14;
967:5;968:11;972:12;
973:2,21;976:24;
977:7;981:4,23;
983:20;990:20;
991:13;992:19;993:1,
10;994:5;997:5,10,
17;998:13,19,23;
999:1,2,6;1000:25;
1001:2,20;1003:8,25;
1004:16,18;1005:2,

14,17;1007:4,8,13,16,
22,25;1010:24;
1011:1,5,16;1013:14;
1014:11,15,25;1015:7
**Honor's (1)**
964:20
**hope (2)**
989:15;991:8
**hoping (3)**
988:14,19;989:11
**hospital (8)**
967:17,21;969:2;
978:8;980:17;985:5,
16;987:14
**hotel (2)**
977:17;1012:12

## I

**identification (1)**
999:17
**identified (4)**
966:13;999:25;
1014:19,20
**illustrate (1)**
1009:25
**immediately (1)**
1008:7
**impeach (1)**
973:24
**impressed (2)**
989:9;991:7
**improper (3)**
1007:22,23,24
**improvements (1)**
980:16
**inaccurate (1)**
999:5
**inappropriate (1)**
1008:23
**INC (1)**
959:5
**include (1)**
1013:22
**inconvenient (1)**
1008:6
**incumbent (1)**
997:23
**indicate (4)**
997:25;1000:23;
1001:1;1006:15
**indicated (1)**
982:13
**individual (3)**
1000:23;1001:8;
1003:24
**ineligible (4)**
997:22;998:10,16;
999:5
**information (4)**
996:10,12,13;
1001:9
**informed (1)**

988:20
**informing (1)**
977:8
**infusions (1)**
982:21
**interest (2)**
1008:7;1014:9
**interested (1)**
986:3
**internal (4)**
995:15,23,24;996:3
**Internet (1)**
1003:25
**interview (1)**
975:21
**interviewed (1)**
988:22
**into (6)**
973:23;996:15;
1000:18;1001:18;
1003:12;1008:12
**invoices (2)**
996:16;1000:19
**I-O-N-E (1)**
995:8
**ISSI (3)**
996:18;999:19;
1005:7
**issue (1)**
991:15

## J

**JACKSON (33)**
964:8,24;966:4;
972:11,13;973:5,9;
974:11,25;977:4,11;
979:22;980:8,19;
981:2,5,9,16,21;
983:21;984:3;990:19,
21;991:19;992:19;
993:5,13;997:17;
1011:16;1014:15,17,
23;1015:7
**Jacobson (3)**
994:20,21,21
**Jayro (1)**
1010:14
**job (15)**
969:11,13,15,24;
975:6,12;977:8,18,22;
978:5,23;979:11;
980:2;988:20;995:22
**Johnny (1)**
976:20
**Joint (4)**
964:13,14,18,22
**Josh (2)**
969:23;977:3
**Juan (1)**
1010:6
**Judge (145)**
959:16;964:3,6,15,

17,25;965:3,5,7,11,
16,20,24;966:2,7,9,
11,16,23;967:2;
968:7;972:9;973:3,8,
22;974:1,7,24;
976:25;977:10;
979:21;980:11,13,23;
981:8,15,19,22,24;
982:5,8,11,13,16,18;
983:2,8,12,16,19,22;
984:4,6,9,16,19,21,
23;990:17;991:14,18,
20,22;992:1,6,10,18,
20,23,25;993:3,9,15,
18,23;994:2,7,12,14,
16,19,24;995:5,10;
997:7,12,14,19;998:4,
6,8,12,14,17,22,25;
999:4,7;1001:3,10,13,
21;1002:12;1003:15;
1004:1,4,7,11,14,17,
20;1005:1,3,21;
1006:7,13;1007:5,11,
15,19,23;1008:1,5,10,
13,18,21;1009:1,5;
1011:6,14,17;1013:3,
5,11,13,16,21;
1014:12,14,16,21;
1015:1,4,8
**July (2)**
959:18;1007:1

## K

**keep (1)**
1002:4
**kept (1)**
1001:15
**kind (2)**
986:24;988:2
**knew (1)**
983:11
**knowledge (2)**
992:8;1005:12

## L

**LABOR (4)**
959:2,17;972:13;
990:21
**Labuda (1)**
994:23
**last (10)**
964:9;968:17,18;
972:25;983:23;
986:24;987:21;988:3;
993:1;995:18
**late (2)**
987:16;1013:24
**later (1)**
1009:23
**Law (2)**
959:16;1013:21

**leading (5)**
1005:14,17,20;
1006:3,6
**leaning (1)**
971:19
**learn (1)**
975:11
**leave (1)**
1013:7
**left (1)**
970:6
**legal (1)**
988:8
**lengthy (1)**
1014:3
**light (1)**
993:10
**limited (1)**
990:20
**line (2)**
1007:20,21
**list (18)**
964:10,21;997:3;
999:10,21,24;
1000:12,15,17;
1001:15;1006:25;
1007:10;1009:13,16,
17;1010:7,8,9
**listed (2)**
1010:5,20
**Listen (2)**
974:7;1005:21
**listing (2)**
996:22;1000:9
**lists (1)**
1000:6
**litigation (1)**
979:25
**little (4)**
974:10;982:19,25;
983:7
**lobby (3)**
969:2;978:8;987:13
**LOCAL (12)**
959:8;995:15,19,
20,23;997:4;999:10,
22;1000:10,13;
1002:7;1010:5
**location (2)**
965:15;1000:10
**locations (1)**
965:15
**long (5)**
965:21;969:8;
987:23;988:3;995:16
**longstanding (1)**
1003:10
**look (5)**
976:11,14,14,15;
1002:7
**lost (3)**
1006:11;1011:1;
1012:18

**Lot (2)**
976:13;980:17
**lots (1)**
976:14
**love (1)**
987:3
**lowest (2)**
979:10;986:19

## M

**maintain (4)**
1000:12;1001:25;
1002:1;1011:10
**maintained (1)**
1000:16
**majority (4)**
988:1;998:3;
1009:22;1012:5
**management (1)**
975:10
**manager (6)**
968:2,3;969:4;
975:9;978:19;987:21
**manager's (1)**
967:25
**many (3)**
977:5,12;1012:20
**MAPS (3)**
980:4,6,14
**marked (1)**
999:16
**master (1)**
1000:5
**material (2)**
994:2,3
**Matt (2)**
972:13;990:20
**Matter (6)**
959:4,15;985:3;
999:3;1014:9;
1015:10
**Mauro (1)**
966:10
**maximum (1)**
1013:17
**may (13)**
964:16;988:24;
990:25;998:5,7;
1010:11,14,15,15,17,
18;1012:20,25
**Maybe (2)**
969:9;997:17
**mean (10)**
966:7;971:18;
974:1,17;987:24;
989:4;993:16,23;
1002:11;1007:19
**meaning (1)**
1004:4
**meet (3)**
972:17;978:17;
979:2

**meeting (36)**
969:8,10,20,22,25;
970:1,3,7,9,21,22;
971:10;972:22;
973:11;974:3;976:10,
12;977:15,17,20;
978:6,9;979:4,12;
986:23;987:11,19,23;
988:12,12,25;989:4,
13;990:4,7,22
**meetings (3)**
977:5,9,12
**members (9)**
996:14;997:4;
999:10;1000:10;
1005:13;1006:1;
1010:4;1011:24;
1012:8
**members' (1)**
996:23
**membership (9)**
996:10,14;997:3;
999:10,21;1000:17,
21;1009:16;1011:10
**mention (3)**
971:9,9;982:1
**mentioned (3)**
971:11;997:10;
1005:7
**mentions (1)**
1002:7
**met (4)**
972:20;976:5,13;
978:14
**Michael (1)**
994:21
**might (6)**
964:12;966:5;
968:7;993:6,21;
997:17
**Millman (1)**
979:23
**MILMAN (114)**
964:16,18;965:2,4,
6,8,12,18,23;966:5,8,
10,14;967:4;968:8;
972:8,20;973:2,4,6,
13,20,21,23;974:3,12,
21;976:24;977:7;
979:18,20;980:7,10,
12,22;981:4,14,18;
983:20;984:25;
990:16;991:13;
992:13,17,22,24;
993:1,10,14,17,19,25;
994:5,8,23;997:5,10;
998:5,7,9,13,15,18,
23;999:1,5,13;
1000:25;1001:7,20,
23;1002:11,13;
1003:8,17,22;1004:3,
5,8,12,16,18,21;
1005:2,14,17,20;

1006:3,6,12,22;
1007:4,6,13,16,22,24;
1008:4,9,11,19,24;
1009:3;1010:24;
1011:4,19;1012:4;
1013:1,12,14;
1014:11,13,24;1015:2
**minutes (3)**
969:9;987:24;988:3
**Mm-hmm (1)**
983:24
**moment (2)**
987:24;999:23
**money (2)**
981:3;1014:2
**month (2)**
996:24;1000:20
**monthly (4)**
996:15;997:2;
1000:19,22
**months (1)**
991:6
**more (2)**
965:12;983:7
**morning (2)**
972:12;985:1
**move (3)**
964:13;1001:18;
1014:23
**much (7)**
992:10,20;995:5,
10;1013:1,5,15
**Multiple (1)**
998:11
**myself (3)**
969:4,17;987:20

## N

**name (15)**
966:24;968:10,17,
18;972:12;984:17,19;
986:24;987:21;
988:10;990:20;
994:21;995:6,7;
996:17
**names (6)**
967:25,25;996:23;
1009:16;1010:6,18
**Narvaez (1)**
1010:15
**NATIONAL (4)**
959:2,17;972:13;
990:21
**nearing (1)**
992:5
**necessary (1)**
997:19
**need (4)**
975:5;997:14,15;
1014:10
**needed (1)**
975:8

**negotiation (1)**
992:3
**negotiations (1)**
992:4
**New (9)**
959:18,18;985:25;
986:5;994:2,3;
999:11;1001:6,6
**newly (1)**
1000:23
**next (1)**
1010:13
**Nicholas (1)**
966:25
**N-I-C-H-O-L-A-S (1)**
966:25
**Nick (4)**
966:15,19;987:20;
990:23
**Nidia (1)**
988:6
**NLRB (1)**
1014:3
**None (2)**
993:5;1012:25
**non-union (2)**
992:5,15
**nor (1)**
997:11
**Noted (1)**
964:2
**notice (1)**
959:16
**notify (1)**
978:13
**November (2)**
987:16;990:22

## O

**object (3)**
998:9;1000:25;
1003:9
**objecting (1)**
1007:19
**Objection (34)**
973:2,3,21,22;
974:21;976:24;977:7;
979:20;980:7,10,11,
22;981:14,18;993:13;
997:5;999:2;1000:25;
1001:7;1002:10;
1003:23;1004:19,22;
1005:14;1006:3,12;
1007:4,5,6,20;
1010:24;1011:4;
1012:2;1015:2
**obviously (2)**
1014:3;1015:3
**occupation (1)**
995:14
**off (9)**
994:15,16,17;

**1000:17;1002:18,20;**
1003:24;1005:21;
1015:8
**offer (15)**
969:11,13,15;
971:15;975:18,18,20;
976:2,7,9,11;977:8;
978:24;988:20,23
**offered (9)**
969:23;975:12;
977:18;978:5;988:21;
989:18,22;991:9;
1014:19
**office (4)**
1002:1,5,19,21
**official (1)**
1003:3
**often (1)**
996:25
**one (20)**
965:15;968:23;
973:6;974:19,22;
975:1;977:14;979:8,
14;981:13;983:16,22;
991:11;993:7;995:8;
1000:8;1009:23;
1010:6,13;1014:15
**only (9)**
970:22,24;971:11;
974:19;975:1;979:14;
991:6;998:15;1007:8
**Oops (1)**
995:8
**operate (1)**
1002:19
**operating (1)**
1010:23
**Operations (9)**
967:11;968:12;
980:3;981:11;985:10;
995:15,23,24;996:3
**operator (2)**
967:17;985:15
**opinion (1)**
992:14
**opportunity (8)**
967:18;970:11,24;
978:22;989:16;994:4;
998:24;1009:15
**ordinary (1)**
1001:15
**organization (1)**
992:5
**out (10)**
965:13;971:12;
981:3;1000:8;
1003:19,21;1009:5;
1011:23;1012:6,14
**outstanding (1)**
975:8
**over (10)**
974:18;975:14;
983:4;991:4;992:2;

993:21;997:23;
1006:15;1008:17;
1012:11
**overall (1)**
965:15
**Overruled (16)**
973:8;974:24;
976:25;977:10;
979:21;980:13,23;
981:8,19;1001:3,10;
1003:16;1004:14;
1006:7,13;1011:6
**oversee (6)**
980:15,16,25;
981:11;995:24;996:9
**overseen (1)**
991:3
**owner (1)**
968:2
**owner's (1)**
967:25

---

**P**

**Page (10)**
999:21,24;1000:9;
1002:8;1008:22;
1010:8,9,13,14;
1011:2
**paid (3)**
996:23;1000:20;
1002:22
**Park (15)**
975:12;980:14;
997:4,11;999:10,22;
1005:13;1006:1,11;
1007:12;1009:23;
1010:5,22;1012:9,20
**PARKING (59)**
959:5;964:11;
965:7,14;967:12;
969:7,11,17;970:12;
971:3,7,21,24;972:2,
5,20;977:6,12;979:18,
23;980:2,16;982:16;
983:4,13;985:3,6,9,
13,25;986:2,17;
988:18,21;989:16;
990:5,7,11,14;992:1,
7;997:11,21,24;998:1,
2;1006:19;1007:1,12;
1008:7;1009:12,18,
22;1010:6,9,19;
1011:20,23;1012:11
**Park's (1)**
1009:23
**part (5)**
978:1;980:3;
988:24;990:25;
1002:6
**parties (5)**
999:16;1013:18,19,
23,23

---

**Party (3)**
959:12;985:3;993:2
**patients (1)**
982:21
**Patricio (1)**
1010:17
**payroll (2)**
965:14,15
**people (7)**
970:13;973:14;
982:22,24;987:1;
1007:12;1012:20
**performed (1)**
985:5
**performing (4)**
967:20;968:14,19;
985:21
**period (5)**
989:2,7;991:3;
1005:11,24
**person (2)**
978:20;982:14
**personable (1)**
978:20
**personality (1)**
982:25
**pertained (1)**
984:2
**phone (7)**
970:6;972:22,22,
24;973:13;988:1;
989:3
**phonetic (2)**
987:20;988:7
**place (9)**
969:8,20,21,22;
987:12,15,23;988:12,
13
**Plaza (1)**
959:17
**please (11)**
966:23;970:9;
984:16;995:6,22;
999:23;1000:15;
1010:3;1013:20,22;
1014:24
**PLUS (1)**
959:5
**point (3)**
976:5;984:1;989:25
**policy (3)**
1001:8;1003:10;
1004:13
**pose (1)**
981:6
**position (10)**
968:12;970:11;
989:18;991:9;995:16,
17;1004:1;1013:22;
1014:18,25
**positions (1)**
995:19
**possibility (1)**

---

987:3
**posted (1)**
999:11
**postponement (1)**
1013:19
**potential (1)**
1014:4
**potentially (1)**
1014:7
**predecessor (3)**
967:20;997:22;
998:20
**prep (2)**
974:8,8
**prepare (4)**
972:14,17;974:13,
16
**preparing (1)**
975:18
**present (9)**
969:3;976:16,16,
18,20;977:2,20;
982:6;987:19
**presently (1)**
1006:25
**pretty (1)**
965:21
**prevail (1)**
979:24
**previous (2)**
985:20;998:20
**previously (1)**
995:3
**print (2)**
999:18;1003:24
**printed (3)**
965:25;1003:19,24
**prior (1)**
975:13
**privilege (1)**
974:2
**Pro (15)**
997:4,11;999:10,
22;1005:13;1006:1,
10,10;1007:12;
1009:22,23;1010:5,
22;1012:8,20
**problem (1)**
981:6
**procedure (1)**
993:20
**proceeding (1)**
1014:7
**process (4)**
986:4,9,9;992:7
**produce (1)**
964:21
**produced (4)**
964:20;998:1;
1004:23;1008:25
**pronounced (1)**
987:21
**proper (2)**

---

1003:13;1008:1
**property (1)**
976:11
**proposal (1)**
964:12
**provide (2)**
1009:25;1010:3
**provided (2)**
1003:6;1009:17
**pull (2)**
965:13;999:19
**purporting (1)**
999:18
**purports (2)**
964:10;999:21
**purpose (5)**
965:8;969:10,11;
1009:3,6
**pursuant (2)**
959:15;964:20
**put (3)**
971:11;998:22;
1001:5

---

**Q**

**Queens (1)**
999:11
**quick (1)**
1005:6

---

**R**

**R-14 (3)**
966:11,11,13
**raise (3)**
966:17;984:11;
994:25
**rather (1)**
994:22
**read (4)**
998:16;1008:11,19,
20
**ready (2)**
995:11;1011:20
**realization (1)**
983:25
**really (2)**
970:13;976:14
**reason (1)**
997:15
**rebuttal (13)**
993:4,7,14,18;
994:3;997:6,8;
1007:24;1008:1,20,
24;1011:22;1013:12
**recall (16)**
968:22;973:11,12,
14,14;975:13,15,17;
976:3;978:1;979:17;
982:8;987:18;989:19,
21;991:15
**received (5)**

---

966:13;996:25;
1005:4;1006:10;
1015:6
**recent (1)**
993:11
**recess (1)**
994:18
**recognize (4)**
1000:2,4;1009:9,11
**recollect (1)**
991:17
**recollection (2)**
974:19;975:1
**reconcile (1)**
1000:20
**record (28)**
964:4,5,7,22;
966:24;984:17;
993:11,20,21;994:8,
15,16,17,19,20;995:6;
999:15;1001:11,24,
25;1002:3,4;1004:2;
1008:12,20;1010:25;
1014:14;1015:8
**records (9)**
996:4,8,9;997:25;
1000:13;1010:21;
1011:9,10;1012:23
**recross (1)**
992:18
**redirect (4)**
983:19;992:11,12;
1013:3
**refer (1)**
975:8
**referenced (1)**
996:19
**referred (1)**
987:11
**referring (2)**
1012:5,6
**reflect (1)**
999:15
**regarding (10)**
970:18,25;974:22;
975:3;977:8;985:4;
987:9;1003:9;
1004:22;1013:23
**regardless (1)**
964:11
**Region (1)**
959:17
**regularly (1)**
978:2
**reinstate (1)**
1003:22
**rejected (1)**
976:1
**relation (1)**
967:16
**RELATIONS (4)**
959:2,17;972:13;
990:21

**Relevance (4)**
973:4;981:18;
1007:6,8
**reliable (1)**
1011:11
**remains (1)**
1000:24
**remember (3)**
977:16;990:24;
991:11
**Remind (1)**
980:9
**rep (1)**
1006:10
**reported (2)**
996:10,13
**REPORTER (3)**
964:5;965:22;
994:17
**reports (7)**
996:10,19,20,21,22,
25;1000:22
**represent (1)**
990:21
**representative (5)**
983:10;994:22;
1003:13,14;1004:9
**representatives (1)**
997:21
**representing (1)**
972:13
**request (3)**
993:16;1013:20,22
**requested (1)**
1009:12
**require (2)**
971:12;979:10
**requirements (1)**
981:12
**requiring (1)**
979:5
**resolving (1)**
1014:9
**Respondent (3)**
959:6;964:8;966:13
**Respondent's (3)**
964:25;1006:21,25
**response (1)**
970:15
**rest (3)**
970:12;993:11;
1013:14
**restroom (1)**
994:13
**rests (1)**
993:2
**resubmitted (1)**
1000:19
**result (1)**
1014:2
**RETAIL (1)**
959:8
**retain (1)**

969:19
**review (3)**
972:14;999:24;
1009:14
**reviewed (1)**
1012:24
**reviews (1)**
986:25
**Reyes (2)**
974:20;975:2
**RFP (3)**
986:2,8,19
**Rich (1)**
972:19
**Richard (17)**
968:1,15;969:4,14;
970:5;972:20;975:9;
976:4;977:20,23;
978:2,16;979:8;
987:20,25;989:1;
990:23
**right (37)**
965:17;966:8,17;
969:25;981:3,6;
982:5;983:19;984:10,
11;986:11;987:6;
988:11,25;989:24;
994:24,25;997:8,13;
998:4,9;1001:12;
1002:8,16,25;1003:3,
20,22;1008:3,8,10,13,
17;1012:1,15,20;
1013:16
**ROCCO (35)**
965:25;981:23;
984:5;991:21;993:7;
994:10,13,15;995:13;
997:13,15,20;999:8,
14;1001:12,14,18;
1002:10;1005:5,15,
18,23;1006:4,8,14,23;
1008:16;1009:7;
1011:2,7,13;1012:2;
1013:4,8,10
**role (5)**
980:15;983:3;
1000:12;1003:15;
1011:9
**room (1)**
999:16
**rule (1)**
1004:6
**rules (1)**
1004:4
**ruling (1)**
1015:3
**run (2)**
978:20;982:14

**S**

**S- (1)**
966:25

same (4)
991:4;1002:19;
1003:4;1008:22
**Sanan (1)**
1010:17
**sat (1)**
987:24
**saved (1)**
1014:2
**saying (4)**
975:5;991:1;
1008:4,14
**scheduled (2)**
978:9,10
**scope (3)**
977:8;980:12;
1002:10
**screen (1)**
999:18
**screenshot (1)**
1000:5
**seat (2)**
966:16;984:10
**second (3)**
995:8;1000:9;
1002:6
**seeing (1)**
1007:17
**selected (1)**
986:4
**selection (1)**
986:9
**sense (1)**
983:12
**sensitive (3)**
978:21;982:14,24
**sent (3)**
1000:19,22;
1009:13
**separate (4)**
1002:16,25;1003:4,
11
**separately (1)**
977:22
**September (2)**
985:12;991:4
**serve (1)**
996:4
**services (7)**
967:20;968:14,19;
980:14;985:5,21;
1012:14
**set (3)**
973:11;978:10;
1013:16
**settle (1)**
1013:24
**settlement (1)**
1014:3
**shape (1)**
971:25
**shared (1)**
1005:8

**sheet (1)**
1002:7
**short (4)**
989:2,6;991:2;
993:7
**shortly (1)**
987:17
**shot (1)**
999:18
**show (5)**
964:10;973:6;
1001:4;1002:6;
1008:16
**showing (2)**
999:19;1006:24
**shows (1)**
964:10
**side (3)**
966:4;967:17;
980:17
**signage (1)**
980:17
**signed (2)**
996:14;1000:18
**six (5)**
1010:6,18;1011:23;
1012:6,14
**Skyline (12)**
997:25;999:11,19,
23;1005:13;1006:1,
11,16;1009:17;
1010:23;1012:12,13
**slide (1)**
966:2
**smart (1)**
969:19
**software (2)**
999:19;1005:7
**somebody (1)**
982:3
**somehow (1)**
1008:6
**someone's (1)**
1001:4
**sometime (1)**
1012:17
**Sometimes (1)**
1013:24
**sorry (7)**
974:14;983:6;
986:14;988:6;995:8;
997:10;1014:16
**speak (5)**
967:19;978:1;
989:16;990:1;
1007:10
**speaking (2)**
976:6;979:15
**speaks (1)**
1009:4
**special (1)**
978:20
**specific (1)**

996:24
**specifically (2)**
982:2;1000:8
**specifics (2)**
1009:25;1010:3
**speculation (1)**
981:14
**spell (5)**
966:23;984:16,17,
21;995:6
**spend (1)**
974:9
**spoke (9)**
968:15;975:21;
977:15,22;978:2;
979:4;982:2;987:2;
988:22
**spoken (2)**
989:20,23
**spread (1)**
1002:6
**staff (2)**
976:13;984:2
**standing (3)**
1004:19,22;1015:2
**Starbucks (11)**
969:2;970:1,21;
971:6;978:6,7,14;
982:1;987:13;988:12;
990:22
**start (1)**
1013:25
**started (2)**
984:2;985:18
**state (3)**
966:23;984:17;
995:6
**stated (2)**
998:16;1011:22
**statement (3)**
993:11;1014:18,25
**state's (1)**
994:20
**stay (8)**
970:11;978:18,22;
979:1;987:3;988:15,
19;989:12
**staying (1)**
991:8
**Stefanelli (7)**
966:15,19,25;
967:5;972:12;984:6;
987:20
**still (6)**
971:16,19;989:8;
993:18;1014:2,9
**Stony (19)**
965:10;967:7,16,
20;968:14;971:11,13;
973:18;974:4,6;
976:13;978:7;979:4;
980:20;985:5,7,15;
988:8;990:13

**STORES (1)**
959:9
**street (1)**
977:18
**strike (3)**
967:19;980:2;988:6
**study (1)**
1002:20
**stuff (4)**
980:17;982:22;
988:15;989:10
**subject (4)**
990:24;993:12,14;
1015:3
**submitted (4)**
964:9;986:2,6;
996:20
**subpoenaed (1)**
1001:9
**substantial (2)**
979:19,24
**suggestion (1)**
964:20
**supervisor (1)**
986:24
**supposed (1)**
978:14
**sure (4)**
964:17;994:6;
998:8;1008:21
**Sustained (1)**
981:15
**swear (3)**
966:17;984:10;
994:24
**sworn (3)**
966:20;984:14;
995:3
**System (5)**
992:1;996:15;
1000:18;1003:19;
1011:21
**SYSTEMS (51)**
959:5;965:7,14;
967:12;969:12,17;
970:12;971:3,7,21,24;
972:2,5,21;975:12;
977:6,13;979:18,23;
983:4,13;985:3,6,13,
25;986:17;988:18,21;
989:16;990:5,7,11,14;
992:7;997:11,21,24;
998:1,2;1006:19;
1007:1,12;1008:7;
1009:13,18,22;
1010:6,9,19;1011:23;
1012:11
**System's (1)**
964:11

**T**

**talk (10)**

**969:11;970:1,3,5,7,**
24;976:9;988:18;
989:1,13
**talked (4)**
971:16;988:2,14;
989:6
**talking (1)**
991:1
**T-E-F-A-N-E-L-L-I (1)**
967:1
**tenure (4)**
967:18;968:12;
985:5;990:13
**term (1)**
1001:5
**terminated (1)**
1001:5
**testified (8)**
966:21;973:25;
974:22;981:25;
984:15;995:4;998:18;
1003:15
**testify (2)**
1004:2;1008:25
**testifying (3)**
1001:8;1003:9;
1004:12
**testimony (14)**
972:15,17;973:25;
996:19;997:20;
998:11;999:3;1001:1;
1003:10;1004:22;
1010:21;1011:22;
1012:2,11
**Thanks (2)**
999:13;1006:22
**thereafter (1)**
987:17
**thinking (1)**
1013:25
**though (2)**
1004:9;1014:8
**thought (2)**
966:3;976:6
**throughout (1)**
994:8
**Thursday (1)**
972:25
**times (2)**
982:1;1004:15
**title (2)**
967:10;985:8
**titled (1)**
1003:5
**today (6)**
967:6;972:15,18;
973:25;974:9;984:7
**together (1)**
1002:19
**told (11)**
970:16;973:25;
975:15,17;976:4,7;
986:16;987:3,4;

**989:11;991:7**
**took (12)**
969:20,22;975:14;
983:4;987:11,15,23;
988:12;991:3;992:2;
1008:17;1012:11
**topic (1)**
979:12
**towards (1)**
971:19
**transcripts (1)**
998:15
**transition (2)**
987:17;992:4
**trial (2)**
993:25;1014:9
**true (1)**
980:20
**try (1)**
973:24
**trying (2)**
997:9;1007:9
**turns (1)**
997:23
**two (3)**
995:17,18;998:2
**two-page (1)**
999:17
**type (1)**
978:20

**U**

**undecided (2)**
978:5,23
**under (4)**
980:15;985:5;
986:7,15
**understood (1)**
994:5
**UNION (61)**
959:9;971:3,7,9,11,
12,22,25;972:3,6;
979:5,9,10,12;981:22;
982:1;983:4,9,11,13;
984:4;990:5,11,24;
991:11,15,15,20;
992:15;993:6,7;
995:25;996:4,5,9,11,
13,14,22;997:1;
998:20,20;999:17,25;
1000:17;1001:18;
1002:15,16,18,19,25;
1003:3,11,14;1005:3,
4,8;1006:10;1009:16;
1010:25;1011:2
**unionized (3)**
991:24;992:2,7
**unions (2)**
990:8,14
**Union's (3)**
996:17;997:25;
1010:21

**unit (4)**
998:3;999:22;
1005:13;1006:1
**UNITED (1)**
959:10
**University (3)**
967:7;980:17;985:7
**unless (1)**
1014:10
**up (11)**
973:6,11;978:3,10;
979:7,12,15;990:24;
991:12,15;994:3
**use (1)**
994:13

**V**

**valet (11)**
967:17,20;976:14;
982:16;983:1;985:4,
15,24;986:25;987:5;
1012:14
**valets (1)**
991:4
**valued (1)**
970:10
**ve (1)**
975:9
**Verde (1)**
1010:10
**violation (1)**
1014:6
**Voir (2)**
1001:20,22

**W**

**wants (1)**
980:20
**Washington (1)**
1013:21
**way (10)**
964:21;965:13;
971:25;973:6,24;
983:16;991:11;
1002:9;1003:4;
1014:1
**Wednesday (1)**
959:18
**week (4)**
968:25;972:25;
975:13;1009:23
**weeks (1)**
998:2
**weren't (1)**
970:13,16;987:4
**What'd (1)**
974:12
**what's (10)**
967:10;973:3,22;
976:12;980:11;
1006:24;1007:5,9,9;

**1009:1**
**Whereupon (5)**
966:18;984:12;
994:18;995:1;1015:9
**WHOLESALE (1)**
959:8
**Who's (5)**
967:6;969:6;985:3,
6;1003:14
**wins (1)**
979:10
**withdraw (1)**
999:2
**within (1)**
1008:6
**witness (59)**
966:12,15,20,22,25;
973:5,24;974:5,22;
977:1;980:14,24;
981:20;982:4,7,10,12,
14,18;984:8,14,18,20,22;
991:17,25;992:3,8;
993:1,8;994:11;
995:3,7;997:18;
1001:4,7;1003:9;
1004:8,10,22,24;
1006:24;1007:7,8,18,
24;1008:1,11,19,20,
25;1011:22;1013:7,9
**witnesses (3)**
993:14;998:11,18;
1013:10,12
**word (2)**
971:9;998:16
**work (5)**
964:12;982:14;
989:10;991:2;997:4
**worked (5)**
989:7;991:6;
998:19;1000:10;
1012:8
**WORKERS (2)**
959:11;999:22
**working (5)**
965:10;991:10;
999:10;1005:13;
1006:1
**works (2)**
993:16,20
**worth (1)**
1015:5
**wrong (1)**
1009:1

**Y**

**year (1)**
991:5
**years (2)**
995:17,18
**York (1)**
959:18,18;999:11

## 1

**1 (8)**
999:17,24,25;
1001:18;1005:3,4;
1009:16;1011:3
**10 (5)**
1010:4;1012:2,5,6,
14
**10:00 (1)**
959:19
**100% (1)**
986:13
**10278 (1)**
959:18
**11 (1)**
1011:23
**11:07 (1)**
1015:9
**1102 (16)**
959:8;995:15,19,
20,23;997:4;999:10,
22;1000:10,13;
1002:7,8;1003:5;
1010:5;1011:24;
1012:8
**11th (1)**
967:9
**12 (3)**
1014:18,20;1015:6
**14 (4)**
965:1;1006:21,25;
1008:12
**15 (1)**
969:9
**1st (4)**
968:25;975:13;
1012:21,25

## 2

**2 (1)**
999:21
**2007 (2)**
995:21;996:2
**2019 (1)**
985:12
**2023 (2)**
967:9;985:19
**2024 (17)**
959:19;999:23;
1000:11;1005:11,19,
25;1006:9;1007:1;
1009:16;1010:11,14,
15,16,17,18;1011:8;
1013:18
**24 (1)**
959:18
**26 (1)**
959:17
**28th (2)**
1013:18;1014:11

**29 (1)**
959:17
**29-CA-331253 (1)**
959:4
**2nd (2)**
959:18;1007:1

## 3

**30th (3)**
1000:11;1011:8;
1012:17
**35 (1)**
1013:17

## 4

**4/30/2024 (1)**
1000:9

## 6

**6 (3)**
1010:9,13,14

## 8

**8th (6)**
1010:11,14,15,16,
17,18

## 9

**9:07 (1)**
964:2